UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF LOUDMILA BOURLAKOVA AND VERONICA BOURLAKOVA TO TAKE DISCOVERY FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782 | Case No. 24 Misc. _____<br><br>**DECLARATION OF NAOMI SIMPSON IN SUPPORT OF APPLICATION TO TAKE DISCOVERY** |

I, NAOMI SIMPSON, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a partner at the law firm Mishcon de Reya LLP, counsel to Petitioners Loudmila Bourlakova ("Mrs. Bourlakova" or "Loudmila") and Veronica Bourlakova ("Veronica" and together with Loudmila, "Petitioners").

2. I submit this declaration in support of Petitioners' Application and Petition for an Order, pursuant to 28 U.S.C. § 1782 to obtain discovery from Clearing House Payments Company, L.L.C. ("CHIPS").

3. I represent Loudmila and Veronica in their civil proceeding currently pending in the High Court of Justice, Business and Property Courts of England and Wales, Claim No. BL-2020-001050 the ("U.K. Proceeding"). A true and correct copy of the Amended Particulars of Claim dated 16 October 2023 are attached as **Exhibit 1** hereto.

4. I am familiar with the matters set forth herein based upon my knowledge as counsel to the Petitioners. The following details have been alleged to as fact by Petitioners in the U.K. Proceeding, under punishment of contempt.

### A. The Bourlakov Family and Family Assets

5.  Loudmila is a resident of Monaco and was born in Ukraine. Loudmila was married to Oleg Bourlakov ("Mr. Bourlakov" or "Oleg") until his death in June 2021.

6.  Veronica lives in the United Kingdom, and was born in Ukraine. She is Loudmila and Oleg's youngest child.

7.  Oleg and Loudmila met when they were college students in Ukraine and were married on 2 June 1972 in Kiev, Ukraine, and Veronica was born in 1984.

8.  In the 1990s, Oleg, with Loudmila's support, acquired Novoroscement OJSC ("Novoroscement"), one of Russia's largest national cement companies. In March 2007, Novoroscement was sold for approximately USD $1.45 billion.

9.  Part of the proceeds from the Novoroscement sale were ultimately invested in Burneftegaz, a substantial oil and gas business in Russia founded by Oleg and a minority partner. Burneftegaz was sold in 2014, by which time Oleg owned 90% of the company, netting him approximately $642 million.

10. By 2018, Oleg stated the Bourlakov Family Assets were worth around $3.7 billion. As is common for ultra-high-net-worth families, the Family Assets are and were held in a variety of forms and spanned multiple international entities and trusts.

### B. Mr. Bourlakov's Actions to Hide and Transfer Family Assets in Anticipation of Divorce

11. In 2018, Loudmila and Oleg's 46-year marriage began to break down. In response to their impending separation, Oleg developed and set into motion a plan to hide Bourlakov Family Assets from his wife and adult daughters, who supported their mother in their parents' separation, and otherwise maximize the value of that part of the Family Assets over which he exerted exclusive control. Oleg's plan involved a variety of fraudulent and unlawful means, as part of which he

recruited his sister and brother-in-law, Vera and Nikolai ("Nikolai") Kazakov (together, the "Kazakovs"), among others, to act in concert with him.

12. Following the breakdown in marital relations, it is the Petitioners' case that Oleg pursued a strategy (in combination with others) of dishonest and/or improper and/or unlawful actions with the ultimate objective of maximizing his own share of the Family Assets, and minimizing or even extinguishing Loudmila's share.

13. Oleg made misrepresentations to the Petitioners as to the Family Assets and their true value. Oleg, alongside the Kazakovs and others misappropriated assets from Loudmila and Veronica and sought to conceal his own assets so as to reduce the amount which Loudmila and her daughters would receive and retain in Loudmila's divorce from Oleg.

14. A linchpin of Oleg's strategy was fabricating the idea of a purported long-standing oral partnership between Oleg and Nikolai, entitling Nikolai to 50% of the Family Assets.

15. On 5 April 2018, during a visit in London, Oleg falsely told Loudmila that Nikolai was and had always been an equal partner in all of Oleg's business ventures, pursuant to an alleged historical oral agreement between the two, and that Oleg claimed that this agreement entitled Nikolai to half of the family's fortune. Such an oral arrangement was a legal impossibility under Russian law. Further, the applicable laws and regulations would have required Nikolai to disclose his purported interest in Bourlakov family companies on multiple occasions, which he never did.

16. The supposed partnership was fabricated to provide cover for Oleg's attempt to appropriate or hide more than 50% of the Family Assets from any potential claim by Loudmila or Veronica, to mislead Loudmila and Veronica about the value of the Family Assets, and to pressure Loudmila to accept a reduced settlement as part of divorce proceedings that were later initiated in

Monaco in December 2018. It also formed the basis of a specific false narrative that one of the family entities belonged to Nikolai and, in turn, that an enormous debt was due to that entity.

