# Exhibit 1

CLAIM NUMBER: BL-2020-001050

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

BUSINESS LIST (ChD)

B E T W E E N

(1) LOUDMILA BOURLAKOVA

(2) HERMITAGE ONE LIMITED

(3) GREENBAY INVEST HOLDINGS LIMITED
(formerly known as Maravan Services Limited)

(4) VERONICA BOURLAKOVA

Claimants

- and -

(1) OLEG BOURLAKOV

(2) DANIEL TRIBALDOS

(3) LEO SERVICES HOLDING LTD

(4) LEO TRUST SWITZERLAND AG

(5) REUWEN SCHWARZ

(6) SEMEN ANUFRIEV

(7) NIKOLAI KAZAKOV

(8) VERA KAZAKOVA

(9) COLUMBUS HOLDING AND ENTERPRISES SA

(10) FINCO FINANCIAL INC

(11) GATIABE BUSINESS INC

(12) EDELWEISS INVESTMENTS INC

(13) IPEC INTERNATIONAL PETROLEUM CO INC

Defendants

_____

AMENDED PARTICULARS OF CLAIM

_____

1

**Introduction**

1.  The First Claimant, Loudmila Bourlakova (née Marchenko) ("Mrs Bourlakova"), is a Ukrainian, Russian and Canadian national. Mrs Bourlakova ~~is~~ was married to the First Defendant, Oleg Bourlakov ("Mr Bourlakov"), who ~~is~~ was also a Ukrainian, Russian and Canadian national, until his death in June 2021. Mrs Bourlakova and Mr Bourlakov married on 2 June 1972. The Fourth Claimant ("Veronica") is one of their two daughters. On 19 December 2018, Mrs Bourlakova filed a divorce petition in Monaco.

2.  Since Perestroika, the Bourlakov family's commercial enterprises have been extremely successful, resulting in the Bourlakov family becoming dollar multi-billionaires.

3.  ~~Since~~ Between December 2017 / January 2018 and Mr Bourlakov's death in June 2021, there ~~has been~~ was an irretrievable breakdown in marital and familial relations between Mrs Bourlakova and her daughters, on the one hand, and Mr Bourlakov, on the other hand.

4.  ~~Since~~ Following that breakdown in marital and familial relations, Mr Bourlakov ~~has~~ pursued a strategy (in combination with the other Defendants) of dishonest and/or improper and/or unlawful actions with the ultimate objective of maximising his own share of assets which are (or have been) assets of each of the separate members of the Bourlakov nuclear family ("Bourlakov family assets") and minimising or even extinguishing the shares of Mrs Bourlakova and her daughters ~~Mrs Bourlakova's share~~.

5.  As set out in detail below, the strategy included at least the following features:

    a.  Lying to Mrs Bourlakova and her daughters as to the Bourlakov family assets and/or their true value, including by seeking to disguise the majority of those assets held or controlled by Mr Bourlakov;

    b.  Forging documents purporting to create non-existent liabilities so as to diminish (or pretend to diminish) the value of the available assets and/or to misappropriate or devalue the assets of Mrs Bourlakova and Veronica ~~Mrs Bourlakova's assets~~.

    c.  Concocting false stories that half of the Bourlakov family assets (including assets beneficially owned by Mrs Bourlakova and/or Veronica) belongs to Mr Bourlakov's brother in law, Mr Kazakov, and (in contradiction of that story) that the current value of debts owed to Mr Kazakov exceeds or almost exceeds the entire

value of the Bourlakov family assets;

    d. Misappropriating assets from ~~structures in which~~ Mrs Bourlakova and/or Veronica and/or from structures in which Mrs Bourlakova and/or Veronica had an interest and arranging for those assets to be placed in structures which are owned and/or controlled by Mr Bourlakov, either directly or through nominees, including in particular Mr Kazakov and/or his wife Mrs Kazakova.

6. It was inherent in Mr Bourlakov's strategy that the steps planned and taken pursuant to it should, so far as possible, be concealed from Mrs Bourlakova, Veronica (and the other Claimants). The concealment was carried out by, among other things, destroying documents which would evidence the creation of forged and/or sham documents and the other unlawful steps taken by Mr Bourlakov and those who have assisted him and acted on his instructions. Those who participated or assisted in the destruction of documents for these purposes include (a) Mr Bourlakov (b) the Second Defendant, Mr Tribaldos (c) the Third Defendant, Leo Services Holding Ltd ("Leo England"), and (d) the Fourth Defendant, Leo Trust Switzerland AG ("Leo Trust").

7. Sometime in 2020, in order to further and conceal Mr Bourlakov's strategy and the unlawful steps taken pursuant to it, Mr Tribaldos caused his fellow directors of Leo England to resign. In his capacity as the sole remaining director of Leo England, Mr Tribaldos then arranged for the dismissal of all the directors of Leo Trust other than himself (and replaced them with directors who he could procure would act as he directed). Mr Tribaldos then destroyed evidence held by Leo Trust of the matters complained of in these proceedings and his, Leo England's and Leo Trust's participation in them. Mr Tribaldos acted on the instructions of or with the knowledge and authority of Mr Bourlakov.

7A. The Claimants have discovered that documents relevant to the matters complained of in these proceedings and Mr Tribaldos', Leo England's and Leo Trust's participation in them were also held by Leo Trust Cyprus Ltd ("Leo Cyprus"). Leo Cyprus is a wholly owned subsidiary of Leo England and provided IT and other support services to Leo Trust until mid-2020. Having become aware that Mr Tribaldos was in the process of destroying evidence of wrongdoing, the directors of Leo Cyprus refused to comply with instructions from Mr Tribaldos and Leo Trust to provide IT administrator access to electronic documents (which access Mr Tribaldos intended to use in order to delete documents that

would incriminate him and the other Defendants in relation to the matters complained of in these proceedings). Leo Cyprus also refused to comply with instructions from Leo England to appoint new directors (including Mr Tribaldos) who would then have had control of Leo Cyprus and intended to use such control to complete the destruction of incriminating documents.

7B.  In order to prevent the destruction of Leo Cyprus' documents, on 28 December 2020, the Claimants (other than Veronica) applied for and were granted an Anton Piller order in Cyprus (the "Cyprus AP Order") against Leo Cyprus in relation to documents relevant to these proceedings. As set out below, the documents obtained pursuant to the Cyprus AP Order (the "Cyprus AP documents") provide confirmation of the Claimants' claims. The need for the Cyprus AP Order was confirmed when Leo England and Mr Tribaldos obtained control of Leo Cyprus in April 2021.

8.  In the circumstances, these Amended Particulars of Claim are the best particulars the Claimants are able to give at present of the unlawful conduct of the Defendants. The full extent of the actions planned or taken pursuant to Mr Bourlakov's strategy or the full extent to which each Defendant had knowledge of or was involved in the overall strategy and each constituent part will no doubt come to light in due course.

9.  All references in these Amended Particulars of Claim to the assets of a party (or to a party being the beneficial owner of assets) include assets legally or beneficially owned by that party or which they had or have the power, directly or indirectly, to dispose of or deal with as if they were their own or of which they are the beneficiary under trust or foundation structures. Some of the assets may be subject to potential claims under Ukrainian matrimonial law, which are not the subject of these proceedings.

9A.  Following Mr Bourlakov's death Mr Kazakov (with the assistance of Mrs Kazakova and Mr Anufriev) now appears to intend to maintain the fiction that half of the Bourlakov family assets belong to him and also to claim all assets which he (or Mrs Kazakova) held as nominee for Mr Bourlakov as his own. All references below to assets owned by Mr Bourlakov (and as such not including assets that had previously been transferred to Mrs Bourlakova or Veronica), including assets held by Mr Kazakov (or Mrs Kazakova) as nominee for Mr Bourlakov, are to assets which were owned by Mr Bourlakov as at the date of his death, which assets now form part of his estate (subject to potential claims under Ukrainian matrimonial law).

**The other Claimants**

10. **H1:** The Second Claimant, Hermitage One Limited, is a company incorporated on 1 March 2011 in the Isle of Man. So far as ~~Mrs Bourlakova is~~ the Claimants are aware, until 18 February 2014, the ultimate beneficial owner of H1 was Mr Bourlakov. Since February 2014 Mrs Bourlakova has been the ultimate beneficial owner of H1 and/or a beneficiary of trusts that have legal title to its shares. Mr Bourlakov has had no interest in H1 since February 2014.

11. **Greenbay**: The Third Claimant, Greenbay Invest Holdings Limited, is a company incorporated on 27 July 2006 in the Seychelles. So far as ~~Mrs Bourlakova is~~ the Claimants are aware, until 18 February 2014, the ultimate beneficial owner of Greenbay was Mr Bourlakov. Since February 2014 Mrs Bourlakova has been the ultimate beneficial owner of Greenbay and/or a beneficiary of trusts that have legal title to its shares. Mr Bourlakov has had no interest in Greenbay since February 2014.

**The other Defendants**

12. **Mr Tribaldos**: The Second Defendant provide~~ds~~d corporate services and advice to Mr Bourlakov in relation to offshore holding structures through companies controlled by him. Mr Tribaldos is the ultimate beneficial owner of the majority of the shares (or alternatively controlled the majority of the voting rights) in Leo England and through Leo England of Leo Trust and Leo Cyprus. Mr Tribaldos was at all relevant times a director of Leo England and of Leo Trust and was previously a director of Leo Services (the predecessor to Leo Trust).

13. **Leo England**: The Third Defendant is a company incorporated on 11 December 2012 in England. Leo England was at all material times a holding company which owned 100% of the shares in Leo Trust and, until on or around 11 October 2021, in Leo Cyprus. The Claimants understand that, on or around 11 October 2021, Leo Cyprus's shares were transferred by Leo England to Leo Trust, making Leo Cyprus an indirect wholly owned subsidiary of Leo England, through Leo Trust, rather than a direct wholly owned subsidiary. Mr Tribaldos was at all material times a director of Leo England and the ultimate beneficial owner of the majority of the shares (or alternatively controlled the majority of the voting rights) in Leo England.

14. **Leo Trust**: The Fourth Defendant, is a company incorporated on 2 October 2017 in Switzerland. In March 2018, Leo Trust acquired the assets and liabilities of Leo Services AG (formerly known as MMG Zurich AG) ("Leo Services"). Leo Trust (and Leo Services before it) were at all material times a fiduciary and corporate services provider and have provided fiduciary and corporate services to Mr Bourlakov and companies and foundations owned and/or controlled by him and/or used as repositories of Bourlakov family assets since the mid-1990s. The services provided by Leo Trust and Leo Services included: advising on the asset holding structure, setting up that structure (including companies, trusts and foundations), managing the structure (including conducting all communications with the local office holders) and drafting or assisting in drafting relevant documentation including incorporation documents, minutes of directors' meetings, resolutions, agreements and arranging for the execution of these documents. Mr Tribaldos was at all material times a director of Leo Trust and the ultimate beneficial owner of the majority of the shares (or alternatively controlled the majority of the voting rights) in Leo Trust.

15. **Mr Schwarz**: The Fifth Defendant is an Austrian and Israeli national. Between 2017 and February 2020, Mr Schwarz was a director of Leo Trust.

16. **Mr Anufriev**: The Sixth Defendant is the son of Mr Bourlakov's cousin. Mr Anufriev is a German qualified lawyer and was at all material times the managing director of the Bourlakov family office. Mr Anufriev was is Mr Bourlakov's right hand man and manageds Mr Bourlakov's business interests and personal wealth (having previously managed the Bourlakov family assets since 2012), including being the principal person responsible for passing on Mr Bourlakov's instructions to third parties including banks and fiduciary and corporate service providers.

17. **Mr Kazakov and Mrs Kazakova**: The Seventh Defendant is Mr Bourlakov's brother-in-law. He is married to the Eighth Defendant, who is Mr Bourlakov's sister.

18. **Columbus**: The Ninth Defendant is a company incorporated in Panama on 24 June 2003. So far as Mrs Bourlakova and Veronica are is aware, Mr Bourlakov was the ultimate beneficial owner of Columbus (either alone or along with their daughter Veronica) until it was transferred to the Panamanian Foundation, Tribaline Stiftung ("Tribaline"), in on or around 15 March 2014. To the best of Mrs Bourlakova's knowledge, she became the sole beneficiary of Tribaline at around that time and was still remained the sole

beneficiary until she was replaced as sole beneficiary (or shortly before) it was dissolved on 15 May 2018 without her knowledge or consent. by Anahill Stiftung ("Anahill"). is now the owner of the shares in Columbus and the Claimants infer that the The shares in Columbus were transferred from Tribatline to Anahill prior to around the time of the dissolution of Tribatline on about 25 May 2018. To the best of the Claimants' knowledge, Anahill remains the owner of the shares in Columbus and Mr Bourlakov controlled and was the sole named beneficiary of Anahill until his death.

19. **Finco**: The Tenth Defendant was incorporated in Panama on 8 April 1994. Finco was dissolved on 20 November 2014 and reactivated on 30 August 2018. So far as Mrs Bourlakova and Veronica are is aware, Mr Bourlakov is and has at all material times been was the ultimate beneficial owner of Finco. until it was transferred to Tribatline on or around 15 March 2014 (albeit that Finco had no value at that time). After its reactivation in 2018, Finco was purportedly transferred on 7 September 2018 by Tribatline to Delos Global SA ("Delos") (which the Claimants infer was acting as trustee for Mr Bourlakov or for a nominee acting on his behalf, possibly Mr Kazakov). The purported transfer took place after Tribatline had been dissolved so that it lacked the ability to make this transfer. By documents purportedly dated 26 February 2019, Finco was purportedly transferred by Delos to the Panamanian Foundation, Wlamil Foundation ("Wlamil"). Mr Kazakov was (and so far as the Claimants are aware still is) the sole named beneficiary of Wlamil. Mr Bourlakov had *de facto* control over Finco and Wlamil until his death and Mr Kazakov was acting as a nominee for Mr Bourlakov, although following Mr Bourlakov's death Mr Kazakov now appears to intend to claim all assets which he held as nominee for Bourlakov as his own. The Claimants refer to an email chain between Mr Tribaldos and Leo Cyprus in April 2020 (obtained pursuant to the Cyprus AP Order) in relation to the preparation of accounts for, inter alia, Finco and Wlamil, which refers to Mr Bourlakov as "the client" in relation to these entities and passes on his instructions. The Claimants rely upon this as generally evidencing the true nature of the relationship between Mr Bourlakov and Mr Kazakov and the manner in which Mr Kazakov was used by Mr Bourlakov as his nominee, in order to shelter his assets.

20. **Gatiabe**: The Eleventh Defendant is a company incorporated in Panama on 14 January 2003. Gatiabe was dissolved on 26 December 2014 and was reactivated, without Mrs Bourlakova's knowledge or consent, on 25 June 2018. As explained in paragraph 90A below, Mrs Bourlakova is and has at all material times since December 2014 been the

holder of the entirety of the shares in Gatiabe and the ultimate beneficial owner of Gatiabe., although: (1) as set out below the bearer shares held by Mrs Bourlakova were purportedly (but not validly) cancelled and shares were purportedly (but not validly) issued to Delos in her place; (2) as set out at paragraphs 79 and 85 below, a sham declaration of trust was entered into and purportedly dated 12 July 2018, purporting to record that the shares were held on trust for Mr Kazakov (who was, in any event, acting as nominee for Mr Bourlakov); and (3) as set out at paragraph 85 below, by documents purportedly dated 26 February 2019, Gatiabe was purportedly transferred by Delos to Wlamil. By virtue of the purported (but invalid) issue of shares to Delos, Mr Bourlakov was thereafter able to exercise *de facto* control over Gatiabe and Wlamil until his death. If, contrary to the Claimants' primary case, Mr Kazakov, or any person other than Mr Bourlakov and Mrs Bourlakova, has or had any form of interest in Gatiabe, he, or they, held such interest as nominee for Mr Bourlakov. In this regard, the Claimants rely upon the email chain referred to above, which also describes Mr Bourlakov as the "client" in relation to Gatiabe and passes on his instructions.

21. **Edelweiss**: The Twelfth Defendant is a company incorporated in Panama on 2 June 2010. As explained in Section C0 below, Veronica is, and has at all material times since late 2014 been, the holder of the entirety of the shares in Edelweiss and the ultimate beneficial owner of Edelweiss. However, in or around January 2016 the shares held by Veronica were purportedly (but not validly) cancelled and shares were purportedly (but not validly) issued So far as Mrs Bourlakova is aware, Mr Bourlakov was the ultimate beneficial owner of Edelweiss (either alone or along with their daughter Veronica) prior to the point at which Edelweiss was transferred to the Panamanian Foundation, Fundacion Merenguito ("Merenguito"), at some time during 2014/5 but in any event prior to 18 August 2016 but backdated so as to appear to have been issued on 9 April 2015. To the best of the Claimants' Mrs Bourlakova's knowledge, those shares in Edelweiss were (purportedly) held by Merenguito on trust for Veronica, or in the alternative as nominee for her, as confirmed by the Declaration of Trust executed by Merenguito on 18 August 2016. Also on 18 August 2016, Merenguito adopted regulations pursuant to which Mrs Bourlakova she became the sole beneficiary of Merenguito. at around the same time and Mrs Bourlakova remained the sole beneficiary until she was replaced as sole beneficiary or shortly before it was dissolved on 15 May 2018 without her or Veronica's knowledge or consent, by another Panamanian foundation, Hemaren Stiftung ("Hemaren"). Prior to the dissolution of Merenguito, the The shares in Edelweiss purportedly held by

8

Merenguito were purportedly transferred to Hemaren. another Panamanian foundation. The Claimants believe that the recipient of the shares was Hemaren Stiftung ("Hemaren"). By virtue of the purported (but invalid) issue of shares to Merenguito and the purported transfer of those shares to Hemaren, Mr Bourlakov has was able to exercise *de facto* control over Edelweiss. As set out below, Mr Bourlakov controlled and the foundation that now owns it Hemaren until his death. Mrs Bourlakova understands that Mr Kazakov (or Mrs Kazakova) may be has asserted that following Mr Bourlakov's death he is the sole a beneficiary of Hemaren the foundation that owns Edelweiss. If so, Mr Kazakov and/or Mrs Kazakova are acting as a nominee for Mr Bourlakov. To the extent that Mr Kazakov held any interest in Hemaren he held it as nominee for Mr Bourlakov, until his death, and it now forms part of Mr Bourlakov's estate.

22. **IPEC**: The Thirteenth Defendant is a company registered in Panama on 5 June 1992. So far as Mrs Bourlakova and Veronica are is aware, Mr Bourlakov was the ultimate beneficial owner of IPEC (either alone or along with their daughter Veronica) until around 15 March 2014. From around 15 March 2014, the shares in IPEC were owned by Tribatline (of which Mrs Bourlakova was the sole beneficiary). IPEC went into liquidation in December 2015 and was dissolved on or before 24 May 2016. IPEC was reactivated on or around 28 20 July 2020. on Mr Bourlakov's instructions, and without Mrs Bourlakova's knowledge or consent. On or about 17 August 2020, IPEC purportedly issued a share certificate to Anahill in respect of the entire share capital of IPEC of 100 shares.

**Other relevant parties**

23. **Anahill, and Hemaren and Wlamil**: Anahill, and Hemaren and Wlamil are foundations incorporated in Panama. Mr Bourlakov had *de facto* control over Anahill, Hemaren and Wlamil until his death. Mr Bourlakov was the sole named beneficiary of Anahill and a named beneficiary of Hemaren, having previously been its only beneficiary. Mr Kazakov was added as a named beneficiary of Hemaren by an amendment purportedly dated 29 June 2018 to Hemaren's regulations (and so far as the Claimants are aware still is a named beneficiary) and is so far as the Claimants are aware the sole named beneficiary of Wlamil. Mr Kazakov was acting as a nominee for Mr Bourlakov and he, and any other person with any interest in Anahill, Hemaren and Wlamil, now holds any interest in Anahill, Hemaren and Wlamil for Mr Bourlakov's estate. The Claimants do not have access to Anahill's or Hemaren's Regulations, but infer that Mr Bourlakov has *de facto*

~~control over and/or is the sole or main beneficiary of them. If there is some other beneficiary, such as Mr Kazakov or Mrs Kazakova, they hold their interest as nominee for Mr Bourlakov.~~

24. **Jeswalt**: Jeswalt International Limited was a company incorporated in the British Virgin Islands on 7 July 2011. It was a holding company through which Mrs Bourlakova beneficially owned a number of companies including Greenbay, H1 and Chasehill between 2014 and 2016. Jeswalt was dissolved on 22 February 2016.

25. **Egerson:** Egerson Investments Limited is a company incorporated in the British Virgin Islands on 29 September 2015. It was a holding company through which Mrs Bourlakova beneficially owned a number of companies including Greenbay, H1 and Chasehill between 2016 and 2018.

26. **Chasehill**: Chasehill Investments SA is a company incorporated in Panama on 8 October 2008. The Claimants understand that Mr Bourlakov was the ultimate beneficial owner of Chasehill from 2011 until 2014, when its shares were transferred to Jeswalt, so that Mrs Bourlakova became the ultimate beneficial owner. The principal asset of Chasehill was a 350 foot superyacht, the Black Pearl, which was completed on 16 March 2018.

26A. **Jovellanos**: Jovellanos Investments Corp is a company incorporated in Panama. Jovellanos was dissolved on 26 December 2014 and was reactivated, without Mrs Bourlakova's knowledge or consent, on 3 October 2018. So far as the Claimants are aware, Mrs Bourlakova is and has at all material times since December 2014 been the holder of the entirety of the shares in, and the ultimate beneficial owner of, Jovellanos. As set out at paragraph 90B below, and without Mrs Bourlakova's knowledge or consent, the bearer shares held by Mrs Bourlakova were purportedly (but not validly) cancelled and shares were purportedly (but not validly) issued to Delos in her place. By virtue of the purported (but invalid) issue of shares to Delos, Mr Bourlakov was thereafter able to exercise and had *de facto* control of Jovellanos until his death. If, contrary to the Claimants' primary case, Mr Kazakov, or any person other than Mr Bourlakov and Mrs Bourlakova, has any form of interest in Jovellanos, he, or they, held such interest as nominee for Mr Bourlakov and it now forms part of Mr Bourlakov's estate. In this regard, the Claimants again refer to an email chain between Mr Tribaldos and Leo Cyprus in April 2020 which refers to Mr Bourlakov as "the client" in relation to Jovellanos and passes on his instructions.

26B. **Nuptials**: Foundation Nuptials ("**Nuptials**") was a foundation incorporated in Panama. To the best of the Claimants' knowledge, Mrs Bourlakova was the sole beneficiary of Nuptials on 18 August 2016 and was still the sole beneficiary until she was replaced as sole beneficiary without her knowledge or consent by Fundacion Cantucci ("**Cantucci**"). However, the Claimants have a copy of a letter dated 31 January 2017 from Nuptials to Heda Airlines Limited, which asserts that the beneficial owners of Nuptials are Veronica (as to 92%) and Mr Bourlakov (as to 8%). If and to the extent that Veronica was made a beneficiary of Nuptials, she brings claims on that alternative basis (as set out below). Nuptials was dissolved on 25 May 2018.

26C. **Cantucci**: Cantucci is a foundation incorporated in Panama. Mr Bourlakov was the sole named beneficiary and had *de facto* control over Cantucci until his death and it now forms part of Mr Bourlakov's estate.

26D. **Hydrangea**: Hydrangea Group SA ("**Hydrangea**") is a company incorporated in Panama on 16 April 2013. Between 3 December 2014 and a date after 29 May 2018, the shares in Hydrangea were held by the Panamanian company PZ Nominees II SA as nominee for Nuptials. After 29 May 2018, the shares in Hydrangea were transferred to Cantucci.

**The origins of the Bourlakov family's wealth**

27. The Bourlakov family's wealth originates substantially from the acquisition and subsequent sale of Novoroscement OJSC, which operated one of the largest cement factories in Russia. Novoroscement was sold by Mr Bourlakov in 2007 for approximately $1.45 billion.

28. Mr Bourlakov (until his death) and Mr Kazakov ~~now~~ contend that Novoroscement was a 50:50 joint venture between them and consequently that Mr Kazakov was entitled to 50% of the proceeds of sale. This is false. Mr Bourlakov was the ultimate beneficial owner of Novoroscement (with Leonid Yasud, his business partner, having a small minority shareholding). Mr Kazakov had no beneficial interest in Novoroscement, although he did from time to time hold shares as nominee for Mr Bourlakov.

29. The proceeds of the sale of Novoroscement (and other monies) were transferred between a number of companies owned by members of the Bourlakov family. The first transfers

were to companies beneficially owned by Mr Bourlakov. Subsequently, part of the proceeds was transferred to companies which were beneficially owned by other members of the Bourlakov family, but with the majority retained in entities held by Mr Bourlakov. Companies involved in the transfers included Gatiabe, Jovellanos, Finco, Edelweiss, IPEC and Greenbay.

30. Part of the proceeds were ultimately invested (on a leveraged basis) in Burneftegaz, which was an oil and gas business founded by Mr Bourlakov and a minority partner, Pavel Mitrofanov.

