# Exhibit 2

**CLAIM NUMBER BL-2020-001050**

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES</u>
<u>BUSINESS LIST (ChD)</u>
**BETWEEN:**

| | | |
|---|---|---|
| **(1)** | **LOUDMILA BOURLAKOVA** | |
| **(2)** | **HERMITAGE ONE LIMITED** | |
| **(3)** | **GREENBAY INVEST HOLDINGS LIMITED (formerly known as Maravan Services Limited)** | |

<u>Claimants</u>

-and-

| | |
|---|---|
| **(1)** | **OLEG BOURLAKOV** |
| **(2)** | **DANIEL TRIBALDOS** |
| **(3)** | **LEO SERVICES HOLDING LTD** |
| **(4)** | **LEO TRUST SWITZERLAND AG** |
| **(5)** | **REUWAN SCHWARZ** |
| **(6)** | **SEMEN ANUFRIEV** |
| **(7)** | **NIKOLAI KAZAKOV** |
| **(8)** | **VERA KAZAKOVA** |
| **(9)** | **COLUMBUS HOLDING AND ENTERPRISES SA** |
| **(10)** | **FINCO FINANCIAL INC** |
| **(11)** | **GATIABE BUSINESS INC** |
| **(12)** | **EDELWEISS INVESTMENTS ONC** |
| **(13)** | **IPEC INTERNATIONAL PETROLEUM CO INC** |

<u>Defendants</u>

---

**FIRST WITNESS STATEMENT OF NICOLA JANE BOULTON**

---

**I, NICOLA BOULTON,** of 1 Plough Place, London, EC4A 1DE, **WILL SAY AS FOLLOWS:**

1. I am a Partner in the firm of PCB Byrne LLP of the above address. Along with my Partner, Elizabeth Seborg I have overall conduct of this matter on behalf of the Seventh, Eighth, Tenth, Eleventh, and Twelfth Defendants (the "**Kazakov Defendants**"). In this witness statement I refer to the Seventh and Eighth Defendants as "**Mr Kazakov**" and "**Mrs Kazakova**" respectively, and together as the "**Kazakovs**". I refer to the Tenth to Twelfth Defendants as the "**Panamanian Companies**". This is my first witness statement in these proceedings.

2. I make this statement in support of the Kazakov Defendants' application dated 18 August 2021, for orders pursuant to CPR Part 11: (**i**) setting aside Orders of Mr Justice Johnson dated 17 December 2020 (as amended), 31 December 2020, 31 March 2021 and 7 June 2021, granting permission for service of the Claim Form and Particulars of Claim out of the jurisdiction (including service out of the jurisdiction by alternative means on, inter alia, the Tenth to Twelfth Defendants) and/or extending time for service of the Claim Form ("the Johnson J Orders"); and/or (**ii**) declaring that the Court does not have and/or will not exercise jurisdiction to hear the claims made against the Kazakov Defendants in these proceedings.

3. As to the sources of my information in making this statement:

   a. I make this witness statement based in part on my personal knowledge of these proceedings and from the documents to which I refer, in which case I believe the statements to be true.

   b. Where I provide factual information about the Kazakovs or underlying events, I do so based on instructions from Mr Kazakov and Mrs Kazakova. Mr Kazakov and Mrs Kazakova do not speak English and this statement has been read to them in translation and they have confirmed the accuracy of the parts which relate to them. I do not waive privilege in my discussions with the Kazakovs.

c. Where I make statements about the proceedings in Monaco or about Monegasque law, I do so based on information provided by the Kazakovs' Advocate in Monaco, Maître Richard Mullot of Etude Mullot Avocat (who has read and confirmed the accuracy of my evidence in that regard). Maître Mullot is an experienced Monegasque lawyer, who has been a practising Advocate of the Court of Appeal of Monaco since 1994 and is a former Chairman of the Monaco Bar Association. He is very familiar with the various proceedings in Monaco given his involvement in them. I do not waive privilege in any of my discussions with Maître Mullot. To the extent that any of the matters stated are disputed, the Kazakovs reserve the right to adduce a separate expert report on Monegasque law.

4. Where I have relied on information provided by others, I confirm that the matters stated are true to the best of my knowledge, information and belief.

5. Attached to this witness statement is a paginated exhibit marked "[NJB1]" containing the relevant documents to which I refer below. Where reference is made in the witness statement to a page number, the reference is to the relevant page number in the exhibit unless it appears otherwise from the context.

## A. INTRODUCTION

6. This action arises out of the breakdown in the marriage of the First Claimant ("**Mrs Bourlakova**") and the First Defendant ("**Mr Bourlakov**") and the ownership/division of disputed assets, as well as disputes relating to whether Mr Kazakov has an interest in those assets as a result of his long-running joint business activities with Mr Bourlakov. The disputed assets are, or derive from, the multi-billion US Dollar proceeds of sale of two Russian business, which Mr Bourlakov and (on the Kazakov Defendants' case) Mr Kazakov owned and managed.

7. Sadly, Mr Bourlakov passed away on 21 June 2021. As I explain in further detail below, Mr Bourlakov's demise will have a significant impact on the claims advanced by the Claimants in these proceedings, as well as proceedings in various other

jurisdictions. However, notwithstanding his death, it will still be necessary to identify what interest Mr Bourlakov and Mr Kazakov have in the disputed assets given that it will now be necessarily to recover and distribute Mr Bourlakov's estate (to which, as I explain below, the Kazakovs are the universal legatees under Mr Bourlakov's will).

8. In circumstances where the Kazakovs challenge the Court's jurisdiction, I have not addressed in this witness statement the merits of the Claimants' allegations against the Kazakovs except where those allegations bear directly on the grounds of this application. The fact that I have not done so is not intended to imply that the Kazakovs accept that those allegations have any merit. However, it is important to understand the nature and scale of the overarching dispute which has given rise to global litigation (including the present claim). In very broad summary:

    a. Mrs Bourlakova makes serious allegations that, following the breakdown of her marriage, she was the victim of a fraud orchestrated by Mr Bourlakov which was intended to maximise his share of what she refers to as the "Bourlakov family assets". She says that, as part of that fraud, Mr Bourlakov has misappropriated assets; that Mr Kazakov has falsely claimed to be entitled to a share of the disputed assets because he engaged in joint business activities with Mr Bourlakov since the 1980s; and that debts have been invented artificially to depress the true value of the matrimonial property. I understand that she also says that Mr Bourlakov gifted to her sole personal ownership of assets derived from the sale of Russian businesses which were worth billions of US Dollars, which she was free to deal with as she wished. I should record that those allegations are strenuously denied by the Kazakovs.

    b. On the other hand, the Kazakovs contend (as Mr Bourlakov contended, until his death) that it is in fact Mrs Bourlakov who, in combination with her daughters Elena and Veronica, has defrauded Mr Bourlakov and the Kazakovs. They say that, when the marriage broke down and immediately before commencing divorce proceedings, Mrs Bourlakova seised control of assets worth billions of US Dollars which had been entrusted to her as a nominee by Mr Bourlakov (and

by Mr Kazakov, who had an interest in those assets as Mr Bourlakov's long-time business partner) and which had, until their misappropriation, remained under the management and control of Mr Bourlakov. They say that Mrs Bourlakova dissipated those assets so as to put them beyond the reach of Mr Bourlakov and Mr Kazakov by transferring hundreds of millions of US Dollars to her two daughters ("**Elena**" and "**Veronica**") as well as settling around US$1.5 billion of assets into offshore structures, including particularly a discretionary trust known as the "Golden Wheat Trust" which she established in the Bahamas (a jurisdiction which is favoured for asset protection, particularly against matrimonial claims).

9.  As will be apparent from that brief summary, the overarching dispute between the parties is who was the true owner of assets worth billions of US Dollars. Each 'side' claims to be the rightful owner of disputed assets, and accuses the other of misappropriating their assets. Ultimately, there will need to be a resolution as between Mrs Bourlakova, Elena, Veronica, the Kazakovs and others as to who is entitled to the disputed assets and which assets have been misappropriated by whom. As I will explain, that dispute is already the subject of several sets of proceedings in Monaco, which is clearly the most natural forum for the resolution of that overarching dispute.

10. The essential issue in this jurisdiction challenge is whether the Claimants are entitled to have some of the issues arising out of their overarching dispute decided in England, such as (**i**) whether Mr Kazakov has an interest in the disputed assets by virtue of his joint business interests with Mr Bourlakov, (**ii**) whether certain documents are forgeries, and (**iii**) whether the Kazakovs hold property as nominees for Mr Bourlakov. The Claimants seek to force the resolution of such issues through the device of a tort claim in deceit which seeks to recover pre-action legal costs in the low millions of pounds. The Claimants contend that the English court ought to determine such issues, notwithstanding that the determination of those issues is integral to the overarching dispute over the assets, because, they say, the English court has unique "*skills and*

*experience*" which would enable it to "*[grab] this case by the scruff of the neck*"[1], whereas courts in other jurisdictions are either too slow or lack effective procedures to obtain evidence. The Kazakovs contend that the short and obvious answer to the present application is that there is no legitimate basis for the Claimants to bring these claims in England and, to the contrary, that these proceedings are an obvious and impermissible attempt at forum shopping.

11. Whilst I explain the Kazakov Defendants' case in detail below, I make three broad points by way of introduction.

12. **First,** the connections with England are extremely limited. None of Mrs Bourlakova, Mr Bourlakov, Mr Kazakov or Mrs Kazakova have ever been domiciled in England, nor do they have any substantial connection with this jurisdiction. The same is true of the other Defendants to these proceedings, save for the Third Defendant ("**Leo Holding**"), which is incorporated in England, but which is a holding company and had (at most) a peripheral role in the relevant events. The disputes themselves have very little to do with England. The vast majority of the alleged wrongdoing took place abroad. Virtually none of the relevant documentary evidence or witnesses are to be found in England.

13. **Second,** as I explain in more detail below, the disputes have by far their closest connection with Monaco, where (in particular) (**i**) Mr Bourlakov and Mrs Bourlakova had their shared marital home, (**ii**) the divorce proceedings to which the alleged fraud related were taking place, (**iii**) the Kazakovs have been domiciled for some time, (**iv**) the single family office which administered Mr Bourlakov's affairs (the "**Family Office**") was located, (**v**) much of the relevant documentary evidence will be located, and many key witnesses live, and (**vi**) many of the relevant assets are located (and some of which are now held in judicial escrow by the Monegasque courts).

14. **Third**, there are (or were) various proceedings in Monaco arising out of these disputes, to which the present claims are very closely connected. I explain certain of those

---

[1] First Witness Statement of Alexandra Whiston-Dew dated 16 November 2020 ("**Whiston-Dew 1**"), paras 10-11 **[NJB1/4]**

proceedings in further detail in **Section G** below.  For present purposes, I summarise six sets of proceedings in Monaco in particular:

a.  On 19 December 2018, Mrs Bourlakova commenced divorce proceedings in Monaco (the "**Monaco Divorce Proceedings**").[2]  Within those proceedings, Mrs Bourlakova also applied to court for orders to effect the recovery, liquidation and distribution of their matrimonial property (which, as was common ground between the Bourlakovs,[3] is held subject to a 'community property' regime under Ukrainian law).  It should be noted that the claims in these English proceedings relate to an alleged fraud carried out in connection with these Monaco Divorce Proceedings.  Whilst many of the issues raised in these English proceedings would have arisen for decision in the course of the Monaco Divorce Proceedings, I do not consider the Monaco Divorce Proceedings in any detail[4] because they have been terminated as a result of Mr Bourlakov's death and, as I explain below, the matrimonial property will now be assessed and liquidated as part of the administration of Mr Bourlakov's estate;

b.  There are also ongoing criminal investigations, which were initiated on the basis of complaints lodged by Mr Kazakov on 21 December 2018 and by Mr Bourlakov on 5 January 2019 in their capacities as civil parties.  These complaints were joined on 26 March 2019 and are the subject of ongoing criminal proceedings in Monaco in which investigating judges have been appointed, although no charges have yet been laid (the "**Monaco Criminal Proceedings**").  In his criminal complaint, Mr Kazakov has complained that Mrs Bourlakova has conspired to misappropriate assets in which he has an interest and which were held by Mrs Bourlakova as a nominee, including by means of transferring those assets to her family members.  Mr Kazakov alleges

---

[2] However, Mr Bourlakov only became aware of the Monaco Divorce Proceedings on 11 January 2019.

[3] Mrs Bourlakova herself relied upon the Ukrainian community property regime as governing the spouses' interests in the Monaco Divorce Proceedings.

[4] It should not, however, be assumed that the Kazakovs agree with the positions taken in Whiston-Dew 1 or the exhibited "Monaco Opinion" [NJB1/63-76] in respect of the Monaco Divorce Proceedings.

the crimes of breach of trust, concealment and money laundering. If Mrs Bourlakova is charged as a result of this investigation, then Mr Kazakov will be entitled to obtain a determination of his civil rights within the criminal proceedings as a civil party pursuant to Article 74 of the Monaco Criminal Procedure Code[5] because he is a person injured by the misappropriation.

c.  On 5 June 2020, Mr Bourlakov commenced proceedings against Mrs Bourlakova and Elena and Veronica. In those proceedings, Mr Bourlakov alleged that there had been unlawful transfers of assets for the purpose of defeating Mr Bourlakov's and the Kazakovs' interests in those assets (the "**Monaco Asset Transfer Proceedings**"). The transfers which are the subject of those proceedings include the US$265 million to Veronica in June 2018, transfers with a value in excess of US$29 million to Elena between October and December 2018, and a transfer of assets with a value of around US$1.5 billion to the Golden Wheat Trust in December 2018. Mr Bourlakov applied to annul those transfers and sought to have those assets sequestered pending their distribution as part of the matrimonial property. The Monaco Asset Transfer Proceedings have been suspended as a result of Mr Bourlakov's death but the Kazakovs are able to (and will) apply to reinstate those proceedings in their capacity as Mr Bourlakov's universal legatees under his will. They will seek to pursue those proceedings so that Mr Bourlakov's share of the matrimonial property which has been misappropriated by Mrs Bourlakova can be recovered and distributed as part of his estate.

d.  Following *ex parte* applications made on 11 December 2020 and 26 February 2021, Mr Kazakov has obtained orders for judicial escrow of assets held by UBS, Société Générale and Barclays in the names of Mrs Bourlakova, Elena, Veronica and numerous offshore companies related to them (including Hermitage One and Greenbay, which are the Second and Third Claimants in these proceedings) (the "**Monaco Judicial Escrow**"). The judicial escrow has

---

[5] [NJB1/79-80]

been granted on the basis of the dispute as to ownership of assets as between Mr Bourlakov, Mrs Bourlakova and Mr Kazakov. The effect of the judicial escrow is to place the relevant assets under judicial control pending a determination of Mr Kazakov's civil law rights in respect of those assets (which may take place either by way of a determination of Mr Kazakov's civil rights as part of the Monaco Criminal Proceedings or, if no criminal charges are brought, by way of separate civil proceedings in Monaco). There are pending proceedings in which Mrs Bourlakova, Elena and Veronica seek to lift the judicial escrow.

e.   Mr Bourlakov's estate was opened by a notary public in Monaco on 7 July 2021 because he was domiciled in Monaco at the time of his death. Mr Bourlakov's will has been duly registered with the President of the Court of First Instance in Monaco under Article 858 of the Civil Code[6]. The administration of his worldwide estate will now be conducted under Monegasque law and any disputes arising from the administration of his estate (including the recovery, accounting and distribution of his assets) will be resolved in the Monegasque courts (the "**Monaco Estate Proceedings**"). As I explain below, the Monaco Estate Proceedings will necessarily result in the determination in Monaco of the rival claims to the disputed assets, including the issue of whether Mr Kazakov has an interest in those assets by virtue of his joint business activities with Mr Bourlakov.

f.   Between May 2019 and June 2020, Mrs Bourlakova made three criminal complaints in Monaco, as a civil party, alleging the offences of forgery, use of forgeries and attempted fraud in judgment[7] in connection with the allegedly forged documents in respect of which she also brings claims in the present proceedings. In her complaints, she also alleges that Mr Kazakov's business partnership is a fiction with the aim of reducing the assets available for liquidation of the matrimonial property regime. This is the subject of an

---

[6] [NJB1/104, 132]
[7] That is, reliance on forged documents in legal proceedings (in Monaco).

ongoing criminal investigation in Monaco (the "**Monaco Bourlakova Criminal Proceedings**"), which was joined with the Monaco Criminal Proceedings in May 2021.

