# Exhibit 3

<u>CLAIM NUMBER BL-2020-001050</u>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES</u>
<u>BUSINESS LIST (ChD)</u>
**BETWEEN:**

|       |                                                                                    |
|-------|------------------------------------------------------------------------------------|
| **(1)** | **LOUDMILA BOURLAKOVA**                                                           |
| **(2)** | **HERMITAGE ONE LIMITED**                                                         |
| **(3)** | **GREENBAY INVEST HOLDINGS LIMITED (formerly known as Maravan Services Limited)** |

<u>Claimants</u>

-and-

|        |                                              |
|--------|----------------------------------------------|
| **(1)**  | **OLEG BOURLAKOV**                         |
| **(2)**  | **DANIEL TRIBALDOS**                       |
| **(3)**  | **LEO SERVICES HOLDING LTD**               |
| **(4)**  | **LEO TRUST SWITZERLAND AG**               |
| **(5)**  | **REUWAN SCHWARZ**                         |
| **(6)**  | **SEMEN ANUFRIEV**                         |
| **(7)**  | **NIKOLAI KAZAKOV**                        |
| **(8)**  | **VERA KAZAKOVA**                          |
| **(9)**  | **COLUMBUS HOLDING AND ENTERPRISES SA**    |
| **(10)** | **FINCO FINANCIAL INC**                    |
| **(11)** | **GATIABE BUSINESS INC**                   |
| **(12)** | **EDELWEISS INVESTMENTS ONC**             |
| **(13)** | **IPEC INTERNATIONAL PETROLEUM CO INC**    |

<u>Defendants</u>

---

**THIRD WITNESS STATEMENT OF ELIZABETH ANN SEBORG**

---

**I, ELIZABETH ANN SEBORG,** of 1 Plough Place, London, EC4A 1DE, **WILL SAY AS FOLLOWS:**

1. I am a Partner in the firm of PCB Byrne LLP of the above address, and along with my Partner, Nicola Boulton, I have overall conduct of this matter on behalf of the Seventh, Eighth, Tenth, Eleventh, and Twelfth Defendants (the "**Kazakov Defendants**"). In this witness statement I refer to the Seventh and Eighth Defendants as "Mr Kazakov" and "Mrs Kazakova" respectively, and together as the "**Kazakovs**". I refer to the Tenth to Twelfth Defendants as the "**Panamanian Companies**". This is my third witness statement in these proceedings.

2. I make this statement in support of the Kazakov Defendants' application dated 18 August 2021, for orders pursuant to CPR Part 11: (**i**) setting aside the orders dated 17 December 2020 (as amended), 31 December 2020 and 31 March 2021, granting permission for service of the Claim Form and Particulars of Claim out of the jurisdiction and/or extending time for service of the Claim Form; and/or (**ii**) declaring that the Court does not have and/or will not exercise jurisdiction to hear the claims made against the Kazakovs Defendants in these proceedings, in addition to the first witness statement of Nicola Jane Boulton dated 18 August 2021 ("**Boulton 1**").

3. More specifically, in this statement I respond to a number of matters raised in the factual evidence served by the Claimants on 22 October 2021, and in particular the seventh witness statement of Ms Alexandra Whiston-Dew dated 22 October 2021 ("**Whiston-Dew 7**") and Exhibit AWD7. Much of the content of Whiston-Dew 7 is a matter of submission. The Kazakov Defendants will make submissions at the appropriate time, in their skeleton argument and at the oral hearing of the applications. In light of this, and given the reply nature of this statement, I do not seek to respond to every point made in the Claimants' evidence. The Kazakov Defendants should not be taken to accept any point which I do not address. Where I refer to documents contained in Exhibit AWD7 to Whiston-Dew 7 in the course of this statement I will refer to them as "**[AWD7/x-x]**". For ease of reference, the structure of this witness statement adopts the headings used in Whiston-Dew 7.

4. As to the sources of my information in making this statement:

   a. I make this witness statement based in part on my personal knowledge of these proceedings and from the documents to which I refer, in which case I believe the statements to be true.

   b. Where I provide factual information about the Kazakovs or underlying events, I do so based on instructions from the Kazakovs. The Kazakovs do not speak English, so their detailed instructions have been obtained in Russian and they have confirmed the accuracy of the facts stated.

   c. Where I make statements about the proceedings in Monaco, I do so based on information provided by either the Kazakovs' lawyers in Monaco, Etude Mullot Avocat (who have confirmed the accuracy of that information), or in the Expert Report prepared by Maître Patricia Rey dated 12 November 2021.

5. Where I have relied on information provided by others, I confirm that the matters stated are true to the best of my knowledge, information and belief.

6. Attached to this witness statement is a paginated exhibit marked "[**EAS3/x-x**]" containing the relevant documents to which I refer below. Where reference is made in the witness statement to a page number, the reference is to the relevant page number in the exhibit unless it appears otherwise from the context.

7. Nothing in this statement is intended as a waiver of privilege.

## THE DOMICILE OF THE KAZAKOVS

8. In Section A of Whiston-Dew 7, the Claimants contend that Mr Kazakov lived permanently and primarily in Estonia and that, "*given that it appears that Mr and Mrs Kazakov lived together during their marriage*", Mrs Kazakova is "*most likely*" to have lived permanently or primarily in Estonia.

9. Mr Kazakov agrees (without making any admissions) that he should, for the purposes of determining jurisdiction for these proceedings, be regarded as domiciled in Estonia. Having conducted further investigation, the Kazakov Defendants withdraw the evidence contained in paragraph 37 of Boulton 1 (as well as the Kazakov Location

Schedule insofar as it relates to Mr Kazakov), which should not be relied upon as accurate.[1]

10. However, whilst no longer relevant, I would make the following brief observations in respect of paragraphs 9 to 17 of Whiston-Dew 7:

   a. The fact that Mr Kazakov referred in submissions to the Monaco Court to a meeting in 2014 near his "residence in Estonia" or "home in Estonia" does not mean that he was permanently or primarily resident in Estonia in 2014 (still less in any other year). It is perfectly possible to have a home in one country, visited (for example) during the holidays, but to live primarily in another country. As explained in Boulton 1, and explained further at paragraphs 23 to 25 below, Mr Kazakov has residential property in Estonia, including a property inherited from his mother. However, he also has substantial property in Russia, and I am instructed by Mr Kazakov that, in fact, he lived primarily in Russia until 2019.

   b. The Claimants' reliance on those statements in isolation is particularly surprising given that the submission at AWD7/2 begins by recording that Mr Kazakov is domiciled and resides in Monaco ("*domicilié et demeurant… à MONACO*"). Therefore, on the basis of Ms Whiston-Dew's own argument that Mr Kazakov's statements to the Monegasque Court should be regarded as reliable because they were made "before he had a reason to argue in these proceedings that he did not live in Estonia", the submissions in fact support the argument that Mr Kazakov regarded himself as domiciled in Monaco by December 2020.

   c. These proceedings were successfully served on Mr Kazakov in Monaco (but not in Estonia).

   d. In the proceedings commenced by Mrs Bourlakova in the Monaco Court in October 2021, to which I refer further below, Mrs Bourlakova describes Mr Kazakov as "*previously domiciled…. in Monaco*" and positively asserts that "*Until the date of Mr. Bourlakov's death, Mr. Nikolai Kazakov and his wife,*

---

[1]   It follows that the statements in the fourth sentence of paragraph 33 and in paragraph 36 of Boulton 1 are withdrawn as regards the position of Mr Kazakov's domicile at the time the claim was issued.

*Mrs. Vera Kazakova, occupied Mr. and Mrs. Burlakov's marital home in La Reserve, Monaco…*".

11. However, the Claimants are wrong to contend that Mrs Kazakova should be regarded as domiciled in Estonia because it can be assumed that she was domiciled in the same place as her husband. In fact, as explained in paragraph 38 of Boulton 1, Mrs Kazakova lived permanently and primarily in Russia.

12. Having carefully considered again her whereabouts during 2019 and 2020, Mrs Kazakova confirms that she was permanently resident and spent the majority of her time prior to issue of the claim form in Russia. A slightly revised schedule of her whereabouts in 2019 and 2020, updated to correct minor errors, and which shows she spent most of these two years in Russia, is exhibited. Mrs Kazakova has confirmed that this schedule is accurate to the best of her knowledge and belief.

13. In Whiston-Dew 7 the Claimants have criticised the evidence given on behalf of Mrs Kazakova including a lack of documentation. Mrs Kazakova has the documents discussed below which confirm her whereabouts.

