# Exhibit 4

Neutral Citation Number: **[2022] EWHC 1945 (Ch)**

Case No: **BL-2020-001050**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: **19 July 2022**

**Before** :

**The Honourable Mr Justice Trower**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

(1) **Loudmila Bourlakova**
(2) **Hermitage One Ltd**
(3) **Greenbay Investment Holdings Limited**

**Claimants**

and

(1) **Oleg Bourlakov**
(2) **Daniel Tribaldos**
(3) **Leo Services Holding Limited**
(4) **Leo Trust Switzerland AG**
(5) **Reuwen Schwarz**
(6) **Semen Anufriev**
(7) **Nikolai Kazakov**
(8) **Vera Kazakova**
(9) **Columbus Holding and Enterprises SA**
(10) **Finco Financial Inc**
(11) **Gatiabe Business Inc**
(12) **Edelweiss Investments Inc**
(13) **IPEC International Petroleum Co Inc**

**Defendant**

**Helen Davies QC** and **Patrick Harty** (instructed by **Mishcon de Reya LLP**) for the **Claimants**
**Andrew Scott QC** (instructed by **Asserson Law Offices**) for the **6th Defendant**
**James Willan QC** and **Adam Woolnough** (instructed by **PCB Byrne LLP**) for the **7th, 8th, 10th, 11th and 12th Defendants**

Hearing date: **19th July 2022**

- - - - - - - - - - - - - - - - - - - - -

# CONSEQUENTIAL RULINGS

**Mr Justice Trower**                                    **Tuesday, 19 July 2022**
 (11:52 am)

Rulings given by **MR JUSTICE TROWER**

1. I have to rule on the costs of the Kazakov application. It is accepted by the Kazakov defendants that they were the unsuccessful party in their application to challenge the court's jurisdiction, and, therefore, that the starting point is that they should pay the costs. The first question I must determine is the basis of assessment. The claimant says that it should be indemnity costs, the Kazakov defendants submit that the proper order is standard costs.

2. As Lord Woolf explained in *Excelsior Commercial & Industrial Holdings Ltd v Salisbury Hamer Aspden & Johnson* [2002] EWCA Civ 879 at paragraph 32, the correct approach is that before an indemnity costs order can be made there must be some conduct or some circumstance which takes the case out of the norm. That is the critical requirement. Waller, LJ put the same point in slightly different words in *Excelsior* at paragraph 39, there must be "something in the conduct of the action or the circumstances of the case which takes the case out of the norm in a way which justifies an order for indemnity costs".

3. What amounts to conduct or circumstance that is out of the norm will vary considerably from case to case. As Waller, LJ, again, explained in *Esure Services Ltd v Quarco* [2009] EWCA Civ 595 at paragraph 25, the mere fact that particular conduct may be normal in the sense of being seen regularly or often in particular types of proceedings, does not mean that it should be excluded for that reason from being out of the norm. What is meant by conduct outside the norm includes occurrences "outside the ordinary and reasonable conduct of proceedings". Thus, the dishonest bringing or maintenance of a claim will normally warrant an order for indemnity costs.

4. Mr Willan's principal submission was not that the conduct which is relied on by Ms Davies was not out of the norm. He accepted that it could be so characterised, but his argument was that it did not justify an order for an indemnity costs for other reasons, largely on the grounds of lack of proportionality. In support of that submission, the Kazakov defendants said that the discretion to award indemnity costs is a wide one to be determined in light of all the circumstances of the case, and I agree that the conduct of the parties is one, but only one, of the circumstances to be taken into account.

5. Initially the Kazakov defendants also submitted that the conduct of the paying party must be unreasonable to a high degree, although in the event Mr Willan did not advance the point in quite that way in the oral submissions he made. I think he was right to take that course, because I do not think that unreasonable conduct to a high degree is a necessary prerequisite to the making of an order for indemnity costs. That would be to add a gloss to the concept of what is sufficiently out of the norm to justify an order for indemnity costs that is not, on the face of it, warranted by the authorities. Nonetheless, Mr Willan still relied on the point in a more limited sense, viz that the degree of unreasonableness of the conduct informed the question of whether considerations of proportionality justify the making of an order for indemnity costs. This was the point on which he essentially based his submissions.

6. I accept that the conduct required for an order for indemnity costs must also normally be relevant in some way to the costs that have been incurred. In my view, however, the important words are "in some way". This imports a link between the conduct of the proceedings and the costs of the proceedings so that conduct that does not affect the costs in any way may not be relevant for these purposes. However, the point does not go any further than that, and when it came to it, I did not understand Mr Willan to submit to the contrary.

