# Exhibit 5



Neutral Citation Number: [2022] EWHC 1269 (Ch)

Case No: BL-2020-001050

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

Royal Courts of Justice
Rolls Building
7 Fetter Lane, London
EC4A 1NL

Date: 26/05/2022

**Before** :

**THE HONOURABLE MR JUSTICE TROWER**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

(1) **LOUDMILA BOURLAKOVA**
(2) **HERMITAGE ONE LIMITED**
(3) **GREENBAY INVEST HOLDINGS LIMITED**
(formerly known as Maravan Services Limited)

**Claimants**

- and –

(1) **OLEG BOURLAKOV**
(2) **DANIEL TRIBALDOS**
(3) **LEO SERVICES HOLDING LIMITED**
(4) **LEO TRUST SWITZERLAND AG**
(5) **REUWEN SCHWARZ**
(6) **SEMEN ANUFRIEV**
(7) **NIKOLAI KAZAKOV**
(8) **VERA KAZAKOVA**
(9) **COLUMBUS HOLDING AND ENTERPRISES SA**
(10) **FINCO FINANCIAL INC**
(11) **GATIABE BUSINESS INC**
(12) **EDELWEISS INVESTMENTS INC**
(13) **IPEC INTERNATIONAL PETROLEUM CO INC**

**Defendants**

**Helen Davies QC, Matthew Cook QC, Patrick Harty, Georgina Petrova** and **Daniel Fletcher** (instructed by Mishcon de Reya LLP) for the **Claimants**
**Andrew Scott** (instructed by Asserson Law) for the **6th Defendant**
**James Willan QC** and **Adam Woolnough** (instructed by PCB Byrne LLP) for the **7th, 8th, 10th, 11th and 12th Defendants**

Hearing dates: 25, 26, 29, 30 November and 1 December 2021
Further written submissions 13 and 23 December 2021, 1 and 8 March 2022

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR JUSTICE TROWER

**Covid-19 Protocol: This judgment will be handed down by the
judge remotely by circulation to the parties' representatives by
email and National Archives. The date and time for hand-down
will be deemed to be 10.30am on 26th May 2022.**

**Mr Justice Trower :**

Introduction and the Parties

1.  This judgment is primarily concerned with challenges by some of the defendants to the jurisdiction of the English court. It is contended by those of the applicants who are domiciled outside the EU that orders granting permission to serve out ought not to have been made or that the proceedings ought now to be stayed on the grounds that England is a forum non conveniens. In the case of those applicants domiciled in the EU it is said that stays ought to be granted under article 34 of the Brussels Regulation (Recast) (Regulation (EU) No. 1215/2012) (the "BRR").

2.  Stays are also sought on case management grounds and by one of the defendants pursuant to section 9 of the Arbitration Act 1996. There are also applications to set aside extensions of the claim form and a challenge by one of the defendants to service on him in Latvia.

3.  The claimants are Mrs Loudmila Bourlakova and two companies of which she is the ultimate beneficiary, one of which (Hermitage One Limited ("H1")) is incorporated in the Isle of Man and the second of which (Greenbay Invest Holdings Limited ("Greenbay")) is incorporated in the Seychelles.

4.  The first defendant is Mr Oleg Bourlakov, who died on 21 June 2021, which was after the commencement of these proceedings but before the applications to challenge jurisdiction had been made. The major part of his and his family's wealth derived from the acquisition and subsequent sale of Novoroscement OJSC, a major Russian cement producer, which was sold for US\$1.45 billion in 2007.

5.  Both Mrs Bourlakova and Mr Bourlakov are or were Ukrainian, Russian and Canadian nationals. At the material time they were both domiciled in Monaco, although during the course of their marriage they had lived in a number of other jurisdictions including Canada. They were married in Ukraine in June 1972, where their two children were born in 1973 and 1984: Elena who lives in Canada and Veronica who is married to Mr Gregory Gliner and lives in London.

6.  The claimants allege that, since late 2017, there had been an irretrievable breakdown in marital relations between Mr Bourlakov and Mrs Bourlakova. On 19 December 2018, divorce proceedings were initiated by Mrs Bourlakova in Monaco. It was common ground in the Monaco divorce proceedings that the law governing the matrimonial property regime is Ukrainian law and the Ukrainian concept of community property applied to the marriage. The Monegasque courts remained seised of the divorce proceedings at the time of Mr Bourlakov's death.

7.  The second to fourth defendants were all involved in the provision of fiduciary corporate services and advice to Mr Bourlakov, together with companies and foundations owned or controlled by him. The second defendant, Mr Daniel Tribaldos, who is domiciled in Switzerland, owns or controls a substantial proportion (the precise amount of which may be in dispute) of the shares in the third defendant, Leo Services

Holding Limited ("Leo Holding"), an English company of which Mr Tribaldos is the sole director.  In turn, Leo Holding owns all of the shares in the fourth defendant, Leo Trust Switzerland AG ("Leo Trust"), a company incorporated in Switzerland and Leo Trust Cyprus Ltd ("Leo Cyprus"), a company incorporated in Cyprus.  Mr Tribaldos is also a director of both Leo Trust and Leo Cyprus.

8.      The fifth defendant, Mr Reuwen Schwarz, was a director of Leo Trust until February 2020 and is domiciled in Israel.  A family trust associated with Mr Schwarz indirectly holds shares in Leo Holding through a Panamanian company, Rudan Business Holdings SA ("Rudan").  He is now in dispute with Mr Tribaldos, apparently as a result of his discovery of some of the matters of which the claimants make complaint in these proceedings.  Litigation arising out of that dispute is currently proceeding in England.

9.      The sixth defendant, Mr Semen Anufriev, is a relative of Mr Bourlakov's and a German qualified lawyer.  He was managing director of the Bourlakov family office and since 2012 has played a central role in the management of Mr Bourlakov's business interests and personal wealth.  He is domiciled in Latvia.

10.     The seventh and eight defendants are Mr Bourlakov's brother-in-law, Mr Nikolai Kazakov and his wife, Mr Bourlakov's sister, Mrs Vera Kazakova.  Although Mr Kazakov initially said that he was domiciled outside the EU in Monaco, he has now withdrawn his evidence to that effect and accepts that at the material times he was domiciled within the EU in Estonia.  The claimants point to the circumstances in which this evidence was changed in support of a submission that I should not place any weight on evidence from the Kazakovs in the absence of independent corroboration.  There is a dispute, which is one of the issues that arises on these applications, as to whether Mrs Kazakova was also domiciled in Estonia as the claimants contend or whether, as she contends, she was domiciled in Russia.

11.     The ninth to thirteenth defendants are all companies incorporated in Panama.  It is said by the claimants that Mrs Bourlakova and/or Mr Bourlakov (and now his estate) have been or continue to be the ultimate beneficial owners of each of them through their interest in other Panamanian companies or foundations including Delos Global SA ("Delos"), Tribatline Stiftung ("Tribatline"), Anahill Stiftung ("Anahill"), Wlamil Stiftung ("Wlamil"), Fondacion Merenguito (Merenguito") and Hemaren Stiftung ("Hemaren"), as to which:

        i)      Tribatline and Merenguito ("the Foundations") are said by the claimants to have been in the sole beneficial ownership of Mrs Bourlakova between about March 2014 and the date of their dissolution on about 15 May 2018.

        ii)     Mr Bourlakov is said by the claimants to have been the controller and ultimate beneficial owner of Anahill and Hemaren at all material times until his death. The claimants believe that Mr Kazakov and Mrs Kazakova may be the nominees through which Mr Bourlakov's control and ultimate beneficial ownership was achieved.

        iii)    Mr Kazakov is said by the claimants to have been the sole named beneficiary of Wlamil, acting as a nominee for Mr Bourlakov.

12.    The precise ownership of the ninth to thirteenth defendants and how they have come to
       be owned or controlled by the protagonists to this dispute are amongst the issues with
       which these proceedings are concerned. For present purposes, it suffices to summarise
       what the claimants say about their ownership and control as follows:

       i)      The ninth defendant, Columbus Holding and Enterprises SA ("Columbus"): the
               claimants allege that Columbus' current shareholder is Anahill and that
               Columbus was misappropriated from Tribatline (by which it had been owned
               since March 2014) prior to Tribatline's dissolution on about 15 May 2018.

       ii)     The tenth defendant, Finco Financial Inc ("Finco"): the claimants allege that
               Finco was originally in the beneficial ownership of Mr Bourlakov but was
               transferred to Tribatline in March 2014. They say that its current shareholder is
               Wlamil, having been transferred to Wlamil in February 2019 via Delos, and
               therefore that Mr Bourlakov was Finco's controller at all material times between
               the dissolution of Tribatline on about 15 May 2018 and his death. He exercised
               that ownership and control through Mr Kazakov as the sole named beneficiary
               of Wlamil acting as his nominee.

       iii)    The eleventh defendant, Gatiabe Business Inc ("Gatiabe"): the claimants allege
               that, having been dissolved in December 2014 and reactivated in June 2018,
               Gatiabe's current shareholder is Wlamil, to whom it was transferred in February
               2019 by Delos. It is said that, as with Finco, Mr Bourlakov was Gatiabe's
               controller and ultimate beneficial owner at all material times until his death
               through Mr Kazakov as the sole named beneficiary of Wlamil acting as his
               nominee.

       iv)     The twelfth defendant, Edelweiss Investments Inc ("Edelweiss"): the claimants
               believe that its current shareholder is Hemaren and that it was misappropriated
               from Merenguito when its shares were transferred prior to Merenguito's
               dissolution on about 15 May 2018. It is said to have remained under the de facto
               control of Mr Bourlakov at all times prior to his death.

       v)      The thirteenth defendant, IPEC International Petroleum Co Inc ("IPEC"): the
               claimants allege that its shares were held by Tribatline from March 2014. It
               went into liquidation in December 2015 and was dissolved on or before 24 May
               2016. It was purportedly reactivated on 20 July 2020.

13.    Mr Kazakov, Mrs Kazakova, Finco, Gatiabe and Edelweiss were all represented at the
       hearing by the same solicitors and counsel, who referred to their clients as the Kazakov
       defendants. For convenience, I shall do the same in this judgment, whilst recognising
       that the claimants do not accept that Mr Kazakov or Mrs Kazakova have the interests
       in Finco, Gatiabe and Edelweiss (the "Panamanian Companies") which they purport to
       have.

14.    Although Mr Bourlakov died in June 2021, by the time of the hearing five months later
       no steps had been taken by any party to obtain the appointment of anyone to represent
       his estate, whether under CPR Part 19.8 or otherwise. As will become apparent, it is
       clear that there are issues in Monaco as to the validity of his will which may affect the
       question of what steps if any ought to be taken in England to protect the interests of his

estate. The Kazakov defendants submitted that this was a factor that I should take into account when determining how, if at all, these proceedings are to progress.

## The Claimants' Case

15.     The current proceedings were commenced by claim form originally issued on 16 July 2020 and then reissued on amendment on 15 November 2020, accompanied by particulars of claim. The relief sought was damages for fraudulent and negligent misrepresentation and declarations relating to a number of aspects of the defendants' conduct said to underpin the claimants' case that (quoting a passage from the particulars of claim):

> "Following the breakdown in marital relations, Mr Bourlakov pursued a strategy (in combination with the other Defendants) of dishonest and/or improper and/or unlawful actions with the ultimate objective of maximising his own share of assets which are (or have been) assets of each of the separate members of the Bourlakov nuclear family … and minimising or even extinguishing Mrs Bourlakova's share."

16.     Drafts of amended particulars of claim were filed by the claimants on 27 May 2021 and 12 November 2021, as to the latter of which permission to amend has not yet been granted. I will come back to the question of amendment a little later in this judgment. The allegations are said to be evidenced (anyway in part) by documents disclosed when the Cypriot court granted an Anton Piller order against Leo Cyprus in December 2020.

17.     The claimants plead that the development and implementation of the strategy has given rise to a number of different claims. They arise out of what is alleged to have been the tortious conduct of Mr Bourlakov as principal instigator and the other defendants as participants. For present purposes, they can conveniently be divided into 4 categories:

i)      Section A: claims arising out of misrepresentations made and lies told by Mr Bourlakov to Mrs Bourlakova as to the family assets and their true value.

ii)     Section B: claims arising out of Mr Bourlakov's efforts to disguise and conceal his assets and/or their true value. The disguise is said to have involved forging documents and purporting to create non-existent liabilities so as to diminish or pretend to diminish the value of those assets. It is also said to have involved concocting false stories that half of the family assets belong to Mr Kazakov and that the current value of debts owed to him exceeds the entire value of those assets.

iii)    Section C: claims arising out of what are alleged to have been misappropriations and attempted misappropriations by Mr Bourlakov of assets from the structures in which Mrs Bourlakova had an interest. Those assets were then placed in structures which he owned and/or controlled either directly or through nominees, including Mr Kazakov and/or Mrs Kazakova.

iv)     Sections D and E: claims arising out of the subsequent destruction of documents which evidenced the unlawful strategy. These claims relate to acts committed by Mr Tribaldos and the Leo group defendants (and possibly also Mr Schwarz)

committed so as to assist Mr Bourlakov in defrauding Mrs Bourlakova and to conceal evidence of the forgeries and other evidence of the true position.

18. It is necessary to give some detail of these claims because it informs the extent of the dispute's connections to England and Wales, which is itself an important factor in the jurisdiction challenge. It also enables an assessment to be made of the extent to which the issues that are raised will or may be determined in subsisting proceedings elsewhere, more specifically in Monaco which is said by the Kazakov defendants to be a more appropriate jurisdiction than England and Wales for resolution of the dispute.

19. The claimants plead that Mr Bourlakov's dishonest strategy was discussed and developed by Mr Bourlakov and Mr Anufriev during the course of a number of visits to Mr Tribaldos in Zurich between February 2018 and June 2018. Steps are said to have been taken in a number of different locations to implement that strategy, including in Monaco where it is alleged that there was a meeting in March 2018 at which Mr Bourlakov demanded that Mrs Bourlakova sign documents transferring beneficial ownership of H1 to him, a demand with which Mrs Bourlakova refused to comply.

20. It is also said that during this period one of the core misrepresentations at the heart of the strategy, and the claimants' section A claims, was made by Mr Bourlakov at a meeting in London on 5 April 2018. It is alleged that he stated (amongst other matters) that all of the Bourlakov family business interests were subject to a longstanding oral partnership with Mr Kazakov, pursuant to which 50% of those interests, together with the resulting proceeds and profits were held for his benefit. Mr Bourlakov stated that the family assets were worth a total of around US$3.7 billion and that the consequence of the existence of the partnership with Mr Kazakov was that only US$1.85 billion was available for distribution between him and Mrs Bourlakova.

21. This and other representations made at the same time are said to have been fraudulent and untrue and to have been designed to mislead Mrs Bourlakova as to the value of the family's assets and to pressurise her into accepting a reduced sum in settlement of the claims that she had in light of the breakdown of her marriage. It is alleged that these representations were endorsed and confirmed by Mr Kazakov, Mrs Kazakova and Mr Anufriev. It is also said that they agreed to cooperate in Mr Bourlakov's attempts to mislead Mrs Bourlakova, including by participating in the forgery of the documents (acts which are at the heart of the section B claims) and by supporting their authenticity in consideration for which Mr Bourlakov agreed to remunerate them and provide continued financial support.

22. These misrepresentations are said to have been continued at two meetings at which some form of mediation was attempted: one in Monaco in June 2018 and another in London in September 2018. It is said that, at the June 2018 meeting, the false representations relating to Mr Kazakov's interest in the Bourlakov family assets continued to be made by Mr Bourlakov and Mr Anufriev, but that some form of agreement in principle was reached. There is some documentation which appears to evidence the arrangement that the parties had in mind.

23. However, it is not alleged by either side that the Monaco discussions in June 2018 gave rise to legally binding obligations and it is the claimants' case that there was then a radical change in Mr Bourlakov's position at the London mediation meeting held in September 2018. The amount which he said was available for Mrs Bourlakova was

very substantially less than the figures discussed in June, because of significant indebtedness owed to third parties other than Mr Kazakov. It is the claimants' case that Mr Bourlakov and Mr Anufriev continued to make the false representations that they together with Mr Kazakov and Mrs Kazakova had made in April 2018 in order to try and pressurise Mrs Bourlakova into accepting a reduced sum in settlement. In the event, no agreement was reached after the September meeting.

24.     There were then a number of further communications relied on by the claimants, all of which are said to be part of Mr Bourlakov's overarching strategy to defraud Mrs Bourlakova. They included the sending of text messages by Mr Kazakov and Mrs Kazakova demanding repayment of sums said by Mr Kazakov to have been lent by his companies to Mrs Bourlakova, Elena and Veronica, which are said by the claimants to be untrue. Mr Bourlakov also made a written declaration (witnessed by Mr Anufriev) in front of a notary in Monaco on 20 December 2018 confirming the existence of the oral partnership with Mr Kazakov. This was the day after Mrs Bourlakova commenced divorce proceedings in Monaco.

25.     Mrs Bourlakova said that she was willing to accept a third of the family assets, because it was clear from the false representations that Mr Bourlakov had made at the London meeting that he was willing to defraud her. The claimants plead that Mrs Bourlakova knew that these false representations were untrue and it follows that they did not have their intended effect. However, she also said that she believed that they would be repeated and relied upon in the event that a settlement could not be reached.

26.     By their section B claims, the claimants allege that Mr Bourlakov's dishonest strategy involved a number of the other defendants (acting at his direction) participating in the concealment of his assets and their true value. They did so by forging documents designed to invent debts affecting companies in respect of which Mrs Bourlakova says she had become entitled to a share and by taking other steps designed to support a pretence that assets to which she was entitled belonged to entities controlled by Mr Kazakov and Mrs Kazakova. It is said that, in relation to some of these activities, the claimants suffered loss and damage by reason of the costs incurred by Mrs Bourlakova in seeking to unravel what occurred.

27.     The first group of documents said to have been forged on the instructions of Mr Bourlakov relate to what is said to be the fraudulent imposition of loan obligations on Finco. Those documents include a loan agreement by which Gatiabe (which was said by Mr Bourlakov to be owned by Mr Kazakov) is said to have lent US$1.349 billion to Finco in 2007 and resolutions of the directors of Gatiabe and Finco all purporting to date from 2007 which are said to support the existence of the loan. Almost all of the amount so lent is then said to be due from Gatiabe to another Panamanian foundation controlled by Mr Bourlakov called Jovellanos Investment Corpn ("Jovellanos"). It is alleged that, in April 2019, a further agreement was forged recording what is said to have been this fictitious back to back loan by Jovellanos to Gatiabe. The claimants also contend that a declaration of trust dated 12 July 2018 purporting to record that the shares in Gatiabe were held by Delos on trust for Mr Kazakov was a sham.

28.     The claimants allege that Mr Tribaldos and the two Leo group companies assisted in the production of these forged and sham documents on the instructions of Mr Bourlakov. Mr Tribaldos is also said to have been a party to the production of

backdated accounts for Gatiabe.  To the extent that they are identified, the alleged acts themselves occurred in either Switzerland or Cyprus.

29.     However, Mr Tribaldos is said to have done all of this not just in his capacity as a director of Leo Trust and Leo Cyprus but also with the knowledge and permission of Leo Holding.  It is said that Leo Holding's participation was a necessary part of the scheme because Leo Trust and Leo Cyprus had to work together for it to be effective and it was through Leo Holding that Mr Tribaldos exercised his control over them.  It follows that it is part of the claimants' case that Mr Tribaldos was acting on behalf of Leo Holding (an English company) when he agreed on the strategy which led to the representations made in London in April 2018 and procured Leo Trust and Leo Cyprus to do what they did to support, perpetuate and conceal Mr Bourlakov's fraudulent strategy.  The claimants seek declaratory relief to confirm that this is the case and that the relevant agreements are of no effect.

30.     The second category of allegations relates to Mr Bourlakov's assertion that security interests have been created in favour of Mr Kazakov and/or Gatiabe over the family's interests in two valuable assets: a super yacht worth several hundred million dollars called the Black Pearl then in the registered ownership of a Cypriot company, Silver Angel Yachting Ltd ("Silver Angel"), and the family flat at La Reserve, Avenue Princess Grace, Monaco ("La Reserve") said to be worth c.US$100 million and/or certain Seychellois companies with an interest in La Reserve.  It is not said that any of these assets are located in England.  The claimants seek declaratory relief to confirm that the relevant pledges and security agreements were forgeries and of no effect.

31.     The next series of allegations form the claimants' section C claims, which fall into four parts.  They relate to acts said to be actual or attempted misappropriations and devaluations of Mrs Bourlakova's assets in the form of her interests in H1 and Greenbay.  The sums involved amounted to many hundreds of millions of US$. The assets included the following, which Mr Bourlakov had originally transferred to Mrs Bourlakova in 2014 as part of a process of rearranging the family holdings and succession planning:

i)       the proceeds of sale of his shares in an oil exploration company, Burneftegaz, in which he had invested part of the proceeds of sale of Novoroscement;

ii)      his interest in Greenbay, H1 and a company called Chasehill which was later to acquire the Black Pearl;

iii)     Finco, Columbus and IPEC, all of which were transferred to Tribatline of which Mrs Bourlakova was made the sole beneficiary as described above; and

iv)      Edelweiss, which was transferred to Merenguito of which Mrs Bourlakova was also made the sole beneficiary as described above.

32.     The first of these allegations is that, during the course of March 2018, Mr Bourlakov and Mr Anufriev sought to change the ownership structure of H1 so that it was transferred to Mr Bourlakov.  They are also said to have attempted to put in place a retrospective loan agreement reflecting an amount of c.US$348 million outstanding from Edelweiss to H1 and subsequently to have procured Edelweiss to demand repayment of the loan.  The claimants do not plead that Mr Tribaldos or the two Leo

group defendants positively participated in this part of Mr Bourlakov's strategy, but they do allege that it was part of the strategy which Mr Tribaldos had agreed to support. It is said that this part of Mr Bourlakov's strategy did not succeed, but the claimants seek declaratory relief to confirm that it was of no effect.

33.     The second of these allegations relates to a sum of c.US$143 million said by Mr Bourlakov to have been lent by IPEC to H1, the benefit of which was then assigned by IPEC to Columbus. The claimants accept that this money was transferred, but it is said that at that time H1 and IPEC were both owned by Tribatline. They assert that Mrs Bourlakova was the ultimate beneficial owner of both of them, and that no legal debt from H1 to IPEC was incurred. They also assert that the document reflecting the assignment to Columbus was a forgery and was produced by Mr Tribaldos (in his capacity as a director of Leo Trust and acting with the knowledge and permission of Leo Holding) on the instructions of Mr Bourlakov and Mr Anufriev. In October 2018, Columbus sought immediate repayment of the loan. As with the claim by Edelweiss against H1, it is said that this part of Mr Bourlakov's strategy did not succeed, but the claimants seek declaratory relief to confirm that the purported assignment to Columbus was a forgery and of no effect.

34.     The third of these allegations relates to Greenbay. It is said that, in September and October 2018, Mr Bourlakov attempted to devalue Greenbay and misappropriate its assets by attempting to procure it to accept that in September 2008 it had incurred an obligation to IPEC amounting to what was described as a loan in the form of securities of c.US$250 million. This obligation was said to have been assigned by IPEC to Finco in 2016. These assertions were made after the shares in Finco had been transferred to Wlamil.

35.     Further allegations by the claimants relate to the dissolution of the Foundations and what they contend to be Mr Bourlakov's misappropriation of Columbus (which had been Tribatline's principal asset) and Edelweiss (which had been Merenguito's principal asset). As I have already mentioned, the Foundations were dissolved on 15 May 2018. It is the claimants' case that, immediately prior to their dissolution, Mrs Bourlakova was the beneficial owner of each of them.

36.     Mrs Bourlakova does not know how the Foundations came to be dissolved or how their assets came to be transferred, but it is the claimants' case that, without her knowledge or consent, Anahill has now become the owner of Columbus and Hemaren has now become the owner of Edelweiss. The claimants also plead that Finco, which had been an asset of Tribatline has now ended up as an asset of Wlamil, having first been transferred to Delos. The net effect of these transactions is that, prior to his death, Mr Bourlakov had de facto control of Columbus, Edelweiss and Finco.

37.     It is said that the means by which this was achieved involved the participation of Mr Bourlakov, Mr Anufriev and Mr Tribaldos. It also involved the appointment of Mrs Kazakova as the protector of the Foundations in place of Mr Anufriev shortly before their dissolution. The assistance of Leo Trust was required because of the need to communicate with the foundation councils for each of the Panamanian foundations involved in the transfers.

38.     The effect of these transfers was that assets worth hundreds of millions of dollars were removed out of the ownership and control of Panamanian foundations of which Mrs

Bourlakova was the ultimate beneficial owner and into the ownership and control of Panamanian foundations of which it is said that Mr Bourlakov was the ultimate beneficial owner through the nomineeship of Mr Kazakov and Mrs Kazakova. Those assets were:

i)      investments held by Edelweiss with amongst others UBS said to be worth in excess of US$700 million in 2018;

ii)     debts owed by other Bourlakov companies to Columbus (including if enforceable the debt of c.US$143 million owed by H1); and

iii)    if enforceable, the loan due from Greenbay to Finco of US$250 million.

39.     Mr Bourlakov also claimed that Finco had another asset which is said by the claimants to be fictitious and part of his fraudulent scheme for the misappropriation of assets beneficially owned by Mrs Bourlakova. This was a US$950 million debt which he claimed that Edelweiss owed Finco pursuant to an agreement dated 2011, but which the claimants say was only produced in late 2018. The claimants originally pleaded that the directors of Edelweiss then determined to transfer its assets to Finco by way of repayment of the US$950 million loan and invited the court to infer that those assets were then transferred to Gatiabe in purported partial discharge of Finco's supposed liability under the forged Gatiabe / Finco US$1.349 billion loan. It appears from their skeleton argument that they do not know whether any of these steps have in fact taken place.

40.     It is the claimants' case that many of the documents evidencing these transactions were forgeries designed to show that Finco had assets from which it could meet its liabilities under the Gatiabe / Finco loan. They are said to have been produced by Mr Tribaldos (in his capacity as a director of Leo Trust and acting with the knowledge and permission of Leo Holding) on the instructions of Mr Bourlakov and Mr Anufriev.

41.     It is also part of the claimants' case (its section D and E claims) that Mr Tribaldos took a series of steps in order to conceal Mr Bourlakov's strategy, in circumstances in which the other directors of Leo Trust, including Mr Schwarz, had become aware that Mr Tribaldos had falsified documents on the instructions of Mr Bourlakov. The steps included the destruction of evidence by Mr Tribaldos. They also involved causing the directors of the English company, Leo Holding, to resign and procuring Leo Holding, as shareholder of Leo Trust and Leo Cyprus, to replace those companies' directors, including Mr Schwarz, events which occurred between February and September 2020. It is said that these steps were taken to prevent the exposure of the forgeries and other wrongdoing of which complaint is made in these proceedings. This is said to be part of the means by which Mr Tribaldos continued to assist Mr Bourlakov in his efforts to defraud Mrs Bourlakova. There are proceedings in Switzerland and in Cyprus arising out of the steps which were taken during the course of 2020 which involved, amongst other matters, the grant of the Anton Piller relief to which I have already referred.

42.     In large part, the matters which are relied on by the claimants in relation to the concealment to which Mr Tribaldos is alleged to be party mostly occurred in Switzerland and Cyprus and took effect in Panama. With the following exceptions, the concealments were unrelated either to this jurisdiction or to Monaco:

i) So far as England is concerned, the only exception is that the parts of the concealment which involved the replacement of the board of directors of Leo Trust in February and March 2020 and the removal of the directors of Leo Cyprus in June 2020 and their replacement by more compliant directors in September 2020 were achieved by resolutions passed at EGMs of Leo Holding. More generally it is also said that Mr Tribaldos' control of Leo Holding was a necessary aspect of his involvement, because it enabled him to ensure that Leo Trust and Leo Cyprus acted together in the roles which they performed. Although Leo Holding is an English company there is no suggestion that it carried out any commercial activities in England and Wales nor that it had anything other than a formal legal presence in this jurisdiction.

ii) So far as Monaco is concerned, it is said by the Kazakov defendants (although this is disputed by the claimants) that, because Mr Bourlakov was domiciled in Monaco, it is likely that some at least of the instructions were given by him to the other defendants, including Mr Tribaldos, in or from Monaco. A role was also played by Equiom, a corporate services provider based in Monaco.

43. The dispute within the Leo group has led to proceedings in Switzerland by Mr Schwarz and another director (Mr Adgar Kircher) against Leo Trust and unfair prejudice proceedings in England in relation to Leo Holding, which Mr Schwarz procured Rudan to issue under section 994 of the Companies Act 2006 on 26 October 2020. It is said by the claimants that a number of the factual matters which arise in the current proceedings will also be in dispute in those proceedings. At the root of what was said by Rudan to be the breakdown in the relationship between Mr Tribaldos and Mr Schwarz and the exclusion of Rudan's representatives from any effective participation in the management of the Leo group companies was an allegation that Mr Tribaldos had forged or been involved in the forgery of the Gatiabe / Finco loan agreement. Those allegations came to the attention of Mr Schwarz in the context of Swiss document production proceedings initiated by Mrs Bourlakova against Leo Trust in aid of her Monaco divorce proceedings.

44. The claimants submitted that there are a number of different laws which govern their claims in the current proceedings. I shall come back to the question of governing law later in this judgment, but it is convenient to describe at this stage the claimants' pleaded case both on governing law and the relief to which they contend they are entitled.

45. The allegations made in sections A and B of the amended particulars of claim are all said to give rise to English law unlawful means conspiracy claims and claims in deceit against Mr Bourlakov, Mr Kazakov, Mrs Kazakova, Mr Anufriev, Mr Tribaldos and the two Leo group companies. It was said that, since the original misrepresentations were made in London at the April and September meetings, and since all further steps complained of were to support those misrepresentations, and since their likely and intended effect was to obtain a reduction in the sum which Mrs Bourlakova would be willing to accept as her share of the family assets, the likely damage would have occurred in London. It was then said that damage was in fact incurred in England in the form of substantial sums paid to legal and other professionals in England in order to demonstrate that the representations referred to were untrue.

46. The claimants submitted in the alternative that the section A and B claims are governed by Monegasque law. The reason for this is that the objective was to cause harm to Mrs

Bourlakova, who was an habitual resident of Monaco. In that regard, they are said to give rise to claims under article 1229 of the Monegasque Civil Code, which provides that "any act of man which causes damage to another person obliges the person through whose fault it occurred to repair it". The fault relied on is then identified by reference to specific articles of the Monegasque penal code.

47. As I have already mentioned, it is not pleaded that any of the misrepresentations in relation to the Kazakov partnership had the effect of deceiving Mrs Bourlakova as to the value of the assets which are said to have been depleted by what she contends to be the fictitious and contrived liabilities. However, it is contended by the claimants that, even though Mrs Bourlakova knew she was being misled and that Mr Bourlakov and the Kazakov defendants were trying to defraud her, she was forced to incur substantial investigation costs in multiple jurisdictions, including most especially in England, in order to identify and obtain evidence of the matters on which she relies in support of her allegations of conspiracy and deceit.

48. Mrs Bourlakova initially contended that those investigation costs would be in excess of £5 million. The claim is now for a figure closer to £8 million, but the difference between these two amounts is immaterial when set against the value of the further claims which are said by the Kazakov defendants to be consistent with their case that the true nature of the dispute which the claimants wish to have resolved in England is not the tort claim but rather is the dispute as to ownership of assets worth hundreds of millions of dollars.

