# Exhibit 6

IN THE HIGH COURT OF JUSTICE                    Claim No. BL-2020-001050
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
BUSINESS LIST (ChD)

B E T W E E N :

|      | (1)  | **LOUDMILA BOURLAKOVA** |
|------|------|-------------------------|
|      | (2)  | **HERMITAGE ONE LIMITED** |
|      | (3)  | **GREENBAY INVEST HOLDINGS LIMITED** |
|      |      | (formerly known as Maravan Services Limited) |

**Claimants/Applicants**

|      | (4)  | **VERONICA BOURLAKOVA** |
|------|------|-------------------------|

**Third Party/Applicant**

-and-

(1) **OLEG BOURLAKOV**
(2) **DANIEL TRIBALDOS**
(3) **LEO SERVICES HOLDING LTD**
(4) **LEO TRUST SWITZERLAND AG**
(5) **REUWAN SCHWARZ**
(6) **SEMEN ANUFRIEV**
(7) **NIKOLAI KAZAKOV**
(8) **VERA KAZAKOVA**
(9) **COLUMBUS HOLDING AND ENTERPRISES SA**
(10) **FINCO FINANCIAL INC**
(11) **GATIABE BUSINESS INC**
(12) **EDELWEISS INVESTMENTS INC**
(13) **IPEC INTERNATIONAL PETROLEUM CO INC**

**Defendants/Respondents**

---

**SEVENTH AND EIGHTH DEFENDANTS' SKELETON
ARGUMENT**
**For the hearing listed in the week commencing 24 April 2023**

---

**Hearing time estimate:** 2 days          **Reading list:** Enclosed (time estimate 1 day)

## I. INTRODUCTION

1.  The present hearing is principally concerned with four separate applications made by the Applicants to amend the Claim Form and Particulars of Claim (the "**Amendment/Joinder Applications**"). Amongst other things, the proposed amendments seek to add Veronica Bourlakova ("**Veronica**") as an additional Claimant for the purposes of advancing new claims, and to add new claims by the existing Claimants. The amendments are shown in a single consolidated draft Amended Particulars of Claim and are colour-coded by reference to each of the four Amendment/Joinder Applications {A/3}. These applications are addressed in **Sections V and VI** below, first in relation to Veronica's joinder and, second, in relation to the new claims sought to be added by the existing Claimants (led by Mrs Bourlakova).

2.  A series of ancillary applications made by the Seventh and Eighth Defendants (the "**Kazakovs**") also arise for determination, as follows:

    (1)  An application dated 3 April 2023 for permission to rely on further evidence in relation to the Amendment/Joinder Applications, including factual evidence and expert evidence on matters of Panamanian and Florida law (the "**Further Evidence Application**") {D/5}. This is addressed in **Section III** below.

    (2)  An application dated 17 April 2023 to adjourn the present hearing pending the appointment of a representative of the deceased First Defendant's estate (the "**Adjournment Application**") {K/1}. This is addressed in **Section IV** below.

    (3)  An application dated 3 April 2023 for a stay of the new claims (if permission for the Amendment/Joinder Applications is granted) pursuant to Articles 33 and/or 34 of Regulation (EU) No 1215/2012 ("**Brussels I Recast**") (if applicable) (the "**Stay Application**") {F/1}. This is addressed in **Sections V and VI** below in the context of the Amendment/Joinder Applications.

3.  In order properly to address the live issues which arise at the hearing, it is first necessary to provide a brief history of these proceedings and to explain the nature of the draft amendments which form the basis of the Amendment/Joinder Applications. This is addressed in **Section II** below.

## II. BACKGROUND AND OVERVIEW OF DRAFT AMENDMENTS

*(i)     Overview of the proceedings*

4.  The claims in these proceedings are but one part of a much larger dispute spanning an ever-increasing number of jurisdictions. The centre of gravity of the dispute has been in Monaco, but the First Claimant ("**Mrs Bourlakova**") and Veronica (and others at their direction) have recently commenced multiple further proceedings in Panama and in Florida concerning directly or indirectly

the ownership of certain Panamanian companies, amongst other things. Those proceedings overlap significantly with the relief they now seek by way of the amendments which are the subject of Amendment/Joinder Applications, giving rise to the prospect of the same or similar claims falling for determination with potentially different results by different courts in at least three jurisdictions which have been asked, or are being asked, to determine claims initiated by Veronica and/or Mrs Bourlakova. For example, Veronica has brought two sets of proceedings in Panama and two sets of proceedings in Florida which allege and/or which are founded upon her claim to be the owner of Edelweiss, a claim which is at the heart of the new claims she wishes to pursue in these proceedings. Similarly, Mrs Bourlakova has brought two sets of proceedings in Panama which allege and/or which are founded upon her claim to be the owner of Gatiaba and Jovellanos, claims which are at the heart of the new claims she wishes to pursue in these proceedings. Both Veronica and Mrs Bourlakova had also brought RICO proceedings in Miami, which have now been abandoned but not before they had made use of the existence of the proceedings. These are examples of extensive forum-shopping by the Applicants.

5. These proceedings spawn from an overarching dispute about the ownership and division of disputed assets worth billions of US Dollars. The dispute arose in 2018 following the breakdown in the marriage of Mrs Bourlakova and the First Defendant ("**Mr Bourlakov**"). The overarching dispute as it existed prior to the draft amendments was summarised in paragraphs 1 to 54 of the judgment of Trower J dated 26 May 2022 ([2022] 4 WLR 79).

*(ii)    Procedural history*

6. The Claimants issued their original claims on 16 July 2020. Those claims involve multiple serious allegations of fraud and criminal conduct. They also raise complex issues of English and foreign law (Monegasque, Panamanian and Swiss) and intersect with various other proceedings around the world, the number of which continues to grow. Following various extensions of time, the Claimants finally served the Kazakovs on 16 June 2021. The Kazakovs (and other Defendants) challenged the English Courts' jurisdiction. Those jurisdiction challenges were heard by Trower J in November 2021. Judgment dismissing those jurisdiction challenges is dated 26 May 2022.

7. The Claimants issued two applications to amend their Particulars of Claim prior to the determination of the jurisdiction challenges, on 27 May 2021 {G/4} and on 12 November 2021 {G/7}. Neither application was determined at the jurisdiction hearing. Instead, they were listed for determination at a hearing in November 2022 with a time estimate of two days. On 12 July 2022, the Applicants' solicitors (Mishcon de Reya or "**MdR**") circulated a further draft amended Particulars of Claim which raised Veronica's joinder for the first time and which it was anticipated would be the subject of an application that would be heard at the November 2022 hearing. No such application was ever

issued. Instead, after significant delay and much chasing in correspondence, the Applicants eventually issued a different application on 28 September 2022 with yet more draft amendments {A/1}.

8. Following much procedural wrangling, and faced with the Applicants' delay in issuing the September application, the November hearing could not be effective and after just half a day, the hearing of the Applicants' applications was adjourned to the present hearing by the Order of HHJ Keyser KC dated 17 November 2022 {H/9} (the "**Keyser Order**"). The costs arising from that hearing have been adjourned to the present hearing. The Kazakovs suggest that this issue is best dealt with at a future consequentials hearing and further submissions on costs will be made in due course.

9. Ms Seborg explains the chronology of evidence relevant to the Amendment/Joinder Applications at §§90-92 of Seborg 6 {D/7/26-27}. In short, following service of the 28 September application, the Kazakovs worked hard to produce evidence in time for the aborted November 2022 hearing. The Applicants sought a deadline for reply evidence to the end of January 2023 but they were ordered to produce such evidence by mid-January. Despite this, they achieved their aim by seeking various extensions of time into early February 2023. At all times since the November 2022 hearing, the Kazakovs have made clear that they may serve rejoinder evidence of Panamanian law (and the order from that hearing reflects this). The Applicants were also informed that this would necessarily be delayed in light of their extensions of time.

10. The Applicants issued their fourth amendment/joinder application on 6 April 2023 {A/2}.

*(iii)    Overview of draft amendments*

11. The draft APOC is at {A/2.1}. It is an unwieldy document which stands at 99-pages long and appears to contain almost as much coloured text (representing amendments) as it does black text (representing the original, unamended PoC). It would not be realistic in this skeleton argument to go through in detail each of the draft amendments to which the Kazakovs object.[1] The best way to grapple with the draft amendments to which an objection is made is to approach them thematically, which is what this skeleton argument seeks to do.

12. Very broadly, and as described in further detail below, the key draft amendments to which the Kazakovs object are at their core concerned with the alleged ownership of various Panamanian companies and their alleged relationships with various Panamanian foundations. The most important companies and foundations for present purposes are as follows:

(1)    The Twelfth Defendant ("**Edelweiss**"), as to which:

(a)    The Claimants' original (unamended) case was that Mr Bourlakov (alone or together

---

[1] A full list of objections can be found in Seborg 5 §§7-8 {C/1/3-4}, and Seborg 6 §§7-13 {D/7/4-6}.

with Veronica) was the ultimate beneficial owner of Edelweiss before it was transferred to Merenguito (a Panamanian foundation), which was dissolved on 15 May 2018 and subsequently restored, and then transferred to an entity called Hemaren Stiftung (another Panamanian foundation). Mrs Bourlakova alleged that she was the sole beneficiary of Merenguito prior to its dissolution and that as a result of steps taken by Mr Bourlakov, assisted by others, Mr Bourlakov is said to have acquired Edelweiss and misappropriated its assets. It is further alleged that any interests which Mr Kazakov has in Edelweiss were acquired as nominee for Mr Bourlakov. Mrs Bourlakova claimed damages estimated as $1.18bn in respect of Edelweiss and other companies.[2]

(b)     The amendments seek to advance a new case that Veronica is the sole shareholder of Edelweiss, alternatively that she was the beneficial owner of Edelweiss and/or that Merenguito held shares in Edelweiss as a nominee for her. In the further alternative, Mrs Bourlakova advanced her original case that she is the beneficial owner of Edelweiss. In the yet further alternative, it is alleged that Mr Kazakov holds his interests as nominee for Mr Bourlakov's estate. Veronica therefore seeks declarations that she is the sole shareholder and ultimate beneficial owner of Edelweiss and significant damages estimated at $1.18bn. Alternatively Mrs Bourlakova claims such damages.[3]

(2)     The Eleventh Defendant ("**Gatiabe**"), as to which:

(a)     The Claimants' original (unamended) case was that Mr Bourlakov was and had at all material times been the ultimate beneficial owner of Gatiabe, although the shares in Gatiabe were allegedly transferred to an entity called Delos Global SA, said to be holding the shares on trust for Mr Kazakov as a nominee for Mr Bourlakov.[4]

(b)     The amendments seek to advance a new case that Mrs Bourlakova is and has at all material times since December 2014 been the holder of the entirety of the shares in Gatiabe and its ultimate beneficial owner. Mrs Bourlakova seeks a declaration to that effect. The transfer/issue of shares which ultimately made their way to a Panamanian foundation called 'Wlamil' (for the benefit of Mr Kazakov) is said to have been invalid, based on cancelled share certificates which Mrs Bourlakova has apparently only recently discovered. Alternatively, Mr Kazakov holds his interests as nominee for Mr Bourlakov's estate.

(3)     A further company (not a party to these proceedings) called Jovellanos Investments Corp

[2] Draft APOC §§21 and 200 {A/2.1/8-9} and {A/2.1/88} (ignoring the amendments).
[3] Draft APOC §§96A-F, 145, 156, 196A and 199A-200 {A/2.1/44-49}, {A/2.1/65}, {A/2.1/69-70}, {A/2.1/85} and {A/2.1/86-88}.
[4] Draft APOC §§20, 41.j.iv, 79 and 85 {A/2.1/7-8}, {A/2.1/17-18}, {A/2.1/30}, and {A/2.1/32} (ignoring the amendments).

("**Jovellanos**"), as to which:

(a)     The Claimants' original (unamended) case was that Mr Bourlakov was and had at all material times been the beneficial owner of Jovellanos.[5]

(b)     The amendments seek to advance a new case that Mrs Bourlakova is and has at all material times since December 2014 been the holder of the entirety of the shares in Jovellanos and its ultimate beneficial owner. Mrs Bourlakova seeks a declaration to that effect. Shares which had been issued to Delos Global SA as legal owner are said to have been invalid. Alternatively, Mr Kazakov holds his interests as nominee for Mr Bourlakov's estate.[6]

13.     The key new claims relevant to the Kazakovs and to which the Kazakovs object can be broadly divided into claims for damages and claims for declarations. The new claims for damages and declarations both principally arise in respect of the Panamanian companies referred to above, as follows:

(1)     Veronica's new claims for declarations that she is the *"sole shareholder of, and ultimate beneficial owner of, Edelweiss"*, and a much broader declaration (presumably directed at ownership of Edelweiss, but perniciously more expansive) that the Kazakovs do not have *"any interest in any asset held by any of the Claimants"*.[7]

(2)     Veronica's new claims for damages pursuant to Articles 128 and 129 of the Panamanian Penal Code. These claims are based on what is said to be the Applicants 'primary' and 'secondary' cases regarding ownership of Edelweiss and are based on the Kazakovs' alleged role as 'instigators or participants' in Mr Bourlakov's alleged primary wrongdoing, alleged to be breaches of Articles 220, 243 and 253 of the Panamanian Penal Code.[8]

(3)     Mrs Bourlakova's new claims for declarations that she *"is, and has been since December 2014, the holder of the entirety of the shares of both Gatiabe and Jovellanos and the ultimate beneficial owner of each"*, and the perniciously expansive declaration that the Kazakovs do not have *"any interest in any asset held by any of the Claimants"*.[9]

(4)     Mrs Bourlakova's new claims for damages pursuant to Articles 128 and 129 of the Panamanian Penal Code. These claims are based on what is said to be the Applicants 'tertiary' case regarding ownership of Edelweiss and are again based on the Kazakovs' alleged role as 'instigators or participants' in Mr Bourlakov's alleged primary wrongdoing, said to be alleged

---

[5] Draft APOC §§26A and 41.j.iv {A/2.1/10} and {A/2.1/17-18} (ignoring the amendments).
[6] Draft APOC §§26A, 90B and 186A {A/2.1/10}, {A/2.1/40-42} and {A/2.1/83}.
[7] Draft APOC §196B and prayer for relief (2A) and (5B) [A/2.1/85] and A/2.1/91}.
[8] Draft APOC §§198-199 {A/2.1/85-86} and 199C-G {A/2.1/87-88}.
[9] As to latter, Draft APOC prayer for relief (2A) {A/2.1/91}.

breaches of Articles 220, 243 and 253 of the Panamanian Penal Code.[10] These claims are materially similar in nature to Veronica's damages claims.

(5) Veronica and Mrs Bourlakova each also seek to introduce materially similar damages claims in relation to a Panamanian company called 'Hydrangea',[11] although they do not advance these claims against Mrs Kazakova (accepting that such claims must be brought by way of arbitration proceedings),[12] nor do they appear to advance such a claim against Mr Kazakov (whose only alleged acts of instigation and participation are said to relate to separate entities which are not alleged to be relevant to the alleged wrongdoing re Hydrangea).[13] Mrs Bourlakova also seeks to introduce a similar new claim against the Thirteenth Defendant ("**IPEC**"), but not against the Kazakovs for the same reasons.[14]

(6) By a series of other amendments, the Applicants also appear to seek join Veronica as an additional claimant in relation to existing claims. This is done by simply changing the drafting from *"Mrs Bourlakova"* to *"the Claimants"* (including Veronica) or by adding in Veronica's name.[15] These amendments are resisted – if Veronica's joinder is not permitted in respect of her new declarations or damages claims, there is no basis for adding her as an additional claimant to the other claims. The same applies to the catch-all plea of joint-tortfeasance at draft APOC §172A {A/2.1/76-77} and, further, that claim is not arguable so far as Veronica is concerned because it is not alleged that she has suffered any loss: draft APOC §185, which alleges that only Mrs Bourlakova has suffered loss.

## III. THE FURTHER EVIDENCE APPLICATION

14. Before turning to the substantive issues to be determined at this hearing, it is necessary to consider the Further Evidence Application by which the Kazakovs seek permission to rely on: (i) Ms Seborg's Sixth Witness Statement dated 3 April 2023 ("**Seborg 6**"); (ii) the expert evidence of Mr Peter H. Levitt on the matters of Florida law which is set out in Seborg 6; and (iii) Mr Aued's second expert report dated 3 April 2023 on matters of Panamanian law ("**Aued 2**"). The Kazakovs seek permission to rely on that evidence for the reasons set out at §§82-96 of Seborg 6 {D/7/26-28}. In overview:

(1) Seborg 6 seeks to update the court on relevant factual matters and developments after Ms Seborg filed her Fifth Witness Statement dated 15 November 2022 ("**Seborg 5**"), including as to the progress which has been made in the various sets of overlapping proceedings in

---

[10] Draft APOC §§199D(c) {A/2.1/87} and 199G {A/2.1/88}.
[11] Draft APOC §200 {A/2.1/88}.
[12] Draft APOC §§199D {A/2.1/87} and 200 {A/2.1/88}.
[13] Draft APOC §199C {A/2.1/87}.
[14] Draft APOC §§22, 199C and 200 {A/2.1/9}, {A/2.1/87} and {A/2.1/88}.
[15] See the claims arising out of Sections C1, C2 and C4 and the claim at draft APOC §186 for a declaration as to the existence of the partnership between Mr Kazakov and Mr Bourlakov.

Panama and in Florida. It also seeks to respond to questions and issues raised by the Eleventh Witness Statement of Alexandra Whiston-Dew dated 3 February 2023 ("**Whiston-Dew 11**") and to narrow the issues which arise for determination at this hearing.

(2)   Seborg 6 also introduces expert evidence on certain matters of Florida law. This has become necessary following recent developments in Florida, including fresh parallel proceedings commenced by Veronica in Florida in January 2023 (after Seborg 5 was filed). These and other proceedings in Florida are addressed in further detail below.

(3)   Aued 2 supplements Mr Aued's First Expert Report dated 15 November 2022 (for which permission was given in the Keyser Order at §5 {H/9/3}). This responds to matters raised in the First Expert Report of Jorge Federico Lee dated 3 February 2023, which includes Mr Lee's opinions on matters which are outside the scope of the permission contained in the Keyser Order at §6 {H/9/4}. The Kazakovs raised the prospect of further evidence of Panamanian law before HHJ Keyser K.C at the November 2022 hearing and the Keyser Order contains liberty to apply in this regard at §7 {H/9/4}.

15.   After close of business on 14 April 2023, the Applicants served two further witness statements and a further expert report from Mr Lee in response to the Further Evidence Application. They appear to consent to parts of the Kazakovs' further evidence being admitted, provided that their further evidence is also admitted (to which the Kazakovs do not object). However, they oppose particular aspects of the Kazakovs' further evidence:[16]

(1)   Evidence which relates to the Kazakovs' argument that Florida is a more appropriate forum than England. The complaint is that this argument is made too late. However, as will be apparent from the section of this skeleton argument below dealing with Florida as the appropriate forum, there have been material developments in Florida since the date of Seborg 5. This includes a counterclaim in the 'Florida Asset Proceedings' being filed on 19 December 2022 and a new claim being filed by Veronica on 23 January 2023 (referred to below as the "**Edelweiss Complaint**") which is a mirror-image of the declarations claims which lie at the heart of her joinder application and on which her damages claims are based. This significant development was hidden away in just two paragraphs (198-199) of the 213 paragraphs of Whiston-Dew 11 {D/3/44}.

(2)   Expert evidence of Florida law, again on grounds of lateness (as to which see above) and on the ground that it is provided by an attorney representing the Kazakovs rather than an *"independent expert of the kind that could be adduced under Pt 35"*. That is a bad point. First, that

---

ignores the modern practice in this court of accepting evidence from the parties' foreign lawyers: Chancery Court Guide §9.48(d). It also ignores the fact that the Applicants' own expert on Panamanian law (Mr Lee) advised both Mrs Bourlakova and Veronica in relation to proceedings to which they are parties in Panama: Lee 1 §9 {F/5/3}; Lee 2 §6 {G/1.1/2}.

