# Exhibit 7



Neutral Citation Number: 2023 EWHC 2233 (Ch)

Claim No. BL-2020-001050

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST**

7 Rolls Building
Fetter Lane,
London, EC4A 1NL

Date: 8 September 2023

**Before**:
**THE HONOURABLE MR JUSTICE RICHARD SMITH**

Between:

**1. LOUDMILA BOURLAKOVA**
**2. HERMITAGE ONE LIMITED**
**3. GREENBAY INVEST HOLDINGS LIMITED**
**(formerly known as Maravan Services Limited)**
**4. VERONICA BOURLAKOVA**
And        Claimants/ Applicants
**1. OLEG BOURLAKOV**
**2. DANIEL TRIBALDOS**
**3. LEO SERVICES HOLDING LTD**
**4. LEO TRUST SWITZERLAND AG**
**5. REUWEN SCHWARZ**
**6. SEMEN ANUFRIEV**
**7. NIKOLAI KAZAKOV**
**8. VERA KAZAKOVA**
**9. COLUMBUS HOLDING AND ENTERPRISES SA**
**10. FINCO FINANCIAL INC**
**11. GATIABE BUSINESS INC**
**12. EDELWEISS INVESTMENTS INC**
**13. IPEC INTERNATIONAL PETROLEUM CO INC**
**Defendants/Respondents**

**Helen Davies KC, Patrick Harty and Daniel Fletcher** (instructed by **Mishcon de Reya LLP**) for the **Claimants**
**Alan Gourgey KC and Mark Belshaw** (instructed by **PCB Byrne LLP**) for the **Seventh** and **Eighth Defendants**
**Daniel Feetham KC and Mr Rowan Pennington-Benton** (instructed by **Madison Legal**) for the **Ninth** to **Thirteenth Defendants**

Hearing dates: 25, 26 and 27 April 2023
- - - - - - - - - - - - - - - - - - - -
**APPROVED JUDGMENT**

This judgment was handed down remotely at 10.30am on 8 September 2023 by circulation to the parties or their representatives by e-mail and by release to the National Archives

**Mr Justice Richard Smith:**

A. **Introduction**

1. This judgment concerns four applications by the Claimants for permission to amend their Particulars of Claim (**PoC**), including the proposed joinder of an additional claimant. The seventh and eighth Defendants have themselves made three related applications, namely (a) to adjourn the hearing of the Claimants' amendment applications (b) for permission to rely on further evidence and (c) for a stay under Articles 33 or 34 of Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 (**Brussels Recast**) of such amended claims for which the Claimants may be given permission.

**The parties**

2. The (existing) Claimants are Mrs Loudmila Bourlakova (**Mrs Bourlakova**) and two companies of which she is the ultimate beneficiary, one of which, Hermitage One Limited (**H1**), is incorporated in the Isle of Man and the other, Greenbay Invest Holdings Limited (**Greenbay**), is incorporated in the Seychelles.

3. The first Defendant, Mr Oleg Bourlakov (**Mr Bourlakov**), died on 21 June 2021, after the commencement of these proceedings but before certain applications to challenge jurisdiction had been made and dismissed by Trower J on 26 May 2022 (*Bourlakova and others* v *Bourlakov and others* [2022] EWHC 1269 (Ch)). The major part of the wealth of Mr Bourlakov and his family derived from the acquisition and subsequent sale in 2007 of a major Russian cement producer for US$1.45 billion.

4. Both Mrs Bourlakova and Mr Bourlakov are or were Ukrainian, Russian and Canadian nationals, albeit domiciled in Monaco at the material time. They were married in Ukraine in June 1972. The Claimants allege that there had been an irretrievable breakdown in marital relations between Mr Bourlakov and Mrs Bourlakova since late 2017. On 19 December 2018, divorce proceedings were initiated by Mrs Bourlakova in Monaco. They have two daughters, Elena who lives in Canada, and Veronica who lives in London. It is Veronica who now seeks to be added as an additional claimant.

5. The second to fourth Defendants (**the Leo Defendants**) were all involved in the provision of fiduciary corporate services and advice to Mr Bourlakov, together with companies and foundations owned or controlled by him. The second defendant, Mr Daniel Tribaldos, who is domiciled in Switzerland, owns or controls a substantial proportion of the shares in the third Defendant, Leo Services Holding Limited (**Leo Holding**), an English company of which Mr Tribaldos is sole director. In turn, Leo Holding owns all the shares in the fourth Defendant, Leo Trust Switzerland AG (**Leo Trust**), a company incorporated in Switzerland, and Leo Trust Cyprus Ltd (**Leo Cyprus**), a company incorporated in Cyprus. Mr Tribaldos is also a director of both Leo Trust and Leo Cyprus.

6.    The fifth Defendant, Mr Reuwen Schwarz, was a director of Leo Trust until February 2020 and is domiciled in Israel.  A family trust associated with Mr Schwarz indirectly holds shares in Leo Holding through a Panamanian company, Rudan Business Holdings SA.

7.    The sixth Defendant, Mr Semen Anufriev, is a relative of Mr Bourlakov and a German qualified lawyer.  He was managing director of the Bourlakov family office and, since 2012, has played a central role in the management of Mr Bourlakov's business interests and personal wealth.  He is domiciled in Latvia.

8.    The seventh and eight Defendants (**the Kazakovs**) are Mr Bourlakov's brother-in-law, Mr Nikolai Kazakov, and his wife, Mr Bourlakov's sister, Mrs Vera Kazakova.  Although Mr Kazakov initially said on the jurisdiction applications that he was domiciled in Monaco, he later withdrew his evidence to that effect and accepted that, at the material time, he was domiciled within the EU, in Estonia.  Trower J found the same in relation to Mrs Kazakova.

9.    The ninth to thirteenth Defendants, Columbus Holdings and Enterprises SA (**Columbus**), Finco Financial Inc (**Finco**), Gatiabe Business Inc (**Gatiabe**), Edelweiss Investments Inc (**Edelweiss**) and IPEC International Petroleum Co Inc (**IPEC**) (together, **the Panamanian Companies**), are companies incorporated in Panama.  The precise ownership of the Panamanian Companies and how they came to be owned or controlled by the protagonists to this dispute are amongst the issues with which these proceedings are concerned, including a number of the Claimants' proposed related amendments.

## B.    Representation at the hearing/ the Kazakovs' adjournment application

10.   The Claimants (and Veronica) were represented at the hearing by Ms Davies KC, Mr Harty and Mr Fletcher.  The Kazakovs were represented by Mr Gourgey KC and Mr Belshaw.  The Panamanian Companies were represented by Mr Feetham KC and Mr Pennington-Benton.  Mr Anufriev lodged a written skeleton argument but did not make oral submissions.

11.   Although Mr Bourlakov died in June 2021, a representative has not yet been appointed on behalf of his estate in these proceedings, whether under CPR, Part 19.12 or otherwise.  Shortly before the hearing, the Kazakovs applied to adjourn the amendment applications on the basis of that lack of representation.  I heard that application at the start of the hearing and refused it then, with reasons to follow, as they do below.  Although I have not summarised here all the parties' arguments, I took them fully into account in reaching my decision.

12.   As a preliminary matter, the position of the parties as to why no representative had yet been appointed was polarised, the Kazakovs pointing the finger of delay firmly at the Claimants (despite previous assurances to this court that the matter was in hand), also suggesting tactical motivations for that delay, namely to obtain an advantage through a succession proceeding in Latvia.  The Claimants denied this, saying that the Latvian proceeding was unconnected and explaining "*the great difficulties*" experienced in

appointing a representative willing to act given the Russian invasion of Ukraine, associated sanctions measures and issues in arranging payment of any representative.

13. In this highly tactical case, spawning multiple disputes beyond these English proceedings, it is not possible for me to make conclusive determinations on the machinations suggested by the parties. Nor is it necessary for me to do so. Suffice to say that I am satisfied of the following: (a) despite the limited evidence about the Claimants' efforts to appoint a representative, I accept that it would not have been a straightforward matter to secure the engagement of a representative given the jurisdictional connections of the relevant parties and the potential sanctions concerns arising, even if not themselves sanctioned individuals (b) although the question of the representation of Mr Bourlakov's estate was raised at the two earlier hearings, the parties (including the other Defendants) were not preparing for this hearing on the basis that the representation issue had to or would be resolved beforehand (c) if it was to be suggested that the amendment applications could not be heard absent representation of Mr Bourlakov's estate, the Kazakovs should have said so much earlier than shortly before the hearing and (d) in any event, based on the Kazakovs' stance in relation to the identity of any representative, namely that an administrator appointed by the Monaco court should take the role, it is unlikely that the representation issue could have been resolved beforehand, even if it had been possible for the Claimants to accelerate their efforts to that end. Accordingly, the adjournment application was made very late.

14. Having regard to the way in which the amendment applications unfolded procedurally prior to the hearing, particularly in terms of the burgeoning body of evidence, I was also satisfied that what should have been relatively straightforward applications (already listed for two days) would, if delayed, become even more 'bogged down' and spawn yet further unsolicited evidence as the parties sought to refine the arguments further. That outcome would have been most undesirable. In this regard, I remind myself of Lord Templeman's admonition in *Spiliada Maritime Corp* v *Cansulex Ltd (The Spiliada)* [1987] A.C. 460) about the desirability of the submissions in jurisdiction applications being measured in hours, not days. Although this is an application for permission to amend, with jurisdiction being but one issue arising, it seems to me that the same approach should obtain here as well.

15. Turning to matters of substance, I accept that the amendment applications should be looked at on a defendant-by-defendant basis, the respective claims and applicable jurisdictional rules arising on the amendment applications being different for each of them and with each of the Defendants taking a different stance.

16. In this regard, I was not persuaded by the Kazakovs' suggestion of the importance of a single Claim Form and PoC document. Indeed, the notes to CPR, Part 16.4 in the White Book expressly envisage differently worded PoC in multi-defendant proceedings.

17. I am therefore satisfied that there is no reason, in principle, why I cannot deal with the Defendants separately such that the Kazakovs' concerns about determining the amendment applications without notice to Mr Bourlakov's representative need not arise.

18.     Moreover, after testing the Claimants' position closely in submission, I was satisfied that there would be no risk of inconsistency in their pleaded cases as between the different Defendants if I heard separately the amendment applications as they affect the claims against the Defendants currently represented before the court and later went on to decide them differently as they affect the claims against Mr Bourlakov.

19.     I was not persuaded that the court's earlier determination of the amendment applications as against all the other Defendants in this way would present Mr Bourlakov's estate with a *fait accompli* if the latter was minded to contest them in due course. No doubt, any representative appointed on behalf of the estate would have regard to the court's determination based on the existing evidence and any objections by the representative to the amendment applications would usefully be more focused on that account. However, this would not preclude the representative from advancing such evidence and arguments of its own as it may be advised to put forward.

20.     Nor was I persuaded that such separate determination would give rise to a procedural 'quagmire'. The court can readily tailor its directions to meet the particular circumstances of this case.

21.     I was, however, satisfied that the Claimants would be seriously prejudiced by further delay in these proceedings, not least in circumstances in which limitation defences had been intimated and in light of the nature of the claims, concerning an alleged international fraud.

22.     Accordingly, although it would, of course, have been more desirable to deal with all the arguments arising from all the proposed amendments at the same time, I was in no doubt that the appropriate course, consistent with the overriding objective, was to refuse the adjournment and to hear and determine the amendment applications in respect of all the Defendants excluding Mr Bourlakov.

## C.     Overview of the claims

23.     The current proceedings were commenced by Claim Form originally issued on 16 July 2020, then reissued on amendment on 15 November 2020, accompanied by the PoC. The Claimants sought damages and declarations relating to a number of aspects of the Defendants' conduct, described as the pursuit of a strategy by Mr Bourlakov in combination with the other Defendants "*of dishonest and/or improper and/or unlawful actions with the ultimate objective of maximising his own share of assets which are (or have been) assets of each of the separate members of the Bourlakov nuclear family … and minimising or even extinguishing Mrs Bourlakova's share*." The Claimants plead that the development and implementation of the strategy has given rise to a number of different claims arising out of the tortious conduct of Mr Bourlakov as principal instigator and the other Defendants as participants. The current claims are divided into four categories in the PoC.

24.     **Section A (PoC [35]-[74])** concerns claims arising out of alleged fraudulent misrepresentations by Mr Bourlakov, the Kazakovs and Mr Anufriev, assisted by the Leo Defendants, concerning (a) an alleged oral partnership between Mr Bourlakov and Mr Kazakov and (b) certain alleged debts, the effect of either of which, if genuine, would be to substantially reduce the assets available to Mr Bourlakov and, therefore, to Mrs Bourlokova and her daughters.  The Claimants say the partnership and debts are fictitious.

25.     **Section B (PoC [75]-[96])** concerns claims arising out of Mr Bourlakov's alleged efforts to disguise and conceal his assets and/ or their true value by the creation of forged and sham documents with the assistance of the Kazakovs, Mr Anufriev and the Leo Defendants.  These include an allegedly forged loan agreement for US$1.35bn from Gatiabe to Finco and a supposedly sham declaration of trust in favour of Mr Kazakov with respect to the shares in Gatiabe.

26.     The Claimants say that the claims under **Sections A and B** are governed by English, alternatively Monagasque, law, with the primary relief sought being:-

        (i)     A declaration that there was no partnership between Mr Bourlakov and Mr Kazakov;

        (ii)    A declaration that any interest held by the Kazakovs in Edelweiss, Gatiabe or any foundation which held them, together with other assets, were held as nominee for Mr Bourlakov's estate.  (For present purposes, the Claimants say it is significant that this has always been part of their case);

        (iii)   Declarations that various documents, including the US$1.35bn loan agreement from Gatiabe to Finco, are forgeries or shams; and

        (iv)    Damages exceeding £8.8m for deceit and unlawful means conspiracy relating to the Claimants' legal and investigation costs.

27.     **Section C** concerns claims arising out of alleged misappropriations (or attempted misappropriations) by Mr Bourlakov of assets from structures in which Mrs Bourlakova had an interest, including by the removal of the beneficiary from the Panamanian foundations, Tribatline and Merenguito, replacing the beneficiary with new Panamanian foundations under Mr Bourlakov's control and distributing assets of the original foundations to the new ones.  Those assets are said to include Edelweiss which held a valuable portfolio of assets.  Section C breaks down into the following sub-sections:-

        (i)     **Section C1 (PoC [97]-[120])** concerns the alleged attempted misappropriation of the second Claimant, H1, from Mrs Bourlakova and its attempted devaluation and/ or misappropriation of its assets, including through an allegedly (a) sham US$348m loan and (b) forged assignment of a purported US$143m loan;

(ii) **Section C2 (PoC [121]-[133])** concerns the alleged attempted devaluation of the third Claimant, Greenbay, and the misappropriation of its assets through forged minutes relating to a fictitious loan for US$250m allegedly made by IPEC to Greenbay; and

(iii) **Section C3: (PoC [134]-[146])** concerns the alleged misappropriation of the assets of Tribatline and Merenguito, including Columbus, Finco and IPEC. The Claimants (excluding Veronica) say they originally believed these assets to include Edelweiss as a result of its transfer to Merenguito in 2014 or 2015, albeit they now understand such transfer did not take place and that Edelweiss remained in Veronica's ownership.

28. The *modus operandi* for the alleged misappropriations is said to be broadly the same for each foundation, namely:-

(i) Mr Anufriev was the initial protector of each foundation, required to be consulted about any change to its beneficiaries or its dissolution;

(ii) Mr Anufriev resigned as protector by letters dated 27 April 2018;

(iii) Mrs Kazakova was then appointed protector;

(iv) With Mrs Kazakova's approval, the Foundation Council of the relevant foundation amended the articles to replace Mrs Bourlakova as beneficiary and substitute another foundation under Mr Bourlakov's control, then passing a motion to liquidate the foundation and distribute its assets to the new beneficiary; and

(v) Mr Bourlakov agreed to remunerate Mrs Kazakova for acting in breach of her duties as protector.

29. **Section C4 (PoC [147]-[157])** concerns, amongst other things, an allegedly forged US$950m loan agreement between Finco and Edelweiss and its subsequent use to attempt to misappropriate the assets of the latter.

30. The Claimants say that the **Sections C1, C2 and C4 claims** are governed by English law, with the primary relief sought being:-

(i) declarations that the US$348m loan, assignment of the US$143m loan, minutes relating to the US$250m loan and the purported US$950m loan are forgeries and/ or shams; and

(ii) damages for the investigation and legal costs incurred by Mrs Bourlakova.

31. The Claimants say that the **Section C3 claims** are governed by Panamanian law. They seek damages under Articles 128 and 129 of the Panamanian Penal Code (**PC**) for the value of at least Columbus, Finco and IPEC. Damages were also sought for what was believed to be the misappropriation of Edelweiss but, as noted, it is now believed that

Edelweiss was not validly transferred, with Veronica remaining its sole shareholder since 2014, albeit with some or all of its assets having since been misappropriated.

32.     **Sections D and E** concern claims arising out of the subsequent destruction (or threatened destruction) of documents said to have evidenced the unlawful strategy outlined above. These claims relate to acts supposedly committed by the Leo Defendants and Mr Schwarz.

**D.      The proposed amendments/ joinder - chronology**

33.     The chronology of the Claimants' **four** applications to amend the PoC is as follows: **first**, on 27 May 2021, the Claimants applied to amend their PoC following the grant by the District Court of Nicosia on 28 December 2020 of an *Anton Pillar* order against (a) Leo Cyprus and (b) Leo Fiduciaries Ltd (a Cypriot subsidiary of Leo Cyprus). The documents obtained were said to provide further support for the existing claims and evidence of further wrongful conduct, the details of which the Claimants then sought to introduce into the PoC by way of amendment.

34.     **Second**, on 12 November 2021, the Claimants sought to amend the PoC further to reflect the death of Mr Bourlakov and the position said to have been taken by Mr Kazakov in light thereof. The draft also sought to develop some of the existing allegations, particularly with respect to the use of forged or sham documents.[1]

35.     It appears that none of the Defendants, including the Leo Defendants, the Kazakovs, Finco, Gatiabe and Edelweiss, oppose the first two sets of amendments from May and November 2021.

36.     **Third**, on 12 July 2022, the Defendants were provided with further draft amendments to address the proposed addition of Veronica as fourth Claimant, her alleged ownership of Edelweiss and Mrs Bourlakova's alleged ownership of Gatiabe and Jovellanos Investment Corp (**Jovellanos**). That amendment was said to follow the recovery by Veronica of the bearer shares in Edelweiss, Gatiabe and Jovellanos. On 28 September 2022, the Claimants applied to make the July 2022 amendments and to add an additional claim in relation to the change of beneficiaries of a Panamanian foundation called Nuptials and the alleged misappropriation of its assets, including Hydrangea Group SA (**Hydrangea**). This third set of amendments is controversial, with the Kazakovs leading the resistance at the hearing. Mr Anufriev says he "*endorses the objections to the amendments raised by the Kazakov Defendants*". Gatiabe and Edelweiss raised related jurisdictional objections. The Leo Defendants, Columbus, Finco and IPEC do not oppose them.

