**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

APPLICATION OF LOUDMILA
BOURLAKOVA AND VERONICA
BOURLAKOVA TO TAKE DISCOVERY FOR
USE IN A FOREIGN PROCEEDING
PURSUANT TO 28 U.S.C. § 1782

Case No.  24 Misc. _____

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION**
**OF THE PETITIONERS FOR AN ORDER TO TAKE DISCOVERY**
**FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

E. Scott Schirick
Sidhardha Kamaraju
Daniel J. Pohlman
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
*Attorneys for Petitioners*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

   A.  The Parties ......................................................................................................... 3

   B.  The Bourlakov Family ...................................................................................... 4

   C.  Mr. Bourlakov's Attempt To Hide or Misappropriate Family Assets in Anticipation of Divorce ............................................................................................................. 5

   D.  The U.K. Proceeding ........................................................................................ 7

   E.  The Requested Discovery .................................................................................. 9

ARGUMENT ........................................................................................................................... 9

   I.      LEGAL STANDARDS ..................................................................................... 10

   II.     PETITIONERS SATISFY THE STATUTORY THRESHOLD REQUIREMENTS OF SECTION 1782 ................................................................. 11

       A.  CHIPS Resides in this District .................................................................... 11

       B.  The Discovery Sought Is "For Use" in a Foreign Proceeding .................... 12

       C.  The Petitioners Are Interested Persons Under Section 1782 ...................... 12

   III.    INTEL'S DISCRETIONARY FACTORS FAVOR GRANTING THE PETITION ........ 13

       A.  CHIPS Is Not a Party to the U.K. Proceeding ........................................... 13

       B.  The U.K. Court Will Be Receptive to the Discovery .................................. 13

       C.  The Discovery Sought by Petitioners Would Not Circumvent the U.K. Judicial Process ...................................................................................................... 14

       D.  The Discovery Sought Is Narrowly Tailored .............................................. 15

   IV.    THE COURT SHOULD GRANT PETITIONERS' APPLICATION EX PARTE .......... 16

CONCLUSION ....................................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>**                                                                                           **<u>PAGE(S)</u>**

*In re 28 U.S.C. 1782*,
    249 F.R.D. 96 (S.D.N.Y. 2008) ...................................................................13, 15

*In re Abraaj Inv. Mgmt. Ltd.*,
    No. 20 Misc. 229 (VSB), 2023 WL 2674752 (S.D.N.Y. Mar. 29, 2023)...............................13

*In re Application of Malev Hungarian Airlines*,
    964 F.2d 97 (2d Cir. 1992)...........................................................................15

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012)..........................................................................11, 13

*In re Byrne*,
    No. 23 Misc. 048 (VEC), 2023 WL 3203811 (S.D.N.Y. May 2, 2023)...................................12

*In re del Valle Ruiz*,
    939 F. 3d 520 (2d. Cir. 2019)........................................................................11

*In re Deposit Guarantee Fund (Ukraine)*,
    No. 21 Misc. 203 (AT), 2021 WL 1857090 (S.D.N.Y. Apr. 21, 2021)...................................13

*Ecoprivate Bus. Ltd. v. The Clearing House Payments Co.*
    L.L.C., No. 23 MISC. 232 (KPF), 2023 WL 4848516 .......................................................4, 11

*In re Edelman*,
    295 F.3d 171 (2d Cir. 2002).........................................................................11

*In re Emergency Ex Parte Application of Godfrey*,
    No.17-21631-CV-COOKE-GOODMAN, 2018 WL 1863749 (S.D. Fla. Feb.
    22, 2018), *report and recommendation adopted sub nom., In re Godfrey*,
    No.17-21631-Civ-COOKE/GOODMAN, 2018 WL 1859344 (S.D. Fla. Mar.
    15, 2018) ...........................................................................................14

*Euromepa S.A. v. R. Esmerian Inc.*,
    154 F.3d 24 (2d Cir. 1998)..........................................................................12

*In re Ex Parte Application of Glob. Energy Horizons*,
    No. 5:15 Misc. 80078-PSG, 2015 WL 1325758  (N.D. Cal. Mar. 24, 2015)..........................14

*In re First Monolith Inc.*,
    No. 20 Misc. 735 (AT), 2021 WL 1093658 (S.D.N.Y. Feb. 1, 2021)...................................12

