**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE:

APPLICATION OF LOUDMILA
BOURLAKOVA AND VERONICA
BOURLAKOVA TO TAKE DISCOVERY
FOR USE IN A FOREIGN PROCEEDING
PURSUANT TO 28 U.S.C. § 1782

Case No. 1:24-mc-00071

---

**DECLARATION OF NICOLE A. SULLIVAN IN SUPPORT OF THE**
**MOTION OF NIKOLAI KAZAKOV AND VERA KAZAKOV TO**
**INTERVENE, VACATE THE ORDER GRANTING THE APPLICATION AND**
**TO QUASH THE SUBPOENA**

NICOLE A. SULLIVAN hereby declares and states under the penalties of perjury as follows:

1.      I am a partner in the law firm of White and Williams LLP, attorneys for proposed Intervenors Nikolai Kazakov ("Nikolai") and Vera Kazakova ("Vera") (collectively, the "Kazakovs" or the "Intervenors"). I make this Declaration out of personal knowledge, except where otherwise indicated, in support of the Kazakovs' Motion to Intervene in this proceeding and to Vacate the Order Granting the Application and to Quash the Subpoena served in connection with this Application, pursuant to 28 U.S.C. § 1782 (the "1782 Application"), which purportedly seeks documents for use in their application for a world-wide freezing order against the Kazakovs and two other parties ("WFO Application") pending in the High Court of London, England (the "London Proceedings").

2.      For the reasons set forth herein and in the accompanying Memorandum of Law, the Kazakovs should be permitted to intervene, the order granting the application vacated and the

Subpoena should be quashed. The Petitioners herein, Loudmila Bourlakova ("Loudmila") and Veronica Bourlakova ("Veronica") (collectively, "Petitioners" and, with non-party Elena Boulrlakova ("Elena") the "Bourlakovas") purportedly seek documents to support their WFO Application. That application, however, was premised on forged, fraudulent and illegally obtained materials, including substantial privileged documents that were improperly accessed by the Petitioners and only returned to the Kazakovs months later. In fact, Petitioners have now withdrawn this evidence entirely from their WFO Application, have agreed to withdraw the WFO Application against the Kazakovs, and have agreed to pay the Kazakovs costs associated therewith.

3.      Furthermore, the Subpoena itself is wildly overbroad, seeking significant information about the Kazakovs' financials from various entities and over one-hundred accounts. Finally, while the Bourlakovas purportedly seek the assistance of this Court to obtain information relating to their case in London, they neglect to mention that one or both is either a plaintiff and/or a counterclaim-defendant in two separate actions pending in State Court in Miami-Dade County, Florida that address issues related to those pending in the London Proceedings and in which they have steadfastly refused to provide discovery while seeking discovery from the Kazakovs, in part, about their assets.

## I.      BACKGROUND OF THE GLOBAL LITIGATION

4.      The 1782 Application and the London Proceeding are two of the many proceedings pending throughout the world that relate to the ownership and control of a significant fortune accumulated by Nikolai and his late, longtime business partner, Oleg Bourlakov ("Oleg") over the course of many years. As set forth in Kazakovs' counterclaims (the "Counterclaims") asserted in the two separate actions pending in Florida (the "Florida Actions") (true and correct copies of

which are attached hereto as **Exhibits A and B**), Oleg was Vera's brother and Nikolai's brother-in-law and is the late husband of Loudmila and father of Veronica.

5.      The Counterclaims allege that in 1988, Oleg and Nikolai agreed to enter a partnership whereby they would share the risks and rewards of the various business ventures they would pursue together, with each being entitled to 50% of the accumulated assets. The partnership was entirely valid under Russian law and consistent with the business arrangements that were common at the time in Russia, which was transitioning from the long Soviet-era communist phase. Over the course of the next thirty years, Oleg and Nikolai built several substantial and successful businesses, creating a partnership fortune valued at over $3 billion at Oleg's death in 2021.  *See* Exhibit A at Counterclaims ¶¶ 45-47, 110, 224-228; Exhibit B at Counterclaims ¶¶ 27-29, 92, 156.

6.      The Counterclaims go on to allege that, in 2018, Oleg's marriage to Loudmila came under stress, and that, at that time, Loudmila was holding substantial assets for the benefit of Oleg and Nikolai. Nikolai became concerned about the potential ramifications that these marital problems could have on the partnership assets and therefore sought to protect the fortune he had built with Oleg by requesting that his share of the partnership assets being held by Loudmila for the benefit of the partners, be returned to him. Loudmila refused to do so and for the first time, the Bourlakovas denied that the partnership had ever existed insisting instead that all the assets accumulated over 30 years were "family assets." Exhibit A at Counterclaims ¶¶ 4, 75-76, 84-94; Exhibit B at Counterclaims ¶¶ 4, 57-58, 65-73.

