# Exhibit A

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO. 21-025928-CA-01 (43)

ELENA BOURLAKOVA as natural guardian
for her three minor children, and VERONICA
BOURLAKOVA as natural guardian for her
three minor children,

        Plaintiffs,

v.

STEVEN LANDAU, individually and as
trustee, THOMAS BUTLER, individually and
as trustee, NATALIA ROUSSO, NIKOLAI
KAZAKOV, VERA KAZAKOVA, SEMEN
ANUFRIEV, IGOR KRUTOY and OLGA
KROUTOIA,

        Defendants.

_____/

## AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS
## OF NIKOLAI AND VERA KAZAKOV

Defendants NIKOLAI and VERA KAZAKOV, by and through undersigned counsel, for

their Amended Answer, Defenses and Counterclaims allege as follows:

### RESPONSE TO SUMMARY

The Summary provided by Plaintiffs does not contain allegations of fact to which the

Kazakovs are required to respond, but, rather merely provides Plaintiff's self-serving description

of their claims in this action.  To the extent the Summary is intended to allege facts that are not

alleged in the numbered paragraphs of the Amended Complaint, such allegations are denied.

## JURISDICTION

1.      Admitted that this action purports to be as alleged in this paragraph and that Plaintiffs have demanded a jury trial on all claims.

2.      Admitted that Plaintiffs seek the remedy of ejectment and to quiet title, but denied that Plaintiffs are entitled to such relief.

3.      Admitted that this action purports to seek equitable relief, but denied that Plaintiffs have stated any causes of action for equitable relief or that they are entitled to any equitable relief or that a jury may grant equitable relief.

## VENUE

4.      Denied that all of Plaintiffs' causes of action arose in Miami-Dade County, but admitted that venue is proper in Miami-Dade County.

## THE PLAINTIFFS

5.      Denied.

6.      Admitted that Elena is a parent of three of the Minor Children, but denied that she is, individually, the natural guardian, pursuant to Fla. Stat. § 744.301, of those Minor Children. Elena and her husband together are the natural guardians.  Without knowledge of whether Elena's husband provided the "written consent" referred to herein.  Denied that Elena's sole purpose is to act as a guardian herein.

7.      Admitted that Veronica is a parent of three of the Minor Children, but denied that she is, individually, the natural guardian, pursuant to Fla. Stat. § 744.301, of those Minor Children. Veronica and her husband together are the natural guardians.  Without knowledge of whether Veronica's husband provided the "written consent" referred to herein.  Denied that Veronica's sole purpose is to act as a guardian herein.

8.     Admitted that neither Elena nor Veronica purports to bring claims in personal capacities, but the Kazakovs assert that Elena and Veronica in fact are acting in their personal capacities and alleging claims in their personal capacities and for their own individual purposes.

## THE ACTIVE DEFENDANTS[1]

9.     Without knowledge.

10.     Admitted that Butler is sued in his individual capacity and as a purported trustee, but denied that Butler committed a theft of Florida assets from the Minor Children or any wrongdoing whatsoever.

11.     Without knowledge.

12.     Denied.

13.     Denied.

14.     Admitted that Semen Anufriev is licensed to practice law in Germany and is domiciled in Latvia, but denied that he committed a theft of Florida assets from the Minor Children.

15.     This allegation provides a definition and requires no response.

## THE NOMINAL DEFENDANTS

16.     Without knowledge.

17.     Without knowledge.

18.     Without knowledge.

19.     Without knowledge.

---

[1] For the sake of clarity, in this Amended Answer the Kazakovs are utilizing the headings and subheadings of the Amended Complaint.  The use of such headings is not an admission that the Kazakovs agree with the headings to the extent they convey any statements, allegations or positions.

## PERSONAL JURISDICTION

20.    Without knowledge.

21.    Denied.   However, the Kazakovs do not contest the Court's specific personal jurisdiction over them in respect of their beneficial ownership interests in Florida situs assets.

22.    Denied.

23.    Denied.

24.    Without knowledge.

## FACTS

### Background

25.    Admitted.

26.    Denied, but admitted that Oleg Bourlakov was wealthy.

27.    Without knowledge.

28.    Without knowledge.

29.    Without knowledge.

30.    Without knowledge.

31.    Without knowledge.

32.    Without knowledge.

### The Purchase of the Fisher Island Property

33.    Without knowledge.

34.    Without knowledge.

35.    Without knowledge.

36.    Without knowledge.

**The Creation of the 2017 Florida Trust**

37.     Admitted only that the conveyance referred to occurred as shown in public records of Miami-Dade County.  Denied that the referenced 2017 Land Trust is a valid and effective Florida land trust, but admitted that it is titled as a "revocable" trust.

38.     Admitted that the purported 2017 Land Trust so provides, but otherwise without knowledge.

39.     Without knowledge.

40.     Admitted that the purported 2017 Land Trust so provides, but otherwise without knowledge.

41.     Admitted that the purported 2017 Land Trust so provides, but otherwise without knowledge.

42.     Denied that the purported 2017 Land Trust so provides, because it states that it is revocable, but otherwise without knowledge.

43.     Denied that the purported 2017 Land Trust so provides.

**Anufriev's Role in the Funding of the 2017 Florida Land Trust**

44.     Without knowledge.

45.     Without knowledge.

46.     Without knowledge.

47.     Without knowledge.

48.     Without knowledge.

49.     Without knowledge.

50.     Without knowledge.

51.     Without knowledge.

52.     Without knowledge.

53.     Without knowledge.

54.     Without knowledge.

55.     Without knowledge.

56.     Without knowledge.

57.     Without knowledge.

## The Closing on the Fisher Island Property

58.     Without knowledge.

59.     Without knowledge, but the referenced Warranty Deed speaks for itself.

60.     Without knowledge, but the referenced Corrective Quit Claim Deed speaks for itself.

61.     Without knowledge.

## Funding of the 2017 Florida Land Trust to Pay Maintenance and Taxes

62.     Without knowledge.

63.     Without knowledge.

64.     Without knowledge, but the referenced Corrective Warranty Deed speaks for itself.

## The Rift in the Family Develops in 2018

65.     Without knowledge.

66.     Denied.

67.     Denied.

68.     Denied.

**The Theft of the Minor Children's Florida Property**

69.     Denied, but admitted that related litigation instituted by Plaintiffs is pending in other jurisdictions.

70.     Without knowledge, but denied that any such theft took place.

71.     Denied.

72.     The Kazakovs responses to specific allegations are set forth below.

**Theft of $5 Million from the 2017 Florida Land Trust**

73.     Denied.

74.     Denied.

75.     Admitted, but no such permission or consent was required.

76.     Denied except admitted that the referenced apartment was purchased with funds provided to Landau by Oleg and that Landau caused the apartment to be titled in the name of Landau's wife.

77.     Admitted that Landau used funds Oleg provided to him to purchase the referenced property.  Without knowledge of Rousso's knowledge of the source of the funds.

78.     Denied that Landau stole the referenced funds.  Without knowledge of the referenced tax payments.

79.     Denied that the Kazakovs received any cash or property they were not lawfully entitled to receive.  Without knowledge of the extent of Plaintiff's knowledge as to the location of the referenced cash.

80.     Denied.

## **Theft of the $10 Million Fisher Island Property**

81.     The paragraph contains argument and accusation and requires no response. However, the Kazakovs deny any fraudulent activity or theft with respect to the Fisher Island Property.

82.     Denied.  The Kazakovs deny any wrongdoing whatsoever and deny any conspiracy to commit any wrongful acts.

83.     Denied.  The Kazakovs deny any wrongdoing whatsoever and deny any conspiracy to commit any wrongful acts.

84.     Denied.  the Kazakovs deny any wrongdoing whatsoever and deny any conspiracy to commit any wrongful acts.

85.     Denied.

86.     Without knowledge of the title commitment requirements, but the referenced document speaks for itself.

87.     Without knowledge of the title commitment requirements, but the referenced document speaks for itself.

88.      Without knowledge of the title commitment requirements, but the referenced document speaks for itself.

89.     Denied.

90.     Without knowledge.

91.     Without knowledge.

92.     Without knowledge.

93.     Without knowledge.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Without knowledge, but the referenced document speaks for itself

98.     Admitted.

99.     Admitted.

100.    Admitted.

101.    Admitted.

102.    Admitted, but the referenced provision refers to the lineal descendants of the Kazakovs.

103.    This allegation call for a legal opinion to which no response is required.  However, the Kazakovs believe that the Trustee of the 2020 Trust holds legal title to the Fisher Island Property and that they are the beneficiaries.

104.    Denied.

105.    Denied.

106.    Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

107.    Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

108.    Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

109.    Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

110.   Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

111.   Denied.

112.   Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

113.   Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

114.   Denied.

115.   Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

116.   Without knowledge of the facts alleged in this paragraph, but denied that any theft or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

117.   Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

118.   Denied.

119.   Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

120.   Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

121.   Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

122.   Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

123.     Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

124.     Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

125.     Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

126.     Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

127.     Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

128.     Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

129.     Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

130.     Denied.

### Butler Succeeds Landau as Trustee of the 2020 Trust

131.     Admitted that Oleg appointed Butler is the Trustee of the 2020 Trust.  Denied that any theft or other wrongful conduct took place.  As to the remaining allegations of this paragraph, the referenced document speaks for itself.

### Butler Sues Landau and Rousso to Recover Monday for Oleg

132.     Without knowledge of the facts alleged in this paragraph, but denied that any theft, conspiracy or other wrongdoing was committed by the Kazakovs or anyone acting on their behalf.

133.     Without knowledge.

134.   Denied.

135.   Without knowledge.

## Oleg's Death and Aftermath

136.   Admitted that Oleg died on or about the date referenced from Covid-19 and that he was age 72 at the time of his death.  The remaining allegations of this paragraph are denied.

137.   Denied.

138.   Denied.

139.   Denied.

140.   Denied.

## Attempts to Export the Proceeds of Sale of the Fisher Island Property

141.   Denied.

142.   Denied except admitted that one sale was wrongfully thwarted by Plaintiffs by their filing of multiple unlawful notices of lis pendens.

## Butler Sues Landau and Rousso to Recover Monday for the Kazakovs

143.   Without knowledge.

144.   Without knowledge.

145.   Denied.

146.   Denied.

147.   This paragraph contains a statement of Plaintiff's intent to which no response is required.

## Conditions Precedent

148.   Without knowledge.

149.   Denied.

## COUNT I
## <u>CIVIL THEFT AGAINST ALL ACTIVE DEFENDANTS</u>

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 149 as though fully set forth herein.

150.     Denied.

151.     Denied.

152.     Denied.

153.     Denied.

154.     Denied.

155.     Admitted only that Plaintiffs have demanded a jury trial as of right.

## COUNT II
## <u>CIVIL THEFT – CONSPIRACY AGAINST ALL ACTIVE DEFENDANTS</u>

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 151 as though fully set forth herein.

156.     Denied.

157.     Denied.

158.     Denied.

159.     Denied.

160.     Denied.

161.     Denied.

162.     Admitted only that Plaintiffs have demanded a jury trial as of right.

**COUNT III**
**CIVIL THEFT - AIDING AND ABETTING AGAINST ALL ACTIVE DEFENDANTS**

163.    Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 151 as though fully set forth herein.

164.    Denied.

165.    Denied.

166.    Denied.

167.    Denied.

168.    Admitted only that Plaintiffs have demanded a jury trial as of right.

**COUNT IV**
**FRAUD AGAINST LANDAU**

The Count is not asserted against Defendant Landau and, therefore, no response by the Kazakovs is required.

**COUNT V**
**CONSPIRACY TO DEFRAUD**
**AGAINST ALL ACTIVE DEFENDANTS**

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 149 and 169 through 171 as though fully set forth herein.

174.    Denied.

175.    Denied.

176.    Denied.

177.    Admitted only that Plaintiffs purport to reserve the right to claim punitive damages, but denied that Plaintiffs have any such right.

178.    Admitted only that Plaintiffs have demanded a jury trial as of right.

**COUNT VI**
**AIDING AND ABETTING FRAUD AGAINST ALL ACTIVE DEFENDANTS**

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 149 and 169 through 171 as though fully set forth herein.

179.    Denied.

180.    Denied.

181.    Denied.

182.    Denied..

183.    Admitted only that Plaintiffs purport to reserve the right to claim punitive damages, but denied that Plaintiffs have any such right.

184.    Admitted only that Plaintiffs have demanded a jury trial as of right.

**COUNT VII**
**CONVERSION AGAINST ALL ACTIVE DEFENDANTS**

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 149 as though fully set forth herein.

185.    Denied.

186.    Denied.

187.    Admitted only that Plaintiffs purport to reserve the right to claim punitive damages, but denied that Plaintiffs have such right.

188.    Admitted only that Plaintiffs have demanded a jury trial as of right.

**COUNT VIII**
**CONVERSION – CONSPIRACY AGAINST ALL ACTIVE DEFENDANTS**

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 149 and 185 through 186 as though fully set forth herein.

189.    Denied.

190.    Denied.

191.    Admitted only that Plaintiffs purport to reserve the right to claim punitive damages, but denied that Plaintiffs have any such right.

192.    Admitted only that Plaintiffs have demanded a jury trial as of right.

**COUNT IX**
**CONVERSION – AIDING AND ABETTING AGAINST ALL ACTIVE DEFENDANTS**

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 149 and 185 through 186 as though fully set forth herein.

193.    Denied.

194.    Denied.

195.    Admitted only that Plaintiffs purport to reserve the right to claim punitive damages, but denied that Plaintiffs have any such right.

196.    Admitted only that Plaintiffs have demanded a jury trial as of right.

**COUNT X**
**BREACH OF FIDUCIARY DUTY AGAINST LANDAU**

The Count is not asserted against the Kazakovs and, therefore, no response by them is required.

**[COUNT XI OMITTED]**

**COUNT XII**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**AGAINST ALL ACTIVE DEFENDANTS**

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 149 and 197 through 199 as though fully set forth herein.

202.    Denied.

203.    Denied.

204.    Denied.

205.   Denied.

206.   Admitted only that Plaintiffs purport to reserve the right to claim punitive damages, but denied that Plaintiffs have any such right.

207.   Admitted only that Plaintiffs have demanded a jury trial as of right.

## COUNT XIII
## EJECTMENT AND QUIET TITLE
## AGAINST ALL DEFENDANTS

Defendants Kazakovs repeat and reallege their responses to paragraphs 1 through 149 as though fully set forth herein.

208.   Admitted only that Count XIII purports to be a claim pursuant to Fla. Stat. § 66.021 for ejectment and Fla. Stat. § 65.081 et seq. for an order to quiet title to Florida real estate.

209.   Denied.

210.   Denied.

211.   Denied.

212.   Without knowledge.

213.   Admitted only that Plaintiffs have demanded as of right.

**WHEREFORE**, Defendants Kazakovs deny that Plaintiffs are entitled to any relief whatsoever on the claims alleged in the Amended Complaint.

## DEFENSES

### First Defense
### Failure to Join Indispensable Parties

Section 744.301(1), Florida Statutes, provides that "[t]The parents jointly are the natural guardians of their own children . . . unless the parents' parental rights have been terminated . . . ." The Amended Complaint alleges that the Plaintiff children have mothers and fathers, but only the mothers are identified as guardians and are parties to this action in that capacity.  The Amended

17

Complaint alleges that the fathers have consented to the mothers serving as sole guardians, but, by statute, the parents are joint guardians.  One parent cannot, merely by alleging the consent of the other, eliminate the statutory requirement of joint guardianship.  Accordingly, the husbands of Elena and Veronica are necessary and indispensable parties in this action as joint guardians of their minor children, and the Amended Complaint must be dismissed if they are not joined.

### Second Defense
### Lack of Written Declaration of Trust

Pursuant to § 689.05, Florida Statutes, all declarations of trust must be in writing signed by the declarant.  The document purported to be an agreement for the creation of the 2017 Trust (Exhibit "A" to the Amended Complaint) is not signed by Oleg Bourlakov or any other declarant, and Plaintiffs have not attached any declaration of trust signed by Oleg Bourlakov or any other declarant.  On information and belief, no such document exists.  Accordingly, absent any signed declaration of trust, the purported 2017 Trust is legally invalid and unenforceable.  As such, the Amended Complaint must be dismissed.

### Third Defense
### Lack of Standing -- Guardians

Section 744.301(1), Florida Statutes, provides that "[t]he parents jointly are the natural guardians of their own children . . . unless the parents' parental rights have been terminated . . . ." The Amended Complaint alleges that the Plaintiff children have mothers and fathers, but only the mothers are identified as guardians and are parties to this action in that capacity.  The Amended Complaint alleges that the fathers have consented to the mothers serving as sole guardians, but, by statute, the parents are joint guardians.  One parent cannot, merely by alleging the consent of the other, eliminate the statutory requirement of joint guardianship.  Accordingly, Elena and Veronica lack standing, in their individual capacities, to serve as guardians in this action for their children.

**Fourth Defense**
**Lack of Standing – Beneficiaries**

Fla. R. Civ. P. 1.210(a) provides that "[e]very action may be prosecuted in the name of the real party in interest, but a personal representative, administrator, guardian, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party expressly authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought." To have standing, the plaintiff must be a real party in interest. This means that the plaintiff must have a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy.

The Fisher Island Property was never legally transferred to the Trustee of the 2017 Trust, and there is no evidence that any cash was transferred to the 2017 Trust or held by the 2017 Trust, to the extent it existed. Hence, the Trustee of the 2017 Trust, to the extent the 2017 Trust existed as a valid Florida land trust, acquired no property.

