# Exhibit M

# CT GROUP REPORT

# 17 January 2024

**TABLE OF CONTENTS**

A. Introduction .................................................................................5

    I.      Scope of Investigation ..................................................................5

    II.     Summary of Findings ...................................................................7

        *Ownership and Control of Assets, Companies and Bank Accounts* ...................7

        *Stated Intention to Dissipate and Hide Assets* .....................................9

        *Attempts to Obtain Control of OB's Assets* ..........................................9

        *Funds Transfers*......................................................................10

        *Other Findings* ......................................................................14

    III.    Approach to gathering material ..................................................14

    IV.    Sources and Methodology ..........................................................15

        *Open Source Enquiries* ............................................................15

        *Confidential Human Source Enquiries*..............................................15

        *Challenge to Copy Transaction Records in Other Proceedings* .......................21

B. Dramatis Personae ....................................................................26

C. Findings: Emails Between SA and NK showing an intention to dissipate assets and obtain control of OB assets..................................................29

    I.      Email from October 21 showing an intention to dissipate Edelweiss assets using KESK ...........................................................................29

    II.     Emails from October 2021 showing an intention to transfer Wlamil 2 and Wlamil 3 to NK/KESK .............................................................. 30

    III.    Emails from November 2021 about the transfer of Gatiabe and Captain Vrungel to KESK ................................................................... 31

    IV.    Emails from October and November 2021 showing attempts by SA/NK to obtain control of OB's accounts at Signet Bank Latvia ...........................32

D. Findings: Attemped transfers of OB assets........................................33

E. Finding: NK Control of certain Edelweiss Companies ........................34

    I.      Edelweiss Investment Inc. and its UBS portfolio ...........................35

    II.     Transfer of funds from Edelweiss Investments Inc to NK: March 2021......35

    III.    Agreements for the transfer of Edelweiss Investment Holding SA subsidiaries (including ESP and ESPB) to NK in January 2019 ..................................36

F. Findings: ESPB's Bank Accounts - Transfers to and from UAE-based and unknown companies  (Feb 20 – Dec 22) ...............................................36

    I.      Overview ..........................................................................36

    II.     Investigations into the Relevant Companies ................................38

    III.    Transactions involving ESPB's Swiss UBS account (Monston Trading Ltd and Acorn) ................................................................................ 41

        *Summary of Payments from CTR Source material* ............................. 41

        *Additional Detail from CTR Source Material* ...................................42

IV. Transactions involving ESPB's Swiss Pictet Account (Amblex, Avanda and Blinton) ...................................................................................................43

    *Summary of Payments from CTR Source Material* ...........................................43

    *Additional Detail from CTR Source Material* ................................................45

    *Further Material from Other Sources* ..............................................................46

V. Payments involving ESPB'S Swiss Julius Baer account (unknown entities and Cordax) .................................................................................................................47

    *Summary of Payments from CTR Source Material* ...........................................47

    *Further Material from Other Sources: Cordax* ............................................... 48

**G. Findings: NK's Bank Accounts—Transfers to and from NK's Accounts and the Accounts of Companies he is believed to control (Feb 21-Mar 23) 49**

    I. Overview ..........................................................................................................49

    II. Investigations into the relevant companies .................................................. 51

    III. Transfers involving NK's Swiss Julius Baer account .......................................54

        *Summary of Payments from CTR Source Material* ...........................................54

        *Additional Detail from CTR Source Material* ................................................55

    IV. Transfers involving NK's Swiss Pictet bank account .......................................56

        *Summary of Payments from CTR Source Material* ...........................................56

        *Additional Detail from CTR Source Material* ................................................57

        *Further Material from Other Sources* ..............................................................58

    V. Transfers involving NK's Banque de Luxembourg account ...............................59

        *Summary of Payments from CTR Source Material* ...........................................59

        *Additional Detail from CTR Source Material* ................................................ 60

    VI. Transfers involving NK's Banque Havilland account .......................................61

**H. Findings: Transfers From NK, ESPB and GATIABE to Russia (Mar/Apr 22) ................................................................................................62**

    I. Overview ..........................................................................................................62

        *Summary of Payments from CTR Source Material* ...........................................63

    II. Ownership, control and affiliation of the relevant parties ...................................64

        *Further Detail from CTR Source Material* .......................................................65

**I. Findings: NK's Portfolios .............................................................................. 67**

    I. Transfer of NK's Julius Baer Monaco Account (2019-2022) portfolio to UBS....67

    II. NK's Banque Havilland Monaco Account (c. 2022-present)............................. 68

**J. Findings: Payments of $34m from OB to VK in 2018..........................68**

**K. Findings: NK assets .....................................................................................69**

    I. Properties owned and/or controlled by NK.......................................................69

    II. Companies believed to be controlled by NK.................................................... 71

    III.     Bank accounts owned by NK.......................................................................72

IV.     Bank Accounts in the Name of Entities which NK Controls ........................73

V.      Bank Accounts in the name of individuals who appear to have received funds from NK ..................................................................................................................75

**L. Findings: VK assets ............................................................................. 75**

I.      Bank Accounts .............................................................................................75

**M. Appendix............................................................................................... 77**

## A. INTRODUCTION

1.    CT Group ("**CT**") is a private company established in 2002 that operates in a variety of jurisdictions. It undertakes research, campaigns, intelligence and advisory work. The intelligence practice uses its global network to provide intelligence, investigations, deep due diligence, asset tracing, wealth authentication, data analytics, digital investigations and forensics for clients including law firms, corporate and private clients.

2.    CT is an established and reputable firm with a proven track record of assisting clients in a variety of circumstances, including litigation support and dispute resolution. It is staffed by individuals who have distinguished careers and reputations. The majority of its senior team have the benefit of years of public service in related fields, working for intelligence agencies and in law enforcement, as well as experienced former bankers and accountants.

3.    Leah James is the Head of the Intelligence Practice for CT and has been authorised to sign this report on its behalf. Leah has extensive experience running multi-jurisdictional investigations.

4.    The following report sets out CT's findings from a series of investigations commissioned by Mishcon de Reya LLP ("**Mishcon**") on behalf of its clients, Loudmila, Veronica and Elena Bourlakova (the "**Clients**") concerning whether Nikolai Kazakov ("**NK**"), Vera Kazakova ("**VK**") and Semen Anufriev ("**SA**") have been engaged in the dissipation of assets (the "**Project**"). We understand that these investigations, and our instructions from Mishcon, are privileged, and we do not have authority to waive any privilege.

### I.    Scope of Investigation

5.    During its investigations, CT has uncovered material that clearly indicates money movements and interactions between individuals and entities at certain points in time. Such material provides snapshots that CT and its sources were able to obtain at any particular point in time. In a case such as this, which pertains to alleged global and widescale fraud, it is virtually impossible for CT to uncover every relevant transaction, every step in the transactions identified

or every asset in the control of the relevant individuals. CT makes no such claims in respect of this investigation.

6. CT does not represent that the material presented in this report is conclusive proof of the matters identified or referred to in that material. As explained further below, different types of the material may be more or less reliable. In particular, the majority of the material obtained by CT has come from human sources. This includes both simple "intelligence" (where the source has conveyed information, e.g. from a record that they have viewed themselves) and copies of documents the sources have obtained. CT has attempted to test the reliability of the sources, and corroborate the material provided by them as far as possible and, as a result of the corroboration that has been obtained, CT has a high degree of confidence that the material is reliable. However, it is not possible for CT to guarantee that the material provided by the sources is accurate.

7. In this Report, we will present the available material by topic, as an aggregation of the results of CT's various enquiries using a range of sources.

## II.   Summary of Findings

8.   CT has obtained material  suggesting that:

   a)  NK, VK and SA are in control of substantial assets and companies (including assets and companies that CT understands are disputed in these proceedings);

   b)  NK and SA have stated an intention to dissipate and hide assets;

   c)  NK and SA have been attempting to take control of some of Mr Bourlakov's ("**OB**") assets and bank accounts; and

   d)  There have been significant and largely unexplained funds transfers across borders over the last few years involving companies under NK's apparent control and NK himself. Where reference is made in this report to unexplained transfers of funds, we mean that CT has not been able to find any evidence of any underlying commercial activity to which these transfers relate, including any underlying commercial activities undertaken by the transferees. CT has not been able to identify any corporate information at all in relation to some of the transferees.

9.   CT's findings do not purport to comprise a comprehensive picture of all dealings and transfers involving all relevant entities and individuals, all companies controlled by NK, VK or SA or all assets within the possession or control of NK, VK, SA or these companies. Rather, these findings are a series of snapshots that CT has been able to obtain.

10.   CT's findings are set out in detail in Sections C-L below, with supporting documents appended in the Exhibit. References to pages of the Exhibit will be in the form 'Exhibit number/page number(s)'.

### *Ownership and Control of Assets, Companies and Bank Accounts*

11.   The entities that CT has identified as being likely within NK's ownership and/or control are listed in the Dramatis Personae (at Section B) and the table at Section K (II). These include the following key companies which are involved in unexplained substantial transfers and dissipation of funds, and include some

companies which CT understands its Clients claim to own or to be part of OB's estate:

a)  Edelweiss Investments Inc (Panama) (D12), including its portfolio of assets held with UBS.

b)  Edelweiss Investment Real Estate SA ("**EIRE**"), Edelweiss Investment S.PB SA ("**ESPB**") and Edelweiss Investment S.P. SA (Switzerland) ("**ESP**").

c)  Finco Financial Company Inc ("**Finco**") (Panama) (D10).

d)  Gatiabe Business Inc ("**Gatiabe**") (Panama) (D11).

e)  KESK Stiftung ("**KESK**") (Liechtenstein).

f)  Wlamil Foundation (Panama).

g)  Wlamil 2 and Wlamil 3 (Panama).

h)  Ten companies involved in substantial funds transfers with other companies under NK's control, including six that appear to be based in the UAE (Monston, Amblex, Avanda, Acorn, Irtum and Cordax) and four which CT has been unable to locate (Asakren, Blinton, Canford and Gefan).

i)  OOO Admiral Invest ("**Admiral Invest**") (Russia).

j)  OOO GeoKompas (Russia).

12.  CT has also identified certain bank accounts in the name of NK and VK and in the name of companies within their apparent control. These are listed at Section K below. CT does not have information concerning the balance of these bank accounts; however, it has obtained material to indicate the value of two of NK's portfolios:

a)  As at June 2022, NK's portfolio at Julius Baer Monaco, which was then transferred to his account at UBS Switzerland, had a market value of approximately €15,571,439.49.

b)  As at 30 June 2023, NK's portfolio at Banque Havilland contained total net assets worth €9,872,214.14

13.     CT has also identified certain properties in the name of NK, VK and in the name
        of companies within their apparent control. These are listed at Section K(I)
        below.

### Stated Intention to Dissipate and Hide Assets

14.     CT has obtained email correspondence between NK and SA from October and
        November 2021 which states an apparent intention to dissipate the assets of
        "Edelweiss"[1], Gatiabe, Wlamil and Finco using other companies owned and
        controlled by NK and/or VK. This includes plans to transfer "Edelweiss" assets,
        the Panamanian foundations Wlamil 2 and Wlamil 3 and the Panamanian
        company Gatiabe to KESK, NK and VK's foundation in Liechtenstein.

15.     The emails suggest that NK and SA were attempting to hide these assets from
        other parties e.g. saying that "*[t]he other side does not know about these
        assets*", that the planned transfer of  Wlamil 2 and Wlamil 3 to KESK was to
        "*protect the cash from third party claims*" and that "*[t]he most important
        thing is that this information isn't leaked to our opponents*".

### Attempts to Obtain Control of OB's Assets

16.     CT has obtained emails from between October 2021 and March 2022 that
        appear to show SA and NK attempting to take control of various of OB's assets:

        a)   Emails from October/November 2021 showing attempts to take control
             of OB's accounts at Signet Bank, Latvia.
        b)   Emails of January 2022 between SA and UBS, forwarded to NK,
             showing an attempt to transfer CHF 116 million from OB's Geneva UBS
             account to Edelweiss.
        c)   Emails in February 2022 between SA and UBS, forwarded to NK,
             showing NK and SA attempting to transfer CHF 115 million from OB's
             Monaco UBS account.

---

[1] It is unclear from the email which Edelweiss entity or entities this is.

    d) Emails in February/March 2022 between Signet Bank and SA, forwarded to NK, showing NK and SA trying to transfer €9 million to ESPB's UBS account from Black Pearl Investment SIA's account.

    e) An email from March 2022 between SA and NK discussing their attempt to access OB's safety deposit box at Raiffeisen bank.

17.    Email correspondence between SA, various banks and NK showing evidence of attempts by NK and SA to transfer OB's assets to individuals and entities related to them.

### *Funds Transfers*

18.    CT has identified material showing substantial transfers of funds involving NK and companies that appear to be within his control. The transactions involve companies located in Panama, Liechtenstein, Switzerland, Russia, Dubai and unknown jurisdictions, and (to the extent CT has information on the bank accounts used) their (and NK's) bank accounts in Monaco, the Bahamas, Switzerland, Dubai, Abu Dhabi, Russia, Liechtenstein and Luxembourg. The transfers are of substantial sums.

19.    Many transfers of funds use companies which CT has been unable to locate or find information about, or companies incorporated in jurisdictions where there is little publicly available corporate information. This includes (i) five companies which CT has been unable to locate or find any active details of, despite undertaking thorough searches of publicly available records and investigations between August and October 2023 (Asakren, Canford, Gefan, Irtum, Blinton) and (ii) five companies which appeared from investigations carried out between August and October 2023 to be registered in the Jebel Ali Free Zone, Dubai (Monston, Amblex, Avanda, Acorn, Cordax). However, further material obtained by CT in January 2024 (discussed in more detail at Sections F and G below) suggests that Irtum, Cordax and Amblex may in fact be registered in the Ras Al Khaimah Economic Zone, Dubai ("**RAK Free Zone**"). CT understands that, in respect of the Dubai companies, as non-resident offshore entities, they are not obliged to provide any public details or

documentary evidence pertaining to their registration. The transfers involving these companies total EUR 657,375,447.64 and US$256,047,330.33.

20.    Some of the material CT has obtained includes some limited information about the supposed purpose of some of the transactions in the form of payment references. It is not for CT to express a view as to whether these are accurate. But CT has found no material to suggest that the relevant companies are conducting genuine commercial activity. If the companies are not conducting genuine commercial activities, or if the stated payment purposes are regarded as suspicious, CT considers from its professional experience in conducting investigations that an inference can be drawn that these transfers comprise or involve asset dissipation.

21.    CT has calculated below the total figures for the transactions it has identified. However, it is possible that some funds have been double counted (if the same funds flowed through multiple entities). CT does not have the information necessary to conduct a forensic tracing exercise and is therefore unable to identify this.

22.    In summary, CT has obtained material showing 142 transfers with a total approximate value of €716,929,959.40 and US$441,463,946.00 between 2020 and 2023, broken down as follows:

   a) **Three transfers totalling approximately US$9.5million and €16.5million from Edelweiss Investments Inc to NK in April 2020 and March 2021:**

      i.   15 April 2020 €15 million from Edelweiss Investments' Pictet Bahamas account to NK's Julius Baer Monaco account.

      ii.  16 March 2021 €1.5 million from Edelweiss Investments' Pictet Bahamas account to NK's Julius Baer Monaco account.

      iii. 16 March 2021 US$ 9.5 million from Edelweiss Investments' Pictet Bahamas account to NK's Pictet Geneva bank account.

   b) **64 transfers totalling approximately €620.5million between ESPB and UAE-based and other (jurisdiction unknown) entities between February 2020 and December 2022:**

      i.   60 transfers totalling €327,571,192.51 to ESPB's Swiss bank accounts at UBS and Pictet from the accounts of Monston,

Amblex and Avanda and (in respect of 8 transfers) from unknown accounts of other unknown entities.

ii. Four transfers totalling €292,934,321.33 from ESPB's Swiss bank accounts at UBS, Pictet and Julius Baer to the accounts of Acorn, Blinton and Cordax.

c) **Nine transfers totalling approximately US$24,945,605 (converted from ₽) from ESPB and Gatiabe to Russian entities linked to NK in March/April 2022**:

   i. Two transfers totalling ₽885,000,000 from NK's Julius Baer Monaco account to Admiral Invest's Russian Stroylesbank account.

   ii. Two transfers totalling ₽698,500,000 from ESPB's Swiss UBS accounts to Admiral Invest's Russian Stroylesbank account.

   iii. A transfer of US$3million from Gatiabe's Swiss Pictet account to Admiral Invest's Russian Stroylesbank account.

   iv. Three transfers totalling ₽330,900,000 from NK's Swiss UBS account to the Russian bank accounts of OOO GeoKompas and two Admiral Invest employees.

   v. A transfer of ₽75,000,000 or ₽70,500,000  from ESPB's Swiss UBS account to the Russian bank account of an Admiral Invest employee.

d) **58 transfers totalling approximately €43,566,670.13 and US$ 222,578,308.14 to NK from Canford, Asakren and Gefan (jurisdictions unknown) between 25 February 2021 and 21 March 2023:**

   i. 17 transfers totalling US$43,747,656.95 from Canford to NK's Julius Baer Switzerland account.

   ii. 16 transfers totalling €43,566,670.13 from Asakren to NK's Swiss Pictet account.

   iii. 25 transfers totalling US$178,830,651.19 from Gefan to NK's Banque de Luxembourg account.

e) **Three transfers totalling of US$142,469,022.21 between NK and Irtum (jurisdiction unknown) in December 2021 and February/March 2023:**

      i. Two transfers (one in December 2021 and one in March 2023) totalling US$141,479,322.21 from NK's Banque de Luxembourg account to Irtum.

      ii. One transfer in February 2023 of US$989,700 from Irtum to NK's Banque Havilland Monaco account.

f) **At least five transfers totalling approximately US$41,971,010.68 and €36,357,775.42 between NK's bank accounts in different countries, between December 2021 and January 2023:**

      i. A payment of US$17,985,442.91 from NK's Julius Baer Switzerland account to an account of NK's on 31 December 2021.

      ii. A payment of €36,357,775.42 from NK's Swiss Pictet account to NK's ENBD Dubai account on 16 November 2022.

      iii. A payment of US$13,773,724.48 from NK's Julius Baer Switzerland Account to NK's CFM Monaco Account on 22 December 2022.

      iv. A payment of US$10,211,843.29 from NK's Julius Baer Switzerland Account to an account of NK's on 25 January 2023

      v. Payments of an unknown amount from NK's Banque Havilland Monaco Account to NK's ENBD Dubai account in June 2023.

As explained below, the material for the majority of these transfers has been obtained from one source (the CTR Source). This material has certain limitations and CT has clearly indicated in the report where material from the CTR Source has been used.

