UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF LOUDMILA BOURLAKOVA AND VERONICA BOURLAKOVA TO TAKE DISCOVERY FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782 | Case No. 24 Misc. 71 (JPO)<br><br>**FIRST DECLARATION OF VICTORIA PIGOTT IN OPPOSITION TO MOTION TO VACATE ORDER** |

I, VICTORIA PIGOTT, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

### I.   Background

1. I am a partner at the law firm Mishcon de Reya LLP, counsel to Petitioners Loudmila Bourlakova ("Mrs. Bourlakova" or "Loudmila") and Veronica Bourlakova ("Veronica" and together with Loudmila, "Petitioners").

2. I submit this declaration in opposition to the Motion to Intervene, Vacate the Order Granting the Application and Quash the Subpoena (the "Motion") submitted by Nikolai Kazakov and Vera Kazakova (the "Kazakovs").

3. As counsel to Loudmila and Veronica in their civil proceeding currently pending in the High Court of Justice, Business and Property Courts of England and Wales, Claim No. BL-2020-001050 the (the "U.K. Court" and "U.K. Proceeding" respectively), I write to clarify certain matters put before the Court by the Kazakovs in support of their Motion.

4. I am familiar with the matters set forth herein based upon my knowledge as counsel to the Petitioners in the U.K. Proceeding. I am also personally familiar with facts and details related to the other global litigations between the parties, including the proceedings in Florida (a real estate

dispute), the Republic of Panama (a corporate dispute), Monaco (probate proceedings and escrow proceedings), and Russia (where the Kazakovs have recently commenced bankruptcy proceedings, as well as probate proceedings), Latvia (succession proceedings), Switzerland (asset recovery proceedings) and Cyprus.

**II.     Current Status of the U.K. Proceeding**

5.      As stated in the declaration of NAOMI SIMPSON dated 20 February 2024 (the "Simpson Declaration"), on 18 January 2024, Petitioners applied to the U.K. Court for a worldwide freezing order (the "U.K. Freezing Order Application") against the Kazakovs, among others.

6.      The U.K. Freezing Order Application was sought due to Petitioners' understanding that the Kazakovs and their associates had and, unless restrained, would continue to dissipate and conceal the nature and whereabouts of their assets and the Family assets (including those of Edelweiss and those which are property of Mr. Bourlakov's estate). In particular, Petitioners stated there was a very clear risk of dissipation because, amongst other reasons, the Kazakovs and their associates had a pattern and practice of forging documents in support of their plot to steal Family assets, including a fraudulent loan agreement for $1.349 billion, backdated account statements, falsified security interests concerning a yacht worth several hundred million dollars and real property worth around $100 million, in addition to backdated loan agreements in the amounts of $348 million, $143 million and $250 million. These allegations are set forth in the Petitioners' Amended Particulars of Claim in the U.K. Proceeding, and are summarized in a Judgment of the U.K. Court dated 26 May 2022,[1] a true and correct copy of which is attached as Exhibit 5 to the Simpson Declaration.

---

[1] *See*, in particular, paragraphs 75 to 133 Amended Particulars of Claim (Simpson Decl. Ex. 1) concerning the creation and use of forged and backdated documents, and paragraphs 26-34 of the Judgment of the UK Court (Simpson Decl. Ex. 5).

2

7. Indeed, multiple defendants in the U.K. Proceeding have now admitted that certain key documents were backdated and/or that the individuals who executed them were not authorized signatories at the time. This is reflected in submissions made by Mr. Anufriev, Tribaldos, and Leo Trust. True and correct copies of which are attached as Exhibits 1 and 2 hereto.[2]

8. The U.K. Freezing Order Application was scheduled to come before the U.K. Court on 21 and 22 February 2024 (the "February Hearing"). However, on 20 February 2024, the same day as the Simpson declaration and the commencement of the instant proceeding, the Kazakovs applied to adjourn the hearing on the WFO.

9. In advance of the February Hearing, contemporaneous with the commencement of this action, the Kazakovs filed evidence that an investigative report submitted in support of the Petitioners' U.K. Freezing Order Application authored by CT Group (the "CT Report") was allegedly predicated upon forged documents and that most of the material in it was fictitious.

10. Out of an abundance of caution, in light of the Kazakovs' representations, on 20 February 2024, in advance of the scheduled February Hearing, Petitioners withdrew their reliance on the CT Report in support of their U.K. Freezing Order Application for the purposes of the February Hearing.

11. The validity of the CT Report and the records it relied upon have subsequently become a fractious and sensitive issue for all parties to the U.K. Freezing Order Application. On the back (in part) of the allegation that the material is not authentic, the Kazakovs have made wide-ranging allegations against the Petitioners and CT Group in relation to the CT Report and the

---

[2] *See*, for example, paragraph 90-91 of Mr. Anufriev's Defence and paragraphs 125-127 of Leo Trust and Mr. Tribaldos's Defence, in which Mr Anufriev admits that the purported US$1.349bn loan agreement was backdated, and Leo Trust / Mr. Tribaldos admit that it was (i) backdated, and (ii) signed in the name of individuals who were not directors of the company at the relevant time.

3

manner in which much of the material contained in the report was obtained by CT Group (although the vast majority of it is said to be fictitious).

12. The Kazakovs' outlined their positions regarding the CT Report in detail on 9 March 2024. *See* Dkt. No. 11-9, Twelfth Witness Statement of Elizabeth Ann Seborg. In sum and substance, the Kazakovs contend that records relied on by the CT Group were some mixture of (i) forgeries (ii) privileged communications or (iii) legitimate records obtained by illegitimate means.