17. In June 2021, Oleg died unexpectedly from COVID-19. Shortly thereafter, the Kazakovs directed the further movement of Family Assets into entities and bank accounts over which the Kazakovs had gained exclusive control. Certain of those transfers involved U.S. correspondent banking transactions.

### C. Counsel's Investigation and the U.K. Proceeding

18. In connection with the U.K. Proceeding, my firm instructed an investigation into whether there has been any dissipation of the Family Assets by, or at the instruction of, the Kazakovs. Based on documents produced as a result of that investigation, it appears that a significant amount of the Family Assets (around $425 million) may have been moved into entities or bank accounts controlled by the Kazakovs (although at this stage, a full tracing exercise has not been completed and some of the transfers identified could involve the same monies). As at the date of this declaration, the Kazakovs dispute the authenticity of the documents produced by the investigation and therefore the underlying transactions.

19. Although these transfers were directed from and to entities and individuals that are located outside of the United States, a number of the transactions were denominated in U.S. Dollars and appear to have involved United States-based correspondent banks.

20. In July 2020, Petitioners initiated the U.K. Proceeding, seeking, among other things, damages caused to Loudmila by the fraud perpetrated by that proceeding's defendants and a declaration that no partnership agreement exists or ever existed between Oleg and Nikolai.

21. The Kazakovs, among others, mounted challenges to the English Court's jurisdiction in the U.K. Proceeding, leading to a five-day hearing beginning in November 2021.

22. Initially, and in advance of the hearing, the Kazakovs contended that, at the time the claims were initiated, they were not domiciled in the European Union and that Nikolai lived in Monaco and his wife in Russia, in an attempt to bolster their challenge to the jurisdiction of England to hear the dispute. A true and correct copy of a sworn statement of the Kazakovs' solicitor, dated 18 August 2021, is attached as **Exhibit 2** hereto (*see* paragraph 39).

23. In particular, the Kazakovs instructed their solicitor to make a sworn statement to the court that Nikolai had "not lived in Estonia since he left in 1971" and "spends only a few weeks in Estonia each year to visit relatives, generally during the holidays." *See* **Exhibit 2** at paragraph 37(d).

24. This representation was false, and very shortly before the listed hearing, the Kazakovs withdrew that evidence, conceding that Nikolai in fact had been domiciled in Estonia during the relevant time. A true and correct copy of a sworn statement dated 12 November 2021 provided by the Kazakovs' solicitor to the Court and acknowledging that their prior representation as to Mr Kazakov's domicile was inaccurate, is attached as **Exhibit 3** hereto (*see* in particular, paragraph 9).

25. In ruling on the consequential issues, the judge in U.K. Proceeding (the "U.K. Court") found that this statement was "a plain misrepresentation to the court on an issue which both [the Kazakovs] knew was central to the jurisdiction applications they had made." A true and correct copy of that consequential ruling of the U.K. Court, dated 19 July 2022, is attached as **Exhibit 4** hereto.

26. In May 2022, the court dismissed defendants' jurisdictional challenges and held that the U.K Court was the appropriate forum to adjudicate the dispute. A true and correct copy

of the U.K. Court's Judgment dismissing the jurisdictional challenges is attached as **Exhibit 5** hereto.

27. Notwithstanding this ruling, the Kazakovs mounted a separate jurisdictional challenge following an application by Veronica to be added as a Claimant to the U.K. Proceedings, in particular relating to the control of Bourlakov family company Edelweiss Investment, Inc. ("Edelweiss"), arguing in part that Panama or Florida were more appropriate jurisdictions to hear the dispute. A true and correct copy of a submission by the Kazakovs challenging the U.K. Court's jurisdiction is attached as **Exhibit 6** hereto.

28. In September 2023, the U.K. Court denied this second challenge, holding that it had "no hesitation in concluding that England is by some considerable distance a more appropriate forum than Panama," and that "the case for England as the appropriate forum is also overwhelming when compared to Florida too." Further, the "case concerns an international fraud allegedly perpetrated by Mr Bourlakov and a number of other players against the immediate family of the former. It is highly desirable that the claims and defences of all those players should be brought forward and resolved at the same time in the same set of proceedings in the appropriate forum (England)." A true and correct copy of the September 2023 Judgment from the U.K. Court is attached as **Exhibit 7** hereto.

29. By the end of November 2023, the Kazakovs had answered the APOC and served their defences in the U.K. Proceeding. The Kazakovs also served a counterclaim, seeking, among other things, declarations that a 50/50 partnership agreement between Nikolai and Oleg existed and that the claimants have no interest in Edelweiss.

30. On 18 January 2024, Loudmila and Veronica applied to the U.K. Court for a worldwide freezing order against the Kazakovs, among others, preventing them from further

6

transferring or dissipating the Family Assets (the "U.K. Freezing Order Application"). As of the time of this declaration, that application remains pending.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: London, U.K.
    **20** February 2024

                                              Naomi Simpson
                                              *Counsel for Petitioners*