31. Burneftegaz was sold in 2014. By the time of the sale, Mr Bourlakov owned 90% of Burneftegaz. Following the sale, Edelweiss received $319 million in repayment of loan funding which it had (indirectly) provided to Burnetegaz and Mr Bourlakov received $642 million for his 90% shareholding.

**Mrs Bourlakova and Veronica's assets**

32. In and after 2014, as part of rearranging the holding of family assets and succession planning, Mr Bourlakov transferred (directly or indirectly) a number of assets and companies to Mrs Bourlakova including:

   a. The $642 million which Mr Bourlakov had received for his shares in Burneftegaz;

   b. Greenbay, H1 and Chasehill which were transferred to Jeswalt;

   c. Finco, Columbus and IPEC which were transferred to Tribatline, of which Mrs Bourlakova was made the sole beneficiary; and

   d. Gatiabe and Jovellanos which were transferred to Mrs Bourlakova in or around December 2014 as set out in paragraphs 90A and 90B below. Edelweiss which was transferred to Merenguito, of which Mrs Bourlakova was made the sole beneficiary.

   It should be noted that the reference to Mr Bourlakov transferring assets is a reference to the practical steps taken by him, not a reflection of the pre-existing ownership position.

32A. In or around late 2014, Mr Bourlakov also transferred Edelweiss to Veronica, as set out in paragraph 96C below.

33. Mr Kazakov had no involvement in these transfers since he had no interest in the

Bourlakov family assets.

**Breakdown of marital and familial relations**

34. ~~Since~~ Following the breakdown in marital and familial relations in December 2017 / January 2018 until his death in June 2021, Mr Bourlakov ~~has~~ pursued a strategy (in combination with the other Defendants) of engaging in dishonest and/or improper and/or unlawful actions with the ultimate objective of maximising his own share of assets which are (or have been) assets of the Bourlakov family and minimising or even eliminating the shares of Mrs Bourlakova and her daughters ~~Mrs Bourlakova's share~~.

**A.  Lying to Mrs Bourlakova and Veronica about the Bourlakov family's assets and/or their true value**

**A1.  Discussions in London on 5 April 2018 / the supposed Kazakov partnership**

35. On or around 5 April 2018, Mr Bourlakov visited Mrs Bourlakova and their daughters (Elena and Veronica) in London. Mr Kazakov, Mrs Kazakova and Mr Anufriev attended in support of Mr Bourlakov.

36. During the course of the discussions, Mr Bourlakov represented that the assets available for distribution were much smaller than Mrs Bourlakova and Veronica believed was the case. He said that all of the Bourlakov family's business interests were subject to a longstanding oral partnership with Mr Kazakov, pursuant to which 50% of these business interests (and the resulting proceeds and profits) were held for the benefit of Mr Kazakov – the supposed Kazakov partnership.

37. Mr Bourlakov represented that in the light of the supposed Kazakov partnership, 50% of the Bourlakov family assets (which Mr Bourlakov stated were worth a total of around $3.7 billion, including Edelweiss) in fact belonged to Mr Kazakov, leaving $1.85 billion for distribution ~~between Mr Bourlakov and Mrs Bourlakova~~. It was inherent in this representation (as confirmed by Mr Kazakov's supposed demands) that the assets beneficially owned by Mrs Bourlakova and Veronica were also subject to the supposed Kazakov partnership and Mr Kazakov could, therefore, claim 50% of their assets.

38. Mr Kazakov also represented that he was entitled to 50% of the Bourlakov family assets and stated that he could and would supply proof of the partnership. Mrs Kazakova and Mr Anufriev expressly endorsed the representations made by Mr Bourlakov and Mr

Kazakov as to the existence of the supposed Kazakov partnership.

39. Although the Claimants have no direct knowledge of the discussions which took place between Mr Bourlakov, Mr Kazakov, Mrs Kazakova and Mr Anufriev prior to the discussions with Mrs Bourlakova and her daughters, the Claimants infer that:

   a. Mr Bourlakov discussed with Mr Kazakov, Mrs Kazakova and Mr Anufriev in advance of the visit the nature of the false representations that would be made to Mrs Bourlakova and her daughters and that Mr Kazakov, Mrs Kazakova and Mr Anufriev would repeat and support those representations. Unless this had been discussed with them in advance, there would have been a risk that they would contradict Mr Bourlakov. Mr Kazakov, Mrs Kazakova and Mr Anufriev agreed to cooperate in the attempts to mislead Mrs Bourlakova and her daughters.

   b. Since each of Mr Kazakov, Mrs Kazakova and Mr Anufriev have subsequently further assisted Mr Bourlakov's attempts to defraud Mrs Bourlakova and Veronica, they each agreed to take all necessary further steps to support these false representations (including creating forged documents or supporting their authenticity) and/or to assist Mr Bourlakov's strategy to defraud Mrs Bourlakova and Veronica.

   c. Given the fraudulent nature of the conduct involved, Mr Bourlakov agreed to remunerate each of Mr Kazakov, Mrs Kazakova and Mr Anufriev for their participation (or made clear that continued employment (in the case of Mr Anufriev) or continued financial support (in the case of Mr Kazakov and Mrs Kazakova) was dependent upon their participation).

40. The representations made by Mr Bourlakov, Mr Kazakov, Mrs Kazakova and Mr Anufriev about the supposed Kazakov partnership and Mr Kazakov's 50% interest in the Bourlakov family's wealth were untrue and Mr Bourlakov, Mr Kazakov, Mrs Kazakova and Mr Anufriev knew they were untrue. The supposed Kazakov partnership was a fabrication designed to allow Mr Bourlakov to protect 50% of the family's assets from any potential claim by Mrs Bourlakova and Veronica and to either (a) mislead Mrs Bourlakova and Veronica as to the value of the family's assets, and/or (b) pressurise her Mrs Bourlakova into accepting a reduced sum in settlement of the divorce, and her daughters into encouraging her to do so and/or (c) pressurise Veronica into agreeing to

transfer to Mr Bourlakov or entities which he controlled (or accept the validity of invalid transfers of) assets which had previously been given to her, such as Edelweiss, and/or to allow those assets to be used as part of the divorce settlement (as a result of the risk that Mr Bourlakov would successfully conceal assets in reliance on the supposed Kazakov partnership and/or that Mr Kazakov would bring proceedings against ~~her~~ Mrs Bourlakova and/or Veronica claiming 50% of the assets beneficially owned by ~~her~~ them).

41. The Claimants will rely, inter alia, on the following:-

   a. Mr Bourlakov and Mr Kazakov have offered no proper explanation of why the supposed Kazakov partnership should have been concealed so assiduously and for so many years, only to be brought up following the breakdown of the marriage between Mr Bourlakov and Mrs Bourlakova.

   b. Mr Kazakov played no role in major business decisions made in relation to the Bourlakov family businesses. Mr Bourlakov and Mr Kazakov have offered no explanation of the origins of the supposed Kazakov partnership or the rationale for Mr Kazakov's entitlement to his supposed share.

   c. There is no good reason why Mr Kazakov would have allowed the entirety of his supposed wealth to remain under the exclusive control of (and to be exclusively used by) the Bourlakov family for decades.

   d. Despite Mr Kazakov stating that he would supply proof of the partnership, over the subsequent two years the Defendants have been unable to produce any evidence of the supposed partnership or produce any third party who can confirm the existence of such an agreement (with Mr Bourlakov and Mr Kazakov suggesting that only one third party knew of the existence of the partnership – Mr Bourlakov's mother – who is now dead).

   e. Mr Kazakov has failed to produce any documents showing that he declared his supposed 50% beneficial interest in the companies in which he is now said to have had a beneficial interest to any third parties including banks, accountants, corporate service providers and tax/government authorities. Under the relevant money laundering regulations in each applicable jurisdiction and Russian tax and company registration rules, Mr Kazakov would have been required to disclose these interests on multiple occasions. Mr Kazakov did not do so because he had no such interests.

f.  Keeping the supposed Kazakov partnership an undocumented secret would have exposed Mr Kazakov to significant and unnecessary risk in the event that:

   i.  Anything happened to Mr Bourlakov (such as his death); or

   ii.  A dispute arose between Mr Kazakov and Mr Bourlakov for any reason.

g.  As set out below, Mr Anufriev admitted informally to ~~the Bourlakovs' daughter,~~ Veronica~~,~~ that this was the first time he had heard of the supposed Kazakov partnership. Mr Anufriev ha~~d~~s been Mr Bourlakov's right hand man for some years, and managed Mr Bourlakov's business interests and assets on a daily basis, including being the principal person responsible for passing on Mr Bourlakov's instructions to third parties. There was no good reason to have concealed the supposed Kazakov partnership from Mr Anufriev and if any such partnership had existed, he would have known about it.

h.  As set out below, the documents produced and relied upon that might support Mr Kazakov having some entitlement to Bourlakov family assets are forgeries and contradict the supposed Kazakov partnership. One of those forgeries is a purported loan of $1,349,443,000 made by Gatiabe (now said to be owned by Mr Kazakov) to Finco in 2007 and carrying interest at 7.5% per annum (although another forged document which was concealed from Mrs Bourlakova purportedly reduced this to 2% per annum, as described in paragraph 88.0.ii below). This contradicts Mr Bourlakov and Mr Kazakov's own account of their supposed partnership and joint ownership of other Bourlakov family assets. The sum supposedly loaned by Gatiabe to Finco would have represented almost the entirety of the proceeds of sale from Novoroscement (which at the time represented almost all of the Bourlakov family's wealth). If the Finco / Gatiabe document had generated a genuine liability in favour of Gatiabe (a company said to be wholly owned by Mr Kazakov) this would have meant that Mr Kazakov was entitled to almost 100% of the proceeds of sale, whereas the supposed partnership is meant to have been 50:50. Further and in any event, there would be no reason in those circumstances for Mr Kazakov to have a further interest in any of the Bourlakov family's other assets.

i.  If the Finco / Gatiabe loan had been a genuine transaction, the capital sum plus interest would now amount to around $3 billion, which accounts for nearly the

entirety of the Bourlakov family wealth, not merely the 50% that Mr Bourlakov and Mr Kazakov claimed during the discussions in London on 5 April 2018. It would have made no sense for the Bourlakov family to retain possession of Mr Kazakov's assets if that possession had to be paid for at the rates of interest claimed in the forged documents which have been produced.

i.1. As set out at paragraph 88.0.iii below, the Cyprus AP documents have revealed that, in addition to the forged Finco / Gatiabe loan, Mr Bourlakov also arranged (but concealed from Mrs Bourlakova) a forged back to back loan agreement between Gatiabe (as borrower) and Jovellanos (as lender) in the sum of $1,307,428,847.96. The purported effect of the forged agreements is that almost the entire sum purportedly due from Finco to Gatiabe is in turn purportedly due from Gatiabe to Jovellanos. Since Mr Bourlakov appears to have believed he had successfully become the ultimate beneficial owner of Jovellanos and/or able to exercise control over it, the intended end result is that the sum of $1,307,428,847.96 plus interest would ultimately go back to Mr Bourlakov, albeit with that purported ownership concealed by the chain of companies and contracts involved. The fact that this structure was ultimately intended to result in almost the entire sum purportedly due to Gatiabe pursuant to the forged Finco / Gatiabe loan going to Mr Bourlakov (or now his estate) further confirms that the supposed Kazakov partnership is a fabrication.

j. Mr Bourlakov (or people acting on his instructions or with his knowledge and authority) ~~has~~ made repeated representations to third parties, such as banks, accountants, corporate service providers and other professionals concerning the beneficial ownership of the companies in which Mr Kazakov is now said to have ~~had~~ a beneficial interest. These statements recorded the beneficial ownership of members of the Bourlakov family (in particular Mr Bourlakov, ~~or~~ Mrs Bourlakova or Veronica) and made no mention of Mr Kazakov. For example:

   i.  A Société Générale form dated 12 February 2014 records that Mrs Bourlakova was the beneficial owner of Chasehill (which ~~owns~~ owned the Black Pearl).

   ii. A Société Générale form dated 17 February 2014 records that Mrs Bourlakova was the beneficial owner of Maravan.

17

iii. A UBS form dated 7 April 2014 records that Mrs Bourlakova was the "*effective beneficial owner*" of H1.

iv. A Corporate Depositors form dated 5 December 2014 ~~(and signed by Mr Tribaldos on behalf of Leo Trust as the corporate administrator)~~ in relation to Gatiabe (and ~~another Bourlakov family company,~~ Jovellanos) states that Mr Bourlakov was the ultimate beneficial owner of Gatiabe and Jovellanos. The Claimants rely on the absence of any reference to Mr Kazakov in this form.

v. UBS's records in relation to Veronica note that "*the family visited us on 23.03.2015 to inform about the step with the advancement of inheritance and that V.B is entitled to hold 92% of all bankable assets at UBS*". This was a reference to a portfolio held by Edelweiss with UBS. Edelweiss held 8% of that portfolio for Mr Bourlakov with the remainder being held for Veronica or Edelweiss itself (and therefore ultimately for Veronica as the holder of the shares in Edelweiss).

vi. On 29 August 2016 and 7 September 2016, Leo Services (then known as MMG Zurich) wrote to UBS confirming that "*the Beneficial Owners of Edelweiss Investments Inc are the following: 92% Ms Veronica Bourlakova ... 8% Mr Oleg Bourlakov*". The reference to Mr Bourlakov having an 8% interest in Edelweiss was a reference to his interest in the UBS portfolio referred to in the preceding subparagraph rather than to any interest in Edelweiss itself.

vii. On 8 November 2016, a form was filed with VQF (a Swiss self-regulatory organisation which, among other things, assists in relation to anti-money laundering measures for financial intermediaries) confirming that "*Oleg Bourlakov and Veronica Bourlakova are the Beneficial Owners of the company*", the company being Edelweiss.

viii. A meeting on 16 March 2018 with Saffery Champness, the firm of chartered accountants and tax advisors, was attended by Mr Bourlakov, Mr Anufriev, Veronica and Elizabeth Hartless of Saffery Champness. The notes prepared by Saffery Champness of that meeting record: "*March 2015 – VB added as*

*beneficial owner to Panamanian Co* [i.e. Edelweiss] *due to ill health of OB*". The notes also asked "*SA/VB/OB to confirm how beneficial ownership was transferred to VB*". The response, which the Claimants believe came from Mr Anufriev or was based on information provided by him, stated: "*VB is one of the two beneficiaries of a foundation which is the owner of the company*". There was no suggestion that Mr Kazakov had any interest in Edelweiss or Merenguito.

k.  Prior to the breakdown of their marriage, Mr Bourlakov and Mrs Bourlakova did not declare to any third party (whether professional, business counterparty or state agency) that they Bourlakov family were not beneficial owners of the assets or that Mr Kazakov had any interest in them.

k.1. The Cyprus AP documents do not include any reference to Mr Kazakov having any beneficial interest in any of the Bourlakov family assets prior to 2018. Rather, they show that KYC information in relation to Mr Kazakov was first provided to Leo Trust from 4 April 2018 onwards, including a passport scan provided on 4 April 2018 and a Leo Trust "Identification Sheet" dated 27 April 2018. Such KYC information is a necessary pre-requisite for a fiduciary and corporate services provider like Leo Trust administering assets on behalf of a client. This confirms that Leo Trust had not been informed and did not believe at any time prior to April 2018 that Mr Kazakov had any interest in any of the Bourlakov family's assets (many of which were managed by Leo Trust). Otherwise, Leo Trust would have been obliged under Swiss money laundering rules to obtain this information (and provide it to relevant third parties, such as banks), which it did not do.

l.  The Bourlakov family wealth was used in a manner consistent only with its exclusive entitlement to it. Mr Kazakov had no involvement in any of the relevant decision making. By way of example, over $173 million was spent on the construction of the Black Pearl, one of the largest yachts in the world, for the use of the Bourlakov family.

m.  Since its construction and until Mr Bourlakov's death, the Black Pearl whas been used by Mr Bourlakov and not by Mr Kazakov. It was decorated in a manner designed to replicate the decoration of the Bourlakov family residence. Sworn affidavit evidence has been served by lawyers on instructions from Mr Bourlakov

stating that "*all parties involved were aware and treated Mr Bourlakov as the Yacht owner*", Mr Bourlakov had unilateral authority in relation to the construction of the Yacht and he was party to thousands of messages exchanged in the period 2012-2018 in relation to the construction, in which instructions were sought from and given by Mr Bourlakov in relation to every detail of the construction. Although the affidavit also asserts that Mr Kazakov was involved in the decision to commission the Black Pearl, the other evidence referred to above contradicts that (unsupported) assertion. Mr Kazakov had no substantive involvement in the construction of the Black Pearl and did not even attend the launch. Nevertheless, prior to his death Mr Bourlakov asserted and Mr Kazakov asserts that Mr Kazakov was in fact always the owner of 50% of all Bourlakov family assets, including the Black Pearl.

n.  The respective lifestyles of Mr Bourlakov (until his death) and Mr Kazakov are inconsistent with the suggestion that Mr Kazakov is entitled to 50% of the wealth owned by the Bourlakov family Mr Bourlakov and/or Mrs Bourlakova. The Bourlakov family has or had multiple properties around the world with their principal home in Monaco being worth in excess of $100 million. Mr Bourlakov and Mrs Bourlakova spent tens of millions of dollars on art and antiques for the properties in which they lived and over $173 million on the construction of one of the largest yachts in the world for Mr Bourlakov and his immediate family's personal use. Mr Kazakov has always had a modest lifestyle, living in modest homes with limited day to day expenditure e.g. budget flights. Even when Mr Kazakov produced KYC documents to Leo Trust in April 2018 for the purpose of having assets transferred to him as part of the conspiracy, these documents contradict the supposed Kazakov partnership. In the Leo Trust Identification Sheet dated 27 April 2018, Mr Kazakov ticked the box to state that he had an average annual gross income of USD100,000 to USD 1 million, rather than the box stating he had an average annual gross income over USD 1 million. If Mr Kazakov had indeed had a multi-billion dollar interest in the Bourlakov family assets, his annual income would have been substantially higher than this.

o.  Although Mr Kazakov has received money from Mrs Bourlakova, these were limited sums provided either by way of loans or of a kind consistent with the gratuitous provision of support to a close family member. For example, an email dated 10 November 2016 sent from the Bourlakov Family Office to Société

Générale asks the bank to transfer €26,000 from Mrs Bourlakova's personal account to Mr Kazakov with the reference "Financial Support". Neither the amount nor the description is consistent with the idea that Mr Kazakov was a multi-billionaire receiving a tiny proportion of his own funds.

42. The Claimants will seek early disclosure of:

   a. Declarations and filings made by or on behalf of Mr Bourlakov to banks, accountants, other professionals, corporate service providers (including Leo Trust) and tax authorities in relation to the beneficial ownership of the companies which Mr Bourlakov ~~now~~ contend~~s~~ed were beneficially owned in whole or in part by Mr Kazakov. There will be no reference to Mr Kazakov on any genuine documents pre-dating April 2018, save for limited situations in which Mr Kazakov was acting as nominee or agent for Mr Bourlakov.

   b. Declarations and filings made by or on behalf of Mr Kazakov to banks, accountants, other professionals, corporate service providers (including Leo Trust) and tax authorities making representations as to his assets or income. There will be no such documents relating to his supposed beneficial ownership of the companies which it is now contended were beneficially owned in whole or in part by Mr Kazakov pre-dating April 2018.

43. Mrs Kazakova knew that the representations made by Mr Bourlakov and Mr Kazakov were untrue. She knew that her husband was not a secret multi-billionaire.

44. Mr Anufriev knew that the representations made by Mr Bourlakov and Mr Kazakov about the supposed Kazakov partnership were untrue:

   a. Mr Anufriev ha~~d~~s been Mr Bourlakov's right hand man for some years and manage~~s~~d Mr Bourlakov's business interests and assets on a daily basis, including being the principal person responsible for passing on Mr Bourlakov's instructions to third parties.

   b. Mr Anufriev will have witnessed Mr Bourlakov making innumerable unilateral decisions (covering hundreds of millions of dollars) in relation to his business interests and the Bourlakov family assets without requesting Mr Kazakov's views or taking into account Mr Kazakov's supposed interests.

c. Mr Anufriev will have been involved in or known about the multiple representations made by or on behalf of Mr Bourlakov to third parties which contradict the supposed Kazakov partnership, including due diligence and ownership representations. As a lawyer, Mr Anufriev would have been well aware that these representations were required to comply with money laundering regulations and, therefore, the importance of accuracy.

d. Mr Anufriev will never have taken instructions from Mr Kazakov as a partner with Mr Bourlakov or considered his interests.

e. Mr Anufriev will have been party to discussions with Mr Bourlakov, Mr Tribaldos, Mr Kazakov and others from at least April 2018 in which it was made clear that the supposed Kazakov partnership was a mere device in order to deprive Mrs Bourlakova and Veronica of assets.

f. Mr Anufriev admitted informally to ~~the Bourlakovs' daughter~~ Veronica that this was the first time he had heard of the supposed Kazakov partnership.

g. Mr Anufriev attended the meeting with Saffery Champness referred to in paragraph 41(j)(viii) above at which Saffery Champness were informed that the only persons interested in Edelweiss were Veronica and Mr Bourlakov and at which Mr Anufriev did not suggest that Mr Kazakov had any interest in Edelweiss. Further, Mr Anufriev responded to Saffery Champness's questions by addressing Veronica's interest in Edelweiss and without suggesting that Mr Kazakov had any interest in Edelweiss.

## A2. Mediation in Monaco on 28/29 June 2018

45. On 28 and 29 June 2018, mediation discussions took place between Mrs Bourlakova and Mr Bourlakov in Monaco. Their purpose was to try to agree a final division of assets following the breakdown of their marriage. Mr Anufriev attended as an adviser to Mr Bourlakov.

46. These discussions followed on from the misrepresentations made by Mr Bourlakov and Mr Kazakov during the discussions in London on 5 April 2018 which asserted that 50% of the Bourlakov family assets (which Mr Bourlakov stated were worth a total of around $3.7 billion, including Edelweiss) belonged to Mr Kazakov, with the result that only

$1.85 billion was available for distribution ~~between Mr Bourlakov and Mrs Bourlakova~~. Since Mr Bourlakov had not acknowledged the falsity of these representations, they were continuing representations which Mr Bourlakov hoped and expected would pressurise Mrs Bourlakova into accepting a reduced sum in settlement, would pressure her daughters into encouraging her to do so and would pressure Veronica into agreeing to transfer to Mr Bourlakov (or accept the validity of invalid transfers of) assets which had previously been given to her, such as Edelweiss, and/or into allowing those assets to be used as part of the divorce settlement. Although Mrs Bourlakova and Veronica knew that these representations were untrue, ~~she was~~ they were aware that Mr Bourlakov, Mr Kazakov, Mrs Kazakova and Mr~~s~~ Anufriev would repeat and rely upon them in the event that a settlement could not be reached. Mr Anufriev's attendance at this meeting with Mr Bourlakov confirmed his willingness to support Mr Bourlakov in any way necessary including by supporting his misrepresentations about the supposed Kazakov partnership and Mr Anufriev has subsequently done so. Mr Anufriev's representations about the supposed Kazakov partnership made in London in April 2018 were, therefore, continuing representations and Mr Anufriev impliedly joined in the continuing representations by Mr Bourlakov.

47. It was agreed at this meeting (although ultimately the agreement was not implemented) that Mrs Bourlakova and her daughters would retain/receive:

    a. Unencumbered assets worth $500 million including investments in an investment fund called Ironwall, which would be allocated from funds already controlled by Mrs Bourlakova or her daughters.

    b. Assets worth $450 million, which would come so far as possible from funds already controlled by Mrs Bourlakova or her daughters. These assets were to be managed jointly by Mr Bourlakov and ~~the Bourlakovs' daughter~~ Veronica for five years, with the profits shared equally between Mr Bourlakov and Mrs Bourlakova, following which Mrs Bourlakova would receive the principal sum.

    c. The apartment at La Reserve in Monaco which was worth $100-150 million at that time.

    d. The antiques in the apartment worth a substantial sum, subject to Mr Bourlakov having a right to purchase items.

47A.   The agreement reached at the meeting was recorded in a manuscript written agreement signed by both of Mr Bourlakov and Mrs Bourlakova on 29 June 2018 (but erroneously dated 29 July 2018). The manuscript agreement recorded the terms summarised above and, further, recorded that "*Anything not mentioned goes to the husband. All property registered in the name of the children … goes to the husband*". Subsequently a typed Memorandum of Agreement Regarding the Division of Family Assets was produced which recorded similar terms and recorded that: "*All other family assets held directly or indirectly will become the property of Mr Bourlakov or to whom he may direct.*"

48.   Mrs Bourlakova ~~and her daughters~~ ~~was~~ were willing to accept a settlement under which ~~she~~ they would retain/receive assets worth approximately a third of the total Bourlakov family assets (which Mr Bourlakov had previously stated were worth a total of around $3.7 billion (albeit that he had falsely contended that 50% belonged to Mr Kazakov)) because it was clear from the false representations which Mr Bourlakov had made in London that he was willing to defraud ~~her~~ them.

**A3.   Mediation in London on 13-16 September 2018**

49.   There were further discussions between Mrs Bourlakova, Veronica, and Mr Bourlakov in London, with a mediator, on 13-15 September 2018. There was then a further meeting in London without the mediator on 16 September 2018. Mr Anufriev attended part of the meetings as an adviser to Mr Bourlakov.