15. **Fourth,** the appropriateness of these claims being resolved in Monaco has become even clearer following the death of Mr Bourlakov. Whilst Mr Bourlakov's death will affect various existing proceedings, the most important consequence is that his estate will be administered in Monaco. As I explain in detail below, this will inevitably require the courts in Monaco to undertake a process known as the recovery, liquidation and distribution of the estate. The courts in Monaco are competent to deal with the administration of Mr Bourlakov's assets worldwide because he was domiciled in Monaco at the time of his death. Indeed, the Kazakovs have already appointed a notary public in Monaco who has formally opened the estate and registered Mr Bourlakov's will before the Monaco courts.

16. The importance of the administration of Mr Bourlakov's estate in Monaco cannot be overstated. As I explain in detail below, the courts in Monaco will inevitably be required to make decisions relating to the recovery, liquidation and distribution of Mr Bourlakov's estate because there is no real prospect of a consensual resolution. The court will necessarily undertake, amongst others, the following steps:

    a. First, the identification, recovery and liquidation of the Bourlakov matrimonial property, because Mr Bourlakov's half share of such matrimonial property (under the Ukrainian concept of community property, which it has been common ground between Mr Bourlakov and Mrs Bourlakova applied to their marriage) will form part of his estate. This will, in turn, require the court to identify what assets formed matrimonial property; whether matrimonial property was misappropriated and wrongly transferred away by Mrs Bourlakova; what gifts have been made by Mrs Bourlakova out of the matrimonial property; and whether Mr Kazakov has an interest in any such property (because, to the extent of Mr Kazakov's interest, such assets will not form part of the matrimonial property).

b. Second, the identification of Mr Bourlakov's personal assets. This will, in turn, require determination of various issues as to whether Mrs Bourlakova held assets as nominee for Mr Bourlakov or whether he gifted assets worth over US$1 billion to her outright; whether (as Mrs Bourlakova alleges in these proceedings) the Kazakovs hold assets as nominee for Mr Bourlakov; and, again, the question of whether Mr Kazakov has an interest in property owned by Mr Bourlakov by virtue of their joint business activities.

17. If (as Mr Bourlakov contended and the Kazakovs contend) Mrs Bourlakova has misappropriated or improperly transferred assets in which Mr Bourlakov had an interest to others, including to Elena and Veronica, then the Monaco court will also be entitled to order the return of those assets (or payment of their value to the estate by way of damages) as part of the process of recovering Mr Bourlakov's estate before its distribution.

18. The courts in Monaco will, therefore, be called upon to determine the core issues which the Claimants are seeking to have determined in these proceedings, including (**i**) whether Mr Kazakov has an interest in the disputed assets by virtue of his joint business activities with Mr Bourlakov (which the Claimants allege in these proceedings is a fraudulent invention), and (**ii**) the value of the assets in which Mr Bourlakov is interested, which will necessarily require investigation of the assets and liabilities of the companies (some of which are said by the Claimants to result from forged documents).

19. In those circumstances, it would be far better for the courts in Monaco to determine the ancillary claims made in the present proceedings, if Mrs Bourlakova has any genuine desire to pursue such claims other than as a device for seeking the determination of issues relating to the disputed assets in England.

20. For all of the reasons which I have summarised above, Monaco is by far the most appropriate jurisdiction to hear the claims, given that the principal parties and the claims are intimately connected to Monaco. Further, if the Claimants were to bring their claims in Monaco, that would both enable the claims to be managed alongside the other

proceedings in Monaco (including those relating to Mr Bourlakov's estate) and avoid the risks associated with parallel proceedings, including additional costs and inconsistent judgments.

21. There would be no difficulty in the Claimants bringing their claims in Monaco. As I explain below, as a matter of Monaco private international law, proceedings could be brought by the Claimants against Mr Kazakov in Monaco because he is domiciled there and the Monegasque courts would then also have jurisdiction over any co-defendants to that claim.

22. However, Mrs Bourlakova brought her claims in England as an attempt to "forum shop". The English proceedings arise in the context of a dispute worth billions of dollars, yet the bulk of the proceedings concern a claim for only a few million pounds said to have been spent on pre-action costs (because Mrs Bourlakova chose to instruct lawyers in England, as well as in other jurisdictions). In reality, the tort claims are a vehicle for Mrs Bourlakova to try to have this Court determine certain issues which Mrs Bourlakova considers will help her in the substantive proceedings elsewhere, and principally in Monaco, relating to the division of the matrimonial property and/or concerning the entitlements to disputed assets.

23. Mrs Bourlakova seeks to have such issues resolved in England even though it is not, on any sensible view, the natural or most appropriate forum for such disputes to be resolved. The Claimants seek to justify bringing the claim in England because it has special "*skills and experience*" in dealing with complex international fraud, which apparently means that only it, rather than the courts actually dealing with the substantive disputes about the assets, are capable of properly investigating whether there has been an alleged fraud to deprive Mrs Bourlakova of her share of the matrimonial property. That is not an appropriate basis for the Court to exercise its jurisdiction, not least because it involves both an impermissible and unjustified comparison of the ability of different courts to resolve disputes.

24. It is also striking that, having issued the proceedings with the aim (as the Claimants concede) of seeking to prevent any of the Defendants commencing proceedings in

another forum, the Claimants have then taken nearly a year to serve proceedings on the Kazakovs. This is a further demonstration of the improper manner in which these proceedings have been brought in England as part of a strategy of interfering with the ability of Mr Bourlakov and the Kazakovs to pursue their claims to the disputed assets.

25. Accordingly, and as set out more fully below, it is the Kazakov Defendants' position that the English court should set aside the permission which the Claimants obtained to serve these proceedings out of the jurisdiction and should declare that it has no jurisdiction over the claims. In the alternative, the court will also be asked to set aside the extensions to the validity of the Claim Form, which would also bring an end to the proceedings against the Kazakovs.

## B.    THE CLAIMS

26. In these proceedings, Mrs Bourlakova alleges that Mr Bourlakov has adopted a fraudulent "*strategy*" with a view to "*minimising or even extinguishing*" her share of the Bourlakov family assets in the Monaco Divorce Proceedings, which are said to be worth billions of US Dollars.

27. When these proceedings were issued, the overarching dispute as to ownership of assets and questions as to the recovery and distribution of the Bourlakovs' assets were already the subject of the Monaco Divorce Proceedings and the Monaco Asset Transfer Proceedings. They were separately the subject of criminal complaints against Mrs Bourlakova in Monaco. One might have thought that Mrs Bourlakova would want to bring any further claims relating out of the same dispute in the same jurisdiction as those extant proceedings so that they could be managed together and conducted efficiently. That is exactly what she ought to have done.

28. As I have identified above, and as I explain in further detail in **Section G** below, the arguments in favour of these claims being brought in Monaco is even stronger following Mr Bourlakov's death, because issues relating to Mr Bourlakov's assets will be determined in Monaco as part of the administration of his estate.

29. Instead, the Claimants have decided further to complicate their disputes by opening another front in England. The other Defendants have been joined into these proceedings on the basis that they have all allegedly played some part in Mr Bourlakov's alleged strategy to reduce the pool of marital assets. The principal financial relief sought by the Claimants in their 211-paragraph Particulars of Claim (the "**POC**") arises form claims for what are described as 'damages' worth approximately £5m. Those claims are in fact an attempt to recover legal costs under the guise of a commercial fraud claim. Contrary to the impression given in the introduction to the POC, they are not claims for the alleged diminution in assets arising from Mr Bourlakov's alleged pursuit of any strategy: they are claims for the costs of trying to prove that Mr Bourlakov was engaged in such a strategy. Despite the lack of any particulars in the POC, it is apparent that, insofar as such costs have been incurred in England, they must relate to Mishcon de Reya's fees, which can only have been incurred after Mishcon de Reya were instructed in April 2019. Those fees must have been incurred either:

   a. in the context of the other ongoing foreign proceedings, in which case they should form part of the claim for costs in those proceedings; or

   b. in formulating these proceedings, in which case the claim is misconceived: a party cannot claim as damages the costs that it has incurred in preparing that very claim.

30. The POC contains only one claim for substantial damages that are not part of the claim for costs, at Section C3 of the POC. That is a claim under Panamanian law for some US$700m which is said to arise from an alleged dissolution of two Panamanian Foundations and misappropriation of two Panamanian companies.. As I explain in **Section E** below, the allegations against the Kazakovs in Section C3 of the POC are entirely speculative. In any event, it should be noted that (**i**) those claims have no connection with England whatsoever but are essentially brought on the basis they arise out of the same overall alleged fraud as the claim for legal costs, and (**ii**) no financial relief is sought against the Kazakovs in respect of this claim – the Claimants seek only declarations that any interest which the Kazakovs may have in the assets would be as nominee for Mr

Bourlakov (which will be an issue that needs to be resolved, in ascertaining what assets form part of Mr Bourlakov's estate, as part of the Monaco Estate Proceedings in any event), and (**iii**) no claims in respect of Section C3 are brought against the Panamanian Companies. In any event, this is an attempt to isolate one alleged misappropriation of Mrs Bourlakova's choosing from the broader disputes about entitlement to the disputed assets which will need to be resolved in Monaco.

## C.     JURISDICTION

31. These proceedings were commenced before the end of the Brexit transition period such that jurisdiction over the Kazakovs must be determined in accordance with Regulation 1215/2012 (the "**Brussels Recast Regulation**"). I understand that the starting point for this jurisdictional analysis is the relevant defendant's domicile (determined in accordance with the Brussels Recast Regulation, which effectively applies the law of the place of putative domicile).

### C.1     Domicile

32. The Claimants accept that the Panamanian companies are not domiciled in any EU Member State and, therefore, that jurisdiction to hear the claims against them is governed by the common law.

33. The Claimants do not advance any positive case as to where they say that the Kazakovs are domiciled, ostensibly on the basis that they do not have sufficient information about the relative amounts of time spent by them in each location. The Claimants say that they sought permission to serve out "on a precautionary basis". The Claimants' position is misconceived because it is not legitimate to seek permission on that basis: if a person is domiciled in an EU Member State then jurisdiction must be determined under the Brussels Recast Regulation; if they are not, jurisdiction must be determined under the common law rules. In fact, neither Mr Kazakov nor Mrs Kazakova are (or were at the relevant time) domiciled in any EU Member State. In the absence of a positive case from the Claimants (who bear the burden of establishing jurisdiction), and in circumstances where permission to serve out has been obtained on a basis which

necessarily assumes that the Kazakovs are not domiciled in an EU Member State, I will address the question of domicile briefly but reserve the right to respond to any case which the Claimants might subsequently advance.

34. The Claimants first sought leave to serve the Kazakovs in Estonia and Russia, on the basis that these are the countries in which the Claimants say they believed the Kazakovs spent time[8]. It does not appear, however, that the Claimants took any steps to serve them in Estonia or in Russia. The Claimants subsequently obtained permission to serve the Kazakovs in Monaco, which they eventually did (almost a year after the claim was issued) in June 2021.

35. The only EU Member State in which it has been suggested that the Kazakovs might be domiciled is Estonia. I am advised by Leon Glikman, a Vandeavokaat (sworn attorney in Estonia) and partner in the firm of Advokaadibüroo Glikman Alvin OÜ, that domicile would be determined in accordance with the provisions of §14(1) of the General Civil Law Act, which provides that the residence of a person is "*where he or she permanently or primarily lives*". The word "*primarily*" (in Estonian, "peamislt") has the sense of most of the time; for example, in Judgment of Tartu County Court dated 19 March 2018 no. 2-17-118332 and Judgment of the Tallinn Circuit Court dated 29.5.2020 no. 2-19-123941, "*primarily*" was interpreted to mean more than in any other place. Judgment of the Tartu Circuit Court dated 25.11.2018 no. 2-18-2866 shows that owning property in Estonia and visiting Estonia do not prove that a person is primarily resident in Estonia.

36. Applying these criteria, neither Mr Kazakov nor Mrs Kazakova were or are domiciled in Estonia.

37. As to Mr Kazakov:

   a. Mr Kazakov was born in Estonia in 1952, which was then part of the USSR. Mr Kazakov left Estonia in 1971 when he was 18 to study at the State University of Leningrad (*i.e.* St Petersburg) in Russia. He met his wife, Mrs Kazakova,

---

[8] Whiston-Dew 1, paras 72-73 [NJB1/16].

there and they married in 1975. He set up home with Mrs Kazakova in St Petersburg. Mr Kazakov lived in St Petersburg until he moved to Monaco.

b.  Mr Kazakov moved his primary residence to Monaco in 2019. The Kazakovs were granted Monaco residence permits on 13 January 2020.[9] They subsequently rented an apartment in Monaco and intend to purchase a property there (although this has been delayed by the pandemic).

c.  Mr Kazakov travelled extensively in early 2020, principally because, with Mr Bourlakov, he was taking steps to recover monies taken by Mrs Bourlakova as Mr Bourlakov's marriage broke down. In connection with the disputes, Mr Kazakov made several trips to Switzerland and the UK, as well as joining Mr Bourlakov on several trips to Latvia, Germany and Russia. However, this did not affect the fact that his primary residence was in Monaco. In any event, from 13 March 2020 (at around the time that many countries were being locked down due to the global pandemic) Mr Kazakov travelled to Monaco, where he stayed until 10 November 2020 (save for incidental business trips).

d.  Mr Kazakov has not lived in Estonia since he left in 1971. Although he owns three properties there (one which he inherited from his mother, and two which were purchased as investment properties), he spends only a few weeks in Estonia each year to visit relatives, generally during the holidays.

e.  At [NJB1/144-145] I exhibit a schedule ("the Kazakov Location Schedule") prepared by Mr Kazakov and Mrs Kazakova, which sets out where they were on each day in 2019 and 2020 together with the dates when they entered and left each country. This schedule was prepared to the best of their ability using a wide variety of sources (including travel records, photographs and mobile telephone messages) which indicate where they were on any particular day.