14. <u>Mrs Kazakova's Russian passport:</u> Mrs Kazakova provided my firm with scanned copies of the pages of her Russian Federation international travel passport, issued on 28 June 2017 and expiring on 28 June 2022. Copies of the pages related to travel in 2019-2020 are exhibited at [**EAS3/2-5**]. Border control stamps are contained on these pages. In relation to this information, I note the following:

   a. The border control stamps contained information about her travel into and out of Russia. Mrs Kazakova has confirmed that she only used this international travel passport for travel into and out of Russia.

   b. Mrs Kazakova believes that the passport was not always stamped when Mrs Kazakova entered or left Russia by car (as she often would when travelling from or to Estonia, for instance).

c. I understand from publicly available information that the stamps placed by Russian border control agents include multiple data points, numbered in the below diagram:[2]



1 - Transport type
2 - Country and authority
3 - Stamp tool number
4 - Six-digit date (DD.MM.YY)
5 - Arrow indicating departure from or arrival to Russia
6 - Border staff shift number
7 - Port name

15. These stamps are placed in rows of two, with the left-hand side stamp indicating departure from Russia and the right-hand one the corresponding return.

16. Some stamps, however, are not legible due to the ink fading over time and/or the blurriness of the text on the stamps, and this information has not been incorporated in the Updated Location Schedule.

17. Mrs Kazakova's Estonian passport: Mrs Kazakova provided my firm with scanned copies of the pages of her Estonian international travel passport, issued on 1 December 2016 and expiring on 1 December 2021. Copies of the pages related to travel in 2019 and 2020 are exhibited at [**EAS3/17-18**]. This passport contains only one stamp in the period 2019 to 2020. Mrs Kazakova has confirmed that she uses this primarily for travel within the European Union, for which border stamps are not provided.

18. Photos: Exhibited at [**EAS3/20-68**] are various photos in Mrs Kazakova's possession taken during the years 2019 and 2020 where dates and locations are identifiable either from the data of the photo or from the content of the pictures. I set out a summary below of the various pictures:

---

2    GoingRus Travel "Штамп о пересечении российской границы в паспорте иностранного гражданина" ("Stamp on crossing the Russian border in the passport of a foreign citizen") (accessed on 12 November 2021) <https://goingrus.com/info/ru/get-russian-visa/informatsiya-k-prochteniyu/shtamp-na-granitse#rasshifrovka-shtampa>, a copy of which I exhibit at [**EAS3/6-10**], with a machine translation at [**EAS3/11-14**].

a. At [**EAS3/20-23**] are the photos of the historical building in St Petersburg known as the **"Apraksin House"** which is being restored by Mr Kazakov. The photos were taken by Mrs Kazakova on 10 January 2019, 21 January 2019 and 1 February 2019.

b. At [**EAS3/24-25**] is a photo taken near "Voyenno-Morskoy Politekhnicheskiy Institut" in St Petersburg on 4 February 2019.

c. At [**EAS3/26-27**] is a photo of Mrs Kazakova and their family dog taken in their family apartment in Kamennoostrovsky Prospekt, St Petersburg on 27 March 2019.

d. At [**EAS3/28-29**] is a photo of Mrs Kazakova's daughter and granddaughter taken in St Petersburg on 18 April 2019.

e. At [**EAS3/30-31**] is a photo of Mrs Kazakova taken on 19 May 2019. There is no location data available for this photo, but I am instructed that it was taken in the hallway of the Kamennoostrovsky apartment in St Petersburg.

f. At [**EAS3/32-33**] is a photo of Mrs Kazakova with one of her grandchildren in St Petersburg on 8 August 2019.

g. At [**EAS3/34-35**] is a photo of the Apraksin House taken by Mrs Kazakova on 13 August 2019.

h. At [**EAS3/36-37**] is a photo of the Nevskiy Prospect in St Petersburg, taken by Mrs Kazakova from the car window on 25 August 2019 (for comparison, Google Maps street view is exhibited at [**EAS3/38**]).

i. At [**EAS3/39-40**] is a photo of Mrs Kazakova next to the Apraksin House taken on 12 October 2019.

j. At [**EAS341-42**] is a photo of Mr and Mrs Kazakov's lounge at the Kamennostrovskiy Prospect Apartment. I am instructed that Mrs Kazakova took this photo on 17 December 2019 when she noticed a small water leakage on the ceiling.

k.  At **[EAS3/43-44]** is a photo of Mrs Kazakova and her friend at Mariinskiy II Theatre in St Petersburg taken on 16 February 2020. There is no location data for this photo but the theatre's main foyer's rear-lit onyx stone walls are easily recognisable and are featured on the official website **[EAS3/45]**.

l.  At **[EAS3/47-48]** is a photo of the construction works taken by Mrs Kazakova from the balcony of La Reserve, Monaco on 28 February 2020.

m.  At **[EAS3/49-50]** is a photo of the Monaco marina taken by Mrs Kazakova on 1 March 2020.

19. <u>WhatsApp messages:</u>  Exhibited at **[EAS3/51-67]** (with office translations at **[EAS3/68-71]**) are extracts from WhatsApp messages sent in 2019 and 2020 between Mrs Kazakova and her friend, which make various references to Mrs Kazakova's location.

20. <u>Social media post:</u>  Mrs Kazakova spent significant periods of time in 2020 in St Petersburg subject to lockdown measures imposed by the Russian government, between 9 March and 21 June 2020, and then again between 25 August and 30 December 2020. I am instructed that the sources above provide limited evidence of her location during these times.  However, at **[EAS3/73]** (with an office translation at **[EAS3/75]**) is screenshot of a message containing a post made on 21 June 2021 on Facebook by Mrs Kazakova's daughter, Svetlana, which states that after a three-month lockdown period, "*three comrades and a dog ... crossed the border on the route Ivangorod-Narva*", referring to the Russian-Estonian border. As indicated in the schedule, I am instructed that Mrs Kazakova spent some 2 months in Narva, Estonia as a summer holiday (including 14 days of quarantine on arrival) leaving Russia on 21 June 2020 and returning on 25 August 2020.  Following this, Mrs Kazakova returned to St Petersburg.

**Long-standing permanent residence in Russia**

21. In paragraph 22 below, I set out more information about Mrs Kazakova's life in Russia. Much of this detail was not included previously in circumstances where, as set out in

paragraph 33 of Boulton 1, the Claimants were not advancing any positive case that Mrs Kazakova was resident in Estonia.

22. Mrs Kazakova has stable and long-standing links to Russia, and to St. Petersburg in particular:

   a. As stated in in paragraphs 38 of Boulton 1, Mrs Kazakova was born in Kerch, in Crimea in 1955 and has spent her adult life in St Petersburg, where she met Mr Kazakov in April 1974 and where they married the following year and set up their home.

   b. <u>Property:</u> Prior to the dissolution of the Soviet Union, accommodation was state controlled and largely assigned according to employment status. After the dissolution of the Soviet Union in December 1991, the Kazakovs bought an apartment located in the historical centre of St Petersburg (with the address Bolschoy Prospekt 4, Flat 28). This was their family home for many years. In 2016, the Kazakovs purchased in a quieter location in St Petersburg (address flat 17, 73-75A Kamenoostrovskiy Prospekt, St Petersburg, Russia). Copies of the registration certificates for these properties, showing the properties in Mrs Kazakova's name, are exhibited (with machine translations) at [**EAS3/74-81**] and [**EAS3/82-91**] respectively. The Kazakovs retain both properties and, when in Russia, continue to live in one or other of the two properties. I am instructed that the Kazakovs' dog, Masik, lived at Kamennoosotrvski in St Petersburg with Mrs Kazakova until it recently passed away.

   c. <u>Family:</u> The Kazakovs' daughter, Svetlana, was born in St Petersburg and still currently lives there with her 2 children (aged 17 and 12). When Svetlana's children were young, Mrs Kazakova provided substantial childcare support to her daughter in place of a nanny. Mrs Kazakova would walk her grandchildren to school and looked after them after school. Mrs Kazakova remains close to her daughter and grandchildren.

   d. In addition, Mrs Kazakova's family are mostly based in Russia, and she has maintained close contact with her family. In particular, Mrs Kazakova managed the care of her elderly mother, who lived in St Petersburg until her death in 2018. A copy of a medical bill that was paid for by Mrs Kazakov in 2017 (with

office translation) is at [**EAS3/92-93**] and a copy of her death certificate (with office translation) is at [**EAS3/94-95**].

e. <u>Religion:</u>  Mrs Kazakov attends Russian Orthodox churches in St Petersburg, namely the Knyaz-Vladimirsky Cathedral at 26 Blokhina Street and the Church of the Nativity of John the Baptist in St. Petersburg, 83 Kamennoostrovsky Prospekt.

f. <u>Theatre:</u>   For many years, Mrs Kazakova has had season tickets to the Mariinskiy Theatre in St Petersburg, where she attends operatic and ballet performances with her grandchildren.  Exhibited to this witness statement are:

   i.  a copy of a Mariinskiy Theatre membership document for a type 12 subscription for the 2019/2020 season purchased on 31 May 2019 and entitling the owner (customer number 1105076) to attend 6 performances [**EAS3/96-99**]; and

   ii.  screenshots of the order history from the Mariinskiy Theatre's website, which includes tickets purchased for performances [**EAS3/100-109**].

g. <u>Official government documentation:</u>[3]  Mrs Kazakova can produce the following official documents showing her residency of Russia:

   i.  Her registered address in Russia is the Bolschoy Prospekt apartment in St Peterburg, as shown in her domestic Russian passport, and has been since 25 May 1993 [**EAS3/110-111**].

   ii.  She has state health insurance in Russia and receives a state pension. Mrs Kazakova's Russian state insurance certificate is exhibited at [**EAS3/113-114**].