7. Against that background, the principal circumstance relied on by the claimants is the dishonesty of the evidence produced by the Kazakov defendants as to Mr Kazakov's domicile. For the reasons I explained in the judgment I was satisfied that the original presentation of Mr Kazakov's evidence as to his domicile in Monaco, which was only withdrawn shortly before the hearing, was a plain misrepresentation to the court on an issue which both Mr Kazakov and Mrs Kazakova knew was central to the jurisdiction applications they had made. As there has never been any proper explanation as to how or why these misrepresentations came to be made in the way that they were, I do not think that it is necessary of itself to make a determinative finding on whether or not Mr Kazakov's conduct was actually dishonest, although it seems to me that it may well have been.

8. For present purposes, it is sufficient to say that this conduct falls very significantly outside the ordinary and reasonable conduct of proceedings and was conduct in respect of which it was always open to the Kazakov defendants to provide an explanation, but in respect of which they declined to do so. I accept, of course, that Mr Willan has conceded for the purposes of this application that the conduct was outside the ordinary and reasonable conduct of proceedings, but the extent to which it was remains a relevant question and in my judgment it was significantly so.

9. As I indicated, Mr Willan's answer to the application was that an indemnity order across the board would be disproportionate because the change of position did not have very much impact on costs. He said that an application of the overriding objective pointed against such relief being granted. There was, therefore, a distinction to be drawn between dishonest conduct in relation to the whole claim where the court might be minded to make an order for indemnity costs across the entirety of the proceedings, and dishonest conduct in relation to a particular application, and, more specifically, one part of a particular application.

10. On this part of his submissions, Mr Willan drew my attention to the passage in the White Book (at para 44.2.22) which discusses *Hutchinson v Neale* [2012] EWCA Civ 345 and the relevance of dishonesty in a slightly different costs context. In *Hutchinson,* Pichford LJ said, at paragraph 28 of his judgment that:

> "There is no general rule that a finding of dishonest conduct by the successful party will replace the usual starting point. What is required is an evaluation of the nature and degree of the misconduct, its relevance to and effect upon the issues arising in the trial, and its tendency to create an unwarranted increase in the costs of the action to either or both of the parties".

11. In particular, Mr Willan submitted that the actual evidence which went to Mr Kazakov's domicile was, as he put it "very limited", and he reminded me of the paragraphs in the witness statements which dealt specifically with that issue. To that extent Mr Willan's submission was borne out.

12. However, looked at in the round, I do not agree that the limited extent of Mr Kazakov's actual evidence as to his domicile reflects the significance of the point. The evidence in relation to Mr Kazakov's domicile was central to the jurisdiction challenge in a number of respects. It was relevant to the jurisdiction challenge not just for itself, but because of its consequences. The change in that evidence caused the focus of the Kazakov defendants' application to shift from one purely based on the fact that permission to serve out was not required pursuant to CPR6.33 (or should not have been granted under CPR6.36), to one which included an application for a stay under Article 34 of the BRR. It also affected the question of more appropriate forum, which was central to the issues in dispute on the applications. I do not accept that this change in evidence had no real impact on the costs the claimants incurred. I think it did.

13. Another of the reasons for this was, as Ms Davies submitted, that the change of evidence was made very late in the day, and it was only very late in the day that an Article 34 application was actually made. One aspect and consequence of this was that the claimant's evidence and their skeleton argument had to be resubmitted and redrafted shortly prior to the hearing.

14. I think it is no answer to say that the sixth defendant (that is Mr Anufriev) was making an application for a stay under Article 34 in any event, or that the Kazakovs' asserted domicile was always challenged by the claimants. The misrepresentations that were made in relation to Mr Kazakov's domicile were intimately inter-related to the dispute which then arose in relation to Mrs Kazakova's domicile, the parties' and the court's approach to which was inevitably coloured by the consequence of Mr Kazakov's misrepresentations. This was exacerbated by the fact that the initial position appeared to be that both Mr Kazakov's and Mrs Kazakova's asserted domicile was elsewhere (in Monaco) although they both then changed their position (to Estonia and Russia respectively). Their case as to their own domicile sat on constantly shifting sands.