49. The H1 and Greenbay forgeries giving rise to some of the section C claims fall into a slightly different category. Initially it was said that they were governed by Monegasque law on essentially the same basis as the alternative claim relating to the other misrepresentations and concealments. The claimants now contend that they have an English law claim in deceit against Mr Bourlakov and Mr Anufriev, because misrepresentations relating to those forged documents were originally made in London and an unlawful means conspiracy claim against Mr Anufriev, Mr Tribaldos, Leo Trust and Leo Holding because they all conspired together to participate in or assist in the creation of forged of sham documents with the intention of injuring Mrs Bourlakova. As I understand their case, it is said that English law governs the issues because England is said to be the place of the likely and actual damage. They have applied to amend their particulars of claim to plead this case, but the parties accepted that this was not a matter for me to determine at this hearing.

50. The section C claims relating to the transfer of Columbus, Edelweiss and Finco from the Foundations so that they ended up in the hands of Anahill, Hemaren and Wlamil are said to be governed by Panamanian law as the jurisdiction with which they are manifestly most closely connected. Mr Bourlakov is said to have been in breach of articles 220, 243 and 253 of the Panamanian penal code in procuring Mrs Bourlakova's removal as a beneficiary by inducing the protectors to accede to it. Mr Tribaldos, the Leo group entities and Mr Anufriev (together with Mr Kazakov and Mrs Kazakova if permission to amend the particulars of claim is granted) are also said to be liable as instigators and participators in that wrongdoing. Mrs Bourlakova now claims that she has suffered damage of at least US$1.18 billion from these breaches (the figure in the original version of her particulars of claim was US$700 million), and is entitled to recover against those defendants as authors, instigators or participants in a criminal act pursuant to articles 128 and 129 of the Panamanian penal code.

51.     The claimants also seek declaratory relief in the form of declarations that there was no partnership between Mr Bourlakov and Mr Kazakov at any relevant time and that the December 2018 notarised declaration by Mr Kazakov is a sham and of no legal effect. They also seek declarations that the Finco and Gatiabe documents are forgeries and/or shams and that the liabilities purportedly created by them do not exist and that the 12 July 2018 declaration of trust in relation to Gatiabe is a sham and of no legal effect. In the alternative they seek declaratory relief that Mr Kazakov holds his beneficial interest in Gatiabe as nominee for Mr Bourlakov. Declaratory relief in similar terms is sought in relation to any documents purporting to create security interests over any Bourlakov family assets (including the Black Pearl, Silver Angel and La Reserve) for the benefit of Mr Kazakov.

52.     The section D claims in relation to the destruction and concealment of documents by Mr Tribaldos and the Leo group companies acting on Mr Bourlakov's instructions are said to be governed by Swiss law as the law of the place in which destruction and concealment took place. They rely on article 41 of the Swiss code of obligations. The damages to which Mrs Bourlakova says she is entitled amounted to CHF 250,000, £600,000 and €650,000. The section E claims against Mr Schwarz are said to be governed by Monegasque law as the tortious acts were intended to harm Mrs Bourlakova who is an habitual resident of Monaco.

53.     Other issues may be governed by other laws. Thus, so far as the law governing the alleged partnership is concerned, Mr James Willan QC for the Kazakov defendants suggested that it might be Monegasque law based on the declaration that was made to the Monaco notary in December 2018, but that it certainly would not be English law. Ms Helen Davies QC for the claimants did not suggest that the partnership might be governed by English law, but she said that the prospects of it being Monegasque law were slim in the extreme not least because Mr Bourlakov had asserted that it had existed for the previous 30 years, i.e. long before there was any suggestion that Monaco had anything to do with the Bourlakovs' family affairs. She said that Russian law was the most likely candidate and I think she is probably correct. For present purposes, all that matters is that I do not consider that there is any real prospect of the law of either of the competing jurisdictions (England and Monaco) being the law that governs this important part of Mr Kazakov's claim to be entitled to a significant proportion of the assets to which Mrs Bourlakova could otherwise lay claim.

54.     Ms Davies stressed that the claimants' case was that Mrs Bourlakova had been defrauded on a vast scale and through conduct by the defendants which warranted condemnation in the strongest terms. That is undoubtedly the case if the allegations prove to be true and it is not said by any of the defendants in these applications that the various claims do not give rise to serious issues to be tried.

## The applications

55.     By order dated 17 December 2020, Adam Johnson J granted the claimants' application (made by application notice dated 16 November 2020) for permission to serve the amended claim form out of the jurisdiction on Mr Bourlakov in both Latvia and Monaco, on Mr Schwarz in Israel, on Mr Kazakov and Mrs Kazakova in both Estonia and Russia and on the Panamanian Companies, Columbus and IPEC in Panama. He

also extended time for service of the claim form on all of those defendants and Mr Anufriev until 16 March 2021.

56.     On 31 December 2020, Adam Johnson J made a further order granting the claimants permission to serve the amended claim form out of the jurisdiction on Leo Trust in Switzerland and Mr Anufriev in Latvia and France. He also granted a further extension of time for service on all of the defendants except Mr Tribaldos and Leo Holding until 30 April 2021.

57.     On 31 March 2021, Adam Johnson J gave the claimants permission to serve the amended claim form out of the jurisdiction on Mr Kazakov and Mrs Kazakova in Monaco. He also extended time for service on Mr Bourlakov, Leo Trust, Mr Anufriev, Mr Kazakov and Mrs Kazakova until 31 December 2021 and on the Panamanian Companies, Columbus and IPEC until 30 June 2022. On 7 June 2021, he made a further order giving directions for service on Mr Schwarz, the Panamanian Companies, Columbus and IPEC.

58.     The first application challenging jurisdiction was issued by Mr Anufriev on 1 July 2021. He did so in light of the order granting the claimants permission to serve the amended claim form on him out of the jurisdiction in Latvia and France. His challenge is based on two principal grounds. The first is that he maintains that he has not been validly and effectively served and the second is that, pursuant to the BRR, the court has no jurisdiction against him.

59.     Mr Anufriev also maintains that, if the court does have any jurisdiction as against him:

   i)      the proceedings should be stayed until further order pursuant to article 34 of the BRR or pursuant to CPR 3.2(2)(f) on case management grounds; and/or

   ii)     the proceedings, in so far as they advance claims pursuant to articles 128 and 129 of the Panamanian penal codes seeking compensation for loss and damage as a result of the dissolution of the Foundations and the misappropriation of Columbus and Edelweiss, should be stayed as against him pursuant to section 9 of the Arbitration Act 1996.

60.     The second set of applications were issued by the Kazakov defendants on 18 August 2021. They seek orders pursuant to CPR Part 11 setting aside the four orders made by Adam Johnson J on 17 December 2020, 31 December 2020, 31 March 2021 and 7 June 2021 granting permission for service of the claim form on them out of the jurisdiction and extending time for its service. The Kazakov defendants also seek a declaration that the court does not have and/or will not exercise jurisdiction to hear the claims made against them in these proceedings.

61.     At the time these applications were listed for hearing, three other applications had been issued Mr Tribaldos, Leo Holding and Leo Trust. They also were listed for hearing at the same time. So far as Mr Tribaldos and Leo Trust were concerned, these applications were challenges to the court's jurisdiction. So far as Leo Holding was concerned, its application sought to strike out the proceedings on the basis that there were no reasonable grounds for bringing the claim and/or summary judgment on the grounds that the claim had no real prospects of success. On 8 November 2021, the court was informed by the claimants' solicitors that Mr Tribaldos, Leo Holding and Leo Trust

wished to withdraw their applications and that Mr Tribaldos and Leo Trust now submitted to the jurisdiction.

62.     At the core of the jurisdiction challenges by the Kazakov defendants and Mr Anufriev is a submission that the description in the particulars of claim of how Mr Bourlakov attempted to misappropriate assets worth billions of dollars demonstrates that the dispute has very little to do with England. They pointed out that Mr Bourlakov and Mrs Bourlakova have never lived in England and that the alleged partnership at the heart of the dispute is unrelated to England, did not operate here and is not governed by English law. They also demonstrated that none of the underlying assets which the claimants believe form part of Mr Bourlakov's estate are located in England (or even held through English companies).

63.     This last point cuts both ways, however, in the sense that the vast majority of assets are also located outside Monaco. Those held outside Monaco through the web of companies and foundations I have already described, are a portfolio held with UBS in Switzerland worth c.US$1.79 billion, Black Pearl worth c.US$200 million, real estate in St Petersburg worth c.US$80 million, artwork and antiques worth c.US$100 million and the credit balances on Mr Bourlakov's bank accounts with Credit Suisse in Russia and Switzerland worth tens of millions of US$. La Reserve, and some of the works of art and antiques likely to be housed in La Reserve, are the known property located in Monaco.

64.     The Kazakov defendants also submitted that in reality, there are only two connections with England, both of which are slender in the extreme. The first is that one of the defendants, Leo Holding, is incorporated in England and is subject to an unfair prejudice petition issued in England. Some of the factual allegations which arise in those proceedings are common with the allegations made in the present proceedings. The Kazakov defendants submitted that the role that Leo Holding is said to have carried out was very limited. Its only participation in the acts said to be part of the misrepresentations and concealments was its removal of the directors of Leo Trust, its Swiss incorporated subsidiary. Nothing it is said to have done was actually done in England.

65.     The second is that two meetings held in London in an attempt to negotiate an amicable resolution to the divorce were occasions on which the misrepresentations were made. As to this, the Kazakov defendants accepted that the claim in tort is said to arise out of an attempt to deceive Mrs Bourlakova as to the nature and value of the Bourlakov assets by misrepresentations made at two meetings in London. However, the significance of this English connection is said to be undermined by the fact that these were only two of a number of meetings which are relied on by the claimants, others of which took place in Monaco. Investigation costs may have been incurred in England, but they could have been incurred anywhere.

66.     The Kazakov defendants also submitted that the claim arising out of what was said at these meetings does not focus on the real dispute between the parties. As these misrepresentations and deceptions did not succeed in achieving their object, the loss said to have been sustained as a result was limited to the legal and investigation costs incurred by the claimants. Those costs amounted to c.£8 million incurred in a number of separate jurisdictions and are said to be wholly insignificant by comparison to the value of the assets in dispute, which are said to exceed £3 billion. The real dispute is

all about the identification and liquidation of the matrimonial assets, not about what are said to be the efforts by Mr Bourlakov and those associated with him to conceal from Mrs Bourlakova their whereabouts, nature and value.

67. Mr Willan submitted that the way in which the case is put therefore reflects the fact that the real issue which the claimants seek to have determined in England is that Mr Kazakov has no interest, whether by way of security or otherwise in the disputed assets. It is, he submitted a transparent attempt to seise the English court of a dispute as to ownership of assets worth hundreds of millions of dollars (but which have nothing to do with England) based on a claim in tort which has some connection to England, but in respect of which the alleged wrongdoing had a very limited effect because Mrs Bourlakova always believed that the documents and representations on which it depends were forged and untrue, and behaved accordingly.

68. Furthermore, Mr Willan did not just submit that the dispute had very little to do with England. He also relied on the existence of litigation elsewhere between some or all of the protagonists to this dispute. In general terms, he also relied on the fact that there are criminal complaints and civil proceedings in Russia, Switzerland, the Isle of Man, Cyprus and Monaco, which to a greater or lesser extent touch on the same or related issues or raise common questions of fact. For the purposes of these jurisdiction challenges, it is only Monaco that is said to be a more appropriate jurisdiction than England to litigate the issues with which these proceedings are concerned. This is partly because Monaco is the jurisdiction in which both Mr Bourlakov and Mrs Bourlakova were domiciled at the time of the commencement of these proceedings and to which Mr Kazakov and Mrs Kazakova say that they have now moved. It is also because there are some assets of substance there and the proceedings which have already been commenced in Monaco raise questions that are intimately connected to many of those which arise in this action.

69. The Kazakov defendants submitted that the opening of a new front in England is inappropriate and likely to lead to huge inefficiency and a risk of inconsistent judgments. In short summary, this risk is said to arise in relation to a number of issues including (i) whether Mr Kazakov has an interest in the disputed assets by virtue of his joint business interests with Mr Bourlakov, (ii) whether certain documents are forgeries, and (iii) whether the Kazakov defendants hold property as nominees for Mr Bourlakov.

70. It was said that this is particularly acute where there is a serious issue as to whether an English judgment will be recognised in Monaco. The consequence is that, if these proceedings are permitted to continue, there is a material risk that the matters with which they are concerned will have to be re-litigated in Monaco after a huge amount of time and money has been spent in England. As the Kazakov defendants, including the Panamanian Companies, have agreed to submit to the jurisdiction in Monaco if the allegations made in the current proceedings were to be made in Monegasque proceedings, this court should do what it can to ensure that that is what occurs.

71. It is necessary to describe the Monaco proceedings in outline in order to make an assessment of the extent to which they traverse the same or similar issues to those with which these proceedings are concerned. However, in doing so, I accept Ms Davies' submission that I should keep firmly in mind that there is an important distinction between those matters which existed at the time of the application for permission to serve out and those which only arose subsequently. Although the latter are capable of

being relevant to an application for a stay on forum non conveniens grounds, it is only the former which are capable of being relevant to the application for permission to serve out.

72.    Before describing the various Monaco proceedings, I should mention that there are also two applications by the claimants for permission to amend their particulars of claim:

    i)    The first application for permission was issued on 27 May 2021 and is not opposed by any of the defendants, although Mr Schwarz has not confirmed his non-opposition because he has not participated in the hearing of any of the applications. So far as the Kazakov defendants and Mr Anufriev are concerned, their non-opposition was without prejudice to their position on jurisdiction.

    ii)    The second application for permission was made on 12 November 2021, less than two weeks before the start of the oral hearing. In light of the limited notice given to the defendants, it was accepted by the claimants that it would not be possible for the matters which it raised to be determined in the time allowed. However, Ms Davies made clear that, to the extent that anything contained in the draft amended particulars of claim attached to the November application turned out to be critical to the stay application, I should have regard to the case sought to be advanced in that further draft of the pleading.

73.    There were three major differences between the two drafts of the amended particulars of claim, which I understood Mr Willan to accept as being the ones which mattered for present purposes. The first and second were (a) that the November draft alleged an increase in the amount of the loss sustained by reason of the breaches of the Panamanian Penal Code in relation to Edelweiss, Columbus and Finco from US$700 million to US$1.18 billion and (b) that Mr Kazakov and Mrs Kazakova were sought to be included amongst the defendants liable in respect of those breaches. The third was that the claims arising out of what the claimants accept to have been the unsuccessful attempts to misappropriate or devalue Mrs Bourlakova's assets, in the form of H1, Greenbay and Edelweiss are subject to English law as the place of the likely and actual damage.

74.    In these circumstances, the applications were argued by reference to the draft amended particulars of claim annexed to the claimants' May 2021 application. I will however have regard to what Ms Davies said about the need to take into account these three material differences when considering the question of whether or not a stay ought to be granted.

The Monaco Divorce Proceedings

75.    The first set of proceedings in Monaco were the divorce proceedings commenced by Mrs Bourlakova on 19 December 2018 on the grounds of Mr Bourlakov's adultery. In light of Mr Bourlakov's death, it is common ground that these proceedings can no longer proceed, but they are more than simply relevant background, because they were extant at the time the original applications for permission to serve out were granted by Adam Johnson J in December 2020.

76.     In the normal course there are two separate stages to divorce proceedings in Monaco. In the absence of agreement to terminate the marriage (which Mr Bourlakov rejected), the first stage is the question of fault such as to justify the divorce. The second stage is the working out of the financial consequences of the divorce and the liquidation of the matrimonial property.

77.     It is common ground that one of the issues relied on by Mrs Bourlakova in relation to fault was what she contended to be the lies about the Kazakov partnership originally told by Mr Bourlakov at the London meeting in April 2018. It is also common ground that Mr Bourlakov had counterclaimed for a fault-based divorce on the grounds amongst others that Mrs Bourlakova had misappropriated assets held by her on trust for Mr Bourlakov and Mr Kazakov as partners. To that extent, there is overlap between some of what was alleged in stage one of the divorce proceedings and some of the factual matters which arise in these proceedings.

78.     However, the claimants' evidence supported their submission that at stage one the Monaco court was only concerned with the existence of some fault sufficient to justify a divorce. There was no guarantee that findings would be made in relation to all or indeed any of the fault-based allegations made by both sides in the context of these proceedings. I think it is inherently credible (and is adequately supported by the evidence) that the Monegasque divorce court would be reluctant to engage in the kind of investigative enquiry which might be required for the purposes of the current English proceedings, when it was clear that there had been at least some fault and the marriage had irretrievably broken down.

79.     It was also accepted by the claimants that, if agreement were not to be reached about the asset distribution for stage two of the divorce proceedings, it may have been necessary for the Monaco divorce court to consider whether the supposed Kazakov partnership was real or a fiction, although at the outset of these proceedings (which was of course before Mr Bourlakov died) it was said that this was some time away and there was no guarantee that it would happen.

80.     As to timing, the claimants' evidence was that at the time these proceedings were commenced and permission to serve out of the jurisdiction was sought, the Monaco court was not yet seised of stage two of the divorce which required fresh proceedings. The evidence is that these only occur once the divorce has been pronounced and the divorce judge has ordered the liquidation and division of the common assets and appointed a notary for that purpose.

81.     Before his death, Mr Bourlakov did not accept that the Monegasque courts were not yet seised of the stage two proceedings. It was said that Mrs Bourlakova had triggered them when she filed an interim application for the appointment of a notary. However, in my view the evidence is clear that, whatever may have been sought or granted by way of interim relief prior to the grant of the divorce, the process for the liquidation and distribution of the assets (if required) takes place pursuant to separate proceedings which are commenced after the divorce itself is pronounced and (as it is put in the authorities) "can only be introduced after referral to the notary, the opening of the operations and the drawing up of a report of difficulties". That stage had not been reached by the time permission to serve out was granted, or indeed at the time of Mr Bourlakov's death.

82.     In any event, it is clear that the divorce proceedings were only capable of resolving the common issues as between spouses (Mr Bourlakov and Mrs Bourlakova). Even where common issues might have been decided in that context, the divorce proceedings were for spouses only and it would seem that the determinations would not be binding on Mr Kazakov, Mrs Kazakova or any of the other parties to these proceedings.


The Criminal Proceedings

83.     Immediately after Mrs Bourlakova's commencement of the divorce proceedings in Monaco, Mr Kazakov and Mr Bourlakov, as civil parties, filed criminal complaints in Monaco against Mrs Bourlakova. Mr Kazakov's was filed two days later on 21 December 2018 and alleged breach of trust, concealment and money-laundering. He alleged that Mrs Bourlakova had conspired to misappropriate assets in which he had an interest through the partnership. Mr Bourlakov's was dated 9 January 2019 and alleged breach of trust and concealment. These complaints were joined in March 2019. It was the position of the Kazakov defendants that, if Mrs Bourlakova were to be charged as a result of the investigation, Mr Kazakov will be entitled to obtain a determination of his civil rights in those proceedings as a civil party.

84.     The claimants submitted that the point at which Mr Kazakov will be entitled to obtain a determination of his civil rights as a civil party will not arise until a later stage, because it is only when the complaints are referred to the Tribunal Correctionnel, that it can be said that proceedings are then commenced. The evidence indicates that, where a civil claim is based on criminal conduct, the civil action can either be brought at the same time and before the same judges as the criminal proceedings or it may be pursued separately once a final decision has been made in those criminal proceedings. The way it is brought is by lodging a civil claim with an investigating judge who will eventually be required to rule on the civil claim.

85.     There is a conflict of evidence as to whether or not the Monegasque criminal court will determine the ownership of the assets disputed in the present proceedings. The claimants submitted that the assets in respect of which the allegations of breach of trust, concealment and money laundering were made have not been identified. Even if they had been, it is said that, as very few of the assets with which the present proceedings are concerned are located in Monaco, the Monegasque court is unlikely to be concerned with offences relating to them. Indeed it goes further than that, because the evidence is that "Monegasque criminal law requires an act which forms an element of the crime to have been committed in Monaco in order for a matter to fall within the Monegasque Courts' criminal jurisdiction." As these proceedings are concerned with many matters which occurred outside Monaco in their entirety, it is said that they could not (anyway to that extent) be the subject of criminal proceedings in Monaco at all.

86.     The Kazakov defendants' evidence is that the Monegasque criminal court will be required to determine the dispute as to the existence of the partnership, since Mr Kazakov's allegation that Mrs Bourlakova has misappropriated assets of his which had been entrusted to her is predicated on Mr Kazakov having an interest in those assets. They therefore disputed the claimants' contention that it was unlikely that a criminal court would consider it necessary to determine whether a partnership formed under Soviet law in the 1980s existed.

87.     A criminal complaint was also filed by Mr Bourlakov against Mrs Bourlakova in Switzerland in March 2019 alleging embezzlement, disloyal management and money laundering.  The Swiss complaint has been dismissed by the Zurich prosecutor for lack of credible evidence to support the claim, as has an appeal against that decision.  Mrs Bourlakova also made civil claims in a Swiss criminal complaint which she lodged, although they have now been withdrawn.

88.     Before the dismissal of Mr Bourlakov's Swiss complaint, Mrs Bourlakova made her own criminal complaints against Mr Bourlakov in Monaco in her capacity as a civil party.  These criminal complaints were made between May 2019 and June 2020 and related to the reliance by Mr Bourlakov in his defence to the divorce proceedings on some of the documents relating to IPEC/Greenbay and Gatiabe/Finco, which are said both in her criminal complaint and in these proceedings to be forgeries.  These included some IPEC minutes dated April 2016 resolving to cede a loan due from Greenbay to Finco, the purported loan agreement between H1 and Edelweiss and the purported assignment to Columbus of the loan due from H1 to IPEC.

89.     Although the claimants accept that there is to that extent overlap between Mrs Bourlakova's criminal complaint in Monaco and this claim in England, they also pointed out that there are a number of other alleged forgeries in issue in these proceedings which are not also the subject matter of the Monaco criminal complaint.  Likewise, the misappropriations alleged as the third category of claim in these proceedings are not in issue in the criminal complaint.  However the dispute over the Bourlakov / Kazakov partnership does play a role in both sets of proceedings.  As part of her complaints, Mrs Bourlakova contends that the partnership is a fiction, invented with the aim of reducing the assets available as part of the matrimonial property regime.

90.     In May 2021, Mrs Bourlakova's criminal complaints were joined to the criminal investigations initiated by Mr Bourlakov and Mr Kazakov in 2019.  Mrs Bourlakova had sought compensation in these criminal proceedings and this is relied on by the Kazakov defendants as a recognition by her that Monaco was the most appropriate place for compensation arising out of the forgeries to be determined.  The evidence is that the civil aspects of these claims (like those commenced by Mr Kazakov and Mr Bourlakov) can be determined by a compensation judge who may also be the same judge as the one who conducts the criminal trial.  In any event it seems that any reasoned judgment of the criminal judge will be binding on another judge hearing the compensation claim, although there is a conflict of evidence as to whether or not binding reasons are likely to be given if the criminal proceedings are dismissed.

91.     The claimants asserted that the complaints have not yet reached the stage of criminal proceedings.  In any event, Mrs Bourlakova has said that she will give an undertaking to this court not to seek compensation in any criminal proceedings in Monaco so long as the present proceedings in England are ongoing against the Kazakovs.  This is regarded by the Kazakov defendants as unsatisfactory because Mrs Bourlakova's claim as a civil party in the criminal proceedings could be resurrected thereafter, although whether that has any significance will depend on the extent to which any determination of common issues by the English court would have any binding or even persuasive effect in Monaco if that were to occur.

92.     The Kazakov defendants also pointed out that, although Mrs Bourlakova would be entitled to withdraw her claim as a civil party in the criminal proceedings, she has not

done so. They suggested that this may be because she wants to keep alive the Monegasque criminal proceedings to which she is a civil party, so as to strengthen her argument that she has a pending complaint qua civil party pending before that court. I should add that these criminal complaints focused on the conduct of Mr Bourlakov. There is a question mark, not answered by any evidence to which my attention was drawn, as to their status in light of the death of Mr Bourlakov.

93.     None of the criminal complaints were in evidence in the current applications. The court was told that the reason for this is that they are subject to certain secrecy provisions of Monegasque law. As at the time of the oral hearing of these applications, the claimants said that it was wrong to characterise the making of these complaints as "ongoing proceedings" (as the Kazakov defendants do in their evidence), because that is not what they are. All that had happened was that investigating judges had been appointed, the Monegasque criminal complaints remained outstanding and the investigating judges were still considering whether there was sufficient evidence to justify continuing their investigation.

94.     After the oral hearing of their applications had concluded, I was informed by the solicitors to the Kazakov defendants that, on 9 December 2021, the investigating judges, who had been continuing to conduct what the Kazakov defendants called a "detailed and ongoing investigation in Monaco", had indicted Mrs Bourlakova on charges of breach of trust in Monaco and money laundering of the proceeds of an offence in Monaco, both on unspecified dates between 1 January 2018 and 7 December 2021. The parties then made further written submissions during the course of December in order to deal with this development.

95.     The undisputed evidence is that the issue of an indictment in Monaco is not equivalent to an indictment under English law and does not involve charging a defendant with an offence. It is a further step in the investigation process which confers on the accused the right to see the complaint against them, to have the assistance of a lawyer and to make requests of the investigating judge. There are still a number of investigations and other steps in the procedure that have to be gone through before the complaint is referred to the Tribunal Correctionnel. From the evidence I have seen, Ms Davies was right to submit that the putative Monaco criminal proceedings are therefore still at the investigation stage. It is possible that, even if the matter is referred to the Tribunal Correctionnel in due course, that may not be for some time in light of the fact that it has taken just under three years to reach this stage of the investigation. But be that as it may, I am satisfied that it is only when that occurs that it can be said that formal criminal proceedings have been initiated.

96.     Ms Davies also submitted that it is well-established in English law that a judgment in the Monegasque criminal proceedings would not be admissible in any civil proceedings in England in accordance with the principle considered and confirmed in *Hollington v Hewthorn* [1943] 1 KB 587. She submitted that the court should proceed on the basis that there is no reason to believe that the position would be different elsewhere. It follows that, whatever happens in the Monegasque criminal proceedings will not serve to resolve any issues that will result in any judgment that could be recognised or enforced in England or indeed elsewhere. It would not therefore resolve any of the issues in the present proceedings.

The Asset Transfer Proceedings

97.    On 5 June 2020, just over a month before the commencement of these proceedings, Mr Bourlakov commenced a civil claim in Monaco against Mrs Bourlakova, Veronica and Elena (the "Asset Transfer proceedings"). Mr Bourlakov alleged that all the assets transferred to Mrs Bourlakova, including in particular those transferred in 2014, were held in her name as family assets for the joint benefit of Mr Bourlakov as well as herself and subject to the rights of Mr Kazakov as partner in respect of which she simply had custody.

98.    Mr Bourlakov's complaint in those proceedings was that Mrs Bourlakova had wrongly transferred away the assets that had been entrusted to her and were held in her name as matrimonial property. These amounted to substantial sums in cash, together with H1, and were said to have been transferred to Elena and Veronica or into discretionary trusts, thereby seeking to deprive him of his half share under the Ukrainian matrimonial property regime.

99.    To put a little more flesh on that description, the transfers which are the subject matter of the Asset Transfer proceedings include c.US$290 million transferred to Veronica in June and December 2018, substantial sums transferred to Elena between October and December 2018 and, in December 2018, a transfer of assets worth c.US$1.5 billion (including shares in H1 and Greenbay) to the Golden Wheat Trust, a discretionary trust said to have been established by Mrs Bourlakova in the Bahamas of which Veronica is the protector and Elena, Veronica and Mrs Bourlakova are the beneficiaries. The last of these transfers occurred very shortly before the commencement of the divorce proceedings but some time after the failed mediations at which Mrs Bourlakova says that the unsuccessful deceits were perpetrated on her by Mr Bourlakov.

100.   Although the summons opening the Asset Transfer proceedings refers to and describes the Kazakov partnership in a number of different contexts, Mr Kazakov did not join as a claimant in his capacity as a partner said to have sustained any loss as a result of the misappropriations for which Mrs Bourlakova was said to have been responsible. There was no evidence to indicate that he could not have been joined if it was any part of the claim in the Asset Transfer proceedings to obtain a determination that the misappropriations said to have been made by Mrs Bourlakova were to his detriment as well as that of Mr Bourlakova. In short, the partnership and what is said to have been Mr Kazakov's interest in it, is not relied on as part of the cause of action. The claim is simply that the assets which were misappropriated were all joint assets that were subject to the matrimonial property regime governed by Ukrainian law.

101.   Mrs Bourlakova's defence to the Asset Transfer proceedings was that she received the asset transfers in 2014 in circumstances in which Mr Bourlakov wanted to restructure the family assets and wished to protect her as his wife. She included an allegation that when Mr Bourlakov transferred assets to her in 2014, "he firmly intended to dispossess himself to her benefit in order to protect her". She then went on to explain how, once their relationship had broken down, Mr Bourlakov developed and implemented a strategy "to monopolise the family's fortune" in similar terms to the way in which she has described what she alleges in these proceedings to be his strategy to defraud her.

102.   In that sense, Mrs Bourlakova relies on many of the same events which are pleaded in these proceedings as the events at which the misrepresentations I have already

described were made to her. As with her claim in these proceedings, her defence to the Asset Transfer proceedings denied the existence of the Kazakov partnership and that Mr Kazakov had any entitlement to the Bourlakov family assets. I accept Ms Davies' submission, however, that it is not clear that the Monegasque court is required to make a finding as to the existence of the partnership in order to determine whether or not the relief sought should be granted.

103. It is the position of the Kazakov defendants that the existence of the partnership is at the heart of one of the central issues raised by Mrs Bourlakova in these proceedings when she pleads that Mr Kazakov had no involvement in these transfers because they were of assets in which he had no interest. Although the transfers challenged by Mr Bourlakov in the Asset Transfer proceedings are not themselves the subject of the claims made in these proceedings, they submitted that for that reason it is wholly unrealistic to suggest that these proceedings will not traverse much of the same ground as is already in issue in the Asset Transfer proceedings. That may or may not prove to be correct, but it is difficult to say with certainty that it is. The claim made by Mrs Bourlakova in these proceedings is that assets of the Foundations of which she was the beneficiary were misappropriated. It is not said (anyway yet) that the Foundations were not in Mrs Bourlakova's ownership from the time of the 2014 transfers.

104. As I have mentioned, Mr Kazakov is not a party to the Asset Transfer proceedings in his capacity as a partner, and neither he nor Mrs Kazakova are (anyway at the moment) parties in any other capacity, nor indeed are any of the other defendants. Furthermore, there was no basis on which it could be suggested that Mr Anufriev or the Leo group defendants could be joined.

105. The present position is that the Asset Transfer proceedings have been suspended as a result of Mr Bourlakov's death, but the Kazakov defendants submitted that they remain pending for the purposes of the BRR and they are in a position to reinstate those proceedings so that Mr Bourlakov's share of the matrimonial property which they assert to have been misappropriated by Mrs Bourlakova can be recovered and distributed as part of his estate. Mr Kazakov and Mrs Kazakova have sought to do this by summons dated 9 November 2021, in what they assert to be their capacity as universal legatees of Mr Bourlakov's estate under a manuscript will dated 21 October 2019.