(3)   Evidence about the assistance provided to the Applicants by Mr Tribaldos and his companies and the inference to be drawn as a consequence. This evidence is relevant to the Applicants' reliance on the Third Defendant ("**Leo England**") as an anchor defendant for the purposes of arguing this Court has jurisdiction to try their claims. The Applicants argue that this evidence is too late and that the challenge to Leo England as an anchor defendant has already been rejected by Trower J at the November 2021 jurisdiction challenge. That is wrong. As will be seen below, the argument again arises in part as a result of the fourth round of amendments which form the subject of the 6 April 2023 amendment/joinder application, which were first circulated in correspondence on 23 March 2023. Further, the argument advanced before Trower J was a different one (as the Applicants accept[17]) made at a different stage in the proceedings and in respect of different claims which Trower J was not considering.

(4)   The Stay Application (although apparently not the evidence which relates to that application, because they must accept that such evidence would be live and before the court in any event in relation to the other aspects of the Amendment/Joinder Applications). This is dealt with at §§64-71 below in the section of this skeleton argument dealing with Brussels I Recast.

(5)   Evidence relating to the absence of a representative of Mr Bourlakov's estate. That evidence is relevant to the question of whether the Amendment/Joinder Applications can proceed in the absence of such representation, and also to the Adjournment Application. This is dealt with in **Section IV** below. The crux of the Applicants' argument is that this all comes too late. But that is a problem of the Applicants' own making in doing nothing to appoint a representative in the nearly two years since Mr Bourlakov's death, despite assurances to the court that they would/were in the process of doing so. Further, even in the absence of an application by the Kazakovs, the court would need to address this issue of its own motion at the present hearing.

(6)   Evidence in Aued 2 which responds to Mr Lee's opinion on issues of causation under Panamanian law, for which the Applicants lacked permission in the first instance.

16.   In the Kazakovs' submission, admission of this evidence is reasonably necessary for the fair disposal

---

[17] Whiston-Dew 12 §9(3) {J/1/3-4}. See e.g. [120] of Trower J's judgment, where the argument was about the application of Article 6(1) of the Lugano Convention where the sole purpose of the claim against the anchor defendant was to enable claims to be brought against third parties. The argument which the Kazakovs advance at this hearing is different, as explained below.

of the Amendment/Joinder Applications and they respectfully invite the court to grant permission to rely on such evidence. For the reasons explained above, the Applicants' objections are without merit and simply seek to stifle evidence which they perceive to be unhelpful.

## IV.  THE AMENDMENT/JOINDER APPLICATIONS SHOULD BE ADJOURNED

17.  Mr Bourlakov was (before his death) the principal Defendant in these proceedings, from whose alleged acts all other claims against each of the other Defendants are said by the Applicants to flow. Mr Bourlakov's central role can be seen from the draft APOC:

(1)  The Introduction explains that the proceedings arise out of the *"irretrievable breakdown in marital and familial relations between Mrs Bourlakova and her daughters on the one hand, and Mr Bourlakov, on the other hand"*: §3 {A/2.1/2}. Following this irretrievable breakdown, it is alleged that Mr Bourlakov pursued a dishonest, unlawful and improper strategy in combination with the other Defendants aimed at stealing assets from Mrs Bourlakova and her daughters: §§4 and 34 {A/2.1/2} and {A/2.113}.

(2)  Mr Bourlakov is alleged to have been the beneficial owner of all assets in this case (save for those which the Applicants say were beneficially owned by them) with every other party who owned assets alleged to have been acting as a nominee for Mr Bourlakov, e.g. §9A {A/2.1/4}. Amongst other things, it was alleged that Mr Bourlakov was the owner of the Panamanian companies which lie at the centre of the Amendment/Joinder Applications e.g. Gatiabe (§20 {A/2.1/7-8}); Edelweiss (§21 {A/2.1/8-9}) and Jovellanos (§26A {A/2.1/10}). Similarly, he was alleged to have been the sole beneficiary of the relevant Panamanian foundations and to have had control over them e.g. Hemaren and Wlamil (§23 {A/2.1/9-10}).

(3)  The alleged dishonest scheme is introduced in Section A of the Draft APOC, and it is alleged that the scheme was developed by Mr Bourlakov and deployed in the context of, *inter alia*, Bourlakov family meetings and separation mediations. This was all allegedly for the purposes of pressurising Mrs Bourlakova (and her daughters) to accept less by way of a separation settlement than she (or they) say they were actually entitled to e.g. §§73-74 {A/2.1/29-30}.

(4)  Section B is entitled *"Concealing and/or allowing Mr Bourlakov to conceal his assets and/or the true value of his assets"* {A/2.1/30}. Again, it is Mr Bourlakov who is alleged to have developed this scheme and to have given instructions for its implementation e.g. §§85-86 {A/2.1/32}. Amongst other things, the claims arising out of Section B include Mrs Bourlakova's new claims that she is the ultimate beneficial owner of Gatiabe and Jovellanos: §§90A-C and 186A {A/2.1/38-42} and {A/2.1/83}.

(5)  Section C is entitled *"Misappropriating or devaluing (or attempting to misappropriate or devalue) the assets*

of *Mrs Bourlakova and Veronica*" {A/2.1/44} . Sections C1, C2 and C4 are concerned with the creation of various documents by which it is alleged that Mr Bourlakov sought to misappropriate assets. Again, Mr Bourlakov is the principal alleged wrongdoer, with other alleged to have been "*acting on Mr Bourlakov's instructions or with his knowledge and authority*" e.g. §§100, 112, 121, 126, 147, 155 {A/2.1/49}, {A/2.1/51} {A/2.1/54}, {A/2.1/67} and {A/2.1/69} . Sections C0 and C3 are concerned with alleged ownership of the Panamanian companies and foundations which lie at the centre of the Amendment/Joinder Applications. Again, Mr Bourlakov is alleged to be the principal wrongdoer at the centre of the new damages claims which the Applicants now seek to advance. It is Mr Bourlakov's alleged primary wrongdoing (said to be a breach of Articles 220, 243 and/or 253) of the Panamanian Penal Code from which the other Defendants' alleged liability as "*instigators or participants*" is said to arise pursuant to Articles 128 and 129 of the Panamanian Penal Code: e.g. §§199 *et seq* {A/2.1/86} .

(6) Sections D and E are concerned with alleged destruction of documents in order to "*conceal Mr Bourlakov's [alleged] strategy and the unlawful actions…taken pursuant to it*": §161 {A/2.1/72} .

18. Mr Bourlakov died on 21 June 2021 and, as such, his estate (the "**Estate**") is now the appropriate Defendant to these proceedings and the appropriate Respondent to the Amendment/Joinder Applications. Despite repeated assurances from the Applicants that they intended to take steps to appoint a representative of the Estate to act on its behalf in these proceedings, the first time they made any proposals about this in correspondence was on 20 March 2023. That is almost two years after Mr Bourlakov's death and just over one month before the present hearing. The relevant procedural chronology is explained at §§131-140 of Seborg 6 {D/7/36-38}. In overview:

(1) On 22 July 2021, the Kazakovs' legal representatives ("**PCBB**") wrote to MdR asking if the existing Claimants intended to pursue their claims against Mr Bourlakov {E/1/487}. On 27 July 2021, MdR responded to PCBB and wrote to the Court stating that they intended to make an application under CPR r.19.12[18] to appoint a representative for the Estate in these proceedings "*when it is appropriate to do so*" {E/1/492}.

(2) Before his death, Mr Bourlakov had indicated an intention to dispute the court's jurisdiction over him in respect of claims in the original (unamended) Claim Form and Particulars of Claim. He died before his evidence was finalised and the jurisdiction challenges of the other Defendants proceeded to a hearing before Trower J in November 2021. The court's jurisdiction over the Estate has therefore not yet been conclusively determined. At the hearing

---

[18] What is now CPR r.19.12 was, until recent amendments, CPR r.19.8. Accordingly, CPR r.19.12 is referred to in this skeleton argument and any references to CPR r.19.8 in underlying documents should be read accordingly. The substance of the provisions remains materially unchanged for present purposes.

in November 2021, the Claimants' Leading Counsel assured the Judge that a representative for the estate could be appointed under CPR r.19.12 and that *"once we have finished this hearing, a consideration will be given to doing it, and there is no reason why that should take any lengthy period of time"*: Transcript, Day 4 p.18 lines 8-19 {H/35/6}.

(3) Despite this assurance, the Claimants appear to have done nothing in this regard after the November 2021 hearing. Even when circulating draft amended Particulars of Claim in July 2022, no proposals for appointment for a representative were forthcoming. Similarly, the Applicants said nothing about this when they issued their 28 September 2022 amendment and joinder application, notwithstanding the obvious relevance of the Estate to the new claims sought to be advanced. So obvious was the lack of representation for the Estate as the Defendant that HHJ Keyser K.C. raised the issue of his own motion at the November 2022 hearing (at which the Applicants sought to move the amendments/joinder). The Applicants' leading counsel again assured the Judge that they intended to issue an application under CPR r.19.12, which they were *"endeavouring to achieve…as soon as possible"*; the matter was in hand and progressing: Transcript, p.56 lines 6-21 {E/1/478}.

(4) Despite those renewed assurances to the court, it was not until 20 March 2023 that the Applicants solicitors sent to the other Defendants a proposal for the appointment of a representative {I/72} to act for the Estate. The Applicants' excessive delay was not explained in their letter. However, as Ms Seborg explains at §§142-150 of Seborg 6 {D/7/38-41}, one reason for that delay may have been because of the Applicants' illegitimate attempts to obtain an inheritance certificate in Latvia declaring Mrs Bourlakova to be the sole heir of Mr Bourlakov's estate, whilst concealing from the Latvian authorities the existence of Mr Bourlakov's will dated 2019 which declares the Kazakovs to be his heirs (the "**Last Will**"). This was supplemented by further attempts in Latvia and in Cyprus to seize assets relevant to this dispute.

(5) The Applicants' proposal was to appoint London solicitors to act as representatives of the Estate under CPR r.19.12, who would be paid (at least for the time being, pending any availability of funds in Mr Bourlakova's estate) by Mrs Bourlakova and Veronica. The particular mischief in that proposal is that Mrs Bourlakova and Veronica would meet (presumably what they consider to be) the representative's costs *"reasonably incurred"*. Such costs would also be subject to detailed assessment on the indemnity basis on the conclusion of the proceedings, at which Mrs Bourlakova and Veronica would be the representative's counterparties and incentivised to argue that the representative had acted unreasonably in litigation against them. Those factors mean that Mrs Bourlakova and Veronica would obtain at least influence over the representative's conduct of litigation against them.

(6)  Seborg 6 refers to that proposal and the Kazakovs' response was sent by way of letter dated 11 April 2023 {I/84}.  As the terms of the Kazakovs' response make clear, the Applicants' proposal was obviously unworkable and, amongst other things: (i) it ignored the appointment of an administrator over Mr Bourlakov's estate in Russia; (ii) it ignored an order of the Courts in Monaco to appoint an independent professional to act as provisional administrator of Mr Bourlakov's global estate, which the Applicants have sought to frustrate; and (iii) the potential for a conflict of interest was plain on the face of the Applicants' proposal (with Mrs Bourlakova and Veronica controlling the purse strings).  The Kazakovs made alternative and more suitable proposals, to which no substantive response has yet been received.

19.  The Kazakovs have an interest in the proceedings against the Estate not only as co-defendants in those proceedings, but because they have a claim to be the beneficiaries of that Estate under Mr Bourlakov's Last Will. That claim is the subject of ongoing proceedings in Monaco. It has also been the subject of a recent decision of the appeal court in Russia which, for reasons contained in a judgment dated 4 April 2023 and delivered on 14 April 2023 {K/4/2-36} upheld the lower court decision determining the Last Will to be valid and the Kazakovs to be heirs thereunder. The appeal against that decision by Veronica and Mrs Bourlakova was dismissed by the appeal court.

20.  This court's jurisdiction over the claims pursued against the Estate in respect of the original (unamended) claims is yet to be conclusively determined.  Further, and importantly in the context of the Amendment/Joinder Applications, the Estate has not been served with the Amendment/Joinder Applications showing draft amendments in green, purple or blue text.  This obviously has implications for the present hearing, as identified in Seborg 6 §§151-158 {D/7/41-42}.  Importantly, the Amendment/Joinder Applications cannot (alternatively, should not) proceed against the Estate for the following reasons:

(1)  The English courts may well lack jurisdiction against the Estate even as regards the original (unamended) Claim Form and Particular of Claim.  Once a representative has been appointed for the Estate, that representative will need to consider whether the Estate wishes to contest jurisdiction over the original claims (as Mr Bourlakov did proper to his death).  This will require legal advice, including in relation to foreign law.

(2)  As the Estate has not been served with the Amendment/Joinder Applications, the applications are without notice as against the Estate, despite being the primary Defendant. The Applicants have not even adverted to this issue, still less have they explained to the Court why they say it is appropriate to determine the applications without notice.  The Kazakovs' submission is that it is not, and the conditions for determining applications without notice are not met and the application should be adjourned until notice has been given: Chancery Court

Guide §§15.29-15.31. Similarly, the Applicants have not even attempted to comply with the duty of full and frank disclosure, as required by Chancery Court Guide §§15.32-15.33.

(3) It is abundantly clear from CPR r.19.12(5) that without the prior appointment of a representative to act for the Estate in these proceedings, alternatively an order under CPR r.19.12(1)(a) to proceed without such an appointment (for which there is properly no application as it would not be appropriate), no order made on the Amendment/Joinder Applications will bind the Estate – even if they were allowed to go ahead without notice. The reasons for this are obvious and are mirrored by the provisions in CPR r.21.3 which prevent a party taking any step in proceedings against a child/protected party without the appointment of a litigation friend. In neither case will the Court allow anything to be done do as to bind an unrepresented party under a disability without taking proper steps to ensure that the party has an opportunity to consider its position and be represented if it so chooses.

(4) It would be substantively unfair to consider the Amendment/Joinder Applications as against the Estate without service, without a properly constituted representative and without giving the representative (whoever it may be) a proper opportunity to determine whether the Estate wishes to oppose the applications and, if so, the grounds on which it may wish to do so. The only way in which the Amendment/Joinder Applications could proceed against, and bind, the Estate without an appointed representative, and proper service on that representative, would be by way of an order under CPR r.19.12(1)(a) – for which there is no application. It is assumed the Applicants have not made such an application as they agree that it would not be an appropriate use of the provision.

21. In circumstances where the Amendment/Joinder Applications cannot proceed against the Estate, it would be disproportionate and contrary to the Overriding Objective to proceed with the Amendment/Joinder Applications against the other Defendants without the primary Defendant. Not least:

(1) Each of the new declarations claims advances fundamentally different allegations as to the ownership of the relevant Panamanian companies/foundations from the allegations originally advanced. If the applications do not proceed against the Estate, this is obviously relevant to the question whether those amendments should be permitted as against the remaining Defendants – and indeed it would be inappropriate to decide whether to allow such amendments against the other Defendants without considering first the position of the primary Defendant, with the benefit of the court being aware of that Defendant's position.

(2) Each of the new damages claims (including those against the Kazakovs as alleged 'instigators or participants' in those alleged criminal acts) are premised on Mr Bourlakov's alleged criminal

wrongdoing pursuant to the Panamanian Criminal Code: see §13 above. Again, the Estate may well wish to take a position on that, and the court should be aware of that position before considering the position of the other Defendants. If the amendments/joinder as against the Estate were to be refused, that would be relevant to the new damages claims sought to be advanced against the Kazakovs (and others).

(3) A significant number of the draft amendments rely on documents provided to the Applicants by Mr Tribaldos and his companies. It seems (at the very least) likely that such documents have been provided in breach of duties of confidentiality owed to Mr Bourlakov (before his death) and now owed to the Estate. Such conduct may also be criminal, for example if it amounts to a breach of professional secrecy or trust obligations. The Estate may wish to take a position on that, and may object to those documents being relied on in support of the Amendment/Joinder Applications. That would (again) obviously have implications for the totality of the amendments, including as against the Kazakovs (and others).

(4) Self-evidently, determining those applications as against the existing Defendants at this stage would serve no useful purpose and would create a case-management quagmire. The court could not sensibly direct the remaining Defendants to plead back to the amendments before the applications have been determined as against the estate. For example, if permission was granted against the remaining Defendants but refused against the estate, the result would be that the Applicants would be running two mutually inconsistent cases on which they could not sign statements of truth. Further, no progress can be made towards listing a case management conference to see these proceedings through to trial until <u>all</u> defences have been filed: Chancery Court Guide §6.5 (not to mention potential counterclaims, Reply pleadings etc.). This reflects the important role which pleadings perform in any case in this court: Chancery Court Guide §4.7.

22. The Applicants appear to suggest that the Kazakovs cannot make that submission because it was raised for the first time in rejoinder evidence (Seborg 6) and that it should have been raised sooner: Whiston-Dew 12 §9(5) {J/1/4}. That is wrong. The Court can (and, it is respectfully submitted, should) confront this issue of its own motion, as HHJ Keyser K.C. did at the aborted November 2022 hearing. Indeed, it must do so given the terms and effect of CPR r.19.12 and CPR 3.1A (since the Estate is unrepresented both by a representative and by its own lawyers), and the Overriding Objective.

23. Accordingly, the fact that Ms Seborg identified this issue in detail Seborg 6 is nothing to the point; it is something which the Applicants themselves should have done long ago. In the circumstances, it was also unnecessary for the Kazakovs to make a formal application for adjournment. However,

14

they have done so as a matter of good order and to provide the Applicants with a formal opportunity to explain their position to the court.

24. For the reasons explained above, the Kazakovs submit that the present hearing cannot be effective until a representative is appointed in respect of the Estate. Accordingly, the Amendment/Joinder Applications ought to be adjourned pending the appointment of such a representative, at which point further directions can be given.

## V.    AMENDMENT/JOINDER APPLICATIONS CONCERNING VERONICA'S CLAIMS

25. This section deals with the Amendment/Joinder Applications insofar as they concern Veronica's joinder and new claims, as follows:

(1)    **Section A** deals with whether the court has jurisdiction to hear these new claims and, if so, whether it should exercise its discretion in favour of doing so. The Stay Application is considered in this context.

(2)    **Section B** deals with the law applicable to the new claims. This is relevant to issues of limitation and, in particular, operation of the doctrine of 'relation back'.

(3)    **Section C** addresses why the court should refuse permission for Veronica's joinder.

26. Mrs Bourlakova's amendment applications are addressed separately in **Section VI** below. Many of the principles addressed in the present Section below on jurisdiction and limitation apply equally in relation to Mrs Bourlakova's amendment applications and cross-references will be made as necessary.

## A.    JURISDICTION

27. The Court must be satisfied that it has jurisdiction in respect of the new claims sought to be advanced by Veronica. The Kazakovs' primary position is that jurisdiction over these claims falls to be determined under the common law rules. Alternatively, Brussels I Recast applies. In overview, they say that, if the common law rules apply, Veronica's new claims do not fall within the scope of the gateways for service out of the jurisdiction; furthermore, England is not the *forum conveniens* and/or the Court should not exercise its residual discretion to assume jurisdiction. Alternatively, if Brussels I Recast applies, the court should in the exercise of its discretion refuse permission for joinder in circumstances where, in the event of joinder, the new claims would be stayed in favour of related proceedings already well under way in Panama and/or Florida (Articles 33 and/or 34). Alternatively, if permission for joinder is granted, the claims should be stayed under Articles 33 and/or 34.