37.     **Fourth**, on 6 April 2023, the Claimants applied for permission to make certain further limited amendments intimated in March 2023, apparently to address amendments requested by Mr Anufriev and Mrs Kazakova and matters of which the Claimants had

---

[1]     The May and November 2021 proposed amendments were before Trower J at the hearing of the jurisdictional challenges, albeit he did not decide the related applications then.

become aware since making the September 2022 application. The Claimants said that none of the parties had confirmed their position on this fourth set of amendments.

**E.    The Claimants' proposed new case**

38.    Central to the proposed amendments is the Claimants' new case concerning the alleged ownership of some of the Panamanian Companies, most importantly, Edelweiss, Gatiabe and Jovellanos, and their relationship with various Panamanian foundations.

**Edelweiss**

39.    It was originally claimed that Mr Bourlakov (alone or with Veronica) was the ultimate beneficial owner of Edelweiss before its transfer to Merenguito, a Panamanian foundation dissolved on 15 May 2018, then transferred to another Panamanian foundation, Hemaren Stiftung (**Hemaren**). Mrs Bourlakova alleged that she was the sole beneficiary of Merenguito prior to its dissolution and that, through steps taken by Mr Bourlakov, assisted by others, Mr Bourlakov acquired Edelweiss and misappropriated its assets. It was further alleged that any interest which Mr Kazakov had in Edelweiss was acquired as nominee for Mr Bourlakov. Mrs Bourlakova claimed estimated damages of US$1.18bn in respect of Edelweiss and other companies.

40.    The amendments now seek to advance a new case that Veronica is sole shareholder of Edelweiss, alternatively that she was the beneficial owner of Edelweiss and/ or that Merenguito held shares in Edelweiss as a nominee for her. In the further alternative, Mrs Bourlakova advances her original case that she was beneficial owner of Edelweiss and that Mr Kazakov now holds any interests as nominee for Mr Bourlakov's estate. Veronica (alternatively Mrs Bourlakova) seeks significant damages estimated at US$1.18bn

**Gatiabe**

41.    It was originally claimed that, at all material times, Mr Bourlakov had been the ultimate beneficial owner of Gatiabe, albeit its shares were allegedly transferred to an entity called Delos Global SA, said to be holding them on trust for Mr Kazakov as nominee for Mr Bourlakov.

42.    The amendments seek to advance a new case that, at all material times since December 2014, Mrs Bourlakova has been the holder and ultimate beneficial owner of Gatiabe's shares. She also says that the transaction by which Gatiabe's shares ultimately reached a Panamanian foundation called Wlamil (for the benefit of Mr Kazakov) is invalid, being based on the cancellation of share certificates only recently discovered. Alternatively, she says that Mr Kazakov holds his interests as nominee for Mr Bourlakov's estate.

**Jovellanos**

43.    Jovellanos is not party (or proposed party) to these proceedings. It was originally claimed that, at all material times, Mr Bourlakov was beneficial owner of Jovellanos.

44.    The amendments seek to advance a new case that, at all material times since December
2014, Mrs Bourlakova has been the holder and ultimate beneficial owner of the shares in
Jovellanos.  She also says that the issue of Jovellanos shares to Delos Global SA was
invalid.  Alternatively, she says that Mr Kazakov holds his interests as nominee for Mr
Bourlakov's estate.

**The contested amendments**

45.    The key new claims to which objection is taken are as follows:-

(i)     Veronica's new claims for declarations that she is sole shareholder and ultimate
beneficial owner of Edelweiss and that the Kazakovs do not have any interest in
any assets held by the Claimants;

(ii)    Veronica's new claims for damages pursuant to Articles 128 and 129 PC based on
the Claimants' primary and secondary cases regarding the ownership of Edelweiss
and the role of the alleged instigators or participants in Mr Bourlakov's alleged
primary wrongdoing;

(iii)   Mrs Bourlakova's new claims for declarations that she is sole shareholder and
ultimate beneficial owner of Gatiabe and Jovellanos and that the Kazakovs do not
have any interest in any assets held by the Claimants;

(iv)    Mrs Bourlakova's new claims for damages pursuant to Article 128 and 129 PC
based on the Claimants' tertiary case regarding the ownership of Edelweiss and
the role of the alleged instigators or participants in Mr Bourlakov's alleged
primary wrongdoing (materially similar to Veronica's damages claims);

(v)     Similar new damages claims by Veronica and/ or Mrs Bourlakova against Mr
Kazakov and/ or Mr Anufriev in relation to IPEC, Finco[2] and Hydrangea; and

(vi)    The proposed addition of Veronica as Claimant to the claims against the Kazakovs
and Mr Anufriev as alleged joint tortfeasors with respect to the matters set out in
Sections A and B of the PoC (at [172A]).

46.    Although permeating the PoC, the amendments to which exception is taken feature
principally in:-

(i)     an expanded Section B1 entitled "*The creation of sham/ forged liabilities*" in
which the Claimants now explain Mrs Bourlakova's alleged ownership of Gatiabe
and Jovellanos;

(ii)    a new Section C0 of the PoC entitled "*The ownership of Edelweiss*" in which
Veronica's alleged ownership of that company is now explained; and

---

[2]       Mr Anufriev does not object to the proposed amendment in relation to Finco.

(iii)     a significantly expanded Section C3 entitled "*The dissolution of Tribatline, Merenguito and Nuptials, misappropriation of Columbus, Finco, IPEC and Hydrangea and attempted, or actual, misappropriation of Edelweiss*".

47.     The Kazakovs' opposition to the proposed amendments rested on three overarching grounds: (a) limitation (b) jurisdiction and (c) discretion.  The objections of Gatiabe and Edelweiss were focused on jurisdiction.

**F.     The evidence**

48.     The evidence on the amendment applications was extensive.  This included Veronica's first witness statement dated 28 September 2022 (**VB1**) in which she explained the decision for her to become the owner of Edelweiss and how the Edelweiss, Gatiabe and Jovellanos bearer share certificates were only located in January 2022 after her father's death.

49.     In her tenth witness statement also dated 28 September 2022 (**AWD10**), Ms Alexandra Whiston-Dew, a partner in Mischon de Reya LLP (solicitors for the Claimants), explained the history to the various amendments, the Defendants' position thereon, the Kazakovs' objections and why it is said those objections were not warranted.

50.     The Kazakovs' evidence in answer was contained in the fifth witness statement dated 15 November 2022 of Ms Elizabeth Seborg (**EAS5**), a partner in PCB Byrne LLP, solicitors for the Kazakovs, who explains her clients' objections and seeks permission to rely on the Panamanian law expert report of Mr Fernando Aued also dated 15 November 2022 (**Aued 1**).

51.     In his witness statement dated 25 November 2022, Mr Robert Pollock-Hill, partner in Rosling King LLP, former solicitors for the Panamanian Companies (**RPH1**), sets out his clients' position on the amendment applications.

52.     Ms Whiston-Dew provided her eleventh witness statement on 3 February 2023 (**AWD11**), responding to EAS5 and RPH1 and relying on the Panamanian law expert report of Mr Jorge Federico Lee also dated 3 February 2023 (**Lee 1**).

53.     Ms Seborg served (without permission) a further (sixth) witness statement on 3 April 2023 (**EAS6**), purporting to respond to certain matters in AWD11 and to provide an update on developments since EAS5, also requesting permission to rely on a second expert report from Mr Aued also dated 3 April 2023 (**Aued 2**) and, now, the expert evidence of Peter Levitt (as summarised in EAS6) relating to matters of Florida law (as such permission was sought in an application notice also issued on 3 April 2023).

54.     Finally, Ms Whiston-Dew served a further (twelfth) witness statement dated 14 April 2023 (**AWD12**) in response to EAS6 (and the related expert evidence), seeking (in the event reliance on the Kazakovs' further April 2023 evidence was permitted) to rely on (a) the further (second) witness statement of Veronica also dated 14 April 2023 (**VB2**) (b) the further expert report of Mr Lee also dated 14 April 2023 (**Lee 2**) and (c) advice received from Florida counsel.

55.     Considering the nature and significance of the Kazakovs' rejoinder evidence, the suggested reasons for its late production, the potential prejudice to the parties were it to be admitted or excluded and the Claimants' further evidence, I have come to the view that it would be appropriate to grant permission to the Kazakovs to rely on this, albeit taking fully into account the Claimants' related reservations and their own further evidence.

## G.     Limitation issues arising

56.     As noted, the principal substantive objections are founded on limitation and jurisdictional concerns.  As to the former, the following issues potentially arise with respect to Mrs Bourlakova's damages claims, namely whether:-

(i)     Any new cause of action is asserted against Mr Anufriev or the Leo Defendants in relation to Edelweiss, IPEC and Finco[3] so as to engage any limitation or jurisdiction issue at all;

(ii)     In relation to Mrs Bourlakova's new damages claims against Mr Kazakov with respect to Edelweiss and Finco and against Mr Anufriev with respect to Edelweiss, IPEC and Nuptials, the applicable rule is CPR, Part 17.1(2)(b) (as the Claimants contend) or 17.4 (as the Kazakovs contend) and, relatedly, whether:-

(a)     any reasonably arguable limitation defence has been advanced to these claims and, even if it has;

(b)     the (non)-operation of any concept of 'relation back' bears on the Claimants' standard of proof on these amendment applications with respect to the limitation defence posited in this case;

(iii)     Mrs Bourlakova's new damages claims engage CPR, Part 17.4(2) as arising "*out of the same facts or substantially the same facts as a claim in respect of which the party applying for permission has already claimed a remedy in the proceedings*"; and

(iv)     The power to permit the amendments on the basis identified in *Mastercard Inc* v *Deutsche Bahn AG* [2017] EWCA Civ 272 can and should be exercised in this case.

57.     The Claimants say that the Kazakovs would need to prevail on each of the above, failing which, limitation does not provide a good ground of objection.

---

3          As noted, Mr Anufriev does not object to the amendment with respect to Finco.

58. In relation to Veronica's damages claims against the Kazakovs and Mr Anufriev with respect to Edelweiss and against Mr Anufriev[4] with respect to Nuptials, the same issues at 56(ii)(a)-(b) and (iv) above arise, albeit in the context of CPR, Part 19.2 or 19.6 concerning the joinder of a new party.

59. In relation to Mrs Bourlakova's claims for declaratory relief with respect to the ownership of Gatiabe, Jovellanos and Edelweiss, the issues at 56(ii)(a), (iii) and (iv) arise.

60. In relation to Veronica's claims for declaratory relief with respect to the ownership of Edelweiss, the issues at 56(ii)(a) and (iv) arise, albeit again in the context of CPR, Part 19.2 or 19.6.

61. Finally, the Kazakovs say that, if the amendments on account of Veronica's claims for damages and declaratory relief with respect to Edelweiss are not permitted, the amendments on account of her claim for damages against the Kazakovs and Mr Anufriev as joint tortfeasors under Sections A and B of the PoC should not be allowed either, albeit no objection is raised to Mrs Bourlakova's proposed amendments in that regard.

62. As noted, there is a threshold issue as to whether the operation (or otherwise) of any applicable doctrine of relation back determines whether CPR, Part 17.1(2)(b) or 17.4 (or, in relation to Veronica, the corresponding joinder provisions under CPR, Part 19.2 or 19.6) are engaged. The Claimants contend that it does, the Kazakovs otherwise, the latter saying that this would be the relation back 'tail wagging the dog': whether CPR, Part 17.4 (or 19.6) is engaged depends on its own terms, namely whether a relevant "*period of limitation had expired*" (CPR, Part 17.4) or there has been a "*change of parties after the end of a limitation period*" (CPR, Part 19.6). Relation back is not a condition of either. However, it was common ground that, for either to be engaged, the Defendants had to show a reasonably arguable limitation defence.

**(a)** **Limitation defence (damages claims)**

63. As noted, Mrs Bourlakova's and Veronica's proposed new damages claims are advanced under Articles 128 and 129 PC which provide in the following terms:-

"*Article 128*

*Civil liability arises from every offence for:*

*1. Those guilty as perpetrators, instigators or participants; and*

*2. Those who have been favoured with a guilt exemption.*

---

[4] There was some suggestion at the hearing (and in the Claimants' post-hearing note) that Veronica also asserted a damages claim as against Mr Kazakov with respect to Nuptials. Given the clarification provided by the Claimants at the hearing (Day 1, p.96) and thereafter on 11 May 2023, the court understands that she does not.

*The causes of justification exonerate from civil liability, except for the state of necessity,*
*provided that the beneficiary has not benefited materially.*

*The extinction of the criminal action or of the penalty does not exonerate from civil responsibility.*

### *Article 129*

*The perpetrators and participants shall be jointly and severally liable for the payment of the damages. The persons indicated in Article 1645 of the Civil Code shall also be jointly and severally liable with the perpetrators and the participants of the punishable act for payment of the damages.*"[5]

64.  Accordingly, Panamanian law admits of a civil claim in damages for those guilty of a criminal offence. The specific offences relied upon by the Claimants are those identified in Articles 220, 243 and/ or 253 PC. Although the route by which this is achieved is contentious, it is common ground that Panamanian law governs the question of any available limitation defence to claims brought under these articles. It is also common ground that the damages claims could be brought in Panama in different ways, namely:-[6]

(i)    within criminal proceedings;

(ii)   before the civil courts without awaiting the outcome of any criminal trial; or

(iii)  before the civil courts after the criminal court has issued its final liability ruling.

65.  The Kazakovs say that if, as here, a claim for civil damages arising from alleged criminal acts under Articles 128 and 129 PC is filed without a criminal conviction having first been obtained or in the absence of criminal proceedings, this would have to be submitted as an extra-contractual or tortious claim under Article 1644 of the Civil Code (**CC**) which provides that:-

"*Whoever by act or omission causes damage to another, through fault or negligence, is bound to repair the damage caused. If the act or omission is attributable to two or more persons, each of them shall be jointly and severally liable for the damage caused.*"

66.  The Kazakovs also say that the relevant limitation period for such a claim is one year by operation of Article 1706 CC which provides:-

"*The civil action to claim indemnification for slander or insult or to demand civil responsibility for the obligations resulting from guilt or negligence to which Article 1644 refers, shall prescribe in the term of one (1) year, counted from the moment in which the victim knew.*

---

[5]    Article 1645 CC provides that the obligation imposed by Article 1644 extends to the acts and omissions of others for which one is responsible (eg parents for their children).

[6]    Aued 1 at [11]-[13]; Lee 1 at [14]-[15].

*If criminal or administrative action is timely initiated for the facts foreseen in the previous paragraph, the prescription of the civil action shall be counted from the moment when the criminal judgment or the administrative resolution became firm, as the case may be.*

*For the recognition of the civil claim, in no case is the intervention of the criminal jurisdiction essential.*"

67.   The Claimants disagree with this analysis. They say that a claim for civil damages for an alleged criminal act may be brought directly under Articles 128 and 129 PC (without regard to Article 1644 CC) by operation of Article 977 CC which provides that :-

"*Civil obligations arising from crimes or offences shall be governed by the provisions of the Penal Code.*"

68.   The Claimants say that the applicable limitation period for a claim under Articles 128 and 129 PC is seven years by operation of Article 1701 CC which provides that:-

"*Actions in personam for which there is no special limitation period shall prescribe in seven years.*"

69.   Mr Anufriev's expert, Dr Carlos Montenegro, agrees with this analysis.[7]

70.   Based on this (unresolved) conflict on the expert evidence, the Kazakovs say that they have established a reasonably arguable limitation defence in relation to these new damages claims:-[8]

"*127. ………………………..*

*(4) As a matter of Panamanian law in respect of the damages claims: (i) the appropriate legal basis for Mrs Bourlakova's new damages claims is Article 1644* [CC]*; (ii) the applicable limitation period is one year in accordance with Article 1706; and (iii) time starts to run from the date on which Mrs Bourlakova had actual or constructive knowledge of the alleged wrongful act or damage. As a matter of fact, it is (at the very least) reasonably arguable that the limitation period has now expired. As explained* [..] *above, the Applicants accept that there is a "real prospect" that it has expired if the relevant limitation period is one year as Mr Aued suggests.*

*128. In the circumstances, it is (at the very least) reasonably arguable that the limitation periods applicable to Mrs Bourlakova's new claims have expired. CPR r.17.4 is therefore applicable.*"

**Limitation defence (damages claims) - discussion**

71.   The Claimants point out that there is no dispute between the parties that these new damages claims could still be brought within Panamanian criminal proceedings or,

7       In his report dated 1 July 2021 (at [136]-[137]).
8       Kazakovs' skeleton argument at [127]-[128]).

following conviction, in the Panamanian civil courts. As Aued 2 itself confirms, "*if, for example, the victim commenced civil proceedings (tort) and did not prevail or otherwise did not timely file its claim, the victim would still have an opportunity to file a damages claim in the criminal proceedings or within the year following the issuance of a conviction by the criminal court*." Moreover, the earlier expert evidence on this point (not disputed by the Kazakovs) is that, by operation of Article 116 PC, the limitation period for initiating criminal proceedings in Panama is the maximum term of imprisonment available for the relevant offence, in the case of Article 220 PC, 10 years.[9] Before which court in Panama any claim could be asserted is a matter of *procedure* (whether considered under Rome II or the common law). According to Dicey, Morris & Collins on the Conflict of Laws (16th ed., at [4-074]), this includes the question whether a civil action can be brought in respect of alleged criminal acts before criminal proceedings have been taken. Since the English court is only concerned with the relevant foreign law as it applies to matters of *substance*, the Claimants are entitled to rely on the limitation period which remains available under Article 116 PC even if criminal proceedings have not begun and may not yet eventuate.

72. The Kazakovs say that there is a world of difference between the English court ignoring as a bar to recovery a procedural requirement for criminal proceedings prior to the commencement of a civil action (a proposition from which they do not demur) and the broader proposition (from which they do) that, where multiple potential routes for bringing civil damages claims are available locally, it matters not which particular procedural route the claimant has, in fact, adopted. The Claimants have brought a claim where there has been no criminal conviction as they were entitled to do so under Panamanian law. Having done so, the limitation period is one year. No question of having or failing to comply with local procedural requirements arises.