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004)............................................................................. *passim*

## <u>TABLE OF AUTHORITIES, CONT.</u>

**<u>CASES</u>**                                                                                                                      **<u>PAGE(S)</u>**

*In re Investbank PSC*,
    No. 20 Misc. 260 (AT), 2020 WL 8512850 (S.D.N.Y. Dec. 30, 2020) ..................................12

*In re JSC BTA Bank*,
    577 F. Supp. 3d 262 (S.D.N.Y. 2021)..............................................................................13, 16

*In re Litasco SA*,
    No. 23 Misc. 354 (AS), 2023 WL 8700957 (S.D.N.Y. Dec. 15, 2023)..................................12

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015)........................................................................................10, 14, 15

*In re Servicio Pan Americano*,
    354 F. Supp. 2d 269 (S.D.N.Y. 2004).....................................................................................14

*In re Simetra Glob. Assets Ltd. & Richcroft Investments Ltd.*,
    No. 16-2389 (JLL) (JAD), 2016 WL 3018692 (D.N.J. May 25, 2016)..................................14

*In re Vinmar Overseas, Ltd.*,
    No. 20 Misc. 277 (RA), 2020 WL 4676652 (S.D.N.Y. Aug. 12, 2020)................................12


**<u>STATUTES AND RULES</u>**

28 U.S.C. § 1782......................................................................................................... *passim*


**<u>WEBSITES</u>**

https://www.fincen.gov/sites/default/files/shared/Appendix_D.pdf..................................................4

https://www.linkedin.com/company/the-clearing-house/ ................................................................4

https://www.theclearinghouse.org/About/History ........................................................................3

https://www.theclearinghouse.org/payment-systems/chips............................................................3

Petitioners Loudmila Bourlakova and Veronica Bourlakova (collectively the "Petitioners") respectfully submit this Memorandum of Law in support of their Application and Petition (the "Application") for an Order, pursuant to 28 U.S.C. § 1782 ("Section 1782"), authorizing them to obtain certain limited discovery from Clearing House Payments Company L.L.C. ("CHIPS"), a United States-based private clearing house, in aid of their civil proceeding currently pending in the High Court of Justice, Business and Property Courts of England and Wales, Claim No. BL-2020-001050 (the "U.K. Proceeding"). This Application is supported by the points and authorities set forth below, together with the Declaration of Naomi Simpson ("Simpson Decl.") and the Declaration of Daniel J. Pohlman (the "Pohlman Decl.). The proposed order and the subpoena *duces tecum* (the "Subpoena") to be served on CHIPS is annexed as Exhibit 1 to the Pohlman Declaration.

## INTRODUCTION

Petitioners bring this Application pursuant to Section 1782 to obtain limited discovery from Manhattan-based payments clearing house CHIPS in aid of Petitioners' civil litigation claims pending in the London, England. In July 2020, Petitioners initiated the U.K. Proceeding to recover assets that are rightly owned by the Petitioners (the "Family Assets") but were misappropriated and transferred by Mrs. Bourlakova's late husband, Oleg Bourlakov, in anticipation of Mr. and Mrs. Bourlakova's divorce that would have settled the division of assets that Mr. Bourlakov stated were worth approximately $3.7 billion.

Petitioners' case turns, in part, on the details of numerous U.S. dollar-denominated transactions that occurred through financial intermediaries which Mr. Bourlakov and his associates used to hide or obscure Family Assets to give the appearance that Mr. Bourlakov's net worth was less than in fact it was, and to otherwise misappropriate assets that were rightly under

the control of Mrs. Bourlakova and/or her daughter, Veronica Bourlakova.  Most recently, on January 18, 2024, Petitioners applied in the U.K. Proceeding for a world-wide freezing order, barring certain of the key defendants in that action from further transferring or dissipating the Family Assets.

Petitioners amply satisfy the two-step analysis set out by the Supreme Court—a threshold statutory test, followed by an analysis to guide the district court's exercise of discretion—in evaluating Section 1782 applications. As for the threshold statutory factors: CHIPS "resides or is found" in this District, where it is headquartered and regularly does business, as numerous courts in this District have found; the discovery sought by Petitioners is "for use in the foreign proceeding," given the importance to the U.K. Proceeding of identifying Family Assets wherever they may be for the purpose of quantifying the Petitioners' claims in the U.K. Proceedings for damages in respect of the misappropriation of certain Family Assets and for the purpose of identifying the dissipation of assets by certain key defendants in support of their application for a world-wide freezing order and, if granted, the enforcement of such an order; and the discovery is sought by "interested parties" in the U.K. Proceeding for the self-evident reason that Petitioners are claimant-litigants there.