7.      Since 2018, litigation over the assets accumulated by Nikolai and Oleg has arisen and been pursued across the globe. This includes cases in Monaco, the Isle of Mann, Cyprus, Switzerland, Russia, Ukraine, Latvia and Panama. Included among these are the London Proceedings, a case commenced by Loudmila in the High Court of London in July 2020, seeking

recovery from Oleg, Nikolai, Vera and others under a number of legal theories. In September 2023, Veronica's motion to join that litigation and assert her own claims of ownership of a Panamanian company called Edelweiss, Inc. ("Edelweiss") was granted. Edelweiss is owned by a foundation of which Nikolai is the sole beneficiary. Exhibit A at Counterclaims ¶¶ 20, 146; Exhibit B at Counterclaims ¶¶ 100-101, 104-105, 128.

8.      In July of 2021, Oleg died in Moscow of Covid-19. Oleg left a holographic will, in which he named the Kazakovs as his universal legatees. Oleg's estate has been the source of additional litigation, including claims asserted by the Kazakovs in Florida. Exhibit A at Counterclaims ¶¶ 6, 108-109; Exhibit B at Counterclaims ¶¶ 6, 90-91.

## II.      PETITIONERS' FLORIDA LITIGATIONS

9.      One or more of the Bourlakovas has filed three separate litigations in the State of Florida relating to the assets of Oleg and Nikolai.

10.     In November 2021, Veronica and Elena, purportedly in their capacities as guardians of their minor children, brought the first action in Florida state court in Miami-Dade County. In that action, they sought to gain control of a condominium on Fisher Island in Miami Beach Florida that Oleg had place in a trust for the benefit of the Kazakovs, as well as certain cash, contending that these assets were improperly diverted from a trust that had originally named Veronica and Elena's minor children as beneficiaries (the "2021 Action"). Veronica and Elena subsequently filed an amended complaint in the 2021 Action, naming the Kazakovs as additional defendants and asserting broad claims of global fraud. A true and correct copy of the Amended Complaint is attached hereto as **Exhibit C**.

11.     In November 2022, the Bourlakovas brought another action, this one in the United States District Court for the Southern District of Florida, which asserted a number of claims under

the Racketeer Influenced and Corrupt Organizations Act, against various parties, claiming that the defendants in that case had helped to divert various assets from their control to the control of Nikolai and Oleg. A true and correct copy of the complaint is attached hereto as **Exhibit D**. The complaint alleged that Nikolai and Vera, among others, formed an illegal "enterprise" under the RICO statute. In February of 2023, the Bourlakovas voluntarily dismissed that action without having ever served it. A true and correct copy of the docket sheet is attached hereto as **Exhibit E**.

12.     In January of 2023, Veronica brought yet a third action in Florida, this one seeking a declaration that she was the owner of the Panamanian company called Edelweiss (the "2023 Action"). A true and correct copy of the Complaint is attached hereto as **Exhibit F**. Veronica contended that the action was a "protective action" -- a concept that does not exist under Florida law -- that she brought to avoid the running of the statute of limitations on her ownership claim while her motion to join the London Proceeding and assert her claim to ownership of Edelweiss there was pending.

13.     In response to the claims brought against them by the Bourlakovas, Nikolai and Vera asserted Counterclaims in the 2021 Action and 2023 Action. By such Counterclaims, they have sought, *inter alia*, a declaration that Nikolai and Oleg were partners; damages arising from Loudmila's breach of her agreement to hold certain partnership assets for the benefit of Nikolai; damages for breach of Loudmila's fiduciary duty to Nikolai and tortious interference with Nikolai's partnership with Oleg, and her interference with the Kazakovs' rights as universal legatees under Oleg's will; and an accounting of partnership assets stolen by Loudmila. They also have sought damages against Veronica, Elena and Veronica's husband, Greg Gliner ("Gliner"), for aiding and abetting and conspiring in this wrongful conduct, and a declaration that Veronica is not the beneficial owner of Edelweiss, among other relief. *See* Exhibits A and B.

14.     The Bourlakovas and Gliner all moved to dismiss the claims on various grounds, including *forum non conveniens* and alleged lack of both personal jurisdiction and subject matter jurisdiction. The Florida court has issued orders denying the motions to dismiss for *forum non conveniens*, lack of personal jurisdiction and lack of subject matter jurisdiction.  Those decisions are annexed hereto as **Exhibits G, H, I**. The Florida District Court of Appeal recently rejected the Bourlakovas' Petition to review the decision on subject matter jurisdiction. **Exhibit J**.