Since the Plaintiffs' and their childrens' only alleged interest in this matter derives from the children purportedly being named as beneficiaries under the 2017 Trust, neither Plaintiffs nor their children have any legally cognizable interests in property that is the subject of the claims in the Amended Complaint, and, hence, they are not real parties in interest and lack standing to sue.

**Fifth Defense**
**Disqualification of Guardians**

Plaintiffs Elena and Veronica are not qualified to serve as guardians in this matter for their minor children because they are not disinterested parties. Rather than acting on behalf of their minor children, Elena and Veronica are seeking to further their own selfish financial interests and those of other parties. Elena and Veronica, a self-described financier, have participated, in concert with others, in efforts to misappropriate assets rightfully owned by Nikolai and Vera Kazakov.

Some of their actions outside of Florida are alleged in paragraphs 93 to 119 of the Counterclaim herein.

Plaintiffs Elena and Veronica are supporting continuing judicial proceedings throughout the world in which efforts are being made to gain ownership and/or control over assets owned by Nikolai and Vera Kazakov.  This action, which is intended to misappropriate Florida-based assets that do not belong to Elena and Veronica, is simply a continuation of those wider wrongful efforts. Because they are personally interested in this matter and are using this case to pursue ulterior financial motives, and are otherwise unfit to serve as guardians for their children based on their prior and continuing wrongful actions, the Court should determine that Elena and Veronica lack standing to serve as guardians, and the Court should appoint a guardian ad litem for the minor children or dismiss the Amended Complaint.

### Sixth Defense
### <u>Revocation By Settlor</u>

To the extent the 2017 Trust was validly created, it was revoked by the settlor, Oleg Bourlakov, upon his execution of the 2020 Trust.  The 2017 Trust is titled as a "revocable trust," and a presumption exists that an *inter vivos* trust is revocable unless the trust instrument clearly states otherwise, and the purported agreement for the 2017 Trust does not clearly state otherwise. By executing the 2020 Trust, Oleg Bourlakov exercised his retained power of revocation.

### Seventh Defense
### <u>Failure to State Cause of Action for Civil Theft</u>

Plaintiffs had no legally cognizable property rights that could be the subject of a civil theft. Further, Plaintiffs did not provide a civil theft notice to the Kazakovs prior to filing this action. The purpose of the civil theft notice is to advise a prospective defendant, in advance of filing a legal action, of the potential assertion of a civil theft claim.  The statute expressly requires that the

notice be sent in advance of filing the action.  Because Plaintiffs flouted the statute, and proceeded in a manner inconsistent with the purpose of the statute, the civil theft claim must be dismissed.

Finally, Plaintiffs do nothing more than recite, in a conclusory manner, the ultimate elements of a cause of action for civil theft.  They have not alleged that the Kazakovs had knowledge of the Plaintiffs' childrens' alleged beneficial interests or that the Kazakovs acted with criminal intent to deprive the children of their interests and committed a theft of their property. Plaintiffs have failed to allege facts stating a cause of action against the Kazakovs for civil theft. For all of these reasons, the civil theft claim fails to state a cause of action against the Kazakovs.

**Eighth Defense**
**Failure to State Cause of Action for Conspiracy to Commit Civil Theft**

The Kazakovs incorporate herein the grounds stated for their Seventh Defense herein.  In addition, under Florida law, to state a claim for civil conspiracy, a plaintiff must allege: (1) an agreement between two or more parties, (2) to do an unlawful act or to do lawful act by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) damage to the plaintiff as a result of the act performed in furtherance of it.  Plaintiffs have not alleged any specific facts showing that the Kazakovs entered into any agreement with Steven Landau or with the Krutoys or with any other defendants or other persons to do an unlawful act or that the Kazakovs took specific actions in furtherance of an agreement among various parties.  Plaintiffs have merely alleged the elements of civil conspiracy conclusorily.  They have failed to allege any facts concerning the Kazakovs' knowledge that the purpose of the alleged agreement was an unlawful act or that the Kazakovs knowingly took actions in furtherance of such unlawful act.

**Ninth Defense**
**Failure to State Cause of Action for Aiding and Abetting Civil Theft**

The Kazakovs incorporate herein the grounds stated for their Eighth Defense herein.  In addition, under Florida law, to state a claim for aiding and abetting, a plaintiff must allege knowledge by the defendant of the unlawful act and that the defendant rendered substantial assistance in committing the wrongful act.  The allegations as to the Kazakovs' involvement in the alleged wrongdoing do not satisfy these requirements.  Further, no cause of action exists for "aiding and abetting" a civil theft.  "Civil theft" is a statutory claim.  *See* Fla. Stat. §§ 772.11, 812.012-812.037, 825.103(1).  The statute does not provide for "aiding and abetting" liability.

**Tenth Defense**
**Failure to State Cause of Action for Conversion**

The Amended Complaint fails to state a cause of action for conversion against the Kazakovs.  The Trustee of the purported 2017 Trust never acquired the Property and the Amended Complaint does not contain sufficient allegations that the Trustee of the 2017 Trust did acquire the Property.  Accordingly, conversion of the Property or the Plaintiffs' childrens' alleged beneficial interest in the Property is not possible.  Beyond this, the Amended Complaint does not allege that the Kazakovs intentionally acquired interests in the Property in derogation of the rights of Plaintiffs' children or with knowledge of their alleged rights and with the intent to deprive them of their lawful rights to own, occupy or use the Property.

**Eleventh Defense**
**Failure to State Cause of Action for Quiet Title**

Plaintiffs' Count XIII does not allege the elements of a quiet title claim.  Plaintiffs do not allege that they ever had title to the Property.  They do not even allege that the Trustee of the 2017 Trust had title; indeed, he did not, as Plaintiffs alleged in their original Complaint.  Plaintiffs do not allege any other title interest in the Property, and the 2017 Trust itself, upon which Plaintiffs

rely, states that the beneficiaries identified therein have no legal or beneficial interest in the Property. Plaintiffs do not allege that legal title is in dispute or that there is a cloud on title. Further, to the extent that the 2017 Trust was validly formed and ever owned the Property, the sole person with standing to sue to quiet title or for ejectment is the Trustee of the 2017 Trust, not the children who are the alleged beneficiaries.

**Twelfth Defense**
**Failure to State Cause of Action for**
**<u>Aiding and Abetting Breach of Fiduciary Duty</u>**

Count XII of the Amended Complaint alleges that the Kazakovs aided and abetted a breach of fiduciary duty. The Kazakovs did not owe a fiduciary duty to the Plaintiffs. Plaintiffs recognize that fact and seek to hold the Kazakovs liable for aiding and abetting Landau's alleged breach of fiduciary duty. But, Plaintiffs have not adequately alleged a breach by Landau. Plaintiffs have not alleged facts showing that the Trustee of the 2017 Trust, Landau, ever acquired legal title to the Property. Landau, as a trustee of a land trust, can have no duties in respect of property that the land trust does not own.

In addition, the aiding and abetting claim against the Kazakovs fails because, to allege a cause of action for aiding and abetting breach of a fiduciary duty, the pleader must allege that the putative aider and abettor knew of the wrongdoing and provided substantial assistance to the alleged wrongdoer. The Amended Complaint does not allege any facts showing that the Kazakovs knew of any wrongdoing by Landau or that they did anything to aid or abet Landau in the purported breach of a fiduciary duty.

**WHEREFORE**, for the foregoing reasons, judgment should be entered for the Kazakovs and the Amended Complaint dismissed with prejudice.

## COUNTERCLAIMS

Counterclaim-Plaintiffs NIKOLAI and VERA KAZAKOV (collectively, "**Counterclaim-Plaintiffs**"), by and through undersigned counsel, hereby file their Amended Counterclaims and allege as follows:

## INTRODUCTION

1.      For at least the last five years, Counterclaim-Defendants, Veronica Bourlakova ("**Veronica**") and Elena Bourlakova ("**Elena**"), along with Additional Counterclaim-Defendants, Loudmila Bourlakova ("**Loudmila**") and Gregory Gliner ("**Gregory**") (collectively, "**Counterclaim-Defendants**"), have been engaged in a wide-ranging conspiracy to divert, steal, and conceal the whereabouts of property and assets beneficially owned by Counterclaim-Plaintiffs, Nikolai Kazakov ("**Nikolai**") and Vera Kazakov ("**Vera**"), as well as Oleg Bourlakov ("**Oleg**"). Oleg is Nikolai's late business partner and Vera's only brother.   He also is the late husband of Loudmila, the father of Veronica and Elena, and the father-in-law of Gregory.  For years, Oleg enjoyed a close and loving relationship with all of them, until he became aware that they were embarking on an uncompromising and wide-ranging effort to deprive him of the significant fortune that he and Nikolai had built together, through incredibly hard work and perseverance, over the course of thirty years.

2.      This criminal conspiracy was meticulously prepared and secretly orchestrated over a period of several years. While it largely took place within Oleg's very close family circle, it nevertheless took many forms and was implemented with the critical assistance and support of many professionals and accomplices across the globe.  Included in the wrongdoing was the diversion and theft of funds being *held in trust* for the benefit of Nikolai; and the theft, illegal cancellation or use of stolen or forged documents, including the knowing use of invalid documents in Court proceedings.  The wrongdoing also included the brazen theft or forgery of bearer shares

24

in certain Panamanian companies owned by foundations of which Nikolai is the beneficiary, and subsequent efforts to implement a raid on these companies with a view to gaining control over them by replacing duly appointed and valid officers and directors of those companies with illegitimate officers and directors loyal to Counterclaim-Defendants.  In addition, the conspiracy has included the transfer of assets to accounts in secret, offshore jurisdictions and to various furtive entities to prevent Nikolai and Vera from accessing them. The fraud, conversion, and theft have reached the United States and the State of Florida, insofar as Counterclaim-Defendants, under the fabricated guise of protecting minor children, now seek to take control of property and other assets in this State in which Nikolai and Vera rightfully have an interest.

3.     Veronica, joined by Loudmila and Elena, have used the courts systems of various jurisdictions to gain control of Florida and global assets through false allegations and the assertion of positions that lack merit.  They also have misused litigation to damage the Kazakovs' reputations, burden them, intimidate them and cause them undue expense and emotional distress. To this point, Veronica, Loudmila and Elena recently filed a legal in the Southern District of Florida that asserted frivolous claims, *inter alia*, under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**").  *See Loudmila Bourlakova, et al v. Anthony Virgil Raftopol, et al.*, Case Number 22-cv-23634 JEM (the "**RICO Action**").  After using this action to damage the Kazakovs in other jurisdictions, to damage their reputations, and to intimidate them and cause them emotional distress, Veronica, Loudmila and Elena voluntarily dismissed the RICO Action without prejudice.

4.     The Amended Complaint in this action puts directly at issue the relationship among the parties and the relevant history alleged herein.  Veronica and Elena allege that there was no partnership between Oleg and Nikolai and that the transfer of Florida assets to a trust for the benefit

of Nikolai and Vera was part and parcel of a larger scheme to create a false pretense that half of the so-called "family assets" were owned by Nikolai, a scheme purportedly intended to minimize the size of the "family fortune," and thereby "cheat" Oleg's wife and daughters.  Veronica and Elena falsely allege that Nikolai was merely a "nominee" and not Oleg's business partner at all. They even contend that the Florida assets were paid for by a foreign entity owned by Veronica (not her father Oleg) and that Nikolai is now seeking to convert and control Florida property that Veronica, through that foreign entity, paid to acquire. Elena has joined in these false allegations. Thus, Veronica and Elena, who have enjoyed lavish lifestyles because of the hard work of Oleg and Nikolai, seek to use these proceedings to advance their efforts to take control not only of Florida assets, but of global assets in which Nikolai and Vera have interests.

5.     By these Counterclaims, Counterclaim-Plaintiffs seek to put an end to this blatant and unrelenting effort to steal billions of dollars in cash and other assets, to ensure that the same are vested in their rightful owners, Nikolai and Vera, and more broadly, to put an end to the unlawful activity being committed by Counterclaim-Defendants in Florida and in multiple other jurisdictions using a plethora of fraudulent schemes and the filing of false pleadings in Florida and elsewhere.

## THE PARTIES AND OTHERS

6.     Counterclaim-Plaintiff, Nikolai Kazakov, is a dual Estonian/Russian citizen, and a resident of Monaco. Nikolai was the sole brother-in-law and long-time business partner of Oleg Bourlakov.  Under Oleg's holographic Last Will and Testament dated October 21, 2019 (the "**Will**"), Nikolai and his wife Vera are designated as Oleg's universal legatees, either directly, or through their "Fund" or "Foundation," and were gifted Oleg's technologically sophisticated sailing yacht, named the Black Pearl.

7.     Counterclaim-Plaintiff Vera Kazakova is a dual Estonian/Russian citizen, and a resident of Monaco.  Vera was the sister of Oleg Bourlakov, and along with her husband Nikolai, is the universal legatee under Oleg's Will.

8.     Upon information and belief, Counterclaim-Defendant, Veronica Bourlakova, is a Russian/Ukrainian/Canadian and recently English citizen, and allegedly a tax resident of Monaco, but living permanently with her second husband Gregory Gliner and her children in the United Kingdom.  She is the younger daughter of Oleg and Loudmila.  This Counterclaim is filed against her both individually and in her purported capacity as a guardian for her minor children.

9.     Upon information and belief, Counterclaim-Defendant, Elena Bourlakova, is a Russian/Ukrainian and Canadian citizen, resident with her second husband Sergey Kozoryezov and her children in Canada.  She is the elder daughter of Oleg and Loudmila.  This Counterclaim is filed against her both individually and in her purported capacity as a guardian for her minor children.

10.     Upon information and belief, Additional Counterclaim-Defendant Loudmila Bourlakova (original last name Marchenko), is a Russian, Ukrainian and Canadian citizen, and a resident of Monaco.  She was divorcing Oleg at the time of his death and is the widow of Oleg.

11.     Upon information and belief, Additional Counterclaim-Defendant, Gregory Gliner, is a citizen of the United States and the State of Florida, and currently resides in the United Kingdom, Monaco and Florida.  He is the second husband of Veronica and was the son-in-law of Oleg.

12.     Upon information and belief, non-party, Sergey Kozoryezov, is a resident of Canada. He is the second husband of Elena and was also the son-in-law of Oleg.

13.     Upon information and belief, non-party, Daniel Tribaldos, is a citizen of Switzerland.

14.     Upon information and belief, non-party, Rhone Trustees, Bahamas, Ltd., is the trustee of a Bahamas Trust known as Golden Wheat.

15.     Upon information and belief, non-party Taylor Wessing is a global law firm headquartered in London, and Nicholas Warr is one of its partners.

## JURISDICTION AND VENUE

16.     Based on the allegations in the Amended Complaint and accepting those allegations as true solely for jurisdictional purposes, Veronica engaged in substantial and not isolated activity in the State of Florida including, but not limited to, investing and acquiring alleged equitable ownership in Florida real estate and allegedly acquiring a home that she intended to retain as a long-term vacation home for herself and her family members.  Accordingly, Veronica is subject to personal jurisdiction pursuant to Fla. Stat. § 48.193(2).

17.     Further, Veronica committed a tortious act in the State of Florida by slandering the title to a property located on Fisher Island (the "**the Fisher Island Property**"), which is held by Thomas Butler, as Trustee for the Kazakovs.  Relying solely on a purported 2017 trust agreement, which was not signed by Oleg, the settlor, as required by Florida law and that, in any event was, as stated in its title, revocable, and knowing that her father Oleg had given direction for the Fisher Island Property to be transferred to a new trust  for the benefit of Nikolai and Vera, Veronica nevertheless intentionally clouded title.  Nikolai and Vera have been injured by Veronica's slander of title as the Trustee has been unable to sell the Fisher Island Property for their financial benefit.

18.     Moreover, Veronica's filing of this action and recording of notices of *lis pendens* in Miami-Dade County, Florida was one aspect of a larger conspiracy, engaged in with Elena, Veronica's husband Gregory Gliner, Loudmila and others, to divest Nikolai of his ownership

interest in numerous assets, as well as his legacy, shared with his wife Vera, as universal legatees under Oleg's 2019 Will. Accordingly, Veronica is subject to personal jurisdiction pursuant to Fla. Stat. § 48.193(1)(a)(2).

19. Further, Veronica consented to personal jurisdiction in her personal capacity by voluntarily electing to file a legal action in Miami-Dade County, Florida seeking damages and other relief against Nikolai and Vera and other parties. Although Veronica purports to bring this action as a "natural guardian" of her minor children, that allegation cannot shield her from personal jurisdiction because her children are not the beneficiaries of any valid trust that owns the Fisher Island Property or any other Florida property and because her allegations show that she is, in fact, pursuing personal claims. Veronica is suing to recover monies ($5 million) that her father transferred to a Florida bank account and that was never contributed to the trust she seeks to enforce. She is also suing herein to obtain the possession and use of the Fisher Island Property as a family vacation home for her personal use and that of her family members.