23. CT also has material obtained by other sources which suggests that NK is in control of Irtum, Cordax and Amblex, being:

a) Three invoices from Sky Consulting Group LLC FZ dated 27 November 2023, addressed to NK, in respect of "*Consulting Services for RAK company annual administration*" provided to each of Irtum, Cordax and Amblex; and

13

b) Three payments to Sky Consulting Group LLC FZ from NK's personal account with Banque Havilland, the payment description on which reflects the Sky Consulting Invoice numbers.

24.     CT has also obtained a copy of an email from a different source showing that NK is connected to Irtum and Asakren, namely an email of 1 February 2023 from Banque Havilland to NK referring to a transfer to him from Irtum and a transfer from him to Asakren.

### *Other Findings*

25.     CT has also obtained material showing that between October and December 2018, OB sent VK payments totalling €34 million.

## III.     Approach to gathering material

26.     In its work on the Project, CT has acted in accordance with all applicable laws. CT adheres to the local laws of the countries in which it is working.

27.     CT has considerable experience in providing litigation support services to law firms, as well as individual and corporate clients. The directors and employees of CT are therefore aware that the information and documents we provide to clients will be subject to rigorous scrutiny by clients and lawyers, and may potentially feature directly in litigation. Accordingly, CT adopts a rigorous and cautious approach to its investigations and the assessment of the credibility and reliability of all information and documentation it receives. All information and documentation provided to Mishcon in respect of the Project has been provided in good faith, based on CT's genuine belief in the authenticity of the documents and information received. Further explanation on sourcing and the handling of confidential, human sources, as well as the processes CT has conducted to test the authenticity of the material is below.

28.     CT is not paid on a success fee basis.

## IV.    Sources and Methodology

29.    As a business intelligence company, CT provides investigative assistance to clients by utilising two different methods for acquiring relevant material, both of which have been used in the Project:

   a) Open source investigation, which involves in-depth research and analysis of publicly available information including databases, corporate records, legal records, media archives; and

   b) Confidential human source investigation, which utilises CT's global network of individual human sources to acquire additional material in support of a particular investigation.

### *Open Source Enquiries*

30.    The publicly available sources used in the Project are corporate registries, including the Russian, Swiss, Belizean, Luxembourgish corporate registries, third party global corporate records aggregators, land registries including the Russian Cadastral register, media reporting and litigation records.

### *Confidential Human Source Enquiries*

31.    All confidential human sources ("**CHS**") enquiries on the Project have been conducted discreetly, on a confidential basis, and on the condition that CT protects each source's identity and upholds obligations of confidentiality to that source at all times. The identity of the human sources used by CT has not been disclosed to Mishcon de Reya or the Client, or to any other person or in any other circumstances whatsoever.

32.    CHS sources within CT's network provide a range of specialist insights and assistance in respect of differing sectors, from politics to commodities trading, banking, security, and extractive industries, in jurisdictions across the world.

33.    There are two levels of CHS that CT has used in the Project (in accordance with its usual practice):

   a) **Field Team**: this is a small group of investigators with whom CT has direct contact. They are professional investigators, licensed where

necessary in the jurisdictions where they operate. They are former intelligence officers. The Field Team are known to CT employees, often as a result of the individual employees' former professional careers. The relationship between CT's employees and the Field Team dates back many years.

b) **Underlying Sources**: these are the 'on the ground' individuals who have obtained the material set out in this report. CT does not have direct contact with these sources and is not aware of all of their identities. The Field Team do however provide CT with some information about the Underlying Sources, such as their suitability for the investigation in question and their ability to access relevant information. The Underlying Sources interact with the Field Team, who in turn report back to CT. Where we refer below to information "obtained from" one of the Underlying Sources, in all cases this was obtained through the Field Team.

34.   CT takes steps to verify the credibility and reliability both of its Field Team and – insofar as possible – the Underlying Sources:

a) **Field Team**: CT has built a relationship of trust with the Field Team. CT has worked with the Field Team in hundreds of cases and the Field Team has provided material to CT that has proved to be reliable. In this investigation, CT conducted a test whereby it asked the Field Team to obtain certain material already held by the Clients. The Field Team independently obtained material that was an exact match with documents that were already held by the Clients and the Clients were therefore able to confirm the authenticity of the documents that had been obtained by the Field Team.

b) **Underlying Sources**: The Field Team works with contacts who are already known to them and who have helped on previous cases. The Field Team also identify new Underlying Sources from time to time. Investigations related to this matter began in February 2020. Information and material provided by the Underlying Sources has been tested against the Clients' own knowledge of events. The Field Team has also carried out tests by independently instructing Underlying Sources to carry out

investigations and comparing the results of those investigations (see paragraph 51.b) below).

35. The material provided by the Underlying Sources (through the Field Team) may be categorised as follows:

a) **Category 1:** Copies or images of original documents obtained by the sources (for example, copies of contracts or records) that have not been altered by the Underlying Sources (albeit certain redactions have been made by the Field Team to protect the confidentiality of the Underlying Source). Documents falling within this category are listed in Section 1 of Appendix 1.

b) **Category 2:** Information that has been obtained by the Underlying Sources and presented to CT (through the Field Team) in a form that does not show the origin of the document (for example its metadata or digital trail) but where the format and content of the document has otherwise not been changed. This is done to protect the identification of the source. Examples include the text of certain SWIFT payment records and emails sent by SA to NK. In these circumstances, CT and the Field Team do not receive copies of the original document. CT has exhibited the documents in the form received from the Field Team. The documents falling within this category are listed in Section 2 of Appendix 1.

c) **Category 3:** Information that has been relayed by the Underlying Sources to CT (through the Field Team) based on information that has been seen or relayed to the Underlying Source in question. CT has itself created pdf documents which include all of the information relayed by the CHS. The documents falling within this category are listed in Section 3 of Appendix 1.

d) **Category 4:** All documents provided by the CTR Source are listed in Section 4 of Appendix 1.

36. In relation to material provided by Underlying Sources, CT takes steps to verify or corroborate this information insofar as possible either (i) with another Underlying Source (through the Field Team); (ii) using other investigators with whom CT is in direct contact (and who are independent of the Field Team); or (iii) through open-source investigation. As described in further detail in the

Findings section below, CT has used all three of these methods in this case, by which it has been able to corroborate a subset of material.

37.    CT considers material to be most reliable where the documents or materials are in the public domain or are provided by a third party who is willing to have their identity disclosed and where those documents or materials are corroborated or otherwise provable. However, in a case such as this, where NK appears to have gone to some lengths to conceal the ownership of assets, and whose business dealings appear to lack transparency, the potential scope of open-source investigation is invariably limited. Further, in this case the identities of all sources (both the Field Team and Underlying Sources) have been kept confidential.

38.    The identities of the sources are protected for two reasons:

    a)  Firstly, Underlying Sources will speak more objectively and openly on the basis of a guarantee of anonymity.

    b)  Secondly, both the Field Team and Underlying Sources are at risk of serious harm if their involvement in these types of cases becomes known. This was acknowledged and accepted by Charles Hollander KC, sitting as a Judge of the High Court in proceedings in the English court recently, where CT defended its protection of CHS against an application for a *Norwich Pharmacal Order* (NPO), discussed in more detail below. Such harm goes well beyond the risk of professional or reputational damage and involves a genuine and assessed threat to the physical welfare of the CHS and, in certain cases, their families.

### *The Underlying Sources*

39.    The Underlying Sources used during the Project are the following. It is CT's understanding that each category of source below is independent of the others (e.g. Sources A are independent of Sources B etc.). However, as explained above, all of the Underlying Sources report to CT through the Field Team:

a) Sources who were in a position to provide information about SA and NK ("**Sources A**"). For reasons of source protection outlined above, no further identifiers can be provided except to say that these sources comprise multiple persons.

b) Sources close to financial and banking institutions, including the Dubai-based banks, Standard Chartered UAE and Emirates NBD ("**Sources B**"). Again, this constitutes multiple persons. CT does not know if the sources know each other. CT understands from the Field Team that they were accessed and managed independently of each other. Save for in one instance, Sources B have provided information about banking transactions and not copies of the underlying banking documents themselves in order to ensure that it was not forensically traceable to the sources providing it. Accordingly, the information provided is set out in the documents produced by CT included within Section 3 of Appendix 1. It does not contain all of the information that would be expected to be contained in a banking document.

c) Sources close to the Estonian, Latvian, Ukrainian, Russian, Swiss and Bahamian intelligence and law enforcement services, including retired intelligence officers (**"Sources C"**). We do not know if the sources from one country know sources from another, but for the purposes of this work, they were approached and run independently of one another by the Field Team. Due to their backgrounds, such sources are clearly sensitive.

d) A source who has access to a specialised database that aggregates banking data for statistical purposes and analysis (including macro-economic trends), as well as law enforcement purposes for the European Central Bank ("**ECB**") and member states of Europol (the "**Specialised Database**"). Data from this source is provided in the form of files generated by the CTR Source from searches of the database known as Copy Transaction Records ("**CTR**" and the "**CTR Source**"). CT is not able to access the Specialised Database itself and is unable therefore to provide a comprehensive description of what it contains. However, CT  understands, from information provided by the CTR Source, that this is not the ECB's Eurosystem and that the information contained in the Specialised Database may not be complete. For example, it may not contain all USD payments

made through the SWIFT system and the information pertaining to certain transactions may appear incomplete (as described further below). The authenticity of CTR data provided by this source, through the Field Team, in relation to a separate project has been called into question in the separate proceedings before Charles Hollander KC, explained further below. Whilst accepting its limitations, CT remains confident in the accuracy and authenticity of this material but in view of the questions that have been raised, CTR material is expressly identified as such in this report. CT has been provided with a general description of the CTR Source but is not aware of their identity.

40.  In this report, we have sought to identify where the material has been obtained from each of the Underlying Sources listed above.

41.  The descriptions of the Underlying Sources above are intentionally generic. It is the clear and firm position of CT that no further detail can be provided without a serious and credible risk of compromising the anonymity of the sources.

### *Investigator-Led Enquiries*

42.  In addition to the CHS enquiries, three separate investigators (the "**UAE Investigators**") were tasked by CT to determine whether certain companies were registered in the United Arab Emirates. These three UAE Investigators worked independently of each other and CT did not inform any of them that it had worked with the others. They also worked independently of the Field Team and CT had direct contact with the investigators.

43.  The first of the UAE Investigators ("**UAE Investigator One**"), was provided with the names of companies which CT understood from its CHS enquiries may be registered in the UAE.  The UAE has more than 40 free zones in which foreign investors can have full ownership of companies[2]. As described below, it is possible to conceal the ownership of a company registered in a freezone if the corresponding corporate registry is not public. UAE Investigator One was able

---

[2] https://www.moec.gov.ae/en/free-zones

to identify that some of the target companies were in fact registered in one of the freezones. UAE Investigator One's findings were (separately) corroborated by the investigations carried out by the second and third investigators instructed by CT.

***Challenge to Copy Transaction Records in Other Proceedings***

44. Material obtained by the CTR Source from the same database was provided to CT for the purpose of a separate investigation and was deployed in June 2023 in respect of another, separate case. CT understands that this investigation is also covered by legal privilege and it is not entitled to waive any privilege in the investigation or in its instructions.

45. In that case, the defendants (CT's clients) sought to admit CTR Source material into evidence in contested estate proceedings in the Channel Islands, primarily to show ownership and control of assets by the claimant. The material showed substantial cash transfers being made to or from accounts in that party's name. The material in that case was provided to CT through an individual who is also a member of the Field Team in this Project.

46. The authenticity of this material was challenged by a party to that litigation who then sought *Norwich Pharmacal* relief against CT to require it to reveal the identity of its sources. The judgment on this relief was handed down on 11 December 2023: *Linda May Green v CT Group Holdings Limited* [2023] EWHC 3168 (Comm).

47. The judge (Charles Hollander KC, sitting as a Judge of the High Court) did not grant the *Norwich Pharmacal* order sought by the claimant (Ms Green).

48. The judge was not required to make any final conclusions as to the authenticity of the documents and noted in his judgment that CT is taking further steps, for example commencing s.1782 proceedings in New York, to determine the authenticity of the documents. Further, CT notes that in the *Linda May Green* case, the judge noted "*For the avoidance of doubt, I do not consider that the evidence before the court demonstrates wrongdoing or improper behaviour by CT Group.*"

49.    However, in his judgment, the judge expressed a view that there was evidence that the material was not authentic. For example, he stated *"The evidence of forgery is, as it presently appears, very strong"*.

50.    The judgment refers to three individual sources – Person A, Person X and Person Y. Person A was the individual from the field team with whom CT had direct contact (and who is also a member of the Field Team in this case). Person X is the CTR Source. CT notes that, although the judgment cast doubt on the veracity of the information, it did not suggest that Person A was to blame for this. Person Y has no involvement in the present Project.

51.    CT considers that the comments of the judge in the *Linda May Green* case do not impact on the likely authenticity of the material obtained from the CTR Source in the Bourlakova matter. This stems from the following factors:

a)    Firstly, the methodology used to obtain material from the CTRs (obtained by the same CTR Source) has been used in two other cases, neither of which came to court as the material found was used to settle the disputes with no dispute arising as to its authenticity.

b)    Secondly, a test was conducted on the CTR Source (through the Field Team) to check the methodology and the accuracy of the material being obtained. This test involved asking the CTR Source to identify three examples of payments made to or from accounts belonging to NK (and which would have been available on information accessible to the CTR Source). CT provided date or value parameters to the CTR Source for these test payments, but did not provide any further detail (e.g. as to transferor/recipient name or bank account, NK bank account number, jurisdiction or currency). CT then compared the results of the test with payments that were known to have been made to or from NK based on previous intelligence (obtained from other sources), or presented the results to the end clients, to confirm if the payments identified by the CTR Source made sense in the context of the wider litigation. The three test payments (screenshots of which are shown in Exhibit 78/pages 380-381) were:

    i.    **Test 1:** CT asked the CTR Source (via the Field Team) to identify a payment of between 100,000 and 3million (currency not

specified) made into a NK Julius Baer account (Monegasque or Swiss not specified) between February and May 2020. The CTR Source identified a payment of USD 475,000 to NK's account with Julius Baer Monaco (with IBAN MC6714508000015107181001Y35) from 7471 Fisher Island Dr 2017 on 20 April 2020. The Field Team and CT were aware of this transfer from previous intelligence obtained by Sources A.

ii.  **Test 2:** CT asked the CTR Source (via the Field Team) to identify a more recent payment of a lower value, between 20,000 and 100,000, from any NK bank account (CT did not specify a particular account). The CTR Source identified a payment of 24,904.23 (currency unknown) on 22 November 2022 made from NK's bank account with Banque du Luxembourg (LU210086893221395048) to Shutts & Bowen LLP. CT presented this finding to Mishcon, who confirmed that Shutts & Bowen LLP represent NK and VK in proceedings in Florida. CT and the Field Team were not aware of the involvement of Shutts & Bowen LLP.

iii.  **Test 3:** CT asked the CTR Source (via the Field Team) to identify a payment at random from the CTR Records involving NK so that CT, in conjunction with Mishcon, could see whether the payment made sense in the context of the information that they knew about NK from their involvement in the wider litigation. The CTR Source identified a payment of USD 38,972.91 to De la Guardia, Neuman, Faraudo y Bermudez (**DENFAB**), Panama on 13 April 2021. The CTR Source confirmed verbally to the Field Team that this payment was made from NK's account with Banque du Luxembourg. CT presented this finding to Mishcon, who confirmed that DENFAB represent NK, and certain of the Panamanian companies he controls, in proceedings in Panama. The CTR Source would not have been aware of the involvement of DENFAB.

c)  Thirdly, certain material obtained from the CTR Source has been found in information obtained by the Field Team separately from two different Underlying Sources (Sources A and Sources B). As explained in the Findings section below, three payments have been corroborated in this way as well as connections between NK and various companies involved in payments identified in the CTR Source material. By contrast, in the Linda May Green case the CTR material had to be presented in court, before CT Group had a sufficient opportunity to provide corroboration from other sources and context.

52.  CT considers that the claims that the CTR Source material are inauthentic may have come from a fundamental misunderstanding about the nature of the data contained within them. This data has not been extracted from a settlements database that would be utilised in normal commercial banking processes and the material provided are not banking documents. Rather, we understand that the CTR Source material has been extracted from the Specialised Database described above. The CTR Source provided material based on what the source could see on its screen from searches conducted of the Specialised Database.

53.  The CTR Source material obtained and exhibited to this report includes : (i) lists of bank transactions as they appear on the database; and (ii) records of SWIFT messages as they appear on the database. As a result of the nature of the database, the CTR data appears different in a number of respects from that which would be obtained from a normal banking system and it cannot be expected that it will contain all of the information that would appear in a normal banking document.

54.  To take an example, in the *Linda May Green* case, it was alleged (amongst other things) that the CTR material was inauthentic on the basis that SWIFT messages obtained from the CTR Source contained errors (e.g. omitting characters or adding excess characters). However, CT understands from the CTR Source that details in SWIFT messages as they appear on the Specialised Database appear different to those obtained from another banking record. Simply by way of example, it is common that, in the Specialised Database, a destination BIC can have both the seventh and eighth characters missing or redacted from SWIFT Messages so that the destination BIC cannot be used

without the destination bank's permission. Further, it is not unusual for some details from actual payment systems to be omitted or redacted where extracted from the Specialised Database. These omissions or redactions are to ensure that, in the event of an unauthorised data leak, an extract from the Specialised Database could not be used as proof of payment. Effectively, the entire details of an individual transaction cannot be validated solely based on an extract from such a database.

55.     Furthermore, as the Specialised Database is primarily used to aggregate data, and relies on central banks voluntarily filing relevant data, it is possible that extracts from the Specialised Database can contain errors. It is CT's understanding that individual banks may choose the amount of data they send on specific transactions, and often redact data before sending it to their regulator, who then sends the data to the ECB.

56.     It is for this reason that CT has attempted to obtain further information from Underlying Sources for certain pieces of CTR material in this case.