13. If the claims made by the Kazakovs in relation to the alleged fabrication of much of the contents of the CT Report are correct, it would appear that Petitioners may have been the victims of a further fraud in relation to the CT Report. For the avoidance of doubt, the Bourlakovas (as well as the Kazakovs) would be the victims of any such fraud/fabricated evidence, having expended extensive resources both in funding the CT Report, and having spent significant time and money examining and following transfers that—if the Kazakovs claims are correct— for the most part never occurred. The Petitioners therefore withdrew any reliance upon the CT Report for the purpose of the U.K. Freezing Order Application on 15 March 2024, and informed the Respondents to that application accordingly. For the avoidance of doubt, the withdrawal of reliance was not because of allegations raised by the Kazakovs that information in the CT Report had been illegally obtained—CT Group made expressly clear in the CT Report that it has not been. Rather, the reason for withdrawing reliance on the CT Report was that the Kazakovs' evidence raised serious concerns as to the veracity of the material contained within it and the Petitioners were not, and are still not, in a position to adduce evidence to contradict that.

14. Additionally, in connection with the above, a corporate entity which Petitioners allege is under the de facto control of the Kazakovs, Edelweiss (which is also a Respondent to the

U.K. Freezing Order Application), submitted evidence that it possesses a portfolio with a current value of over 843 million USD. Accordingly, in circumstances where the amount claimed in the U.K. Freezing Order Application was 902 million USD, and where Edelweiss had provided an undertaking to the U.K. Court that it would not deal with, diminish or dispose of its assets (save for in the ordinary course of business and to pay reasonable legal expenses) until final determination of the U.K. Freezing Order Application or further order of the U.K. Court, the Petitioners concluded that it would be inappropriate and disproportionate to maintain the U.K. Freezing Order Application against the individuals.

15. In light of the totality of these circumstances, on 19 March 2024 (less than one week before the instant Motion was filed), Petitioners withdrew the U.K. Freezing Order Application as against the Kazakovs (and Mr. Anufriev) individually. The Petitioners maintain the U.K Freezing Order Application against Edelweiss, and following her application to the U.K. Court on 28 February 2024, Veronica also has a pending application for an asset preservation order against both Edelweiss and its shareholder, Hemaren Stiftung (the "U.K. APO Application").

16. A true and correct copy of my First Affidavit dated 19 March 2024, filed in support of both the U.K. Freezing Order Application and the U.K. APO Application, is attached as Exhibit 3 hereto.

17. There remain very important issues (both substantively in the U.K. Proceeding and for the purpose of the extant U.K. Freezing Order Application and U.K. APO Application) as to, among other things, the asset position of Edelweiss. These matters are addressed in detail at pages 11–17 of Exhibit 3 and include, most notably, the fact that it is clear on the material available to the Petitioners at this stage, including the partial picture presented by Edelweiss in its evidence in

5

response to the U.K. Freezing Order Application, that substantial sums have already been extracted from Edelweiss by or for the benefit of the Kazakovs.

18. As is clear from the above, contrary to the suggestion implied by the Kazakovs in their Motion (*see, e.g.*, Dkt 9 at 12), Petitioners have not "abandoned" the U.K. Freezing Order Application. In fact, as set out above, following the hearing on 26 and 27 March 2024, Edelweiss has provided an undertaking to the U.K Court that until final determination of the U.K. Freezing Order Application, or further order of the U.K Court, it shall not deal with, diminish or dispose of its assets save for: (i) in the ordinary course of its business; (ii) to pay reasonable legal expenses; and (iii) to make other payments of a kind set out in the schedule to the order of the U.K. Court dated 27 March 2024, a true and correct copy of which is attached as Exhibit 4 hereto.[3]

19. Given the ongoing lack of clarity regarding the extent to which assets were transferred by, to, or from Edelweiss and other entities, Petitioners continue to seek a freezing order against the entity.

20. Moreover, (somewhat ironically and further complicating the picture) the Kazakovs' lawyers themselves have confirmed that the sub-set of documents that they have access to (which are said to be privileged) are almost entirely authentic.

21. Thus, in light of the allegations made by the Kazakovs and the unreliability of other sources of information to date, the discovery sought from the CHIPS system is of paramount importance. Such evidence will shed light on the veracity of allegations levied by the Kazakovs in the U.K. Proceeding, the legitimacy of unconfirmed bank records proffered by Edelweiss, and more.

---

[3] Following the entry of this Order, the parties to the U.K. Proceeding corresponded regarding whether Petitioners' instant opposition would, in some manner, violate the Order. Through a letter dated 17 April 2024, the U.K. Counsel for the Kazakovs confirmed "on behalf of all Applicants to the Confidentiality Order" that the instant opposition would not constitute such a breach.

### III. The Florida State Court Litigations

22. Separately, I understand that the Kazakovs have put the issue of certain litigations pending in Florida (the "Florida State Court Litigations") before this Court. There are two such actions, one relating to real and trust property located in Fisher Island, Florida (the "Fisher Island Action"), and one where Petitioner Veronica Bourlakova filed, but did not pursue a complaint against the Kazakovs, to preempt any potential statute of limitations issues (the "Protective Action").

23. Regarding the Fisher Island Action, no discovery requests that overlap with the discovery sought in this 1782 proceeding have been allowed. The only discovery sought by a Petitioner with any potential relevance to the 1782 proceeding related to jurisdictional issues and was denied.

24. Regarding the Protective Action, Petitioners have never sought discovery in that action, and have repeatedly asserted that the action should be dismissed or stayed in favor of the U.K. Proceedings. Nikolai Kazakov has, however served two requests for production on Veronica. Veronica objected to the first of those requests on the basis that discovery was premature considering her pending motions to stay and dismiss.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: London, U.K.
**22** April 2024

_____
Victoria Pigott /EM
*Counsel for Petitioners*