50.   During these meetings, Mr Bourlakov radically changed his position compared to the original mediation in Monaco in June 2018 and now claimed that the Bourlakov family assets only included $900 million of what he described as "good money" to be divided, since the rest was encumbered by debt. Mr Bourlakov initially proposed that Mrs Bourlakova and her daughters should receive and retain a total of $600 million of the "good money" of $900 million, although after the meetings his proposal reduced to $300 million.

51.   Again, these discussions followed on from the misrepresentations made by Mr Bourlakov, Mr Kazakov, Mrs Kazakova and Mr Anufriev during the discussions in London on 5 April 2018 which asserted that 50% of the Bourlakov family assets (which Mr Bourlakov stated were worth a total of around $3.7 billion) in fact belonged to Mr Kazakov. Since Mr Bourlakov had not acknowledged the falsity of these representations,

they were continuing representations which Mr Bourlakov intended would pressurise Mrs Bourlakova into accepting a reduced sum in settlement, would pressure her daughters into encouraging her to do so and would pressure Veronica into agreeing to transfer to Mr Bourlakov (or accept the validity of invalid transfers of) assets which had previously been given to her, such as Edelweiss, and/or into allowing those assets to be used as part of the divorce settlement. Mr Bourlakov's representations about the amount of "good money" available were dependent on both the supposed Kazakov partnership and new alleged debts. Although no specifics of the further alleged debts were provided, Mr Bourlakov represented that the further reduction in the funds available was due to debts to third parties other than Mr Kazakov and that these amounted to hundreds of millions of dollars.

52. Mr Anufriev's presence at these meetings confirmed his continued willingness to support Mr Bourlakov in any way necessary. When asked by Mr Bourlakov to produce the loan documents, Mr Anufriev referred to the 'IPEC loan for [$]145 [million]' and suggested it was not necessary to produce documents which Mrs Bourlakova and her daughters knew all about. This was a reference to one of the loans in respect of which Mr Anufriev had arranged for forged documents to be produced – see paragraphs 112-120 below. Mr Anufriev thereby impliedly joined in Mr Bourlakov's false representations about the debts.

53. These representations about debts were untrue and Mr Bourlakov and Mr Anufriev knew they were untrue. This was a further fabrication designed to mislead Mrs Bourlakova and her daughters as to the value of the Bourlakov family assets and/or to pressurise Mrs Bourlakova into accepting a reduced sum in settlement rather than pursuing proceedings for the distribution of assets following divorce, to pressure her daughters into encouraging her to do so and to pressure Veronica into agreeing to transfer to Mr Bourlakov (or accept the validity of invalid transfers of) assets which had previously been given to her, such as Edelweiss, and/or into allowing those assets to be used as part of the divorce settlement, due to the risk of a court being misled by misrepresentations to this effect by Mr Bourlakov.

54. The Claimants will rely on the fact that Mr Bourlakov and Mr Kazakov have has not subsequently been able to provide any particulars or produce any evidence of substantial debts to third parties.

55. Mr Anufriev also knew that these representations were untrue since his daily involvement in Mr Bourlakov's business interests meant that he would have known if there were substantial debts to third parties.

56. Mrs Bourlakova was unwilling to accept the terms proposed by Mr Bourlakov and no agreement was reached.

**A4.    Demands for payment by Mr Kazakov**

57. In December 2018, Mr Kazakov sent a series of phone text messages to Mrs Bourlakova and her daughters (a number of which were signed off by "*N Kazakov, Vera*", thereby indicating they were sent jointly by Mr Kazakov and Mrs Kazakova) referring to the discussions in London in 2018 (at which representations about the supposed Kazakov partnership had been made). In those messages Mr Kazakov sought repayment of unspecified sums of his money which he claimed had been transferred to Mrs Bourlakova and her daughters and then misappropriated. Mr Kazakov went on to state that "*in 2007 my Company loaned money (into management) to your company*" and demanded repayment.

58. The only specific figure referred to was in a message that said: *'Veronika, I am resending you the cash transfer request.'*. The message attached an image of a request to make a transfer of $439,000 with the reference "*reimbursement of loan*". The justification given for the demand was that Mr Kazakov needed funds to comply with the Russian tax amnesty process.

59. These representations that Mr Kazakov had advanced funds which were now repayable were untrue and Mr Kazakov knew they were untrue. These messages referred to a 2007 loan which did not exist but purports to have been created by forged documents that were subsequently produced by Mr Bourlakov (see paragraphs 75-90 below). It is therefore to be inferred that Mr Kazakov sent these messages on Mr Bourlakov's instructions or with his knowledge and authority.

60. The relatively small sum sought by Mr Kazakov contradicts Mr Bourlakov and Mr Kazakov's representations about the supposed Kazakov partnership. If Mr Kazakov had been the co-owner of businesses which had been sold for billions of dollars:

   a. The requested amount would have been insufficient to meet his tax liabilities. The Claimants will seek early disclosure of all documents in the possession or control of

Mr Kazakov relating to the Russian tax amnesty (including documents explaining the amount of money he alleges he needed in order to participate in it);

b. There is no obvious reason why he would not have asked for the full amount of any entitlement; and

c. There is no reason why he would not have asked Mr Bourlakov for the necessary funds in the light of the refusal of Mrs Bourlakova to hand them over.

61. These demands reinforced the risk that Mr Kazakov (acting on instructions from Mr Bourlakov) might seek to claim 50% of the assets beneficially owned by Mrs Bourlakova and her daughters.

**A5. Mr Bourlakov's declaration**

62. On or around 20 December 2018, Mr Bourlakov executed a declaration (also signed by Mr Anufriev in his capacity as Mr Bourlakov's lawyer) stating that Mr Kazakov was an equal business partner of Mr Bourlakov in all business dealings, thereby repeating in a formal legal document the misrepresentations made to Mrs Bourlakova and her daughters in London in April 2018.

63. For the reasons set out above, the contents of the declaration are untrue and Mr Bourlakov knew that they were untrue, since there was no partnership between Mr Bourlakov and Mr Kazakov.

64. Mr Anufriev signed the declaration, thereby supporting the false statements being made by Mr Bourlakov about the supposed Kazakov partnership, despite knowing that the contents were untrue.

65. The Claimants do not know whether the declaration was specifically discussed with Mr Kazakov before it was made, but it was executed by Mr Bourlakov in circumstances where Mr Kazakov had already agreed that he would support and repeat false representations about the supposed Kazakov partnership.

**A6. The involvement of Mr Tribaldos, Leo England and Leo Trust in the lies concerning the supposed Kazakov Partnership**

66. Mr Tribaldos and Leo Trust (and previously Leo Services) had advised Mr Bourlakov on his asset holding structure and had set up and managed that structure on his instructions.

Pursuant to their money laundering procedures, Mr Tribaldos and Leo Trust (and previously Leo Services) will have sought and received representations made by or on behalf of Mr Bourlakov about the ownership of assets which prior to his death Mr Bourlakov now claims claimed are owned in whole or in part by Mr Kazakov. They will also have arranged or seen multiple representations to third parties about the ownership of assets which contradict the supposed Kazakov partnership. See paragraphs 41j-k.1 above. In its role as service provider to Leo Trust, many of the relevant documents would be held by Leo Cyprus.

67. Given that Mr Tribaldos and Leo Trust knew that the supposed Kazakov partnership was false and they (and Leo Cyprus) would have documents contradicting Mr Bourlakov's misrepresentations, Mr Bourlakov knew that he needed Mr Tribaldos and Leo Trust to support his misrepresentations, to produce or assist in the production of forged or sham documents supporting them and to destroy documents contradicting them.

68. Mr Bourlakov knew and/or Mr Tribaldos explained to him that Mr Tribaldos and Leo Trust could participate in such fraudulent activities because Mr Tribaldos (through Leo England) controlled Leo Trust and Leo Cyprus, and Leo England could and would remove any directors or employees (of either company) who were unwilling to support and conceal the fraudulent activities.

69. Between February 2018 and June 2018, Mr Bourlakov visited Zurich on multiple occasions. The purpose of some or all of these visits was for Mr Bourlakov (and Mr Anufriev) to meet Mr Tribaldos in order to discuss, develop and give effect to Mr Bourlakov's strategy (including the supposed Kazakov partnership).

70. In the course of these (and other) meetings and conversations, Mr Tribaldos (acting on behalf of Leo England and Leo Trust) agreed to participate and assist in that strategy, including by supporting Mr Bourlakov's false assertions about the supposed Kazakov partnership, assisting in the production of forged and/or sham documents, concealing evidence of the forgeries and/or shams and concealing evidence of the true position. The Cyprus AP documents indicate this agreement had been reached in advance of the discussions in London on 5 April 2018, since Mr Kazakov started providing KYC information to Leo Trust the previous day for the purpose of having assets transferred into his name. The Claimants infer from this that there was a meeting between Mr Bourlakov, Mr Kazakov and Mr Tribaldos (acting on behalf of Leo Trust and Leo

England) on or before 4 April 2018 to, *inter alia*, agree the strategy for the London discussions, including the false assertions to be made in relation to the supposed Kazakov partnership.

71. As set out below, Mr Tribaldos and Leo Trust (with the knowledge and permission of Leo England, acting through Mr Tribaldos) did support Mr Bourlakov's strategy, including his false assertions about the supposed Kazakov partnership as particularised further below. Mr Tribaldos, Leo England and Leo Trust all assisted in the destruction of documents and Mr Tribaldos and Leo England sought to procure the destruction of documents held by Leo Cyprus in order to support, perpetuate and conceal Mr Bourlakov's fraudulent strategy.

72. Mr Tribaldos and Leo Trust assisted (with the knowledge and permission of Leo England, acting through Mr Tribaldos) in the production of the 20 December 2018 declaration (on Mr Bourlakov's instructions, either directly or through Mr Anufriev) or knew that it was being produced in order to give false evidence pursuant to the fraudulent strategy in which they had agreed to participate.

## A7. Consequences of the above lies

73. As set out above, the purpose of the above misrepresentations was to ~~either~~ (a) mislead Mrs Bourlakova and her daughters as to the value of the family's assets, or (b) pressurise ~~her~~ Mrs Bourlakova into accepting a reduced sum in settlement, and her daughters into encouraging her to do so and/or (c) pressurise Veronica into agreeing to transfer to Mr Bourlakov (or accept the validity of invalid transfers of) assets which had previously been given to her, such as Edelweiss, and/or to allow those assets to be used as part of the divorce settlement. If successful, the likely effect would have been to obtain an immediate reduction in the sum which Mrs Bourlakova was willing to accept as her share of the Bourlakov family assets and/or an agreement by Veronica to transfer assets to Mr Bourlakov or his nominee.

74. Although that objective has not (yet) been finally achieved, Mrs Bourlakova and her daughters have ~~has~~ faced and continue~~s~~ to face ongoing risks as a result of these misrepresentations, including that Mr Bourlakov ~~will~~ has successfully conceal~~ed~~ assets in reliance upon them and/or that Mr Kazakov (now acting on his own behalf following Mr Bourlakov's death, with the assistance of Mrs Kazakova and Mr Anufriev ~~Mr Bourlakov's instructions~~) will bring proceedings against ~~her~~ them claiming 50% of the

assets beneficially owned by ~~her~~ them, and will seek to retain assets which Mr Kazakov held as nominee for Mr Bourlakov. Mrs Bourlakova has, therefore, had to incur (and continues to incur) substantial sums on legal and other fees (much of them in England) in order to be able to investigate and establish the falsity of the representations and the forged and sham documents created in order to further and support them – as to which see Section B below.

**B. Concealing and/or allowing Mr Bourlakov to conceal his assets and/or the true value of his assets**

**B1. The creation of forged / sham liabilities**

75. Mr Bourlakov has produced and relied upon a document which purports to be a loan agreement between Gatiabe and Finco dated 19 March 2007 (the "Finco / Gatiabe document").

76. The Finco / Gatiabe document purports to record a loan of $1,349,443,000 made by Gatiabe to Finco, repayable on demand, and accruing interest at 7.5% a year. It is purportedly signed by Jose Silva and Dianeth de Ospino (who were directors of Gatiabe in March 2007) for Gatiabe and Adelina de Estribi (who was a director of Finco in March 2007) for Finco.

77. Mr Bourlakov has also produced and relied upon a document which purports to be a resolution of the Board of Directors of Gatiabe dated 23 March 2007 and signed by Jose Silva and Dianeth de Ospino authorising the execution of the Finco / Gatiabe document (the "Gatiabe resolution").

78. The Claimants are also aware of a document which purports to be a resolution of the Board of Directors of Finco dated 23 March 2007 and signed by Adelina de Estribi authorising the execution of the Finco / Gatiabe document (the "Finco resolution").

79. Mr Bourlakov has also produced and relied upon a declaration of trust purportedly dated 12 July 2018 entered into by Delos ~~Global SA~~, purportedly as the holder of the shares in Gatiabe, stating that it holds the shares on trust for Mr Kazakov. The Claimants do not accept that the declaration was in fact executed on 12 July 2018 but believe it was not created until at least October 2018. References to the date of this document hereafter are references to the date it bears and should not be taken as an acceptance that it was in fact executed on that date.

80.    Prior to his death, Mr Bourlakov contendeds (and Mr Kazakov continues to contend) that the loan recorded in the Finco / Gatiabe document is still outstanding to Gatiabe (which they say/said he says is owned by Mr Kazakov) and over $3 billion is due pursuant to it (including accrued interest). This supposed liability would wipe out the vast majority of the Bourlakov family fortune. As confirmed by the Cyprus AP documents (see paragraph 88.0.iii below), Mr Bourlakov did does not intend to impoverish himself. The purpose of this purported loan wais artificially to suppress the value of Mr Bourlakov's assets, in circumstances in which Mr Bourlakov hads agreed that he would will be able to recover from Mr Kazakov any money which Mr Kazakov / Gatiabe obtaineds in reliance on it.

81.    The Finco / Gatiabe document, the Gatiabe resolution, and the Finco resolution and the Gatiabe / Jovellanos documents (see paragraph 88.0.iii below) are forgeries which were produced in or around October 2018 (and April 2019 respectively) by or with the assistance of Mr Tribaldos (in his capacity as a director of Leo Trust with the knowledge and permission of Leo England). Mr Tribaldos was acting on instructions from Mr Bourlakov which were communicated to him by Mr Anufriev. The Claimants will refer to emails sent by Mr Tribaldos in October 2018 in relation to the production of the Finco / Gatiabe document, the Cyprus AP documents (see paragraph 88.0 below), and Leo Trust's invoice for work during October 2018 which includes a charge for the production of the Finco / Gatiabe document, and Leo Trust's invoice dated 28 May 2019 which includes a charge for the production of the Gatiabe / Jovellanos documents.

82.    The signatures on the documents were either (a) written by someone other than the signatories or (b) written by the relevant individuals long after they ceased to be directors of the relevant companies on the dissolution of Finco and Gatiabe in 2014.

83.    Each of Mr Bourlakov, Mr Tribaldos and Mr Anufriev was aware that there was no loan between Finco and Gatiabe and consequently that documents would need to be forged in order to create and/or support a purported liability to Gatiabe. To the extent that there was any transfer from Gatiabe to Finco in 2007 (which is not admitted), this would have been a gratuitous transfer between companies with the same ultimate beneficial owner and there was no intention by either company for Finco to have any repayment obligation.

84.    Further or alternatively, the Finco / Gatiabe document, the Gatiabe resolution, and the

Finco resolution and the Gatiabe / Jovellanos documents are shams:

a. The Finco / Gatiabe document does not record a genuine agreement or liability between Gatiabe and Finco.

b. No resolution to enter into the Finco / Gatiabe document was passed by the Board of Directors of Gatiabe or the Board of Directors of Finco in or around March 2007, since the Finco / Gatiabe document did not exist at that time and there was no actual or intended agreement between Gatiabe and Finco in the terms of the Finco / Gatiabe document.

c. The Gatiabe / Jovellanos documents do not record a genuine agreement or liability between Gatiabe and Jovellanos.

85. The declaration of trust purportedly dated 12 July 2018 entered into by Delos Global SA is a sham. Delos Global SA executed this declaration on the indirect instructions of Mr Bourlakov and/or in reliance upon the forged documents referred to above. Gatiabe was then purportedly transferred by Delos to Wlamil, with Mr Kazakov being the sole named beneficiary of Wlamil. Mr Bourlakov had *de facto* control over Wlamil and Gatiabe until his death (although, as set out below, Mrs Bourlakova was, and remains, the sole holder of Gatiabe's shares). Mr Kazakov was is acting as nominee for Mr Bourlakov and so, if and to the extent that Mr Kazakov, Wlamil or any person other than Mrs Bourlakova has any interest in the true beneficial owner of Gatiabe such interest forms part of Mr Bourlakov's estate remains Mr Bourlakov (although, as set out below, Mrs Bourlakova's primary case is that she is the sole holder of Gatiabe's shares and its sole ultimate beneficial owner).

86. The declaration of trust was prepared by or on instructions from Mr Tribaldos (in his capacity as a director of Leo Trust with the knowledge and permission of Leo England). Mr Tribaldos was acting on instructions from Mr Bourlakov which were communicated to him by Mr Anufriev. Alternatively, Mr Tribaldos and/or Mr Anufriev would have known that it was being prepared. Mr Tribaldos and Mr Anufriev knew that Mr the Bourlakov family had always been the ultimate beneficial owner of Gatiabe, that Mr Kazakov had no interest in it, and that the declaration was a sham.

87. On instructions from Mr Bourlakov which were communicated to Leo Trust by Mr Anufriev, between in October 2018 and July 2019 Leo Trust (with the assistance of Leo Cyprus) prepared backdated accounts for Gatiabe for 2015 and 2016 which included the

sums purportedly due pursuant to the Finco / Gatiabe document. These accounts were fraudulent since no such loan existed, to the knowledge of the persons involved in their creation. Mr Anufriev dealt with the potential Russian tax implications of these accounts. Given that Mr Anufriev acted on behalf of Mr Bourlakov and not Mr Kazakov, his involvement shows that Mr Bourlakov continued to own and control Gatiabe and that any interest Mr Kazakov held was held as nominee for Mr Bourlakov.

88. The Claimants will rely, inter alia, on the following:-

0. The Cyprus AP documents include emails between Leo Trust and Leo Cyprus between October 2018 and July 2019 in relation to the preparation of the backdated accounts for Gatiabe for 2015 and 2016. Mr Tribaldos is a party to the majority of these emails, which refer to instructions from Mr Bourlakov as communicated by Mr Anufriev. These emails show as follows:-

i. The Finco / Gatiabe document, although purportedly signed in March 2007, only existed in draft in October 2018, with the result that Leo Cyprus was instructed to prepare the accounts based on an unsigned draft.

ii. It became clear at the end of 2018/early 2019 that recording interest due from Finco as an asset in Gatiabe's accounts would be likely to result in a tax charge under Russian law once Mr Kazakov was recorded as the beneficial owner (as was necessary for the purpose of the fraud even though Mr Kazakov would in fact be acting as nominee, in respect of any interest Mr Kazakov might have had, for Mr Bourlakov). A forged addendum to the Finco / Gatiabe document was therefore prepared (backdated to 31 December 2013) reducing the interest rate from 7.5% to 2% with effect from 1 January 2014 in order to reduce the interest to be shown in the Gatiabe accounts. This further forgery and then the concealment of this addendum from Mrs Bourlakova in order to mislead her as to the sums purportedly due from Finco to Gatiabe pursuant to the Finco / Gatiabe document is further evidence that the Finco / Gatiabe document is a forgery (or alternatively a sham).

iii. In April 2019, further forged agreements were put in place, namely a loan agreement between Gatiabe (as borrower) and Jovellanos (as lender) purportedly dated 19 March 2007 and an addendum purportedly dated 31 December 2013, on substantially the same terms as the forged Finco / Gatiabe document and the forged

addendum to that document, but for the sum of $1,307,428,847.96 ("the Gatiabe / Jovellanos documents"). Charges for "*preparing, forwarding and signing*" the Gatiabe / Jovellanos documents were included in an invoice from Leo Trust dated 28 May 2019. As a result of this chain of contracts, almost the entire sum purportedly due from Finco to Gatiabe became purportedly due from Gatiabe to Jovellanos. Again, these agreements were concealed from Mrs Bourlakova so that the Finco / Gatiabe document could be relied on as evidence supporting the supposed Kazakov partnership while Mr Bourlakov (through his control of Jovellanos) would be able to recover all (or almost all) of any money obtained in reliance on the Finco / Gatiabe document. This structure between companies all beneficially owned by Mr Bourlakov at the time they were purportedly entered into would have served no sensible commercial purpose, confirming that the Finco / Gatiabe document is a forgery. Furthermore, as set out above at paragraph 41.i.1, the creation of these further agreements shows that there is no truth to the supposed Kazakov partnership and that the July 2018 declaration of trust is a sham. In the alternative, if the July 2018 declaration of trust is not a sham, the effect of the Finco/Gatiabe documents and the Gatiabe/Jovellanos loan was that almost the entire value in the structure was in fact ultimately held in Jovellanos (which was controlled by Mr Bourlakov until his death) and only a small interest held in Gatiabe purportedly for Mr Kazakov.

a. The purpose of the loan purportedly created by the Finco / Gatiabe document is to evidence and give effect to the supposed Kazakov partnership, which is of recent invention.

b. The Finco / Gatiabe document gives the contact address of Gatiabe and the registered office of Finco as MMG Tower, Floor 23, Avenida de Pacifico with Avenida Paseo del Mar in Panama City. The tower block known as "MMG Tower" in Panama City did not exist in 2007. It was completed after approximately twelve months of construction in 2012. In 2007, the registered address of both Gatiabe and Finco was Swiss Tower in Calle 53 Marbella, approximately five miles away from where the MMG Tower was built five years later.

c. Under Finco's constitution documents, two directors were required to execute documents. The Finco / Gatiabe document purports to be signed by just one

director. If there had been a genuine agreement for a sum totalling over $1.3 billion, the directors of Finco and Gatiabe would have ensured that it was entered into in compliance with all required formalities.

d. The directors of Gatiabe would not have lent such an enormous sum without security and without making any attempt to ensure that Finco was able and continued to be able to meet its repayment obligation.

e. Gatiabe was dissolved in December 2014. Under Panamanian law, the directors of a dissolved company are required to collect in debts and discharge liabilities upon dissolution.

f. If Gatiabe had genuinely had an asset worth $1,349,443,000 (plus accrued interest) (which would have amounted to over $2 billion by December 2014), the directors of Gatiabe would have sought payment of this sum from Finco. No attempt was made to seek payment of this supposed debt, demonstrating that no such debt existed. Gatiabe was only reactivated in June 2018, without Mrs Bourlakova's knowledge or consent, following the dispute arising between Mrs Bourlakova and Mr Bourlakov.

g. If Finco had a genuine liability of $1,349,443,000 (plus accrued interest), the directors of Finco would have needed to ensure that Finco retained sufficient funds to meet this liability. Finco did not retain sufficient funds to meet this liability and the directors of Finco dissolved the company in November 2014 without making any attempt to discharge this liability (which would have amounted to over $2 billion by this time, including accrued interest) or even notify Gatiabe that Finco could not do so.

h. As set out below, Finco now contends: (a) that it was owed $950 million by Edelweiss pursuant to a 2011 loan agreement; and (b) that in 2016 it received an assignment of a supposed loan due from Greenbay in approximately the sum of $250 million. Both the 2011 loan and the 2016 assignment are forgeries, but if they were genuine, it would mean that Finco had substantial assets. As set out above, the directors of a dissolved Panamanian company are required to discharge its liabilities. Their failure to do so demonstrates that no such debt existed. Furthermore, if Finco had liabilities which it was unable to meet, the directors

would have been required to declare it bankrupt rather than dissolve it. The director of Finco who purportedly signed the Finco / Gatiabe document attended the Shareholders Meeting on 20 November 2014 at which the dissolution of Finco was agreed. Finco was only reactivated in August 2018, without Mrs Bourlakova's knowledge or consent, following the dispute arising between Mrs Bourlakova and Mr Bourlakov.

i.  The loan purportedly created by the Finco / Gatiabe document makes no sense even if the supposed Kazakov partnership had any basis in fact, which it does not. Paragraphs 41a-41o are repeated.

j.  The Finco / Gatiabe document contradicts Mr Bourlakov and Mr Kazakov's account of their supposed partnership and joint ownership of other Bourlakov family assets. Paragraphs 35-40 are repeated.

k.  If there had been a genuine liability of approximately $3 billion owed by Finco to a company owned by Mr Kazakov, Mr Bourlakov would not have proposed that Mrs Bourlakova receive a settlement in excess of $1 billion in June 2018 or a settlement of $600 million in September 2018, since this liability due to ~~Gatiabe~~ a company purportedly owned by Mr Kazakov would have wiped out the vast majority of the entire Bourlakov family fortune.

l.  The true position is that at all material times, Gatiabe and Finco have been under the ~~same~~ beneficial ownership of the Bourlakov family and there was no commercial or other reason for there to have been any loan agreement between them (let alone on the terms of the Finco / Gatiabe document).

m.  Although it is now claimed that Mr Kazakov was and is the ultimate beneficial owner of Gatiabe, all filings up to 5 December 2014 ~~prior to 2018~~ with banks, accountants and corporate service providers in relation to the beneficial ownership of Gatiabe (all of which were made on Mr Bourlakov's instructions or with his knowledge and authority) stated that Mr Bourlakov was the ultimate beneficial owner of Gatiabe.  For example, a Corporate Depositors form dated 5 December 2014 in relation to Gatiabe states that Mr Bourlakov was the ultimate beneficial owner of Gatiabe. Around or shortly after the date of that form, Mrs Bourlakova became the sole holder of Gatiabe's shares and its sole beneficial owner.

n.  Mr Kazakov has been unable to produce any genuine documentation showing that, prior to the dispute arising between Mrs Bourlakova and Mr Bourlakov, he disclosed his supposed 100% stake in Gatiabe to any third parties including banks, accountants, corporate service providers (including Leo Trust) and tax authorities. Under relevant money laundering regulations and Russian tax rules, Mr Kazakov would have been required to disclose this interest on multiple occasions. Mr Kazakov did not do so because he had no such interest. Paragraphs 41(m) and 41(p) are repeated.

o.  Mr Bourlakov (and companies and individuals acting on his instructions) have a record of producing and relying upon forgeries and sham documents in the course of his dispute with Mrs Bourlakova.