---

[9] Mr Kazakov's Monaco Residency Cards № TE 072105 Mr Kazakova's Monaco Residency Cards № TE 072106 [NJB1/140-143]

Each day has been included based on where they were at the beginning of that day. As regards Mr Kazakov, the schedule illustrates that from 2019-2020:

    i.   Mr Kazakov spent 339 days in Monaco, and a further 98 days between Germany, France and Monaco (i.e. approximately 60% of his time); and

    ii.  In contrast, Mr Kazakov spent only 96 days in Estonia spread across 10 trips (i.e. approximately 13%), consistent with him largely spending time with his family in Estonia during holiday periods, and on short business trips.

38. As to Mrs Kazakova:

    a.   Mrs Kazakova was born in Kerch, in the Crimea in 1955. She did not have any connection to Estonia before she met Mr Kazakov but obtained an Estonian passport as Mr Kazakov's spouse.

    b.   As I have explained above, the Kazakovs spent their married life in Russia, with visits to Mr Kazakov's family in Estonia from time to time. Mrs Kazakova intended to relocate from Russia to Monaco with her husband in 2020 and, like him, obtained a residence permit[10]. However, having stayed in Monaco for an initial period during February 2020, she returned to Russia and was then prevented from returning to Monaco, first by international travel restrictions imposed as a result of the pandemic and then her own ill health due to contracting COVID. Mrs Kazakova also spent two months in Estonia over the summer recuperating with family.

    c.   Whilst Mrs Kazakova during her marriage has made periodic visits to Mr Kazakov's family in Estonia, particularly in the summer, she has never regarded herself as residing in Estonia, does not speak the language, and has no connections there outside of her marriage.

---

[10] [NJB1/142-143]

    d.   Mrs Kazakova is now based in Monaco and intends it to become her permanent home going forward.

    e.   Referring again to the Kazakov Location Schedule [NJB1/145], it illustrates that during 2019-2020:

        iii.   Ms Kazakova spent 502 days in Russia (i.e. approximately 69% of her time);

        iv.   In contrast, Ms Kazakova spent only 135 days in Estonia (i.e. approximately 19% of her time) spread across 12 trips.

39. In light of the above, I believe that (judged at the time when the Claim Form was issued) Mr Kazakov lived permanently or primarily in Monaco and Mrs Kazakova lived permanently or primarily in Russia. On any view, they did not live 'permanently' or 'primarily' in Estonia and were therefore not domiciled there according to Estonian law. In circumstances where the Kazakovs were not domiciled in an EU Member State, I understand that the Brussels Recast Regulation provides that jurisdiction must be determined in accordance with the English common law rules.

## C.2    Common law jurisdictional regime in overview

40. As I have explained above, by virtue of the fact that they are not domiciled in an EU Member State, this Court's jurisdiction against each of the Kazakov Defendants must be determined in accordance with the Common Law rules. That appears to be accepted by the Claimants. The burden is upon the Claimants to establish that:

    a.   the Claimants have much the better of the argument that each of their claims falls within one of the jurisdictional 'gateways';

    b.   there is a serious issue of fact or law which should be tried; and

    c.   England is the 'proper place' to bring the claim in that it is clearly or distinctly the most appropriate forum.

41. The jurisdictional gateways relied on by the Claimants are:

d. The PD6B §3.1(9) tort gateway: a claim is made in tort where: (**i**) substantial damage was sustained (or will be sustained) within the jurisdiction as a result of the alleged wrong ("**Limb (i)**"); or (**ii**) the damage which has been or will be sustained resulted from substantial and efficacious acts committed (or likely to be committed) within the jurisdiction ("**Limb (ii)**"). The Claimants contend that the claims against the Kazakovs set out in POC Sections A and B fall within the tort gateway.[11]

e. The PD6B §3.1(4A) closely connected facts gateway: a claim is made against the defendant in reliance on one or more of paragraphs PD6B §3.1(2), (6) to (16), (19) or (21), and a further claim is made against the same defendant which arises out of the same or closely connected facts. In this case, the only relevant paragraph is PD6B §3.1(9), the tort gateway. The Claimants therefore contend that the claims made against Mr Kazakov and Mrs Kazakova in Section C3 of the PoC arise out of the same or closely connected facts as the claims made against them in Sections A and B of the POC (insofar as those claims can themselves be shown to fall within the tort gateway).[12]

f. The PD6B §3.1(3) necessary or property party gateway: a claim is made against a person (an anchor defendant) in respect of which there is a real issue which it is reasonable for the Court to try, and the defendant is a necessary or proper party to that claim. The Claimants allege that each of the Kazakov Defendants is a necessary or proper party to the claims made against the Third Defendant, Leo Holding (an English Company) and the Second Defendant, Mr Tribaldos (domiciled in Switzerland but purportedly served in England under s.1140 of the Companies Act 2006, although the validity of service on Mr Tribaldos is

---

[11] Whiston-Dew 1 at paras. 183(a); 203(a); 205; 212(a) and 214 [NJB1/39, 43-45]. Whilst some of the claims in Sections B1 and B2 of the POC are said by Ms Whiston-Dew to be directed against the Tenth and Eleventh Defendants (Whiston-Dew 1, paras. 226 and 232), the Claimants do not rely on the 'tort' gateway as the basis for service out on those Defendants. No relevant claims for damages are pleaded against the Tenth and Eleventh Defendants and it appears that the claims in Sections A and B are only relevant to them insofar as the Claimants seek declarations relevant to them. Accordingly, I do not address this gateway *vis-à-vis* those Defendants in this witness statement. To the extent that it becomes necessary, I will do so in reply evidence.

[12] Whitson-Dew 1 at paras. 216 and 205. [NJB1/46]

disputed).[13]   The Claimants also seem to suggest that the Panamanian Companies are each a necessary or proper party to the claims against a number of non-domiciled Defendants (Mr Bourlakov and the Kazakovs).[14]   As the Claimants seem to recognise, those Defendants cannot act as an 'anchor defendant' if this Court's jurisdiction over them is established only under the necessary or proper party gateway.

## D.     POC SECTIONS A & B – THE TORT GATEWAY (PD6B §3.1(9))

42.   The Claimants rely on the tort gateway for the purposes of their claims against the Kazakovs in Sections A and B of the POC.  Before considering the tort gateway, and the tests which the Claimants bear the burden of satisfying, I make the following comments about the tort claims against the Kazakovs.

43.   **First**, the only basis on which the tort claims are advanced against Mrs Kazakova is that she allegedly knowingly made false representations to Mrs Bourlakova at a meeting in London on 5 April 2018 (POC at paras. 178 and 179), which are said to have been designed to mislead Mrs Bourlakova as to the value of Mr Bourlakov's assets and to pressurise her into accepting a reduced sum as part of a divorce settlement with Mr Bourlakov (POC at paras. 35-40).  Similarly, the only positive act alleged against Mr Kazakov is that he allegedly knowingly made false representations to Mrs Bourlakova at the same meeting in London in April 2018 and in text messages sent in December 2018 for the same purposes (POC at paras. 176 and 177(a)).

44.   The Claimants' own case is that these alleged false representations were not effective. The only 'losses' said to have been suffered as a result of the alleged false representations are the unparticularised legal costs said to have been incurred by Mrs Bourlakova in connection with investigating the truth of the representations.  The Claimants' case is that those costs have been incurred in order to avoid the 'risks' that:

(i) the representations <u>may</u> be effective in allowing Mr Bourlakov to conceal assets

---

[13] Whitson-Dew1 at paras. 207, 216, 228, 235 and 239. [NJB1/44, 46, 48, 50]
[14] Whitson-Dew 1 at paras. 229-230; 234-235 and 240-241. [NJB1/50]

(although exactly what that risk was, and exactly how Mr Bourlakov may have sought to do so, is unpleaded); and (**ii**) Mr Kazakov <u>may</u> bring claims against her (POC at paras. 73 and 74).

45. **Second**, insofar as the tort claims are based on an alleged unlawful means conspiracy, the Claimants' own case appears to allege that the conspiratorial agreement was concluded in Zurich (POC at para. 69). Many of the allegedly wrongful acts, such as the creation of allegedly forged documents, are said to have occurred outside the jurisdiction (see *e.g.* Section B1 of the POC). Further, as is clear from, *inter alia,* Section B1 of the POC, the crux of the alleged fraud is Mr Bourlakov's reliance on allegedly false documents in extant proceedings in other jurisdictions, principally the Monaco Divorce Proceedings. There is no allegation that the Kazakovs were involved in the creation of the relevant documents (POC at paras. 75 to 89 and 91 to 95). Instead, all that is said is that Mr Bourlakov *"discussed"* his plans with Mr Kazakov and that Mr Kazakov is alleged to have agreed to assist him (POC at paras. 90 and 96).

46. **Third**, the only loss alleged is c. £5 million in respect of legal and other costs relating to the alleged fraud, which it will be submitted are irrecoverable as damages in any event. On the Claimants' own case, that alleged fraud was not effective. The Claimants have apparently chosen to incur (part of) these alleged costs of investigating an alleged attempted fraud in England rather than in any other jurisdiction.

**D.1**   **Limb (i): substantial damage within the jurisdiction**

47. The first way in which the tort gateway could be satisfied is by the Claimants proving that damage has occurred within the jurisdiction of the English Court.

48. In the present case, the Claimants allege that unparticularised "*investigation costs*" have been incurred in *"multiple jurisdictions"* in respect of acts said to have taken place almost exclusively outside of England (POC at paras. 185 and 195). The only alleged loss said to have been sustained in England is stated by the Claimants at paragraphs 74 and 169 of the POC *viz.* unparticularised sums said to have been "*incurred*" by Mrs Bourlakova to unidentified "*legal and other professionals*" in England for the purpose

of demonstrating that representations made during meetings in London were allegedly false (presumably for the predominant purpose of deployment in foreign proceedings). The Claimants have made no attempt to particularise those alleged losses, still less to demonstrate that those alleged losses are in fact attributable to investigation of the misrepresentations for which it is alleged that the Kazakovs are responsible as distinct from costs involved in assisting Mrs Bourlakova with the overall dispute (which would have been incurred irrespective of the alleged misrepresentations).

49. In the circumstances, and for reasons which will be developed in argument, the Kazakovs will contend that the Claimants have not established a good arguable case that this Limb (i) applies. In particular:

    a. The Claimants have not demonstrated that the damage is recoverable. In particular, to the extent that such costs would be recoverable as costs in proceedings in this jurisdiction, they are irrecoverable as damages.

    b. The damage suffered in this jurisdiction must be shown to be 'substantial' or 'significant'. It is necessary for the Court to consider the damage as a whole in order to determine whether the damage suffered in any one jurisdiction can overcome the 'substantial' threshold. In circumstances where Mrs Bourlakova claims to be the victim of a fraud which has (or threatens to) deprive her of assets worth in the order of billions of US Dollars, and which she says was targeted at the Monaco Divorce Proceedings, the legal costs incurred in England cannot be regarded as 'substantial' or 'significant'. That is particularly so where, even on the Claimants case, such costs have in fact been incurred "*in multiple jurisdictions*" (and the Claimants have provided no breakdown of the costs incurred in England as compared with other jurisdictions). Were it otherwise, any claimant could obtain jurisdiction in England for a fraud anywhere in the world simply by choosing to instruct English lawyers to conduct pre-action investigations of the alleged fraud and then seeking to recover those costs as part of the action.

50. For at least the reasons set out above, I do not believe that the Claimants can satisfy Limb (i) of the tort gateway.

**D.2**     **Limb (ii): substantial and efficacious acts within the jurisdiction**

51. The second way in which the tort gateway could be satisfied is by the Claimants proving that recoverable damage has resulted from 'substantial and efficacious acts' committed within the jurisdiction. It is possible that 'substantial and efficacious acts' may have been committed in more than one jurisdiction, but it is essential for Limb (ii) of the tort gateway that such acts are also committed in England.

52. As I have explained at paragraphs 43 to 44 above, the only positive acts said to have been committed by the Kazakovs were: (**i**) allegedly false representations said to have been made by both Mr Kazakov and Mrs Kazakova to Mrs Bourlakov at a meeting in London in April 2018; and (**ii**) allegedly false representations said to have been made by Mr Kazakov to Mrs Bourlakova by text message in December 2018. Even on the Claimants' own case, the alleged false representations were not effective and were not relied on by Mrs Bourlakova. These are not 'substantial and efficacious' acts occurring within the jurisdiction and, as I have explained above, they do not in any event give rise to recoverable loss.

53. As to the conspiracy claim, I understand that the essence of the tort of conspiracy is an agreement between the alleged conspirators. On the Claimants' own case, that alleged agreement was formed in Zurich (POC at para. 69). Further, insofar as it is relevant, the steps which are said to have been taken to implement the alleged conspiracy are said to have been taken outside of England, and principally directed at the Monaco Divorce Proceedings. Again, I do not believe that the Claimants can point to any 'substantial and efficacious acts' within this jurisdiction which would satisfy Limb (ii) of the tort gateway.

54. For at least the reasons set out above, I do not believe that the Claimants can satisfy Limb (ii) of the tort gateway. In the circumstances and coupled with their failure to

satisfy Limb (i), the Claimants are unable to rely on the tort gateway as a basis for serving the Kazakovs out of the jurisdiction.

### D.3    Serious issue of fact or law

55. Even if the Claimants were able to discharge the burden of proving that the tort gateway is satisfied, they would also need to prove that there is a serious issue to be tried in respect of the tort claims against the Kazakovs.

56. The Claimants' primary case is that English law applies and that the Kazakovs are liable for deceit and unlawful means conspiracy (POC para 169). Even on the basis of the Claimants' own pleaded case, I do not believe there is a serious issue to be tried. Inducement is an essential part of the cause of action in deceit. If there is no inducement, there is no cause of action. The Claimants do not plead any inducement and, on the contrary, as I have explained at paragraphs 43 to 47 above, their positive case is that Mrs Bourlakova did not rely on the allegedly false representations, which she apparently considered to be false when those representations were made. Accordingly, the Claimants' own pleaded case discloses no cause of action and there is no serious issue to be tried.

### D.4    Conclusion on the tort gateway

57. For at least the reasons set out above in this **Section D** of my witness statement, I do not believe the Claimants can discharge the burden upon them to prove that the tort gateway is satisfied or that there is a serious issue to be tried.

58. If the Claimants suggest that the tort gateway can be used to pursue their claims for declarations (including as regards the existence of a partnership, that documents are forgeries or shams, or that the Kazakovs hold interests as nominees for Mr Kazakov, or otherwise) or for an anti-suit injunction then the Claimants' case is denied. That relief does not arise from a claim in tort and, therefore, cannot fall within this gateway.

59. If, however, the Claimants are able to rely on the tort gateway, it will be apparent that they are relying on limited (and, on their case, inefficacious) acts and limited (and, in

the context of this case, comparatively trivial) alleged losses in England. Those are relevant factors when considering, as I explain in further detail in **Section G** below, why England is not the proper place to bring these claims.

**E.** **POC SECTION C3 – THE CLOSELY CONNECTED FACTS GATEWAY (PD6B §3.1(4A))**

60. I understand that the 'closely connected facts' gateway applies where a claim is made against a defendant in reliance on another relevant gateway (here, the tort gateway) and a further claim is made against the same defendant which arises out of the same or closely connected facts. In the present case, the Claimants rely on the 'closely connected facts' gateway for the purposes of their claims against the Kazakovs in Section C3 of the POC, which the Claimants say arise out of the same or closely connected facts as the claims made against the Kazakovs in Sections A and B of the POC (insofar as those claims themselves fall within the tort gateway).