---

[3]  For the avoidance of doubt, I note that Mrs Kazakova is also on the Estonian population register and participates in the Estonian health insurance system. I am told she has done this to support her entitlement to an Estonian passport, obtained through her marriage to Nikolai, as at times it is convenient to travel on an EU passport.

iii. She pays income tax in Russia at the rate appliable to residents (13%), as opposed to non-residents.[4] A redacted copy of her tax declaration and its translation is at [**EAS3/116-118**].

23. In paragraphs 15 and 16 of Whiston-Dew 7, the Claimants assert that the Kazakovs own a number of properties in the town of Narva-Jõesuu, Estonia and suggest that this indicates that Mrs Kazakova (along with Mr Kazakov) lived permanently and primarily in Estonia.

24. As set out in paragraph 25below, the Kazakovs own four properties in Narva-Jõesuu, Estonia (not five, as alleged by the Claimants). The Kazakovs' ownership of properties needs to be put in the context of their use as summer properties (*dachas*) by the Kazakovs' immediate and wider family. Narva-Jõesuu is a coastal town on the Russian/Estonian border which has been a popular summer destination for Russians since the late 19th century, particularly for residents of St Petersburg (which is two to three hours away by car) who own their summer cottages and spend the summer months in this border town. Mrs Kazakova regularly spends time at these house in Narva with her family, which is included in the schedule she has prepared, but she has never considered it her main or permanent home.

25. In terms of the specific properties identified by the Claimants, I am instructed by Mrs Kazakova as follows:

a. Vambola pork 1, 29022, Narva-Joesuu: This is a new plot of land which the Kazakovs acquired through an exchange of their plot on Raya Street (see subparagraph e below). The new plot is bigger and closer to the sea, and the Kazakovs are planning to build a house on it as the family is growing and their existing flats in Narva-Jõesuu are becoming crowded. The intention is for the property to be used as a summer residence by their direct family as well as relatives from their respective wider families. It follows that, to the extent that Ms Whiston-Dew's reference to it being intended to be used as "a substantial private residence" is intended to suggest this use is as their permanent or primary residence, this is incorrect.

---

4    Pursuant to Art.224 of the Russian Tax Code.

b. Flat 28, 6 Mere Puiestee, Sillamäe City, Ida-Viru, Estonia: This is Mr Kazakov's parents' flat and family home. After the death of his parents, he inherited the property and keeps it in remembrance of them, without making any changes to the property. His niece and her child use it during the summer.

c. Flat 18, Kesk 11, Narva-Joesuu, Ida-Viru, Estonia: The Kazakovs bought this flat when their eldest granddaughter was 5 years old, and they use it as a *dacha*.

d. Flat 9, Kesk 11, Narva-Jõesuu, Ida-Viru, Estonia: The Kazakovs bought the flat from a neighbour when their youngest granddaughter was born. This flat is connected with Flat 18 by a shared balcony and the properties are treated as one, which may be the reason for Boulton 1 referring to the Kazakovs owning three (rather than four) properties in Estonia.

e. Estonia, Narva-Joesuu Linn, Raja TN 2. AMV: The Kazakovs no longer own this property, which was exchanged for the plot of land at Vombola pork above.

**Monaco**

26. At paragraph 38(d) of Boulton 1, I note that Mrs Kazakova is now based in Monaco, which she (like Mr Kazakov) intends to be her permanent home going forward. Mrs Kazakova has confirmed that she is in the process of permanently settling in Monaco, but continues to spend some time in Russia, particularly as a Covid infection and pre-existing health conditions have led to a deterioration of her overall health, which has necessitated several trips back to St Petersburg. The doctors who have treated her for pre-existing medical conditions for several years are based in St Petersburg and the translation and transfer of medical records and finding appropriate specialists in Monaco is taking some time.

27. Since September 2021 she (along with Mr Kazakov) have resided in a property at "Chateau Périgord", 6 Lacets Saint-Léon, 98000 Monaco. A copy of the lease for this property (with translation) is at [**EAS3/119-136**]. Prior to moving to Chateau Périgord, starting from 1 October 2020 the Kazakovs rented an apartment on Parc Saint Roman, Monaco. A copy of the lease for this property (with translation) is at [**EAS3/137-144**]. Prior to this, while in Monaco during 2020 they resided (as Mrs Bourlakova has herself alleged to the courts in Monaco) at the property at "La Reserve", 5 Avenue Princesse

Grace (being the Bourlakovs' matrimonial home, with the Kazakovs staying with Mr Bourlakov).

28. In paragraph 11 of Whiston-Dew 7, the Claimants raise an alleged issue regarding service on the Kazakovs in September 2021, reported by a bailiff instructed by Mrs Bourlakova. The significance of this point is limited in circumstances where service of these proceedings on the Kazakovs was effected in Monaco in June, without difficulty. Regardless, I am instructed by Mr Kazakov that the explanation for these events is as follows:

   a. On leaving Parc Saint Roman, the Kazakovs declined to provide their new address to the Parc Saint Roman apartment manager, who I understand is the spouse of the bailiff employed by Mrs Bourlakova, due to suspicions that the manager may have been using her position to provide covert assistance to the Claimants against the Kazakovs' interests. This explains why neither the former apartment manager nor the bailiff are (or were) aware of the Kazakovs' current residence in Monaco.

   b. The Kazakovs did not immediately advise their new residency to the Claimants' legal representatives, seeking to keep this information confidential from the Claimants so as to protect the privacy of their home. The Kazakovs have now disclosed their address in Monaco proceedings regarding the Will (which I discuss below in paragraphs 48 to 58).

**THE BRUSSELS 1 REGULATION**

29. Very shortly before this witness statement was due to be filed, on 9 November 2021, the Claimants sent a letter to this firm advising that Leo Holding, Leo Services and Mr Tribaldos had decided to withdraw their respective applications. The Kazakov Defendants have not been informed of that decision by those defendants. The Kazakov Defendants also do not know the circumstances in which those defendants apparently took this decision (as to which they reserve all of their rights) but they infer that some arrangement has been reached between the Claimants and those defendants.

30. However, in light of this recent development, the Kazakov Defendants recognise that:

a. (as regards the common law regime) the necessary or proper party gateway contained in PD6B §3.1(3) will be available for the Claimants' claims; and

b. (as regards Regulation (EU) No 1215/2012 on the jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast), the "**Brussels Regulation**") the co-defendant jurisdiction under Article 8(1) will be available for the Claimants' claims.

31. In those circumstances, the Kazakov Defendants will not pursue the arguments set out in paragraphs 40 to 89 of Boulton 1. For the avoidance of doubt, the Kazakov Defendants do not submit to the jurisdiction of this court and it remains their position that the claims do not have a sufficient link to England and, in particular, that the Claimants have artificially sued Leo Holding for the purposes of obtaining an 'anchor' to drag them into proceedings in England. The Kazakov Defendants recognise that these are not matters which, as a matter of English law, provide a valid basis for challenging the jurisdiction. However, the Kazakov Defendants reserve the right to rely on those facts (and any other relevant matters) as may be appropriate in other jurisdictions as necessary.

32. The Kazakov Defendants maintain their jurisdiction challenges on the basis that it would be inappropriate for this court to exercise jurisdiction over the present claims, in particular given that the Monaco Courts are already hearing closely related matters (and can be expected to be seised of further related matters in the near future). Accordingly:

a. Mr Kazakov (and Mrs Kazakova, if she is found to be domiciled in Estonia) will contend that the proceedings should be stayed under Article 34 of the Brussels Regulation on the basis that the Monaco Asset Transfer Proceedings (which are in the process of being taken over by Mr Kazakov and Mrs Kazakova, as I explain in paragraph 38below) are related proceedings;

b. Mrs Kazakova and the Panamanian Companies contend that (*i*) the English courts do not have jurisdiction because Monaco was the proper forum for the Claimants' claims against them at the time when permission for service out was granted, alternatively (*ii*) the English court should stay proceedings on *forum non conveniens* grounds because Monaco is the proper forum for those claims as matters now stand; and

c. in any event, and in the alternative, the Kazakov Defendants ask the court to grant a stay on case management grounds in light of the Monaco Estate Proceedings (including the Will Forgery Claim and Will Enforcement Claim to which I refer below), the Monaco Criminal Proceedings and/or the Monaco Asset Transfer Proceedings.