15. I therefore agree with the claimant's submissions that the way in which the application was approached by the Kazakovs amounted to conduct outside the ordinary and reasonable conduct of the proceedings, and, in my view, it did so in a manner that affected a significant and material part of the Kazakov application, and was relevant to costs in the impact that it had. In my judgment, this was conduct that the court is required to take into account pursuant to CPR44.2(4)(a) when deciding what order to make about costs, and that, having regard to all the circumstances of the case, the appropriate and proportionate response is to make an order for indemnity costs pursuant to CPR44.2 and CPR 44.3 and in furtherance of the application of the overriding objective.

16. The second question is as to the allocation of the costs as between the Kazakov defendants. The claimants contend that Mr Kazakov and Mrs Kazakova should pay 90 per cent of the costs of the

Kazakov application and the Panamanian companies should only pay 10 per cent. Mr Kazakov and Mrs Kazakova contend that the liability should be joint and several between them and the Panamanian companies. In the alternative, for reasons I shall mention shortly, the claimants seek 90 per cent of the costs only against Mr Kazakov and Mrs Kazakova with no order for costs against the Panamanian companies.

17. The court is, therefore, faced with an application by the claimants which, in some respects, is counter-intuitive. In the normal course a claimant will wish to obtain relief which renders as many of the defendants as possible jointly and severally liable for the costs of all or some part of the proceedings. In the present case, the claimants do not seek that outcome because it is part of their case that the 11th and 12th defendants, two of the Panamanian companies, are, in fact, owned by Veronica and Mrs Bourlakova. The same situation would also pertain if the 11th and 12th defendants were also to form part of Mr Bourlakov's estate, and Mrs Bourlakova and Veronica were then to be established as his heirs.

18. The claimants say that for this reason they do not seek an order for all of their costs against the Panamanian companies because they may thereby end up in a situation in which they have a claim against an entity which they, themselves, own. They submit that only 10 per cent of the hearing was spent on matters relating to their position, ie the position of the Panamanian companies, and, therefore, that Mr Kazakov and Ms Kazakova should be responsible for 90 per cent of the costs and the Panamanian companies should only be responsible for 10 per cent, and they say that such liabilities should be several not joint with the consequence that, that no right of contribution in respect of a joint liability (anyway pursuant to the order itself) would arise.

19. The Kazakov defendants resist this application on the grounds that the substantive jurisdictional challenge was made jointly, and it is not possible to say that any element is attributable to the

challenge by any one or more of them. They submit that the claimants' application is an impermissible attempt to increase the costs liability of Mr Kazakov and Mrs Kazakova to the advantage of the Panamanian companies. It is said to have been a recent change in heart by the claimants only included by them, I think, in their recent draft order, and to be driven by tactical considerations, not ones which reflect the substantial justice of the case.

20. The Kazakov defendants also say that it is impossible to divide up the issues as between the two groups of defendants in the way suggested by the claimants. They submit that all of the questions were extant as against both of them. Mr Willan, during the course of his oral submissions, took me through how it was that the evidence raised common issues between the two groups of defendants, and without resolving that issue I think that there is some substance in what he had to say.

21. However, I also agree with the claimants that the starting point is that the claimants should not be required to seek a costs order against a defendant which they do not wish to seek. As the claimant submitted, it is not for one group of defendants to say that the claimant must also seek the costs sought from them against another group of defendants, more particularly where the alternative suggested by the first group as being appropriate is (as it is in the present case) that both groups should be jointly and severally liable to pay the whole of the costs in any event.

22. In my view, this dispute can only go so far. The mere fact that party A is liable to party C for one amount and party B is liable to party C for another amount does not exclude anyway the possibility that, as between A and B, one may be liable to indemnify the other in respect of the costs that have been incurred. In other words, the mere fact that an order is only made against one does not settle forever the position as between the two. Mr Willan may be correct to say, in the absence of an order for cost against both groups jointly and severally, that no contribution can arise as a direct result of the order itself, but there may well be other bases on which contribution is available and whether

any such contribution is justified cannot be determined by me now in the context of a dispute between C on the one hand and A and B on the other. If there is to be such a dispute, it can only be determined when the relationship between B and C ultimately comes to be resolved, the timing of which in the present case may well depend on whether and if so when any battle for control of the 11th and 12th defendants is determined

23. In my view, against the background to those considerations the right solution in the present case is to adopt Mr Davies' fall back position. In circumstances in which joint and several liability for the full amount is said by Mr Willan's clients to be the appropriate order, I think that an order for several liability against Mr Kazakov and Ms Kazakova for 90 per cent is the just result. If they are able to persuade the directors of the Panamanian companies that those companies should contribute to the costs for which they are liable, then so be it. That is not a matter which, in my judgment, I am in a position to determine conclusively today.