106. The validity of the October 2019 will is disputed in the proceedings for the administration of Mr Bourlakov's estate. It is common ground between the experts on Monegasque law that Mrs Bourlakova, Elena and Veronica will be able to challenge the standing of Mr Kazakov and Mrs Kazakova to reinstate the Asset Transfer proceedings as universal legatees by raising a plea for non-admissibility. As I read the evidence, it is also common ground between the experts that it is likely that the Monegasque court would delay ruling on the claims made in the Asset Transfer proceedings until such time as the issues about the validity of the will have been resolved. Indeed, those proceedings are unlikely to be permitted to proceed until the issues as to the validity of the will have been determined.

107. The Kazakov defendants say that in that context as well as others the allegations that Mrs Bourlakova makes in the current proceedings about misrepresentations and forgeries are bound to feature in the dispute as to the validity of the will, both for the purposes of entitling Mr Kazakov and Mrs Kazakova to apply to reinstate the Asset Transfer proceedings as universal legatees and more generally. Mr Willan submitted

that it is unrealistic to think that it will not become a central plank in Mrs Bourlakova's arguments on validity that the October will is just the latest example in a long line of forgeries. I think there is force in the submission that the earlier alleged forgeries will feature in the evidence. On the evidence available to me it is more difficult to assess the extent to which the Monegasque court will permit a trial as to the validity of the 2019 will to become a vehicle for it to make findings on other allegations of forgery.

## The Monaco Judicial Escrow

108.    The next relevant legal proceeding in Monaco was commenced after the original issue of the claim form in these proceedings and after the claimants had made their first application to extend time for its service and for permission to serve it out of the jurisdiction. On 11 December 2020, Mr Kazakov applied to the civil courts in Monaco for protective relief. This relief was refused at first instance but, on 11 February 2021, the Monaco Court of Appeal allowed an appeal by Mr Kazakov and ordered that funds totalling €60 million held in certain accounts at UBS, Société Générale and Barclays Bank in Monaco be placed into judicial escrow, pending resolution of the dispute as to their ownership. Similar protective relief was granted in relation to certain assets held in the vaults of those banks on an application made by Mr Bourlakov on 30 April 2021 shortly before his death.

109.    The evidence of the Kazakov defendants is that the effect of the Monaco judicial escrow is to protect assets pending the resolution of Mr Kazakov's claims as a civil party in the Monaco criminal proceeding, although Mr Willan accepted that, because they were protective and not substantive, they had less significance for present purposes. In the course of its determination, the Monaco Court of Appeal referred to the dispute as to ownership with which the Monaco criminal courts were then concerned and in particular the claim by Mr Kazakov to joint ownership as a result of his claim to a partnership with Mr Bourlakov. It is also said that the orders made will operate to protect Mr Kazakov's interest in the outcome of the proceedings for the administration of Mr Bourlakov's estate (the "Monaco Estate proceedings").

## The Monaco Estate proceedings

110.    It is common ground that Mr Bourlakov was domiciled in Monaco at the time of his death. The Monaco Estate proceedings were opened on 7 July 2021 when the manuscript will (to which I have already referred) was deposited by Mr Kazakov with a notary public in Monaco under article 858 of the Monegasque Civil Code. The Kazakov defendants contended that the administration of Mr Bourlakov's worldwide estate will now be conducted under Monegasque law and any disputes arising from that administration (including the recovery, accounting and distribution of his assets) will be resolved in the Monegasque courts.

111.    Amongst the issues which arise in the Monaco Estate proceedings is the central one of the validity of Mr Bourlakov's will. There are two rival documents. The first is a will made in Canada on 8 January 2004 under which Mrs Bourlakova is the sole beneficiary. The second is an informal Russian language holograph dated 21 October 2019 under

which Mr Bourlakov appears to have bequeathed all of his assets to the Vera and Nikolai Kazakov Foundation. This document also contains a direction that payments should be made to cover the vital needs amongst others of the family of Sofia Shevtsova, who has commenced paternity proceedings in Russia to establish that Mr Bourlakov was the father of her young daughter. Although the validity of the 2019 will is in dispute in the Monaco Estate proceedings, for ease of reference I shall call these two documents the 2004 will and the 2019 will respectively.

112. The dispute as to the validity of the 2019 will is to be resolved under Monegasque law as the law of the place of Mr Bourlakov's domicile at the date of his death and is a matter for the Monegasque court to determine. In recognition of the jurisdiction of the Monegasque courts in relation to this issue, on 27 October 2021, Mrs Bourlakova, Veronica and Elena applied for the 2019 will to be declared a forgery contending that they are the sole heirs to Mr Bourlakov, entitled to inherit his estate in succession. Two days later, on 29 October 2021, Mrs Kazakova and Mr Kazakov applied for a determination that the 2019 will is valid, as are the universal bequests granted by it to Mrs Kazakova and Mr Kazakov.

113. Although the claimants place much emphasis on the facts that the Kazakov Foundation did not appear to exist at the time of Mr Bourlakov's death and that to English eyes the 2019 will appears to be a very informal manuscript document I am not in a position to express any clear view on the merits of Mrs Bourlakova's challenge. The dispute has, however, been considered in Switzerland in the context of a number of contested interlocutory applications which can be summarised as applications by Mrs Bourlakova to exclude Mr Kazakov from involvement in proceedings to seal and preserve the estate in that jurisdiction (comprising assets in accounts held at UBS and Credit Suisse) and by Mr Kazakov to exclude Mrs Bourlakova and Veronica likewise. The Swiss court recognised that the substantive underlying questions relating to the validity of the will were to be determined in Monaco, applying Monegasque law, and concluded that all of these procedural applications should be dismissed. It held that its role was to grant relief to preserve the assets, not to decide matters which went to the merits of the parties' substantive entitlements to them.

114. In the context of her attack on the 2019 will, Mrs Bourlakova refers to the fact that Mr Kazakov and Mrs Kazakova have wrongly declared themselves to be creditors of half of the joint estate of Mr Bourlakov and Mrs Bourlakova. This would appear to be a reference to the disputed partnership said by the Kazakov defendants to be at the root of their case in much of the litigation. It is also said by the Kazakov defendants that the dispute as to the validity of the 2019 will is intimately interconnected with these proceedings for a more general reason. If Mrs Bourlakova establishes that she is the sole heir to Mr Bourlakov's estate, she will have suffered no loss by reason of the misappropriations from which Mr Bourlakov is said to have benefitted. It follows, so it is said, that the interconnectedness between the two sets of proceedings is very great.

115. The evidence is that the Monegasque court dealing with the Monaco Estate proceedings has a broad jurisdiction to resolve disputes relating to the ownership of assets located abroad and any issues of fraud raised in the course of those disputes. If necessary, it will also determine disputes as to the identity of the notary where there is an issue, such as there is in the present case, as to the identity of the universal legatee who is entitled to choose the notary. I did not understand there to be any significant disagreement

between the Monegasque experts as to the extent of the Monaco's court's jurisdiction as a matter of Monegasque law to resolve these categories of dispute.

116. Once the appointment of the notary has been settled, he or she is responsible for the drawing up of an inventory of the deceased's assets. It was common ground that this extended to assets both in Monaco and abroad. If necessary the notary will pause the administration of the estate pending the determination of any dispute relating to the question of whether particular assets ought to be included on the notary's inventory. Where appropriate, the court may, before ruling on the merits of any such dispute, appoint an expert or curator with the task of determining the composition of the estate. It follows that the Monaco Estate proceedings will necessarily result in the determination in Monaco of the rival claims to the disputed assets, including the issue of whether Mr Kazakov has an interest in those assets by virtue of what he asserts to have been his joint business activities with Mr Bourlakov, whether through the medium of the disputed partnership or otherwise.

117. The Kazakov defendants contended that the decision of a foreign court as to Mr Bourlakov's entitlement to an asset will not be determinative of the question of whether or not that asset should be included on the inventory being drawn up by the notary. The question is whether, applying conventional rules of recognition of foreign judgments, the Monegasque court will be required to recognise the decision of the foreign court. If it is, the effect of that decision will be reflected on the notary's inventory. If it is not, the Monegasque court may have to re-decide the matter for itself.

118. It was submitted by the Kazakov defendants that a trial of an ownership dispute in England would give rise to an undesirable situation. An English judgment would amount to a determination in proceedings to which the notary responsible for administrating the estate is not a party and in respect of which there are real question marks as to recognition in Monaco. Mr Willan said that this was all the more undesirable in a situation in which there may be other people with an interest in the estate (and he drew attention to the potential claim of Ms Shevtsova's daughter) and submitted that for that reason it was all the more important to have ownership claims litigated in the place where the estate is being administered.

119. It was also submitted, supported by their expert on Monegasque law (Maître Patricia Rey), that the court in Monaco would be unlikely to stay resolution of proceedings for the determination of asset ownership required to enable Mr Bourlakov's estate to be administered, pending a decision of the English court in these proceedings. These proceedings are primarily concerned with the resolution of claims in tort, which depend on whether or not the alleged victim of the tort was able to establish a right to the relevant asset. It was submitted that the Monegasque court would conclude that it was the appropriate court to determine whether or not the disputed assets fell within Mr Bourlakov's estate, and that it would be unlikely to wait for the determination of that question as some form of "bolt on" to the tort claim being pursued in England.

120. The claimants submitted that, so long as the English court takes jurisdiction under the BRR, the Lugano Convention or at common law there is no reason to believe that an English judgment would not be recognised in Monaco. The Kazakov defendants submitted to the contrary and pointed out that the claimants' own expert evidence simply asserts that the question for the Monegasque court will be whether it itself would have exercised jurisdiction in the relevant circumstances. The answer to that question

is uncertain, because it will remain open to them to argue in Monaco that the Monegasque court would not have assumed jurisdiction in equivalent circumstances, because the anchor defendant for BRR purposes (Leo Holding) was an artificial defendant joined simply for jurisdiction purposes. While such an argument may no longer be available in England (*PJSC Commercial Bank Privatbank v Kolomoisky* [2020] Ch 783), it may be available in Monaco, although the evidence to that effect is far from certain.

121.   More broadly, the Kazakov defendants also submitted that there is what their expert witness on Monegasque law called "a substantial and real risk" that any foreign judgment made in the current proceedings would not be declared enforceable in Monaco "given the number of factors and the complexity of the issues in this case". Those factors and issues pointing against recognition were described in their expert's report as being:

   i)     Whether the judgment related to immovable property located in Monaco and therefore within the exclusive jurisdiction of the Monegasque Court – this is the case in relation to La Reserve.

   ii)    Whether the judgment related to matters of succession in relation to an estate opened in Monaco or in respect of which property belonging to the estate is situated in Monaco.

   iii)   Whether or not the judgment related to property within England.

   iv)    Whether or not any party claiming disputed ownership rights in property addressed in the foreign judgment was domiciled in England.

   v)     Whether, under the Monegasque jurisdictional rules, any tortious act occurred within England or whether the damage was suffered there.

   vi)    Whether, under the Monegasque jurisdictional rules, any defendant domiciled in England is a serious co-defendant whose interests are affected by the dispute and/or whether that defendant has been pursued with the sole object of bringing other co-defendants into the jurisdiction.

   vii)   Whether it is contrary to a decision made between the same parties in other civil or criminal proceedings in Monaco and whether there is a dispute pending before a Monegasque court between the same parties concerning the same subject matter. This consideration is said to be of particular relevance given the several civil and criminal proceedings that have been commenced in Monaco, including proceedings arising out of the administration of the estate (in respect of which the Monegasque court has jurisdiction in relation to all matters of succession).

122.   On the evidence, I accept that there is a significant risk that the Monegasque court would not stay any proceedings for the administration of Mr Bourlakov's estate pending resolution of proceedings in England. As to recognition of any English judgment, there is no bilateral convention on mutual assistance between Monaco and the United Kingdom and the claimants' expert evidence establishes that it would be necessary for an English decision to be declared enforceable in Monaco by an exequatur procedure

before the court of first instance, which may only be commenced when the foreign judgment is no longer capable of being opposed or appealed. Recognition of an English judgment will not be afforded under the exequatur procedure if it relates to a dispute where the Monegasque courts have exclusive jurisdiction under Monegasque law, such as where it relates to property located in Monaco. That would be a complicating factor, and I think that there is a risk that the considerations I have outlined above may lead to the Monegasque courts declining recognition of an English judgment given in these proceedings in the Monegasque proceedings for the administration of Mr Bourlakov's estate in Monaco. However, the evidence does not enable me to assess the materiality of that risk or the extent of any additional complications with any degree of certainty.

The 2022 Monaco claim

123.   On 17 February 2022, well after the conclusion of the oral argument on these applications, Mrs Bourlakova commenced further proceedings in Monaco against Mr Kazakov and Mrs Kazakova, by the issue of what is said to be an action commenced for protective purposes. In those proceedings, she seeks an order to annul a number of transactions, including the partnership declaration made in front of the Monegasque notary in December 2018, the transfer of the shares in Gatiabe to Mr Kazakov, the pledge and/or transfer of the Black Pearl and the transfer of Edelweiss, Hemaren, Jovellanos, Finco, Merenguito and Tribatline to or for the benefit of Mr Kazakov. As Mr Willan submitted, all of these transactions fall within the subject matter and scope of the current English proceedings. The 2022 Monaco claim also makes a number of other challenges to transactions which appear to be within the contemplation of a catch-all paragraph in the amended particulars of claim.

124.   Mrs Bourlakova sues in the 2022 Monaco claim as Mr Bourlakov's spouse and automatic heir and has joined Elena and Veronica as automatic heirs as well. As the Kazakov defendants submitted in their further written submission filed at the beginning of March 2022, at the centre of each of these new claims is the fundamental dispute as to who was the true owner of the disputed assets, including whether Mrs Bourlakova held assets as a mere nominee and whether Mr Kazakov has an interest in those assets as Mr Bourlakov's business partner.

125.   There are some differences between the allegations made in the 2022 Monaco claim and the present case but it is clear, as the Kazakov defendants submit, that there is a very significant overlap between what is alleged in those proceedings and what is alleged in these proceedings. The legal bases of some of the causes of action are different but the underlying factual allegations are very similar, including the claim that Mrs Bourlakova was the sole beneficial owner of assets entrusted to her by Mr Bourlakov, rather than being (as the Kazakov defendants assert to be the case) the person to whom they were entrusted.

126.   The claimants accept that there is a substantial overlap. They submitted that Mrs Bourlakova had no other choice but to bring an action for the annulment of the transfers without waiting for the outcome of these proceedings (amongst others). The reason for this is said to be that there is a three year limitation period under Ukrainian law, which means that she needed to commence the 2022 Monaco claim for protective purposes to cover against the eventuality that this court might decline jurisdiction. They submitted

that the issue of that claim is not, therefore, a material development for the purposes of the jurisdiction challenges.

127.    By her counsel's 8 March 2022 submission note, Mrs Bourlakova said that she would not pursue the 2022 Monaco claim if the court finally dismisses the jurisdiction challenges made by the Kazakov defendants. She also said that she was willing to undertake to this court:

> "1.    To apply to the Monaco court for an immediate stay of the proceedings commenced by a summons dated 17 February 2022 ("the 2022 Monaco claim") pending the final resolution of the Jurisdiction Challenges by the English Court; and
>
> 2.    In the event that the English Court finally determines the Jurisdiction Challenges in favour of the First Claimant (and for the avoidance of doubt, after the expiry of exhaustion of the Seventh, Eight and Tenth to Twelfth Defendants' rights of appeal), to discontinue the 2022 Monaco claim."

128.    So far as paragraph 1 of the proposed undertaking is concerned, the claimants and the Kazakov defendants disagreed as to whether the Monegasque court would grant a stay of the 2022 Monaco claim pending final resolution of the jurisdiction challenges in England. I do not know what, if any, developments have taken place in Monaco since the beginning of March, but the claimants rely on the fact that the evidence from the Kazakov defendants' own expert is that the Monegasque court has the power to stay proceedings on the basis of "good administration of justice" quite apart from the jurisdiction to stay under Article 12 of the Code on Private International Law where it is seised after a foreign court concerned with proceedings "in which there is an identity of parties and subject matter". The claimants submitted that it is obvious that a stay of the 2022 Monaco claim (initiated as it was by a protective summons) would promote the good administration of justice.

129.    There was also disagreement as to whether or not it was likely that the Monegasque court would stay the 2022 Monaco claim, whether or not properly to be characterised as merely protective, on the grounds that the English claim would be unlikely to lead to a judgment that would be recognisable or enforceable in Monaco. The Kazakov defendants submitted that there would not be any appetite to stay Monegasque proceedings in favour of an English claim, as any English judgment would not be recognised or enforceable in Monaco because the claim made and any judgment entered in these proceedings has no connection to the administration of the Bourlakov estate or the transfers in dispute.

130.    Despite these submissions and whatever the position may be as against the other Monaco proceedings, I agree with the claimants that there is no obvious reason why the Monegasque court would insist on Mrs Bourlakova pushing ahead with the 2022 Monaco claim in circumstances in which it is merely protective and will be discontinued if the English court dismisses the jurisdiction challenges with which these applications are concerned. It follows that I agree with the claimants' submission that the issue of the 2022 Monaco claim is not of itself a material development for the purposes of these applications challenging jurisdiction.

The Domicile of Mr Kazakov and Mrs Kazakova

131.    These proceedings were commenced before the UK's withdrawal from the EU.  It is
        common ground that in those circumstances the BRR applies in relation to those
        defendants who were domiciled in the EU when the claim form was issued.  So far as
        the applicants are concerned, there is now no dispute that this includes Mr Anufriev
        (domiciled in Latvia) and Mr Kazakov (who now accepts that he was domiciled in
        Estonia having initially said that he was domiciled in Monaco), and that it does not
        include the Panamanian Companies.  There is, however, a dispute as to whether or not
        it includes Mrs Kazakova.  The claimants contend that at the time the claim form was
        issued she, like her husband, was domiciled in Estonia.  The Kazakov defendants
        contend that she was not and that she was domiciled outside the EU in Russia.

132.    The Kazakov defendants also contend that the position has changed since 2020.  They
        now say that, as at the date of the hearing of these applications, the domicile of both Mr
        Kazakov and Mrs Kazakova has changed to Monaco.

133.    It is important to note at the outset that the place of domicile of both Mr Kazakov and
        Mrs Kazakova has taken on significance for two separate reasons.  The first is that it
        dictates the jurisdictional regime applicable to each of them.  If Mrs Kazakova was
        domiciled in Estonia at the time the claim form was issued, article 8 of the BRR is
        capable of being engaged so as to give this court jurisdiction if there is an anchor
        defendant domiciled in England and Wales.  Leo Holding is such an anchor defendant:
        it is an English company and the claims against it and Mrs Kazakova are sufficiently
        closely connected for it to be expedient to hear and determine them together (article
        8(1)).  It follows that, if Mrs Kazakova was domiciled in Estonia, service can be effected
        on her pursuant to the version of CPR 6.33(2) applicable to these proceedings, without
        the court's permission.  This therefore gives rise to the question of whether Mrs
        Kazakova was domiciled in Estonia in 2020, which is to be determined as a matter of
        Estonian law.

134.    The second reason is that it was originally asserted by the Kazakov defendants that both
        Mr Kazakov and Mrs Kazakova have been domiciled in Monaco for some time, which
        anyway in the case of Mr Kazakov was said to be several years.  The evidence as to Mr
        Kazakov's domicile was initially relied on as part of their forum non conveniens
        argument that Monaco was a more appropriate place for litigation to determine the
        issues in these proceedings.  It was also said that the claimants would have jurisdiction
        as of right against him in Monaco because he was domiciled there.

135.    Mr Kazakov's case as to his domicile in Monaco in 2020 then changed in the
        circumstances which I shall explain shortly. The Kazakov defendants still submitted,
        however, that whatever the position may have been in 2020, they were both now
        domiciled in Monaco, although this is disputed by the claimants.  That is a matter of
        Monegasque law.  If established, it would provide the Kazakov defendants with a
        continuing connecting factor to Monaco in relation to the current proceedings and
        would also mean that they were capable of being anchor defendants as a matter of
        Monegasque law for any new proceedings commenced by the claimants in Monaco
        against all of the defendants to these English proceedings.

Late Evidence

136.    At this stage it is convenient to deal with a question that arose during the course of the hearing over the admission of a late witness statement made by Ms Alexandra Whiston-Dew on behalf of the claimants. It was adduced in evidence in response to a statement from Ms Elizabeth Seborg, the Kazakov defendants' solicitor. In that statement Ms Seborg explained a significant change in Mr Kazakov's case on his domicile and indicated that the Kazakov defendants intended to pursue an application for a stay under article 34 of the BRR, an application which flowed from the fact that Mr Kazakov had now accepted that he was domiciled in the EU. This meant that permission to serve out of the jurisdiction against him was not required and the English court had no jurisdiction to grant a stay on common law forum non conveniens grounds (*Owusu v Jackson* [2005] QB 801).

137.    Ms Whiston-Dew's witness statement was served by the claimants on the morning of the hearing. She dealt with matters relating to Mrs Kazakova's domicile, and in particular gave some evidence in relation to the Estonian population register which I will come to a little later. She commented on Ms Seborg's further assertions that Mr Kazakov and Mrs Kazakov spend considerable time in Monaco and criticised them for not giving a full explanation of how they obtained their Monaco residence permits when they did not have a property in Monaco at the time they obtained them. She also gave some evidence on whether or not the Asset Transfer proceedings had been resumed and why the matters in issue in the Monaco criminal proceedings were not the same as the matters in these proceedings. The witness statement also explained why it was that Ms Seborg was wrong to challenge the evidence that Veronica and Mr Gliner live in London and have done so for some time. This evidence included a number of instances in which documents produced by or in the name of Mr Kazakov had asserted that Veronica lives in London.

138.    I heard argument on Day 3 of the hearing as to whether or not Ms Whiston-Dew's new witness statement should be admitted. I was satisfied that the fair and just result was that it should be, but indicated that I would give my reasons for doing so in this judgment.

139.    Mr Willan accepted that, if the issues in the new witness statement had only arisen out of the delay in the taking of the article 34 point that would be one thing, but he submitted that most of the matters with which the new witness statement was concerned had been in issue from the outset of the applications. Thus he said that there was no reason why the evidence in relation to the Estonian property register could not have been acquired earlier and there was no excuse for the further delay which occurred once the information had been obtained, which was some 12 days before the evidence was put in.

140.    He made similar points in relation to a number of other matters. He said that the evidence in relation to the resumption of the Asset Transfer proceedings amounted to a qualification of what the experts had already said. He submitted that the evidence in relation to the matters in play in the Monaco criminal proceedings was simply another round of evidence on an issue which had already been the subject of evidence.

141.    In my view it is clear Ms Whiston-Dew's witness statement either evidenced the claimants' response to the consequences of the new case being advanced as to Mr

Kazakov's domicile or contained information that was relevant to the new case on article 34. Merely because some of the questions of fact may already have been in issue in some other context does not mean to say that the claimants should be prevented from revisiting those questions in the revised landscape of the Kazakov defendants' wholly reformulated case. The lateness of their new case justified an even later response, even where some of the evidence related to facts that were already the subject matter of the dispute.

142. While I agree with Mr Willan's criticism that service as late as the morning of the hearing was difficult to justify, I am satisfied that by the time the application to admit the evidence came to be heard on Day 3 (a Monday), Mr Willan had had sufficient time to take instructions from his clients and their Estonian and Monegasque lawyers on the issues that arose. I took the view that this was sufficient to counteract any prejudice that the Kazakov defendants might otherwise have suffered from the admission of this late evidence and indicated that, if the Kazakov defendants wished to put in further evidence in reply on any of the points, they could anyway in principle do so. In the event, they did so with a further witness statement from Ms Boulton served during the course of the hearing.

Kazakov Domicile: 2020

143. Dealing first with the position in 2020, it is common ground that the Estonian law test for determining whether Mrs Kazakova was domiciled in Estonia is whether she was living there permanently or primarily at the relevant time. The word "primarily" means "more than in any other place". It is also common ground that the relevant time is the time at which the claim form was issued.

144. The standard of proof to which the court has to be satisfied is whether there is a good arguable case on the factual issue concerned: *Canada Trust Co v Stolzenberg (No 2)* [1998] 1 WLR 547, 555, per Waller LJ, who made clear that this evidential standard applies to the determination of domicile for the purposes of the equivalent of CPR 6.33 as much as it does to the question of whether one of the gateways referred to in CPR 6.36 and PD6B para 3.1 is engaged. This approach has been approved at the highest level on a number of subsequent occasions, although with some additional amplification. As Lord Sumption JSC explained in *Brownlie v Four Seasons Holding Inc* [2018] 1 WLR 192 at [7] in a passage that he reiterated in his judgment in *Goldman Sachs International v Novo Banco SA* [2018] 1 WLR 3683 at [9]:

"What is meant is (i) that the claimant must supply a plausible evidential basis for the application of a relevant jurisdictional gateway; (ii) that if there is an issue of fact about it, or some other reason for doubting whether it applies, the court must take a view on the material available if it can reliably do so; but (iii) the nature of the issue and the limitations of the material available at the interlocutory stage may be such that no reliable assessment can be made, in which case there is a good arguable case for the application of the gateway if there is a plausible (albeit contested) evidential basis for it. I do not believe that anything is gained by the word "much", which suggests a superior standard of conviction that is both uncertain and unwarranted in this context."

145. As Mr Kazakov now accepts that he was domiciled in Estonia, the essence of the claimants' case as to why I can be satisfied that Mrs Kazakova was living permanently or primarily in Estonia starts with the propositions that the Kazakovs are married and, because there is no suggestion that they have ever been separated or that they were separated at the time the claim forms were issued, it is to be expected that they live together and share the same domicile. As it is also common ground that Mrs Kazakova spent at least some time in Estonia, it is submitted that there is at least plausible evidence that she is domiciled in the same place as her husband.

146. This submission is said by the claimants to be bolstered by the way in which the evidence as to the Kazakovs' domicile was first put before the court and then changed. It was originally said by their solicitor, Ms Nicola Boulton, on the basis of information provided by the Kazakovs that as at the date of her witness statement (August 2021) both Mr Kazakov and Mrs Kazakova had been domiciled in Monaco for some time. Ms Boulton then returned to the question of domicile when explaining why it was her clients' case that, as at the earlier time at which the proceedings were issued, neither Mr Kazakov nor Mrs Kazakova was domiciled in Estonia (being the jurisdiction of their address as referred to on the face of the claim form).

147. In support of this conclusion it was said at this stage that, although Mr Kazakov had been born in Estonia in 1952, he left in 1971 to go to university in what was then Leningrad and it was said in terms that he did not go back to live in Estonia at any time thereafter. Mr Kazakov was said to have set up home together with Mrs Kazakova in St Petersburg after they were married in 1975 and they continued to live there together until he moved his primary residence to Monaco in 2019. It was said that in the initial period after his move to Monaco he travelled extensively, but he stayed there for the full period of pandemic lockdown from 13 March 2020 to 10 November 2020, being the period within which the claim form was issued

148. It was said that Mrs Kazakova also intended to move to Monaco at the same time and they both received their Monegasque residence permits in January 2020 and rented an apartment in Monaco pending a purchase. However, Ms Boulton said on the basis of what she was told by her clients that Mrs Kazakova was only there for a short while in February 2020, when she returned to Russia. She was then prevented from going back to Monaco because of the travel restrictions imposed by the Covid-19 pandemic.

149. This evidence was presented together with a location schedule prepared by Mr Kazakov and Mrs Kazakova. The source of the information from which it was prepared was not fully particularised, but it purported to show that Mr Kazakov spent the majority of his time in 2019 and 2020 in Monaco and a material but much more limited amount of his time in Estonia and Russia. So far as Mrs Kazakova was concerned, this schedule purported to demonstrate that she spent the majority of her time in Russia and about two months of each year in Estonia.

150. That is not to say that Ms Boulton's evidence did not also make clear that both Mr Kazakov and Mrs Kazakova have quite strong Estonian connections. It was explained that Mr Kazakov was Estonian by birth and that Mrs Kazakova had had an Estonian passport since their marriage. They both described their nationality as Estonian (not Russian) on their Monegasque residence permits. It was also disclosed that they had three properties in Estonia, although the impression was given that they did not use them themselves because two were said to have been purchased as investments and one

was said to have been inherited by Mr Kazakov from his mother without any indication that they ever spent any time there. It was said by Ms Boulton that the visits that both of them made to Estonia were to Mr Kazakov's relatives and there was no suggestion that they went there as a family independently of those visits. Mrs Kazakova's lack of any substantial connection to Estonia was emphasised by a statement that she had never regarded herself as residing in Estonia, did not speak the language and had no connections outside her marriage. The conclusion was therefore said to be that neither of the Kazakovs was domiciled in Estonia: Mr Kazakov was said to be domiciled in Monaco and Mrs Kazakova was said to be domiciled in Russia.

151.    The claimants' evidence in answer to Ms Boulton's statement disputed this conclusion. It explained that Mr Kazakov had represented to the courts in Monaco that he had lived in Estonia as his home in recent years, which was obviously inconsistent with what he had said through Ms Boulton. They also pointed out that the location schedule exhibited to Ms Boulton's statement was highly unspecific, contained no supporting material and was of little evidential weight. Amongst other matters, they also relied on their understanding that the Kazakovs owned five not three properties in Estonia, located in Narva-Jõessu and the neighbouring town of Sillamäe City.

152.    On 12 November 2021, a further witness statement was made on behalf of the Kazakov defendants by Ms Seborg – the statement to which I have referred above. She explained that the evidence relating to Mr Kazakov's domicile in Monaco (including the schedule which the claimants had criticised for its lack of specificity) was inaccurate, should not be relied upon and was being withdrawn. No details were given as to the extent of the inaccuracies but Mr Kazakov accepted that, although he had told Ms Boulton that over a period of 2 years he had only spent 96 days in Estonia spread over 10 trips, he now accepted that he should "be regarded as domiciled in Estonia".

153.    As to Mrs Kazakova, Ms Seborg confirmed that "having carefully considered again her whereabouts during 2019 and 2020, Mrs Kazakova confirms that she was permanently resident and spent the majority of her time prior to issue of the claim form in Russia." She invited this evidence to be assessed against the background of the fact that the Kazakovs had lived together in St Petersburg since their marriage in one of two properties, both of which they still retain. She said that her daughter and grandchildren to whom she remains close still live in St Petersburg and she cared for her elderly mother until her death in 2018. She is said to have attended church in St Petersburg and is a season ticket holder at the Mariinsky theatre. She is also said to have paid Russian tax at a rate applicable to residents.

154.    Ms Seborg then exhibited to her statement a revised location schedule which was said to summarise the time that Mrs Kazakova spent in Russia, Estonia and elsewhere during the course of 2019 and 2020. Ms Seborg said that Mrs Kazakova had confirmed that the schedule was accurate to the best of her knowledge and belief. It disclosed an increase in the amount of time that she spent in Estonia as compared to that which she had disclosed in her original schedule, but still showed that she spent the major part of her time in Russia.

155.    Not surprisingly, the claimants made much of the highly significant change in position so far as Mr Kazakov's domicile is concerned. They did not mince their words, accusing Mr Kazakov of having lied to the court and to his own solicitors and pointed out that it is incredible to think that Mrs Kazakova was not aware of the extent of these

misrepresentations given what Ms Boulton said about the way in which she took her clients' instructions. This is said to bear directly on the approach the court should take to assessing the weight to be given to the evidence adduced by Mrs Kazakova.