*(i)       The applicable regime*

28. The relevant tests under the common law rules and under Articles 33/34 Brussels I Recast are

different.  Which jurisdictional regime applies is therefore a live (and important) issue.  The Kazakovs submit that the common law rules apply, for the following reasons:

(1) Regulation 89 of the Civil Jurisdiction and Judgments (Amendment) (EU Exit) Regulations 2019 (the "**2019 Regulations**") revoked Brussels I Recast at the end of the transition period.[19] Regulation 93A contains a saving to the effect that nothing in the 2019 Regulations affects the application of Article 67.1(a) of the EU-UK Withdrawal Agreement (the "**Withdrawal Agreement**").[20]  Article 67.1(a) of the Withdrawal Agreement provides that *"in respect of legal proceedings instituted before the end of the transition period and in respect of proceedings or actions related to such legal proceedings pursuant to Articles 29, 30 and 31 of [Brussels I Recast]"*, the provisions of Brussels I Recast shall continue to apply.

(2) The expression *"proceedings instituted"* in Article 67.1(a) ought to have the same meaning as the date on which the English Court was first 'seised' within the meaning of Article 32 of Brussels I Recast: *Dicey, Companion Volume to The Conflict of Laws* (16th ed) at comp. §12-004, footnote 11 and comp. §12-027.[21]  In the circumstances, where a claim form is amended to add an additional claim or to introduce a new claim brought by a new party sought to be joined, the Court is not seised of the new claim until the amended claim form is issued (after permission is granted): *Dicey* comp. §12-030; see also The Alexandros T [2014] 1 All ER 590 at [60]-[72].  The Kazakovs note Judge Cawson K.C. in Simon v Taché [2022] QB 917 at [74] held to the contrary in the context of addition of new claims and/or new defendants.  However, they submit that *Dicey's* approach ought to be preferred.  That approach is consistent with the reasoning in The Alexandros T.

(3) In the present case, where all of the new claims are brought (and indeed in some instances are brought by a new party) after the expiry of the transition period, Article 67.1(a) of the Withdrawal Agreement does not apply.  In the circumstances, Brussels I Recast does not apply and, instead, jurisdiction falls to be determined in accordance with the common law rules.

(4) Even if (which is denied) Brussels I Recast applies to Mrs Bourlakova's new claims, there is no justification for it to apply to those of Veronica; a new claimant who was not party to the proceedings before IP completion day.

*(ii)    Common law*

29.   The Applicants must prove that the English court has jurisdiction over the new claims and that it

---

[19] The transition period ended at 11p.m. on 31 December 2020.
[20] A similar saving applies under Regulation 92 in respect of the Lugano Convention where it applied immediately before 'IP completion day' *"to determine questions relating to the jurisdiction of a court in any part of the United Kingdom to hear proceedings of which that court was seised before [IP completion day] and which are not concluded before [IP completion day]"*.
[21] The same reasoning applies to the phrase *"proceedings of which that court was seised"* in Regulation 92 of the 2019 Regulations.

ought to exercise its jurisdiction to try those claims: <u>Donohue v Armco Inc</u> [2001] 1 All ER 749 at [17]-[21] (Lord Bingham). The test is the same as that which applies when seeking permission to serve documents out of the jurisdiction, namely: (i) there is a good arguable case that claims fall within one of the gateways for service out in PD6B para. 3.1;[22] (ii) there is a serious issue to be tried; and (iii) in all the circumstances (a) England is clearly or distinctly the appropriate forum, and (b) the court ought to exercise its discretion to permit service out of the jurisdiction.[23]

**Gateways**

30. In the event that the common law regime applies, Veronica relies only on gateway (3) (necessary or proper party) on the basis that the Kazakovs (and others) are said to be necessary or proper parties to her claims against the Third Defendant ("**Leo England**"), which is a company located within the jurisdiction.[24] For the reasons explained below, the Kazakovs submit that Veronica's claims do not fall within the scope of the 'necessary or proper party' gateway.

31. In <u>Lungowe v Vedanta Resources Plc</u> [2020] AC 1045, at [20], Lord Briggs explained that a claimant relying on the 'necessary or proper party' gateway must demonstrate, amongst other things, that the claims against the anchor defendant involve a real issue to be tried and that it is reasonable for the English court to try that issue. The question whether it is reasonable for the English court to try the claim between the claimant and the anchor defendant is an objective one: it is not the same question as whether it was reasonable for the claimant to start proceedings against that defendant within the jurisdiction: <u>Erste Group Bank AG v JSC "VMZ Red October</u> [2015] 1 CLC 706 at [48].

32. In assessing whether there is a real issue which it would be reasonable for the court to try, the court will also consider the likelihood that the anchor defendant would be an active defendant: <u>Satfinance Investment Ltd v Athena Art Finance</u> [2020] EWHC 3527 (Ch) at [52], [87]-[89] (Morgan J). The fact that the anchor defendant is sued only for the purpose of bringing in the foreign defendants is a factor in the exercise of the court's discretion: <u>Altimo Holdings v Kyrgyz Mobil</u> [2012] 1 WLR 1804 at [79].

33. In the present case, and for the reasons explained in Seborg 6 §§59-75 {D/7/18-24}, Veronica's reliance on Leo England as the anchor defendant is artificial and there is no real issue between Veronica and Leo England which it is reasonable for the court to try. In summary:

    (1)   Leo England is part of a group of companies owned and/or controlled by the Second

---

[22] For guidance on the 'good arguable case' test in this context, see <u>Kaefer Aislamientos SA de CV v Atlas Drilling Mexico SA de CV</u> [2019] EWCA Civ 10; [2019] 1 WLR 3514.

[23] See e.g. Lloyd Jones LJ in <u>VTB Capital Plc v Nutritek International Corp</u> [2012] EWCA Civ 808, [2012] 2 Lloyd's Rep 313 at [99]-[101].

[24] Whiston-Dew 10 §§40-41 {B/1/12-13}. In contrast, Mrs Bourlakova relies on gateway (3) on the basis that various Defendants are said to be necessary or proper parties for <u>her</u> new claims.

Defendant ("**Mr Tribaldos**").  That group of companies also includes the Fourth Defendant ("**Leo Trust**"), which is Leo England's wholly-owned subsidiary.[25]

(2)     Mr Tribaldos has provided a witness statement in support of Veronica's oral process claim against Edelweiss in Panama.[26]  As explained in further detail below, that oral process claim is brought by Veronica on the alleged basis that she is Edelweiss's sole shareholder.[27]  That is in substance the same claim which she now seeks to advance in the present proceedings.

(3)     Ms Whiston-Dew accepts that Mr Tribaldos provided that witness statement and that he has also provided the Applicants with *"relevant documents"*.[28]  Although Ms Whiston-Dew does not explain what those *"relevant documents"* are or the circumstances in which they were provided, it is clear from the latest round of draft amendments circulated on 23 March 2023 that they includes documents on which the Applicants rely in these proceedings to support the draft amendments.[29]  This is not an isolated example.  Mr Tribaldos and his companies have been funnelling confidential documents to the Applicants since the withdrawal of Leo Trust's jurisdiction challenge in late 2021.[30]

(4)     In early 2020 (before Veronica's joinder application, and before Mr Tribaldos and his companies withdrew their jurisdiction challenges to the original (unamended) claim form), Veronica sought to obtain documents from Leo Trust in Switzerland, including documents relating to Edelweiss.  That application was opposed by Leo Trust.  In January 2023 (while the joinder application was live), Edelweiss applied to the Swiss Court to obtain access to the Court File.  Both Veronica and Leo Trust opposed that application in circumstances which suggest that they are actively cooperating to prevent Edelweiss from obtaining documents which may be relevant to the claims which Veronica now seeks to advance in these proceedings.[31]

34.     In these circumstances, the Kazakovs have submitted,[32] and continue to submit, that  it is to be inferred that Mr Tribaldos and his companies, including Leo England, are not in truth adverse parties to the Applicants and that the Applicants have no intention to pursue their claims against them to judgment.  In the face of such submission, the Applicants make a bare assertion that their claims

[25] Draft APOC §§12-14 {A/2.1/5-6}.
[26] Seborg 6 § 62 {D/7/19}
[27] See Aued 2 §§ 78 and 89 {F/10/22} and {F/10/26}.
[28] Whiston-Dew 11 §182 {D/3/41}; Seborg 6 §63 {D/7/19}.  Ms Whiston-Dew says that this was not in breach of confidence because Mrs Bourlakova and Veronica are potential heirs: Whiston-Dew 12 §42 {J/1/15}.  But that is contrary to the 2019 naming the Kazakovs as Mr Bourlakov's heirs, and contrary to the Russian court's judgment at {K/4/2-36}.
[29] Seborg 6 §64 {D/7/19-20}.
[30] Seborg 6 §§74-75 {D/7/23-24}.
[31] Seborg 6 §§65-73 {D/7/20-23}.
[32] Seborg 6 §61 {D/7/18-19}.

against Mr Tribaldos have not been settled and they continue to pursue those claims.[33] However, no disclosure has been provided and indeed no detail has been provided of the communications that must have taken place between the Applicants and Mr Tribaldos and his companies and that would serve to explain why they have been providing substantial assistance for the Bourlakovas' claims, notwithstanding that Mrs Bourlakova is currently claiming massive damages against them and alleging dishonesty. Veronica's second statement is carefully worded. It does not say that there has been no agreement or understanding of any kind reached between the Bourlakovas and Mr Tribaldos and his companies concerning the claims in this litigation.

35. The Kazakovs invite the Court to draw the inference that Mr Tribaldos and his companies are not in truth adverse parties. Whether or not the claims have been formally settled, it can readily be inferred from the foregoing that they continue to exist purely for tactical reasons and that they do not give rise to any real issue, still less a real issue which it is reasonable for the Court to try. There is no other plausible reason why Mr Tribaldos and his companies would continue to provide confidential documents to the Applicants (likely in breach of duty), which the Applicants then use to pursue claims against the Defendants, including Veronica's claims which are the subject to the present application and including in particular her claims against Mr Tribaldos and his companies.

36. For these reasons, Veronica has failed to establish a gateway for her new claims if the common law regime applies. For this reason alone, the Joinder Application fails. In the event that the Brussels I Recast applies, then for the reasons given below, the Joinder Application fails for lack of jurisdiction.

*Forum Non Conveniens*

General

37. If the common law regime applies, the burden rests on the Applicants to prove that England is clearly or distinctly the appropriate forum for each of the new claims they now seek to advance, in the sense that England is the place where those new claims could most suitably be tried for the interests of all of the parties and for the ends of justice: Lungowe v Vedanta Resources plc [2020] AC 1045 at [66]. For the reasons explained below, the Kazakovs submit that England is not the appropriate forum for any of the new claims advanced by Veronica. Instead, both Panama and/or Florida are more appropriate fora for those new claims.

38. Before turning to the substance of the Kazakovs' case on this issue, it is necessary to address two preliminary points made by the Applicants in their evidence:[34]

---

[33] Whiston-Dew 11 §182 {D/3/41}; Veronica 2 §4 {J/3/2-3}. Whiston-Dew 12 makes a throw-away remark that the Applicants *"believe"* that the Kazakovs have documents provided to them by Mr Tribaldos and his companies, at §43 {J/1/15}. No evidence is provided, nor is any further information given about this alleged 'belief'.

[34] These arguments were made in the context of Panama as the appropriate forum, but it is assumed that the Applicants will advance the same arguments in respect of Florida as the appropriate forum.

(1) First, the Applicants contend that the Kazakovs must show that Panama (or Florida) is the appropriate forum not only for the new claims which are the subject of the present application, but also for *"all the other claims pursued in the present proceedings against all the defendants"*.[35] That is wrong. Where the Court is concerned with new claims brought by way of joinder or amendment, the Court considers whether England is the appropriate forum <u>only</u> for those new claims which are the subject of the joinder or amendment application; not any existing claims to which the new claims are to be added. In a case of joinder: see <u>Donohue v Armco</u> [2001] 1 All ER 749 at [10] and [17]-[21] (Lord Bingham) and [45] (Lord Hobhouse). In a case of amendment by an existing claimant: see <u>Apple Retail UK Ltd v Qualcomm (UK) Ltd</u> [2018] FSR 27 at [117]-[119] (Morgan J).

(2) Second, the Applicants contend that the Kazakovs are precluded from arguing that Panama (or Florida) is the appropriate forum for the new claims because, as part of their jurisdiction challenge, the Kazakovs had argued that Monaco was the appropriate forum.[36] That is also wrong. The arguments advanced as part of the Kazakovs' jurisdiction challenge in November 2021 were concerned with the original claims pleaded in the unamended Particulars of Claim. None of the claims now advanced by way of four separate sets of draft amendments over the ensuing 1.5 year period (including by Veronica, who was not and is not a party to the proceedings) were considered at that hearing.[37] In any event, *forum conveniens* falls to be considered in April 2023, and not in the different circumstances existing when these proceedings were brought or when Trower J gave his judgment on the jurisdiction challenges. It is therefore open to the Kazakovs to advance this argument; *a fortiori* in circumstances where the court is solely concerned with the new claims (as explained above).

39. The court must therefore determine whether the Applicants have shown that England is clearly or distinctly the appropriate forum for each of Veronica's new claims. In circumstances, where as part of her forum-shopping on a grand scale: (i) Veronica has already advanced in Florida her central claim as to ownership of Edelweiss against not only Mr Kazakov and Edelweiss, but (unlike in her proposed claim in England) against Hemaren, which is the registered shareholder in Edelweiss; and (ii) where her oral process claim against Edelweiss in Panama will require determination of her central claim to ownership, the court should put an end to her forum-shopping and dismiss the application for her joinder.

---

[35] Whiston-Dew 11 at §§126-128 {D/3/25-26}. The argument was made in respect of Panama only, but it is assumed that the Applicants will advance the same
[36] Whiston-Dew 11 §§130-135 {D/3/26-27}.
[37] Seborg 6 §§104-106 {D/7/29-30}.

40.   The Kazakovs accept that in order for Panama to be the appropriate forum for determination of the new claims, it must be an available forum.  Whilst in their evidence the Applicants complain that the Kazakovs have not done so, they are very careful not to advance any positive case of their own on this issue.[38]  The reality is that Panama is plainly an available forum, as the Kazakovs' evidence and the facts of this case show:

(1)   The Panamanian company (Edelweiss) and foundations (Hemaren and Merenguito) which lie at the centre of the new claims are all incorporated and domiciled in Panama.  That is sufficient to give the Panamanian courts jurisdiction over those entities and, as explained in further detail below, Veronica has in fact already commenced proceedings  against Edelweiss.  In circumstances where the relevant claims are at their core concerned with the internal management of Panamanian companies, as a matter of English law, Panama (as the place of incorporation) is the natural forum: *Dicey* at §12-037.

(2)   The corporate acts which lie at the heart of the new claims all took place in Panama and the relevant share registers are (or are likely to be) located in Panama; each of which is sufficient to give the Panamanian courts jurisdiction over claims relating to such acts.[39]  Similarly, if the Applicants have in fact suffered damage as alleged, it is highly likely that such damage will have been suffered in Panama, which is again sufficient to give the Panamanian courts jurisdiction over claims relating to damage.[40]

(3)   Mr Lee accepts each of the declarations and damages claims advanced by Mrs Bourlakova and by Veronica could be brought in Panama, that the Panamanian courts could have jurisdiction in respect of the damages claims, and that those courts definitely would have jurisdiction in respect of the declarations claims: Lee 2 §§15-19 {G/1.1/4-5}.

(4)   The Kazakovs have offered to provide an undertaking that if the Court refuses permission for the amendments/joinder, or otherwise stays the new claims in favour of Panama, the Kazakovs will submit to the jurisdiction of the Panamanian courts.[41]  In any event, if the Applicants were to advance their claims in Panama, the Panamanian courts could assert jurisdiction over persons who are not domiciled in Panama.[42]

41.   Not only is Panama an available forum for determination of Veronica's new claims for declarations

---

[38] Whiston-Dew 11 §129 {D/3/26}.
[39] Aued 2 §98(c) and (d) {F/10/28-29}.  Although guardedly expressed, Mr Lee appears to agree that this is in principle possible on the basis of Article 11(1)-(2) of the Code of Private International Law: Lee 2 §20(3)-(4).
[40] Aued 2 §98(c) and (f)  {F/10/28-29}.
[41] Seborg 6 §112 {D/7/31}.
[42] Aued 2 §99{F/10/29}.

and damages; it is also the appropriate forum for determination of those claims, for the reasons explained below.

42.  **First**, all of the new claims advanced by Veronica by way of amendment/joinder relate to and are premised upon the internal affairs and/or ownership of Panamanian companies or foundations, and the alleged actions said to give rise to liability predominantly occurred in Panama.

43.  **Second**, the claims sought to be advanced by Veronica overlap to a significant degree with claims already underway in Panama, including claims in Panama which were commenced by Veronica (and Mrs Bourlakova) after they orchestrated a series 'corporate raids' in Panama designed to obtain control of valuable Panamanian companies, or claims arising from such raids.[43]  Ms Seborg explains the relevant corporate raids and claims in detail at §§87-125 of Seborg 5 {C/1/23-34} and §§45-58 of Seborg 6 {D/7/15-18}; a helpful overview can be found in Seborg 6, Annex 2 {D/8/6-9}.  In summary, the relevant Panamanian raids and claims are as follows:

(1)  A series of corporate raids on 19 January 2022 by which Veronica and Mrs Bourlakova purported to use recently-discovered but cancelled and invalid bearer share certificates to convene shareholder meetings of Edelweiss, Jovellanos and Gatiabe[44] in order to pass resolutions appointing new directors loyal to them.[45]  This was followed on 26 January 2022 by purported meetings of those invalidly-appointed directors to issue new shares in favour of Veronica (Edelweiss) and Mrs Bourlakova (Gatiabe and Jovellanos), and to cancel and annul the existing share certificates in favour of the then-existing and only true legal shareholders Hemaren (Edelweiss), Mr Kazakov and Mr Bourlakov's estate (Jovellanos) and Wlamil (Gatiabe).[46]  The true legal shareholders of each of those entities passed various counter-resolutions on 27 January 2022 to restore the original directors and to cancel the new share certificates which Mrs Bourlakova and Veronica had procured to be issued.

(2)  Administrative claims (*amparos*) submitted by each of Edelweiss, Jovellanos, and Gatiabe to the Panamanian courts in the period March-May 2022 which sought to require the Director of the Panamanian Public Registry place a note of warning on the Public Register in respect of Mrs Bourlakova's and Veronica's illicit actions.  The *amparo* submitted by Edelweiss was successful; the *amparos* submitted by Gatiabe and Jovellanos were not admitted for

---

[43] As to the significance of existing proceedings in another forum, see *Dicey* at §12-051: concurrent proceedings give rise to a risk of irreconcilable judgements which, whilst not a trump card, is a weighty factor in favour of finding that the forum in which the related actions are proceeding is the appropriate forum.

[44] There was a similar raid in respect of another Panamanian company called and Columbus Holding and Enterprises Two ("**Columbus 2**").  The Applicants advance no claims in respect of Columbus 2 in the present proceedings and nothing more is said about that entity in this skeleton argument.

[45] The cancelled share certificates are the same cancelled share certificates on which Mrs Bourlakova and Veronica seek to rely in the present proceedings in support of their amendment/joinder applications.

[46] Seborg 5 §§87-101 {C/1/23-27}.

consideration on the merits by the Panamanian court.[47]

(3)   Oral process claims brought before the Panamanian Civil Courts pursuant to Article 418 of the Panamanian Commercial Code, including:[48]

   (a)   A claim by Veronica against Edelweiss (represented by the board of directors validly appointed by Hemaren) on 10 February 2022 in the 12th Circuit Court. That claim seeks a declaration that Edelweiss' shareholders' resolution dated 27 January 2022 (passed by Hemaren to unwind the illicit purported resolutions passed as part of the corporate raid) is null and void and seeks the reinstatement of the Board of Directors appointed by the 19 January corporate raid resolution. The determination of that claim will determine ownership of Edelweiss.[49] The claim has already proceeded to a merits hearing in Panama, which remains ongoing.