73. As the Kazakovs say, this was not a case in which there was a *requirement* for a criminal conviction to be secured before the Claimants could commence a civil claim. It was common ground that the Claimants could avail themselves in Panama of a civil action for alleged criminal acts without ongoing criminal process or prior criminal conviction. That is the course the Claimants have taken in England. I understand the logic of the Claimants' position that, being a matter of procedure, it is irrelevant which particular course the Claimants may, in fact, have pursued in this case. However, it seems to me that the distinction between the position indicated in *Dicey*, where the need for a criminal conviction is a bar to the commencement of a civil action, and the position here, where multiple routes are potentially available, may, in fact, be more meaningful than the Claimants suggest. I am therefore unable to say, without more direct authority on the point at least, that the Kazakovs' limitation defence falls short of the reasonably arguable threshold on this account.

74. Where, however, the Kazakovs' limitation defence does fall short of that low threshold is through its failure to address the <u>actual</u> damages claims sought to be advanced by the Claimants. As noted, the Kazakovs say that any claim for damages under Articles 128 and 129 PC in respect of criminal acts filed outwith criminal proceedings or without a

---

[9] Expert reports of Gracias Dixon Caton dated 16 September 2021 on behalf of the Claimants (at [116]-[117]), Camilo Valdes dated 14 April 2021 (at [6(a)]) on behalf of Leo Holding.

criminal conviction would have to be brought as extra-contractual or tortious claims under Article 1644 CC. In those circumstances, the limitation period would, by operation of Article 1706 CC, be one year. For these limitation purposes, there is no need for me to decide who is right in that regard. The Claimants having expressly limited their claim to one for civil damages based on Articles 128 and 129 PC - in fact, having expressly disavowed Article 1644 CC as forming any part of the basis of their claims - the proper question is the applicable limitation period under Panamanian law on the assumption that such a freestanding claim under Articles 128 and 129 is open to them, there being no dispute that the Claimants have demonstrated a real prospect of success that it is.

75.     In my judgment, there was no meaningful answer to that question from the Kazakovs. A careful and fair reading of the evidence and the Kazakovs' related written submissions does not suggest any basis for the application of the one year limitation period independent of Article 1644 CC. According to EAS5:-

"*11.    The Kazakovs wish to rely on the expert report of Mr Aued on Panamanian law in relation to prescription and other matters. ……………*

*13.    **Mr Aued concludes that any claim based on a breach of the Panamanian Penal Code brought in the civil courts would be made under Article 1644 of the Panamanian Civil Code**. He explains that these claims have a one-year limitation period pursuant to Article 1706 and that time begins to run from when the claimant became aware of the harmful event and the damages caused by the defendant. ……*" (my emphasis **in bold**)

76.     In Aued 1, the author sets out in answer to the first two questions posed of him his related thesis which led him to that conclusion, including by reference to decisions of the Civil Chamber of the Supreme Court of Justice, themselves indicating that the available action would be one for tortious damages under Article 1644.

77.     In AWD11 (at [13]-[21]), the Claimants took issue with the Kazakovs' position that the damages claims arise under both (i) Articles 128 and 129 PC and (ii) Article 1644 CC, and therefore rejected the one year limitation period suggested by Article 1706 CC. However, they also explicitly confirmed (at [20]) that they did not pursue any claims under Article 1644 but only under Articles 128 and 129 PC, as applied by Article 977 CC, noting that Aued 1 "*does not suggest that damages claims outside Article 1644 CC are subject to any limitation defence*." Lee 1 (at [28]-[75]) then addressed why the author disagreed with Mr Aued's assertion that "*a claim in the civil courts prior to a criminal conviction (or in the absence of criminal proceedings at all) would be a claim under Article 128 and Article 1644.*"

78.     EAS6 confirmed (at [8]) that, having considered the Claimants' most recent evidence, the Kazakovs maintained their objections to the amendments, the grounds for which remained the same save for certain points, none of which touched upon the interaction of Articles 128 and 129 PC with Article 1644 CC. In Aued 2, Mr Aued again confirmed (at [10]) that a civil claim for damages arising from criminal acts under Articles 128 and 129 PC would, absent criminal proceedings or conviction, "*have to be submitted as a civil claim for tortious damages under Article 1644 …*" with a one year limitation period under Article 1706 CC, before then addressing the contentions otherwise in Lee 1.

79.     Seemingly realising that Mr Aued had addressed the claims he thought the Claimants <u>should bring</u> rather those they <u>actually were bringing</u>, the Kazakovs submitted at the hearing that "*whilst Mr Aued does say that a claim for breach of the criminal code would have to be addressed using Article 1644 that is not the only basis for his opinion that there is a one-year limitation period*."   The Kazakovs referred in this context to the commentary by Mr Tello of the Panamanian Attorney General's Office (cited in Aued 1 at [31]-[33]) that "[i]*n matters of prescription, the procedural legislation does not provide anything in this respect, which obliges us to apply the term of prescription established by the Civil Code in article 1706 ...*".   The Kazakovs also referred in oral submission to certain further matters in Aued 2.   After referring again to Mr Tello's commentary, Mr Aued summarised Mr Lombardi's thesis that "*the part relevant to the civil crime is regulated by Article 1644 and following referred to in 1706 ...*".   Mr Aued then referred to Mr Saldana's thesis that Article 1706 is not limited to "*crimes of slander and libel*" and "*obligations originating from extracontractual liability*" but the "*same refers to all crimes*."   Finally, Mr Aued referred to the distinction drawn by the authors, Mr Cuestas G and Mrs de Villalaz, which he described as "*a variant on the position taken by me and Mr Lee*", those authors drawing the distinction in their "*third approach*" between criminal acts committed with intent (to which Article 1701 is said to apply) and those 'faultful' acts (to which Article 1706 is said to apply).

80.     The Kazakovs argued in oral submission that these further legal materials provided support for the proposition that Article 1706 applies to civil liability from criminal acts more generally (whether or not Article 1644 is engaged).   However, I was unable to discern this from the materials themselves, let alone from Mr Aued's related references to them.   In relation to Mr Tello's commentary, Mr Aued did not suggest that this identified some basis other than Article 1644 for applying Article 1706.   To the contrary, Mr Aued said in Aued 1 that the commentary "*accords with several decisions of the Supreme Court of Panama*", decisions concerned with the operation of Articles 1644 and 1706.   Likewise, Mr Lombardi's analysis appeared consistent with Mr Aued's thesis based on Article 1644.   Mr Saldana's thesis was difficult to discern but appears to envisage an expansive interpretation of extracontractual liabilities (under Article 1644 as referred to in Article 1706) to include criminal acts.   In any event, Mr Aued expressed no comment about it at all.   Although Mr Aued did take issue with the distinction drawn by Mr Cuestas G and Mrs de Villalaz concerning wilful and 'faultful' acts, the authors could not have been asserting that Article 1706 applied to criminal acts generally since, as Mr Aued also noted, "[f]*or them, a criminal conviction is required*" such that a freestanding civil claim for criminal acts could never arise.

81.     Moreover, although Mr Aued quite properly referred to the arguments of other legal commentators of which he was aware, <u>his</u> thesis (as explicitly relied on by the Kazakovs) was unequivocally that civil claims for criminal acts <u>are</u> governed by Article 1644 and, therefore, for limitation purposes, Article 1706.   There is no statement by Mr Aued in his report that a freestanding claim under Articles 128 and 129 PC is available that does not rely on Article 1644.   To the contrary, Mr Aued went on to maintain (at [24]) his position that "*absent a conviction, a civil judge* [cannot] *apply the Penal Code in a case of civil liability arising from criminal act*" and (at [33]) that:-

"*The possibility of a single standing civil claim for damages arising from Articles 128 and 129* [PC] *does not appear to be a feasible scenario for the Third Chamber: a final criminal court decision is required, otherwise the action would be a tortious claim action governed by Articles 1644 and 1706* [CC]."

82.    That both the Claimants and the Kazakovs understood, and the latter contended for, the dependency of Mr Aued's thesis on Article 1644 CC is also evident from the witness statements already referred to, as well as the Kazakovs' skeleton argument.  So, in their skeleton in relation to Veronica's damages claims, they asserted (my emphasis **in bold**):-

"*In the circumstances, the Kazakovs submit that it is (at the very least) reasonably arguable that: (i)* **the appropriate legal basis for Veronica's new damages claims is Article 1644** [CC]*; (ii) the applicable limitation period is one year in accordance with Article 1706; and (iii) time starts to run from the date on which Veronica had actual or constructive knowledge of the alleged wrongful act or damage.*" [90]

83.    Likewise, in relation to Mrs Bourlakova's damages claims, the Kazakovs say that, "[a]*s a matter of fact, it is (at the very least) reasonably arguable that …*" (my emphasis **in bold**):-

"*As a matter of Panamanian law in respect of the damages claims: (i)* **the appropriate legal basis for Mrs Bourlakova's new damages claims is Article 1644** [CC]*; (ii) the applicable limitation period is one year in accordance with Article 1706; and (iii) time starts to run from the date on which Mrs Bourlakova had actual or constructive knowledge of the alleged wrongful act or damage.*" [127(4)]

84.    And, more generally in relation to Mr Aued's evidence, the Kazakovs say:-

"***Mr Aued's opinion is that a freestanding civil action for damages under Articles 128 and 129* [PC] *is an extra-contractual or tortious claim. Such a claim is civil claim governed by Article 1644* [CC]***. **The limitation period applicable to claims under Article 1644** *(including claims under that Article in respect of Articles 128 and 129* [PC]*) is the one year limitation period in Article 1706* [CC]." [87]

85.    Finally, the Kazakovs' skeleton (at [87(5)]) identifies the additional legal commentary referred to in Aued 1 and 2 as supportive of Mr Aued's thesis on Articles 1644 and 1706 CC, not some alternative route by which Article 1706 might also be invoked.  On any fair reading of the evidence and submissions, the Kazakovs' argument does <u>not</u> address the limitation position on the actual claims being advanced by the Claimants under Articles 128 and 129 PC alone.  The Kazakovs' attempts to suggest otherwise in oral submission were unpersuasive and unavailing.

86.    Accordingly, no reasonably arguable limitation defence to the proposed new damages claims by Mrs Bourlakova and Veronica has been disclosed.  As such, limitation at least does not present an impediment to the related amendments.

**(b)**     **Limitation (declaration claims)**

87.     As for the proposed new claims for declaratory relief with respect to the ownership of Edelweiss, Gatiabe and Jovellanos, in answer to the first related question posed of him, Mr Aued asserts in Aued 1 (at [55]-[58]) that "*a declaration of ownership could not be made until the court had considered and made determinations on each of the relevant corporate acts*" such as "*directors' resolutions to cancel the shares, the issue of the new share certificate, and the voiding of any transfers of shares*."  So, he says (at [58]) "*in relation to the claim for a declaration of ownership of the shares in Edelweiss, it would be necessary to seek orders from the courts setting aside the board resolution cancelling the bearer shares and issuing shares to Merenguito and (2) annulling an assignment or transfer of shares from Merenguito to Hemaren (if there was one) and (3) setting aside a board resolution issuing a share certificate to Hemaren (if there was one)*."

88.     Aued 1 went on to consider the applicable limitation period, stating (at [62]) that Article 1652.2 of the Code of Commerce (**CoC**) would apply "*to those individualized situations or acts of the Declarations Claims, that are considered to be acts that fall within Article 1652.2*", having explained (at [59]) that this "*applies to matters governed by the* [CoC], *in respect of corporate relations between shareholders and shareholders vis a vis the company*" and provides that-

> "*Article 1652.  Shall lapse in three years*
> 1.  .....
> 2.  *Actions derived from corporation contract and of corporate operations in respect of the rights and obligations of the corporation with the shareholders, of the shareholders with the corporation and between the shareholders themselves in relation to the corporation*."

89.     Mr Aued gives examples of the types of the corporate acts that might engage Article 1652.2 such as resolutions "*adopted by the board of directors in connection with the disputed shares*" or "*resolutions adopted by the [questioned] shareholders where the disputed shares were voted*."   However, in Aued 1, he does not identify specific resolutions or other corporate acts said, in fact, to have been made or performed in this case.

90.     Finally, Mr Aued explains (at [63]-[66]) that the limitation period for a claim under Article 1652.2 CoC begins to run from the moment the obligation can be enforced, as to which, "*it is important that the individual become* [sic] *aware of the harmful event or breach, in order to enforce the obligation or exercise rights*".   As to such awareness, Mr Aued also states (at [66]) that " … *if it is apparent from registrations on the Public Registry that resolutions of the company have been made* [sic] *the boards or directors and/or its shareholders, which are inconsistent with the claimant being owners of the shares, then this* [sic] *sufficient to start time running for limitation purposes on a claim by the claimant owner of the shares*."

91. EAS5 then takes Mr Aued's analysis and considers the limitation period that would apply to any claims for the annulment of corporate acts allegedly undertaken in violation of the Claimants' purported ownership of the bearer shares in the relevant Panamanian Companies. So, in relation to:-

    (i) **Edelweiss**, EAS5 relies (at [23]) on the Claimants' (proposed) pleaded case as to the purported cancellation of the bearer shares in or around January 2016. Veronica had given evidence of her awareness on 13 February 2018 of the regulations of Merenguito identifying Edelweiss as its asset. If time runs from this date, the limitation period expired on 13 February 2021;

    (ii) **Gatiabe**, EAS5 relies (at [24]) on the Claimants' (proposed) pleaded case as to the reinstatement on 25 June 2018 of the company and the purported cancellation of the bearer shares. Given that the reinstatement was publicised by entry on the Public Registry on 25 June 2018, the limitation period would run from the date of cancellation on 12 July 2018; and

    (iii) **Jovellanos**, EAS5 relies (at [26]) on the Claimants' (proposed) pleaded case as to the reactivation of Jovellanos on 3 October 2018 and purported cancellation of the bearer shares. Given that the reactivation was publicised by entry on the Public Registry on 8 October 2018, the limitation period would run from the date of cancellation on 8 October 2018.

92. The Kazakovs also rely on subsequent entries in the Panamanian Public Register said to be inconsistent with the Claimants' ownership of each of the companies as further evidence of the Claimants' relevant knowledge for limitation purposes.

93. In AWD11, the Claimants reject Mr Aued's thesis that declarations of ownership could not be made until the court had considered, and made determinations on, each of the relevant corporate acts. However, they also say that it is no part of the Claimants' case that there has ever been any act by any duly authorised person to cancel the bearer share certificates. To the extent the Kazakovs allege some relevant corporate act occurred that requires annulment, it was incumbent on them to advance positive evidence about it. That is said to be all the more important in this case where the clear evidence shows documents being backdated and forged. Likewise, AWD11 explains (at [33]-[36]) that Aued 1 gives examples of relevant corporate acts falling within 1652.2 CoC (such as director resolutions in connection with the disputed shares) but neither Aued 1 nor Seborg 5 identifies any in respect of which a relevant limitation period is said to be engaged. Moreover, the fact that other resolutions may have been passed does not advance matters since these would not give the Claimants any information as to the resolutions relating to the purported issue and cancellation of their shares the object of the annulment action that Mr Aued says would need to be brought.

94.     EAS6 responds to these criticisms in AWD11 in the following terms (at [80]-[82]):-

"80.    *The Applicants have also complained that the Kazakovs have not identified the intermediate corporate acts which we say as a matter of Panamanian law must be challenged by the Applicants and annulled as part of any claim to be recognised as owner of the companies. Again this is a strange and disingenuous criticism. It is difficult to see why it is necessary for these acts to be identified at this stage. First, Mr Aued in his evidence gives examples of the type of corporate acts that must be declared void by the Court: the cancellation of shares, the issue of new share certificates, and the transfer of shares. Second, the Particulars of Claims detail some of the key acts in question at paragraphs 90A, 90B and 90C.*

81.     *In any event, the relevant corporate acts include:*

a.     *In the case of Edelweiss, the board resolution dated 9 April 2015 for the withdrawal and invalidation of the bearer share certificate No. 3.and for the issue of a new share certificate (No. 4) to Merenguito [AWD10/161], the issue of a share certificate to Merenguito [AWD10/162], the board resolution dated 23 May 2018 to withdraw and invalidate 1 the share certificate No. 4 and to the issue of a new share certificate (No.5) to Hemaren [AWD/242], the issue of a share certificate to Hemaren [AWD10/243], and the recording of these certificates and their withdrawal and invalidation in Edelweiss's share register [EAS6/456].*

b.     *In the case of Gatiabe, the board resolution dated 12 July 2018 for the withdrawal and invalidation of bearer share certificate no. 2 and for the issue of share certificate No. 3 to Delos Global SA (a Panamanian company) [EAS6/457], the board resolution dated 26 February 2019 to withdraw and invalidate share certificate No. 3 and to issue a new certificate of shares (No.4) in the name of Wlamil Foundation [AWD10/259], the issue of the share certificate No.4 to Wlamil, and the recording of these matters in Gatiabe's share register [EAS6/458].*

c.     *In the case of Jovellanos, the board resolution dated 18 October 2018 [EAS6/459] for the withdrawal and invalidation of bearer share certificate no. 2 and for the issue of share certificates No. 3 and No. 4 to Delos Global of 42 and 58 shares, respectively, and the board resolution of 16 February 2022 withdrawing and cancelling share certificate No. 3 and issuing share certificate No.5 to Mr Kazakov [EAS6/460-461]."*

95.     Aued 2 also states (at [58]) in relation to Edelweiss, for example, that each of the corporate resolutions or acts identified in EAS6 (at [81a.]) would have to be annulled as part of Veronica's declaration claim, being corporate acts for the purpose of Article 1652.2 CoC, requiring her to successfully challenge their validity, the limitation period running from the date of her awareness of those acts. He goes on (at [59]-[62]) to state that the recording on the Panamanian Public Register of other corporate acts indicating the exercise by someone other than Veronica of the rights as shareholder in Edelweiss

would be sufficient to treat her as having knowledge of the former and, therefore, to start time running.