Likewise, each of the discretionary factors identified by the Supreme Court in *Intel* decision favors the discovery sought by Petitioner.  *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004).  The Application is limited, seeking only information and documents related to U.S. dollar-denominated transactions tied to the defendants in the U.K. Proceeding.  Indeed, if the U.K. Proceeding were pending in New York, there would be no question that the information and documents sought in this application would be discoverable and relevant.  In addition, as numerous district courts have recognized, there is no reason to

believe that the English court would not accept and consider evidence responsive to the

Subpoena, which cannot be obtained in other fora.  Accordingly, and as set forth in greater detail

below, Petitioners respectfully request that this Court grant Petitioners' Application authorizing

service of the Subpoena on CHIPS.

**FACTUAL BACKGROUND**

**A.  The Parties**

*Loudmila Bourlakova*. Petitioner Loudmila Bourlakova ("Mrs. Bourlakova" or

"Loudmila") is an individual who is a resident of Monaco and of Ukrainian birth who was

married to Oleg Bourlakov at the time of his death in June 2021.  Loudmila is a claimant/litigant

in the U.K. Proceeding.[1]

*Veronica Bourlakova*.  Petitioner Veronica Bourlakova ("Veronica") is an individual

who lives in the United Kingdom, and was born in Ukraine.  She is the youngest child of Oleg

and Loudmila. Veronica is a claimant/litigant in the U.K. Proceeding.[2]

*CHIPS*. CHIPS operates the Clearing House Interbank Payments System.[3]  CHIPS "is

the largest private sector USD clearing system in the world, clearing and settling $1.8 trillion in

domestic and international payments per day."[4] CHIPS provides both transmission of instruction

messages and settlement of funds between institutions to process international U.S. dollar fund

transfers made among international banks. CHIPS "is the United States' main electronic funds-

transfer system for processing international U.S. dollar funds transfers made among international

---

[1] Simpson Decl., ¶¶ 3, 5.
[2] *Id.* ¶¶ 3, 6.
[3] *Our History*, THE CLEARING HOUSE, https://www.theclearinghouse.org/About/History (last visited February 20, 2024)
[4] *About CHIPS*, THE CLEARING HOUSE, https://www.theclearinghouse.org/payment-systems/chips (last visited February 20, 2024).

3

banks."[5] CHIPS estimates that it handles more than 90% of all U.S. dollar-based funds transfers

moving between countries around the world.[6]  CHIPS is owned by The Clearing House, which is

headquartered and regularly does business in this District.[7]

### B.  The Bourlakov Family

Oleg and Loudmila met when they were college students in Ukraine and were married on

June 2, 1972 in Kiev, Ukraine.  They welcomed Veronica into their family in 1984.   In the

1990s, Oleg acquired Novoroscement OJSC ("Novoroscement"), one of Russia's largest national

cement companies.  In March 2007, Novoroscement was sold for approximately USD $1.45

billion.  Part of the proceeds were ultimately invested in Burneftegaz, a substantial oil and gas

business in Russia founded by Oleg and a minority partner. Burneftegaz was sold in 2014, by

which time Oleg owned 90% of the company, netting him approximately $642 million. In 2018,

Oleg stated the Bourlakov Family Assets were worth around $3.7 billion.  As is common for

ultra-high-net-worth families, the Family Assets are and were held in a variety of forms and

spanned multiple international entities and trusts.[8]

### C.  Mr. Bourlakov's Attempt To Hide or Misappropriate Family Assets in Anticipation of Divorce

In 2018, Loudmila and Oleg's 46-year marriage began to break down.  In response to

their impending separation, Oleg developed and set into motion a plan to hide Bourlakov Family

---

[5] *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act*, FINCEN, U.S. DEPARTMENT OF THE TREASURY, available at https://www.fincen.gov/sites/default/files/shared/Appendix_D.pdf (last visited February 20, 2024).
[6] *Id.*
[7] *See, e.g., See, e.g.*, *Ecoprivate Bus. Ltd. v. The Clearing House Payments Co.* L.L.C., No. 23 Misc. 232 (KPF), 2023 WL 4848516, at *1; https://www.linkedin.com/company/the-clearing-house/ (last visited February 20, 2024) (listing 1114 Avenue of the Americas, New York, NY 10036, US, as its headquarters location).
[8] Simpson Decl., ¶¶ 7-10.