15.     The 2021 Action has a trial date set for the week of October 27, 2024. A true and correct copy of the case management order is attached hereto as **Exhibit K**. The parties have served significant discovery on each other. As part of the discovery, Veronica has sought documents relating to many of the entities referenced in the Subpoena. Nevertheless, Loudmila and Veronica continue to contest efforts to pursue discovery against them in Florida. This has included a complete failure to produce any documents other than limited documents relating to the Florida assets and the refusal to agree to dates for depositions, despite repeated requests. It also includes directions to Elena not to answer any questions concerning the allegations in her complaint or the Counterclaims. The Kazakovs have moved to compel production of documents in the 2021 case and to compel Elena to answer the inquiries and for Veronica to appear for a deposition in the two cases. Hearings on the parties' respective motions to compel are scheduled to be heard in April 2024.

### III.    THE LONDON PROCEEDINGS

16.     The London Proceedings were originally filed by Loudmila against Nikolai, Vera, Oleg and others in 2020. The case asserted several claims, essentially contending that Nikolai and Oleg had somehow misappropriated certain assets that they had generated over the course of their thirty-year partnership. Veronica moved to join the litigation to assert her claim to ownership of

Edelweiss (essentially the same claim that is pending in Florida) and successfully joined the litigation as a plaintiff in late 2023.

17.     The London Proceedings have gone through certain motion practice, as well as the filing of defenses and counterclaims by Nikolai and Vera.

### The Freezing Order Application

18.     On about January 18, 2024, Loudmila and Veronica filed an application in the High Court of London seeking a worldwide freezing order against the assets of Nikolai, Vera and another party, Semen Anufriev.  The application was filed *ex parte,* and no notice was provided to the Kazakovs until February 12, 2024, when the application was finally served on them. The principal support that the Petitioners offered for this application -- which sought to freeze almost $1 billion in assets (the "WFO Application") -- was a report that they had purportedly obtained from an investigator in London known as CT Group (the "CT Report"). *See* Twelveth Witness Statement of Elizabeth Ann Seborg dated March 9, 2024, a true and correct copy of which is attached hereto as **Exhibit L**.

19.     The 85-page CT Report (a true and correct copy of the CT Report is attached hereto as **Exhibit M**) referenced a number of transactions that purportedly demonstrated an effort on the part of Nikolai and Vera to dissipate disputed assets. It also referenced what it claimed were emails and other documents supposedly demonstrating a conspiracy on the part of Nikolai, and Vera and Mr. Anufriev to dissipate these assets. Upon examination, it became apparent that the CT Report contained a great deal of fictitious and fraudulent material. It referenced numerous "payments" that did not in fact occur – 138 in all. It also made reference to a number of email communications involving Nikolai that in fact were forgeries, and referenced several companies that did not exist. *See* Exhibit L, ¶¶ 47-54.

20.     Despite the highly questionable contents of the CT Report, counsel for Petitioners utilized the CT Report as their principal evidence in support of their WFO Application and obtained a hearing date before the London Court of February 21, 2024.  This was only six business days after the Kazakovs first received notice of the application. *See* Exhibit L, ¶¶ 8, 11.

21.     Prior to the hearing, counsel for the Kazakovs brought to the attention of the Bourlakovas' English counsel -- the global firm Mishcon de Reya ("Mishcon") -- that the CT Report consisted primarily of fraudulent, fictitious, and fabricated material. *See* Exhibit L, ¶¶ 11, 12.

22.     The problems with the CT Report should not have been a surprise to Mishcon. Mishcon had previously utilized the same investigator -- CT Group -- in a similar investigation that likewise resulted in a false, fabricated, and fraudulent report that Mishcon attempted to use in the London Court. This received considerable attention in London. *See* **Exhibit N**.

23.      On the eve of the London hearing on the WFO Application and one day after filing this 1782 Application, Mishcon informed the London Court that it would not be utilizing the CT Report in support of its WFO Application. *See* Exhibit L, ¶ 12. Doing so eliminated virtually all evidence of purportedly improper transactions that formed the basis for the WFO Application, as well as the discovery sought here.

24.     A hearing was then held in London on February 21 and 22. During the hearing, the Court understandably expressed concerns about the use of fraudulent or fabricated evidence. A true and correct copy of the hearing transcript is attached as **Exhibit O**, pp. 105-108. At that time, Mishcon specifically indicated its desire to use this 1782 Application to "verify" that the information included in the CT Report (or at least some of it) was valid. *Id.* At the conclusion of the hearing, the London Court determined that the hearing would be adjourned to March 26 and

-8-

27 (Nikolai provided an undertaking that no assets would be moved in the meantime) but ordered that Mishcon inform the Kazakovs no later than the following Tuesday, February 27, whether Petitioners intended to place any reliance upon the CT Report or whether it would be permanently withdrawn. Exhibit L, ¶ 13.

**The Post-Hearing Investigation and Injunction Motion**

25.     Since the hearing, the Kazakovs and counsel have continued to investigate the CT Report and the underlying transactions. This investigation has raised further, serious concerns about the CT Group, the CT Report, and the "evidence" employed by Petitioners. *See e.g.* Exhibit L.