20. Further, Veronica contends that she has rights in the disputed Florida assets as the "economic settlor" of the 2017 trust. In that regard, Veronica has filed a separate action, in her individual capacity, in which she seeks, among other relief, a determination that she owns a Panamanian company, Edelweiss Investments, Inc. ("**Edelweiss**") and that Edelweiss is the "economic settlor" of the 2017 trust and that she, through her ownership of Edelweiss, has rights in the Fisher Island Property. *See Veronica Bourlakova v. Nikolai Kazakov, et al.*, Case No. 23-001158-CA-01 (43) (the "**Related Action**"). The Complaint in the Related Action, which is pending in this division, and as to which a motion to consolidate with this action is pending, alleges that it is a related action to this one and that the claims therein would have been joined herein but for timing issues impacting a possible statute of limitations. The Court may take judicial notice of

the Complaint in the Related Action; its allegations demonstrate the strong personal interest Veronica has in pursuing the claims herein and those in the Related Action.  Veronica has alleged a direct personal stake in the matters at issue herein, and, despite purporting to sue solely as a "guardian," is suing both in her personal capacity and as a guardian.

21.     In addition, Veronica consented to the jurisdiction of courts in the State of Florida by filing the **RICO Action**.  The RICO Action was brought in Veronica's personal as well as representative capacity and addresses substantially similar matters as this action.  In her Complaint in the RICO Action, Veronica stated that she submitted to the jurisdiction of the Florida courts to adjudicate this dispute, but, after invoking the jurisdiction of the Florida courts, and after using the RICO Action in other jurisdictions to serve her purposes, and after learning of the Counterclaims herein, Veronica dismissed the RICO Action voluntarily and without prejudice in the hope that she could undo her submission to personal jurisdiction.  She cannot do so.  Further, as detailed in Count XIV below, Veronica used the Complaint in the RICO Action (the "**RICO Complaint**"), after it was filed, for an improper purpose and thereby committed the tort of abuse of process in Florida.

22.     Further, Veronica is a co-conspirator in a broad and pernicious scheme to wrest assets from Nikolai and Vera, and the actions Veronica took in Florida were overt actions in furtherance of this fraudulent and tortious scheme.  Veronica illegally holds the stolen assets and uses them as if they were hers. Veronica, by engaging in a conspiracy and committing overt actions in Florida in furtherance thereof, became subject to personal jurisdiction concerning all actions that are part of the broader conspiracy, wherever those actions took place.

23.     Upon information and belief, Veronica's husband Gregory is a United States citizen and a Florida resident and has a Florida Driver's License and , therefore, is present in Florida and subject to personal jurisdiction here.

24.     Further, upon information and belief, Gregory, together with Veronica, authorized the filing of the slanderous notices of *lis pendens*, thereby causing injury in the State of Florida to Nikolai and Vera, as co-beneficiaries of the land trust for which Butler serves as Trustee and that owns the Fisher Island Property.  Upon information and belief, Gregory knowingly assisted his wife Veronica in her Florida activities, including the filing of the RICO Complaint, as part of a broad and far-ranging effort to wrest assets from Nikolai and Vera, all for the purpose of enhancing the couple's combined wealth.  Therefore, Gregory is subject to personal jurisdiction pursuant to Fla. Stat. § 48.193(1)(a)(2).

25.     Further, Gregory is subject to personal jurisdiction pursuant to Fla. Stat. § 48.193(1)(a)(2) because he engaged in a conspiracy with Veronica and others to divest Nikolai and Vera of their rightful assets, including Nikolai's partnership interests and the rights of Nikolai and Vera as the universal legatees of Oleg under Oleg's Will.  Gregory illegally holds the stolen assets and uses them as if they were his own.  The actions Veronica and Gregory took in Florida were overt actions in furtherance of a broader conspiracy to divest Nikolai and Vera of their assets.

26.     The Court also has jurisdiction over Elena.  Elena, acting in concert with Veronica, Gregory, Loudmila and others, committed a tortious act in the State of Florida by slandering the title to the Fisher Island Property held by Thomas Butler, as Trustee for the benefit of Nikolai and Vera.  Elena committed tortious acts in Florida that injured Nikolai and Vera by depriving them of their beneficial ownership rights in the Fisher Island Property and, in particular, the right to sell

the property.  These substantial acts in Florida were part of a larger conspiracy to divest Nikolai and Vera of their property interests in various assets worldwide.

27.     Further, Elena, like Veronica, consented to personal jurisdiction by voluntarily electing to file this legal action in Miami-Dade County, Florida, seeking damages and other relief against Nikolai, Vera and other parties and filing slanderous notices of *lis pendens* Miami-Dade County, Florida.  Although Elena purports to bring the action as a "natural guardian" of her minor children, that allegation cannot shield her from personal jurisdiction because her children are not beneficiaries of any valid trust that owns the Fisher Island Property or any other Florida assets. Further, Elena, like Veronica, is suing herein in her personal capacity, as evidenced by her claims to recover $5 million of monies that were never part of the alleged trust and her allegations that the Kazakovs and others deprived her of a right to the use and enjoyment of a family vacation home—the Fisher Island Property.  Like Veronica, Elena has alleged that the defendants injured her personal property rights and financial interests.  Like Veronica, Elena is not suing solely in the interests of her minor children.

28.     In addition, Elena consented to the jurisdiction of courts in the State of Florida by filing the RICO Action.  The RICO Action was brought in Elena's personal and representative capacity and addresses substantially similar subject matters as this lawsuit.  Like Veronica, Elena cannot invoke the jurisdiction of Florida's courts to resolve this dispute and then, when it suits her purposes, withdraw the claim and assert that she is not subject to personal jurisdiction.  Further, as detailed in Count XIV below, Elena used the RICO Complaint, after it was filed, for an improper purpose and thereby committed the tort of abuse of process in Florida.

29.     Further, Elena is an additional co-conspirator in a broad and pernicious scheme to wrest assets from Nikolai and Vera, and the actions Elena took in Florida were overt actions in

furtherance of this fraudulent and tortious scheme. Elena illegally holds the stolen assets and uses them as if they were her own. Like Veronica, Elena, by engaging in a conspiracy and committing overt actions in Florida in furtherance thereof, became subject to personal jurisdiction concerning all actions that are part of the broader conspiracy, wherever those actions took place.

30.     Finally, the Court has jurisdiction over Loudmila, the widow of decedent Oleg Bourlakov. Prior to his untimely death from Covid-19 in June 2021, Oleg and Loudmila were estranged, living apart and in the process of a contested divorce proceeding.

31.     Loudmila and the couple's two adult daughters, Vera and Elena, after having already diverted substantial assets belonging to the Counterclaim-Plaintiffs or in which Counterclaim-Plaintiffs have an interest, embarked on a scheme, described in greater detail elsewhere herein, to acquire and keep for themselves all of the assets Oleg and Nikolai had entrusted to Loudmila, the assets Oleg bequeathed to Nikolai and Vera, and other assets in which Nikolai has an interest. That scheme has many tentacles and has engendered litigation in various jurisdictions. Some of the tentacles of the scheme reached Florida when Loudmila, Veronica, Elena and Veronica's husband Gregory collectively decided to further their conspiracy by interfering with the property interests of Nikolai and Vera in Florida real property and $5 million in cash that was transferred by Oleg to a Florida bank account.

32.     Loudmila, upon information and belief, is a Russian, Ukrainian and Canadian citizen, and a permanent resident of Monaco, but she took action, in conspiracy with her daughters, to steal Florida assets in which Nikolai and Vera are beneficially interested. She, like the others, continues to act as a co-conspirator in this unlawful venture. She is also subject to jurisdiction in Florida because, upon information and belief, she conspired with Veronica and Elena to commit tortious acts in Florida -- specifically, the filing of this action as part of a broad scheme to misuse

the court systems of various jurisdictions and the recording of slanderous notices of *lis pendens* in bad faith and without justification. She entered into an agreement with her daughters and several accomplices to commit these continuing acts, participated in the planning of these continuing acts and supported these continuing acts as a participant in an unlawful conspiracy. Veronica and Elena then acted in Florida in furtherance of the conspiracy, thereby submitting themselves and their mother Loudmila, a co-conspirator, to the personal jurisdiction of this Court.

33.    In addition, Loudmila consented to the jurisdiction of courts in the State of Florida by filing, along with her two daughters, the RICO Action. The RICO Action was brought in Loudmila's personal capacity against other parties and addresses substantially similar subject matters as this lawsuit. The same fact and circumstances as alleged above with respect to Veronica, in connection with the RICO Action, also apply to Loudmila's actions. Having invoked the jurisdiction of the Florida courts to resolve the disputes that are at issue in this action, Loudmila cannot, for strategic reasons, withdraw her voluntary submission to jurisdiction when she perceives that it is in her interests to do so because she wishes to avoid submitting to jurisdiction in connection with this Counterclaim. Further, as detailed in Count XIV below, Loudmila used the RICO Complaint, after it was filed, for an improper purpose and thereby committed the tort of abuse of process in Florida.

34.    The children of Veronica, who are not identified in the Complaint, are subject to personal jurisdiction in this Court because Veronica admittedly sues as their parental guardian. Certain of the claims herein are against both Veronica and her children.

35.    The children of Elena, who are not identified in the Complaint, are subject to personal jurisdiction in this Court because Elena admittedly sues as their parental guardian. Certain of the claims herein are against both Elena and her children.

36.     The joinder of Loudmila and Gliner as Counterclaim-Defendants is necessary to afford complete relief.  Veronica and Elena are Plaintiffs, and, therefore, their joinder was not necessary.  However, in the very unlikely event that Veronica and Elena  persuade the Court that they did not submit themselves to the jurisdiction of this Court for purposes of the Counterclaim—because they claim relief only in the capacity of guardians—they have been joined individually by the service of Counterclaim summonses upon them, and their joinder is necessary to afford complete relief.

37.     Subjecting the Counterclaim-Defendants to personal jurisdiction here will not offend the due process clause of the Fourteenth Amendment to the United States Constitution because the Counterclaim-Defendants engaged in or caused substantial tortious activity in Florida and, by their actions and their co-conspirators' actions of which they had knowledge, could reasonably have anticipated being subject to a counterclaim or other legal action here.  The Counterclaim-Defendants also have utilized courts located in Miami for purposes of pursuing relief directly related to the claims asserted herein.

38.     Venue is proper in Miami-Dade County, Florida, because a substantial part of the events, omissions, communications, and transactions giving rise to Counterclaim-Plaintiffs' claims occurred in Miami-Dade County, including the filing of this action, the Related Action and the RICO Action, the recording of the slanderous notices of *lis pendens*, communications by the Counterclaim-Defendants with their legal counsel in Miami-Dade County concerning these matters, the wiring of monies into Miami-Dade County, and the sending of documents to the attorneys representing them in Miami-Dade County, all in furtherance of the unlawful and tortious conspiracy described herein.

39.     Venue is also proper in Miami-Dade County, Florida, because Counterclaim-Defendants Veronica and Elena voluntarily elected to file a legal action here and submitted to the Court's jurisdiction, and, when they did so, they were acting as co-conspirators with and agents for the other Counterclaim-Defendants.

## BACKGROUND

40.     Nikolai and Oleg (collectively, the "**Partners**") were business partners who, over the course of working together for over thirty (30) years, built a number of substantial businesses in Russia and abroad and in the process accumulated tremendous wealth.  The Partners did not have any written partnership agreement, which is not uncommon or surprising given the evolution and development of this business in the former Soviet Union and subsequently Russia.  Instead, as long-time friends and close family members, their relationship was built on mutual respect and trust. Nikolai was married to Oleg's only sister, and, in addition to working together, their families often spent time together on holiday when they were living in Russia and after the Bourlakovs left Russia and moved abroad.  The Partners operated their partnership business at all times with an understanding that they shared equally both the risk and reward and so therefore both profits and losses.

**A.     The Partnership**

**1.   The Early Years**

41.     Nikolai was born in 1952 in what was then the Estonian Soviet Socialist Republic and is now the independent nation of Estonia.  In 1975, while studying at the State University of Leningrad, he met and married Oleg's sister, Vera, who was born in 1955. They had one daughter together, Svetlana Kazakova, Oleg's niece.  Through Vera, Nikolai immediately met Oleg, who at the time was serving in the Soviet military.

36

42.     Oleg was born in 1949 in what was then the city of Leningrad in the then Soviet Union.  He joined the Soviet military at an early age and lived for a period of time in the Ukrainian Soviet Socialist Republic.  In 1972, he married Loudmila, who resided in Ukraine and had been born in 1951.

## 2.   Changes in the Soviet Union Create Opportunities

43.     Given their familial relationship, Nikolai and Oleg became close friends and frequently spent time together when Oleg was on leave from his military duties. During this time, the two discussed business opportunities that could potentially arise given that the Soviet Union was undergoing a momentous transformation.

44.     Indeed, in the late 1980s, the Soviet Union began going through significant political changes and subsequent economic reforms, as the old Soviet system began to break down.  As part of these reforms, in 1988, the government introduced new legislation that allowed limited forms of free enterprise.

45.     Nikolai and Oleg were both very excited about the prospect of embracing free enterprise and grabbed the opportunity to engage in entrepreneurial activity the moment that it appeared.   Each enjoyed the chance to use his own complementary knowledge, connections and experience to pursue free enterprise.  They were also astounded by the success of their initial entrepreneurial activity and very much liked how they worked well together as a team of equals.

46.     In or around mid-1988, Nikolai and Oleg decided to enter into business together. It was orally and expressly agreed at that time, when they met at the apartment of Oleg's mother in Leningrad (now St Petersburg), that they would conduct business jointly and would share in the work, risk and reward of the business activities which they considered from time-to-time would benefit them  (the "**Partnership**").  As set forth below, the Partnership's initial activities were on a relatively small scale, but eventually the Partnership grew into a multi-billion-dollar business.

47.     The background against which Nikolai and Oleg entered into the Partnership, and against which the Partnership conducted its business, included, but was not limited to, the following:

- The Soviet Union was in decline and was in the middle of rapid (and radical) changes to promote economic liberalization and emerging free enterprise during the "Perestroika" era.  As an example, on May 26, 1988, the Soviet Union enacted the "Law on Cooperatives," which permitted the formation of independent worker-owned autonomous cooperatives for the first time;

- It was common practice at that time for businesspeople not to reduce their agreements to writing, but to rely on oral agreements, especially given that the framework for doing business was still in its infancy and formal business practices had not yet been established.  An oral agreement was also satisfactory to the Partners given their close family ties and their personal relationship of trust, friendship and confidence;

- Through polar geological expeditions and other work he had done outside of the Soviet Union, Nikolai had generated savings equivalent to approximately $10,000 (a significant sum in the Soviet Union at the time), which he was prepared to contribute to the Partners' Partnership in agreement with Oleg;

- Oleg, while serving in the Soviet military, did not wish to participate actively and directly in any for-profit business venture, but he contributed to the Partnership in other ways.  For instance, through his role in the Soviet military, Oleg had developed a network of contacts which he was prepared to utilize for the benefit of the Partnership in agreement with Nikolai.

48.     At all times from the commencement of the Partnership, Loudmila was fully aware of its existence and its material terms.

### 3. __The Partners' First Business Entities__

49.     The first business entity that the Partners utilized was a cooperative called Integral, which was created in October 1988.  Because Oleg was still in the military at that time, he did not take a formal stake in the business. However, Nikolai, Vera and Loudmila became founding members, along with two of their acquaintances who subsequently dropped out.  Nevertheless, at all material times, and notwithstanding the formal legal ownership of Integral, the reality was that Integral was owned equally by Nikolai and Oleg in accordance with their Partnership.  This was accepted by Integral's members, including Loudmila.  Nikolai made an initial capital contribution equivalent to $10,000, in addition to offering his time and expertise.  The Integral cooperative engaged in a number of different businesses, from sales and bartering of furs, to construction of refrigerated warehouses, and several types of industrial machinery or materials.  It was by every objective measure a very successful business.  Contrary to what has been alleged, Loudmila played no role in these businesses, except for the sale in the market of fur hats and coats and providing other administrative support.

50.     In mid-1989, following further economic liberalization in the Soviet Union that permitted foreign investment, the Partners created a joint venture between Integral and a relative of Nikolai's named Alexis Storch, a French national. The joint venture was called "Sov-Inter-France" ("**SIF**") and was incorporated and registered in Kharkov.  Both Nikolai and Oleg were heavily involved in the operation of the business, running it together, and sharing all of the risks and rewards of the ownership of this business equally.

51.     SIF also was very successful.  The Partners used the entity to pursue a number of profitable projects, which profits were reinvested in the business by agreement of the Partners.

These included a successful oil and gas production joint venture with a Company named "NGDU PRIOBNEFT," with fabrication of specific submersible pumps; the importation of French Peugeot and other cars for business use in Russia; a project for construction of refrigeration warehouses in Karelia; and a project for joint production of cement in Belgorod, Russian Federation.

52.     The Partners instigated, managed, and implemented the projects pursued by SIF together.  Oleg often served as the public face of the ventures, but Nikolai played a substantial role.  Other than performing minor administrative tasks, Loudmila played no significant role whatsoever in these businesses.

### 4.  The Partners Set Up Panamanian Companies

53.     Through the late eighties and early nineties, the economic and political reforms in the Soviet Union continued.  However, such reforms were accompanied by significant upheaval, as the government system that had prevailed for much of the twentieth century continued to deteriorate.  The volatility and upheaval in the system was evidenced by the August 1991 coup attempt against the then-government of the Soviet Union.

54.      On December 25, 1991, the Soviet Union collapsed and all accounts in Russian banks were suddenly frozen. SIF faced a loss of around U.S. $5,000,000; thus, the Partners had to manage a very difficult situation for their joint businesses.