## B. DRAMATIS PERSONAE

57.    In the table below, CT has summarised the individuals and companies relevant to the Project. Where the description of the entity comes from information obtained through CT's investigations, CT has included a reference to the source of that information. Where CT has concluded from its investigations that a company is controlled by NK, this is based on information or documents from a certain point in time which are referenced in this report. CT has no reason to believe that the position has changed since that time; however, CT does not have sight of all possible evidence to the contrary.

| Name | Description |
|---|---|
| **Key individuals** | |
| Oleg Bourlakov ("**OB**") | The late father of Veronica and Elena Bourlakova and husband of Loudmila Bourlakova. |
| Nikolai Kazakov ("**NK**") | OB's brother-in-law and a Defendant in the proceedings. |
| Vera Kazakova ("**VK**") | OB's sister, NK's wife and a Defendant in the proceedings. |
| Svetlana Kazakova ("**SK**") | NK and VK's daughter. |
| Semen Anufriev ("**SA**") | NK's nephew, director of the Bourlakov family office and a Defendant in the proceedings. |
| Sofia Shvetsova ("**SS**") | OB's mistress and the mother of his daughter Nicole Shvetsova. |
| **Banks** | |
| OOO KB Stroylesbank ("Stroylesbank") | A Russia-incorporated bank, of which OB was a shareholder. |
| Pictet Group ("**Pictet**") | A Switzerland-headquartered banking and financial services group with a Bahamas based subsidiary. |
| Credit Suisse Group ("**Credit Suisse**") | A Switzerland-headquartered banking and financial services group. |
| PAO Sberbank ("**Sberbank**") | A Russian, majority state-owned banking and financial services company. |
| Bank Julius Baer ("**Julius Baer**") | A Switzerland-headquartered banking and financial services group with a Monaco-based subsidiary. |
| UBS Group AG ("**UBS**") | A Switzerland-headquartered banking and financial services group. |
| Banque de Luxembourg | A Luxembourg-headquartered banking and financial services organisation. |
| Banque Havilland S.A. | A Luxembourg-headquartered banking and financial services organisation. |
| Commercial Bank "Stroylesbank" Limited | A Russia-headquartered banking and financial services organisation. |
| Standard Chartered Bank | A UK-headquartered banking and financial services organisation. |
| Indosuez Wealth | A French wealth management company. |
| Neue Bank AG | A Liechtenstein banking and financial services organisation. |
| Abu Dhabi Commercial Bank | A UAE banking and financial services organisation. |

| Emirates NBD | A UAE banking and financial services organisation. |
| --- | --- |
| **Key Companies** | |
| OOO Admiral Invest ("**Admiral Invest**") | A Russia-incorporated property management company, owned by NK. |
| Captain Vrungel Yachting Limited | A Cyprus-incorporated company which used to own the Black Pearl yacht. |
| Edelweiss Investments Inc. | A Panama-incorporated holding company and a Defendant in these proceedings. Edelweiss is currently controlled by NK through the Hemaren Foundation (a Panamanian entity), of which (CT understands from its instructions) NK alleges he is the sole beneficiary. |
| Edelweiss Investment Holding SA | A Swiss-incorporated holding company, which held Edelweiss Investment Real Estate SA, Edelweiss Investment S.PB SA and Edelweiss Investment S.P. SA, of which the director is Patrick Eraers. |
| Edelweiss Investment Real Estate SA ("**EIRE**") | A Swiss holding company, of which the director is Patrick Eraers. CT's investigations show that it may have been  transferred to NK in January 2019 and appears to be under his control: see paragraphs 83-85 below. |
| Edelweiss Investment S.PB SA ("**ESPB**") | A Swiss holding company, of which the director is Patrick Eraers. CT's investigations show that it may have been transferred to NK in January 2019 and appears to be under his control: see section paragraphs 83-85 below. |
| Edelweiss Investment S.P. SA ("**ESP**") | A Swiss holding company, of which the director is Patrick Eraers. CT's investigations show that it may have been transferred to NK in January 2019 and appears to be under his control: see section paragraphs 83-85 below. |
| Finco Financial Company Inc. ("**Finco**") | A   Panamanian company and a Defendant in the proceedings. CT understands from its instructions that NK alleges he owns and controls Finco via the Wlamil Foundation. |
| Gatiabe Business Inc | A   Panamanian company and a Defendant in the proceedings. CT understands from its instructions that NK alleges he owns and controls Gatiabe via the Wlamil Foundation. |
| KESK Stiftung | A Liechtenstein-based foundation that was set up by NK and VK to, according to the foundation's purpose as stated in the Liechtenstein Commercial Register, receive assets under the purported will of OB dated 21 October 2019. |
| Wlamil Foundation | A   Panamanian foundation of which (CT understands from its instructions that) NK alleges he is the sole beneficiary. |
| Wlamil 2 | Foundation which CT's investigations suggest was set up by OB/NK and is controlled by NK: see section C below. |
| Wlamil 3 | Foundation which CT's investigations suggest was set up by OB/NK and is controlled by NK: see section C below. |
| **Other companies** | |
| OOO GeoKompas | A Russian Admiral Invest contractor: see paragraph 152 below. |
| Asakren Trading Ltd | CT's investigations suggest that this is a NK-controlled company used to dissipate funds: see section G below. Its place of registration is unknown. |
| Blinton Trading Ltd | CT's investigations suggest that this is a company used to dissipate funds: see section F below. Its place of registration is unknown |
| Canford Trading Corp. | CT's investigations suggest that this is a  NK-controlled company used to dissipate funds: see section G below. Its place of registration is unknown |
| Gefan Trading Ltd | CT's investigations suggest that this is a NK-controlled company used to dissipate funds: see section G below. Its place of registration is unknown |

| | |
|---|---|
| Irtum Trading Corp | CT's investigations show this company is registered in the RAK Free Zone and suggest that this is a NK-controlled company used to dissipate funds: see section G below. |
| Acorn Services Inc | CT's investigations show this company is registered either in the Jebel Ali Free Zone or the RAK Free Zone and suggest that it is a NK-controlled company used to dissipate funds: see section F below. |
| Amblex Trading Ltd | CT's investigations show this company is registered in the Jebel Ali Free Zone, Dubai and suggest that it is a NK-controlled company used to dissipate funds: see section F below. |
| Avanda Services Ltd | CT's investigations show this company is registered in the Jebel Ali Free Zone, Dubai and suggest that it is a NK-controlled company used to dissipate funds: see section F below. |
| Cordax Trading SA | CT's investigations show this company is registered in either the Jebel Ali Free Zone or the RAK, Dubai and suggest that it is a NK-controlled company used to dissipate funds: see section F below. |
| Monston Trading Ltd | CT's investigations show this company is registered in the Jebel Ali Free Zone, Dubai and suggest that it is a NK-controlled company used to dissipate funds: see section F below. |
| **Other individuals** | |
| Denis Arkhipov | NK's lawyer at EPAM, an international law firm in the CIS with offices in Russia, UAE, Ukraine, Belarus and associated office in Cyprus. |
| Patrick Eraers | A director of Edelweiss Investment Holding SA, Edelweiss Investment Real Estate SA, Edelweiss Investment S.PB SA and Edelweiss Investment S.P.SA. |
| Oxana Filina | NK's private banker at Banque Havilland (paragraph 143 below). |
| German Aleksovich Krasnoshekov | An Admiral Invest employee: see section H below. |
| Alexey Yurievich Planson | An Admiral Invest employee: see section H below. |
| Vladislavs Platonenko | SS's private banker at Signet Bank (see paragraph 70 below). |
| Denis Anatolevich Smirnov | An Admiral Invest employee: see section H below. |

## C. FINDINGS: EMAILS BETWEEN SA AND NK SHOWING AN INTENTION TO DISSIPATE ASSETS AND OBTAIN CONTROL OF OB ASSETS

58.    CT obtained copies of emails between SA and NK from Sources A suggesting that they were intending to dissipate the assets of an Edelweiss entity, Gatiabe, Wlamil and Finco using other companies owned and controlled by NK and/or VK namely KESK, Wlamil 2 and Wlamil 3. Translations of the emails (from their original Russian language) are reproduced below.

### I. Email from October 21 showing an intention to dissipate Edelweiss assets using KESK

59.    On 13 October 2021, SA emailed NK (Exhibit 16/pages 58-59):

*I just met with Farida from Pictet and explained our problems with Edelweiss. They studied the documents relating to Edelweiss Investment and Edelweiss Real Estate, and made a decision about your new foundation in Liechtenstein. They have already contacted VP Bank AG in Liechtenstein and discussed the documents relating to the evaluation of Edelweiss' St. Petersburg assets (I have attached the files that I sent them earlier).*
*We decided the following. Pictet and the Liechtenstein bank will look for new nominees in Liechtenstein, who will be entrusted with the Edelweiss new holding. It will be registered in Liechtenstein. Farida promised that they will have this done by the end of the year. Then Edelweiss will transfer all the cash and the property rights for the St. Petersburg-based properties to the new Liechtenstein-based Edelweiss holding company. They will then close the accounts at UBS and transfer this structure with the cash to the KESK Shtiftung and then close the existing accounts.*
*In relation to the two joint projects with OB with bank accounts at Pictet, Farida will talk to their managers about whether or not your agreement with OB from 10 December 2020 and your PoA is enough to have you recognised as the current, sole beneficiary.*
*The balances of both of these companies now amounts to c. CHF 43 million. <u>The other side does not know about these assets and the bank has not received any requests from them in relation to this. I will keep you in the loop in regards to this.</u>* (emphasis added)

60.    KESK is a family foundation that appears to have been established after Mr Bourlakov's death (in June 2021), registered in Liechtenstein on 18 July 2021

and of which NK and VK are the beneficiaries (see Exhibit 62/pages 283-296). It appears that the reference to "*your new foundation in Liechtenstein*" is to KESK.

61.    "*Edelweiss Real Estate*" likely refers to Edelweiss Investments Real Estate SA ("**EIRE**"). It is unclear from the email which Edelweiss entity or entities is referred to as "*Edelweiss Investment*". CT is aware of four other Edelweiss entities: Edelweiss Investments Inc (Panama), Edelweiss Investment Holding SA (Switzerland, the holding company of ESPB, ESP and EIRE), ESPB (Switzerland) and ESP (Switzerland). CT has identified the following assets which may be relevant to the matters discussed in the email:

a)  Various properties in St Petersburg registered in the name of ESP.

b)  Bank accounts with UBS Switzerland in the name of ESP, ESPB and Edelweiss Investments.

c)  Bank accounts with Pictet Geneva in the name of ESPB and Edelweiss Investments Inc and an account with Pictet Bahamas in the name of Edelweiss Investments Inc.

62.    Based on open source searches, CT considers that "*Farida*" is likely to refer to Faria Osmanova, a senior Client Relationship Officer at Pictet Geneva.

63.    CT has not identified any accounts at VP Bank Liechtenstein.

64.    The "*two joint projects with OB with bank accounts at Pictet*" with balances of "*c. CHF 43 million*" may refer to Wlamil 2 and Wlamil 3, as shown by the email in the section directly below.

## II.    Emails from October 2021 showing an intention to transfer Wlamil 2 and Wlamil 3 to NK/KESK

65.    On 19 October 2021, SA emailed NK (Exhibit 17/pages 60-61):

> "*I spoke to Farida. They are ready to start the process of getting NK recognised as the sole beneficiary of two new Panamanian foundations, Wlamil 2 and Wlamil 3. By January OB's PoA will be cancelled and they will make a new one using Amiorp BVP. There will not be any problems in doing this as OB's trust deed was not signed correctly. Nor was it notarised by Amiorp. I checked it and I'm sure of that. Our Panama agent for Finko and Wlamil does not know about these two new funds. When*

*the bank has formed everything, we will transfer both foundations to KESK through the new Edelweiss agent in Liechtenstein <u>and therefore 'protect the cash from third party claims'.</u>*

*I have a question about how much SS knows – did OB tell her about these new structures? <u>The most important thing is that this information isn't leaked to our opponents.</u>*
*Farida stated that the total cash held by at Pictet exceeds CHF 49 million. Wlamil 2 has CHF 23 million, and Wlamil 3 has CHF 26.34 million. OB transferred US$ 9.6 million from Sberbank in April."* (emphasis added)

66.   Given the coincidence in amounts, it is possible that the reference in the email of 13 October 2021 (Exhibit 16/pages 58-59) to the "*two joint projects with OB with bank accounts at* Pictet" with a balance of "*c. CHF43 million*" also refers to Wlamil 2 and Wlamil 3.

67.   CT understands from instructions that "SS" may refer to Sofia Shevtsova, with whom OB was in a relationship before his death and who was appointed in Latvia as a trustee of his estate.

### III.   Emails from November 2021 about the transfer of Gatiabe and Captain Vrungel to KESK

68.   On 3 November 2021, SA emailed NK (Exhibit 18/pages 62-63):

*"I received your signed instructions through a courier, all is good. I have already contacted our Panamanian agent for Wlamil Foundation and handed over our instructions and sent your papers. They will contact VP Bank AG in Liechtenstein and begin the process of transferring Gatiabe to KESK. When the process has been completed, we will transfer Gatiabe's funds to bank accounts in Liechtenstein at VP Bank and close the old accounts. <u>The main thing from a thing from a legal/court proceedings perspective is NOT to transfer the money now from their personal accounts to Switzerland and Monaco, and not to pay dividends from Edelweiss' structures.</u>"* (emphasis added)

69.   On 10 November 2021, SA emailed NK about 'Vrungel' (which likely refers to Captain Vrungel Yachting Limited ("**Captain Vrungel**"), the Cyprus-incorporated owner of the Black Pearl yacht) (Exhibit 19/pages 64-65):

*"I spoke to the Cypriots, VP Bank and Credit Suisse about Vrungel* [Captain Vrungel Yachting Limited, the Cyprus-incorporated owner of the Black Pearl yacht]. *We decided that first, we will transfer the accounts to*

*VP Bank in Liechtenstein and close the Credit Suisse accounts. We will notarise everything for you and pass it onto the Cypriots. The we will begin the process of transferring Vrungel to KESK, but there are risks. They told me that possibly it would be better to break the chain and buy the Vrungel from a new structure in Liechtenstein, which is initially registered to me. I can then cede ownership of the structure in favour of you and VK's foundation. What do you think?"*

### IV.    Emails from October and November 2021 showing attempts by SA/NK to obtain control of OB's accounts at Signet Bank Latvia

70.    On 18 October 2021, SA emailed NK (Exhibit 20/pages 66-67):

*"I met with Vlad from Signet Bank. Our conversation was strange. He started by saying that he represents the interests of SS, and that he must, therefore, inform her. I said that this is nonsense, we directed OB to the bank, I myself personally opened everything at the bank and I had a PoA to OB's accounts, so why were we excluded from communications and why did OB not warn me or VK in April that the PoA to his accounts in the bank had been cancelled. He showed me the papers. It seemed to me that they were not signed by OB.*

*We should ask EPAM for copies and samples and compare them with SS's. I asked where the cash that we transferred from OB's accounts in Moscow to the bank are, as well as other balances. He said that he requires an official legal decision in Latvia recognising you and VK as OB's official heirs. I asked whether SS has a PoA to OB's accounts, but he would not say anything. The matter is serious, there is a chance that SS has received access to a minimum of US\$ 12-15 million in these accounts, possibly more. We must discuss this with Arkhipov, it is a violation of the agreement of cooperation that we signed with SS in the summer. What do you think?"*

71.    As above, CT understands from instructions that "*SS*" may refer to Ms Shevtsova.

On 5 November 2021, SA emailed NK (Exhibit 21/pages 68-69):

*"I had another conversation with Vlad from Signet Bank. I showed him OB's will and its certificate from Monaco, and reminded Vlad that VK is, regardless, unconditionally OB's heir and that you were his equal partner. I showed him the documents from ESPAM about the Russian shared assets./ Vlad said that yes, OB gave him instructions this year to transfer cash to SS and that after the 21 June 2021, SS transferred several million from OB's accounts to her own. Vlad does not know the exact sum.*

> *We must hire local lawyers through EPAM and demand that this information is disclosed."*

72.    The above emails paint a picture that NK and SA have been engaged in the movement of assets, specifically to protect the assets from claims and to ensure the Clients do not find out about them.

## D. FINDINGS: ATTEMPED TRANSFERS OF OB ASSETS

73.    Exhibits 58 (pages 272-275), 59 (pages 276-277), 60 (pages 278-279) and 61 (pages 281-282) are copies of emails obtained from Sources C. They have been translated from their original Russian language and show the following:

   a)    Emails of 29 January 2022 between SA and UBS show NK/SA attempting to transfer CHF 116 million "*collateral pledged to Edelweiss*" from "*Oleg's 3189 9809 M account in Geneva*" (OB's Geneva UBS account) to Edelweiss. UBS responded that there were outstanding issues "*regarding unconditional right of Mr Kazakov to access the 9809 M account once Mr Burlakov's liabilities to Edelweiss are settled*". UBS noted that, in April 2021, it had processed a CHF 98.45 million payment from OB's account to Edelweiss at OB's instruction, but that it had not obtained a written authorisation from OB regarding Mr Kazakov having rights to draw funds from the account. SA forwarded this exchange to NK on 30 January 2022 saying "*For now, this is the situation...I spoke with Arnault and Geneva lawyers, we will work. Requested a meeting with the bank. Elvira seems to support us.*" (see Exhibit 58/pages 272-275).

   b)    An email of 17 February 2022 from UBS to SA, forwarded on by him to NK shows that UBS had received a request from a "Ms Stuki", to transfer CHF 115 million, from OB's Monaco UBS account (number: BRN R0179523 special account 8091 M). UBS stated that they need to undertake an internal legal review on the request's supporting documents before the transfer could be approved. On forwarding this email to NK, SA stated "*I have a feeling that the other side might have known about this special account of OB in the Monaco*" (see Exhibit 59/pages 276-277).

   c)    In an email of 24 February 2022 to SA, Signet Bank confirmed that it would transfer    EUR    9    million    to    ESP's    UBS    SA    account    (number

33

CH93002062061040636oV) from Black Pearl Investment SIA's account "*in accordance with the loan agreement provided by you...between the companies dated 0210/2021*". SA forwarded this to NK saying that "*Signet agreed to unfreeze Oleg's funds in the accounts of BPI, everything is fine. I'm waiting for the payment.*" However, on 10 March 2022, SA informed NK that the payment had been blocked by regulators who have blocked any payments relating to companies where the beneficiaries have ties to Russia. He stated that he had provided the bank with all the documentation regarding NK's Estonian citizenship and residence in Monaco and is waiting to hear back (see Exhibit 60/pages 278-279).

d)  In an email of 15 March 2022, NK asked SA "*What do we have on Oleg's safety deposit box in Raiffeisen?*" SA replied saying that he was attempting to obtain access to the safety deposit box for NK:

> "*The safety deposit box was opened at their private banking branch on Smolensk Square in December 2020. OB gave the key from the safety deposit box to Aunt Vera in the hospital, you know. I told you what was there: RUB 250 million and $12 million from Credit Suisse in Moscow. But OB forgot to give VK a copy of the safety deposit box contract. We don't know where it is. I suspect that SS has it and has opened it. Arkhipov went to the bank and showed them the PoA that OB gave you for the safety deposit box, but there's just the number of the contract, which we don't have on our hands. EPAM will think with the bank, how to make a request in such a way that, if we have a key, they can give you access. We're working on this use.*" (see Exhibit 61/ pages 281-282).

### E.  FINDINGS: NK CONTROL OF CERTAIN EDELWEISS COMPANIES

74.  The emails described at paragraph 59 above (obtained from Sources A) suggest that NK is in control of certain Edelweiss entities, including EIRE and (likely) Edelweiss Investments Inc and/or ESPB.