89.  The Claimants will seek early disclosure of:

a.  Accounting records prepared for Gatiabe and Finco in the period from 2007 onwards. Although Panamanian companies were not required to prepare formal income statements until January 2017, professional directors would have maintained accounting records in order to keep track of assets and liabilities. Any genuine accounting records prepared prior to 2018 will not make any reference to Gatiabe having an asset worth $1,349,443,000 (plus accrued interest) or Finco having a liability to Gatiabe in the same amount, since there was no genuine liability owed by Finco to Gatiabe and the Finco / Gatiabe document is a later forgery.

b.  Invoices for the work done by the relevant corporate service providers in relation to Gatiabe and Finco in 2007. Genuine invoices will not include work in relation to the Finco / Gatiabe document or the Gatiabe resolution at this time, since no such work was undertaken. The Claimants (other than Veronica) have obtained through the Cyprus AP Order copies of invoices produced by MMG Panazur Ltd SA, a Panamanian company related to Leo Services, in relation to Finco, Gatiabe and Jovellanos for 2007 to 2013. These invoices do not include any charge for the Finco / Gatiabe document (purportedly entered into in 2007), the addendum thereto (purportedly entered into in 2013) or the Gatiabe / Jovellanos documents (purportedly entered into in 2007 and 2013), confirming that all these documents are backdated forgeries. A further invoice from Leo Trust dated 1 November 2018

includes charges for "*drafting of a loan agreement by swiss lawyer*" and "*Completing, signing and forwarding of Loan agreement dd. 23.03.07 and 19.03.2007 incl. Resolution*", i.e. the Finco / Gatiabe document and related documents.

c. Documents recording instructions given to Finco and Gatiabe in relation to the money paid by Finco to Gatiabe and the reasons for it. Those documents will not refer to or be consistent with the supposed Kazakov partnership or the supposed loan.

90. Mr Bourlakov discussed with Mr Kazakov at some time in 2018 his plan to reactivate Finco and Gatiabe and then create a forged loan in favour of Gatiabe and to attempt to transfer Gatiabe to Mr Kazakov. As set out in paragraph 70 above, it is likely that this took place prior to 5 April 2018. Mr Bourlakov needed Mr Kazakov to agree that he was willing to hold any interest he acquired in Gatiabe as nominee for Mr Bourlakov, while falsely representing to Mrs Bourlakova and third parties such as banks, accountants, corporate service providers and relevant tax authorities that he (Mr Kazakov) was the beneficial owner and that the Finco / Gatiabe document, the Gatiabe resolution and the Finco resolution are genuine documents. It is clear from the fact that the plan was implemented and/or the attempts to implement it that Mr Kazakov agreed to do so. This was in furtherance of the lies told to Mrs Bourlakova in April 2018 and Mr Bourlakov's overall strategy.

90A. In fact, Mrs Bourlakova is, and has been since December 2014, the holder of the entirety of the shares of both Gatiabe and Jovellanos and the ultimate beneficial owner of each. The Claimants rely on the following in relation to Gatiabe:

a. From 17 March 2011 until 26 January 2022, Gatiabe's share capital consisted of 100 shares of $100 each issued to bearer as recorded in Share Certificate No 2 issued by Gatiabe on 17 March 2011 ("the Gatiabe Bearer Share Certificate").

b. To the best of the knowledge of the Claimants, the Gatiabe Bearer Share Certificate was initially held by Mr Bourlakov. In or around December 2014, Mr Bourlakov gave the Gatiabe Bearer Share Certificate to Mrs Bourlakova to hold on her own behalf so that she was the sole holder of Gatiabe's shares and its sole beneficial owner. At the time, Gatiabe did not have any substantial assets.

c. After Gatiabe was reactivated on 25 June 2018, and without Mrs Bourlakova's knowledge or consent, the Gatiabe Bearer Share Certificate was purportedly cancelled and purportedly replaced by 100 shares which were purportedly issued to Delos. As a matter of Panamanian law, the cancellation of a share certificate issued to bearer can occur only if (a) the original certificate is delivered to the board or (b) the original certificate has been destroyed, lost, or stolen and (i) the former holder of the original certificate requests the board to cancel and replace the original certificate or (ii) the original certificate is judicially annulled. Save as set out in subparagraphs (e) and (f) below, the Gatiabe Bearer Share Certificate was not delivered to Gatiabe's board, destroyed, lost, stolen or judicially annulled, nor did Mrs Bourlakova ask Gatiabe's board to cancel or replace the Gatiabe Bearer Share Certificate. Its purported cancellation was therefore invalid as a matter of Panamanian law. Further, the purported issuance of 100 shares to Delos was invalid as it was in excess of the authorised capital of Gatiabe, as set out in its articles of association, and/or Gatiabe did not receive any consideration for the issuance of such shares.

d. In or around early 2019, Delos appears to have purported to transfer its purported 100 shares in Gatiabe to Wlamil and, by documents purportedly dated 26 February 2019, the invalid share certificate purportedly issued to Delos appears to have been cancelled and 100 shares purportedly issued to Wlamil in its place. The purported issuance of those shares was also invalid as a result of the invalidity of the purported prior issuance of shares to Delos, as set out above, and/or because they were in excess of the authorised capital of Gatiabe and/or issued for no consideration.

e. On 19 January 2022, a meeting of Gatiabe's shareholders was held which was attended by Nicholas Warr ("Mr Warr") who represented Mrs Bourlakova as the sole shareholder in Gatiabe under a proxy executed by her on 19 January 2022. At the meeting Yessica Gisselle Carew Moreno de Murgas, Ricardo Jose Murgas Carew, Joel Luis Romer Valle, Mehi River Corp, TIA River Corp and Coen River Corp ("the January 2022 Directors") were appointed as directors of Gatiabe.

f. At a meeting of Gatiabe's directors on 26 January 2022, it was resolved: to re-issue

all the shares in Gatiabe by issuing 100 shares in favour of Mrs Bourlakova; to cancel and annul the Gatiabe Bearer Share Certificate, and all other outstanding bearer share certificates; and to declare void and order the cancellation of all other share certificates purportedly issued by Gatiabe including those purportedly issued to Delos and Wlamil, as set out above. Thereafter 100 shares in Gatiabe were duly issued to Mrs Bourlakova ("the January 2022 Gatiabe Shares") in place of the Gatiabe Bearer Share Certificate.

g. Since the meetings on 19 and 26 January 2022, representatives of the Kazakovs have challenged the validity of those meetings and of the January 2022 Gatiabe Shares. If and to the extent that the January 2022 Gatiabe Shares were for any reason not validly issued, the sole shares in Gatiabe remained those represented by the Gatiabe Bearer Share Certificate. On 16 July 2022, the Gatiabe Bearer Share Certificate was deposited with Sucre, Briceno & Co ("SB & Co") as authorised custodian.

h. On 18 July 2022 at 1pm (Panama time), a meeting of Gatiabe's shareholders was held which was attended by Franklin Briceño Salazar who represented Mrs Bourlakova as the sole shareholder in Gatiabe, as her proxy in respect of the January 2022 Gatiabe Shares or, in the alternative, by virtue of SB & Co's custody of the Gatiabe Bearer Share Certificate. At the meeting, it was resolved, among other things: to ratify and confirm the resolution of 19 January 2022 to appoint the January 2022 Directors as directors of Gatiabe; and, if and to the extent that such appointment was for any reason or to any extent not valid, to appoint the January 2022 Directors as directors of Gatiabe.

i. On 18 July 2022 at 1.15pm (Panama time), a meeting of Gatiabe's directors was held. At the meeting, Gatiabe's directors resolved to ratify and confirm the resolutions set out in paragraph (f.) above.

90B. The Claimants rely on the following in relation to Jovellanos:

a. From 17 March 2011 until 26 January 2022, Jovellanos' share capital consisted of 100 shares of $100 each issued to bearer as recorded in Share Certificate No 2 issued by Jovellanos on 17 March 2011 ("the Jovellanos Bearer Share Certificate").

b. To the best of the knowledge of the Claimants, the Jovellanos Bearer Share Certificate was initially held by Mr Bourlakov. In or around December 2014, Mr Bourlakov gave the Jovellanos Bearer Share Certificate to Mrs Bourlakova to hold on her own behalf so that she was the sole holder of Jovellanos' shares and its sole beneficial owner. At the time, Jovellanos did not have any substantial assets.

c. After Jovellanos was reactivated on 3 October 2018, and without Mrs Bourlakova's knowledge or consent, the Jovellanos Bearer Share Certificate was purportedly cancelled and replaced by 100 shares which were purportedly issued to Delos. Save as set out in subparagraphs (d) and (e) below, the Jovellanos Bearer Share Certificate was not delivered to Jovellanos' board, destroyed, lost, stolen or judicially annulled, nor did Mrs Bourlakova ask Jovellanos' board to cancel or replace the Jovellanos Bearer Share Certificate. Its purported cancellation was therefore invalid as a matter of Panamanian law. Further, the purported issuance of 100 shares to Delos was invalid as it was in excess of the authorised capital of Jovellanos, as set out in its articles of association, and/or Jovellanos did not receive any consideration for the issuance of such shares.

d. On 19 January 2022, a meeting of Jovellanos' shareholders was held which was attended by Mr Warr who represented Mrs Bourlakova as the sole shareholder in Jovellanos under a proxy executed by her on 19 January 2022. At the meeting the January 2022 Directors were appointed as directors of Jovellanos.

e. At a meeting of Jovellanos' directors on 26 January 2022, it was resolved: to re-issue all the shares in Jovellanos by issuing 100 shares in favour of Mrs Bourlakova; to cancel and annul the Jovellanos Bearer Share Certificate and all other outstanding bearer share certificates; and to declare void and order the cancellation of all other share certificates purportedly issued by Jovellanos including those purportedly issued to Delos, as set out above. Thereafter 100 shares in Jovellanos ("the January 2022 Jovellanos Shares") were duly issued to Mrs Bourlakova in place of the Jovellanos Bearer Share Certificate.

f. Since the meetings on 19 and 26 January 2022, representatives of the Kazakovs have challenged the validity of those meetings and of the January 2022 Jovellanos Shares. If and to the extent that the January 2022 Jovellanos Shares were for any

reason not validly issued, the sole shares in Jovellanos remained those represented by the Jovellanos Bearer Share Certificate. On 16 July 2022, the Jovellanos Bearer Share Certificate was deposited with SB & Co as authorised custodian.

g. On 18 July 2022 at 1:45pm (Panama time), a meeting of Jovellanos' shareholders was held which was attended by Franklin Briceño Salazar who represented Mrs Bourlakova as the sole shareholder in Jovellanos, as her proxy in respect of the January 2022 Jovellanos Shares or, in the alternative, by virtue of SB & Co's custody of the Jovellanos Bearer Share Certificate. At the meeting, it was resolved, among other things: to ratify and confirm the resolution of 19 January 2022 to appoint the January 2022 Directors as directors of Jovellanos; and, if and to the extent that such appointment was for any reason or to any extent not valid, to appoint the January 2022 Directors as directors of Jovellanos.

h. On 18 July 2022 at 2pm (Panama time), a meeting of Jovellanos' directors was held. At the meeting, Jovellanos' directors resolved to ratify and confirm the resolutions set out in paragraph (e.) above.

90C. However, while Mrs Bourlakova is, and has been since December 2014, the sole shareholder and beneficial owner of Gatiabe and Jovellanos, between the Gatiabe and Jovellanos Bearer Share Certificates being given to her in December 2014 and the present dispute arising in 2018, Mrs Bourlakova forgot that she had become the sole shareholder and beneficial owner of Gatiabe and Jovellanos and that she still had those share certificates. Mrs Bourlakova was only reminded of the true position in January 2022 when Veronica found the Gatiabe and Jovellanos Bearer Share Certificates together with the Edelweiss Bearer Share Certificate (as defined below), in the circumstances described below. In the interim, Mr Bourlakov was able to exercise *de facto* control over both Gatiabe and Jovellanos by virtue of the shares purportedly issued to Delos and Wlamil (which were under Mr Bourlakov's control until his death).

**B2.** **Mr Kazakov's supposed ownership of assets**

91. As set out above, Mr Bourlakov has asserted that Mr Kazakov is the beneficial owner of 50% of all of the Bourlakov family assets.

92. Furthermore:

a. Mr Bourlakov has asserted that security interests have been created as security for sums said to be due pursuant to the supposed Kazakov partnership or the Finco / Gatiabe document in favour of Mr Kazakov or Gatiabe over The Black Pearl, which is said to have been pledged at the end of 2018 under a debenture issued by Silver Angel Yachting Limited (a company incorporated in Cyprus) and the registered owner of the Black Pearl at that time, along with a share pledge over the shares in Silver Angel.

b. The Claimants have reason to believe that security interests have also been created in favour of Mr Kazakov or Gatiabe over the family flat at La Reserve, 5 Avenue Princesse Grace, Monaco and/or companies in the Seychelles which own interests in the flat.

93. In the light of Mr Bourlakov's assertion that Mr Kazakov is the beneficial owner of 50% of all of the Bourlakov family assets, it is likely that other documents have been entered into which purport to create or record interests (whether by way of security or otherwise) in Bourlakov family assets for the benefit of Mr Kazakov. Following Mr Bourlakov's death, it appears that Mr Kazakov intends to claim all assets in respect of which interests have purportedly been created as his own.

94. For the reasons set out above, there are no sums due pursuant to the supposed Kazakov partnership or the Finco / Gatiabe document (or even if any sums were due pursuant to the Finco / Gatiabe document, as a result of the back-to-back Gatiabe / Jovellanos documents, almost all such sums are then payable to Jovellanos, a company that was (until his death) controlled by Mr Bourlakov, so they would have returned to Mr Bourlakov's control, albeit Mrs Bourlakova was in fact the sole valid shareholder of both Gatiabe and Jovellanos, as set out above). Any purported interest of Mr Kazakov, whether direct or indirect, or Gatiabe in Bourlakov family assets and any documents purporting to create such interests (whether by way of security or otherwise) in such assets including the Black Pearl or La Reserve (or the companies which own them) are forgeries or shams, since there is in fact no relevant debt to be secured and Mr Kazakov wais acting as a nominee for Mr Bourlakov. The absence of any genuine debt is confirmed by the fact that, until his death, Mr Bourlakov has retained control of assets purportedly pledged to Mr Kazakov / Gatiabe, whereas if a genuine liability had existed the assets would have

been transferred.

95. Mr Tribaldos (in his capacity as a director of Leo Trust with the knowledge and permission of Leo England) (acting for and on instructions from Mr Bourlakov) and Mr Anufriev will have been involved or assisted in the preparation and/or execution of any documents which purport to record or create such security interests. Alternatively, they would have known that they were being prepared. Mr Tribaldos and Mr Anufriev knew that there was no Kazakov partnership and consequently any such documents were a sham.

96. Mr Bourlakov agreed with Mr Kazakov prior to the creation of any such documents that Mr Kazakov would hold such purported interests as nominee for Mr Bourlakov, while falsely representing to Mrs Bourlakova and third parties such as banks, accountants, corporate service providers and relevant tax authorities that he was the beneficial owner and that such documents were genuine. It is clear from the fact that the plan was implemented that Mr Kazakov agreed to do so, although following Mr Bourlakov's death, it appears that Mr Kazakov now intends to claim all such assets as his own.

**C. Misappropriating or devaluing (or attempting to misappropriate or devalue) the assets of Mrs Bourlakova ~~and Veronica's assets~~**

~~C1. Attempts to misappropriate or devalue H1 and/or misappropriate its assets~~
**C0. The ownership of Edelweiss**

*Edelweiss*

96A. As set out below, Mrs Bourlakova was the sole beneficiary of Merenguito until the events in 2018 described in Section C3 below. At the time of issue of these proceedings and prior to January 2022, Mrs Bourlakova understood that, until the events in 2018 described in Section C3 below, Merenguito was the valid registered shareholder in Edelweiss.

96B. In contrast, Veronica's position, which the other Claimants now accept and adopt, in relation to Edelweiss is as follows:

a. From late 2014 onwards, Veronica understood that she was the owner of Edelweiss. However, between the dispute with Mr Bourlakov arising and early 2022, Veronica was unable to substantiate her belief as she did not have ready access to the key documents evidencing her ownership of Edelweiss. As set out

below, those documents were in fact in Veronica's bedroom at La Reserve but, from shortly after the commencement by Mrs Bourlakova of divorce proceedings in December 2018, La Reserve was divided in two, with Mrs Bourlakova permitted to use one half and Mr Bourlakov the other half. The bedroom which Veronica had used before the division of La Reserve was in Mr Bourlakov's half and, because of the breakdown in familial relations, she was unable to visit it after 2019. Following Mr Bourlakov's death, La Reserve was sealed by the Monegasque authorities and Veronica was not able to access it until January 2022.

b. In those circumstances and in the context of the serious fraud which Mr Bourlakov, Mr Kazakov and Mrs Kazakova were seeking to perpetrate against Mrs Bourlakova and her daughters, Veronica was not in a position to dispute that Merenguito and in turn Hemaren were the valid registered shareholders of Edelweiss.

c. In January 2022, Veronica was able to access her bedroom at La Reserve and discovered that she still retained the Edelweiss Bearer Share Certificate (as defined below) which had never been presented to the board of Edelweiss for cancellation, and which had not been judicially annulled. As set out below, the consequence of that is that, as a matter of Panamanian law, Veronica remains the sole shareholder of, and the beneficial owner of, Edelweiss, as she had always believed herself to be.

d. Further, Veronica's ownership of Edelweiss is supported by a number of contemporaneous documents, such as those set out in paragraphs 41(j)(v) – (viii) above, which show, among other things, that UBS was aware that Veronica was the beneficial owner of Edelweiss (albeit that, as noted above, it appears that Mr Bourlakov may have retained an 8% interest in the portfolio held by UBS for Edelweiss).

96C. Veronica is, and has been since late 2014, the holder of the entirety of Edelweiss' shares and its ultimate beneficial owner:

a. From 17 March 2011 until 26 January 2022, Edelweiss' share capital consisted of 100 shares of $100 each issued to bearer as recorded in Share Certificate No 3

issued by Edelweiss on 17 March 2011 ("the Edelweiss Bearer Share Certificate").

b. To the best of the knowledge of the Claimants, the Edelweiss Bearer Share Certificate was initially held by Mr Bourlakov. In or around late 2014, Mr Bourlakov gave the Edelweiss Bearer Share Certificate to Veronica to hold on her own behalf so that she was the sole holder of Edelweiss' shares and its sole beneficial owner.

c. In or around January 2016, the Edelweiss Bearer Share Certificate was purportedly cancelled and purportedly replaced by 100 shares which were issued to Merenguito but backdated so as to appear to have been issued on 9 April 2015. However, and save as set out in subparagraphs (e) and (f) below, the Edelweiss Bearer Share Certificate was not delivered to Edelweiss' board, destroyed, lost, stolen or judicially annulled, nor did Veronica ask Edelweiss' board to cancel or replace the Edelweiss Bearer Share Certificate. Its purported cancellation in or around January 2016, or, in the alternative, in April 2015 was therefore invalid as a matter of Panamanian law. Further, the purported issuance of 100 shares to Merenguito was invalid as it was in excess of the authorised capital of Edelweiss, as set out in its articles of association, and/or Edelweiss did not receive any consideration for the issuance of such shares.

d. In relation to the backdating of the share certificate purportedly issued by Edelweiss and purportedly dated 9 April 2015, the Claimants rely on the following:

   (i)   On 9 April 2015, Sylvia Büchen of MMG Zurich AG emailed Mr Anufriev, asking him to provide the Edelweiss Bearer Share Certificate in order for it to be declared invalid and for new shares to be issued in Edelweiss.

   (ii)  On 15 April 2015, Ms Büchen emailed Mr Anufriev draft minutes for a purported meeting of the Foundation Council of Merenguito on 14 April 2015. The draft included a purported resolution to accept from Veronica a contribution of her shares in Edelweiss. No such contribution was ever made.

   (iii) On 30 April 2015, Jürg Brinkmann of MMG Zurich AG emailed Sylvia Büchen, asking whether she had received feedback from Mr Anufriev in relation to the draft minutes of the purported meeting on 14 April 2015 (which remained unsigned).

(iv)   On 24 June 2015, Ms Büchen emailed Mr Anufriev, again requesting that he provide the Edelweiss Bearer Share Certificate.

(v)   On 25 January 2016, Ms Büchen emailed Mr Anufriev, stating that a shareholder consent letter could not be signed unless he were to provide the Edelweiss Bearer Share Certificate. Mr Anufriev replied, falsely stating that the Edelweiss Bearer Share Certificate was in a safe in Zurich and requesting an alternative proposal from Ms Büchen. She replied, stating that the letter would be signed prior to receipt of the Edelweiss Bearer Share Certificate. Noemi Trummer of MMG Zurich SA then sent Mr Anufriev an email, asking him what date should be added to documents relating to Edelweiss.

(vi)   On 27 January 2016, Ms Trummer emailed Mr Anufriev, stating that original documents would arrive the following week.

(vii)   On 28 January 2016, Ms Trummer emailed Mr Anufriev an electronic copy of Share Certificate No. 4, purportedly issued by Edelweiss on 9 April 2015. The metadata for the electronic copy suggests that that copy was created on 25 January 2016.

(viii) A charge for "*Issuing of Share Certificate No. 4 & signing of Minutes 09.04.15*" was included in an invoice from MMG Zurich AG dated 10 February 2016.

e. On or around 23 May 2018, the shares in Edelweiss purportedly issued to Merenguito appear to have been purportedly transferred to Hemaren and shares purportedly issued to it in place of Merenguito. That purported share issuance was also invalid as a result of the invalidity of the purported issuance of shares to Merenguito, as set out above, and/or because they were in excess of the authorised capital of Edelweiss and/or issued for no consideration.

f. On 19 January 2022, a meeting of Edelweiss' shareholders was held which was attended by Mr Warr who represented Veronica as the sole shareholder in Edelweiss under a proxy executed by her on 19 January 2022. At the meeting the January 2022 Directors were appointed as directors of Edelweiss.

g. At a meeting of Edelweiss' directors on 26 January 2022, it was resolved: to re-issue all the shares in Edelweiss by issuing 100 shares in favour of Veronica; to

cancel and annul the Edelweiss Bearer Share Certificate, and all other outstanding bearer share certificates; and to declare void and order the cancellation of all other share certificates purportedly issued by Edelweiss including those purportedly issued to Merenguito and Hemaren, as set out above. Thereafter 100 shares in Edelweiss were duly issued to Veronica ("the January 2022 Edelweiss Shares") in place of the Edelweiss Bearer Share Certificate.

h. Since the meetings on 19 and 26 January 2022, representatives of the Kazakovs have challenged the validity of those meetings and of the January 2022 Edelweiss Shares. If and to the extent that the January 2022 Edelweiss Shares were for any reason not validly issued, the sole shares in Edelweiss remained those represented by the Edelweiss Bearer Share Certificate. On 16 July 2022, the Edelweiss Bearer Share Certificate was deposited with SB & Co as authorised custodian.

i. On 18 July 2022 at 12pm (Panama time), a meeting of Edelweiss' shareholders was held which was attended by Franklin Briceño Salazar who represented Veronica as the sole shareholder in Edelweiss, as her proxy in respect of the January 2022 Edelweiss Shares or, in the alternative, by virtue of SB & Co's custody of the Edelweiss Bearer Share Certificate. At the meeting, it was resolved, among other things: to ratify and confirm the resolution of 19 January 2022 to appoint the January 2022 Directors as directors of Edelweiss; and, if and to the extent that such appointment was for any reason or to any extent not valid, to appoint the January 2022 Directors as directors of Edelweiss.

j. On 18 July 2022 at 12.15pm (Panama time), a meeting of Edelweiss' directors was held. At the meeting, Edelweiss' directors resolved to ratify and confirm the resolutions set out in paragraph (g.) above.

96D. Further, if, contrary to the Claimants' primary case set out above, shares in Edelweiss were validly issued to Merenguito, Merenguito held those shares on trust for Veronica, or in the alternative as nominee for her, pursuant to a declaration of trust dated 18 August 2016 which acknowledged and declared that Merenguito held any shares in Edelweiss on trust for Veronica.