61. In order to satisfy this gateway in respect of the claims against Mr Kazakov, the Claimants must prove that the claims against Mr Kazakov in Section C3 are closely connected to another claim against Mr Kazakov which falls within the tort gateway. Similarly, in order to satisfy this gateway in respect of the claims against Mrs Kazakova, the Claimants must prove that the claims against Mrs Kazakova in Section C3 are closely connected to another claim against Mrs Kazakova which falls within the tort gateway. In other words, it is irrelevant whether the claims against Mr Kazakov in Section C3 are closely connected to claims against Mrs Kazakova (or any other Defendant) in Sections A and B (and *vice versa*); the claims must be closely connected to other claims against the same defendant. Further, it is not sufficient that the Section C3 claims are closely connected to another claim which has itself been permitted under either the closely connected facts gateway or the necessary or proper party gateway.

62. As a preliminary matter, the Claimants must therefore show that the claims against each of the Kazakovs in Sections A and B: (**i**) are within the scope of the tort gateway; and (**ii**) raise a serious issue to be tried. For the reasons I have explained above, I do not

believe that the Claimants can discharge this burden. The Claimants' reliance on the closely connected facts gateway therefore falls at the first hurdle.

63. Even if the Claimants do succeed in showing those matters, they must also establish (to the standard of a good arguable case) that the claims against each of the Kazakovs in Section C3 of the POC are closely connected to the relevant claims in Sections A and B of the POC. For at least the reasons I explain below, I do not believe that the Claimants can satisfy this requirement. Before turning to that analysis, I believe it will assist the Court if I provide a brief overview of the claims in Section C3.

64. The factual background to the claims in Section C3 (as it appears from the POC) is as follows:

   a. Mrs Bourlakova was a discretionary beneficiary of two Panamanian foundations, known as "**Merenguito**" and "**Tribaltine**". Merenguito was the owner of the shares in a Panamanian company known as "**Edelweiss**". Tribatline was the owner of the shares in another Panamanian company known as "**Columbus**". Edelweiss and Columbus are alleged to have had significant assets worth well over US$800 million (POC at para. 146).

   b. In around May 2018 Columbus and Edelweiss are said to have been transferred to two different Panamanian foundations (known as "**Anahill**" and "**Hemaren**"). Mrs Bourlakova is not a beneficiary of either of those foundations, which the Claimants allege are controlled by Mr Bourlakov (POC at para. 136(b)).

   c. Whilst he was alive, Mr Bourlakov is said to have had *de facto* control over Edelweiss and Columbus (POC at para. 137). Although the Claimants do not know who the beneficiaries of Anahill and Hemaren are, they allege that any such beneficiary is merely acting as nominee for Mr Bourlakov (POC at para. 138).

65. It is in this context that serious allegations of fraud and criminality under Panamanian law (which the Claimants say is the governing law of the claims made in Section C3 of

the POC) are made against the Kazakovs, including participation in *"misappropriation"* of assets (POC at para. 139). This is founded on the allegations that: (**i**) Mrs Kazakova may have been appointed as a protector of Merenguito and/or Tribatline in order to facilitate the alleged dissipation of Edelweiss and/or Columbus (POC at paras. 136(a) and 140), which the Claimants appear to accept would fall within a binding arbitration agreement contained in the regulations of Merenguito and Tribatline and so therefore do <u>not</u> bring a claim against Mrs Kazakova in her capacity as an alleged protector of those foundations; and (**ii**) each of the Kazakovs may have been nominated as a beneficiary of Anahill and/or Hemaren as Mr Bourlakov's nominee in order to facilitate the alleged dissipation of Edelweiss and/or Columbus (POC at paras. 140 and 141).

66. The basis for these allegations is said to be the Kazakovs' alleged *"willingness to participate"* in Mr Bourlakov's alleged schemes because of the allegedly false representations made at the meeting in London in April 2018 (which appears to be a transparent attempt to tie events in Panama to unconnected events in London) and an entirely speculative allegation that Mr Bourlakov agreed to remunerate the Kazakovs for their participation, which is said to have involved a criminal offence in Panama (POC at paras. 140-141 and 199). These serious allegations have been made without any supporting particulars, and apparently without any material (still less reasonably credible material) which would support a plea of fraud.

67. It is also important to appreciate that the only relief sought in respect of the Section C3 claims against the Kazakovs is declaratory relief as to the beneficial ownership of Anahill and Hemaran. Although the Claimants seek substantial damages against a range of other Defendants, no such relief is sought against the Kazakovs (POC at paras. 197-200).

**E.1     There are no "closely connected facts"**

68. The Claimants' argument is that the claims in Section C3 of the POC arise out of facts which are closely connected with the claims in Sections A and B of the POC. I do not believe that is correct for at least the following reasons:

    a. The claims in Section C3 of the POC are factually discrete from the claims in Sections A and B of the POC. This is apparent even from the structure of the Claimants' own pleaded case, with Edelweiss and Columbus only entering into the narrative in Section C rather than earlier in respect of any of the facts and matters alleged in Sections A and B. Further, the factual arguments and lines of enquiry in Section C3 are different from those in Sections A and B: Section C3 relates solely to the beneficial ownership of Panamanian entities, which is not in issue elsewhere in the POC. The wrongdoing alleged in Section C3 also depends on an allegation that payments were made by Mr Bourlakov to the Kazakovs to induce them to act in breach of the Regulations of Tribatline and Merenguito (Mrs Kazakov) and/or to act as his nominee beneficiaries of Anahill and/or Hemaran (each of the Kazakovs) in breach of Panamanian criminal law. That is discrete wrongdoing from that alleged in Sections A and B of the POC

    b. The claims in Section C3 are also legally discrete from the claims in Sections A and B. They are said by the Claimants to be governed by Panamanian law (POC at para. 197) and involve the interpretation of Panamanian documents (being the regulations of the various Panamanian entities) and the duties of a protector of a foundation under Panamanian law. These legal enquiries are closely interwoven with the facts pleaded in Section C, and the factual enquiries to which they give rise. By contrast, the claims advanced in Sections A and B are said to be governed by either English law or Monegasque law (POC at paras. 169 and 170) and facts alleged in those Sections have nothing to do with the legal enquiries raised by Section C3 at all.

69. On any view therefore, even if there is some common 'background' between the Claims in Sections A and B on the one hand and the claims in Section C on the other (which is

not accepted), the claims in Section C3 will undoubtedly involve significant additional factual and legal investigation which take those claims outside this gateway.

## E.2    Serious issue of fact or law

70. As I have explained at paragraphs 60 to 67 above, the claims advanced against each of the Kazakovs in Section C3 are purely speculative.  In particular, there are no primary facts pleaded to support the inference that (in breach of Panamanian criminal law) each of the Kazakovs was remunerated by Mr Bourlakov for their alleged participation in an allegedly fraudulent scheme relating to these foundations. In the circumstances, I believe that the Claimants' claims against the Kazakovs in Section C3 are inadequately pleaded and are liable to be struck out.  There is therefore no serious issue to be tried.

## E.3    Conclusion on the closely connected facts gateway

71. For at least the reasons set out above in this **Section E** of my witness statement, I do not believe the Claimants can discharge the burden upon them to prove that the closely connected facts gateway is satisfied or that there is a serious issue to be tried.

72. In any event, as I explain in further detail in **Section G** below, I do not believe that England is the proper place to bring these claims.  These claims have no connection whatsoever with England, but form part of the much broader set of claims to the disputed assets and allegations of misappropriation, which ought properly to be (and will be) determined in Monaco.

## F.    THE NECESSARY OR PROPER PARTY GATEWAY (PD6B §3.1(3))

73. The final gateway relied on by the Claimants is the 'necessary or proper party' gateway. I understand that this gateway requires the Claimants to prove that:

  a.  the claims against the anchor defendant involve a real issue to be tried;

  b.  it is reasonable for the Court to try that issue;

  c.  the foreign defendant is a necessary or proper party to those claims.

74. Insofar as the claims against the Kazakovs are concerned, the anchor defendants are said by the Claimants to be Leo Holding and Mr Tribaldos (Whiston-Dew 1 at paras. 207-209 and 216-218[15]).  Insofar as the claims against the Panamanian companies are concerned, the anchor defendants are said by the claimants to be: (**i**) Leo Holding and Mr Tribaldos; (**ii**) Mr Bourlakov; and (**iii**) the Kazakovs (Whiston-Dew 1 at paras 229-230, 234-235, 240-241)[16].  I explain why the Claimants disagree that this gateway is available by reference to each of the alleged anchor defendants in turn below.

75. In addition to those arguments relating to the claims against each of the proposed 'anchor defendants', the Kazakov Defendants will also make the overarching argument that it is not reasonable for the Court to try the issues raised against any of those defendants because, it is to be inferred, the real purpose of seeking the resolution of such issues is to obtain a judgment from the English court which can then be deployed in foreign proceedings in which the 'real' dispute (over the ownership of the disputed assets) will be determined.  It is not reasonable to use the English court to obtain a decision, let alone a non-binding advisory opinion, on certain questions for the real purpose of influencing the determination of foreign proceedings.

## F.1    Leo Holding

76. Leo Holding is a company incorporated in England.  I understand that at the relevant times it acted as a holding company for Leo Trust, which is an operating professional services provider in Switzerland.  The claims against Leo Holding are poorly particularised and generally do not involve any allegations that Leo Holding itself did anything (there is a rote assertion that Leo Trust acted with Leo Holding's knowledge and permission).  It can be inferred that Leo Holding has been sued for the purpose of establishing an anchor defendant within the jurisdiction, which is a relevant factor when considering whether England is the proper forum to hear this claim.

77. I understand that Leo Holding has applied to strike out the claims against it.  The Kazakov Defendants will rely as necessary on the arguments advanced by Leo Holding

---

[15] [NJB1/44-46]
[16] [NJB1/48-50]

in its application for the purpose of arguing that Leo Holding is not an anchor defendant for the claims against the Kazakov Defendants because there is no serious issue to be tried and/or because it is not reasonable for the Court to try any such issue. I do not repeat those arguments here.

**F.2    Mr Tribaldos**

78. I understand the Claimants' case to be that jurisdiction can be established over Mr Tribaldos because he was served at an address within the jurisdiction in accordance with s.1140 of the Companies Act 2006.[17] That provision provides (among other things) that a document may be served on a director by leaving it at, or sending it by post to, any address shown as a current address in relation to the director on the companies register at Companies House.

79. I understand that Mr Tribaldos has filed an application seeking:

a. a declaration that there has not been valid service of the Claim Form and Particulars of Claim on him, alternatively a declaration setting aside service of the Claim Form and Particulars of Claim; or

b. in the alternative, a declaration that the Court has no jurisdiction to hear the claims against him.

80. In broad overview, I understand that Mr Tribaldos' application is based on arguments that:

a. Mr Tribaldos has not been properly served with proceedings and the English Court is not seised, on the basis that s.1140 of the Companies Act 2006 does not permit service of originating process out of the jurisdiction when the person to be served is domiciled outside of the jurisdiction and, further or alternatively,

---

[17] Whiston-Dew 1 at para. 67(b). [NJB1/14]

that even if s.1140 of the Companies Act 2006 does provide a mechanism for service, it does not confer jurisdiction on the English Court;[18] and

b. even if Mr Tribaldos has been served, the Lugano Convention (and not s.1140 of the Companies Act 2006) governs the allocation of jurisdiction in this case, and only the Swiss courts have jurisdiction over the claims against Mr Tribaldos under the Lugano Convention.[19]

81. The Kazakov Defendants will rely as necessary on the arguments advanced by Mr Tribaldos in his application for the purpose of arguing that Mr Tribaldos is not an appropriate anchor defendant for the claims against the Kazakov Defendants. I do not repeat those arguments here.

## F.3    Mr Bourlakov

82. The Claimants appear to rely on Mr Bourlakov as an anchor defendant for the purposes of their claims against the Panamanian Companies (Whiston-Dew 1 at paras. 229(b), 234(b), 240(b)[20]).

83. The Panamanian Companies reserve their position as to whether Mr Bourlakov can possibly qualify as an anchor defendant given that, at present, the proceedings cannot continue against him. The Panamanian Companies have requested, and await, the Claimants' proposals as to how (if at all) the claim will now proceed against the First Defendant.

84. In any event, in order for Mr Bourlakov to be a suitable anchor defendant, he must have been served out of the jurisdiction otherwise than in reliance on the 'necessary or proper party' gateway. In the context of the present claim, the relevant gateways on which the Claimants rely against Mr Bourlakov are the tort gateway and the closely connected facts gateway (Whiston-Dew 1 at para. 183[21]). As a preliminary matter, the Claimants

---

[18] Second witness statement of Alastair David Shaw dated 25 February 2021 at para. 26. [NJB1/154]
[19] Second witness statement of Alastair David Shaw dated 25 February 2021 at para. 18. [NJB1/151]
[20] [NJB1/48-50]
[21] [NJB1/39]

must therefore show that the claims against Mr Bourlakov in Sections A and B of the PoC: (**i**) are within the scope of the tort gateway; and (**ii**) raise a serious issue to be tried. The Panamanian Companies will rely on any jurisdiction challenge which is brought on behalf of the First Defendant once the proceedings have been regularised. Pending that, the Panamanian Companies will say that the claims against Mr Bourlakov do not satisfy those requirements for materially identical reasons as have been set out above in respect of the equivalent claims against Mr Kazakov.

**F.4**    **The Kazakovs**

85. The Claimants' also appear to rely on the Kazakovs as anchor defendants for the purposes of their claims against the Panamanian Companies (Whiston-Dew 1 at paras. 229(c), 234(c) and 240(c)[22]) . In particular, the Claimants' position appears to be that each of the Panama Companies is a necessary or proper party to the claims advanced against the Kazakovs in Sections A and B of the POC.

86. This argument will only be available if, contrary to the arguments set out in **Sections D and E** of my witness statement, the Kazakovs can be served in respect of the claims contained in Sections A and B of the PoC in reliance on some gateway other than the necessary or proper party gateway.

87. In any event, the Panamanian Companies are not necessary or proper parties to the claims against the Kazakovs in circumstances where those companies are not themselves alleged to be involved in the alleged deceit or conspiracy and no substantive claims are brought against them.

**F.5**    **Conclusion on the necessary or proper party gateway**

88. For at least the reasons set out above in this **Section F** of my witness statement, I do not believe the Claimants can discharge the burden upon them to prove that the necessary or proper party gateway is satisfied.

---

[22] [NJB1/48-50]

89. Furter, if the Claimants suggest that the necessary or proper party gateway can be used to pursue their claims for declarations or for an anti-suit injunction then the Claimants' case is denied. The Kazakov Defendants are not proper parties to the (tortious) claims against the proposed anchor defendants for the purposes of pursuing claims for declaratory relief (*e.g.* as to ownership of assets) or anti-suit injunctions.