33. For the avoidance of doubt, the Kazakov Defendants disagree with the argument advanced in paragraph 21 of Whiston-Dew 7. It has always been part of the Kazakov Defendants' application that the Court should not exercise any jurisdiction which it may have (which is a request to stay proceedings). In any event, the Claimants cannot realistically suggest that they are prejudiced or unable to deal with the requests for the court to stay proceedings identified above: the related proceedings in Monaco have been exhaustively addressed by both parties in their evidence. The Kazakov Defendants will explain why a stay is appropriate and permissible in their submissions.

## **PROCEEDINGS IN OTHER JURISDICTIONS**

34. Section D of Whiston-Dew 7 consists largely of comment and submission on other proceedings. The Kazakov Defendants will respond, as necessary, in their argument. In fact, Section D demonstrates that the centre of gravity of these worldwide proceedings is in Monaco: proceedings in other jurisdictions largely relate to other matters (*e.g.* the Russian criminal proceedings relating to an alleged attempt on Mr Bourlakov's life), are not progressing (*e.g.* Mrs Bourlakova's attempt to raise a criminal complaint in Panama), or are of an ancillary nature (*e.g.* applications for disclosure or search orders). I make some brief comments on some of the proceedings to which the Claimants refer below.

35. In paragraph 30(2)(a), Ms Whiston-Dew refers to current proceedings in Switzerland which, as she notes, are applications in effect to freeze any Swiss assets falling within Mr Bourlakov's estate. In relation to these proceedings:

a. I understand from Professor Dr. Andrew Garbarski, a lawyer practicing in Switzerland and a partner at the Zurich law firm of Bär & Karrer (and who is instructed by Mr Kazakov in relation to proceedings in that jurisdiction), that:

i. the relief granted in these proceedings is pursuant to the Swiss courts' power under Article 89 of the Federal Act on Private International Law ("**PILA**"), which provides the Swiss courts with the power to impose interim measures where a deceased, with their last domicile abroad, leaves assets in Switzerland. Those proceedings do not deal with the merits of ownership of those assets;

ii. if the deceased was a foreign citizen domiciled abroad, the Swiss authorities have jurisdiction to deal with those parts of the estate that are located in Switzerland only to the extent that the foreign authorities do not deal with them (pursuant to Article 88 para. 1 of the PILA);

iii. in his view, a Swiss court will therefore conclude that the courts of Monaco are dealing with the estate of Mr Bourlakov, in circumstances where (**i**) Mr Bourlakov had his last domicile in Monaco, (**ii**) was not a Swiss national, (**iii**) the handwritten will dated 21 October 2019 (the "**Will**") does not include a choice of forum in favour of the Swiss authorities, (**iv**) proceedings regarding the estate of Mr Bourlakov have been initiated by Mr and Mrs Kazakov in Monaco, and (**v**) Mrs Bourlakova, Veronica and Elena have initiated proceedings in Monaco challenging the validity of the Will and asserting their own rights (which I address further in paragraphs 48 to 58 below); and

iv. accordingly, a Swiss Court would not consider itself to have jurisdiction to rule on the merits of the estate of Mr Bourlakov (and therefore the ownership of any assets in Switzerland that fall within that estate).

b. Ms Whiston-Dew notes that Mrs Bourlakova and Veronica have opposed Mr Kazakov's application for access to the files, alleging (*inter alia*) he has misled the Swiss Court and that the Will on which he relies "*is not valid*". Mr Kazakov strongly denies any allegation he has misled the Swiss Court. I address Mrs Bourlakova and Veronica's position as to the Will below.

36. Accordingly, these Swiss proceedings can properly be regarded as ancillary to the Monaco Estate Proceedings.

37. As to paragraph 33, I have used the phrase "Monaco Estate Proceedings" as a term to refer, generally, to proceedings which form part of the administration of Mr Bourlakov's estate. Given their importance, I address these proceedings in a separate sub-section below.

38. At paragraphs 37 and 40, Ms Whiston-Dew refers to the fact that the Kazakovs have yet to take steps to resume the Monaco Asset Transfer Proceedings, and suggests that even if they did so it could not be determined until after the Monaco Estate Proceedings. I am advised by Etude Mullot that the Kazakovs have now resumed the Monaco Asset Transfer Proceedings (on the basis that they are Mr Bourlakov's universal legatees) by filing a summons, a copy of which is attached (with translation) at [**EAS3/145-213**]. The effect of filing this summons is that the proceedings have been resumed. At a hearing on 11 November 2021, the court fixed the Monaco Asset Transfer Proceedings for a directions hearing on 13 January 2022. I anticipate that Mrs Bourlakova will dispute the Kazakovs' standing to do so on the basis of the matters relief upon in the Will Forgery Claim (which I address below), which will result in the issues raised by that claim identified below being considered by the courts in Monaco in due course. Despite Ms Whiston-Dew's assertions that Mrs Bourlakova is the universal legatee, that is plainly a matter in dispute which will have to be resolved (and is already the subject of pending proceedings) in Monaco.

39. As to paragraphs 42 to 44, Ms Whiston-Dew is wrong to say that the partnership is irrelevant to the community property claim advanced by Mr Bourlakov. For example, I understand from Etude Mullot that whether Mr Kazakov had an interest in the relevant monies will form an important issue because Mr Bourlakov could not (and would not) have made an outright gift of those monies to Mrs Bourlakova, as she contends, if they belonged in part to Mr Kazakov.

40. At paragraph 52, Ms Whiston-Dew confirms that the Monaco Bourlakova Criminal Proceedings have not been terminated by Mr Bourlakov's death. Etude Mullot confirms to me that this is correct and that an indictment could be issued against other persons who may be identified during the investigation of the matters alleged. If an indictment is issued against any person, Mrs Bourlakova (as a civil party) will be entitled to seek civil compensation against some or all of the individuals who are prosecuted.

41. At paragraph 56, Ms Whiston-Dew notes that Ms Lindon's view is that criminal proceedings would take at least five years before being finally resolved at a final hearing. I am advised by Etude Mullot that this estimate is likely too much, and a more reasonable estimate is closer to two to three years. I note that, even if it were right that it would take 5 years to reach a final hearing before the Tribunal, that would mean that those proceedings would be taking place in parallel to the present proceedings (if they are permitted to continue).

42. At paragraphs 58 and 59, Ms Whiston-Dew suggests ("*broadly speaking*") that the Monegasque Criminal Courts will only have jurisdiction where an act which forms an element of the crime has been committed in Monaco. I note, in that regard, that Mrs Bourlakova has made a criminal complaint (as civil party) in respect of the alleged forgeries and alleged invention by Mr Kazakov of an interest in the disputed assets, such that she must consider that elements of this alleged wrongdoing took place in Monaco.

43. At paragraph 60, Ms Whiston-Dew states that the understanding of Ms Lindon is that Monegasque criminal judgments are normally short and are not appropriate to resolve complex civil disputes. I am advised by Etude Mullot that while short judgments may be issued in simple criminal cases, this is not an accurate description of judgments that the Monaco criminal courts may produce in matters with complex factual and legal questions such as this one. In any event, the judgments are fully reasoned and identify the facts on which the court relies.

44. At paragraph 65 Ms Whiston-Dew states that if the criminal complaints do not result in an actual criminal conviction, they will not resolve any of the factual allegations. I am advised by Etude Mullot that she is wrong. Etude Mullot informs me that, where the criminal (investigating) judge or criminal court concludes that there has been no breach of a provision of the Criminal Code, a civil judge would be bound by that finding and that no civil proceedings could be brought on the same legal basis. For example, if the criminal proceedings were to conclude that a particular document had not been forged, a civil judge would be bound by this conclusion and civil proceedings could not be brought alleging the use of a forged document.

45. At paragraph 68, Ms Whiston-Dew states that a Monegasque Criminal Court would be unlikely to determine matters such as the ownership of the assets in issue in the present proceedings. I am advised by Etude Mullot that, contrary to Ms Whiston-Dew's statement, the Monegasque Criminal Court would be <u>required</u> to determine the existence of the partnership between Mr Bourlakov and Mr Kazakov in coming to a determination as to whether offences had been committed, since Mr Kazakov's allegation that Mrs Bourlakova has misappropriated assets of his which had been entrusted to her is predicated on Mr Kazakov having an interest in those assets.

46. At paragraph 78, Ms Whiston-Dew states that the Monegasque police have only conducted initial fact-finding interviews. Etude Mullot informs me that, based on the substantial steps (including interviews of third parties) which have been taken, that description is not accurate. I also note that Ms Whiston-Dew accepts that Mrs Bourlakova's own position is that "*an indictment [against her] appears to be imminent*".