24. I will, however, say just this, so far as the question of apportionment is concerned. If the question for the court were to be an attempt to assess those aspects of the application in respect of which costs were incurred in respect of the Panamanian companies, and those aspects in respect of which costs were incurred in respect of Mr and Mrs Kazakova, I have no doubt that more was incurred in respect of Mr and Mrs Kazakova than was incurred in respect of the Panamanian companies. I am sceptical that it is as much as 90 per cent as against 10 per cent. In my view, the more likely division between the two is 75/25, but as I have just indicated I don't think that that is the right order to be made in the present case. The order will simply be for several liability for 90 per cent as against Mr Kazakov and Mrs Kazakova. That is without prejudice to any future contribution or indemnity proceedings that one may wish to bring against the other in due course.

(**12:56** pm)

25. I am not going to grant permission on Grounds 1, 3, 4 or 5.

26. Very briefly, as to ground one I am satisfied that the plausible evidential basis test that I applied is well-established. I do not consider that there is an real prospect of success on an appeal against my determination that this was the correct test or as to the way in which I applied that test.

27. So far as Ground 3 is concerned, while I can see that the argument in relation to whether the related foreign proceedings are within the material scope of the BRR might, in certain circumstances warrant consideration by the Court of Appeal, I do not consider that there is a real prospect of success on an appeal against the conclusion I reached on the subject-matter of Ground 5. I therefore do not think this is the right case to give permission to appeal on Ground 3. The Court of Appeal may of course take the view that, if they think my decision is capable of challenge on Ground 5, that will also open up a basis for giving permission on Ground 3 as well.

28. The same point arises in relation to ground 4.

29. As to Ground 5 I am not going to give permission because the challenge mounted by the Kazakov defendants is a challenge to an evaluative exercise that I carried out, balancing a number of competing considerations. This is not a matter on which, I think, the Court of Appeal will interfere, and there are no real prospects of establishing that they should. So those are my short reasons for refusing permission on grounds 1, 3, 4 and 5, but I will hear you, Mr Willan, on Ground 2 after the short adjournment.

30. So, what we will do now is we will break until 2 o'clock. I will rule at 2 o'clock on the Anufriev application, and the costs of that, and we will deal with the Anufriev payment on account and your

argument on Ground 2. Good. Well, thank you all very much indeed. I hope you will be able to log back in on the same space.

(**13:58** pm)

31. I must now deal with the costs of the Anufriev application. The claimants seek their costs in full. They say that they succeeded in resisting the application for a stay. They also resist the suggestion that they abandoned any part of their claim because they have maintained their claim against Mr Anufriev for the losses they say they have suffered.

32. The sixth defendant says that so far as the section 9 aspects were concerned, he was the one who was successful because the outcome of his application was that the claimants could no longer rely on much of their factual case against him. Therefore, he said that the claimants should not be entitled to their costs of that application as against him. Indeed, he goes further and says that he was the successful party and the claimants should pay his costs of that part of the application.

33. The first point is that I agree that it is appropriate to have regard to that part of the application which was concerned with the section 9 stay distinctly and separately from the remainder of Mr Anufriev's application. I did not understand any party to assert to the contrary.

34. I also agree that the starting point is to make an assessment of who is the successful party so as to determine which party would be entitled to their costs of the application if the general rule were to be applied. When determining who is the successful party, the court has to stand back and seek to answer that question as a matter of common sense.

35. In that respect, the claimants say that as a matter of common sense they were the successful party because the application for a stay on the basis of the arbitration clause was dismissed, and the

quantum of their claim continues for the full amount. Mr Anufriev, submits that that is wrong because he has avoided a substantial part of the claims that have been made against him, or, anyway, the matters which have been asserted against him, because of the amendments to the particulars of claim that were forced upon the claimants by the application that he had made. In particular, he stressed that the claimants have been required to make clear that any allegation based on conduct in which he participated in his capacity as a protector was not being pursued. He relied on the fact that I said in the judgment that this limited the allegations that the claimants were able to make, and did so significantly. He relied on the fact that there is only one instance of conduct identifiable on the face of the pleadings which survived this clarifications. He said that even this was now of doubtful substance in the light of further amendments that the claimants wish to make. He also said that I could not assume that any part of the claims against Mr Anufriev would now survive to be tried.