156.    I agree with the substance of this submission. It must have been obvious to both Mr Kazakov and Mrs Kazakova that the places of their respective domiciles were central to the applications they had made. The withdrawal of this evidence is highly significant in the light of what had been said before and the nature of the jurisdictional advantage which Mr Kazakov had sought to achieve by his earlier pretence that he was domiciled in Monaco not Estonia. In the absence of a full explanation as to how the inaccuracies came to be presented through Ms Boulton and the extent of the discrepancies between what Mr Kazakov told Ms Boulton to include in her witness statement and what the true position is now accepted as being, I must treat Mrs Kazakova's evidence on the same point (expressed as it is through her solicitors) with real caution. Mr Willan accepted that this was an approach I could take, in any event where her evidence was not supported by other objective evidence. I do not think that it would be right simply to reject it unless corroborated, as the claimants urge me to do, but the confidence I can have in its accuracy is materially compromised by what has occurred.

157.    Of course, the court must be careful before tainting Mrs Kazakova with the misrepresentations that were made to the court by her husband. However, one of the more striking pieces of evidence that has now been disclosed by Mrs Kazakova is a WhatsApp message she sent on 13 March 2020 confirming that Mr Kazakov had gone to Estonia. That was the same day that Mr Kazakov had said (through Ms Boulton) that he went to Monaco. As Estonia closed its borders on the same day, this at least suggests not just that Mr Kazakov misrepresented his whereabouts but also that Mrs Kazakova knew that this was the case.

158.    The claimants' case that Mrs Kazakova was domiciled in Estonia is not just that Mr Kazakov now accepts that he was domiciled in Estonia and the circumstances in which his change of position occurred, but is also based on a number of other factors some of which I have already alluded to above. The first is the ownership of properties in Estonia. In answer to Ms Boulton's assertion that the Kazakovs owned three properties in Estonia, the claimants had asserted that there were in fact five, four of which were in Narva-Jõessu. Through Ms Seborg, Mrs Kazakova now accepts that there are four not three properties in Estonia, one of which is being developed to be used as a summer residence, but does not accept that there are five as one has been sold.

159.    The Kazakovs' original lack of accuracy on the number of properties they owned in Estonia is troubling, but in my view of greater significance is the fact that it is now clear that the properties are more than simply investments, which was the impression given by Ms Boulton's statement. This appears from the fact that it is now admitted that they are used by the Kazakovs' immediate and wider families as summer dachas, where it is much more probable that the Kazakovs might have been permanently or primarily living pending the implementation of any move to Monaco or indeed elsewhere. This is not the type of use which had originally been conveyed by Ms Boulton's statement. As Ms Seborg explained:

"Narva-Jõessu is a coastal town on the Russian/Estonian border which has been a popular summer destination for Russians since the late 19th century, particularly for residents of St Petersburg (which is two to three hours away by car) who own

their summer cottages and spend the summer months in this border town. Mrs Kazakova regularly spends time at these house (sic) in Narva with her family, which is included in the schedule she has prepared, but she has never considered it her main or permanent home."

160. The documents exhibited to Ms Seborg's witness statement also include copies of the entry and exit stamps in Mrs Kazakova's Russian passport (which is the one she says that she uses for travel into and out of Russia) and tickets for performances at the Mariinsky Theatre. There were also a number of photographs of St Petersburg and WhatsApp messages indicating her presence in St Petersburg on specific dates and some government documentation which was at least consistent with residence in Russia. Taken at face value this evidence is consistent with a case that Mrs Kazakova spent most of her time in 2019 and 2020 in Russia not Estonia.

161. However, I am not satisfied that any of this evidence has the probative value asserted by the Kazakov defendants. The ballet tickets and the photographs are relatively few in the overall scheme of things and consistent with occasional travel from Estonia to Russia from time to time. Furthermore, they, together with some of the other material described as official Government documentation, relate more to 2019 and earlier and less to the time after the stage at which the Kazakovs started to implement their intention to make some form of move to Monaco as evidenced by the issue of their Monegasque residence permits at the beginning of January 2020.

162. Furthermore, not only did Mrs Kazakova have an Estonian passport, which might not of itself add very much to the other evidence, but she is also registered on the Estonian population register and participates in the Estonian health insurance system. Her registration on the population register is recorded as being at one of the Narva-Jõessu properties described by Ms Seborg, which is said to have been her registered residence from 17 May 2012. The same register also discloses Mr Kazakov as residing in St Petersburg from 3 May 2010, but as having an additional residence at the same Narva-Jõessu property from 4 October 2021.

163. The significance of this evidence is that Estonian law provides (a) that persons "shall submit the residential address where they permanently or primarily reside for entry in the population register", (b) that there may be a presumption that the data entered in the register is correct (although this is disputed), (c) that persons are responsible for ensuring the existence and accuracy of their entry and (d) that residences other than their permanent or primary residence are to be included as additional addresses. Ms Boulton's most recent witness statement contained evidence from the Kazakovs' Estonian lawyers that the entry in the population register is not decisive for determining domicile, but even accepting that as correct, it seems to me that, as 'permanent or primary residence' is the language used as the test for determining a person's domicile under Estonian law, the entry in the population register is material corroboration of the claimants' case that Mrs Kazakova was domiciled in Estonia at the time of issue of the claim form.

164. The only other material bearing on the issue of Mrs Kazakova's location from time to time was the date stamps in her Russian passport, even though not all of them were legible. The difficulty with this evidence is that, even if the stamps had been legible, their value was compromised by the accepted fact that the passport was not always stamped when she entered and left Russia by car. As Narva-Jõessu is a two and a half

hour drive from St Petersburg, this was the means by which she travelled regularly between Russia and Estonia. In any event, those that are legible do not of themselves justify a conclusion that Mrs Kazakova was in Russia for any more than a relatively few days during the course of 2019 and 2020. It follows that it is difficult to place any real weight on the reliability of the passport stamps as a complete record of her movements. It is self-evident that the omission of only a very few stamps had the capacity to make a serious impact on the reliability of the remainder of the record.

165. Stepping back, while there is evidence that Mrs Kazakova spent a significant amount of time in Russia in the period 2019 and 2020, I think it is clear that there is a plausible evidential basis, albeit one that is contested, for a conclusion that she was domiciled in Estonia. That is where she continued to represent to the Estonian public authorities that she was permanently and primarily living. While I accept that this is not conclusive, when set in the context of the remaining evidence I am satisfied that the claimants have established, a good arguable case (in the sense explained by Lord Sumption JSC in *Brownlie* and *GSI v Novo Banco*) that Mrs Kazakova was domiciled in Estonia at the time the proceedings were issued. It follows that article 8(1) of the BRR is engaged and service on Mrs Kazakova without permission was possible under CPR 6.33. That ground for her jurisdiction challenge fails.

Kazakov domicile: the current position

166. I turn next to the current domicile of Mr Kazakov and Mrs Kazakova. There is some evidence that Mr Kazakov and Mrs Kazakova may have moved to Monaco and may intend to remain there. This is relevant for the reasons I explained at the beginning of this section of the judgment.

167. The starting point is that both Mr Kazakov and Mrs Kazakova hold Monegasque residence permits issued in January 2020, which was before the commencement of these proceedings. These permits give rise to a presumption that, as a matter of Monegasque law, they were both by then domiciled in Monaco. However, that presumption is also rebuttable as a matter of Monegasque law and Mr Kazakov now accepts that, despite his original assertion that he was domiciled in Monaco at the time these proceedings were issued and notwithstanding his possession of a Monegasque residence card at that time, he was in fact then domiciled in Estonia. Likewise, Mrs Kazakova did not assert a Monaco domicile notwithstanding her residence card – rather she said that she was domiciled in Russia. Furthermore, the location schedule she put in evidence in support of her claim to be domiciled in Russia showed that she only spent 7 days in Monaco during 2020. It seems to me that it must follow that the evidential weight that might otherwise be attributed to possession of a Monegasque residence card is therefore very weak.

168. In any event, if there has been a move to Monaco it is very recent. As at the time of Ms Seborg's witness statement it was only said that Mrs Kazakova was in the process of permanently settling in Monaco, while the residence at "Chateau Perigord" had only been leased by them since September 2021. Before that they are said to have rented another apartment or when in Monaco to have stayed at La Reserve with Mr Bourlakov.

169.     I also think there is some substance in the claimants' submission that the weight I am able to give to their expression of intention to base themselves primarily in Monaco is adversely affected by the approach that Mr Kazakov took to his initial assertion that, at the time of issue of these proceedings, his domicile was in Monaco not in Estonia. I do not think that the force of this point is weakened by the fact that in the will validity claim made by Mrs Bourlakova, Veronica and Elena in the Monaco Estate proceedings in October 2021 (and indeed in the 2022 Monaco claim), Mrs Bourlakova alleged that both Mr Kazakov and Mrs Kazakova were now residing and domiciled at an address in Monaco. The evidence is that this was the appropriate and necessary course to take as it was the address that Mr Kazakov had given in his own court filings.

170.     This means that, whatever may have been the position at the time these proceedings commenced, there is some evidence that Monaco is now their place of domicile, but in the light of all that has gone before, it is insufficient to satisfy me that this is in fact the case. I do, however, accept that Monaco is likely to be a more convenient place (in the forum non conveniens sense) for Mr Kazakov and Mrs Kazakova to have to answer the claim against them than England to which there is no evidence that they have any specific connection at all.

The Applications to serve out: legal principles

171.     In the light of my conclusions on Mrs Kazakova's domicile, the claimants did not require permission to serve the claim form on Mr Kazakov and Mrs Kazakova out of the jurisdiction under the version of CPR 6.33(2) applicable to these proceedings. The court has power to determine the claims against them in accordance with article 8(1) of the BRR, because another defendant Leo Holding is domiciled in England and Wales and the claims against all defendants are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments. The same principle is applicable to Mr Anufriev, because he, like Mr Kazakov and Mrs Kazakova, was domiciled in the EU at the relevant time (in his case in Latvia).

172.     With the exception of the Panamanian Companies, none of the other defendants (Mr Tribaldos, Leo Holding, Leo Trust, Mr Schwarz, Columbus and IPEC) have challenged the jurisdiction. Likewise, no jurisdiction challenge was made by Mr Bourlakov before his death and nobody has sought to do so on behalf of his estate since then. It remains the case, however, that permission was required to serve the ninth to thirteenth defendants out of the jurisdiction in Panama and the Panamanian Companies challenge the jurisdiction by seeking to set aside the grant of that permission by Adam Johnson J on 17 December 2020.

173.     There is no dispute as to the applicable requirements for obtaining the court's permission for service of the claim form out of the jurisdiction under CPR 6.36. They were summarised by the Privy Council in *Altimo Holdings and Investment Ltd v Kyrgyz Mobile Tel Limited* [2012] 1 WLR 1804 ("*Altimo*") at [71]. The three questions are:

i)       Is there a serious issue to be tried on the merits of the claim?

ii)     Has the claimant satisfied the court that there is a good arguable case that the claims fall within one or more classes of case in which permission to serve out may be given, i.e. as to the availability of a gateway in PD6B para 3.1?

iii)    In all the circumstances, is England clearly and distinctly the appropriate forum for the trial of the dispute and ought the court to exercise its discretion to permit service out?

174.    The question of serious issue to be tried was not disputed by the Kazakov defendants. They contended that there remained serious threshold deficiencies with the claims, but accepted that, for the purposes of the Panamanian Companies' jurisdiction challenge, there is a serious issue to be tried. They also accepted that a PD6B para 3.1 gateway is available to the claimants (the necessary or proper party gateway for which provision is made by PD6B para 3.1(3)). They made this concession after it had been indicated that Mr Tribaldos and Leo Trust were proposing to withdraw their jurisdiction challenges and Leo Holding would withdraw its strike out and summary judgment applications. Once that had occurred Leo Holding would be an anchor defendant domiciled in England.

175.    The claimants had also relied on the tort gateway described in PD6B para 3.1(9), a contention which was initially resisted by the Kazakov defendants. However, once it became apparent that the necessary or proper party gateway would be satisfied in any event, their opposition on this ground was not pursued.

176.    The Kazakov defendants did not, however, accept that the third requirement is satisfied. They submitted that England was not "the proper place in which to bring the claim" at the time permission was granted, and the requirements of CPR 6.37(3) were not therefore complied with so far as the Panamanian Companies were concerned. They are the only defendants against whom this must be established because none of the other defendants domiciled outside the EU are continuing with a challenge to the English court's jurisdiction.

177.    The principles applicable to the question of whether the third question on a permission to serve out application can be answered in the affirmative are similar to those applicable to the question of whether a stay should be granted on forum non conveniens grounds. The difference (as Lord Goff explained in *Spiliada Maritime Corp v Cansulex Ltd* [1987] AC 460 at 480G/H) is that the burden of proof is reversed in a stay application and rests on the defendant seeking that relief. In the present case the Panamanian Companies seek a stay on forum non conveniens grounds in the alternative, as did Mrs Kazakova, but only in the event that she was successful in her case on domicile (which is not now the position).

178.    At this stage, the burden remains on the claimants to establish that England is clearly the more appropriate forum (e.g., per Lawrence Collins J in *Komanenemi v Rolls Royce Industrial Power India) Ltd* [2002] 1 WLR 1269 at [175]). Whenever there is a challenge to jurisdiction on forum non conveniens grounds, whether that challenge arises on the application of the third stage in the test for permission to serve out of the jurisdiction or on an application for a stay, the challenger must identify some other forum which does have jurisdiction to determine the dispute and that jurisdiction must be the more appropriate forum: *Unwired Planet International Ltd v Huawei Technologies (UK) Co Ltd* [2020] UKSC 37 at [96]. In the present case, the Kazakov

defendants and Mr Anufriev submitted that Monaco is the other more appropriate forum.

179.    To enable the court to reach an informed conclusion on that aspect of the application, it is incumbent upon the party challenging jurisdiction, so far as possible, to identify the issues which he says should be tried in the other jurisdiction and to state as clearly as possible how they arise or may arise in the proceedings (*VTB Capital plc v Nutritek International Corpn* [2013] 2 AC 337 at [36] per Lord Mance JSC and [192] per Lord Clarke JSC).

180.    It was not disputed by the Kazakov defendants that the time at which this assessment must be made for CPR 6.37(3) purposes is the time that the application for permission to serve out was made. They said that the position was different so far as concerned the application by the Panamanian Companies for a stay on forum non conveniens grounds and they submitted that there was no principled reason why the challenge to service out and the stay on forum grounds could not be made in the alternative (cf. *Credit Agricole Indosuez v Unicof Limited* [2004] 1 Lloyd's Rep 196). The question then is whether the alternative forum is, as matters now stand, the proper forum for the claims to be determined. It was explained that this was why some of the evidence adduced by the Kazakov defendants appeared to concentrate on what had occurred after the date at which permission to serve out had been granted.

181.    There was some debate at the hearing as to whether there had to be exceptional circumstances for a court which has granted permission to serve out (and therefore been satisfied that England is clearly and distinctly the appropriate forum for the trial of the dispute) to later grant a stay based on the facts as they stand at the time of an application for a stay. Ms Davies relied on a passage from the judgment of Evans LJ in *Mohammed v Bank of Kuwait* [1996] 1 WLR 1483, 1493B/C in support of her submission to that effect. I think that Mr Willan was correct to submit that Evans LJ was dealing with a rather different situation because there was no application to serve out in that case. The issue was whether, in the case of an application to stay, the court was able to look at what had occurred between the date of the application and the date of the hearing, not what had occurred between the date of any earlier application for permission to serve out and the application for a stay.

182.    However, I also consider that, while there may be circumstances in which a defendant against whom permission to serve out of the jurisdiction has been granted can nonetheless later seek a stay on forum grounds, it would be necessary to demonstrate that there had been a material change in circumstances between the relevant time for the original grant of permission and the time at which the application for a stay is made.

183.    There are two changes of circumstance on which the Kazakov defendants rely, both of which relate to Mr Bourlakov's death. The first is that the role of Mr Kazakov and Mrs Kazakova has taken on greater significance in light of the fact that they now claim to be entitled to Mr Bourlakov's estate. This is said to be a material change because it is clear that they have been living in Monaco in more recent times. I am not persuaded that this is a particularly significant factor, because even if their residence in Monaco has now become established, that has relatively little impact on the overall position given that there is no doubt that Mr Bourlakov (to whose estate Mr Kazakov and Mrs Kazakova now claim to be entitled) was domiciled in Monaco at the time these proceedings commenced.

184.    The second change relied on by the Kazakov defendants is the termination of the divorce proceedings and the opening of Mr Bourlakov's estate in Monaco. The way that Mr Willan advanced this point was to say that the opening of the estate fundamentally anchored issues as to ownership of assets in Monaco, where the Monaco notary will have to attempt to draw up an inventory and there is already extant a dispute about heirship.  I have already alluded to this point, but he submitted that it would be very unsatisfactory if an English judgment bearing on asset ownership were not to be recognised in that context, more particularly if there were then to be a dispute in a third jurisdiction (such as Switzerland) as to which of two conflicting judgments from England and Monaco should be recognised.

185.    I have reached the conclusion that the opening of the administration of Mr Bourlakov's estate in Monaco is a change of circumstance in the sense that this court should be able to reconsider the appropriate forum on an application by Panamanian companies for a stay at common law, even though the court may consider that, at the time permission to serve out was granted, England was the appropriate forum for the resolution of this dispute.  However, as will appear, it does not appear to me that this makes any difference to the ultimate result.

186.    There are many cases in which appellate courts have explained the principles for determining whether England is the proper place in which to bring the claim.  In *Lungowe v Vedanta Resources Plc* [2020] AC 1045 at [66], Lord Briggs JSC said this about the correct approach:

> "66.  I have found this to be the most difficult issue in this appeal. It does raise an important question of law.  CPR 6.37(3) provides that: "The court will not give permission [to serve the claim form out of the jurisdiction] unless satisfied that England and Wales is *the proper place in which to bring the claim* " (my emphasis). The italicised phrase is the latest of a series of attempts by English lawyers to label a long-standing concept. It has previously been labelled forum conveniens and appropriate forum, but the changes in language have more to do with the Civil Procedure Rules' requirement to abjure Latin, and to express procedural rules and concepts in plain English, than with any intention to change the underlying meaning in any way.  The best known fleshed-out description of the concept is to be found in Lord Goff of Chievely's famous speech in the *Spiliada* case [1987] AC 460, 475-484, summarised much more recently by Lord Collins in the *Altimo* case [2012] 1 WLR 1804 at [88] as follows: "the task of the court is to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice …".  That concept generally requires a summary examination of connecting factors between the case and one or more jurisdictions in which it could be litigated.  Those include matters of practical convenience such as accessibility to courts for parties and witnesses and the availability of a common language so as to minimise the expense and potential for distortion involved in translation of evidence.  Although they are important, they are not necessarily conclusive.  Connecting factors also include matters such as the system of law which will be applied to decide the issues, the place where the wrongful act or omission occurred and the place where the harm occurred."

187.    This passage places some emphasis on matters of practical convenience, but it is evident from the last sentence that they are not the only relevant connecting factors.  As Lord

Lloyd-Jones JSC explained in *Brownlie v FS Cairo (Nile Plaza) LLC* [2021] 3 WLR 1011 at [78-79]:

> "78. In *Brownlie I* [2018] 1 WLR 192 Lord Sumption suggested (at para 31) that the main determining factor in the exercise of discretion on forum non conveniens grounds is not the relationship between the cause of action and England but the practicalities of litigation. While it is correct that practical issues can feature large in the exercise of the discretion, the discretion is not so limited. As Lord Wilson pointed out in *Brownlie I* (at para 66) the *Spiliada* criteria are not limited to matters of mere practical convenience. On the contrary, Lord Goff made clear in *Spiliada* (at p 474E-G) that the Latin tag is something of a misnomer:
>
> > "I feel bound to say that I doubt whether the Latin tag forum non conveniens is apt to describe this principle. For the question is not one of convenience, but of the suitability or appropriateness of the relevant jurisdiction. However, the Latin tag (sometimes expressed as forum non conveniens and sometimes as forum conveniens) is so widely used to describe the principle, not only in England and Scotland, but in other Commonwealth jurisdictions and in the United States, that it is probably sensible to retain it. But it is most important not to allow it to mislead us into thinking that the question at issue is one of 'mere practical convenience'."
>
> Having considered the leading Scottish authorities he concluded:
>
> > "In the light of these authoritative statements of the Scottish doctrine, I cannot help thinking that it is wiser to avoid use of the word 'convenience' and to refer rather, as Lord Dunedin did [in *Societe du Gaz de Paris v Societe Anonyme de Navigation 'Les Armateurs Francais'*, 1926 SC (HL) 13, 18] to the appropriate forum." (Original emphasis)
>
> In applying the principle, the ultimate objective is "to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice" (per Lord Goff at p 480G).
>
> 79. The discretionary test of forum non conveniens, well established in our law, is an appropriate and effective mechanism which can be trusted to prevent the acceptance of jurisdiction in situations where there is merely a casual or adventitious link between the claim and England. Where a claim passes through a qualifying gateway, there remains a burden on the claimant to persuade the court that England and Wales is the proper place in which to bring the claim. Unless that is established, permission to serve out of the jurisdiction will be refused (CPR rule 6.37(3)). In addition - and this is a point to which I attach particular importance - the forum non conveniens principle is not a mere general discretion, the application of which may vary according to the differing subjective views of different judges creating a danger of legal uncertainty. On the contrary, the principle applies a structured discretion, the details of which have been refined in the decided cases, in a readily predictable manner."

188. Where the cause of action is in tort, and more especially where it relates to an international fraud, it will often be the case that the place of commission of the tort will end up as the most appropriate jurisdiction, being described by the Court of Appeal in

*Manek and others v IIFL Wealth (UK) Limited* [2021] EWCA Civ 625 at [66] as very significant. However, that is not always the case and the position will be more nuanced where actionable misrepresentations as part of the same overall fraud were made in a number of different places: *Manek* at [66]–[67]. In such a case, there will still be a need to give careful consideration to all of the countervailing factors which may dwarf what may otherwise be the significance of the place of commission (*VTB Capital* at [51]).

189.    It is also important to appreciate that the court is concerned with the totality of the dispute, identifying the forum in which the case as a whole can suitably be tried for the interests of all the parties and for the ends of justice. This was a significant point in *Vedanta* in which Lord Briggs JSC emphasised (at [68]) that the court is looking for a single jurisdiction in which the claims against all the defendants may most suitably be tried, and rejected (at [73] and [74]) an argument that the court was only concerned with the issues as the arose between the claimants and the foreign defendants, rather than the case as a whole. When considering the totality of the dispute, the court is concerned not just with all of the parties to the dispute, but also where appropriate the defendants' answer to the claim (*Shenzhen Senior Technology Material Co Ltd v Celgard LLC* [2020] EWCA Civ 1293 at [71]).

190.    As Lord Briggs JSC also explained in *Vedanta* at [69], the risk of multiplicity of proceedings about the same issue with the consequential risk of inconsistent judgments is also a very important factor indeed, in the evaluative task of identifying the proper place. As he went on say at [70], the consequence of this is that:

> "In cases where the court has found that, in practice, the claimants will in any event continue against the anchor defendant in England, the avoidance of irreconcilable judgments has frequently been found to be decisive in favour of England as the proper place, even in cases where all the other connecting factors appeared to favour a foreign jurisdiction."

191.    This risk is less material as a connecting factor if all of the defendants are either subject to the jurisdiction of the foreign court or have offered to submit to that jurisdiction. It will then simply be by reason of the claimants' choice that the proceedings are sought to be pursued in England: see the further analysis of the position in *Vedanta* at [75] to [84]. Where that is the case, the fact that the claimants will in any event continue against the anchor defendant remains a relevant factor in favour of England, but as Lord Briggs JSC put it at [84] "it does in my view mean that it ceases to be a trump card".

192.    However, a further question arises on this aspect of the case. Is it right to say that the claimants have made a choice (with a consequential impact on the weight to be attributed to the desirability of avoiding irreconcilable judgments) only when the defendants have all agreed to submit to the relevant foreign jurisdiction? Or is the claimants' choice also relevant in the same way and to the same extent where the foreign jurisdiction was an available forum in the sense that its rules of jurisdiction would have permitted the claims to be brought there? This point arises if it will in fact be possible (for whatever reason) to proceed against the anchor (and indeed other) defendants abroad even though they do not expressly submit to the foreign jurisdiction as occurred in *Vedanta*.

193.    Ms Davies submitted that the reason there was a choice in *Vedanta* was only because the anchor defendant had agreed to submit in Zambia, and that it was only where there was an agreement to submit that the choice discussed by Lord Briggs can be said to have been made by the claimants. She submitted that the importance of submission is that it is only when there has been a submission by an anchor defendant that it can be said that the foreign proceedings are a genuine substitute for the English proceedings in light of the fact that it has a right under the BRR to be sued here. Perhaps more importantly, it may well not be possible to enforce a foreign judgment in England against an English anchor defendant who has no presence in and has not submitted to the foreign jurisdiction. She said that this flowed from the way that Lord Briggs (at para [40] of his judgment in *Vedanta*) described his solution to one of the problems thrown up by *Owusu v Jackson* in circumstances in which the court is persuaded that the claimants will proceed in England against the anchor defendant. His description of the solution was to temper the rigour of the need to avoid irreconcilable judgments as follows:

> "As will appear, I consider that there is a solution to this difficulty along those lines, where the anchor defendant is prepared to submit to the jurisdiction of the domicile of the foreign defendant in a case where, as here, the foreign jurisdiction would plainly be the proper place, leaving aside the risk of irreconcilable judgments."

194.    Mr Willan submitted that the underlying question in *Vedanta* was broader. In essence he said that Ms Davies approached the question the wrong way round. Once it was clear that all of the defendants could have been sued in Monaco because the Monegasque court had jurisdiction whether through domicile, the ability to sue an anchor defendant or otherwise, the claimants had a choice whether to do so. As the claimants accepted that they could have sued all of the defendants in Monaco because of the domicile of Mr Bourlakov as anchor defendant, the only question then was whether that choice was justified or reasonable. He said that where, for whatever reason, the foreign country was an available forum for the pursuit of the claims against all of the defendants the principle would apply. He said that if the foreign court would exercise jurisdiction under its own private international law rules, the claimants will have made a choice in the same way as they would have made a choice if all of the defendants had agreed to submit in the foreign jurisdiction.

195.    The extent of the *Vedanta* principle was considered by the Court of Appeal in *ED&F Man v Capital Markets Ltd v Straits (Singapore) Pte Ltd* [2019] EWCA Civ 2073. At [46], Flaux LJ cautioned against treating *Vedanta* as laying down a wider general principle, but identified that Lord Briggs clearly regarded the fact that the defendant was offering to submit to the jurisdiction of Zambia as a critical factor because it gave the claimants what he called "a real ability" to sue all the defendants in one jurisdiction, whereas they were choosing to proceed against the anchor defendant in England. Ms Davies relied on this passage to submit that Flaux LJ regarded submission as what she called the critical factor in *Vedanta*. In *ED&F Man* there was no real ability to sue elsewhere because the anchor defendants had given no intimation of willingness to waive the benefit of the English exclusive jurisdiction clauses to which they were entitled and so the claims against them in England would continue regardless. It followed that it could not be said the claimants had made a choice of the quality under consideration in *Vedanta*.

196.     Lord Briggs' analysis was based on the fact that Zambia was an available forum in *Vedanta* because the anchor defendant had offered to submit, a point stressed by Flaux LJ in *ED&F Man*.  However, in my view it is important not to lose sight of the underlying principle, which is broader and flows not just from the fact of submission but also from the fact that what matters is whether jurisdiction will be accepted by the foreign court and whether its judgment will be recognised elsewhere in the same way as it would were there to be submission.  In my view this is the effect of what Lord Briggs said in [83] of his judgment in *Vedanta*, when he explained that a claimant will be exposed to the same choice whether or not to avoid the risk of irreconcilable judgments whenever "another proper, convenient or natural forum is available for the pursuit of the case against all the defendants".  This will be the case if but only if there is what Flaux LJ called a "real ability" to sue all of the defendants (in respect of whom the avoidance of irreconcilable judgments is a material consideration) in a single foreign jurisdiction.

197.     It therefore follows that it would not be right to characterise the claimants as having made a choice for *Vendanta* purposes unless the ability to sue abroad is a real one: availability and real ability are the touchstones.  Notwithstanding Mr Willan's submission to the contrary, it seems to me that this carries with it a need to be satisfied that a judgment in the foreign court will be enforceable.  Otherwise the real ability to sue will not be established in a fully meaningful way.  In my view, in practice this means that the English court will have to be satisfied both that the foreign court will take jurisdiction to try the claim against an English anchor defendant and all of the defendants capable of being sued in England and that any judgment it gives will be capable of enforcement in England and in such other jurisdictions as may be required to give substantial effect to it, anyway to the same extent as would have been achieved if the defendants had submitted to the jurisdiction of the foreign court.

198.     In my view, because this is part of the balancing of connecting factors in accordance with the exercise of a structured discretion, the underlying principle is wider than the means by which it will normally be established.  However, in practice, it will often be difficult for anything short of submission abroad to satisfy the court in England that a choice of the quality discussed by Lord Briggs has been made by the claimants.  I will come back to this aspect of the applications once I have considered the other connecting factors.

199.     As to enforcement more generally, it is well established that the enforceability of an English judgment (whether in England or in other jurisdictions in which assets are located), as compared to a judgment from the jurisdiction said by the defendants to be a more appropriate forum, is a factor on which a claimant is entitled to rely (*Sharab v Al-Saud* [2009] 2 Lloyd's Rep 160 at [62] and [63]).  It is apparent from *Sharab* that this factor will often be material and sometimes, depending on the extent of the differences in the ease with which the competing judgments might be enforced in the jurisdictions that matter, is one capable of being decisive.

200.     In the case of an application for permission to serve out, the court is also required to have in mind the fact that defendants who would not otherwise be subjected to the jurisdiction of the English court will be required to defend themselves within this jurisdiction – the obverse from the situation in which they themselves are seeking a stay.  This factor was traditionally referred to by what Lord Goff called the old fashioned word "exorbitant", but he was at pains to point out that its significance will

vary from case to case and at the end of the day it remains the case that "the task of the court is to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice …" (per Lord Collins in *Altimo* at [88] as approved by Lord Briggs JSC in *Vedanta* at [66]).

England or Monaco: Connecting Factors

201.    In the present case the Kazakov defendants rely on Monaco as an available alternative to England and contend that it is the proper forum for resolution of the dispute.  Before comparing the English and Monegasque connecting factors, it is appropriate to explain why it is that the Kazakov defendants assert that the claimants are engaged in illegitimate forum shopping in seeking to proceed in England and why it is that the claimants say that the existing proceedings in Monaco do not ultimately assist in identifying the appropriate forum.

202.    It was submitted that the benefit which the claimants sought to gain by suing in England was the ability to take an English declaratory judgment to Monaco, which could then be used in the divorce and other proceedings on the asset ownership questions which arose in those proceedings.  The Kazakov defendants said that this was what the English proceedings were really all about, not the questions of liability in tort in respect of which the connections to England were more obviously identifiable.