   (b)   A claim brought be Hemaren against Edelweiss (represented by the board of directors purportedly appointed by Veronica) on 18 February 2022 in the 3rd Circuit Court. That claim seeks a declaration that the purported shareholders' meeting held on 19 January 2022 as part of the corporate raid (and acts deriving from it) are void and illegal and seeks reinstatement of the true directors in place prior to the corporate raid. That claim will involve determination of ownership of Edelweiss. Veronica filed an application to intervene in those proceedings, which was apparently dismissed on 31 March 2023 but which is under appeal.[50]

(4)   Ordinary civil proceedings filed in the Panamanian Civil Courts, namely:

   (a)   A claim by Edelweiss against Veronica, Mrs Bourlakova and the directors they purported to appoint by way of the Edelweiss corporate raid resolution of 19 January 2022. This claim was commenced on 16 January 2023 in the 16th Circuit Court and was admitted by the Court on 8 February 2023. On 17 January 2023, the Panamanian court granted a civil protection measure prohibiting Veronica, Mrs Bourlakova and the purported directors from carrying out or continuing any act connected with Edelweiss. This order has been served on the Panamanian Public Registry, preventing Veronica, Mrs Bourlakova and the purported directors from registering any documents relating to Edelweiss.

   (b)   A claim by Hemaren against Veronica, Mrs Bourlakova and the directors they purported to appoint by way of the Edelweiss corporate raid resolution of 19 January 2022. This

---

[47] Seborg 5 §§102-104 {C/1/27-28}; Seborg 6 §§50-51 {D/7/16-17}] and 56 {D/7/18}.
[48] Seborg 5 §§105-115 {C/1/28-32}; Seborg 6 §52-54 {D/7/17} and Annex 2 {D/8/6-9}.
[49] Aued 2 §89 {F/10/26}.
[50] Whiston-Dew 12 §38 {J/1/15}.

23

claim was commenced on 1 June 2022 in the 7th Circuit Court. It has been archived at Hemaren's request following the commencement of Edelweiss's civil claim (see above).

(5) Criminal proceedings, in particular, Hemaren, Edelweiss and its true board of directors lodged a criminal complaint against the persons purporting to act as President and Secretary of Edelweiss at the purported shareholders' meeting convened by Veronica on 19 January 2022 based on the cancelled share certificated on which she relies in the English proceedings. On 14 September 2022, acting at the request of the Panamanian Prosecutor, the Panamanian Court of Guarantees ordered the seizure of the cancelled share certificates and new share certificates purportedly issued to Veronica. The Panamanian Court has also ordered Veronica and her purported directors to refrain from performing or continuing any act related to Edelweiss based on the cancelled/purported share certificates.

44. These various sets of Panamanian proceedings are therefore based on the same core of ownership of Edelweiss on which Veronica seeks to rely for her new claims in the English proceedings. The Panamanian proceedings will determine the true ownership of Edelweiss. Those proceedings are well underway, with various protective measures having been granted and merits hearings continuing.

45. Panama is therefore a more appropriate forum than England for determining Veronica's claim for a declaration of ownership re Edelweiss and for determination of the closely-connected damages claims. That is particularly so in circumstances where:[51]

(1) Veronica's oral process proceedings will give rise to binding *res judicata* in Panama (where the relevant companies and foundations are incorporated and domiciled) in respect of the core ownership issue which Veronica now also wants to have determined in the present proceedings. The only significant dispute between the Panamanian experts on this issue is whether Veronica's oral process claim will have *res judicata* effect. The position, in overview, is as follows:

(a) Mr Lee recognises that a decision of the Panamanian court would create a *res judicata* as between the parties to that dispute.[52] So in Veronica's oral process claim, that would be Veronica and Edelweiss (against whom she seeks a declaration in the present proceedings). As Mr Aued explains, such a judgment can also be used as evidence by third parties, such as Hemaren (Edelweiss's true legal shareholder).[53]

(b) Mr Lee explains that only the *"resolutive"* or *"short"* part of a Panamanian judgment will create a *res judicata* and not the detailed reasoning. The short part of the judgment deals

[51] Aued 1 §§67-80 {F/3/26-29}; Aued 2 §§88-95 {F/10/26-28}.
[52] Lee 1 §149 {F/5/35}.
[53] Aued 2 §90 {F/10/27}.

with only the claims and defences which are specifically advanced by the parties. He then analyses Veronica's petition which specifically asks for declarations: (i) invalidating Edelweiss's shareholder resolution of 27 January 2022 (which sought to unwind the corporate raid); and (ii) restoring the directors appointed by the 19 January 2022 raid resolution. He concludes that Veronica has not sought a declaration that the cancelled and invalid bearer share certificate on which she relied to pass the 19 January raid resolution was valid or that she is the sole shareholder, so there can be no *res judicata* of those issues.[54]

(c) Mr Lee's position entirely ignores Edelweiss's defences to Veronica's oral process claim (and Hemaren's oral process claim against Edelweiss), which include that Veronica lacked standing to pass the relevant shareholder resolutions because she was not a shareholder.[55] Indeed, Edelweiss has specifically asked the Panamanian court to declare that Veronica is not a true shareholder.[56] This issue (which lies at the heart of the claims now sought to be advanced in England) will therefore be the subject of a *res judicata* binding on Veronica and Edelweiss in Panama.[57] Despite the importance of this issue to Mr Lee's opinion, it was not addressed in his first report, but he now accepts it as correct in Lee 2 §§13-14 {G/1.1/4}.

(d) Further, Mr Lee's conclusion on this issue is undermined by his own reasoning. It is a central part of his theses (on various issues running through his report) that invalid share cancellations and issuances are an absolute nullity, which a Panamanian Judge has a <u>duty</u> to declare null and void even if that relief is not requested by the parties: see e.g. Lee 1 §§92 {F/5/22}, 101-106 {F/5/25-26}, 143 {F/5/34}. Mr Lee is at pains to make this point to save the inadequately pleaded declarations claims the Applicants now seek to advance. But when it comes to questions of Veronica's ownership, he instead concludes that the Panamanian judge might ignore their duty and *"in practice they might choose not to make declarations to that effect"*: Lee 1 §146 {F/5/34}; and to like-effect in Lee 2 §§13-14 {G/1.1/4}. That is unreal and exposes the fallacy of Mr Lee's opinion on this issue.

(2) Unlike Veronica's claim in Florida for declaratory relief as to ownership, which is made against Hemaren (the current registered shareholder) as well as Edelweiss and Mr Kazakov, her proposed claim in England for declaratory relief does not include a claim against Hemaren. As a consequence, any judgment by the English court which makes findings as to ownership

---

[54] Lee 1 §§140-145 {F/5/33-34}.
[55] Seborg 6 §47 {D/7/15-16}.
[56] Seborg 6 §48 {D/6/16}.
[57] Aued 2 §§89-92 {F/10/26-27}.

would not be enforceable or recognisable in Panama unless (amongst other matters) each of the shareholders was a party to the proceedings.[58]  Any failure to observe these requirements would be treated by the Panamanian courts as a breach of due process and public policy.

(3)     A judgment of the Panamanian courts would also be recognisable and/or enforceable in England.  At common law, a foreign judgment will be entitled to recognition if:[59]

    (a)     The foreign court had international jurisdiction over the person against whom judgment was given.  This is readily satisfied in circumstances where the proceedings all involve Panamanian entities and parties who have voluntarily submitted to the Panamanian courts' jurisdiction by voluntarily submitting claims or counterclaims or applying to intervene in the proceedings.

    (b)     The judgment is final and conclusive on the merits in the sense that *"in the court by which it was pronounced, it conclusively, finally, and forever established the existence of the debt of which it is sought to be made conclusive evidence in this country, so as to make it res judicata between the parties"*.[60]  The possibility of an appeal to a higher court is irrelevant to the finality of a judgment for these purposes,[61] but may give rise to a stay of execution in England pending appeal.[62]  A first instance judgment in the oral process claims is expected within the next 2-2.5 years, while a first instance judgment in the ordinary civil claims is expected within around four years.[63]

    (c)     It is not impeachable on the grounds stated in *Dicey* Rules 52-55 (*e.g.*, fraud, public policy *etc*).  No such suggestions have been made to date.

46.     The Applicants had at one point suggested that, if they are permitted to advance their new claims in England, they would stay (or discontinue if a stay is unavailable) the claims they advance in Panama if Mr Kazakov, Hemaren and (and Wlamil in the case of Mrs Bourlakova's claims): (i) accept that the English Court has jurisdiction; and (ii) discontinue (rather than stay) their own claims.[64]  However, that offer of an undertaking has now been withdrawn and the Applicants' position is that if the Amendment/Joinder Applications are granted, they intend to continue to proceed with the multiple overlapping sets of proceedings in Panama.[65]

---

[58] This appears to be common ground between the experts: Aued 1 §§67-80 {F/3/26-29}; Lee 1 §§150-151 {F/5/35-36}.

[59] See <u>Dicey</u> §§14R-024; 14-058.  Similar rules apply to enforcement of money judgments.

[60] <u>Nouvion v Freeman</u> (1889) 15 App. Cas. 1 at 9; *Dicey* §14-027.

[61] <u>Nouvion v Freeman</u> at 13.

[62] <u>Dicey</u> §14-030.

[63] Lee 1 §§132, 135-136 {F/5/31} and {F/5/31-32}; Aued 2 §87 {F/10/26}.

[64] Whiston-Dew 10 §49 {B/1/14}.

[65] Whiston-Dew 11 §181 {D/3/41}.  In any event, for the reasons Ms Seborg explains at §§122-125 of Seborg 5 {C/1/33-34}, Mr Kazakov is not prepared to discontinue his Panamanian claims, which are already well-advanced.  Further, Hemaren and Wlamil cannot be expected to do so in circumstances where they are not parties to the present English proceedings, no claims are advanced against them and the Applicants have not even suggested that they will bring claims against those entities in

47.    **Third**, to the extent that any damage has been suffered by Veronica, most or all of such damage is likely to have been suffered in Panama where the actions complained of are said to have taken place and where the relevant entities are located. The relevant actions for these purposes are the alleged misappropriation of Edelweiss and its assets.[66]

48.    **Fourth**, the key witnesses and documentary evidence relevant to the new claims are located in Panama and the claims raise complex issues of Panamanian law.[67]

49.    **Fifth**, the Applicants' arguments in favour of England being the appropriate forum seek to downplay the significance of the new claims which they seek to add by way of amendment/joinder.[68] It is unreal to suggest that the new claims and voluminous amendments, which are fundamentally concerned with ownership of Panamanian companies, are *"limited in number"* and that Panama is only of incidental importance because *"certain of the entities involved were located in Panama"*.

50.    In the circumstances, Panama is plainly a more appropriate forum than England for Veronica's new claims. Veronica recognised this by commencing her own proceedings in Panama in the first instance. The oral process proceedings are already well-advanced and Veronica should not be allowed to forum shop now that the tide of those proceedings has turned against her in certain respects. To allow her to do so would be contrary to the interests of justice and would be an abuse of this court's process.[69]

Florida is a more appropriate forum than England

51.    Further or alternatively, the Kazakovs submit that Florida is an available and more appropriate forum than England for determination of Veronica's new claims for the reasons explained below.

52.    **First**, Florida is an available forum:

       (1)    As explained in further detail below, Veronica has already commenced proceedings in Florida in which she has asserted that the Florida courts have jurisdiction over her claim to the ownership of Edelweiss (defined below as the "**Edelweiss Complaint**") as against the Kazakovs, Hemaren and Edelweiss, none of whom are challenging the Florida courts'

---

England or would submit to claims made in England by those entities: Seborg 6 §109 {D/7/30-31}.

[66] The Applicants' speculative suggestion that there may (or may not) be some evidence in future of actions taking place or losses being suffered elsewhere is irrelevant, as is their reference to the allegations pleaded in Sections A1 and A3 of the draft APOC, which the Applicants on in support of the new claims but which instead relate to different claims: Whiston-Dew 11 §137(3)-(4) {D/3/31-32}.

[67] As to the location of documents and witnesses, the relevant documents/witnesses are those which relate only to the new claims which are the subject of the amendment/joinder application; not the documents/witnesses relevant to the existing (unamended) claims in England: Donohue v Armco. As to Panamanian law, see Seborg 6 §108 {D/7/30}; the Applicants' position is also be that Panamanian law is applicable.

[68] Whiston-Dew 11 §§136-137 {D/3/28-32}.

[69] As Sir Nicholas Browne-Wilkinson VC explained in Australian Commercial Research and Development Ltd v ANZ McCaughan Merchant Bank Ltd [1989] 3 All ER 65 at 69, in order to prevent such abusive tactics, a claimant must elect which set of proceedings it wishes to pursue. The Applicants have not given any indication that they will do so. Instead, they intend to continue to proceed with their claims in Panama come what may: Whiston-Dew 11 §181 {D/3/41}.

jurisdiction. Veronica could in principle amend her complaint to bring related damages claims (as she seeks to do by way of joinder in the English proceedings).[70] Indeed, one of the many bases on which Veronica asserts that the Florida courts have jurisdiction is that tortious acts have allegedly been committed in Florida.

(2) The Florida courts would have jurisdiction over any other additional defendants who were involved in those (or other) alleged tortious acts directed at or involving Florida. It is notable in this regard that, in RICO proceedings commenced by Mrs Bourlakova, Veronica and Elena Bourlakova in Florida on 6 November 2022 (but subsequently abandoned less than three months later) (the "**RICO Proceedings**"), it was alleged that the Kazakovs, Mr Anufriev, Mr Bourlakova, Mr Tribaldos, Leo England, Leo Trust and others were all co-conspirators in a fraudulent conspiracy said to have involved acts which now lie at the heart of the present amendment/joinder applications.[71] Similarly, in related (and extant) Florida proceedings (defined below as the "**Florida Asset Proceedings**") Veronica has made claims against the Kazakovs and Mr Anufriev (who has challenged jurisdiction over him).

(3) As explained below, the Kazakovs have counterclaimed against *inter alios* Mrs Bourlakova and Veronica in the context of both the Edelweiss Complaint and the Florida Asset Proceedings and have sought to consolidate those two sets of proceedings. Amongst the various objections which Veronica raised to those motions, she argues that it has no jurisdiction over her in respect of the Florida Asset Proceedings, but not the Edelweiss Complaint.[72]

53. **Second**, the new claims sought to be advanced by Veronica by way of joinder in these (English) proceedings overlap to a very significant degree with claims already underway in Florida, including claims in Florida which were commenced by Veronica. Ms Seborg explains the relevant claims in detail at §§79 and 126-130 of Seborg 5 {C/1/34-35} and §§14-44 of Seborg 6 {D/7/6-15}; a helpful overview can be found in Seborg 6, Annex 1 {D/8/1-5}. The relevant Florida claims are summarised below.

54. **Florida Asset Proceedings**.[73] On 29 November 2021, Veronica and her sister (Elena) commenced proceedings in the Florida State Courts purportedly as guardians of their minor children. On 1 September 2022, the complaint was amended to add claims against the Kazakovs, Mr Anufriev and others.[74] The amended claims make allegations which bear a striking similarity to the allegations which Veronica now seeks to advance in the present proceedings, including:

[70] Seborg 6 §114(a) {D/7/31}.
[71] Seborg 5 §§126-129 {C/1/34-35}; Seborg 6 §§41-44 {D/7/14-15}, 114(b) {D/7/32} and [119] {D/7/33}.
[72] Seborg 6 §§20-22 {D/7/7-8} and 32-35 {D/7/10}.
[73] Seborg 6 §§15-28 {D/7/6-9}.
[74] {D/4/276-310}.

(1) The allegation that Edelweiss is and was owned by Veronica.

(2) An allegation that the Kazakovs and Mr Anufriev were part of an alleged global conspiracy hatched by Mr Bourlakov to defraud his family of their assets, including by reason of asserting the existence of a partnership between Mr Bourlakov and Mr Kazakov. The Applicants seek to pass this off these allegations as mere *"factual background"*,[75] but that contention has no basis and ignores not only the terms of the complaint, but also the content of the admissions which they have requested of parties to the proceedings and the submissions made in Veronica and Elena's motions in those proceedings, including as to the scope of the matter which they say the Florida State Courts will need to determine.[76]

55. On 19 December 2022, the Kazakovs served a Defence and Counterclaim counterclaiming against Veronica, Mrs Bourlakova and others.[77] Amongst other things, the counterclaims allege that Mrs Bourlakova (assisted by others) misappropriated assets to which Mr Kazakov is entitled through his partnership with Mr Bourlakov, and conspired to misappropriate further assets to which the Kazakovs are entitled, including Edelweiss. The Kazakovs specifically seek a negative declaration that Veronica is not the rightful owner of Edelweiss.[78]

56. Various jurisdiction challenges have been made by Mr Anufriev, Veronica and Mrs Bourlakova, which are expected to be determined in the coming months.[79] Notwithstanding those challenges, the proceedings are already well advanced:[80] (i) a mediation was scheduled for 19 April 2023; (ii) the parties have filed substantial requests for discovery, including in respect of issues relating to the partnership and the ownership of Edelweiss[81]; (iii) Mrs Kazakova is being deposed on 24-25 April 2023 and Elena is being deposed on 10 May 2023; and (iv) a 28 day jury trial is listed to commence on 27 May 2024.[82]

57. **Edelweiss Complaint**.[83] On 23 January 2023, Veronica lodged a complaint in the Florida State Courts seeking a declaration that she is the owner of Edelweiss.[84] That is exactly the same claim

---

[75] Whiston-Dew 11 §186 {D/3/43}.
[76] Seborg 6 §§36-38 {D/7/11-13}.
[77] {E/1/169-220}.
[78] The Applicants have suggested that this is inconsistent with the Kazakovs' argument that a declaration as to the ownership of Edelweiss made by the English court would not be effective in Panama because the necessary parties (such as Hemaren) are not parties to the English proceedings. Not only is that argument inconsistent with the Applicants' own Panamanian law evidence (Lee 1 §§150-151 {F/5/35-36}), it is also conceptually flawed for the reason explained by Ms Seborg in Seborg 6 §21, fn4 {D/7/8}.
[79] As to Veronica's objection to jurisdiction, see Seborg 6 §39 {D/7/13-14}.
[80] Seborg 6 §§22-28 {D/7/8-9}.
[81] For example, Veronica and Elena have served an 84-paragraph document request on Mr Kazakov, a large number of which relate to the partnership: Seborg 6 §26 {D/7/8}; request {E/1/138-149}.
[82] Seborg 6 §28 {D/7/9}; that trial date is unlikely to be adjourned: §122 {D/7/34}.
[83] Seborg 6 §§29-35 {D/7/9-10}.
[84] {D/4/418-432}. Even a cursory review of the complaint makes clear that it raises identical issues to those which veronica seeks to litigate in this jurisdiction, save that Hemaren (as Edelweiss's true legal shareholder) is also a party in Florida but Veronica does not seek to join Hemaren in England.

which she seeks to advance in the present proceedings by way of her joinder, and which forms the basis of her claims for damages in respect of Edelweiss: draft APOC §196B, 199E-F {A/2.1/85} and {A/2.1/87-88}.

58. Ms Whiston-Dew seeks to characterise this complaint as *"protective"*, designed to stop time running <u>given the Kazakovs' opposition to her joinder to these proceedings</u>.[85] However, that is not what the complaint says.[86] Instead, it refers to the Florida Asset Proceedings, which are described as a *"related"* case and sates that it seeks to toll the limitation period because leave of the Florida Court would be required to raise the claim in those proceedings. Veronica is therefore asserting that the Florida State Courts are the appropriate forum for determination of her claim to own Edelweiss, and intimating that she will or may seek leave to bring that claim in the Florida Asset Proceedings. Further, the 'protective claim' includes a heading *"Impact of ownership of Edelweiss on Issues in the Companion Case in Florida"* {D/4/428}. Beneath that, Veronica explains that the question of ownership of Edelweiss is critical to the first case because it will determine who the 'economic settlor' of the Trust is and therefore who (if anyone) can exercise the right of revocation of the Trust. Thus, she contends that that is absolutely essential to her claim in the first case. This is also a basis on which she says the Florida courts have jurisdiction in the Edelweiss Complaint.