**The Claimants' position**

96. Despite the identification in EAS6 of supposed specific corporate acts (also referred to in Aued 2), the Claimants maintain for a number of reasons that the Kazakovs' position still discloses no reasonably arguable limitation defence as to whether (a) any valid corporate acts requiring challenge took place and (b) the Claimants had knowledge of those acts in time to give rise to a reasonably arguable limitation defence. As to the former:-

   (i) Although he asserts in Aued 2 (at [77]) that the acts relied on "*were carried out by the board of directors of the relevant companies*", that assumes the relevant resolutions were, in fact, passed. Mr Aued was obviously unable to give evidence as to whether a particular corporate act had occurred, having no personal knowledge;

   (ii) The Kazakovs nevertheless bear the burden of showing a reasonably arguable defence and are, therefore, required to put forward positive evidence to that end. Despite this, the Kazakovs declined to do so in EAS5;

   (iii) AWD11 made clear (not least in light of the evidence of backdating and forging of documents) that the Claimants did not accept that the Kazakovs had established any arguable limitation defence and that positive evidence was required to that end;

   (iv) Although the Kazakovs equivocated in EAS6 as to the need for such evidence, they did go on to identify certain "*relevant corporate acts*" and to identify some documents, matters which should have been included in EAS5, not by way of rejoinder evidence;

   (v) However, like Mr Aued, the author of EAS6 has no personal knowledge of whether the documents she exhibits are a genuine record of the events they purport to describe and her statement does not suggest she has relied on information from the Kazakovs (or some other source with relevant knowledge). As such, it too provides no evidence that any "*relevant corporate act*" did, in fact, take place;

   (vi) That is particularly significant in this case given that (a) the Claimants pointed out to the Kazakovs on 23 March 2023 the clear evidence that a significant number of the documents exhibited to EAS6 are not genuine (b) no attempt has been made in EAS6 to explain how these can be relied on and (c) the Kazakovs have previously caused evidence to be put forward containing "*a plain misrepresentation to the court*" which "*may well have been*" dishonest;

   (vii) In the absence of positive evidence that any actual corporate act took place and that the documents relied on are genuine, the Kazakovs have failed to establish the factual premise for their limitation defence; and

(viii)   The Kazakovs having failed to establish a valid "*corporate act*", the position on limitation is as stated in Lee 1 (at [120]), namely that "*a document purporting to be a resolution passed by a company's board, but in fact created by a third party, is an absolute nullity to which the 15-year limitation period in Article 1143 of the Civil Code applies* ...", a proposition contested only by reference to the assumption that Mr Aued was in no position to make that the corporate resolutions he identifies were, in fact, carried out by the relevant board of directors.

97.   As to the latter:-

(i)   The basis on which the Kazakovs say the Claimants had the necessary knowledge is that other resolutions reflecting the exercise by someone else of shareholder rights (but not those required to be challenged) were recorded at the Panamanian Public Registry;

(ii)   This makes no sense given that Mr Aued's thesis is premised on the need for the Claimants to "*challenge the validity of each of those corporate acts*", stressing (in Aued 1) the importance of awareness of the harmful event or breach to enforce the obligation or exercise rights and (in Aued 2) that "*awareness of the acts*" is required.  The documents he relies on would not enable the Claimants to make that challenge.   AWD11 explains that conundrum but Aued 2 did not engage meaningfully with it;

(iv)   The Claimants say the Kazakovs' position makes even less sense here given that they argue the time to challenge some of the supposed "*relevant corporate acts*" began to run before those acts even took place.  So, in relation to:-

(a)   **Edelweiss**, the Kazakovs rely on Veronica's knowledge in February 2018 to start time running.  However, three of the five acts Mr Aued says need to be annulled occurred thereafter;

(b)   **Gatiabe**, the Kazakovs rely on public deeds dated June 2018 (published in July 2018) but every supposed corporate act they rely on occurred thereafter (and the documents relied on were at most only drafts even in October 2018 such as not to reflect any genuine corporate act);

(c)   **Jovellanos**, the Kazakovs rely on public deeds dated 3 October 2018 (recorded on 8 October 2018) but every corporate act they rely on is said to have occurred after 8 October 2018 (and, again, the documents relied on only existed in draft on 17 October 2018).

(v)   According to the Claimants, the idea that the limitation period could begin running <u>before</u> the "*relevant corporate acts*" is absurd.  In an apparent attempt to circumvent this absurdity, EAS6 asserts that the Claimants' earlier deemed knowledge of other resolutions means that the Claimants had knowledge of the

(later) "*relevant corporate acts*" when they took place but Aued 2 does not support the analysis; and

(vi)     In any event, it is illogical to say that a document from June 2018 could make a person aware of a subsequent corporate act and the dates the documents bear are clearly unreliable as to when any "*relevant corporate act*" actually took place, if ever.

98.     As such, the Kazakovs have also failed to establish as part of its limitation defence a reasonably arguable case that the Claimants had necessary knowledge.

**The Kazakovs' position**

99.     The Kazakov's 'headline' submission was that where, as here, there is a dispute between the parties' experts as to the applicable limitation period (and for that purpose, when time starts to run), the court cannot, without cross-examination, determine who is right. The consequence of the court's inability to decide which expert is right means that the court should readily conclude that the principles advanced by Mr Aued are reasonably arguable.

100.    The Kazakovs emphasise Mr Aued's evidence that knowledge of a "*relevant corporate act*" arises not only from actual knowledge of that act but knowledge too of the acts of a new shareholder exercising rights as such, such knowledge capable of being deemed by reason of matters appearing on the Panamanian Public Register.

101.    As to the Claimants' case in relation to Edelweiss, their pleaded case was (and remains) that the bearer shares were cancelled in or around 2016 and Veronica's evidence is that she received a copy of the Merenguito regulations, naming Edelweiss as its asset, on 13 February 2018.  The acts which the Claimants would need to invalidate to establish Veronica's ownership of Edelweiss start with the acts that gave rise to Merenguito becoming owner.  Veronica knew of those acts in 2018.  Later corporate acts are relied on (such as the transfer of the share from Merenguito to Hemaren) but the fact that, by the time of those later acts, the limitation period had already begun to run in relation to the cancellation of the Edelweiss shares is simply a function of the operation of the CoC which looks at the individual corporate acts concerned.

102.    In relation to Gatiabe and Jovellanos, the Kazakovs do not accept that there is a lacuna in their evidential case.  EAS5 refers (at [24] and [26]) to the dates of cancellation of the Gatiabe and Jovellanos bearer shares, those dates being those advanced by the Claimants against the Defendants in the prior incarnation of the proposed amended pleading from September 2022 (removed from the April 2023 version).  Although the Claimants' letter of 23 March 2023 pointing out the backdating of documents in relation to Gatiabe and Jovellanos was circulated (together with the final iteration of the proposed amended PoC) shortly before EAS6, the significance of this point to the amendment applications was not explained.  On the basis of the Claimants' own prior proposed pleading, and as explained in EAS5, the cancellation of the Gatiabe and Jovellanos bearer shares would, if they were valid acts, have been time barred on the basis of Mr Aued's analysis, including as to deemed awareness of entries on the Public Register.  Documents relevant

to the corporate acts for Gatiabe and Jovellanos were then provided in EAS6 for both companies. To the extent the Claimants now seek to make some forensic point as to the absence of independent corroborative evidence that these corporate acts took place on the dates alleged, they should not be permitted to do so. However, if the court considers otherwise, the matter should be adjourned to allow the Kazakovs more time to put in further evidence.

## Limitation defence (declaratory relief) - discussion

103. Although a low bar, I am satisfied that the Kazakovs have again failed to establish a 'reasonably arguable' case that a relevant limitation period has expired in relation to Mrs Bourlakova's and Veronica's proposed new claims for declaratory relief with respect to Edelweiss, Gatiabe and Jovellanos. I reach that view for the following reasons:-

(i) Mr Aued's thesis is that the claims for the declaratory relief sought require the court first to set aside "*relevant corporate acts*" by which the Claimants' alleged shareholdings in those entities were cancelled and transferred to others such as, for example, directors' resolutions to cancel the bearer certificates;

(ii) Although the Claimants do say that their bearer shares in Gatiabe, Jovellanos and Edelweiss were "*purportedly cancelled and purportedly replaced*" (PoC at, respectively, ([90A(c)], [90B(c)] and [96(C)(c)]), they do not identify those events as having occurred pursuant to any corporate act of the nature described by Mr Aued such as a board resolution to that end;

(iii) Nor, as was pointed out in AWD11, did Aued 1 or EAS5. This lack of evidence was surprising, as too was the statement in EAS6 that "[i]*t is difficult to see why it is necessary for these acts to be identified at this stage.*" It was incumbent on the Kazakovs to do exactly that, the reference in EAS6 to Mr Aued's evidence as to the type of corporate acts that might engage Article 1652.2 CoC and to the Claimants' pleading both being clearly insufficient for that purpose;

(v) Even more surprising in my view was the position then taken in the Kazakovs' rejoinder evidence. Apparently realising that the Kazakovs had not made good, even on a 'reasonably arguable' basis, the proposition that relevant corporate acts requiring annulment had taken place in relation to the alleged deprivation of the Claimants' ownership of the relevant companies, the author of EAS6 identified (at [81]) by reference to the underlying documents the "*intermediate corporate acts which we say as a matter of Panamanian law must be challenged by the Applicants and annulled as part of any claim to be recognised as owner of the companies.*" However, the author of EAS6 had no personal knowledge of the occurrence of such acts. Nor did her statement suggest that the she had obtained confirmation of this from any person who might have had such knowledge.

(vi)   Aued 2 also adopted without question the documents referred to in EAS6 (at [81]), even stating (at [77]) that "[t]*hose corporate acts or resolutions, such as listed in paragraph 58 above in the case of Edelweiss, were carried out by the board of directors of the relevant companies ..*".  However, Mr Aued did not know this and he had no basis for making that unqualified statement.

(vii)  Nor was there any basis for the author of EAS6 to rely on the Claimants' (proposed) pleaded case in this regard.  To the contrary, it is evident from the proposed amendments that the Claimants take issue with the authenticity of some of the very documents prayed in aid by the Kazakovs.  In relation to Edelweiss, for example, the Kazakovs rely on an Edelweiss board resolution dated 9 April 2015 for the withdrawal and invalidation of a share certificate as one of the corporate acts.  However, the Claimants' amended pleading explains by reference to the underlying documents over the period 2015 and 2016 how the relevant resolution was, in fact, backdated.  It therefore remains at large whether the resolution was, in fact, passed and, if so, on what date, the evidence showing that it was not signed on the date it indicates.

(viii) Likewise, in relation to Gatiabe, EAS6 refers (at [81b.]) to the board resolution dated 12 July 2018 for the withdrawal and invalidation of the bearer share certificate.  Although the resolution does bear that date, the other related documents indicate that this could not have been made then, the relevant board minutes, directors' letters of acceptance and new share certificates still being circulated in draft months later in October 2018.

(ix)   Finally, in relation to Jovellanos, EAS6 refers (at [81c.]) to the board resolution dated 8 October 2018 for the withdrawal and invalidation of the bearer share certificate.[10]  However, the other related documents again indicate that this could not have been made then, the relevant board minutes, directors' letters of acceptance and new share certificates still being circulated in draft later on 17 October 2018.

104.   This represented much more than an evidential lacuna or a forensic or 'dating' point as the Kazakovs seemed to put matters in submission.  There is no evidence from the Kazakovs as to the actual occurrence of a corporate act (or its date) for the purpose of asserting a reasonably arguable limitation defence to the declaration claims.  The mere reference in EAS6 to documents does not get the Kazakovs home for this purpose.  To the contrary, such evidence as there is shows that a number of the resolutions relied on were not, in fact, passed on the date suggested, there is no evidence that the relevant meetings approving the resolutions did, in fact, take place (or when) and the identity and authority of the relevant signatories is not explained.

105.   Nor is it open to the Kazakovs to complain that they did not understand the significance of the 'backdating' point being made by the Claimants in their letter of 23 March 2023.  First, the Kazakovs should have set out their position on the relevant corporate acts much

---

[10]    EAS6 says the board resolution is dated 18 October 2018 but the document is dated 8 October 2018.

earlier in EAS5. They did not. Second, AWD11 expressly raised in this very context the need for positive evidence from the Kazakovs as to the relevant corporate act, particularly in light of the existing evidence of forgery and backdating. Third, even if the Claimants had not pointed this out earlier, the point was, in my view, a rather obvious one. The suggestion that the matter should be adjourned to allow further evidence was misguided.

106. The Kazakovs have had ample opportunity to show a reasonably arguable limitation defence in relation to the proposed claims for declaratory relief. They have again failed to do so. Accordingly, the limitation issue presents no impediment to those claims either.

### G. Jurisdictional issues

### (a) Introduction

107. Given the jurisdictional aspects arising on the Claimants' amendment applications, it is appropriate to note here that the rival jurisdictions contended for by the Claimants and the Kazakovs before Trower J were, respectively, England and Monaco. Despite the pendency of certain legal proceedings in Monaco involving some of the parties to, and issues arising in, these proceedings, and certain other factors favouring Monaco, in dismissing the jurisdictional challenges, Trower J found that, in the absence of "*a real ability equivalent to submission to sue all of the defendants in Monaco*", the risk of a multiplicity of proceedings and of irreconcilable judgments were powerful factors in support of England as the appropriate forum for the purpose of the common law jurisdictional regime. Given the nature of the amendments and developments in the litigation position as between some of the parties, the focus of the jurisdictional debate for the purpose of these applications has shifted, with Panama or Florida now the suggested alternative fora to England.

108. The jurisdictional issues arising on these amendment applications are whether:-

   (i)    despite the UK's withdrawal from the EU, the Brussels Recast (including Article 8(1)) applies to the proposed new claims against the Kazakovs and Mr Anufriev;

   (ii)   in relation to the Claimants' proposed new claims subject to the common law regime, England, Panama or Florida is clearly and distinctly the appropriate forum;

   (iii)  the Claimants' proposed new claims against the 'anchor defendant', Leo Holding, are artificial and abusive such that the amendment applications fail for lack of jurisdiction, whether through their inability to invoke Article 8(1) of the Brussels Recast or the relevant jurisdictional gateway at common law;

   (iv)   Gatiabe is a 'necessary or proper' party with respect to the proposed new claims concerning the ownership of that company; and

   (v)    if the EU jurisdictional regime does apply to the Kazakovs, whether a stay should be granted under Articles 33 and 34 of the Brussels Recast of any new claims the Claimants might be permitted to advance.

109.    As to the 'intersection' of proposed amendment and jurisdiction, "*there is, in principle, no objection to amending a pleading which has been served out of the jurisdiction unless the effect will be to add a claim in respect of which leave could not, or would not, have been given to serve out*" (*NML Capital Ltd* v *Republic of Argentina* [2011] 2 AC 495 at [77]).  However, it is not necessary for the Claimants to obtain formal permission to serve out.  Likewise, where a claim has been served out under the Brussels Recast, it is necessary to show that its jurisdictional requirements would have been satisfied in respect of any new claims proposed to be added by amendment.


**(b)    The application of the Brussels Recast**

110.    As to the first question above, Regulation 89 of the Civil Jurisdiction and Judgments (Amendment) (EU Exit) Regulations 2019 (**2019 Regulations**) revoked the Brussels Recast at the end of the transition period.[11]  Regulation 93A contains a saving to the effect that nothing in the 2019 Regulations affects the application of Article 67.1(a) of the EU-UK Withdrawal Agreement (**Withdrawal Agreement**).  Article 67.1(a) provides that "*in respect of legal proceedings instituted before the end of the transition period and in respect of proceedings or actions related to such legal proceedings pursuant to Articles 29, 30 and 31 of* [the Brussels Recast]", the provisions of the Brussels Recast shall continue to apply.

111.    Relying on *Dicey*, Companion Volume to The Conflict of Laws (16th ed.) (at [12-004], fn. 11), the Kazakovs contend that the expression "*proceedings instituted*" in Article 67.1(a) (as also used in the transitional provision of Article 66 of the Brussels Recast) ought to have the same meaning as the date on which the English Court was first 'seised' within the meaning of Article 32 of the Brussels Recast.  *Dicey* also observes (at [12-027]) that, although Article 32 is not an article given transitional effect under the Withdrawal Agreement, Article 29 uses the term *''first seised''* which ought to be applied in a consistent manner in the UK and EU .  This provides that a court is deemed to be seised either when the document instituting the proceedings is lodged with the court, provided that the claimant has not subsequently failed to take the requisite steps to have service effected on the defendant, or if the document has to be served before being lodged with the court, at the time the document is received by the first authority responsible for service, provided that the claimant has not failed to take the steps required to have the document lodged with the court.  Finally, *Dicey* observes in relation to new claims (at [12-029]) that:-

> "*Where a claim form which has been issued and served is amended to add an additional claim (as distinct from the amendment of an existing claim), or by the introduction of a claim or counter-claim against another party, it is submitted that the court is not seised of the new claim until the amended claim form is reissued. ………. If the view expressed here is correct, the consequence for the purpose of the Withdrawal Agreement is that a new claim or counter-claim brought in existing proceedings after*

---

[11]    11pm on 31 December 2020.

*the end of the transition period will not be subject to the transitional lis pendens arrangements*."

112.    The Kazakovs say that the above is consistent with the reasoning in *The Alexandros T* [2014] 1 All ER 590 which considered (at [60]-[72]) the court first seised for the purpose of the predecessor to Article 29 of the Brussels Recast[12] relating to "*proceedings involving the same cause of action and between the same parties [ ] brought in the courts of different Member States*", holding (at [60]) that "*a court is only seised of claims by or against new parties from the date that those parties are added to the proceedings*". The Kazakovs say that this reflects the position of Veronica in this case. As for when the court was first seised with respect to new claims added by way of amendment, Lord Clarke considered (at [72]) that this "*issue is by no means acte clair*" and did not decide the point. Nevertheless, the Kazakovs say the approach indicated by *Dicey* is to be preferred. Where a claim form is amended to add an additional claim or to introduce a new claim brought by a new party sought to be joined, the court is not seised of the new claim until permission is granted and the amended claim form re-issued. As such, matters of jurisdiction on these amendment applications fall to be considered under the common law rules.

113.    The Claimants, by contrast, say that since these proceedings commenced on 16 July 2020, they are "*legal proceedings instituted before the end of the transition period*" such that the provisions regarding jurisdiction of the Brussels Recast continue to apply to them, including any new claims introduced therein by way of permitted amendment, by reason of Article 67(1)(a) of the Withdrawal Agreement. That approach is necessary because Article 67(2) of the Withdrawal Agreement goes on to provide that any judgment given in any proceedings commenced before the end of the transition period will be capable of recognition under the Brussels Recast regime.

114.    As a preliminary matter, I found unpersuasive the Kazakov's reliance on the excerpts from Dicey which, they suggested, were consistent with the reasoning in *The Alexandros T*. As the latter itself made clear, context is all important. Article 27 of the Brussels Regulation (now Article 29 in the Brussels Recast) is concerned with the jurisdictional treatment of "*proceedings involving the **same cause of action** and between the same parties [ ] brought in the courts of different Member State*" (my emphasis **in bold**). The phrase "*same cause of action*" has an autonomous EU law meaning, namely "*le même objet et la même cause*" or same "*end in view*", the relevant assessment to be undertaken by reference to the claims in each action. Given this context, it is hardly surprising that the Supreme Court found (at [60]) that, for the purpose of Article 27, a court is only seised of claims by or against new parties from the date that those parties are added to the proceedings. Notably, the position with respect to new claims added by amendment was less straightforward.