Assets from his wife and adult daughters, who supported their mother in their parents' separation, and otherwise maximize the value of that part of the Family Assets over which he exerted exclusive control.  Oleg's plan involved a variety of fraudulent and unlawful means, as part of which he recruited his sister and brother-in-law, Vera and Nikolai ("Nikolai") Kazakov (together, the "Kazakovs"), among others, to act in concert with him.[9]

As detailed in the APOC, a linchpin of Oleg's strategy was fabricating the idea of a purported long-standing oral partnership between Oleg and Nikolai—which, to that point, Oleg had never once mentioned to anyone in his family—entitling Nikolai to 50% of the Family Assets.[10]

Specifically, during a visit in London on April 5, 2018, Oleg misrepresented to Loudmila that Nikolai was and had always been an equal partner in all of Oleg's business ventures, pursuant to an alleged historical oral agreement between the two.  Oleg claimed that this agreement entitled Nikolai to half of the family's fortune.  Not only was this a total fiction, but such an oral arrangement was a legal impossibility under Russian law. Further, the applicable laws and regulations would have required Nikolai to disclose his purported interest in Bourlakov family companies on numerous occasions—which he never did.  In truth, the supposed partnership was fabricated to provide cover for Oleg's attempt to appropriate or hide more than 50% of the Family Assets from any potential claim by Loudmila or Veronica; to mislead Loudmila and Veronica about the value of the Family Assets; and to pressure Loudmila to accept a reduced settlement as part of divorce proceedings that were later initiated in Monaco in

---

[9] *Id.* ¶¶ 11-13.
[10] *Id.* ¶ 14 & Ex. 1, pp. 91-92.

December 2018.[11]  It also formed the basis of a specific false narrative that one of the family entities belonged to Nikolai and, in turn, that an enormous debt was due to that entity.

According to the APOC, the upshot of this strategy was to place Bourlakov Family Assets in the hands of entities controlled by Mr. Bourlakov, either directly or through various nominees, including the Kazakovs.[12]  To make matters more complicated, in June 2021, Oleg died unexpectedly from COVID-19.  With Oleg gone, the Kazakovs spotted an opportunity for themselves.  Presented with an opening, the Kazakovs decided to try to covert Oleg's fictional handshake partnership agreement into a new reality—and, in the process, turn themselves from mere nominees in Oleg's scheme to obscure his family's finances, into the ultimate beneficiaries of the Bourlakov Family Assets—by directing the further movement of Family Assets into entities and bank accounts over which the Kazakovs had fraudulently gained exclusive control.[13]

Certain of the transfers by the Kazakovs in furtherance of their scheme involved U.S. correspondent banking transactions.  Based upon investigation directed by counsel to date, at least $425 million of the Family Assets appears to have been moved via entities controlled by the Kazakovs into international bank accounts owned or believed to be controlled by them.[14]  Although these transfers were directed from and to entities and individuals that are located outside of the United States, a number of the transactions were denominated in U.S. Dollars and, based upon counsel's investigation, appear to have involved United States-based correspondent banks.[15]

[11] Simpson Decl., ¶¶ 15-16 & Ex. 1, pp. 13-20, 62-63.
[12] Simpson Decl., ¶ 12, 17.
[13] *Id.*, ¶ 17.
[14] A full tracing exercise has not been completed at this stage and some of the transfers identified (totaling the $425 million) could involve the same monies: *Id.*, ¶ 18.
[15] *Id.*, ¶ 19.