26.     Most significantly, there is compelling evidence that CT Group's agents have deployed unlawful means to obtain the Kazakov's confidential information, which likely includes hacking into email accounts. *See* Exhibit L, ¶¶ 37-46.

27.     On March 6, 2024, Mishcon sent two letters to the Kazakovs' counsel, in which Mishcon informed counsel that 1) since August, 2023, Mishcon had been in possession of a substantial number of confidential documents, including a number of documents that apparently were privileged; 2) upon becoming aware that it apparently possessed privileged documents, rather than return them or notify the Kazakovs, Mishcon commissioned an "independent" barrister to review the same and determine what was privileged; and 3) Mishcon had identified thirty-two documents that it believed to be privileged. A true and correct copy of the letters are attached as **Exhibits P and Q** respectively. A true and correct copy of the Kazakovs response is attached as **Exhibit R**.

28.     The thirty-two documents were thereafter provided to the Kazakovs' counsel. These included multiple exchanges between the Kazakovs and their counsel in various

jurisdictions. They also addressed numerous sensitive matters pertaining to the global litigation and the Kazakovs' strategy in this multi-jurisdictional, billion-dollar global litigation. The Kazakovs do not know if all of the improperly obtained privileged documents were returned. *See* Exhibit L, ¶¶ 34-36.

29.    The CT Report also contained numerous other, authentic but confidential documents that only could have been obtained through improper access to the Kazakovs' email accounts other personal records.  These include:

- a copy of a genuine email exchange between Nikolai and his bank, Banque Julius Baer in Monaco regarding his portfolio;

- confidential banking information and genuine banking documents relating Nikolai's account with Banque Havilland, Monaco, including a certification of the value of Nikolai's account, a request for transfer of securities, and IBAN and other details for Nikolai's USD and EURO accounts;

- a screenshot of what appears to be the first page of a portfolio statement of Edelweiss in connection with its account with Banque Pictet;

- what appears to be a genuine list of the employees and their salaries of Admiral Invest LLC, a company solely owned by Nikolai.

Exhibit L, ¶¶ 37-45; Exhibit M.

30.    At no time in the course of the correspondence between the Kazakovs' counsel and Mishcon has Mishcon provided any explanation for how confidential and/or privileged material ended up in its possession, or how it came into possession of forged and fabricated emails or other improper materials. The Kazakovs likewise have no explanation for how these materials could have been obtained lawfully. Nor has Mishcon returned all the ill-gotten documents and information. *See* Exhibit L, ¶¶ 58-59, 79.

31.     As a result, on March 9, 2024, the Kazakovs made an application to the London High Court seeking the following relief:

- an order compelling delivery of all confidential and privileged communications provided to the Bourlakovas by the CT Group and agreement to seek to compel the CT Group to do the same;

- an order enjoining any further use of the confidential/privileged material; and

- an order compelling the Bourlakovas to instruct the CT Group to cease further investigation of the Kazakovs;

- adjournment of the March 26 and 27 hearing pending resolution of their application.

A true and correct copy of the papers filed by the Kazakovs in support of their application are attached as **Exhibit S** excepting the Seborg Witness Statement already annexed as Exhibit L.

32.     Despite the London Court's directive, Mishcon did not inform the London Court of their intentions with respect to the CT Report. However, on March 15, 2024, Mishcon informed the Kazakovs that they "will not be relying on the CT Report in support of the WFO Application;" "no longer seek a freezing order against [the Kazakovs] or Mr. Anufriev;" and "are prepared to pay [the Kazakovs] costs of the WFO Application to date." A true and correct copy of the March 15 correspondence is attached hereto as **Exhibit T**. That same day, they disclosed another 23 documents that were privileged to the Kazakovs' counsel in London.

### IV.     THE 1782 APPLICATION

33.     Despite the serious questions that had already arisen about the integrity of their evidence, on February 20, 2024, Petitioners filed the 1782 Application in this Court. While the supporting documents discuss at length Petitioner's purported arguments on the merits (supported by a declaration of counsel with no personal knowledge on the subject), and alleged need for this material, counsel does not even mention the existence of significant litigation in the State of Florida and devoted a single sentence to questions raised about their London evidence.

34.     Moreover, while the 1782 Application indicated that Petitioners seek "limited evidence," the Subpoena and attached schedule revealed the enormity of what Petitioners in fact

seek. The Application seeks "all" documents relating to ten individuals, thirty-eight companies and one-hundred and sixty-six accounts.

35.     For all of these reasons, and those set out in the accompanying Memorandum of Law, the order granting the 1782 Application should be vacated, the 1782 Application should be denied, and the Subpoena quashed, or, in the alternative, depositions of Petitioners should be immediately scheduled to address the matters raised herein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
        March 25, 2024

_____
Nicole A. Sullivan