55.     In light of the upheaval in the Soviet Union, the Partners continued to look to the creation of foreign entities as a safe and effective way to manage their Partnership and as a means of protecting the assets they were accumulating.  To that end, in late 1991, the Partners looked into setting up offshore companies and Nikolai subsequently travelled to Malta to gather information related to offshore companies and structuring opportunities for their Partnership.

56.     Consequently, during this time period, the Partners established a company called Central Cement, to be utilized to acquire an interest in a cement production company.  The shares

of Central Cement were bearer shares, which allowed the Partners to enjoy discretely the benefit of ownership without being registered as owners.  Half of the bearer shares of Central Cement were held for Nikolai and the other half for Oleg.

57.     On April 10, 1991, SIF had signed an initial agreement to take a stake of 20% of the Belgorod Cement Company and obtain access to the cement industry. The remaining 80% of the company belonged directly to the employees.

58.     In 1992, the ownership of the Belgorod Cement Plant was restructured and Central Cement became -- through a series of acquisitions -- the holder of 49% of the business, with the employees of the business holding the other 51%. Between 1992 and 2003, Nikolai and Oleg together oversaw the running and development of the Belgorod Cement Plant, turning it into a leading plant in the region and a successful business.  Nikolai played a key role in the transformation of the plant into a success, along with Oleg.

59.     Similar to the steps taken to incorporate Central Cement, Oleg and Nikolai set up Panamanian companies, FINCO Financial Company, Inc. (“**FINCO**”) (in 1994) and International Petroleum Co., Inc. ("**IPEC**”) (in or around 1992), as an offshore finance vehicle and an offshore vehicle to hold oil-related assets, respectively.  The shares of each company were bearer shares, which were held equally for the benefit of the Partners.

60.     In February of 2003, the Partners caused FINCO (which by then held the shares in Central Cement or the right to dispose of them) to sell those shares for $75 million.  The proceeds were used for the benefit of the Partnership, including as set out below.

### 5.  Oleg Moves Abroad

61.     During the early 1990s, the security situation in Russia continued to deteriorate and organized crime was rampant in the country, and particularly directed toward visibly successful businessmen and their families.  While Nikolai and Oleg were doing their best to stay reasonably

low-profile and very discreet about their growing businesses, the Partners' early successes made them potential targets for criminal elements.  In or around 1994, an attempt was made to kidnap Veronica and Elena, who were eight (8) and nineteen (19) years old, respectively.  Following this incident, Oleg chose to move away from Russia with his family.  Thereafter, Oleg moved first to Switzerland, Israel, and the United States, and then to Canada (where Oleg and all the family members applied for and acquired the Canadian citizenship), and later to Monaco.

62.     Even with Oleg's move, he continued to travel frequently and spent substantial time in Russia. The Partners also remained personally close and continued to spend significant time together, in Russia and in Europe, and at all times continued to build their joint businesses through their Partnership.

**6.   The Purchase and Sale of Novoroscement**

63.     Between 1993 and 2003, the Partners purchased increasing shareholdings in OJSC Novoroscement ("**Novoroscement**"), one of the biggest cement plants in Russia, which was located in Novorossiysk.  The purchases were made through companies beneficially owned by the Partners.

64.     These companies included CJSC "BBK" and CJSC "SIF," registered in St. Petersburg, which both acquired shares of Novoroscement at an auction; and Gatiabe Business Inc. ("**Gatiabe**") and Jovellanos Investments Corp. ("**Jovellanos**"), each incorporated in January 2003. Bearer shares of those companies were held on behalf of the Partners as well.

65.     By the end of 2003, the Partnership owned a majority stake in Novoroscement.  The Partners proceeded to build and expand Novoroscement into a substantial and highly profitable entity.

66.     Following a reorganization, in around 2007, the Partnership owned substantially all of the shares of Novoroscement through Jovellanos and Gatiabe.

67.     In March 2007, the Partners caused Gatiabe and Jovellanos to sell the shares in Novoroscement for $1,449,500,000.  The transaction was handled and finalized with the support of competent and reputable professionals.

### 7.  The Purchase of Burneftegaz

68.     Oleg was extremely enthusiastic about the oil industry.  While Nikolai knew the oil business could be tremendously lucrative, he recognized it could be very dangerous as well. Nikolai, who was still living in Russia with his family, made clear to Oleg that he did not want to be directly involved in such business, given that this industry was much more exposed to political influence or pressure, corruption and crime organizations, and therefore created significant safety risks for the owners and managers and their families.

69.     Against this backdrop, in around 2005, Oleg invested in a petroleum development company, Burneftegaz, acquiring a majority stake.  Later, in 2009, Nikolai invested in Burneftegaz as well, and the Partners regarded Burneftegaz as a Partnership investment, each Partner having an equal share.

70.     In keeping with the Partners' relationship of complete trust, when Oleg suffered health problems in 2008, as a safety precaution, Oleg and Nikolai executed a share purchase agreement, whereby Oleg's majority shareholding in Burneftegaz was transferred to Nikolai at par value.  Oleg wanted to ensure that Nikolai, Oleg's trusted Partner, could take control of Burneftegaz in the event that Oleg became incapacitated.

## B.     The Sale of Burneftegaz and the Safekeeping Agreement

### 1.  The Partners Address How to Handle the Burneftegaz Sale

71.     In the aftermath of the purchase of Burneftegaz, Oleg and Nikolai continued to be in regular contact and to discuss their various joint projects as and when required.  In the meantime, Burneftegaz had become extremely successful.  Indeed, Oleg indicated that he believed its value

had doubled and reached over $4 billion.  While on the surface this was great news for the Partners, Oleg was at the same time growing concerned about Burneftegaz and had become increasingly anxious.  Oleg expressed the concern that certain dangerous elements were circling Burneftegaz.

72.     Nikolai shared Oleg's concerns.  While Nikolai had always wanted to maintain an extremely low profile concerning Burneftegaz, he grew concerned that, in addition to the company being at risk, Nikolai and his family were at risk as well.  Nikolai was also very concerned that Oleg and his family, given Oleg's role as the principal face of the company, were likewise at risk. In view of these concerns, Nikolai and Oleg decided to sell the company.  But a sale similarly was not without risk. Significant Russian companies had previously been sold only to have the companies subsequently sue the seller or for unanticipated tax issues to arise and create problems for the seller.  Given this history, the Partners came to the view that the proceeds of the sale of Burneftegaz should be transferred to a secure location outside of Russia.

73.     Adding to the Partners' concerns was the fact that, at the end of 2013, the political situation in Ukraine had become toxic, and relations between Russia and Ukraine deteriorated to the point where there was a serious threat of a general conflict between the countries.  The Partners became concerned over the prospect of increased controls over the movement of foreign currency from Russia and currency residency requirements.  In addition, the government announced that it might implement a "foreign entities control law" that would require Russian tax residents to provide reports with respect to ownership of companies abroad with substantial tax consequences if not managed properly.  This heightened the need to quickly resolve the Burneftegaz sale and related issues.

74.     Oleg and Nikolai had a number of discussions about how to achieve the objective of selling Burneftegaz and securely removing their proceeds from Russia.

75.     Oleg proposed to Nikolai, based on professional advice he was given, that the sale proceeds and their other Partnership assets be transferred to Loudmila abroad so that she could hold the assets on behalf, and for the benefit, of the Partners. This was because, as opposed to Nikolai and Oleg, who were still holding significant assets in Russia and were still Russian taxpayers, Loudmila was already a Canadian citizen and neither a tax nor a currency resident of Russia and therefore had no obligations to the Russian authorities. The transfer of the funds to Loudmila would not only be an attractive means to comply with Russian currency control legislation but would also be a simple and protective measure taken based on fears that, with the changing environment in Russia, Russian authorities could freeze the funds or even seize them unlawfully.

76.     Nikolai's immediate reaction, despite the difficult circumstances that the Partners were facing and the need to come up with a way to get the funds out of Russia, was that this was not an ideal solution. Nevertheless, the Partners continued discussions about this in late 2013.

**2.   The Safekeeping Agreement**

77.     In early January of 2014, Loudmila called Vera and suggested that Loudmila, Vera, Oleg and Nikolai meet in Latvia. Nikolai liked the idea because he believed that a discussion was a good opportunity to make decisions about the transfer of funds and put appropriate arrangements in place to achieve the Partners' objectives.

78.     Later that month, Loudmila, Oleg, Vera and Nikolai stayed together in the Presidential Suite at the Baltic Beach Hotel and Spa in Jurmala, Latvia. While there, an express oral agreement was reached between the Partners and Loudmila to the effect to that, upon the transfer of Partnership assets (including the Burneftegaz sale proceeds) to Loudmila (and/or entities under her ownership and/or control), she would hold such assets together with their fruits

and traceable proceeds as nominee and custodian for the benefit of Oleg and Nikolai (the "**Safekeeping Agreement**").

79.      To assuage Nikolai's concerns about the proposal to transfer Partnership assets from Oleg's control to Loudmila's, Oleg provided Nikolai with a power of attorney dated January 22, 2014, which Loudmila had executed before a public notary of the Riga District Court (the "**Bourlakova PoA**").  Pursuant to the Bourlakova PoA, Loudmila authorized Nikolai to conclude a post-nuptial agreement on her behalf in respect of all property jointly earned during the period of her marriage to Oleg on such terms as Nikolai required and to perform all necessary actions in her name to transfer title to property.  The effect of the Bourlakova PoA was to give Nikolai the power to deprive Loudmila of her interest in any marital property shared with Oleg, a power Nikolai might exercise if she failed to return Nikolai's share of the Partnership's assets.

80.      Considering the trust and loyalty by and among the Partners and their wives, Nikolai agreed to this arrangement.

### 3.      The Transfer of Partnership Assets to Loudmila

81.      Burneftegaz was subsequently sold to another Russian oil company called Bashneft.  The final sale price was approximately $1 billion, which was much less than its market value.  Indeed, Burneftegaz was valued in 2017 at more than $10 billion.  However, the company had to be sold, mainly due to the political risks and security exposure issues about which the Partners were concerned. Once Bashneft paid the purchase price, as planned, the funds -- received in rubles -- were exchanged for U.S. dollars and transferred out of Russia to Switzerland, with a significant portion, amounting to over $645 million, being received in a bank account at Credit Suisse in Loudmila's name as agreed by the Partners. In addition, $319 million was transferred to the Swiss entity Edelweiss Investment Holding SA as payments in respect of loans.

82.     In addition to the proceeds of the sale of Burneftegaz, and pursuant to the Safekeeping Agreement, other Partnership assets were transferred to Loudmila or to entities she held an interest in, to hold on behalf of the Partners. These transfers included, but were not limited to, the following:

- The shares in a Seychelles company named Maravan Services Limited ("**Maravan**");

- A Panamanian company named Chasehill Investments SA ("**Chasehill**"); and

- An Isle of Man company named Hermitage One Limited ("**Hermitage**").

83.     In the ensuing months, the holdings of the assets that had been transferred to Loudmila were rearranged and reorganized, through various transfers between entities under her nominal control, but at all times the assets were being held for the benefit of the Partners pursuant to the Safekeeping Agreement.  In fact, at all times, Loudmila knowingly held all such assets for the benefit of the Partners without issue.

## C.     <u>Nikolai Requests the Return of His Assets</u>

### 1.   <u>Tensions Arise in the Bourlakov Family</u>

84.     In late 2017, Nikolai learned that certain tensions had arisen within the Bourlakov family. His daughter Svetlana had gone to Florida to spend the Christmas holidays with her uncle, aunt and cousins. When Svetlana returned home in January 2018, Svetlana told her parents that Loudmila, Elena, Veronica and their husbands had accused Oleg of having an extra-marital affair with a young woman who was hoping to have a baby with him.

85.     Regrettably, at the same time, Oleg also was coming under pressure from his children, Elena and Veronica, with respect to his finances.  Even though Oleg already had provided generously for them and had fully secured their financial futures, each daughter selfishly

demanded that Oleg transfer additional and substantial assets to them without any restrictions, which they could use as they chose. Upon information and belief, Veronica and Elena were unable to pressure Oleg to provide substantial additional gifts to them. On the contrary, they faced strong resistance to these demands from Oleg, who told them that they should learn how to work to accumulate and save assets instead of spending them with no regard for how such a fortune was built.

86.     For the next few months, Nikolai and Vera tried to assist Oleg in resolving the apparent family crisis and finding a way that the Bourlakovs could come together again. Unfortunately, their efforts were in vain and tensions between Loudmila and her daughters, on the one hand, and Oleg on the other hand, intensified. This seemed to be due to the threat that the Bourlakovs believed that the girlfriend posed to the portion of Oleg's wealth that they hoped to secure.

87.     Given the tensions and the fact that Loudmila had become uncooperative, and in an effort to ensure that his share of the assets was protected from the demands of Veronica and Elena, Nikolai eventually approached Oleg and requested that they discuss how the portion of the assets being held by Loudmila for Nikolai's benefit under their Partnership could be returned to Nikolai's custody.

88.     Nikolai's suspicions and discomfort with the situation grew when Elena made a series of calls to Vera during 2018. During these calls, Elena told Vera that she believed that Oleg was either drugged or psychologically disturbed. In the same time period, Oleg complained to Nikolai and Vera about his own well-being and recent memory loss. These complaints were confirmed when blood tests Oleg took showed a significant excess of arsenic, lead, and heavy metals in his blood. This gave rise to suspicions that someone was trying to poison Oleg.

89.     Given that the situation seemed to be growing increasingly dire, Nikolai again made a firm determination that he should ensure that his interests were separated from the disharmony that had engulfed the Bourlakov family and take independent control of his portion of the Partnership assets.

90.     At the same time, because they were unable to convince their father to do what they wished, Veronica and Elena instead persuaded Loudmila that, given Oleg's apparent affair, she should seize control of most of the assets that Loudmila had agreed to hold for the benefit of the Partners and transfer them directly for their benefit into some previously created offshore structures -- to the detriment of both Oleg and Nikolai.

91.     Upon information and belief, Veronica and Elena were aware at this time of the Partnership, having observed Oleg and Nikolai's business interactions over the years, and that Loudmila was holding these assets on behalf of and for the benefit of each of the Partners.

## 2. April 2018 Meeting

92.     On or about April 5, 2018, a meeting took place in London, attended by Oleg, Loudmila, Elena, Veronica, Vera, Nikolai and Semen Anufriev ("**Semen**"), the director of Oleg's single-family office in Monaco, a Monaco company called SARL Hermitage Family Office ("**Hermitage FO**").  While Gregory did not attend the meeting, he was present in London at the time and consulted with his wife and mother-in-law regarding what was going on.  At the meeting, Nikolai demanded that the Bourlakov family return his share of the Partnership assets to him.  Oleg supported his request, but Loudmila, Elena, and Veronica, who never actively or substantially participated in building, creating or maintaining these assets, unfoundedly refused it.  Despite the fact that Oleg was 100% in agreement with Nikolai and was the person who worked, together with Nikolai, to grow this wealth (not Oleg's daughters), Elena actually pretended that she was not aware of any interest that Nikolai had in the assets and demanded documentary proof of the same.

93.     In the aftermath of the London meeting, Nikolai continued to press Oleg for a resolution.  Oleg assured Nikolai that he believed matters would be resolved swiftly and that Nikolai would receive his money in short order.  In fact, over the course of 2018, Nikolai and Oleg had numerous discussions about the transfer of Nikolai's share of the Partnership assets to his custody.

94.     Nikolai became increasingly concerned about the failure to resolve these matters, and this growing discourse in the Bourlakov family, particularly because on November 3, 2018, Oleg was the victim of an assassination attempt in Moscow, when an individual approached his vehicle, knocked on the window and shot two or three times at Oleg inside the vehicle, then left. For Nikolai, this episode added additional pressure to get his assets back given that Oleg's involvement was obviously critical to Nikolai being able to recover his Partnership share.

95.     On December 20, 2018, and for the purposes of formally recording the Partnership in the face of Loudmila's false denials, and Oleg's daughters' misplaced sense of entitlement, Oleg appeared before a notary public in Monaco, Maître Magali Crovetto-Aquilina, to make a formal declaration (the "**Notarial Declaration**").  The Notarial Declaration, which was duly executed by Oleg and notarized, provides that:

> *I declare that all the products generated by my activities of any kind and in any field whatsoever, in RUSSIA and everywhere else in the world, belong half to my associate for thirty years, Mr. Nikolai KAZAKOV; including those held by or in various legal structures, trusts or trusts, even those which would be registered in the name of my wife, Mrs Loudmila BOURLAKOVA or in the names of my children, Veronika BOURLAKOVA wife GLINER and Elena BOURLAKOVA wife KOZORYEZO V.*

96.     As a result of the continuing failure to return Nikolai's assets and the assassination attempt on his life and given the provocative behavior of Loudmila and her daughters, in December

of 2018, Nikolai brought a criminal proceeding against Loudmila and others in Monaco, where they lived, for breach of trust, concealment and money laundering.

97.     At or about the same time, Loudmila filed an *ex parte* divorce proceeding against Oleg – also in Monaco.  This proceeding was not served on Oleg until January, 2019.

**D.     The Conspiracy Against Nikolai and Misappropriation
         of Assets By Counterclaim-Defendants**

98.     Upon information and belief, beginning in late 2017, Loudmila, Veronica and Elena with the assistance of Gregory, began engaging in a concerted and illegal conspiracy aimed at taking control for themselves of as many Partnership assets as they possibly could from among the assets that had been entrusted to Loudmila by Nikolai and Oleg.  Thereafter, they took a number of steps to further their fraud and theft and to ensure that their ill-gotten gains were concealed from the Partners, as set forth below.