75.  CT has obtained further material from Sources A and C suggesting NK controls or may control Edelweiss Investments Inc,  EIRE, ESPB and ESP, as set out below.

### I.   Edelweiss Investment Inc. and its UBS portfolio

76.   Mishcon has instructed CT that since OB's death, NK claims he is the sole beneficial owner of Edelweiss Investments Inc, via the Hemaren Foundation.

77.   CT has obtained from Sources A a copy of a UBS Digital Banking document dated 8 December 2021 which provides a list of the account numbers and IBANs belonging to Edelweiss Investment Inc. held at UBS. On page 12, it lists NK as the sole "*authorised user*" of Edelweiss Investment Inc's account at UBS (see Exhibit 15/pages 44-57).

78.   This document suggests that NK has been able to control Edelweiss' assets, at least at UBS, which we understand from instructions would have a current value of circa $1bn.

### II.   Transfer of funds from Edelweiss Investments Inc to NK: March 2021

79.   CT obtained from Sources C a copy of a SWIFT message showing that, on 15 April 2020, Edelweiss Investments Inc. sent €15 million from Pictet Bahamas (account number unknown) to NK's account at Julius Baer Monaco SAM bank (IBAN: MC5214508000001510718100ZZ02). The payment is referenced as "disbursement decision 03-14042020" (see Exhibit 75/pages 363-366).

80.   CT obtained from Sources C a copy of a SWIFT message showing that, on 16 March 2021, Edelweiss Investments Inc. sent €1.5 million from Pictet Bahamas (account number unknown) to NK's account in Monaco at Julius Baer (IBAN: MC5214508000001510718100ZZ02). The payment is referenced as "disbursement decision 01-09032021" (see Exhibit 3/page 4).

81.   CT obtained from Sources C a copy of a SWIFT message showing that on 16 March 2021, Edelweiss Investments' Pictet Bahama's account sent US$ 9.5 million to NK's Pictet Geneva bank account (number: CH7608755013335200100). The payment is referenced as "disbursement decision 04-09032021" (see Exhibit 75/pages 363-366).

82.   CT understands that Mr Kazakov has admitted in these proceedings that he received these sums.

### III.    Agreements for the transfer of Edelweiss Investment Holding SA subsidiaries (including ESP and ESPB) to NK in January 2019

83.    CT has obtained from Sources A copies of three Share Transfer Agreements all dated 24 January 2019, by which Edelweiss Investment Holding SA agreed to transfer three companies to NK for a purchase price of CHF 100,000 each. The three companies were EIRE, ESPB and ESP.

84.    The transfers were signed on behalf of Edelweiss Investment Holding SA by Patrick Eraers in his capacity as a board member and by NK (see Exhibit 34/pages 108-112, Exhibit 35/pages 113-117 and Exhibit 36/118-122).

85.    As set out in sections F-H below, there is material showing transfers of money in the period 2020-2022 between ESPB and other companies with links to NK.

### F.   FINDINGS: ESPB'S BANK ACCOUNTS - TRANSFERS TO AND FROM UAE-BASED AND UNKNOWN COMPANIES  (FEB 20 – DEC 22)

#### I.    Overview

86.    CT has been provided with various material, all explained in detail below, showing significant transfers of money involving ESPB and UAE-based (and other) companies after the date of the share transfer document described above (pursuant to which ESPB's shares were to be transferred to NK). The majority of this material is from the CTR Source, but some has been corroborated by material from other sources. This material is set out in the sections headed "Investigations into the relevant companies" and "Further material from other Sources" below.

87.    Over this period, ESPB received 60 transfers into its Swiss accounts totalling €327,571,192.51. This comprised €323,000,000 (52 transactions) from the three companies (Monston, Amblex and Avanda) and a total of €4,571,192.51 in eight transactions from an unknown sender:

| Number of transactions | Type | Sender | Sender Account | Recipient | Recipient Account | Currency | Value |
|---|---|---|---|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11 | Receipt | Monston Trading Ltd | Standard Chartered Bank, UAE and unknown. | ESPB | UBS, Switzerland | Euros | 122,000,000.00 |
| 31 | Receipt | Amblex Trading Ltd | Standard Chartered Bank, UAE and unknown | ESPB | Pictet, Switzerland | Euros | 171,000,000.00 |
| 10 | Receipt | Avanda Services Ltd | Standard Chartered Bank, UAE, and unknown | ESPB | Pictet, Switzerland | Euros | 30,000,000.00 |
| 8 | Receipt | Unknown | Unknown | ESPB | Julius Baer, Switzerland | Euros | 4,571,192.51 |
| **60** | | | | | | | **327,571,192.51** |

88.     Over this period, ESPB sent a total of €292,934,321.33 from its Swiss accounts to the accounts of three companies (Acorn, Blinton and Cordax):

| Number of transactions | Type | Sender | ESPB Account | Recipient | Recipient Account | Currency | Value |
|---|---|---|---|---|---|---|---|
| 1 | Payment | ESPB | UBS | Acorn Services Inc. | Banque de Luxembourg, Lux | Euros | 120,000,000.00 |
| 2 | Payment | ESPB | Pictet | Blinton Trading Ltd | Indosuez Wealth Management, Monaco and unknown | Euros | 157,000,000.00 |
| 1 | Payment | ESPB | Julius Baer | Cordax Trading SA | Standard Chartered Bank, UAE | Euros | 15,934,321.33 |
| **4** | | | | | | | **292.934,321.33** |

89.     ESPB also transferred c.US$8m to the Russian accounts of two entities: these transfers are set out in Section H below, which describes various transfers to Russian entities in March 22.

37

90.   These are the only payments involving ESPB of which CT is aware but CT has no reason to believe that they are a full account of payments in and out of the relevant accounts (or that all ESPB accounts have been identified).

91.   The payments are set out in further detail below, grouped by each of ESPB's Swiss bank accounts at UBS, Julius Baer and Pictet. In summary, in relation to each account, the CTR Source material identifies numerous transfers into the account, with a few larger transactions out of each account. CT does not have information as to ESPB's account balances and has been unable to determine if the funds being transferred into the account are the same funds as are transferred out. Nor does CT have any material or evidence as to the ultimate source or ultimate destination of the funds.

92.   CT has obtained records of SWIFT messages from the CTR Source for five of the transactions which contain payment references, variously "*Dividends*" and references to agreements. CT does not have any further information on the purpose of any of the transactions.

93.   Some of the CTR Source material has been corroborated by other sources as identified below.

## II.    Investigations into the Relevant Companies

94.   Corporate search enquiries conducted in August-October 2023 by the UAE Investigators,  found that the following five companies are registered in the Jebel Ali Free Zone ("**JAFZA**") in Dubai:[3]

a)  Monston Trading Ltd;

b)  Acorn Services Inc.;

c)  Amblex Trading Ltd;

d)  Avanda Trading Ltd; and

e)  Cordax Trading SA.

---

[3] No information pertaining to the date of incorporation for the JAFZA-registered companies was identified. There are no documentary records showing the results of these enquiries.

95.   CT recently obtained further material from Sources A which (1) suggests Amblex and Cordax are registered in the RAK Free Zone, and (2) links Amblex and Cordax to NK. This consists of:

   a)  A copy of an invoice dated 27 November 2023, with Invoice number 010913-1 from a company called Sky Consulting Group LLC FZ addressed to NK for *"Consulting Services for RAK company annual administration"* for Cordax (Exhibit 80/page 383) the "**Cordax Invoice**");

   b)  A copy of a second invoice dated 27 November 2023, with Invoice Number 010913-2 from Sky Consulting Group, addressed to NK, in respect of the same services as described above, but for Amblex (Exhibit 81/page 384, the "**Amblex Invoice**"); and

   c)  The contents of three SWIFT messages (copied from an original document) detailing transfers made from an account in Mr Kazakov's name with IBAN: MC5816038000010101119097877 to Sky Consulting Group each for USD17,340 (Exhibit 83/pages 386-387):

      i.   The first SWIFT message (seen at Exhibit 83/page 386) contains the payment description *'INVOICE NO 01903-1 AGRMNT 020923'*. The invoice number therefore matches that on the Cordax Invoice above; and

      ii.  The second SWIFT message (Exhibit 83/pages 387-387) contains the payment description *'INVOICE NO 01903-2 AGRMNT 020923'*. The invoice number therefore matches that on the Amblex Invoice.

96.   CT is also aware from other material (obtained from Sources A) that the account with IBAN MC5816038000010101119097877 is a Banque Havilland account in the name of NK.

97.   According to its website[4], Sky Consulting provides a wide range of consulting services for creating and developing business within the Middle East. Its list of services includes: UAE Business Registration, Bank account Registration and Business Relocation.

---

[4] Home | Sky Consulting Group (uaeadvisers.com)

98.   It is therefore not known in which of the Dubai free zones Cordax and Amblex are registered, or whether the two companies have been recently redomiciled from the JAFZA to the RAK Free Zone.

99.   Regardless of the free zone in which they are registered, the five companies are classified as non-resident offshore entities.

100.   There is limited information available about these companies in the public domain. CT understands from its discussions with the above-mentioned sets of investigators that offshore companies registered in the UAE, such as these, can hold bank accounts and property in the country, but are prohibited from conducting business inside the UAE. As non-resident offshore entities, the companies are not obligated to provide public details of their activities.

101.   CT understands that UAE-registered offshore companies are often utilised by investors as part of complex corporate structures. As they are outside the UAE's main corporate regime, it is often difficult to trace such offshore companies and identify registration details.

102.   CT has attempted to find information on the commercial activities undertaken and any non-financial assets owned by Monston, Acorn, Amblex, Avanda and Cordax through enquiries undertaken through the Field Team with Sources A and C. No such activities or assets were identified by the two sets of sources.

103.   Neither were CT able to identify any information on Blinton, including its place of registration, despite open source research and enquiries with Sources A and C. However, a SWIFT message obtained from the CTR Source lists the beneficiary as "*Blinton Trading Ltd, 2, Rue des Princes, Monte Carlo, Monaco*" (Exhibit 3/page 4).

104.   It is inferred that NK controls Monston, Acorn, Amblex, Avanda, Blinton and Cordax on the basis that:

   a)   Amblex, Avanda and Monston made numerous transfers of (in total) substantial sums to ESPB, which is also a company within NK's control;

   b)   Blinton, Acorn and Cordax received large sums from ESPB (controlled by NK);

c) In respect of Amblex and Cordax, invoices in respect of services provided to Amblex and Cordax were addressed to NK and appear to have been paid from NK's personal account with Banque Havilland;

d) In respect of Monston, one of the payments to ESPB has a reference of "dividends", suggesting ESPB (controlled by NK) was a shareholder in Monston.

### III. Transactions involving ESPB's Swiss UBS account (Monston Trading Ltd and Acorn)

105. CT has obtained material from the CTR Source that the following transactions were made   involving ESPB's UBS Switzerland bank account (IBAN: CH540020620610452061C (Exhibit 38/page 132):

a) 11 transfers from Monston to ESPB totalling €122,000,000 between 10 March 2020 and 22 September 2022.

b) One transfer from ESPB to Acorn of €120,000,000 on 28 December 2022.

### *Summary of Payments from CTR Source material*

| Date | From (account) | To (account) | Amount | Payment reference |
|------|----------------|--------------|--------|-------------------|
| 10.3.20 | Monston (unknown) | ESPB (UBS, Switzerland) | €2,000,000 | Unknown |
| 11.6.20 | Monston (unknown) | ESPB (UBS, Switzerland) | €2,000,000 | Unknown |
| 10.9.20 | Monston (unknown) | ESPB (UBS, Switzerland) | €2,000,000 | Unknown |
| 10.12.20 | Monston (unknown) | ESPB (UBS, Switzerland) | €2,000,000 | Unknown |
| 16.3.21 | Monston (unknown) | ESPB (UBS, Switzerland) | €12,000,000 | Unknown |
| 16.6.21 | Monston (Standard Chartered Bank, UAE) | ESPB (UBS, Switzerland) | €12,000,000 | *"Dividends"* |
| 16.9.21 | Monston (unknown) | ESPB (UBS, Switzerland) | €12,000,000 | Unknown |
| 16.12.21 | Monston (unknown) | ESPB (UBS, Switzerland) | €12,000,000 | Unknown |
| 22.3.22 | Monston (unknown) | ESPB (UBS, Switzerland) | €22,000,000 | Unknown |

| 22.6.22 | Monston (unknown) | ESPB (UBS, Switzerland) | €22,000,000 | Unknown |
| 22.9.22 | Monston (unknown) | ESPB(UBS, Switzerland) | €22,000,000 | Unknown |
| 28.12.22 | ESPB (UBS, Switzerland) | Acorn (Banque de Luxembourg, Luxembourg) | €120,000,000 | *'services agreement 28.12.2022'.* |

106. CT has also identified (from material provided by the CTR Source) two other transfers totalling c.US$8m out of ESPB's Swiss UBS account to a Russian entity and individual in March 2022. These are described in the section below, alongside other transfers to Russia.

### *Additional Detail from CTR Source Material*

107. The CTR Source also provided records of SWIFT MT 103 messages[5] relating to two of these transactions, which contain the following details (Exhibit 38/pages 133-134):

a) One shows the payment on 16 June 2021 of €12 million from Monston to ESPB. It shows the payment came from Monston's bank account at Standard Chartered Bank in the UAE (IBAN: AE020440001621305948574), branch code: SCBLAEAD. The payment reference is "*Dividends*", indicating that (if the payment was truly "dividends") ESPB was likely a shareholder in Monston at that time.

b) The second shows the payment from ESPB to Acorn of €120m, albeit dated 30 December 2022 (rather than 28 December 2022). The small discrepancy in dates is explained by different points at which the payment was registered and recorded. The recipient is listed as "*Acorn Services Inc., PO Box 8442, Dubai, UAE*" and". The payment was sent to Acorn's Banque de Luxembourg bank account (IBAN: LU220086586982134952), branch reference: BLUXLULL. The payment was referenced as '*services agreement 28.12.2022*'.

---

[5] SWIFT MT 103 is standard message type/format for the exchange of information between financial institutions in relation to cross border wire transfers undertaken by their customers.

108.   CT has no information the 'services agreement' referred to in the SWIFT but note that is appears to have the same date as the payment of €120 million.

### IV.   Transactions involving ESPB's Swiss Pictet Account (Amblex, Avanda and Blinton)

109.   CT has obtained material from the CTR Source that the following transactions were made involving ESPB's bank account at Pictet, Geneva, Switzerland (IBAN: CH1008755057388100100) (Exhibit 38/pages 135-136):

   a)   transfers from Amblex to ESPB totalling €171m between 10 February 2020 and 23 November 2021;

   b)   transfers from Avanda to ESPB totalling €30m between 18 January 2022 and 29 January 2022; and

   c)   Two transfers from ESPB to Blinton totalling €157,000,000 on 30 July 2021 and 28 December 2022.

### *Summary of Payments from CTR Source Material*

| Date | From (account) | To (account) | Amount | Payment ref |
|---|---|---|---|---|
| 10.2.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 2,000,000.00 | Unknown |
| 27.2.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 4,000,000.00 | Unknown |
| 19.3.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 2,000,000.00 | Unknown |
| 30.3.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 12.5.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 3,500,000.00 | Unknown |
| 21.5.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 2,000,000.00 | Unknown |
| 29.5.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 8,500,000.00 | Unknown |
| 17.6.20 | Amblex (Standard Chartered Bank, UAE) | ESPB (Pictet, Switzerland) | € 12,000,000.00 | *"agreement date 15.06.2020"* |
| 8.9.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 9,000,000.00 | Unknown |
| 23.9.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 18,000,000.00 | Unknown |

| | | | | |
|---|---|---|---|---|
| 7.10.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 13,000,000.00 | Unknown |
| 29.10.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 8,000,000.00 | Unknown |
| 24.11.20 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 13,000,000.00 | Unknown |
| 19.1.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 9,000,000.00 | Unknown |
| 28.1.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 10,000,000.00 | Unknown |
| 10.2.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 19.2.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 4.3.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 18.3.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 4.5.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 20.5.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 31.5.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 22.6.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 28.6.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 20.7.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 29.7.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 21,000,000.00 | Unknown |
| 30.7.21 | ESPB (Pictet, Switzerland) | Blinton (Indosuez Wealth Management, Monaco) | € 100,000,000.00 | "contract 3211.332.21" |
| 29.9.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 5,000,000.00 | Unknown |
| 19.10.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 7,000,000.00 | Unknown |
| 22.10.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 4,000,000.00 | Unknown |
| 8.11.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 8,000,000.00 | Unknown |
| 23.11.21 | Amblex (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 18.1.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |

44

| | | | | |
|---|---|---|---|---|
| 27.1.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 5,000,000.00 | Unknown |
| 23.2.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 4,000,000.00 | Unknown |
| 9.3.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 3,000,000.00 | Unknown |
| 22.3.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 4,000,000.00 | Unknown |
| 27.4.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 3,000,000.00 | Unknown |
| 24.5.22 | Avanda (Standard Chartered Bank, UAE) | ESPB (Pictet, Switzerland) | € 4,000,000.00 | *"agreement date 20.05.2022"* |
| 22.6.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 3,000,000.00 | Unknown |
| 27.7.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 3,000,000.00 | Unknown |
| 29.9.22 | Avanda (unknown) | ESPB (Pictet, Switzerland) | € 1,000,000.00 | Unknown |
| 28.12.22 | ESPB (Pictet, Switzerland) | Blinton | € 57,000,000.00 | Unknown |

### *Additional Detail from CTR Source Material*

110.  The CTR Source also provided records of SWIFT MT 103 messages relating to three of these transactions, which contain the following details (Exhibit 38/pages 137-139):

a)  One shows the payment of €12m from Amblex to ESPB on 17 June 2020. It shows the sender to be "Amblex Trading Ltd, Dubai, UAE", sending from its bank account at Standard Chartered Bank, UAE (IBAN: AE420440001628495890494), branch code: SCBLAEAD. The payment is referenced as "*agreement date 15.06.2020*".

b)  The second shows the payment of €4m from Avanda to ESPB on 24 May 2022. It shows the sender to be "Avanda Services Ltd, Dubai, UAE", sending from its bank account at Standard Chartered Bank, UAE (IBAN: AE400440001626394112184). The payment is referenced as "*agreement date 20.05.2022*".

c)  The third shows the payment of €100m from ESPB to Blinton but dated 3 August 2021 (rather than 31 July 2021). "Blinton Trading Ltd, 2, Rue des

Princes, Monfte Carlo, Monaco" is listed as the recipient of the payment, which went into its bank account at Indosuez Wealth Management, Monaco (IBAN: MC5812739000700004859438179), branch code: CFMOMCM. The payment is referenced as "*contract 3211.332.21*". Similarly to above, the minor discrepancy in date is explained by different points at which a transaction is recorded by different sources.