96E. Veronica's ownership of Edelweiss is supported by a number of contemporaneous

documents, such as those set out in paragraphs 41(j)(v) – (viii) above.

96F.  In the further alternative, if and to the extent that Merenguito held the shares in Edelweiss and did not hold those shares on trust for Veronica or as nominee for her then, until the events described in Section C3 below, it held them for the benefit of Mrs Bourlakova as the sole beneficiary of Merenguito.

## C1.    Attempts to misappropriate or devalue H1 and/or misappropriate its assets

97.    On 21 August 2017, Edelweiss resolved to transfer $347 million from its Credit Suisse account to H1's Credit Suisse account. The reason for the transfer, as stated in the directors' resolution was that H1 "*ha[s] the same beneficial owner than Edelweiss Investment Inc.*".

98.    On 5 September 2017, Edelweiss resolved to transfer a further $1.664 million from its Credit Suisse account to H1's Credit Suisse account. The reason for the transfer, as stated in the directors' resolution was again that H1 "*ha[s] the same beneficial owner than Edelweiss Investment Inc.*".

99.    At the time of these transfers, Mrs Bourlakova was the beneficial owner of H1 and the sole beneficiary of Merenguito, which owned had purportedly been issued shares in Edelweiss.

100.    On or about 1 March 2018, Mr Anufriev (acting on Mr Bourlakov's instructions or with his knowledge and authority) wrote to Credit Suisse seeking a line of credit in favour of Mr Bourlakov secured on bank accounts in H1's name. This would have allowed Mr Bourlakov to drain H1 of assets (as he intended to do) by failing to repay the loan and leaving Credit Suisse to enforce against the money in H1's accounts.

101.    Mrs Bourlakova was consulted by the directors of H1 and refused to consent to this proposal. This attempt to drain H1 of assets therefore failed.

102.    At around the same time, Mr Anufriev (again acting on Mr Bourlakov's instructions or with his knowledge and authority) sought to change the ownership structure of H1 so that Mr Bourlakov became the sole beneficial owner. On being told that this would require Mrs Bourlakova's signature (as the ultimate beneficial owner of H1), Mr Anufriev sought to persuade the directors of H1 to change the ownership structure on the basis that

signatures would follow. They refused to proceed on this basis. This attempt to misappropriate H1, therefore, also failed.

103. On 20 March 2018, there was a meeting between Mrs Bourlakova and Mr Bourlakov in Monaco. Mr Bourlakov aggressively demanded that Mrs Bourlakova sign documents transferring beneficial ownership of H1 to Mr Bourlakov. Mrs Bourlakova refused.

104. Mr Bourlakov attempted to misappropriated Edelweiss some time before the end of May 2018 (see paragraphs 135-8 below). In that month Mr Anufriev (acting on Mr Bourlakov's instructions or with his knowledge and authority) instructed the corporate service providers of H1 (Equiom) to put in place a retrospective loan agreement between H1 and Edelweiss in relation to the August/September 2017 transfers (set out in paragraphs 97 and 98 above) and thereby to create a loan payable by H1 to Edelweiss. Equiom refused since there had been no agreement for a loan at the time of the transfers.

105. After Equiom's refusal, Mr Anufriev (acting on Mr Bourlakov's instructions or with his knowledge and authority) arranged for the preparation of a loan agreement between Edelweiss and H1 - the "Edelweiss Loan Document".

106. Each of Mr Bourlakov and Mr Anufriev was aware that there had been no agreement of a loan as at the time of the transfers so any such document would not be a genuine agreement. Mr Bourlakov was aware that there was no genuine loan because if there had been, he would have been aware of it at the date of the transfers. The arrangements for any such loan would have been communicated to the relevant companies by Mr Anufriev to Edelweiss and H1. Mr Anufriev would also have prepared or assisted in the preparation of the loan agreement. No such instructions were given or passed on and no such agreement was prepared.

107. The document ultimately produced states that it was executed on 11 May 2018 with an effective date of 20 August 2017. Mr Anufriev (acting on Mr Bourlakov's instructions or with his knowledge and authority) procured that the loan agreement be purportedly executed by individuals purporting to act as Edelweiss' directors. It is not admitted that those individuals were ever validly appointed as directors of Edelweiss and, in any event, the document but it has never been executed by H1 because it purports to create or to evidence a non-existent loan.

108. On 4 October 2018, persons purporting to act as directors of Edelweiss (it is not admitted

that those persons were ever validly appointed as such but, in any event, they were acting on Mr Bourlakov's instructions and/or with his knowledge and authority) sent a letter to H1 demanding repayment of a loan made on 10 September 2015. This appears to have been an error but indicates that the Edelweiss Loan Document was not in existence on 4 October 2018 despite a purported execution date of 11 May 2018.

109. On 25 January 2019, lawyers purportedly acting for Edelweiss (but who had not been validly appointed to act for it and who were acting on Mr Bourlakov's instructions and/or with his knowledge and authority) sent a letter to H1 demanding repayment of the $348.664 million in purported reliance on the Edelweiss Loan Document, which was provided to H1 for the first time with this letter.

110. The Edelweiss Loan Document is a sham and/or of no legal effect and the attempt to rely upon it is dishonest.

111. The Claimants do not know whether the Edelweiss Loan Document was specifically discussed with Mr Tribaldos before it was purportedly executed, but it was purportedly executed in circumstances where Mr Tribaldos (and through him Leo England and Leo Trust) had agreed to support Mr Bourlakov's strategy, including assisting in the creation of forged / sham documents. Mr Bourlakov (and Mr Anufriev) therefore knew that Mr Tribaldos, Leo England and Leo Trust would take any steps necessary to support this sham agreement.

*Columbus*

112. Mr Bourlakov has produced and relied upon:

    a. A document which purports to be a loan agreement between IPEC (as lender) and H1 (as borrower) dated 10 September 2015, for "*up to USD 143,298,000… or the balance outstanding from time to time*".

    b. A document which purports to be an assignment agreement dated 23 May 2016 between IPEC and Columbus assigning this loan to Columbus – the "Columbus assignment".

113. On or around 8 September 2015, Mrs Bourlakova gave instructions to Credit Suisse to transfer $143,298,000 plus interest of approximately $262,713 from IPEC to H1. At the time of the transfer, Mrs Bourlakova was the ultimate beneficial owner of H1 and the

sole beneficiary of Tribatline which owned IPEC. This was a gratuitous transfer between companies with the same effective beneficial owner.

114. If the IPEC / H1 loan agreement was entered into at the time (which is not admitted) it would have been intended simply to "paper" the cash transfer between companies in the same beneficial ownership and there was no intention that HI would be under any genuine obligation to make any repayment to IPEC. H1 relies on the fact that IPEC was dissolved in May 2016. Under Panamanian law, the directors of a dissolved company are required to collect in debts upon dissolution. If IPEC had genuinely had a debt worth $143 million, the directors of IPEC would have sought payment of this sum from H1. No attempt was made to seek payment of this supposed debt, demonstrating that no such debt existed. IPEC was only reactivated on or around 28 ~~20~~ July 2020 after Mrs Bourlakova and H1 had obtained evidence that the Columbus assignment was a forgery.

115. The Columbus assignment is a forgery. It was produced in or around late 2018 by or with the assistance of Mr Tribaldos (in his capacity as a director of Leo Trust with the knowledge and permission of Leo England). Mr Tribaldos was acting on instructions from Mr Anufriev, who in turn was instructed by Mr Bourlakov.

116. The signatures on the documents were copied from a prior resolution or either (a) written by someone other than the signatories or (b) written by the relevant individuals long after the purported date of the agreement and (in the case of IPEC) after they had ceased to be directors on the liquidation of IPEC in December 2015. IPEC was dissolved in May 2016.

117. Each of Mr Bourlakov, Mr Tribaldos and Mr Anufriev was aware that there was no assignment agreement between IPEC and Columbus and consequently that documents would need to be forged in order to evidence such an agreement. If there had been any assignment as at the relevant date, it would have been entered into on the basis of instructions by Mr Bourlakov and communicated to Mr Tribaldos by Mr Anufriev and by Mr Tribaldos to IPEC and Columbus. Mr Tribaldos would also have prepared or assisted in the preparation of the assignment agreement. Nothing of the kind took place. Further or alternatively, the Columbus assignment is a sham. No agreement was reached between IPEC and Columbus for the assignment of a loan in May 2016 (or at all).

118. On 4 October 2018, Coluembus (acting on Mr Bourlakov's instructions and or with his knowledge and authority) sent a letter to H1 informing it that IPEC had assigned the

benefit of the loan to Columbus by assignment dated 23 May 2016, and seeking immediate repayment.

119. The Claimants will rely, inter alia, on the following:-

    a. The Columbus assignment purports to be signed by Ms Aoun, Mr Arcia and Ms Ponce. IPEC went into liquidation in December 2015 and Ms Aoun was appointed liquidator. If an agreement had been entered into in May 2016, Ms Aoun would have described herself as liquidator (as required under Panamanian law) rather than director. Mr Arcia and Ms Ponce would not have signed the document as directors or at all.

    b. In 2015, Mrs Bourlakova was the effective beneficial owner of H1, Columbus and IPEC. It would have served no purpose to assign a loan due from H1 to IPEC to Columbus in those circumstances.

    c. There would have been no purpose to entering into the Columbus assignment in 2016. The only purpose was is to allow Mr Bourlakov to devalue H1 following the breakdown of his marriage after December 2017.

    d. The Defendants have not been able to produce any resolution of the Board of Directors of IPEC resolving to assign the loan to Columbus and enter into an assignment agreement. As set out below, the Defendants' case in relation to a similar supposed transaction also supposed to have been undertaken by IPEC at around the same time is that the Directors of IPEC passed such a resolution.

    e. The invoices issued by Leo Trust for work done during the liquidation and dissolution of IPEC and in relation to other entities including Columbus during the relevant period will not include any entries in relation to a supposed assignment from IPEC to Columbus of a loan due from H1. In particular, the invoice for the relevant period dated 23 June 2016 does not include any such entries. One of Leo Trust's invoices for work done in relation to Columbus in 2018 (dated 18 May 2018) includes an entry which appears to relate to the Columbus assignment.

    f. Mr Bourlakov (and companies and individuals acting on his instructions) have a record of producing and relying upon forgeries and sham documents in the course of his dispute with Mrs Bourlakova.

120. The Claimants will seek early disclosure of the invoices issued by Leo Trust for work done during the liquidation and dissolution of IPEC and in relation to the same period for work done in relation to Columbus. The Claimants anticipate that any genuine record of these invoices will not include any entries in relation to a supposed assignment from IPEC to Columbus of a loan due from H1.

## C2.  Attempts to devalue Greenbay and/or misappropriate its assets

121. On 27 September 2018 Finco (acting on Mr Bourlakov's instructions or with his knowledge and authority) wrote to the corporate service providers of Greenbay seeking immediate repayment of an alleged "*loan in the form of securities*" from Finco to Greenbay (formerly Maravan) of USD 249,678,340 of 23 September 2008.

122. On 5 October 2018, Monegasque lawyers acting for Finco (acting on Mr Bourlakov's instructions or with his knowledge and authority) wrote to Greenbay in similar terms, save that it referred to the loan as being dated 27 September 2008.

123. On 16 October 2018, Greenbay's corporate service providers, Equiom, responded indicating that they did not accept there was a loan between Finco and Greenbay.

124. Mrs Bourlakova and Greenbay accept that on or around 30 September 2008, a transfer of securities was made from IPEC to Greenbay. At the time of the transfer, Mr Bourlakov was the ultimate beneficial owner of both IPEC and Greenbay. The transfer was gratuitous, having been made between companies with the same ultimate beneficial owner.

125. The directors and liquidators of IPEC did not consider that it had any entitlement to any sum from Greenbay as at the date of its liquidation in December 2015 and dissolution in May 2016.

126. Mr Bourlakov and Finco have subsequently produced a document which purports to be signed minutes of a meeting of the Board of Directors of IPEC held on 15 April 2016 resolving to *"cede its loan in the amount of USD 249,678,340 that it is holding against Greenbay Invest Holding Limited (formerly known as Maravan Services Limited)"* to Finco and enter into an assignment agreement with Finco to this effect - the "IPEC minutes". The IPEC minutes purport to be signed by Ms Aoun, Mr Arcia and Ms Ponce, all as directors of IPEC.

127. The IPEC minutes are a forgery. No document in these terms was in existence in April 2016 and the directors of IPEC did not approve a resolution in these terms at or around this time. Furthermore, there was no loan between IPEC and Greenbay at that time or at all.

128. The IPEC minutes were produced in or around late 2018 by or with the assistance of Mr Tribaldos (in his capacity as a director of Leo Trust and with the knowledge and permission of Leo England). Mr Tribaldos was in turn acting on instructions from Mr Anufriev, who was acting on the instructions of Mr Bourlakov.

129. The signatures on the documents were either (a) written by someone other than the signatories or (b) written by the relevant individuals long after they ceased to be directors on its liquidation in December 2015 or (c) the supposed resolution was inserted in 2018 without the knowledge or approval of the signatories into a blank document signed by these individuals some years earlier. IPEC was dissolved in May 2016.

130. Each of Mr Bourlakov, Mr Tribaldos and Mr Anufriev was aware that there was no loan between IPEC and Greenbay and no assignment between IPEC and Finco and consequently that documents would need to be forged in order to evidence such an agreement. Had there been any such assignment, it would have been made on instructions given by Mr Bourlakov and communicated to Mr Tribaldos by Mr Anufriev and by Mr Tribaldos to IPEC and Finco. Mr Tribaldos would also have prepared or assisted in the preparation of the assignment agreement. Nothing of the kind happened.

131. Further or alternatively, the IPEC minutes are a sham: No resolution was passed by the Board of Directors of IPEC to assign a loan due from Greenbay in April 2016 (or at all), since no such loan existed.

132. The Claimants will rely, inter alia, on the following matters:

   a. The IPEC minutes purport to be signed by Ms Aoun, Mr Arcia and Ms Ponce, all as directors of IPEC. However, IPEC had gone into liquidation in December 2015 and Ms Aoun had been appointed liquidator. If a resolution had been passed in April 2016, Ms Aoun would have described herself as liquidator (as required under Panamanian law) rather than director. Mr Arcia and Ms Ponce would not have signed the document as directors or at all.

b. The IPEC minutes describe the loan as being held *"against Greenbay Invest Holding Limited (formerly known as Maravan Services Limited)"*. Maravan did not change its name to Greenbay until 6 November 2017, more than 18 months after the purported date of the IPEC minutes. The IPEC minutes must, therefore, have been created retrospectively.

c. Finco was dissolved in November 2014 and was not reactivated until 30 August 2018. It was therefore not in existence as at the date of the purported assignment "evidenced" by the IPEC minutes. Under Panamanian law, a dissolved company only remains in existence for the purpose of collecting in its debts and discharging its liabilities. Finco could not, therefore, have entered into the assignment agreement which the IPEC minutes purport to approve. The professional directors of IPEC would have been aware of this and would not have approved a transaction which they knew could not be undertaken. No assignment agreement would have been entered into in any event.

d. Furthermore, under Panamanian law, the directors of a dissolved company are required to collect in its debts. Finco's directors made no attempt to seek payment following the supposed assignment in April 2016, further confirming no such assignment occurred.

e. In or around 2014, Mr Bourlakov had transferred Maravan, Finco and IPEC (indirectly) to Mrs Bourlakova. In those circumstances, it would have served no sensible commercial purpose ~~contradicted and undermined the purpose of this process~~ if a debt owed by Maravan to IPEC was transferred to Finco (which had been dissolved two years earlier). ~~(which, if it had not been dissolved, would have been beneficially owned by Mr Bourlakov). Since the relationship between Mr Bourlakov and Mrs Bourlakova had not broken down in 2016, there would have been no reason to reverse the effect of the transfer by making Maravan liable for a substantial debt to a company still owned by Mr Bourlakov.~~ The purpose of the forgery was ~~is~~ to allow Mr Bourlakov to devalue Greenbay following the breakdown of his marriage after December 2017.

f. The Defendants have not been able to produce any loan agreement between IPEC and Maravan in respect of this payment or any assignment agreement between

IPEC and Finco. A resolution in the terms of the IPEC minutes would only have been passed if a loan agreement existed and an assignment agreement would then have been entered into between IPEC and Finco.

g.1. The Cyprus AP documents include emails from 2019 between Leo Cyprus, Leo Trust and Mr Anufriev in relation to the preparation of backdated accounts for Finco. In preparing the accounts, Leo Cyprus identified the fact that payments totalling approximately $400 million had been made by Finco to IPEC in 2007 and 2008 and asked how these should be reflected in the accounts. In response, Leo Trust (it is to be inferred acting on instructions from Mr Bourlakov as communicated by Mr Anufriev) informed Leo Cyprus that there were no documents in relation to these transfers and since IPEC had been dissolved in 2016, they should be written off. The directors of IPEC would not have transferred an asset worth approximately $250 million to Finco without ensuring that any liability which IPEC had to Finco was correspondingly reduced: confirming that no transfer did in fact take place.

g. Mr Bourlakov (and companies and individuals acting on his instructions) have a record of producing and relying upon forgeries and sham documents in the course of his dispute with Mrs Bourlakova.

133. The Claimants will also seek early disclosure of:

a. Accounting records prepared for Finco in the period from 2016 onwards. Any genuine accounting records prepared prior to 2018 will not make any reference to Finco having an asset worth USD 249,678,340 (namely a liability in this amount owed by Greenbay), since there was no genuine liability owed by Greenbay to Finco.

b. The invoices issued by Leo Trust for work done during the liquidation and dissolution of IPEC and in relation to the same period for work done in relation to Finco. Any genuine record of these invoices will not include any entries in relation to a supposed assignment from IPEC to Finco of a loan due from Maravan.

**C3. The dissolution of Tribatline, / Merenguito and Nuptials, and misappropriation of Columbus, Finco, IPEC and Hydrangea and attempted, or actual, misappropriation of Edelweiss**

134. Under the Regulations of Tribatline, ~~and~~ Merenguito and Nuptials:

   a. The Foundation Council was required to administer each foundation for the benefit of the beneficiaries.

   b. The Foundation Council had the power to change the class of beneficiaries but such changes could only be made with the prior consultation of the Protector.

   c. Dissolution of the foundation could only be implemented with the prior consultation of the Protector.

   d. The Protector had a duty to *"ensure compliance by the Foundation Council with the purposes of the Foundation and to **safeguard the rights and interests of the Beneficiaries"*** and was required to exercise his/her powers (which included the power to approve or reject changes to the class of beneficiaries and the dissolution of the foundation, as well as the power to remove members of the Foundation Council) in the best interests of the foundation and for the best interests of the beneficiaries taking into consideration the wishes of the Settlor.

135. Mrs Bourlakova was the sole beneficiary of the Panamanian foundations Tribatline and Merenguito until ~~(or~~ shortly before~~)~~ their dissolutions on about 25 ~~15~~ May 2018. Mrs Bourlakova was also the sole beneficiary of Nuptials, alternatively, the beneficiaries were Veronica (as to 92%) and Mr Bourlakov (as to 8%), until shortly before the dissolution of Nuptials on about 25 May 2018. Despite being or having been the sole and/or primary beneficiary of these foundations, Mrs Bourlakova and/or Veronica were ~~was~~ not asked to consent and did not consent to the dissolution of Tribatline, ~~or~~ Merenguito or Nuptials, nor to their replacement as beneficiary of those foundations. No explanation has been given to Mrs Bourlakova or Veronica for their replacement as beneficiary, the dissolution of Tribatline, ~~and~~ Merenguito and Nuptials or the purported transfer and/or transfer of their assets prior to their respective dissolutions.

136. ~~Although Mrs Bourlakova does not know the specifics of the~~ The Claimants rely on the following events leading up to the dissolutions:

   a. Mr Anufriev was the original protector of Tribatline and Merenguito. He was also the protector of Nuptials from 18 August 2016 (at the latest). Mrs Bourlakova and Veronica were ~~was~~ not informed of Mr Anufriev standing down as protector, ~~but~~

understands that Mr Anufriev may have resigned and been replaced by Mrs Kazakova but he did so shortly before their dissolutions, by resignation letters dated 27 April 2018 to the Foundation Council of each of Tribatline, Merenguito and Nuptials, in each case designating Mrs Kazakova as his replacement.

a.1. On an unknown date between 27 April 2018 and 23 May 2018, Mrs Kazakova was appointed as protector of Tribatline. By a letter purportedly dated 27 April 2018, Mrs Kazakova accepted her appointment as protector of Tribatline.

a.2. On an unknown date between 30 April 2018 and 23 May 2018, the Foundation Council of Tribatline passed the following, which Mrs Kazakova had previously acknowledged and approved: (a) an amendment to the Regulations of Tribatline to replace Mrs Bourlakova with Anahill as the sole beneficiary of Tribatline; and (b) a motion of Tribatline's Foundation Council that Tribatline be liquidated and its entire assets and capital be distributed to Anahill.

a.3. On an unknown date between 27 April 2018 and 23 May 2018, Mrs Kazakova was appointed as protector of Merenguito. By a letter purportedly dated 27 April 2018, Mrs Kazakova accepted her appointment as protector of Merenguito.

a.4. On an unknown date between 30 April 2018 and 23 May 2018, the Foundation Council of Merenguito passed the following, which Mrs Kazakova had previously acknowledged and approved: (a) an amendment to the Regulations of Merenguito to replace Mrs Bourlakova with Hemaren as the sole beneficiary of Merenguito; and (b) a motion of Merenguito's Foundation Council that Merenguito be liquidated and its entire assets and capital be distributed to Hemaren.

a.5. By documents purportedly dated 27 April 2018, Mr Bourlakov, in his purported "*capacity as Founder of the Foundation*" instructed Leo Trust to inform the Foundation Council of each of Tribatline, Merenguito and Nuptials that the beneficiaries of those foundations wished for those foundations to be dissolved at the earliest convenience. The Claimants do not know whether these instructions were given before or after Mrs Bourlakova was replaced as the sole beneficiary of each of Tribatline, and Merenguito, and Mrs Bourlakova, alternatively Veronica, was replaced as a beneficiary of Nuptials. In any event, Mrs Bourlakova and Veronica did not wish for any of Tribatline, Merenguito and Nuptials to be dissolved.

a.6.  Also on or after 27 April 2018, Mr Bourlakov entered into Mandate Agreements with Leo Trust regarding Cantucci, Hydrangea, Hemaren, Edelweiss, Anahill, Columbus and another Panamanian company, Columbus Holding and Enterprises Two SA. The Mandate Agreements were signed by Mr Bourlakov, Mr Tribaldos and Andrea Stadelmann of Leo Trust. They referred to Mr Bourlakov as "*Principal"* and recorded that he had "*appointed*" Cantucci, Hemaren and Anahill "*as shareholder of*" Hydrangea, Edelweiss and Columbus (respectively) and wished "*individuals of* [Leo Trust] *will be appointed to act as Councillors/Directors of the Structure or to assume other functions or duties with regard to*" Cantucci, Hemaren and Edelweiss. They further recorded that Leo Trust and its appointees "*will, under normal circumstances, only act with regard to the Structures affairs upon written instructions … from the Principal or any person explicitly authorised by the Principal*". The Mandate Agreements demonstrate: (1) Mr Bourlakov's ongoing control of Cantucci, Anahill and Hemaren and that any interest of Mr Kazakov was simply as nominee for Mr Bourlakov; and (2) the involvement of Mr Tribaldos and Leo Trust (with the knowledge and permission of Leo England, acting through Mr Tribaldos) in the attempted misappropriation or misappropriation of Edelweiss and the misappropriation of Columbus and Hydrangea.

a.7.  On an unknown date between 27 April 2018 and 22 May 2018, Mrs Kazakova was appointed as protector of Nuptials. By a letter purportedly dated 27 April 2018, Mrs Kazakova accepted her appointment as protector of Nuptials.

a.8.  On an unknown date between 30 April 2018 and 22 May 2018, the Foundation Council of Nuptials passed the following, which Mrs Kazakova had previously acknowledged and approved: (a) an amendment to the Regulations of Nuptials to replace Mrs Bourlakova, alternatively Veronica and Mr Bourlakov, with Cantucci as the sole beneficiary of Nuptials; and (b) a motion of Nuptials' Foundation Council that Nuptials be liquidated and its entire assets and capital be distributed to Cantucci.

b.  Columbus (the principal asset of Tribatline prior to its dissolution) ~~and Edelweiss (the principal asset of Merenguito prior to its dissolution) are~~ is now owned by the Panamanian foundation~~s~~ Anahill ~~and Hemaren~~. Edelweiss (which had purportedly been transferred to Merenguito prior to its dissolution and which would have been Merenguito's principal asset, had the transfer been valid, albeit as set out above that

asset would have been held for Veronica) was purportedly transferred to Hemaren. Mrs Bourlakova was not informed of any changes to the class of beneficiaries, and nor was Veronica informed of the purported transfer. ~~Mrs Bourlakova infers that~~ As set out above, the class of beneficiaries was changed prior to dissolution so that the new owners and purported owners of Columbus and Edelweiss i.e. Anahill and Hemaren were made beneficiaries of Tribatline and Merenguito respectively (~~either in addition to or~~ in substitution for Mrs Bourlakova) with Columbus and Edelweiss then being respectively transferred and purportedly transferred to them.

   c.   After 29 May 2018, the shares in Hydrangea were transferred to Cantucci. Mr Bourlakov was the sole named beneficiary of Cantucci until his death.