90. In any event, as I explain in further detail in **Section G** below, I do not believe that England is the proper place to bring these claims. If jurisdiction is only established on the basis of the necessary or proper party gateway (*i.e.*, the claim against the Kazakov Defendants otherwise has no connection with England) then that is an important factor in considering whether England is the proper place for the claim to be heard. That is particularly so if the anchor defendant has a relatively limited role in the dispute (*e.g.*, Leo Holding).

## G.    ENGLAND IS NOT THE PROPER PLACE TO BRING THE CLAIMS

91. Even if the Claimants can bring their claims within one of the gateways for service out, they must also establish that England is the 'proper place' to bring each claim. I understand that this means that the Claimants must prove that England is 'clearly or distinctly' the most appropriate forum in which the claims should be heard. I understand that, very broadly, the English Court will examine the factors which link the claims to England with those which link the claim to other available jurisdictions. The existence of proceedings in other jurisdictions will be a significant factor in this analysis.

92. For at least the reasons I set out below, I do not believe that England is the proper place to bring any of the claims against the Kazakov Defendants.

93. Although it is not necessary for the Kazakovs to demonstrate which forum is more appropriate, the proper forum to determine any such claims is Monaco.

94. The Claimants could bring their claims against all the defendants to these proceedings in Monaco because (**i**) the courts in Monaco have jurisdiction over Mr Kazakov because

he is domiciled there,[23] and (**ii**) those courts also have jurisdiction over all co-defendants to a claim, provided the claim was not filed with the sole purpose of bringing a defendant outside the jurisdiction of his domicile.[24] The Claimants' argument to the contrary[25] appears to be based on the misapprehension that it would be necessary to join this claim to some existing proceedings in Monaco, whereas the correct position is that the Claimants could simply commence the equivalent of this claim as a separate action (which, as I explain below, the Monegasque courts could then manage alongside the existing proceedings).

95. The question of proper forum is largely one for argument. Therefore, whilst I summarise the Kazakovs' case and set out the evidence on which they will rely in this section, that is without prejudice to the arguments which will be deployed at the hearing of this application.

## G.1    Connecting factors generally

96. The parties and this dispute have only a very limited connection with England. On the other hand, both the parties and the dispute have much closer connections to Monaco. In particular:

   a. As I explained at the outset of this statement, I believe that the Claimants' claims are fundamentally concerned with improving Mrs Bourlakova's position in the overarching dispute concerned with establishing the parties' entitlements to assets worth billions of US Dollars. The rival claims to the assets and the disputes arising in that regard have nothing whatsoever to do with England. To the extent that the disputes arise from the marriage, Mr Bourlakov and Mrs Bourlakova lived together in Monaco and the law governing the matrimonial property regime is Ukrainian law; the marriage has nothing whatsoever to do with England. To the extent that the disputes arise from the business relationship between Mr Bourlakov and Mr Kazakov, that business relationship

---

[23] Article 4 of Law 1.448 of the 28 June 2017 relating to private international law (the "**PI Law**"). [NJB1/169]
[24] Article 5 of the PI Law. [NJB1/169]
[25] Whiston-Dew 1 paras. 146 and 165. [NJB1/30, 35]

related primarily to activities in Russia and, most recently, both Mr Bourlakov and Mr Kazakov had lived in Monaco; again, their relationship has nothing whatsoever to do with England.  So far as the Kazakovs are aware, none of the assets (and, certainly, no significant assets) are located in England, whereas there are significant disputed assets – including those which are now in judicial escrow pending resolution of Mr Kazakov's claims – in Monaco.

b.  The disputes about the interests of Mrs Bourlakova and Mr Kazakov in the disputed assets should be determined where the claims to the assets arise (which, as I explain below, will now form part of the administration and liquidation of Mr Bourlakov's estate in Monaco) rather than through the back door by way of an artificial tort claim for pre-action legal costs which represent only a tiny fraction of the value of the disputed assets (and, indeed, the pre-action legal costs will be a fraction of the costs spent in these proceedings supposedly to recover those costs).  This claim is nothing more than a hook to obtain determination of issues so that, in the event of a favourable judgment, Mrs Bourlakova can deploy this Court's judgment in support of other extant and future proceedings relating to the disputed assets.  This is the clearest possible example of impermissible forum shopping.

c.  The pursuit of these claims in England is particularly inappropriate in circumstances where the Claimants appear to accept that any determination of the claims to assets would not be binding (see paragraph 104 below), most importantly in Monaco where the claims to assets will have to be determined in due course, such that all the issues would likely be re-litigated anyway.  It is not appropriate to use (supposedly substantive) proceedings in this jurisdiction as a means of obtaining an advisory opinion (including on matters of fact and foreign law) for another court, nor as a back-door for obtaining disclosure for use in other proceedings.

d.  Each of the Claimants is domiciled and resident outside England.  They do not have any significant connection to the jurisdiction: Mrs Bourlakova lived in

Monaco for many years but has recently moved to Canada; H1 is a company incorporated in the Isle of Man; and Greenbay is a company incorporated in the Seychelles.

e. The Kazakovs are domiciled outside England and have no personal connection with the jurisdiction. This true of all of the defendants, save for Leo Holding, as to which:

i) Leo Holding is, as its name suggests, simply a holding company which, insofar as relevant to the present claim, held the shares in Leo Trust, which is a Swiss professional services business (which business is said to have participated in the alleged fraud).

ii) Save for its place of incorporation, Leo Holding appears to have no significant connection with England. For example, to the best of my knowledge, Leo Holding does not have an office in England and the only English directors it had[26] were not employed in the business but independent professionals engaged to provide corporate services.

iii) In any event, the only particular conduct of Leo Holding relied upon by the Claimants relates to the removal of directors of Leo Trust. On the Claimants' own case, the removal of those directors takes place at a late stage in the narrative and is only said to be related to the concealment of the alleged wrongdoing (POC at para 7).

iv) Leo Holding has been sued for the purposes of establishing an 'anchor defendant' in order to obtain jurisdiction against third parties. I understand that this is a relevant factor in the Court's exercise of its discretion to permit service out, and that it militates in favour of refusing permission.

---

[26] P. Goldwin (a British accountant) was a director of Leo Holding from Dec 2012 to Feb 2020 and D Miller (a British solicitor) was a director from Jan 2015 to Feb 2020 (source - Companies House). [NJB1/197]

f.   The principal protagonists have close connections with Monaco.  Mr Bourlakov was, until his death, resident and domiciled in Monaco.  Mrs Bourlakova was resident in Monaco throughout the relevant period and remains domiciled in Monaco.  Veronica (and her husband, Gregory Gliner, who has played a significant role in events) are domiciled in Monaco.  Mr Kazakov has been domiciled in Monaco for several years.  Many of the relevant companies were managed by the Family Office, which operated principally from offices in Monaco, and were administered at the relevant time by Equiom, a corporate service provider based in Monaco.

g.   Whilst one or two meetings took place in England, the alleged conspiracy is said to have been hatched in Zurich and it appears that many of the allegedly wrongful acts (such as the alleged creation of forged documents) occurred outside the jurisdiction.

h.   Further, the claims appear to be concerned principally with: (**i**) the Monaco Divorce Proceedings, and the consequent division of matrimonial property and potential settlement, all of which arose out of the marriage of the Bourlakovs (who had their common domicile in Monaco); (**ii**) the operation of the Family Office based in Monaco; and (**iii**) the dealings with fiduciaries and corporate service providers operating in Switzerland and Monaco.  None of this is connected to England.

i.   There is no "Cambridgeshire" factor in favour of the English courts, which would only be relevant (if at all) if there had been an analogous action in England.  To the contrary, the Claimants are simply making an (impermissible) comparison of the supposed quality of justice in different courts by inviting this Court to use its special *"skills and experience"* to *"grab this case by the scruff of the neck"* in circumstances where, the Claimants say, the courts in the other jurisdictions (a number of which have been seised by Mrs Bourlakova herself) are either too slow or lack adequate procedures.  To the extent that there is any "Cambridgeshire" factor, it plainly operates in favour of Monaco given that:

i)     the Monegasque courts have been investigating the same or closely related issues for several years, and have collected a wide variety of documentary and witness evidence; and

ii)     Mrs Bourlakova, Hermitage One Limited and Greenbay Holding Limited (which are co-claimants in these proceedings), the Kazakovs, and Columbus Holding and Enterprises SA (which is a co-defendant in these proceedings) all have, and Mr Bourlakov had, lawyers in Monaco who are extremely well-versed in the underlying disputes given the multitude of civil and criminal proceedings which have been taking place in Monaco since 2018.

j.    It is likely that at a significant part of the alleged damage was suffered out of the jurisdiction. The Claimants themselves allege that they have incurred fees in several jurisdictions, have drawn attention to the *"multi-jurisdictional nature of the Bourlakovs' asset holding structures"* and acknowledge that the events complained of have connections to multiple jurisdictions.[27] The bulk of the particularised financial loss (*i.e.* the value of the assets allegedly misappropriated from the Panamanian foundations) does not appear to have any connection to England at all. The remaining alleged financial loss, representing legal costs, has not been particularised and it appears to have been incurred by the Claimants, after the alleged wrongdoing, in part in England as a matter of choice.

k.    None of the likely witnesses (and, certainly, none of the principal witnesses) live in England. However, key witnesses are either resident in Monaco (such as Mr Kazakov and Veronica) or have strong connections with Monaco (such as Mrs Bourlakova, who lived in Monaco for most of her married life and retains substantial property there).

---

[27] Whitson-Dew 1 at para. 290(a). [NJB1/57]

l.   Very little of the documentary evidence is likely to be located in England.  It appears that some of the corporate service providers and banks hold documents in Switzerland and Cyprus (but not England).  However, the bulk of the relevant documentary evidence is likely to be in Monaco, where (**i**) Mr Bourlakov had his principal residence, (**ii**) Mr Kazakov has resided in recent years, (**iii**) the Family Office was located, which is likely to hold a large number of documents relevant to the ownership and administration of the companies, and (**iv**) various banks and corporate service providers (including Equiom) which were involved in the administration of the relevant companies are located.

m.   Furthermore, the civil courts in Monaco will be able to obtain access to evidence obtained as part of the Monaco Criminal Proceedings (which have involved a detailed investigation, under the control of investigating judges, into the allegations of misappropriation of assets by Mrs Bourlakova and the alleged forgery of documents) pursuant to Article 177 of the Criminal Procedure Code[28], which permits the President of the Civil Court of First Instance to request access to the criminal investigation file for evidence that may assist its ruling.  Whilst I am not able to exhibit copies of the materials produced by the criminal investigation due to the secrecy attaching to the investigations in Monaco, I am able to inform the Court that the criminal investigations have been very extensive, involving interviews of numerous witnesses, searches and extensive investigations by the police.  The investigations have involved third parties, including banks and professional service providers in Monaco.  Those efforts have led to the production of numerous reports supported by thousands of pages of relevant evidence.  I provide greater detail about this material in paragraph 141 below.  However, the English court would not be able to obtain access to this important source of material.

n.   On the other hand, conducting proceedings in England is likely to be complicated by the fact that both the Monaco Divorce Proceedings and the

---

[28] [NJB1/83]

Monaco Criminal Proceedings are subject to obligations of secrecy, breach of which attracts criminal penalties under Article 202-6 of the Civil Code[29] (with penalties as prescribed by Article 26 of the Criminal Code[30]) and Article 31 of the Criminal Procedure Code[31]. This means that, if these proceedings continue in England, it will be considerably more difficult to place all relevant materials before the courts. Further, if there were related proceedings taking place in both England and Monaco, there is a real risk that inconsistent positions may be taken or inconsistent evidence may be given in circumstances where it may well be impossible to show the English court what is being said in Monaco.

o. As to governing law, a number of different laws are potentially in issue, but the law which appears to have the largest scope of likely application is Monegasque law:

    i) Mrs Bourlakova contends that tort claim is governed by English law or, alternatively, Monegasque law. The Kazakovs will contend that Monegasque law is the applicable law. In any event, it does not appear that any complex issues of English law would arise, if that were the applicable law;

    ii) it is Mrs Bourlakova's case that claims for loss arising out of the alleged forgery of documents are governed by Monegasque law, including specifically various articles of the Criminal Code (POC at para. 191); and

    iii) in any event, the majority of the issues in dispute will certainly not be governed by English law. The (critical) question of Mr Kazakov's interest in the disputed assets by virtue of his joint business activities with Mr Bourlakov will not be governed by English law. Issues about the validity of contracts will not be subject to English law, which is not

---

[29] [NJB1/200]
[30] [NJB1/217]
[31] [NJB1/77]

the putative applicable law of any of those contracts. Mrs Bourlakova contends that the claims set out in Section C3 of the POC are governed by Panamanian law (the Kazakov Defendants reserve their position on the correctness of that position, but it seems likely that the applicable law will be Panamanian law and/or Monegasque law).

p. As I explained further in **Section G.2** below, when the claim was issued there were close connections to existing proceedings in Monaco. The interests of Mr Bourlakov, Mrs Bourlakova and Mr Kazakov in the disputed would have been determined for the purposes of the liquidation of the matrimonial property and to resolve Mr Bourlakov's claim to annul certain transfers. Indeed, there is a strong inference that Mrs Bourlakova's principal purpose in commencing these proceedings was to obtain the determination in England of issues which Mrs Bourlakova considered would be relevant to the Monaco Divorce and Asset Transfer Proceedings.

q. Whilst the Monaco Divorce Proceedings have come to an end given that Mr Bourlakov is deceased, Mr Bourlakov's estate has been opened in Monaco and that estate will be administered in Monaco and through proceedings before the Monegasque courts (as I explain below). Such proceedings will inevitably require determination of the key issues raised in these proceedings, including (**i**) whether (as he contends) Mr Kazakov has an interest in the disputed assets by virtue of his joint business interests with Mr Bourlakov, and if so what interest, and (**ii**) the financial position of the various companies within Mr Bourlakov's estate, including questions about their indebtedness. I address this connection to Monaco in **Section G.2** below.