## **MR BOURLAKOV'S ESTATE AND SUCCESSION**

47. Section E of Whiston-Dew 7 (as well as Section D.2 and in various other paragraphs) attempts to downplay the relevance of proceedings in Monaco relating to Mr Bourlakov's estate. In summary, her arguments come down to two points:

    a. the determination of disputes relating to the administration of the estate, including the ownership of assets and claims to them, need not be made by the Monaco Courts as part of the Monaco Estate Proceedings; and

    b. the Kazakovs are not Mr Bourlakov's residuary legatees ("*and indeed have no interest in his estate*"), and that this "*will be resolved … in the administration of Mr Bourlakov's estate*".

48. While I respond (as appropriate) to the substance of these points below, crucial developments have occurred in the Monaco Estate Proceedings since Whiston-Dew 7 was filed on 22 October 2021 – namely, the filing of competing civil proceedings regarding entitlement to Mr Bourlakov's residuary estate. It is perhaps surprising that the Claimants saw fit to inform the court that there were "presently" no proceedings in relation to Mr Bourlakov's estate in Monaco, but omitted to mention the fact that Mrs

Bourlakova intended imminently to commence (and did, in fact, commence within days of filing that statement) proceedings in Monaco relating to the administration of Mr Bourlakov's estate.

49. On 27 October 2021, Mrs Bourlakova, Veronica and Elena made an application for the Russian-language Will to be declared a forgery ("**the Will Forgery Claim**") (a copy of which, with official translation, is exhibited at [**EAS3/214-255**]). Mrs Bourlakova, Veronica and Elena put themselves forward as the sole heirs of Mr Bourlakov and as entitled to inherit his estate in succession. The Kazakovs are the primary respondents to this application and, as per the procedural process described by Maître Bergonzi at paragraphs 28 to 29 of his Second Expert Report, the two notaries are also in effect joined to the application so that they will be bound by the ultimate decision of the Court. In these proceedings, Mrs Bourlakova and her daughters contest the authenticity and validity of the Will and claim that they are the sole heirs pursuant to a will made in Canada on 8 January 2004 which purports to leave the estate to Mrs Bourlakova alone. (For ease of reference I shall refer to this document as "**the 2004 Will**" but this term is used without any admission of the document's validity or authenticity.)

50. The first hearing date in this application is scheduled for 9 December 2021.

51. Unsurprisingly, the Will Forgery Claim relies on many of the matters which form the basis of the fraud allegations in these proceedings. For example:

  a. In the Will Forgery Claim, Mrs Bourlakova alleges at paragraphs 3 and 4 that Mr Kazakov falsely demanded money from her. This was said to follow shortly after Mr Bourlakov rejected the proposed distribution of marital assets in 2018:

> *"The BOURLAKOV spouses tried to reach an amicable agreement for the distribution of matrimonial property but, at the time when the latter was about to be signed, Mr BOURLAKOV ended the discussion without the implementation of the agreement being finalised.*
>
> *Shortly thereafter, in December 2018, Ms. Loudmila and Ms. Veronica BOURLAKOVA received several messages from Mr. Nikolai KAZAKOV, Oleg BOURLAKOV's brother-in-law, claiming money, without right or title and without them understanding why."*

b. In paragraph 36 of the Will Forgery Claim, Mrs Bourlakova asserts: *"After having wrongly declared themselves to be creditors of half of the joint estate of Mr. and Mrs Bourlakov, Mr and Mrs Kazakov are now declaring themselves to be universal legatees of Mr Bourlakov without any right … They are thus using a false capacity before the courts"*. The Will Forgery Claim therefore expressly seeks to link the Kazakovs' allegedly false claims of partnership to the allegations of false claims to be legatees.

c. Mrs Bourlakova also relies in the Will Forgery Claim on what she describes as the *"deceit and treachery shown by the KAZAKOV family"* (paragraph 33).

52. Further, whilst Mrs Bourlakova has been careful in the Will Forgery Claim not to refer at this time to her allegations that the Kazakovs have created forged documents, it would be wholly unrealistic to think that (after the resolution of this jurisdiction challenge) Mrs Bourlakova will not seek to rely on her allegations that Mr Kazakov has been involved in creating other forgeries to support her Will Forgery Claim.

53. The Will Forgery Claim also seeks that the Monegasque court determine the issue of ownership of the Black Pearl, specifically whether this asset formed part of Mr Bourlakov's estate (paragraph 78). This appears to raise issues of ownership of this asset which overlap with the Claimants' claims in these proceedings, where a declaration is sought that any interest which the Kazakovs hold in the Black Pearl is held as nominee for Mr Bourlakov (see Prayer (6) in the Amended Particulars of Claim).

54. On 29 October 2021, the Kazakovs filed proceedings against Mrs Bourlakova, Veronica and Elena seeking a declaration that the Will is valid and that the Kazakovs are the universal legatees of Mr Bourlakov's residuary estate ("the **Will Enforcement Claim**") (a copy of which, with official translation, is exhibited at [**EAS3/256-309**]. In consequence, the Kazakovs seek an order placing them in possession of Mr Bourlakov's estate in accordance with Article 864 of the Civil Code.

55. The first hearing in this claim is scheduled for 6 January 2022.

56. As with the Will Forgery Claim, the Will Enforcement Claim brings into play the events which form the subject-matter of these proceedings. Thus, in explaining why the Will

disinherits Mrs Bourlakova and her daughters, the Kazakovs rely on the breakdown of Mr Bourlakov's relationship with Mrs Bourlakova and his belief that she and her daughters misappropriated monies from the business partnership formed by Mr Bourlakov and Mr Kazakov monies:

> "*since 2018 his wife and daughters had completely abandoned him after stealing more than 1,500,000,000.00 euros of assets from the business partnership with Nikolai KAZAKOV, the divorce petition launched by Ludmila [BOURLAKOVA], the criminal complaints, the request for revocation of donations, etc. The deceased had lost all confidence in his wife and daughters since they had committed numerous offences against him and he did not intend to let them keep the assets they had misappropriated.*"

And:

> "*The climax was reached when Oleg Bourlakov discovered that his wife, two daughters and sons-in-law had embezzled considerable assets, as well as those of his brother-in-law and business partner, Nikolai Kazakov, from the joint business, since they were the only ones who worked tirelessly. Like his brother-in-law Nikolai KAZAKOV, Oleg BOURLAKOV filed a complaint in the Principality with civil action against Loudmila [BOURLEKOVA] on 9 January 2019 on charges of breach of trust and concealment*"

57. As a result, and as foreshadowed in paragraph 124 of Boulton 1, the Monaco Courts will now determine the entitlement of those claiming to be heirs to Mr Bourlakov's residuary estate.

58. Given the allegations made in the Will Forgery Claim and the Will Enforcement Claim, it appears that the Monaco Court as part of these proceedings will consider whether there was a scheme by Mr Bourlakov and the Kazakovs to falsely assert that Mr Kazakov was his business partner to deprive Mrs Bourlakova of her share of the marital assets. Given the allegations of dishonesty already made against the Kazakovs, it is likely that Mrs Bourlakova will, at some point in the Will Forgery Claim also seek to rely on allegations that the Kazakovs were part of a scheme to produce forged documents, another aspect of her claim in England. As such, it is likely that the

Monegasque court will consider and determine the very things which would, if the English court accepts jurisdiction, be considered in parallel in England.

59. This supports the Kazakov Defendants' position that Monaco is the proper forum.

60. Further, as explained in the Expert Report prepared by Maître Patricia Rey dated 12 November 2021, the courts in Monaco are competent to resolve any disputes arising out of the administration of Mr Bourlakov's estate (and, indeed, are exclusively competent to do so in respect of the substantial assets in Monaco). Whether or not it is theoretically possible for such issues to be resolved by foreign courts and recognition then to be sought of those judgments, it is perfectly clear that the courts in Monaco can resolve such disputes and that, in the circumstances of this case, the courts in Monaco are likely to be called upon to resolve numerous disputes and that they are the most appropriate forum for the comprehensive resolution of all such disputes. The Kazakov Defendants' position will be developed further in argument.