36. Mr Scott reminded me that the application under section 9 was concerned with all of the matters that were the subject of the arbitration clause. The effect of section 9 is that none of those matters can be raised in any claim against Mr Anufriev in these proceedings. Mr Scott also pointed out that there were a number of aspects of the pleaded case which can only have related to conduct which occurred while Mr Anufriev was a protector of the Foundations. Furthermore, there was no indication in the pleading itself that only some of the allegations were to be relied on as against him. This only became apparent after the claimants' case had been clarified in the face of his application. Mr Scott also said that the claimants failed to grapple with how the C.3 case looked when the application was brought, and how it looked by the time of the hearing. He said that all that remained was a single pleaded instance as against Mr Anufriev. All the other allegations against him, were disavowed, apart from that single instance.

37. All this meant, so Mr Scott submitted, that the case now pleaded against Mr Anufriev was radically different to the form of the claim that was the original target of his section 9 application. This should, he submitted, be recognised in the costs order that I make.

38. Ms Davies did not dispute the fact that, the matters in issue, not the claims which are made, are what is important in the context of a section 9 application. But she submitted that I had concluded that there were matters which justified the proceedings against Mr Anufriev, but which were not caught by the arbitration clause. They had survived in the proposed amended particulars of claim as confirmed by that part of my judgment in which I said that a stay was not required. It followed, she stressed, that both in its unamended and its amended form the case against the sixth defendant survived with no entitlement to a section 9 stay. To that extent it is clear, she submitted, that Mr Anufriev failed.

39. Ms Davies accepted that the changes which were included in the amended particulars of claim were made late. They were made only very shortly before the skeletons were due to be served. But she said that the arguments made by Mr Anufriev were persisted in by him, even in the light of the amendments to their case proposed by the claimants, and those arguments failed in the ultimate result. They failed because I reached the conclusion that some part of the claim could still be pursued, and that would always have been the case.

40. On this aspect of the case, I prefer Ms Davies' submissions. Furthermore, I also think that there is some substance in two additional aspects of what she said. The first is that although I took the view that the original ambit of the claimants' case on the extent to which Mr Anufriev was also sued in his capacity as protector was unclear on the face of the pleading, the claimant's evidence on the original application for permission to serve out had always asserted that he was not sued in his capacity as protector. This was reiterated in evidence served on behalf of the claimants over a

month before the start of the hearing. To that extent, and without minimising the importance of pleadings in any way, this is not a case in which the defendant had no idea of the case that he might have to meet.

41. The second is that the claimants are entitled to say that the lack of clarity in their position was exacerbated by what I agree was a remarkable coyness on the part of Mr Anufriev to be straightforward in his case as to when he ceased to be protector. In these circumstances, the fact that the claimants, who had no knowledge of their own as to when Mr Anufriev resigned, advanced two alternative factual cases, and were not as clear as they might otherwise have been, is more explicable.

42. In that context, it is only since the hearing that it has become apparent when Mr Anufriev did in fact resign. This was information that in my judgment could and should have been put before the court on the stay application. Mr Scott said that there were difficulties in doing so. He did not develop this in oral submissions, but said that there were difficulties in adding the relevant evidence because of a risk of submission to the jurisdiction. I do not think that is right. I was shown Lord Clarke's judgment in *VTB Capital Plc v Nutritek International Corpn* [2013] 2 AC 337 at paragraph 194 which supports that view. I also do not think that it was open to Mr Anufriev to place the burden on the claimants to assert the true position in the particular circumstances of this case. Mr Anufriev knew the position but did not clarify it, while the claimants did not know the true position and were not in a position to do so.

43. In my view, therefore, despite the fact that the sixth defendant's application went some material way towards achieving more focus in the way that the claimants put their case, serving to narrow what might otherwise have fallen foul of the arbitration clause, the claimants were still substantially the successful party. Nonetheless, I do think that the justice of the case requires some form of reduction

14

to reflect the way in which their case against Mr Anufriev came to be clarified. But in my view that comes nowhere near the order which is sought by Mr Anufriev. I consider that this would be achieved by making an order that the sixth defendant pay 80 per cent of the claimant's assessed costs of the section 9 application.