203.    The claimants submitted that this was the wrong way of looking at it.  The factors on which they rely must be assessed in the context of a case which alleges a fraudulent conspiracy in which defendants domiciled in a number of different jurisdictions are said to have participated.  Indeed, those of the defendants in these proceedings who are not also party to proceedings in Monaco (Mr Anufriev, the Leo group defendants and the Panamanian companies) are said to have been at the centre of the conspiracy because they did what was necessary to enable it to happen.  In the claimants' submission, it is obvious that all of the co-conspirators and those who participated in and benefitted from the conspiracy (i.e. including the Panamanian companies) ought to be sued in the same proceedings.  Therefore, the focus should be on a jurisdiction in which the liability of all of them, together with their obligations to make restitution, can be established.

204.    I accept the claimants' submission on this point.  There is good reason for the claimants to wish to sue in a single set of proceedings all of the defendants capable of being liable in tort arising out of the dishonest conspiracy to which it is said they are all party.  The relief sought in the current proceedings will bind all of the defendants over whom this court is able to exercise jurisdiction. I am satisfied from the expert evidence that it is unlikely to be practicable to join all of the defendants in the current proceedings to any of the subsisting Monaco proceedings, including the Asset Transfer proceedings.  It follows that, if the claimants were to seek in Monaco the relief sought against all of the defendants to the current English proceedings, they would have to issue new proceedings in Monaco and seek to persuade the Monegasque court to accept jurisdiction against each of the defendants.

205.    Once that had been achieved it would then be necessary to demonstrate that consolidation (or some other form of joint trial or determination) of these new Monaco proceedings with the Asset Transfer proceedings, or indeed one of the other sets of

Monaco proceedings, would be ordered in order to justify a conclusion that the pendency of the existing Monaco proceedings gave rise to any form of advantage to weigh in the balance when determining whether England or Monaco is the most appropriate forum. The evidence was not very clear but as I understood it, this was achievable in theory in relation to the Asset Transfer proceedings, but not the Monaco criminal proceedings. The Monaco court has a broad procedural discretion to give appropriate case management directions, but it is I think inevitable that there would be some difficulties arising out of the disparity in party identity and differences in the causes of action and the nature of some of the facts in dispute.

206. I shall revert to this point a little later and also in the context of the article 34 stay application, but it follows from this that the real question is more about where the issues in these proceedings can be decided in a single place, than it is about whether there are subsisting proceeding in which all of the issues in the current proceedings can be determined.

207. The first group of connecting factors comprise the place of commission of the tort, the locations at which the key events occurred and where the loss is said to have been suffered. It is I think helpful to look at this group of factors by reference to the three categories of claim made in the separate sections of the particulars of claim: section A (the misrepresentations), section B (the concealment of Mr Bourlakov's assets through forgeries), section C (the misappropriations of Mrs Bourlakova's assets) and section D (the destruction of documents by the Leo group defendants).

208. As to section A, the misrepresentations which were designed to conceal the truth from Mrs Bourlakova as the victim of the conspiracy were initially made in London. While the conspiracy is said to have been conducted on a global scale, it is said by the claimants that the first part of their claim therefore has strong English connections.

209. The Kazakov defendants submitted that the significance of this was reduced by the fact that what was alleged to be the fraudulent strategy was developed elsewhere, mostly in Switzerland where the alleged conspiracy was formed. It was also said that, even the misrepresentations on which particular reliance is placed by the claimants, were then repeated elsewhere (and in particular at the meeting in Monaco where an agreement in principle was reached although not implemented).

210. As to the last point, I agree with Ms Davies that neither the reiteration at the June meeting in Monaco nor the declaration before the Monegasque notary was the most significant aspect of the alleged deceit, the various manifestations of which occurred in more than one place. On the evidence adduced for the purposes of this hearing, what happened in Monaco was either a rowing back from the initial fraudulent misrepresentations on which Mrs Bourlakova says that she did not act, a simple reiteration of what had already been said in London or the reaching of an ineffective agreement on the basis of the misrepresentations that had already been made. To that extent, I accept the claimants' submission that a significant aspect of the alleged tortious acts occurred in England, although that must be set against the fact that they are likely to have been planned elsewhere.

211. The claimants also relied on the further mediation meetings that took place in London in September 2018 at which further misrepresentations are alleged to have been made. They submitted, and I agree, that they too were more significant than the mediation

meeting in Monaco at which it is not alleged that any further misrepresentations were made, and in respect of which the offer made by Mr Bourlakov was withdrawn at the September mediation in London. However, I also think that what was said by way of misrepresentation is only at the core of one part of the claim in tort. While the section A misrepresentations and the section B concealment and forgeries were all at the heart of what is said to have been the defendants' tortious conduct, it was the product of the section B forgeries none of which are said to have taken place in England, which were then deployed in proceedings in Monaco.

212.     The forgeries themselves are alleged to have been committed with the assistance of Mr Tribaldos. He arranged for most of the forged and sham documents to be produced and he gave instructions to the Panamanian foundations which led to the bulk of the misappropriations. He did so, anyway in part, in his capacity as a director and controller of Leo Holding which is domiciled in England and Wales. This was because Leo Holding was the entity through which Mr Tribaldos was able to procure the participation in the fraud of the other members of the Leo group.

213.     However, none of the forgeries are said to have taken place in England and it was accepted by the claimants that there was no further connection between England and the acts said to constitute torts in relation to this part of the claim. Most of what occurred between Mr Bourlakov, Mr Anufriev and Mr Tribaldos occurred in Switzerland. Indeed the claimants plead that the purpose of some or all of the many visits which Mr Bourlakov and Mr Anufriev made to Zurich between February and June 2018 was to meet Mr Tribaldos for the purpose of discussing, developing and giving effect to the dishonest strategy I have already described. They submitted that there is, however, no evidence and no allegation that any of the tortious acts were committed in Monaco either.

214.     All of this places some focus on England, but it is limited. Recognising that there were also other jurisdictions with connections to the forgeries, the Kazakov defendants submitted that there were more powerful connections to Monaco than there were to England in respect of this aspect of the dispute for a number of reasons. Monaco was where demands for repayment of some of the alleged loans were made because they were sent from Monegasque lawyers to Equiom in Monaco, although the claimants said that this was a weak connection and I agree. They also submitted that, if there were directions for forgeries, they would have come from Monaco, because the fraudulent strategy was implemented on the instructions of Mr Bourlakov who was domiciled in Monaco and some at least of the instructions will have been received by Equiom in Monaco. As to this last point, the claimants said that there was no evidence to indicate that the instructions were in fact given in Monaco and pointed to the evidence that at that time, Mr Bourlakov was spending considerable periods of time outside Monaco, most especially in Latvia with Ms Shevtsova.

215.     The attempted misappropriations of Mrs Bourlakova's assets which are at the heart of three of the section C claims were also said to have been attempted through forgeries and the production of sham documents. None of this conduct is said to have occurred in England, although it is now pleaded that the misrepresentations that were made in England also concerned those forged and sham documents and their effect.

216.     So far as actual financial loss in relation to the section A, section B and three of the section C claims is concerned, investigation and legal costs have been incurred,

principally in this jurisdiction as well as elsewhere, as a result of the misrepresentations, concealments and forgeries. The claimants said that this was the natural consequence of the misrepresentations being made here. But I think there is force in Mr Willan's submission that there was no particular reason why England should be the place where the claimants chose to incur the costs after the time at which they knew or certainly believed that a dishonest stratagem was being practised on Mrs Bourlakova. In my view, this is not a very strong connecting factor to England.

217.     The third part of the claimants' section C case seeks declarations relating to the misappropriation of the Foundations by or for the immediate benefit of Mr Kazakov and Mrs Kazakova and with their participation. Damages totalling US$1.18 billion are now claimed in the proposed amended particulars of claim. This part of the fraudulent scheme is said to have dispossessed Mrs Bourlakova of very valuable assets said to be worth more than 100 times the value of her claim for damages as a result of the section A and B claims. It is not pleaded that these claims have anything in themselves to do with England.

218.     So far as the tortious acts which underpin the section D and E claims are concerned, the conduct said to be tortious either occurred in Switzerland (in the case of the section D claims) or elsewhere unknown. The only allegation that relates to tortious conduct connected with England was the role of Leo Holding in removing the directors of Leo Trust and Leo Cyprus. Like the losses claimed in relation to the section A, the section B and the three section C claims, the damages said to have been incurred are limited to the investigation and legal costs incurred in multiple jurisdictions, including some incurred in England. They too are very small indeed compared with the losses said to have been incurred as a result of the conduct underlying the section C3 claims.

219.     The Kazakov defendants submitted that the allegations as to the implementation (albeit unsuccessful) of the fraudulent strategy through tortious acts committed in England is part of a much larger dispute as to the ownership and division of the Bourlakov family assets, the centre of gravity of which is in Monaco. The Bourlakovs were domiciled in Monaco and the divorce proceedings, the Asset Transfer proceedings and the Estate proceedings were or are being pursued in Monaco. It follows that the proceedings to determine entitlements to the underlying assets are vastly more significant than the losses suffered from the misrepresentations and those proceedings are what the dispute is really all about. This is said to be very important as a factor pointing away from England as the more appropriate forum, because, as Ms Davies accepted, this claim does not in itself have any connections to this jurisdiction.

220.     The claimants' response is that its connections to England are through the other claims in what Ms Davies called a broad factual sense. She submitted that, although the tort claims for losses sustained as a result of the misrepresentations and the forgeries are small in value terms, the claimants were right not to accept that they are small in the context of the issues with which Mrs Bourlakova is faced. They pointed out that the tortious acts of which complaint is made in these proceedings are at the root of the reason why they have an ultimate entitlement to the assets with which this aspect of the proceedings is concerned. It makes sense for this claim, in respect of which Mr Kazakov and Mrs Kazakova are central participants, to be tried together with the claims in tort against the other defendants.

221.    The claimants also submitted that, although they will have to prove the absence of the Kazakov partnership as part of their claim in deceit against all of the various alleged tortfeasors who have been joined as defendants, these English proceedings are not about the competing entitlements of Mr Kazakov on the one hand and Mrs Bourlakova on the other to particular assets. They are claims which rely on the absence of the partnership as part of the foundation for establishing that losses have been sustained by the fraudulent misrepresentations and unlawful conspiracies in which all of the defendants participated. The right way therefore of characterising their true nature is as a pre-emptive response to Mr Kazakov's assertion, made for the first time in London, that he was entitled to Bourlakov family assets by reason of the existence of the partnership.

222.    As to the governing law, the parties contend that there are a number of different laws which are likely to govern the different issues to which the proceedings give rise. Some of the claims may be governed by English law, some may be governed by Monegasque law (and the claimants plead English and Monegasque law as alternative governing laws in relation to the section A, B and part of the section C claims), some may be governed by Panamanian law and some may be governed by Swiss law. The important issue of the existence and nature of the partnership alleged by the Kazakov defendants is likely to be governed by Russian law.

223.    No positive case was made by either party that either English law or Monegasque law applies to the section C3 claims (to which Panamanian law is likely to apply) or to the section D claims (to which Swiss law is likely to apply). The claimants pleaded that Monegasque law is likely to apply to the section E claims and Mr Willan did not disagree. So far as the remaining claims were concerned, the claimants' case is that they are governed by English law (albeit they do not yet have permission to amend to make that clear in relation to the other three section C claims), although they also plead Monegasque law in the alternative. The Kazakov defendants do not accept that English law governs any of these claims.

224.    Mr Willan submitted that I should reach a provisional view on the issue of what is likely to be the applicable law of the claims where the parties take a different view. I think it is appropriate to express some initial views, although I do not think it is possible at this stage to reach a clear conclusion on the extent to which particular laws will apply to particular aspects of the dispute. Nor do I think that it is strictly necessary for two reasons.

225.    The first is that, wherever the proceedings take place, there will have to be evidence from a number of different experts on foreign law and it is not possible to say at this stage that any single law, and more particularly the law of England or the law of Monaco, is clearly the law with the most significant connection to all or indeed the most important or significant issues in dispute.

226.    Secondly, I agree with the claimants' submission that the identity of the law applicable to the issue of whether the defendants were liable for acts said to be tortious is unlikely to have a substantive effect on the outcome of the dispute. It is most improbable that they would not be entitled to redress under all of the laws that may be said to govern the issues in the proceedings if the dishonest conduct they allege against any one or more of the defendants is established (cf. Coulson LJ in *Manek v IIFL Wealth (UK) Ltd* [2021] EWCA Civ 625 at [72]). That does not of course mean that there may not be differences in the precise nature of the relief available, but I agree that it is improbable

that the identity of the law applicable to any of the central issues in the case will have a material impact on the extent of any recovery to which they may ultimately demonstrate they are entitled. It follows (as was the case in *VTB v Nutritek* at [46] per Lord Mance) that this is not a case in which differences in the applicable legal rules in the two competing jurisdictions will have substantial relevance to the questions raised on these applications.

227. So far as concerns the claims in tort as between Mrs Bourlakova and Mr Bourlakov the applicable law is likely to be the law of Monaco, as the place in which both had their habitual residence at the time when the damage occurred (article 4(2) of Regulation (EC) No 864/2007 ("the Rome II Regulation)). So far as the claims against the remaining defendants are concerned, the law applicable to the tortious conduct relied on is (article 4(1) of the Rome II Regulation):

> "the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of the event occur."

228. It is established that this is the place where the event giving rise to the damage directly produced its harmful effects on the claimants, or anyway Mrs Bourlakova, as the immediate victim of the event: *Dumez France SA v Hessische Landesbank* [1990] ECR I-49 at [20]. As Simon J explained in *London Helicopters Ltd v Heliportugal LDA-INAC* [2006] 1 CLC 297 at p.305H "[t]he place where the damage occurred … is not the place where a claimant simply suffers financial loss. It is necessary to see where the event giving rise to the damage produced its 'initial', 'direct', 'immediate' or 'physical' harmful effect."

229. Mr Willan suggested that this pointed to Monaco, because it was in Monaco that an agreement was reached in June 2018, which was inspired or influenced by the misrepresentations made at the London meeting in April. He submitted that the entry into this agreement in principle was the applicable harmful effect. I do not think that is correct, partly because the claimants contend that they sustained losses subsequent to the original misrepresentations but prior to that event, but mainly because the Monaco June agreement was only ever an agreement in principle. It was never implemented, and it is not part of any party's case that the agreement itself gave rise to any actionable loss or had any other adverse effect. He also adopted the governing law analysis advanced as the claimants' alternative pleaded case, which was to the effect that, because the object of the fraudulent strategy was Mrs Bourlakova, who was an habitual resident of Monaco, this was therefore the place where the damage would or would be likely to occur. The claims were therefore governed by Monegasque law.

230. Ms Davies submitted that the applicable test does not mean that the court seeks to identify the location of the place in which Mrs Bourlakova might ultimately end up with less money in consequence of the losses that she sustained as a result of the misrepresentations. If that were to be the case, it would point to Monaco as the place of her domicile which is not the right answer. As the ECJ explained in *Löber v Barclays Bank Plc* [2019] 4 WLR 4:

> "In this connection, the court has held that the term "place where the harmful event occurred" may not be construed so extensively as to encompass any place where the adverse consequences of an event, which has already caused damage actually

arising elsewhere, can be felt (Marinari v Lloyds Bank plc (Case C-364/93) EU:C:1995:289; [1996] QB 217; [1995] ECR I-2719, para 14; Kronhofer's case, para 19 and the Universal Music case, para 34) and that such a concept does not refer to the place where the applicant is domiciled and where his assets are concentrated by reason only of the fact that he has suffered financial damage there resulting from the loss of part of his assets which arose and was incurred in another member state: Kronhofer's case, para 21 and the Universal Music case, para 35."

231.   Ms Davies submitted that the real question is where it can be said that Mrs Bourlakova suffered the immediate adverse consequences of the representations through a realisation that she would then have to utilise her assets to incur the costs and expense of obtaining the assistance she needed to counteract the consequences of the fraudulent strategy she says was being practised on her. Mr Willan said that this argument is unsustainable. He submitted that Ms Davies' analysis goes no further than identifying the place of receipt of the representation and the place at which Mrs Bourlakova apprehended the possibility of future damage. He disagreed that a mere state of mind could be damage for these purposes.

232.   Ms Davies also relied on the fact that fees and expenses relating to the investigation caused by the original misrepresentations were incurred in England. She accepted that they could have been incurred anywhere, depending on the jurisdiction in which those assisting her were located. But she said that there was a natural connection to England, because the initial tortious acts were committed here, anyway insofar as they had an impact on the mind of Mrs Bourlakova as the recipient of the actionable misrepresentations. I agree, to that limited extent, that the fact that the claimants chose to incur financial obligations in England by way of response to the misrepresentations made here is a legitimate further connecting factor to this jurisdiction, although as I have already explained this is not of itself a very strong one.

233.   The claimants make a rather more difficult argument in relation to the claims flowing from the forgeries. They submitted that English law also applied to those claims because they were simply additional steps to further and support the misrepresentations, but it is not at all evident to me that, even if that is correct, this link means that any of the damage occurred in England. The overall fraudulent strategy manifested itself in a number of different places which had nothing to do with England and, on the assumption that Ms Davies' analysis is correct, it is not clear where it was that the forgeries first operated on Mrs Bourlakova's mind. In any event this submission would require an amendment to the claimants' pleadings for which permission has not yet been granted.

234.   More generally, I have formed the clear view that there is not enough information to make anything other than a very provisional assessment of the likely applicable law. Even though there are some torts in which the wrongful act is immediately contemporaneous with the damage, I do not think that the mere receipt of a misrepresentation is sufficient, simply because it was registered by the claimant and therefore affected their mind. To that extent I agree with Mr Willan. I think that it is likely to require at least the taking of some act (or possibly omitting to act) in response to the information which does or is likely to give rise to the incurring of actual financial loss in due course.

235.    In the present case, the evidence is consistent with that having occurred in England, although it is not so clear that I am in a position to make a finding to that effect. For that reason, and because I have already concluded that questions of the governing law on these issues are unlikely to have a substantive impact on the outcome of the dispute (and there will in any event have to be a fair amount of expert evidence on foreign law wherever the cases is tried), I propose to say no more than this: I consider that there is greater probability of Mrs Bourlakova having first sustained some damage in London as a result of the misrepresentations made by Mr Bourlakov in London than there is that she first sustained such damage in Monaco.

236.    More generally, Mr Willan also argued that it was very likely that Monegasque law would apply for another reason. He said that it was clear from all the circumstances of the case that the alleged torts were manifestly more closely connected with Monaco given that the alleged wrongdoing was directed at maximising Mr Bourlakov's share of the marital assets at the expense of Mrs Bourlakova's share and both spouses were habitually resident in Monaco (a reference to article 4(3) Rome II Regulation). I accept that is a possible answer if the manifestly closer connection is clear from all the circumstances of the case. Although that remains a possible result, it is my view that it as yet far from established.

237.    The next connecting factor relates to the location of the key protagonists. The claimants are correct that they are (or at the relevant times were) based in a number of different jurisdictions including not just England and Monaco, but also Switzerland (Mr Tribaldos and Leo Trust), Latvia (Mr Anufriev), Panama (the Panamanian Companies, IPEC and Columbus), the Isle of Man (H1), the Seychelles (Greenbay) and Estonia (Mr Kazakov and Mrs Kazakova).

238.    So far as England is concerned, Leo Holding is an English company, but I agree with the claimants that a more significant factor is that Veronica and her husband Mr Gliner have lived in England with their children since 2016. The significance of this is that Veronica is one of the three individuals, who together with her sister Elena and Mrs Bourlakova, are alleged by Mr Kazakov and Mrs Kazakova to have been instrumental in defrauding them and Mr Bourlakov in anticipation of the marital breakdown. All parties seem to accept that both Veronica and Mr Gliner will be important witnesses at the trial.

239.    Veronica's presence in England was not accepted by the Kazakov defendants, because a number of the documents on which the claimants rely refer to her as also having a place of residence in Monaco. She also has a Monaco residence permit and that is where Mrs Bourlakova has identified her as residing in the summons initiating the 2022 Monaco claim. However, there are a number of examples of documents prepared by Mr Bourlakov and the Kazakov defendants, including Mr Bourlakov's summons and submissions in the Asset Transfer proceedings which refer to her as residing in the UK and more specifically in London, although they also refer to her as "currently residing" in Monaco. Her English residence has also been confirmed (as at 22 October 2021) by the personal knowledge of a partner at Mishcon de Reya, the claimants' solicitors who was first instructed in April 2019 and has visited her repeatedly in her London home. The evidence is that she and Mr Gliner now have indefinite leave to remain in the UK and two of their children are at a nursery and a school in London.

240.     Some of this material appears to be internally contradictory, but on balance I think that the evidence sufficiently establishes that Veronica and her family have lived in London (in the sense or having their usual and primary residence in London) for some time, although she also uses an apartment in Monaco on a regular basis.

241.     Mrs Bourlakova is domiciled in Monaco, so to that extent the location of one of the key protagonists is there, albeit one who seeks to persuade the court that the proper jurisdiction for the conduct of these proceedings is England. It was also said by the Kazakov defendants that evidence may be required from witnesses from Equiom in Monaco. The claimants submitted that their evidence was unlikely to be of great significance. I have briefly alluded to their involvement above, and based on the role that the existing evidence discloses them as having played in the relevant events, I agree with that submission. There will be other witnesses from whom the parties may wish to obtain evidence based in Cyprus, Switzerland and Panama. I have already explained my findings about the location of the Kazakov defendants earlier in this judgment.

242.     Another possible material factor is the ability of witnesses to speak English as opposed to French. The evidence appears to be that some of the core potential witnesses speak neither English nor French (Mrs Bourlakova, Mr Kazakov and Mrs Kazakova) or appear to speak both languages (Mr Tribaldos and Mr Anufriev). So far as they are concerned, a trial in England or Monaco would give rise either to the same need for translation or no translation as the case may be. However, some of the witnesses speak English and either do not speak sufficiently good French to give evidence without an interpreter (Veronica and Mr Gliner) or are not known to speak French. No witness is said to speak French but not English. I think that the evidence demonstrates that more translation would be required for proceedings in Monaco than would be the case for proceedings in England.

243.     The claimants also submitted that many of the core forged documents, and this was said to be particularly the case in relation to the Finco / Gatiabe loan agreement, were in English, as was much of the material on which the claimants wished to rely in support of the allegation that the agreements had been forged, much of it having been obtained as a result of the Anton Piller proceedings in Cyprus. In relation to the Foundations aspects of the claim, some of the documentation was in Spanish. By contrast, none of this material had anything to do with Monaco and the only documentation I was referred to as having been written or drafted in French (or in any other language with which the court in Monaco might have been more familiar than this court) was the partnership declaration made in front of the notary in December 2018. Even that was retranslated into Russian for Mr Bourlakov to confirm before it was notarised, because he did not speak French.

244.     In those respects the connections to England are said to be genuine and substantial, and certainly more genuine and substantial than any connections to Monaco. Although, Ms Davies accepted that the language of a formal agreement was not a particularly powerful connecting factor, given the extent to which English is used in the drafting of formal agreements relating to international lending, she said that what was said about these agreements in more informal documentation emanating from those alleged to have participated in the fraud (such as Mr Tribaldos who normally communicated in English) may well take on real significance. I accept that submission in the sense that the use of English in less formal documents said to evidence forgery and fraud may mean that a judge who speaks English as their first language, and would not therefore

have to assess the significance of words as expressed through a translation or an interpreter will be at some limited advantage.

245.    As to the location of the relevant documents, there are not said to be any documents in England. The Kazakov defendants suggested that the Bourlakov family office, which operates from offices in Monaco, where Equiom which is said to have administered relevant companies is also based, will be the location at which important documentation will be held. In my view the evidence does not establish that that is likely to be the case to any greater or more significant extent than a number of other places. Much of the documentation is likely to be held outside both Monaco and England. There is evidence that the offices of the Morgan & Morgan group in Panama will be the repository of much of the documentation in relation in particular to the affairs of the Panamanian Companies, Columbus and IPEC, while other documentation will be with Leo Trust based in Switzerland. Furthermore, I think there is substance in the claimants' evidence that the most likely individual having access to or control of documentation relating to Bourlakov family assets is Mr Anufriev. He is domiciled in Latvia not Monaco.

246.    There was also evidence on the extent to which material generated during the course of the other proceedings already commenced in Monaco might be available for use either in these proceedings in England or in alternative proceedings in Monaco dealing with issues relating to the relief sought in these proceedings. It did not seem to me that the evidence disclosed that this factor would give rise to any material advantage to one jurisdiction over the other. In particular there was no suggestion that in the normal course, the Monaco court would be better placed to make use of material derived from others sets of proceedings.

247.    I have reached that last conclusion in light of specific evidence relating to the Monaco criminal proceedings and the Monaco divorce proceedings, both of which had been commenced before the issue of these proceedings:

    i)    So far as the Monaco criminal proceedings are concerned, the file may not be disclosed or used outside the investigation procedure anyway until such time (if at all) that the proceedings are sent to the Tribunal Correctionnel. This restriction applies both in relation to proceedings in Monaco as well as proceedings outside the Monegasque jurisdiction. However, there is a procedure by which the civil judge may request, on his own initiative or at the request of one of the parties to the civil proceedings, that the criminal investigation file be communicated to him. The civil court is entitled to retain the file for not more than 48 hours, and so in practice it would appear that documentation generated during the course of the investigation of the criminal complaint would not be available for use by the parties in civil proceedings either in England or Monaco.

    ii)    So far as the divorce proceedings are concerned, I have already explained that they are for the spouses alone to the exclusion of their heirs or any third party. They are held in private, and lawyers and counsel for the parties to the proceedings are bound by obligations of professional secrecy. I understood that these restrictions apply to collateral use of disclosed documentation both in Monaco proceedings and in proceedings elsewhere.

248.    The next question relates to the relative ease with which an English judgment determining the issues raised in the present proceedings might be enforced elsewhere, as compared to a judgment of the Monegasque courts. The claimants pointed out that, because the claim form in the present proceedings was issued before the end of the transition period for the UK's withdrawal from the EU (Article 126 of the Withdrawal Agreement), the BRR will continue to apply to the recognition and enforcement of an English judgment (Article 67(2) of the Withdrawal Agreement). This means that any judgment obtained in these proceedings will be enforceable under the BRR within the EU. As Monaco is not and never has been a member of the EU, a Monegasque judgment cannot be enforced under the BRR.

249.    The claimants submitted and I agree that ease of enforcement is a factor of some relevance in the present case. The ability to enforce under the BRR against the Estonian assets of Mr Kazakov and Mrs Kazakova and Latvian assets of Mr Anufriev is a legitimate advantage of an English judgment over one given in Monaco. They also rely on the fact that the Black Pearl is owned by a Cypriot (and therefore EU incorporated) company. If they are required to litigate these issues in Monaco, those BRR-based enforcement advantages will not be available to them.

250.    The claimants also submitted that there was likely to be a greater ease of enforcement in respect of any of the defendants' assets in Switzerland if the Lugano Convention was available, which it would not be in relation to a Monegasque judgment. The Kazakov defendants objected to the way in which this point was raised and complained that they had had insufficient time to put in a proper response on the evidence.

251.    While the claimants accepted that there was academic debate in Switzerland as to whether any English judgment rendered after 2020 would be recognised under the Lugano Convention even where the proceedings were initiated before 1 January 2021, it was submitted that the Swiss courts would be likely to recognise the jurisdiction of the English court under the Lugano Convention in those circumstances, even if enforcement under that convention was no longer available. That possibility would not, it was submitted, assist the claimants if they were to be successful in proceedings in Monaco, because unlike the UK (as a member of the EU), Monaco had never been a party to the Lugano Convention. There are valuable assets in Switzerland which are the subject matter of the current dispute, including the UBS portfolio, with an estimated total market value of approximately US$1.18 billion as at 31 August 2020. It is also the case that Mr Tribaldos and Leo Trust are both domiciled in Switzerland, which is therefore the jurisdiction in which enforcement against them is most likely to be productive.

252.    However, in weighing the significance of this factor, I bear in mind what Mr Willan said to the effect that his clients had evidence, which they had not had an opportunity to adduce in light of the lateness with which the point had been raised by the claimants, that a Monegasque judgment obtained against co-defendants was likely to be enforceable in both Estonia and Switzerland. In the light of this I accept that I should not assume that Estonia and Switzerland would only recognise a judgment from a country such as Monaco where the judgment debtor was only resident or submitted in the foreign jurisdiction. Broadly speaking therefore, so long as the court in which the judgment to be enforced was obtained had jurisdiction to grant the relevant relief so far as the law of the country in which the judgment is to be enforced is concerned, there is insufficient evidence to persuade me that there is a clear difference between the

enforceability of an English and a Monegasque judgment on the issues with which these proceedings are concerned.

253. Although all of these connecting factors need to be taken into account in identifying the most appropriate forum for resolving the dispute, the same cannot be said in quite the same way for another factor, more strictly I think what was said to be a juridical advantage, which was at least mentioned in the claimants' evidence. In her witness statement in support of the original application for permission to serve out, the claimants' solicitor, Ms Whiston-Dew, made the following point:

> "10. The Claimants have brought these proceedings in order to bring the totality of the Defendants' wrongful actions before the Courts of a single jurisdiction which is capable of grabbing this case by the scruff of the neck, resolving the issues and exposing the wrongdoing for what it is.

> 11. The English Court is best placed to do this as a result of its skills and experience (particularly in relation to complex international holding structures and issues of foreign law), its ability to hear the claims against all the participants in one set of proceedings and the procedural mechanisms it has developed for uncovering the truth."

254. At later stages in her witness statement, Ms Whiston-Dew went on to suggest that courts in Monaco (anyway those that would be dealing with the divorce) will not have the same kind of specialised experience as the English Court and would not conclude proceedings within a reasonable time. She said that the English courts had procedures (disclosure in particular) which were better-suited for uncovering the truth in relation to issues like forgery and whether parties are acting as nominees.

255. While the desirability of a single jurisdiction is obviously relevant, the Kazakov defendants said that the comparisons between the courts of England and Monaco made in this part of the claimants' evidence were invidious, unjustified and impermissible. The test is whether there is a real risk that justice will not be obtained in the foreign court, as to which cogent evidence is required (see the discussion in *Altimo* at [89] to [102]). Not surprisingly there was no such evidence in relation to Monaco in the present case.

256. It is fair to say that Ms Davies did not approach the case in reliance on any such considerations and I think that she was right to take the course that she did. Seeking to ascertain the comparative capabilities of the English and Monegasque courts in the manner expressed in this evidence does not in my view assist. The evidence falls far short of establishing that justice will be impaired by reason of any actual or perceived deficiencies in the expertise or procedures of the Monegasque courts. This conclusion extends to the relevance of any delays that might occur in the Monaco court system when dealing with matter of this level of complexity. It suffices to say that I do not think that the evidence comes anywhere near substantiating a case that any delays in Monaco are sufficiently serious to give rise to substantial injustice. Nor do I accept that there is any evidence that the Monaco courts may not be complying with their article 6 obligations to determine civil rights within a reasonable period of time.

257. The position is slightly different when it comes to the available resources of the Monaco bar. The Kazakov defendants submitted that they have what they call fully-versed

lawyers in Monaco, and that the investigating judges have undertaken significant steps that have produced substantial work product which will not be available in England. As to legal representation, this is correct so far as it goes, but the claimants' evidence is that none of Mr Anufriev, IPEC or the Leo group defendants (including Mr Tribaldos) have Monegasque representation. They said that the size of the Monaco bar is so relatively small that there may be difficulties in the defendants obtaining proper representation if a case against them seeking the relief sought in these proceedings were to go ahead in Monaco. Mr Willan sought to cast doubt on this, but the claimants' submission was supported by evidence which gave specific details of the roles which were already being played by the limited number of Monegasque lawyers available for this kind of work, i.e., those who were already instructed either to represent one of the parties in the existing Monegasque litigation or to give expert evidence of Monaco law in proceedings in England and elsewhere.