59. Although Hemaren and Edelweiss have not yet been served, without prejudice to the existing Panamanian proceedings and their rights in Panama, they do not intend to contest the Florida State Courts' jurisdiction.[87] The proceedings are already well-advanced and the Kazakovs have filed counterclaims against Veronica, Mrs Bourlakova and others in terms which are materially similar to those already advanced in the Florida Asset Proceedings.[88] Now that those counterclaims have been made, Veronica cannot voluntarily discontinue her own Edelweiss Complaint (she would require leave of the Florida State Court) and, even if she did, the counterclaims would continue.[89]

60. The Kazakovs have also lodged a motion to consolidate the Florida Asset Proceedings and the Edelweiss Complaint given the substantial overlap between them.[90] Veronica and Elena are currently resisting consolidation pending determination of Mrs Bourlakova's challenges to the counterclaims (and the challenges of another defendant, Gregory Gliner – Veronica's husband).[91] The consolidation motion is likely to be heard at a case management conference on 8 May 2023 and it is likely to be granted, with both sets of proceedings proceeding to the trial already listed for May

---

[85] Whiston-Dew 11 §198 {D/3/44}.
[86] It is also obviously wrong in circumstances where Veronica has also issued a 'protective claim' in England: Whiston-Dew 11 §200 {D/3/45}.
[87] Seborg 6 §30 {D/7/9}.
[88] Seborg 6 §32 {D/7/10}; Counterclaim {E/1/169-220}.
[89] Seborg 6 §40 {D/7/14}. Despite the terms of her own complaint, on 31 March 2023, Veronica filed a motion to dismiss and a *forum non conveniens* challenge: Seborg 6 §35 {D/7/10}.
[90] Seborg 6 §33 {D/7/10}; Motion {E/1/221-227}.
[91] Seborg 6 §34 {D/7/10}; Opposition {E/1/228-239}.

2024.[92] Even if the two sets of proceedings are not consolidated, they are likely to be determined within 2-2.5 years from the date of issue.[93]

61. **RICO Proceedings**.[94] On 6 November 2022, Veronica, Mrs Bourlakova and Elena issued proceedings in the US District Court, Southern District of Florida, Miami Division against Anahill, Cantucci, Hemaren, Wlamil and others. Those claims again made the same factual allegations which the Applicants seek to advance in the present proceedings, naming the Kazakovs, Mr Bourlakov, Mr Anufriev, Mr Tribaldos and his companies as alleged co-conspirators in an unlawful scheme. The claims also replicated the claims which the Applicants now seek to advance by way of amendment/joinder. Despite the serious allegations made in the complaint, those proceedings were withdrawn within a matter of months after issue, without explanation or apology,[95] but not before Veronica deployed them in her Panamanian oral process claim to seek to enhance her position in that jurisdiction and not before such allegations were published in online reports.[96]

62. **Third**, a judgment of the Florida State Courts would be recognisable and/or enforceable in England: §45(3) above is repeated *mutatis mutandis*; see also Seborg 6 §124 {D/7/34}.

63. In the circumstances, the Florida State Courts are plainly a further or alternative appropriate forum in which to determine ownership of the Panamanian companies/foundations, which lie at the heart of the new claims for declarations and damages. Veronica recognised this by commencing her own proceedings in Florida in the first instance. Veronica, who has advanced her own claims in Florida, should not be allowed to forum shop. To allow her to do so would be contrary to the interests of justice and would be an abuse of this court's process. It will also give rise to risk of inconsistent judgments and continuing proliferation of overlapping proceedings.

*(iii)    Brussels I Recast and the Stay Application*

64. Alternatively, if Brussels I Recast applies, the Kazakovs will say that: (*i*) Article 8(1) is not available to Veronica; and (*ii*) even if it is, the new claims would fall to be stayed pursuant to Article 33 (in favour of Florida) and/or Article 34 (in favour of Panama and/or Florida) if joinder were to be allowed, and for that reason, joinder should be refused as a matter of discretion; alternatively, if joinder is allowed, a stay should be ordered.

65. Point (ii) forms the basis of the Stay Application. In a letter to the court, the Applicants argued that the Stay Application could not (or should not) be heard at the present hearing {I/85}. The

---

[92] Seborg 6 §§34 {D/7/10} 121-123 {D/7/33-34}.
[93] Seborg 6 §123 {D/7/34}.
[94] Seborg 5 §§126-129 {C/1/34-35}; Seborg 6 §§41-44 {D/7/14-15}.
[95] Whiston-Dew 11 simply states that *"Mrs Bourlakova, Elena and Veronica have decided not to pursue this claim"* at §191 {D/3/44}. Whiston-Dew 12 states (without more) that it was withdrawn for *"a variety of reasons"*: at §32 {J/1/12}.
[96] Seborg 6 §44 {D/7/15}. An example of public reporting can be seen in the article at {E/1/258-259}.

Kazakovs responded explaining why it could and should be heard at this hearing {I/87}, and they invite the court to do so for the following reasons:

(1)    The Kazakovs submit that permission for joinder/amendment should be refused because, if it were granted, the court would in fact grant a stay pursuant to Articles 33 and/or 34.

(2)    Further or alternatively, if permission for joinder/amendment is granted, then the court should grant a stay pursuant to Articles 33 and/or 34. It can do so of its own motion,[97] and would plainly wish to consider doing so at the present hearing in light of the multiple sets of overlapping proceedings and the serious risk of irreconcilable judgments.

(3)    In the circumstances, it was strictly unnecessary for the Kazakovs to issue the Stay Application, but they did so for the sake of good order and in light of the Applicants' complaints (the issue of a stay under Article 34 having been raised by the Kazakovs in witness evidence in November 2022 and the Applicants thereafter complaining that an application was necessary). Further, the factual evidence which relates to the Stay Application will be before the Court in any event and is relevant to the Joinder/Amendment Applications more generally, including in the context of the Kazakovs' *forum conveniens* arguments.

(4)    The Stay Application can and should be determined at the present hearing, and the Applicants' suggestion that this is hived off to a future consequentials hearing serves only to waste time and resources, contrary to the Overriding Objective in CPR r.1.

66.    As to point (i), the question is whether Article 8(1) is available to Veronica.[98] The Kazakovs submit that it is not:

(1)    Article 4(1) provides for the general rule that persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State. There has never been any suggestion that the Kazakovs are domiciled in England.

(2)    Article 8(1) operates as an exception to that general rule, enabling a person domiciled in a Member State to be sued "*where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings*".

(3)    For the reasons explained at §33 above, the Kazakovs submit that the new claims advanced by Veronica against Leo England are artificial and abusive. The evidence strongly supports the inference that Leo England (the anchor defendant) is colluding with the Applicants to

---

[97] As provided for in Articles 33.4 and 34.4 '*The court of the Member State shall apply this Article on the application of the parties or, where possible under national law, of its own motion.*", and in accordance with the court's general case management powers in CPR r.3.1.
[98] This is the relevant Article relied on by both Mrs Bourlakova and Veronica as against, *inter alia*, the Kazakovs: Whiston-Dew 10 §§36 {B/1/10} and 39 {B/1/11}.

assist them in foreign proceedings and in these proceedings (including in relation to the amendments/joinder which lie at the heart of the present application) and/or that the claims are not genuine claims which are intended to be pursued to judgment. In those circumstances, the Applicants are precluded from relying on Article 8(1): see Privatbank v Kolomoisky [2020] Ch 783 at [77], [85]-[87], [102], [108] and [111]; see also Briggs, *Civil Jurisdiction and Judgments* 7th ed at [15.06] (p.304) on the equivalent Article 6(1) of the Lugano Convention.

67.  Even if Article 8(1) is available, the Kazakovs rely on Article 33 and invite the Court to stay Veronica's new claims (if permission is granted) in favour of the proceedings already underway in Florida. The grant of a stay under Article 33 is discretionary, but the discretion only arises upon fulfilment of the five threshold conditions outlined in the text of the Article: (i) the Member State jurisdiction must be based on Articles 4, 7, 8 or 9; (ii) the action in the third state must be pending before the third state court when the Member State court becomes seised of the action; (iii) the two sets of actions must involve *"the same cause of action and [be] between the same parties"*; (iv) it must be expected that the court of the third state will give a judgment capable of recognition, and where applicable, enforcement, in the Member State (Article 33(1)(a)); and (v) the Member State court must be satisfied that a stay is necessary for the proper administration of justice (Article 33(1)(b)).

68.  Each of those conditions is satisfied in this case, and the court should exercise its discretion in favour of granting the stay:

(1)  If Article 8(1) applies (which is the only relevant Article relied on by the Applicants), the first condition is satisfied.

(2)  So too is the second condition, because the English court is not seised of the new claims unless and until (and then only to the extent that) permission to amend is given and the amended Claim Form is served: *Dicey* comp. §12-030; see also The Alexandros T at [60]-[72].

(3)  The third condition (same cause of action and same parties) is also satisfied:

(a)  When considering whether two or more actions are between the *"same parties"* in litigation involving multiple parties, Article 33 does not require that all of the parties to the first action are also parties to the second action. Instead, the court looks at pairs of claimant and defendant.[99] In the present case, both the Florida Asset Proceedings and the Edelweiss Complaint are between, *inter alios*, the Kazakovs and Veronica: see §§54-60 above. Those actions therefore involve the *"same parties"* as the action which Veronica seeks to bring in the present proceedings.

---

[99] *Dicey*, Comp. V §§12-018 to 12-020 (dealing with Article 29, which is the equivalent Article where the two actions are pending before two Member State courts rather than a Member State court and a court of a third state); Case C-406/92 The Tatry [1999] QB 515.

(b) Two or more actions will involve the *"same cause of action"* if they have the same end in view and when the facts and rules of law relied on as the basis for the actions are the same; so a claim for a declaration and a claim for damages can be the *"same cause of action"*.[100] The question is whether there is identity of issues which make up the essential element of the claim, such that each can be regarded as the mirror of each other and the fact that each court must apply its own national laws, which may involve different legal bases for establishing or resisting liability, will not of itself suffice to prevent the relevant identity from arising.[101] In the present case, both the Florida Asset Proceedings and the Edelweiss Complaint seek or require determination, *inter alia*, of the ownership of Edelweiss: see §§54-60 above. Those actions therefore involve the *"same cause of action"* as that which Veronica seek to pursue for a declaration in the present proceedings.

(4) The fourth condition (judgment capable of recognition/enforcement) is also satisfied:

(a) Article 33(1) is engaged if an action is pending before the foreign court. That will ordinarily involve an expectation of a judgment in due course, absent a settlement. Article 33(1)(a) is <u>not</u> concerned to introduce a factual question as to the degree of likelihood of expectation, but to characterise the pending action by reference to its capability of resulting in a recognisable or, where applicable, enforceable judgment: <u>Município de Mariana v BHP Group</u> [2022] 1 WLR 4691 at [261] (dealing with the similarly-worded Article 34).

(b) All that is required is that the judgment in the pending action is 'capable' of recognition. The exercise is a conceptual one, looking at the type of judgment to which the third state pending action may give rise, and evaluating whether it attracts recognition, or where applicable enforceability. The exercise is not premised on a factual enquiry as to what will happen; on the contrary, it assumes that the court cannot embark at this stage upon an assessment of the outcome on its merits, but focuses on what outcomes the pending action is 'capable' of giving rise to: <u>Município de Mariana</u> at [269].

(c) For the reasons explained at §62 above, it is expected that the Florida State Courts will give a judgment which is capable of recognition/enforcement.

(5) The fifth condition (stay necessary for the proper administration of justice) is also satisfied:

(a) Recital (24) to Brussels I Recast provides that, when taking account of the proper administration of justice, the court should have regard to *"all the circumstances of the case*

---

[100] *Dicey*, Comp. V §§12-021 to 12-023; <u>The Tatry</u>.
[101] *Dicey*, Comp. V §12-025; <u>Easygroup Ltd v Easy Rent a Car Ltd</u> [2019] EWCA Civ 477, [2019] 1 WLR 4630; <u>Wright v Granath</u> [2021] EWCA Civ 28.

*before it"*.  These words are extremely wide and are not limited to connections with the third state, as the wording of the second sentence of the Recital makes clear: <u>Ness Global Services Ltd v Perform Content Services Ltd</u> [2021] 1 WLR 4146 at [66] (Sir Julian Flaux).  Other relevant factors include: (*i*) the extent of relatedness and the risk of mutually irreconcilable decisions; (*ii*) the stage reached in each set of proceedings; and (*iii*) the proximity of the courts to the subject matter of the case: <u>Município de Mariana</u> at [280].  This requirement may also be satisfied where consolidation of the related actions in the third state is available; this is sufficient but not necessary for the purposes of the fifth requirement: <u>Município de Mariana</u> at [273] *et seq*.

(b) In the present case, the Florida Asset Proceedings and the Edelweiss Complaint overlap to a significant degree with the claims which Veronica seeks to advance in the present proceedings regarding alleged ownership of Edelweiss and damages flowing from such alleged ownership – they are identical in many respects: see §§53-60 above.  The proceedings in Florida are already well-advanced (and the Florida Courts will have a detailed and developed view of the subject matter of the case), with discovery requests having been made, depositions due to take place in the coming days and weeks and a trial date already set for May 2024.  It is also possible to consolidate proceedings in Florida, and the Kazakovs have already sought to consolidate the Florida Asset Proceedings and the Edelweiss Complaint.

(6) As to discretion, the court should exercise its discretion to order a stay in the present case for the following reasons (and should for the same reasons refuse the joinder application itself):

(a) Where each of the threshold conditions is met, and in circumstances where Article 33 is designed to avoid the risk of irreconcilable judgments, that in itself ought to weigh heavily in favour of granting a stay.

(b) Another relevant factor may be whether the claims sought to be advanced in England could instead be advanced in Florida and consolidated with the existing proceedings there, in the sense of being determined at the same time even if not formally consolidated.  Although this issue may already arise as part of the fifth condition, it may also be relevant to discretion: see e.g. <u>Município de Mariana</u> at [275]-[276].  However, where the existing foreign proceedings involve the same parties and seek the same relief as that sought in the English proceedings, this ought to be of little relevance.  In any event, as explained at §60 above, consolidation is available in Florida.  The grant of a stay until determination of the Florida proceedings would therefore be appropriate.

69. Further or alternatively, the Kazakovs rely on Article 34 and invite the Court to stay Veronica's new

claims (if permission is granted) in favour of the proceedings already underway in Panama and/or Florida. As with Article 33, the grant of a stay under Article 34 is discretionary, but the discretion only arises upon fulfilment of the five threshold conditions outlined in the text of the Article (see Município de Mariana at [241]): (i) the Member State jurisdiction must be based on Articles 4, 7, 8 or 9; (ii) the action in the third state must be pending before the third state court when the Member State court becomes seised of the action; (iii) the member state action must be 'related to' the pending third state action (the 'related' condition in the introductory words and the expediency condition in Article 34(1)(a) form a single threshold condition); (iv) it must be expected that the court of the third state will give a judgment capable of recognition, and where applicable, enforcement, in the Member State (Article 34(1)(b)); and (v) the Member State court must be satisfied that a stay is necessary for the proper administration of justice (Article 34(1)(c)).

70. Each of those conditions is satisfied in this case, and the court should exercise its discretion in favour of granting the stay:

(1) If Article 8(1) applies (which is the only relevant Article relied on by the Applicants), the first condition is satisfied.

(2) So too is the second condition, because the English court is not seised of the new claims unless and until (and then only to the extent that) permission to amend is given and the amended Claim Form is served: *Dicey* comp. §12-030; see also The Alexandros T at [60]-[72].

(3) The third condition (related actions) is also satisfied:

(a) What is required to fulfil Article 34(1)(a) is that it must be desirable for the two actions to be heard and determined together in order to avoid the risk of irreconcilable judgments, irrespective of whether that is a practical possibility: Município de Mariana at [236]. The test of relatedness for the purposes of Article 34 is the broad test identified in Sarrio SA v Kuwait Investment Authority [1999] 1 AC 32 (such that the inquiry is not limited to 'primary' issues which are those necessary to establish the cause of action): Município de Mariana at [243] and [257]. As stated by Lord Saville in Sarrio at p.41, there should be a broad common-sense approach to the question whether the actions are related, refraining from an over-sophisticated analysis of the matter.

(b) As explained at §§42-45 above, the existing Panamanian proceedings and the new claims which Veronica now seeks to advance in England are closely related. The primary issues necessary to establish the cause of action in each jurisdiction (namely, the ownership of the various Panamanian companies/foundations) are the same. There is undoubtedly a significant risk that, if the amendments/joinder are permitted and the English Court proceeds to determine those amended claims, irreconcilable judgments will result. That

36

includes as between the parties to the proceedings in England and as between those parties and other third parties who are not party to these proceedings, but who are party to the proceedings in Panama, particularly Hemaren and Wlamil.

(c)     As to the Florida proceedings, see §68(3) above (so far as Veronica is concerned).

(4)     The fourth condition (judgment capable of recognition/enforcement) is also satisfied:

(a)     The analysis is the same as the analysis applicable to the fourth condition of Article 34: see §68(4) above. The question is whether it is expected that the foreign court will give judgment which is capable of recognition or enforcement, without enquiring into the factual likelihood of that.

(b)     For the reasons explained at §45(3) above, it is expected that the oral process claims will result in a judgment capable of recognition or enforcement within the next 2-2.5 years, with the courts hearing the ordinary civil claims expected to give a judgment capable of recognition or enforcement within the next 4 years.

(c)     The condition is also satisfied in respect of the Florida proceedings, for the reasons explained at §68(4)(c) above.

(5)     The fifth condition (necessary for the proper administration of justice) is also satisfied and the relevant principles are those set out at §68(5)(a) above:

(a)     In respect of the Panamanian proceedings, for the reasons explained at §§40-50 above: (i) there very strong connections to Panama (where the relevant companies are incorporated and domiciled); (ii) the new claims which each of Veronica and Mrs Bourlakova seek to advance in these proceedings overlap to a significant degree with the claims already underway in Panama; (iii) the Panamanian proceedings are already well-advanced, with merits hearings already underway in certain of the proceedings and judgements capable of recognition/enforcement expected within the next 2-2.5 years (oral process claims) or 4 years (ordinary civil claims); (iv) the Courts in Panama are obviously much more proximate to the subject matter of the case, which is at its core concerned with the internal operations of Panamanian companies.

(b)     The condition is also satisfied in respect of the Florida proceedings for the reasons explained at §68(5)(b) above (so far as Veronica is concerned).

(6)     As to discretion, the court should exercise its discretion to order a stay in the present case for the following reasons:

(a)     The points made at §68(6) above apply *mutatis mutandis* to the exercise of the court's discretion under Article 34.

(b)    Insofar as consolidation is relevant:

    (i)    As to Panama, the claims which Veronica seeks to advance by way of amendment/joinder could be pursued in Panama (see §§40-45 above), and indeed some of those claims are already being pursued there.

    (ii)    As to Florida, the analysis at §68(6)(b) applies. The grant of a stay until determination of the Florida proceedings would therefore be appropriate.

71.    Accordingly, the Kazakovs submit that permission to amend to join Veronica should be refused. To grant permission would serve no useful purpose, since the new claims would be met with a (successful) stay application under Articles 33/34. Alternatively, if permission is given, a stay should be granted under Articles 33/34.