115.    By contrast, Article 28 (now Article 30 in the Recast) arises in a different context, namely the jurisdictional treatment of "***related actions** [ ] pending in the courts of different member states*" (my emphasis), "*related actions*" meaning actions so closely connected

---

[12]     Article 27 of the Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters.

that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments, as to which, Lord Clarke agreed (at [88]) with Longmore LJ in the Court of Appeal that "*…in the context of Article 28 it is wrong in principle to ask which court is first seised of a **cause of action**, because Article 28 is concerned with **related actions as a whole**"* (my emphasis **in bold**).

116.    The context of Article 67 of the Withdrawal Agreement is different again, being concerned with the continuing jurisdictional treatment of "***legal proceedings** instituted before the end of the transition period*" (my emphasis **in bold**), as to which, HHJ Cawson KC (sitting as a High Court Judge) held in *Simon* v *Taché* [2022] QB 917 ((at [74]) that:-

"Mr Ruddell, on behalf of the defendants, makes the point that article 67 preserves the applicability of Brussels Recast to "proceedings" and not to particular claims in proceedings.   On that basis, and having regard to what I consider to be the proper construction of article 76, I accept Mr Ruddell's submission that Brussels Recast continues to apply to new claims added to proceedings commenced prior to 31 December 2020 and claims against new defendants joined to such proceedings after that date.   ….."

117.    The Claimants say that the same logic applies to claims against existing defendants by an additional claimant.  I agree.  I also agree with the Judge's analysis more generally, informed not only by consideration of the jurisprudence relating to both Articles 29 and 30 of the Brussels Recast, including *The Alexandros T*, but also, correctly in my view, the language, context and objectives of Article 67 of the Withdrawal Agreement itself. Accordingly, the proceedings in this case having been instituted prior to the end of the transition period, I find that, by reason of the operation of Article 67(1)(a), the Brussels Recast would apply (as appropriate) to the proposed new claims by Mrs Bourlakova and (as new claimant) Veronica.  Nevertheless, in case I am wrong about that, I consider the common law jurisdictional regime on the basis it extends to the Kazakovs and Mr Anufriev as well.

## Article 8(1) Brussels Recast

118.    As to the engagement of the Brussels Recast, the Claimants rely on Article 8(1) to establish jurisdiction over the Kazakovs and Mr Anufriev.  Article 8(1) provides that:-

"A person domiciled in a Member State may also be sued … where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings".

119.    In this case, the Claimants rely on the English domicile of Leo Holding as anchor defendant and the close connection of the claims against the Kazakovs (domiciled in Estonia) and Mr Anufriev (domiciled in Latvia) to say that the English court has jurisdiction over them as well by reason of Article 8(1).  They also say that, prior to the filing of EAS6, the Kazakovs did not challenge the Claimants' reliance on Article 8(1) or seek to depart from their prior express acceptance that Leo Holding could act as an anchor defendant or seek to suggest that the new claims against them were not

sufficiently closely connected to the new or existing claims against Leo Holding. However, in what the Claimants describe as "*a striking volte face*", the Kazakovs now seek to challenge the Claimants' reliance on Leo Holding as anchor defendant on the ground that "*such reliance is artificial, abusive and/or ... the Applicants have no intention to pursue their claims against them to judgment*".

120.    According to the Claimants, this argument is not open to the Kazakovs and is without merit in any event. First, they say that substantially the same submission was made at the jurisdiction hearing before Trower J as to the position between the Claimants and Mr Tribaldos, albeit the Kazakovs accepted that this did not mean that Leo Holding could not act as an anchor defendant. The Kazakovs invited Trower J to "*express some scepticism about whether the proceedings against the Leo Group defendants if all the other defendants were out would really progress to trial*", asserting that it was "*clear in our submission that something has been going on between the claimants and the Leo Group defendants because suddenly a week or so ago they abandoned their strike-out or summary judgment and their jurisdiction challenges*." Despite this, the Kazakovs accepted that as regards:-

(i)     the common law regime, the broad reach of the "*necessary or proper party*" gateway in PD6B, para 3.1(3) would be available for the Claimants' claims; and

(ii)    the Brussels regime, the co-defendant jurisdiction under Article 8(1) would be available.

121.    The Claimants say the Kazakovs accepted the latter because the contrary argument was not open to them as a result of *Privatbank* v *Kolomoisky* [2020] Ch 783, the Court of Appeal in that case holding (at [111]) in relation to the provision of the 2007 Lugano Convention corresponding to Article 8(1) of the Brussels Recast that:-

"Accordingly, we conclude in the present case that the Bank, which has a sustainable claim against the English Defendants and which intends to pursue the claim to judgment against those Defendants in combination with its claims against Mr Kolomoisky and Mr Bogolyubov, is entitled to rely on article 6(1) even if its sole object in commencing the proceedings against the English Defendants is to be able also to sue those individuals in the same proceedings."

122.    Having chosen expressly not to run the point before Trower J on the basis it was hopeless, the Claimants say choosing to run it now is a paradigm example of an abuse of process. Second, the Kazakovs having submitted that the court was entitled to be sceptical, Trower J went on expressly to reject it (at [265]):-

"While I can understand why this submission was made, I do not accept it. Having regard to the fact that Mr Tribaldos and the two Leo companies were, on the claimants' case, intimately involved in the implementation of what they allege to be Mr Bourlakov's dishonest strategy to defraud her, and because of the role which Leo Holding plays as an anchor for the other defendants, I agree with Ms Davies' submission that there are no grounds on which I can conclude that the claimants do not

have a genuine intention to continue those claims. In my view, I have to proceed on that basis."

123.    The Claimants say there is no basis for departing from that finding.  To the contrary, VB2 expressly confirms that there has been no settlement of the claims against the Leo Defendants or agreement or understanding that precludes the pursuit of those claims and that, absent an acceptable settlement offer or other development, the Claimants intend to pursue to trial their claims against the Leo Defendants.

124.    The Claimants also say that none of the matters now relied on by the Kazakovs (principally the provision of documents by the Leo Defendants) are of significance and most of them predate EAS5 in which they did not seek to challenge Leo Holding's position as anchor defendant.

125.    They also say that the point remains a hopeless one in light of *Kolomoisky* which held that an "*abuse of law*" would be required, the (extreme) examples given by the Court of Appeal being a collusive arrangement to conceal a settlement of the claim against the anchor defendant, a fictitious anchor defendant and commencing proceedings against the anchor, knowing that the underlying claim was inadmissible, none of which features here.

126.    Relying on the various matters set out in their evidence (EAS5 (at [112]); EAS6 (at [59]-[75]), including the following, the Kazakovs say that Veronica's reliance on Leo Holding as anchor defendant is artificial because:-

(i)     Leo Holding is part of a group of companies owned and/ or controlled by Mr Tribaldos.  That group of companies includes Leo Trust, Leo Holding's wholly-owned subsidiary;

(ii)    Mr Tribaldos has provided a witness statement in support of Veronica's oral process claim against Edelweiss in Panama.  That claim (discussed below) is brought by Veronica on the alleged basis she is Edelweiss's sole shareholder, in substance the same claim as now sought to be advanced in these proceedings;

(iii)   Although the Claimants accept that Mr Tribaldos provided that statement and "relevant documents", they do not explain what those documents are or the circumstances of their provision.  However, it is clear from the draft amendments circulated on 23 March 2023 that they include documents relied on by the Claimants to support the same.  This is not an isolated example, Mr Tribaldos and his companies having 'funnelled' confidential documents to the Claimants since the withdrawal of Leo Trust's jurisdiction challenge in late 2021; and

(iv)    In January 2023, Edelweiss applied to the Swiss Court to obtain access to the court file.  Both Veronica and Leo Trust opposed that application in circumstances suggesting their active cooperation to prevent Edelweiss from obtaining documents relevant to the claims which Veronica now seeks to advance in these proceedings.

127.    In these circumstances, the Kazakovs submit that it is to be inferred that Mr Tribaldos and his companies, including Leo Holding, are not adverse to the Claimants and that they have no intention of pursuing their claims to judgment.  The Claimants may say

otherwise but they have provided no disclosure or detail of the communications that must have taken place between them . In this regard, Veronica's evidence is carefully worded and does not say that there is no arrangement or understanding between them concerning the claims against them in these proceedings. Whether or not the claims have been formally settled, they continue to exist for tactical reasons, there being no other plausible reason for providing confidential documents to the Claimants then deployed against the Defendants, including Veronica's claims also brought against the Leo Defendants.

128. Having carefully considered the various matters relied on by the Kazakovs, I am unable to conclude that the Claimants' claims against Leo Holding are artificial, abusive or do not reflect a genuine intention to sue the 'anchor defendant'. The fact that, for example, the Leo Defendants have not pursued certain jurisdictional or other interlocutory challenges, have provided documents to the Claimants (ostensibly on the basis of their entitlement to these as heirs) and have taken certain steps in other proceedings to resist the disclosure of documents to Edelweiss in Switzerland and to provide a statement in Veronica's Panamanian oral process claim, explaining what Mr Tribaldos knows about the share certificates of Edelweiss, Gatiabe and Jovellanos, comes nowhere close to establishing an "*abuse of law*". Although it is unsurprising in litigation as hard fought as this, involving such serious allegations, that the Kazakovs should question the motives of the other defendants, it is also unsurprising that different defendants might take a different procedural or tactical approach towards the other parties. That does not mean that the Claimants do not have a genuine intention to pursue their claims against the Leo Defendants to trial. Even with the further matters relied on by the Kazakovs that have occurred since the jurisdiction hearing, the inference they invite the court to draw in this regard is based on little more than suspicion and speculation. In light of this and Veronica's direct evidence that there is no settlement or other arrangement precluding the pursuit of the proceedings against the anchor defendant and that, bar settlement or further developments in the litigation, the Claimants intend to pursue the related claims to judgment, I am satisfied that Article 8(1) is engaged in this case with respect to the proposed new claims against the Kazakovs and Mr Anufriev such that, if permission to amend is granted, the court would have jurisdiction in respect of the new claims against them (those claims being sufficiently closely connected with those against Leo Holding).

**(c)** **Common law jurisdictional regime**

129. In relation to those new claims not subject to the Brussels regime, including against Edelweiss and Gatiabe, there was no dispute as to the applicable principles, namely:-

   (i)     there must be a serious issue to be tried on the merits of the claim;

   (ii)    there must be a good arguable case that one or more of the jurisdictional gateways under CPR, PD6B, paragraph 3.1 is engaged; and

   (ii)    in all the circumstances (a) England must be clearly or distinctly the appropriate forum; and (b) the court considers it appropriate in its discretion to permit service out.

**Jurisdictional gateway**

130. The main jurisdictional gateway relied on by the Claimants is CPR, PD6B, para 3.1(3) which provides that:-

"3.1    The claimant may serve a claim form out of the jurisdiction with the permission of the court under rule 6.36 where:-
................

(3)      A claim is made against a person ('the defendant') on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and:-

(a)      there is between the claimant and the defendant a real issue which it is reasonable for the court to try; and

(b)      the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim."

131. Although there is no dispute that there is a serious issue to be tried as between the Claimants and the Kazakovs (and Edelweiss and Gatiabe), the Kazakovs say, for similar reasons to those already discussed as to the engagement of Article 8(1) of the Brussels Recast, that there is no real issue to be tried as between the Claimants and the 'anchor defendant', Leo Holding, at least in relation to the new claims for declaratory relief, themselves concerned with the ownership of Edelweiss, Gatiabe and Jovellanos, the very subject matter of Mr Tribaldos' witness statement in Panama in Veronica's oral process claim in which the ownership of Edelweiss will be decided.  To that end, they also say that, in assessing whether there is a real issue that it would be reasonable for the court to try, the court will consider the likelihood that the anchor defendant would be an active defendant (*Satfinance Investment Ltd* v *Athena Art Finance* [2020] EWHC 3527 (Ch) (at [52], [87]-[89]).  Moreover, the fact that the anchor defendant is sued only for the purpose of bringing in the foreign defendants is a factor in the exercise of the court's discretion (*Altimo Holdings* v *Kyrgyz Mobil* [2012] 1 WLR 1804 (at [79])).  As they submitted in relation to Article 8(1), the Kazakovs said it was to be inferred that Mr Tribaldos and his companies, including Leo Holding, were not, in truth, adverse parties to the Claimants and that the latter had no intention to pursue their claims against the former to judgment.  As such, Leo Holding was not an appropriate 'anchor defendant'.

132. Although I have found that the Brussels Recast is engaged by the proposed new claims by Mrs Bourlakova and Veronica as against the Kazakovs and Mr Anufriev, had it been necessary for me to decide the point, I would have held that the 'necessary or proper party' gateway was engaged in this case with respect to those claims.  Despite the considerations at common law not being the same (or as stringent) as those indicated in *Kolomoisky*, I would still have come to that view for much the same reasons as already indicated in relation to Article 8(1), not least the evidence in VB2 which, in my view, establishes a plausible (even if disputed) evidential basis that the Claimants intend to pursue to trial their claims against the Leo Defendants so as to engage the 'necessary or proper party' gateway (see *Four Seasons Incorporated* v *Brownlie* [2017] UKSC 80 (at [7]), as applied in *Satfinance* (at [86] *et seq*) in the context of CPR, PD6B, para 3.1(3)).

133. Gatiabe also argued in oral submission that the 'necessary or proper' party gateway is not available for the proposed new claim against it concerning the ownership of that company. Although the Claimants say that Mr Anufriev and the Leo Defendants are defendants "*on whom the claim form has been or will be served (otherwise than in reliance on this paragraph)*" within the meaning of para 3.1(3) and that Gatiabe (and other defendants to which there is no issue the common law regime applies[13]) are necessary or proper parties to the claims against the former, there is no claim against the former in relation to the ownership of that company nor, indeed, any related damages claim to which the latter could be considered a necessary or proper party. If anyone, the Kazakovs are the real defendants. Although the Claimants rely on the English 'anchor defendant', Leo Holding, to say that the court has jurisdiction over the Kazakovs, Leo Holding has nothing to do with the Gatiabe ownership claim. That Trower J accepted jurisdiction over the original claim against Gatiabe does not change the analysis, that original claim being concerned with transactions sought to be impugned to which Gatiabe was a party, not a new standalone ownership claim. As such, there would be no basis for permitting service out of the latter as against Gatiabe.

134. I have no hesitation in rejecting this argument. Having carefully reviewed the PoC, I am satisfied that Gatiabe's ownership is (and was prior to the proposed amendment) relevant, for example, to the damages claims in sections A and B with respect to alleged forged and sham documents concerning Gatiabe and Jovellanos, matters in which Leo Holding is implicated and against which claims are asserted, including, for example (as pleaded in the original and amended PoC) in the preparation of an allegedly sham declaration of trust in relation to Gatiabe. There is therefore good reason for the Claimants to claim declaratory relief as against Leo Holding with respect to Gatiabe's ownership, I accept the Claimants' submission that they seek to do so and there is no basis for me to say that such a claim does not have a real prospect of success. As such, there is a real issue between the Claimants and Leo Holding in this regard, it is reasonable for the court to try that issue, Gatiabe is a necessary or proper party to that claim and the para 3.1(3) gateway would therefore be engaged. Moreover, even if I had accepted Gatiabe's characterisation of the proper Defendants to the ownership claim, this gateway would still be engaged against that company through the auspices of the Kazakovs. Indeed, the connection between the respective (proposed amended) claims against Leo Holding and the Kazakovs would (as the Kazakovs themselves appear to accept) still be such that the former would supply jurisdiction over the latter through the operation of Article 8(1) of the Brussels Recast. Since, as Gatiabe accepts, the Kazakovs are proper Defendants to the ownership claim, Gatiabe would, again, be a necessary or proper party thereto.

## *Forum non conveniens*

135. As to the appropriate forum, "[t]*he task of the court is to identify the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice; ...*" (see *Lungowe* v *Vedanta Resources plc* [2020] AC 1045 at [66], citing Lord Collins in *Altimo Holdings and* Investment Ltd v Kyrgyz Mobil Tel Ltd [2012] 1 WLR 1804 (at [88]), himself summarising Lord Goff's famous speech in *The Spiliada*.

---

13 Mr Bourlakov, Mr Schwarz, Columbo, Finco and Edelweiss.

136. As a preliminary matter, there was some difference between the parties as to the proper focus of the forum enquiry. The Kazakovs contended that, where the court is concerned with new claims brought by way of joinder or amendment, it considers whether England is the appropriate forum for those new claims and not any existing claims to which these are to be added. They relied for that proposition on *Donohue* v *Armco* [2001] 1 All ER 749 (at [17]-[21] and [45]) (joinder) and *Apple Retail UK Ltd* v *Qualcomm (UK) Ltd* [2018] FSR 27 (at [117]-[119]) (amendment). However, in oral submission I discerned an easing of the Kazakovs' stance through their apparent acceptance of the relevance of the wider case to the appropriate forum enquiry.

137. The Claimants say the Kazakovs' position lacks logic and ask rhetorically, if permission to serve the amended claim out of the jurisdiction containing all the claims that will be pursued would have been granted, what unfairness would there be to the defendant in allowing the amendments? Further, it is hard to see what purpose would be served by considering the new claims alone, with the Court shutting its eyes to the existing claims when all the claims are to be heard together. The Claimants also say that the Kazakovs are forced to this illogical position because Trower J has already held that the appropriate jurisdiction to try the existing claim is England. Since the new claims are a combination of the same claims but either brought by different parties (*viz* Veronica in relation to the Section C3 Edelweiss claim) or new claims inextricably bound up with the existing ones, if all the claims are considered together, it is obvious that Trower J's reasoning will continue to apply and that England remains the appropriate forum.

138. I found unpersuasive the Kazakovs' reliance on *Donohue*. That case concerned, in part, the potential joinder in England of certain new claimants with a view to them seeking anti-suit relief to restrain proceedings in New York. Unlike the existing claimants, those new claimants did not enjoy the benefit of an English jurisdiction agreement. It is entirely understandable in this (anti-suit) context that the court considered whether the proposed claimants could show any cause of action entitling them to claim an injunction. More instructive, in my view, was Lord Bingham's observation (at [20]) as to appropriate forum and its reference not to individual claims but to the dispute between all the parties:-

> "The Armco companies are incorporated in Ohio, Delaware, Wisconsin and (in the case of APL) Singapore. Messrs Rossi and Stinson and their companies have no English links. **The dispute** between them and the Armco companies concerns the alleged breach of the fiduciary duty they owed to their employers. It is plain that England is not the natural forum for resolution of **this dispute** and that the New York proceedings by the Armco companies against these PCCs are neither vexatious nor oppressive." (my emphasis **in bold**)

139. More pointedly still, similar considerations informed Lord Bingham's view (at [34]-[36]) of the position of one of the existing claimants who *did* enjoy the contractual right to be sued in England:-

> "It seems to me plain that in a situation of this kind the interests of justice are best served by the submission of the whole dispute to a single tribunal which is best fitted to make a reliable, comprehensive judgment on all the matters in issue. A procedure which permitted the possibility of different conclusions by different tribunals, perhaps

made on different evidence, would in my view run directly counter to the interests of justice.