### D. The U.K. Proceeding

In July 2020, Petitioners initiated the U.K. Proceeding, seeking multiple forms of relief or alternative relief.  This includes, among other things: damages caused to Petitioners by the fraud perpetrated by that proceeding's defendants; a declaration that no partnership agreement exists or ever existed between Oleg and Nikolai.[16]

A number of the key defendants in the U.K. Proceeding sought to challenge the English Court's jurisdiction, leading to a five-day hearing beginning in November 2021.  Initially, and in advance of the hearing, the Kazakovs contended  that, at the time the claims were initiated, they were not domiciled in the European Union and that Nikolai lived in Monaco and his wife in Russia, in an attempt to bolster their challenge to the jurisdiction of England to hear the dispute.[17]  In particular, the Kazakovs instructed their solicitor to make a sworn statement to the court that Nikolai had "not lived in Estonia since he left in 1971" and "spends only a few weeks in Estonia each year to visit relatives, generally during the holidays."[18] The Kazakovs later were forced to withdraw that evidence, conceding that Nikolai in fact had been domiciled in Estonia during the relevant time.[19] In ruling on consequential issues arising from the hearing, the judge in U.K. Proceeding (the "U.K. Court") found that this statement was "a plain misrepresentation to the court on an issue which both [the Kazakovs] knew was central to the jurisdiction applications they had made."[20] In May 2022, the court dismissed defendants' jurisdictional challenges and held that England was the appropriate forum to adjudicate the dispute.[21]

---

[16] *Id.*, ¶ 20 & Ex. 1.
[17] Simpson Decl., ¶¶ 21-22 & Ex. 2, ¶ 39.
[18] Simpson Decl., ¶ 23 & Ex. 2, ¶ 37(d).
[19] Simpson Decl., ¶ 24 & Ex. 3, ¶ 9.
[20] Simpson Decl., ¶ 25 & Ex. 4.
[21] Simpson Decl., ¶ 26 & Ex. 5.

Undeterred, the Kazakovs mounted a separate jurisdictional challenge following an application by Veronica to be added as a Claimant to the U.K. Proceeding, in particular relating to the control of Bourlakov family company Edelweiss Investment, Inc. ("Edelweiss"), arguing in part that Panama or Florida were more appropriate jurisdictions to hear the dispute.[22] In September 2023, the U.K. Court denied this second challenge, holding that it had "no hesitation in concluding that England is by some considerable distance a more appropriate forum than Panama," and that "the case for England as the appropriate forum is also overwhelming when compared to Florida too." Further, the U.K. Court ruled that the "case concerns an international fraud allegedly perpetrated by Mr Bourlakov and a number of other players against the immediate family of the former. It is highly desirable that the claims and defences of all those players should be brought forward and resolved at the same time in the same set of proceedings in the appropriate forum (England)."[23]

By the end of November 2023, the Kazakovs had answered the APOC and served their defenses.[24]  The Kazakovs also served a counterclaim, seeking declarations that a 50/50 partnership agreement between Nikolai and Oleg existed and that the claimants have no interest in Edelweiss.[25]

On January 18, 2024, Loudmila and Veronica applied to the U.K. Court for a worldwide freezing order against the Kazakovs, among others, preventing them from further transferring or dissipating the Family Assets (the "U.K. Freezing Order Application").[26]  The U.K. Freezing Order Application is listed to be heard on 21 and 22 February 2024.

---

[22] Simpson Decl., ¶ 27 & Ex. 6.
[23] Simpson Decl., ¶ 28 & Ex. 7.
[24] Simpson Decl., ¶ 29.
[25] *Id.*
[26] *Id.* ¶ 30.

**E.  The Requested Discovery**

Petitioners seek discovery from CHIPS in support of their claims in the U.K. Proceeding. As noted above, CHIPS is a wire-transfer clearing house based in Manhattan that is commonly known to act as a clearing firm for U.S. dollar-denominated wire transfers between international banks.  *See infra* p. 6.  Accordingly, and as described in the proposed Subpoena attached as Exhibit 1 to the Pohlman Declaration, Petitioners seek limited documents and information from CHIPS concerning any assets, accounts, or transfers to or from the defendants in the U.K. Proceedings or entities related to them.[27]  Documents responsive to the Subpoena are highly relevant to the U.K. Proceeding for several reasons, including so that the Family Assets can be traced and tracked (both for the purpose of quantifying the Petitioners' claims in the U.K. Proceedings for damages in respect of the misappropriation of certain Family Assets and for the purpose of identifying the dissipation of assets by certain key defendants in support of the U.K. Freezing Order Application) and, should the U.K. Freezing Order Application succeed, to prevent further movement or dissipation of the Family Assets, pending resolution by the U.K. Court of the parties' respective claims.