99.     Upon information and belief, the Counterclaim-Defendants began broad surveillance of Oleg, going so far as illegally placing a tracer on Oleg's private plane.  Upon information and belief, Elena's husband, Sergey, a former police officer, was instrumental in planting the tracer.  In addition, Veronica and Elena broke into Oleg's single-family office, which was located in the same premises as the family's apartment in Monaco, removed various hard copies of documents and also seized and took an image of Semen's computer.  Upon information and belief, this conduct was consistent with Elena's and Veronica's earlier efforts to  steal Oleg's phone and access his personal data.  In fact, at that time, Gregory, without permission, screenshotted several messages on Oleg's phone, which he shared with Loudmila while suggesting that her husband was cheating.

100.    To facilitate the fraud and theft on which she and her daughters were about to embark, Loudmila created new companies in Guernsey at the very beginning of 2018.  These

51

included new Guernsey companies called Blue Castle Holdings Ltd. and Long River Ltd.  She also settled a Bahamas trust called Golden Wheat in favor of Loudmila, Veronica and Elena on December 11, 2018.  In addition, she emptied most of the bank accounts shortly before she filed her petition for divorce against Oleg in Monaco and left the common domicile. Upon information and belief, she was supported in these efforts by her daughters as well as by Gregory, who was in the financial services industry and used his knowledge and professional connections to facilitate these efforts.

101.    Golden Wheat would become a critical component of the effort to steal and hide Partnership assets in complex structures.  Loudmila transferred substantial assets to Golden Wheat, including Hermitage and Maravan, and Golden Wheat in turn provided a haven for concealing these assets and thereby facilitating the fraud. Even more tellingly, a provision was included in the settlement of Golden Wheat whereby all of Oleg's rights to these assets would be forever forfeited, even if he survived Loudmila!  This was clearly an effort to abscond forever with Partnership assets that belonged to Nikolai and Oleg.

102.    Loudmila made a number of transfers in 2018 apparently with the specific intent to conceal the transferred assets from the Partners and make their recovery more difficult.  These included, but are not limited to, the following:

- On June 5, 2018, Loudmila transferred $256 million out of a Credit Suisse account in Zurich to an account in the name of Veronica with a reference "Deed of gift 22.05.2018";

- On June 27, 2018, Loudmila transferred $39 million to her Credit Suisse account in the United Kingdom.  Of this, $5 million was transferred to Elena's account at Royal Bank of Canada on October 10, 2018, with "Gift" indicated as the purpose

of the payment, and $34 million was transferred to Veronica's account at Credit Suisse on December 4, 2018;

- On October 9 and 10, 2018, Loudmila transferred $30,000 and $68,000 from her Credit Suisse account in Zurich to J.P. Morgan Chase in New York apparently to pay off the balance on Gregory's American Express card;

- On December 20, 2018, Loudmila applied to open a dealing and advisory account with J.P. Morgan.  Upon information and belief, this was an attempt to open an account that Oleg would not be aware of given that the Bourlakov family had not previously had any relationship with J.P. Morgan;

- Upon information and belief, over a twenty-four (24) month period in 2018 and 2019, Loudmila purportedly lost multiple millions of dollars on the stock exchange primarily through investments that Gregory made through a fund he ran that was called Ironwall.  These losses do not appear to be possible.  Instead, they would appear to be part of a ruse; false losses created with Gregory's assistance in an effort to cover-up significant transfers of those assets abroad;

- Between May 31, 2018 and March 19, 2019, funds were drained from the account at Hermitage in the amount of hundreds of millions of dollars.

103. Upon information and belief, during 2019, bank accounts and safe deposit boxes at Barclays Bank, Monaco, in the name of Chasehill (a Panamanian company), one of the companies transferred to Loudmila by Oleg in 2014, were also drained.  Upon information and belief, the same happened with other safe deposit boxes in Monaco banks, such as Société Générale.

104. Loudmila, Veronica and Elena even used a nominee, an employee named Natalia Kozina (now Panchuk), to open certain safes at the Compagnie Monégasque de Banque (unknown

to the Partners), so they could hide certain documentation and very expensive jewelry that was financed by the Partnership's assets, without Oleg and/or Nikolai's authority or approval.

105.    Upon information and belief, Loudmila, Veronica, and Elena, with the assistance of Gregory, took additional steps to hide and conceal their fraud and theft of assets.  As an example, on May 11, 2018, Loudmila wrote to Société Générale, Credit Suisse and UBS, informing the banks that she had instructed the Directors of Templeston, Maravan, and Hermitage to ensure that any information relating to those companies should only be given to Loudmila, Veronica and Elena.  This was a clear attempt to prevent information from being provided to the Partners.

106.    In addition, Loudmila revoked powers of attorney that had been given to Oleg over her Credit Suisse and UBS accounts.  These powers of attorney had been specifically provided to ensure that Oleg retained control over these Partnership assets.

107.    Through the aforementioned maneuvers, the Counterclaim-Defendants were able to steal a substantial portion of the Partnership assets that had been entrusted to Loudmila, representing more than $1.4 billion.

**E.     Oleg Dies After Naming Nikolai and Vera as his Universal Legatees**

108.    Oleg died unexpectedly on June 21, 2021 in Moscow from a Covid-19 infection. Only Vera and her daughter Svetlana were close to him at the time of his passing. At no point did Loudmila, Elena or Veronica fly to Russia or even try to assist him in this time of need. In fact, they only appeared, after his death, through their proxies.  At that time, they aggressively took control of Oleg's remains, and illegally had his Covid-19 infected body flown to Canada.  They buried him secretly, and anonymously, on the outskirts of a Toronto cemetery mainly used by Italian Christian families.

109.    The holographic Will left by Oleg is written in Cyrillic language.  It names Nikolai and Vera as his universal legatees and refers to a Fund or a Foundation belonging to Nikolai and

Vera while providing some instructions and guidance for them. The Will also includes a specific bequest to Nikolai and Vera as well -- the sailing yacht named "Black Pearl."

110.     Oleg's decision to name Nikolai and Vera as his universal legatees was entirely consistent with the relevant history and prevailing circumstances.  Nikolai had been his long-time life business Partner and brother-in-law, but the decision of Counterclaim-Defendants to steal and hide Partnership assets placed Nikolai's interests -- and the results of a life of hard work -- in considerable jeopardy.  Loudmila, Veronica and Elena caused considerable harm to Nikolai and his family, and Loudmila, acting in concert with her daughters, Gregory and various professionals and agents, betrayed the trust that Nikolai and Oleg had reposed in her for many years.  In addition, Oleg, before this betrayal, had already provided significantly for his now-estranged wife and daughters, allowing them to live lives of great luxury and privilege, even though they had not participated in the creation of Oleg's wealth or its maintenance.  Thus, the main objective for Oleg when making Nikolai and Vera his universal legatees was to make sure that neither Loudmila nor their daughters would be able to inherit from him or obtain anything from his estate beyond what he had already provided them.  The goal of Counterclaim-Defendants clearly is to bypass the Will and obtain more substantial assets, totaling approximately $3 billion.

111.     The Will has been filed with a Monaco Public Notary, Maître Magali Crovetto Aquilina, and registered with the Monaco Court.  Not surprisingly, it has been the subject of considerable litigation brought by Counterclaim-Defendants, including some challenges to Monaco's jurisdiction.

112.     Significantly, on October 6, 2022, the Monaco Court issued a ruling confirming that Monaco had jurisdiction over the estate and rejecting various procedural challenges to the Will. Not surprisingly, appeals have been lodged against this ruling.

113.    On October 28, 2022, a Russian court likewise rejected various challenges to the validity of the Will in proceedings that had been brought in that court by Nikolai and Vera, based, *inter alia*, on a handwriting forensic expert opinion ordered by the Russian court, and confirming that, as opposed to what the opposite side claimed, the handwritten Will was genuine and actually handwritten by Oleg.  In fact, after a trial, that court in Russia determined that the Will was valid, and specifically declared that Nikolai and Vera were personally, without reference to their Fund or Foundation, Oleg's rightful heirs. On April 4, 2023, this ruling was upheld by a Russian appeals court.

**F.**    **Veronica Attempts to Steal Panamanian Assets in which Nikolai has an Interest**

114.    Rather than deter the co-conspirators from further criminal conduct, Oleg's death apparently emboldened them to step-up their efforts, to broaden their fraud to include additional assets bequeathed to Nikolai and Vera by Oleg or in which Nikolai or Vera otherwise had an interest, and to seize additional assets by more nefarious means with the support of additional accomplices.

115.    A substantial number of legal and financial documents regarding the Partnership's assets and structures were held in the Hermitage FO at Oleg's residence.  Additional documents were held in Switzerland by Tribaldos. Tribaldos, like his father before him, was responsible for the management of several Partnership entities of Oleg and Nikolai and had acted on behalf of the Partners for many years through the corporate service providers, LEO Trust in Zurich and Tridan Trusted Advisors AG in Zug.

116.    After Oleg's death, Loudmila, Veronica and Elena illegally accessed the premises of Hermitage FO in Monaco.  Its offices were on the same floor as Loudmila's living quarters, but were legally used by Hermitage FO, owned 99.99% by Oleg and managed by him and Semen, a German lawyer who is also a relative of Oleg and Nikolai.

117.    Upon information and belief, Loudmila, Veronica and Elena went through the financial and business records of Hermitage FO in an effort to obtain information and documents to use in furtherance of their efforts to take full control of the Partnership's assets.

118.    While doing so, Loudmila, Veronica and Elena, may have come across old bearer shares in certain of the Panamanian companies in which Nikolai held an interest either directly or as a beneficiary of certain foundations; specifically, shares in Edelweiss Investments, Inc. ("**Edelweiss**"), which was owned by a Panamanian foundation in which Nikolai is the sole beneficiary; Gatiabe, whose shareholder is a Panamanian foundation in which Nikolai is the sole beneficiary; and Jovellanos, in which some of the shares are owned directly by Nikolai.  They also may have received these certificates from Tribaldos, or forged certificates may have been created by them or their accomplices.

119.    The bearer shares were in fact worthless.  That is because Panama had previously passed legislation significantly restricting the use of bearer shares; the share ownership of the companies at issue had been switched to registered shares years earlier; and the bearer shares had been cancelled and the shares of the companies were reissued to the foundations.  Nevertheless, Loudmila, Veronica and Elena were undeterred, and upon information and belief, with support and assistance from Gregory, Tribaldos and various other professionals, including their original advisors from Taylor Wessing, through its partner Nicholas Warr, took possession of the old or forged bearer shares, hired Panamanian counsel and various other advisors, and launched a systematic effort to try to take control of these companies, to the detriment of Nikolai.

120.    Upon information and belief, through further wrongdoing in December of 2021 and January of 2022, Veronica, Elena and Loudmila used the worthless bearer shares to try to appoint purported new boards of directors in each of the Panamanian companies and thereby take control

57

of the assets -- totaling around $1 billion -- being held therein.  In the aftermath of this attempted coup, the co-conspirators took additional steps to solidify their control over the entities and assets they had endeavored to steal, including through the appointment of a new registered agent, gaining access to bank accounts, and seeking to terminate counsel for the companies that had been retained by the legitimate directors, among other efforts. Upon information and belief, all of this was again done with the active assistance of Tribaldos, Rhone and Taylor Wessing.

121.    Having set in motion their plan to take control of the assets, Loudmila and Veronica took further steps to secure their position by, among other things, sending a series of letters from a prominent U.S. law firm to various parties threatening dire consequences if they took further steps with respect to the companies. They have even gone so far as to have a retired U.S. government official reach out to Nikolai's Panamanian counsel, improperly seeking information, thereby attempting to violate and vitiate strict legal privileges.  It would appear that their ultimate goal was to send these assets to Golden Wheat, as they had done with other assets misappropriated by them since 2018.

122.    Several civil and criminal claims have been launched to challenge this attempted coup and ensure that the rightful owners and managers regain and maintain control over these companies and their assets.  Of note, on August 31, 2022, and September 14, 2022, a Panamanian Court issued criminal injunctions prohibiting any steps being taken with respect to Gatiabe and Edelweiss, respectively, on the basis of the bearer shares, such injunctions to operate through to the conclusion of the criminal investigation. This included preventing new changes on the public register regarding these companies. The courts also restored the directors and registered agent appointed to their positions by the legitimate shareholders. Furthermore, the Sucre, Briceno & Co Law Firm, which assisted the Counterclaim-Defendants on the ground in Panama, was notified of

the August 31, 2022 and September 14, 2022 Orders, including the criminal freeze of the old share certificates and the new ones, issued on behalf of the Plaintiffs.  These injunctions were upheld and maintained by Panamanian courts in hearings held as late as November 22, 2022 and November 23, 2022.

123.    In this action, Counterclaim-Defendants, relying on their misdeeds in Panama described above, allege falsely that Veronica "owns" Edelweiss. Plaintiffs therefore contend that, as a result of this purported ownership, Veronica effectively paid for the apartment on Fisher Island at the crux of this case and contributed the funds necessary for its maintenance.  As a result, the actual ownership of Edelweiss, as well as Veronica's personal self-interest, has been expressly interjected into this case by Counterclaim-Defendants.  The position espoused by Counterclaim-Defendants is obviously contrary not only to indisputable facts but also to the injunctions that remain in place in Panama.

124.    In addition, Veronica, along with Loudmila and Elena, recently filed a lawsuit in the United States District Court for the Southern District of Florida captioned *Loudmila Bourlakova, et al v. Anthony Virgil Raftopol,* et al., Case Number 22-cv-23634-JEM, in which they seek, among other relief, a determination that Edelweiss is owned by Veronica.

**G.    The Conspirators' Efforts to Gain Control over Florida Assets**

125.    The conspirators' efforts to gain control over assets owned by the Partnership, or of which Nikolai and Vera now have an interest by virtue of being universal legatees under the Will or otherwise, have never subsided, and have now extended to assets in the State of Florida.

**1.    Oleg's Purchase of the Fisher Island Property**

126.    In 2017, prior to the breakdown of the Bourlakov family relationships, Oleg had discussions with his friend and business associate, Nominal Defendant Igor Krutoy.  Mr. Krutoy was the then-owner of the Fisher Island Property, which he was planning to sell in connection with

his purchase of a new apartment.  Mr. Krutoy asked Oleg if he would be interested in purchasing the Fisher Island Property, which would enable Mr. Krutoy quickly to obtain the funds for his purchase of the new property. Oleg and Mr. Krutoy worked out the details of the proposed purchase and sale entirely between themselves.  Oleg agreed to purchase the Fisher Island Property principally as a favor for his long-time friend Mr. Krutoy. From Oleg's perspective, this was simply an investment, and an opportunity for further diversification of assets.

127.    Upon information and belief, neither Veronica, nor Elena, nor Loudmila was involved in the decision to purchase property in Florida or any of the details of the transaction. None of them inspected the Property before it was purchased, participated in the sale discussions, participated in the closing or otherwise was involved in the acquisition of the Fisher Island Property.  The Fisher Island Property was therefore not purchased by the "family" as a vacation home, and it was never used as such.

128.    Oleg approached Steven Landau, who was married to Mr. Krutoy's niece and was a real estate agent in South Florida, to consult regarding the purchase.  Oleg had previously discussed possible Florida real estate investments with Mr. Landau. Mr. Landau told Oleg that he believed that purchase of the Fisher Island Property was a wise investment, given the likelihood of price appreciation. Oleg emphasized that he wanted to assist his friend and business associate Mr. Krutoy by making this purchase, but, at the same time, it was essential that he not lose money on this transaction.  Moreover, Oleg was not seeking to keep the Fisher Island Property for the long term.  That was never his plan.  Upon hearing that it was a sound financial deal, Oleg agreed that he would purchase the Fisher Island Property from Mr. Krutoy.

129.    Oleg asked Mr. Landau to come up with an appropriate structure for purchasing/holding the Property. It was Oleg's desire that he not hold property in his own name.

Mr. Landau referred Oleg to his brother, Burton Landau, a lawyer based in South Florida, who discussed with Oleg what the terms of the purchasing instrument should be. Burton Landau recommended the use of a Florida land trust. Oleg was unfamiliar with that vehicle, but, as long as it satisfied his objectives of maintaining privacy and full control, Oleg had no problem with it. But Oleg was told that a land trust must have beneficiaries. Solely to comply with that requirement, and not to effectuate a permanent transfer to his grandchildren, Oleg approved the naming of his grandchildren as beneficiaries. He did so with full knowledge that the 2017 Trust would be freely revocable by him at any time. Burton Landau drafted a trust instrument for this purpose, which named Steven Landau as trustee (the "**2017 Trust**"). A copy of the agreement for the 2017 Trust is attached to the Amended Complaint as Exhibit "A."

130. The 2017 Trust was specifically named a "revocable trust." That was significant to Oleg and done at his specific request. Oleg wanted to retain control over the Fisher Island Property and to be able to sell it at his sole discretion and at any time.

131. Consistent with his objective that he would not lose money on this transaction, shortly after the purchase, Oleg instructed Steven Landau to look for a buyer for the Fisher Island Property. The Bourlakov family never actually utilized the Fisher Island Property for family vacations or otherwise. In fact, shortly after the purchase was made in 2017, the Bourlakov family vacationed in the Miami area for the holiday season and stayed in a rented home on Palm Island, paid for by Oleg.