### *Further Material from Other Sources*

111.  CT has also obtained information from Sources B in relation to two of the same payments with minor discrepancies from the information in the CTR Source material. As explained above, Sources B have provided information about banking transfers but have not provided the underlying banking document themselves:

   a)  The first transfer identified by Sources B is a payment of €12,000,957.57 on 17 June 2020 from Amblex Trading Ltd's Dubai-based Standard Chartered bank account (account number: 28495890494; IBAN: AE420440001628495890494) to ESPB's Swiss Pictet account (IBAN: CH1008755057388100100). This confirms the date of the payment, Amblex's bank account details, including its IBAN, and the payment information, which is listed as '*Agreement Date 15.06.2020*' as shown in the material from the CTR Source (Exhibit 52/page 265). There is a small discrepancy in the value of the payment shown in the CTR Source material (Exhibit 38/page 137) and the information provided by Sources B. CTR understands from verbal discussions with the Field Team that this is likely due to the fact that the figure provided by Sources B includes the bank fees whereas the CTR Source material shows the net amount of the transfer.

   b)  The second transfer identified by Sources B is a payment of €4,000,458.50 on 22 May 2022 from Avanda's Dubai Standard Chartered bank account (account number: 26394112184; IBAN: AE400440001626394112184) to ESPB's Swiss Pictet bank account (IBAN: CH1008755057388100100). The international transaction reference for the payment is: SC212139059684592 (Exhibit 51/page 264). This corroborates Avanda's IBAN and the details of the payment ('*Agreement Date 20.05.2022*'), which

are the same as in the material from the CTR Source. There is a minor discrepancy in the value and date of the payment. CTR understands from discussions with the Field Team that this is likely due to the different sourcing of the payment details.

112. CT has no information on the 'agreements' or 'contracts' referred to in the records of the SWIFT messages obtained from the CTR Source or any commercial activity conducted by the companies that would have warranted the payments, nor on the ultimate source or destination of the funds. However, note the proximity in dates between the agreements of 15.6.20 and 20.5.22 and the transfers to which they relate.

113. CT also notes that it has identified an account at Swiss Pictet with the same IBAN (CH1008755057388100100) but in Edelweiss Investments Inc's name (rather than ESPB's). This is from a screenshot of the first page of a Pictet USD Financial Statement dated 19 March 2019 obtained by Sources A (Exhibit 79/page 382).

## V.   Payments involving ESPB'S Swiss Julius Baer account (unknown entities and Cordax)

114. CT has obtained material from the CTR Source that the following transactions were made involving ESPB's bank account at Julius Baer Switzerland (IBAN: CH9508515834950688905) (Exhibit 38/page 140):

a) Eight transfers to ESPB's account totalling €4,571,192.51 between 30 June 2020 and 31 March 2022 from an unknown sender. The receipts are listed as "*Contract 1433.20*";

b) One transfer from ESPB's account of €15,934,321.33 on 17 May 2022 to a company called Cordax Trading SA ("**Cordax**").

### *Summary of Payments from CTR Source Material*

| Date | From (account) | To (account) | Amount | Payment ref |
|------|----------------|--------------|--------|-------------|
| 30.6.20 | Unknown | ESPB (Julius Baer, Switzerland) | € 504,942.22 | Unknown |
| 30.9.20 | Unknown | ESPB (Julius Baer, Switzerland) | € 510,942.02 | Unknown |

| 31.12.20 | Unknown | ESPB (Julius Baer, Switzerland) | € 506,983.22 | Unknown |
|---|---|---|---|---|
| 31.3.21 | Unknown | ESPB (Julius Baer, Switzerland) | € 612,903.42 | Unknown |
| 30.6.21 | Unknown | ESPB (Julius Baer, Switzerland) | € 608,933.21 | Unknown |
| 30.9.21 | Unknown | ESPB (Julius Baer, Switzerland) | € 609,442.93 | Unknown |
| 31.12.21 | Unknown | ESPB (Julius Baer, Switzerland) | € 614,992.32 | Unknown |
| 31.3.22 | Unknown | ESPB (Julius Baer, Switzerland) | € 601,993.17 | Unknown |
| 17.5.22 | ESPB (Julius Baer, Switzerland) | Cordax (Standard Chartered Bank, Dubai) | € 15,934,321.33 | "*Contract 3224.443.22*" |

115. CT has no further information in relation to the payments into ESPB.

### *Further Material from Other Sources: Cordax*

116. The payment from ESPB to Cordax is also shown in material from two separate sources, Sources A and Sources B:

117. Sources B identified a payment of €15,934,321.33 from ESPB's Zurich, Switzerland Julius Baer bank account (IBAN: CH9508515834950688905) to Cordax Trading SA's bank account at Standard Chartered Bank, Dubai (account number: 28945099458; IBAN: AE730440001628945099458). The payment date is 20 May 2022 and the payment reference is "*Contract 3224.443.22*" (see Exhibit 53/page 266).

118. Sources A provided a copy of a SWIFT MT 103 message which shows the same payment, providing corroboration for the IBANs, payment amount and description (see Exhibit 54/page 267). The date is recorded as 19 May 2022. As with above, CT understands from discussions with the Field Team that the reason for the minor discrepancies in date is likely due to the different sourcing of the payment details and the different points at which the transaction is recorded by different sources.

119. CT has no information on the 'contract' referred to in the SWIFT or what (if any) services Cordax, a UAE based company, could be undertaking for ESPB with a value of almost €16m, nor on the ultimate source or destination of the funds. However, note the similarity between the payment reference for the transfer from ESPB's Swiss Julius Baer account to Blinton on 17.5.22 ("*Contract 3224.443.22*") and the transfer from ESPB's Swiss Pictet account to Blinton on 30.7.21 ("*Contract 3211.332.21*").

## G. FINDINGS: NK'S BANK ACCOUNTS – TRANSFERS TO AND FROM NK'S ACCOUNTS AND THE ACCOUNTS OF COMPANIES HE IS BELIEVED TO CONTROL (FEB 21-MAR 23)

### I. Overview

120. CTR Source material identifies 64 transactions made to and from NK between 24 February 2021 and 21 March 2023 (Exhibit 37/pages 123-131). 60 are between NK and four companies that he appears to control (Canford, Asakren, Gefan and Irtum). Insofar as CT has information on the bank accounts used, the transfers were made across borders, variously between Liechtenstein and Switzerland, Liechtenstein and Luxembourg and Luxembourg and Abu Dhabi. Some of this material has been corroborated by material from other sources. This material is set out in the sections headed "Investigations into the relevant companies" and "Further material from other Sources" below.

121. This material shows that NK received into his Swiss and Luxembourg accounts the following transfers from Canford, Asakren and Gefan between 24 February 2021 and 21 March 2023:

| Number of transactions | Type | Sender | Sender Account | Recipient | Recipient Account | Currency | Value |
|---|---|---|---|---|---|---|---|
| 17 | Receipt | Canford Trading Corp. | Neue Bank AG Liechtenstein and unknown | NK | Julius Baer Switzerland Account | US Dollars | 43,747,656.95 |
| 16 | Receipt | Asakren Trading Ltd | Neue Bank AG Liechtenstein and unknown | NK | Pictet Switzerland Account | Euros | 43,566,670.13 |
| 25 | Receipt | Gefan Trading Ltd | Neue Bank AG Liechtenstein and unknown | NK | Banque de Luxembourg Account, Luxembourg | US Dollars | 178,830,651.19 |

122.   It also shows that NK made the following payments to Irtum from his Luxembourg account on 21 December 2021 and 8 March 2023:

| Number of transactions | Sender | Sender Account | Recipient | Recipient Account | Currency | Value |
|---|---|---|---|---|---|---|
| 2 | NK | Banque de Luxembourg Account | Irtum Trading Corp. | Abu Dhabi Commercial Bank, Abu Dhabi, UAE and unknown | US Dollars | 141,479,322.21 |

123.   Finally, it shows four transactions made between NK's personal accounts, including accounts in Switzerland, Monaco and Dubai between 31 December 2021 and 25 January 2023.

| Number of transactions | Sender | Sender Account | Recipient | Recipient Account | Currency | Value |
|---|---|---|---|---|---|---|
| 3 | NK | Julius Baer Switzerland Account | NK | CFM Indosuez Wealth Monaco and unknown | US Dollars | 41,971,010.68 |
| 1 | NK | Pictet Switzerland Account | NK | ENBD Dubai Account | Euros | 36,357,775.42 |

124.   Some of the CTR Source material has been corroborated by other sources, as identified below.

125.   CT has also obtained material from Sources A showing:

   a)  Additional payments of an unknown amount made from NK's accounts at Banque Havilland to his ENBD Dubai Account in June 2023 (Exhibit 30/pages 91-95). This corroborates the existence of NK's ENBD Dubai account.

   b)  An intended payment of an unknown amount to Asakren from NK (CT is unaware if this payment went through) (Exhibit 29/pages 87-90). This corroborates NK's connection to Asakren;

   c)  A payment from Irtum to NK's Monaco account of US$989,700 (Exhibit 29/pages 87-90). This corroborates NK's connection to Irtum; and

   d)  A payment from NK's account at Banque Havilland to Sky Consulting Group LLC FZE which appears to be in respect of an invoice for services provided to Irtum (Exhibit 83/pages 386-387, and set out in more detail at paragraph

134 below). This again corroborates NK's connection to Irtum and suggests that he controls it.

| Number of transactions | Sender | Sender Account | Recipient | Recipient Account | Currency | Value |
|---|---|---|---|---|---|---|
| 1 | Irtum Trading Corp. Dubai | Unknown | NK | Banque Havilland (Monaco) S.A.M | US Dollars | 989,700 |
| Unknown | NK | Banque Havilland Monaco Account | NK | ENBD Dubai Account | Unknown | Unknown |

126. CT has also identified certain payments from NK's personal accounts at UBS Switzerland and Julius Baer Monaco to Russian entities. These are described in the next section, grouped with other payments made to Russia at the same time.

127. These (and the payments from Edelweiss to NK set out above) are the only payments involving NK's accounts of which CT is aware but CT has no reason to believe that they are a full account of payments in and out of the relevant accounts (or that all NK accounts have been identified).

128. The payments are set out in further detail below, grouped by each of NK's bank accounts at Julius Baer, Pictet, Banque de Luxembourg and Banque Havilland. In summary, in relation to each account, the CTR Source material shows numerous transfers into the account, with a few larger transactions out of each account. CT does not have information as to NK's account balances and has been unable to determine if the funds being transferred into the account are the same funds as are transferred out. Nor does CT have any material or evidence as to the ultimate source or ultimate destination of the funds.

## II.   Investigations into the relevant companies

129. No active companies with the names Canford Trading Corp., Asakren Trading Ltd, Gefan Trading Ltd or Irtum Trading Corp. were identified in a thorough search of publicly available sources, namely third party corporate records aggregators.

130. Four companies were identified with corresponding names which had been incorporated in Belize. These were identified in publicly available sources

including the Belize corporate registry and third party corporate records aggregators. The companies identified were:

a) 'Canford Trading Corp.' (company number: 13,064) incorporated in Belize on 3 January 2000 and the company's registered agent was Morgan & Morgan Trust Corporation (Belize) Limited, address: Jasmin Court, 25A Regent Street, PO Box 1777. However, the company was struck off the Belizean corporate register on 3 January 2017 and subsequently compulsorily dissolved due to non-payment of governmental fees (see Exhibit 41/pages 147-164 and Exhibit 42/pages 165-167).

b) 'Asakren Trading Ltd' (company number 166,062) incorporated in Belize on 4 April 2017 with a share capital of US$1,000. The company's registered agent was Summit Corporate Services Limited. The company applied for voluntarily dissolution on 14 December 2021 and was ultimately dissolved on 12 January 2022 (see Exhibit 43/pages 168-195, Exhibit 44/pages 196-201 and Exhibit 45/pages 202-204).

c) 'Gefan Trading Ltd' (company number 4,096) incorporated in Belize on 2 August 1996 with an authorised share capital of US$50,000. The company's registered agent was Glenn D. Godfrey of 35 Barrack Road, Belize City. This company was struck off on 4 January 1999 and ultimately compulsorily dissolved in January 2003 due to non-payment of governmental fees (Exhibit 46/pages 205-226 and Exhibit 47/pages 227-228).

d) 'Irtum Trading Corp' (company number: 133,320) incorporated in Belize on 26 April 2013 under the name Building Goods Investment Inc. The company's name was changed to Irtum Trading Corp. on 26 April 2013. The company was struck-off on 1 January 2015 and was ultimately compulsorily dissolved in January 2018 due to non-payment of governmental fees (see Exhibit 48/pages 229-230 and Exhibit 49/pages 231-262).

131. All four companies had been dissolved prior to the date of the transactions. It is therefore possible that these are not the correct companies, alternatively that the companies' bank accounts continued to be used after their dissolution.

132. Records of SWIFT messages obtained from the CTR Source in respect of four transfers identify the companies as "Asakren Trading Ltd, Vaduz, Liechtenstein", "Canford Trading Corp, Vaduz, Liechtenstein", "Gefan Trading

Ltd, Vaduz, Liechtenstein" and "Irtum Trading Corp, Dubai, UAE". These also identify six transfers variously as "*Dividends*", "*own funds*" and relating to agreements. CT does not have any further information on the purpose of any of the transactions.

133.    No other companies by these names were identified in publicly available sources.[6] Thorough checks of global corporate registries, global corporate records aggregators and publicly available sources were conducted.

134.    However, CT has obtained further material from Sources A which (1) links Irtum to NK, and (2) suggests that Irtum may be registered in the RAK Free Zone. This material consists of:

a)    A third invoice dated 27 October 2023, with Invoice Number 010913-3 from Sky Consulting Group, addressed to NK, in respect *"Consulting Services for RAK company annual administration"* for Irtum (Exhibit 82/page 385, the "**Irtum Invoice**"); and

b)    The reproductions of three SWIFT messages (described at paragraphs 95 and 125 above), the third of which (seen at Exhibit 83/page387) details a transfer made from NK's account with Banque Havilland (IBAN: MC5816038000010101119097877) to Sky Consulting Group for USD17,340 with payment description *'INVOICE NO 01903-3 AGRMNT 020923'*. The invoice number therefore matches that on the Irtum Invoice above.

135.    As explained below, it is inferred that NK controls each of these companies on the basis that:

a)    Large transfers were made between those companies and NK;

b)    For each of Canford, Asakren and Gefan, a SWIFT message has been identified for one transaction which shows payment to NK with the reference "dividends";

c)    An invoice in respect of services provided to Irtum by Sky Consulting is addressed to NK and has seemingly been paid from NK's personal account with Banque Havilland;

---

[6] A company named Canford Trading SA which was incorporated in Belize on 28 January 1993 and subsequently dissolved on 25 August 1994 was identified.

d) An email from Banque Havilland to NK of 1 February 2023 refers to an intended transfer to Asakren; and

e) CT has not seen any explanation for the other transfers.

### III.   Transfers involving NK's Swiss Julius Baer account

136.   CT has obtained CTR Source material that the following transactions were made involving NK's Swiss Julius Baer account (IBAN: CH3908515684003948532) (Exhibit 37/page 123):

a) 17 payments in totalling US$43,747,656.95 from Canford between 12 May 2021 and 23 November 2022;

b) Three payments out totalling US$41,971,010.68 to himself, at least one of which to his account at CFM Indosuez Wealth Monaco.

#### *Summary of Payments from CTR Source Material*

| Date | From (account) | To (account) | Amount | Payment ref |
|---|---|---|---|---|
| 12.5.21 | Canford (unknown) | NK (Julius Baer, Switzerland) | $1,000,000.00 | Unknown |
| 9.6.21 | Canford (unknown) | NK (Julius Baer, Switzerland) | $1,000,000.00 | Unknown |
| 29.6.21 | Canford (unknown) | NK (Julius Baer, Switzerland) | $2,943,904.33 | Unknown |
| 22.7.21 | Canford (unknown) | NK (Julius Baer, Switzerland) | $3,884,531.42 | Unknown |
| 16.9.21 | Canford (unknown) | NK (Julius Baer, Switzerland) | $2,000,000.00 | Unknown |
| 28.9.21 | Canford (unknown) | NK (Julius Baer, Switzerland) | $3,954,214.55 | Unknown |
| 13.10.21 | Canford (unknown) | NK (Julius Baer, Switzerland) | $2,000,000.00 | Unknown |
| 23.11.21 | Canford (unknown) | NK (Julius Baer, Switzerland) | $2,000,000.00 | Unknown |
| 31.12.21 | NK (Julius Baer, Switzerland) | NK (unknown) | $17,985,442.91 | Unknown |
| 8.3.21 | Canford (Neue Bank | NK (Julius Baer, Switzerland) | $4,932,843.91 | "Dividends" |

| | AG, Liechtenstein) | | | |
|---|---|---|---|---|
| 30.3.22 | Canford (unknown) | NK (Julius Baer, Switzerland) | $3,990,121.39 | Unknown |
| 19.4.22 | Canford (unknown) | NK (Julius Baer, Switzerland) | $2,990,431.42 | Unknown |
| 30.5.22 | Canford (unknown) | NK (Julius Baer, Switzerland) | $1,945,942.82 | Unknown |
| 23.6.22 | Canford (unknown) | NK (Julius Baer, Switzerland) | $3,221,452.84 | Unknown |
| 25.8.22 | Canford (unknown) | NK (Julius Baer, Switzerland) | $2,000,000.32 | Unknown |
| 21.9.22 | Canford (unknown) | NK (Julius Baer, Switzerland) | $1,000,000.00 | Unknown |
| 20.10.22 | Canford (unknown) | NK (Julius Baer, Switzerland) | $1,000,000.00 | Unknown |
| 23.11.22 | Canford (unknown) | NK (Julius Baer, Switzerland) | $3,884,213.31 | Unknown |
| 22.12.22 | NK (Julius Baer, Switzerland) | NK (CFM Indosuez Wealth, Monaco) | $13,773,724.48 | "Own funds" |
| 25.1.23 | NK (Julius Baer, Switzerland) | NK (unknown) | $10,211,843.29 | Unknown |

### *Additional Detail from CTR Source Material*

137.   The CTR Source also provided records of SWIFT MT 103 messages relating to two of these transactions, which contain the following details (Exhibit 37/ pages 124-125):

   a)   One shows the payment from "Canford Trading Corp, Vaduz, Liechtenstein" to NK of US$4,932,843.91 on 8 March 2021. The sender bank reference, NBANLI22, indicates that the payment came from an account in Canford's name at Neue Bank AG ("**Neue Bank**"), Vaduz Liechtenstein (IBAN: LI0208802546889405923). This payment is referenced as "*Dividends*", indicating that Canford must be at least partially owned by NK.

   b)   The second shows the payment from NK to himself of US$13,773,724.48, but listing the date as 27 December 2022. It shows that the payment was sent to his bank account at  CFM Indosuez Wealth, in Monaco (IBAN:

MC5812739000700634675433464), branch reference CFMOMCM and the reference for the payment was "*own funds*". Similarly to above, the small discrepancy in dates is explained by the different points at which a transaction is recorded, likely accounting for longer transfers times over the Christmas and bank holiday period.