136A.  Four months after the dissolution of Tribatline, Finco was reactivated and its shares purportedly transferred from Tribatline to Delos (which the Claimants infer was acting as trustee for Mr Bourlakov or for a nominee acting on his behalf, possibly Mr Kazakov). The shares in Finco were then purportedly transferred to Wlamil. As set out below, Finco now contends: (a) that it was owed $950 million by Edelweiss pursuant to a 2011 loan agreement; and (b) that in 2016 it received an assignment of a supposed loan due from Greenbay in approximately the sum of $250 million. Although both documents are forgeries, they purport to show (and Mr Bourlakov contended and Mr Kazakov contends) that Finco had substantial assets which could be used to meet the liability to Gatiabe pursuant to the forged Finco / Gatiabe document.

136B.  On or about 17 August 2020, IPEC purportedly issued a share certificate to Anahill in respect of the entire share capital of IPEC of 100 shares. Mr Bourlakov was the sole named beneficiary of Anahill until his death.

137.  As demonstrated by the events set out above Mr Bourlakov ha~~ds~~ de facto control over Edelweiss, ~~and~~ Columbus, Finco, IPEC and Hydrangea until his death. This is confirmed by the fact that Mr Bourlakov ~~is~~ was an authorised sole signatory on Edelweiss's~~s~~ UBS bank account.

138.  Mr Kazakov was (and so far as Mrs Bourlakova is aware still is) the sole named beneficiary of Wlamil. Mr Kazakov was acting as a nominee for Mr Bourlakov until Mr Bourlakov's death, although he now seeks to claim Wlamil's assets as his own. ~~Mrs Bourlakova has not~~ The Claimants have now seen copies of the Regulations of Anahill

and Hemaren, which identify Anahill's sole beneficiary as Mr Bourlakov, and initially identified Hemaren's sole beneficiary as Mr Bourlakov before Mr Kazakov was added as a beneficiary in June 2019. and does not, therefore, know the beneficiary/ies of each under the Regulations, but understands that Mr Kazakov or Mrs Kazakova may nominally be the beneficiary of one or both of these foundations. If this is In the case of Mr Kazakov (or if any other individual or entity other than Mr Bourlakov is nominally the beneficiary), they weare acting as nominee for Mr Bourlakov until his death, although they now claim those assets as their own.

139.  [1][Intentionally left blank]

Involvement of Mrs Kazakova and Mr Kazakov

140.  If Mrs Kazakova did replaced Mr Anufriev as protector of Tribatline, and/or Merenguito and Nuptials this would have taken place on Mr Bourlakov's instructions. Before giving these instructions, Mr Bourlakov would have obtained Mrs Kazakova's agreement that she would act on his instructions and approve the transfer of Columbus and Hydrangea and the purported transfer of Edelweiss to new foundations of which Mrs Bourlakova and Veronica were was not a beneficiary (but of which Mrs Kazakova was made the protector on or after 27 April 2018), rather than complying with her duties as protector of Tribatline, Merenguito and Nuptials. Mr Kazakov is the nominated beneficiary of Wlamil and a nominated beneficiary of Hemaren. Insofar as Mr Kazakov or Mrs Kazakova were nominated beneficiaries of Anahill and/or Hemaren, Mr Bourlakov would also have obtained Mr Kazakov's their agreement in advance that they Mr Kazakov would act as his nominee and/or on his instructions.

141.  The willingness of Mr Kazakov and Mrs Kazakova to participate in Mr Bourlakov's attempts to defraud Mrs Bourlakova and her daughters is demonstrated by their participation in the lies told to Mrs Bourlakova during the discussions in London in April 2018. Their participation in the misappropriation of Columbus, Finco, IPEC and Hydrangea and the attempted or actual misappropriation of Edelweiss would have been agreed at or around that time. Given the fraudulent nature of the conduct involved, Mrs Bourlakova the Claimants infers that Mr Bourlakov agreed to remunerate Mr Kazakov and Mrs Kazakova for their participation and agreement to act on his instructions (or made clear

[1] The text previously in paragraph 139 has been moved to paragraph 143A.

62

that continued financial support was dependent upon this). ~~Mrs Bourlakova~~ The Claimants will rely on the fact that there has been a substantial improvement in the standard of living of Mr Kazakov and Mrs Kazakova since 2018 (though not a change consistent with them being entitled to half the Bourlakov family assets). Furthermore, the Claimants understand that Mr Kazakov is the nominated beneficiary of Wlamil and a nominated beneficiary of Hemaren. ~~and/or Mrs Kazakova may be beneficiaries of the foundations.~~ Although the Claimants do not accept that Mr Kazakov is a ~~they are~~ genuine ~~beneficiaries~~ beneficiary rather than ~~a~~ nominees, if there was any truth to such interests, it would mean that ~~they~~ Mr Kazakov and, through him, Mrs Kazakova had been remunerated by receiving an asset (or a share of an asset) worth hundreds of millions of dollars.

142. ~~Alternatively, if Mr Anufriev remained as protector of Tribatline and/or Merenguito throughout the relevant period, before giving instructions for the assets of these foundations being transferred to Anahill and Hemaren, Mr Bourlakov would have obtained Mr Anufriev's agreement that he would act on Mr Bourlakov's instructions and approve the transfer of Columbus and Edelweiss. Mr Anufriev's willingness to participate in Mr Bourlakov's attempts to defraud Mrs Bourlakova is demonstrated by his involvement in the other parts of Mr Bourlakov's strategy as particularised above and below. Given the fraudulent nature of the conduct involved, Mrs Bourlakova infers that Mr Bourlakov agreed to remunerate Mr Anufriev for his participation and agreement to act on Mr Bourlakov's instructions (or made clear that his continued employment was dependent upon this).~~ [Intentionally left blank]

143. Mrs Kazakova ~~(or alternatively Mr Anufriev)~~ agreed to Anahill, ~~and~~ Hemaren and Cantucci being made beneficiaries of Tribatline, ~~and~~ Merenguito and Nuptials respectively (~~either in addition to or~~ in substitution for Mrs Bourlakova, alternatively Veronica and Mr Bourlakov in relation to Nuptials) with Columbus and Hydrangea, and Edelweiss, then being respectively transferred and purportedly transferred to them because she had been instructed to do so by Mr Bourlakov and remunerated for following his instructions. As a result, Mrs Kazakova ~~(or alternatively Mr Anufriev)~~ made no attempt to comply with ~~their~~ her obligation under the Regulations to act in the best interests of the foundation and for the best interests of the beneficiaries or to seek to ensure that the Foundation Council only acted in accordance with the Regulations of the foundation. Further, Mrs Kazakova agreed to Finco being reinstated and transferred to

Delos and IPEC being reinstated and transferred to Anahill.

Involvement of Mr Tribaldos, Leo England and Leo Trust

143A. It is likely that the strategy for misappropriating and/or attempting to misappropriate Columbus, Hydrangea and Edelweiss (and reactivating Finco and then misappropriating it so that, among other things, Finco could be used as a party to the forged Finco / Gatiabe document in order to evidence the supposed Kazakov partnership) was agreed at some point during the meetings between Mr Bourlakov, Mr Anufriev and Mr Tribaldos in Zurich in early 2018 (as referred to in paragraph 69 above) i.e. at some point between February 2018 and 27 April 2018 in which Mr Bourlakov's strategy was discussed and developed. During the course of these (and other) meetings and conversations, Mr Tribaldos (acting on behalf of Leo England and Leo Trust) agreed to participate and assist in the misappropriation of Columbus and Hydrangea and the attempted or actual misappropriation of Edelweiss (and the reactivation and then misappropriation of Finco). Mr Bourlakov needed their assistance since Leo Trust was responsible for communicating with the Foundation Council of each foundation. The involvement of Mr Tribaldos and Leo Trust is further demonstrated by the Mandate Agreements referred to in subparagraph 136(a.4) above. Mr Tribaldos (in his capacity as a director of Leo Trust and with the knowledge and permission of Leo England) (or an employee of Leo Trust acting on his instructions) did assist Mr Bourlakov by communicating his instructions that Columbus, Hydrangea and Edelweiss were to be transferred to new foundations (along with the steps required to be taken to implement this objective) and then, despite Tribatline already having been dissolved, Finco was to be reactivated and its shares were to be transferred to Delos (as trustee for Mr Bourlakov or a nominee acting on his behalf).[2]

Involvement of Mr Anufriev

144. In arranging for Anahill and Hemaren to be used as new holding structures, Mr Anufriev specifically sought to obtain Panamanian foundations which had been incorporated in 2003. There was no good reason for this request and it is likely it was motivated by a desire to create structures which had been in existence for an extended period and could, therefore, be used to support the false contention that Mr Kazakov had long-standing

---

[2] This text has been moved from paragraph 139, save for amendments shown in red.

rights to a share of Bourlakov family assets.

144A. Given Mr Anufriev's role as Mr Bourlakov's right hand man and his responsibilities in relation to Cantucci, Hemaren and Anahill (as set out below), it is to be inferred that, following his resignation as protector of Nuptials, Merenguito and Tribatline, he was instrumental in procuring that some or all of the steps identified in paragraphs 136(a.1) – (a.8) took place. Furthermore, as set out below, Mr Anufriev was or is likely to have been actively involved in implementing Mr Bourlakov's instructions in relation to Anahill, Hemaren, Edelweiss, Finco, IPEC and Columbus. The Claimants rely on the following:

 a. Notification forms apparently filed by Leo Trust in Panama dated 1 June 2018 recorded that Mr Anufriev had custody of the accounting records and supporting documents for Cantucci, Merenguito, Hemaren and Anahill (as to the latter two foundations, the documents referred to Hemaren Stiftung and Anahill Stiftung which the Claimants believe and aver were references to Hemaren and Anahill);

 b. Mr Anufriev accepted appointments as the protector of Cantucci, Anahill and Hemaren on 23 January 2019;

 c. Mr Anufriev's involvement in procuring persons purporting to act as directors of Edelweiss to execute the Edelweiss Loan Document, as set out in paragraphs 106 to 107 above.

144B. Mr Anufriev participated in these matters knowing of Mr Bourlakov's strategy to misappropriate Hydrangea, Columbus, Finco, IPEC and Edelweiss and that Cantucci, Anahill, Hemaren and Wlamil were being used for this purpose.

Effect of the above

145. Mr Bourlakov thereby successfully appropriated Columbus, and Edelweiss Finco, Hydrangea and IPEC from Mrs Bourlakova (alternatively from Veronica in relation to Hydrangea) with the assistance of Mr Tribaldos, Leo England, Leo Trust, Mr Anufriev, Mrs Kazakova and/or Mr Kazakov. Further, he attempted to misappropriate Edelweiss from Veronica and succeeded in obtaining *de facto* control over it, with the assistance of the same persons. In the alternative, if, contrary to the Claimants' primary case, Veronica is not currently Edelweiss' sole shareholder, Mr Bourlakov successfully appropriated Edelweiss and/or Veronica's beneficial interest in it and/or interest as nominee from her with the assistance of the same persons. In the further alternative, if Edelweiss was not owned (whether legally or beneficially) by Veronica, Mrs Bourlakova was the person

ultimately interested in it, as the sole beneficiary of Merenguito, and Mr Bourlakov successfully appropriated it from her with the assistance of the same persons.

146. At that time:

    a. Edelweiss had net assets worth in excess of $700 million (including investments held through UBS). Those assets (which have subsequently been transferred to Finco) are likely to be worth approximately $1 billion substantially more today. If (which is denied), the Edelweiss Loan Document is enforceable, Edelweiss was worth a further $348.664 million;

    b. Columbus had substantial assets consisting of debts owed by other Bourlakov family companies. If (which is denied), the Columbus assignment is genuine and enforceable, Columbus had a further asset being a debt from H1 in the sum of $143.6 million.

    c. If (which is denied), the Finco / Edelweiss document and/or the assignment of the supposed loan due from Greenbay are genuine, Finco had assets worth $950 million and $250 million respectively.

    d. If (which is denied), the IPEC / H1 loan agreement is genuine and enforceable and/or there was a loan between IPEC and Greenbay (formerly Maravan), IPEC has assets worth $143 million and $250 million respectively.

    e. Hydrangea had net assets worth in excess of $150 million.

146A. The Claimants have no current information in relation to the assets still retained by Edelweiss and consequently do not know the full extent of the sums misappropriated from Edelweiss by or on instructions from Mr Bourlakov, Mr Kazakov and/or Mr Anufriev and/or anyone else since its purported transfer to Hemaren. From the limited historic information available to the Claimants, it appears that there were substantial transfers of funds between different accounts in Edelweiss' name held with UBS and Banque Pictet in 2019, including the sale or transfer of 160,000 ounces of gold in November 2019 (worth approximately $234 million) and the transfer of approximately $458 million from Edelweiss' UBS account to Edelweiss' accounts with Banque Pictet (Geneva and Bahamas). In addition, payments totalling over $130 million were made from Edelweiss' UBS accounts to third parties, including over $100 million to Columbus,

of which at least \$58 million were transferred to Mr Bourlakov's personal account. In addition, Edelweiss appears to have made payments totalling at least €16.5 million and \$9.5 million between 15 April 2020 and 16 March 2021 from Edelweiss' account at Banque Pictet (Bahamas) to accounts held by Mr Kazakov in Switzerland and Monaco. In the light of the Finco / Edelweiss document (see section C4 below) and in circumstances where, during the course of 2019, Mr Bourlakov had been seeking to transfer all of Edelweiss' assets to Gatiabe, it is likely that a substantial part of Edelweiss' assets have been successfully misappropriated, and indeed it may well be that all of Edelweiss' assets have been successfully misappropriated.

**C4. Misappropriation of Edelweiss' assets ~~through the use of forged documents~~**

147. Although ~~Mrs Bourlakova has~~ the Claimants have not seen copies of the relevant documents (save that Mrs Bourlakova has now obtained a copy of the Finco / Edelweiss document as a result of the Cyprus AP Order), ~~she~~ they understand~~s~~ that:

   a. In or around late 2018, Mr Bourlakov procured the production of a document which purported to be a ~~2011~~ loan agreement "*concluded on 03.01.2011*" pursuant to which Finco loaned \$950 million to Edelweiss – the Finco / Edelweiss document;

   b. Mr Bourlakov then procured that the document be given to Finco, which, in purported reliance on the Finco / Edelweiss document, sought payment from Edelweiss of this sum (and is also likely to have sought payment of further sums by way of interest);

   c. In purported reliance on the Finco / Edelweiss document, in early 2019, individuals purporting to act as the directors of Edelweiss (but who had not been validly appointed as directors) ~~resolved to transfer~~ acknowledged that all of Edelweiss' assets were due to Finco by way of repayment of the supposed loan~~.~~;

   d. ~~All of Edelweiss' assets were then transferred to Finco.~~

148. The directors of Finco and the persons purporting to act as directors of Edelweiss either knew that the Finco / Edelweiss document was a forgery or (if they were not aware of it) Mr Bourlakov procured that they would be misled.

149. The Claimants do not know the extent to which any transfer of Edelweiss' assets has taken place pursuant to the Finco / Edelweiss document (whether directly to Finco or to

Gatiabe in purported (partial) discharge of Finco's supposed liability under the forged Finco / Gatiabe document) or otherwise. To the extent that Edelweiss retains any assets, the Claimants infer ~~do not know what has subsequently happened to Edelweiss' assets, but infer that Finco has either transferred these assets to Gatiabe in purported (partial) discharge of Finco's supposed liability under the forged Finco / Gatiabe document or~~ that Mr Bourlakov intend~~ed~~s to contend (and it appears that Mr Kazakov is likely to contend in the future) that ~~Finco has~~ Edelweiss had and has no net asset value despite holding these assets as a result of Edelweiss' supposed liability under the forged Finco / Edelweiss document and in turn that Finco had and has no net asset value despite the sums supposedly due to it under the forged Finco / Edelweiss document as a result of Finco's supposed liability under the forged Finco / Gatiabe document.

150. The Finco / Edelweiss document is a forgery. No document in these terms was in existence in 2011 or at any time prior to 2018. T~~he~~o ~~the extent that there was any~~ transfer of assets from Finco to Edelweiss in 2011 ~~(which is not admitted), this would have been~~ was a gratuitous transfer between companies with the same effective beneficial owner and there was no intention by either company for Edelweiss to have any repayment obligation.

151. ~~The Claimants infer that t~~The Finco / Edelweiss document was produced in or around late 2018 by or with the assistance of Mr Tribaldos (in his capacity as a director of Leo Trust and with the knowledge and permission of Leo England). Mr Tribaldos was in turn acting on instructions from Mr Anufriev, who was acting on the instructions of Mr Bourlakov.

152. The signatures on the Finco / Edelweiss document were either (a) written by someone other than the signatories or (b) written by the relevant individuals long after they ceased to be directors of the relevant companies.

153. Each of Mr Bourlakov, Mr Tribaldos and Mr Anufriev was aware that there was no loan between Finco and Edelweiss and consequently that documents would need to be forged in order to evidence such an agreement. Had there been any such loan, it would have been made on instructions given by Mr Bourlakov and communicated to Mr Tribaldos by Mr Anufriev and by Mr Tribaldos to Edelweiss and Finco. Mr Tribaldos would also have prepared or assisted in the preparation of the loan agreement. Nothing of the kind happened.

154. Further or alternatively, the Finco / Edelweiss document is a sham: No such loan had been agreed between Finco and Edelweiss in 2011 (or at all).

155. The purpose of the Finco / Edelweiss document was to allow Mr Bourlakov to extract all of the assets from Edelweiss if it became necessary to do so (e.g. if the attempted misappropriation of Edelweiss failed for some reason and/or if it became likely that Edelweiss would be treated as Mr Bourlakov's asset such that Mrs Bourlakova would be able to claim a share of Edelweiss in the divorce) so that Finco could then transfer the assets to Gatiabe in purported discharge of Finco's supposed liabilities under the Finco / Gatiabe document, with the objective of artificially suppressing the value of Mr Bourlakov's assets, in circumstances in which Mr Bourlakov ha~~ds~~ agreed that he would ~~will~~ be able to recover from Mr Kazakov any money which Mr Kazakov / Gatiabe obtains and had procured the forgery of the Gatiabe / Jovellanos documents in order to give a company which he controlled until his death a documented right of recovery. While, as set out above, Mrs Bourlakova was the sole shareholder of Gatiabe and Jovellanos, those entities were under Mr Bourlakov's *de facto* control and had been purportedly transferred to Delos and, in the case of Gatiabe, subsequently purportedly transferred to Wlamil. Alternatively, the purpose of the Finco / Edelweiss document was to allow Mr Bourlakov to contend that Edelweiss had no net asset value despite in fact owning assets worth hundreds of millions of dollars.

156. The Claimants will rely, inter alia, on the following matters:

   a. As set out above, Finco was dissolved in November 2014 and was not reactivated until 30 August 2018. Under Panamanian law, the directors of a dissolved company are required to collect in its debts. Finco's directors made no attempt to seek payment of this supposed loan, confirming no such loan existed.

   b. In late 2014, Edelweiss had been given to Veronica. ~~At some time prior to August 2016, Mr Bourlakov had transferred~~ Subsequently, in or around January 2016 or, in the alternative in April 2015, Edelweiss was purportedly transferred to the Panamanian Foundation, Merenguito, and Mrs Bourlakova was subsequently ~~had been~~ made the sole beneficiary of Merenguito. It would have contradicted and undermined the purpose of both transactions ~~this process~~ if Edelweiss still owed Finco (which was owned by Tribatline, of which Mrs Bourlakova was also the sole

beneficiary ~~remained owned by Mr Bourlakov~~) $950 million. Since the relationship between Mr Bourlakov, ~~and~~ Mrs Bourlakova and Veronica had not broken down in 2014 or 2016, there would have been no reason to transfer an asset which was encumbered with such substantial liabilities.

c.  The Finco / Edelweiss document ~~is~~ was intended to ensure that the forged Finco / Gatiabe document fulfils its objective of artificially suppressing the value of Mr Bourlakov's assets. It is to be inferred from this that the Finco / Edelweiss document ~~is~~ was also forged with the same objective.

d.  Mr Bourlakov (and companies and individuals acting on his instructions) have a record of producing and relying upon forgeries and sham documents in the course of his dispute with Mrs Bourlakova.

e.  The Claimants (other than Veronica) have obtained through the Cyprus AP Order:

    i.  Copies of invoices produced by MMG Panazur Ltd SA, a Panamanian company related to Leo Services, in relation to Finco for 2007 to 2013. These invoices do not include any charge for the Finco / Edelweiss document (purportedly entered into in 2011), confirming that this document is a backdated forgery. The invoices do, however, include reference to a "Resolution for the Transfer of Assets" in 2011 confirming that the movement of assets between Finco and Edelweiss in 2011 were by way of transfer and not loan.

    ii. Emails between Leo Cyprus, Leo Trust and Mr Anufriev from 2019 in relation to the preparation of backdated accounts for Finco. As part of the accounting process, copies of relevant documents were obtained from UBS (which appears to have held all or substantially all of Finco's assets at the purported date of the Finco – Edelweiss document). The documents received from UBS include a tri-partite "Transfer of Assets and Assumption of Debt Agreement" between Finco, Edelweiss and UBS dated 17 March 2011. This agreement records the transfer from Finco to Edelweiss of Finco's assets and liabilities with UBS.  This genuine document obtained from UBS and signed by Mr Bourlakov on behalf of each of Finco and Edelweiss, contradicts the forged Finco / Edelweiss document since it records an asset transfer and not

a loan.

157. The Claimants will seek early disclosure of accounting records prepared for Finco or Edelweiss in the period from 2011 onwards. Any genuine accounting records prepared prior to 2018 will not make any reference to Edelweiss having a $950 million liability to Finco, since there was no such liability.

**D. Destruction of documents evidencing A-C above.**

158. As set out above, the forged or sham documents created and/or relied upon by Mr Bourlakov (including the Finco / Gatiabe document, the Gatiabe resolution, the Finco resolution, the July 2018 declaration of trust, the Gatiabe / Jovellanos documents, the Columbus assignment, the IPEC minutes and the Finco / Edelweiss document) were produced by or on instructions from Mr Tribaldos (in his capacity as a director of Leo Trust with the knowledge and permission of Leo England). In relation to the Edelweiss Loan Document, see paragraph 111 above.

159. Mr Tribaldos (acting on behalf of Leo England and Leo Trust) agreed to participate and assist in this conduct (or instruct such conduct to be undertaken) and conceal evidence of the true position because (as Mr Bourlakov knew and/or Mr Tribaldos explained to him) Mr Tribaldos (through Leo England) controlled Leo Trust and Leo Cyprus, and Leo England could and would remove any directors or employees who were unwilling to support and conceal the fraudulent activities, so that the attempts to defraud Mrs Bourlakova and her daughters by the means identified herein could succeed.

160. At the latest by the end of 2019, the other directors of Leo Trust (Messrs. Schwarz, Kircher and Keller) had become aware that Mr Tribaldos had falsified documents on Mr Bourlakov's instructions. The Claimants refer to the Swiss Civil petition filed by Messrs Schwarz and Kircher against Leo Trust (obtained pursuant to the Cyprus AP Order) which records that Mr Tribaldos admitted having forged the Finco / Gatiabe document. By the end of 2019 February 2020 they either had appointed or intended to appoint an external law firm (Neiderer Kraft Frey AG) to carry out a review of which documents had been falsified by Leo Trust and what other wrongdoing Leo Trust had perpetrated. Furthermore, by this time both Mrs Bourlakova and her daughter Veronica had made applications in Switzerland against Leo Trust for disclosure of data held by Leo Trust concerning them, which was likely to reveal Leo Trust's wrongdoing. Furthermore, in

response to a criminal complaint by Mrs Bourlakova, in early 2020, the prosecutor in Zurich made an order requiring Leo Trust to disclose certain classes of documents.

161. In order to conceal Mr Bourlakov's strategy and the unlawful actions (including falsification of documents) taken pursuant to it (including his, Leo Trust's and Leo England's participation in them):

   a. Mr Tribaldos caused the other two directors of Leo England to resign, so that he was the sole director of Leo England;

   b. As the sole shareholder in Leo Trust, Leo England (acting through Mr Tribaldos as its sole remaining director) arranged for two Universal General Meetings of Leo Trust to take place (on 27 February 2020 and 30 March 2020);

   c. At those General Meetings, Leo England (acting through Mr Tribaldos as its sole remaining director), in its capacity as sole shareholder, voted on 27 February 2020 for the dismissal of Messrs. Schwarz and Kircher (and their replacement with two new directors who Mr Tribaldos could procure would act as he directed) and on 30 March 2020 for the dismissal of Mr Keller.