97. Against these overwhelming factors against England being the proper place, the Claimants appear to rely principally on three factors, which I will address in turn.

a. First, they argue that the English court has unique abilities to determine complex fraud claims. For reasons which will be developed in submissions, this argument is not open to the Claimants as it involves a comparison of the quality

of judicial procedures in different countries in circumstances where there is (rightly) no suggestion that the Monegasque courts cannot provide a fair and effective determination of the claim. In reality, this factor is nothing more than an admission by the Claimants that they are engaged in forum shopping by trying to choose a jurisdiction which they consider offers favourable procedures. In any event, there is no proper basis for the suggestion that the Monegasque courts lack the judicial tools or competence to determine the issues in these proceedings: the Monegasque courts have fair and adequate procedures to ascertain the truth[32] (and it will also be possible, where appropriate, to use the procedures available in foreign jurisdictions to order production of documents relevant to Monegasque proceedings).

b.   Second, they argue that an "important factor" is that the Claimants are bringing a claim against Leo Holding as of right in England, which enables the Claimants to join in all other relevant parties into a single set of proceedings. However, even assuming (contrary to the arguments set out above) that all of the Defendants can be joined into a single set of proceedings in England, the position is no different in Monaco. If the Claimants were to commence this claim in Monaco, they would have jurisdiction as of right against Mr Kazakov because he is domiciled there.[33] As a result, the Monegasque courts would have jurisdiction over the claims against all co-defendants, provided the claim was not filed with the sole purpose of bringing a defendant outside the jurisdiction of his domicile.[34] Accordingly, this factor is (at best) neutral as between England and Monaco: in either case, the court would have jurisdiction over all defendants because one defendant is domiciled in the relevant country. However, this factor in substance points in favour of Monaco given that the

---

[32] These include, but are by no means limited to, judicial instructions for investigation (Articles 300 to 308 of the Civil Procedure Code), personal verification by the judge (Articles 309 to 311), questioning of the parties (Articles 312 to 322), receiving declarations from third parties and/or summoning such parties for examination (Articles 323 to 343) and the use of experts (Articles 344 to 368). [NJB1/220]  As the Claimants themselves accept, the Monegasque courts are also able to obtain relevant documents from the parties.
[33] Article 4 of the PI Law. [NJB1/169]
[34] Article 5 of the PI Law. [NJB1/169]

anchor defendant in Monaco would be Mr Kazakov, who is one of the major protagonists, whereas the anchor defendant in England is Leo Holding, which (as I have explained) is a mere holding company with very limited (if any) involvement in the relevant eventsand which appears to have been sued with the principal purpose of establishing jurisdiction in England.

c.  Third, it appears to be suggested that the claim will proceed against some of the defendants, including Leo Holding, in England such that there would be a risk of parallel proceedings. For reasons which will be developed in submissions, where the risk of parallel proceedings results from the Claimants' own decision to continue its claim against some defendants in England rather than bringing a single claim against all defendants in the more natural forum, it cannot rely on that risk as a factor in favour of England. This factor applies with particular force here given that Mrs Bourlakova has submitted to the jurisdiction of the courts in Monaco by defending the Monaco Asset Transfer Proceedings on their merits and, further, by initiating the Monaco Bourlakova Criminal Proceedings (arising out of the same alleged forgeries) as a civil party in Monaco. In any event:

  i.  given that there are and will be substantial proceedings involving Mrs Bourlakova and the Kazakovs in Monaco, the risk of parallel proceedings would be reduced by this court declining jurisdiction over the claims against the Kazakovs so that, at least as between Mrs Bourlakova and the Kazakovs, the issues are only resolved in one court (*i.e.*, Monaco) rather than two; and

  ii.  if the Claimants insist on continuing with these proceedings against certain defendants even after this Court has determined that the most appropriate forum would be Monaco, the court can manage the parallel proceedings in England using stays for *lis alibi pendens* or on case management grounds.

**G.2     Impact of proceedings in Monaco**

98. It is a critically important feature of this case that the centre of gravity for the overarching disputes between Mrs Bourlakova (and Elena and Veronica), Mr Bourlakov and the Kazakovs (and the companies under their respective control) has been and will remain Monaco.

99. This is, I suggest, hardly surprising.  The disputes have largely arisen out of the breakdown of Mr Bourlakov and Mrs Bourlakova's marriage, which has resulted in the need to divide their matrimonial property and to identify the true owner of assets under their respective control.  Mr Bourlakov and Mrs Bourlakova had their common domicile and matrimonial home in Monaco.  That is why Mrs Bourlakova herself started the Monaco Divorce Proceedings in Monaco.  Further, the Family Office operated from Monaco.  The Kazakovs are now also domiciled in Monaco.  It would therefore be expected that litigation between Mr Bourlakov, Mrs Bourlakova and the Kazakovs would take place in Monaco, as has indeed been the case.  Mrs Bourlakova's attempt to spin-off some of the issues into England is, I suggest, regrettable.

100.     The existence of proceedings in Monaco means that it would be most convenient for the parties and in the interests of justice for any further, closely related, claims also to be determined in Monaco.  The benefits of having related proceedings determined in a single (and the most natural) forum perhaps go without saying.  In particular, it is likely to be far more efficient in terms of the parties' and court resources; it reduces the risk of inconsistent decisions or clashes between jurisdictions; and it enables the knowledge acquired by the parties' existing teams in Monaco to be used without duplication of effort by further sets of lawyers.

101.     The Kazakovs will contend that this is a strong reason in favour of the court concluding that the Claimants' tort claims should be brought in Monaco.

102.     In this regard, it is important to look at the overall picture.  Here, there is a dispute about who is entitled to assets worth billions of US Dollars and whether assets have been misappropriated from their true owner.  In particular:

a. Mrs Bourlakova contends that she was the true and sole owner of assets worth billions of US Dollars, the majority of which she transferred into a Bahamian discretionary trust just as her marriage to Mr Bourlakov was breaking down. Mr Bourlakov contended and the Kazakovs contend that these assets belonged to Mr Bourlakov and/or Mr Kazakov; or, in the alternative, were Bourlakov matrimonial property (in which case the Kazakovs will, in whole or in part, inherit Mr Bourlakov's half share of those assets). There are ongoing proceedings against Mrs Bourlakova and others to recover assets which, it is alleged, she has misappropriated.

b. On the flip-side, Mrs Bourlakova contends that Mr Bourlakov and others have misappropriated assets which, she says, belonged to her or formed part of the matrimonial property. She also says that Mr Bourlakov and others sought to defraud her about the true ownership of assets. Mr Bourlakov denied and the Kazakovs strongly deny these allegations.

103. That is the essence of the real and substantial dispute between the parties. Given that the rival claims to the assets will be determined in Monaco, it is undesirable for certain issues which form part of that broader dispute (*e.g.* whether Mr Kazakov has an interest in the disputed assets by virtue of his joint business activities with Mr Bourlakov) to be determined, in parallel, in England, purportedly for the purpose of a tort claim to recover a few million pounds of pre-action costs. Further, whatever happens to the present claim, the claims alleging that Mrs Bourlakova and others have misappropriated assets which truly belonged to Mr Bourlakov and/or Mr Kazakov will be determined in Monaco by virtue of the proceedings brought there; this would produce the highly undesirable position where most of the story would be being litigated in Monaco, with a part of it being litigated in parallel in England at the same time.

104. It is also important for to emphasise that it is very unlikely that the Monegasque courts will consider any judgment of the English courts to be binding. I note that the Claimants do not advance any positive case that a judgment from this Court would be

binding, saying that then courts in Monaco "*will not necessarily treat an English judgment as binding*".[35]  In fact, it is very unlikely that an English judgment would be recognised in Monaco pursuant to Articles 15.1 and 17 of the PI Law[36] given that the Monegasque courts would be unlikely to consider the dispute to have a "sufficient link" with England.  Further, a foreign judgment will not be recognised pursuant to Article 15.4 of the PI Law [37]where it is contrary to a decision rendered between the same parties in Monaco.  Whilst the Claimants suggest that the Monegasque courts will take a prior judgment "into account", it is Maître Mullot's view that the courts are unlikely to give significant weight to a foreign judgment which is not entitled to recognition but will, instead, decide the case on the evidence before it. In that regard, it is noteworthy that the Monegasque criminal investigation has taken its own course notwithstanding judgments of the Zurich courts discontinuing the equivalent investigation in Switzerland.   In any event, I suggest that it is not a proper purpose of English proceedings to obtain what would be, in effect, an advisory opinion on the merits of certain disputed issues for use in a foreign court.

105.     This court should, therefore, do everything it can to ensure that **all** claims relating to the broader disputes relating to the Bourlakov's assets are determined in a single, and the most appropriate, forum, *i.e.* Monaco.

106.     This is particularly so where it is clear, I suggest, that Ms Bourlakova's true purpose in bringing the English proceedings is to seek an advantage in the proceedings in Monaco either by obtaining judgments on issues which she will seek to deploy as persuasive evidence in Monaco and/or to obtain anti-suit injunctions to prevent arguments being advanced in Monaco.

107.     If the Claimants were to bring their claim in Monaco, either as a civil claim or as a counterclaim in the Monaco Asset Transfer Proceedings (described below at paras. 130-136), the Monegasque courts would have a broad procedural discretion to manage

---

[35] Whiston-Dew 1 para. 148. [NJB1/31]
[36] [NJB1/170-171]
[37] [NJB1/170]

all related proceedings together as part of their overall duty and power to achieve the good administration of justice. For example, the Court may also order a common timetable in related litigation and conduct joint hearings across multiple claims or indeed merge proceedings, as has already been done in regard to criminal complaints brought by Mr Bourlakov and Mr Kazakov and Mrs Bourlakova.

108. I will now summarise each of the key proceedings in Monaco.

**The Monaco Divorce Proceedings**

109. I do not deal with the Monaco Divorce Proceedings in any detail for two reasons:

  a. The Kazakov Defendants have limited knowledge about the Monaco Divorce Proceedings because they are a confidential procedure with disclosure to third parties prohibited and subject to criminal sanctions.

  b. In any event, the Monaco Divorce Proceedings have been automatically terminated by Mr Bourlakov's death pursuant to Article 202-10 of the Civil Code[38] and I will not address them in any detail.

110. As I explain below, the effect of Mr Bourlakov's death is to bring an end to his marriage to Mrs Bourlakova. As a result, it will now be necessary to ascertain and divide Mr Bourlakov and Mrs Bourlakova's matrimonial property as part of the administration of Mr Bourlakov's estate (that is, within the Monaco Estate Proceedings).

111. As the Claimants accept, one of the key issues in this claim (that is, whether Mr Kazakov has an interest in assets held by Mr Bourlakov by virtue of their joint business interests) would necessarily have been determined as part of the liquidation of matrimonial property following divorce, which they described as "Phase 2" of the Monaco Divorce Proceedings. What would have been "Phase 2" of the Monaco Divorce Proceedings will now fall to be decided as part of the Monaco Estate

---

[38] [NJB1/201]

Proceedings. Importantly, all of the arguments which Ms Whiston-Dew makes about the potential for delay in deciding whether there should be a divorce (*i.e.*, "Phase 1") have now fallen away.

### The Monaco Estate Proceedings

112.     As I have already explained, following his death from COVID in June 2021, Mr Bourlakov's estate has been opened in Monaco. His worldwide estate will be collected in and distributed in accordance with Monegasque law and by way of an action for distribution in the Monegasque courts.

113.     Monaco is the place where Mr Bourlakov's estate will be administered because, until his death in June 2021, Mr Bourlakov was domiciled in Monaco. I am informed that, because Mr Bourlakov was a holder of a Monaco residence permit, as a matter of Monaco law he is presumed, in the absence of proof to the contrary, to have his place of domicile in the Principality of Monaco.[39] In any event, as a matter of fact, Mr Bourlakov was domiciled in Monaco, which had been his principal place of residence from about 2007 until his death.

114.     The fact that Mr Bourlakov's domicile is in Monaco has been recognised by Mrs Bourlakova in various legal proceedings, including Mrs Bourlakova's assertion in their divorce proceedings that the marital home of Mr and Mrs Bourlakov was in Monaco and that Mr Bourlakov needed to be ordered to stay out of the marital home (which request the Monaco court refused).

115.     As a matter of Monegasque law:

   a.   The estate of a deceased person is to be opened in the place where that person was domiciled.[40]

   b.   The courts in Monaco have jurisdiction in respect of all matters relating to succession when the estate has been opened in Monaco, as well as for claims by

---

[39] Article 2 of the PI Law. [NJB1/169]
[40] Article 83 of the Civil Code. [NJB1/199]

third parties against an heir or between co-heirs until the final distribution of the estate.[41]

c.  The law governing succession is that of the domicile of the deceased person at the time of his death.[42]

d.  That law, with limited exceptions relating to issues of forced heirship, governs the whole of the succession from its opening until its final distribution to the beneficiaries.  This includes, in particular, (**i**) the opening of the estate, (**ii**) the inheritance rights of heirs and legatees, as well as exclusion (unworthiness) from inheritance, (**iii**) the transmission to heirs and legatees of the property, rights and obligations making up the estate, (**iv**) the return and reduction of gifts, including their taking into account in the calculation of hereditary shares, and (**v**) the distribution of the estate.[43]

e.  The procedure for opening an estate is governed by Articles 853 *et seq* of the Civil Procedure Code.

f.  The distribution (sharing) of the estate is undertaken pursuant to an action for distribution, which is governed by Articles 696 *et seq* of the Civil Code[44] and Articles 913 to 924 of the Civil Procedure Code[45].  In particular, Article 914 of the Civil Procedure Code provides that the most diligent party will summon the co-sharers before the court of first instance for the purpose of distributing the estate.  Article 915 of the Civil Procedure Code provides that a judgment pronouncing on the application for distribution must appoint a notary (who is a public official) and for a judge to make a report in the event of any disputes.  Under Article 919 of the Civil Procedure Code, where the court has ordered the distribution without an expert report, the most diligent party will summon the co-sharers to appear before the appointed notary for the purposes of opening the

---

[41] Article 6.4 of the PI Law. [NJB1/169]
[42] Article 56 of the PI Law. [NJB1/176]
[43] Article 63 of the PI Law. [NJB1/177]
[44] [NJB1/210]
[45] [NJB1/228-239]

taking of accounts, reports, formation of masses,[46] deductions, and composition of lots and supplies, in accordance with Articles 696 *et seq* of the Civil Code. The notary will then seek to reach an amicable resolution as to the distribution of the estate amongst the interested parties. Under Article 920, if disputes arise before the notary, the notary will draw up a minute of the difficulties and refer the parties to the appointed judge. The judge will then decide how to administer the estate and, in the event of significant disputes, the court may undertake a "judicial distribution" where the court takes decisions on the recovery, accounting and distribution of the estate.

g.  As part of the distribution of the deceased's estate, the court may:

   i)  order that assets forming part of the estate, wherever located, should be valued (so that they can be divided and allocated to the heirs) or sold in accordance with Articles 703 *et seq* of the Civil Code; and

   ii)  order parties to return assets in which the deceased had an interest. Where the deceased's assets have been misappropriated or wrongly transferred, the court is also able to order parties to pay damages (which will form part of the estate to be distributed) in accordance with the general liability for wrongdoing contained in Article 1229 of the Civil Code.

116.  Given that Mr Bourlakov was domiciled in Monaco when he died, his estate has (in accordance with Monegasque law) been opened in Monaco.

117.  In that regard, Mr Kazakov deposited a holographic will of Mr Bourlakov with a Monaco notary, Maître Magali Crovetto-Aquilina, on 7 July 2021[47]. The will, which I exhibit at [NJB1/253-254], was written in Russian, dated 21 October 2019 and signed by Mr Bourlakov personally. An English translation of the will is at [NJB1/255].

---

[46] This refers to the identification of the estate as well as relevant *inter vivos* gifts.
[47] [NJB1/104]

118.     Maître Magali Crovetto-Aquilina duly opened the estate of Mr Bourlakov on 7 July 2021.  On 13 July 2021, she filed the will with the Registry of the Monaco Court of First Instance. On 4 August 2021, the Notary provided a certified copy of the registration of the Will (and its translation to French) by the Court. [NJB1/85].

119.     In accordance with the provisions of Monegasque law I have identified above, Mr Bourlakov's estate will now be administered until the final distribution in accordance with the provisions of Monegasque law and subject to the jurisdiction of the Monegasque courts.

120.     In the will, Mr Bourlakov makes a bequest to the mother of his youngest child,[48] but otherwise leaves his assets and belongings to Mr Kazakov and Mrs Kazakova, with charges on them to take care of certain extended family members. The decision not to leave any of his estate to his estranged wife and their daughters no doubt reflected the breakdown in his relationship with them, as well as the fact that Mr Bourlakov considered that they had misappropriated his assets from him and believed that they, shockingly, had tried to have him assassinated in Russia.