61. As regards Ms Whiston-Dew's second point, the assertion that the Monaco courts will determine that the Kazakovs have no interest in Mr Bourlakov's estate, these are clearly matters in dispute (as demonstrated by the rival claims pending before the Monaco court). In circumstances where it is clear that it will be litigated in the appropriate jurisdiction (Monaco), but the Kazakovs have not yet filed their response to the Will Forgery Claim, I do not intend to respond to the matters made in paragraphs 114 to 127 which purport to support her conclusion, save to note that:

    a. The Kazakovs strongly deny that the Will is not authentic or valid, and any allegation (express or implied) as to their having any participation in the production of a forgery is strongly denied.

    b. In both these proceedings and the Will Forgery Claim, Mrs Bourlakova relies on a report by Fiona Marsh M.Sc (exhibited at [**AWD7/201**]). The Kazakov Defendants are in the process of obtaining their own expert report on the Will; in the meantime, I note briefly that:

        i. It does not appear that Ms Marsh can read Cyrillic script. This is based on (i) Ms Marsh being provided a line-by-line translation of the Will from Russian to English, and (ii) her profile on the Law Society Gazette

Legal Services Directory of expert witnesses (which does not indicate she can read Cyrillic script). If that is the case, it is unclear to me how Ms Marsh could properly examine Cyrillic handwriting. In fact, perhaps implicitly acknowledging this, Ms Marsh's conclusion that the document exhibits a "*change in writing style*" is based solely on the fact that the writing on the page changes from "*regular spacing with wide gaps*" to "*lines [being] closer together and on two consecutive lines the word on the right hand edge curves down into the right hand margin due to a lack of space*", without any analysis of the handwriting itself at all.

ii. In circumstances where Ms Marsh does not – and, indeed, could not – opine on the authenticity of the handwriting of the Will, I do not consider the Claimants have raised any *prima facie* basis to challenge its authenticity.

c. As summarised in paragraphs 35 and following of the Will Enforcement Claim, the Kazakovs contend (by reference to case law) that the courts will adopt a common sense and liberal interpretation to a will which (a) seeks to preserve and give effect to the intention of the testator and (b) avoids rendering it invalid; and that, applying these principles, courts have interpreted legacies in favour of a foundation which did not exist as being a gift to persons who already existed and would be responsible for setting up a foundation. These arguments are, of course, matters of Monegasque law for decision by the courts in Monaco.

62. As regards Ms Whiston-Dew's position on the limits of the Monegasque courts to resolve disputes about assets in foreign jurisdictions, I am advised by Etude Mullot that the only class of asset which the Monaco courts are restricted from determining is foreign real estate which is legally owned (i.e. in the name of the deceased); for the avoidance of doubt, the courts in Monaco are able to determine the ownership of an entity which itself owns real estate abroad.

**THE PROPER FORUM**

63. Section F of Whiston-Dew 7 details the Claimants' position on the issue of *forum non conveniens*. Much of this section deals with matters of submission to which I do not respond here. For the avoidance of doubt, the Kazakov Defendants other than Mr

Kazakov will contend that the court should decline jurisdiction on the basis that it was not the proper forum or, in the alternative, grant a stay on *forum non conveniens* grounds on the basis that it is no longer the proper forum.

64. At paragraph 132, Ms Whiston-Dew sets out what she describes as a summary of the competing positions of the Claimants and the Kazakov Defendants. Much of this is a matter of submission to which the Kazakov Defendants will respond properly in submission, but I note that Ms Whiston-Dew appears to misunderstand the Kazakov Defendants' position. Whatever the position may have been in 2020, in circumstances where (as set out above in paragraph 27) the Kazakovs are now residing in Monaco, the position remains as I set out at paragraph 107 of Boulton 1, *i.e.* that the Claimants could and should bring their claims as a standalone civil proceedings in Monaco, and the courts in Monaco would then be able to case manage such proceedings alongside all the other proceedings currently pending and which may be commenced in Monaco relating to the overarching disputes between Mr Bourlakov, Mrs Bourlakova and the Kazakovs.

65. In paragraph 136, Ms Whiston-Dew suggests that there is some doubt as to whether Monaco is an available forum. Under Monaco law, the Kazakovs would be presumed to be domiciled in Monaco given that both hold residence permits. In any event, I confirm that all of the Kazakov Defendants will undertake (in the event that their jurisdiction challenge is granted) to submit to the jurisdiction of the courts of Monaco in respect of the claims being advanced by the Claimants in these proceedings.

66. I do not respond to paragraphs 139 and 140, which are matters for argument, save to observe that Ms Whiston-Dew ignores the fact that the proceedings are all about an alleged fraud relating to the breakdown of the marriage of Mr Bourlakov and Mrs Bourlakova, who were domiciled in Monaco and whose divorce was subject to proceedings in the courts in Monaco (which were the subject of the settlement discussions in which the fraudulent misrepresentations are said to have been made). The Kazakov Defendants will submit that it is overwhelmingly likely that the majority of the claims are governed by Monegasque law.

67. In paragraphs 143 and 144, Ms Whiston-Dew sets out a number of reasons which purport to show an "*extremely limited*" connection to Monaco and instead "*more*

*substantial connections*" to England.  I do not respond to the vast majority of these, which will be a matter of submission, save to note the following:

a. At paragraph 143(1)(c), Ms Whiston-Dew states that, by the time the dispute between Mr Bourlakov and Mrs Bourlakova arose, Mr Bourlakov "*was spending substantial periods in Latvia with Ms Shevtsova and substantial periods on his yacht (the Black Pearl)*". Surprisingly, Ms Whiston Dew does not identify her source for this information, and there is reason to place little weight on this vague assertion. I am advised by Mr Anufriev that, to the best of his knowledge, Mr Bourlakov spent very little time on the Black Pearl, partly on the basis that it had not been fully furbished or completed.

b. As to paragraph 143(2), on any view the Kazakovs have a far closer connection to Monaco (where they have obtained a residence permit and spend considerable time) than England (where they have no connections).

c. At paragraphs 143(4) and 143(4), Ms Whiston-Dew states that Veronica and Mr Gliner "*live in London*".  She gives no evidence about their domicile or usual or permanent residence, notwithstanding Veronica's status as a Monaco resident. Regardless of her claimed (and unevidenced) connection to this jurisdiction, I note that in all proceedings filed in Monaco since 2018, including (as of October 2021) in the Will Forgery Claim, Veronica has consistently described herself as "*demeurant [residing / inhabiting] "One Monte-Carlo", 1 place du Casino à Monaco*", which I understand is Mrs Bourlakova's Monaco residence..

d. At paragraph 143(5), Ms Whiston-Dew asserts that the Family Office in Monaco, and the corporate service provider used by the Family Office and Mr Bourlakov, SAM Equiom ("**Equiom**"), have little to no relevance to the dispute. In response to this, I understand (from documents or information provided by Etude Mullot) that:

    i. Equiom (previous Carey Group) and its employees acted for the Family Office, and thereby managing the affairs of Mr Bourlakov, since the Family Office was set up in 2012;

ii.  it is the Kazakovs' position that certain entities, including Hermitage One, Chasehill and Greenbay, were managed by the Family Office and administered by Equiom (as corporate service providers). Those entities play important roles in the dispute;

iii.  the managing director of Equiom, Mr Stephan Postifferi, has been interviewed by the Monaco authorities in relation to both Mrs Bourlakova's criminal complaint (alleging that Mr Kazakov and Mr Bourlakov have created a false story of the partnership and forged documents) and the Kazakovs' criminal complaint. This gives an indication of Equiom's relevance and significance;

iv.  similarly, Equiom personnel have been interviewed by the Monaco investigating authorities in relation to Mr Kazakov and Mr Bourlakov's criminal complaint against Mrs Bourlakova regarding for misappropriation of their assets; and

v.  the Particulars of Claim make specific allegations about interactions with Equiom concerning the loans in issue in these proceedings.

I therefore consider it extremely likely that:

i.  the Family Office and Equiom would have relevant documents relating to administration of companies which are central to the dispute;

ii.  individuals from Equiom would be called to give evidence relevant to the dispute.

e.  The Kazakov Defendants have addressed the argument made in paragraph 143(6) as to the importance of the proceedings in Monaco extensively above and in Boulton 1. On any view, the Claimants can no longer maintain that there are no ongoing substantive civil proceedings in Monaco.

f.  As to paragraph 144(1) to (3), the Kazakov Defendants contend that key meetings also took place in Monaco; all of the meetings related to divorce proceedings in Monaco; the 'loss' in England appears to be some (unidentified) proportion of legal fees, which are a fraction of the true amounts in dispute; and

most of the claims are overwhelmingly likely to be governed by Monegasque law.

g. As to paragraph 144(4), it appears to be common ground that none of the key protagonists (i.e. Mr Kazakov, Mrs Kazakova and Mrs Bourlakova) are connected with England, although all of them have connections with Monaco. Further, as I explain above, Veronica and Mr Gliner have consistently informed the courts in Monaco that they reside in Monaco.