(**14:27** pm)

44. As to the application for Mr Anufriev to make a payment on account, the jurisdiction derives from CPR44.2(8). This provides that the court will order the paying party to pay a reasonable sum on account of costs unless there is good reason not to do so. It is not said that there is no good reason to do so, and therefore the only question is what is a reasonable sum. As is well known, there is no rule that the amount ordered to be paid should be the irreducible minimum of what may be awarded on a detailed assessment, but the court does have to arrive at some estimation of the costs that the receiving party is likely to be awarded. In the normal case, a reasonable sum is an estimate of the likely level of recovery, subject to an appropriate margin to allow for error in the estimation, allowing also for any difficulty in recovery in the case of any overpayment, a point that was made in *Excalibur Ventures LLC v Texas Keystone Inc* [2015] EWHC 566 (Comm) at paragraph 23. The claimants seek a figure amounting to 50 per cent of what they have actually spent.

45. In *Excalibur* Christopher Clarke LJ went on to say at paragraph 24:

"In determining whether to order any payment and its amount, account needs to be taken of all relevant factors including the likelihood (if it can be assessed) of the claimants being awarded the costs that they seek or a lesser and if so what proportion of them; the difficulty, if any, that may be

faced in recovering those costs; the likelihood of a successful appeal; the means of the parties; the imminence of any assessment; any relevant delay and whether the paying party will have any difficulty in recovery in the case of any overpayment".

46. Paragraph 23 of the judgment also recognises that, in making the estimate, the court must take account of the fact that the amount which is likely to be recovered on a detailed assessment should be reasonable and proportionate, judged objectively. This focus on reasonableness and proportionality is also explained in one of the most often-cited decisions on the point (*Kazakhstan Kagazy plc and ors v Zhunus and ors* [2015] EWHC 404 (Comm)). Leggatt J said that what is reasonable and proportionate is to be judged objectively and the touchstone is that it must reflect the lowest amount which the receiving party could reasonably have been expected to spend in order to have their case conducted and presented proficiently.

47. Mr Scott submits that the total costs which are put forward in the schedule prepared on behalf of the claimants were eyewatering with a grand total of somewhere just short of £1 million, of which, after deduction of 20 per cent of the costs relating to the section application, the claimants seek 50 per cent. He said that this level of expenditure was wholly disproportionate and could be seen to be so for a number of reasons which included a range of different factors -- excessive hourly rates, excessive number of fee earners, excessive number of hours spent (he drew my attention to 239 hours on the Anufriev application spent after it was heard), and excessive counsel, the claimants being represented by two leaders and three juniors.

48. He said that, when approaching the amount which the claimants seek, I should look at the context of the case as a whole, and, in particular, the fact that this application related to a jurisdiction challenge as to which the courts have long stressed that major expenditure of time and cost is neither necessary nor appropriate, and conclude that there should be a very heavy discount by reason of

those, amongst other, factors. He submitted that rather than the 50 per cent of the schedule which is claimed by the claimants for a payment on account, the right figure is approximately in the region of 30 per cent.

49. The upshot of those two percentage figures is that the claimants seek somewhere in the region of £435,000 by way of payment on account. Mr Scott says that the right figure is somewhere in the region of £300,000 to £350,000.

50. In many respects the exercise I have to carry out is one of impression, but in my judgment, this is a case in which the claimants' schedule seeks a figure which is very substantially more than the amount which I consider is likely to be awarded on a detailed assessment. In my view, the reduction to 50 per cent is not a sufficient discount to reflect the *Excalibur* test. Having said that, I also recognise that this is a case of considerable significance to all parties and its complexity is such that the points which it was reasonable for them to take are more numerous and extensive than may be the case in other contexts.

51. In all those circumstances, and doing the best I can as a matter of impression, I think the right figure for a payment on account is £400,000 to be paid within 14 days with liberty to apply as to timing.

 **(15:03** pm)

52. As to ground 2 of the proposed appeal, I think that largely for reasons relating to the final point that Ms Davies has made, I am not going to grant permission. Ground 2 focuses on the analysis I adopted as to the impact of Vedanta on whether or not the claimants had a real ability to sue in Monaco and whether they had nonetheless chosen to sue in England. I think that this ground of appeal does not give sufficient weight to the balancing exercise that I carried out. The judgment

discusses many factors of which enforceability was one which weigh in the balance, but I do not accept that in a multiparty case such as the present the defendants have a real prospect of showing that the balance I struck was wrong. Even if there are aspects of the way in which I approached Vedanta which the Court of Appeal may wish to consider, I do not consider that there is a real prospect of the result being reversed. It follows that, largely for the reasons that have just been given by Ms Davies, I think that the defendants will have to seek permission from the Court of Appeal.