258. The same considerations do not apply in relation to the availability of legal representation in England. Of course, that is an inevitable consequence of the fact that England is a very much larger jurisdiction than Monaco, which has a population of less than 50,000, and does not impugn in any way the quality of the legal services that are available there. It follows that it appears to me that the claimants' submission has some substance, although I stress that it does so only because of the size of the Monegasque bar, and not because there is any doubt as to the competence or expertise of those who practice in this field.

259. As to the amount of work that has already been done on matters bearing on the issues to be resolved in these proceedings, the Kazakov defendants were entitled to point to the fact that there is as yet no English equivalent to the substantial work product that has been produced by the Monegasque investigating judges. However, as I have already mentioned, there are limits on the extent to which that work product is available for use in other proceedings either in England or Monaco. Its significance is reduced as well by the fact that it was clear to me from the conduct of the hearing and the detailed body of evidence adduced by the parties that they all have capable and experienced legal teams in this jurisdiction.

260. Taken in the round, I have formed the view that there are a number of weighty considerations which point to England as the appropriate jurisdiction for the resolution of this dispute. This is not a case in which there is "merely a casual or adventitious link to England" (per Lord Lloyd Jones in *Brownlie* at [79]). But I also think that Monaco has the edge when it comes to seeking to identify the centre of gravity when it comes to the resolution of more general issues relating to the relationship between Mr Bourlakov, Mrs Bourlakova, Mr Kazakov and Mrs Kazakova. In particular, Monaco is the place in which Mr Bourlakov and Mrs Bourlakova are or were domiciled and therefore has been the place in which legal proceedings arising out of the collapse of their marriage and the administration of Mr Bourlakov's estate are being conducted.

261. However, for reasons I shall now explain, I have also formed the view that considerations relating to the multiplicity of proceedings and the avoidance of conflicting judgments shifts the focus of the proper forum firmly back to England. It does so in the context of the comparative advantages of England and Monaco in relation to enforcement of judgments and the prospects of any form of consolidation in Monaco.

Multiplicity of Proceedings

262.    As Lord Briggs explained in the passage from his judgment in *Vedanta* at [70] (cited above), the desirability of avoiding a multiplicity of proceedings and minimising the risk of inconsistent judgments is frequently a decisive factor in identifying the appropriate forum. All parties relied on this principle but they did so in rather different ways.

263.    The claimants submitted that the claims against each of the defendants all flow from what Mrs Bourlakova contends to be a single overarching strategy to defraud her. It is said that the defendants were all participants in that strategy and it is at the core of the claimants' argument that the court can safely conclude that, subject to any stay, these English proceedings will continue in any event not just against those other defendants (including the Leo group defendants) who have not sought to challenge this court's jurisdiction, but also against the defendants domiciled in the EU (Mr Kazakov, Mrs Kazakova and Mr Anufriev) against whom the claimants can proceed in any event because Leo Holding, as an anchor defendant, is domiciled in the UK.

264.    This means that there is a risk of inconsistent judgments if the claimants are required to proceed in Monaco against the Panamanian Companies. Precisely the same allegations would be being pursued against different defendants in two separate jurisdictions. On the face of it, this would be a powerful factor in favour of England, but its weight depends (anyway in part) on the extent to which I can safely reach a conclusion that proceedings will indeed continue against the other defendants (and in particular Leo Holding as anchor defendant) in England in any event. The evidence from the claimants' solicitors is that those claims have not been compromised and that the proceedings against them will continue in England, unless stayed. It is confirmed in that evidence that there is no agreement or understanding which precludes or limits their pursuit.

265.    Mr Willan submitted that his clients were entitled to be sceptical that this would be the case, on the grounds that it was clear that something had been going on between the claimants and the Leo group defendants in light of the way that they suddenly abandoned their strike out and jurisdiction applications. While I can understand why this submission was made, I do not accept it. Having regard to the fact that Mr Tribaldos and the two Leo companies were, on the claimants' case, intimately involved in the implementation of what they allege to be Mr Bourlakov's dishonest strategy to defraud her, and because of the role which Leo Holding plays as an anchor for the other defendants, I agree with Ms Davies' submission that there are no grounds on which I can conclude that the claimants do not have a genuine intention to continue those claims. In my view, I have to proceed on that basis.

266.    Ms Davies also submitted that the unfair prejudice proceedings which Rudan (acting at the instigation of Mr Schwarz) had commenced in England in relation to the conduct of Leo Holding's affairs were relevant to this issue. They are English proceedings in relation to the affairs of the anchor defendant and Ms Davies submitted that they raised some of the matters which arise in the current proceedings. She said that they strengthened her case that continuing with the current proceedings in England in order to resolve the disputes with which they are concerned would give opportunities for case management directions to be given which would minimise the prospect of conflicting judgments as against the unfair prejudice proceedings.

267.    Like the Monegasque Asset Transfer proceedings, these unfair prejudice proceedings had been commenced before the application for permission to serve out had been made to Adam Johnson J. I was shown the petition and it is clear that a number of the factual matters which are relied in those proceedings are very similar to the complaints made by the claimants in these proceedings. In very short summary, Mr Schwarz contends that the breakdown in the relationship between himself and Mr Tribaldos was driven in significant and material respects by his participation in what the claimants contend to be Mr Bourlakov's strategy to defraud Mrs Bourlakova, including by way of example the important matters of the Finco / Gatiabe loan and the change in membership of the boards of Leo Services and Leo Trust which are said to tie Leo Holdings into the tortious conduct.

268.    Mr Willan accepted that there was some overlap, but also submitted that there were a significant number of questions, such as the breakdown in the relationship between Mr Tribaldos and Mr Schwarz and the nature of the fundamental understanding between them which had nothing to do with the issues in the current proceedings. I agree with that submission, but it helps to illustrate the care which is required before reaching a conclusion that the existence of proceedings in jurisdiction A, raising questions and issues that are related to proceedings in jurisdiction B, justifies the court in jurisdiction A setting aside permission to serve out because there is a greater prospect of inconsistent judgments being avoided if as much of the dispute as is possible is litigated in the same jurisdiction.

269.    So far as the Kazakov defendants' reliance on the principle explained by Lord Briggs in *Vedanta* at [70] is concerned, the argument is rather different. They submitted that the principle pointed to Monaco as the more appropriate forum because there must be a greater prospect of inconsistent judgments being avoided if as much of the overall dispute as possible is litigated in the same jurisdiction. That place was Monaco because of the proceedings that have already been commenced there and had been commenced there at the time these proceedings were issued. This argument is closely allied to the points made by some of the EU domiciled defendants in support of their application for a stay under article 34.

270.    In my view, these contrasting arguments give rise to two separate questions: (a) the extent to which the substance of the claims in Monaco and England are the same and are capable of being tried together and (b) whether Monaco is an available forum for the claims against all of the defendants.

271.    On the first of these questions, I have already summarised in some detail the proceedings that have already been commenced in Monaco, and indeed elsewhere, which relate anyway in broad terms to the same underlying dispute. Mr Willan submitted that the opening of a yet further front in England through the commencement of these proceedings was particularly undesirable, not least because there are a number of common factual issues, which will have to be addressed in those proceedings in any event. At first blush this appears to be a point of real significance, but it seems to me that there are real difficulties in placing too much reliance on the fact that a number of sets of proceedings, in respect of which the same facts are alleged by some of the claimants and the defendants against each, are already afoot in Monaco.

272.    The first reason for this is that, in the context of the service out application, the question for the court is the avoidance of a multiplicity of proceedings by reference to what the

judge hearing that application could have anticipated as being the prospects of factual overlap in light of the issues in play in the proceedings that had already been commenced. That means that the only subsisting Monaco proceedings which can properly be taken into account are the Asset Transfer proceedings to which only Mr Bourlakov, Mrs Boulakova, Veronica and Elena are party and possibly the compensation claim elements of the Monaco criminal proceedings in which Mr Kazakov is also a complainant. None of the other claimants or defendants are parties to those proceedings and, although there are many common factual questions, their focus is on what were said to be misappropriations by Mrs Bourlakova and her daughters. They do not require the determination of the tort claims and none of the other parties to the fraudulent strategy alleged to have been practised on Mrs Bourlakova are parties.

273.    Furthermore, and this is relevant to the alternative application by the Panamanian Companies for a stay on forum non conveniens grounds, the death of Mr Bourlakov has given rise to practical difficulties of real complexity. The evidence is that it is only if Mr Kazakov and/or Mrs Kazakova can get themselves into a position where they are able to take on the conduct of the Asset Transfer proceedings that the suspension which came into effect on Mr Bourlakov's death may be lifted. As I have explained, in relation to the disputes that have arisen in the Monaco Estate proceedings, it seems most improbable that those questions will be resolved so as to give rise to the possibility that the suspension might be lifted in the short term.

274.    Even if proceedings making the allegations advanced in the current proceedings were able to be commenced by the claimants in Monaco, the advantage of doing so would only be significant if they could then be consolidated or tried together whether in whole or in part with any of the other extant proceedings in Monaco. If that were to be possible, there would be a greater opportunity for coordinated case management with limitations on the risk of inconsistent judgments being given on common issues arising in both these proceedings and the existing claims in Monaco.

275.    At this stage in the litigation, it is difficult to make any clear assessment of the extent to which it will prove possible to engage in efficient case management in either England or Monaco so as to enable common issues arising in different sets of proceedings to be tried at the same time (in England the issue is relevant to the unfair prejudice proceedings in relation to Leo Holding). It follows from what I have explained above that these difficulties are exacerbated by three factors in particular. The first is that the parties in the various sets of proceedings are not the same. The second is that some of the proceedings are concerned with the administration of the affairs of a company and a deceased estate respectively. The third is that a major part of the litigation now proceeding in Monaco (albeit still at the investigation stage) is in part criminal in form. Ms Davies pointed out that the expert evidence was clear that any civil proceedings brought in Monaco, which covered the same subject matter as that being tried in criminal proceedings, would have to be stayed until a final decision on the criminal complaint.

276.    I think it is possible that, with imaginative case management, the first and second of these difficulties could be overcome or at least mitigated in England, and it may be possible to achieve the same in Monaco. The third is more difficult, as Monegasque law prioritises the resolution of criminal proceedings over the determination of associated civil litigation. It seems likely to me that this will provide a significant

impediment to a case management approach in Monaco that would enable, anyway in the short term, the Monegasque court to ensure that issues in any proceedings equivalent to the current claims brought by the claimants in Monaco that were common to existing Monaco proceedings could be tried and determined both together and with reasonable expedition.

277. Another factor related to the trial of common issues together is the question of whether an English judgment in these proceedings would be recognised in Monegasque proceedings in which common issues arise. This is a point to which I have already alluded, because the Kazakov defendants have said in a number of different contexts that recognition of an English judgment may not be afforded in Monaco because a dispute resolved by any judgment in these proceedings may not have had a sufficient connection to England. One of the points made was that this would be a particularly significant consideration if the proceedings against the anchor defendant had been pursued with the sole object of gaining jurisdiction against the other defendants.

278. As to the second separate question referred to in paragraph 270 above, viz., whether Monaco is an available forum for the claims against all of the defendants, much depends on the extent to which it can be said that all of the defendants were subject to or had submitted to the jurisdiction in Monaco at the time of issue of the current proceedings in England. If that was the case, it would have been possible at the time of issue for the claimants to bring a claim in Monaco. It would then have been an available forum for claims against them.

279. However, unlike the position in *Vedanta*, there was and is no submission to the jurisdiction in Monaco of the English anchor defendant, Leo Holding (or indeed a number of the other defendants) and there is no undertaking or agreement by all of them to do so, which Flaux LJ in *ED&F Man* described as the critical factor for Lord Briggs in *Vedanta* (see para [75]). Although Mr Kazakov, Mrs Kazakova and the Panamanian Companies have all now offered to undertake to submit in Monaco (and the offer by the Panamanian Companies was said to be important because of the value of the assets they control), none of the Leo group defendants (Mr Tribaldos, Leo Holding and Leo Trust), Columbus, IPEC and Mr Schwarz has said they will do so. Mr Anufriev, who is domiciled in Latvia, said that he would consider his position as to submission in Monaco if the court were to indicate that the only basis on which it would grant an article 34 stay as against him is if he undertook to do so, but it was made clear on his behalf that he would go no further than that.

280. Might it be said that if it is sufficient that, although jurisdiction could not and cannot be established by the submission of each defendant in Monaco, and more especially the anchor defendant, the jurisdictional rules applicable in Monaco would have enabled proceedings to be commenced in Monaco against each of them?

281. In my view the position is very doubtful in respect of any proceedings that might now be commenced in Monaco (relevant as it may be to any application for a stay on common law forum grounds) as the only available anchor defendants in Monaco are said to be Mr Kazakov and Mrs Kazakova. The evidence is that their submission in Monaco is not sufficient to render them anchor defendants because they must be domiciled there, and as I have explained I am not satisfied that is the case. I should add that, even if Mrs Bourlakova might have difficulty in taking the point as to the Kazakovs' domicile in the light of what she said about where they lived in the Monaco

Estate proceedings and the 2022 Monaco claim, the same would not apply so far as the remaining defendants are concerned. If any of them wish to challenge Monegasque jurisdiction, which may in particular be the position of Mr Tribaldos and the Leo group companies, one basis on which it would remain open to them to do so would be that Mr Kazakov and Mrs Kazakova cannot be treated as anchor defendants for the purposes of any new claims brought against them in Monaco. I do not agree with Mr Willan's submission that it is fanciful to think that they would take that course merely because there is the presumption that domicile is dictated by the holding of a Monaco residence permit. The history of this case shows that this presumption is well capable of being rebutted.

282. It seems to me that the case on choice was more arguable as at the time of issue of the claim form and the application for permission to serve out. The claimants accept that Mr Bourlakov was domiciled in Monaco and so could have been sued there as of right under article 4 of the Private International Law Act. Article 5 gives the Monegasque courts jurisdiction over non-domiciled co-defendants if the anchor in Monaco is a "serious co-defendant whose interests are affected by the dispute". There is no question that any such requirement would have been satisfied in the case of Mr Bourlakov. To that extent, the Monegasque rules of private international law would have meant that jurisdiction was established against each defendant and Monaco might therefore be said to be a place in which there was a real ability to sue all of them. It might therefore be said that the claimants had a *Vedanta* choice to sue in Monaco which they eschewed.

283. In my view, however, the choice which was available to the claimants was not a clearcut choice of the type under consideration in *Vedanta*. The risk of irreconcilable judgments was not one which the claimants had chosen to bring upon themselves in the manner contemplated by Lord Briggs. It remains the case that there were good reasons to sue an English anchor in England in circumstances in which the claimants would have the ability to utilise the BRR to enforce any judgment they obtained against all of the defendants. This choice is all the more unattractive in circumstances in which any Monegasque proceedings seeking the relief sought in the current proceedings could not have been consolidated or tried together with the Monaco proceedings then extant for the reasons that I have already explained.

284. In these circumstances, it seems to me that the desirability of avoiding to the extent possible a multiplicity of proceedings and of minimising the prospect of inconsistent judgments are highly material factors pointing to England as the proper place for the claims against the Panamanian Companies to be determined. It is only if it can be said that the claimants had a real ability equivalent to submission to sue all of the defendants in Monaco, and simply chose to proceed in England that their intent to continue in England ceases to be Lord Briggs' trump card. I am not satisfied that is the case. Whether in the particular circumstances of this case it is right to characterise it as a trump card is not necessary to say – the risk of irreconcilable judgments on the actual claims made in these proceedings, is a powerful factor in support of the claimants' case. Taken together with the others factors I have already considered, the orders permitting service out of the jurisdiction on the Panamanian Companies were rightly made.

285. It follows that in my judgment the challenge to jurisdiction by the Panamanian Companies, both on their application to set aside the order giving permission to serve out of the jurisdiction by reference to the position in 2020, and on their alternative application to stay on forum grounds at common law, fails.

Article 34 stay application

286.    It is not in issue that the court cannot grant a stay on common law forum non conveniens grounds where the claimants have a right under the BRR to sue the relevant defendants in England and Wales. That is the case so far as the majority of the defendants are concerned. There is, however, a limited jurisdiction to grant a stay under article 30 of the BRR where related actions are pending in the courts of different member states and under article 34 of the BRR where there are related proceedings pending before the courts of a member state and a third state such as Monaco.

287.    Article 34 of the BRR applies where jurisdiction is based on articles 4, 7, 8 or 9. In the present case, jurisdiction is based on articles 4 and 8. It provides that where an action is pending before a court of a third state such as Monaco at the time when a court in a member state (which the UK is treated as being for these purposes) is seised of an action which is related to the Monegasque action, the English court has a discretion to stay the proceedings if certain conditions are met. Those conditions are that the English court must be satisfied that:

> "(a) it is expedient to hear and determine the related actions together to avoid the risk of irreconcilable judgments resulting from separate proceedings;

> (b) it is expected that the court of the third State will give a judgment capable of recognition and, where applicable, of enforcement in that Member State; and

> (c) … that a stay is necessary for the proper administration of justice."

288.    The Kazakov defendants' application notice did not make an article 34 application in terms and, in their initial evidence in support of their set aside application, no mention was made of article 34. The only mention of a stay was the possibility of applying for a case management stay at some stage in the future depending on the arguments that might be made by the claimants. The article 34 application was only spelt out in evidence served just under two weeks before the start of the hearing. Even then they only relied on the Asset Transfer proceedings as being "an action pending before a court of a third State".

289.    It was only on service of his skeleton argument shortly before the hearing that Mr Willan first appeared to rely on the Monaco criminal proceedings for that purpose. In his oral submissions, the related third state action on which Mr Willan said that the Kazakov defendants relied for these purposes were the Asset Transfer proceedings, although they also submitted that the court would reach the same conclusion by reference to the Monaco criminal proceedings. The way it was put was that, at the time the English court became seised of these proceedings, both the Asset Transfer proceedings and the Monaco criminal proceedings were pending in Monaco, were related to the current English proceedings because they gave rise to the risk of irreconcilable judgments, and for that reason it is expedient for the present claim to be heard and determined together with the Asset Transfer proceedings. They therefore said that the claims against them should be stayed under article 34 to enable that to be done.

290.    Mr Anufriev made the same submission.  On one reading of his evidence he appeared to be relying on the Monaco criminal proceedings as third state proceedings for article 34 purposes as well as the Asset Transfer proceedings, and in general terms Mr Scott's skeleton argument did the same in that it referred to all of the Monaco proceedings. However, the substance of his oral submissions only made specific reference to the Asset Transfer proceedings and I did not understand him to advance a case that I could treat the Monaco criminal proceedings as a related action as well.

291.    Ms Davies did not submit that the application for an article 34 stay could not be made at all on the grounds that it was too late.  However she submitted that the reliance on the Monaco criminal proceedings was far too late, because her clients had had insufficient opportunity to address the point.  I agree.  However, this made little difference in practice because, when it came to it, Mr Willan accepted that the analysis was much the same, whether the third state proceedings were the Asset Transfer proceedings or the Monaco criminal proceedings. I shall therefore consider only the former as a related action, although the existence of the latter is a factor to be included in the overall discretionary mix.

292.    I should, however say this.  I am very doubtful that the Kazakov defendants would have been able to demonstrate (and the burden is on them) that the Monaco criminal proceedings were an "action pending before the court of a third state" for the purposes of article 34 at the time the current proceedings were commenced.  While as a matter of principle, the joinder of a civil claim for damages to criminal proceedings still at the investigation stage is capable of meaning that a civil or commercial matter is pending for the purposes of article 34 (cf: *Aannemingsbedrijf Aertssen NV v VSB Machineverhuur BV* [2016] ILPr 387), I do not agree that the Kazakov defendants have demonstrated that in the present case.  They adduced no expert evidence establishing when and how it was that the Monaco court became seised of the civil claim made in the Monaco criminal proceeding so as to render it an action pending before a court of a third State.  On the basis of the existing evidence, the better view is that, whatever the position might been established to be in the *Aertssen* case in Belgium and the Netherlands, in Monaco this only occurs if and when the matter is passed to the Tribunal Correctionnel.

293.    I also do not think that the Kazakov defendants have established that the condition contained in article 34(1)(b) of the BRR would be satisfied in relation to the Monaco criminal proceedings.  In general terms, the claimants had relied on *Hollington v Hewthorn* [1943] 1 KB 587 (as applied in the context of a foreign criminal conviction in *Daley v Bakiyev* [2016] EWHC 1972 (QB)) in support of a submission that an English court would not recognise the judgment of a foreign criminal court.  The Kazakov defendants argued in response that the issue was not recognition of a foreign criminal verdict, but rather was recognition of findings made in the civil action which proceeds before the criminal courts. There may be substance to this point, but when it came to the way in which it was put for the purposes of the argument on article 34, Ms Davies said that her clients had not had any opportunity to deal with it, because it was only relied on by the Kazakov defendants in that context at the very last minute.  As I have already indicated, I agree that this was a legitimate position for the claimants to adopt and I do not therefore consider that the Kazakov defendants have discharged the burden on them of demonstrating that this condition has been satisfied in relation to the Monaco criminal proceedings.

294.   The claimants submitted that, before considering the conditions contained in article 34, it is necessary for the court to be satisfied not just that the current proceedings fall within the scope of the BRR (i.e. are not excluded by article 1(2)), but also that the proceedings pending in the foreign jurisdiction (the third state) do so as well. This submission was made in circumstances in which it was common ground that the Asset Transfer proceedings fall within the matrimonial property exception in article 1(2)(a) of the BRR, or anyway would do so if they were to have been commenced in an EU member state. They said that this question was distinct from the question of whether or not the two sets of proceedings were related, because it went to the issue of whether the court's power to grant a stay under article 34 was engaged at all.

295.   Ms Davies argued that her submission on this point was supported by the decision of the Court of Appeal in *Moore v Moore* [2007] EWCA Civ 361 at [87], [91] and [95]. This was an authority on what are now articles 29 and 30 of the BRR, which make provision for a lis pendens stay where proceedings are brought in the courts of different EU member states. They require the court other than the court first seised to stay such proceedings if they involve the same cause of action between the same parties (article 29) or empower it to do so if they constitute a related action (article 30). It was argued that in those categories of case the proceedings before the court first seised must fall within the scope of the BRR and, if they do not, neither article 29 nor article 30 will apply.

296.   There was a debate at the hearing as to the precise extent of the ratio in *Moore v Moore*, because the actual argument in that case was about whether the relevant proceedings were or were not within the scope of the BRR. This depended on whether or not the other member state proceedings related to maintenance (which was then within the scope of the Brussels I Regulation: see article 5(2)). It was not argued that even though the proceedings were out of scope, the ability to stay under the relevant article (then articles 27 and 28 of Brussels 1, the equivalent of articles 29 and 30 of the BRR) still applied. Nonetheless, it is clear that Lawrence Collins LJ, who was described as the principal architect of the judgment, proceeded on the basis that, if the proceedings before the court first seised were to have fallen within one of the exclusions now contained within article 1(2), there would be no basis for the application of the stay jurisdiction (see para [95]).

297.   In my view the approach adopted by the Court of Appeal is highly persuasive, even if the point was not taken that what is now an article 29 or article 30 stay depends on both sets of proceedings within the EU being in scope of the BRR. If Lawrence Collins LJ had thought that it was not clear that this was the case he would have qualified his conclusion in some way – he did not do so. This approach was also reiterated by Lord Collins in his capacity as general editor of Dicey and Morris on the Conflict of Laws (15th edn at para 12-056) where he said that, if proceedings are pending before the courts of another member state, so that what is now article 30 may apply, the proceedings must first be within the scope of the BRR *ratione materiae*.

298.   However, it does not necessarily follow from this that the same conclusion should be reached where the jurisdiction relied on is said to arise under articles 33 or 34 of the BRR on the grounds that proceedings are pending in a third state (rather than another member state) at the time the court of a member state becomes seised of an action involving the same cause of action or a related action. Ms Davies referred to two cases in which it was accepted that the court must be satisfied that the proceedings pending

in the foreign jurisdiction, as well as the English proceedings, fall within the scope of the BRR. However, in neither was there a judicial decision on the point.

299.     The first case was *BB Energy (Gulf) DMCC v Al Amoudi* [2018] EWHC 2595 (Comm). It was common ground (see para [15] of the judgment of Andrew Baker J) that because the proceedings pending in the courts of the third state (in that case Morocco) were in the nature of insolvency proceedings, a form of process excluded from the scope of the BRR by article 1(2)(b), article 34 of the BRR did not apply.

300.     The second case, *WWRT Ltd v Tyshchenko* [2021] Bus LR 972, was also concerned with the insolvency exclusion. An application was made for a stay by analogy with article 34, on the basis that the applicant conceded (while reserving the right to argue the contrary in due course) that the bankruptcy exclusion in article 1 of the BRR precluded the express application of article 34 if the pending action in the third state is in the nature of bankruptcy or insolvency proceedings. Bacon J refused to apply article 34 in a reflexive or analogous manner (as the Court of Appeal had done in *Privatbank* at [181] when considering article 28 of the Lugano convention), because to do so would be applying article 34 to a situation deliberately excluded from the scope of the jurisdictional rules the BRR. In para [94] of her judgment, Bacon J said:

     "I do not consider that this would be a proper extension of article 34. It would not fill a lacuna or apply article 34 in a way that would further the purpose of the BRR. Rather, it would apply article 34 to a situation deliberately *excluded* from the scope of the jurisdictional rules of the BRR."

301.     The claimants submitted that it is possible to extrapolate from this passage a decision that the related third state action must fall within the scope of the BRR for article 34 to apply. They said that it must be implicit in Bacon J's reasoning that article 34 applies neither directly nor by analogy where article 1(2) excludes the subject matter of the foreign proceedings from the scope of the BRR. I do not agree. I accept Mr Willan's submission that this passage is based on the premise of the concession recorded in para [90] of her judgment that the bankruptcy exclusion in article 1 precludes the express application of article 34 if the pending action in the third state is in the nature of insolvency proceedings. However, Ms Davies noted that if the point conceded was a good one there is no very obvious reason why (as with the common ground before Andrew Baker J in *BB Energy*) it was not argued by the experienced counsel who appeared before Bacon J.

302.     Ms Davies also relied on the fact that, in Civil Jurisdiction and Judgments (7th edn) at para 18.10 fn 2, Professor Adrian Briggs said in relation to the provisions in the Lugano Convention equivalent to article 30 of the BRR that "[t]he proceedings before the other court must obviously be within the material scope of the Convention as well". The cases cited by Professor Briggs in support of that proposition, *Skarb Panstwa Rzeczpospolitej Polskiej v Riel* [2019] ILPr 35 and *Fondazione Enasarco v Lehman Brothers Finance SA* [2014] EWHC 34 (Ch), support a conclusion that the proceedings in both states must be within scope of the Convention where the automatic stay provisions of the Lugano Convention equivalent of article 29 of the BRR is in issue. Strictly speaking, I do not think that they go any further than this so as to apply even to the Lugano equivalent of article 30, and David Richards J in *Enasarco* at [51] to [53] left open the question of whether the answer would be the same. *Moore v Moore* is not referred to in the judgment, and while David Richards J's conclusion is consistent with

the approach adopted by Lawrence Collins LJ, in my view it does not take matters very much further so far as either articles 30 or 34 are concerned.

303. I have not therefore been referred to any clear decision on the point. This is not very surprising, because it will not often be the case that the conditions contained in article 34(1) will be satisfied where the proceedings in a member state are within scope but the related third state action is not. However, there is obvious potential for the point to arise in the present case and I think that I should address it. Mr Willan gave five reasons why he said that the common ground on which Andrew Baker J proceeded in *BB Energy* and Bacon J proceeded in *WWRT* does not reflect the true legal position.

304. First he submitted that, although there is no doubt that the BRR applies to these proceedings, there is nothing in the BRR which means that when considering these proceedings it must close its eyes to matters which fall outside the BRR. He relied on *Hoffman v Kreig* [1990] ILPr 4, a case under the Brussels Convention in which the ECJ was concerned with an attempt to enforce in the Netherlands a German judgment within the scope of the Convention which was irreconcilable with a prior Dutch divorce decree that was outside the scope of the Convention. The ECJ said at para [25] that:

> "… a foreign judgment ordering a person to make maintenance payments to his spouse by virtue of his conjugal obligations to support her is irreconcilable within the meaning of article 27(3) of the Convention with a national judgment pronouncing the divorce of the spouses".

305. He submitted that this was an example of an instance in which, if Ms Davies were to be correct, the ECJ could and would have said that the divorce decree was outside the scope of the Convention. But it did not do so and had regard to that decree in the context of an application to enforce the German judgment. He said that it would be particularly odd to look at matters outside the scope of the BRR when deciding whether to refuse enforcement on the grounds of irreconcilability, but not to do so when considering whether to stay proceedings in advance of any judgment in respect of which questions of enforceability might arise.

306. I am not persuaded that this is a very powerful point. As Ms Davies pointed out, *Hoffmann* was a case in which the Dutch court was being asked to enforce a judgment given in foreign proceedings within the scope of the BRR which directly contradicted a judgment it had given in proceedings that fell outside the scope of the BRR. As the proceedings which the Dutch court was asked to stay were outside the scope of the BRR, the stay provisions of the BRR do not apply at all. At the end of the day, the question is not whether the court might have regard to out-of-scope proceedings for some purposes. It is whether that extends to related third state actions for the purposes of article 34.

307. Secondly, Mr Willan said that there was nothing in article 34 itself which made clear that only an action in scope of the BRR is capable of being a related third state action for the purposes of the article. While I accept that there is nothing in the wording of articles 33 or 34 that expressly requires that the related third state action should fall within the scope of the BRR, the same is equally true of articles 29 and 30. In relation to those articles there is a respectable body of academic authority and case law to the effect that the proceedings in the court first seised must fall within the scope of the BRR. I do not see why the absence of an express requirement as to scope should point

to one conclusion in the case of articles 33 and 34, without having the same effect (which it does not) in the case of articles 29 and 30.

308. Thirdly, Mr Willan submitted that the regime was meant to be read broadly and it was much more likely that the legislative intention was to take into account the nature of the third state action as one of the circumstances of the case. In support of his submission that a flexible approach was required, he pointed out that the language of articles 29 and 30 is different from the language of articles 33 and 34 and in particular that article 34(1)(b) makes express provision for the need to show that the judgment of the court of the third state (in this case Monaco) is expected to be capable of recognition and enforcement in the relevant member state (in this case England). No such requirement is of course necessary or appropriate where the competing proceedings are before courts in separate EU states, but he submitted that this illustrates that it is appropriate to adopt a more flexible approach where the courts of a third state are involved than what he called the more mechanistic allocation of jurisdiction where both sets of proceedings were in a member state.

309. In support of this submission, Mr Willan referred to recitals 23 and 24 to the BRR, which he said confirmed that article 34 was intended to provide a flexible mechanism for taking into account proceedings pending in third states with particular reference to whether a third state judgment would be capable of recognition and enforcement in the relevant member state. This he said was consistent with the need to adopt a broad construction.