## B.    APPLICABLE LAW

72.    There is a dispute between the parties as to whether the applicable law falls to be determined in accordance with Regulation (EC) No. 864/2007 ("**Rome II**") or in accordance with the common law rules. The Kazakovs accept that the substantive law of the claims sought to be advanced against them is Panamanian law. However, the route by which one gets there remains relevant (and important) to questions of limitation (principally the application of the doctrine of 'relation back').

73.    The Applicants' position is that Rome II applies to at least some of their claims, although they have failed to explain precisely which claims they say it applies to and on what basis.[102] The Kazakovs submit that the new claims sought to be advanced fall outside the scope of Rome II and applicable law falls to be determined by applying the common law rules, for the following reasons:

(1)    Rome II applies, in situations involving a conflict of laws, to non-contractual obligations in civil and commercial matters: Article 1.1. Certain matters are expressly excluded from this apparently broad scope. The exclusion which applies in the present case is Article 1.2(d):

*"non-contractual obligations arising out of the law of companies and other bodies corporate or unincorporated regarding matters such as the creation, by registration or otherwise, legal capacity, internal organisation or winding-up of companies and other bodies corporate or unincorporated, the personal liability of officers and members as such for the obligations of the company or body and the personal liability of auditors to a company or to its members in the statutory audits of accounting documents"*

(2)    The purpose of this provision is to exclude matters which properly belong to company law rather than to the law of obligations: *Dicey* at § 34-030. Similar exclusions can be found in the

---

[102] See the single passing reference in Whiston-Dew 10 §27 {B/1/8}. The Draft APOC plead that certain of the claims are fall within the scope of Rome II (e.g. at §197 in respect of various alleged misappropriations {A/2.1/85}), whilst ignoring applicable law and/or the basis for its application in relation to other claims (e.g. at §§196A-197 {A/2.1/85} in respect of the validity of transfers of Edelweiss's shares and Veronica's claim for a declaration as to ownership).

Rome I Regulation (Article 1.2(f)) and its predecessor the Rome Convention (Article 1.2(e)), which concern situations involving a conflict of laws in relation to contractual obligations in civil and commercial matters. The Giuliano-Lagarde Report on the Rome Convention remains relevant to the interpretation of Rome I and, by extension in the present circumstances, Rome II. The Giuliano-Lagarde Report explains at p.12 that this exclusion is intended to cover *"all the complex acts (contractual, administrative, registration) which are necessary to the creation of a company or firm and to the regulation of its internal organisation and winding up, i.e. acts which fall within the scope of company law".*

(3) In the context of the present case, both the claims for declarations and the damages claims are principally concerned with the question of ownership of the relevant Panamanian companies and the validity of the decisions of its organs (being the board of directors and shareholders). They fall squarely within the scope of the exclusion in Article 1.2(d), and therefore squarely outside the scope of Rome II.

(4) Further or alternatively, the new claims for declarations fall outside the scope of Rome II because declarations are a form of non-monetary remedy. Article 15 of Rome II provides that the material scope of the Regulation extends to remedies: Article 15(c) and (d). However, according to the Court of Appeal in <u>Actavis UK Ltd v Eli Lilly</u> [2015] Bus LR 1068 at [129] and [139]-[143], the 'remedies' contemplated by Article 15(c) and (d) are financial; declaratory remedies do not fall within its scope (overturned on appeal, but not on this point).

74. In circumstances where the applicable law is not determined under Rome II, the Panamanian law of limitation applies by reason of s.1 of the Foreign Limitation Periods Act 1984 (the "**FLPA**") and, in particular, the doctrine of 'relation back' applies by virtue of s.1(3) FLPA. In any event, even if Rome II is applicable, such that s.1 FLPA is disapplied by s.8 FLPA (as the Applicants argue),[103] the doctrine of 'relation back' still applies because it is inherent in the relevant procedural rules for amendment and joinder (CPR r.17 and r.19). In this regard, the Kazakovs submit that the court should follow the reasoning of Saini J in <u>Qatar Airways v Middle Eastern News</u> [2021] EWHC 2180 (QB) at [14]-[22], applying the Court of Appeal's *obiter* remarks in <u>Tatneft v Bogolyubov</u> [2018] 4 WLR 14 at [77]-[87]. This should be preferred to the contrary reasoning of Stuart-Smith J in <u>Vilca v Xstrata</u> [2018] EWCH 27 (QB) (with which Saini J disagreed in <u>Qatar Airways</u>).[104]

---

[103] Whiston-Dew 10 §27 {B/1/8}.
[104] <u>Vilca</u> was referred to by Nicol J with apparent approval in <u>Brownlie v Four Seasons Holdings Inc</u> [2019] EWHC 2533 (QB) at [47], although it appears to have been common ground between the parties that relation back did not apply where claims were within the scope of Rome II ([48]). Nicol J did refer to and agree with the Court of Appeal's *obiter* remarks in <u>Tatneft</u>, although this was not linked with the application of the doctrine of relation back and it seems that counsel in that case did not suggest that those *obiter* comments led to the application of that doctrine, possibly because of the concession made at [48]: [52]-[53]. Saini J was apparently not referred to <u>Brownlie</u>, yet it is unlikely to have made any difference to his reasoning that relation back is an inherent part of CPR r.17.4 and r.19.5 (now r.19.6), irrespective of any statutory basis for application of the principle;

75.     The Kazakovs submit that, even if Veronica satisfies the Court as to jurisdiction for her claims, joinder should be refused because Veronica needs to satisfy the requirements of CPR r.19.6 and has failed to do so and/or because the Court should in its discretion refuse joinder.

76.     Joinder of third parties to existing proceedings is determined in accordance with CPR r.19.  Where (as here) a third party is sought to be joined after the expiry of a relevant limitation period, CPR r.19.6 applies.[106]  The Applicants argue that CPR r.19.6 is not the applicable rule and that, instead, Veronica's joinder falls to be determined in accordance with CPR r.19.2.  The basis for this argument appears to be that (according to the Applicants):[107] (i) CPR r.19.6 only applies in a scenario where the doctrine of 'relation back' applies to deprive the Kazakovs of a reasonably arguable limitation defence; and (ii) 'relation back' does not apply in this case.  Each limb of that analysis is wrong:

(1)     First, CPR r.19.6 applies in those circumstances listed in sub-rule (1).  Those are the only conditions for the application of CPR 19.6.  'Relation back' is not one of them.  If CPR 19.6 applies, CPR 19.2 does not: see the proviso in 19.2(1).

(2)     Second, case law explains that 'relation back' is not a *pre-condition* to the application of CPR r.19.6, but a *consequence* thereof. In other words, if the requirements of CPR r.19.6 are fulfilled, and the addition/substitution is permitted, the *consequence* is that there is 'relation back': see Qatar Airways at [15]; Parsons v George [2004] 1 WLR 3264 at [11], [18] and [30]; Tatneft at [81]-[83].

(3)     Third, even if 'relation back' is a pre-condition to the application of CPR r.19.6, that is satisfied in this case because 'relation back' does apply.  As explained at §§73-74 above, it either applies because of s.1 FLPA or because of the inherent nature of the rule.  That is consistent with the fact that Rome II is an *"enactment"* within the meaning of CPR r.19.6(1)(c): see Tatneft at [83] (relating to the equivalent provision in CPR Part 17); Brownlie at [53] (Nicol J); Lonestar Communications Corporation v Kaye [2023] EWHC 421 (Comm) at [226(ii)] (Foxton J).  Further, it is sufficient for these purposes that the point is *"reasonably arguable"*, which it plainly is (at the very least): see the cases cited at §79 below.

77.     In the circumstances, Veronica's joinder application falls to be determined under CPR r.19.6 and not CPR r.19.2.  The following questions arise under CPR r.19.6, each of which is addressed below

---

points which were not (fully) argued in Vilca or in Brownlie.

[105] Until recent amendments to the CPR in 2023, CPR r.19.6 was numbered r.19.5.  The text of the rule remains materially unchanged for present purposes.  This skeleton argument refers to CPR r.19.6, but the court should be aware that authorities and the parties' evidence refer to CPR r.19.5.

[106] CPR r.19.2(1) and CPR r.19.6(1).

[107] Whiston-Dew 11 §18 {D/3/5}.

in turn: (i) is there an applicable limitation period under the Limitation Act 1980, the FLPA, or *"any other enactment which allows such a change [a change of parties after the end of a period of limitation], or under which such a change is allowed"*; (ii) has the relevant limitation period expired; (iii) was the relevant limitation period current when the proceedings were started; (iv) is the addition/substitution 'necessary' within the meaning of CPR 19.6(3); and (v) should the Court exercise its discretion to permit the addition or substitution? The Applicants have made no attempt to engage with these requirements. Instead, they simply assert that the necessary requirements for CPR r.19.6 are satisfied and that *"this will be addressed in submission in due course"*.[108] The Kazakovs set out their position briefly below and will respond in oral submission as necessary when the Applicants make their position clear.

*(i)*     *Relevant limitation period*

78.     The 'relevant' limitation period in the present case is a period of limitation under Panamanian Law, which is applicable by reason of s.1 FLPA,[109] alternatively Rome II:[110] see §§73-74 and 76(3) above.

*(ii)*     *Expiry of relevant limitation period*

79.     It is sufficient for the defendant to show that it has a reasonably arguable limitation defence: <u>Welsh Development Agency v Redpath Dorman Long</u> [1994] 1 WLR 1409 at 1423H and 1425G-H (Glidewell LJ); <u>Chandra v Brooke North</u> [2013] EWCA Civ 1559 at [67] (Jackson LJ); <u>Ballinger v Mercer</u> [2014] 1 WLR 3597 at [27] (Tomlinson LJ). The question is to be answered as at the date when permission is (or would be) granted (because the new claim is not made until the amendment actually takes place): <u>*Welsh Development Agency*</u> at 1421D (in the context of s.35 of the Limitation Act 1980, which is carried into effect by CPR r.19.6: Notes to the White Book at §§17.4.2 and 19.6.1

80.     For the reasons set out below, the Kazakovs submit that there is (at the very least) a reasonably arguable limitation defence to Veronica's new claims for damages and declarations. For the same reasons, and to the extent necessary (which is denied), the limitation defence would satisfy a *"real prospect of success"* threshold.[111]

81.     The relevant claims by Veronica are for declaratory relief as to the ownership of Edelweiss and for damages pursuant to Article 128 and 129 of the Panamanian Penal Code. It is common ground that these claims are governed by Panamanian law. There is a dispute between the Panamanian law experts (Mr Aued and Mr Lee) as to the applicable limitation periods for these claims. If Mr Aued is correct, then Veronica's claims are, as of now, at least arguably time-barred.

---

[108] Whiston-Dew 11 §27 {D/3/7}.
[109] CPR r.19.6(1)(b).
[110] CPR r.19.6(1)(c); <u>Qatar Airways</u> at [17]; and see <u>Tatneft</u>.
[111] The Applicants also accept if the applicable limitation period is 1 year, then the Kazakovs have a real prospect of establishing that the new claims for damages are time-barred: Whiston-Dew 11, §29 {D/3/5}, although that is not the threshold for present purposes.

82. It is submitted that the Court is not in a position to determine in the absence of cross-examination which expert is correct (and indeed for that reason, the Kazakovs have not pursued their argument that the new claims have no real prospect of success under Panamanian law because they are time-barred: see Seborg 6 §§9-10 {D/7/4-5} ). The Kazakovs submit that the court should adopt a similar approach to that taken by Butcher J in <u>PJSC Tatneft v Bogolyubov</u> [2019] Costs LR 1815 at [19] in the context of disputed foreign law expert evidence concerning obstacles to enforcement of an English costs order in a foreign jurisdiction. In short, where there are arguments either way and the court cannot determine which is correct, the court should err on the side of concluding that the limitation defence is available. In this case, the court should readily conclude from a brief review of the expert reports that it is not in a position to determine which of the experts is correct, and that the claims are as a consequence arguably time-barred. For these reasons, the Kazakovs do not address the expert reports in detail in this skeleton argument, and restrict themselves to an outline of the competing positions.

83. Veronica seeks to advance a claim for declarations that she is the *"sole shareholder of, and ultimate beneficial owner of, Edelweiss.* The Panamanian law experts disagree about the applicable limitation period in his situation, as follows:

    (1) Mr Aued's opinion is that the three-year limitation period in Article 1652.2 of the Panamanian Code of Commerce would apply.[112] Mr Aued's opinion is that time starts to run for the purposes of Article 1652.2 from the moment the relevant obligation can be enforced, in accordance with Article 1650 of the Code of Commerce.[113] As with Article 1706, Mr Aued's opinion is that this requires actual or constructive knowledge of the alleged wrongful act.[114]

    (2) Mr Lee disagrees with Mr Aued's opinion on the applicability of Article 1652.2 as a matter of analysis (without relying on any authority). Instead, his opinion is that the relevant limitation period is 15 years pursuant to Articles 1143 and 1151 of the Civil Code because, if they are invalid as alleged, the corporate acts challenged by Veronica and by Mrs Bourlakova would be an 'absolute nullity'.[115] As with Article 1706, Mr Lee's opinion is that time only starts to run from the date when the applicant had actual knowledge and that constructive knowledge is not sufficient; again, this is a matter of analysis only.[116]

84. In his second report, Mr Aued explains why Mr Lee's criticisms of his opinion are without foundation and why Mr Lee's own analysis is incorrect, including by reference to Articles 14.1 and 14.2 of the Civil Code which provide that a general provision (such as Article 1151) must yield to a

---

[112] Article 1652.2 {F/4/18}.
[113] Aued 1 §§63-64 {F/3/25}.
[114] Aued 1 §§65-66 {F/3/25}; Aued 2 §§60-63 {F/10/17-18} , 69 {F/10/20} and 81 {F/10/25}.
[115] Lee 1 §§107-120 {F/5/26-29} ; Articles 1143 {F/6/19} and 1151 {F/6/20}.
[116] Lee 1 §§121-124 {F/5/29}.

specific provision (such as Article 1652.2)[117] and by reference to case law.[118]  Further, Mr Aued explains that if Article 1652.2 does not apply, and if the relevant corporate acts are invalid, then the applicable limitation period would be four years under Article 1151 of the Civil Code because the relevant acts would be a 'relative nullity', rather than an 'absolute nullity' as suggested by Mr Lee.[119]

85.  The second category of claims Veronica seeks to advance are claims for damages pursuant to Articles 128 and 129 of the Panamanian Penal Code.  These claims are based on the Kazakovs' alleged role as 'instigators or participants' in Mr Bourlakov's alleged primary wrongdoing, said to be alleged breaches of Articles 220, 243 and 253 of the Panamanian Penal Code.[120]

86.  The Panamanian law experts appear to agree that, as a matter of Panamanian law, these claims can be pursued in three different ways: (i) within criminal proceedings in the Panamanian criminal courts; (ii) in civil proceedings following the conclusion of criminal proceedings by relying on a judgment of the criminal courts; or (iii) in civil proceedings as a freestanding cause of action which must be proved without relying on a pre-existing criminal judgment.[121]  In the present case, the only method Veronica relies on (and the only method she could rely on) is method (iii).  The experts disagree as to the correct legal basis for a freestanding civil claim such as that which Veronica seeks to advance in these proceedings.  The experts' competing opinions on these issues are outlined below.

87.  Mr Aued's opinion is that a freestanding civil action for damages under Articles 128 and 129 of the Penal Code is an extra-contractual or tortious claim.[122]  Such a claim is civil claim governed by Article 1644 of the Civil Code.[123]  The limitation period applicable to claims under Article 1644 (including claims under that Article in respect of Articles 128 and 129 of the Penal Code) is the one year limitation period in Article 1706 of the Civil Code.  Mr Aued's opinion is supported by, *inter alia*:

(1)  The wording of Articles 128 and 129, the latter of which expressly refers to the Civil Code.[124]

(2)  Article 29 of the Code of Criminal Procedure, the effect of which is that civil court judges cannot directly apply rules form the Penal Code to a civil claim.[125]

(3)  Article 1644 is the general regime for extra-contractual liability in Panama and it is the prism through which the Panamanian courts apply Articles 128 and 129 of the Penal Code in a freestanding civil claim.[126]

---

[117] Aued 2 §§57-84 {F/10/16-25}.
[118] Aued 2 §80 {F/10/23-24}.
[119] Aued 2 §§82-83 {F/10/25}.
[120] Draft APOC §§198-199 {A/2.1/85-86} and 199C-F {A/2.1/87-88} .
[121] Aued 1 §§11-13 {F/3/4-5}; Lee 1 §§14-15 {F/3/5}.
[122] Aued 1 §14 {F/3/5}.
[123] Aued 1 §15 {F/3/5} ; Article 1644 {F/4/5}.
[124] Aued 1 §15 {F/3/5}; Articles 128 and 129 {F/4/3}.
[125] Aued 1 §§16-17 {F/3/5-6}
[126] Aued 1 §§17-25 {F/3/6-8}.

(4)     Panamanian case law, including cases from the Supreme Court of Panama which confirm both the applicability of Article 1644 and that the relevant limitation provision is Article 1706. Relevant cases include <u>Levy Strauss & Co v Nippan, SA</u> (June 13, 2000);[127] <u>Camaronera de Cocle, SA v Virgilio Reyez Pinzon</u> (August 23, 2004);[128] <u>Alberto Lazaro Ramos v Reynaldo Lewis</u> (March 8, 2016); <u>Nun-Choy Chan v Transportes Zupri, SA and Aseguradora Mundial</u> (September 21, 2017);[129] and <u>Rodriguez Moralez v Autoridad del Transito y Transporte Terrestre</u> (April 14, 2010).[130]

(5)     Commentary on the Penal Code published by the Office of the Attorney General and freely available on its website which supports the application of the limitation period in Article 1706.[131] Mr Lee criticises Mr Aued's reliance on this commentary, *inter alia*, on the basis that the author (Mr Cesar Roman Tello Solano) is simply an attorney in the Attorney General's Office and not a *"recognised scholar of Panamanian law"*.[132] The point is a bad one on its face but, in any event, Mr Lee's assertion is wrong; Mr Solano is a scholar with detailed experience in these matters, as Mr Aued explains and as Mr Solano's CV amply demonstrates.[133] Mr Aued cites further academic commentary in his second report which both supports Mr Aued's own opinion and demonstrates why Mr Lee's opinion is wrong.[134]

88.     Mr Lee's opinion is that a freestanding civil claim under Articles 128 and 129 of the Penal Code can be brought directly under those articles without having to rely on Article 1644 of the Civil Code.[135] This leads him to conclude that the appropriate limitation period is seven years, which he considers to be applicable under Article 1701 of the Civil Code. His reasoning is broadly as follows:

(1)     He disagrees with Mr Aued's reliance on the express reference to the Civil Code in the text of Article 129.[136]

(2)     He disagrees with Mr Aued's reliance on Article 29 of the Code of Criminal Procedure, and instead seeks to rely on Article 977 of the Civil Code, which in his opinion requires civil judges to apply provisions of the Penal Code.[137] However, as Mr Aued explains, this is inconsistent with the <u>Camaronera</u> case.[138]

---

[127] Aued 1 §§35-38 {F/3/11-12}
[128] Aued 1 §§39-42 {F/3/14-17}.
[129] Aued 1 §43 {F/3/17}.
[130] Aued 1 §44, fn9 {F/3/17}; Aued 2 §§27-33 {F/10/9-12}.
[131] Aued 1 §§31-34 {F/3/10}; the commentary is at {F/4/36}.
[132] Lee 1 §§66-71 {F/5/17-18}.
[133] Aued 2 §§15-16 {F/10/5-6}; Mr Solano's CV {G/1/256}.
[134] Aued 2 §§17-23 {F/10/6-8}.
[135] Lee 1 §§26-27 {F/5/7}.
[136] Lee 1 §28 {F/5/7}.
[137] Lee 1 §§29-31 {F/5/8-9}.
[138] Aued 2 §§25-26 {F/10/8-9}.