I cannot for my part accept that the ends of justice would be well served if Armco's allegations concerning the transfer and sale and purchase agreements were determined in England and its allegations concerning the collection agreement and trust fund withdrawals were determined in separate proceedings in New York. The judgment made of the motives and honesty of the four alleged conspirators in the one context would plainly have an important bearing on the judgment made in the other.

In my opinion, and subject to an important qualification, the ends of justice would be best served by a single composite trial in the only forum in which a single composite trial can be procured, which is New York, and accordingly I find strong reasons for not giving effect to the exclusive jurisdiction clause in favour of Mr Donohue."

140. That the court was willing not to give effect to an agreement expressly affording Mr Donohue the contractual right to be sued in the *agreed* forum, England, confirms, in my view, the importance English law attaches to multiple claims involving multiple parties being heard together.

141. Nor, in the context of the amendment of claims, did I discern that *Apple* afforded support for the Kazakovs' position either. That case concerned, in part, an application to set aside service out of an existing competition claim for abuse of dominant position for which an application for permission to amend, albeit apparently not by way of a new cause of action, was also considered. Although the Kazakovs correctly note that Morgan J did consider (at [118]) "*the question of forum on a narrower basis in relation only to a claim by the first claimant for damages for an abuse of dominant position contrary to art.102*", I did not understand this to indicate an approach of more general application in an amendment context rather than reflecting the narrowing of the claims and related jurisdictional aspects falling to be decided in that case. In his exposition of general principle, Morgan J appears to have had well in mind (at [100]) that the relevant enquiry was the appropriate forum "*for the trial of **the dispute***" or put another way (at [101]) "*the forum in which **the case** can be suitably tried for the interests of all the parties and for the ends of justice*" (my emphasis **in bold**). The fact that Morgan J had regard to the dispute as a whole is confirmed by his view (at [119(5)]) that the pendency of other related patent claims in this jurisdiction was a matter pointing to it being the proper forum.

142. Finally on this issue, the Kazakovs' argument did not sufficiently engage with the more recent analysis in *Lungowe* v *Vedanta Resources Plc* [2020] AC 1045, succinctly distilled by Trower J in his jurisdiction judgment in this case in the following terms (at [189]):-

"It is also important to appreciate that the court is concerned with the totality of the dispute, identifying the forum in which the case as a whole can suitably be tried for the interests of all the parties and for the ends of justice. This was a significant point in *Vedanta* in which Lord Briggs JSC emphasised (at [68]) that the court is looking for a

single jurisdiction in which the claims against all the defendants may most suitably be tried, and rejected (at [73] and [74]) an argument that the court was only concerned with the issues as the arose between the claimants and the foreign defendants, rather than the case as a whole.    ”

143.   Significantly, Lord Briggs noted (at [74]) in relation to the change of language in CPR, Part that 6.37(3) in this context that "*I have not been persuaded that this change of language from "the case" to "the claim" was intended to effect any change in the previously clearly stated requirement for the court to consider the proper place for the case as a whole.*" Those observations are no less relevant in the present context. I agree that looking at the proposed amendments in isolation from the case which will continue in this jurisdiction in any event lacks logic and would fail to pay appropriate regard to the interests of all parties and, more generally, the ends of justice. That said, I do agree with the Kazakovs' submission that the jurisdictional position falls to be considered anew as at April 2023. The fact that the Kazakovs previously argued before Trower J that Monaco was the appropriate forum does not, in my view, preclude them from contending for a different forum on these amendment applications. Moreover, I accept that the burden on these applications lies on the Claimants to show that England is clearly and distinctly the appropriate forum just as it would fall on them on an application to serve out the jurisdiction.

144.   Finally, it is important to note that the identification of the forum in which the case can be suitably tried for the interests of all the parties and for the ends of justice is an objective enquiry, engaging different considerations, including procedural efficiency, the risk of irreconcilable judgments and injustice to the parties of proceedings taking place in multiple jurisdictions, with a number of related factors potentially in play, including personal and factual connections with the relevant fora, practical convenience, cost-effectiveness, the applicable law and the existence and status of any parallel proceedings. The extent to which those considerations might be engaged and the approach to the evaluation of the different factors in play will depend upon the circumstances of the particular case.

145.   In this case, the Kazakovs, Edelweiss and Gatiabe say that Panama or Florida are both available fora and either of them is more appropriate than England.

## The Kazakovs' position on Panama

146.   As to the *availability* of Panama as a forum for Mrs Bourlakova's and Veronica's new claims, the Kazakovs also say that:-

(i)    The relevant Panamanian Companies and foundations at the centre of the new claims are incorporated and domiciled in Panama. That is sufficient to give the Panamanian court jurisdiction over those entities and Mrs Bourlakova and Veronica have, in fact, both already commenced proceedings there. Where the internal corporate management of those companies is, as here, at the core of the new claims, *Dicey* indicates (at [12-037]) that the place of incorporation (Panama) would normally be the natural forum;

(ii) The corporate acts at the heart of the new claims all took place in Panama and the relevant share registers are (or are likely to be) located in Panama, each of which is again sufficient to give the Panamanian courts jurisdiction over claims relating to such acts. Likewise, if the Claimants have, in fact, suffered damage as alleged, it is highly likely that this will have been suffered in Panama, again sufficient to give the Panamanian courts jurisdiction over claims relating to such damage;

(iii) Mr Lee accepts that each of the declarations and damages claims advanced by Mrs Bourlakova and Veronica could be brought in Panama, that the Panamanian courts could have jurisdiction in respect of the damages claims and that they would have jurisdiction in respect of the declaration claims; and

(iii) The Kazakovs are willing to undertake that, if the court refuses permission for the amendments and joinder, or otherwise stays the new claims in favour of Panama, they will submit to the jurisdiction of the Panamanian courts. In any event, the Panamanian courts could assert jurisdiction over persons not domiciled in Panama such that the Claimants could advance their claims there.

147. The Kazakovs also say that Panama is the *appropriate* forum for the determination of Mrs Bourlakova's and Veronica's damages and declarations claims because **first**, all Veronica's new claims by way of amendment and joinder relate to, and are premised upon, the internal affairs and/ or ownership of Panamanian companies or foundations, and the alleged actions said to give rise to liability predominantly occurred in Panama.

148. **Second**, Mrs Bourlakova's and Veronica's proposed claims are said to overlap to a significant degree with claims already underway in Panama arising from their suggested orchestration of a series of 'corporate raids' in Panama, those raids and claims including:-

(i) The convening by Mrs Bourlakova and Veronica in January 2022 of purported **shareholder meetings** of Edelweiss, Gatiabe and Jovellanos to pass resolutions appointing new directors, followed by meetings of those directors to issue new shares in favour of Veronica (Edelweiss) and Mrs Bourlakova (Gatiabe and Jovellanos), and to cancel and annul the existing share certificates in favour of Hemaren (Edelweiss), Wlamil (Gatiabe) and Mr Kazakov and Mr Bourlakov's estate (Jovellanos). Various shareholder counter-resolutions were then passed on 27 January 2022 to restore the original directors and to cancel the new share certificates that Mrs Bourlakova and Veronica had procured to be issued.

(ii) **Administrative claims** (*amparos*) by each of Edelweiss, Gatiabe and Jovellanos, submitted to the Panamanian courts between March and May 2022, seeking to require the Director of the Panamanian Public Registry to place a note of warning on the Public Register in respect of Mrs Bourlakova's and Veronica's actions, as to which, Edelweiss' *amparo* was successful, with those submitted by Gatiabe and Jovellanos not admitted for consideration on the merits by the Panamanian court.

(iii) **Oral process claims** in relation to **Edelweiss** before the Panamanian Civil Courts pursuant to Article 418 of the Panamanian Commercial Code. These include Veronica's claim dated 27 January 2022 against Edelweiss for a declaration that

Edelweiss' shareholder counter-resolutions were null and void and seeking reinstatement of the directors Veronica had sought to have appointed. The Kazakovs say that such claim will determine the ownership of Edelweiss and had already proceeded to a merits hearing (which was ongoing). In addition, Hemaren brought a claim against Edelweiss (represented by the board of directors purportedly appointed by Veronica) on 18 February 2022 for declarations that the purported shareholder meeting held on 19 January 2022 was void and illegal and seeking reinstatement of the 'pre-raid' directors. Veronica's unsuccessful application to intervene in those latter proceedings was under appeal.

(iv)   **Oral process claims** in relation to **Gatiabe** before the Panamanian Civil Courts pursuant to Article 418 of the Panamanian Commercial Code. These include Mrs Bourlakova's claim dated 10 February 2022 against Gatiabe, seeking relief materially similar to that sought by Veronica in her oral process claim against Edelweiss. The Kazakovs say that Mrs Bourlakova's oral process claim will in substance determine the ownership of Gatiabe and had already proceeded to a merits hearing in Panama (which was ongoing). In addition, Wlamil has brought a claim against Gatiabe (represented by the board of directors purportedly appointed by Mrs Bourlakova) on 18 February 2022, seeking relief materially similar to that sought by Hemaren in its oral process claim against Edelweiss. The Kazakovs say that Wlamil's oral process claim will in substance determine ownership of Gatiabe and that Mrs Bourlakova had been granted permission to intervene, with an appeal on that issue pending.

(iv)   **Oral process claims** in relation to **Jovellanos** before the Panamanian Civil Courts pursuant to Article 418 of the Panamanian Commercial Code. These include Mrs Bourlakova's claim against Jovellanos dated 10 February 2022, seeking materially similar relief to Veronica in her oral process claim against Edelweiss. The Kazakovs say Mrs Bourlakova's oral process claim will in substance determine ownership of Jovellanos and that the Panamanian court's decision on admissibility was pending. In addition, Mr Kazakov has brought a claim against Jovellanos (represented by the board of directors purportedly appointed by Mrs Bourlakova) on 18 February 2022, seeking relief materially similar to that sought by Hemaren in its oral process claim against Edelweiss. The Kazakovs say that Mr Kazakov's oral process claim may in substance determine ownership of Jovellanos. Mrs Bourlakova had sought permission to intervene in those proceedings but this had been rejected. Her appeal on that issue was also rejected on 30 January 2023. The parties were waiting for a hearing date.

(v)   **Ordinary civil claims** in the Panamanian civil courts, including a claim commenced on 16 January 2023 by Edelweiss against Mrs Bourlakova, Veronica and the directors they had purported to appoint, admitted on 17 January 2023, with a civil protection measure granted prohibiting the defendants from carrying out any act connected with Edelweiss. In addition, Hemaren began a claim on 1 June 2022 against the same defendants, albeit that claim is now 'archived' following Edelweiss' civil claim.

(vi) **Criminal proceedings**, including a criminal complaint by Hemaren, Edelweiss and the 'pre-raid' board of directors, against the persons purporting to act as President and Secretary at the Edelweiss shareholder meeting convened by Veronica on 19 January 2022, with the Panamanian court having seized the new share certificates purportedly issued to Veronica and having ordered her (and her appointed directors) to refrain from performing any act relating to Edelweiss based on those certificates. In addition, Wlamil lodged a criminal complaint on 2 June 2022 in relation to Gatiabe against the purported 'post-raid' directors. This is said to be materially similar to the criminal complaint lodged in respect of Edelweiss. Mrs Bourlakova also lodged a criminal complaint against Wlamil's 'pre-raid' directors.

149. According to the Kazakovs, these various sets of Panamanian proceedings are based on the same core ownership of Edelweiss, Gatiabe and Jovellanos as Mrs Bourlakova and Veronica rely on for their new claims in the English proceedings. Those Panamanian proceedings will determine the true ownership of those companies and they are well underway. As such, Panama is said to be a more appropriate forum than England for determining the claims for declarations of ownership and the closely connected damages claims, not least say the Kazakovs where the oral process proceedings will give rise to binding *res judicata* in Panama, any judgment of the English court which makes findings as to ownership would not be enforceable in Panama unless each shareholder is a party, a judgment of the Panamanian court would be recognisable and enforceable in England and the Claimants have withdrawn their undertaking to stay or discontinue their Panamanian proceedings if English jurisdiction were accepted.

150. **Third**, the Kazakovs say that any damage suffered by Mrs Bourlakova and Veronica is likely to have been suffered in Panama where the misappropriation of Edelweiss, Gatiabe and Jovellanos and their assets is said to have taken place and where the relevant entities are located.

151. **Fourth**, the Kazakovs say that the key witnesses and documentary evidence relevant to the new claims are located in Panama and the claims raise complex issues of Panamanian law.

152. **Fifth**, the Claimants downplay the significance of the new claims sought to be added by way of amendment and joinder. The new claims and related voluminous amendments are fundamentally concerned with ownership of Panamanian companies.

153. For these reasons, the Kazakovs say that Panama is plainly a more appropriate forum than England for Mrs Bourlakova's and Veronica's new claims, the latter recognised this themselves by commencing their own proceedings there in the first instance, the oral process proceedings are already well advanced and they should not be allowed to forum shop now that the tide of those proceedings has turned against them in certain respects. This would be contrary to the interests of justice and an abuse of process.

**The position of the Panamanian Companies on Panama**

154. Edelweiss and Gatiabe also object to the September 2022 amendments, their main concern being the duplication of proceedings if the amendments are permitted, with the English court determining substantially the same legal and factual issues as fall to be determined in the Panamanian proceedings with respect to the ownership of those companies, with the risk of irreconcilable judgments and significant additional cost.

155. In support of their position, Edelweiss and Gatiabe rely on Mr Pollock-Hill's witness statement dated 25 November 2022 in which he explains the ongoing litigation in Panama, including the oral process claims with respect to Edelweiss and Gatiabe in which, respectively, Veronica and Mrs Bourlakova are said to be asserting the ownership of those companies for essentially the same reasons now indicated in the proposed amendments.

156. Edelweiss says that there are already proceedings on foot in two jurisdictions with respect to Veronica's alleged ownership of that company (Panama and Florida) and the proposed amendments now contemplate – unacceptably – a third (England). Panama is plainly an available, and the more appropriate, forum for the proposed new claims, not least in light of the following:-

   (i) Edelweiss, Gatiabe and the foundations at the centre of the new claims are incorporated and domiciled in Panama;

   (ii) the Panamanian courts have jurisdiction over those entities;

   (iii) the proposed new claims relate to the internal management and ownership of Panamanian companies, including the alleged misappropriation of Edelweiss and its assets;

   (iv) the corporate acts underpinning the new claims all took place in Panama;

   (v) any damage will have been suffered in Panama; and

   (vi) the new claims raise complex issues of Panamanian law.

157. To use the words of Lord Briggs in *Vedanta*, these "connecting factors" have a closer nexus with Panama than England. Moreover, the existence of, as here, voluntary parallel proceedings are also a factor relevant to appropriate forum, as to which:-

   (i) the proposed new claims replicate to a significant degree the claims on foot in Panama;

   (ii) those Panamanian proceedings are premised on the same assertions of ownership and will determine that issue;

(iii)    the Claimants' focus on the availability of Panama through the prism of their proposed new damages claims is misguided given that they initiated ownership claims there and there is no damages claim in relation to Gatiabe;

(iv)    those Panamanian proceedings are well underway compared to England where pleadings have not even closed;

(v)     evidence has been presented in Panama in the oral process claims by Mrs Bourlakova and Veronica.  It is unclear what further evidence could be provided in England on the ownership issue;

(vi)    it seems the Claimants will (unacceptably) proceed with the multiple overlapping sets of proceedings in Panama even if their amendments are permitted; and

(vii)   Edelweiss and Gatiabe should not be put to the additional expense of defending multiple proceedings in multiple jurisdictions.

158.   Moreover, it cannot be said (as the Claimants do) that England is the single forum in which all claims between all the Defendants can be most suitably tried in the interests of justice because not all the relevant parties to the ownership claims (such as Hemaren and Wlamil) are, or are proposed to be, parties to these English proceedings.  Those entities are already party to the Panamanian proceedings but the Claimants effectively seek through these amendment applications to dispossess them of their shares without hearing from them.  The argument has even greater force for Gatiabe, in relation to which, no damages claim is asserted.

**The Claimants' position on Panama**

159.   As a preliminary matter, the Claimants say that the *availability* of Panama as a forum was not addressed in EAS5 nor Aued 1 and has only belatedly, and even then, briefly, been addressed in Aued 2 (at [97]-[99]).  Although the Claimants accept that the proposed new claims for declarations could be brought against the Panamanian Companies in Panama by reason of their incorporation there (and against the other Defendants wherever domiciled), they also say that the evidence does not establish Panama as an available forum for the proposed new <u>damages</u> claims.  As to the specific matters relied on in Aued 2:-

(i)     Although Mr Aued relies (at [98(a)-(b)]) on Article 255 of the Panamanian Judicial Code as establishing Panamanian jurisdiction over claims brought against the Panamanian Companies and foundations by reason of their incorporation there, the Claimants say that its relevance to the proposed new damages claims is not explained in circumstances in which these are not pursued against the Panamanian Companies, nor is it suggested that those companies are "*joint and liable debtors*" within the meaning of Article 259 of the Judicial Code.

(ii)    Mr Aued also asserts (at [98(c)]) that the corporate acts took place in Panama but (as already noted in a limitation context) he was in no position to give evidence about that, the evidence does not, in fact, establish any corporate act at all and his

reliance for this purpose on Article 259(1) of the Judicial Code is misplaced, being a procedural provision concerned with personal actions resulting from contracts which, according to Mr Lee, would be interpreted strictly such that the same principle would not be followed with respect to corporate acts. Moreover, the damages claims are based on Mr Bourlakov's wrongful financial inducement of Mrs Kazakova, as to which, there is no suggestion that either of them ever went to Panama.

(iii) Mr Aued also relies (at [98(d)]) on the fact that the share registers are, or should have been, in Panama as another matter said to found jurisdiction there under Article 259(7) of the Judicial Code. However, the Claimants say that, if anything, the evidence (including related e-mail correspondence) suggests that the share registers may well have been maintained by Leo Trust in Switzerland. Moreover, Mr Lee points out that Article 259(7) is concerned with mixed claims, both personal and *in rem* but the latter do not feature in this case. As such, that article has no application here.