## **ARGUMENT**

**I.    LEGAL STANDARDS**

Section 1782 of Title 28 of the United States Code permits United States District Courts to grant discovery for use in a pending or reasonably contemplated foreign proceeding.  *Intel Corp.*, 542 U.S. at 259.  The statute states, in relevant part:

---

[27] For purposes of this Application, Petitioners have not included a proposed return date in the Subpoena because the timeline on which the Court will rule on the application is yet unclear. Should the Court grant Petitioners' Application, Petitioners will include a reasonable return date before serving CHIPS with the Subpoena.

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person.

28 U.S.C. § 1782.

"A district court has authority to grant a § 1782 application where: (1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made; (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal; and (3) the application is made by a foreign or international tribunal or any interested person." *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) (citation and quotations omitted).

If the three statutory requirements are satisfied, courts consider four discretionary factors in deciding whether to grant a Section 1782 application:  (1) whether discovery is sought from a participant in the foreign proceeding who is accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the tribunal to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests.  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80-81 (2d Cir. 2012) (*citing Intel*, 542 U.S. at 264-65).

Both the Supreme Court and the Second Circuit have acknowledged that Congress intended to provide a liberal avenue to discovery in aid of foreign proceedings.  *See Intel,* 542 U.S. at 247-48; *Brandi-Dohrn,* 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability") (citation and quotations omitted); *In re Edelman,* 295 F.3d

10

171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

## II.    PETITIONERS SATISFY THE STATUTORY THRESHOLD REQUIREMENTS OF SECTION 1782

Petitioners satisfy the three statutory threshold requirements of Section 1782:  (1) CHIPS "resides" and is "found" in the Southern District of New York; (2) the requested information is for "use in a foreign proceeding"; and (3) Petitioners are "interested persons" as the litigants in the U.K. Proceeding, all within the meaning of the statute.

### A.  CHIPS Resides in this District

Courts in this circuit apply a "flexible reading" of the words "reside" and "found" in Section 1782 and interpret the terms broadly.  *In re Edelman*, 295 F.3d at 180.  Generally speaking, the scope of this language "extends to the limits of personal jurisdiction consistent with due process."  *In re del Valle Ruiz*, 939 F. 3d 520, 527 (2d. Cir. 2019) (cleaned up).

As numerous courts have found, CHIPS both "resides" and is "found" in New York, New York because it is headquartered and operates its business here.  Applications for 1782 discovery from CHIPS are thus routinely granted in this District.  *See, e.g.*, *Ecoprivate Bus. Ltd. v. The Clearing House Payments Co.* L.L.C., No. 23 Misc. 232 (KPF), 2023 WL 4848516, at *2 (S.D.N.Y. July 28, 2023) (granting 1782 application for subpoena to CHIPS seeking documents relating to wire payments); *In re Vinmar Overseas*, *Ltd.*, No. 20 Misc. 277 (RA), 2020 WL 4676652, at *2 (S.D.N.Y. Aug. 12, 2020) (granting 1782 application for discovery from CHIPS relating to alter ego allegations); *In re Byrne*, No. 23 Misc. 048 (VEC), 2023 WL 3203811, at *6 (S.D.N.Y. May 2, 2023) (grating application for discovery from CHIPS and 13 financial institutions regarding transactions between 17 entities and individuals); *In re Investbank PSC*, No. 20 Misc. 260 (AT), 2020 WL 8512850, at *1 (S.D.N.Y. Dec. 30, 2020) (granting 1782

application as to CHIPS); *In re First Monolith Inc.*, No. 20 Misc. 735 (AT), 2021 WL 1093658, at *1 (S.D.N.Y. Feb. 1, 2021) (same); *In re Litasco SA*, No. 23 Misc. 354 (AS), 2023 WL 8700957, at *3 (S.D.N.Y. Dec. 15, 2023).