132. Upon information and belief, the Bourlakov family knew at all times that Oleg retained ultimate control over the Fisher Island Property and that it was not an asset held in an irrevocable trust for the benefit of the Bourlakov grandchildren. In fact, when Oleg and Loudmila participated in a marital mediation during 2018, as part of a proposed settlement, they created a

list of assets that would go to each spouse.  The Fisher Island Property was included among the assets that would go to Oleg.  If the Fisher Island Property had been transferred to an irrevocable trust for the benefit of the Bourlakov grandchildren, it would not have been an asset available for distribution to either spouse. Thus, Loudmila recognized that the Fisher Island Property belonged to Oleg and that he could dispose of it as he wished.

## 2.  Oleg Provides Funds for Additional Investments, Maintenance and Costs.

133.    After the purchase of the Fisher Island Property was completed, Oleg sent certain funds to Florida, which could be used to pay expenses for the Fisher Island Property and fund other purchases or investments Oleg might wish to make in Florida.

134.    In connection with and to facilitate the transfer of funds, Landau registered an LLC which in turn opened an account at Wells Fargo (the "**LLC Account**").  Thereafter, Oleg arranged for $5 million to be wired to the LLC Account

135.    While the $5 million was used to pay taxes, association fees and other expenses associated with the Fisher Island Property, at no time was it ever held in a trust account, and at no time was it ever an asset of the 2017 Trust or even listed as such.  At no time did Oleg provide instructions to Landau that the cash funds be held in the 2017 Trust or any other trust.  The 2017 Trust never held a bank account.

136.    Given the strength of the real estate market in South Florida, in 2018, Landau requested that Oleg allow him to borrow funds held in the LLC Account to purchase another apartment, located in Miami Beach, which he and his wife would use as a residence.  Oleg agreed, and Landau used $2.2 million to purchase the apartment (the "**Turnberry Apartment**"). The Turnberry Apartment, purchased by Landau utilizing Oleg's money, with Oleg's approval, was placed in the name of Landau's wife, Natalia Russo. The funds utilized by Landau were a loan

from Oleg to Landau.  These funds were never part of the 2017 Trust or any other any trust for the benefit of Oleg's grandchildren.

137.    In addition to the purchase of the Turnberry Apartment, Oleg utilized the funds for other Florida asset purchases.

### 3.  Oleg Creates a New Trust with Nikolai and Vera as Beneficiaries.

138.    Because Counterclaim-Defendants had stolen a significant number of assets belonging to the Partners, in 2019 and 2020, Nikolai and Oleg had discussions about ways in which Oleg could reimburse Nikolai for some of the purloined amounts.  One asset discussed by the Partners was the Fisher Island Property.  Oleg decided to create a new trust and make Nikolai and Vera beneficiaries, thereby defraying a small portion of the losses suffered by Nikolai as a result of Counterclaim-Defendants' misappropriation.

139.    Having determined that he would make Nikolai and Vera beneficiaries, Oleg took the steps necessary to effectuate that objective legally.  To that end, Oleg arranged for a new trust to be drafted and for the Fisher Island Property, which had never been properly transferred to the 2017 Trust, to be transferred to the trustee of a newly created trust (the "**2020 Trust**") by a deed executed by Mr. Krutoy and his wife.  As a result, the Fisher Island Property became an asset of the 2020 Trust.

140.    With regard to the funds that Oleg had advanced to Landau, Oleg determined that the proceeds and all assets purchased with the funds should likewise be for the benefit of Nikolai and Vera.  To that end, Oleg entered into an Assignment Agreement whereby he assigned all of his claims and rights to those assets and funds to the trustee of the newly formed 2020 Trust. Subsequently, the trustee of the 2020 Trust commenced a legal action against Natalia Russo concerning the Turnberry Apartment.

141.    During 2021, the property market in South Florida continued to be extremely robust, confirming that Oleg's investment in the Fisher Island Property was sound.  As a result, the value of property in South Florida, including the Fisher Island Property, increased dramatically. Nikolai and Vera, as beneficiaries of the 2020 Trust and in light of advice they received from real estate professionals, wished to take advantage of the favorable market.  To that end, they approved of the 2020 Trust entering into a contract to sell the Fisher Island Property for $8.4 million. Negotiations to close the transaction continued during late 2021.

142.    The effort to complete the sale of the Fisher Island Property came to an abrupt end in early December 2021 as a result of an improper *lis pendens* filed by Veronica and Elena on the Fisher Island Property.  Purportedly acting as "natural guardians" of their children, Veronica and Elena wrongfully commenced this action, in which they claimed that the transfer of the Fisher Island Property to the 2020 Trust somehow was improper.  Subsequently, they filed an Amended Complaint, in which they wrongly claimed:

- The 2017 Trust was valid and irrevocable (which it is not) and therefore could not be revoked and the Fisher Island Property could not be transferred;

- The creation of the 2020 Trust naming Nikola and Vera as beneficiaries was part of an improper plan by Oleg and Nikolai to claim fraudulently that Nikolai was a partner of Oleg entitled to 50% of their joint assets; and

- That the Fisher Island Property actually had been purchased by Edelweiss, which Veronica claimed was "her company"; and efforts to transfer assets located in Florida were part of a broader conspiracy to transfer and steal assets worldwide.

143.    Through their filing of the Complaint, Amended Complaint and *lis pendens*, the co-conspirators have slandered the 2020 Trust's title to Florida property and have further conspired

to divert property beneficially owned by Nikolai and Vera, or in which Nikolai and Vera have an equitable interest, to their ownership or that of their allies.

## H.   **Criminal and Other Proceedings are Commenced Against Veronica and Loudmila**

144.    The efforts of Veronica, Loudmila, and the other co-conspirators to gain control of the Partnership assets have led to a number of criminal proceedings and other proceedings being filed.

145.    The criminal proceedings include a criminal indictment for money laundering and breach of trust that was handed down in Monaco against Loudmila on December 9, 2021 and an arrest warrant issued for Loudmila in Ukraine. Notably, the Monaco proceedings and the subsequent criminal freezes on Loudmila's, her daughters' and their offshore companies' bank accounts in place since spring 2019 have continued despite numerous applications made by them to various courts to have them dismissed.

146.    At the same time, efforts by Counterclaim-Defendants to challenge Oleg's Will and to frustrate Oleg's clear intent and thereby steal additional assets, and other efforts to take control of stolen assets, have led to civil cases in Monaco (where the Monaco courts have issued freezing orders preventing further transfers of assets located there by Loudmila); Switzerland; Cyprus; Russia; Montenegro; the United Kingdom and Panama.

147.    Counterclaim-Plaintiffs have retained the undersigned attorneys to represent them in the prosecution of this action and are obligated to pay such attorneys their attorneys' fees and costs.  To the extent that same are recoverable, Counterclaim-Plaintiffs will seek to recover same from the Counterclaim-Defendants.

### AS AND FOR COUNT I
### (Nikolai's Breach of Contract Claim Against Loudmila)

148.    Counterclaim-Plaintiff Nikolai repeats, reasserts, and realleges each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

149.    Loudmila entered into the Safekeeping Agreement with Nikolai and Oleg.  The Safekeeping Agreement was evidenced by the Bourlakova PoA described above, but the agreement was an oral one.

150.    Loudmila breached the Safekeeping Agreement by, *inter alia,* refusing to turn over to Nikolai upon demand his substantial assets that she had been holding for him and by instead transferring Nikolai's assets (as well as Oleg's) to different entities and individuals in an attempt to conceal the assets from Nikolai and impede his ability to recover them.

151.    Nikolai has been damaged by Loudmila's breach of contract in an amount to be determined at trial.

152.    The Safekeeping Agreement was to be performed by Loudmila in and from Monaco where she resided and where Oleg's family office was located, and, therefore, it is governed by Monaco law.

153.    Monaco law permits the enforcement of the Safekeeping Agreement, and Nikolai's claim is not time-barred under Monaco law.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV, demands judgment in his favor and against Counterclaim-Defendant, LOUDMILA BOURLAKOVA, for damages, the amount of which shall be determined at trial, for prejudgment interest, and for such other and further relief as the Court deems just and proper.

## AS AND FOR COUNT II
### (Nikolai's Breach of Fiduciary Duty Claim Against Loudmila)

154.    Counterclaim-Plaintiffs repeat, reassert, and reallege each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

155.    Loudmila owed a fiduciary duty to Nikolai, insofar as she was a trusted member of Nikolai's family (his sister-in-law) and the wife of his trusted business partner Oleg, and, because of this close relationship, Nikolai placed his trust and confidence in Loudmila to hold certain of his assets as his nominee and for his personal benefit.

156.    Loudmila breached her fiduciary duty to Nikolai by, *inter alia*, the following:

- failing to hold Nikolai's assets as his nominee and at his direction and for his benefit;

- refusing to turn assets belonging to him over to him at his request;

- transferring assets in which he had an ownership interest to other entities for purposes of stealing the assets and secreting and concealing the same from his reach;

- transferring his assets to Elena, Veronica and Gregory, or entities under their management or control, to the exclusion of Nikolai;

- assisting Veronica in efforts to take control of Panama companies beneficially owned by foundations of which Nikolai was a beneficiary; and

- assisting Veronica and Elena in their efforts to wrest Florida assets from Nikolai's ownership and control.

157.    Nikolai has been damaged by Loudmila's breach of fiduciary duty.

158.    Monaco law applies to the fiduciary relationship between Nikolai and Loudmila because Loudmila resided in Monaco, she undertook to perform her fiduciary duties from her

residence in Monaco, Oleg's single family office was located in Monaco, and Loudmila breached her fiduciary duties in and from Monaco.

159.    Monaco law permits the enforcement of Loudmila's fiduciary duty to Nikolai, and permits Nikolai to sue Loudmila for breach of trust, and Nikolai's claim is not time-barred under Monaco law.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV, demands judgment in his favor and against Counterclaim-Defendant, LOUDMILA BOURLAKOVA, for damages, the amount of which shall be determined at trial, for prejudgment interest, and for such other and further relief as the Court deems just and proper.

### AS AND FOR COUNT III
### (Nikolai's Conversion Claim Against Counterclaim-Defendants Jointly and Severally)

160.    Counterclaim-Plaintiff Nikolai repeats, reasserts, and realleges each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

161.    Nikolai was and is the owner of 50% of the assets generated by the Partnership.

162.    Nikolai entrusted his share of the Partnership assets to Loudmila for safekeeping. Those assets consisted primarily of Nikolai's share of the net cash proceeds from the sale of Burneftegaz and other companies and the earnings on the funds (hereafter, as referenced in all counts, **"Nikolai's Partnership Share"**).

163.    Veronica, Elena, Loudmila and Gregory knowingly, intentionally and wrongfully asserted dominion and control over Nikolai's Partnership Share and converted Nikolai's Partnership Share to their own use.

164.    Veronica, Elena, Loudmila and Gregory, jointly and severally, have worked individually and/or in concert to deprive Nikolai permanently of his legal right to the possession and use of Nikolai's Partnership Share.

165.     As a result of Veronica's, Elena's, Loudmila's and Gregory's actions and inactions, Nikolai has been deprived of his ownership rights and his right to the use and possession of the assets constituting Nikolai's Partnership Share, and he, thus, has been severely damaged.

166.     The law of Monaco applies to this claim because Loudmila, who controlled the relevant accounts and assets, was domiciled in Monaco, and she, in concert with the others, planned and perpetrated their acts of conversion from Monaco.

167.     Monaco law permits the maintenance of this action for conversion, and it is not time-barred.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV demands judgment in his favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, LOUDMILA BOURLAKOVA and GREGORY GLINER, individually and jointly and severally, for damages, the amount of which shall be determined at trial, for prejudgment interest, and for such other and further relief as the Court deems just and proper.

**AS AND FOR COUNT IV**
**(Nikolai's and Vera's Conversion Claim**
**Against Counterclaim-Defendants Jointly and Severally)**

168.     Counterclaim-Plaintiffs Nikolai and Vera repeat, reassert, and reallege each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

169.     Nikolai and Vera are the universal legatees under Oleg's Will, and therefore are the primary intended beneficiaries of his estate with a right to the use and possession of the principal estate assets therein (the "**Estate Assets**").

170.     The Estate Assets include, without limitation, Oleg's share of the Partnership assets, the Black Pearl yacht, Oleg's ownership interests in real estate and all other assets in which

Oleg owned an interest, subject to any inalienable right of Loudmila, under applicable law, as Oleg's surviving spouse to a share of such assets.

171.    Veronica, Elena, Loudmila and Gregory knowingly, intentionally and wrongfully asserted dominion and control over the Estate Assets and converted the Estate Assets bequeathed to Nikolai and Vera to their own use.

172.    Veronica, Elena, Loudmila and Gregory, jointly and severally, have worked individually and/or in concert to deprive Nikolai and Vera permanently of their legal right to the ownership, possession and use of the Estate Assets.

173.    As a result of Veronica's, Elena's, Loudmila's and Gregory's actions and inactions, Nikolai and Vera have been deprived of their ownership and possessory rights in the Estate Assets and have been severely damaged.

174.    The law of Monaco applies to this claim because Loudmila, who controlled the majority of the Estate Assets, was domiciled in Monaco, and she, in concert with the others, planned and perpetrated the conversion scheme from Monaco, and Oleg's estate is being administered in Monaco.

175.    Monaco law permits the maintenance of this action for conversion, and it is not time-barred.

**WHEREFORE**, Counterclaim-Plaintiffs, NIKOLAI KAZAKOV and VERA KAZAKOVA, demand judgment in their favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, LOUDMILA BOURLAKOVA and GREGORY GLINER, individually and jointly and severally, for damages, the amount of which shall be determined at trial, for prejudgment interest, and for such other and further relief as the Court deems just and proper.

### AS AND FOR COUNT V
**(Nikolai's Tortious Interference Claim Against
Counterclaim-Defendants, Jointly and Severally)**

176.    Counterclaim-Plaintiff Nikolai repeat, reassert, and reallege each of the allegations in paragraphs 1 through 147 as if set forth at length herein.

177.    Nikolai and Oleg had a long-term and mutually beneficial business relationship, their Partnership.  The Partners agreed that Oleg, for Nikolai's benefit, would hold Nikolai's Partnership Share in Oleg's own name or in accounts and/or entities under Oleg's control.  This agreement was central to the Partnership.

178.    In 2014, as alleged elsewhere herein, Oleg and Nikolai made a decision to entrust Partnership assets, including Nikolai's Partnership Share, to Loudmila for safekeeping and as a nominee for the Partners.

179.    Veronica, Elena, Loudmila and Gregory were aware of the existence of the Partnership and Oleg's obligations to Nikolai.

180.    Loudmila, Veronica, Elena, and Gregory intentionally and without justification interfered with the business relationship between Nikolai and Oleg to prevent Oleg from performing his obligations under the Partnership agreement.

181.    Loudmila, Veronica, Elena, and Gregory took steps to interfere with Nikolai's ability to realize the benefit of his interest in the Partnership and to make it impossible for Oleg to satisfy his obligations to Nikolai under the Partnership agreement.  Those steps include but are not limited to:

- persistently refusing to turn over assets comprising Nikolai's Partnership Share to which Nikolai is entitled;

- facilitating efforts to make assets inaccessible to Nikolai by helping to hide them from Nikolai in offshore jurisdictions;

- taking steps or assisting in efforts to steal and/or convert assets in which Nikolai has an interest, including the Panamanian companies owned by foundations of which Nikolai is a beneficiary and their bearer shares; and

- interfering with Nikolai's interest in the Fisher Island Property and in cash Oleg sent to a Florida bank account.

182.   Nikolai has been damaged by this tortious interference in an amount to be determined at trial.

183.   Monaco law applies to Nikolai's tortious interference claim because the interference, though impacting several jurisdictions, was conducted primarily in and from Monaco where Loudmila, who held the Partnership assets as nominee, was located throughout the period of the interference.   Monaco therefore has the most significant relationship to the tortious interference.

184.   Nikolai may maintain this claim for tortious interference under Monaco law, and it is not time-barred.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV, demands judgment in his favor and against Counterclaim-Defendants, LOUDMILA BOURLAKOVA, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, and GREGORY GLINER, individually and jointly and severally, for damages, the amount of which shall be determined at trial, for prejudgment interest, and for such other and further relief as the Court deems just and proper.

## AS AND FOR COUNT VI
**(Nikolai's Aiding and Abetting Breach of Fiduciary Duty Claim
Against Veronica, Elena and Gregory)**

185.    Counterclaim-Plaintiff Nikolai repeats, reasserts, and realleges each of the allegations in paragraphs 1 through 147 as if set forth at length herein.

186.    Loudmila was a trusted member of Nikolai's family (his sister-in-law) and the wife of his trusted business partner Oleg.  Because of this close relationship, Nikolai placed his trust and confidence in Loudmila to hold certain of his assets in safekeeping, pursuant to the Safekeeping Agreement, as his nominee and for his ultimate benefit.

187.    Loudmila breached her fiduciary duty to Nikolai by, *inter alia*, the following:

- refusing to turn assets belonging to him or in which he had an interest over to him at his request;

- transferring assets in which he had an ownership interest to other entities for purposes of stealing and secreting these assets and concealing the same from Nikolai's reach;

- wrongfully transferring his assets to Elena, Veronica and Gregory to the exclusion of Nikolai;

- assisting Veronica in efforts to take control of Panamanian companies owned by foundations of which Nikolai is a beneficiary; and

- assisting Veronica and Elena in their efforts wrongfully to wrest Florida assets from Nikolai's ownership and control to his detriment.