138. It is unclear what trading Canford, a company which has not proven possible for CT to locate, carries out, to enable it to pay over US$47m to NK (of which US$4,932,843.91 described as "dividends") in an 18 month period.

## IV.   Transfers involving NK's Swiss Pictet bank account

139. CT has obtained CTR Source material showing that the following transactions were made involving NK's Swiss Pictet account (IBAN: CH7608755013335200100) (Exhibit 37/page 126):

   a) payments in totalling €43,566,670.13 from Asakren between 25 February 2021 and 21 March 2023;

   b) One payment out of €36,357,775.42 to NK's bank account at Emirate NBD Bank PJSC, Dubai, UAE ("**ENBD**") on 16 November 2022.

### *Summary of Payments from CTR Source Material*

| Date | From (account) | To (account) | Amount | Payment ref |
|------|----------------|--------------|--------|-------------|
| 25.2.21 | Asakren (unknown) | NK        (Pictet, Switzerland) | €1.000.000,00 | Unknown |
| 23.3.21 | Asakren (unknown) | NK        (Pictet, Switzerland) | €3.125.543,83 | Unknown |
| 19.5.21 | Asakren (unknown) | NK        (Pictet, Switzerland) | €4.334.908,92 | Unknown |
| 8.6.21 | Asakren (unknown) | NK        (Pictet, Switzerland) | €1.000.000,00 | Unknown |
| 24.8.21 | Asakren (unknown) | NK        (Pictet, Switzerland) | €2.155.933,42 | Unknown |
| 29.9.21 | Asakren (unknown) | NK        (Pictet, Switzerland) | €1.943.884,52 | Unknown |
| 10.11.21 | Asakren (unknown) | NK        (Pictet, Switzerland) | €2.553.621,42 | Unknown |

| 27.1.22 | Asakren (unknown) | NK (Pictet, Switzerland) | €3.900.411,82 | Unknown |
|---|---|---|---|---|
| 24.2.22 | Asakren (unknown) | NK (Pictet, Switzerland) | €1.000.342,77 | Unknown |
| 29.3.22 | Asakren (unknown) | NK (Pictet, Switzerland) | €5.533.873,82 | Unknown |
| 17.5.22 | Asakren (unknown) | NK (Pictet, Switzerland) | €1.000.000,52 | Unknown |
| 27.6.22 | Asakren (Neue Bank AG, Liechtenstein) | NK (Pictet, Switzerland) | €4.875.388,51 | "Dividends" |
| 25.7.22 | Asakren (unknown) | NK (Pictet, Switzerland) | €2.000.000,00 | Unknown |
| 14.9.22 | Asakren (unknown) | NK (Pictet, Switzerland) | €3.674.772,91 | Unknown |
| 16.11.22 | NK (Pictet, Switzerland) | NK (ENBD, Dubai) | €36.357.775,42 | "Own funds" |
| 9.2.23 | Asakren (unknown) | NK (Pictet, Switzerland) | €1.000.000,32 | Unknown |
| 21.3.23 | Asakren (unknown) | NK (Pictet, Switzerland) | €2.342.443,52 | Unknown |

### *Additional Detail from CTR Source Material*

140. The CTR Source also provided records of SWIFT MT 103 messages relating to two of these transactions, which contain the following details (Exhibit 37/pages 127-128):

   a) One shows the payment of €4,875,388.51 on 27 June 2022 from "Asakren Trading Ltd, Vaduz, Liechtenstein" to NK's Pictet account. The payment came from Asakren's bank account at Neue Bank AG in Vaduz (IBAN: LI7508802569004592234), branch reference NBANLI22. The payment is referenced as "*Dividends*".

   b) The second shows the payment from NK's Pictet account to himself, identifying this account with IBAN: AE090261324450697655544 and branch code: EBILAED. This is an account at Emirate NBD Bank PJSC, Dubai, UAE ("**ENBD**"), as shown by the branch code. The payment is referenced as "*own funds*"

### *Further Material from Other Sources*

141.   CT has also obtained material from Sources B corroborating the payment from NK's Pictet account to his ENBD account (Exhibit 50/page263). This is an electronic image of an original email. This shows that, on 21 November 2022, SA received a "Credit Notification" email from ENBD, stating that the bank had effected a credit of €36,357,775.42 from an account with IBAN: CH7608755013335200100 (NK's Pictet Geneva bank account) to NK's account at ENBD, with account reference 17655544 and account number 1050697655544. The initial date of transaction is listed as 18 November 2022 and the payment details are "*own funds*". The transaction reference number is CT945022111234892. The email does not state the IBAN number (as set out in the SWIFT message) and there is a slight discrepancy in the recording of the date of the payments owing to different points at which the payment was registered by different sources.

142.   CT has also obtained from Sources A (Exhibit 30/pages 91-95) a copy of an email from NK to Banque Havilland setting out details of an account in his name with ENBD. The IBAN of this account matches that of the account identified by the CTR Source.

143.   CT has also obtained material from Sources A, linking NK to Asakren. This is a copy of an email of 1 February 2023, from a relationship manager at Banque Havilland, (Monaco), Oxana Filina to NK stating that she was waiting for a copy of the agreement from NK for their compliance team in order to complete a planned transfer of an unknown amount to '*Asakren Trading Ltd in Liechtenstein*' (see Exhibit 29/pages 87-90). CT does not know if this transfer was completed.

144.   It is unclear what trading Asakren, a company which has not proven possible for CT to locate, carries out, to enable it to pay over €US$43m to NK (of which €4,875,388.51 descried as "dividends") in a 2 year period. Absent any explanation, the inference is that NK is using Asakren to launder and / or dissipate money.

145.   CT has also obtained from Sources C a copy of a SWIFT message showing a transfer from Edelweiss to NK's account at Pictet, Switzerland (described at

paragraph 81 above) (Exhibit 75/pages 363-366). Mr Kazakov admits in these proceedings that he received this payment. The IBAN number for the NK Swiss Pictet account identified in Exhibit 75 matches that in the transfers identified by the CTR Source.

## V.   Transfers involving NK's Banque de Luxembourg account

146.   CT has obtained CTR Source material that the following transactions were made involving NK's Banque de Luxembourg account in Luxembourg (IBAN: LU210086893221395048) (Exhibit 37/page 129):

    a) 25 payments from Gefan totalling US$178,830,651.19 between 24 February 2021 and 8 February 2023.

    b) Two payments out to Irtum totalling US$141,479,322.21, one on 21 December 2021 and one on 8 March 2023.

### *Summary of Payments from CTR Source Material*

| Date | From (account) | To (account) | Amount | Payment ref |
|---|---|---|---|---|
| 24.2.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $4,905,432.54 | Unknown |
| 11.3.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $5,906,546.32 | Unknown |
| 12.5.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $4,909,435.39 | Unknown |
| 31.5.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $8,990,489.42 | Unknown |
| 9.6.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $12,546,892.44 | Unknown |
| 27.7.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $3,899,903.09 | Unknown |
| 7.9.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $7,904,932.84 | Unknown |
| 22.9.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $10,008,435.82 | Unknown |
| 21.10.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $5,904,983.52 | Unknown |
| 17.11.21 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $12,098,934.02 | Unknown |

| 21.12.21 | NK (Banque de Luxembourg, Lux) | Irtum (unknown) | $42,490,894.00 | Unknown |
|---|---|---|---|---|
| 10.3.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $4,990,931.43 | Unknown |
| 7.4.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $5,903,231.03 | Unknown |
| 28.4.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $6,903,782.21 | Unknown |
| 10.5.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $5,098,903.88 | Unknown |
| 31.5.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $4,902,331.02 | Unknown |
| 16.6.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $6,903,902.35 | Unknown |
| 20.7.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $8,904,091.42 | Unknown |
| 23.8.22 | Gefan (Neue Bank, Lux) | NK (Banque de Luxembourg, Lux) | $22,342,804.42 | "Dividends" |
| 20.9.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $12,344,312.55 | Unknown |
| 22.11.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $3,021,653.11 | Unknown |
| 28.12.22 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $5,312,652.92 | Unknown |
| 18.1.23 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $4,002,934.21 | Unknown |
| 25.1.23 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $5,908,903.32 | Unknown |
| 8.2.23 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $4,214,231.92 | Unknown |
| 23.2.23 | Gefan (unknown) | NK (Banque de Luxembourg, Lux) | $1,000,000.00 | Unknown |
| 8.3.23 | NK (Banque de Luxembourg, Lux) | Irtum (Abu Dhabi Commercial Bank, Abu Dhabi) | $98,988,428.21 | "consultancy agreement 08.03.2023" |

**Additional Detail from CTR Source Material**

147. The CTR Source also provided records of SWIFT MT 103 messages relating to two of these transactions, which contain the following details (Exhibit 37/ pages 130-131):

   a) One shows the payment of US$22,342,804.42, listed on 23 August 2022 from "Gefan Trading Ltd, Vaduz, Liechtenstein" bank account at Neue Bank AG, Liechtenstein (IBAN: L174088026950049584411), branch code: NBANLI22. The payment reference is listed as "*Dividends*", implying that NK holds shares in Gefan;

   b) The second shows a payment of US$98,988,428.21, dated 10 March 2023.[7] The document shows that "Irtum Trading Corp, Dubai, UAE", received the payment into its bank account at Abu Dhabi Commercial Bank in Abu Dhabi, UAE (IBAN: AE840030013499568456334), branch reference ADCBAEAA. The payment is referenced as "*consultancy agreement 08.03.2023*".

148. CT does not know what trading Gefan, a company which has not proven possible for CT to locate, carries out, to enable it to pay over US$178m to NK (of which €22,342,804.42 described as "dividends") in a 2 year period or what "consultancy" services Irtum, a company which has not proven possible for CT to locate in public records, carries out, for NK to pay it over US$141m in two sizeable transactions. Note that the date of the "*consultancy agreement 08.03.2023*" is the same as the date of the transfer to which it relates. Absent any explanation, the inference is that NK is using Gefan to launder and / or dissipate money.

149. NK's relationship with Irtum has been corroborated from material obtained from Sources A, as described at paragraphs 125c)- d) above.

## VI.   Transfers involving NK's Banque Havilland account

150. CT has also obtained material (copies of two emails) from Sources A showing two payments involving NK's Banque Havilland account:

---

[7] The small discrepancy in dates is explained by different points at which the payment was registered and recorded by different sources.

a) On 1 February 2023, a relationship manager at Banque Havilland (Monaco) Oxana Filina sent NK an email confirming a payment of US$989,700 from Irtum Trading Corp, Dubai, that was credited to him that day (see Exhibit 29/pages 87-90).

b) On 28 June 2023, NK emailed Oxana Filina at Banque Havilland asking her to pay invoices (the details and value of which are unknown) to new details for NK in Dubai: NK's same bank account at ENBD Bank (IBAN: AE090261324450697655544, branch code: EBILAED). Oxana Filina responded the same day confirming they would *"pay everything now"* (see Exhibit 30/pages 91-95).

## H. FINDINGS: TRANSFERS FROM NK, ESPB AND GATIABE TO RUSSIA (MAR/APR 22)

### I.   Overview

151.   Records of SWIFT messages obtained from the CTR Source shows that in March/April 2022, NK, and companies that appear to be controlled by him - ESPB and Gatiabe - sent nine payments, totalling approximately US$24,945,604 from their bank accounts in Switzerland and Monaco to bank accounts in Russia belonging to Admiral Invest (a NK-controlled company) and associated parties (see Exhibits 4, 5, 7, 8, 10, 11, 12, 13, 14). The timing of these payments moving funds from Europe to Russia may be significant because this was shortly after Russia invaded Ukraine in February 2022.

152.   The nine payments were made between and 10 March 2022 and 7 April 2022 and comprised eight rouble payments totalling ₽1,989,400,000 (c. US$21,945,604) and one US Dollar payment of US$3 million. The recipients were: Admiral Invest, three Russian Admiral Invest employees and a Russian contractor (OOO GeoKompas). Source C has informed CT that OOO GeoKompas is possibly controlled by Admiral Invest.

a) Between 16 March 2022 and 5 April 2022, Admiral Invest's Russian bank accounts received ₽1,583,500,000 (c. US$17,973,116):

    i.   ₽885,000,000 (c. US$10,509,576) from NK (Exhibit 12/page 41 and Exhibit 13/page 42) ; and

     ii.   ₽698,500,000 (c. US$7,463,540) from ESPB (Exhibit 5/page 6 and Exhibit 7/page 35).

b)  Admiral Invest's Russian bank accounts also received US$3 million on 7 April 2022 from Gatiabe (Exhibit 14/page 43) .

c)  Admiral Invest employees and OOO GeoKompas received a total of ₽405,900,000 (c. US$3,972,488):) into Russian bank accounts:

     i.   ₽75,000,000 (c. US$640,858) or ₽70,500,000 (c. US$602,406) from ESPB (Exhibit 4/page 5) ; and

     ii.   ₽330,900,000 (c. US$3,331,630) from NK (Exhibit 8/page 36, Exhibit 10/page 39 and Exhibit 11/page 40).

### *Summary of Payments from CTR Source Material*

| Date | From (account) | To (account) | Amount | Payment ref |
|---|---|---|---|---|
| 10.3.22 | ESPB (UBS, Switzerland) | Smirnov (Sberbank, Russia) | ₽75,000,000 or ₽70,500,000 | *"Loan disbursement loan agrmnt N1 d 09032022"* |
| 16.3.22 | ESPB (UBS, Switzerland) | Admiral Invest (Stroylesbank, Russia) | ₽325,000,000 | *"Project finance contract N23 04052021 redevelopment of Chaev residence"* |
| 23.3.22 | NK (UBS, Switzerland) | Krasnoshekov (Russian account) | ₽70,500,000 | *"Loan disbursement loan agrmnt N2 a 15032022"* |
| 23.3.22 | NK (UBS, Switzerland) | Planson (Russian account) | ₽85,900,000 | *"Loan disbursement loan agrmnt N1a 15032022"* |
| 27.3.22 | NK (UBS, Switzerland) | OOO GeoKompas (Russian account) | ₽174,500,000 | *"Contract N59VB-25 20092021"* |
| 30.3.22 | NK (Julius Baer, Monaco) | Admiral Invest (Stroylesbank, Russia) | ₽400,000,000 | *"Loan disbursement shareholder loan* |

| | | | | *agrmnt 01 28032022"* |
|---|---|---|---|---|
| 1.4.22 | NK (Julius Baer, Monaco) | Admiral Invest (Stroylesbank, Russia) | ₽485,000,000 | *"Loan disbursement shareholder loan agrmnt 02 30032022"* |
| 5.4.22 | ESPB (UBS, Switzerland) | Admiral Invest (Stroylesbank, Russia) | ₽373,500,000 | *"Principal repayment to agent contract N 1/2020 10122020 on project redevelopment of Chaev residence"* |
| 7.4.22 | Gatiabe (Pictet, Switzerland) | Admiral Invest (Stroylesbank, Russia) | US$3,000,000 | *"Principal payment to agent contract no4 12122020"* |

## II.    Ownership, control and affiliation of the relevant parties

153.    It appears that NK controlled ESPB, Gatiabe and Admiral Invest:

    a) ESPB: As explained above, there is an agreement dated January 2019 for the transfer of ESPB from Edelweiss Investment Holding SA to NK (Exhibit 35/pages 113-117, obtained from Sources A).

    b) Gatiabe: We are instructed that NK alleges that he owns and controls Gatiabe via the Wlamil Foundation. It appears that he has exercised control over Gatiabe for a number of years. On 27 September 2019, NK wrote to Hemaren Stiftung stating that he is the primary beneficiary of Gatiabe (see Exhibit 55/page 268, obtained from Sources A).

    c) Admiral Invest: Russian corporate records show that NK is the general director and 100% shareholder of Admiral Invest (see Exhibits 56 and57/pages 269-271 (which are corporate records). NK and VK are also listed as employees of Admiral Invest (see Exhibit 9/pages 37-38, obtained from Sources A).

154.    CT understands that the following three individuals who received payments were Admiral Invest employees:

a) Denis Anatolevich Smirnov ("Smirnov"): Contacts in the Field Team were able to verify through Russian tax records (copies of which were not provided to CT) that Smirnov is an Admiral Invest Employee.

b) German Alexevich Krasnoshekov ("Krasnoshekov"): Exhibit 9/pages 37-38 (obtained from Sources A) shows that Krasnoshekov received a salary of ₽45,977 (c. US$492) for September 2021 from Admiral Invest.

c) Alexey Yurievich Planson ("Planson"): Sources C have viewed Planson's tax files which state that Planson is employed as a CCTV operator/guard at Admiral Invest. According to Exhibit 9/pages 37-38, (obtained from Source A), he received a salary of ₽25,287 (c. US$347) from Admiral Invest in September 2021.

155.   CT understands from Sources C that OOO GeoKompas is possibly controlled by Admiral Invest. CT has no further detail on the control of OOO GeoKompas by Admiral Invest.

### *Further Detail from CTR Source Material*

156.   The detail of the payment information shown in the records of SWIFT messages obtained from the CTR Source is set out below:

a)   on 10 March 2022, ESPB sent ₽75 million (c. US$640,858)[8]  or ₽70.5 million (c. US$602,407.01[9]) from its Swiss UBS account (IBAN: CH540020620610452061C) to Smirnov[10]. The funds were sent to Smirnov's (account number 40817810455866474383) (see Exhibit 4/page 5). Sources C has identified in comments that this is a Russian Sberbank account.

b)   on 16 March 2022, ESPB sent ₽325 million (c. US$2,991,941)[11] from its UBS Swiss account (IBAN: CH540020620610452061C) to an account with number: 40702810700000000792 (see Exhibit 5/page 6). The message lists the beneficiary's account number and address as Edelweiss Investment

---

[8] As per a conversion rate of approximately 1 RUB=0.008545 USD on 10 March 2022: FX Top.

[9] Ibid.

[10] Of note, on the document the value date, currency code, amount is listed as date: 20220310; currency RUB and amount 75,000,000. However, the currency/instructed amount is listed as currency/instructed amount RUB, amount 70,500,000. We have not been able to corroborate which sum is the correct amount.

[11] As per a conversion rate of approximately 1 RUB=0.009206 USD on 16 March 2022: FX Top.