162. The purpose of these steps was to remove the senior staff at Leo Trust who had taken and/or intended to take steps (including the appointment of an external law firm to carry out a review of Mr Tribaldos's activities on behalf of Mr Bourlakov) which were likely to expose the wrongdoing complained of herein and to ensure that Mr Tribaldos has free reign to destroy evidence of his, Leo Trust's and Leo England's participation in this wrongdoing. This was done:

   a. pursuant to the agreement referred to in paragraph 70 above to conceal evidence of the forgeries and/or shams and conceal evidence of the true position;

   b. so as to continue to assist in the steps taken by Mr Bourlakov and the other Defendants to defraud Mrs Bourlakova and her daughters and to prevent the wrongdoing being exposed.

163. Following the dismissal of Messrs Schwarz, Kircher and Keller, on or around 28 30 April 2020, Mr Tribaldos disconnected arranged the disconnection of Leo Trust's servers (so that his actions would not be visible to Leo Trust's IT providers), switched and the

72

switching off or covering up of the cameras in Leo Trust's offices (so that subsequent actions in relation to Leo Trust's electronic data and hard copy documents would not be visible to Leo Trust's IT providers). He then sought to obtain administrative access to Leo Trust's email systems, for the purpose of destroying documents. The Claimants refer to the pleadings in Swiss proceedings filed by Solaro AG and BN Finanz AG, companies related to another shareholder in Leo England, Rudan Business Holdings SA, against, inter alia, Mr Tribaldos (obtained pursuant to the Cyprus AP Order) which recite the terms of a note produced by an employee of Leo Cyprus dated 28 April 2020 recording these events. Mr Tribaldos and Leo Trust subsequently obtained administrative access to Leo Trust's email systems on or around 23 May 2020. Mr Tribaldos and/or Leo Trust employees acting on his instructions and destroyed documents held electronically (or in hard copy) by Leo Trust relating to the matters complained of above (and, most likely, other matters designed to achieve the same or similar ends of which the Claimants are not yet aware) and his, Leo Trust's and Leo England's participation in them.

163A. Documents relating to Mr Bourlakov's strategy and Mr Tribaldos', Leo England's and Leo Trust's participation in it were also held by Leo Cyprus through its provision of IT and other support services to Leo Trust.

163B. The Cyprus AP documents show that:-

    a.  Mr Tribaldos instructed Leo Cyprus to provide IT administrator access to electronic documents (which, it is inferred, he wanted in order to destroy documents).

    b.  Having become aware that Mr Tribaldos was in the process of destroying evidence of wrongdoing, the employees of Leo Cyprus refused to comply with these instructions, although Leo Cyprus was ultimately unable to prevent Mr Tribaldos and Leo Trust obtaining partial access (and in turn destroying electronic documents held by Leo Trust).

    c.  On 1 June 2020, Leo England (as 100% shareholder in Leo Cyprus) gave notice to Leo Cyprus of its intention to pass a resolution at an EGM removing two directors of Leo Cyprus, including Mr Keller. The notice was signed by Mr Tribaldos.

    d.  On 8 September 2020, Leo England (as 100% shareholder in Leo Cyprus) passed a resolution appointing four new directors of Leo Cyprus (including Mr Tribaldos)

and amending the Articles of Leo Cyprus in order to give these directors full control. The resolution was signed by Mr Tribaldos.

e. The existing directors of Leo Cyprus refused to comply with this resolution since they rightly feared, in the light of the events set out above, that the purpose of this resolution was to allow Leo England and Mr Tribaldos to complete the destruction of incriminating documents by also destroying such documents held by Leo Cyprus.

163C. As set out above, in order to prevent the destruction of these documents, on 28 December 2020, the Claimants (other than Veronica) applied for and were granted an Anton Piller order in Cyprus (the "Cyprus AP Order") against Leo Cyprus in relation to documents relevant to these proceedings. In April 2021, Leo England and Mr Tribaldos obtained control of Leo Cyprus. In the light of the above, it can reasonably be inferred that, but for the Cyprus AP Order, Leo England and Mr Tribaldos would have used this control in order to destroy incriminating documents held by Leo Cyprus.

163D. While the Cyprus AP Order has allowed the Claimants to preserve some relevant material, the documents held by Leo Cyprus were only a sub-set of those held by Leo Trust. The destruction of documents held by Leo Trust in Switzerland has, therefore, ~~The effect of this was to~~ prevent~~ed further~~ documents which would have revealed in full the wrongdoing by the Defendants being available to ~~Mrs Bourlakova~~ the Claimants in the course of litigation or to the Swiss prosecutor. Mr Tribaldos acted throughout on the instructions of or with the knowledge and authority of Mr Bourlakov.

**E. Mr Schwarz's concealment of evidence of wrongdoing**

164. Pending disclosure, the Claimants do not know whether Mr Schwarz actively participated in any of the above matters. Nevertheless, Mr Schwarz was aware that Mr Tribaldos (or others acting on Mr Tribaldos' instructions) was falsifying or had falsified documents in order to assist Mr Bourlakov in his dispute with Mrs Bourlakova.

165. Having become aware of Mr Tribaldos's actions, Mr Schwarz secured copies of Leo Trust documents evidencing the matters complained of above and Mr Tribaldos' and Leo Trust's participation in them.

166. In May 2020, after becoming aware that Mr Tribaldos had destroyed evidence held by

Leo Trust of the matters complained of above, Mr Schwarz approached representatives of Mrs Bourlakova informing them of this and suggesting that, as a result, he was the person with the best evidence of the fraudulent steps taken by Mr Tribaldos and Leo Trust on Mr Bourlakov's instructions. Mr Schwarz offered to make the copy documents which he had available to Mrs Bourlakova in return for the payment of $10 million (to be structured as a purchase of an unnamed offshore company which Mr Schwarz stated was in possession of the documents). Mr Schwarz's representative referred to the fact that Mr Bourlakov would also be interested in obtaining these documents. It was inherent in this proposal that unless the requested payment is made, Mr Schwarz would destroy the information or sell it to Mr Bourlakov so that Mr Bourlakov could ensure it never saw the light of day.

**Choice of Law**

167.  Pursuant to Articles 2 and 4 of the Rome II Regulation:

   a.  The law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs (which includes damage which is likely to occur) irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur.

   b.  However, where the person claimed to be liable and the person sustaining damage both have their habitual residence in the same country at the time when the damage occurs, the law of that country shall apply.

   c.  Where it is clear from all the circumstances of the case that the tort/delict is manifestly more closely connected with a country other than that indicated in paragraphs 1 or 2, the law of that other country shall apply. A manifestly closer connection with another country might be based in particular on a pre-existing relationship between the parties, such as a contract, that is closely connected with the tort/delict in question.

168.  The multi-jurisdictional nature of the Bourlakov family's asset holdings means that the events set out above have connections to multiple jurisdictions. Choice of law is, therefore, addressed separately below in relation to each sets of wrongs.

**Claims arising out of Sections A and B above**

169. Mrs Bourlakova will contend that the claims arising out of Sections A and B above are governed by English law, since the misrepresentations were originally made during discussions/meetings in London in April and September 2018 (see Sections A1 and A3) and all further steps were taken in order to further and support those misrepresentations and the likely and intended effect of those misrepresentations was to obtain an immediate reduction in the sum which Mrs Bourlakova and her daughters (who ~~was~~ were present at the meetings in London) would be willing to accept as their share of the Bourlakov family assets, including as part of a settlement which Mr Bourlakov sought to reach at the meetings in London in September 2018. The likely damage would, therefore, have occurred in London. Mrs Bourlakova has also incurred substantial sums on fees paid to legal and other professionals in England in order to be able to demonstrate that the above representations were untrue.

170. In the alternative, Mrs Bourlakova will contend that the claims arising out of Sections A and B above are governed by Monegasque law, since the objective was to cause harm to Mrs Bourlakova, who was a habitual resident of Monaco.

171. Article 1229 of the Monegasque Civil Code provides: "*Any act of man which causes damage to another person obliges the person through whose fault it occurred to repair it*" and Article 1231 provides that a principal is responsible for the damage caused to a third party by his agent who is acting in the scope of his/her functions. The Claimants ~~rely on the provisions of the Monegasque Penal Code set out at Schedule 1 as showing~~ contend that the Defendants' actions (as pleaded below) involved fault under Article 1229 of the Monegasque Civil Code ~~Monegasque law~~. The Claimants also rely on the provisions of the Monegasque Penal Code set out at Schedule 1 as demonstrating that the actions involved fault. All references to Articles are to the relevant Articles in the Monegasque Penal Code.

172. Mr Bourlakov, Mr Kazakov, Mrs Kazakova, Mr Anufriev, Mr Tribaldos, Leo Trust and Leo England are liable for unlawful means conspiracy, since they agreed or combined to participate in or assist the making of representations which they knew to be false and/or the creation of forged or sham documents with the intention of injuring Mrs Bourlakova. Mrs Bourlakova will further rely on the destruction of documents, as set out in Section D, both as evidence that Mr Bourlakov, Mr Tribaldos, Leo Trust and Leo England were parties to the conspiracy and as amounting to further participation in the conspiracy.

172A. Mr Bourlakov, Mr Kazakov, Mrs Kazakova, Mr Anufriev, Mr Tribaldos, Leo Trust and Leo England are each joint tortfeasors in respect of the deceits committed by the others, as set out below, as, by acting as set out in Sections A and B above, they each acted in a way which furthered the commission of the deceits committed by the others and did so pursuant to a common design that fraudulent misrepresentations should be made to Mrs Bourlakova and Veronica.

173. Mr Bourlakov is liable in deceit since he knowingly made false representations during the discussions / meetings in London (see paragraphs 35-44 and 49-56 above) and/or by executing and relying on the 20 December 2018 declaration and/or by giving instructions for the production of the Finco / Gatiabe document, the Gatiabe resolution, the Finco resolution, the 12 July 2018 declaration, the Gatiabe / Jovellanos documents, any documents purporting to create security interests (direct or indirect) over the Black Pearl, Silver Angel or La Reserve and/or any other documents which may purport to create interests (whether by way of security or otherwise) in Bourlakov family assets for the benefit of Mr Kazakov.

174. Alternatively, Mr Bourlakov is liable under Articles 1229 and/or Article 1231 of the Monegasque Civil Code breached:

   a. Article 330, since he acted under false pretences and/or used fraudulent tactics to persuade Mrs Bourlakova of the existence of false enterprises or to bring about the hope or fear of an accident (namely that such false representations and/or forged documents might be believed by relevant courts or authorities) and thereby attempted to defraud her (see Article 330); and/or

   b. Articles 94 and/or 95 by executing and relying on the 20 December 2018 declaration, with the intention of causing harm to Mrs Bourlakova, since he thereby committed a forgery (since the purpose of the declaration was for it to serve as evidence of a right or fact having legal effect and it did not reflect the truth) and/or knowingly made use or attempted to make use of a forged document (see Articles 94 and/or 95); and/or

   c. Articles 42 and/or 95 and/or 330 by giving instructions for the production of the Finco / Gatiabe document, the Gatiabe resolution, the Finco resolution, the 12 July

77

2018 declaration, the Gatiabe / Jovellanos documents, the 20 December 2018 declaration and any documents purporting to create security interests (direct or indirect) over the Black Pearl, Silver Angel or La Reserve and/or any other documents which may purport to create interests (whether by way of security or otherwise) in Bourlakov family assets for the benefit of Mr Kazakov and by knowingly making use or attempting to make use of those documents, with the intention of causing harm to Mrs Bourlakova, thereby acting under false pretences and/or using fraudulent tactics to persuade Mrs Bourlakova of the existence of false enterprises or to bring about the hope or fear of an accident (namely that such forged or sham documents might be believed by relevant courts or authorities) and thereby attempted to defraud her (see Articles 42, 94 and/or 95).

175. Furthermore, Mr Bourlakov is liable under Articles 1229 and/or 1231 of the Monegasque Civil Code breached Article 42 in relation to the actions of Mr Kazakov, Mrs Kazakova, Mr Anufriev, Mr Tribaldos, Leo Trust and Leo England since they were acting on his instructions.

176. Mr Kazakov is liable in deceit since he knowingly made false representations during the discussions in London on 5 April 2018 (see paragraphs 35-44 above) and/or knowingly made false demands in December 2018 (see paragraphs 57-61 above).

177. Alternatively, Mr Kazakov is liable under Article 1229 of the Monegasque Civil Code breached:

    a. Article 330 by making the false representations made during the discussions in London on 5 April 2018 and/or the false claims made in December 2018, since he acted under false pretences and/or used fraudulent tactics to persuade Mrs Bourlakova of the existence of false enterprises or to bring about the hope or fear of an accident (namely that such false representations might be believed by relevant courts or authorities) and thereby attempted to defraud her (see Article 330); and/or

    b. Article 42 by agreeing to help or assist with the forgery and usage of the Finco / Gatiabe document, the Gatiabe resolution, the Finco resolution, the 12 July 2018 declaration, the Gatiabe / Jovellanos documents, the 20 December 2018 declaration and any documents purporting to create security interests (direct or indirect) over the Black Pearl, Silver Angel or La Reserve and/or any other documents which may purport to create interests (whether by way of security or otherwise) in Bourlakov

78

family assets for the benefit of Mr Kazakov knowing that they would be forgeries and would be used to cause harm to Mrs Bourlakova ~~and would thereby involve breaches of~~ (see Articles 42, 94 and/or 95 and/or 330).

178. Mrs Kazakova is liable in deceit since she made false representations during the discussions in London on 5 April 2018 as to the supposed Kazakov partnership despite knowing those representations were untrue.

179. Alternatively, Mrs Kazakova is liable under Article 1229 of the Monegasque Civil Code as a result of ~~breached Article 42 by~~ agreeing to co-operate and/or co- operating with the false representations made during the discussions in London on 5 April 2018 and thereby Mr Bourlakov and Mr Kazakov's attempt to defraud Mrs Bourlakova ~~breaches of Article 330~~ (see Articles 42 and 330).

180. Mr Anufriev is liable in deceit since he made false representations during the discussions in London on 5 April 2018 as to the supposed Kazakov partnership despite knowing those representations were untrue and/or impliedly joined in the representations made by Mr Bourlakov at the meeting in September 2018 about debts despite knowing those representations were untrue and/or by executing the 20 December 2018 declaration, since he did so knowing that the supposed Kazakov partnership (and, therefore, the declaration) was untrue and/or by giving instructions for the production of the Finco / Gatiabe document, the Gatiabe resolution, the Finco resolution, the 12 July 2018 declaration, the Gatiabe / Jovellanos documents, the 20 December 2018 declaration, any documents purporting to create security interests (direct or indirect) over the Black Pearl, Silver Angel or La Reserve (or the companies which own interests in it) and/or any other documents which may purport to create interests (whether by way of security or otherwise) in Bourlakov family assets for the benefit of Mr Kazakov, despite knowing that these documents would be forgeries and/or shams.

181. Alternatively, Mr Anufriev is liable under Articles 1229 and/or Article 1231 of the Monegasque Civil Code ~~breached~~:

    a. as a result of ~~Article 42 by~~ co-operating with the false representations made during the discussions/ meetings in London in April and September 2018 and thereby Mr Bourlakov's attempt to defraud Mrs Bourlakova ~~breach of Article 330~~ and by giving instructions for the production of the Finco / Gatiabe document, the Gatiabe

resolution, the Finco resolution, the 12 July 2018 declaration, the Gatiabe / Jovellanos documents, the 20 December 2018 declaration, any documents purporting to create security interests (direct or indirect) over the Black Pearl, Silver Angel or La Reserve and/or any other documents which may purport to create interests (whether by way of security or otherwise) in Bourlakov family assets for the benefit of Mr Kazakov, knowing that they would be forgeries and/or shams and would be used to cause harm to Mrs Bourlakova ~~and would thereby involve breaches of~~ (see Articles 42, 94 and/or 95 and/or 330); and/or

b. ~~Article 330~~ by executing the 20 December 2018 declaration, since he acted under false pretences and/or used fraudulent tactics to persuade Mrs Bourlakova of the existence of false enterprises or to bring about the hope or fear of an accident (namely that such false representations might be believed by relevant courts or authorities) and thereby attempted to defraud her (see Article 330).

182. Mr Tribaldos and/or Leo Trust and/or Leo England are liable in deceit as a result of preparing or giving instructions for the preparation of the Finco / Gatiabe document, the Gatiabe resolution, the Finco resolution, the 12 July 2018 declaration, the Gatiabe / Jovellanos documents, the 20 December 2018 declaration, any documents purporting to create security interests (direct or indirect) over the Black Pearl, Silver Angel or La Reserve and/or any other documents which may purport to create interests (whether by way of security or otherwise) in Bourlakov family assets for the benefit of Mr Kazakov, knowing that they would be forgeries and/or shams and would be used to cause harm to Mrs Bourlakova.

183. Alternatively, Mr Tribaldos, Leo England and Leo Trust are each liable under Article 1229 of the Monegasque Civil Code ~~breached Article 42 by~~ as a result of agreeing to support the false representations about the supposed Kazakov partnership and thereby Mr Bourlakov and Mr Kazakov's attempt to defraud Mrs Bourlakova (see Articles 42 and ~~breaches of Article~~ 330).

184. Mr Tribaldos, Leo England and Leo Trust is each liable under Articles 1229 and/or 1231 of the Monegasque Civil Code ~~breached Articles 42 and/or 94 by~~ as a result of committing or attempting to commit a forgery (or giving instructions for the commission of a forgery) in relation to the Finco / Gatiabe document, the Gatiabe resolution, the Finco resolution, the 12 July 2018 declaration, the Gatiabe / Jovellanos documents, the 20 December 2018

declaration, any documents purporting to create security interests (direct or indirect) over the Black Pearl, Silver Angel or La Reserve and/or any other documents which may purport to create interests (whether by way of security or otherwise) in Bourlakov family assets for the benefit of Mr Kazakov, knowing that they would be forgeries and/or shams and would be used to cause harm to Mrs Bourlakova ~~and would thereby involve breaches of~~ (see Articles 42, 94 and/or 95 and/or 330).

185. As a result of the above, Mrs Bourlakova has been forced to incur substantial investigation and legal costs in multiple jurisdictions in order to identify and obtain evidence of the matters set out above and otherwise as a result of the matters set out above. The combined damages claimed under this paragraph and paragraph 195 below (which, for the avoidance of doubt, do not include the costs of the present litigation) will ~~be in excess of £5 million.~~ include but are not limited to the following:

   a. Fees of at least £5 million incurred by Mrs Bourlakova in England with Mishcon de Reya LLP, Taylor Wessing LLP and TB Legal Limited (trading as Bersheda Law) in relation to, among other things, identifying and obtaining evidence of the matters set out above and coordinating Mrs Bourlakova's strategy in relation to the multiple legal issues that have arisen as a result of the wrongful acts referred to above;

   b. Fees of at least €900,000 incurred in Monaco by Mrs Bourlakova with CMS Pasquier Ciulla Marquet & Pastor in relation to, among other things, criminal complaints made in Monaco by, among others, Mr Bourlakov against, among others, Mrs Bourlakova, the Monegasque divorce proceedings between Mrs Bourlakova and Mr Bourlakov (for the avoidance of doubt, these fees do not represent the entirety of the fees which Mrs Bourlakova incurred in respect of the divorce proceedings but only the increased fees resulting from the matters set out above) and other legal issues in Monaco arising as a result of the wrongful acts referred to above;

   c. Fees of at least €1.1 million incurred in France by Mrs Bourlakova with Lindon & Rohan Chabot and Cabinet Temime et Associés in relation to, among other things, criminal complaints made in Monaco by, among others, Mr Bourlakov against, among others, Mrs Bourlakova;

d. Fees of at least CHF 1.5 million incurred in Switzerland by Mrs Bourlakova with Klein Rechtsanwälte AG and Lalive SA in relation to, among other things, criminal complaints made in Switzerland against Mr Bourlakov, Leo Trust and Columbus;

e. Fees of at least €650,000 incurred in Cyprus with George Z Georgiou & Associates LLC in relation to, among other things, obtaining and maintaining the Cyprus AP Order;

f. Fees of at least €100,000 incurred in Ukraine with V Teterskyi & Partners in relation to, among other things, criminal complaints made in Ukraine against, among others, Mr Bourlakov and Mrs Bourlakova;

g. Fees of at least USD 100,000 incurred in Panama with Carlos Eugenio Carrillo Gomila y Asociados, Alemám Cordero Galindo & Lee, and Fabrega Molino in relation to, among other things, identifying and obtaining evidence of the matters set out above and criminal complaints made in Panama against Mr Bourlakov, Finco and Gatiabe.

186. ~~Mrs Bourlakova~~ The Claimants also seek~~s~~ declarations that:

a. There was no partnership between Mr Bourlakov and Mr Kazakov at any relevant time.

b. The 20 December 2018 declaration is a sham and of no legal effect.

c. The Finco / Gatiabe document, the addendum to that document, the Gatiabe resolution, ~~and~~ the Finco resolution and the Gatiabe / Jovellanos documents are a forgery and/or a sham and that the liabilities purportedly created by these documents do not exist.

d. The 12 July 2018 declaration is a backdated sham and of no legal effect or alternatively that Mr Kazakov holds ~~his~~ any beneficial interest he may have in Gatiabe as nominee for Mr Bourlakov's estate.

e. Any documents purporting to create security interests (direct or indirect) over the Black Pearl, Silver Angel ~~or La Reserve~~ and/or any other documents which may purport to create interests (whether by way of security or otherwise) in Bourlakov family assets (other than La Reserve itself) for the benefit of Mr Kazakov are a

sham and of no legal effect or alternatively that Mr Kazakov holds any such interests as nominee for Mr Bourlakov's estate.

186A. The Claimants will contend that the validity of each purported issuance and transfer of shares in Gatiabe and Jovellanos is subject to Panamanian law. The Claimants seek declarations that Mrs Bourlakova is, and has been since December 2014, the holder of the entirety of the shares of both Gatiabe and Jovellanos and the ultimate beneficial owner of each.

**Claims arising out of Sections C1, C2 and C4 above**

187. In relation to the validity of the Edelweiss Loan Document, the Columbus assignment, the IPEC minutes and the Finco / Edelweiss document, the Claimants will contend that the question of whether these documents are forgeries / shams is a factual issue.

188. H1 seeks declarations that the Edelweiss Loan Document and/or the Columbus assignment are a forgery or alternatively a sham and that the IPEC / H1 loan agreement is a sham and that the liabilities purportedly created by these documents do not exist.

189. Greenbay seeks a declaration that the IPEC minutes are a forgery or alternatively a sham and that the liability purportedly created by this document does not exist. Greenbay also seeks a declaration that the loan between IPEC and Greenbay purportedly assigned by the IPEC minutes did not exist and consequently that Greenbay has no liability to IPEC.

190. Mrs Bourlakova and Veronica seeks a declaration that the Finco / Edelweiss document is a forgery or alternatively a sham and that the liability purportedly created by this document did not exist.

191. In relation to the parties involved in the creation of the Edelweiss Loan Document, the Columbus assignment, the IPEC minutes and the Finco / Edelweiss document, the objective of producing these documents was to cause harm to Mrs Bourlakova (as the beneficial owner of H1 and Greenbay). As set out at paragraph 51 above, misrepresentations concerning these supposed agreements were originally made to Mrs Bourlakova and Veronica by Mr Bourlakov and Mr Anufriev during meetings in London in September 2018 (see Section A3) and all further steps were taken to further and support those misrepresentations and the likely and intended effect of those misrepresentations was to obtain an immediate reduction in the sum which Mrs Bourlakova and Veronica

(who were present at the meetings in London) would be willing to accept as their share of the Bourlakov family assets, including as part of a settlement which Mr Bourlakov sought to reach at the meetings in London in September 2018. The likely damage would, therefore, have occurred in London. Furthermore, the creation of these documents has caused harm to Mrs Bourlakova, since she has incurred substantial legal and other fees in England in order to be able to demonstrate that these documents are forgeries and/or shams. Mrs Bourlakova will, therefore, contend that her claim for those losses is subject to English law as the place of the likely and actual damage. Alternatively, Mrs Bourlakova's claim in relation to those losses is subject to Monegasque law, pursuant to Article 4(1) of the Rome II Regulation, since Mrs Bourlakova is a habitual resident of Monaco, and Monaco is, therefore, the place where the damage occurred. Mrs Bourlakova repeats paragraph 171 above.

191A. Mr Bourlakov, Mr Anufriev, Mr Tribaldos, Leo Trust and Leo England are liable for unlawful means conspiracy, since they agreed or combined to participate in or assist the creation of forged or sham documents with the intention of injuring Mrs Bourlakova.

192. Alternatively, Mr Bourlakov is liable under Articles 1229 and/or 1231 of the Monegasque Civil Code for ~~breached Articles 42 and/or 95 and/or 330 by~~ giving instructions for the production of the Edelweiss Loan Document and/or the Columbus assignment and/or the IPEC minutes and/or the Finco / Edelweiss document and/or by giving instructions for use to be made of those documents, thereby acting under false pretences and/or using fraudulent tactics to persuade Mrs Bourlakova of the existence of false enterprises or to bring about the hope or fear of an accident (namely that such forged documents might be believed by relevant courts or authorities) and thereby attempted to defraud her (see Articles 42, 95 and 330).