121.     Mr Kazakov and Mrs Kazakova are the universal legatees of Mr Bourlakov pursuant to the will, as well as the beneficiaries of a specific bequest of an extremely valuable yacht known as the "Black Pearl".  Mr Kazakov and Mrs Kazakova are therefore taking, and will continue to take, the necessary steps in Monaco to enforce their rights to recover and have distributed to them the assets which formerly belonged to Mr Bourlakov and which he bequeathed them under his will.  To that end, on 9th August 2021, Mr Kazakov sent a formal notice to the Notary under Articles 861 and 862 of the Civil Code, of a demand as the universal legatee under a will for the delivery to the legatee of the assets included in the will [NJB1/257-258]].  A similar notification will imminently by made by Mrs Kazakova. We are informed that the office of Maitre Mullot has received a letter from the Juge de Paix explaining that a procedure for

---

[48] Who is not Mrs Bourlakova. Ms Shevtsova has initiated proceedings in Russia, where her daughter (Nicole) was born, to establish Mr Bourlakov's paternity. It is anticipated that she will assert rights on behalf of Nicole in the Estate of Mr Bourlakov (over and above her rights as a named legatee).

sealing of premises of the estate and searching for wills has been initiated (presumably at the request of Mrs Bourlakova and/or her daughters) and is suspended until 23rd August 2021 when the Judge returns from leave. In due course, and after the resolution of any necessary prior issues, Mr Kazakov and Mrs Kazakova will also pursue an action for distribution of Mr Bourlakov's estate under Article 696 *et seq* of the Civil Code.

122.     On 27 July 2021, Maître Magali Crovetto-Aquilina informed the Kazakovs that she had been contacted by another notary, Maître Henry Rey, who had advised her that he had received a mandate from Mrs Bourlakova, Veronica and Elena in connection with succession to Mr Bourlakov's estate.  It therefore appears that Mrs Bourlakova, Veronica and Elena intend to assert some form of interest in Mr Bourlakov's estate (and that they recognise that Monaco is the proper place for the administration of that estate).

123.     Whilst none of Mrs Bourlakova, Veronica or Elena have any interest under Mr Bourlakov's will, they (and Mr Bourlakov's infant daughter) may seek to assert an entitlement to receive a share of the estate by way of forced heirship rights (which are also known as "reserved rights" under Monegasque law).  Such claims are likely to give rise to disputes, including as to whether such persons enjoy reserved rights at all, whether such forced heirship rights existed under the laws of the country/ies in which Mr Bourlakov was a national at the time of his death,[49] and whether any rights which might otherwise exist are excluded by unworthiness of the heir.  The issue of exclusion is likely to raise issues which are related to the broader dispute given that the Kazakovs are likely to contend that Mrs Bourlakova, Elena and Veronica should be excluded as heirs, if they would otherwise have any interest, given that they have misappropriated and concealed assets belonging to Mr Bourlakov (and in which Mr Kazakov has an interest) as part of a fraudulent conspiracy[50].

---

[49] This is because, under Article 63 of the PI Law [NJB1/177], Monegasque law will not create reserved rights to the estate of a person whose law of the state of which he was a national at the time of his death does not provide for such rights.  Mr Bourlakov was a national of Russia, Ukraine and Canada, whose forced heirship regimes are significantly different to those under Monegasque law.

[50] Mr Bourlakov had relied upon these matters as justifying a divorce based on Mrs Bourlakova's "fault" in the Monaco Divorce Proceedings.

124.    In practice, it is likely that the court will first determine any disputes as to the applicable law and the entitlement of those claiming to be heirs, before proceeding to deal with the recovery, accounting and liquidation of Mr Bourlakov's estate in a second phase of the proceedings.

125.    As regards the distribution of Mr Bourlakov's estate, the taking of accounts, reports and formation of masses will initially be referred to a notary public to seek an amicable distribution.  However, it is virtually certain - given the nature and complexity of the disputes - that an amicable solution will not be reached, with the consequence that the notary will produce a "minute of difficulty" and the parties will be referred back to a judge of the Court of First Instance in Monaco to resolve the disputes as to the identification, recovery and distribution of Mr Bourlakov's estate.  The parties to any such proceedings will be those asserting any interest in the estate, which will include (at least) the Kazakovs, Mrs Bourlakova, Elena and Veronica.

126.    As I have explained above, the action for distributing the estate will **necessarily** require determination of (amongst other issues):

   a.    what property formed part of matrimonial (community) property of Mr Bourlakov and Mrs Bourlakova.  This is a critical issue because Mr Bourlakov's half share of the matrimonial property forms part of his estate and will, therefore, be distributed to his legatees and heirs (rather than to his spouse, Mrs Bourlakova).  This will also involve an inquiry into transfers made by the spouses to others during their marriage (a process known as *rapport*);

   b.    whether matrimonial assets have been wrongly misappropriated or transferred by Mrs Bourlakova, such that those assets (or their value) should be restored to the estate and/or taken into account in fixing the entitlement of any heirs;

c.   whether Mr Bourlakov transferred assets to Mrs Bourlakova by way of gift or to hold as nominee;[51]

d.   whether Mr Kazakov has an interest (and, if so, what interest) in the disputed assets as a result of their joint business activities.[52]  This will be an essential issue because, to the extent that Mr Kazakov has an interest in those assets or an entitlement to receive sums from Mr Bourlakov, those assets will fall outside both Mr Bourlakov's estate and the matrimonial (community) property of Mr Bourlakov and Mrs Bourlakova.  I note that the Claimants have accepted that the process of liquidating the matrimonial property will necessarily require the Monegasque courts to determine "*whether the supposed Kazakov partnership is real or a fiction*";[53] and

e.   the rights and liabilities of the companies within Mr Bourlakov's estate, which will be essential to the valuation of the companies within his estate.

127.   These issues will form an essential part of the taking of accounts to identify the content of Mr Bourlakov's estate (the "masses") before it can be distributed to his legatees and (if appropriate) heirs.

128.   It is difficult to predict precisely how long the Monaco Estate Proceedings will take.  Maître Mullot's best estimate is that the proceedings will take somewhere between 2 and 10 years, depending on precisely what disputes arise and whether decisions are appealed.  I do not know whether it will be suggested by the Claimants that this is an unreasonable time.  If it is, I would point out that (**i**) the length of proceedings is in large part a product of the complexity of the issues, which is itself increased by the fact that Mrs Bourlakova (and those assisting her) have gone to great

---

[51] This is necessary because, if the assets were held as nominee, they will form part of Mr Bourlakov's estate.  If they were transferred by way of *inter vivos* gifts, they must be considered under the provisions of Article 712 *et seq* of the Civil Code which generally reduces a heir's entitlement by the value of any gifts received during the life of the testator.

[52] I can confirm that Mr Kazakov intends to assert such an entitlement in the administration of the estate.

[53] Whiston-Dew 1 para. 140. [NJB1/29]

efforts to transfer assets away and to conceal their whereabouts[54], **(ii)** the length of proceedings will also be dictated by whether rights of appeal are exercised, **(iii)** Monaco is a state party to the European Convention on Human Rights and can therefore be expected to provide a hearing of civil claims within a reasonable period, and **(iv)** the time estimate is unlikely to be significantly different in England once allowance is made for possible appeals; indeed, it seems likely that the jurisdiction phase alone will take more than 2 years from the date on which the claim was commenced.

129.     For completeness, I understand from Mr Kazakov's Russian lawyers, EPAM, that Veronica has also opened an estate for Mr Bourlakov with a notary in St Petersburg, even though Mrs Bourlakova, Veronica and Elena caused his body to be taken from Russia to Canada in opposition to Mr Bourlakov's expressed desire to be buried with his parents in Serafimovskoye cemetery in St Petersburg. However, I do not believe that this will affect the likely course of the administration of the estate in Monaco, as I have described above.

### The Monaco Asset Transfer Proceedings

130.     On 5 June 2020, Mr Bourlakov commenced a civil claim in Monaco against Mrs Bourlakova, Veronica and Elena in which he sought to invalidate transfers by Mrs Bourlakova of hundreds of millions of US Dollars to Veronica and Elena, as well as the transfer of assets worth around US$1.5 billion into the Golden Wheat Trust [NJB1/323-356]. Mr Bourlakov contended that such transfers were misappropriations of matrimonial property without his consent. He also referred to Mr Kazakov's interest in the same property by virtue of their joint business interests, which he said is also in jeopardy owing to the misappropriations.

131.     On 2 December 2020, Mrs Bourlakova filed written submissions [NJB1/357-373]. In those submissions, Mrs Bourlakova makes many of the same allegations as

---

[54] As observed by the Monaco Court of Appeal ruling of 19 May 2021 in favour of Mr Kazakov, reversing a first instance decision to lift the sequestration of assets ordered against Mrs Bourlakova and in Monaco: the duration of the freeze did not justify its discharge given the complexity of the investigations required into the multiple accounts, held by natural and legal persons and in foreign jurisdictions, when the sum in issue is in excess of $1.3 billion. [NJB1/268]

are relied upon in the Particulars of Claim, including relating to the allegedly false demands of Mr Kazakov referred to in Sections A1 to A4 of the Particulars of Claim. Mrs Bourlakova also contends that Mr Bourlakov transferred assets to her in 2014 as an outright gift, and refutes (at length) the arguments that Mr Bourlakov had entrusted her with the assets and/or that Mr Kazakov had any interest in the assets by virtue of their joint business activities. Mrs Bourlakova expanded on these arguments, including her allegations that Mr Kazakov's interest was an invention intended to mislead her to accept a reduced sum in the divorce, in further submissions dated 8 April 2021 [NJB1/400-422].

132.    Mrs Bourlakova also argued in her submissions made on 2 December 2020 that Mr Bourlakov's claim should be stayed, primarily pending the decision of the judge responsible for the liquidation of the matrimonial property in the Monaco Divorce Proceedings, who (she said) was exclusively competent to determine the disputes as to ownership of matrimonial property.

133.    Mr Bourlakov responded to those submissions on 2 February 2021.

134.    Based on a letter dated 27 May 2021 from the Monaco firm of Gardetto (which was acting for Mr Bourlakov in the Monaco Asset Transfer Proceedings) it is apparent that the Court had directed that the timetable in the Monaco Asset Transfer Proceedings should be aligned with the Monaco Divorce Proceedings so that the court had all necessary information when it handed down its decision[55]. This is an example of the ability of the Monegasque courts to manage related proceedings.

135.    As a result of Mr Bourlakov's death, the Monaco Asset Transfer Proceedings have been automatically suspended under Article 389 of the Civil Procedure Code[56]. However, the Kazakovs intend to issue a writ of summons to resume the proceedings under Article 392 of the Civil Procedure Code[57] on the basis that they are now entitled to pursue those proceedings as the beneficiaries (*i.e.*, universal legatees) of Mr

---

[55] [NJB1/454-457]
[56] [NJB1/224]
[57] [NJB1/225]

Bourlakov's will. It is to be expected, however, that the Monaco Asset Transfer Proceedings will be managed alongside the Monaco Estate Proceedings since their purpose is to recover assets in which Mr Bourlakov had an interest as part of the matrimonial property for the benefit, now, of Mr Bourlakov's estate.

136.    The Claimants argue at paras. 99-104 Whiston-Dew 1 that the Monaco Asset Transfer Proceedings seek relief on the basis that assets constituted matrimonial property and, accordingly, do not pursue any claim on behalf of Mr Kazakov[58]. This is correct insofar as it goes, given that Mr Kazakov is not a claimant in those proceedings (although Mr Bourlakov refers to the fact that the same transfers have also imperilled Mr Kazakov's interest in the assets). However, it is unrealistic to suggest - if this is the Claimants' case - that the court hearing the Monaco Asset Transfer Proceedings will not need to consider the broader dispute or Mr Kazakov's interest in the assets. Indeed, it will necessarily need to do so given that the assets cannot be matrimonial assets to the extent that they in fact belong to Mr Kazakov. In any event, the broader dispute will form an essential part of the factual inquiry as to whether the disputed assets, which represent the proceeds of the sale of a Russian business, were gifted solely to Mrs Bourlakova (as she contends) or were simply entrusted to her by Mr Bourlakov and Mr Kazakov (as they contend). That is, of course, why Mrs Bourlakova herself has made extensive submissions in the Monaco Asset Transfer Proceedings in support of her argument that Mr Kazakov's interest in the assets was a fiction designed to defraud her. It would be untenable for Mrs Bourlakova to say that such matters are irrelevant and will not need to be considered by the Monegasque court given that she has herself argued such matters at length in support of her defence.

### The Monaco Criminal Proceedings

137.    On 21 December 2018, Mr Kazakov made a criminal complaint against Mrs Bourlakova, Veronica and Elena in his capacity as a civil party. Mr Kazakov was

---

[58] [NJB/20-21]

entitled to constitute himself a civil party under Article 74 of the Code of Criminal Procedure[59] because he is a person injured by the crime.

138.    The essential basis for Mr Kazakov's complaint is that Mrs Bourlakova was only ever entrusted with the proceeds of the sale of Mr Bourlakov's and Mr Kazakov's joint business interests in Russia, and that she (together with Veronica and Elena) has misappropriated and transferred away assets belonging to Mr Bourlakov and Mr Kazakov and which had only been entrusted to her. Mr Kazakov further complains that Mrs Bourlakova (and Veronica and Elena) have sought to hide those assets using complex and opaque offshore structures and trusts. Mr Kazakov alleges the crimes of breach of trust, concealment and money laundering.

139.    Mr Bourlakov made an equivalent criminal complaint on 9 January 2019.

140.    The Prosecutor confirmed on 8 January 2019 that there was a sufficient connection with Monaco to open criminal proceedings in the Monegasque courts. Subsequently, on 26 March 2019, Mr Kazakov's and Mr Bourlakov's criminal complaints were joined under reference CAB 3 – 2018/0001863.

141.    By virtue of the criminal complaints, criminal proceedings are now pending before the Monegasque courts. Two investigating judges (out of the three judges available) have been appointed, which is reserved for complex and large investigations. Whilst the Claimants suggest that the Monaco Criminal Proceedings have not made any significant progress, this is incorrect. Significant investigatory steps have been taken. These include:

    a.  an interview of Mr Bourlakov on 15 March 2019. A further interview of Mr Bourlakov had been scheduled for 17 June 2021 but was cancelled due to his ill health;

---

[59] [NJB1/79]

b. an extensive letter rogatory of 23 April 2019 by which the presiding judges directed the Police to:

    i. interview witnesses, including bankers, corporate service providers, real estate agents and employees;

    ii. conduct all necessary investigations and forensic analysis of relevant financial assets, documents, bank accounts or structures related to the dispute.

These directions resulted in numerous interviews (including of bankers and professional service providers in Monaco) and investigations, leading to seven reports with hundreds of pages of supporting evidence (largely legal and bank statements) collected and analysed by the Police between 5 August 2019 and 23 April 2021;

c. searches and forensic studies of legal and banking documents from the office of SAM Equiom (corporate services providers used by Mr Bourlakov and the Family Office);

d. an interview of Semen Anufriev, one of the defendants to these proceedings, on 28 February 2020;

e. an interview of Veronica on 2 July 2020;

f. searches of vaults at all banks in Monaco in January 2021, including Société Génerale, Barclays Bank and Compagnie Monegasque de Banque; and

g. an interview of Mr Kazakov on 15 June 2021.