h. At paragraph 144(5)(b), Ms Whiston-Dew identifies a transaction she describes as "*key*" to any claim by the Kazakovs (being US$39 million transferred by Mrs Bourlakova from a Swiss account to a Credit Suisse account in the United Kingdom). This single transaction should be considered in the context set out above – i.e. part of a dispute over the misappropriation of US$1.5 billion of assets into offshore structures and transfers of hundreds of millions of US dollars to numerous jurisdictions (including Canada, Switzerland, and Monaco), which is itself part of a dispute about total sums exceeding US$4 billon (according to paragraph 171 of Ms Whiston-Dew's First Witness Statement). I also understand from Etude Mullot that within six months of the transfer of US$39 million into Mrs Bourlakova's account, transfers totalling that amount had been made to Veronica and Elena at accounts in Canada and Switzerland. Insofar as the Claimants are suggesting that the presence of this single transaction would make England the obvious location for any claim by the Kazakovs against Mrs Bourlakova and others, in circumstances where those funds appear to have been transferred out of the jurisdiction, I disagree.

i. At paragraph 144(6), Ms Whiston-Dew suggests that it is important that many of the key witnesses appear to speak English while few appear to speak French. The reality appears to be that the key witnesses speak neither English nor French (or, in any event, would wish to give evidence in their first language, which is neither English nor French). In any event I am advised by Etude Mullot that the Monaco courts can provide for the use of a certified translator when a witness does not speak French.

j. At paragraph 144(7), Ms Whiston-Dew suggests that many key documents are in English. Notwithstanding that at the start of a case it is difficult to identify what will be the key documents for a dispute, I note that equally, many key documents are in (**i**) French, particularly relating to the transfers of the entities to Mrs Bourlakova in 2014 and the various transfers of funds in 2018/2019, including correspondence with banks, bank statements, transcripts of interviews undertaken by the Monaco Police or (**ii**) other languages, particularly Russian, in circumstances where the main business interests of Mr Bourlakov and Mr Kazakov were in Russia, and correspondence relating to those business interests (including between Russian-speaking defendants and/or the Claimants to these proceedings) is likely to be relevant to prove (or disprove) the existence of any partnership, such that the English courts are in no better position than those in Monaco.

k. At paragraph 144(8), Ms Whiston-Dew suggests that the existence of an unfair prejudice claim under s. 994 of the Companies Act 2006 by Rudan Business Holdings SA ("**Rudan**", a shareholder in the Third Defendant, Leo Holding) against Leo Holding, Mr Tribaldos, and the other corporate shareholder of Leo Holding. I note that:

   i. The Kazakov Defendants have a very limited understanding of the unfair prejudice petition, which is an entirely separate set of proceedings involving different parties. There has been no suggestion that those proceedings (which appear to be somewhat advanced) would, or sensibly could, be heard together with these proceedings.

   ii. In any event, there are substantial factual matters on which there is no overlap between the proceedings, including:

      1. in the Rudan claim, matters relevant to the shareholding and control of Leo Holding, including the existence of a "Fundamental Understanding" and a "DT Non-Participation Agreement"; and

      2. in these proceedings, an overarching alleged conspiracy directed at Mrs Bourlakova, as well as issues relating to the partnership

between Mr Bourlakov and Mr Kazakov, which are of no relevance to the claims in the Rudan proceedings.

iii.  There is no apparent overlap of legal issues.

iv.  The limited extent of this overlap is even more superficial when taking into account the broader dispute between the parties across multiple jurisdictions, as set out in paragraphs 8 and 9 of Boulton 1.

l.  As to paragraph 144(9), whilst primarily a matter for submission, the Kazakov Defendants do not accept that the Claimants would (or would necessarily be permitted to) continue their proceedings against Leo Holding (or others) if this court concluded that the proper forum for the proceedings was Monaco and that the English courts did not have or would not exercise jurisdiction over the Kazakov Defendants.  In any event, if the Claimants choose to proceed against certain defendants in a less appropriate forum, they bear the consequences of their own decision and it does not follow that they can dictate that the Kazakov Defendants should also be sued in a less appropriate forum.

m.  As to paragraph 146, and as explained in the Expert Report prepared by Maître Patricia Rey dated 12 November 2021, the Kazakov Defendants do not accept that a judgment rendered by this court would be recognised against them in Monaco.  To the contrary, the Kazakov Defendants will contend that the claims do not have a "sufficient connection" with England for the purposes of enforcement in Monaco, particularly given that Leo Holding is being sued for the purpose of obtaining jurisdiction in England.

n.  As to paragraph 148, the Claimants ignore the fact that Mr Bourlakov was alive and domiciled in Monaco when they commenced proceedings.  There was no reason why they could not have commenced proceedings against all of the defendants in the most appropriate jurisdiction, i.e. Monaco, rather than engaging in forum shopping.  Now, given the Monaco Estate Proceedings, it is even more appropriate that these disputes should be resolved in Monaco.

68. At paragraphs 151 to 156, Ms Whiston-Dew suggests that it may be impossible for all of the defendants to obtain representation in Monaco.   I note that no defendant has

raised any such concern. Ms Whiston-Dew sets out a list of separately represented defendants she is not aware of having Monegasque representation. Of the five named, I am advised by Etude Mullot that Leo Holding has a Monaco lawyer engaged as an expert in these proceedings, who could be instructed should the English proceedings terminate. While, to the best of my and Etude Mullot's knowledge, the other defendants have not yet engaged Monaco lawyers, I consider that there are sufficient options among the fifteen lawyers who appear to be conflict free, by the Claimants' count, to represent them, assuming they wished to have separate representation to Leo Holding.

69. As to paragraph 160, it is not appropriate for the Claimants to engage in comparisons as to how long proceedings are likely to take in the respective jurisdictions. In any event, there is no reason to believe that the time taken to reach a final resolution will be markedly different in England and Monaco.

## EXTENSIONS OF TIME FOR SERVICE OF THE CLAIM FORM

70. In Section G, Ms Whiston-Dew criticises the Kazakov Defendants apparently for not actively engaging in these proceedings prior to PCB Byrne coming on the record in this jurisdiction and acknowledging service in July of this year, without prejudice to its position in this application. I note, however, that at no time prior to that did the Claimants contact the Kazakovs to notify them of the proceedings and/or to invite them to accept service. This was the case even though Mrs Bourlakova was in correspondence with the Kazakovs and their legal representatives for other purposes, including in Monaco where – notably – Etude Mullot's representation of Mr Kazakov was acknowledged by Mrs Bourlakova in a letter sent to him by Mischon de Reya, her (and now the other Claimants') English solicitors, dated 14 June 2020, "*in relation to your role in acting for Mr Nikolai Kazakov*" [**EAS3/310**]. If it is being suggested that the Kazakov Defendants should have sought out the Claimants to ask them to serve the proceedings, even though the Claimants had not asked the Kazakov Defendants to do so, I disagree.

71. In paragraph 171, Ms Whiston-Dew suggests that the present proceedings involve many issues not the subject of proceedings in Monaco at the time the Particulars of Claim were finalised. This point appears to be a matter of submission, based on a careful

definition of what constitutes "*the subject of proceedings extant at the time*". Specifically:

    a.  As set out in paragraphs 130 and 131 of Boulton 1, Mrs Bourlakova, Veronica and Elena's written submissions in the Monaco Asset Transfer Proceedings (which Mr Bourlakov commenced on 5 June 2020) contain numerous allegations that are relied upon in the Particulars of Claim. Accordingly, Ms Whiston-Dew relies on the fact that those submissions were not filed until 2 December 2020 (i.e. barely two weeks after Particulars of Claim were "*finalised*") to argue that they were not "*the subject of the proceedings*" at that time, despite the fact that the Monaco Asset Transfer Proceedings were live and the fact that it would have been known to the Claimants at that time that they imminently would be the subject of them. I note that the submission filed on behalf of Mrs Bourlakova, Veronica and Elena's included an allegation that in March 2018, Mr Anufriev had sought to arrange with Equiom the transfer of the beneficial ownership of Hermitage One from Mrs Bourlakova to Mr Bourlakov, in conduct that appears very much part of the course of conduct alleged in paragraph 104 of the Particulars of Claim.

    b.  As set out in paragraphs 137 to 141 of Boulton 1, many of the allegations of forgery and misappropriation have been the subject of criminal complaints made in Monaco. Accordingly, to exclude these from consideration, Ms Whiston-Dew (as she does in other parts of Whiston-Dew 7) relies on a definition of "*proceedings*" which excludes criminal complaints where an indictment had not been issued.

72. I also note that Ms Whiston-Dew had not identified any evidence or information which only became available in the period after July 2020 but before the Particulars of Claim were first served in November 2020. The Kazakov Defendants will invite the court to infer that the Claimants would have been able to produce Particulars of Claim in or shortly after July 2020, as a result of the apparently extensive investigations undertaken by Mishcon de Reya, but made a conscious choice not to do so.

73. In paragraph 173 to 176, Ms Whiston-Dew sets out steps that her firm took to serve the claims. Whilst this is a matter for submission, the Kazakov Defendants will contend

that this chronology demonstrates a lack of sufficient effort (and, in some cases, errors on the part of the Claimants) which cannot justify the significant extension to the validity of the Claim Form.