310. Ms Davies submitted that article 34 is an important derogation from the operation of the ordinary rules of jurisdiction (and more particularly the general rule that defendants are entitled to be sued in the place of their domicile). There is every reason why that derogation should not extend to the effect of third state proceedings, where the member state equivalent of those proceedings would not engage the operation of article 34 in the first place. Mr Willan said that this submission was not justified in light of the CJEC's approach to the then equivalent of article 30 which is to be interpreted broadly so as "to cover in principle, all situations of lis pendens before courts in contracting states, irrespective of the parties' domicile" (*Overseas Union Insurance Ltd v New Hampshire Insurance Co* [1992] ECJC 351/89, [1992] 1 QB 434, 457H).

311. While I accept that the BRR contemplates a flexible approach, I agree with Ms Davies that it would be strange to find that the related action stay provisions of article 34 were capable of applying in the context of a particular category of proceedings before the courts of a third state first seised, where the equivalent related action stay provisions of article 30 would not apply if the same category of proceedings were before the courts of another member state first seised. I think that this would be particularly odd given that article 34 is narrower in its scope than article 30. It only applies where jurisdiction in the member state is founded on articles 4, 7, 8 and 9, while article 30 applies more generally, for example in relation to cases where jurisdiction is founded on the insurance, consumer and employment special provisions in articles 10 to 23 of the BRR or the jurisdiction agreement provisions of article 25.

312. It follows that I agree with Ms Davies' submission that article 34 accepts more risk of an irreconcilable judgment than article 30, which in my view is inconsistent with Mr Willan's submission. While he is correct to identify article 34(1)(b) as a provision that differentiates article 34 from article 30, it does not do so in a manner which undermines

the essential purpose which is concerned with avoiding the risk of irreconcilable judgments. There is nothing in the language of article 30 or article 34 to indicate that the characteristics of what is capable of being a related action is different depending on the question of whether or not that related action is proceeding in a member state or a third state.

313. Mr Willan's fourth point was that it did not matter to the operation of the BRR whether the third state action is or is not within its scope. The reason for this is that the court in the third state is not itself applying the BRR. I do not think that this is right. It matters to the operation of the BRR because it affects the extent to which the court of the member state is empowered to grant a stay of its own proceedings.

314. Fifthly, Mr Willan said that the purpose of article 34 is to avoid the risk of irreconcilable judgments. That risk arises irrespective of whether or not the third state proceedings are within the scope of the BRR. The way in which its application is restricted to cases in which there is genuinely a risk of irreconcilable judgments is by the inclusion of a precondition in article 34(1)(b) that the judgment of the third state court must be capable of recognition and enforcement in the relevant member state. There is then no need for there to be any additional concern about scope.

315. I do not agree that this factor has the significance for which Mr Willan contends. As I have already explained, article 34 only applies in a limited set of circumstances anyway. It has no application where the member state proceedings are outside scope by reason of article 1(2) and it has no application where jurisdiction for the member state proceedings is based other than on articles 4, 7, 8 or 9. In light of the strong persuasive authority that article 30 has no application where the related member state proceedings are out of scope, I do not see why the legislative intent was to give a more expansive power to stay on the grounds of a risk of an irreconcilable judgment given in a related third state action than would be the case in these other categories of related proceeding.

316. In these circumstances I prefer Ms Davies' submissions to those made Mr Willan on this point. I think that the bases on which Andrew Baker J in *BB Energy* and Bacon J in *WWRT* proceeded were correct. It follows that, in my judgment, the application for a stay under article 34 must fail.

317. Notwithstanding that conclusion, I think it is appropriate for me to explain why I was not persuaded that a stay would have been appropriate even if I had decided that there was no need for the related third state action to be in scope of the BRR for article 34 purposes. These reasons go some way towards explaining why I also think that a case management stay would not be justified.

318. There is no doubt that the Asset Transfer proceedings were pending at the time this court became seised of the current proceedings. It follows that the next question is whether the current proceedings and the Asset Transfer proceedings are 'related' as that word is used in article 34(1). Mr Willan submitted that this question is to be subsumed into whether or not there was a risk of irreconcilable judgments (*Municipio de Mariana v BHP Group PLC* [2020] EWHC 2930 (TCC) at [163], a case which applied the meaning of 'related' in article 30(3) to article 34). This means that actions will be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings. He also submitted that a broad common-sense approach to the question

is required (per Lord Savile in *Sarrio SA v Kuwait Investment Authority* [1999] 1 AC 32 at p. 41F). I accept both of those submissions in relation to any judgments that might be given in these current proceedings and the Monaco Asset Transfer proceedings.

319.    Mr Willan went on to submit that it is possible for actions to be related even where there is no overlap between the parties (*Viegas v Cutrale* [2021] EWHC 2956 (Comm) at [153]). He also said that whether it is expedient to hear and determine the related actions together requires a court to ask whether that solution is theoretically desirable, not whether it would be achievable in practice, and he relied on *PJSC Commercial Bank Privatbank v Kolomoisky* [2020] Ch 783 at [191-192]. If it were to be possible, would it be desirable for the proceedings to be heard and determined together?

320.    I accept the first of Mr Willan's submissions about overlap of parties, in the sense that it is possible for proceedings to be related for the purposes of article 34(1) even where the parties are not the same, although it seems to me that the less correlation there is between the parties in the two actions, the less likely it is that the preconditions to exercise the jurisdiction will be satisfied. However, I also agree with Ms Davies submission that in applying the related action test it is clear that the mere fact of some overlap is not sufficient to render the two actions related. As I see it, this is because the test requires an analysis of both the extent of the overlap and the expediency of a joint hearing. As the Court of Appeal explained in *Research in Motion UK Ltd v Visto Corporation* [2008] 2 All ER (Comm) 560 at [37], article 34(1) requires:

> "an assessment of the degree of connection, and then a value judgment as to the expediency of hearing the two actions together (assuming they could be so heard) in order to avoid the risk of inconsistent judgments. It does not say that any possibility of inconsistent judgments means that they are inevitably related. It seems to us that the Article leaves it open to a court to acknowledge a connection, or a risk of inconsistent judgments, but to say that the connection is not sufficiently close, or the risk is not sufficiently great, to make the actions related for the purposes of the Article."

321.    In broad terms I also accept the second of Mr Willan's submissions, because it reflects what was decided in *Privatbank* at [192], although the use of the word "theoretically" adds an emphasis which does not appear in the judgment. The Court of Appeal held that it was not necessary for actions to be capable of consolidation in practice in order to conclude that the actions were related in the sense that it is expedient to hear and determine them together. However it is clear from [193]-[210] that, absent some strong countervailing factor, the fact that proceedings cannot be consolidated or heard and determined together will be a compelling reason for refusing a stay.

322.    The decision in *Privatbank*, to the effect that there is no jurisdictional bar on granting a stay where proceedings cannot be consolidated or heard and determined together in a single jurisdiction, sits uneasily with the later decision of the Court of Appeal in *EuroEco Fuels (Poland) Ltd v Szczecin and Swinoujscie Seaports Authority* [2019] 4 WLR 156 (a case on article 30 not article 34). In his judgment in *EuroEco Fuels*, delivered after citation of the Court of Appeal's decision in *Privatbank*, Bean LJ (with whom Lewison and Baker LJJ agreed) held at [48] that the question for the English court is whether it is expedient that the two actions be "heard and determined" together. This means that, even if the two actions cannot be formally consolidated, they must at least be able to be tried by the same judge or panel of judges in the same court with

judgment being given in both actions at the same time. It is said in terms by all three members of the court (at [53], [64] and [66]) that, if that is not the case, the discretion to stay does not arise.

323. The prevailing view, as reflected in (e.g.) *Federal Republic of Nigeria v Royal Dutch Shell Plc* [2020] EWHC 1315 (Comm) at [77] per Butcher J, is that *EuroEcho* should not be read as conflicting with *Privatbank*, not least because Bean LJ in *EuroEco* had discussed the relevant passages from *Privatbank* in an immediately preceding section of its judgment and did not say that he disagreed. For my part I have some difficulty in reconciling *EuroEcho* and *Privatbank* on this point but, in light of the fact that Ms Davies said that she would not seek to persuade me that I should not follow the approach adopted by Butcher J, I think that I should proceed on the basis of what seems to me to follow from both judgments: where it cannot be said that the two sets of proceedings can be heard and determined together, that will be a compelling reason for refusing a stay.

324. The next jurisdictional question is whether it is expected that the court of the third state (i.e. Monaco) will give a judgment capable of recognition and, where applicable, of enforcement in the UK. Mr Willan said that this part of the test is not concerned with whether a judgment will in fact be given by the third state court, but rather whether any Monegasque judgment that may be given in due course is enforceable as a matter of principle. I can deal with this factor quite shortly. It was not suggested Ms Davies that a Monegasque judgment was not capable of recognition and enforcement in England. To that extent the requirements of article 34(1)(b) are satisfied.

325. However, she submitted (and I agree) that it is also necessary as a matter of discretion for the court to be satisfied that a judgment of the Monegasque court would give rise to an issue estoppel in England in relation to matters sought to be determined by the English proceedings sought to be stayed under article 34. Ms Davies submitted that if that is not established by the applicants for a stay it will not be possible for them to demonstrate that there is sufficient benefit to justify holding up these English proceedings pending resolution of the Asset Transfer proceedings in Monaco. I agree that this is a relevant factor.

326. This overall discretion comes into play at the last stage of the analysis as well. Mr Willan submitted (and I agree) that the broad exercise undertaken when considering whether a stay is "*necessary for the proper administration of justice*" as required by article 34(1)(c) is identified in Recital 24 of the BRR, namely to:

> "assess all the circumstances of the case before it. Such circumstances may include connections between the facts of the case and the parties and the third State concerned, the stage to which the proceedings in the third State have progressed by the time proceedings are initiated in the court of the Member State and whether or not the court of the third State can be expected to give a judgment within a reasonable time."

He also said that the concept of justice invoked in article 34(1)(c) is a broad international concept underlying the general principle of *lis pendens*. The factors to be considered may include what are recognisable to English lawyers as factors taken into account in the doctrine of forum non conveniens: *Municipio de Mariana* at [206-207]

in a passage cited with approval by the Court of Appeal in *Ness Global Services Ltd v Perform Content Services Ltd* [2021] 1 WLR 4146 at [66-67].

327. Mr Willan relied on the forum non conveniens connecting factors, and submitted that the Monegasque connectors were very much more significant than what he called the relatively slender connections pointing towards England. He also relied on the undesirability of parallel proceedings and the reality that the nature of the proceedings in Monaco are such that it is only the English proceedings, not the Monegasque proceedings, which can sensibly be stayed. He also submitted that I can and should take into account the existing familiarity that the parties lawyers in Monaco have with the issues, the existence of other proceedings in Monaco whether or not they were pending at the time of the commencement of these proceedings and the fact that Mrs Bourlakova has herself commenced divorce proceedings and criminal proceedings in Monaco, which seised the Monegasque courts with proceedings raising a number of the issues in these proceedings.

328. As to the question of whether, if it were to be possible, it would be desirable for the proceedings to be heard and determined together Mr Willan invited me to test the position by asking whether, if both sets of proceedings were being heard in England, there would be any prospect of the English court allowing them to be heard at different times by different judges. He said that the focus should not be on the form of the proceedings, but rather should be on the question of whether similar facts are going to be important in both these proceedings and in the Asset Transfer proceedings in Monaco. This was the correct way of reflecting the approach described by Lord Saville in *Sarrio*.

329. I am satisfied on the facts, that there are a significant number of common issues which will have to be determined not just in these proceedings and the Asset Transfer proceedings, but also in some of the other proceedings which have now been commenced in Monaco. They include in particular the questions of (a) whether Mrs Bourlakova was entrusted in 2014 with assets which belonged in part to Mr Kazakov or whether they were transferred to her outright (b) whether the Kazakov partnership existed and if so its terms and (c) whether there was a dishonest and unlawful strategy by Mr Bourlakov to maximise his share of the family assets and minimise or extinguish Mrs Bourlakova's share. They also may include allegations relating to the forgeries which are relied on in section B of the claimants' particulars of claim, although, as Ms Davies pointed out, those allegations are more likely to arise at an earlier stage in the sense that they will be argued out as part of the dispute as to whether Mr Kazakov can take over conduct of the Asset Transfer proceedings as universal legatee of Mr Bourlakov's will.

330. These are all powerful and relevant factors, but in my judgment on the facts of this case they would not justify the grant of a stay.

331. The first reason for this is that I do not consider that the claims against the Kazakov defendants and Mr Anufriev in these proceedings are so closely related to the Asset Transfer proceedings that it is expedient to hear and determine the actions together to avoid the risk of irreconcilable judgments. The Asset Transfer proceedings allege that Mrs Bourlakova disposed of joint matrimonial property without Mr Bourlakov's consent, but those transfers do not form any part of the current proceedings in England. In particular, although the Kazakov partnership is referred to in a number of different

contexts, Mr Kazakov is not joined to the proceedings in his capacity as a partner said to have sustained any loss as a result of the misappropriations for which it is said that Mrs Bourlakova was responsible. It follows from this that it seems unlikely that the existence and terms of the Kazakov partnership is a matter which the Monaco court will be required to determine in the context of the Asset Transfer proceedings.

332. Secondly, and flowing from the first reason, I do not think that the evidence establishes to a sufficient degree of assurance that proceedings in Monaco seeking determination of the issues raised in the current English proceedings against those defendants would be consolidated with the Asset Transfer proceedings. For the reasons that I have already given, I accept that there is a possibility of consolidation, and so to that extent I do not consider this is a case where it could be said that there is a compelling reason for refusing a stay as was held to be the case in *Privatbank* at [210]. However, the burden is on the applicants for a stay (the Kazakov defendants and Mr Anufriev) and they have not satisfied me that a hearing and determination together is sufficiently likely to be ordered in Monaco. If there is no reasonable certainty that this can be achieved, the basis for a stay is significantly undermined.

333. The third reason is the present state of suspension of the Asset Transfer proceedings. The problem here is not that there will therefore be a delay such that the Monegasque court will not give judgment within a reasonable time per se. Rather, it is the consequences that flow from the need to resolve the issues in relation to standing so as to take the Asset Transfer proceedings forward. It seems to me that the nature of those issues, depending as they do on resolution of the challenges to the 2019 will, mean that a very significant delay is inevitable, and it is unrealistic to think that there will not be an appeal given the amount of money at stake.

334. I understand, although the evidence was not very clear, that there is a procedure in Monaco for the appointment of a receiver where an asset needs to be recovered for the benefit of the estate and there was a dispute as to the heirs. But I had no evidence as to whether the procedure was capable of being utilised in the present case, whether it would be and if so how that would be achieved. The Kazakov defendants have not themselves taken any steps in Monaco to implement any such procedure and the very fact that they themselves have applied to resume the Asset Transfer proceedings in what they say is their capacity as universal legatees is indicative of the fact that no such steps will in fact be taken.

335. Mr Willan submitted that there was a similar question to be addressed in England, namely the appointment of a person to represent Mr Bourlakov's estate in the current proceedings. I do not think that this is a comparable problem. In England the court is able to appoint a person in order to represent Mr Bourlakov's estate as a defendant. The position seems to be more complex in Monaco so far as the Asset Transfer proceedings are concerned, where Mr Bourlakov was claimant, more particularly where there is no indication that a third party curator or receiver will be sought to take over their conduct. The evidence is that their resumption by Mr Kazakov and Mrs Kazakova is only achievable by them as universal legatees, a standing which is challenged by Mrs Boulakova, Veronica and Elena (there may be others as well such as Ms Shevstova's minor daughter or those acting on her behalf).

336. In my judgment, this is a powerful freestanding reason for refusing a stay in the present case. While there are differences in the procedural context in which the point arose, I

think that Ms Davies is justified in relying on what David Richards LJ said in *Easygroup Ltd v Easy Rent a Car Ltd* [2019] 1 WLR 4630 at [71]. This was an article 30 case where Cyprus was the equivalent of Monaco in the current applications, but it seems to me that the overall point is essentially the same:

> "… the fact that there will be no Cypriot proceedings unless the defendants succeed in their appeal in Cyprus, and the fact of the very lengthy delay in any progress in the Cypriot proceedings even if the appeal is allowed, are overwhelming factors against the grant of a stay of the English proceedings under article 30."

337.    Fourthly, the evidence is that there is a risk that the Asset Transfer proceedings will be stayed pending the Monaco criminal proceedings. Mr Willan sought to counter this factor by submitting that it was always open in those circumstances for the claimants to vindicate their civil rights in the context of the civil claim in the criminal proceedings, even if the Asset Transfer proceedings were stayed. In my view that is an unsatisfactory answer for two reasons.

338.    The first is that the issues that arise in the Monaco criminal proceedings are not the same as the issues that arise in the Asset Transfer proceedings. Some of the same facts are relevant and some of the same allegations are made, but the parties and the claims themselves are different. The second is that the basis of the article 34 stay application is the fact that the Asset Transfer proceedings were pending at the time these English proceedings were commenced. It seems to me that it would be wrong in principle for the Kazakov defendants to be able to rely on the existence and progress of the Monaco criminal proceedings to any material extent as an answer to the fact that the Asset Transfer proceedings on which they do rely are liable to be stayed.

339.    Fifthly, Mr Anufriev and the Leo group defendants have not agreed to submit to the jurisdiction in Monaco. I am satisfied that there is a real risk that jurisdiction would not be established against them such that they could either be joined to the Asset Transfer proceedings or could successfully be sued in other proceedings to be heard and determined together with the Asset Transfer proceedings. It is said by the Kazakov defendants that jurisdiction would be established as a result of Mr Kazakov and Mrs Kazakova being present and domiciled in Monaco. While, for the reasons I have already explained, an argument to that effect may be good as against Mrs Bourlakova in light of the fact that she has asserted their domicile in Monaco in the context of Monegasque proceedings, there is a real and substantial risk that one or more of Mr Anufriev and the Leo group defendants will mount a successful challenge to the point.

340.    In these circumstances, I refuse the article 34 stay sought by paragraph 3 of Mr Anufriev's application notice and more informally by the Kazakov defendants.

## Case management stay

341.    I can deal with the application for a case management stay more shortly. Mr Willan realistically accepted that any such application would only get off the ground if I were to conclude that the Asset Transfer proceedings fell outside the scope of the BRR with the consequence that the court had no jurisdiction under article 34 to grant a stay of these proceedings. He said that in those circumstances the court could order a case

management stay on the same basis as the court would be able to do if this were not to be a case under the BRR at all.

342.    I do not accept this approach, largely for the reasons explained by Ms Davies.  It is well established that a case management stay cannot be used to circumvent the fact that, in a case in which the BRR applies, a stay under article 34 is not available.  The principles are conveniently summarised in the discussion by Zacaroli J of what was common ground in *Galapagos Bidco SARL v Kebekus* [2021] EWHC 68 (Ch) at [159] and [160], in which amongst other things he confirms what Bryan J had said in *MAD Atelier International BV v Manès* [2020] EWHC 1014 (Comm) at [82] to the effect that the risk of inconsistent judgments does not justify a case management stay outside the confines of the BRR.  The question therefore is not whether the Asset Transfer proceedings are within the scope of the BRR (and I have held that they are not).  Rather it is whether these proceedings are within the scope of the BRR, which they are.  As they are, the court should not exercise the power to stay on case management grounds where such an order would be inconsistent with the BRR (*Mazur Media Ltd v Mazur Media GmbH* [2004] 1 WLR 2966, per Lawrence Collins J at [69]-[71]).

343.    In my view a case management stay of the type sought by the Kazakov defendants and Mr Anufriev would be inconsistent for two reasons.  First, it would seek to achieve through the back door that which is barred at the front by the fact that the Asset Transfer proceedings are not within the scope of the BRR.  Secondly, because I would not in any event have exercised my discretion to grant an article 34 stay even if I had concluded that I had jurisdiction to do so, I do not think that a case management stay is justified for the same reasons.

## The Applications to extend the validity of the claim form

344.    As the claim form was originally issued on 16 July 2020, time for service expired on 16 January 2021.  Extensions of time were granted by Adam Johnson J to enable service to take place in December 2020 and March 2021, but the Kazakov defendants contended that those orders granting extensions ought to be set aside.  In approaching that question, the court must start afresh.  As Mr Willan put it, the mere fact that an extension has been granted ex parte, does not give the claimants a leg-up on the application to set aside the original order.

345.    The starting point is that a claim form to be served out of the jurisdiction is required to be served within six months of its issue (CPR 7.5(2)).  The court has power to extend time for compliance with the obligation to serve within that six month period and the general rule is that any such application must be made within that period or within the period of any prior extension (CPR 7.6(2)).

346.    In order to determine an application to extend time, the court must understand why the claim form was not served within the time provided for by the rules and must exercise its power in accordance with the overriding objective.  It will adopt a calibrated approach, so the better the reason for not serving in time, the more likely it is the court will grant an extension: *Hashtroodi v Hancock* [2004] 1 WLR 3206 at [18] and [19].  One obvious consequence of this principle is that, if the court does not know why the claimant has failed to serve within the specified period, that will often (but not always)

be a compelling reason for refusing the extension: *Qatar Investment and Project Development Holding Co v Phoenix Ancient Art* [2022] EWCA Civ 422 at [17].

347.    Many of the cases in which the courts have considered applications to extend time arise in the context of the expiry of the limitation period. Where that is the case, it is capable of being a significant discretionary factor in determining the right result. Another discretionary factor is whether or not the proceedings have been brought to the attention of the defendants prior to expiry of the validity of the claim form (*Hoddinott v Persimmon Homes (Wessex) Limited* [2008] 1 WLR 806 at [57] and *Imperial Cancer Research Fund v Ove Arup & Partners Ltd* [2009] EWHC 1453 (TCC) at [9]).

348.    Limitation issues do not arise in the present case, because there is no suggestion that any of the claims became time barred between issue and service. But Mr Willan submitted that the court should have regard to the fact that the claimants had succeeded in seising this court of these proceedings by issue, but had not then proceeded with them in accordance with the rules. Having obtained that advantage as against proceedings elsewhere, it was in the public interest that this claim should proceed with all due expedition. In *Debt Collect London Limited v SK Slavia Praha-Fotbal AS* [2011] 1 WLR 866 at [55], Stanley Burnton LJ made the point that it was clearly undesirable for a litigant to be able to seise the court of his choosing with proceedings against a foreign defendant without that defendant being reasonably promptly served. However, the reason he expressed himself in the way he did was because it is also undesirable for a party to a dispute to be in ignorance of the fact that there are pending proceedings against him in a foreign jurisdiction, which is not the present case.

349.    It was also said that the real reason that these proceedings were issued with great haste was as a response to the issue of the Asset Transfer proceedings in Monaco. As that was the case, it was particularly incumbent on the claimants to get on with progressing them as expeditiously as possible. In support of that submission the Kazakov defendants said it was plain that this was not a case in which the claimants had been unable by the expiry of the time for service to finalise the essence of their claim, because the claim form itself was relatively well particularised. They also relied on a letter from the claimants' solicitors, which showed how detailed their clients' understanding of the issues and their factual basis must have been even before the claim form was issued. The Kazakov defendants also submitted that the claimants should have been in a position to prepare their particulars of claim more rapidly than they did because they had already been obliged to consider matters in the context of the existing proceedings in Monaco and Switzerland and that Mishcon de Reya had been instructed for over a year.

350.    I accept that these points go some way towards substantiating an argument that the claimants were not faced with having to prepare their case from a standing start. I do not, however, consider that it is a very powerful point in circumstances in which there are a significant number of issues raised in these proceedings that were not foreshadowed in the Monegasque proceedings or the Monaco criminal complaints during the period in which the particulars of claim and applications for permission to serve out of the jurisdiction were being prepared. The causes of action are for the most part different and, as I have already explained, none of the Leo group defendants, Mr Anufriev, Mrs Kazakova or the Panamanian Companies were party to those proceedings.

351.   The Kazakov defendants accepted that the court should proceed on the basis that they were aware of the proceedings and the nature of the case that was to be made against them at or shortly after the time they were commenced. This was in any event substantiated by the claimants' evidence that Mr Bourlakov knew of these proceedings some time before the end of September 2020, because that was when they were referred to by Mr Anufriev, then Mr Bourlakov's right hand man, in evidence in other proceedings in the Isle of Man.

352.   To that extent, this is not a case in which it can be said that the Kazakov defendants were in any way taken by surprise on receipt of the proceedings after the six -month period had already expired, nor that the reasoning which underpinned what Stanley Burnton LJ said in *Debt Collect* at [55] is engaged. However, they submitted that this was a neutral factor because it was always open to them to sit back and wait to be served (cf. *Sodasteam Ltd v Coates* [2009] EWHC 1936 (Ch) at [50] cited with approval in *Euro-Asian Oil SA v Abilo (UK) Ltd* [2014] 1 All ER at [21]). They also relied on the fact that there had never been any explanation of why the proceedings were not formally drawn to their attention, nor was any attempt made to ask whether their solicitors would accept service. The upshot of these considerations was that they invited me to infer that the claimants would have been in position to produce particulars of claim on or shortly after July 2020, but made a conscious choice not to do so.

353.   As to the relevance of the Kazakov defendants' knowledge of the proceedings shortly after their issue, I agree with the submission of Mr Matthew Cook QC (who argued this part of the applications for the claimants) that there is nothing in these two cases which detracts from the principle that it is relevant that the defendants knew of the existence and nature of the claim (*Hoddinott* at para [57]). That is in any event what Stanley Burnton LJ said in *Debt Collect* at [55]. Where that occurs, what Mr Cook called the concern that there are extant proceedings which the defendants know nothing about is removed. It also means that the defendants have the choice (without being under any obligation to do so) to compel service by serving notice under CPR 7.7.

354.   It was submitted by Mr Willan that, in carrying out the exercise of evaluating the reasons the claimants have given for not serving the claim form within the period provided by the CPR, I should have regard to the principle that the general regime provided for by CPR 7.6 is a strict one (*Cecil v Bayat* [2011] 1 WLR 3086 at [90]). I do not doubt that proposition, although it is to be borne in mind that in that case the limitation period expired during the period for which the first of two extensions had been granted, a context which is absent in the present case. It is also clear from *Cecil v Byatt* at [94] that the court was concerned to contrast a situation in which the claimant had experienced difficulty in serving and needed the court's assistance (where the court would be sympathetic to an extension application) and a situation in which there had been a deliberate decision to keep the defendant in the dark as to a claim pending delayed service (where the court would not).

355.   That contrast does not illuminate the question which I have to decide, because I do not accept the conclusion urged on me by Mr Willan, viz. that the claimants intended (whether subjectively or objectively) to avoid progressing the action for the longest possible time. In my judgment, the evidence simply does not establish that this was the case. I also do not accept the suggestion that there was any deliberate decision to keep the Kazakov defendants in the dark. I agree with Mr Cook's submission that this

is an unrealistic suggestion in light of the fact that the existence of these proceedings and their general purpose had been referred to in the Isle of Man.

356.    What then was the claimants' actual explanation?  In large part they said that the need for an extension related to the sheer volume of work required in preparing the evidence to justify the applications for permission to serve out.  Mr Willan said that preparing the application for permission to serve out should have taken no more than a month but I think that is wholly unrealistic.  I am satisfied that this is a case in which the number of defendants and their varied assumed domiciles, the nature of the causes of action, the existence of proceedings elsewhere and the explanation of why England was the proper forum for the determination of these claims meant that properly evidencing the application was a much more complex exercise than would normally be the case.

357.    In particular, I think that the claimants and their lawyers were justified in their belief that it was necessary for them to obtain expert evidence from local lawyers in Panama, Monaco and Switzerland in order to determine whether there were properly arguable claims against each defendant.  The evidence from the claimants' solicitor is that, in the absence of that foreign law advice, she would not have been able to confirm her view that each claim against each defendant had a real prospect of success.

358.    I agree with this approach.  I think that the claimants are entitled to rely on what the Court of Appeal said in *Steele v Mooney* [2005] 1 WLR 2819 at [33] to the effect that this was the only sensible and responsible course for their solicitors to take.  While Mr Willan was right to submit that, on this point, *Steele v Mooney* was distinguished in *Cecil v Byatt (see* at [46]), it was distinguished on the grounds that the claimant in *Steele v Mooney* did not know that she had a good cause of action, while in *Cecil v Byatt* the problem was that the proceedings were said to be not viable without a conditional fee agreement and after the event insurance, which the Court of Appeal did not accept.  The *Cecil v Byatt* context was very different from a case in which the issue was ensuring that the claim was sufficiently well formulated to justify the grant of permission to serve out.  The present case is therefore much closer to *Steele v Mooney*.

359.    Mr Willan also submitted that there was a significant difference between the work required to be done to prepare fully pleaded particulars of claim and the marshalling of sufficient evidence to justify a conclusion that there was a serious issue to be tried so as to enable the claimants to satisfy the requirements for service out of the jurisdiction.  He referred to authority (*Sodasteam Ltd v Coates* [2009] EWHC 1936 (Ch) at [50(7)] and *Collier v Williams* [2006] 1 WLR 1945 at [148]) in which the court has held that delay in service of the claim form until the particulars of claim were ready does not justify an extension, nor more generally does the need to extend time for service of the particulars of claim of itself justify an extension of the claim form.  But in neither case was the court concerned with these two questions in the context of an application for permission to serve out.

360.    In my view, the present case is one in which it was reasonable and appropriate for the claimants and their lawyers to satisfy themselves that there was a serious issue to be tried against each of the defendants.  I do not accept Mr Willan's submission that there is any meaningful difference between the work that was likely to be required in that context and for that purpose, and the work required to produce a fully particularised statement of case.  The nature of the claims made in these proceedings, the impact of various foreign laws on those claims and the number of different defendants and causes

of action means that it would have been unrealistic for the claimants to make decisions about whether they had enough to show a serious issue to be tried against each defendant, without also being in a position to plead their case. As the claimants' counsel observed in their skeleton argument, "given the duty of full and frank disclosure in the context of an ex parte application the claimants had to anticipate and address all of the potential arguments that might be raised by the defendants".

361.    In my view this observation applied not just to the question of serious issue to be tried in relation to each defendant. It also applied in relation to the other issues which arose on the service out application - the need to adduce evidence to establish one of the service out gateways and that England is the appropriate forum for the dispute. Thus, foreign law advice was also required to explain what was happening in the existing Monaco proceedings and to provide evidence in relation to the domicile of the various defendants. I agree that this required foreign law advice from Ukrainian, Estonian, Latvian and Monegasque lawyers. The claimants' evidence, which I accept, also explained that the process of obtaining that advice was rendered more complex by the difficulties arising out of the working restrictions imposed by the Covid-19 pandemic.

362.    Having given careful consideration to the evidence from the claimants, which was verified by their solicitor, I am satisfied that the explanations given amount to good reason for needing an extension of time to serve the claim form in these proceedings out of the jurisdiction in those cases in which permission to do so was required. In my judgment, having regard to the factors I have explained above, at the time the orders were made initially on 17 December 2020 and then a few days later on 31 December 2020, it was appropriate in accordance with the overriding objective for an extension to 16 March 2021 and then 30 April 2021 to be granted.

363.    The Kazakov defendants also criticised the claimants for then making insufficient effort to effect service on them, such that the further extensions to the validity of the claim form granted after the initial orders made by Adam Johnson J in December 2020 could not be justified. So far as the Kazakov defendants are concerned this was a reference to the order made by Adam Johnson J on 31 March 2021 extending time for service on Mr Kazakov and Mrs Kazakova until 31 December 2021 and on the Panamanian Companies until 30 June 2022.

364.    I think that there is substance in the claimants' response that these criticisms were not sufficiently particularised before the hearing (whether in evidence or in the Kazakov defendants' skeleton argument) to enable them to respond with full and detailed evidence as to exactly what occurred. I bear that in mind when assessing whether good reason has been advanced for the further extensions granted in March 2021.