(3) He opines that Article 128 of the Penal Code is a specific provision which takes precedence over Article 1644 of the Civil Code, which is a general provision.[139] But that fails to meet Mr Aued's opinion that the two provisions do not compete with one-another, rather Article 1644 is the prism through which Article 128 applies in freestanding civil proceedings.

(4) He opines that there is no policy justification for Mr Aued's approach because it would lead to different limitation periods depending on whether or not the claim was brought in criminal proceedings.[140] However, he offers no authority to support this criticism, still less authority which posits any policy justification for his own opinion.

(5) He opines that Mr Aued's reasoning is contrary to the reasoning in the <u>Rodriguez Morales</u> case.[141] However, Mr Aued explains why that is wrong and why the reasoning in that case in fact supports his opinion.[142] Mr Lee goes on examine the reasoning in the <u>Levy Strauss</u> and <u>Camaronera</u> cases in an attempt to undermine Mr Aued's analysis.[143] Mr Aued explains in his second report why Mr Lee's analysis of these cases is wrong.[144] Mr Lee also states that the decisions relied on by Mr Aued are not strictly binding because they do not satisfy the requirements of 'probable doctrine' under Panamanian law,[145] but Mr Aued explains that they are nevertheless persuasive and can (indeed have) been relied on by courts in Panama in other similar cases.[146] It is notable that, whilst he seeks to undermine the cases (and academic commentary) on which Mr Aued relies in support of his opinion, Mr Lee has not identified a single case or academic commentary which supports his own opinion.

(6) This all leads Mr Lee to conclude that *"the applicable limitation period for a claim under Article 128 in the absence of a criminal conviction is the ordinary limitation period set forth in Article 1701 of the Civil Code".*[147] Mr Aued explains in detail in his second report why Mr Lee's analysis is misconceived.[148]

89. The experts also disagree as to when time starts to run for the purposes of Article 1706.[149] The dispute is in essence whether time only starts to run when the alleged victim has actual knowledge of the relevant harmful event or damage (as Mr Lee suggests)[150] or whether constructive knowledge

---

[139] Lee 1 §32 {F/5/9}.
[140] Lee 1 §§33-34 {F/5/9-10}.
[141] Lee 1 §§35-43 {F/5/10-12}.
[142] Aued 2 §§27-30 {F/10/10-11}.
[143] Lee 1 §§44-63 {F/5/12-16}.
[144] Aued 2 §§25-26 {F/10/8-9}; 38-39 {F/10/12}.
[145] Lee 1 §§64-65 {F/5/16-17}.
[146] Aued 1 §43 {F/3/17}; Aued 2 §§8-9 {F/10/3-4}.
[147] Lee 1 §74 {F/5/18}.
[148] Aued 2 §§10-39 {F/10/4-12}.
[149] Mr Lee has not offered any opinion as to when time starts to run for the purposes of Article 1701 on which he relies, but the arguments ought to be materially the same.
[150] Lee 1 §§76-81 {F/5/19-20}.

(as Mr Aued suggests).[151]  Again, for the reasons explained in Mr Aued's report, this is (at the very least) reasonably arguable.  This debate is, in any event, irrelevant at the present hearing because the Applicants accept that (even on their own case that actual knowledge is required), if the one-year limitation period applies then there is a *"real prospect"* (which is significantly greater than the *"reasonably arguable"* threshold required) that their new damages claims are time-barred.[152]

90.  In the circumstances, the Kazakovs submit that it is (at the very least) reasonably arguable that: (i) the appropriate legal basis for Veronica's new damages claims is Article 1644 of the Civil Code; (ii) the applicable limitation period is one year in accordance with Article 1706; and (iii) time starts to run from the date on which Veronica had actual or constructive knowledge of the alleged wrongful act or damage.

91.  For the reasons explained in Seborg 5 §§17-30 {C/1/7-10}, application of the relevant limitation periods leads to the conclusion that it is at least reasonably arguable that both the claim for a declaration and the claims for damages are now time-barred:

(1)  As to the damages claims, the Applicants themselves accept that, if Mr Aued is correct that the one-year limitation period applies, there is a *"real prospect"* that the damages claims (both veronica's and Mrs Bourlakova's) are now time-barred.[153]  That is significantly higher than the *"reasonably arguable"* threshold required.

(2)  As to the declarations claims, Veronica's own evidence is that she received a copy of Merenguito's regulations on 13 February 2018, which named Edelweiss as an asset of Merenguito.[154]  In light of that evidence as to Veronica's actual knowledge, the date of her constructive knowledge is irrelevant for current purposes, although she would have had such constructive knowledge from at least 20 November 2018 when a public deed relevant to the alleged wrongful acts was recorded by the Panamanian public registry.[155]  The relevant limitation period would therefore have expired by no later than 13 February 2021.

*(iii)    Position at the date proceedings were started*

92.  As to the currency of the limitation period when proceedings were started, the Kazakovs accept (solely for the purposes of the Amendment/Joinder Applications) that on the current evidence this

---

[151] Aued 1 §§48-54 {F/3/19-22}; Aued 2 §§40-46 {F/5/13-14}.  Mr Aued explains that this can include deemed awareness of documents on a public register, such as documents of title.
[152] Whiston-Dew 11 §29 {D/3/7}.
[153] Whiston-Dew 11 §29 {D/3/7}.  Ms Whiston-Dew refers to the amendments to Section C3 of the Draft APOC, while the damages claims at §§196A-200 appeal under a the heading *"Claims arising out of Sections C0 and C3 above"* {A/2.1/85-88}.  It is unclear whether the Applicants seek to allege that the amendments to Section C0 are the basis for damages claims, but that is not how it is pleaded – only Section C3 deals with the alleged misappropriation of assets and only the amendments to that Section can be the basis of any damages claims: see especially §§145-146A {A/2.1/65-66}.
[154] Veronica's first witness statement §19 {A/7/5}; Seborg 5 §23 {C/1/8-9}.
[155] Seborg 5 §28 {C/1/10}.

threshold condition is satisfied.

*(iv)    Is Veronica's joinder necessary?*

93.    The court's discretion to permit joinder only arises if joinder is *"necessary"* (CPR r.19.6(2)(b)), which must be determined solely by reference to CPR r.19.6(3).  The Applicants have not identified in their evidence why they say that Veronica's joinder is necessary.  The only ground of necessity on which the Applicants could conceivably seek to rely is CPR r.19.6(3)(b): *"the claim cannot properly be carried on by or against the original party unless the new party is added or substituted as claimant or defendant"*.  This derives from s.35(6) Limitation Act 1980 (the "**1980 Act**") and must be construed consistently with that provision: <u>Parkinson Engineering Services plc (in liquidation) v Swan</u> [2010] Bus LR 857.  This provision requires the Applicants to show that: (i) a claim made in the <u>original</u> action is not sustainable by or against the existing party without joinder;[156] and (ii) it is the same claim which will be carried on by or against the new party: <u>*Insight Group Ltd v Kingston Smith*</u> [2014] 1 WLR 1448 at [96] (Leggatt J).

94.    The Applicants have not addressed the issue of necessity in their evidence. The Kazakovs submit that Veronica's joinder fails to satisfy this threshold condition, for the following reasons:

(1)    Both Veronica's damages claim and her declarations claim are premised on the allegations that she is the sole shareholder of Edelweiss, alternatively that she was the beneficial owner of Edelweiss and/or that the Panamanian Foundation Merenguito held shares in Edelweiss as a nominee for her.[157]  Mrs Bourlakova's claims in respect of Edelweiss (which were the only claims in the original, unamended pleading) are now relegated to being a *"tertiary case"*.[158]

(2)    Those allegations are <u>inconsistent</u> with the allegations made in the original (unamended) POC as to the ownership of Edelweiss and the claims said to arise from such alleged ownership. Far from being necessary to allow the original (unamended) claim to be carried on, the amendments have the effect of undermining that claim and almost writing it out of existence.

(3)    Further, the Applicants' own evidence is that, in the original unamended pleading, *"The ownership of Edelweiss prior to its apparent transfer to Merenguito was not a part of the cause of action pursued by the Claimants and was not a matter on which it was necessary for the Claimants to adopt any positive position"*.[159]  In other words, Veronica's alleged ownership of Edelweiss is completely irrelevant

---

[156] That the *"claim"* for these purposes is the original (unamended) claim as pleaded in the original (unamended) Claim Form and Particulars of Claim is clear from the wording of the 1980 Act: see s.35(6) of the 1980 Act, which refers to the joinder being necessary for the determination of the *"original action"*.  It is also clear from the authorities: <u>Roberts v Gill & Co</u> [2009] 1 WLR 531 at [36]; and on appeal ([2011] 1 AC 240) at [42]-[44] and [70]-[71]; and see how this was interpreted in <u>Nemeti v Sabre Insurance Co Ltd</u> [2012] EWHC 3355 (QB) at [42]; and on appeal ([2014] CP Rep 16) at [38] and [45].  The result is that the court must ignore Mrs Bourlakova's draft amendments when determining whether Veronica's joinder is necessary.
[157] Draft APOC §§21, 96A-F, 145, 156, 196A and 199E-F {A/2.1}.
[158] Draft APOC §199G {A/2.1/88}.
[159] Whiston-Dew 11 §81 {D/3/16}.

to the original claims, so much so that the Claimants saw no reason to plead anything about it at all. Instead, these are entirely new claims which bear no relation to the claims in the original, unamended pleading.

95.    In the circumstances, Veronica's claims for damages and a declaration do not satisfy the threshold condition in CPR r.19.6(3). Her joinder application should therefore be refused.

*(v)    Discretion*

96.    Even if all of the threshold conditions for the application of CPR r.19.6 are met, the Court still has a discretion as to whether to permit joinder.[160] When exercising its discretion, the court should have regard to all of the circumstances of the case. Whilst it is not possible to set out a comprehensive list, the factors set out by Coulson J in <u>CIP Properties (AIPT) v Galliford Try Infrastructure Limited</u> [2015] EWHC 1345 (TCC) at [19], which are frequently referenced by other courts,[161] should be considered. The relevant factors include: (i) the lateness of, or delay in making, the amendments; (ii) the *"history"* of the amendment, including whether there is a *"good reason"* for lateness or delay; (iii) the particularity or clarity of the proposed amendments; and (iv) the prejudice to the parties if the amendments are permitted/refused. Further, in any case where an amendment is sought to be made after the expiry of a limitation period, the Court should err on the side of caution; *a fortiori* where the amendment seeks to join a new claimant. Lewison J explained the position in the following terms in <u>Fattal v Walbrook Trustees (Jersey) Ltd</u> [2012] Bus LR D7 at [41]: *"In my judgment the discretion to allow an amendment after the expiry of a limitation period should not lightly or routinely be exercised in a way that would deprive a defendant of a limitation defence…"*.[162]

97.    In the present case, the court should refuse to exercise its discretion to join Veronica for the following reasons.

98.    **First**, the effect of permitting Veronica's joinder would be that her claims would 'relate back' to the original action issued on 16 July 2020: see §§74-77 above. In circumstances where it is (at the very least) reasonably arguable that Veronica's claims for damages expired in September 2019 (at the latest) and that her claims for declarations expired on 13 February 2021, the operation of the doctrine of relation back would deprive the Kazakovs of a limitation defence. That in itself is a good reason for refusing the Veronica's joinder: see <u>Fattal</u> at [41].

---

[160] This is reflected in the opening words of CPR r.19.6(2) that the court *"may"* permit joinder if the threshold conditions are satisfied.
[161] See e.g. Stuart-Smith J in <u>Vilca v Xstrata Limited</u> [2017] EWHC 2096 (QB) at [28]-[29], with the slight caveat that there is no strict rule that the absence of a good explanation for delay is fatal to the application, but it is one of the factors to be considered in striking a fair balance. These cases concerned the exercise of discretion under CPR r.17, but the same basic principles ought to apply under CPR r.19.6.
[162] This case was again concerned with CPR r.17, but the position ought to apply *a fortiori* to an application for joinder of a new claimant pursuant to CPR r.19.6.

99.    The Applicants seek to circumvent this issue by suggesting that the court can grant Veronica's joinder on what is known as the 'Mastercard basis', following the decision of Field J in WM Morrison Supermarkets plc v Mastercard Incorporated [2013] EWHC 3271 (Comm) *i.e.* that the court should grant permission to amend but make a direction that the doctrine of relation back should not apply. In the Kazakovs' submission, the so-called 'Mastercard basis' has no operation in a case such as the present where each claim is time-barred in its entirety, as opposed to only a portion of each claim being time-barred: see HHJ Russen K.C. (sitting as a Judge of the High Court) in DR Jones Yeovil Limited v Drayton Beaumont Services Limited [2021] EWHC 1971 (TCC) at [62]-[64].

100.   **Second**, as explained above, irrespective of which jurisdictional regime applies, Veronica's new claims for damages and declarations overlap to a significant degree with claims already proceeding in Panama and in Florida.    This is itself a strong reason for refusing permission to amend.  It also amply demonstrates that: (i) Veronica would suffer no injustice by permission being refused – she could continue her claims in both Panama and in Florida, where the Kazakovs and others have offered to submit (or have already submitted) to the relevant courts' jurisdiction;[163] and (ii) the Kazakovs would suffer significant prejudice if the amendments were permitted – they would be faced with a multiplicity of overlapping proceedings in no less than three different jurisdictions. Relatedly, the fact that Veronica intends to continue to pursue her claims in Panama (and, it is inferred, Florida) even if her joinder is successful,[164] means that her claims in this jurisdiction would be an abuse of this court's process: see Sir Nicholas Browne-Wilkinson VC in Australian Commercial Research and Development Ltd v ANZ McCaughan Merchant Bank Ltd [1989] 3 All ER 65 at 69.  That is a further reason for refusing her application.

101.   **Third**, in addition to the overlapping proceedings in Panama and Florida, ownership of Edelweiss is or has been a live issue in other sets of proceedings around the world, where the Applicants have advanced cases inconsistent with Veronica being the alleged shareholder and sole beneficial owner of Edelweiss.[165]  The Applicants seek to explain all of this away on the basis that these inconsistent cases were first advanced before Veronica allegedly discovered her share certificated in a bedside cabinet in January 2022.[166]  The court may well regard it as extraordinary that Veronica simply forgot that share certificates for a company said to be worth c.USD800m were hiding away in her bedside cabinet for years, all while she and her mother were fighting tooth and nail to get their hands on that company in litigation around the world, making serious allegations of wrongdoing in the process.

102.   **Fourth**, Veronica's new claims are pleaded in exceptionally broad terms e.g. the declaration at prayer

---

[163] Veronica has also issued separate 'protective' proceedings in this jurisdiction: Whiston-Dew 11 §200 {D/3/45}.
[164] Whiston-Dew 11 §181 {D/3/41}.
[165] Seborg 5 §§47-74 {C/1/15-21}.
[166] Whiston-Dew 11 §§73-109 {D/3/15-22}.

(2A) that *"neither the Seventh nor Eighth Defendants has any interest in any asset held by any of the Claimants"*. Further, as the Applicants are at pains to stress,[167] the broad declaration sought that *"Veronica is the sole shareholder of, and ultimate beneficial owner of, Edelweiss"* (Draft APOC §196B {A/2.1/85}) does not seek to invalidate any of the shareholder or board resolutions relating to that company and which are inconsistent with that declaration, but which would remain valid even if the declaration was granted.

103. Similarly, no attempt has been made to: (i) particularise the basis on which Mr Kazakov allegedly agreeing to act as a beneficiary of Panamanian foundations was an act of instigation or participation in Mr Bourlakov's allegedly criminal act in allegedly providing a financial inducement to Mrs Kazakova;[168] or (ii) particularise Mrs Kazakova's alleged acts which are said to give rise to her liability – an unparticularised plea that Mrs Kazakova is liable for *"all actions taken by her"* is insufficient.

104. For the reasons explained above, and to the extent that the court's discretion arises at all, the Kazakovs invite the court to exercise its discretion to refuse Veronica's joinder to these proceedings. If (which is denied) the joinder application is to be determined under CPR 19.2 (and not CPR 19.6), the Kazakovs will say that: (i) the threshold conditions in CPR r.19.2(a) are not met for the reasons explained at §94 above; and, in any event (ii) permission should be refused in the Court's discretion for the reasons explained above (save for the limitation point).

## VI.   AMENDMENT/JOINDER APPLICATIONS CONCERNING MRS BOURLAKOVA'S NEW CLAIMS

105. This section deals with the Amendment/Joinder Applications insofar as they concern Mrs Bourlakova's amendments and new claims, as follows:

(1) **Section A** deals with whether the court has jurisdiction to hear these new claims and, if so, whether it should exercise its discretion in favour of doing so. The Stay Application is considered in this context as against Mrs Bourlakova. Applicable law is considered briefly as the analysis is the same as that applied above to Veronica's new claims.

(2) **Section B** addresses why the court should refuse permission for Mrs Bourlakova's amendments and new claims.

## A.   JURISDICTION

106. For the reasons explained at §28 above, the Kazakovs submit that the applicable jurisdictional rules are the common law rules.

*(i)   Common law*

---

[167] Whiston-Dew 11 §37 {D/3/9}.
[168] Draft APOC §§196 {A/2.1/85} and 199C {A/2.1/87}.

**Gateways**

107.　In the event that the common law regime applies, Mrs Bourlakova relies on gateway (3) (necessary or proper party) and gateway (4A) (claims arising out of the same or closely connected facts).[169]  The Kazakovs do not accept that either of these gateways are available in respect of Mrs Bourlakova's new claims for declarations or damages.[170]

108.　As to gateway (4A), the new claims which Mrs Bourlakova seeks to advance do not arise out of the same or closely connected facts as the original (unamended) claims for the following reasons:

(1)　As to her new declarations claims, the position she now adopts is diametrically opposed to the position pleaded in the original (unamended) Particulars of Claim.  As explained at §§12-13 above, the original pleaded claim was that Mr Bourlakov was and had at all material times been the ultimate beneficial owner of Gatiabe (subject to shares being issued to Delos Global for Mr Kazakov's benefit, allegedly as nominee for Mr Bourlakov) and Jovellanos.  The amendments seek to advance a new claim at draft APOC §186A that Mrs Bourlakova is and has at all material times since December 2014 been the holder of the entirety of the shares in Gatiabe (with the shares issued to Delos Global being invalid) and Jovellanos and ultimate beneficial owner of both companies {A/2.1/81}.  Unsurprisingly, this new claim is not supported by any of the original particulars, but only by the significant amendments which are the subject of the present applications: see especially draft APOC §§90A-C {A/2.1/38-40}.  Indeed, the first time Jovellanos is introduced at all is via a proposed amendment at draft APOC §26A {A/2.1/10}.

(2)　As to her new damages claims at draft APOC §200 {A/2.1/88}, the claims in respect of IPEC and Hydrangea are entirely new and arise only out of the substantial draft amendments to Sections C0 and C3 of the draft APOC.  Similarly, her new damages claim in respect of Edelweiss is now a 'tertiary' case which only arises out of the same substantial amendments.  Further, those new claims bear no relation to the original claims against the Kazakovs:

(a)　The original claims can be seen in the purple struck-through text at draft APOC §199A {A/2.1/86}, and the basis for them was that the Kazakovs were alleged to be liable as instigators or participants in Mr Bourlakov's alleged criminal acts *"insofar as either or both of them was nominally a beneficiary of Anahil and/or Hemaren"*.

(b)　The new claims against Mrs Kazakova are not premised on her being a beneficiary of

[169] Whiston-Dew 10 §§33-38 {B/1/9-11}.
[170] These are points for submission and Mrs Bourlakova bears the burden of persuading the court that it has jurisdiction to hear her new claims.  To the extent that any evidence is necessary, it has been adduced by way of Seborg 6 by reference to Veronica, and responded to by the Applicants (including Mrs Bourlakova) in Whiston-Dew 12 and by Veronica 2 (giving evidence on behalf of all of the Applicants).

either of those entities (draft APOC §§199D and 200 {A/2.1/87-88}), and the original allegation that she was a beneficiary is now struck-through in the proposed amendments at draft APOC §23 {A/2.1/9}.