(iv) Mr Aued also relies (at [98(e)]) on the Panamanian governing law as a matter founding jurisdiction there but Mr Lee points out that Mr Aued has not identified any provision of Panamanian law conferring jurisdiction on the Panamanian courts by reason of the claims being made under Panamanian law.

(v) Finally, Mr Aued also relies (at [98(f)]) on part of the damage having materialised in Panama. However, the Claimants say that, with respect to the damages claims (concerned with the loss of assets), there is no evidence that any of the assets were located in Panama or, therefore, that the damage materialised there. Mr Lee considers that the Panamanian court might conclude the damage occurred where the assets were located rather than at the place of incorporation of the relevant foundations or domicile of their council members.

160. Accordingly, say the Claimants, the Kazakovs are wrong to suggest that Mr Lee accepts that Panama is an available forum for the damages claims, nor does any fair reading of Mr Lee's evidence suggest this. Moreover, neither the Leo Defendants nor Mr Anufriev has offered to submit to the jurisdiction of the Panamanian courts such that, even if Panama was, in fact, technically available, and if, as I have found, the Brussels Recast applies, the Claimants would have no choice to sue them for damages in Panama as Trower J found (then in relation to Monaco) would be necessary to engage the *Vedanta* principle (judgment at [197]-[198]). Furthermore, the proceedings in England will continue in any event in respect of the existing claims, including the Edelweiss damages claims, against the Leo Defendants, the Kazakovs and Mr Anufriev. As Trower J also accepted, all those who participated in, and benefited from, the alleged conspiracy ought to be sued in the same single set of proceedings (judgment at [203]-[204]), a finding that applies with equal force in this context. Finally, even if all the claims could be pursued in Panama against all the alleged conspirators, there is no suggestion in the evidence that they could be consolidated or heard together with the other existing proceedings, a point by which Trower J also placed store (judgment at [205]). As such, there would be a risk of parallel proceedings and irreconcilable judgments in Panama and, therefore, no advantage to that jurisdiction as the appropriate forum.

161. As to questions of procedural efficiency, the fact that the new claims are governed by Panamanian law offers no material advantage to Panama as the appropriate forum since that law will be in issue in the existing proceedings in any event. Moreover, although the Kazakovs assert that the proposed new claims are premised on the internal affairs and/ or ownership of the Panamanian Companies or foundations and that the actions alleged to give rise to liability occurred predominantly in Panama, this mischaracterises matters. The claims are, in fact, premised on the offer of a financial inducement to Mrs Kazakova to act contrary to her duties as protector of the relevant foundations, representing the breach of the Panamanian PC for which the other Defendants are liable as instigators or participants, as to which there is no evidence that they did anything in Panama. In fact, all the evidence indicates that matters were directed from the Leo Defendants in Switzerland, making it desirable for the claims to be resolved in proceedings to which they are a party. Likewise, the relevant documents and witnesses are most likely to be found in Europe, not Panama.

162. In relation to the ongoing Panamanian proceedings, the Claimants make a number of points. As to the oral process claims brought by Mrs Bourlakova and Veronica:-

(i) These challenge specific resolutions of the boards of the Panamanian Companies recorded in the Panamanian Public Registry and which had to be challenged there to enable its correction as regards the identity of the directors and those authorised to act on the behalf of those companies.

(ii) Although the Claimants accept that they might consider whether Mrs Bourlakova and Veronica are shareholders of Edelweiss, Gatiabe and Jovellanos, they will not necessarily do so. The claims may, for example, be disposed of on the basis of defences such as the non-deposit of the bearer certificates with an authorised custodian rather than the ownership of the shares such that there will be no *res judicata* in relation to the latter.

(iii) The oral process claims do not allege the misappropriation of Edelweiss' assets as the proceedings do in this jurisdiction, nor do the damages claims feature in Panama.

(iv) None of the Leo Defendants, the Kazakovs or Mr Anufriev is party to the Claimants' oral process claims such that they could not give rise to a judgment binding on them. Mr Aued accepts that *res judicata* only applies to the parties to the proceedings. That could only be achieved if they could be sued in Panama and (which the evidence does not establish) the proceedings could then be consolidated.

(v) Both Mr Lee and Mr Aued agree that any *res judicata* effect in Panama would, in any event, require all appeals to be exhausted. That could take up to six years.

163.    In relation to the oral process claim between Hemaren and Edelweiss, these are two entities controlled by the Kazakovs such that it is difficult to see how this could reliably determine anything. In any event, Veronica's application to intervene has been rejected. On any view, it cannot bind the Claimants.

164.    The same considerations apply in the oral process claim between Mr Kazakov and Jovellanos.

165.    As for the oral process claim between Wlamil and Gatiabe, Mrs Bourlakova has been given permission to intervene but that is being appealed such that the same point potentially applies.

166.    As for the ordinary civil claim recently filed by Edelweiss against Mrs Bourlakova, Veronica and the directors they appointed, this claim was no doubt filed at the behest of the Kazakovs who presently control Edelweiss and shows nothing about Panama being the appropriate forum. In any event, the claim has not proceeded far.

167.    The civil claim filed by Hemaren has not even been served and was archived following the commencement of Edelweiss' claim. As such, it adds nothing to the analysis.

168.    Finally, in relation to the Kazakovs' suggestion that it would be an abuse of process to allow Mrs Bourlakova and Veronica to pursue their oral process claims in Panama and (in their proposed amended form) in these English proceedings, there is, in fact, no rule of law that it is vexatious, oppressive or an abuse of process if a person brings more than one set of proceedings against a defendant (see *JSC BTA Bank* v *Ablyazov* [2017] EWHC 2702 (Comm) at [48], citing *Societe Nationale Industrielle Aerospatiale* v *Lee Kui Jak* [1987] UKPC 12). As Hobhouse LJ said in *Kuwait Oil Tanker Co SAK and anor* v *Al Bader and ors* (27 November 1995, unrep.):-

> "[i]t is unfortunately a feature of modern commercial litigation that proceedings in a number of countries may be necessary in order to enable the proceeds of fraud or other misfeasance to be recovered. It is onerous to a defendant that he should have to defend himself if he chooses to do so, in a number of jurisdictions. But that may be an inevitable consequence of permitting proper remedies to [claimants] who can show … a strong case that they have been defrauded. A multiplicity of proceedings is *prima facie*, but not necessarily, vexatious and it is a matter for the discretion of the Court whether it should put the [claimant] on terms and if so what terms".

169.    The Claimants say that there was good reason why Mrs Bourlakova and Edelweiss brought the oral process claims in Panama, namely to challenge board resolution there as these were later registered in the Public Registry. Bringing those proceedings for those limited purposes against only the Panamanian Companies (not the Kazakovs or Mr Anufriev) cannot be considered vexatious nor should they be required to make any election.

**Discussion on Panama as the appropriate forum**

170. Based on the expert evidence in Aued 2, as analysed and, reasonably in my view, doubted and criticised in Lee 2, I was far from persuaded that Panama would be an *available* forum for the Claimants' proposed new <u>damages</u> claims. I say that essentially for the reasons identified (at [159]) above.

171. By contrast, England clearly is an available forum for that purpose, with the existing claims against all the Defendants already proceeding here in relation to the alleged worldwide fraud of which the proposed new claims are also said to form part. This is an important factor, engaging considerations beyond procedural efficiency and cost-effectiveness but also the (in)justice to the Claimants in having to sue in multiple fora and/ or to the Defendants of being sued in different places rather than in a single composite proceeding.

172. Moreover, even if all the proposed new claims against all the Defendants could be brought before the Panamanian courts, I am far from persuaded that it would be possible to consolidate them with the existing Panamanian proceedings such that the spectre of parallel proceedings and irreconcilable judgments would remain, albeit within Panama.

173. Although the governing law is often an important consideration in the evaluation of the appropriate forum, Panamanian law is one of a number already in issue in these English proceedings. Moreover, although disputed, the new Panamanian law issues thus far intimated did not indicate any particular complexity. As such, the governing law issue is a less weighty consideration here than might otherwise be the case.

174. Although much of the focus of the new claims is the ownership of the Panamanian Companies, I am satisfied based on what is currently known that the relevant documents and witnesses are more likely to be concentrated in Europe than in Panama.

175. As for the ongoing Panamanian proceedings, I found unremarkable that, in a dispute concerning an alleged worldwide fraud, the parties have taken steps locally to protect their positions with respect to their claimed interests in the relevant Panamanian Companies and that those steps have, in turn, spawned legal proceedings there.

176. In this regard, the real gravamen of the Kazakovs' complaint appeared to be the oral process claims brought by Mrs Bourlakova and Veronica. Although I accept that these proceedings may well engage the issue of ownership of the Panamanian Companies, given their focus on the relevant resolutions about which complaint is made, I am far from persuaded that those proceedings will be determinative of the former.

177. Nor, given that focus, am I able to say that the oral process claims are vexatious or abusive. It seems to me that these are the types of foreign proceedings that Hobhouse LJ had in mind in *Kuwait Tanker* in the context of an international fraud claim. I am certainly unable to say they represent blatant or large scale 'forum shopping'.

178.  Significantly, the oral process claims do not allege the misappropriation of Edelweiss'
assets as the English proceedings already do, they do not include the proposed new
damages claims and the parties are more limited than those to the proposed new claims.
As for the other oral process claims not instigated by Mrs Bourlakova or Veronica, I am
unable to conclude, as the Claimants suggest, that these are 'self-serving'.  However,
with the ongoing disputes about intervention, the Claimants' role in them seems
uncertain and, with the small number of parties, and doubts as to consolidation, the
suggested advantage of Hemaren's and Wlamil's participation seems overstated.  Given
these matters, the apparent progress achieved in the oral process claims too is a less
powerful consideration.

179.  It is unclear what, if anything, the administrative and criminal proceedings are said to
add in terms of the analysis of appropriate forum with respect to the new claims.  Nor,
given the party asymmetry with the new claims, and the doubtful scope for consolidation
in Panama, am I persuaded that the ordinary civil claim adds much either.

180.  Finally, the Kazakovs say that a judgment of the Panamanian courts would be
enforceable in England but a judgment of the English court in respect of the ownership
of the Panamanian companies would not be enforceable in Panama unless the
shareholders of those companies were party to the underlying proceedings.  However, as
noted, it is doubtful that Panama is an available forum for the damages claims or, even if
it were, that consolidation of the new claims with the ongoing Panamanian proceedings
could be achieved.  As such, the prospect of a single judgment from the Panamanian
courts dealing with all the proposed new claims and binding on all the key Defendants
seems remote.

181.  Although the proposed new claims are concerned with the ownership of Panamanian
companies, and the corporate governance of, and acts undertaken by, those entities may
well fall to be examined, the gravamen of the case as a whole (including the proposed
new claims) is an alleged international fraud said to have been conceived and/ or
perpetrated by multiple defendants in multiple jurisdictions undertaking multiple
different acts.  As such, I considered wide of the mark the Kazakovs' suggestion that the
focus of the ownership claims was the internal management and affairs of those
companies.

182.  Moreover, given the location of the Defendants and the focus of the damages claims on
the alleged misappropriation of assets (wherever located) of those companies and the
inducement of Mrs Kazakova to breach her duties, I was far from persuaded that Panama
was the place of the relevant harmful acts or damage.  Nor, as I have already noted in the
context of limitation, is it clear what (if any) corporate acts might fall to be examined or
whether these took place in Panama at all.

183.  Standing back from all these matters, I remind myself that "[t]*he task of the court is to
identify the forum in which the case can be suitably tried for the interests of all the parties
and for the ends of justice; ...*".  Although there may be some overlap and potential for
irreconcilable decisions as between the extant Panamanian proceedings and (if I permit
the amendments) the English proceedings, the level of that risk is difficult to discern but,
even if I refused permission, such risk seems likely to persist in Panama.  Nor does

Panama suggest any particularly compelling connecting factors or local drivers for procedural efficiency. Nor am I satisfied that all the new claims (even if it were appropriate to view them in isolation from the case as a whole) could be advanced in Panama, let alone against all the Defendants, let alone in a single composite proceeding.

184. By contrast, all the Claimants' claims (both pending and proposed) can be heard together in a single set of proceedings in England involving all the Defendants, consistent with the objectives of the search for the appropriate forum, particularly in a multi-party context, indicated by authorities such as *Vedanta*. Given that those claims all concern the same alleged international fraud, it makes eminent sense and, in my view, it would serve the interests of all the parties and further the ends of justice for them all to be heard here.

185. I have reached that view without regard (thus far) to the EU jurisdictional regime. However, as I have found, the proposed new claims against Leo Holding, Mr Anufriev and the Kazakovs engage the Brussels Recast. Despite Mr Anufriev's adoption of the Kazakovs' objections, neither he nor Leo Holding has agreed to submit to Panamanian jurisdiction (unlike the English domiciled anchor defendant in *Vedanta*). Another important EU-related factor weighing in favour of England is that any judgment of the English court would be enforceable throughout the EU under the Brussels Recast, including in relation to the proposed new claims, by reason of the operation of the related transition provisions in Article 67(2) of the Withdrawal Agreement. When the EU regime is brought into account, an already overwhelming case in favour of England is even more compelling.

186. I therefore have no hesitation in concluding that England is by some considerable distance a more appropriate forum than Panama.

## The Kazakovs' position on Florida

187. The Kazakovs contend in the alternative that Florida is an available, and the appropriate, forum. **First**, the Kazakovs rely on certain proceedings in Florida, as to which they say:-

(i) Veronica has already commenced proceedings in Florida against the Kazakovs, Hemaren and Edelweiss, asserting that the Florida courts have jurisdiction over her claim to the ownership of Edelweiss, with none of the defendants challenging jurisdiction (**Edelweiss Complaint**). It would be open to Veronica to amend that complaint to bring related damages claims (as she seeks to do by way of joinder in the English proceedings), not least given her assertion for jurisdictional purposes that tortious acts have allegedly been committed in Florida.

(ii) The Florida courts would have jurisdiction over any other additional defendants who were involved in those (or other) alleged tortious acts directed at or involving Florida. Indeed, in RICO proceedings (**RICO Proceedings**) commenced by Mrs Bourlakova, Veronica and Elena in Florida on 6 November 2022 (subsequently abandoned), they alleged that the Kazakovs, Mr Anufriev, Mr Bourlakova, Mr Tribaldos, Leo Holding, Leo Trust and others were all co-conspirators in a

fraudulent conspiracy said to have involved acts lying at the heart of the present amendment and joinder applications.

(iii)   Likewise, in related (extant) Florida proceedings (**Florida Asset Proceedings**), Veronica has made claims against the Kazakovs and Mr Anufriev.

(iv)   The Kazakovs have counterclaimed in the Edelweiss Complaint and Florida Asset Proceedings and have sought to consolidate the two proceedings. Although Veronica denies jurisdiction over her in the Florida Asset Proceedings, she does not do the same in the Edelweiss Complaint.[14]

188.   **Second**, the proposed new claims by Veronica in these (English) proceedings overlap to a very significant degree with the ongoing Florida proceedings, as to which:-

(i)   The **Florida Asset Proceedings**, commenced on 29 November 2021 by Veronica and Elena (purportedly as guardians of their minor children), with the complaint amended on 1 September 2022 to add claims against the Kazakovs and Mr Anufriev, make strikingly similar allegations to those now sought to be advanced in the English proceedings, including that (i) Edelweiss is and was owned by Veronica and (ii) the Kazakovs and Mr Anufriev were part of an alleged global conspiracy hatched by Mr Bourlakov to defraud his family of their assets, including by asserting the existence of a partnership between Mr Bourlakov and Mr Kazakov. The Kazakovs' counterclaims against Mrs Bourlakova, Veronica and others allege that Mrs Bourlakova (assisted by others) misappropriated assets to which Mr Kazakov is entitled through his partnership with Mr Bourlakov, and conspired to misappropriate further assets to which the Kazakovs are entitled, including Edelweiss. The Kazakovs seek a negative declaration that Veronica is not the rightful owner of Edelweiss. Various jurisdictional challenges have been made by Mrs Bourlakova, Veronica and Mr Anufriev, albeit the proceedings are advanced, including ongoing discovery. The trial is set for May 2024.

(ii)   Veronica filed the **Edelweiss Complaint** on 23 January 2023, claiming that she is the owner of Edelweiss, the same claim she seeks to make, and basis for her proposed damages claim, in these (English) proceedings. Although the Claimants now seek to characterise the complaint as 'protective' for limitation purposes in light of the Kazakovs' opposition to her joinder to these (English) proceedings, that is belied by the complaint's description of the proceedings and the relevant limitation issue as closely related to the Florida Asset Proceedings. Although not yet served with the Edelweiss Complaint, Edelweiss and Hemaren do not intend to contest Florida jurisdiction. Now that the Kazakovs have filed a counterclaim (in terms materially similar to that in the Florida Asset Proceedings) against Mrs Bourlakova, Veronica and others,[15] it is not open to Veronica to discontinue without permission. Even if she obtained permission, the counterclaims would

---

[14]   This disputed by the Claimants who say that Veronica has denied jurisdiction in relation to the counterclaim in the Edelweiss Complaint.

[15]   This is disputed by the Claimants who say the counterclaim in the Edelweiss Complaint is directed to Veronica only.

continue. The Kazakovs have filed a motion to consolidate with the Florida Asset Proceedings. This is presently resisted, albeit likely to be granted, with the two actions proceeding to the trial already listed for May 2024. Even if not consolidated, the Edelweiss Complaint would take about 2-2.5 years to conclude.

(iii) On 6 November 2022, Veronica, Mrs Bourlakova and Elena issued the **RICO Proceedings** against Anahill, Cantucci, Hemaren, Wlamil and others, making the same factual allegations as the Claimants seek to advance in these English proceedings, naming the Kazakovs, Mr Bourlakov, Mr Anufriev, Mr Tribaldos and his companies as alleged co-conspirators in an unlawful scheme. The claims also replicated those now sought to be advanced by way of amendment and joinder. Although these proceedings were withdrawn within months of issue, this was not before the publication of those allegations and their deployment by Veronica in her Panamanian oral process claim to enhance her position in that jurisdiction.

189. **Third**, a judgment of the Florida State Courts would be recognisable and/ or enforceable in England.

190. As such, the Kazakovs say that the Florida State courts are plainly a further or alternative appropriate forum in which to determine ownership of the Panamanian Companies and foundations, an issue at the heart of the proposed new claims for declarations and damages. Veronica herself recognised this by commencing her own Florida proceedings. Having done so, she should not be allowed to forum shop. Such a course would be contrary to the interests of justice and an abuse of the English court's process, also giving rise to the risk of inconsistent judgments and continuing proliferation of overlapping proceedings.