**B.   <u>The Discovery Sought is "For Use" in a Foreign Proceeding</u>**

Discovery is considered "for use" in a foreign proceeding where there is an ongoing foreign proceeding, which is adjudicative in nature. *Euromepa S.A. v. R. Esmerian Inc.*, 154 F.3d 24, 27 (2d Cir. 1998).  Here, the English proceeding is plainly an adjudicative, judicial proceeding pending before the High Court of Justice, Business and Property Courts of England and Wales.[28]  The materials, once obtained, will be used in the U.K Proceeding because the information in them is likely to bear on certain facts in dispute, including the value of certain Family Assets that the Petitioners claim to have been misappropriated, and about which value the Petitioners claim the key defendants have sought to mislead them.[29] As explained above, they will also be used in the U.K. Freezing Order Application and the policing and enforcement of any freezing order that is obtained. The timing and amounts of the transfers, as well as the identities of the transferors and transferees will be relevant both to the substantive factual issues (such as whether there was a misappropriation as the Petitioners claim) and to the U.K. Freezing Order Application.

**C.   <u>The Petitioners Are Interested Persons Under Section 1782</u>**

As litigants in the U.K. Proceeding, Petitioners are by definition "interested persons" within the meaning of Section 1782.  *See Intel Corp.*, 542 U.S. at 256 ("No doubt litigants are

---

[28] Simpson Decl., ¶ 3.
[29] Simpson Decl., ¶14-16

included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782 . . .").  As such, Petitioners satisfy the third statutory requirement.

## III    *INTEL*'S DISCRETIONARY FACTORS FAVOR GRANTING THE PETITION

Once the statutory requirements of Section 1782 are met, courts consider the four discretionary factors set forth by the Supreme Court in *Intel*.  *See Brandi-Dohrn*, 673 F.3d at 80-81.  Here, each of these factors weighs in favor of granting the requested discovery.

### A.  <u>CHIPS Is Not a Party to the U.K. Proceeding</u>

As to the first factor, because CHIPS is not a party to the U.K. Proceeding,[30] any potential evidence it may have in the United States "may be unobtainable absent § 1782."  *Intel*, 542 U.S. at 264; *see also In re 28 U.S.C. 1782,* 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (granting petition for discovery and noting that petitioner's "status as a non-party . . . weighs in favor of granting [the] application"). The first *Intel* factor thus weighs in favor of granting the Application.

### B.  <u>The U.K. Court Will Be Receptive to the Discovery</u>

The second *Intel* factor similarly supports granting Petitioners' request. That factor looks to the nature of the foreign tribunal, and the receptivity of the foreign court to U.S. judicial assistance.  *Intel*, 542 at 264-265.  United States courts have consistently allowed participants in U.K. judicial proceedings to obtain discovery under Section 1782.  *See, e.g., In re JSC BTA Bank*, 577 F. Supp. 3d 262, 267 (S.D.N.Y. 2021), *appeal dismissed* (May 10, 2022) (granting 1782 application for discovery in support of action pending before the High Court of England and Wales); *In re Abraaj Inv. Mgmt. Ltd.*, No. 20 Misc. 229 (VSB), 2023 WL 2674752, at *6 (S.D.N.Y. Mar. 29, 2023) (granting 1782 application in support of fraudulent transfer claims

---

[30] *See* Simpson Decl., Ex. 1.

pending in the Grand Court of the Caymans Islands); *In re Deposit Guarantee Fund (Ukraine)*, No. 21 Misc. 203 (AT), 2021 WL 1857090, at *1 (S.D.N.Y. Apr. 21, 2021) (granting 1782 application for discovery in support of action pending in the U.K.).

In addition, several U.S. district courts have specifically observed that there is no indication that English courts would reject evidence obtained pursuant to Section 1782. *In re Simetra Glob. Assets Ltd. & Richcroft Investments Ltd.*, No. 16-2389 (JLL) (JAD), 2016 WL 3018692, at *4 (D.N.J. May 25, 2016) ("[T]here is no indication that the English Court would reject the evidence that Petitioners seek to elicit."); *In re Emergency Ex Parte Application of Godfrey*, No.17-21631-CV-COOKE-GOODMAN, 2018 WL 1863749, at *10 (S.D. Fla. Feb. 22, 2018), *report and recommendation adopted sub nom., In re Godfrey*, No.17-21631-Civ-COOKE/GOODMAN, 2018 WL 1859344 (S.D. Fla. Mar. 15, 2018) ("Some U.S. district courts have also recognized that English courts are generally receptive to § 1782 discovery.") (citation omitted); *In re Ex Parte Application of Glob. Energy Horizons*, No. 5:15 Misc. 80078-PSG, 2015 WL 1325758, at *2 (N.D. Cal. Mar. 24, 2015) ("There is no authority suggesting the English government would be hostile to or otherwise reject discovery obtained through a Section 1782 subpoena.").