188.    Counterclaim-Defendants Veronica, Elena and Gregory were aware of Loudmila's fiduciary obligations to Nikolai, and that Loudmila breached those duties.

189.    Counterclaim-Defendants Veronica, Elena and Gregory substantially assisted and/or encouraged Loudmila's breaches of fiduciary duty and other wrongdoing by, *inter alia*:

- insisting that Loudmila arrange for transfers of Nikolai's assets that she was holding to Counterclaim-Defendants' personal accounts, and/or to pay their personal obligations, and/or to foreign entities in offshore jurisdictions hidden from Nikolai or otherwise for the benefit of the Counterclaim-Defendants;

- supporting Loudmila in her efforts to identify professionals to assist Loudmila in creating various vehicles used to facilitate the transfer of Nikolai's assets beyond the reach and control of Nikolai;

- taking steps to obtain and use invalid bearer shares of Panamanian companies owned by foundations of which Nikolai is beneficiary and utilizing the invalid shares in a wrongful effort to take control of such entities to the detriment and exclusion of Nikolai;

- enlisting the assistance of Tribaldos, who provided the confidential documents and other confidential information to assist Loudmila in carrying out the theft and concealment of the assets of Nikolai; and

- utilizing Golden Wheat as a vehicle for concealing stolen assets and creating roadblocks to recovery by Nikolai.

190.    Nikolai has been injured as a result of Counterclaim-Defendants' aiding and abetting in Loudmila's breaches of fiduciary duty, among other wrongdoing.

191.    As alleged above, Monaco law applies to the fiduciary relationship between Nikolai and Loudmila, and, thus, Nikolai's claim of a aiding and abetting breach of fiduciary duty against Elena, Veronica and Gregory arises under Monaco law.

192.     Monaco law permits the assertion of this claim, and it is not time-barred under Monaco law.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV demands judgment in his favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, and GREGORY GLINER, individually and jointly and severally, for damages, the amount of which shall be determined at trial, for prejudgment interest, and for such other and further relief as the Court deems just and proper.

## AS AND FOR COUNT VII
### (Nikolai's Equitable Accounting Claim Against Counterclaim-Defendants)

193.     Counterclaim-Plaintiff Nikolai repeats, reasserts, and realleges each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

194.     Veronica, Elena, Loudmila and Gregory are holding, in various accounts, assets comprising Nikolai's Partnership Share (as defined above) to the exclusion of Nikolai.

195.     The accounts created by Veronica, Elena, Loudmila and Gregory, and/or by third parties on their respective behalf, are numerous, extensive and complex, and multiple transfers totaling millions of dollars were made to or from the accounts.

196.     In view of the complexity of the accounts and financial transactions, the available remedies at law will be inadequate.

197.     In addition, based on the trust reposed by Nikolai in Loudmila, and Loudmila's acceptance of that trust by agreeing to hold Nikolai's Partnership Share as his trustee and nominee, Loudmila stands in a fiduciary relationship to Nikolai, and Nikolai is, therefore, entitled to an equitable accounting from Loudmila with regard to Nikolai's Partnership Share.

198.    Accordingly, Nikolai seeks that the Court order Veronica, Elena, Loudmila and Gregory, respectively and/or jointly and severally, to produce an accounting of Nikolai's Partnership Share in their custody or control.

199.    This claim is governed by Monaco law for the same reasons that the breach of fiduciary duty claim against Loudmila is governed by Monaco law, as set forth above.

200.    Monaco law permits the maintenance of this claim, and it is not time-barred under Monaco law.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV  demands judgment in their favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, LOUDMILA BOURLAKOVA and GREGORY GLINER, individually and jointly and severally, for an Equitable Accounting and for such further and other relief as the Court deems just and proper.

## AS AND FOR COUNT VIII
**(Nikolai's and Vera's Equitable Accounting Claim Against Counterclaim-Defendants)**

201.    Counterclaim-Plaintiffs Nikolai and Vera repeat, reassert, and reallege each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

202.    Veronica, Elena, Loudmila and Gregory are holding and/or controlling, in various accounts, assets comprising the Estate Assets (as defined above) to the exclusion of Nikolai and Vera, the universal legatees.

203.    The accounts involving Estate Assets that were created by Veronica, Elena, Loudmila and Gregory, and/or by third parties on their respective behalf, are numerous, extensive and complex, and multiple transfers totaling millions of dollars were made to or from the accounts.

204.    In view of the complexity of the accounts and financial transactions, the available remedies at law will be inadequate.

205.   In addition, as Oleg's surviving spouse, Loudmila, under Monaco law, is charged with the duties to maintain and preserve the assets of his estate, to cooperate with estate administrators, legatees and other interested parties in the disposition of the estate assets and to refrain from taking any actions in derogation of the valid and enforceable last will and testament of her husband, Oleg Bourlakov.

206.   Loudmila, because she possesses and/or controls Estate Assets, owes a fiduciary duty to the estate's legatees not to conceal, spend, dissipate or convert Estate Assets and to account to Nikolai and Vera, as the universal legatees, for Estate assets in her possession or control.

207.   Accordingly, Counterclaim-Plaintiffs Nikolai and Vera seek that the Court order Veronica, Elena, Loudmila and Gregory, respectively and/or jointly and severally, to produce an accounting of the Estate Assets in their possession, custody or control.

208.   This claim is governed by Monaco law for the same reasons that the breach of fiduciary duty claim is governed by Monaco law, as set forth above, and because proceedings involving the estate of Oleg Bourlakov are pending in Monaco.

209.   Monaco law permits the maintenance of this claim, and it is not time-barred under Monaco law.

**WHEREFORE**, Counterclaim-Plaintiffs Nikolai and Vera demand judgment in their favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, LOUDMILA BOURLAKOVA and GREGORY GLINER, individually and jointly and severally, for an Equitable Accounting and for such further and other relief as the Court deems just and proper.

**AS AND FOR COUNT IX**
**(Nikolai's and Vera's Civil Conspiracy Claim Against Counterclaim-Defendants)**

210. Counterclaim-Plaintiffs Nikolai and Vera repeat, reassert, and reallege each of the allegations in paragraphs 1 through 147 as if set forth at length herein.

211. Each of the Counterclaim-Defendants entered into an agreement, oral or otherwise, with each of the other Counterclaim-Defendants whereby each agreed to work in concert and/or use various improper means to take control of Nikolai's Partnership Share and the Estate Assets.

212. The Counterclaim-Defendants agreed to commit acts consisting of breach of fiduciary duty, aiding and abetting the breach of a fiduciary duty, conversion and tortious interference with a business relationship, all as more particularly alleged above.

213. The Counterclaims asserted herein alleging breach of fiduciary duty, conversion and tortious interference constitute the predicate acts underlying the civil conspiracy.

214. In furtherance of the conspiracy, the Counter-Defendants used unlawful means and committed wrongful acts to take control both of Nikolai's Partnership Share and the Estate Assets.

215. Such unlawful means and wrongful acts include, without limitation, improperly removing computers, electronic records and files from Oleg's Monaco office; attempting to utilize expired bearer shares to change the ownership of Panama corporations that hold significant assets in which Nikolai, through foundations, has beneficial interests; providing false and incomplete information to a Latvian notary in an effort to obtain an inheritance certificate; clouding the title to the Fisher Island Property by filing improper notices of *lis pendens*; fraudulently transferring assets entrusted by Nikolai to Loudmila to various offshore vehicles and furtive entities for purposes of hiding the assets from Nikolai and Vera; fraudulently transferring and concealing Estate Assets; failing to give Nikolai and Vera adequate notice of legal proceedings commenced in various forums; and engaging in money laundering and the concealment of assets in an effort to

avoid discovery by prosecutorial authorities investigating Counterclaim-Defendants' criminal activities.

216.   Each of the Counterclaim-Defendants committed one or more overt acts in pursuit of and in furtherance of the conspiracy.

217.   Each of the Counterclaim-Defendants deliberately directed actions toward the State of Florida for purposes of advancing the objectives of the Counterclaim-Defendants' conspiracy and as evidenced by their wrongful efforts to gain control of Florida assets including both real property and cash funds.

218.   As a result of Counterclaim-Defendants' actions and inactions, Nikolai and Vera have been damaged in an amount to be determined at trial.

219.   The law applicable to this civil conspiracy claim is Monaco law, which is the law applicable to each of the underlying tortious conduct, as alleged above.

220.   This claim is not time-barred under Monaco law.

**WHEREFORE**, Counterclaim-Plaintiffs, NIKOLAI KAZAKOV and VERA KAZAKOV, demand judgment in their favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, LOUDMILA BOURLAKOVA and GREGORY GLINER, individually and jointly and severally, for damages, the amount of which shall be determined at trial, for prejudgment interest, and for such further and other relief as the Court deems just and proper.

## AS AND FOR COUNT X
### (Nikolai's Declaratory Judgment Claim Under Ch. 86 Fla. Stat. Against Counterclaim-Defendants as to the Existence of a Partnership Between Nikolai and Oleg)

221.   Counterclaim-Plaintiff Nikolai repeats, reasserts, and realleges each of the allegations in paragraphs 1 through 147 as if fully set forth set forth herein.

222.    In their Amended Complaint, Veronica and Elena falsely allege that no Partnership existed between Nikolai and Oleg and that the Partnership was purportedly a ruse created to divert assets, including Florida assets, from Loudmila and/or the Bourlakov family.   Those allegations are false.

223.    In view of Veronica's and Elena's false allegations, an actual and present dispute among the parties exists concerning whether a Partnership existed between Nikolai and Oleg; there is a justiciable question over the existence of the Partnership agreement between Nikolai and Oleg; and there is an actual and present need for a declaration by the Court as to whether there was a Partnership between Nikolai and Oleg.

224.    Accordingly, Nikolai respectfully seeks a declaratory judgment that Nikolai and Oleg entered into a Partnership pursuant to which they jointly agreed to engage in a common enterprise, sharing ownership and sharing both the profits and the losses, and pursuant to which they acquired numerous businesses, all of which were encompassed by the Partnership.

225.    Because the Partnership was formed by Oleg and Nikolai in Russia and primarily performed there, Russian law applies to the Partnership and any questions regarding its existence and its terms.

226.    Under Russian law, partnerships can be written or oral, and Russian courts enforce oral partnership agreements upon appropriate evidence of their existence.

227.    Russian law does not impose any statute of limitations on a claim to recognize and/or enforce an oral partnership agreement.

228.    The oral partnership was not illegal under Russian law in 1988 when it was entered into nor subsequently on the ground that Oleg was an officer in the Soviet military at the time the agreement was first reached.   However, to the extent any regulation of the former Soviet Union

barred Oleg from entering into an oral partnership agreement in 1988, the oral partnership was ratified and reaffirmed repeatedly after Oleg left the military.

229.     The oral partnership is not offensive to Florida's public policy, and, therefore, this Court may declare its existence, recognize it and enforce it.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV, demands judgment in his favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, LOUDMILA BOURLAKOVA and GREGORY GLINER, individually and jointly and severally, for declaratory relief under Chapter 86 as to the fact that an unwritten Partnership agreement existed between Nikolai Kazakov and Oleg Bourlakov and as to the terms thereof, and for such further and other relief as the Court deems just and proper.

## AS AND FOR COUNT XI
### (Nikolai's Declaratory Judgment Claim Under Ch. 86 Fla. Stat. Against Counterclaim-Defendants as to the Ownership of Edelweiss)

230.     Counterclaim-Plaintiff Nikolai repeats, reasserts, and realleges each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

231.     In their Amended Complaint, Veronica and Elena falsely allege that Veronica is the owner of Edelweiss and that Edelweiss paid for the Fisher Island Property and made a $5 million payment for related expenses.

232.     In fact, Edelweiss is not owned by Veronica.  It is owned by Hemaren Stiftung in which Nikolai holds the beneficial ownership interest.

233.     The resolution of this ownership dispute will resolve any claim by Veronica that Edelweiss has rights in the disputed Florida assets.

234.     There is an actual and present dispute between the parties regarding the ownership of Edelweiss; there is a justiciable question over the ownership; and there is an actual and present

need for a declaration as to whether Edelweiss is owned by Veronica as she claims or by Hemaren Stiftung as Nikolai assets.

235.   Nikolai, without prejudice to his position that the courts of Panama have already decided this matter in his favor (a position disputed by Veronica), seeks a declaratory judgment that the owner of Edelweiss is Hemaren Stiftung, not Veronica.

236.   Because Edelweiss is a Panamanian company, Panamanian law applies to the question of whether Veronica or Hemaren Stiftung is the owner of Edelweiss.

237.   Panamanian law also applies in determining whether this claim is timely.  Under Panamanian law, Nikolai's claim for a declaration is not barred by any statute of limitations.

238.   All parties necessary to make the declaration requested herein have been joined herein or in the Related Action filed by Veronica.  The Court's granting of the pending motion for consolidation of the two actions will cure any issue concerning joinder of necessary parties.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV, demands judgment in his favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA, LOUDMILA BOURLAKOVA and GREGORY GLINER, individually and jointly and severally, for declaratory relief under Chapter 86 as to the fact that Veronica Bourlakova is not and never has been the owner of Edelweiss and for such further and other relief as the Court deems just and proper.

## AS AND FOR COUNT XII
**(Nikolai's and Vera's Declaratory Judgment Claim Under Ch. 86 Fla. Stat. Against Plaintiffs in Their Individual and Guardian Capacities as to Rights Under the 2017 Trust)**

239.   Counterclaim-Plaintiffs repeat, reassert, and reallege each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

240.   In their Amended Complaint, Veronica and Elena, purportedly on behalf of their unnamed minor children (the "**Children**"), allege that the Children own beneficial interests under

the 2017 Trust and that the 2017 Trust owns the Fisher Island Property.  A copy of the agreement purportedly creating the 2017 Trust is attached as Exhibit "A" to the Amended Complaint.

241.    In fact, the Children do not own any such beneficial interests under the 2017 Trust, and the 2017 Trust never owned the Fisher Island Property.

242.    The Kazakovs own the beneficial interests in a 2020 irrevocable trust under which Thomas Butler currently serves as trustee (the "2020 Trust").  A copy of the agreement creating the 2020 Trust is attached as Exhibit "G" to the Amended Complaint.

243.    Butler as trustee of the 2020 Trust holds title to the Fisher Island Property and holds the property, pursuant to the 2020 Trust, for the benefit of the Kazakovs.

244.    Oleg Bourlakov, the named settlor of the 2017 Trust, did not sign the agreement creating the 2017 Trust, and he did not execute any other declaration of trust instrument to evidence his creation of this alleged trust.

245.    Section 689.05, Florida Statutes, entitled "How declarations of trust proved," provides:  "All declarations and creations of trust and confidence of or in any messuages, lands, tenements or hereditaments **shall be manifested and proved by some writing, signed by the party authorized by law to declare or create such trust or confidence**, or by the party's last will and testament, or else they shall be utterly void and of none effect . . . ."  Oleg did not sign a declaration of trust for the 2017 Trust.

246.    Further, Section 736.0403(2)(b), Florida Statutes, adds that "the testamentary aspects of a revocable trust, executed by a settlor who is a domiciliary of this state at the time of execution, are invalid unless the trust instrument is executed by the settlor with the formalities required for the execution of a will in this state."  To the extent the 2017 Trust was intended to have any testamentary aspects, this provision applies.

247.     The Children claim, through their parents as guardians, that these requirements do not apply and that the 2017 Trust is valid and enforceable.  Counter-Plaintiffs disagree.

248.     Further, the 2017 Trust is, as stated in its title "revocable."  Nevertheless, the Children contend that the word "revocable" in the title does not refer to the ability of the settlor to revoke, but, rather, to their ability as beneficiaries to revoke the 2017 Trust.  Counter-Plaintiffs disagree.

249.     Further, the Children contend that the Fisher Island Property was purchased by Edelweiss and that Veronica owns Edelweiss.  The Children contend that, even if the 2017 Trust is unenforceable, they have equitable ownership of the Fisher Island Property because Veronica's alleged company, Edelweiss, purchased the property for their benefit.  Counter-Plaintiffs disagree.

250.     Further, the Children contend that the Fisher Island Property was lawfully and validly transferred to the 2017 Trust by an original and/or corrective deeds executed by the prior owners.  Counter-Plaintiffs disagree and contend that those deeds were ineffective because the prior owners, the Krutoys, never granted title to Steven Landau, as Trustee of the 2017 Trust.

251.     Further, the Children contend that the 2017 Trust holds other assets, namely cash in the amount of $5 million or other real property purchased with that cash.  Counter-Plaintiffs contend that this $5 million sum was never added to the corpus of the 2017 Trust (even assuming it was enforceable) by the settlor, the Childrens' grandfather, Oleg.

252.     Further, the Children contend that Oleg purchased the Fisher Island Property with the intention that it be a long-term family vacation home for the enjoyment of his children and grandchildren.  Counter-Plaintiffs disagree and assert that Oleg purchased the Fisher Island Property as an accommodation to his friend, Igor Krutoy, and to hold for a short term period with the expectation of reselling the home at a profit.