SP SA, 12-14 Lit A Admiralteyskaya Nabm St. Petersburg, Russia. However, other material (e.g. Exhibit 6/pages 7-34, a banking document obtained from Sources C  and Exhibit 7/page 35, Exhibit 12/page 41 and Exhibit 13/page 42, records of SWIFT messages obtained from the CTR Source) shows that the bank account is held at Stroylesbank and in fact belongs to Admiral Invest. It appears therefore that there is an inaccuracy in Exhibit 5.

c)   on 23 March 2022, NK sent ₽70.5 million (c. US$714,369)[12] from his Swiss UBS bank account (IBAN: CH120020620650959962N) to the Russian bank account of Krasnoshekov (see Exhibit 8/page 36).

d)   on 23 March 2022, NK sent ₽85.9 million (c. US$870,416)[13] from his Swiss UBS bank account (IBAN: CH120020620650959962N) to the Russian bank account of Planson (see Exhibit 10/page 39).

e)   on 27 March 2022, NK sent ₽174.5 million (c. US$1,746,845)[14] from his UBS bank account (IBAN: CH120020620650959962N) to the Russian bank account of OOO GeoKompas (see Exhibit 11/page 40).

f)   on 30 March 2022, NK sent ₽400 million (c. UD$4,730,898)[15] from his Bank Julius Baer (Monaco) SAM account (IBAN: MC4114508000001510718100B60) to Admiral Invest's Stroylesbank Russia bank account (account number: 4070281070000000792) (see Exhibit 12/page 41).

g)   on 1 April 2022, NK sent ₽485 million (c. US$5,778,678)[16] from his Monaco Julius Baer account (IBAN: MC4114508000001510718100 4B60) to Admiral Invest's Stroylesbank account (account number: 4070281070000000792) (see Exhibit 13/page 42).

h)   on 5 April 2022, ESPB sent ₽373.5 million (c. US$4,471,599)[17] from its UBS Swiss account (IBAN: CH540020620610452061C) to Admiral Invest's Stroylesbank account (account number 40702810700000000792) (see Exhibit 7/page 35).

---

[12] As per a conversion rate of approximately 1 RUB=0.010133 USD on 23 March 2022, as per FX Top.

[13] As per a conversion rate of approximately 1 RUB=0.010133 USD on 23 March 2022, as per FX Top.

[14] As per a conversion rate of approximately 1 RUB=0.010011 USD on 27 March 2022, as per FX Top.

[15] As per a conversion rate of approximately 1 RUB=0.011827 USD on 30 March 2022, as per FX Top.

[16] As per a conversion rate of approximately 1 RUB=0.011915 USD on 1 April 2022, as per FX Top.

[17] As per a conversion rate of approximately 1 RUB=0.011972 USD on 5 April 2022, as per FX Top.

      i)   on 7 April 2022, Gatiabe Business Inc sent US$3 million from its Geneva Pictet bank account to Admiral Invest's Stroylesbank account (account number: 40702840600000030023) (see Exhibit 14/page 43).

157.    It is unclear why, in the space of 23 days, NK and two companies apparently controlled by him (ESPB and Gatiabe), would send circa US$25m to Admiral Invest, its subsidiary and various, seemingly, lowly paid employees of Admiral Invest.

## I.  FINDINGS: NK'S PORTFOLIOS

158.    CT has obtained material showing the value of NK's portfolios in two of his accounts. In June 2022, NK instructed the transfer of one substantial portfolio (comprising over €15m) from Julius Baer Monaco to UBS Switzerland. A full list of accounts in NK's name identified by CT is set out below (Section K).

### I.   Transfer of NK's Julius Baer Monaco Account (2019-2022) portfolio to UBS

159.    CT has obtained copies of three documents from Sources A concerning the transfer of NK's Julius Baer Monaco Account portfolio to UBS Switzerland in June 2022.

160.    A letter from Julius Baer to NK of 17 October 2022 (Exhibit 23/page 71) states that NK opened his account at Julius Baer Monaco (account number: 5107181) on 30 September 2019 and that the account was closed on 20 September 2022, seemingly by the bank. The letter states that NK was the sole beneficial owner of the assets in the account .An email from Julius Baer to NK of 17 June 2022 shows that, as at June 2022, NK's portfolio at Julius Baer Monaco had a market value of approximately €15,571,439.49 (see Exhibit 24/pages 72-81).

161.    By a letter of 13 June 2022, NK instructed Julius Baer to transfer all of his assets held in his account and portfolio to his personal UBS Switzerland account (see Exhibit 22/page 70):

      a)  For securities: Bank account: 0206005763120001.

b) For cash: USD: CH400020620657631260 N; CHF: CH290020620657631201 A; and €: CH120020620657631270 C.

## II.  NK's Banque Havilland Monaco Account (c. 2022-present)

162.  Documents obtained from Sources A show that NK established a Monaco bank account, relationship number: 101119, with Banque Havilland (see Exhibit 25/page 82). Although it is unclear exactly when NK's Banque Havilland account was opened, a form entitled "Client Request for Transfer of Securities" indicates that the account was opened in or around July 2022, shortly after NK's relationship with Julius Baer Monaco was terminated.

163.  Banque Havilland banking documents from July 2022 show that NK's Euro bank account IBAN is MC58 1603 8000 0101 0111 9097 877 (see Exhibit 26/page 83) and his US Dollar bank account IBAN is MC58 1603 8000 0101 0111 9033 372 (see Exhibit 27/page 84). There was also an account statement for NK's Euro Banque Havilland account from 1 January 2022 to 1 February 2023 identified (see Exhibit 31/pages 96-100). The first activity in that period appears to be a payment into the account on 6 August 2022.

164.  In November 2022, NK's private banker at Banque Havilland Oxana Filina provided a letter stating that he has at least €500,000 held with the bank for the purpose of renewing NK and VK's Monaco residency permits (see Exhibit 28/pages 85-86).

165.  A portfolio valuation and composition for NK's portfolio at Banque Havilland, portfolio number: 30.101119_0 dated  30 June 2023 shows that the portfolio contains total net assets worth: €9,872,214.14 (see Exhibit 32/pages 101-105):

a) €9,027,416.47 in bonds; and

b) €844,797.67 in cash in held in the two accounts:

i.   Euro: IBAN:MC58 1603 8000 0101 0111 9097 877; and

ii.  US Dollar :IBAN: MC58 1603 8000 0101 0111 9033 372.

## J.  FINDINGS: PAYMENTS OF $34M FROM OB TO VK IN 2018

166. CT has obtained copies of bank transfer records from Sources A showing that, between October and December 2018, OB sent VK a total of €34 million as follows:

a) On 9 October 2018, OB sent €17 million from his Swiss UBS bank account (IBAN: CH31002062069088996oV) to VK's bank account held at Swedbank Group, the Estonian bank (IBAN: EE852200221059544493) (see Exhibit 1/page 1). The description of the transfer was 'gift' and OB paid a transaction fee of €15.

b) On 24 December 2018, OB sent €10 million from his Zurich UBS bank account to VK's Sberbank account (account number: 42307978355860011823). The transfer was described as "gift from brother" (see Exhibit 2/pages 2-3).

c) On 28 December 2018, OB sent €7 million[18] to VK (see Exhibit 39/pages 141-143) from an account at PAO Severo-Zapadny Sberbank. The transfer was described as "gift from brother". Exhibit 39 does not have an IBAN. It is therefore difficult to say with certainty which bank account at Sberbank the funds were sent from. The document shows the transfer of €7m from one account to another, it also provides details of a corresponding account. However, further details cannot be confirmed. Exhibit 39 also does not name OB or VK as the account holders. This information was provided verbally by Sources A.

## K. FINDINGS: NK ASSETS

### I. Properties owned and/or controlled by NK

167. CT has identified from a combination of Sources A, Sources C and Public Records the following properties that are registered in the name of NK or companies believed to be controlled by him. The relevant information is listed in the table below.

| Jurisdiction | Address | Registered ownership | Exhibit | Source |
|---|---|---|---|---|

---

[18] ₽548,716,000 Russian Roubles (1 Russian Rouble equivalent to €0.0128) was debited from OB's account held at PAO Severo-Zapadny Sberbank.

69

| | | | | |
|---|---|---|---|---|
| Russia | Land plot: 78:07:0003225:1005, 1,068.7sqm hotel at Liter A, 4 Maloy Nevky, St. Petersburg. | "Natural person" believed to be NK | Exhibit 63/pages 297-314 | Sources A |
| Russia | Land plot: 78:07:0003225:1006, 303.7sqm hotel at Liter B, 4 Maloy Nevky, St. Petersburg. | "Natural person" believed to be NK | Exhibit 63/pages 297-314 | Sources A |
| Russia | Land plot: 78:07:0003225:12, 8,210sqm land plot at Liter A, 4 Maloy Nevky, St. Petersburg | NK | Exhibit63/pages 297-214 and Exhibit 64/pages 315-316 | Sources A and Public Records |
| Russia | Cadastral number: 78:07:0003225:1009, 1,587.9sqm, 16-18, Maloy Nevky, St. Petersburg. | EISP | Exhibit 65/pages 317-318 | Public Records |
| Russia | Cadastral number: 78:07:0003225:1010, 623sqpm, 16-18, Maloy Nevky, St. Petersburg. | EISP | Exhibit 66/pages 319324 | Public Records |
| Russia | Cadastral number: 78:07:0003225:1038, 741sqm, Litera X, 16-18, Maloy Nevky, St. Petersburg. | EISP | Exhibit 67/pages 325-326 | Public Records |
| Russia | Cadastral number: 78:32:0001012:1052, 6215.9sqm, St. Petersburg, Admiralteyskaya Embankment, d 12-14, litera A, pom 5-N, 11-N, 13-N, 17-N, 22-N, 24-N, 30-N, 31-N, 32-N, 33-N, 34-N, 35-N, 36-N, 37-N, 4 LK, 5LK, 6LK. | EISP | Exhibit 68/pages 327-330 | Public Records |
| Russia | Flat 287, 10 Khudozhnikov Avenue, St. Peterburg | Believed to be NK | Exhibit 69/pages 331-349 | Source C |
| Russia | Share of property at Khudozhnikov Avenue, house 10, building 1, letter B, St Petersburg, Russia | Believed to be NK | Exhibit 69/pages 331-349 | Source C |
| Russia | Flat 147, 52 Svetlanovsky Prospekt, St. Petersburg | Believed to be NK | Exhibit 69/pages 331-349 | Source C |

| Russia | Vedeneeva Street, house 12, building 4, letter A, room 4H. | Believed to be NK | Exhibit 69/pages 331-349 | Source C |
| Russia | Yesenina Street, house 30, letter A, room 1H. | Belived to be NK | Exhibit 69/pages 331-349 | Source C |

## II.    Companies believed to be controlled by NK

| Name | Jurisdiction | Exhibit | Source |
|---|---|---|---|
| **Foundations Controlled by NK** | | | |
| Wlamil Foundation | Panama | Exhibit 76/pages 367-378 | Sources A |
| Hemaren Stiftung | Panama | Exhibit 55/page 268 | Sources A |
| KESK Stiftung | Liechtenstein | Exhibit 62/pages 283-296 | Sources A |
| Wlamil 2 | Panama | Exhibit 17/pages 60-61 | CTR Source |
| Wlamil 3 | Panama | Exhibit 17/pages 60-61 | CTR Source |
| **Companies Controlled by NK directly and/or through the Foundations** | | | |
| Edelweiss Investments Inc. | Panama | Exhibit 15/pages 44-57 | Sources A |
| Gatiabe Business Inc | Panama | Exhibit 55/page268 | Sources A |
| Edelweiss Investments S. Pb SA (ESPB) | Switzerland | Exhibit 35/pages 113-117 | Sources A |
| Edelweiss Investments Real Estate SA | Switzerland | Exhibit 34/pages 108-112 | Sources A |
| Edelweiss Investments S.P. SA | Switzerland | Exhibit 36/pages 118-122 | Sources A |
| **Other Companies within NK's de-facto Control** | | | |
| Acorn Services Inc. | Unknown (believed to be Dubai) | Exhibit 38/pages 132-140 | CTR Source |
| Amblex Trading Ltd | Unknown (believed to be Dubai) | Exhibit 38/pages 132-140 Exhibit 81/pages | CTR Source Sources A |
| Avanda Services Ltd | Unknown (believed to be Dubai) | Exhibit 38/pages 132-140 | CTR Source |
| Blinton Trading Ltd | Unknown | Exhibit 38/pages 132-140 | CTR Source |
| Canford Trading Corp. | Unknown | Exhibit 37/pages 123-131 | CTR Source |

| Askaren Trading Ltd | Unknown | Exhibit 37/pages 123-131 | CTR Source |
|---|---|---|---|
| Gefan Trading Ltd | Unknown | Exhibit 37/pages 123-131 | CTR Source |
| Irtum Trading Corp | Unknown (believed to be Dubai) | Exhibit 37/pages 123-131<br>Exhibit 83/pages 386-387 | CTR Source<br>Sources A |
| Monston Trading Ltd | Unknown (believed to be Dubai) | Exhibit 38/pages 132-140 | CTR Source |
| Cordax Trading SA | Unknown (believed to be Dubai) | Exhibit 38/pages 132-140<br>Exhibit 80/page 383 | CTR Source<br>Sources A |

## III.   Bank accounts owned by NK

| Account Holder | Bank | Account Number/IBAN | Location | Exhibit | Source |
|---|---|---|---|---|---|
| NK (Closed) | Julius Baer | IBAN: MC5214508000001510718100 2Z02 | Monaco | Exhibit 75/pages 363-366 | Source C |
| NK (Closed) | Julius Baer | IBAN: MC4114508000001510718100 4B60 | Monaco | Exhibit 12/page 41 | Source C |
| NK | Luminor Bank AS | IBAN:<br>USD - EE181700017000044855<br>EUR - EE781700017000044842 | Estonia | Exhibit 70/pages 350-351 | Sources A |
| NK | Swedbank AS | IBAN: EE342200221056375063 | Estonia | Exhibit 77/page 379 | Sources A |
| NK | Pictet | IBAN: CH7608755013335200100 | Switzerland | Exhibit 75/pages 363-366 | Sources C |
| NK | CFM Indosuez Wealth | IBAN: MC5812739000700634675433464 | Monaco | Exhibit 37/pages 123-131 | CTR Source |
| NK | Julius Baer | IBAN: CH3908515684003948532 | Switzerland | Exhibit 37/pages 123-131 | CTR Source |
| NK | Emirates NBD Bank PJSC | IBAN: AE090261324450697655544 | UAE | Exhibit 30 and Exhibit 37/pages 123-131 | Sources A and CTR Source |
| NK | Banque De Luxembourg S.A. | IBAN: LU210086893221395048 | Luxembourg | Exhibit 37/pages 123-131 | CTR Source |
| NK | Banque Havilland | AC: 30.101119_0 | Monaco | Exhibit 31/pages 96-100 | Sources A |
| NK | Banque Havilland | IBAN: MC5816038000010101119033372 | Monaco | Exhibit 27/page 84 | Sources A |
| NK | Banque Havilland | IBAN: MC5816038000010101119097877 | Monaco | Exhibit 26/page 83 | Sources A |
| NK | UBS | AC: 0206005763120001 | Switzerland | Exhibit 22/page 70 | Sources A |
| NK | UBS | IBAN: CH400020620657631260 N | Switzerland | Exhibit 22/page 70 | Sources A |
| NK | UBS | IBAN: CH290020620657631201 A | Switzerland | Exhibit 22/page 70 | Sources A |

| | | | | | |
|---|---|---|---|---|---|
| NK | UBS | IBAN: CH120020620657631270 C | Switzerland | Exhibit 22/page 70 | Sources A |
| NK | UBS | IBAN: CH120020620650959962N | Switzerland | Exhibit 8/page 36, Exhibit 10/page 39 and Exhibit 11/page 40 | CTR Source |
| NK | Alfa Bank | AC: 40817978508900004197/ 301010455469 | Russia | Exhibit 74/pages 361-362 | Sources A |
| NK/VK Joint Account | UBS | IBAN: CH170020620650959901J AC: 206-609599.01J | Switzerland | Exhibit 71/pages 352-357 and Exhibit 72/page 358[19] | Sources A |

## IV.  Bank Accounts in the Name of Entities which NK Controls

| Account Holder | Bank | Account Number/IBAN | Location | Exhibit | Source |
|---|---|---|---|---|---|
| Admiral Invest | Stroylesbank | AC: 4070281070000000792 | Russia | Exhibit 12/page 41 and Exhibit 13/page 42 | CTR Source |
| Admiral Invest | Stroylesbank | AC: 40702840600000030023 | Russia | Exhibit 14/page 43 | CTR Source |
| Wlamil 2 | Pictet | Unknown | Unknown | Exhibit 17/pages 60-61 | Sources C |
| Wlamil 3 | Pictet | Unknown | Unknown | Exhibit 17/pages 60-61 | Sources C |
| ESPB | UBS | IBAN: CH540020620610452061C | Switzerland | Exhibit 4/page 5 | CTR Source |
| ESPB | Pictet | IBAN: CH1008755057388100100 | Switzerland | Exhibit 51/page 264and Exhibit 52/page 265 | Sources B |
| ESPB | Julius Baer | IBAN: CH9508515834950688905 | Switzerland | Exhibit 53/page 266 and Exhibit 54/page 267 | Sources B and A |

---

[19] Exhibit 72 does not name NK as the holder of the accounts. This information was provided verbally by Sources A.

| ESP | UBS | IBAN: CH930020620610406360V | Switzerland | Exhibit 60/pages 278-279 | Sources C |
|---|---|---|---|---|---|
| Gatiabe | Pictet | Unknown | Switzerland | Exhibit 14/page 43 | CTR Source |
| Acorn Services Inc | Banque de Luxembourg SA | IBAN: LU220086586982134952 | Luxembourg | Exhibit 38/pages 132-140 | CTR Source |
| Amblex | Standard Chartered Dubai | IBAN: AE420440001628495890494 | UAE | Exhibit 38/pages 132-140 | CTR Source |
| Avanda | Standard Chartered Dubai | IBAN: AE400440001626394112184 | UAE | Exhibit 38/pages 132-140 | CTR Source |
| Blinton | Indosuez Wealth Management | IBAN: MC58 1273 9000 7000 0485 9438 179 | Monaco | Exhibit 38/pages 132-140 | CTR Source |
| Gefan | Neue Bank AG | IBAN: LI7408802695004958411 | Liechtenstein | Exhibit 37/pages 123-131 | CTR Source |
| Asakren | Neue Bank AG | IBAN: LI7508802569004592234 | Liechtenstein | Exhibit 37/pages 123-131 | CTR Source |
| Canford | Neue Bank AG | IBAN: LI0208802546889405923 | Liechtenstein | Exhibit 37/pages 123-131 | CTR Source |
| Irtum | Abu Dhabi Commercial Bank | IBAN: AE840030013499568456334 | UAE | Exhibit 37/pages 123-131 | CTR Source |
| Monston | Standard Chartered Bank UAE | IBAN: AE020440001621305948574 | UAE | Exhibit 38/pages 132-140 | CTR Source |
| Edelweiss Investment Inc | UBS | IBAN: CH08 0020 6206 4589 6201 E | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | UBS | IBAN: CH02 0020 6206 4589 6202 M | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | UBS | IBAN: CH14 0020 6206 4589 6230 D | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | UBS | IBAN: CH73 0020 6206 4589 6231 F | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | UBS | IBAN: CH36 0020 6206 4589 6260 C | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | UBS | IBAN: CH03 0020 6206 4589 6261 L | Switzerland | Exhibit 15/pages 44-57 | Sources A |

| Edelweiss Investment Inc | UBS | IBAN: CH51 0020 6206 4589 6262 R | Switzerland | Exhibit 15/pages 44-57 | Sources A |
|---|---|---|---|---|---|
| Edelweiss Investment Inc | UBS | IBAN: CH46 0020 6206 4589 6263 H | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | UBS | IBAN: CH17 0020 6206 4589 6270 X | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | UBS | IBAN: CH88 0020 6206 4589 6271 D | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | UBS | AC: 0206 00458962.S2 | Switzerland | Exhibit 15/pages 44-57 | Sources A |
| Edelweiss Investment Inc | Pictet | CH1008755057388100100 AC: W-573881.001 | Switzerland | Exhibit 51/page 264 Exhibit 79/page 382 | Sources B and Sources A |
| Edelweiss Investment Inc | Pictet | Unknown | Bahamas | Exhibit 3/page 4 | Sources C |