193. Mr Tribaldos and/or Leo England and/or Leo Trust is each liable under Articles 1229 and/or 1231 of the Monegasque Civil Code ~~breached Articles 42 and/or 94~~ by committing or attempting to commit a forgery (or giving instructions for the commission of a forgery) in relation to the Edelweiss Loan Document and/or the Columbus assignment and/or the IPEC minutes and/or the Finco / Edelweiss document (see Articles 42 and 94).

194. Mr Anufriev is liable under Articles 1229 and/or 1231 of the Monegasque Civil Code for ~~breached Articles 42 and/or 94 by~~ committing or attempting to commit a forgery (or

giving instructions for the commission of a forgery) in relation to the Edelweiss Loan Document and/or the Columbus assignment and/or the IPEC minutes and/or the Finco / Edelweiss document (see Articles 42 and 94).

195. As a result of the above, Mrs Bourlakova has been forced to incur substantial investigation and legal costs in multiple jurisdictions in order to identify and obtain evidence of the matters set out above and otherwise as a result of the matters set out above. As set out above, the combined damages claimed under this paragraph and paragraph 185 above will be in excess of £5 million. The damages claimed under this paragraph include those set out in paragraph 185 above.

**Injunction**

196. The Claimants will seek an injunction restraining each of the Second to Thirteenth Defendants from commencing or pursuing proceedings (save proceedings within the EU or Lugano Contracting States) relying upon and/or seeking to enforce the supposed partnership between the First and Seventh Defendants and/or the documents declared to be forgeries or shams – see paragraphs 186, 188, 189 and 190 above.

**Claims arising out of Sections C0 and C3 above**

196A. The Claimants will contend that the validity of the purported issuance and transfer of shares in Edelweiss is governed by Panamanian law.

196B. The Claimants seek a declaration that Veronica is the sole shareholder of, and ultimate beneficial owner of, Edelweiss.

197. The Claimants will contend that the claims in relation to the dissolution of Tribatline, / Merenguito and Nuptials and misappropriation of Columbus, and Edelweiss Finco, Hydrangea and IPEC, the attempted misappropriation of Edelweiss, or, in the alternative, the misappropriation of Edelweiss and the transfers from Edelweiss, are subject to Panamanian law pursuant to Article 4(3) of the Rome II Regulation, since these claims are manifestly more closely connected with Panama than any other jurisdiction, since both Nuptials, Tribatline and Merenguito were Panamanian foundations operating under Panamanian law and Columbus, and Edelweiss, Finco, Hydrangea and IPEC are both all incorporated in Panama. Relevant provisions of the Panamanian Penal Code are set out at Schedule 2.

198. Pursuant to Article 128 of the Panamanian Penal Code, civil liability applies to those guilty as authors, instigators or participants of a criminal act.

199. By offering Mrs Kazakova ~~(or alternatively Mr Anufriev)~~ financial inducement in order to discharge her~~/his~~ role as protector of <u>Nuptials,</u> Tribatline and Merenguito in accordance with Mr Bourlakov's instructions (rather than in accordance with her~~/his~~ obligations under the Regulations of each), Mr Bourlakov breached Articles 220~~, and~~ 243 <u>and/or 253</u> of the Panamanian Penal Code.

<u>199A.</u> Mr Tribaldos, Leo England~~,~~ <u>and</u> Leo Trust ~~and Mr Anufriev~~ are also liable as instigators or participants.

<u>199B.</u> <u>In relation to Mr Anufriev:</u>

    a. <u>On the Claimants' primary case in relation to Edelweiss, i.e. that Veronica remains the sole shareholder in Edelweiss, Mr Anufriev is liable as instigator or participant for all actions taken by him.</u>

    b. <u>On the Claimants' secondary case in relation to Edelweiss, i.e. that Veronica was the beneficial owner of Edelweiss and/or that its shares were held by Merenguito as nominee for her prior to any transfer of its shares to Hemaren, Mr Anufriev is liable as instigator or participant for all actions taken by him.</u>

    c. <u>On the Claimants' tertiary case in relation to Edelweiss, i.e. that Mrs Bourlakova was the person ultimately interested in Edelweiss as the sole beneficiary of Merenguito prior to the events described in Section C3 above, Mr Anufriev is liable as instigator or participant for actions taken by him after he stood down as protector of Merenguito, including as pleaded at paragraph 144A above. For the avoidance of doubt, Mrs Bourlakova does make any claim against Mr Anufriev for actions taken in the capacity of protector of Merenguito, since any such claim would need to be pursued by arbitration.</u>

    d. <u>Further, Mr Anufriev is liable as instigator or participant for actions taken by him after he stood down as protector of Tribatline and Nuptials, including as pleaded at paragraph 144A above. For the avoidance of doubt, Mrs Bourlakova does not make any claim against Mr Anufriev for actions taken in the capacity of protector of Tribatline and, in so far as Mrs Bourlakova was a beneficiary of Nuptials, Nuptials,</u>

since any such claim would need to be pursued by arbitration. In so far as Veronica was a beneficiary of Nuptials, Veronica does not make any claim against Mr Anufriev for actions taken in the capacity of protector of Nuptials, since any such claim would need to be pursued by arbitration.

199C. In relation to Mr Kazakov, he is also liable as instigator or participant as a result of agreeing to act as beneficiary of Wlamil and Hemaren.

199D. In relation to Mrs Kazakova:

    a. On the Claimants' primary case in relation to Edelweiss, i.e. that Veronica remains the sole shareholder in Edelweiss, Mrs Kazakova is liable as instigator or participant for all actions taken by her.

    b. On the Claimants' secondary case in relation to Edelweiss, i.e. that Veronica was the beneficial owner of Edelweiss prior to any transfer of its shares to Hemaren, Mrs Kazakova is liable as instigator or participant for all actions taken by her.

    c. On the Claimants' tertiary case in relation to Edelweiss, i.e. that Mrs Bourlakova was the person ultimately interested in Edelweiss as the sole beneficiary of Merenguito prior to the events described in Section C3 above, and their primary case in relation to Hydrangea – i.e. that Mrs Bourlakova was the sole beneficiary of Nuptials prior to the events described in Section C3 above, the Claimants do not pursue any claim against Mrs Kazakova in relation to the dissolution of Tribatline, Merenguito and Nuptials and the misappropriation of Columbus, Edelweiss, Finco, IPEC and Hydrangea in these proceedings, since any such claim would need to be pursued by arbitration.

    d. On the Claimants' secondary case in relation to Hydrangea, i.e. that Veronica was a beneficiary of Nuptials prior to the events described in Section C3 above, the Claimants do not pursue any claim against Mrs Kazakova in relation to the dissolution of Nuptials and the misappropriation of Hydrangea in these proceedings, since any such claim would need to be pursued by arbitration.

199E. On the Claimants' primary case that Veronica remains Edelweiss' sole shareholder, Veronica seeks damages for loss and damage which she has suffered as a result of the above, pursuant to Articles 128 and 129 of the Panamanian Penal Code, including the

amount of all transfers out of Edelweiss. For the reasons set out above, it is likely that a substantial part of Edelweiss' assets have been successfully misappropriated, and indeed it may well be that all of Edelweiss' assets have been successfully misappropriated, and Veronica, therefore, seeks damages of $1 billion less any amount of Edelweiss' assets which it may retain.

199F.  On the Claimants' secondary case that Veronica was the beneficial owner of Edelweiss prior to any transfer of its shares to Hemaren, or in the alternative it was held by Merenguito as nominee for her, Veronica seeks damages for the loss and damage which she has suffered as a result of the above, pursuant to Articles 128 and 129 of the Panamanian Penal Code, namely the full value of Edelweiss' assets, which the Claimants estimate as approximately $1 billion.

199G.  On the Claimants' tertiary case, Mrs Bourlakova seeks damages for loss and damage which she has suffered as a result of the above, pursuant to Articles 128 and 129 of the Panamanian Penal Code against (as indicated above) namely the full value of Edelweiss' assets, which the Claimants estimate as approximately $1 billion.

200.  In any event, Mrs Bourlakova seeks damages for loss and damage which she has suffered as a result of the above, pursuant to Articles 128 and 129 of the Panamanian Penal Code, in the sum of at least $700 million in relation to Edelweiss and Columbus, Finco, IPEC and Hydrangea, save that no such claim is advanced by Mrs Bourlakova against Mrs Kazakova as set out in subparagraph 199D(c) above. Alternatively, Veronica seeks damages for loss and damage which she has suffered as a result of the above, pursuant to Articles 128 and 129 of the Panamanian Penal Code in relation to Hydrangea. The value of those claims depends on, among other things, the validity of the documents challenged in Sections C1, C2 and C4 above.

**Claims arising out of Section D above**

201.  The Claimants will contend that the claims in relation to Section D are subject to Swiss law pursuant to Article 4(1) of the Rome II Regulation, since the damage which occurred was the result of the destruction and concealment of documents, which took place in Switzerland. Mrs Bourlakova has incurred substantial sums on fees of at least CHF 250,000 paid to legal and other professionals in Switzerland with Klein Rechtsanwälte AG in order to be able to demonstrate that the above destruction of documents occurred.

Relevant provisions of the Swiss Civil Code of Obligations and Swiss Penal Code are set out at Schedule 3.

202. Pursuant to Article 41 ~~para 1~~ of the Swiss Code of Obligations, any person who unlawfully causes damage to another, whether wil~~l~~fully or negligently, is obliged to provide compensation <u>and any person who wilfully causes damage to another in an immoral manner is likewise obliged to provide compensation</u>. <u>Pursuant to Article 50 of the Swiss Code of Obligations: *"[where] two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage"*.</u>

203. ~~The Claimants rely on the provisions of the Swiss Penal Code set out at Schedule 3 as showing that the Defendants' actions that caused the damage were unlawful~~. <u>NOT USED.</u>

204. Mr Tribaldos and Leo Trust <u>unlawfully and wilfully (or alternatively negligently) caused damage to Mrs Bourlakova and/or wilfully caused damage to Mrs Bourlakova in an immoral manner</u> ~~breached Article 254 of the Swiss Penal Code (i.e. suppression of documents)~~ by destroying and concealing documents held electronically (or in hard copy) by Leo Trust which would have revealed the wrongdoing by the Defendants and Mr Tribaldos', Leo Trust's and Leo England's participation in them, with the intention of preventing those documents being available to Mrs Bourlakova <u>and Veronica</u> and the Swiss authorities.

205. Leo England was a co-perpetrator of <u>the damage to Mrs Bourlakova</u> ~~this breach of Article 254 of the Swiss Penal Code,~~ since its role (in procuring the dismissal of the other directors of Leo Trust which would have prevented the destruction of these documents) was decisive in allowing the destruction to take place. <u>Alternatively, Leo England was an accomplice of Mr Tribaldos and/or Leo Trust since it wilfully assisted them in the destruction and concealment of documents.</u> Alternatively, Leo England <u>is liable as instigator</u> ~~breached Article 254 in conjunction with Article 24 or Article 25 of the Swiss Penal Code~~ because it knowingly incited Mr Tribaldos / Leo Trust to destroy evidence ~~and/or wilfully assisted them in doing so~~.

206. Mr Bourlakov <u>is liable as instigator</u> ~~breached Article 254 in conjunction with Article 24 of the Swiss Penal Code~~ because he incited Mr Tribaldos and Leo Trust to conceal evidence of the forgeries and/or shams and/or instructed Mr Tribaldos to destroy

documents which would have revealed the wrongdoing by the Defendants.

207. As a result of the destruction and concealment of these documents, Mrs Bourlakova has been forced to incur substantial investigation ~~and legal~~ costs in multiple jurisdictions in order to identify and obtain evidence of the Defendants' wrongdoing. Mrs Bourlakova seeks damages ~~in excess~~ of at least CHF 250,000, £600,000, and €650,000 ~~£5 million~~, ~~which covers the same~~ which comprise some of the costs ~~as~~ claimed under paragraphs 185 and 195 above incurred after 28 April 2020 (including fees incurred in obtaining and maintaining the Cyprus AP Order, and the fees pleaded in paragraph 201 above).

**Claims arising out of Section E above**

208. The Claimants will contend that the claims in relation to Section E are subject to Monegasque law pursuant to Article 4(1) of the Rome II Regulation, since the concealment of relevant documents and/or the need to make payment to obtain these documents would cause harm to Mrs Bourlakova, who is a habitual resident of Monaco, and Monaco is, therefore, the place where the damage would occur or is likely to occur.

209. Mr Schwarz is liable under Articles 1229 of the Monegasque Civil Code ~~breached Article 323 of the Monegasque Penal Code by~~ as a result of attempting to extort funds by means of a threat to conceal evidence of the matters complained of above and Mr Tribaldos and Leo Trust's participation in them, as well as the wrongdoing of the other Defendants (see Article 323).

210. As a result of Mr Schwarz's concealment of evidence of the matters complained of above, Mrs Bourlakova has been forced to incur substantial investigation and legal costs in multiple jurisdictions in order to identify and obtain evidence of the Defendants' wrongdoing. Mrs Bourlakova seeks damages ~~in relation to such costs which will exceed £5 million~~ consisting of those of the costs claimed under paragraphs 185 and 195 above which were incurred after April 2020.

**Interest**

211. Mrs Bourlakova and Veronica are ~~is~~ entitled to and claim~~s~~ interest on all sums awarded to them ~~her~~ by the Court by way of damages pursuant to section 35A of the Seniors Courts Act 1981 or pursuant to the common law at such rate and for such period as the Court thinks fit.

**AND THE CLAIMANTS CLAIM**

(1) Damages;

(2) A declaration that none of the First Defendant's business interests were or are the subject of a partnership with the Seventh Defendant.

(2A) A declaration that neither the Seventh nor Eighth Defendants has any interest in any asset held by any of the Claimants;

(3) Declarations that the documents identified at paragraphs 75, 77, 78, 88.0.ii, 88.0.iii, 92, 112b, 126 and 147a above are forgeries and that the liabilities purportedly created by these documents do not exist;

(4) Declarations that the documents identified at paragraphs 75, 77, 78, 79, 88.0.ii, 88.0.iii, 92, 105, 112a, 112b, 126 and 147a above are sham documents and of no legal effect;

(5) A declaration that there is no loan between the Third Claimant and the Thirteenth Defendant;

(5A) A declaration that the First Claimant is, and has been since December 2014, the holder of the entirety of the shares of the Eleventh Defendant and Jovellanos and the ultimate beneficial owner of each;

(5B) A declaration that the Fourth Claimant is, and has been since late 2014, the holder of the entirety of the shares of, and the ultimate beneficial owner of, the Twelfth Defendant;

(6) A declaration that any interest held by the Seventh or Eighth Defendants in the Eleventh Defendant, or in the Hemaren, Wlamil or in any other new foundations which hold the Ninth and/or Tenth and/or Twelfth Defendants (or directly in those companies), in the Black Pearl or Silver Angel, in the family flat or the companies which own interests in them or La Reserve it are held as nominee from for the First Defendant's estate.

(7) An injunction restraining each of the Second to Thirteenth Defendants (whether directly or through companies which they own or control) from commencing or pursuing proceedings (save proceedings within the EU or Lugano Contracting States) relying upon and/or seeking to enforce the supposed partnership between the First and Seventh Defendants and/or any of the documents declared to be forgeries or shams pursuant to (3) or (4) above.

(8) Declarations in relation to other steps taken by the Defendants (or any of them) to conceal assets and/or the true value of assets legally or beneficially owned by the First Defendant (or which he had and/or has the power, directly or indirectly, to dispose of or deal with as if they were his own or of which he was or is the beneficiary), including in relation to the ownership and/or value of assets.

(9) Declarations as to the roles played by each of the Defendants in producing the forgeries and/or shams and then concealing the fact of the forgeries and/or shams and/or in concealing assets and/or the true value of assets;

(10) interest pursuant to statute or the common law;

(11) such other relief as the Court thinks fit; and

(12) costs.

**NEIL KITCHENER QC**

**MATTHEW COOK**


**HELEN DAVIES KC**

**MATTHEW COOK KC**

**PATRICK HARTY**

**DANIEL FLETCHER**

**STATEMENT OF TRUTH**

**FIRST CLAIMANT**

I believe that the facts stated in these Amended Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: _____

Full name: Loudmila Bourlakova

Date: 28 September 2023

**SECOND CLAIMANT**

The Second Claimant believes that the facts stated in these Amended Particulars of Claim are true. The Second Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Second Claimant to sign this Statement of Truth on its behalf.

Signed: _____

(9)     Declarations as to the roles played by each of the Defendants in producing the forgeries and/or shams and then concealing the fact of the forgeries and/or shams and/or in concealing assets and/or the true value of assets;

(10)   interest pursuant to statute or the common law;

(11)   such other relief as the Court thinks fit; and

(12)   costs.

**NEIL KITCHENER QC**

**MATTHEW COOK**

**<u>HELEN DAVIES KC</u>**

**MATTHEW COOK KC**

**PATRICK HARTY**

**DANIEL FLETCHER**

**STATEMENT OF TRUTH**

Amended

Signed:

Full name: Loudmila Bourlakova

Date:

Amended

I am duly             the S             to sign this Statement of Truth on its behalf.

Signed:

*Nicolas Edward Pell*
*irector*
*12 October 2023*

Amended

I am duly authorised by the Third Claimant to sign this Statement of Truth on its behalf.

Signed

Full name:

Position:

Date:

**FOURTH CLAIMANT**

an honest belief in its truth.

Signed:

Full name: Veronica Bourlakova

Date:

DocuSign Envelope ID: 411BAFA7-D5F7-4926-AA23-8477DCE14DAA

Full name:

Position:

Date:

**THIRD CLAIMANT**

The Third Claimant believes that the facts stated in these <span style="color:red">Amended</span> Particulars of Claim are true. The Third Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Third Claimant to sign this Statement of Truth on its behalf.

Signed: _CdEHills_
DocuSigned by:
5FCD41E968574FC...

Full name: Alison Hills

Position: Authorised Signatory for Anson Limited, Director

Date: 16 October 2023

**FOURTH CLAIMANT**

I believe that the facts stated in these Amended Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: _____

Full name: Veronica Bourlakova

Date:

Full name:

Position:

Date:


**THIRD CLAIMANT**

The Third Claimant believes that the facts stated in these Amended Particulars of Claim are true. The Third Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.


I am duly authorised by the Third Claimant to sign this Statement of Truth on its behalf.


Signed: _____

Full name:

Position:

Date:


**FOURTH CLAIMANT**

I believe that the facts stated in these Amended Particulars of Claim are true. I understand that proceedin s for contem t of court ma be brou ht a ainst an one who makes or causes to be made a false statement in a document verified b a state ent of truth without an honest belief in its truth.

Si ned:

Full name. Veronica ourlakova

Date. Sept 28, 2023

### Article 42
*"The following will be punished as accomplices in an action qualified as a crime or an offense:*
*- those who, by gifts, promises, threats, abuse of authority or power, guilty machinations or artifices, will have provoked this action or given instructions to commit it or to facilitate its execution;*
*- those who have procured weapons, instruments or any other means which will have been used for action, knowing that they were to be used ;*
*- those who have, with knowledge, helped or assisted the author or the authors of the action in the facts which will have prepared or facilitated it, or in those who will have consumed it… even in the case where the crime which was the object of the conspirators or the provocateurs would not have been committed."*

## Article 90
*"Forgery is the alteration of the truth, done with the awareness of harm, in a written document intended to serve or capable of serving as evidence of a right or a fact having a legal effect".*

## Article 94 criminalises committing or attempting to commit a forgery in private, commercial or bank writing including by fabrication or by alteration of the signatures or declaration.

## Article 95 criminalises *"knowingly making use or attempting to make use of a forged document".*

### Article 96
*"The provisions of this paragraph are applicable to foreign documents, regardless of their probative value in the Principality."*

### Article 323
*Anyone who has extorted by force, violence or coercion, either the delivery of funds or securities, or the signature or delivery of a writing, deed, title, any document containing or operating obligation, provision or discharge, will be punished with the penalty of imprisonment of ten to twenty years.*
*Anyone who, by means of a written or verbal threat, defamatory revelation or imputation, has extorted or attempted to extort, either the delivery of funds or securities, or the signing or delivery of any of the writings listed above, will be punished by imprisonment of one to five years and the fine provided for in item 4 of article 26.*

### Article 330(1)
*"Anyone who, either acting under a false name or false pretences, or using fraudulent tactics to persuade of the existence of false enterprises, power or imaginary credit, or to bring about the hope or fear of a success, accident or any other imaginary event, has delivered or issued to them any funds, movable property, effects, money, goods, bills, promises, receipts or any other writings containing or producing an obligation or discharge, and that has, through any of these means, will have defrauded or attempted to defraud another of his or her assets, in whole or in part, will be punished by one to five years of imprisonment and the fine provided for in Article 26 (4)".*

**Article 337**

"*Anyone who diverts or dissipates, to the prejudice of the owners or holders, any funds, movable property, effects, money, goods, bills, promises, receipts, or any other writings containing or producing an obligation or discharge, which would have been delivered to them only as a lease, deposit, mandate, collateral, hire or for work, whether salaried or not, to provide them or pass them on or to make a specific use or employment of them, will be punished by a term of imprisonment of six months to three years and a fine provided for in Article 26 (3).*"

**Article 339**

"*Those who knowingly have concealed things that have been removed, diverted or obtained by means of a crime or an offense will be punished with the penalties provided for in article 325.*"

**Article 379**

"*Anyone who has either voluntarily burned or destroyed, in any way, minutes, registers or other acts originating in the public authority or a public or ministerial officer, securities, notes, bills of exchange, commercial or bank bills containing or operating obligation, disposition or discharge, either knowingly destroyed, withheld, concealed, concealed or altered a public or private document, likely to facilitate the investigation of crimes and misdemeanors, the discovery of evidence or punishment of their author, will be punished…*"

1.   All references to Articles are to the Articles set out above.

**Article 128**

*Civil Liability arises from every offence for:*

*1. Those guilty as perpetrators, instigators or accessories; and*

*2. Those who have been found guilty.*

*The causes of justification exonerate from civil liability, except for the state of necessity, provided that the beneficiary has not benefited materially.*

*The extinction of the criminal action or of the guilty penalty does not exonerate from civil responsibility.*

*~~Civil liability is derived from any crime for:~~*

*~~I. Those who are guilty as authors, instigators or participants;~~*

*~~...~~*

**Article 129**

*The authors and the participants are jointly and severally obligated to pay damages….*

**Article 220**

*Anyone who by deception, procures for themselves or for a third party an unlawful advantage to the detriment of another shall be punished by imprisonment for a term of one to four years.*

*The penalty shall be increased by up to one third when it is committed by abusing personal or professional relationships, or when it is committed by means of a cybernetic or computer medium.*

*~~Whoever through deceit procures an illicit profit to the detriment of another for himself or for another will be punished with a prison term of one to four years.~~*

**Article 243**

*Anyone who, for their own benefit, or that of a third party, seizes, causes the illicit transfer or makes improper use of money, securities or other financial resources of a banking institution, financial or other company that captures or intermediaries with financial resources from the public or that have been entrusted to it, or carries out such conduct*

*through computer manipulation, fraudulent or technological means, shall be punished with imprisonment of four to six years.*

*The penalty shall be of six to eight years' imprisonment, when the punishable act is committed by an employee, worker, manager, dignitary, administrator or legal representative of the entity or company, taking advantage of his position or the error of others.*

~~Who, for his own benefit or that of another, misuses money, value or other financial resources ... entrusted to him and does so by ...fraudulent conduct ...will be punished with a prison term of four to six years.~~

### Article 253

Anyone who directly or indirectly promises, offers, grants, requests or accepts to a person who directs a private sector entity or fulfils any function therein, an undue benefit that redounds to their own benefit or that of another person, so that they act or refrain from acting, lacking the duty inherent in their functions, will be punished with a penalty of two to four 27 years in prison or its equivalent in fine days or community service.

## Article 41 paragraph 1 of the Swiss Code of Obligations

*Whoever unlawfully causes damage to another, whether wilfully or negligently shall be liable for damages.*

## Article 24 of the Swiss Penal Code

*1 Any person who has wilfully incited another to commit a felony or a misdemeanour, provided the offence is committed, incurs the same penalty as applies to the person who has committed the offence.*

## Article 25 of the Swiss Penal Code

*Any person who wilfully assists another to commit a felony or a misdemeanour is liable to a reduced penalty.*

## Article 146 of the Swiss Penal Code

*1 Any person who with a view to securing an unlawful gain for himself or another wilfully induces an erroneous belief in another person by false pretences or concealment of the truth, or wilfully reinforces an erroneous belief, and thus causes that person to act to the prejudice of his or another's financial interests, is liable to a custodial sentence not exceeding five years or to a monetary penalty.*

## Article 251 of the Swiss Penal Code

*1.Any person who with a view to causing financial loss or damage to the rights of another or in order to obtain an unlawful advantage for himself or another, produces a false document, falsifies a genuine document, uses the genuine signature or mark of another to produce a false document, falsely certifies or causes to be falsely certified a fact of legal significance or, makes use of a false or falsified document in order to deceive, is liable to a custodial sentence not exceeding five years or to a monetary penalty.*

## Article 254 of the Swiss Penal Code

*1 Any person who damages, destroys, conceals or misappropriates a document over which he has no exclusive right of disposal, with a view to causing financial loss or damage to the rights of another or in order to obtain an unlawful advantage for himself or another is liable to a custodial sentence not exceeding five years or to a monetary penalty.*