142. The file produced by the investigation contains more than 220 documents totalling thousands of pages.

143. Significant time has also been spent in dealing with unsuccessful applications and appeals by Mrs Bourlakova and companies under her control to set aside

sequestrations which had been obtained by the prosecutor for the purposes of ascertaining the truth.

144.    The next major step in the Monaco Criminal Proceedings will be a decision whether to issue charges against the suspects.  I note, in that regard, Mrs Bourlakov's legal team has informed the Cypriot courts that the filing of an indictment against Mrs Bourlakov is only a matter of time[60].

145.    If Mrs Bourlakova is charged, the criminal court will determine Mr Kazakov's civil claim (as a civil party) as part of the criminal proceedings.  In this way, Mr Kazakov believes that it is likely that the Monaco Criminal Proceedings will result in the determination of his civil claims in respect of Mrs Bourlakova's misappropriation of assets in which he had an interest.  This will necessarily require a determination of (**i**) whether Mr Kazakov had an interest in the disputed assets by virtue of his joint business activities with Mr Bourlakov, and (**ii**) whether the disputed assets were entrusted (as opposed to gifted) to Mrs Bourlakova.   In this regard, I should explain that Mrs Bourlakova would be tried by a panel of three judges, who would deliver a fully reasoned judgment setting out their findings.

146.    However, if Mrs Bourlakova is not charged, then Mr Kazakov will be free to bring a claim before the civil courts.  Without limitation, Mr Kazakov has obtained orders for judicial escrow (as I explain below) and can seek to enforce his interest in those assets.  Mr Kazakov also remains free to withdraw as a civil party in the Monaco Criminal Proceedings at any time and, if he does so, he would then be permitted (in accordance with Article 81 of the Code of Criminal Procedure) to bring an action before the civil courts.

147.    This is therefore a further aspect of the overall dispute between the parties which is being dealt with in the Monegasque courts, with the participation of Mr Kazakov, Mrs Bourlakova and (until his death) Mr Bourlakov and their respective Monegasque lawyers.

---

[60] Application dated 13 July 2021, para. 28  [NJB1/474]

### *The Monaco Judicial Escrow*

148.     In order to preserve monies held in bank accounts and assets at banks in Monaco pending determination of his civil rights in respect of such assets, Mr Kazakov applied *ex parte* to the civil courts in Monaco for protective relief on 11 December 2020.

149.     On 11 February 2021, the Court of Appeal ordered that the funds held in certain accounts at UBS, Société Générale and Barclays Bank in Monaco be placed into judicial escrow, concluding that "*... as things stand, there is a dispute over the ownership or possession of funds between Mr Nikolai KAZAKOV, Mr Oleg BOURLAKOV and Mrs Loudmila MARCHENKO, so that the request for sequestration should be granted, until a decision has been made on the ownership of the funds held in Monegasque accounts up to a sum of €60.000.000*"[61] (the sum of €60 million reflecting the amount remaining in those accounts).

150.     Mr Kazakov sought a further order on 26 February 2021 to address certain disputed issues relating to the effect of the first order.  This was granted by the Court of Appeal on 1 July 2021.

151.     On 8 April 2021, Mrs Bourlakova, Elena and Veronica applied to the *Juge des Référés* to lift the judicial escrow.  Those proceedings are ongoing.

152.     For completeness, Mr Bourlakov also applied on 30 April 2021 for similar protective relief in respect of assets held in vaults at those banks.  He was granted an order for garnishment and judicial escrow by the Court of Appeal on 15 July 2021.

153.     As the Court of Appeal's judgment makes clear, the purpose of the judicial escrow is to protect assets pending the resolution of the disputed claims to the relevant assets.  As I have explained above, as matters stand, Mr Kazakov's claim will be considered by virtue of his status as a civil party in the Monaco Criminal Proceedings, although those claims could also be resolved in separate civil proceedings or in the Monaco Estate Proceedings.  However, the fact that the Monegasque courts have

---

[61] [NJB1/485]

granted a judicial escrow demonstrates that they consider themselves seised of the dispute as to ownership of the relevant assets.

### The Monaco Bourlakova Criminal Proceedings

154. For completeness, on 28 May 2019 and 29 June 2020, Mrs Bourlakova also issued three criminal complaints against Mr Bourlakov in her capacity as a civil party alleging forgery, use of forged documents and attempted fraud in judgment. By an order dated 28 May 2021, the investigation of Mrs Bourlakova's criminal complaints has been merged with the Monaco Criminal Proceedings arising out of Mr Bourlakov's and Mr Kazakov's criminal complaints.

155. Those criminal complaints rely on the same alleged forgeries as are the subject-matter of the present proceedings, including the documents relating to IPEC/Greenbay and Gatiabe/Finco. The complaint also alleged that Mr Kazakov invented his interest in the disputed assets to try to reduce the assets which would form part of the liquidation of the Bourlakov matrimonial property.

156. It is also relevant, in this regard, that the Claimants' alleged claims based on forgery of documents rely entirely on demonstrating of the Monegasque Criminal Code (see paras. 192 *et seq* of the POC, relying on Articles 42, 95 and/or 330 of the Criminal Code). It is perhaps self-evident that the criminal courts in Monaco are the most appropriate forum to decide whether criminal offences have been committed under the Monegasque Criminal Code and that it would be highly undesirable to create the risk of inconsistent decisions. It is also striking that Mrs Bourlakova plainly considered that Monaco was the appropriate place for these issues to be investigated and determined, given that she repeatedly initiated criminal proceedings as a civil party arising out of the alleged forgeries before, later, deciding to change her strategy and commence proceedings (relying on the Monegasque Criminal Code) in England.

157. Criminal proceedings were opened with an investigating judge appointed. That criminal complaint has been the subject of extensive investigation, including searches

of the Family Office (and various computers located there) and an interview of Mr Bourlakov.

158.     So far as the Kazakovs are aware, Mrs Bourlakova has never withdrawn her status as a civil party.

159.     This is, therefore, an example of Mrs Bourlakova raising in Monaco the very issues which she now seeks to litigate in England.  Further, as a result of her criminal complaint, relevant evidence has been collected in Monaco and the parties' Monegasque lawyers are naturally very familiar with these issues.

160.     The status of Mrs Bourlakova's criminal complaints is presently unclear: whilst a criminal investigation would ordinarily end on the death of the accused, the investigation may continue given that it has been merged with the (ongoing) Monaco Criminal Proceedings.

### Conclusion on the Monaco Proceedings

161.     As will be apparent from the summary I have provided above, the Monegasque courts are already seised of a number of actions arising out of the overall dispute between Mr Bourlakov, Mrs Bourlakova and the Kazakovs as to the ownership of the disputed assets and whether there have been misappropriations of those assets.  The parties' Monegasque lawyers are already heavily involved in litigating those issues.

162.     Further, the issues at the heart of the present claim in England will inevitably be determined in the proceedings in Monaco, including (particularly) through the Monaco Estate Proceedings which must resolve the question of which assets belonged to Mr Bourlakov and now form part of his estate.  The Monegasque courts are also far better placed to determine the claims brought in these proceedings given the steps which have already been taken in Monaco.

163.     In the circumstances, the Kazakovs suggest that Monaco is plainly the proper forum for any further claims arising out of the same overall dispute, whether those be claims to recover legal costs due to allegedly false statement being made as part of that

dispute or on the basis of an allegation that particular assets are held by the Kazakovs as nominee for Mr Bourlakov.

### G.3     Conclusion on proper forum

164.     This court is therefore asked to decline jurisdiction over the Claimants' claims on the basis that:

    a.     Even in the absence of proceedings in Monaco, England would not be the most appropriate forum the resolution of the Claimants' claims given the extremely slender connection to England. To the contrary, a far more appropriate forum would be Monaco, with which the parties and the dispute has a far closer connection.

    b.     However, the fact that Monaco is a more appropriate forum for the hearing of the present claims is put beyond any sensible doubt given that the claims in England are closely related to, and will raise issues with overlap with, the proceedings in Monaco.

### H.     THE BRUSSELS RECAST REGULATION

165.     As I have explained in **Section C.1** above, I do not believe that the Kazakovs are domiciled in Estonia (or in any other EU Member State). The Claimants advanced no positive case to the contrary when seeking the Court's permission to serve proceedings on the Kazakovs out of the jurisdiction, nor did they suggest that this Court's jurisdiction against the Kazakovs ought to be determined against the Kazakovs under anything other than the English common law rules. Further, it appears that steps were only taken to serve the Kazakovs in Monaco.

166.     I have also explained in **Section C.1** above that it is common ground that the Panamanian Companies are all incorporated in Panama and that jurisdiction over them must also be determined in accordance with the English common law rules.

167.     In the circumstances, I do not believe that the provisions of the Brussels Recast Regulation apply to any of the claims against the Kazakov Defendants.  Further, I do not understand the Claimants to rely upon those provisions for the purpose of establishing jurisdiction over any of the Kazakov Defendants.  In the circumstances, I do not address such provisions in this witness statement.

168.     In the event that the Claimants do rely on the provisions of the Brussels Recast Regulation, the Kazakov Defendants will both (**i**) deny that they can properly be sued in England, and (**ii**) seek a stay, on case management grounds, pending the resolution of the related proceedings in Monaco, including the Monaco Estate Proceedings.  To the extent that it becomes necessary to do so, I will address such matters in reply evidence in due course.

## I.     EXTENSIONS OF VALIDITY OF THE CLAIM FORM

169.     On 17 December 2020, the Claimants obtained *ex parte* an order granting permission for service out of the jurisdiction and extending the time for service of proceedings on the Kazakov Defendants until 16 March 2021[62]. This was subsequently extended again (on 31 December 2020) until 30 April 2021[63] and then again (on 31 March 2021) until 31 December 2021 for service on Mr and Mrs Kazakov and until 30 June 2022 for service on Panamanian Defendants[64] (together, the "**Extension Orders**").

170.     The Kazakov Defendants contend that the Claim Form was issued to achieve the advantage of seising the English courts in the hope that such proceedings would then take priority over any subsequent claims, but that the proceedings were then not pursued with any or sufficient diligence.  In other words, the Claimants were happy to sit on the claim in the knowledge that, if any of the Defendants sought to assert their

---

[62] Order of Mr Justice Johnson dated 17 December 2020, paras 1 and 5 [NJB1/499]
[63] Order of Mr Justice Johnson dated 31 December 2020, para 3. [NJB1/502]
[64] Order of Mr Justice Johnson dated 31 March 2021, paras 4 and 5 [NJB1/504]

rights in other proceedings, they could then claim that their chosen court should take priority as the first seised.

171.    The Claimants sought to explain their failure to have taken any steps to serve the Kazakov Defendants (and all other defendants outside the jurisdiction) for four months in paragraph 290 of Whiston-Dew 1 [NJB1/57]. The Kazakov Defendants reject the argument that the Claimants reasonably required four months to prepare the Particulars of Claim. If the Claimants had acted with reasonable diligence then, particularly given that the matters had been the subject of extensive consideration in the context of proceedings in Monaco, there was no reason whatsoever why it should have taken so long to prepare the Particulars of Claim. The Kazakov Defendants will invite the Court to infer that the Claimants simply decided not to prepare and serve the claim with any expedition because it suited their litigation strategy to have seised the English court but not to progress the action.

172.    In those circumstances, there was no "good reason" for the extensions of time for service of the Claim Forms sought by the Claimants. To the contrary, the Claimants were seeking to obtain an illegitimate advantage by ensuring that the court was first seised whilst not then progressing the action.

173.    The Claim Form was issued on 16 July 2020. The amended Claim Form (and Particulars of Claim) in relation to the Second and Third Defendants were served (or purportedly served) in England, just as they were about to expire for service within the jurisdiction, in November 2020[65].

174.    On 16 November 2020 the Claimants applied for permission to serve Mr and Mrs Kazakov in Estonia and Russia, as I have explained above.

---

[65] The Second and Third Defendants' acknowledgements of service dated 30 November 2020 [NJB1/506-509]

175.     On 21 December 2021, the Claimants applied for further extension until 30 April 2021 on the basis that the Foreign Process Section will reject claim forms for service overseas unless they have more than three months' validity remaining.[66]

176.     However, it is unclear whether the Claimants in fact took any steps to serve the Kazakovs in Estonia or Russia.  The Kazakovs are not aware of any attempts to effect service in Estonia or Russia.

177.     On 16 February 2021, the Claimants applied for permission to serve Mr and Mrs Kazakov in Monaco since they "*have been informed that Mr Kazakov has obtained a Monegasque residence permit and that he and Mrs Kazakova (his wife) are living in Monaco at least part of the time at the (former) family apartment of the First Claimant and Mr Bourlakov*"[67] and further extension of time until 31 December 2021 to satisfy the Foreign Process Section requirements.  Mr and Mrs Kazakov were eventually served under cover of letters dated 6 April 2021[68].

178.     In relation to the Panamanian Companies, it appears that the Claimants did not take steps to effect service in Panama until they lodged papers with the Foreign Process Section to obtain the Senior Master's signature on 9 April 2021.  It is unclear whether the Claimants have in fact taken any steps to transmit the Claim Form through the FCDO.  On 7 July 2021, the Claimants obtained an order permitting service by the following alternative means[69]:

a)   Posting, or otherwise delivering hard copies, to the addresses of the Panamanian Defendants set out in the amended Claim Form (without the intermediaries of the FPS or the Competent Local Authority in Panama);

b)   Posting, or otherwise delivering hard copies, to the addresses of the directors of the Panamanian Defendants.

---

[66] Whiston-Dew 2, para 42. [NJB1/523]
[67] Whiston-Dew 3, para 14. [NJB1/528]
[68] [NJB1/534-538]
[69] [NJB1/539-543]

179.     I have been informed by the directors of the Panamanian Defendants that as of 29 July 2021 there has been no service, nor attempted service, on those Defendants. However, the Panamanian Defendants have acknowledged service to avoid the Claimants yet further delaying the progress of these proceedings.

180.     For the reasons set out above, I consider there were no good reasons for the delay in service and that, if the Claimants had acted with reasonable diligence, the extensions of time would not have been required (or would not have been required for such lengthy periods). Accordingly, the Extension Orders should be set aside.

## J.    CONCLUSION

181.     For all the reasons set out above, I believe that it is just and appropriate to grant the Kazakovs' applications for orders: (**i**) setting aside Orders of Mr Justice Johnson dated 17 December 2020 (as amended), 31 December 2020, 31 March 2021 and 7 June 2021, granting permission for service of the Claim Form and Particulars of Claim out of the jurisdiction (including service out of the jurisdiction by alternative means on, inter alia, the Tenth to Twelfth Defendants) and/or extending time for service of the Claim Form; and/ or (**ii**) declaring that the Court does not have and/or will not exercise jurisdiction to hear the claims made against them in these proceedings.

**STATEMENT OF TRUTH**

I believe that the facts stated in this Witness Statement are true.

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:    .............................................

Name:        NICOLA BOULTON

Position:    PARTNER

Date:        18th August 2021