74. I do not understand the points made by Ms Whiston-Dew in paragraphs 176 and 177. The Panamanian Companies have acknowledged service. There is, accordingly, no basis for the (exceptional) course of dispensing with service.

## CONCLUSION

75. For all the reasons set out above, I believe that it is just and appropriate to grant the Kazakovs' applications for orders: (i) setting aside the orders granting permission for service of the Claim Form and Particulars of Claim out of the jurisdiction and/ or extending time for service of the Claim Form; and/ or (ii) declaring that the Court does not have and/or will not exercise jurisdiction to hear the claims made against them in these proceedings.

## STATEMENT OF TRUTH

I believe that the facts stated in this Witness Statement are true.

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ........................................................

Elizabeth Ann Seborg

Partner

Dated: 12 November 2021

| | Updated Location Schedule | | |
|---|---|---|---|
| **Country** | **Date of arrival** | **Date of departure** | **Number of days** |
| **2019** | | | |
| Russia | 01/01/2019 | 03/01/2019 | 2 |
| Estonia | 04/01/2019 | 06/01/2019 | 2 |
| Russia | 06/01/2019 | 06/02/2019 | 31 |
| France | 06/02/2019 | 07/02/2019 | 1 |
| Monaco | 07/02/2019 | 08/02/2019 | 1 |
| Russia | 09/02/2019 | 14/02/2019 | 5 |
| Estonia | 14/02/2019 | 16/02/2019 | 2 |
| Russia | 16/02/2019 | 16/02/2019 | 0 |
| Estonia | 16/02/2019 | 17/02/2019 | 1 |
| Russia | 17/02/2019 | 05/03/2019 | 16 |
| Monaco | 06/03/2019 | 08/03/2019 | 2 |
| Latvia | 09/03/2019 | 11/03/2019 | 2 |
| Russia | 11/03/2019 | 15/03/2019 | 4 |
| Estonia | 15/03/2019 | 17/03/2019 | 2 |
| Russia | 17/03/2019 | 05/04/2019 | 19 |
| Estonia | 05/04/2019 | 06/04/2019 | 1 |
| Russia | 07/04/2019 | 08/05/2019 | 31 |
| Estonia | 08/05/2019 | 09/05/2019 | 1 |
| Russia | 09/05/2019 | 25/05/2019 | 16 |
| Estonia | 25/05/2019 | 27/05/2019 | 2 |
| Russia | 27/05/2019 | 07/06/2019 | 11 |
| Estonia | 07/06/2019 | 10/06/2019 | 3 |
| Russia | 10/06/2019 | 12/06/2019 | 2 |
| Monaco | 13/06/2019 | 19/06/2019 | 6 |
| Estonia | 20/06/2019 | 23/06/2019 | 3 |
| Russia | 23/06/2019 | 26/06/2019 | 3 |
| Estonia | 27/06/2019 | 28/06/2019 | 1 |
| Russia | 28/06/2019 | 03/07/2019 | 5 |
| Estonia | 03/07/2019 | 08/07/2019 | 5 |
| Russia | 08/07/2019 | 11/07/2019 | 3 |
| Estonia | 11/07/2019 | 17/07/2019 | 6 |
| Russia | 17/07/2019 | 19/07/2019 | 2 |
| Estonia | 19/07/2019 | 23/07/2019 | 4 |
| Switzerland | 24/07/2019 | 26/07/2019 | 2 |
| France | 26/07/2019 | 26/07/2019 | 0 |
| Monaco | 26/07/2019 | 29/07/2019 | 3 |
| Latvia | 30/07/2019 | 31/07/2019 | 1 |
| Russia | 31/07/2019 | 09/08/2019 | 9 |
| Estonia | 10/08/2019 | 20/08/2019 | 10 |
| Russia | 20/08/2019 | 21/08/2019 | 1 |
| Estonia | 21/08/2019 | 22/08/2019 | 1 |
| Russia | 22/08/2019 | 24/08/2019 | 2 |
| Estonia | 24/08/2019 | 27/08/2019 | 3 |
| Russia | 27/08/2019 | 30/08/2019 | 3 |
| Estonia | 30/08/2019 | 01/09/2019 | 2 |
| Russia | 01/09/2019 | 06/09/2019 | 5 |

| | | | |
|---|---|---|---|
| Estonia | 06/09/2019 | 09/09/2019 | 3 |
| Russia | 09/09/2019 | 14/09/2019 | 5 |
| Estonia | 14/09/2019 | 17/09/2019 | 3 |
| Russia | 17/09/2019 | 22/09/2019 | 5 |
| Estonia | 22/09/2019 | 23/09/2019 | 1 |
| Latvia | 23/09/2019 | 26/09/2019 | 3 |
| Switzerland | 26/09/2019 | 27/09/2019 | 1 |
| Monaco | 28/09/2019 | 30/09/2019 | 2 |
| Monaco | 30/09/2019 | 01/10/2019 | 1 |
| UK | 01/10/2019 | 02/10/2019 | 1 |
| France | 02/10/2019 | 03/10/2019 | 1 |
| Latvia | 03/10/2019 | 05/10/2019 | 2 |
| Estonia | 05/10/2019 | 07/10/2019 | 2 |
| Russia | 07/10/2019 | 11/10/2019 | 4 |
| Estonia | 11/10/2019 | 11/10/2019 | 0 |
| Russia | 11/10/2019 | 13/10/2019 | 3 |
| Estonia | 13/10/2019 | 15/10/2019 | 2 |
| Latvia | 15/10/2019 | 16/10/2019 | 2 |
| Monaco | 16/10/2019 | 18/10/2019 | 3 |
| Latvia | 18/10/2019 | 19/10/2019 | 1 |
| Estonia | 19/10/2019 | 20/10/2019 | 2 |
| Russia | 20/10/2019 | 25/10/2019 | 5 |
| Estonia | 25/10/2019 | 27/10/2019 | 2 |
| Latvia | 27/10/2019 | 28/10/2019 | 2 |
| UK | 28/10/2019 | 30/10/2019 | 2 |
| Latvia | 30/10/2019 | 31/10/2019 | 2 |
| Russia | 31/10/2019 | 03/11/2019 | 4 |
| Latvia | 03/11/2019 | 04/11/2019 | 1 |
| France | 04/11/2019 | 05/11/2019 | 2 |
| USA | 05/11/2019 | 07/11/2019 | 3 |
| France | 08/11/2019 | 09/11/2019 | 1 |
| Latvia | 09/11/2019 | 11/11/2019 | 3 |
| Russia | 11/11/2019 | 28/11/2019 | 17 |
| Estonia | 28/11/2019 | 28/11/2019 | 0 |
| Russia | 28/11/2019 | 29/11/2019 | 1 |
| Estonia | 28/11/2019 | 01/12/2019 | 4 |
| Russia | 01/12/2019 | 08/12/2019 | 7 |
| Monaco | 08/12/2019 | 12/12/2019 | 5 |
| Russia | 12/12/2019 | 22/12/2019 | 10 |
| Estonia | 22/12/2019 | 22/12/2019 | 0 |
| Russia | 22/12/2019 | 28/12/2019 | 6 |
| Estonia | 28/12/2019 | 31/12/2019 | 4 |

| | |
|---|---|
| Russia | 237 |
| Estonia | 72 |
| Monaco | 23 |
| Latvia | 19 |
| France | 5 |
| Switzerland | 3 |
| UK | 3 |
| USA | 3 |

| Country | Date of arrival | Date of departure | Number of days |
|---|---|---|---|
| **2020** | | | |
| Estonia | 01/01/2020 | 10/01/2020 | 9 |
| Russia | 10/01/2020 | 22/01/2020 | 12 |
| Estonia | 22/01/2020 | 23/01/2020 | 1 |
| Russia | 23/01/2020 | 20/02/2020 | 28 |
| Estonia | 20/02/2020 | 23/02/2020 | 3 |
| Monaco | 23/02/2020 | 24/02/2020 | 1 |
| UK | 24/02/2020 | 26/02/2020 | 2 |
| Monaco | 26/02/2020 | 02/03/2020 | 6 |
| Switzerland | 02/03/2020 | 04/03/2020 | 2 |
| Latvia | 04/03/2020 | 06/03/2020 | 2 |
| Estonia | 06/03/2020 | 09/03/2020 | 3 |
| Russia | 09/03/2020 | 21/06/2020 | 104 |
| Estonia | 21/06/2020 | 25/08/2020 | 65 |
| Russia | 25/08/2020 | 30/12/2020 | 127 |
| Estonia | 30/12/2020 | 31/12/2020 | 1 |
| | | **Total days** | **366** |
| | | Russia | 271 |
| | | Estonia | 82 |
| | | Monaco | 7 |
| | | Switzerland | 2 |
| | | UK | 2 |
| | | Latvia | 2 |