365.    The outline explanation was given in evidence from the claimants' solicitors. There were delays in the initial lodging of the service pack until 15 January 2021 and then a further delay until 25 February 2021 in the processing of Mr Kazakov's service pack by the Foreign Process Section. The papers for the Panamanian Companies were then rejected because it transpired that one year's validity was required. In my view, this evidence establishes that the claimants took reasonable steps to progress their efforts to serve Mr Kazakov and Mrs Kazakova in Estonia and Russia and the Panamanian Companies in Panama. In the event, service was eventually effected on Mr Kazakov and Mrs Kazakova in Monaco (in accordance with the permission also granted by Adam

Johnson J's March 2021 order) in circumstances in which it was only in January 2021 that the claimants appreciated that this course was by then open to them.

366. I have been unable to identify any specific prejudice suffered by the defendants arising out of the extensions of time that were granted by the March 2021 order. In my view, it was appropriate in accordance with the overriding objective for those extensions to be granted.

## The Applications under section 9 of the Arbitration Act 1996

367. Mr Anufriev was protector of the Foundations. The claims against him include the matters raised in paragraph 3(h) of the amended claim form and in the section C3 paragraphs (134-146 and 197-200) of the particulars of claim. These are the claims arising out of the alleged Tribatline and Merenguito misappropriations in respect of which it is said that he is liable as an instigator of or participant in Mr Bourlakov's breaches of articles 220, 243 and 253 of the Panamanian penal code. The civil liability of an instigator or participant arises under articles 128 and 129 of the Panamanian penal code.

368. Paragraph 4 of Mr Anufriev's application notice seeks a stay of those matters pursuant to s.9 of the Arbitration Act 1996. The relevant parts of section 9 provide as follows:

(1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.

…

(4) On an application under this section the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed.

369. The burden is on Mr Anufriev to persuade the court on the balance of probabilities that these proceedings are brought in respect of a matter that must be referred to arbitration (*Republic of Mozambique v Credit Suisse International* [2021] EWCA Civ 329 at [62]). The arbitration clauses on which Mr Anufriev relies are contained in clause 19 of the Foundation Charters of each of the Foundations and are in the following terms:

"Any type of conflict which may arise under the foundation charter must be resolved by a court of arbitration made up of three people. The awards of the arbitration court cannot be appealed against. Each one of the litigating parties must chose an arbitrator, and between the two of them a third arbitrator shall be chosen. The arbitrators will jointly decide the jurisdiction or rules of procedure that will govern their office. If an agreement cannot be reached within thirty days as to the third arbitrator or the rules of procedure which will be used, the regulations of the

INTERNATIONAL CHAMBER OF COMMERCE (I.C.C.) will apply and they in turn will assign the third arbitrator upon request of one of the litigating parties. Once the court of arbitration is established it can also resolve other conflicts between the litigating parties arising out of the foundation charter, as long as the original hearing is still in process before said court. The court of arbitration's decision is final. The court of arbitration will determine the expenses of the procedure."

370.    As Coulson LJ confirmed in *Manek v IIFL Wealth (UK) Ltd* [2021] EWCA Civ 625 at [13], the determination of the application for a stay under section 9 requires the court to go through the following exercise:

"As to whether or not the dispute that has arisen falls within the arbitration agreement, that depends on whether, first, the relevant parties have agreed to resolve disputes between them by way of arbitration and second, whether the particular dispute that has arisen is caught by the terms of the arbitration agreement. This latter question is a matter of construction of the agreement: following the change in approach signalled by Lord Hoffmann in *Fiona Trust and Holding Corporation v Privalov* [2007] UKHL 40; [2007] 4 All ER 951, the court will construe the arbitration agreement broadly in order to endeavour to achieve a sensible commercial outcome."

371.    The question of whether the particular dispute that has arisen is caught by the terms of the arbitration agreement is a reference to whether the claim against Mr Anufriev is "in respect of a matter which under the agreement is to be referred to arbitration" within the meaning of section 9. If it is a conflict which may arise under the Foundation Charters it will do so and the proceedings against him must be stayed so far as they concern that matter.

372.    In *Republic of Mozambique v Credit Suisse International*, the judge had concluded that the application for a stay should be refused on the basis that, although one of the issues in relation to certain supply contracts was a matter that had to be arbitrated, it was no more than important background to the main matters of bribery, dishonest assistance, knowing receipt and proprietary claims with which the proceedings were concerned. He also said that, although the entry into of the supply contracts was one of several separate unlawful means relied on for the purposes of a conspiracy claim, it could not infect the whole of that claim. The Court of Appeal disagreed with this approach. In her judgment at [64], Carr LJ said:

"There are two stages of inquiry for a court (although there may be overlapping considerations): first, to identify the "matters" in respect of which the proceedings are brought; secondly, to assess whether those matters are "matters" which the parties have agreed are "to be referred to arbitration". That is to be resolved by reference to the scope of the relevant arbitration agreement properly construed in context. Not every matter that could theoretically be arbitrable is one that the parties are necessarily to be taken to have agreed as a matter that must be referred to arbitration."

373.    Carr LJ then proceeded at [65]-[68] to endorse the following statement of principles by Popplewell J in *Sodzawiczny v Ruhan* [2018] 2 Lloyd's Rep 280:

"43.  The approach to what constitutes a "matter" in section 9 "in respect of which" the proceedings are brought should be capable of application in all these different circumstances and many in between, all of which are contemplated by the section. As a matter of principle the approach should therefore be as follows:

> (1)  The court should treat as a "matter" in respect of which the proceedings are brought any issue which is capable of constituting a dispute or difference which may fall within the scope of an arbitration agreement.

> (2)  Where the issues have been identified at the time the court is making the inquiry, there is no difficulty in conducting that exercise. Where the issues are not fully identified or developed at that stage, the court should seek to identify the issues which it is reasonably foreseeable may arise …

> (3)  The court should stay the proceedings to the extent of any issue which falls within the scope of an arbitration agreement. The search is not for the main issue or issues, or what are the most substantial issues, but for any and all issues which may be the subject matter of an arbitration agreement. If the court proceedings will involve resolution of any issue which falls within the scope of the arbitration agreement between the parties, the court must stay the proceedings to that extent. This is necessary to give effect to the principle of party autonomy which underpins the Act. If a dispute is arbitral, effect should be given to the parties' bargain to arbitrate it. That applies to any dispute with which the court proceedings are, or will foreseeably be, concerned …

> (4)  Further, in considering the claim, the Court should look at the nature and substance of the claim and the issues to which it gives rise, rather than simply to the form in which it is formulated in a pleading. As Andrew Smith J put it in the *Lombard North Central* case at paragraph [14], the latter "would allow a claimant to circumvent an arbitration agreement by formulating proceedings in terms that, perhaps artificially, avoid reference to a referred matter, knowing that any application to stay them must be made before a defence is pleaded." The same is true of identified or foreseeable defences. Section 9 is concerned with substance not form.

44.  The objection that this approach leads to fragmentation of proceedings is not a sufficient reason for departing from these principles. The desideratum of unification of process must give way to the sanctity of contract, as the mandatory terms of section 9(4) intend.  Fragmentation is implicit in the pro tanto wording of section 9, and is in any event often a consequence of the consensual nature of arbitration agreements (for example in string contracts).  The risk of fragmentation is reduced by the expansive approach which is taken to the construction of arbitration clauses, but it may be the inevitable result of upholding the parties' bargain. If so, the adverse consequences can be ameliorated, if not altogether avoided, by the case management power of the court to stay proceedings in so far as they fall outside the scope of an arbitration agreement… "

374.  It is common ground that Panamanian law governs the arbitration clauses contained in the Foundation Charters and that Mrs Bourlakova and Mr Anufriev are both party to and bound by them by reason of their status as beneficiary and protector respectively.

Both experts agree that Panamanian law has a policy in favour of arbitration and that such clauses are to be construed broadly. The claimants also accept that any claim against Mr Anufriev for actions taken by him in his capacity as protector of the Foundations, would need to be pursued by arbitration. However, they said in their original evidence in support of the application for permission to serve out that Mr Anufriev was not sued in that capacity. They also said that it was understood that he had stood down as protector, although there was no firm case that he had and the pleading was equivocal on the question of whether he had been replaced by Mrs Kazakova and if so when. They said that they could not be criticised for this and pointed to the fact that although, unlike them, Mr Anufriev must have known the actual position, he had not sought to clarify it.

375. That equivocation is reflected by parts of the particulars of claim which allege that, if Mr Anufriev remained as protector of the Foundations or either of them, he would have agreed to act on Mr Bourlakov's instructions to approve the transfers of Columbus, Edelweiss and Finco to Anahill, Hemaren and Wlamil (via Delos). It is also pleaded (in paragraphs 143 of the particulars of claim) that Mrs Kazakova or Mr Anufriev made no attempt to comply with their duties under the Regulations of the Foundations, including the obligation to act in the beneficiaries' best interests. The duties referred to were those imposed on them in their capacity as protector to the extent that that is the office they held at the relevant time.

376. However, despite the uncertainty as to the claimants' case on whether or not Mr Anufriev remained as protector of the Foundations when the instructions for the transfer of the assets to Anahill, Hemaren and Wlamil were given, the claimants have now explicitly confirmed that they do not rely on any acts of instigation or participation by Mr Anufriev in that capacity. I do not think that this was at all clear in the original versions of the particulars of claim, not least because the consequences pleaded in paragraph 143 include an allegation that appeared to be one of breach of duty, albeit a complaint made in the alternative. But the claimants now say that the references to Mr Anufriev's activities as protector, and in particular his agreement to those transfers, were pleaded solely as background to the claims against the other defendants.

377. To that end the claimants have now proposed an amendment to the particulars of claim which seeks to explain their position in more explicit terms. If permission is granted for the amendment to paragraph 199, it will plead:

> "By offering Mrs Kazakova (or alternatively Mr Anufriev) financial inducement in order to discharge her/his role as protector of Tribatline and Merenguito in accordance with Mr Bourlakov's instructions (rather than in accordance with her/his obligations under the Regulations of each), Mr Bourlakov breached Articles 220, 243 and/or 253 of the Panamanian Penal Code. Mr Tribaldos, Leo England, Leo Trust, Mr Anufriev (insofar as he resigned as protector prior to the dissolution) and Mr Kazakov and/or Mrs Kazakova (insofar as either or both was nominally a beneficiary of Anahill and/or Hermaren) are also liable as instigators or participants. For the avoidance of doubt, the Claimants do not make any claim against Mrs Kazakova or alternatively Mr Anufriev for actions taken in the capacity of protector of Tribatline and/or Merenguito, since any such claim would need to be pursued by arbitration."

378.    In short the effect of the last sentence of the claimants' pleaded position will be that Mr Anufriev is not being sued in his capacity as protector, because the claims against him are brought on the basis that he resigned as protector before Mrs Bourlakova was removed as a beneficiary and before Columbus, Edelweiss and Finco were transferred out of the Foundations. It is said that it is only insofar as Mr Anufriev had at the relevant time resigned as protector of the Foundations that he is liable with others as an instigator or participant in Mr Bourlakov's breaches of articles 220, 243 and/or 253 of the Panamanian penal code.

379.    The reason the case is put in this way relates to the scope of the arbitration agreement. The claimants have adduced expert evidence of Panamanian law from a former President of the Panamanian Supreme Court, Ms Graciela Dixon Caton. She agreed that any claims against Mr Anufriev that arise in relation to his role as protector would fall within the scope of the arbitration agreement, and to that extent it would follow that allegations to that effect would have to be stayed for arbitration pursuant to section 9. The evidence is that Mr Anufriev is bound by the arbitration clause by virtue of holding office as protector, meaning that he is deemed to have consented to the terms of each of the Foundation Charters including their respective arbitration clauses. However Ms Dixon Caton also said that the position was different after he had resigned. He could not be deemed to have consented to the arbitration clause applying to any claim arising as a result of those post-resignation actions.

380.    Mr Andrew Scott, who appeared for Mr Anufriev, said that Ms Dixon Caton's evidence on post-resignation scope was directed at answering the question of construction which is a matter for the court not the expert. It is a matter for the court to interpret the arbitration clause in accordance with the applicable canons of Panamanian construction (Dicey, Morris and Collins, The Conflict of Laws, 15th edn, at 9-019 and 32-144) and to that extent it is matter for this court to identify whether any of the issues which may be resolved in these proceedings amount to a "conflict which may arise under the foundation charter".

381.    In light of the way that Miss Dixon Caton expressed herself, I am not convinced that Mr. Scott was correct to treat her evidence on this issue as a pure point of construction. She treated it more as a question of the extent to which as a matter of Panamanian law, Mr Anufriev was bound at all by the charter once he had stepped down. However, given the way the argument developed, I do not think that the distinction matters very much. She said:

> "While the arbitration clause would continue to apply to Mr Anufriev after he resigned as Protector in relation to claims for actions connected to his prior role as Protector, it would not apply to subsequent actions after he had resigned as Protector and which, by definition, were not, therefore, undertaken or connected to his role as Protector. If after Mr Anufriev had resigned as Protector he undertook any actions independently of his role as Protector, then any claim based on his involvement in subsequent wrongdoing is not based or connected to his previous role as Protector and does not depend on his exercising powers as a Protector (since he no longer had any such powers following his resignation). In these circumstances, following his resignation, Mr Anufriev is in no different a position to Leo England or Mr Tribaldos: he is a third party who has no role under the Foundation and so is not bound by or subject to the Foundation Charter and Regulations, including the arbitration agreement."

382.    Mr Anufriev adduced expert evidence from Dr Carlos Montenegro as to the applicable rules of construction.  He agreed with Ms Dixon Caton that Panamanian arbitration law generally recognises and applies a presumption in favour of arbitration.  They also both agreed that an arbitration clause should be interpreted broadly, provided that the parties consented to arbitration (*ratione personae*) and that the dispute was clearly one that relates to the contract containing the arbitration agreement (*ratione materiae*). The extent of Dr Montenegro's disagreement with Ms Dixon Caton was therefore limited, but they did not agree on the scope and effect of the clauses.

383.    Dr Montenegro considers that the clauses will apply whenever the claim is connected to the Foundations.  He said that identifying the persons bound by the agreement (the scope *ratione personae*) is a different and independent question from the identity of the disputes that fall within the agreement (the scope *ratione materiae*).  His evidence is that: "even if the substance of the claim has no connection to Mr Anufriev's role as protector (which is the basis for finding *ratione personae* in this case) the claim would still fall within the arbitration clause by reason of its scope *ratione materiae*".

384.    Put another way, the principal difference between the experts is that Dr Montenegro is of the opinion that Panamanian law does not require that the *ratione materiae* relates to the *ratione personae* and both aspects are separate in the sense that they have to be assessed independently of each other.  Ms Dixon Caton takes a different approach in the sense that she says that the arbitration clause would only apply to a claim against Mr Anufriev that is connected to his role as protector.  It would follow from this that it is Dr Montenegro's view that the scope of the arbitration agreement might extend to any conflict arising under the Foundation Charter between parties bound by it, whether or not at the time the relevant facts occurred, both parties continued to have the capacity which caused them to be bound by the agreement in the first place.

385.    Mr Scott submitted that the view expressed by Ms Dixon Caton was based on an erroneous understanding of the facts alleged by the claimants. In particular, it is said that her attention was not drawn to the fact that Mr Anufriev's participation in the events relating to the Foundations were in furtherance of a strategy agreed at a time when he was protector.  He also said that it is necessary to look at what is capable of being a matter for the purposes of section 9 not just from the perspective of the claimants but also from the perspective of the defendants and the reasonably foreseeable defences that they may wish to run.  I agree and I also agree that the court must be astute to identify the substance of the allegations made when seeking to determine whether the proceedings seek to resolve matters that are caught by the arbitration clause. This gives rise to particular difficulties where the allegations made in the proceedings relate to torts in respect of which more than one defendant is said to be liable, but not all of those liable have the benefit of an arbitration clause, as to which see by way of example *Republic of Mozambique v Credit Suisse International* at [102].

386.    I agree with Mr Scott that the consequence of this is that the device of disavowing the matter to be arbitrated as against the party with the benefit of an arbitration clause may not have the desired effect if the claimants continue to rely on that matter as against other parties.  However, that will not necessarily be so, and it remains the case that the point with which I am ultimately concerned is one of construing the scope of the clauses and answering the question whether the matters which those clauses refer to arbitration fall within the current legal proceedings.

387.     In order to answer that question, Mr Scott took me through the factual allegations that are made in relation to the claims against Mr Anufriev in section C3 of the particulars of claim. They start with allegations as to the duties and powers of the Foundations and the duties of the protector. They make averments about Mrs Bourlakova's status as the sole beneficiary until shortly before their dissolution in 2018. They describe what are alleged to be the changes in beneficiary, as to which it is the defendants' case that the Foundation Councils had unfettered powers to remove Mrs Bourlakova as beneficiary. It is averred that Mr Anufriev was the protector of the Foundations at the time they were established until shortly before their dissolution when he was replaced by Mrs Kazakova.

388.     Mr Scott stressed that it remains part of the claimants' case that, whether or not Mr Anufriev resigned before the transfers and dissolutions occurred, he was protector of the Foundations when the fraudulent strategy alleged to have been agreed between amongst others Mr Bourlakov and Mr Anufriev was devised in early 2018. He pointed out that the allegations amounted to a case that at the time Mr Anufriev was protector of the Foundations he joined in a strategy to misappropriate their assets. His role in the implementation of the alleged strategy was to resign so as to enable Mrs Kazakova to replace him shortly before the Foundations were dissolved. Mr Scott submitted that it is difficult to see how Mr Anufriev can have complied with his duty as protector if these allegations were to be established. As Mr Scott put it "rather than safeguarding the rights and interests of beneficiaries, he would have stepped aside as protector in furtherance of a strategy to enable the misappropriation of those rights and interests".

389.     Mr Scott identified the facts that the allegations in relation to the section C3 claim, assessed as a matter of substance, included matters relating to the internal affairs of the Foundations, changes in their beneficiaries and dealings in their assets. They also included matters relating to Mrs Bourlakova's standing to sue and matters relating to the protectors' compliance with their duties, the latter of which is plainly a conflict requiring to be resolved by arbitration because Mr Anufriev has asserted that, in carrying out the acts of which complaint was made, he acted in accordance with his duties as protector.

390.     Ms Davies' response was that the claimants' primary case was based on the factual premise that Mr Anufriev resigned as protector prior to the transfers and dissolutions and that, since the relevant events took place at a point when he was no longer protector, they do not fall within the arbitration clause. In particular she said that the acts of positive assistance relied on appeared to have post-dated his resignation and she pointed to the claimants' pleading in paragraph 144 that the single positive act pleaded was post-resignation, when Mr Anufriev arranged for Anahill and Hemaren (incorporated in 2003) to be used as new holding structures, in order to create the appearance that those structures had been in existence for an extended period, thereby supporting the false contention that Mr Kazakov had long-standing rights to a share in the Bourlakov family assets. In the course of her submissions Ms Davies clarified that in so far as anything pleaded in section C3 of the particulars of claim described Mr Anufriev as having done what he did as protector, it is accepted that such claim cannot be made in these proceedings.

391.     She also submitted that Mr Anufriev's role and duties as protector are not in issue as regards the claims the claimants seek to pursue against him in these proceedings and nor is it reasonably foreseeable that they will be raised in his defence. In particular she

did not accept that Mr Anufriev was still in office as protector when he participated (to the extent that he did) in the fraudulent strategy alleged by the claimants to have been devised by Mr Bourlakov. She also submitted that, even if he was, that is not a matter on which the claims are based, because it is only when the positive acts in furtherance of the strategy were carried out that Mr Anufriev's liability as an accessory is capable of arising. She demonstrated that, as a matter of Panamanian law, it was necessary for the accessory to take part in the relevant act or provide the principal perpetrator (Mr Bourlakov) with assistance.

392. When assessing the matters within the scope of the arbitration clauses, it is important to have in mind that Mr Anufriev had two quite separate roles in relation to Mr Bourlakov's affairs. The first was as protector, and conflicts arising out of his activities in that capacity will be matters caught by the arbitration clause. The second was as Mr Bourlakov's right-hand man in respect of which his acts may not so obviously constitute matters which are caught by the arbitration clauses. Whether or not they do so will depend on the true construction of those clauses, and the effect of that construction on the application of section 9 in accordance with the principles laid down by the Court of Appeal in *Republic of Mozambique v Credit Suisse International*.

393. The clause 19 arbitration agreements require that the conflicts to which they refer should arise under the Foundation Charters. This form of words focuses on the need for the acts or omissions which relate to the conflict to arise out of or under the matters with which the Foundation Charters are concerned. It seems to me that, so far as the protectors are concerned, this requirement is not satisfied if the acts or omissions were committed solely in some other capacity. Even if Dr Montenegro is correct that Panamanian law requires that the *ratione materiae* and the *ratione personae* have to be assessed independently of each other, these arbitration clauses on their true construction still require the conduct out of which the conflict arises to be conduct which itself is committed or omitted in a capacity governed by or arising under the Charters.

394. If they were committed solely in some other capacity, they do not arise out of the relationships or other matters that were governed by the Charters and they cannot in my view be said to give rise to a conflict arising under them. While I accept that an arbitration clause is to be construed broadly, the words "under" and "out of" are narrower than words such as "in relation to" and when used in conjunction with a governing document seems to me to limit their application to conflicts arising out of conduct committed in capacities with which the Foundation Charters are concerned. So far as protectors are concerned, the solution does not necessarily lie in the timing of the act or omission which gives rise to the conflict, but rather in the capacity in which the protector acted or omitted to act when he did so. The timing will be an important but not necessarily determinative indicator of capacity.

395. The claimants have now disavowed any section C3 claim against Mr Anufriev in respect of his role as protector. They only seek to claim against him in respect of his role as manager of Mr Bourlakov's business interests and personal wealth more generally. If any part of what is relied on as against him, as opposed to other defendants, arises out of the role of protector, it will be caught by the arbitration clauses, and cannot be relied on by the claimants in light of the way they will be putting their case by reason of the amended paragraph 199. It does not seem to me that this conclusion cuts across in any way the principles laid down by the Court of Appeal in *Republic of Mozambique v Credit Suisse International*.

396.    If the section C3 case the claimants seek to advance against Mr Anufriev did not allege any matters which were or might have been committed by him solely in some other capacity that part of their claim would therefore be an empty one. But I accept that there are aspects of his alleged conduct in relation to the C3 claims which are capable of giving rise to a liability on him, but which do not fall into that category. Paragraph 144 of the particulars of claim is the particular instance relied on by the claimants and seems to me to be likely to be a good one.

397.    I do not, however, accept that if Mr Anufriev was still protector at the time he participated in the development of the fraudulent strategy, it will be possible (anyway on the basis of the way in which the claimants now put their case) for them to rely on that conduct as part of their section C3 claim against him. It will be excluded by the last sentence of the proposed paragraph 199 because it will not be possible to contend that his participation was solely in some other capacity. The same will apply in relation to any allegation the claimants may seek to advance against Mr Anufriev based on conduct that would have amounted to a breach of duty by him in his capacity as a protector whether or not the claimants specifically allege that such conduct gives rise to liability by him for breach of duty.

398.    It follows that I do not accept that a stay of the claimants' claim against Mr Anufriev is justified or required. However, the effect of the amendment which has been forced upon the claimants by the operation of the arbitration clauses is to limit the allegations it will now be open to them to make and to do so significantly. The intent behind the way in which the claimants propose to put their case was clear from Ms Davies' submissions, which I have endeavoured to summarise above. The form of the proposed amendments may require some adaptation in light of the argument at the hearing and my conclusions, but that is a matter for determination on the application for permission to amend and is something which it is to be hoped can be agreed between the parties.

## Service on Mr Anufriev in Latvia

399.    The final matter with which I must deal is Mr Anufriev's application that he has not been validly and effectively served in Latvia. Ms Davies described this as a highly technical point, but Mr Scott said that, even if it was, it was still necessary for me to decide whether or not it was right. In particular he said that if I were to determine that it is appropriate for this court to exercise jurisdiction the proceedings need to be properly served on Mr Anufriev, something that has not yet happened.

400.    The reason that Ms Davies describes the point as highly technical is that it is common ground that Mr Anufriev actually received copies of the documents and translations sent to be served on him when he collected them from a Latvian post office on 31 March 2021.

401.    Those documents had originally been provided by Mishcon de Reya to the Foreign Process Section to enable Mr Anufriev to be served in Latvia pursuant to article 10(a) of the 1965 Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. On return from the FPS, they were then posted by Mishcon de Reya by a registered postal service provided by Parcelforce.

402. Article 10(a) of the Hague Convention states that "Provided the State of destination does not object, the present Convention shall not interfere with – a) the freedom to send judicial documents, by postal channels, directly to persons abroad". Latvia adopted the Hague Convention on 5 March 2009 and it has made an express declaration regarding its application. In both the adopting law (article 7 of the Hague Convention Law) and the declaration it is recorded that Latvia does not object to the freedom to send judicial documents by postal channels directly to an addressee in the Republic of Latvia "if the document to be served is in Latvian or it is accompanied by a translation into Latvian and it is sent to the addressee using a registered postal letter (with an acknowledgement of receipt)".

403. The point taken by Mr Anufriev is not that the contents of the envelope he received were incomplete or otherwise deficient. Instead his objection is that he did not sign for the envelope on receipt. It is said by his expert on Latvian law, Mr Lauris Liepa, that, at the time of posting, Mishcon de Reya should have applied for and included a particular form provided by the Universal Postal Union's ("UPU") Letter Post Regulations (form CN 07), because Latvian law provides that valid service pursuant to article 10(a) required Mr Anufriev's signature of receipt to be recorded on that form.

404. Mr Liepa relies on the fact that, under article 665 of the Latvian Civil Procedure Law ("CPL") it is expressly provided that where documents to be served under the Hague Convention are sent directly to an addressee in Latvia, the addressee may refuse to accept the documents if they have been sent by a method other than registered post with an acknowledgement of receipt. He said that the sending of such documents with an acknowledgement of receipt is therefore a *conditio sine qua non* for valid and effective service by post under Latvian law.

405. Initially he also appeared to rely on the Latvian requirements for the issuance of ordinary, registered and postal items (Regulation No 477 of 15 October 2019) which he said provides that the action of the addressee signing on receipt of the registered postal item constitutes an "acknowledgement of receipt" as required by Latvia's declaration regarding article 10(a) of the Hague Convention and the other provisions of Latvian law I have referred to. He said that Latvian law requires use of the form CN 07 and for the addressee to sign that form on receipt in order for the requirements of article 10(a) of the Hague Convention (as adopted in Latvia) to be complied with. He said that, because Latvia's declaration in respect of article 10(a) refers to documents being sent "with an acknowledgment of receipt", the use of such a form is a necessary condition for valid service pursuant to that article. In the event, when responding to the claimants' expert evidence in a reply report, he made clear that the substantive basis of his evidence was the application and effect of articles 7 and 655, not that of Regulation 477.

406. The expert evidence from the claimants, in the form of a report prepared by Mr Agris Bitāns, disagrees with Mr Liepa's evidence. Dealing first with regulation No 477, he said there is no justification for what then appeared to be Mr Liepa's conclusion that compliance with its terms had any effect on the validity of service under the Hague Convention. He gave a number of reasons why this was the case. In particular he pointed out that there is no legislative link and no commentary or other authority which makes the connection for which Mr Liepa argued. He also explained that Regulation 477 is secondary legislation made by the Cabinet which can only have effect within the scope of the delegated legislative power. That power gives no hint that it was delegating

power to legislate for what would constitute valid service under the Hague Convention – it was simply limited to what would constitute the requirements for handing over ordinary, registered and insured postal items.

407.    Mr Bitāns also said that, even if compliance with regulation 477 were to be necessary, the signature is simply part of the process of evidencing the handing over of the registered postal item and its receipt by the addressee. He gave an elaborate explanation of how this is confirmed by the provisions which make clear that the signature is given after receipt of the item not as a condition of receiving it. As he put it, the purpose of regulation 477 is simply to prescribe a means of ensuring that in the event of a dispute as to whether or not a particular item had been delivered there will be appropriate documentary evidence to prove that it has.

408.    Mr Bitāns also made a similar point in relation to article 665. He said that any defect in the delivery of the service pack to Mr Anufriev would not mean that service was invalid because article 665 prescribes a right of refusal where an acknowledgement of receipt is not provided. It does not provide for invalidity of service in circumstances in which the addressee does not exercise the right to refuse or otherwise takes away the documents. The reason for this flows directly from the wording of article 665 itself and its commercial purpose. This point was not addressed head on by Mr Liepa, but seems to me to be compelling. In my view article 665 is concerned with the right to refuse receipt. There is nothing about the language and there is no commentary to which my attention has been drawn which supports Mr Liepa's view that even where there is no doubt that the package has been received, the absence of an acknowledgment means that the article 10(a) service is as a matter of Latvian law invalid.

409.    Mr Bitāns then went on to explain that, even if an acknowledgment of receipt was required to validate effective service, the use of form CN 07 was not mandated by Latvian law. In his view, for the purposes of valid service, the receipt could be acknowledged by a number of means, including later acknowledgments in the form of solicitors' letters and confirmations in witness statements as occurred in the present case. He also relied on the case of *Henderson v Novo Banco SA* (Case C-354/15). He pointed out that there is nothing in any commentaries that he had been able to find, and no cross referencing in any of the legislation, to indicate that the UPU's Regulations had any relevance to compliance with article 7 of the Hague Convention Law or article 655 of the CPL. He gave what in my view was a compelling explanation as to why a Latvian court would reject what he called the formalistic arguments made by Mr Liepa.

410.    Mr Bitāns also explained why, even if compliance with regulation 477 were normally to be required, that requirement had been suspended by order 655 of the Latvian cabinet at the time Mr Anufriev collected the service pack. This was legislation introduced in response to the Covid-19 pandemic. It followed so he said that, even if a signature on a form CN 07 had normally been required the obligation to sign had been suspended.

411.    In his response, Mr Liepa accepted that order 655 was in force at the relevant time but said that because it does not refer specifically to the requirement for a CN 07 form to be used and signed, it does not suspend that obligation. Mr Liepa's reasoning started with the proposition that order 655 was only concerned with suspending the signature obligations for delivering a "simple registered postal item" pursuant to regulation 477. It was said not to be concerned with the process of delivering registered post with a CN 07 form. However, as Ms Davies pointed out, Mr Liepa's first report had relied on

regulation 477 (provision 7) as making the appropriate provision for the form of acknowledgment of receipt required to comply with article 10(a) of the Hague Convention and its Latvian law implementing equivalents (articles 7 and 655). I agree that it would be wholly inconsistent to conclude that the suspending provisions of order 655 did not suspend the relevant parts of regulation 477 for that purpose.

412. I also think that Mr Liepa's approach to order 655 was unduly formalistic and did not give adequate weight to the emergency context in which it was introduced. There was evidence from Mr Bitāns that it was the policy of the Latvian postal service not to require the recipient to sign for receipt of registered post in the light of the pandemic, which may explain why Mr Anufriev says he was not asked to sign anything on receipt of the service pack. This evidence is in my view corroborative of the conclusion that I would otherwise have reached on the order 655 point.

413. In the circumstances, I am satisfied that Mr Anufriev is not entitled to the declaration he seeks in paragraph 1 of his application notice. In my view he has been validly and effectively served with these proceedings.