(3) The new claims against Mr Kazakov are on the basis of his allegedly *"agreeing to act as a beneficiary of Wlamil and Hemaren"*: draft APOC §199C {A/2.1/87}. The first time Wlamil is introduced to the proceedings is by way of proposed amendments at draft APOC §23 {A/2.1/85}. So far as Hemaren is concerned, this is only relevant to the new secondary and tertiary cases in relation to Edelweiss: draft APOC §§96D-F and 199E-G {A/2.1/87-88}.

(4) The new claims against Mr Anufriev in relation to Edelweiss are again now a 'tertiary' case which only arise out of the substantial amendments to Sections C0 and C3 of the draft APOC. Further, those new claims bear no relation to the original claims against Mr Anufriev:

    (a) The original claims can be seen in the purple struck-through text at draft APOC §199A {A/2.1/86}, and the basis for them was that Mr Anufriev was alleged to be liable as an instigator or participant in Mr Bourlakov's alleged criminal acts *"insofar he resigned as protector prior to the dissolution"* of Tribatline and Merenguito, on the basis of Mr Bourlakov allegedly having offered him a financial inducement to discharge his duties as a protector of those foundations in Mr Bourlakov's favour: draft APOC §199 {A/2.1/86}.

    (b) The new claims are not premised on any offer of a financial inducement, which now appears in struck-through purple text in §199. Instead, Mr Anufriev is now alleged to be liable as instigator or participant for <u>different</u> alleged acts <u>after</u> he stood down as protector of Merenguito, Tribatline and Nuptials (which is referred to for the first time by way of amendment): draft APOC §§199B(c)-(d) {A/2.1/86-87}. This is all based on the new allegations pleaded for the first time by way of amendment in Sections C0 and C3. Further, Mrs Bourlakova specifically does <u>not</u> bring any claims against Mr Anufriev in his capacity as protector of the foundations.

(5) No new claims are advanced against any of the other Defendants, save to the extent that Mrs Bourlakova relies on the entirely new allegations pleaded for the first time by way of amendment and which are contradictory to her original claims.

109. As to gateway (3), the burden rests on Mrs Bourlakova to prove, *inter alia*, that one of the defendants to each of her <u>new claims</u> has or could be served in respect of each of those <u>new claims</u> otherwise than in reliance on the necessary or proper party gateway. Ms Whiston-Dew's evidence seems to proceed on the basis that it will be sufficient to prove these matters by reference to the original (unamended) claims. To the extent that that is the Applicants' position, it is wrong and contrary to

Donohue v Armco and Apple Retail, which make clear that the court must assess its jurisdiction only by reference to the new claims: see §38 above.

110. In the circumstances, the only relevant 'anchor defendant' is Leo England, being a company incorporated in the jurisdiction. However, for the reasons explained at §§30-35 above, the Kazakovs submit that it is to be inferred that Mr Tribaldos and his companies, including Leo England, are not in truth adverse parties to the Applicants and that the Applicants have no intention to pursue their claims against them to judgment. Leo England is therefore not an appropriate anchor defendant.[171]

## Forum Non Conveniens

Panama is a more appropriate forum than England

111. As with Veronica's new claims, Panama is an available forum for determination of Mrs Bourlakova's new claims and §§40-50 above are repeated *mutatis mutandis*. Further, and as explained in further detail below, Mrs Bourlakova has in fact already commenced proceedings against or in respect of both Gatiabe and Jovellanos in Panama.

112. Not only is Panama a more appropriate than England for determination of Veronica's new claims for declarations and damages; it is also a more appropriate forum for determination of Mrs Bourlakova's new claims, for the reasons explained below.

113. **First**, all of the new claims advanced by Mrs Bourlakova by way of amendment relate to and are premised upon the internal affairs and/or ownership of Panamanian companies or foundations, and the alleged actions said to give rise to liability predominantly occurred in Panama.

114. **Second**, the new claims sought to be advanced by Mrs Bourlakova overlap to a significant degree with claims already underway in Panama, including claims in Panama which were commenced by Mrs Bourlokova (and Veronica) after they orchestrated the 'corporate raids' referred to at §43(1) above. In summary, the relevant Panamanian claims are as follows:

(1) Oral process claims brought before the Panamanian Civil Courts pursuant to Article 418 of the Panamanian Commercial Code, including:[172]

(a) A claim by Mrs Bourlakova against Gatiabe on 10 February 2022 in the 15th Circuit Court. That claim seeks relief which is materially similar to the relief Veronica seeks in her oral process claim against Edelweiss. Mrs Bourlakova's oral process claim will in substance determine ownership of Gatiabe. The claim has already proceeded to a merits hearing in Panama, which remains ongoing.

[171] This point has been advanced in Seborg 6 in respect of Veronica's new claims. It applies equally to Mrs Bourlakova's new claims.
[172] Seborg 5 §§105-115 {C/1/28}; Seborg 6 §52-54 {D/7/17} and Annex 2 {D/8/6}.

(b)     A claim by Mrs Bourlakova against Jovellanos on 10 February 2022 in the 1st Circuit Court. That claim seeks relief which is materially similar to the relief Veronica seeks in her oral process claim against Edelweiss. Mrs Bourlakova's oral process claim will in substance determine ownership of Jovellanos. The claim is currently pending the Panamanian Court's decision on admissibility.

(c)     A claim by Wlamil against Gatiabe (represented by the board of directors purportedly appointed by Mrs Bourlakova) on 18 February 2022 in the 18th Circuit Court. That claim seeks relief which is materially similar to the relief Hemaren seeks in its oral process claim against Edelweiss. Wlamil's oral process claim will in substance determine ownership of Gatiabe. Mrs Bourlakova has been granted permission to intervene in those proceedings and an appeal on that issue is currently pending.

(d)     A claim by Mr Kazakov against Jovellanos (represented by the board of directors purportedly appointed by Mrs Bourlakova) on 18 February 2022 in the 13th Circuit Court. That claim seeks relief which is materially similar to the relief Hemaren seeks in its oral process claim against Edelweiss. Mr Kazakov's oral process claim may in substance determine ownership of Jovellanos. Mrs Bourlakova had sought permission to intervene in those proceedings, which was rejected. Her appeal on that issue was also rejected on 30 January 2023. The parties are waiting for a hearing date from the Panamanian court.

(2)     The ordinary civil proceedings in the Panamanian civil courts referred to at §43(4) above.

(3)     Criminal proceedings, in particular, a criminal complaint was lodged by Wlamil on 2 June 2022 in relation to Gatiabe against the purported directors appointed during the raid. This is materially similar to the criminal complaint lodged in respect of Edelweiss and referred to at §43(5) above. Mrs Bourlakova also lodged a criminal complaint against Wlamil's true directors.

115.    The Panamanian proceedings (which are well underway) therefore give rise to the same core issue of ownership of Gatiabe and Jovellanos on which Mrs Bourlakova seeks to rely for her new claims in these English proceedings. Panama therefore provides a more appropriate forum than England for the claim for a declaration of ownership of Gatiabe and Jovellanos and the closely-connected damages claims. That is particularly so in circumstances where: (i) Mrs Bourlakova's oral process proceedings will give rise to a binding *res judicata* in Panama; (ii) any judgment of the English courts which makes findings as to ownership would not be enforceable or recognisable in Panama unless each of the shareholders was a party; and (iii) a judgment of the Panamanian courts would be recognisable/enforceable in England: §§44-45 above are repeated *mutatis mutandis*.

116.    **Third**, to the extent that any damage has been suffered by Mrs Bourlakova, most or all of such

damage is likely to have been suffered in Panama where the actions complained of are said to have taken place and where the relevant entities are located. The relevant actions for these purposes are the alleged misappropriation of Gatiabe, Jovellanos and their assets.[173]

117. **Fourth**, the key witnesses and documentary evidence relevant to the new claims are located in Panama and the claims raise complex issues of Panamanian law.[174]

118. **Fifth**, the arguments made by the Applicants about the appropriate forum do not lead to a different conclusion: §49 above is repeated *mutatis mutandis*.

119. In the circumstances, Panama is plainly a more appropriate forum than England for Mrs Bourlakova's new claims. Mrs Bourlakova recognised this by commencing her own proceedings in Panama in the first instance. The oral process proceedings are already well-advanced and the Applicants should not be allowed to forum shop now that the tide of those proceedings has turned against them in certain respects. To allow them to do so would be contrary to the interests of justice and would be an abuse of this court's process.[175]

Florida is also a more appropriate forum than England

120. As with Veronica's new claims, Florida is also an available forum for determination of Mrs Bourlakova's new claims and §52 above is repeated *mutatis mutandis*. The Kazakovs note that Mrs Bourlakova has challenged the Florida courts' jurisdiction over her. However, If Mrs Bourlakova's jurisdiction challenge were to fail or be withdrawn, she would likely be able to bring against the Kazakovs in Florida the claims which she now seeks to advance against them in England by way of amendment.[176] The same is likely to be true in respect of the claims against Mr Bourlakov, and possibly other defendants.[177] In this regard, Wlamil and Gatiabe have indicated that, without prejudice to proceedings and their rights in Panama, if the English court determines that Mrs Bourlakova's Declaration Related Claims are not most appropriately heard in Panama, but holds that they should be heard in Florida, Gatiabe and Wlamil would not seek to contest the jurisdiction

---

[173] The Applicants' speculative suggestion that there may (or may not) be some evidence in future of actions taking place or losses being suffered elsewhere is irrelevant, as is their reference to the allegations pleaded in Sections A1 and A3 of the draft APOC, which the Applicants rely on in support of the new claims but which instead relate to different claims: Whiston-Dew 11 §137(3)-(4) {D/3/31}.

[174] As to the location of documents and witnesses, the relevant documents/witnesses are those which relate only to the new claims which are the subject of the amendment/joinder application; not the documents/witnesses relevant to the existing (unamended) claims in England: Donohue v Armco. As to Panamanian law, see Seborg 6 §108 {D/7/30}; the Applicants' position is also be that Panamanian law is applicable.

[175] As Sir Nicholas Browne-Wilkinson VC explained in Australian Commercial Research and Development Ltd v ANZ McCaughan Merchant Bank Ltd [1989] 3 All ER 65 at 69, in order to prevent such abusive tactics, a claimant must elect which set of proceedings it wishes to pursue. The Applicants have not given any current indication that they will do so. Instead, they intend to continue to proceed with their claims in Panama come what may: Whiston-Dew 11 §181 {D/3/41}.

[176] Seborg 6 §116 {D/7/32}.

[177] Seborg 6 §117 {D/7/33}.

of the Florida courts over Mrs Bourlakova's claims.[178]

121. Florida is also a more appropriate forum than England for the reasons explained at §§51-63 above, which are repeated *mutatis mutandis*.

*(ii)     Brussels I Recast*

122. Alternatively, if Brussels I Recast continues to apply, the Kazakovs will say that: (*i*) Article 8(1) is not available to Mrs Bourlakova; and (*ii*) even if it is, the new claims would fall to be stayed pursuant to Article 33 (in favour of Florida) and/or Article 34 (in favour of Panama and/or Florida) if the amendments were to be allowed, and for that reason, the amendments should be refused as a matter of discretion; alternatively, if the amendments are is allowed, a stay should be ordered. The analysis is the same as that applicable to Veronica's joinder and §§64-71 above are repeated *mutatis mutandis*.

*(iii)    Applicable law*

123. The analysis is the same as that applicable to Veronica's joinder and §§72-74 above are repeated *mutatis mutandis*.

**B.     MRS BOURLAKOVA'S AMENDMENTS AND CPR R.17**

124. Mrs Bourlakova's amendments fall to be considered under CPR r.17. Where (as in this case) a party seeks to amend after the expiry of a relevant limitation period, CPR r.17.4 applies.[179] The Applicants argue that CPR r.17.4 is not the applicable rule and that, instead, Mrs Bourlakova's amendments fall to be determined in accordance with CPR r.17.1(2)(b). As with their arguments about Veronica's joinder under CPR r.19.6, the basis for this argument appears to be that (according to the Applicants):[180] (i) CPR r.17.4 only applies in a scenario where the doctrine of 'relation back' applies to deprive the Kazakovs of a reasonably arguable limitation defence; and (ii) 'relation back' does not apply in this case. Each limb of that analysis is wrong for the reasons explained at §75 above, which are repeated *mutatis mutandis*.

125. In the circumstances, Mrs Bourlakova's amendments fall to be determined under CPR r.17.4. The following questions arise under CPR r.17.4, each of which is addressed below in turn: (i) is there an applicable limitation period under the Limitation Act 1980, the FLPA, or "*any other enactment which allows such an amendment, or under which such an amendment is allowed*"; (ii) has the relevant limitation period expired; (iii) do the proposed amendments seek to add or substitute a "*new claim*"; (iv) does the new claim arise out of the "*same facts or substantially the same facts as a claim in respect of which the party applying for permission has already claimed a remedy in the proceedings*"; and (v) should the Court exercise its

---

[178] Seborg 6 §118 {D/7/33}.
[179] CPR r.17.3(2)(c) and CPR r.17.4.
[180] Whiston-Dew 11 §18 {D/3/5}.

discretion to permit the amendment?

*(i)    Relevant limitation period*

126.    The 'relevant' limitation period in the present case is a period of limitation under Panamanian Law, which is applicable by reason of s.1 FLPA,[181] alternatively Rome II:[182] see §§49-50 and 76(3) above.

*(ii)    Expiry of relevant limitation period*

127.    The limitation analysis is materially the same as that applicable to Veronica's new claims as set out at §§79-91 above, which are repeated *mutatis mutandis*.  In overview:

(1)    It is sufficient for the Kazakovs to show that it is reasonably arguable that the limitation periods applicable to Mrs Bourlakova's new claims would have expired as at the date when permission is (or would be) granted.

(2)    As a matter of Panamanian law in respect of the declarations claims, it is (at the very least) reasonably arguable that: (i) the applicable limitation period to the new declarations claim is three years pursuant to Article 1652.2 of the Code of Commerce, alternatively four years pursuant to Article 1151 of the Civil Code; and (ii) time starts to run from the date on which Mrs Bourlakova had actual or constructive knowledge of the alleged wrongful act.

(3)    As a matter of fact, it is (at the very least) reasonably arguable that:

(a)    The date of Mrs Bourlakova's actual knowledge of the alleged wrongful acts relevant to Edelweiss is the same as the date of Veronica's knowledge *i.e.* 13 February 2018 (or 20 November 2018 for constructive knowledge).[183]  The relevant limitation period therefore expired on 13 February 2021.

(b)    The date of Mrs Bourlakova's constructive knowledge of the alleged wrongful acts relevant to Gatiabe is 12 July 2018, being the date when the Panamanian Public Registry published minutes of a special meeting of Gatiabe's shareholders revealing the alleged usurpation of Mrs Bourlakova's rights as the purported owner of Gatiabe.[184]  The relevant limitation period therefore expired on 12 July 2021.

(c)    The date of Mrs Bourlakova's constructive knowledge of the alleged wrongful acts relevant to Jovellanos is 8 October 2018, being the date when the Panamanian Public Registry published minutes of a special meeting of Jovellanos' shareholders revealing the alleged usurpation of Mrs Bourlakova's rights as the purported owner of

---

[181] CPR r.17.4(1)(b)(ii).

[182] CPR r.17.4(1)(b)(iii);  Qatar Airways at [17]; and see Tatneft.

[183] Seborg 5 §23, fn 3 explains that it is likely to be even earlier and as far back as 2016 but, to the extent necessary, it can be inferred that veronica informed her of the relevant matters no later than February 20-18 {C/1/8}.

[184] Seborg 5 §§24-25 {C/1/9}.  The Applicants have not provided any evidence to suggest that the starting point is any later.

Jovellanos.[185]  The relevant limitation period therefore expired on 8 October 2021.

(4)   As a matter of Panamanian law in respect of the damages claims: (i) the appropriate legal basis for Mrs Bourlakova's new damages claims is Article 1644 of the Civil Code; (ii) the applicable limitation period is one year in accordance with Article 1706; and (iii) time starts to run from the date on which Mrs Bourlakova had actual or constructive knowledge of the alleged wrongful act or damage.  As a matter of fact, it is (at the very least) reasonably arguable that the limitation period has now expired.  As explained at §§89 and 91(1) above, the Applicants accept that there is a *"real prospect"* that it has expired if the relevant limitation period is one year as Mr Aued suggests.

128.  In the circumstances, it is (at the very least) reasonably arguable that the limitation periods applicable to Mrs Bourlakova's new claims have expired.  CPR r.17.4 is therefore applicable.

*(iii)     The amendments seek to introduce a "new claim"*

129.  It appears to be common ground that, so far as CPR r.17.4 applies in light of the limitation position, the Mrs Bourlakova's declarations and damages claims are "new claims" for the purposes of CPR r.17.4(2).[186]  That is plainly correct.  To the extent that the Applicants dispute this at the hearing, submissions will be made in due course by reference to the guidance given by Coulson LJ in <u>Mulalley & Co Ltd v Martlet Homes Ltd</u> [2022] EWCA Civ 32 at [40]-[46].

*(iii)     The same or substantially the same facts*

130.  This criterion was recently considered by Coulson LJ in <u>Mullalley</u> at [47]-[54].  The assessment depends on an analysis of both the original and new claims to determine the degree of overlap between them.  It is not sufficient that the new claims arise out of 'similar' facts; they must arise out of *"the same or substantially the same"* facts (at [50]; approving Toulson LJ's remarks in <u>Ballinger v Mercer Limited & Anr</u> [2014] 1 WLR 3597 at [37]).  In the present case, Mrs Bourlakova's new claims do not meet that threshold for the reasons explained at §108 above in respect of Mrs Bourlakova's reliance on gateway (4A).  Even if the argument does not succeed in the gateways context, it remains a good one in the context of CPR r.17.4.[187]  In the circumstances, Mrs Bourlakova's new claims do not arise out of *"the same or substantially the same"* facts as the original claims and the threshold condition in CPR r.17.4 is therefore not met.

---

[185] Seborg 5 §§26-27 {C/1/9-10}.  The Applicants have not provided any evidence to suggest that the starting point is any later.
[186] Whiston-Dew 10 §26 {B/1/8}.  Ms Whiston-Dew also repeatedly refers to these as *"new claims"* elsewhere in her evidence.
[187] See also the reasons given in Seborg 5 §33 {C/1/11}.

131. Even if all of the threshold conditions for the application of CPR r.17.4 are met, the Court still has a discretion as to whether to permit joinder.[188]  When exercising its discretion, the court should have regard to all of the circumstances of the case, including those identified in the authorities cited at §96 above.  In the present case (should the question of discretion arise), the court should refuse to exercise its discretion to permit the amendments for materially the same reasons why it should refuse to exercise its discretion to join Veronica.  §§98-103 above are repeated *mutatis mutandis*.  If (which is denied) the joinder application is to be determined under CPR 17.1 (and not CPR 17.4), the Kazakovs will say that permission should be refused in the Court's discretion for the same reasons (save for the limitation point).

## VII.  CONCLUSION

132. For the reasons explained above, the Kazakovs respectfully invite the court to: (i) grant the Further Evidence Application; (ii) grant the Adjournment Application; alternatively to (ii) if the Amendment/Joinder Applications are determined (iii) to refuse the Amendment/Joinder Applications, alternatively to stay the claims for which permission is granted; and (iv) to order the Applicants to pay the Kazakovs' costs of and occasioned be each of the applications determined at the present hearing.

**ALAN GOURGEY K.C.**

**Wilberforce Chambers**

agourgey@wilberforce.co.uk

**MARK BELSHAW**

**Essex Court Chambers**

mbelshaw@essexcourt.net

**19 April 2023**

---

[188] This is reflected in the opening words of CPR r.17.4(2) that the court *"may"* permit joinder if the threshold conditions are satisfied.