191. Although Mrs Bourlakova has challenged the Florida courts' jurisdiction over her, if her jurisdiction challenge were to fail or be withdrawn, she would likely be able to bring in Florida claims against the Kazakovs that she now seeks to advance against them in England by way of amendment. The same is likely to be true in respect of the claims against Mr Bourlakov and possibly other defendants, with Wlamil and Gatiabe indicating (without prejudice to their rights in the Panamanian proceedings) that, if Florida was determined to be the appropriate forum for Mrs Bourlakova's declaration-related claims, they would not seek to contest Florida jurisdiction.

## The position of the Panamanian Companies on Florida

192. Edelweiss also says that the same claims to its ownership and related allegations of conspiracy to defraud against the Kazakovs and Mr Anufriev as are now proposed by the amendments are already made in the Florida Asset Proceedings. Veronica has also brought proceedings in Florida, including against the Kazakovs and Edelweiss, in the form of the Edelweiss Complaint, in which she again asserts that she is the owner of Edelweiss. The Kazakovs have counterclaimed in both sets of proceedings in Florida and seek their consolidation. Although no claim for damages is made in the Edelweiss Complaint, nothing prevents Veronica from asserting one. Moreover, although the Edelweiss Complaint has not yet been served, Edelweiss and Hemaren have now entered

an appearance such that all the relevant parties are present in Florida. Having chosen to issue proceedings in Florida (and Panama), this is not a case in which Veronica will be deprived of the opportunity to ventilate her claims in a jurisdiction of her choosing. The new claims have very little connection to England and Edelweiss should not be put to the trouble and expense of having to defend these here as well as in Florida (and Panama).

## The Claimants' position on Florida

193. As a preliminary matter, the Claimants say that it is not open to the Kazakovs to argue for Florida as the appropriate forum. No party had contended this before EAS6 was filed in April 2023. Although there were developments in Florida following the filing of EAS5 in November 2022, these took place well before EAS6 and the Kazakovs could (and should) have indicated much earlier their reliance on them as a suggested foundation for Florida as an alternative forum.

194. As to whether Florida is even an *available* forum, the Claimants criticise the lack of independence of the Kazakovs' Florida law expert and his failure to confirm compliance with his expert obligations to the English court. In any event, at its highest, all his evidence suggests is that there is a basis for arguing that Florida *might* have jurisdiction, which is plainly insufficient, not least in circumstances in which one of the key defendants, Mr Anufriev, is contesting the jurisdiction of the Florida court and has made clear he does not contend that Florida is the appropriate forum. The tentative basis asserted by the Kazakovs to suggest Florida as an available forum does not withstand scrutiny:-

(i) As to the Kazakovs' suggestion that the commission of a tortious act in Florida by any of the potential additional defendants could found jurisdiction there, there is nothing in any of the new claims to identify a tortious act directed at, or carried out in, Florida. As the Claimants' evidence on Florida law bears out, conspiracy to do an unlawful act may be the basis for adding a defendant there but the underlying tort must be carried out in Florida. For an additional defendant to be added, it is necessary to ascertain whether (i) they were involved in doing something wrong in Florida and (ii) they have minimal contacts with the State.

(ii) The Kazakovs also state that Veronica has asserted that the Florida court has jurisdiction over her claims against Mr Anufriev in the Florida Asset Proceedings because of his involvement in what are termed the "*Fisher Island Property matters*". They say the same logic should apply with respect to her related damages claims with respect to Edelweiss. However, Veronica has not asserted any damages claim in the Florida Asset Proceedings, those proceedings are brought in a representative capacity on behalf of minor children and they relate to the theft of real property, and money from a bank account, in Florida. Moreover, the Kazakovs have denied that the Florida courts had jurisdiction over them or Mr Anufriev save as regards their beneficial ownership of assets with a Florida *situs*. Just because jurisdiction has been asserted in those Florida proceedings claiming damages for the misappropriation of property based there does not mean that proceedings can also be brought there against all the Defendants to the English

proceedings in respect of the wider damages claims with no such connection to the State.

(iii)   There is no positive evidence that the Florida court would have jurisdiction over the Leo Defendants or Mr Anufriev.  Although the latter is sued in the Florida Asset Proceedings, he has challenged jurisdiction.

(iv)   Finally, the Kazakovs deny in the Florida Asset Proceedings that the Florida court has jurisdiction over Edelweiss.  Although Edelweiss has since indicated that it would submit to Florida jurisdiction, there is no undertaking to that effect.  Such an indication suggests tactical manoeuvring.

195.   As for the RICO proceedings, these were before Federal Court, albeit withdrawn (before service) for several reasons, including concerns as to jurisdiction.  There is therefore nothing in the RICO proceedings to indicate that Florida is an available forum.

196.   Nor are there any factors connecting the new claims to Florida such as the location of the parties, documents, alleged harmful events or alleged losses.  Nor is there any suggestion that Florida law is engaged.

197.   The only suggested connecting factor is the existence of the Florida proceedings.  However, the Florida Asset Proceedings are only brought there because they concern assets with a Florida *situs*, the Kazakovs and Mr Anufriev are defendants but the Panamanian Companies are not, Veronica sues in a representative, not a personal, capacity, no *res judicata* will therefore arise between her and the other parties, and the allegations in those proceedings relating to Edelweiss are made as background and no related determinations will be made.  Although the Kazakovs have sought to counterclaim in those proceedings against Mrs Bourlakova and Veronica in a personal capacity, this appears to be a tactic to circumvent Trower J's jurisdictional ruling by opening up another litigation front, with the counterclaim overlapping with both the existing, and proposed new, claims in England.  It is therefore not clear how this is relevant at all to the forum analysis as regards the new claims.  Mrs Bourlakova and Veronica are seeking the dismissal of the counterclaim on various bases, including jurisdiction, and the proceedings are not advanced in any event.

198.   As for the Edelweiss Complaint, this is a claim made by Veronica in her personal capacity against the Kazakovs, Edelweiss and Hemaren, with the relief sought limited to the ownership of Edelweiss and relevant supporting injunctions.  However, this has not been served and the intention is not to do so pending the resolution of the amendment applications in these English proceedings.  Nevertheless, the Kazakovs found out about this and sought to serve a counterclaim mirroring that in the Florida Asset Proceedings, albeit against Veronica alone.  Veronica is also seeking to have this dismissed, including on jurisdictional grounds.  Veronica's claim was only brought on a protective basis for limitation purposes and she has intimated her intention to seek a temporary stay.

## Discussion on Florida as the appropriate forum

199.  As a preliminary matter, I found the Kazakovs' evidence as to Florida being an *available* forum to be rather vague, hesitantly expressed and 'thin' in substance.  For example, in relation to Veronica's proposed claims, the highest the Kazakovs put matters was that "*it appears likely that Florida could serve*" as a forum for her declaration (and related damages) claims "*against most, if not all, of the proposed defendants to these claims*."

200.  In relation to Mrs Bourlakova's ability to bring claims in Florida against defendants other than the Kazakovs, the Kazakovs say that this "*would require an independent basis for asserting Florida jurisdiction*" but that "*this is likely to be satisfied in relation to Mr Bourlakov and may be satisfied in relation to some of the other defendants, for the reasons set out above*" in relation to Veronica.

201.  Neither assertion was persuasive.  Although it was suggested that jurisdiction could be founded against potential defendants additional to those named in the Edelweiss Complaint on the basis of their tortious conduct, the proposed new claims do not identify any such conduct directed at, or involving, Florida.  The Kazakovs point to the conspiracy claims in the RICO proceedings but these are not pursued, having been withdrawn before service.

202.  I also found unpersuasive the suggestion that, having asserted jurisdiction over Mr Anufriev in the Florida Asset Proceedings, Veronica could do the same with her damages claims relating to Edelweiss.  The Florida Asset Proceedings are a representative action brought on behalf of minors and their subject matter is the misappropriation of Florida-based assets.  It by no means follows that the same jurisdictional considerations would be engaged by the damages claims if she sought to bring these in Florida.

203.  The proposed new claims appear to have no, or no meaningful, connection with Florida in terms of the location of documents, witnesses, harmful event, damage or governing law.

204.  As for the proceedings in Florida, the RICO Proceedings appear to add little to the appropriate forum analysis, having been withdrawn before service.

205.  As for the potential for overlap with the Florida Asset Proceedings, although the ownership of Edelweiss arises as an issue, it is far from clear to what extent there will be any related determination.  Even if there might be, I accept that it will not be binding on Veronica given the representative capacity in which she sues.

206.  Although this issue (and the alleged international fraud more generally) does arise more squarely as against the Kazakovs and Mr Anufriev on Veronica's Edelweiss Complaint, I am satisfied that this (unserved) claim has been issued on a protective basis only and will not be pursued if her joinder to these English proceedings is permitted.

207.  Given the nature of Veronica's proceedings currently before the Florida courts, I am therefore again unable to conclude that either can be regarded as vexatious or abusive, let alone indicative of blatant or large scale 'forum shopping'.

208. As to the status of the Florida proceedings, the position with respect to their consolidation has yet to be determined, there are extant jurisdictional challenges by Mrs Bourlakova, Veronica and Mr Anufriev, the proceedings do not extend to the Leo Defendants, the Claimants' new damages claims do not feature in Florida and, although some of the issues arising on the counterclaims overlap with the proposed new claims, other issues (for example, as to Mr Kazakov's alleged partnership with Mr Bourlakov) overlap with the existing claims in England. As such, the Kazakovs have themselves gone some way to creating a potential for irreconcilable judgments.

209. Nor does the suggested enforceability in England of a judgment of the Florida courts seem to add much to the appropriate forum analysis, with many of the related considerations for Panama already noted applying with equal or even greater force for Florida. Indeed, the existing Florida proceedings are more limited in scope and parties than the proposed new claims, with jurisdictional issues still unresolved there and significant uncertainty as to its availability as a forum for the new claims at all. As such, a single judgment dealing with all the proposed new claims and binding all the key Defendants again seems a remote prospect.

210. By contrast, as noted, the Claimants' existing and proposed claims can all be heard together in England, a course again consistent with the approach indicated in *Vedanta* of looking at the whole case and, in multi-defendant cases, of identifying the forum in which all claims against all defendants can be tried in a single proceeding.

211. As such, the case for England as the appropriate forum is also overwhelming when compared to Florida too. That is, again, even before consideration of the Brussels Recast as it applies to Leo Holding, Mr Anufriev and the Kazakovs. Since the former two have not agreed to Florida jurisdiction and Mr Anufriev positively opposes it, the case for England is again even more compelling.

212. Given all these matters, I find that England is by far the appropriate forum for the proposed new claims, whether compared to Florida or Panama. Accordingly, returning to where the jurisdictional analysis started with *NML*, I am satisfied that permission could have been given to serve out the proposed amended pleading, that I would have granted permission had the issue arisen in that way and that jurisdiction too therefore presents no impediment to the amendment applications.

## Articles 33 and 34 Brussels Recast – stay application

213. Although the Kazakovs had prepared for the hearing before me on the basis that their application for a stay under Articles 33 and 34 of the Brussels Recast would be heard, the application was not pressed then. Given that permission had not been given for the proposed amendments, such that there was nothing against which any stay could 'bite', I agree that this was the appropriate course. If relevant, that application can be re-visited.

## H. The Kazakovs' position on the court's discretion

214. Although I have found that the two most heavily argued potential obstacles to the proposed amendments do not present an impediment, the Kazakovs nevertheless say I

should also refuse the amendments as a matter of discretion.  As to this, I agree that I am required to consider all the circumstances of the case, including the factors identified by Coulson J (as he then was) in *CIP Properties (AIPT)* v *Galliford Try Infrastructure Limited* [2015] EWHC 1345 (TCC) at [19] such as (a) the lateness or delay in making the amendments (b) the 'history' of the amendment, including whether there was 'good reason' for any lateness or delay (c) the particularity or clarity of the proposed amendments and (d) the prejudice to the parties if the amendments are permitted or refused.  The Kazakovs also indicated the need for circumspection where a relevant limitation period has expired but, as I have found, a reasonably arguable limitation defence has not been made out.

215. A number of matters said to implicate the exercise of my discretion were canvassed by the Kazakovs in the evidence although (excluding limitation-related issues) they focused at the hearing on the following:-

(i) The significant overlap of the Claimants' proposed new claims with claims already proceeding in Panama and Florida, as to which, the Kazakovs say (a) the Claimants would suffer no injustice through the refusal of permission since they can continue their claims in Panama or Florida in which fora the Kazakovs (and others) have already agreed to submit to the jurisdiction (b) the Kazakovs would suffer prejudice, being faced with a multiplicity of overlapping proceedings in three jurisdictions and (c) relatedly, the continued pursuit of their claims in Panama and Florida would constitute an abuse of this court's process (*Australian Commercial Research and Development Ltd* v *ANZ McCaughan Merchant Bank Ltd* [1989] 3 All ER 65 at 69).

(ii) In addition, the ownership of Edelweiss is, or has been, a live issue in proceedings around the world where the Claimants have advanced cases inconsistent with Veronica being the alleged shareholder and sole beneficial owner of Edelweiss. The Kazakovs indicate incredulity that Veronica forgot about a share certificate in a company worth US$800m while she and her mother 'fought tooth and nail' to get their hands on that company through litigation.

(iii) The new claims are expressed in broad terms, for example, the declaration sought that "*neither the Seventh nor Eighth Defendants has any interest in any asset held by any of the Claimants*".  Likewise, the Kazakovs question the utility of the declaration sought that "*Veronica is the sole shareholder of, and ultimate beneficial owner of, Edelweiss*" given that she does not seek to invalidate any Edelweiss shareholder or board resolution.  Moreover, the allegedly unlawful acts complained of as against Mrs Kazakova are said to be unparticularised.

(iv) Although not pressed in oral submission, the Kazakovs also say that the proposed amendments could have been advanced earlier and the Claimants' failure to do so has caused unnecessary delay in the progress of the proceedings.

## Discussion on discretion

216.    I address each of these points briefly.  **First**, for essentially the reasons I have already indicated under the analysis of the appropriate forum, principally the different basis, focus, scope and party composition of the existing proceedings in Panama and Florida, I consider the suggestion that there is a "*significant overlap*" between these and the proposed new claims to be overstated.  Moreover, as I have also found, I am satisfied that it would be in the interests of the parties as a whole, and in furtherance of the ends of justice, for the proposed new claims to proceed here.  For the reasons also indicated above, I consider the Claimants would, in fact, be seriously prejudiced were I to refuse the amendments, not least given the serious doubts as to whether Panama and Florida are even available fora (in the case of the former, for some at least) of the proposed new claims.

217.    Finally, although there is some (albeit uncertain) scope for overlap with some of the issues arising in the Panama and Florida proceedings and the proposed new claims, as noted in *Kuwait Oil*, that is sometimes justified as an unfortunate but inevitable consequence of "permitting proper remedies to [claimants] who can show … a strong case that they have been defrauded."  The position here is different from *Australian Commercial Research* in which "the same party has initiated proceedings in two separate jurisdictions, those proceedings raising either at the present time or inevitably in the future exactly the same issues ….", the same defendant being pursued in both.  The oral process claims initiated by Mrs Bourlakova and Veronica in Panama are directed at certain specific resolutions.  Veronica brings the Florida Asset Proceedings on behalf of minor children in relation to certain assets located there.  The Edelweiss Complaint was brought on a protective basis.  In these circumstances, I am unable to conclude that the proposed new claims would, if allowed to be pursued here, be vexatious or abusive, nor, do I consider it appropriate in this case to put the Claimants to election between pursuing the amendments or the Panama or Florida proceedings.

218.    **Second**, as for the suggested inconsistency between Mrs Bourlakova's original claims (including in these proceedings) and Veronica's proposed new claim with respect to the ownership of Edelweiss, the Kazakovs (and other Defendants) may well argue that it shows the implausibility of the Claimants' case on the merits.  However, it is not possible for me at this interim stage to form any meaningful view about that other than to say that the amendment discloses a real prospect of success.  In any event, the ownership and alleged misappropriation of that company were already in issue in the existing proceedings, the Kazakovs and most of the other Defendants have not yet served their defences and there is no difficulty in them addressing the case as re-formulated.

219.    **Third**, considering the Claimants' pleading as a whole, I did not find the proposed amendments to be "*exceptionally*" broadly expressed or lacking in particularity.  Nor am I able to conclude that the declarations sought with respect to the ownership of Edelweiss (or, indeed, Gatiabe or Jovellanos) would not be useful.  No doubt this issue will be revisited at trial but, for present purposes, and largely for the reasons identified in AWD11 (at [110]-[122]), I am again satisfied that the Claimants have demonstrated at least a real prospect of success that such relief will be granted.

220. **Fourth**, I have not sought to resolve the rival contentions concerning the Claimants' suggested delay in advancing the proposed amendments (and any related impact) but, in my view, the more important point is that these proceedings are still at a very early stage in terms of the steps taken (and yet to be taken) such that the prejudice encountered by the Defendants in answering the proposed new claims will be minimal.

221. **Fifth**, and finally, this case concerns an international fraud allegedly perpetrated by Mr Bourlakov and a number of other players against the immediate family of the former. It is highly desirable that the claims and defences of all those players should be brought forward and resolved at the same time in the same set of proceedings in the appropriate forum (England). Splitting the proposed new claims from the existing proceedings makes little sense, not least given that the alternatives in play seem to be the commencement of fresh proceedings here and their consolidation with the action already on foot (a seemingly circuitous exercise), alternatively the advancement of claims in different fora which may not even be available to hear some or all of them and/ or to do so in a single composite proceeding there.

222. Given all these matters, I have no hesitation in exercising my discretion in favour of permitting Mrs Bourlakova's proposed amendments under CPR, Part 17.1 as well Veronica's proposed joinder (and the related amendments) under CPR, Part 19.2(a).

I.  **Disposal**

223. For the reasons given above, I therefore:-

    (i)   refused the Kazakovs' application to adjourn the hearing of the amendment applications;

    (ii)  allow the Kazakovs' application to rely on further evidence;

    (iii) allow the Claimants to make the proposed amendments (including Veronica's joinder) in the form of the further version of the composite PoC handed up to me at the hearing and in the draft Re-Amended Claim Form that accompanied the September 2022 amendment application, such permission to extend to all the proposed new claims against all Defendants (except Mr Bourlakov); and

    (iv)  defer consideration of the Kazakovs' application for a stay under Articles 33 and 34 of the Brussels Recast.

224. I trust that the parties can prepare for my consideration a draft order giving effect to this judgment. If there are any consequential matters arising which cannot be agreed and/ or which require a hearing, including the Kazakovs' outstanding stay application and any issues as to the representation of Mr Bourlakov's estate, I will hear from the parties at the earliest available opportunity next term.