## C. The Discovery Sought by Petitioners Would Not Circumvent the U.K. Judicial Process

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel,* 542 U.S. at 265.  In the Second Circuit, there is no requirement that a petitioner seeking discovery under Section 1782 first attempt to obtain the requested information via the foreign tribunal.  *Mees*, 793 F.3d at 303 (Section 1782 "contains no foreign-discoverability requirement.").  Nor must an applicant wait until the evidentiary stage of the

foreign proceeding.  *In re Servicio Pan Americano*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004)

("Section 1782 may be invoked even where foreign legal proceedings are not even

underway . . . .").

Here, the Application does not attempt to circumvent any proof-gathering restriction or

public policy in the U.K. Proceeding.  Rather, Petitioners invoke Section 1782 to obtain highly

relevant evidence: information concerning potentially significant U.S. dollar transfers involving

Family Assets that occurred outside of the U.K., but which have a connection to the Southern

District of New York.  These transfers spanned multiple countries and involved numerous

entities, and because the transfers appear to have involved U.S. dollar-denominated

transactions,[31] discovery from the U.S.-based entity that likely handled those transfers is entirely

appropriate.  Petitioners' motivations for seeking Section 1782 discovery is thus aligned with

Congress' goals in enacting Section 1782: "[T]o assist foreign tribunals in obtaining relevant

information that the tribunals may find useful but, for reasons having no bearing on international

comity, they cannot obtain under their own laws[.]"  *Intel*, 542 U.S. at 262.

**D.  <u>The Discovery Sought Is Narrowly Tailored</u>**

The fourth *Intel* factor likewise supports granting the Application. That factor looks to

whether the discovery requests are "unduly intrusive or burdensome."  *Intel,* 542 U.S. at 265.

Like all federal discovery, the proper scope of discovery under Section 1782 is governed by

Federal Rule of Civil Procedure 26(b).  *Mees*, 793 F.3d at 302; *In re 28 U.S.C. 1782*, 249 F.R.D.

at 106.  Accordingly, district courts retain "broad authority . . . to fashion discovery orders issued

pursuant to section 1782."  *In re Application of Malev Hungarian Airlines*, 964 F.2d 97, 102 (2d

Cir. 1992).  Here, Petitioner's discovery request is narrowly tailored to the claims at issue.  Even

---

[31]Simpson Decl., ¶ 19.

though the details of the scheme by Oleg and the Kazakovs are not fully known to Petitioners,

the discovery sought is appropriately focused on those entities and transfers that Petitioners have

identified through their investigation to date. Accordingly, Petitioners satisfy the fourth *Intel*

prong.

## IV.    THE COURT SHOULD GRANT PETITIONERS' APPLICATION *EX PARTE*

The Court should grant the Application *ex parte* because doing so would cause no

prejudice to CHIPS as a matter of law.  "Because the respondents will have the opportunity to

challenge [the] subpoena[] once served (including but not limited to a challenge as to whether

section 1782 assistance should be afforded at all)" courts frequently grant Section 1782 requests

*ex parte*.  *In re JSC BTA Bank*, 577 F. Supp. 3d at 268.  Here, CHIPS would not be prejudiced

should the Court grant the Application *ex parte* because CHIPS would have the opportunity to

challenge the Subpoena after service.

### CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court (a) grant the

Application and Petition For an Order to Conduct Discovery; (b) enter the Proposed Order

attached to the Pohlman Declaration as Exhibit 2; (c) order that Petitioners may proceed *ex parte*,

(d) authorize Petitioners, pursuant to 28 U.S.C. § 1782, to serve the Subpoena attached to the

Pohlman Declaration as Exhibit A; and (e) grant such other and further relief as this Court may

deem just and proper.

Dated: New York, New York
       February 20, 2024

                                        PRYOR CASHMAN LLP


                                   By:  */s/ E. Scott Schirick*
                                        E. Scott Schirick
                                        Sidhardha Kamaraju
                                        Daniel J. Pohlman

                                        7 Times Square
                                        New York, NY 10036
                                        (212) 421-4100
                                        *Attorneys for Petitioners*