253.    There is an actual and present dispute between the parties regarding all of the foregoing issues.

254.    There is an actual and present need for the Court to resolve these issues because the resolution of these issues will resolve actual pending disputes between the Children and their parents on the one hand and Nikolai and Vera Kazakov on the other concerning the ownership of the Fisher Island Property as well as the ownership of the $5 million in cash Oleg caused to be transferred to a Florida bank account or the product of that cash.

255.    Nikolai and Vera seek declaratory judgments as to all of the issues described above.

256.    This claim is against Veronica and Elena both in their alleged guardian capacities (and, therefore, is against the Children) and against Veronica and Elena in their individual capacities.

257.    All necessary parties are joined herein.

258.    The law applicable to this claim is Florida law because the trusts are governed by Florida law, and the subject assets are Florida assets.

259.    This claim is not barred by any statute of limitations.

**WHEREFORE**, Counterclaim-Plaintiffs, NIKOLAI KAZAKOV and VERA KAZAKOV, demand a judgment in their favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA and ELENA BOURLAKOVA, in both their individual and guardianship capacities, individually and jointly and severally, for declaratory relief under Chapter 86 as to the matters alleged above and for such further and other relief as the Court deems just and proper.

## AS AND FOR COUNT XIII
### (Nikolai's Claim for Unjust Enrichment[2] Against Counterclaim-Defendants)

260.    Counterclaim-Plaintiffs repeat, reassert, and reallege each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

261.    In or about 2014, Nikolai entrusted substantial assets, referred to above as Nikolai's Partnership Share, to Loudmila to hold for his account and for his benefit.

262.    Loudmila knowingly and voluntarily accepted these assets from Nikolai and has retained them despite Nikolai's demand for the return of same.

263.    Further, Counter-Defendants Veronica, Elena and Gregory were aware that Nikolai had given his assets to Loudmila for safekeeping.  Nevertheless, they knowingly and voluntarily accepted some of Nikolai's assets that Loudmila transferred to them or placed under their control.

264.    Counter-Defendants Veronica, Elena and Gregory have retained Nikolai's assets that were transferred to them by Loudmila despite Nikolai's demand for the return of same.

265.    The circumstances are such that it would be inequitable for the Counter-Defendants to retain Nikolai's assets that he had given to Loudmila for safekeeping without paying the value thereof to Nikolai.

266.    Because Monaco law applies to the claim herein for breach of the Safekeeping Agreement, it also applies to this claim for unjust enrichment.  Under Florida law, the law applicable to a breach of contract claim also applies to a related claim for unjust enrichment.

267.    This claim is not barred by any statute of limitations applicable under Monaco law.

**WHEREFORE**, Counterclaim-Plaintiff, NIKOLAI KAZAKOV, demands judgment in his favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA

---

[2] With respect to Loudmila, Nikolai's unjust enrichment claim is asserted in the alternative to his claim against Loudmila for breach of the Safekeeping Agreement.

BOURLAKOVA, LOUDMILA BOURLAKOVA and GREGORY GLINER, individually and jointly and severally, for damages, the amount of which shall be determined at trial, for unjust enrichment and for such further and other relief as the Court deems just and proper.

## AS AND FOR COUNT XIV
### (Nikolai's and Vera's Abuse of Process Claim Against Loudmila, Veronica and Elena)

268.    Counterclaim-Plaintiffs repeat, reassert, and reallege each of the allegations in paragraphs 1 through 147 as if fully set forth herein.

269.    On or about November 6, 2022, Loudmila, Veronica and Elena (collectively, the "**RICO Plaintiffs**") filed their RICO Complaint in the United States District Court for the Southern District of Florida.

270.    The RICO Plaintiffs alleged that Nikolai and Vera Kazakov, together with Oleg Bourlakov and numerous alleged "co-conspirators," engaged in a "pattern of racketeering activity" and conspired to commit numerous predicate acts of fraud, theft and tortious interference.

271.    The RICO Plaintiffs alleged a worldwide conspiracy to "unlawfully and fraudulently misappropriate assets and real property . . . .belonging to the RICO Plaintiffs—Loudmila, Veronica and Elena—including the ownership of several Panamanian corporations,  a jet airplane, valuable Florida real estate and cash."

272.    The RICO Plaintiffs alleged that the Kazakovs schemed with others to gain unlawful control over several Panama companies, one of which, Edelweiss, holds a portfolio "worth more than $1 billion containing significant U.S. investments" and deposit accounts at several Swiss banks.

273.    The RICO Plaintiffs did not name Nikolai and Vera Kazakov as defendants, perhaps to avoid exposing themselves to counterclaims.  But, they accused Nikolai and Vera of

theft, fraud, tortious interference, money laundering, evasion of sanctions imposed on Russian businesses and other serious wrongdoing.

274.    The RICO Plaintiffs alleged that Nikolai and Oleg Bourlakov (the husband of Loudmila and father of Veronica and Elena) were the central players in the alleged worldwide RICO enterprise.  Indeed, the RICO Plaintiffs described Nikolai as a "co-conspirator" some 160 times in the Complaint.  They described Nikolai's wife, Vera, as a co-conspirator numerous times as well.

275.    In their 110-page, 380-paragraph RICO Complaint, the RICO Plaintiffs alleged that the co-conspirators, to effectuate the RICO enterprise, "used the corporate structures and financial systems of the United States particularly by using Delaware limited liability companies controlled from the U.S. by U.S. persons and others to fraudulently effectuate control of certain Assets and by obscuring the identity of its actors through the use of seemingly legitimate U.S. companies."

276.    Specifically, the RICO Plaintiffs alleged that the co-conspirators, as part of the alleged RICO enterprise, formed Delaware limited liability companies that engaged in various fraudulent corporate actions to frustrate the ownership rights of the RICO Plaintiffs in valuable Panama companies including Edelweiss, Jovellanos and Gatiabe.  The RICO Plaintiffs alleged that Nikolai and Vera, together with Oleg Bourlakov and others, directed these allegedly fraudulent activities from behind the scenes and enlisted the knowing and active support of Anthony Raftopol, a Florida resident, and Gerd Schneider, a Luxembourg resident.

277.    The RICO Plaintiffs named as defendants four Delaware limited liability companies, four Panama foundations, a Luxembourg entity, a Liechtenstein entity and Raftopol and Schneider individually—twelve defendants in all.  They alleged that all of the defendants were

used as tools by the Kazakovs and Oleg Bourlakov to defraud Loudmila, Veronica and Elena and to misappropriate their assets including Florida assets owned by the Panamanian entity Edelweiss.

278. The RICO Plaintiffs alleged that the courts of the United States and Florida had jurisdiction over the subject matter and personal jurisdiction over the defendants, and they expressly stated that they submitted to the jurisdiction of the U.S. District Court.

279. Despite filing the 110-page, 12-count RICO Complaint, the RICO Plaintiffs never served it. Indeed, deviating from standard practice, they did not even obtain the issuance of summonses, which is done almost always at or near the time when a complaint in federal court is filed.

280. While they did not serve the RICO Complaint, they did make active use it. Specifically, the RICO Plaintiffs used it to injure the reputations of the Kazakovs in the eyes of judges and lawyers in other jurisdictions, business associates of the Kazakovs, and bankers.

281. The RICO Plaintiffs, while not serving the RICO Complaint on any of the defendants, used the RICO Complaint to attempt to damage the Kazakovs' position in Panama litigation involving the ownership of the Panama corporations.

282. Their plan was to have Veronica's and Loudmila's Panama attorneys file certified copies of the RICO Complaint in the Panama courts. They carried out this plan. Veronica's and Loudmila's Panama attorneys filed the RICO Complaint in one court in Panama on or about November 8, 2022 and in another court in Panama on or about January 17, 2023, both times in connection with important hearings.

283. At the time, the Panama courts were considering, among other things, issues relating to the ownership of Edelweiss, a Panama company Veronica claims to own that, as noted earlier, reportedly holds a portfolio worth at least U.S. $1 billion. The RICO Plaintiffs wanted to

let the Panama judges know about the RICO Complaint in order to paint the Kazakovs as racketeers and criminals and to attempt to influence the upcoming court decisions in the Panama courts concerning Edelweiss.

284.    The RICO Plaintiffs voluntarily dismissed the RICO Complaint on February 2, 2023, but they did not—and to this day have not—notified the Panama courts of the fact that the RICO Complaint was voluntarily dismissed.  To put the point plainly, the RICO Plaintiffs used the RICO Complaint filed in Florida to inform at least two judges in Panama that the Kazakovs engaged in criminal racketeering without ever correcting the record to advise the judges of the fact that the RICO Plaintiffs withdrew their scandalous and false allegations.

285.    Courts in other countries such as Panama respect the court system of the United States and respect internationally known law firms such as Norton Rose Fulbright, the firm that the RICO Plaintiffs employed to file the RICO Complaint in Florida.

286.    Norton Rose is a global law firm that has more than 3,000 lawyers in 50 locations worldwide, including London, Houston, New York, Toronto, Mexico City, Hong Kong, Sydney and Johannesburg, covering Europe, the United States, Canada, Latin America, Asia, Australia, Africa and the Middle East.  When a firm like Norton Rose files a 110-page complaint accusing persons of racketeering—of serious criminal wrongdoing—jurists in other countries, presiding over related cases, will take notice.  That is exactly why the RICO Plaintiffs took pains to file copies of the RICO Complaint in the Panama courts.  In fact, they did not waste any time.  They filed copies of the RICO Complaint in a Panama court within one week after it was filed in federal court here in Miami.

287.    The RICO Act was a response to organized crime in the United States.  According to statements on the Justice Department's web site, the RICO Act was intended to strengthen the

legal tools for fighting organized crime by establishing new penal prohibitions and providing enhanced sanctions and new remedies for dealing with the unlawful activities of those engaged in organized crime.  Simply put, the term "RICO"—which the RICO Plaintiffs used three times in the case style of their complaint and numerous times throughout its body—connotes criminal conduct because the RICO Act was expressly designed to remedy criminal conduct.  And the RICO Act is widely understood in Panama and other Latin American countries to be aimed at remedying and punishing serious criminal conduct.

288.    The RICO Plaintiffs had no reason whatsoever to file the RICO Complaint in two Panama courts other than to attempt to injure the Kazakovs' reputation and poison the Panama judges against the Kazakovs.

289.    At this point in time, it is not known whether reading the scurrilous accusations made by the RICO Plaintiffs will influence the Panama judges who received copies (or other Panama judges, such as appellate judges, who see the complaints in the court files) to rule against the Kazakovs, to view them as criminals or to doubt their credibility.  But, certainly, that was the RICO Plaintiffs' improper objective.  At the very least, the RICO Plaintiffs, by distributing copies of the RICO Complaint in the Panama courts, caused damage to the Kazakovs' reputations.

290.    Moreover, following Oleg's death, media coverage of the ensuing disputes over the disposition of his assets has been extensive.  The RICO Plaintiffs knew that the RICO Complaint would likely receive substantial publicity, and they were right.  It did.

291.    At the time of the filing of the RICO Complaint, the RICO Plaintiffs and Nikolai were involved in an ongoing dispute concerning blocked Swiss bank accounts.  The RICO Plaintiffs sought to prevent Nikolai from exercising his right to access the accounts.  The RICO Plaintiffs intended that the RICO Complaint would come to the attention of the relevant Swiss

bankers so that any effort by Nikolai to unblock the accounts would fail, and that is what has occurred.

292.    The Kazakovs are not privy to the communications between the Swiss advisors to the Bourlakovas and Swiss bankers, but, on information and belief, some of those bankers became aware of the RICO Complaint.  Whether that happened as a result of direct communications by the Bourlakovas or their advisors, or as a result of media reports, is unknown at this time. Discovery will reveal the extent to which the Bourlakovas and/or their advisors circulated the RICO Complaint in banking circles.

293.    Obviously, allegations of money laundering and evasion of U.S. Treasury Department Russia sanctions—and the RICO Complaint is replete with such allegations—would put any banker overseeing accounts claimed by the Kazakovs or associated with Oleg Bourlakov on high alert.

294.    To ratchet up the pressure, and expose the Kazakovs to scrutiny and disrepute, the RICO Plaintiffs went so far as to reveal information that was provided by the Kazakovs to the RICO Plaintiffs' lawyers in Russia on a confidential and "without prejudice" basis and strictly for settlement purposes.

295.    The information included an authorization letter whereby Nikolai Kazakov authorized a Russian litigation funder to assist in negotiating a settlement with the Bourlakovas. In the RICO Complaint, the RICO Plaintiffs disclosed this information and wrongly insinuated that the Kazakovs have an ongoing relationship with Russian lenders who are the direct subject of Treasury Department sanctions or who are tied to sanctioned parties.

296.    By disclosing that information in a public court filing in the United States, the RICO Plaintiffs violated strict rules of confidentiality governing settlement communications.  They did

so solely to attempt to smear the Kazakovs, injure their reputations and damage their business relationships.

297.    The RICO Complaint is public record in the United States, and, in today's world of easy on-line access to public records, the RICO Complaint is widely available to anyone who performs an on-line search of court records as to the Kazakovs and any of the named defendants. Further, the RICO Complaint has been reported in several media outlets, as the RICO Plaintiffs knew it would be.

298.    The RICO Plaintiffs filed (but never served) the RICO Complaint for still another improper purpose—to damage the reputation of the Kazakovs among corporate professionals and service providers who the Kazakovs depend on.  The strategy worked.

299.     For instance, both of the individual defendants, Raftopol and Schneider, contacted representatives of the Kazakovs to express their shock and dismay concerning the allegations in the RICO Complaint and to request indemnification.

300.    Raftopol and Schneider are professionals who provide advice to high net worth individuals and who specialize in cross-border business, corporate and tax matters.  Nikolai Kazakov has a business relationship with these individuals and relies on them for corporate services.

301.    Prior to seeing the RICO Complaint, Raftopol and Schneider had no reason to think badly of Nikolai or to question his honesty, integrity or good faith.

302.    Raftopol advised the Kazakovs' representatives that some of Raftopol's own investment banker and venture capital clients had seen that he was named in a massive U.S. federal court RICO case.

303.    Raftopol, in addition to requesting an indemnity, asked the Kazakovs to have their legal counsel explain why Raftopol should not be concerned about the allegations in the RICO Complaint.  He also requested that the Kazakovs' attorneys provide an analysis of the RICO Complaint to him that he could share with his clients in order to assuage their concerns.  The Kazakovs, in order to mitigate damage to their own reputations, and to avoid the loss of important business relationships, complied with Raftopol's request and incurred legal fees in doing so.

304.    The reputation of the Kazakovs has been damaged irretrievably in the eyes of Raftopol and Schneider and their colleagues and associates.  Further, because the RICO Complaint is public record and easily accessed by anyone conducting "due diligence" on the Kazakovs, the long-term damage to the Kazakovs' reputation in business and banking circles is incalculable.

305.    Notably, when the RICO Plaintiffs did voluntarily dismiss the Complaint— approximately three months after filing it—they were careful to state that they were dismissing it "without prejudice."  They thus told the world that their RICO claims are still viable and that they may sue the Kazakovs for RICO violations in another action to be filed in the future.

306.    The RICO Complaint was filed by the RICO Plaintiffs for an improper, ulterior and illicit purpose—to damage the Kazakovs in the eyes of jurists, bankers, business associates, business advisors and others—and not for the purpose of actually prosecuting the claims therein.

307.    As a result, the Kazakovs have suffered reputational damage and have been required to expend legal fees attempting to attempt to ameliorate the actual damage and potential damage that was caused to them.

308.    The Kazakovs also have suffered severe emotional distress resulting from false accusations that they are embezzlers, racketeers, money launderers and violators of U.S. Treasury Department sanctions.

309.    As a result of the RICO Plaintiffs' actions in using the RICO Complaint for an improper, ulterior and illicit purpose, the Kazakovs have suffered actual damages in the form of loss of reputation, emotional distress and legal expense.

**WHEREFORE**, Counterclaim-Plaintiffs, NIKOLAI KAZAKOV and VERA KAZAKOV demand judgment in their favor and against Counterclaim-Defendants, VERONICA BOURLAKOVA, ELENA BOURLAKOVA and LOUDMILA BOURLAKOVA, individually and jointly and severally, for actual and nominal damages, the amount of which shall be determined at trial, for abuse of process and for such further and other relief as the Court deems just and proper.

## RESERVATION OF RIGHTS

Counterclaim-Plaintiffs reserve the right to amend these Amended Counterclaims to add such additional claims as may be available after the providing of required statutory notices and to add such additional claims as may be supported by facts obtained during discovery.

*/s/  Peter H. Levitt*
Aliette D. Rodz, Esq.
Florida Bar No. 173592
Peter H. Levitt, Esq.
Florida Bar No. 650978
John W. Bustard, Esq.
Florida Bar No. 641871
Aleksey Shtivelman, Esq.
Florida Bar No. 99159
SHUTTS & BOWEN LLP
*Attorneys for Nikolai and Vera Kazakov*
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
(305) 358-6300 Telephone
(305) 381-9982 Facsimile
Primary Email: plevitt@shutts.com
Primary Email: arodz@shutts.com
Primary Email: jbustard@shutts.com
Primary Email: ashtivelman@shutts.com
Secondary Email: sboisvert@shutts.com

**CERTIFICATE OF SERVICE**

 **I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on this 7th day of June, 2023 by transmission of Notices of Service of Court Document generated by the E-Portal to all parties registered to receive email in this case.

        */s/Peter H. Levitt*
        Peter H. Levitt