## V.   Bank Accounts in the name of individuals who appear to have received funds from NK

| Account Holder | Bank | Account Number/IBAN | Location | Exhibit | Source |
|---|---|---|---|---|---|
| Denis Anatolevich Smirnov | Sberbank | AC: 4081 7810 4558 6640 0000 | Russia | Exhibit 4/page 5 | CTR Source |
| German Alexeevich Krasnoshekov | Sberbank | AC: 4081 7810 0550 0758 4966 | Russia | Exhibit 8/page 36 | CTR Source |
| Alexey Yurivech Planson | Sberbank | AC: 4081 7810 6558 6560 0398 | Russia | Exhibit 10/page 39 | CTR Source |

## L.  FINDINGS: VK ASSETS

### I.   Bank Accounts

| Account Holder | Bank | Account Number/IBAN | Location | Exhibit | Source |
|---|---|---|---|---|---|
| VK | Stroylesbank | AC: 42301810200005105740 | Russia | Exhibit 84/page 388 | Sources A |
| VK | Stroylesbank | AC: 42306810900005112287 | Russia | Exhibit 84/page 388 | Sources A |

| VK | Stroylesbank | AC: 4081781030006101964 | Russia | Exhibit 84/page 388 | Sources A |
|---|---|---|---|---|---|
| VK | Stroylesbank | AC: 42301978900005100259 | Russia | Exhibit 74/pageg 361-362 | Sources A |
| VK | Sberbank | AC: 42307978355860011823 | Russia | Exhibit 73/pages 359-360 | Sources A |
| VK | Swedbank | AC: EE852200221059544493 | Estonia | Exhibit 1/page 1 | Sources A |
| VK | Luminor | AC: USD          - EE141700017000065685 EUR          - EE061700017000763453 | Estonia | Exhibit 70/pages 350-351 | Sources A |
| NK/VK Joint Account | UBS | IBAN: CH170020620650959901J AC: 206-609599.01J | Switzerland | Exhibits 71/pages 352-357 and 72/page 358 | Sources A |

Signed by Leah James on behalf of CT Group:

**Dated:**  17ᵗʰ January 2024

76

## M. APPENDIX

### APPENDIX OF DOCUMENTS REFERRED TO IN REPORT PRODUCED BY CT GROUP
### DATED 17 JANUARY 2024[20]

### 1. Category 1

| Exhibit | Document Type | Description | Date | Source | Pages |
|---|---|---|---|---|---|
| 2 | Bank Document | Transfer of EUR 10 million from Oleg Bourlakov to Vera Kazakova | 24/12/2018 | Source A | 2-3 |
| 3 | SWIFT Payment | Transfer of EUR 1.5 million from Edelweiss Investment Inc to Nikolai Kazakov | 16/03/2021 | Source C | 4 |
| 6 | Bank Document | Transfer of RUB 550,000 from Admiral Invest LLC to OOO Master-Vent | 21/02/2020 | Source C | 7-34 |
| 9 | Excel | List of Admiral Invest LLC's employees' monthly salaries | 01/09/2021 to 30/09/2021 | Source A | 37-38 |
| 15 | Bank Document | UBS Digital Banking which lists all of Edelweiss Investment Inc's UBS Switzerland bank accounts and names NK as the authorised user | 08/12/2021 | Source A | 44-57 |
| 22 | Bank correspondence | Letter from NK to Bank Julius Baer (Monaco) SAM | 13/06/2022 | Source A | 70 |
| 23 | Bank correspondence | Letter from Bank Julius Baer (Monaco) SAM to Nikolai Kazakov | 17/10/2022 | Source A | 71 |
| 24 | Bank correspondence | Emails between NK and Bank Julius Baer (Monaco) SAM | 14/06/2022 to 22/06/2022 | Source A | 72-81 |
| 25 | Bank Document | Document related to Nikolai Kazakov 's account with Banque Havilland | Unknown | Source A | 82 |

---

[20] Note that where an English translation has been provided, this is either a machine translation or has been prepared in-house by CT Group.

| Exhibit | Document Type | Description | Date | Source | Pages |
|---------|---------------|-------------|------|--------|-------|
| 26 | Bank Document | Banque Havilland document relating to Nikolai Kazakov's Euro bank account | 18/07/2022 | Source A | 83 |
| 27 | Bank Document | Banque Havilland document relating to Nikolai Kazakov's USD bank account | 18/07/2022 | Source A | 84 |
| 28 | Bank correspondence | Letter from Banque Havilland stating that Nikolai Kazakov has deposits of more than EUR 500,000 | 21/11/2022 | Source A | 85-86 |
| 29 | Bank correspondence | Email from Banque Havilland to Nikolai Kazakov | 01/02/2023 | Source A | 87-90 |
| 30 | Bank correspondence | Email exchange between Nikolai Kazakov and Banque Havilland | 28/06/2023 | Source A | 91-95 |
| 31 | Bank Document | Banque Havilland Nikolai Kazakov Account Statement (A/C: 30.101119_0) | 01/01/2022-01/02/2023 | Source A | 96-100 |
| 32 | Bank Document | Banque Havilland Nikolai Kazakov Portfolio Statement (A/C: 30.101119_0) | 30/06/2023 | Source A | 101-105 |
| 33 | Bank Document | Transfer of RUB 330,000 from Admiral Invest LLC to Dmitry Trofimov | 26/06/2023 | Source A | 106-107 |
| 34 | Share Transfer Agreement | Share Transfer Agreement between Edelweiss Investment Holding SA and Nikolai Kazakov (regarding shares in Edelweiss Investment Real Estate SA) | 23/01/2019 | Source A | 108-112 |
| 35 | Share Transfer Agreement | Share Transfer Agreement between Edelweiss Investment Holding SA and Nikolai Kazakov (regarding shares in Edelweiss Investment S.Pb SA) | 23/01/2019 | Source A | 113-117 |
| 36 | Share Transfer Agreement | Share Transfer Agreement between Edelweiss Investment Holding SA and Nikolai Kazakov (regarding shares in Edelweiss Investment S.P SA) | 23/01/2019 | Source A | 118-122 |
| 39 | Bank Document | Transfer of EUR 7 million from Oleg Bourlakov to Vera Kazakova | 28/12/2018 | Source A | 141-143 |
| 40 | Correspondence | Email from Vladislav Platonenko (Signet Bank) to Sofia Shvetsova | 03/09/2020 | Source A | 144-146 |

| Exhibit | Document Type | Description | Date | Source | Pages |
|---------|---------------|-------------|------|--------|-------|
| 41 | Corporate Records | Corporate records regarding Canford Trading Corp (Certificate of Incorporation and Memorandum and Articles of Association) | Various | Public Records | 147-164 |
| 42 | Corporate Records | Company summary regarding Canford Trading Corp | N/A | Public Records | 165-167 |
| 43 | Corporate Records | Corporate records regarding Asakren Trading Ltd (Certificate of Incorporation and Memorandum and Articles of Association) | Various | Public Records | 168-195 |
| 44 | Corporate Records | Corporate records regarding Asakren Trading Ltd (relating to its dissolution) | Various | Public Records | 196-201 |
| 45 | Corporate Records | Company summary regarding Asakren Trading Ltd | N/A | Public Records | 202-204 |
| 46 | Corporate Records | Corporate records regarding Gefan Trading Ltd (Certificate of Incorporation and Memorandum and Articles of Association) | Various | Public Records | 205-226 |
| 47 | Corporate Records | Company summary regarding Gefan Trading Ltd | N/A | Public Records | 227-228 |
| 48 | Corporate Records | Company summary regarding Irtum Trading Corp | N/A | Public Records | 229-230 |
| 49 | Corporate Records | Corporate records regarding Irtum Trading Corp (Certificate of Incorporation and Memorandum and Articles of Association) | Various | Public Records | 231-262 |
| 50 | Bank correspondence | Email from Emirates NBD PJSC to Semen Anufriev | 21/11/2022 | Source B | 263 |
| 54 | SWIFT | Transfer of EUR 15,934,321.33 from Edelweiss Investment S.PB SA to Cordax Trading SA | 19/05/2022 | Source A | 267 |
| 55 | Correspondence | Letter from NK to the Foundation Council of Hemaren Stiftung | 27/09/2019 | Source A | 268 |
| 56 | Corporate Records | Corporate records regarding Admiral Invest LLC (in Russian) | N/A | Public Records | 269-270 |
| 57 | Corporate Records | Corporate records regarding Admiral Invest LLC (in English) | N/A | Public Records | 271 |
| 62 | Corporate Records | Registration of KESK Stiftung in Liechtenstein | 18/07/2021 | Source A | 283-296 |

| Exhibit | Document Type | Description | Date | Source | Pages |
|---|---|---|---|---|---|
| 63 | Property Valuation | Proposal for property valuation prepared by Knight Frank for Nikolai Kazakov in respect of properties in St Petersburg | 26/04/2021 | Source A | 297-314 |
| 64 | Russian Land Records | Extract from the Unified State Register of Real Estate regarding land at St. Petersburg, Malaya Nevka River Embankment, 4, lit. A | 29/06/2019 | Public Records | 315-316 |
| 65 | Russian Land Records | Extract from the Unified State Register of Real Estate regarding land at St. Petersburg, Malaya Nevka River Embankment, 16-18 | 04/07/2019 | Public Records | 317-318 |
| 66 | Russian Land Records | Extract from the Unified State Register of Real Estate regarding land at St. Petersburg, Malaya Nevka River Embankment, 16-18 | 04/07/2019 | Public Records | 319-324 |
| 67 | Russian Land Records | Extract from the Unified State Register of Real Estate regarding land at St. Petersburg, Malaya Nevka River Embankment, 16-18, lit. X | 04/07/2019 | Public Records | 325-326 |
| 68 | Russian Land Records | Extract from the Unified State Register of Real Estate regarding land at St. Petersburg, Admiralteskaya nab. 12-14 | 01/08/2019 | Public Records | 327-330 |
| 71 | Bank Document | Bank opening/closure form in respect an account held by Vera Kazakova with UBS Switzerland | 23 April 2019 | Source A | 352-357 |
| 72 | Bank Document | UBS Switzerland document listing bank accounts | Unknown | Source A | 358 |
| 73 | Bank Document | Sberbank document confirming accounts held in the name of Vera Kazakova | 24/06/2019 | Source A | 359-360 |
| 74 | Bank Document | Transfer of EUR 648,852 by Vera Kazakova to Nikolai Kazakov | 22/03/2022 | Source A | 361-362 |
| 75 | SWIFT Payment | Transfers by Edelweiss Investments Inc to Fisher Island DR LLC (USD 500,000) and to Nikolai Kazakov (EUR 1.5 million, USD 9.5 million and EUR15 million). | Various | Source C | 363-366 |
| 76 | Declaration | Notification regarding control of foreign companies by Nikolai Kazakov listing Wlamil, Finco and Gatiabe. | 2018 | Source A | 367-378 |
| 77 | Bank Document | Swedbank cross-border payment order in respect of a transfer from an account held by Nikolai Kazakov | 08/09/2020 | Source A | 379 |
| 79 | Bank Document | Screenshot of the first page of a Financial Statement in USD for a Pictet account in the name of Edelweiss Investments Inc. | 19 March 2019 | Source A | 382 |

| Exhibit | Document Type | Description | Date | Source | Pages |
|---|---|---|---|---|---|
| 80 | Invoice | Invoice from Sky Consulting Group LLC FX addressed to NK in respect of services provided to Cordax | 27 November 2023 | Sources A | 383 |
| 81 | Invoice | Invoice from Sky Consulting Group LLC FX addressed to NK in respect of services provided to Amblex | 27 November 2023 | Sources A | 384 |
| 82 | Invoice | Invoice from Sky Consulting Group LLC FX addressed to NK in respect of services provided to Irtum | 27 November 2023 | Sources A | 385 |
| 84 | Bank Letter | Image of a letter issued by CB Stroylesbank confirming accounts in the name of VK | 18 [June/July] 2019 | Sources A | 388 |

## 2. Category 2

| Exhibit | Document Type | Description | Date | Source | Pages |
|---|---|---|---|---|---|
| 1 | SWIFT Payment | Transfer of EUR 17 million from Oleg Bourlakov to Vera Kazakova | 09/10/2018 | Source A | 1 |
| 16 | Correspondence | Email from Semen Anufriev to Nikolai Kazakov | 13/10/2021 | Source C | 58-59 |
| 17 | Correspondence | Email from Semen Anufriev to Nikolai Kazakov | 19/10/2021 | Source C | 60-61 |
| 18 | Correspondence | Email from Semen Anufriev to Nikolai Kazakov | 03/11/2021 | Source C | 62-63 |
| 19 | Correspondence | Email from Semen Anufriev to Nikolai Kazakov | 10/11/2021 | Source C | 64-65 |
| 20 | Correspondence | Email from Semen Anufriev to Nikolai Kazakov | 18/10/2021 | Source C | 66-67 |
| 21 | Correspondence | Email from Semen Anufriev to Nikolai Kazakov | 05/11/2021 | Source C | 68-69 |
| 58 | Correspondence | Email exchange between Semen Anufriev, Nikolai Kazakov and UBS | 29/01/2022 to 30/01/2022 | Source C | 272-275 |
| 59 | Correspondence | Email exchange between Semen Anufriev, Nikolai Kazakov and UBS | 17/02/2022 | Source C | 276-277 |
| 60 | Correspondence | Email exchange between Semen Anufriev, Nikolai Kazakov and UBS | 24/02/2022 to 10/03/2022 | Source C | 278-279 |
| 61 | Correspondence | Email exchange between Semen Anufriev and Nikolai Kazakov | 15/03/2022 | Source C | 281-282 |

| Exhibit | Document Type | Description | Date | Source | Pages |
|---|---|---|---|---|---|
| 69 | Property list | List of historic Nikolai Kazakov entries in the tax (FNS) official register of property title deeds. | N/A | Source C | 331-349 |
| 83 | SWIFT messages | SWIFT messages in respect of three transfers from NK's Banque Havilland account to Sky Consulting Group LLC FX | Undated | Sources A | 386-387 |

## 3.  Category 3

| Exhibit | Document Type | Description | Date | Source | Pages |
|---|---|---|---|---|---|
| 51 | Banking Document | Transfer of EUR 4,000,458.50 from Avanda Services Ltd to Edelweiss Investment S.PB SA | 22/05/2022 | Source B | 264 |
| 52 | Banking Document | Transfer of EUR 12,000,957.57 from Amblex Trading Ltd to Edelweiss Investment S.PB SA | 17/06/2020 | Source B | 265 |
| 53 | Banking Document | Transfer of EUR 15,934,321.33 from Edelweiss Investment S.PB SA to Cordax Trading SA | 20/05/2022 | Source B | 266 |
| 70 | Bank Document | Document produced by Luminor Bank AS listing accounts held by Nikolai Kazakov and Vera Kazakova | 04/10/2018 | Source A | 350-351 |

## 4.  Category 4

| Exhibit | Document Type | Description | Date | Source | Pages |
|---|---|---|---|---|---|
| 4 | SWIFT Payment | Transfer of RUB 75 million from Edelweiss Investment S.PB SA to Denis Smirnov | 10/03/2022 | CTR Source | 5 |
| 5 | SWIFT Payment | Transfer of RUB 325 million from Edelweiss Investment S.PB SA to Admiral Invest LLC[21] | 16/03/2022 | CTR Source | 6 |

---

[21] Note that further material (Exhibit 6) identifies the account number as belonging to Admiral Invest LLC.

| Exhibit | Document Type | Description | Date | Source | Pages |
|---|---|---|---|---|---|
| 7 | SWIFT Payment | Transfer of RUB 373.5 million from Edelweiss Investment S.PB SA to Admiral Invest LLC | 05/04/2022 | CTR Source | 35 |
| 8 | SWIFT Payment | Transfer of RUB 70.5 million from Nikolai Kazakov to German Krasnoshekov | 23/03/2022 | CTR Source | 36 |
| 10 | SWIFT Payment | Transfer of RUB 85.9 million from Nikolai Kazakov to Alexey Planson | 23/03/2022 | CTR Source | 39 |
| 11 | SWIFT Payment | Transfer of RUB 174.5 million from Nikolai Kazakov to OOO GeoKompas | 27/03/2022 | CTR Source | 40 |
| 12 | SWIFT Payment | Transfer of RUB 400 million from Nikolai Kazakov to Admiral Invest LLC | 30/03/2022 | CTR Source | 41 |
| 13 | SWIFT Payment | Transfer of RUB 485 million from Nikolai Kazakov to Admiral Invest LLC | 01/04/2022 | CTR Source | 42 |
| 14 | SWIFT Payment | Transfer of USD 3 million from Gatiabe Business Inc to Admiral Invest LLC | 07/04/2022 | CTR Source | 43 |
| 37 | SWIFT Payments | Transfers involving Nikolai Kazakov and each of Canford Trading Corp, Asakren Trading Ltd, Gefan Trading Ltd and Irtum Trading Corp | Various | CTR Source | 123-131 |
| 38 | SWIFT Payments | Transfers involving Edelweiss Investment S.PB SA and each of Monston Trading Ltd, Acorn Services Inc, Amblex Trading Ltd, Avanda Services Ltd, Blinton Trading Ltd and Cordax Trading SA | Various | CTR Source | 132-140 |
| 78 | Screenshots | Three screenshots related to transfers made to/from NK's accounts, obtained as a methodology test. | Various | CTR Source | 380-381 |