# Exhibit 1

<u>**Claim No: BL-2020-001050**</u>

**<u>IN THE HIGH COURT OF JUSTICE</u>**

**<u>BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES</u>**

**<u>BUSINESS LIST (ChD)</u>**

**B E T W E E N**

**(1) LOUDMILA BOURLAKOVA**
**(2) HERMITAGE ONE LIMITED**
**(3) GREENBAY INVEST HOLDINGS LIMITED**
**(formerly known as Maravan Services Limited)**
**(4) VERONICA BOURLAKOVA**

<u>**Claimants**</u>

**- and -**
**(1) OLEG BOURLAKOV**
**(2) DANIEL TRIBALDOS**
**(3) LEO SERVICES HOLDING LTD**
**(4) LEO TRUST SWITZERLAND AG**
**(5) REUWEN SCHWARZ**
**(6) SEMEN ANUFRIEV**
**(7) NIKOLAI KAZAKOV**
**(8) VERA KAZAKOVA**
**(9) COLUMBUS HOLDING AND ENTERPRISES SA**
**(10) FINCO FINANCIAL INC**
**(11) GATIABE BUSINESS INC**
**(12) EDELWEISS INVESTMENTS INC**
**(13) IPEC INTERNATIONAL PETROLEUM CO INC**

<u>**Defendants**</u>

_____

**DEFENCE OF THE SIXTH DEFENDANT**
_____

**<u>Introduction</u>**

1.  In this Defence of the Sixth Defendant ("**Mr Anufriev**"):

    1.1.  Save where otherwise stated, references to paragraphs are to paragraphs of the Amended Particulars of Claim ("**APOC**") served pursuant to the Order of Mr Justice Richard Smith dated 13 October 2023;

1.2.   Where definitions, abbreviations or headings in the APOC are adopted, this is without admission as to their accuracy or relevance;

1.3.   Where Mr Anufriev refers to written agreements and other documents, he does so by way of summary and will refer to those documents as necessary in due course for their full terms, meaning, and effects;

1.4.   Where Mr Anufriev expressly does not admit an allegation in the APOC in relation to the claims against him, this is because he is unable to admit or deny the allegation within the meaning of CPR r. 16.5(1)(b) and he requires the Claimants to prove it insofar as relied on;

1.5.   Insofar as the APOC contain allegations relating only to the claims against other Defendants, Mr Anufriev makes no admissions regarding these allegations.

1.6.   Mr Anufriev pleads this Defence in circumstances where his challenge to the jurisdiction of the courts of England and Wales has been rejected and without waiver of his objection.

1.7.   Save insofar as expressly admitted or not admitted below, each allegation in the APOC is denied.

**<u>Summary of Defence</u>**

2.   Mr Anufriev is not liable to the Claimants. His Defence is summarised at paragraphs 3 to 7 below.

3.   As to Mr Anufriev's role in relation to Mr Bourlakov's affairs:

3.1.   The late Mr Bourlakov was a cousin of Mr Anufriev's father. When Mr Bourlakov gave Mr Anufriev the Family Office role as further described below, Mr Bourlakov was 62 years old. Mr Anufriev understood at the time that Mr Bourlakov had acquired substantial wealth during a long and successful business career, including in partnership with Mr Kazakov, as further described below. Mr Bourlakov remained fully in control and closely involved in his business affairs (including management of his wealth) until his death.

3.2.   In 2012, Mr Anufriev became a Director of Hermitage Family Office Sarl, a company incorporated under the laws of Monaco which functioned as Mr

Bourlakov's family office (the "**Family Office**"), a role he held until July 2023. When Mr Anufriev took up this role he was 33 years old.

3.3.   Mr Anufriev understood that it was his role as Director of the Family Office to take instructions from Mr Bourlakov rather than other members of the Bourlakov family and that is what Mr Anufriev did. Mr Bourlakov was himself appointed as a Co-Director of the Family Office from 29 July 2019 onwards and he held that role until his death. As a Director of Mr Bourlakov's Family Office Mr Anufriev was responsible for passing on Mr Bourlakov's instructions to third parties including banks and fiduciary and corporate service providers. Mr Anufriev believed at all material times (and still believes now) that the instructions and information he received from Mr Bourlakov regarding the Kazakov partnership and the transactions addressed in the APOC reflected the true position.

3.4.   It is denied that Mr Anufriev managed Mr Bourlakov's business interests and personal wealth. He lacked the qualifications or experience to carry out such a role. Mr Anufriev did not make investment decisions for Mr Bourlakov, nor was he privy to the top-level discussions regarding Mr Bourlakov's business interests (save on occasion as a translator in respect of discussions that took place outside Russia with parties who did not speak Russian). Instead, by way of example, he conveyed Mr Bourlakov's instructions to third parties, answered (insofar as he was able to do so) such specific questions as Mr Bourlakov asked him to address, accompanied Mr Bourlakov to business meetings and assisted with translations, and carried out administrative tasks (such as completing forms, filing documents and answering information requests) under Mr Bourlakov's supervision.

3.5.   It is denied (if alleged) that Mr Anufriev had complete information regarding Mr Bourlakov's assets and actions. Mr Anufriev generally received information from: (a) Mr Bourlakov on a need to know basis, as determined by Mr Bourlakov, regarding those specific matters in respect of which he was seeking Mr Anufriev's assistance; and (b) from the corporate service providers to whom Mr Anufriev relayed Mr Bourlakov's instructions. Consistently with the limited nature of Mr Anufriev's role (as summarised above), Mr Bourlakov often declined to provide further information even when Mr Anufriev requested it.

3.6.   Insofar as the Claimants intend to allege that Mr Anufriev had any different or more extensive role in relation to Mr Bourlakov's affairs than that summarised in this paragraph 3 of the Defence, including by their use of the vague term "*right hand man*", that is denied.

4.   As to the Kazakov partnership:

4.1.   As particularised below, Mr Anufriev's understanding, formed long prior to the breakdown of Mr Bourlakov and Mrs Bourlakova's relationship and continuing to date, is that Mr Kazakov has worked together with Mr Bourlakov since the early 1990s and been treated and described as a partner since that time.

4.2.   Mr Anufriev believed at all material times (and continues to believe) that Mr Bourlakov and Mr Kazakov had a partnership through which they did business together. The detail and extent of the partnership is outside of Mr Anufriev's knowledge: (a) he was not a party to it; (b) and nor was he privy to its details, consistently with his role in relaton to Mr Bourlakov's affairs as summarised at paragraph 3 above.

4.3.   Mr Anufriev did not make or join in the representations alleged by the Claimants in respect of the Kazakov partnership. To the contrary, Mr Anufriev told Veronica at the meeting on 5 April 2018 that he had not previously been aware of the extent of Mr Kazakov's interest, a fact upon which the Claimants rely and which is inconsistent with their allegation that Mr Anufriev joined in the alleged representations or was a party to the alleged conspiracy asserted in the APOC.

4.4.   Insofar as he was aware of them, Mr Anufriev believed that the statements made by Messrs. Bourlakov and Kazakov to the Claimants regarding their partnership were true, and he regarded them as consistent with his own knowledge and experience of the relationship between them. In particular:

4.4.1.   Based on discussions between Mr Bourlakov's mother and other members of the family, Mr Anufriev understood that since the early 1990s, there had been a longstanding co-operation between Messrs. Bourlakov and Kazakov on business projects.

4.4.2.   Mr Anufriev further understood based on those discussions that Messrs. Bourlakov and Kazakov had together acquired an interest in Novoroscement, one of the major cement manufacturers in Russia, and that Novoroscement was a joint project of theirs.

4.4.3.   Further, in the summer of 2007, Mr Anufriev attended a meeting in Moscow with Messrs. Bourlakov and Kazakov at which each asked him questions which (as Mr Anufriev understood it) were intended to assess his suitability for future employment in one of their businesses.

4.4.4.   In January 2014 Mr Bourlakov discussed and agreed the transfer of assets into the name of Mrs Bourlakova at meetings at the Baltic Beach Hotel in Jurmala, Latvia, attended by Mr Bourlakov, Mrs Bourlakova, Mr Kazakov and Mrs Kazakova. Mr Anufriev was present for parts of these meetings.

4.4.5.   Mr Bourlakov also had meetings with a notary in Riga in January 2014. Mr Anufriev was aware of these meetings taking place and attended some of them. While Mr Anufriev does not now recall whether it is one of the documents executed at the meetings which he attended, he in any event became aware in January 2014 of a power of attorney dated 20 January 2014 in favour of Mr Kazakov permitting him (Mr Kazakov) to negotiate, conclude and execute the sale of Burneftegaz, a Russian oil and gas company. Mr Anufriev understood that this power of attorney served to: (i) give Mr Kazakov assurance that his interests would be secure even after these assets were transferred into the name of Mrs Bourlakova; and (ii) ensure that, in the event Mr Bourlakov was not able to take the necessary steps to complete the Burneftegaz transaction, Mr Kazakov would be able to do so.

4.4.6.   Further, although he was not present when it was executed, Mr Anufriev later saw, in around 2018, a further power of attorney dated 22 January 2014 which had been executed by Mrs Bourlakova in favour of Mr Kazakov, permitting Mr Kazakov to negotiate a post-nuptial agreement with Mr Bourlakov on her behalf. Mr Anufriev understood that this power of attorney was intended to give Mr Kazakov assurance that his

interests would be secure, even after the assets in question were transferred into the name of Mrs Bourlakova.

4.4.7.   Mr Anufriev assisted Mr Bourlakov in relation to the sale process for Burneftegaz which launched in September 2013 and completed on 26 March 2014. Mr Anufriev understood that Mr Kazakov had an interest in Burneftegaz (as reflected in the 20 January 2014 power of attorney) although he was not aware of its precise nature and extent.

4.4.8.   More generally, Mr Anufriev understood that Messrs. Bourlakov and Kazakov: (a) spoke frequently; and (b) met in Russia, sometimes as frequently as once a month or more, for purposes including the discussion of business matters.

5.   As to the beneficial ownership of the companies that are the subject of the Claimants' allegations in the APOC:

5.1.   Mr Anufriev does not claim (and has never claimed) to be the legal or beneficial owner of any of these companies. He does not admit the Claimants' case as to beneficial ownership and sets out his understanding of the position below.

5.2.   Mr Anufriev did not (and does not) understand Mrs Bourlakova or Veronica to be the beneficial owner of any of these companies. Mrs Bourlakova and Veronica formerly shared and acted upon the same understanding (i.e. that they were not the beneficial owners). Pending the provision of disclosure and further information, Mr Anufriev relies in this regard on the following facts and matters:

5.2.1.   Mrs Bourlakova's original and primary pleaded case in these proceedings was that Mr Bourlakov was the ultimate beneficial owner of Gatiabe and Jovellanos. Mrs Bourlakova now alleges, in her amended case, that she "*forgot that she had become the sole shareholder and beneficial owner of Gatiabe and Jovellanos*" (APOC paragraph 90C). Mr Anufriev denies this allegation, in particular because it is:

(a)   inconsistent with Mr Anufriev's understanding of the position as to the ownership of these companies;

(b)    inconsistent with Mrs Bourlakova's understanding of the position as pleaded in her original statement of case (accompanied by a statement of truth);

(c)    inconsistent with the conduct of Mrs Bourlakova and Veronica particularised in the sub-paragraphs of this Defence that follow; and

(d)    inherently incredible, being premised on the suggestion that Mrs Bourlakova "*forgot*" her alleged (but denied) ownership of such valuable assets in the context of the proceedings she commenced to recover what she now alleges to be hers.

5.2.2.    The Claimants continue positively to rely on resolutions passed by Edelweiss on 21 August and 5 September 2017 recording that H1 and Edelweiss had "*the same beneficial owner*" (APOC paragraphs 97-98). That is inconsistent with the case that the Claimants now seek to advance, whereby they now say that H1 is beneficially owned by Mrs Bourlakova and Edelweiss is beneficially owned by Veronica.

5.2.3.    Mrs Bourlakova and Veronica have alleged in proceedings abroad that Edelweiss was beneficially owned by Mr Bourlakov. In particular:

(a)    On 2 July 2021, Mrs Bourlakova applied to the Zurich Court in Switzerland to seal Mr Bourlakov's estate and obtain an inventory of his assets, which she contended included Edelweiss. Mrs Bourlakova made this application on the ground that Mr Bourlakov was the beneficial owner of Edelweiss' assets.

(b)    Further, Mrs Bourlakova contended that Mr Bourlakov's use of foundations and holding companies did not detract from the reality that he was the beneficial owner of the assets in question: "*With regard to the assets held by Edelweiss… it must be pointed out that the testator often used foundations and companies to hold assets, but the assets were often not contributed to the respective foundations and companies but were only held in trust by them.*

*This applies in particular to assets held by Edelweiss*" (in translation from the original German).

(c) In December 2021, Mrs Bourlakova and Veronica applied to the Zurich Court to seal bank accounts of Edelweiss (and also Gatiabe and Finco) on the basis that they formed part of Mr Bourlakov's estate (i.e., that they were beneficially his at his death).

(d) The December 2021 application to the Zurich Court having been rejected, Mrs Bourlakova and Veronica (together with Elena Bourlakova) applied to the Geneva Court for *ex parte* interim measures relating to Edelweiss's bank accounts, again on the stated basis that Edelweiss formed part of Mr Bourlakov's estate (i.e., was beneficially his as at his death).

5.2.4.    Further, in respect of those monies and companies that were transferred into Mrs Bourlakova's name in or after February 2014 (as addressed further below), Mrs Bourlakova acted inconsistently with her having been (or understood that she was) the beneficial owner of these companies. In particular, and by way of example only pending disclosure and further information from the Claimants:

(a) Even after the 2014 transfers, Mr Bourlakov continued to give instructions, including to Mr Anufriev and Mrs Bourlakova, in respect of:

(i)    the funds held in Mrs Bourlakova's name, in a personal bank account; and

(ii)    the companies transferred into Mrs Bourlakova's name (and their assets),

and so far as Mr Anufriev is aware, she complied with all these instructions prior to the breakdown in her relationship with Mr Bourlakov in around December 2017.

8

(b) In the course of 2017 and into early 2018, at Mr Bourlakov's instruction and to Mr Anufriev's knowledge, sums of at least EUR 23.51 million and GBP 1.99 million were transferred from Mrs Bourlakova's personal account at Credit Suisse as contributions to the cost of constructing the Black Pearl, a 350-foot superyacht which was primarily a passion project of Mr Bourlakov's.

5.2.5. Still further, Mr Anufriev was informed by Mr Bourlakov in around January or February 2014 that insofar as assets were transferred into Mrs Bourlakova's name it was in her capacity as a nominee. Mr Anufriev understood from this that Mrs Bourlakova had agreed to hold such assets as nominee for Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

5.2.6. In addition, Mr Anufriev understood that Mr Bourlakov's wealth derived from his business ventures (including the management and sale of Novoroscement which was undertaken together with Mr Kazakov as set out above) rather than any significant contribution from Mrs Bourlakova or Veronica. Neither Mrs Bourlakova nor Veronica alleges that they provided any consideration for the companies (said to be worth in excess of USD $1 billion) which they now claim to own.

5.3. Further, insofar as Mr Anufriev's alleged liability is said to depend on what he understood the position to be regarding the beneficial ownership of the companies that are the subject of the allegations in the APOC when the historic matters upon which the Claimants rely occurred:

5.3.1. When Mr Anufriev took up his role as Director of Mr Bourlakov's Family Office in 2012, he understood that all of these companies were beneficially owned by Mr Bourlakov, subject only to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

5.3.2. Thereafter the ownership structure of the companies changed over time. In summary (and as further particularised below):

(a)   A number of the companies (namely Columbus, Finco, Edelweiss, IPEC and Hydrangea) were transferred into Panamanian foundations, such transfers beginning in around 2014. Mr Anufriev understood that beneficial ownership of those companies then lay with the foundations themselves because the foundation regulations (once put in place): (i) did not confer any vested proprietary interest on the identified beneficiaries (or anyone else); and (ii) left the allocation of proprietary interests in the absolute discretion of the foundation council. Mr Anufriev understood that Mr Bourlakov had *de facto* control of all of these Panamanian foundations save one ("**Wlamil**") which was controlled by Mr Kazakov as further addressed below. Mr Anufriev understood that such control was compatible with the lawful and valid operation of the foundations under Panamanian law and that the foundations were legally valid.

(b)   A number of companies (namely H1, Greenbay and Chasehill) were transferred into Mrs Bourlakova's name in 2014. As set out in paragraph 5.2.5 above, Mr Anufriev did not understand these transfers to have any impact on the beneficial ownership because he understood that Mrs Bourlakova held these companies as a nominee. Mr Bourlakov told Mr Anufriev of this nominee arrangement and it was consistent with Mr Anufriev's understanding (including based on his experience) that Mrs Bourlakova followed Mr Bourlakov's instructions at all stages prior to the breakdown of their relationship.

(c)   A number of companies (namely Finco, Gatiabe and Jovellanos) were held pursuant to declarations of trust executed in 2018 (whether in favour of Mr Bourlakov, Mr Kazakov or both of them). Mr Anufriev understood that those declarations took effect in accordance with their terms and allocated beneficial ownership accordingly: see paragraphs 26.2.3, 27.2.4 and 34.2.4 below.

(d) Thereafter, in 2020-21, the Panamanian foundations were the subject of governance reforms including the adoption of new regulations and changes to the membership of the foundation councils. Mr Anufriev understood that the result of the reforms was that Messrs. Bourlakov and Kazakov no longer had *de facto* control of the foundations; the foundations and their assets were controlled by the foundations themselves in accordance with their governance structures. The genesis of these reforms was a request made by Mr Bourlakov in early 2020 for Mr Anufriev to look into whether there was any issue with the manner in which the foundations had been set up. Mr Anufriev understood that this request was prompted by Mr Bourlakov's increasing concerns in 2020 as to the quality of the work Leo Trust had done for the group and the potential for the foundations to be challenged.

5.3.3. Accordingly, what remained constant in Mr Anufriev's understanding is that all of these companies formed part of the same group, being companies which were:

(a) beneficially owned by Mr Bourlakov and/or by Mr Kazakov or by the foundations they *de facto* controlled (until the foundation governance reforms in 2020-21); and

(b) subject to their partnership, albeit that Mr Anufriev had only a generalised understanding as to nature of the partnership arrangement prior to 2018 as described above.

5.4. In these circumstances, the claims asserting liability against Mr Anufriev in relation to the companies referred to in the APOC, all of which are premised on allegations of dishonesty and/or intentional wrongdoing, are denied: if (which is not admitted) Mrs Bourlakova or Veronica were the benefical owners of the companies at the material time, Mr Anufriev was not aware of that and he had no intention to injure either of them. Mr Anufriev did not believe (and does not believe) that any of these companies was beneficially owned by Mrs Bourlakova or Veronica at any time.

5.5.   As set out above, the detail and extent of the partnership arrangement was outside of Mr Anufriev's knowledge. Not being a party to it, and Mr Bourlakov not having sought his assistance in respect of it, he regarded this arrangement as a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit. At a practical and operational level, Mr Anufriev understood that his responsibility as Director of Mr Bourlakov's Family Office was to take instructions from Mr Bourlakov alone, and Mr Anufriev would assist Mr Kazakov to the extent that he was asked to do so by Mr Bourlakov.

6.   As to the allegations of forgery and/or preparation of sham documents in the APOC:

6.1.   Mr Anufriev was not a party to these documents nor did he execute them. To the extent that Mr Anufriev was involved, it was principally in relaying instructions from Mr Bourlakov to Mr Tribaldos and Leo Trust for the production of the documents. Based on those instructions, and as far as Mr Anufriev was aware, these documents were produced for legitimate purposes as particularised in respect of each document below. Insofar as the purposes of Mr Bourlakov, Mr Tribaldos and Leo Trust (or any of them) in relation to the documents were illegitimate (which is not admitted), Mr Anufriev was not aware of that.

6.2.   Furthermore, Mr Anufriev understood all of these documents to record transactions between companies within the same group (as addressed in paragraph 5.3 above). He did not understand Mrs Bourlakova or Veronica to be the beneficial owner of any of the companies involved, nor did he understand that the purpose of the transactions was to cause any injury to Mrs Bourlakova or Veronica in respect of any company that they beneficially owned; and nor did Mr Anufriev act in relation to the documents (insofar as he did) intending to cause such injury.

6.3.   Mr Anufriev did not himself deal with the nominee directors of the companies in question or obtain their signatures in respect of these documents. Mr Anufriev understood that this was done by Mr Tribaldos and Leo Trust who liaised with Morgan & Morgan, a leading law firm in Panama who also supplied the nominee directors in question. Mr Anufriev believed that documents prepared by Mr Tribaldos and Leo Trust in conjunction with Morgan & Morgan were prepared lawfully and properly in accordance with Panamanian law.

6.4.     In summary, as to purposes for which Mr Bourlakov requested the production of these documents, Mr Anufriev's understanding based on the instructions that he received from Mr Bourlakov was as follows:

6.4.1.     Certain documents recorded pre-existing transactions that had taken place before Mr Anufriev took up his role as Director of Mr Bourlakov's Family Office. As Mr Anufriev understood the position, a number of these documents were prepared for the purpose of allowing Mr Bourlakov and Mr Kazakov to avail themselves of a Russian tax amnesty. The draft law in respect of this amnesty is dated 30 January 2018 and was published on the website of the Russian legislative assembly (the Duma), and Mr Anufriev learned of it shortly after publication. Applicants who availed themselves of this amnesty would then need to prepare audited financial statements and accounts, and to this end it was necessary to document the legal basis on which the pre-existing transfers had been made.

6.4.2.     Certain further documents were prepared by Mr Tribaldos and Leo Trust on Mr Bourlakov's instructions to address defects in the pre-existing transactions. Mr Tribaldos assured Mr Anufriev that these documents were prepared and executed in accordance with Panamanian law.

6.5.     If (which is not admitted) any of these documents was a forgery or sham, it is denied that Mr Anufriev knew that.

6.6.     Further, these documents fall to be assessed in the light of the following features of Mr Bourlakov's business practice as it was understood by Mr Anufriev:

6.6.1.     Mr Bourlakov often relied on oral agreements and did not seek to produce written records of those agreements unless and until it became necessary to do so.

6.6.2.     It was Mr Bourlakov's practice to transfer money between group companies by way of loan, often giving instructions to proceed as a matter of urgency without preparing formal documentation, as a

protective measure against the perceived risk of attacks by third parties and state authorities.

6.6.3.   In accordance with Mr Bourlakov's practice in this regard, Mr Anufriev understood that such intra-group loans created genuine liabilities but that it was not practically envisaged that the loans would be repaid save where Mr Bourlakov required this (for example, as a protective measure in circumstances of necessity or emergency).

6.6.4.   Mr Anufriev's understanding regarding Mr Bourlakov's use of intra-group loans was a longstanding one: he was told of this practice by Mr Bourlakov and Veronica in 2012, shortly after he took up his role as Director of Mr Bourlakov's Family Office, and it was confirmed by his experience carrying out this role.

6.6.5.   The corporate service provider responsible for administering a number of group companies as particularised below was Carey Group, later acquired by Equiom Group ("**Equiom**"). Mr Anufriev received a ledger from Equiom on 30 April 2018 which recorded intra-group transfers as loans. Equiom was apparently content, at all times prior to the breakdown of Mr Bourlakov and Mrs Bourlakova's relationship, to assist with putting in place formal documentation after the event as necessary.

6.6.6.   The Claimants now allege that the intra-group loans were shams, relying on (among other things) the alleged absence of proactive action by the nominee directors of the offshore companies in question to ensure that: (a) the creditor companies would be able to collect their debts; and (b) the debtor companies would have sufficient assets to meet them. Mr Anufriev was not aware of any such steps taken by the nominee directors in this regard, nor however did he expect there to be any in accordance with his understanding of how they operated. In particular, Mr Anufriev's understanding was that the nominee directors would not take action unless instructed to do so.

6.7.  Still further, Mrs Bourlakova's conduct in other proceedings is inconsistent with the allegations against Mr Anufriev that the Claimants maintain in the present proceedings:

6.7.1.  Mrs Bourlakova previously made a criminal complaint against Leo Trust in Zurich dated 12 December 2019, and a supplementary criminal complaint against Mr Tribaldos dated 23 February 2021, alleging that they had engaged in the falsification of documents and other offences. She has since withdrawn those proceedings, for the reasons set out in a letter from her legal representatives dated 22 November 2021:

"*Based on the knowledge we have gained in the meantime, we must assume that the accusation of falsification of documents and other offences against the company Leo Trust Switzerland AG as well as its current or former employees, executive bodies and legal representatives, in particular Mr Daniel Tribaldos, can no longer be upheld, as they were obviously not informed about the actual background of the events under assessment.*"

6.7.2.  On 11 February 2022, the Zurich prosecutor dismissed the case, noting (among other things) that "*In the investigation so far, the analysis of the statements in the criminal complaints, submissions and enclosures had not raised sufficient initial suspicion to enable the establishment of an accusatory case*" (translated from German).

6.7.3.  It is properly to be inferred from this that the Zurich prosecutor so dismissed the case because Mrs Bourlakova had in fact produced no sufficient evidence to support her allegations.

6.7.4.  Mrs Bourlakova's having failed to sustain her allegation of falsification of documents as against the only persons who produced these documents (i.e. Mr Tribaldos and Leo Trust), there is no proper basis for alleging that Mr Anufriev (who did not produce these documents and played only the limited role described in paragraph 3 above) was involved in or aware of the production of forged or sham documents.

7.  As to the alleged misappropriation or devaluation of assets allegedly beneficially owned by Mrs Bourlakova and the alleged attempts to misappropriate or devalue such assets:

7.1.   It is not admitted that Mrs Bourlakova beneficially owned any of the assets identified in the APOC. Paragraph 5.2 above is repeated.

7.2.   If (which is not admitted) Mr Bourlakov had a strategy unlawfully to appropriate or devalue assets allegedly owned by Mrs Bourlakova, it is denied that Mr Anufriev joined in or was otherwise aware of such strategy.

7.3.   As regards allegations of alleged misappropriation or devaluation based on the alleged use of forged or sham documents, paragraph 6 above is repeated.

7.4.   The Claimants further rely on the transfer of assets made in 2018 from Tribatline, Merenguito and Nuptials (three Panamanian Foundations of which Mr Anufriev was the Protector until 27 April 2018 when he was replaced by Mrs Kazakova) to Anahill, Hemaren and Cantucci (three further Panamanian Foundations of which Mr Anufriev became Protector on 23 January 2019). The claims against Mr Anufriev allegedly arising out of these transfers are that he was an accessory to the payment of a bribe by Mr Bourlakov to Mrs Kazakova: the Claimants rely on an unparticularised "*financial inducement*" allegedly provided by Mr Bourlakov to Mrs Kazakova to act inconsistently with unparticularised "*obligations*" that she allegedly owed under the Foundation Regulations (APOC paragraph 199). This is alleged to constitute an offence by Mr Bourlakov of Articles 220, 243 and/or 253 of the Panamanian Penal Code, and Mr Anufriev is in turn alleged to be liable as an "*instigator or participant*" in respect of this offence. Mr Anufriev does not admit that Mr Bourlakov committed the alleged primary offence and in any event denies that he was aware that Mr Bourlakov had committed any such offence, or that he instigated or participated in any such offence. Mr Anufriev was not aware of Mrs Kazakova receiving any remuneration for her role as protector.

7.5.   The Claimants otherwise rely on alleged *failed* attempts to misappropriate or devalue assets. These concern requests made by Mr Anufriev on instructions from Mr Bourlakov to: (a) open a line of credit secured against a bank account held by H1, a company allegedly beneficially owned by Mrs Bourlakova; and (b) change the corporate structure of H1. Mr Anufriev lawfully and properly (and in any event in good faith) made these requests based on the instructions he received from Mr Bourlakov, expecting that Mrs Bourlakova would be consulted on these requests

before they were implemented. In the event Mrs Bourlakova refused to give her consent and the requests were not implemented. This does not give rise to any cause of action.

**The Claimant's Introduction**

8.     Paragraph 1 is admitted.

9.     As to paragraph 2:

    9.1.   It is admitted that Mr Bourlakov's commercial enterprises were extremely successful.

    9.2.   No admissions are otherwise made.

10.    Paragraph 3 is admitted, save that no admission is made as to the exact timing of the breakdown in marital and familial relations.

11.     As to the summary in paragraph 4, and for the reasons set out in this Defence:

    11.1.   It is denied that Mr Anufriev has acted in combination with Mr Bourlakov and the other Defendants as alleged by the Claimants.

    11.2.   It is denied that Mr Anufriev has carried out any dishonest and/or improper and/or unlawful actions, or participated in any dishonest and/or improper and/or unlawful strategy, as alleged by the Claimants.

    11.3.   The Claimants adopt a vague definition of "*Bourlakov family assets*" (see APOC paragraph 4) which is so broad as to include, for example, any salary earned by either of Mrs Bourlakova's daughters or any personal property owned by them. It is denied that definition has any relevance to the matters addressed in the APOC.

    11.4.   Insofar as the "*Bourlakov family assets*" are said to include the companies in respect of which the Claimants now assert a beneficial ownership, if (which is not admitted) the Claimants had such ownership at any time material to their claims asserting liability against him, it is denied that Mr Anufriev was aware of that. Paragraph 5 above is repeated.

    11.5.   No admissions are otherwise made.

12.   As to paragraph 5:

12.1.   It is not admitted that Mr Bourlakov had any "*strategy*" as alleged or that any of the matters alleged in subparagraph (a) to (d) occurred.

12.2.   Insofar as it is alleged that Mr Anufriev was party to or otherwise knew of any such "*strategy*", that is denied.

12.3.   No admissions are otherwise made.

13.   As to paragraph 6:

13.1.   As to the first and second sentences, paragraphs 11 and 12 above are repeated.

13.2.   The third sentence does not make any allegation against Mr Anufriev. He was not aware of any documents being destroyed and does not admit that this occurred.

13.3.   No admissions are otherwise made.

14.   Paragraphs 7-7B do not make any allegation against Mr Anufriev and are not admitted.

15.   As to paragraph 8, paragraph 11 above is repeated.

16.   As to paragraph 9:

16.1.   The first sentence is noted.

16.2.   The second sentence is not admitted.

17.   As to paragraph 9A:

17.1.   It is not admitted that there is any "*fiction*" as alleged.

17.2.   It is denied that Mr Anufriev has provided any assistance in respect of the alleged "*fiction*".

17.3.   It is not admitted that "*assets that had previously been transferred to Mrs Bourlakova or Veronica*" were not owned by Mr Bourlakov. Paragraph 11.3 above is repeated.

17.4.   No admissions are otherwise made.

**The other Claimants**

18. As to paragraph 10 (concerning H1):

    18.1. The first sentence is admitted.

    18.2. As to the remainder of paragraph 10:

        18.2.1. Prior to the transfer of H1 to Jeswalt in February 2014 (as addressed below), Mr Anufriev understood that:

            (a) H1 was beneficially owned by Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

            (b) Mr Bourlakov had *de facto* control of H1.

        18.2.2. It is admitted that H1 was transferred to Jeswalt in February 2014. It is not admitted that Mrs Bourlakova thereby became the beneficial owner of H1 and Mr Anufriev did not understand this to be the case. Mr Anufriev understood that:

            (a) Jeswalt was a company which Mrs Bourlakova held as a nominee for Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit, as further set out in paragraph 31 below.

            (b) In any event, Mrs Bourlakova had agreed to hold the companies transferred into her name in 2014 (including H1) as nominee. Paragraphs 5.2.4 and 5.2.5 above are repeated.

            (c) The transfer to Jeswalt did not therefore alter the position as to beneficial ownership and control of H1 which remained as set out in paragraph 18.2.1 above.

        18.2.3. No admissions are otherwise made.

19. As to paragraph 11 (concerning Greenbay):

19.1.    As to the first sentence, it is admitted that Greenbay is a company incorporated in the Seychelles. The date of incorporation is not admitted.

19.2.    As to the balance of paragraph 11:

19.2.1.    Prior to the transfer of Greenbay to Jeswalt in February 2014 (as addressed below), Mr Anufriev understood that:

(a)    Greenbay was beneficially owned by Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

(b)    Mr Bourlakov had *de facto* control of Greenbay.

(c)    Mr Anufriev's understanding in this regard was based on:

(i)    his attendance at meetings between Mr Bourlakov and Societe Generale in Monaco from 2012 onwards, at which Mr Bourlakov made investment decisions and gave instructions as to the use of Greenbay's assets, and such instructions were followed by Societe Generale;

(ii)    his attendance at meetings between Mr Bourlakov and Mr Postifierri of Carey Group (the corporate service provider in respect of Greenbay) from 2012 onwards, where again Mr Bourlakov gave instructions and those instructions were followed by Mr Postifierri.

19.2.2.    It is admitted that Greenbay was transferred to Jeswalt in February 2014. It is not admitted that Mrs Bourlakova thereby became the beneficial owner of Greenbay and Mr Anufriev did not understand this to be the case. Mr Anufriev understood that:

(a)    Jeswalt was itself a company which Mrs Bourlakova held as a nominee for Mr Bourlakov (subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit), as set out in paragraph 18.2.2 above and paragraph 31 below.

(b)   In any event, Mrs Bourlakova had agreed to hold the companies transferred into her name in 2014 (including Greenbay) as a nominee. Paragraphs 5.2.4 and 5.2.5 above are repeated.

(c)   The transfer to Jeswalt did not therefore alter the position as to beneficial ownership and control of Greenbay which remained as set out in paragraph 19.2.1 above. Mr Bourlakov continued to attend meetings with Societe Generale in Monaco and Mr Postifierri of Carey Group, and give effective instructions, in a manner that was unchanged from the pre-February 2014 mode of working as described in paragraph 19.2.1 above.

19.2.3.   No admissions are otherwise made.

**The other Defendants**

20.   As to paragraphs 12-15:

20.1.   It is admitted that Mr Tribaldos and Leo Trust provided corporate services and advice to Mr Bourlakov in relation to offshore holding structures.

20.2.   It is admitted that the services provided by Leo Trust included: advising on the asset holding structure, setting up that structure (including companies, trusts and foundations), managing the structure (including conducting all communications with the local office holders) and drafting or assisting in drafting documentation including incorporation documents, minutes of directors' meetings, resolutions, agreements and arranging for the execution of these documents.

20.3.   The paragraphs are otherwise not admitted.

21.   The first sentence of paragraph 16 is admitted.

22.   As to the second sentence of paragraph 16:

22.1.   It is admitted that Mr Anufriev is a German-qualified lawyer.

22.2.   It is admitted that Mr Anufriev was a Director of Mr Bourlakov's Family Office between 2012 and July 2023. He held that role along with Mr Bourlakov who, as set out above, was appointed as Co-Director of the Family Office from 29 July

2019 onwards. It is denied that the period referred to by the Claimants covers "*all material times*": as set out below, certain documents alleged by the Claimants to be forgeries or shams record transactions which took place long before Mr Anufriev took up his role as Director of Mr Bourlakov's Family Office.

22.3.   Mr Anufriev's role as Director of Mr Bourlakov's Family Office and his responsibilities as he understood them are set out in paragraph 3 above. To the extent that the Claimants intend to allege any different or more expansive role, that is denied.

23.   As to the third sentence of paragraph 16, paragraph 3 above is repeated.

24.   Paragraph 17 is admitted.

25.   As to paragraph 18 (concerning Columbus):

25.1.   The first sentence is admitted.

25.2.   As to the balance of paragraph 18:

25.2.1.   Prior to the transfer of Columbus into the Panamanian Foundation Tribatline (as addressed below), Mr Anufriev understood that:

(a)   Columbus was beneficially owned by Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit; and

(b)   Mr Bourlakov had *de facto* control of Columbus.

25.2.2.   It is admitted that legal title to the shares in Columbus was transferred to the Panamanian Foundation Tribatline in around 2014. Mr Anufriev understood that following this transfer:

(a)   beneficial ownership of Columbus lay with Tribatline in circumstances where: (i) there were no regulations put in place in respect of Tribatline until 2016; and (ii) the regulations once put in place did not confer on the identified beneficiary of the Foundation any vested proprietary interest, as further set out below;

(b) Mr Bourlakov retained *de facto* control of Columbus and Tribatline.

25.2.3. It is admitted that Tribatline adopted regulations dated 13 June 2016, under which Mrs Bourlakova was the only person identified under Article 2 (entitled "*Beneficiaries*"). Mr Anufriev did not understand this to change the position as to beneficial ownership or *de facto* control:

(a) Under the Tribatline regulations, the identified "*beneficiaries*" did not have any vested proprietary interest and remained subject to the absolute discretion of the Foundation Council as to whether and how to confer any right or benefit upon them, as further addressed in paragraph 151 below. Accordingly, Mrs Bourlakova's identification as the 'beneficiary' of Tribatline within the meaning of Article 2 did not alter his understanding of the beneficial ownership position: in particular, Mr Anufriev understood beneficial ownership of Columbus remained with Tribatline.

(b) Mr Anufriev understood that Mr Bourlakov retained *de facto* control of Columbus and Tribatline.

25.2.4. It is admitted that on or around 27 April 2018 Mrs Bourlakova was replaced by Anahill as the sole identified 'beneficiary' of Tribatline under Article 2 of the Tribatline regulations. Mr Anufriev does not know the precise date upon which this occurred: he had himself resigned and been replaced as protector of Tribatline on 27 April 2018 as further set out below. No admission is made as to Mrs Bourlakova's alleged lack of knowledge or consent regarding her replacement. In any event the replacement of Mrs Bourlakova as the identified 'beneficiary' did not alter Mr Anufriev's understanding of the position regarding beneficial ownership and *de facto* control. In particular, he understood that:

(a) beneficial ownership of Columbus remained with Tribatline.

(b) Mr Bourlakov retained *de facto* control of Columbus and Tribatline.

25.2.5. It is admitted that legal title to the shares in Columbus was transferred from Tribatline to Anahill on or around 23 May 2018 and that Mr Bourlakov was the sole named beneficiary of Anahill until his death. Following this transfer Mr Anufriev understood that:

(a) Beneficial ownership of Columbus lay with Anahill: the regulations of Anahill, like those of Tribatline, did not confer any vested proprietary interest on the identified beneficiary and the Foundation Council had an absolute discretion as to whether and how to confer any right or benefit upon them.

(b) Mr Bourlakov retained *de facto* control of Columbus and Anahill.

25.2.6. In 2020 and 2021 Anahill was the subject of governance reforms including the adoption of new regulations and changes to the membership of the foundation council. Mr Anufriev understood that following these reforms: (a) Mr Bourlakov no longer had *de facto* control of Anahill: (b) the assets of Anahill (including Columbus) were instead controlled by Anahill in accordance with its governance structures.

25.2.7. It is admitted that Mr Bourlakov was the sole named beneficiary of Anahill until his death.

25.2.8. No admissions are otherwise made.

26. As to paragraph 19 (concerning Finco):

26.1. The first sentence is admitted.

26.2. As to the balance of paragraph 19:

26.2.1. Prior to the transfer of Finco into Tribatline in around 2014 (as addressed below), Mr Anufriev understood that:

(a) Finco was beneficially owned by Mr Bourlakov (subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit); and

(b) Mr Bourlakov had *de facto* control of Finco.

26.2.2.  It is admitted that legal title to the shares in Finco was transferred to Tribatline in around 2014. No admission is made as to Finco's alleged lack of value at the time of transfer. Mr Anufriev understood that following the transfer to Tribatline:

(a)  Beneficial ownership of Finco lay with Tribatline for the same reasons set out in paragraph 25.2.2(a) above;

(b)  Mr Bourlakov retained *de facto* control of Finco and Tribatline.

26.2.3.  It is admitted that Finco was dissolved on 20 November 2014 and reactivated on or around 30 August 2018. Mr Anufriev believed that legal title to the shares in Finco was then validly transferred to Delos on around 7 September 2018. He understood that following this transfer:

(a)  Delos held the shares in Finco subject to a declaration of trust in favour Mr Bourlakov.

(b)  Mr Bourlakov thus beneficially owned Finco, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit; and

(c)  Mr Bourlakov had *de facto* control of Finco.

26.2.4.  The Claimants allege that the transfer to Delos was legally ineffective. Mr Anufriev believed the contrary. However, where Mr Anufriev is not (and has never claimed to be) the legal or beneficial owner of Finco, and was not party to the transfer, he advances no case (and makes no admissions regarding the Claimants' case) as to its validity.

26.2.5.  Mr Anufriev believed that legal title to the shares in Finco was validly transferred by Delos to Wlamil shortly after 26 February 2019. It is admitted that Mr Kazakov was and remains the sole named beneficiary of Wlamil. Mr Anufriev understood that following the transfer to Wlamil:

(a)  Beneficial ownership of Finco lay with Wlamil.

(b)  Mr Kazakov had *de facto* control of Finco and Wlamil.

26.2.6.   Thereafter, in 2020, Wlamil was the subject of governance reforms including changes to the membership of its foundation council. Mr Anufriev understood that following these reforms: (a) Mr Kazakov no longer had *de facto* control of Wlamil: (b) the assets of Wlamil (including Finco) were instead controlled by Wlamil in accordance with its governance structures.

26.2.7.   The Claimants allege that the transfer to Wlamil was legally ineffective. Mr Anufriev believed the contrary. However, where he is not (and has never claimed to be) the legal or beneficial owner of Finco, and was not party to the transfer, he advances no case (and makes no admissions regarding the Claimants' case) as to its validity.

27.   As to paragraph 20 (concerning Gatiabe):

27.1.   The first sentence is admitted.

27.2.   As to the balance of paragraph 20:

27.2.1.   Prior to the dissolution of Gatiabe in 2014 (as addressed below), Mr Anufriev understood that:

(a)   Gatiabe's share capital consisted of bearer shares held by Mr Bourlakov.

(b)   Gatiabe was beneficially owned by Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

(c)   Mr Bourlakov had *de facto* control of Gatiabe.

27.2.2.   It is not admitted that Mrs Bourlakova held the bearer shares in Gatiabe at any time and Mr Anufriev did not believe this to be the case. In any event he understood that the bearer shares had been validly cancelled when Gatiabe was dissolved (or otherwise when new shares were issued to Delos Global SA) as set out immediately below.

27.2.3.  It is admitted that Gatiabe was dissolved on 26 December 2014 and reactivated on or around 25 June 2018. No admission is made as to Mrs Bourlakova's alleged lack of knowledge or consent.

27.2.4.  Upon the reactivation of Gatiabe, Mr Anufriev understood that new shares were issued to Delos Global SA in mid-late 2018 and that:

(a)  Gatiabe was beneficially owned by Mr Kazakov by virtue of a declaration of trust that was also executed in mid-late 2018.

(b)  Mr Kazakov had *de facto* control of Gatiabe.

27.2.5.  Mr Anufriev believed that legal title to the shares in Gatiabe was validly transferred by Delos to Wlamil shortly after 26 February 2019. Following the transfer to Wlamil, Mr Anufriev understood that:

(a)  Beneficial ownership of Gatiabe lay with Wlamil;

(b)  Mr Kazakov had *de facto* control of Gatiabe and Wlamil.

27.2.6.  Thereafter, in 2020, Wlamil was the subject of governance reforms as set out in paragraph 26.2.6 above. Mr Anufriev understood that following these reforms the assets of Wlamil (including Gatiabe) were controlled by Wlamil in accordance with its governance structures.

27.2.7.  Mrs Bourlakova now alleges that the cancellation of the bearer shares in Gatiabe, the issuance of new shares to Delos, and the transfer to Wlamil were all legally ineffective. Mr Anufriev believed the contrary. However, where Mr Anufriev is not (and has never claimed to be) the legal or beneficial owner of Gatiabe, and was not party to these transfers, he advances no case (and makes no admissions regarding the Claimants' case) as to their validity.

28.  As to paragraph 21 (concerning Edelweiss):

28.1.  The first sentence is admitted.

28.2.  As to the balance of paragraph 21:

28.2.1.  Prior to the transfer of Edelweiss to Merenguito (as addressed below), Mr Anufriev understood that:

(a)  Edelweiss' share capital consisted of bearer shares which were held by Mr Bourlakov.

(b)  Edelweiss was beneficially owned by Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit; and

(c)  Mr Bourlakov had *de facto* control of Edelweiss.

28.2.2.  It is not admitted that Veronica held the bearer shares in Edelweiss at any time and Mr Anufriev did not believe this to be the case. In any event, he believed that the bearer shares were validly cancelled and new shares were validly issued to Merenguito thereafter. Mr Anufriev first saw the new share certificate issued to Merenguito in January 2016. Following the issuance of shares to Merenguito, he understood that:

(a)  Beneficial ownership of Edelweiss lay with Merenguito.

(b)  Mr Bourlakov had *de facto* control of Edelweiss and Merenguito.

28.2.3.  It is admitted that Merenguito adopted regulations dated 18 August 2016 under which Mrs Bourlakova was the only person identified under Article 2 (entitled "*Beneficiaries*"). Mr Anufriev did not understand this to effect any change to the position as to beneficial ownership or *de facto* control:

(a)  Under the Merenguito regulations, the identified "*beneficiaries*" did not have any vested proprietary interest and remained subject to the absolute discretion of the Foundation Council as to whether and how to confer any right or benefit upon them, as further addressed in paragraph 151 below. Accordingly, Mrs Bourlakova's identification as the 'beneficiary' of Merenguito within the meaning of Article 2 did not alter his understanding of the

beneficial ownership position: in particular, he understood that beneficial ownership of Edelweiss remained with Merenguito.

(b)    Mr Anufriev understood that Mr Bourlakov retained *de facto* control of Edelweiss and Merenguito.

28.2.4.  It is admitted that Mrs Bourlakova was replaced by Hemaren as the sole identified beneficiary of Merenguito on or around 27 April 2018. Mr Anufriev does not know the precise date on which this replacement took effect: he had himself resigned and been replaced as protector of Merenguito on 27 April 2018, as further set out below. No admission is made as to Mrs Bourlakova's alleged lack of knowledge or consent regarding her replacement. In any event Mr Anufriev did not understand that the replacement of Mrs Bourlakova as the identified beneficiary had any effect on the position as to beneficial ownership or control, his understanding being that:

(a)    Beneficial ownership of Edelweiss remained with Merenguito.

(b)    Mr Bourlakov retained *de facto* control of Edelweiss and Merenguito.

28.2.5.  Mr Anufriev believed that legal title to the shares in Edelweiss was validly transferred to Hemaren on or around 23 May 2018. Following the transfer to Hemaren, Mr Anufriev understood that:

(a)    Beneficial ownership of Edelweiss lay with Hemaren.

(b)    Mr Bourlakov had *de facto* control of Edelweiss and Hemaren.

(c)    A power of attorney was granted by Edelweiss in favour of Messrs. Bourlakov and Kazakov on 5 June 2018 permitting them to open and operate banking accounts at UBS on behalf of the company, and following the execution of this power of attorney Mr Kazakov also had *de facto* control of Edelweiss to this extent.

28.2.6.  In 2020 Hemaren was the subject of governance reforms including the adoption of new regulations and changes to the membership of the

foundation council. Mr Anufriev understood that following these reforms:

(a)   Messrs. Bourlakov and Kazakov no longer had *de facto* control of Hemaren;

(b)   the assets of Hemaren (including Edelweiss) were instead controlled by Hemaren in accordance with its governance structures;

(c)   The power of attorney in favour of Messrs. Bourlakov and Kazakov in respect of Edelweiss' UBS bank account (as addressed in paragraph 28.2.5 above) remained in place; the foundation council had the power to revoke this power of attorney but did not in fact do so.

28.2.7.   The Claimants now allege that the cancellation of the bearer shares in Edelweiss, the issuance of shares to Merenguito, and the transfer to Hemaren were legally ineffective. Mr Anufriev believed the contrary. However, where he is not (and has never claimed to be) the legal or beneficial owner of Edelweiss, and was not party to these transfers, he advances no case (and makes no admissions regarding the Claimants' case) as to their validity.

28.2.8.   The Claimants have referred in APOC paragraph 21 to a Declaration of Trust said to have been executed by Merenguito on 18 August 2016. Further, in the course of preparing his Defence, Mr Anufriev has seen a copy of a Declaration of Trust and Nomineeship dated 16 August 2019 stating that Hemaren held its shares in Edelweiss as nominee for Mr Bourlakov (as to 50%) and Mr Kazakov (as to 50%). Mr Anufriev does not recall having seen copies of these documents at the time.

29.   As to paragraph 22 (concerning IPEC):

29.1.   The first sentence is admitted.

29.2.   As to the balance of paragraph 22:

29.2.1.   Prior to the transfer of IPEC into Tribatline in around 2014 (as addressed below), Mr Anufriev understood that:

    (a)   IPEC's share capital took the form of bearer shares which were held by Mr Bourlakov.

    (b)   IPEC was beneficially owned by Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

    (c)   Mr Bourlakov had *de facto* control of IPEC.

29.2.2.   It is admitted that legal title to the shares in IPEC was transferred to Tribatline in around 2014. Following this transfer, Mr Anufriev understood that:

    (a)   Beneficial ownership of IPEC lay with Tribatline for the reasons set out in paragraph 25.2.2(a) above.

    (b)   Mr Bourlakov had *de facto* control of Tribatline and IPEC.

29.2.3.   It is admitted that IPEC was dissolved on 24 May 2016, but denied that it had been put into liquidation prior to being dissolved as alleged.

29.2.4.   It is admitted that IPEC was reactivated on or around 28 July 2020 on Mr Bourlakov's instructions. No admission is made as to Mrs Bourlakova's alleged lack of knowledge or consent in this regard.

29.2.5.   It is admitted that IPEC issued a share certificate to Anahill in respect of the entire issued share capital of IPEC of 100 shares on or around 17 August 2020. Following the issuance of this share certificate, Mr Anufriev understood that:

    (a)   Beneficial ownership of IPEC lay with Anahill.

    (b)   Mr Bourlakov had *de facto* control of IPEC and Anahill.

29.2.6.   Thereafter, in 2020 and 2021, Anahill was the subject of governance reforms as set out in paragraph 25.2.6 above. Mr Anufriev understood

that by following these reforms the assets of Anahill (including IPEC) were controlled by Anahill in accordance with its governance structures.

29.2.7. The APOC describes the share certificate issued to Anahill as "*purportedly*" issued but does not identify any basis for alleging that its issuance was legally ineffective. In any event Mr Anufriev believed the issuance of this share certificate (which was arranged by Mr Tribaldos and Leo Trust) to have been legally effective.

**Other relevant parties**

30. As to paragraph 23 (concerning Anahill, Hemaren and Wlamil):

30.1. The first sentence is admitted.

30.2. The second sentence is not admitted. As set out above, Mr Anufriev understood that (until the governance reforms that took place in 2020-21): (i) Mr Bourlakov had *de facto* control over Anahill and Hemaren; and (ii) Mr Kazakov had *de facto* control over Wlamil, as set out above.

30.3. As to the third sentence, it is admitted that:

30.3.1. Mr Bourlakov was the sole named beneficiary of Anahill.

30.3.2. Mr Bourlakov was the sole named beneficiary of Hemaren until Mr Kazakov was added as a named beneficiary on 29 June 2018.

30.3.3. Mr Kazakov was and remains the sole named beneficiary of Wlamil.

30.4. As to the final sentence:

30.4.1. As set out above, and further addressed in paragraph 151 below, the regulations of these foundations did not confer any vested proprietary interest on any person, and beneficial ownership of the companies held by the foundations therefore lay with the foundations themselves.

30.4.2. The allegation that Mr Kazakov "*was acting as a nominee for Mr Bourlakov*" is vague in that the Claimants omit to identify the alleged interest Mr Kazakov was allegedly holding as nominee. In any event Mr Anufriev did not understand Mr Kazakov to be acting as a nominee for

Mr Bourlakov: as set out above, Mr Anufriev understood that Mr Kazakov himself had *de facto* control of Wlamil.

30.4.3.   The allegation that "*any other person with any interest in Anahill, Hemaren and Wlamil, now holds any interest in Anahill, Hemaren and Wlamil for Mr Bourlakov's estate*" is too vague to permit a specific response and is not admitted.

31.   As to paragraph 24 (concerning Jeswalt):

31.1.   The first sentence is admitted.

31.2.   The second sentence is not admitted. Mr Anufriev understood that:

31.2.1.   A nominee shareholder held 100% of the shares in Jeswalt on behalf of Mrs Bourlakova through a declaration of trust.

31.2.2.   In turn, Mrs Bourlakova held her interest as a nominee for Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit. Mr Anufriev's understanding (including based on his experience) was that Mrs Bourlakova had agreed to this nominee arrangement and followed Mr Bourlakov's instructions at all stages prior to the breakdown of their relationship. Mr Bourlakov had *de facto* control of Jeswalt until its dissolution on or around 22 February 2016.

31.2.3.   The final sentence is admitted.

32.   As to paragraph 25 (concerning Egerson):

32.1.   The first sentence is admitted.

32.2.   The second sentence is not admitted. Mr Anufriev understood that:

32.2.1.   A nominee shareholder held 100% of the shares in Egerson on behalf of Mrs Bourlakova through a declaration of trust.

32.2.2.   In turn, Mrs Bourlakova held her interest in Egerson as a nominee for Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner,

which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

32.2.3. Mr Bourlakov had *de facto* control of Egerson until, following the breakdown in marital and familial relations, Mrs Bourlakova ceased to follow instructions from Mr Bourlakov.

33. As to paragraph 26 (concerning Chasehill):

33.1. The first sentence is admitted, save that Chasehill was incorporated by public deed executed on 6 October 2008 and registered on 7 October 2008, and the Claimants' reference to incorporation on 8 October 2008 is therefore incorrect.

33.2. As to the second sentence:

33.2.1. Prior to the transfer of Chasehill to Jeswalt in 2014 (as addressed below), Mr Anufriev understood that:

(a) Chasehill was beneficially owned by Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

(b) Mr Bourlakov had *de facto* control of Chasehill.

33.2.2. It is admitted that Chasehill was transferred to Jeswalt in 2014. If (which is not admitted) Mrs Bourlakova thereby became the beneficial owner of Chasehill, that was not Mr Anufriev's understanding. Rather, he understood that:

(a) Mrs Bourlakova held Jeswalt as a nominee for Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit. Paragraph 31 above is repeated.

(b) In any event, Mrs Bourlakova had agreed to hold the companies transferred into her name in 2014 (including Chasehill) as nominee. Paragraphs 5.2.4 and 5.2.5 above are repeated.

(c)    The transfer to Jeswalt did not therefore alter the position as to beneficial ownership and control of Chasehill which remained as set out in paragraph 33.2.1 above.

33.2.3.  No admissions are otherwise made.

33.3.  The third sentence is admitted.

34.  As to paragraph 26A (concerning Jovellanos):

34.1.  The first sentence is admitted.

34.2.  As to the balance of paragraph 26A:

34.2.1.  Prior to the dissolution of Jovellanos in December 2014 (as addressed below), Mr Anufriev understood that:

(a)    Jovellanos' share capital consisted of bearer shares held by Mr Bourlakov.

(b)    Jovellanos was beneficially owned by Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

(c)    Mr Bourlakov had *de facto* control of Jovellanos.

34.2.2.  If (which is not admitted) Mrs Bourlakova held the bearer shares of Jovellanos at any time, Mr Anufriev was not aware of that. In any event, he understood that the bearer shares had been validly cancelled when Jovellanos was dissolved (or otherwise when a new share certificate was issued to Delos) as set out immediately below.

34.2.3.  It is admitted that Jovellanos was dissolved on or around 26 December 2014 and reactivated on or around 3 October 2018. No admission is made as to Mrs Bourlakova's alleged lack of knowledge or consent.

34.2.4.  Mr Anufriev understood that the bearer share certificate for Jovellanos was withdrawn and replaced with a new share certificate which was issued to Delos Global SA in or around October 2018. Following the issuance of the share certificate to Delos, Mr Anufriev understood that:

(a)    Delos held its shares on trust for Mr Bourlakov (as to 58%) and Mr Kazakov (as to 42%) pursuant to a declaration of trust dated 8 October 2018.

(b)    Mr Bourlakov had *de facto* control of Jovellanos by virtue of his majority beneficial interest in it.

34.2.5.    The Claimants now allege that the cancellation of the bearer shares in Jovellanos and the issuance of new shares to Delos were legally ineffective. Mr Anufriev believed the contrary. However, where he is not (and has never claimed to be) the legal or beneficial owner of Jovellanos, and was not a party to the transfer, he advances no case (and makes no admissions regarding the Claimants' case) as to their validity.

35.    As to paragraph 26B (concerning Nuptials):

35.1.    The first sentence is admitted.

35.2.    As to the second sentence:

35.2.1.    It is admitted that pursuant to the Nuptials Regulations dated 18 August 2016, Mrs Bourlakova was identified as the sole beneficiary until she was replaced by Cantucci on or around 27 April 2018. Mr Anufriev does not know the precise date of the replacement: he had himself resigned and been replaced as protector of Nuptials on 27 April 2018, as further set out below. No admission is made as to Mrs Bourlakova's alleged lack of knowledge or consent regarding her replacement.

35.2.2.    Neither Mrs Bourlakova's initial identification as the beneficiary, nor her subsequent replacement, altered Mr Anufriev's understanding of the beneficial ownership position. As further set out in paragraph 151 below, Mr Anufriev understood that the regulations of Nuptials: (i) did not confer any vested proprietary interest on the identified beneficiaries (or anyone else); and (ii) left the allocation of proprietary interests in the absolute discretion of the foundation council.

35.3.    The third sentence is not admitted. The regulations of Nuptials were never, to Mr Anufriev's knowledge, amended to include Veronica as an identified beneficiary;

and in any event Mr Anufriev did not understand any identified beneficiary under the regulations to have a vested proprietary interest (as set out in paragraph 35.2.2 above).

35.4.  The fourth sentence is noted.

35.5.  As to the fifth sentence, it is admitted that Nuptials was dissolved on or around 25 May 2018.

36.  As to paragraph 26C:

36.1.  The first sentence is admitted.

36.2.  As to the second sentence:

36.2.1.  It is admitted that under the Cantucci Regulations dated 28 June 2018, Mr Bourlakov was the sole named beneficiary.

36.2.2.  Mr Anufriev understood that:

(a)  Mr Bourlakov had *de facto* control of Cantucci until 2020 when the foundation was the subject of governance reforms including changes to the membership of the foundation council;

(b)  following these reforms, Mr Bourlakov no longer had *de facto* control of Cantucci, and its assets were instead controlled by Cantucci in accordance with its governance structures.

36.2.3.  Mr Anufriev does not claim (and has never claimed) to be the owner of Cantucci, and in those circumstances advances no case (and does not admit the Claimants' case) as to whether it now forms part of Mr Bourlakov's estate.

36.2.4.  No admissions are otherwise made.

37.  As to paragraph 26D (concerning Hydrangea):

37.1.  As to the first sentence:

37.1.1.  It is admitted that Hydrangea is a company incorporated in Panama.

37.1.2.   The date of incorporation was 10 April 2013 and not 16 April 2013 (the latter being the date on which the Panamanian registry issued its confirmation).

37.2.   As to the second and third sentences, it is admitted and averred that:

37.2.1.   Pursuant to a declaration of trust dated 3 December 2014, the shares in Hydrangea were held by PZ Nominees II SA as a nominee for Nuptials. Mr Anufriev therefore understood that:

(a)   The beneficial ownership of Hydrangea lay with Nuptials.

(b)   Mr Bourlakov had *de facto* control of Nuptials and Hydrangea.

37.2.2.   Legal title to the shares in Hydrangea was transferred to Cantucci on or around 23 May 2018. Following this transfer, Mr Anufriev understood that:

(a)   Beneficial ownership of Hydrangea lay with Cantucci.

(b)   Mr Bourlakov had *de facto* control of Cantucci and Hydrangea.

37.2.3.   Thereafter, in 2020, Cantucci was the subject of governance reforms as set out in paragraph 36.2.2 above. Mr Anufriev understood that following these reforms the assets of Cantucci (including Hydrangea) were controlled by Cantucci in accordance with its governance structures.

**The origins of "*the Bourlakov family's wealth*"**

38.   As to paragraph 27:

38.1.   It is admitted that Novoroscement OJSC operated one of the largest cement factories in Russia and was sold in 2007 for approximately $1.45 billion. Mr Anufriev understood that Novoroscement was a joint project of Mr Bourlakov and Mr Kazakov as set out in paragraph 4.4.2 above.

38.2.   It is not admitted that this transaction was the source of "*the Bourlakov family's wealth*". Mr Anufriev did not understand Mrs Bourlakova or Veronica to be the beneficial owner of any of the companies that are the subject of the present proceedings. Paragraphs 5 and 11.3 above are repeated.

39.   As to paragraph 28:

   39.1.   The first sentence concerns the case advanced by Messrs. Bourlakov and Kazakov; it makes no allegation against Mr Anufriev and is not admitted.

   39.2.   The second to fourth sentences are not admitted. Mr Anufriev's understanding of Mr Bourlakov and Mr Kazakov's involvement in Novoroscement, and their partnership arrangement, was as set out in paragraph 4 above.

40.   Paragraph 29 is too vague to permit a specific response. In particular, it does not specify (a) when the transfers are alleged to have taken place; (b) which companies are said to have been involved in which transfers; and (c) what the "*other monies*" allegedly comprised. It is in any event not admitted that any of the companies were "*beneficially owned by other members of the Bourlakov family*" and Mr Anufriev did not believe this to be the case. Paragraph 5 above is repeated.

41.   As to paragraph 30:

   41.1.   It is admitted that Burneftegaz was an oil and gas business. It was founded by Mr Mitrofanov and not Mr Bourlakov (whose involvement began after the company was founded).

   41.2.   It is admitted that part of the proceeds of the sale of Novoroscement were invested in Burneftegaz. It is not admitted whether the investment was made on a leveraged basis.

42.   As to paragraph 31:

   42.1.   The first sentence is admitted.

   42.2.   The second and third sentences are not admitted.

**Mrs Bourlakova and Veronica's alleged assets**

43.   Mr Anufriev did not understand Mrs Bourlakova or Veronica to be the beneficial owner of any of the assets addressed in APOC paragraphs 32 and 32A. Paragraph 5 above is repeated.

44.   As to paragraph 32:

44.1.    Regarding subparagraphs (a) and (b), it is admitted that the identified monetary sum and the three named companies (Greenbay, H1 and Chasehill) were transferred (directly or indirectly) into the name of Mrs Bourlakova. As set out in paragraphs 18, 19 and 33 above, Mr Anufriev understood that Mrs Bourlakova held these assets as nominee.

44.2.    Regarding subparagraph (c), it is admitted that Finco, Columbus and IPEC were transferred to Tribatline. Mr Anufriev did not understand Mrs Bourlakova to be the beneficial owner of any of these companies at any stage. His understanding of the beneficial ownership of these companies was as set out in paragraphs 25, 26 and 29 above.

44.3.    Regarding subparagraph (d), it is not admitted that Gatiabe or Jovellanos were transferred to Mrs Bourlakova. Mr Anufriev did not believe this to be the case. His understanding of the beneficial ownership of these companies was as set out in paragraphs 27 and 34 above.

44.4.    The paragraph is otherwise not admitted.

45.    As to paragraph 32A, Mr Anufriev did not believe Mr Bourlakov to have transferred Edelweiss to Mrs Bourlakova and did not understand Mrs Bourlakova to be the beneficial owner of Edelweiss at any stage. His understanding of the beneficial ownership of Edelweiss was as set out in paragraph 28 above.

46.    Paragraph 33 is not admitted:

46.1.    The allegation that Mr Kazakov had no involvement in "*these transfers*" is vague as to which "*transfers*" are being addressed and in any event is not admitted. As to Mr Anufriev's understanding of Mr Kazakov's involvement, paragraph 4 above is repeated.

46.2.    The remainder of paragraph 33 is based on the Claimants' vague and irrelevant definition of "*Bourlakov family assets*" (as to which paragraph 11.3 above is repeated) and in any event not admitted. Mr Anufriev's understanding of the nature of Mr Kazakov's interest was as set out in paragraphs 4 and 5above.

47.    As to paragraph 34, paragraph 11 above is repeated.

A.    **Alleged lying to Mrs Bourlakova about the Bourlakov family's assets and/or their true value**

A1.    **Alleged discussions in London on 5 April 2018 / the Kazakov partnership: APOC §§35-44.**

48.    Paragraph 35 is admitted save that:

48.1.    Mr Anufriev did not attend the 5 April 2018 meeting "*in support*" of Mr Bourlakov, but rather was instructed by Mr Bourlakov to attend and did so in his capacity as Director of Mr Bourlakov's Family Office.

48.2.    No admission is made as to the capacity in which Mr and Mrs Kazakov attended.

49.    As to paragraph 36:

49.1.    Regarding the first sentence, it is admitted that, during the course of the discussions at the 5 April 2018 meeting, Mr Bourlakov made statements regarding the assets available for distribution. Mr Anufriev pleads further to those statements at paragraphs 49.2 and 50 below. The first sentence is otherwise premised on Mrs Bourlakova's and Veronica's alleged state of mind and is not admitted.

49.2.    Regarding the second sentence, Mr Bourlakov and Mr Kazakov told the other attendees at the 5 April 2018 meeting that they (i.e. Mr Bourlakov and Mr Kazakov) had a longstanding oral partnership pursuant to which 50% of their common business interests (the details of which were not further specified) were held for the benefit of Mr Kazakov. To that extent the sentence is admitted. It is otherwise denied; and in particular it is denied that Mr Bourlakov or Mr Kazakov (or anyone else at the meeting) described the partnership as applying to "*all of the Bourlakov family's business interests*".

50.    As to the first sentence of paragraph 37:

50.1.    It is admitted that Mr Bourlakov made statements at the 5 April 2018 meeting regarding the total value of the assets available for distribution between himself and Mrs Bourlakova in the light of his partnership with Mr Kazakov.

50.2.   It is denied that Mr Bourlakov's statements in this regard were expressed to concern (or were understood by Mr Anufriev to concern) the "*Bourlakov family assets*". Paragraph 11.3 above is repeated.

50.3.   The sentence is otherwise not admitted.

51.   As to the second sentence of paragraph 37:

51.1.   The sentence proceeds on the premise that Mr Bourlakov made at the 5 April 2018 meeting the "*representation*" alleged in the first sentence. Mr Anufriev denies that premise for the reasons set out in paragraphs 49 and 50 above.

51.2.   Without prejudice to that, Mr Anufriev understood from the statements that Mr Bourlakov and Mr Kazakov made at the 5 April 2018 meeting that their partnership encompassed (among others) assets held by Mrs Bourlakova and that Mr Kazakov had claims under the partnership in respect of those assets.

51.3.   Mr Anufriev does not recall Mr Bourlakov's or Mr Kazakov's statements at the meeting having addressed the position so far as concerns assets held by Veronica; however, he cannot exclude the possibility that they did so.

51.4.   Insofar as the second sentence refers to "*assets beneficially owned by Mrs Bourlakova and Veronica*" it is not admitted, and it was not Mr Anufriev's understanding, that Mrs Bourlakova or Veronica beneficially owned any assets said by Messrs. Bourlakov and Kazakov to be subject to their partnership; Mr Anufriev's understanding of the position was as set out in paragraph 5 above.

51.5.   The second sentence is otherwise not admitted.

52.   As to the first sentence of paragraph 38:

52.1.   Mr Kazakov said at the 5 April 2018 meeting that he was entitled to 50% of his and Mr Bourlakov's common business interests in accordance with his oral partnership agreement with Mr Bourlakov.

52.2.   Mr Kazakov also said that he had evidence of the partnership and that if Mrs Bourlakova wanted to see it then he would provide it.

52.3.   To the extent that it is consistent with the foregoing, the first sentence is admitted. It is otherwise denied; and in particular denied that Mr Kazakov's statements at the meeting were expressed to concern (or were understood by Mr Anufriev to concern) "*Bourlakov family assets*".

53.   The second sentence of paragraph 38 is denied. In particular:

53.1.   It is denied that Mr Bourlakov and Mr Kazakov made the alleged "*representations… as to the existence of the supposed Kazakov partnership*". Rather, they made the statements pleaded at paragraphs 49 to 52 above.

53.2.   It is denied that Mr Anufriev and Mrs Kazakova "*expressly endorsed*" those statements or any representation arising from them.

54.   As to paragraph 39:

54.1.   It is denied that the Claimants have pleaded any proper basis for the inferences aserted in relation to Mr Anufriev.

54.2.   Those inferences are in any case denied for the reasons set out in this Defence.

54.3.   For those same reasons, each of paragraphs 39(a) to (c) is denied so far as it concerns Mr Anufriev and is otherwise not admitted.

55.   As to paragraph 40:

55.1.   Regarding the first sentence:

55.1.1.   It is denied that the alleged "*representations*" were made at the 5 April 2018 meeting "*about the supposed Kazakov partnership and Mr Kazakov's 50% interest in the Bourlakov family's wealth*".

55.1.2.   Rather, Messrs. Bourlakov and Kazakov made the statements pleaded at paragraphs 49 to 52 above.

55.1.3.   It is denied (insofar as alleged) that Mr Anufriev or Mrs Kazakova made or endorsed those statements or any representations arising from them.

55.1.4.   Mr Anufriev's understanding at the time of the meeting (as now) was that those statements were true. If (which is not admitted) those

statements were untrue and any of Mr Bourlakov, Mr Kazakov, or Mrs Kazakova knew them to be so, Mr Anufriev was unaware of that.

55.2.   Regarding the second sentence:

55.2.1.   If (which is not admitted) the "*Kazakov partnership was a fabrication*" Mr Anufriev was unaware of that. His understanding at the time of the meeting (as now) was that there was a longstanding business partnership between Mr Bourlakov and Mr Kazakov: paragraph 4 is repeated.

55.2.2.   If (which is not admitted) the "*Kazakov partnership*" was "*designed*" with any of the purposes now alleged by the Claimants, Mr Anufriev was not aware of that and any such purposes would be inconsistent with his understanding of the position: paragraph 4 is repeated.

56.   As to paragraph 41:

56.1.   Subparagraph (a) is not admitted.

56.2.   As to subparagraph (b):

56.2.1.   The vague reference to the existence of "*Bourlakov family businesses*" is not admitted. As set out in paragraph 5.2.6 above, Mr Anufriev understood that Mr Bourlakov's wealth derived from his business ventures (including the management and sale of Novoroscement which was undertaken together with Mr Kazakov) rather than any significant contribution from Mrs Bourlakova or Veronica.

56.2.2.   Subparagraph (b) is otherwise denied. Mr Anufriev's understanding of the partnership and Mr Kazakov's involvement in it was as set out in paragraph 4 above.

56.3.   Subparagrpahs (c)-(f) are not admitted.

56.4.   As to subparagraph (g):

56.4.1.   Regarding the first sentence:

(a)   It is admitted that Mr Anufriev said to Veronica that he was not aware prior to the 5 April 2018 meeting of the extent of Mr

Kazakov's interest under the partnership. This fact (upon which the Claimants rely) is inconsistent with their allegation that Mr Anufriev expressly endorsed the alleged representations by Messrs. Bourlakov and Kazakov regarding their partnership.

(b)   The sentence is otherwise denied. In particular, Mr Anufriev did not say to Veronica that the meeting was the "*first time he had heard of the supposed Kazakov partnership*". Mr Anufriev had long understood that Mr Kazakov had an interest in Mr Bourlakov's business endeavours. Paragraph 4.4 above is repeated. What Mr Anufriev was not aware of prior to the meeting was the detail and extent of Mr Kazakov's interest.

56.4.2.   The second sentence is denied, save that it is admitted that Mr Anufriev was the principal person responsible for passing on Mr Bourlakov's instructions to third parties outside the Russian Federation. Paragraph 3 above is repeated.

56.4.3.   The third sentence is denied:

(a)   It proceeds on the false premise that the partnership was "*concealed*" from Mr Anufriev. No such concealment is particularised and so far as Mr Anufriev is aware there was none. Furthermore, Mr Anufriev was aware prior to the 5 April 2018 meeting that Mr Kazakov had an interest in Mr Bourlakov's business endeavours. Paragraph 4.4 above is repeated.

(b)   It proceeds on the further false premise that there was "*no good reason*" for matters regarding the partnership to be withheld from Mr Anufriev. However, given the true nature of his role, Mr Anufriev would not have been told the details of the agreement between Mr Bourlakov and Mr Kazakov unless and until Mr Bourlakov determined that Mr Anufriev needed to know that information to carry out his role. Paragraph 3 above is repeated.

56.5.   Subparagraphs (h), (i) and (i.1) are not admitted.

56.6. As to subparagraph (j):

56.6.1. The first sentence is admitted to the extent that it is intended to refer to the documents identified in the third sentence at (i) to (viii). It is otherwise too vague to plead to and is not admitted.

56.6.2. As regards the second and third sentences, Mr Anufriev will refer to those documents at trial for their full terms, meaning, and effects.

56.6.3. Insofar as Mr Anufriev was aware of these documents at the time they were prepared, he understood them to reflect Mr Bourlakov's instructions and did not regard them as inconsistent with his (Mr Anufriev's) understanding of the beneficial ownership position as set out in paragraph 5 above, for the reasons set out in paragraph 59.6 below.

56.6.4. As to the meeting addressed in subparagraph (viii), Mr Anufriev understood that the purpose of this meeting, so far as Edelweiss was concerned, was to discuss what the tax consequences would be if the United Kingdom tax authorities were to regard Veronica as one of the beneficial owners of Edelweiss (which was a hypothetical 'worst case scenario'). This did not detract from Mr Anufriev's understanding that Veronica was not in fact the beneficial owner of Edelweiss as set out in paragraph 5 above. Mr Anufriev will rely on the full terms of the notes of the meeting at trial.

56.6.5. No admissions are otherwise made.

56.7. Subparagraphs (k) and (k.1) are not admitted.

56.8. As to subparagraph (l):

56.8.1. Regarding the first sentence, the partnership Mr Bourlakov and Mr Kazakov described at the 5 April 2018 meeting was in respect of common business interests and not "*the Bourlakov family wealth*". The sentence is otherwise too vague to plead to and is not admitted.

56.8.2. Regarding the second sentence, it is denied that Mr Kazakov had no involvement in relevant decision making so far as concerns his common

business interests with Mr Bourlakov. Paragraph 4.4 above is repeated. The sentence is otherwise too vague to plead to and is not admitted.

56.8.3.   The third sentence is admitted, save that it is denied (insofar as the Claimants intend to allege this) that expenditure on the Black Pearl tells anything about the partnership described at the 5 April 2018 meeting. Mr Anufriev understood that the Black Pearl was primarily a passion project of Mr Bourlakov and did not regard it as inconsistent with the description given by Messrs. Bourlakov and Kazakov of their partnership.

56.9.   Subparagraphs (m) and (n) are not admitted.

56.10.   As to subparagraph (o):

56.10.1.   The first sentence is not admitted.

56.10.2.   The second sentence is admitted.

56.10.3.   The third sentence is denied. Mr Anufriev did not regard the email of 10 November 2016 as inconsistent with his understanding of Mr Kazakov's interest as a partner, as set out in paragraph 4 above.

57.   Paragraph 42 is noted as a statement of the Claimants' intention to seek early disclosure and what they expect those documents will show. Such matters are not appropriate for a statement of case and are not admitted.

58.   Paragraph 43 makes no allegation against Mr Anufriev and is not admitted.

59.   Paragraph 44 is denied. In particular:

59.1.   Insofar as Messrs. Bourlakov and Kazakov made representations at the 5 April 2018 meeting regarding their partnership, Mr Anufriev believed these to be true, and they accorded with his understanding of the longstanding co-operation between Messrs. Bourlakov and Kazakov.

59.2.   If (which is not admitted) those representations were false, Mr Anufriev was not aware of that.

59.3.   It is denied that the matters set out in subparagraphs (a) to (g) provide any proper basis for inferring the contrary.

59.4. As to sub-paragraph (a), it is premised on the mischaracterisation of Mr Anufriev's role in relation to Mr Bourlakov's affairs that was addressed at paragraph 3 above. It is denied that Mr Anufriev's role provides any proper basis to infer that he was aware that such representations were untrue.

59.5. As to sub-paragraph (b):

59.5.1. It is denied that Mr Anufriev was in a position to ascertain whether Mr Bourlakov's business decisions were "*unilateral*" in character. Mr Anufriev was not privy to the top-level discussions regarding Mr Bourlakov's business interests in Russia or with Russian-speaking partners.

59.5.2. It is denied that Mr Bourlakov did not request Mr Kazakov's views or take into account his interests. At the least, as Mr Anufriev was aware:

(a) Mr Bourlakov took into account Mr Kazakov's interests in respect of the 2014 transfer of assets into the name of Mrs Bourlakova, by granting Mr Kazakov a power of attorney permitting him to sell Burneftegaz as he saw fit. Paragraph 4.4.5 above is repeated.

(b) Messrs. Bourlakov and Kazakov: (a) spoke frequently; and (b) met in Russia, sometimes as frequently as once a month or more, for purposes including the discussion of business matters. Paragraph 4.4.8 above is repeated.

59.5.3. No admissions are otherwise made.

59.6. As to subparagraph (c):

59.6.1. The allegation in the first sentence is too vague to permit a specific response. It is admitted that Mr Anufriev in his role as Director of Mr Bourlakov's Family Office was involved in the process of providing due diligence and ownership information to a number of banks and corporate service providers and was therefore aware of the content of a number of representations made by or on behalf of Mr Bourlakov in this regard. Mr Bourlakov gave Mr Anufriev specific instructions about what to say to the banks and corporate service providers regarding the beneficial

ownership position and Mr Anufriev understood that he was not allowed to deviate from those instructions. No admissions are otherwise made.

59.6.2. The reference in the second sentence to "*money laundering regulations*" is too vague to permit a specific response. Mr Anufriev was aware of the importance of providing accurate information to banks. However, Mr Anufriev did not understand the representations made by or on behalf of Mr Bourlakov to third parties regarding the beneficial ownership of his assets to be inconsistent with the existence of Mr Kazakov's interest:

(a)   It was Mr Bourlakov's practice frequently to change the recorded beneficial owners of particular assets as a protective measure against the perceived risk of attacks by third parties and state authorities. Mr Bourlakov sought to ensure that the position as to beneficial ownership was opaque to third parties.

(b)   As set out in paragraph 4.3 above, prior to the meeting on 5 April 2018, Mr Anufriev was unaware of the detail and extent of Mr Kazakov's interest as a partner. Mr Anufriev was not therefore in a position to gainsay the instructions that he received from Mr Bourlakov as to what to tell the banks. Further and in any event, insofar as Swiss banks were concerned, it would not be possible (consistently with the applicable formal requirements imposed by the banks as Mr Anufriev understood them) to identify an additional beneficial owner without identifying what share they owned.

(c)   Mr Anufriev further understood that Mr Kazakov did not wish to document his interest due to the risks to his property and person that he faced due to his residence in Russia.

(d)   Accordingly, while Mr Anufriev was not instructed to provide any representations to banks recording Mr Kazakov as a beneficial owner of assets, he regarded this as consistent with Mr Bourlakov's business practice and with Mr Kazakov's interest.

59.7.   As to subparagraph (d), it is admitted that Mr Anufriev took his instructions directly from Mr Bourlakov and not Mr Kazakov. However, Mr Anufriev did not regard this as inconsistent with Mr Kazakov's interest. As set out above, Mr Anufriev was not privy to the top-level discussions regarding Mr Bourlakov's business interests in Russia or with Russian-speaking partners and was aware that Mr Bourlakov discussed business matters with Mr Kazakov and took his interests into account: paragraph 59.5 is repeated.

59.8.   Subparagraph (e) is denied. Mr Anufriev was not party to any such discussions.

59.9.   Subparagraph (f) is denied. Paragraph 56.4 above is repeated.

59.10.  As to subparagraph (g), it is admitted that Mr Anufriev attended the meeting with Saffery Champness in March 2018 and responded to Saffery Champness's questions, having discussed the responses with Mr Bourlakov. As set out in paragraph 56.6.4 above, Mr Anufriev understood that the purpose of this meeting was to discuss what the tax consequences would be in the 'worst case' scenario *if* the United Kingdom tax authorities were to regard Veronica as one of the beneficial owners of Edelweiss. Mr Kazakov's interest was not relevant for this purpose, and in any event Mr Anufriev was not in a position to describe Mr Kazakov's interest to Saffery Champness because he was not, at this stage, aware of the detail or extent of Mr Kazakov's interest.

### A2.   Mediation in Monaco on 28/29 June 2018

60.   As to paragraph 45:

60.1.   The first two sentences are admitted.

60.2.   The third sentence is denied. Mr Anufriev was instructed to attend by Mr Bourlakov and did so in his capacity as Director of Mr Bourlakov's Family Office.

61.   As to paragraph 46:

61.1.   Regarding the first and second sentences:

61.1.1.   Insofar as these repeat the Claimants' case in respect of the representations allegedly made at the 5 April 2018 meeting Mr Anufriev's case in response is set out at paragraphs 49 to 59 above.

61.1.2.  As Mr Anufriev denies that Mr Bourlakov and Mr Kazakov made at the 5 April 2018 meeting the alleged representations concerning "*the Bourlakov family assets*" he denies they were continuing representations.

61.1.3.  Insofar as the statements made by Mr Bourlakov and Mr Kazakov at the 5 April 2018 meeting about their partnership (as set out at paragraphs 49 and 50 above) amounted to representations or continuing representations, Mr Anufriev believed (and still believes) these to be true; and on that basis, there was no "*falsity*" for Mr Bourlakov to "*acknowledge*".

61.1.4.  If (which is not admitted) those statements and any representations arising from them were false and known to be so by Mr Bourlakov, Mr Kazakov, or Mrs Kazakova, Mr Anufriev was not aware of that.

61.1.5.  If (which is not admitted) Mr Bourlakov made those statements and any representations arising from them with the alleged hope and expectation referred to in the second sentence, Mr Anufriev was not aware of that.

61.2.  Regarding the third sentence:

61.2.1.  It is denied that Mr Anufriev had made or had any intention to repeat or rely on the alleged false representations.

61.2.2.  Insofar as any of Mr Bourlakov, Mr Kazakov, or Mrs Kazakova had done so or had any intention to do so, Mr Anufriev was unaware of that.

61.2.3.  Insofar as the Claimants' allege that Mrs Bourlakova and Veronica knew that the alleged representations were untrue, that is denied because no such representations were made.

61.2.4.  Insofar as the Claimants allege that Mrs Bourlakova and Veronica were aware that Mr Anufriev would repeat and rely on those alleged representations, that is likewise denied.

61.2.5.  The sentence is otherwise not admitted.

61.3.  The fourth sentence is denied:

61.3.1.   Mr Anufriev's attendance at this meeting did not confirm his willingness to support Mr Bourlakov as alleged, nor has Mr Anufriev subsequently done so.

61.3.2.   Mr Anufriev attended the mediation in his capacity as Director of Mr Bourlakov's Family Office and assisted with translation (because the mediator did not speak Russian) and administrative matters.

61.3.3.   All parties present to the meeting accepted Mr Anufriev's translation and there was no second translator present. Paragraphs 3 and 60.2 above are repeated.

61.4.   The fifth sentence is denied:

61.4.1.   Mr Anufriev did not make the alleged representations at the 5 April 2018 meeting: paragraph 53.1 above is repeated.

61.4.2.   Mr Anufriev did not make any continuing representation, nor did he impliedly join in the alleged such representations by Mr Bourlakov.

62.   Paragraph 47 is admitted as a broad summary of the 'Memorandum of Agreement Regarding the Division of Family Assets' dated 29 June 2018, save that:

62.1.   It is denied, if alleged, that the agreement was legally binding. It was a preliminary and unimplemented memorandum of agreement which expressly provided that "*(b)oth parties will seek independent legal advice*" and "*(a) formal agreement will be prepared by solicitors unanimously selected by both sides*" (page 2).

62.2.   No admission is made as to the value of the apartment at La Reserve in Monaco.

63.   As to paragraph 47A:

63.1.   The first sentence is admitted, save that it is denied that the date on the manuscript agreement is erroneous: the manuscript is dated 29 June 2018 which is correct.

63.2.   The second and third sentences are incomplete summaries of the documents in question. Mr Anufriev will rely on these documents for their full terms at trial.

64.   Paragraph 48 is not admitted.

**A3.**   **Mediation in London on 13-16 September 2018**

65.   As to paragraph 49:

65.1.   It is admitted that there was a meeting in London between Mr Bourlakov and Mrs Bourlakova between 13 and 15 September 2018 and that Mr Anufriev attended parts of this meeting. Veronica and Elena Bourlakova also attended this meeting.

65.2.   It is admitted that the mediator, a Mr Baratz, attended on the first day of the meeting (13 September 2018). Mr Baratz did not speak Russian and Mr Anufriev provided translation for both Mr Bourlakov and Mrs Bourlakova at the meeting.

65.3.   It is denied (insofar as the Claimants intend to allege this) that Mr Baratz attended the second two days of the meeting.

65.4.   It is admitted that there was a further meeting between Mr Bourlakov and Mrs Bourlakova which took place without the mediator on 16 September 2018. Mr Anufriev attended this meeting.

65.5.   It is denied that Mr Anufriev attended any of these meetings as an "*adviser to Mr Bourlakov*". Mr Anufriev was instructed to attend by Mr Bourlakov and attended in his capacity as Director of Mr Bourlakov's Family Office.

66.   As to paragraph 50:

66.1.   In those parts of the meeting attended by Mr Anufriev, Mr Bourlakov referred to the existence of debts owed to third parties; Mrs Bourlakova, Veronica and Mr Anufriev asked what these debts were and in what sum; and he (Mr Bourlakov) did not provide a clear or exact quantification either of the amount of "good money" (as he described it) or the debts owed to third parties.

66.2.   Mr Bourlakov said in the course of those parts of the meeting that were attended by Mr Anufriev that his (Mr Bourlakov's) assets were under threat from Chechen criminals and the KGB. Mr Anufriev regarded this as a nonsense, and he told Mr Bourlakov so, in the presence of Mrs Bourlakova and Veronica.

66.3.   Regarding the final sentence of paragraph 50: (a) it is admitted that Mr Bourlakov mentioned certain numbers; (b) Mr Anufriev does not now recall the precise

numbers used; and (c) in any event, the numbers used were changing in the course of discussion and did not amount to a clear, exact or final quantification.

66.4.   No admissions are otherwise made.

67.   As to paragraph 51:

67.1.   Regarding the first and second sentences (which are in terms materially identical to those of the first and second sentences of paragraph 46), paragraph 61.1 above is repeated.

67.2.   Regarding the third sentence and fourth sentences:

67.2.1.   Insofar as the Claimants intend to allege that Mr Bourlakov made statements at the mediation on 13-16 September 2018 which provided a clear, exact, and final quantification of the amount of "good money" available, it is denied that he did so in Mr Anufriev's presence.

67.2.2.   Rather, the statements made by Mr Bourlakov in Mr Anufriev's presence were unclear, inexact, and equivocal. Their nature is illustrated by Mr Bourlakov's statement that debts to third parties other than Mr Kazakov amounted to hundreds of millions of dollars.

67.2.3.   In the premises, it is denied that the statements made by Mr Bourlakov in Mr Anufriev's presence regarding the amount of "good money" available amounted to representations as alleged by the Claimants.

67.2.4.   Whereas those statements appeared to Mr Anufriev to depend on sums being due under the Kazakov partnership or to third parties, Mr Bourlakov did not clearly, exactly, or finally quantify those sums.

67.2.5.   The sentences are otherwise not admitted.

68.   As to paragraph 52:

68.1.   The first sentence is denied. Mr Anufriev's presence did not confirm his willingness to support Mr Bourlakov in any way necessary. To the contrary, as set out above, Mr Anufriev questioned Mr Bourlakov as to the extent of the debts

owed to third parties and openly challenged Mr Bourlakov's suggestion that his assets were under threat from Chechen criminals and the KGB.

68.2.  As to the second to fourth sentences:

68.2.1.  Mr Anufriev does not recall referring to the IPEC loan and considers it unlikely that he would have done so, given that the context of the discussion was over debts owed to third parties, and he understood the IPEC loan to be an intra-group transaction that did not constitute a debt owed to any third party (i.e. a party outside of the group). It was not therefore relevant to the discussion as to debts owed to third parties.

68.2.2.  In any event: (a) it is denied that Mr Anufriev has or had arranged any forged documents to be produced in respect of the IPEC loan; and (b) the Claimants' allegation is not understood, as the APOC does not allege that the IPEC loan agreement was a forgery (see APOC paragraph 114).

68.2.3.  If (which is not admitted) Mr Bourlakov made any false representations about debts, it is denied that Mr Anufriev was aware of that or joined in those alleged representations.

69.  As to paragraph 53:

69.1.  Regarding the first sentence, if (which is not admitted) Mr Bourlakov made any false representations about debts, it is denied that Mr Anufriev was aware of that or joined in those alleged representations.

69.2.  Regarding the second sentence, if (which is not admitted) the alleged (but not admitted) false representations by Mr Bourlakov about debts were made for the purposes alleged, Mr Anufriev was unaware of that.

69.3.  The paragraph is otherwise not admitted.

70.  Paragraph 54 is not admitted.

71.  Paragraph 55 is denied. Mr Anufriev did not know that the alleged representations regarding debts to third parties were false:

71.1.   The allegation that Mr Anufriev had "*daily involvement in Mr Bourlakov's business interests*" is based on a mischaracterisation of Mr Anufriev's role as Director of Mr Bourlakov's Family Office. Paragraph 3 above is repeated.

71.2.   In any event it is denied that this allegation (even if true) would support any inference that Mr Anufriev was aware that the alleged representations were false. Mr Anufriev was not involved in top-level discussions of Mr Bourlakov's business interests in Russia or with Russian-speaking partners and did not have full visibility of Mr Bourlakov's assets and liabilities.

71.3.   As set out above, Mr Anufriev questioned Mr Bourlakov at the mediation over the extent of the debts owed to third parties. Mr Anufriev believed what he was told by Mr Bourlakov, namely that there were substantial debts to third parties.

72.   As to paragraph 56, it is admitted that no agreement was reached. No admissions are otherwise made.

### A4.   Demands for payment by Mr Kazakov

73.   Paragraphs 57-61 make no allegation against Mr Anufriev and are not admitted.

### A5.   Mr Bourlakov's declaration on or around 20 December 2018: APOC §§62-65

74.   As to paragraph 62:

74.1.   It is admitted that Mr Bourlakov executed a declaration on or around 20 December 2018 stating (in summary) that Mr Kazakov was an equal business partner of Mr Bourlakov in all business dealings. Mr Anufriev believed (and still believes) that this declaration was true and will rely on this document at trial for its full terms.

74.2.   It is admitted that Mr Anufriev signed the declaration but denied that he did so "*in his capacity as Mr Bourlakov's lawyer*". Mr Anufriev's role was to: (a) translate Mr Bourlakov's instructions (given in Russian) into French for the benefit of the notary; and (b) sign the declaration as a witness. As expressly recorded in the declaration (in translation from the original French):

74.2.1. "*Mr BOURLAKOV expressly waives the need for the undersigned notary to require the services of a translator-interpreter, wishing and intending that the translation be carried out by Mr ANUFRIEV*";

74.2.2. "*The aforementioned Mr BOURLAKOV expressed in Russian to Mr ANUFRIEV the statements that he wished to be transcribed herein, and Mr ANUFRIEV translated them to the undersigned notary in French*";

74.2.3. Mr Bourlakov signed the declaration "*In the presence of the aforementioned Mr Semën ANUFRIEV, who translated this document into Russian for the party appearing*".

74.3. Mr Anufriev did not (and was not in a position to) confirm the correctness of the content of the declaration, nor did he make any representation that it was correct. Mr Anufriev's signature as a witness served only to confirm that Mr Bourlakov had indeed executed and signed the declaration.

74.4. In any event it is not admitted that the 20 December 2018 declaration contained any false representations. Paragraphs 55 and 56 above are repeated.

75. Paragraph 63 is not admitted. Paragraphs 55 and 56 above are repeated.

76. As to paragraph 64:

76.1. It is denied that Mr Anufriev by signing the declaration was "*supporting*" the statements made in the declaration. Mr Anufriev signed the document as a translator and witness: paragraph 74 above is repeated.

76.2. In any event it is denied that Mr Anufriev knew that the contents of the declaration were untrue. To the contrary, Mr Anufriev believed that what Mr Bourlakov stated in this formally executed legal document was true. Paragraph 59 above is repeated.

77. Paragraph 65 does not make any allegation against Mr Anufriev and is not admitted.

**A6.** **The alleged involvement of Mr Tribaldos, Leo England and Leo Trust in the alleged lies concerning the Kazakov partnership**

78. Paragraphs 66 to 68 make no allegation against Mr Anufriev and are not admitted.

79. As to paragraph 69:

    79.1. It is admitted that Mr Bourlakov met with Mr Tribaldos in Zurich on a number of occasions between February 2018 and June 2018 and that Mr Anufriev attended parts of these meetings. There had been meetings in Zurich between Mr Bourlakov and Mr Tribaldos since at least November 2017, with Veronica attending a number of these.

    79.2. It is denied that Mr Anufriev's purpose in attending these meetings was to discuss, develop, or give effect to the alleged "*strategy*". Nor did Mr Anufriev in fact discuss, develop or give effect to the alleged "*strategy*" at these meetings or at all.

    79.3. No admissions are otherwise made.

80. Paragraphs 70 to 71 make no allegation against Mr Anufriev and are not admitted.

81. As to paragraph 72:

    81.1. It is denied that Mr Anufriev conveyed any instruction to Mr Tribaldos, Leo Trust or Leo England to assist in the production of the 20 December 2018 declaration. They were not involved in the production of this declaration.

    81.2. The paragraph is otherwise not admitted.

**A7.** **Alleged consequences of the alleged lies**

82. As to paragraph 73:

    82.1. It is denied that Mr Anufriev made the alleged misrepresentations or had the alleged purposes.

    82.2. If (which is not admitted) any of Mr Bourlakov, Mr Kazakov, Mrs Kazakova, Mr Tribaldos, Leo Trust, or Leo England made the alleged misrepresentations or had the alleged purposes, Mr Anufriev was not aware of that.

82.3.   The paragraph is otherwise not admitted.

83.   As to paragraph 74:

83.1.   It is denied that Mr Anufriev made the alleged misrepresentations or created any forged or sham documents. Neither Mrs Bourlakova nor her daughters face any "*ongoing risks*" as a result of these alleged matters.

83.2.   If (which is not admitted) any of Mr Bourlakov, Mr Kazakov, Mrs Kazakov, Mr Tribaldos, Leo Trust, or Leo England made those alleged misrepresentations or created any such documents, Mr Anufriev was not aware of that.

83.3.   No admission is made as to the costs allegedly incurred by Mrs Bourlakova. It is denied that those costs have been incurred as a result of any alleged misrepresentation, forgery or sham document made by Mr Anufriev (for there was none).

83.4.   In any event any costs incurred by the Claimants in the present proceedings are not properly claimed as damages and are instead recoverable (if at all) only by way of an order for costs.

83.5.   The paragraph is otherwise not admitted.

**B.**   **ALLEGED CREATION OF FORGED/SHAM LIABILITIES**

**B1.**   **The alleged creation of forged/sham liabilities**

84.   As to paragraph 75:

84.1.   The existence of the Finco/Gatiabe document is admitted.

84.2.   It is denied that Mr Bourlakov himself produced the Finco/Gatiabe document. It was instead produced on his instructions (given both directly and via Mr Anufriev) by Mr Tribaldos and Leo Trust with the assistance of a Swiss attorney. Further, based on his understanding of Leo Trust's processes, Mr Anufriev understood that Leo Trust also received assistance in relation to the preparation of the document from the Panamanian law firm Morgan & Morgan.

84.3.  Mr Anufriev believed (and still believes) that the instructions from Mr Bourlakov (insofar as he was aware of them) reflected the true position: in particular, that the Finco/Gatiabe document recorded a pre-existing loan transaction which had taken place in 2007.

84.4.  Further, Mr Anufriev believed at all material times that Finco and Gatiabe were part of the same group (as addressed in paragraph 5.3.3 above) and did not believe (still less intend) that recording an intra-group transaction would injure the Claimants or any other person.

84.5.  Moreover, Mr Anufriev understood that the preparation of this document (and the associated resolutions addressed below) was necessary for the purpose of preparing audited accounts for Finco and Gatiabe with a view to Mr Bourlakov and Mr Kazakov's participation in the Russian tax amnesty that was announced on or around 30 January 2018. Paragraph 6.4.1 above is repeated.

84.6.  The unparticularised allegation that Mr Bourlakov "*relied upon*" the Finco/Gatiabe document is too vague to permit a specific response and is not admitted.

85.  Paragraph 76 is admitted as a summary of the Finco/Gatiabe document, save that:

85.1.  Mr Anufriev did not believe at any point that the document merely purported to record the loan; he believed (and still believes) that it in fact did so.

85.2.  It is not admitted that the document was only purportedly signed by the individuals who were directors of Gatiabe and Finco in 2007. As set out above, the document was produced (and signatures obtained) by Mr Tribaldos and Leo Trust.

86.  As to paragraph 77:

86.1.  The existence of the Gatiabe resolution is admitted.

86.2.  It is denied that Mr Bourlakov himself produced the Gatiabe resolution. It was produced by Mr Tribaldos and Leo Trust as part of the package of documents to document the Finco/Gatiabe loan which (as set out above) Mr Anufriev was

informed and believed was a genuine transaction. As set out above, based on his understanding of Leo Trust's processes, Mr Anufriev understood that Leo Trust received assistance in this regard from Morgan & Morgan.

86.3.   The unparticularised allegation that Mr Bourlakov "*relied upon"* the Gatiabe resolution is too vague to permit a specific response and is not admitted.

87.   As to paragraph 78:

87.1.   The existence of the Finco resolution is admitted.

87.2.   No admissions are made as to the Claimants' awareness.

88.   As to paragraph 79:

88.1.   The existence of the declaration of trust dated 12 July 2018 is admitted.

88.2.   It is denied that Mr Bourlakov himself produced this document. It was produced by Mr Tribaldos, Leo Trust and Delos Global on instructions from Messrs. Bourlakov and Kazakov. The date on which the declaration was executed is outside Mr Anufriev's knowledge and is not admitted.

88.3.   The unparticularised allegation that Mr Bourlakov has "*relied upon"* this document is too vague to permit a specific response and is not admitted.

89.   As to paragraph 80:

89.1.   Regarding the first sentence:

89.1.1.   The Claimants do not specify when or to whom Mr Bourlakov allegedly asserted that the loan recorded in the Finco/Gatiabe document is still outstanding, and the allegation is accordingly too vague to permit a specific response and is not admitted.

89.1.2.   No admission is made as to what Mr Kazakov allegedly continues to contend.

89.2.   The second sentence is not admitted. To the best of Mr Anufriev's knowledge, the effect of the liability recorded in the Finco/Gatiabe document would not be to

wipe out the vast majority of the "*Bourlakov family fortune*" (whichever assets the Claimants mean to refer to by this expression). As set out in paragraphs 84.2 above and paragraphs 92.1 and 97.3 below, Mr Anufriev believed (and still believes) that: (a) the Finco/Gatiabe document recorded a genuine liability which was accompanied by a back-to-back loan agreement between Gatiabe and Jovellanos; and in any event (b) both Gatiabe and Jovellanos were part of the same group (as addressed in paragraph 5.3.3 above).

89.3.   As to the third sentence, no admission is made as to Mr Bourlakov's intentions. In any event Mr Anufriev did not believe that the effect of the Finco/Gatiabe document was to impoverish Mr Bourlakov. Paragraph 89.2 above is repeated.

89.4.   As to the fourth sentence:

89.4.1.   No admission is made as to Mr Bourlakov's alleged purpose. In any event Mr Anufriev did not believe that the purpose or effect of the Finco/Gatiabe document was artificially to supress the value of Mr Bourlakov's assets, but rather to provide proper documentation to allow Mr Bourlakov and Mr Kazakov to take advantage of a Russian tax amnesty. Paragraph 6.4.1 above is repeated.

89.4.2.   No admission is made as to whether Mr Bourlakov had agreed that he would be able to recover from Mr Kazakov any money which Mr Kazakov/Gatiabe obtained in reliance on the Finco/Gatiabe document.

90.   As to paragraph 81:

90.1.   It is admitted that: (a) the Finco/Gatiabe document, the Gatiabe resolution and the Finco resolution were produced in or around October 2018; and (b) the Gatiabe/Jovellanos documents were produced in or around April 2019.

90.2.   It is admitted and averred that these documents were produced by Mr Tribaldos and Leo Trust (with assistance from Morgan & Morgan) acting on instructions from Mr Bourlakov which were provided both directly and via Mr Anufriev. As set out above, Mr Anufriev believed (and still believes) that: (i) the instructions of which he was aware reflected the true position; and (ii) these documents

62

recorded transactions between companies within the same group (as addressed in paragraph 5.3.3 above).

90.3.   It is not admitted that these documents were forgeries and in any event denied that Mr Anufriev knew they were forgeries. Mr Anufriev was informed by Mr Bourlakov and believed at all material times that the purpose of these documents was to document pre-existing transactions.

91.   As to paragraph 82:

91.1.   It is admitted and averred that the Finco/Gatiabe document, Gatiabe resolution and Finco resolution were signed in or around October 2018. Mr Tribaldos and Leo Trust obtained these signatures with the assistance of Morgan & Morgan. Mr Anufriev was told by Mr Tribaldos and believed that the documents were prepared in accordance with Panamanian law.

91.2.   The paragraph is otherwise not admitted.

91.3.   The Gatiabe/Jovellanos documents are addressed in paragraph 97.3 below.

92.   As to paragraph 83:

92.1.   It is not admitted that there was no loan between Finco and Gatiabe:

92.1.1.   Mr Anufriev was informed by Mr Bourlakov and believed that there was a genuine loan agreement between these companies in 2007 which the Finco/Gatiabe document served to record.

92.1.2.   Mr Anufriev in his role as Director of the Mr Bourlakov's Family Office had sight of a bank statement showing that a transfer of US $1.3 billion was in fact made from Gatiabe to Finco in 2007 and therefore knew that this transfer had occurred.

92.1.3.   It is denied (if alleged) that Mr Anufriev understood this transfer to be gratuitous. Such a gratuitous transfer would have been inconsistent with Mr Bourlakov's established business practice of using loans as a method of moving money between companies to protect against the perceived risk of attack by third parties. Paragraphs 6.6.2-6.6.5 above are repeated.

> In any event no admission is made as to the beneficial ownership of Gatiabe and Finco at the time of the 2007 transfer.

92.2.   It is not admitted that any of the documents were forged and in any event denied that Mr Anufriev knew that they were forged. Paragraphs 90.3 and 91.1 are repeated.

92.3.   The paragraph is otherwise not admitted.

93.   As to paragraph 84:

93.1.   The allegation of sham is vague. The Claimants have not identified: (a) which individuals' states of mind are alleged to be relevant for the purposes of this allegation; (b) on what basis the states of mind of those individuals are said to be attributable to the relevant companies; or (c) what primary facts and matters are said to support the allegation that those individuals did not intend for the documents to take effect in accordance with their terms.

93.2.   Without prejudice to that point, it is not admitted that any of the documents identified in paragraph 84 are shams, and in any event denied that Mr Anufriev knew that they were shams:

93.2.1.   Mr Anufriev was informed by Mr Bourlakov and believed that the Finco/Gatiabe document recorded a genuine pre-existing transaction. Paragraph 84.2 above is repeated.

93.2.2.   Mr Anufriev was informed by Mr Tribaldos and believed that the Finco resolution and Gatiabe resolution were part of the package of documents necessary to provide proper documentation for this pre-existing transaction. Paragraph 91.1 is repeated.

93.3.   The Gatiabe/Jovellanos documents are addressed in paragraph 97.3 below.

94.   As to paragraph 85:

94.1.   As to the first sentence:

94.1.1.  The allegation of sham is vague. The Claimants have not identified: (a) which individuals' states of mind are alleged to be relevant for the purposes of this allegation; (b) on what basis the states of mind of those individuals are said to be attributable to Delos Global SA; or (c) what primary facts and matters are said to support the allegation that those individuals did not intend for the declaration of trust to take effect in accordance with their terms.

94.1.2.  Without prejudice to that point, it is not admitted that the declaration of trust is a sham.

94.1.3.  It is not admitted that the declaration of trust was executed in reliance upon the allegedly forged documents, nor that those documents were in fact forged. In any event it is denied that Mr Anufriev knew that any of those documents were forged. Paragraphs 90.3 and 91.1 are repeated.

94.2.  As to the second and third sentences:

94.2.1.  It is admitted that Gatiabe was transferred by Delos Global SA to Wlamil, with Mr Kazakov being the sole named beneficiary of Wlamil.

94.2.2.  It is not admitted that Mr Bourlakov had *de facto* control over Wlamil or Gatiabe until his death, or that Mr Kazakov was acting as nominee for Mr Bourlakov, or that Mr Bourlakov remained the true beneficial owner of Gatiabe. As set out in paragraph 27.2.5 above, Mr Anufriev understood that following the transfer to Wlamil: (i) beneficial ownership of Gatiabe lay with Wlamil; and (ii) Mr Kazakov had *de facto* control of Gatiabe and Wlamil.

94.3.  As to the allegation that Mrs Bourlakova is the sole holder of Gatiabe's shares and its sole beneficial owner, Mr Anufriev's response is as set out in paragraphs 101 and 102 below.

95.  As to paragraph 86:

95.1.   It is admitted and averred that the declaration of trust was prepared by Mr Tribaldos and Leo Trust on instructions from Mr Bourlakov and Mr Kazakov which they provided directly and via Mr Anufriev.

95.2.   It is denied that "*the Bourlakov family*" had always been the ultimate beneficial owner of Gatiabe (or that Mr Anufriev knew this to be the case). Mr Anufriev's understanding was as set out in paragraph 27 above.

95.3.   It is denied that Mr Anufriev knew that the declaration was a sham. Mr Anufriev was told by Mr Bourlakov and believed that the purpose of the declaration of trust was to record Mr Kazakov's ownership of Gatiabe, in circumstances where Mr Bourlakov had previously held the bearer shares in Gatiabe on behalf of Mr Kazakov prior to its dissolution, and the company once reinstated no longer had bearer shares.

96.    As to paragraph 87:

96.1.   It is admitted and averred that:

96.1.1.   Mr Tribaldos and Leo Trust between around October 2018 and July 2019 prepared accounts for Gatiabe for 2015 and 2016, which included the sum said to be due under the Finco/Gatiabe document.

96.1.2.   These accounts were prepared based on instructions from Mr Bourlakov and Mr Kazakov (given directly and via Mr Anufriev). Mr Anufriev believed (and still believes) that the instructions he received from Mr Bourlakov reflected the true position.

96.1.3.   Without waiver of privilege, Mr Anufriev was involved in seeking advice from DLA Piper on the Russian tax implications of the accounts.

96.2.   It is denied that these accounts were "*backdated*". The 2015 and 2016 accounts (as sent to Mr Anufriev by Leo Trust in October 2018):

96.2.1.   Expressly state that "*On 25 October 2018 the Board of Directors of Gatiabe Business Inc. authorised these financial statements for issue*";

96.2.2.   Expressly identify that the board of directors and company secretary had resigned and been replaced in June 2018;

96.2.3.   In any event were not signed.

96.3.   If (which is not admitted) the Gatiabe accounts for 2015 or 2016 contained any false statement, it is denied Mr Anufriev knew that: as set out above, he was told by Mr Bourlakov and believed that the Finco/Gatiabe document recorded a genuine pre-existing liability. Paragraph 84.2 above is repeated.

96.4.   It is denied that Mr Anufriev's role in seeking and obtaining advice on the Russian tax implications of the Gatiabe accounts shows that Mr Bourlakov continued to own and control Gatiabe. Mr Bourlakov instructed Mr Anufriev to carry out this task to assist Mr Kazakov.

97.   As to paragraph 88.0:

97.1.   Regarding subparagraph (i), it is admitted that the Finco/Gatiabe document existed in draft in October 2018. As set out above, Mr Anufriev understood that the document served to record a genuine pre-existing transaction between companies within the same group. Paragraphs 5.3.3 and 84 are repeated.

97.2.   As to subparagraph (ii):

97.2.1.   It is admitted that it became clear in late 2018 that the interest payable under the Finco/Gatiabe loan stood to create a large taxable profit. Mr Anufriev reported this problem to Mr Bourlakov who gave instructions that it should be solved. Mr Anufriev relayed these instructions to Mr Tribaldos and Leo Trust. In the ensuing discussions between Mr Bourlakov, Mr Tribaldos and Leo Trust in Zurich (some of which were attended by Mr Anufriev), Mr Bourlakov suggested that the interest rate on the loan should be amended. Mr Tribaldos said (in Mr Anufriev's presence) that he would need to explain to Panama (which Mr Anufriev understood was a reference to Morgan & Morgan) why the interest rate was being amended. By 4 March 2019 Mr Tribaldos had prepared a draft addendum. Mr Tribaldos thereafter obtained signed documents from

Morgan & Morgan (who supplied the relevant nominee directors in Panama) and Mr Anufriev therefore understood that the amendment was made properly and validly in accordance with Panamanian law.

97.2.2.  Mr Anufriev further suggested to Leo Trust that they seek specific legal advice from DLA Piper and (without waiver of privilege) Mr Anufriev is aware that Leo Trust obtained such advice on 6 March 2019.

97.2.3.  Mr Anufriev's understanding was that the addendum prepared by Mr Tribaldos and Leo Trust served to reduce the taxable profit that would otherwise have arisen. If (which is not admitted) it was created to injure or defraud the Claimants, Mr Anufriev was not aware of that.

97.2.4.  Mr Anufriev further understood that the parties to the addendum (namely Gatiabe and Finco) were members of the same group (as addressed in paragraph 5.3.3 above). Mr Anufriev did not believe (still less intend) that recording a consensual variation to an intra-group transaction would injure the Claimants. Nor did he understand that the addendum recording this variation amounted to a "*forgery*".

97.2.5.  In any event it is denied (if alleged) that Mr Anufriev used the Finco/Gatiabe document to mislead Mrs Bourlakova or concealed the addendum from her. No part of the Finco/Gatiabe document was shown to Mrs Bourlakova at the meeting in London on 5 April 2018 or at either of the mediations addressed above. It is denied that Mr Anufriev was engaged in "*fraud"* or that he was aware of any fraudulent activity by any other party.

97.2.6.  Subparagraph (ii) is otherwise not admitted.

97.3.  As to subparagraph (iii):

97.3.1.  The existence of the Gatiabe/Jovellanos document and addendum is admitted.

97.3.2.  These documents were produced on Mr Bourlakov's instructions (given both directly and via Mr Anufriev) by Mr Tribaldos and Leo Trust in or

around April 2019. Further, based on his understanding of Leo Trust's processes, Mr Anufriev understood that Leo Trust also received assistance from Morgan & Morgan in respect of both the loan document and the addendum at least in order to obtain signatures from the relevant nominee directors.

97.3.3. It is not admitted that the Gatiabe/Jovellanos document and addendum are forged, and in any event it is denied that Mr Anufriev knew that they were forged. As Mr Anufriev was told by Mr Bourlakov (and believed and still believes), these documents served to ensure that Jovellanos received its fair share of the proceeds of the Novoroscement sale (as addressed in paragraphs 4.4.2 and 38.1 above) in circumstances where 90% of the Novoroscement shares were sold by Jovellanos, and only 10% by Gatiabe, and yet Gatiabe received the entirety of the proceeds at the time of the sale.

97.3.4. Mr Anufriev further understood that the parties to these documents (namely Gatiabe and Jovellanos) were members of the same group (as addressed in paragraph 5.3.3 above). Mr Anufriev did not believe (still less intend) that recording such an intra-group transaction would injure the Claimants or any other person.

97.3.5. No admissions are otherwise made.

98. As to the balance of paragraph 88:

98.1. Subparagraph (a) is not admitted. Mr Anufriev did not take up his role as Director of Mr Bourlakov's Family Office until 2012, and is therefore unaware of the purpose of the loan recorded in the Finco/Gatiabe document (which is said to have taken place in 2007).

98.2. As to subparagraph (b):

98.2.1. The addresses given for Finco and Gatiabe in the Finco/Gatiabe document are admitted.

98.2.2. The registered address of Finco and Gatiabe as at 2007 is not admitted.

98.2.3.   No admissions are otherwise made.

98.3.   As to subparagraph (c), it is admitted that: (i) Finco's articles of association required the signature of two directors to bind the company in respect of any act, transaction or business; and (ii) the Finco/Gatiabe document is signed by only one director. The inference in the third sentence is denied: as set out above, Mr Anufriev understood that the Finco/Gatiabe document served to record a pre-existing transaction in respect of which no loan documentation had previously been prepared.

98.4.   As to subparagraph (d):

98.4.1.   It is not admitted that the directors of Gatiabe made no attempt to ensure Finco was able and continued to be able to meet its repayment obligation.

98.4.2.   It is denied that this allegation (even if true) would support the inference that there was no genuine loan:

(a)   The directors of Gatiabe were nominee directors supplied by Morgan & Morgan. It was Mr Tribaldos and/or Leo Trust, and not Mr Anufriev, who liaised directly with Morgan & Morgan to provide instructions to the nominee directors. Mr Anufriev is not a Panamanian lawyer and he expected that Mr Tribaldos and/or Leo Trust, in consultation with Morgan & Morgan, would ensure that the nominee directors acted in accordance with Panamanian law.

(b)   So far as Mr Anufriev is aware, in practice such nominee directors would follow the instructions they received and would not take further steps without instructions. Accordingly, even if (which is not admitted) the directors of Gatiabe did not take positive steps to ensure that Finco was able to meet its repayment obligation, that would not necessarily cast any doubt on the genuine nature of the liability recorded by the Finco/Gatiabe document. Rather, it would reflect the absence of instructions to those directors to take such positive steps.

(c)    As set out in paragraphs 6.6.2-6.6.5 above, Mr Bourlakov's practice was to use loans as a means of transferring money between companies under his control to protect assets against the perceived risk of attack by third parties. It would therefore be consistent with Mr Bourlakov's practice for there to exist a legally valid loan agreement between two such companies, generating a legally valid liability owed by one to the other, without it being envisaged that repayment would in fact be made unless and until he required it.

98.5.    As to subparagraph (e):

98.5.1.    It is admitted that Gatiabe was dissolved in December 2014.

98.5.2.    Based on advice provided by Leo Trust in 2014 and confirmed by Mr Tribaldos in 2018, Mr Anufriev understood that under Panamanian law: (i) there was no duty on the directors to collect in debts and discharge liabilities immediately upon dissolution; and (ii) the position of the company only became final upon the completion of the company's liquidation.

98.6.    As to subparagraph (f):

98.6.1.    It is admitted that Gatiabe was reactivated in June 2018. Mr Anufriev understood that the reason for reactivating Gatiabe was that the Russian tax amnesty (as addressed in paragraph 6.4.1 above) was only available for active companies.

98.6.2.    It is denied that the allegations in this sub-paragraph (even if true) would support the inference that there was no genuine loan. Paragraph 98.4.2 is repeated.

98.6.3.    No admissions are otherwise made.

98.7.    As to subparagraph (g):

98.7.1.    It is admitted that Finco was dissolved in November 2014.

98.7.2.   It is denied that the allegations in this sub-paragraph (even if true) would support the inference that there was no genuine loan. Paragraph 98.4.2 is repeated.

98.7.3.   No admissions are otherwise made.

98.8.   As to subparagraph (h):

98.8.1.   The first sentence is addressed to what Finco "*now contends*" and is not admitted.

98.8.2.   The second sentence is not admitted. As set out below, Mr Anufriev did not produce the 2011 loan agreement or the 2016 assignment, nor did he believe that they were forgeries.

98.8.3.   As to the third and fourth sentences, Mr Anufriev did not understand that under Panamanian law the directors of a dissolved company are immediately required to discharge its liabilities. Mr Anufriev's understanding, based on his discussions with Mr Tribaldos in 2018, was as set out in paragraph 98.5.2 above.

98.8.4.   As to the fifth sentence:

(a)   Mr Tribaldos and Leo Trust liased with Morgan & Morgan in Panama to arrange for the dissolution of Finco. Further, Mr Anufriev was not told by Mr Tribaldos (and did not understand) that it was necessary for Finco to be declared bankrupt rather than dissolved. Mr Anufriev therefore understood that the dissolution of Finco was carried out in accordance with Panamanian law.

(b)   In any event the directors of Finco were nominee directors supplied by Morgan & Morgan. Consistently with the practice addressed in paragraph 6.6.6 above, Mr Anufriev understood that the nominee directors (i) would only accept instructions from Morgan & Morgan; and (ii) would follow the instructions they received and would not take further steps without instructions. Mr Anufriev did not understand the decision by Finco's nominee directors to act

upon the instructions they received to cast any doubt on the genuine nature of the liabilities arising under the documents in question.

98.8.5.   As to the final sentence, it is admitted that Finco was reactivated in August 2018. No admission is made as to Mrs Bourlakova's alleged lack of knowledge or consent and in any event it is denied (if alleged) that her knowledge or consent was required in order for Finco to be reactivated.

98.8.6.   No admissions are otherwise made.

98.9.   Subparagraphs (i)-(j) are not admitted. The Claimants' allegations are premised on the assumption that the liability recorded in the Finco/Gatiabe document would have "*wiped out the vast majority of the entire Bourlakov family fortune*" which to the best of Mr Anufriev's knowledge is incorrect. Paragraph 89.2 above is repeated.

98.10.   Subparagraph (l) is not admitted.

98.11.   As to subparagraph (m):

98.11.1.   It is admitted that all of those filings prior to 2018 of which Mr Anufriev is aware identified Mr Bourlakov as the beneficial owner of Gatiabe. Mr Anufriev did not regard these filings as inconsistent with the partnership arrangement between Messrs. Bourlakov and Kazakov in circumstances where: (a) the implementation of the partnership agreement was a matter for Messrs. Bourlakov and Kazakov to address between themselves; and (b) as set out above, prior to the meeting on 5 April 2018, Mr Anufriev was unaware of the detail and extent of Mr Kazakov's interest as a partner and was not therefore in a position to list Mr Kazakov as a beneficial owner in filings with third parties. Paragraph 59.6.2 is repeated.

98.11.2.   No admissions are otherwise made.

98.12.   Subparagraph (n) is not admitted.

98.13. As to subparagraph (o), it is denied that Mr Anufriev has produced or relied upon any forgery or sham document, and not admitted that any other person has done so.

99. Paragraph 89 is noted as a set of assertions regarding documents the Claimants intend to seek by way of early disclosure and what they expect those documents to show. These assertions are not appropriate for a statement of case and are not admitted.

100. Paragraph 90 makes no allegation against Mr Anufriev and is not admitted.

101. As to paragraphs 90A and 90B:

101.1. It is not admitted that Mrs Bourlakova is or was the holder of the shares of Gatiabe or Jovellanos or the ultimate beneficial owner of either of these companies. Mr Anufriev did not believe this to be the case and Mrs Bourlakova formerly shared this understanding. Paragraph 5.2 above is repeated.

101.2. Mr Anufriev does not claim to be the holder of these shares or the ultimate beneficial owner of these companies. In these circumstances: (a) Mr Anufriev does not advance any case (and does not admit the Claimants' case) as to the ownership of these companies; and (b) it is neither necessary nor appropriate for Mr Anufriev to plead further to the allegations in paragraphs 90A and 90B.

102. As to paragraph 90C:

102.1. It is denied that Mrs Bourlakova "*forgot*" that she had become the sole shareholder and beneficial owner of Gatiabe and Jovellanos. Paragraph 5.2.1 above is repeated.

102.2. Mr Anufriev's understanding of the position regarding the beneficial ownership and *de facto* control of Gatiabe and Jovellanos was as set out in paragraphs 27 and 34 above.

102.3. The paragraph is otherwise not admitted.

**B2.**   **Mr Kazakov's alleged ownership of assets**

103.   As to paragraph 91, the representations made by Messrs. Bourlakov and Kazakov in respect of their partnership are addressed in paragraphs 48-52 above. It is denied that he made the alleged statement in respect of the "*Bourlakov family assets*". Paragraph 11.3 above is repeated.

104.   As to paragraph 92(a):

   104.1.   The allegation that "*Mr Bourlakov has asserted that security interests have been created*" over the Black Pearl is vague and is not admitted. The Claimants have not identified, when, where or to whom this assertion was allegedly made.

   104.2.   It is admitted that there exists a security in respect of the loan recorded in the Finco/Gatiabe document, as further addressed in paragraph 107.3 below.

105.   As to paragraph 92(b):

   105.1.   The allegation in this paragraph is directed to what "*the Claimants have reason to believe*". This is not a proper form of pleading and in any event is not admitted.

   105.2.   Mr Anufriev is not aware of any security interest over La Reserve or any companies which own interests in the flat.

106.   Paragraph 93 is addressed to an unparticularised set of "*other documents*" that the Claimants allege are "*likely*" to have been entered into. This is not a proper form of pleading, is too vague to permit a specific response, and is not admitted.

107.   As to paragraph 94:

   107.1.   The allegation of sham is vague and is not admitted. The Claimants have not identified: (a) which particular documents are alleged to be shams; (b) which individuals' states of mind are alleged to be relevant for the purposes of this allegation; (c) on what basis the states of mind of those individuals are said to be attributable to Delos Global SA; or (d) what primary facts and matters are said to support the allegation that those individuals did not intend for the declaration of trust to take effect in accordance with their terms.

107.2. The allegation of forgery is vague and is not admitted. The Claimants have not identified which particular documents are alleged to be forgeries.

107.3. Without prejudice to the preceding points, the only security interest of which Mr Anufriev is aware is the security provided in respect of the Finco/Gatiabe loan by Silver Angel Yachting Limited ("**Silver Angel**"), a company incorporated in Cyprus which was at the material time and remains the registered owner of the Black Pearl. As to this:

107.3.1. Mr Bourlakov gave Mr Anufriev instructions in around December 2018 to arrange for the creation of this security. Mr Anufriev relayed these instructions to Leo Trust and PricewaterhouseCoopers Cyprus, who prepared the necessary documentation (addressed immediately below).

107.3.2. The security was created in January 2019 pursuant to the following documents:

(a) An amendment made to the Finco/Gatiabe loan agreement (addressed in paragraph 84 above) pursuant to a document entitled "*Amendment Agreement between Finco Financial Company Inc and Gatiabe Business Inc*".

(b) A debenture entered into by Silver Angel as chargor and Gatiabe as chargee.

(c) A share pledge in respect of the shares in Silver Angel entered into by Cypcoserve Limited (a company incorporated in Cyprus) as pledgor and Gatiabe as pledgee.

107.3.3. Mr Anufriev believed, in accordance with the instructions that he received from Mr Bourlakov, that this security served to secure a genuine liability owed under the Finco/Gatiabe loan agreement. Paragraph 84 above is repeated.

107.3.4. Accordingly, if (which is not admitted) the written amendment to the Finco/Gatiabe loan agreement made on 10 January 2019 is a forgery or a sham, and it is denied that Mr Anufriev believed it to be so.

76

107.4. No admissions are otherwise made.

108. As to paragraph 95:

108.1. It is admitted that Mr Anufriev assisted in the preparation of the security documents in respect of Silver Angel as set out above.

108.2. It is not admitted that there was no Kazakov partnership, and in any event it is denied that Mr Anufriev knew this to be the case. Paragraphs 55, 56 and 59 above are repeated.

108.3. It is denied that the security documents in respect of Silver Angel were a sham or that Mr Anufriev knew this to be the case. Paragraph 107.3 above is repeated.

108.4. No admissions are otherwise made.

109. Paragraph 96 makes no allegation against Mr Anufriev and is not admitted.


**C.   Alleged misappropriating or devaluing (or attempting to misappropriate or devalue) Mrs Bourlakova's alleged assets**

**C0.   The ownership of Edelweiss**

110. As to paragraph 96A:

110.1. The first sentence is admitted to the extent that Mrs Bourlakova was the sole identified beneficiary under Article 2 of the Merenguito Regulations dated 18 August 2016 until she was replaced on or around 27 April 2018 as further described below. Paragraph 28.2.3 above is repeated.

110.2. The paragraph is otherwise not admitted.

111. As to paragraph 96B:

111.1. It is admitted that Veronica did not have access to her bedroom at La Reserve: (a) between 8 March 2019 and 21 June 2021; and (b) for a further period from later in June 2021 until 20 December 2021. It is not admitted that there was any

restriction in any other period and to the best of Mr Anufriev's knowledge there was not.

111.2. The paragraph is otherwise not admitted.

112. As to paragraphs 96C to 96F:

112.1. Regarding the statement made by Mr Anufriev on 25 January 2016 that the Edelweiss Bearer Share Certificate was in a safe in Zurich, Mr Anufriev was told by Mr Bourlakov that this was the case and duly relayed this information. Mr Anufriev believed the information to be true and if (which is not admitted) it was false, he did not know that.

112.2. Regarding the allegation in paragraph 96C(c)-(d) that the Edelweiss share certificate issued to Merenguito was backdated:

112.2.1. The process of liasing with the Panamanian nominee directors of Edelweiss and obtaining the executed share certificate was carried out by Leo Trust and not Mr Anufriev, and the date of execution is therefore outside Mr Anufriev's knowledge.

112.2.2. Mr Anufriev admits exchanging with Ms Büchen the emails identified in APOC paragraph 96C(d).

112.2.3. Mr Anufriev admits that he first saw the executed share certificate in January 2016.

112.2.4. No admissions are otherwise made.

112.3. Mr Anufriev does not claim to be the shareholder or ultimate beneficial owner of Edelweiss. In these circumstances: (a) he advances no positive case as to the ownership of Edelweiss; and (b) it is neither necessary nor appropriate for him to plead further to the allegations in paragraphs 96C to 96F.

**C1.** **Alleged attempts to misappropriate or devalue H1 and/or misappropriate its assets**

*Edelweiss*

113. As to paragraph 97:

    113.1. The first sentence is admitted. Mr Bourlakov gave the instructions for this transfer which were relayed by Mr Anufriev to Leo Trust and (so far as Mr Anufriev is aware) from Leo Trust on to the directors.

    113.2. It is denied that the second sentence accurately reflects the reason for the transfer, as stated in the resolution. The reason given in the resolution was that the President of Edelweiss (who was the Chairman of the meeting on 21 August 2017) "*deemed it convenient for the beneficial owner of the company*" to have the sum of US $347 million transferred to H1. The reference to "*beneficial owner*" in this resolution was to Mr Bourlakov, and as set out above it was Mr Bourlakov who gave the instructions for this transfer.

114. As to paragraph 98:

    114.1. The first sentence is admitted. Mr Bourlakov gave the instructions for this transfer which were relayed by Mr Anufriev to Leo Trust and (so far as Mr Anufriev is aware) from Leo Trust on to the directors.

    114.2. It is denied that the second sentence accurately reflects the reason for the transfer as stated in the resolution. The reason given in the resolution was that the President of Edelweiss (who was the Chairman of the meeting on 5 September 2017) "*deemed it convenient for the beneficial owner of the company*" to have the sum of US $1.664 million transferred to H1. The reference to "*beneficial owner*" in this resolution was to Mr Bourlakov, and as set out above it was Mr Bourlakov who gave the instructions for this transfer.

115. Paragraph 99 is not admitted:

    115.1. Mr Anufriev understood that Mrs Bourlakova was holding her interest in H1 for and under the instruction of Mr Bourlakov as set out in paragraph 18 above.

115.2. Mr Anufriev believed that the issue of shares in Edelweiss to Merenguito was legally effective, as set out in paragraph 28.2.7 above.

115.3. Mr Anufriev did not understand Mrs Bourlakova to have any vested interest in the assets of Merenguito (including Edelweiss), as set out in paragraph 28 above.

116. As to paragraph 100:

116.1. The first sentence is admitted.

116.2. Regarding the second sentence:

116.2.1. Mr Anufriev applied for this line of credit because he was instructed to do so by Mr Bourlakov for the purposes of setting up a securities portfolio on a personal bank account for Mr Bourlakov at Credit Suisse. This was, and was in any case believed by Mr Anufriev to be, a lawful and proper purpose.

116.2.2. Mr Anufriev understood that the directors of H1 (and in turn, Mrs Bourlakova) would be consulted by Credit Suisse before opening this line of credit for Mr Bourlakov, because their agreement would be required for it to be secured on bank accounts in H1's name.

116.2.3. It is denied that the opening of the line of credit secured on bank accounts in H1's name "*would have allowed Mr Bourlakov to drain H1 of assets*". Had Mr Bourlakov failed to repay the loan and Credit Suisse enforced against the money in H1's accounts, H1 would have been entitled to reimbursement from Mr Bourlakov in an equivalent sum (that entitlement being an asset equivalent in value to any lost to Credit Suisse).

116.2.4. In any case, if (which is denied as set out above) Mr Bourlakov would thereby have been *"allowed… to drain H1 of assets"* as alleged, and that was his intention as alleged, Mr Anufriev did not know that.

117. As to paragraph 101:

117.1. The first sentence is admitted.

117.2. The second sentence is denied. Paragraph 116.2.1 above is repeated.

118. As to paragraph 102:

118.1. Regarding the first sentence:

118.1.1. It is admitted that Mr Anufriev, acting on Mr Bourlakov's instructions, contacted Equiom Group (the corporate service provider responsible for administering H1) requesting to change the recorded ownership structure of H1 so that Mr Bourlakov would be recorded as the sole beneficial owner. Mr Bourlakov instructed Mr Anufriev to make this change, the instructions being given in person at the family apartment at La Reserve in the presence of Mrs Bourlakova and Veronica who were therefore aware of Mr Bourlakov's intended course of action.

118.1.2. It is not admitted that this would in fact change the ultimate beneficial ownership of H1. Mr Anufriev understood that insofar as Mrs Bourlakova held assets for Mr Bourlakov it was in her capacity as a nominee for him, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit. Paragraph 5 above is repeated.

118.2. Regarding the second and third sentences:

118.2.1. It is admitted that changing the recorded ownership structure of H1 would have required the signature of Mrs Bourlakova as the person who was at that time recorded as the beneficiary of a trust over the shares in Egerson (being the company which held the shares in H1) pursuant to a declaration of trust dated 11 November 2015.

118.2.2. It is not admitted that Mrs Bourlakova was in fact the ultimate beneficial owner of H1. Paragraphs 5 and 18 above are repeated.

118.2.3. These sentences are otherwise denied. Mr Anufriev did not seek to persuade the directors of H1 to change the ownership structure but rather relayed the instructions that he had received from Mr Bourlakov.

118.3. The fourth sentence is denied, there having been no attempt by Mr Anufriev, and nor so far as he was aware Mr Bourlakov, upon whose instructions he was acting, to misappropriate H1. As set out at paragraph 18 above, Mr Anufriev's understanding was that Mr Bourlakov was the ultimate beneficial owner of H1 subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

118.4. Further and in any case, when he contacted Equiom upon Mr Bourlakov's instruction, Mr Anufriev knew, and believes that Mr Bourlakov likewise knew, that, as the corporate service provider which administered H1, Equiom would contact Mrs Bourlakova and seek her approval for the proposed change in structure. Equiom did so and Mrs Bourlakova declined to give her approval.

118.5. In the premises (and even if, contrary to his understanding, Mrs Bourlakova was the beneficial owner of H1 at the time), Mr Anufriev's request to Equiom was not, and could not have been, an attempt to misappropriate H1.

119. As to paragraph 103:

119.1. It is admitted that Mr Anufriev was present at a meeting between Mr Bourlakov and Mrs Bourlakova in Monaco on around 20 March 2018.

119.2. It is admitted that: (a) Mr Bourlakov asked Mrs Bourlakova on several occasions to transfer at Mr Bourlakov's direction the companies that had been transferred to Mrs Bourlakova as nominee for him in 2014 (including H1, Greenbay, Chasehill); and (b) Mrs Bourlakova refused to do so.

119.3. These requests were not (and Mr Anufriev did not understand them to be) for the transfer of "*beneficial ownership*" from Mrs Bourlakova to Mr Bourlakov. Rather, the premise for the Mr Bourlakov's requests (and as Mr Anufriev understood things, the position) was that Mr Bourlakov was the ultimate beneficial owner, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

119.4. Insofar as Mr Anufriev witnessed them, Mr Bourlakov's requests to Mrs Bourlakova were not made "*aggressively*". However, they were made in the

context of discussions in which each of them appeared to him to be emotional and on some occasions voices were raised.

119.5.  The paragraph is otherwise not admitted.

120.  As to paragraph 104:

120.1.  The first sentence is a summary of APOC paragraphs 135-138 to which Mr Anufriev responds in paragraphs 152-157 below. In summary it is not admitted that Mr Bourlakov attempted to misappropriate Edelweiss and denied that Mr Anufriev was aware of any such attempt.

120.2.  The second sentence is denied:

120.2.1.  As the Claimants correctly accept, Edelweiss did in fact make cash transfers to H1 in August and September 2017 (see APOC paragraphs 97-98). Mr Anufriev relayed the instructions from Mr Bourlakov to Leo Trust and Equiom for these payments to be made urgently.

120.2.2.  Mr Anufriev believed that the August and September 2017 transfers from to Edelweiss to H1 had been made by way of loan, albeit without formal documentation being produced at that stage:

(a)  A gratuitous transfer would have been inconsistent with Mr Bourlakov's established business practice of using loans as a method of moving money between companies in order to protect against the perceived risk of attack by third parties. Paragraphs 6.6.2-6.6.5 above are repeated.

(b)  Equiom Group, being the corporate service provider which provided services in respect of H1 at the material times, recorded these transfers in its ledger as shareholder loans. Mr Anufriev received a copy of this ledger on 30 April 2018 and regarded it as consistent with, and supportive of, his understanding that the transfers were not made gratuitously.

120.2.3. Mr Anufriev was then instructed by Mr Bourlakov to put in place proper documentation in respect of this loan in 2018. Mr Anufriev relayed this instruction to Mr Tribaldos and Leo Trust who arranged for the draft loan agreement to be signed by Edelweiss' directors. In the event the loan agreement was not signed by H1's directors as set out below.

120.2.4. In the circumstances, contrary to the Claimants' allegation, Mr Anufriev was not instructing Equiom to put in place a "*retrospective*" loan agreement and "*thereby to create a loan*": Mr Anufriev believed that the transfers in August and September 2017  were made by way of loan and was seeking, in accordance with Mr Bourlakov's instructions, for proper documentation to be put in place in respect of this loan.

120.3. As to the third sentence:

120.3.1. As set out in paragraph 120.2.2(b) above, the ledger received by Mr Anufriev from Equiom on 30 April 2018 showed that Equiom regarded intra-group transfers (including these transfers from Edelweiss to H1) as loans, even prior to any formal documentation being put in place.

120.3.2. Further, as set out in paragraph 6.6.5 above, Equiom had been content at all times prior to the breakdown of Mr Bourlakov and Mrs Bourlakova's relationship to assist with putting in place formal loan documentation after the event as necessary.

120.3.3. Equiom nonetheless declined to assist with putting in place the formal loan documentation in respect of the transfers from Edelweiss to H1 when requested to do so in May 2018. No admissions are made as to Equiom's reasons for declining to do so. In particular, it is not admitted that "*there had been no agreement for a loan at the time of the transfers*": as set out above, Mr Anufriev understood that the transfers were made by way of loan and that Equiom regarded them as such.

121. Paragraph 105 is admitted, save that no admission is made as to the first three words: Mr Anufriev does not now recall whether he relayed Mr Bourlakov's instructions to Mr Tribaldos and Leo Trust (who as set out above arranged for the Edelweiss Loan

Document to be signed by Edelweiss' directors) before or after Equiom had declined to assist on behalf of H1.

122. As to paragraph 106:

122.1. No admission is made as to Mr Bourlakov's alleged state of mind.

122.2. It is admitted that no loan documentation was prepared in respect of the Edelweiss loan at the time that the August and September 2017 transfers were made. It is however denied that Mr Anufriev knew that there was no loan agreement: as set out above, Mr Anufriev believed that the transfers were made by way of loan albeit that the documentation was not prepared until 2018. Paragraph 120 above is repeated.

122.3. Mr Anufriev did not receive instructions to communicate to H1 at the time of the August and September 2017 transfers that they would take effect as loans, nor did he understand that such communication was necessary in order for the transfers to take effect as loans or for Equiom to put in place formal documentation after the event as necessary (consistently with their practice as set out in paragraphs 6.6.2-6.6.5 above). To the contrary, Mr Anufriev understood that it was Mr Bourlakov's established business practice to use loans as a method of moving money between companies rather than gratuitous transfers, even in the absence of formal documentation. Paragraph 6.6 above is repeated.

123. As to paragraph 107:

123.1. The first sentence is admitted.

123.2. As to the second sentence:

123.2.1. It is denied that Mr Anufriev "*procured*" that the loan agreement be executed by Edelweiss' directors: as set out in paragraph 120.2 above, Mr Anufriev relayed instructions from Mr Bourlakov to Mr Tribaldos and Leo Trust who obtained the directors' signatures.

123.2.2. It is admitted that the Edelweiss Loan Document has not been executed by H1. No admissions are made as to their reasons for declining to do so.

123.2.3. Mr Anufriev advances no case (and does not admit the Claimants' case) as to whether the individuals acting as Edelweiss' directors did so validly. Paragraph 112.2 above is repeated.

124. As to paragraph 108:

124.1. The existence of the letter dated 4 October 2018 is admitted.

124.2. It is admitted that this letter was sent by Edelweiss on Mr Bourlakov's instructions which were conveyed by Mr Anufriev.

124.3. It is denied that the Edelweiss Loan Document was not in existence at the date of the letter. Mr Anufriev does not know why the 4 October 2018 letter refers to a loan dated 10 September 2015, but the Edelweiss Loan Document was in existence by the time that the 4 October 2018 letter was sent. In the event, Equiom and H1 declined to sign the document as set out in paragraph 121 above.

124.4. Mr Anufriev advances no case (and does not admit the Claimants' case) as to whether the individuals acting as Edelweiss' directors did so validly. Paragraph 112.3 above is repeated.

124.5. The paragraph is otherwise not admitted.

125. As to paragraph 109:

125.1. The existence of the 25 January 2019 letter is admitted.

125.2. It is admitted that this letter was sent by lawyers for Edelweiss on Mr Bourlakov's instructions. Mr Anufriev believed those lawyers to have been validly appointed and makes no admission as to the Claimants' allegation that they had not been validly appointed.

125.3. The paragraph is otherwise not admitted.

126. As to paragraph 110:

126.1. The allegation of sham is vague and not admitted. The Claimants have not identified (a) which individuals' states of mind are alleged to be relevant for the purposes of this allegation; (b) on what basis the states of mind of those

individuals are said to be attributable to the relevant companies; or (c) what primary facts and matters are said to support the allegation that those individuals did not intend for the documents to take effect in accordance with their terms.

126.2. It is not admitted that the Edelweiss Loan Document has no legal effect. Mr Anufriev believed that it recorded a genuine pre-existing loan. Paragraph 120 above is repeated.

126.3. It is denied that the "*attempt to rely*" on the Edelweiss Loan Document was dishonest:

126.3.1. As set out above, Mr Anufriev believed that the Edelweiss Loan Document recorded a genuine pre-existing loan, and therefore considered that it was lawful and proper for Edelweiss to seek to recover this debt.

126.3.2. In any event, H1 (being the debtor under the loan recorded in the Edelweiss Loan Document) was aware of all material circumstances, including in particular the fact that H1 had not itself executed the Edelweiss Loan Document.

126.3.3. Still further and in any event, Mr Anufriev understood that both H1 and Edelweiss were members of the same group (as addressed in paragraph 5.3.3 above). Mr Anufriev did not believe (still less intend) that formally documenting and seeking to obtain performance of an intra-group transaction would injure the Claimants or any other person.

126.4. The paragraph is otherwise not admitted.

127. As to paragraph 111:

127.1. It is not admitted that the Edelweiss Loan Document is a sham agreement, nor that Mr Bourlakov had the alleged strategy.

127.2. It is denied that Mr Anufriev knew that Mr Tribaldos, Leo England or Leo Trust would take any steps necessary to support the alleged sham document or the alleged strategy.

127.3. The paragraph is otherwise not admitted.

*Columbus*

128.   As to paragraph 112:

128.1. It is admitted that the documents there referred to exist and were produced on Mr Bourlakov's instructions.

128.2. The paragraph (including the vague allegation that Mr Bourlakov "*relied upon*" these documents) is otherwise not admitted.

129.   As to paragraph 113:

129.1. Regarding the first sentence, it is denied that Mrs Bourlakova gave these instructions. Mr Bourlakov gave the instructions and they were conveyed by Mr Anufriev to Credit Suisse.

129.2. The second sentence is not admitted.

129.3. The third sentence is not admitted. Mr Anufriev believed that the transfer was made pursuant to the IPEC/H1 loan agreement dated 10 September 2015 and therefore was not gratuitous.

130.   As to paragraph 114:

130.1. The first sentence is not admitted. The allegation that "*there was no intention that H1 would be under any genuine obligation to make any repayment to IPEC*" is vague. The Claimants have not identified: (a) which individuals are said to have lacked this intention; (b) on the basis of what primary facts and matters these individuals are alleged to have lacked this intention; or (c) on what basis their state of mind is to be attributed to H1. In any event Mr Anufriev believed that the IPEC/H1 loan agreement was a genuine and legally binding agreement that was intended to take effect in accordance with its terms.

130.2. Regarding the second sentence:

130.2.1. It is admitted that IPEC was dissolved in May 2016.

130.2.2. It is denied that this supports any inference that the IPEC/H1 loan agreement was not intended to be legally binding. The loan agreement is dated 10 September 2015 and therefore predates the dissolution.

130.3. Regarding the third sentence:

130.3.1. The directors of IPEC were nominee directors supplied by Morgan & Morgan. Consistently with the practice addressed in paragraph 6.6.6 above, Mr Anufriev understood that the nominee directors of IPEC (i) would only accept instructions from Morgan & Morgan; and (ii) would follow the instructions they received and would not take further steps without instructions. Accordingly, even if (which is not admitted) the directors of IPEC did not take positive steps to seek payment of this sum, that would not necessarily cast any doubt on the genuine nature of the liability recorded by the IPEC/H1 loan document. Rather, it would reflect the absence of instructions to those directors to take such positive steps.

130.3.2. As set out in paragraphs 6.6.2-6.6.5 above, Mr Bourlakov's practice was to use loans as a means of transferring money between companies under his control to protect assets against the perceived risk of attack by third parties. It would therefore be consistent with Mr Bourlakov's practice for there to exist a legally valid loan agreement between two such companies, generating a legally valid liability owed by one to the other, without it being envisaged that repayment would in fact be made unless and until he required it.

130.3.3. In any event Mr Anufriev did not understand that the directors of a dissolved company were required to collect in debts and discharge liabilities immediately upon dissolution under Panamanian law. His understanding, based on advice provided by Leo Trust in 2014 and confirmed by Mr Tribaldos in 2018, was as set out in paragraph 98.5.2 above.

130.4. Regarding the fourth and fifth sentences:

130.4.1. It is not admitted that the directors of IPEC made no attempt to seek payment of this sum from H1.

130.4.2. In any event, it is denied that this allegation (even if true) would support any inference that the IPEC/H1 loan agreement was not intended to be legally binding.

130.5. Regarding the final sentence:

130.5.1. It is admitted that IPEC was reactivated on or around 28 July 2020.

130.5.2. It is denied that the reactivation of IPEC supports any inference that the IPEC/H1 loan agreement was not intended to be legally binding.

130.5.3. It is not admitted that Mrs Bourlakova or H1 has obtained evidence that the Columbus assignment is a forgery.

131. As to paragraph 115:

131.1. Regarding the first sentence, it is not admitted that the Columbus assignment is a forgery, and in any event denied that that Mr Anufriev knew that it was a forgery.

131.2. Regarding the second sentence, it is admitted and averred that the Columbus assignment was produced in 2018 by Mr Tribaldos on instructions from Mr Bourlakov conveyed by Mr Anufriev. Mr Bourlakov's instructions were to the effect that there was a genuine legal liability under the IPEC/H1 loan agreement, but a technical deficiency due to the dissolution of IPEC. Mr Bourlakov therefore told Mr Anufriev to ask Mr Tribaldos to resolve the matter without the need to await reactivation of IPEC. Mr Tribaldos assured Mr Anufriev that he would ensure that the matter was dealt with in accordance with Panamanian law and arranged for the production of the document.

132. As to paragraph 116:

132.1. It is admitted that IPEC was dissolved in May 2016.

132.2. It is denied that IPEC was put into liquidation in December 2015.

132.3. The paragraph is otherwise not admitted. .

133.  As to paragraph 117:

    133.1.  Mr Anufriev was not aware of IPEC having entered into an assignment agreement in respect of the IPEC/H1 loan in May 2016. But it did not occur to him (and so he did not believe) that "*documents would need to be forged in order to evidence such an agreement*":

        133.1.1.  As set out above, the assignment document was created by Mr Tribaldos who assured Mr Anufriev that he was dealing with the matter consistently with Panamanian law.

        133.1.2.  As regards that matter, Mr Anufriev understood that: (i) there was a valid pre-existing liability owed by H1 to IPEC, however the status of IPEC as a dissolved company made it more difficult to enforce the liability; (ii) an assignment would not create any new liability but rather serve to ensure that there was a company in a position to assert and enforce that pre-existing liability; and (ii) all of the relevant entities (i.e. IPEC, H1 and Columbus) were members of the same group (as addressed in paragraph 5.3.3 above).

        133.1.3.  In these circumstances, and consistently with the instructions and assurances he had received as set out above, Mr Anufriev did not believe it was unlawful or inappropriate for the Columbus Assignment to transfer a valid underlying claim between companies in the same group.

    133.2.  The paragraph is otherwise not admitted.

134.  Paragraph 118 is admitted.

135.  As to paragraph 119:

    135.1.  If (which is not admitted) the Columbus assignment is a forgery or a sham, it is denied that Mr Anufriev knew it to be so.

    135.2.  The paragraph is otherwise noted as a non-exhaustive list of alleged matters upon which the Claimants intend to rely in support of their allegation that the Columbus assignment is a forgery or a sham.

135.3. Regarding subparagraph (a), it is denied that IPEC was put into liquidation in December 2015. The allegations in subparagraph (a) are therefore based on an incorrect premise and in any event are not admitted.

135.4. Insofar as the matters referred to at subparagraphs (b), and (c) are true (which is not admitted) Mr Anufriev was not aware of them at the time. In particular, if (which is not admitted) Mrs Bourlakova was in 2015 "*the effective beneficial owner of H1, Columbus and IPEC*" Mr Anufriev did not know that; he did not believe Mrs Bourlakova to be the beneficial owner of these companies at any stage and his understanding was as set out in paragraphs 18, 25 and 29 above.

135.5. Subparagraph (d) is admitted. Insofar as the Claimants intend to allege that such a resolution would be necessary in order for the Columbus assignment to be lawful and effective under Panamanian law, Mr Anufriev was not aware of that. As set out above, he was assured by Mr Tribaldos that the assignment was lawful and effective under Panamanian law.

135.6. Subparagraph (e) is not admitted.

135.7. Regarding subparagraph (f), if (which is not admitted) Mr Bourlakov and others acting on his instructions have "*a record of producing and relying upon forgeries and sham documents in the course of his dispute with Mrs Bourlakova*" it is denied (insofar as alleged) that Mr Anufriev was knowingly involved in this.

136. Paragraph 120 is noted as a set of assertions regarding documents the Claimants intend to seek by way of early disclosure and what those documents will allegedly show. These assertions are not appropriate for a statement of case and are not admitted.

## C2.  Alleged attempts to devalue Greenbay and/or misappropriate its assets

137. Paragraph 121 is admitted.

138. Paragraph 122 is admitted, save that the letter refers to the loan as granted on 23 September 2008 and not 27 September 2008 as alleged.

139. Paragraph 123 is admitted.

140. As to paragraph 124:

140.1. The first sentence is noted.

140.2. As to the second sentence, Mr Anufriev understood that at the time of this transfer IPEC and Greenbay had a common beneficial owner (namely Mr Bourlakov, subject to such interest as Mr Kazakov had as a partner, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit).

140.3. The third sentence is not admitted. Mr Anufriev was not involved in the transfer of securities from IPEC to Greenbay (formerly known as Maravan), which was made in 2007 or 2008 before he assumed his role as Director of Mr Bourlakov's Family Office. Having assumed that role, Mr Anufriev understanding was that the transfer had been made by way of loan rather than gratuitously:

140.3.1. A gratuitous transfer would have been inconsistent with Mr Bourlakov's established business practice of using loans as a method of moving money between companies in order to protect against the perceived risk of attack by third parties. Paragraphs 6.6.2-6.6.5 above are repeated.

140.3.2. Equiom Group, being the corporate service provider which provided services in respect of Greenbay at the material times, regarded this transfer of securities in its ledger as a shareholder loan. As noted above, Mr Anufriev received a copy of this ledger on 30 April 2018. He regarded it as consistent with, and supportive of, his understanding that the transfer was not made gratuitously.

141. Paragraph 125 is not admitted, save that it is denied that IPEC was put into liquidation in December 2015.

142. As to paragraph 126:

142.1. It is admitted that the document there referred to (i.e., the IPEC minutes) exists and contains the text partially quoted in the first sentence.

142.2. The paragraph is otherwise not admitted. In particular, it is not admitted that the document merely purports to be minutes of the Board of Directors of IPEC on 15 April 2016 signed by the directors referred to in the second sentence.

142.3. Mr Anufriev understands that the IPEC minutes were produced by Mr Tribaldos in 2018 on instructions from Mr Bourlakov conveyed by Mr Anufriev. Mr Tribaldos assured Mr Anufriev that he would deal with the matter in accordance with Panamanian law.

142.4. Further, Mr Anufriev understood based on his knowledge of Leo Trust's working practices that Mr Tribaldos would be working with Morgan & Morgan to produce the document, and understood that both Leo Trust and Morgan & Morgan would act in accordance with Panamanian law in so doing.

143. As to paragraph 127:

143.1. As to the first sentence, it is not admitted that the IPEC minutes are a forgery and in any event denied that Mr Anufriev was aware that they were a forgery. As set out above, Mr Anufriev did not produce the IPEC minutes and was assured by Mr Tribaldos that he would address the matter in accordance with Panamanian law.

143.2. The second sentence is not admitted.

143.3. The third sentence is not admitted. Paragraph 140.3 above is repeated.

144. As to paragraph 128, it is admitted that Mr Tribaldos produced the IPEC minutes in 2018 on instructions from Mr Bourlakov conveyed by Mr Anufriev. Paragraph 142.2 above is repeated. No admissions are otherwise made.

145. As to paragraph 129, it is admitted that IPEC was dissolved in May 2016 and denied that it had previously been put into liquidation in December 2015. No admissions are otherwise made.

146. As to paragraph 130, it is denied that Mr Anufriev knew that there was no loan between IPEC and Greenbay and no assignment between IPEC and Finco, or that documents would need to be forged to evidence such agreements:

146.1. Mr Anufriev believed that there was a loan between IPEC and Greenbay and this was confirmed by Equiom Group. Paragraph 140.3 above is repeated.

146.2. Mr Anufriev was not aware of IPEC having entered into an assignment agreement in respect of the IPEC/Greenbay loan in 2016, but it did not occur to him (and so

he did not believe) that "*documents would need to be forged in order to evidence such an agreement*":

146.2.1. As set out above, IPEC minutes were created by Mr Tribaldos who assured Mr Anufriev that he was dealing with the matter consistently with Panamanian law.

146.2.2. As regards that matter, Mr Anufriev understood that: (i) there was a valid pre-existing liability owed by Greenbay to IPEC, however the status of IPEC as a dissolved company made it more difficult to enforce the liability; (ii) an assignment would not create any new liability but rather serve to ensure that there was a company in a position to assert and enforce that pre-existing liability; and (ii) all of the relevant entities (i.e. IPEC, Greenbay and Finco) were part of the same group (as addressed in paragraph 5.3.3 above).

146.2.3. In these circumstances, and consistently with the instructions and assurances he had received as set out above, Mr Anufriev did not believe it was unlawful or inappropriate to transfer a valid underlying claim between companies in the same group.

146.3. The paragraph is otherwise not admitted.

147. As to paragraph 131:

147.1. The premise of the allegation of sham is that no loan existed between IPEC and Greenbay. Mr Anufriev does not admit that premise and believed that there was indeed such a loan. Paragraph 140.3 above is repeated.

147.2. In any event the allegation of sham is not admitted.

148. As to paragraph 132:

148.1. If (which is not admitted) the IPEC minutes are a forgery or a sham, it is denied that Mr Anufriev knew it to be so.

148.2.   The paragraph is otherwise noted as a non-exhaustive list of alleged matters upon which the Claimants intend to rely in support of their allegation that the IPEC minutes are a forgery or a sham.

148.3.   Regarding subparagraph (a):

148.3.1.   It is admitted that the IPEC minutes are signed by the individuals referred as directors of IPEC.

148.3.2.   The second sentence is denied. IPEC was not put into liquidation in December 2015.

148.3.3.   The allegations in the third and fourth sentences are therefore based on an incorrect premise and in any event are not admitted.

148.3.4.   The subparagraph is otherwise not admitted.

148.4.   Subparagraph (b) is admitted. Insofar as the Claimants intend to allege that the fact (which Mr Anufriev admits) that the IPEC minutes were created after the meeting to which they refer makes them a forgery or sham, that is denied.

148.5.   Regarding sub-paragraph (c), as to the first sentence, it is admitted that Finco was dissolved in November 2014 and not reactivated until on or around 30 August 2018. The balance of the sub-paragraph is not admitted. Insofar as the Claimants intend to allege that there were Panamanian law restrictions whereby the IPEC could not approve the transactions to which the IPEC minutes refer, Mr Anufriev was not aware of that, he having been assured of the contrary by Mr Tribaldos.

148.6.   Sub-paragraph (d) is not admitted save that it is denied that the alleged inaction on the part of Finco's directors would confirm that no assignment occurred.

148.7.   Regarding subparagraph (e):

148.7.1.   The first sentence is admitted in respect of Maravan. As set out in paragraph 19 above, Mr Anufriev's understanding was that the transfer of Maravan (indirectly) to Mrs Bourlakova did not affect its ultimate beneficial ownership, which remained with Mr Bourlakov subject to Mr

Kazakov's interest under the partnership, which was a matter for Messrs. Bourlakov and Kazakov to implement as they saw fit.

148.7.2. The first sentence is otherwise not admitted. Mr Anufriev understood the transfers of Finco and IPEC made in around 2014 were to the Panamanian foundation Tribatline, in which Mrs Bourlakova had no vested interest, as set out in paragraphs 26 and 29 above.

148.7.3. The second sentence is not admitted. Insofar as the sentence proceeds on the premise that Mrs Bourlakova was the ultimate beneficial owner of Maravan, Finco, and IPEC, that was not Mr Anufriev's understanding.

148.7.4. The third sentence is not admitted save that it is denied (insofar as the Claimants intend to allege this) that Mr Anufriev was knowingly involved in the alleged forgery or its alleged purpose.

148.8. Subparagraph (f) is not admitted.

148.9. Regarding subparagraph (g.1), insofar as the Cyprus AP documents include the emails referred to in the first sentence, Mr Anufriev will refer to them at trial for their full terms rather than the Claimants' summaries in the second and third sentences. The fourth sentence is not admitted.

148.10.                                    Regarding subparagraph (g), if (which is not admitted) Mr Bourlakov and others acting on his instructions have "*a record of producing and relying upon forgeries and sham documents in the course of his dispute with Mrs Bourlakova*" it is denied (insofar as alleged) that Mr Anufriev was knowingly involved in this.

149. Paragraph 133 is noted as a set of assertions regarding documents the Claimants intend to seek by way of early disclosure and what those documents will allegedly show. These assertions are not appropriate for a statement of case and are not admitted.

**C3.   The dissolution of Tribatline / Merenguito and alleged misappropriation of Columbus and Edelweiss**

150. As to paragraph 134:

150.1. The Foundation Charters for each of Tribatline, Merenguito and Nuptials contains an arbitration clause in the following terms (at clause 19):

*"Any type of conflict which may arise under the foundation charter must be resolved by a court of arbitration made up of three people. The awards of the arbitration court cannot be appealed against. Each one of the litigating parties must chose an arbitrator, and between the two of them a third arbitrator shall be chosen. The arbitrators will jointly decide the jurisdiction or rules of procedure that will govern their office. If an agreement cannot be reached within thirty days as to the third arbitrator or the rules of procedure which will be used, the regulations of the INTERNATIONAL CHAMBER OF COMMERCE (I.C.C.) will apply and they in turn will assign the third arbitrator upon request of one of the litigating parties. Once the court of arbitration is established it can also resolve other conflicts between the litigating parties arising out of the foundation charter, as long as the original hearing is still in process before said court. The court of arbitration's decision is final. The court of arbitration will determine the expenses of the procedure."*

150.2. Accordingly, in accordance with the judgment of the Honourable Mr Justice Trower in these proceedings dated 26 May 2022 (neutral citation [2022] EWHC 1269 (Ch) at paragraph 393), Mrs Bourlakova cannot pursue any claim against Mr Anufriev in these proceedings in relation to these Foundations save in respect of actions and omissions that were committed solely in a capacity other than as their Protector.

151. Without prejudice to the foregoing, if and to the extent necessary, Mr Anufriev will rely on the foundation regulations for their full terms and effect at trial. Paragraph 134 does not provide an accurate or complete statement of the material elements. Under each set of regulations:

151.1. Article 2 provides that "*subject to the provisions of these Regulations*" the Foundation Council shall administer the Foundation for the benefit of all or any of the identified "*Beneficiaries*".

151.2. Article 3.1 provides that the Foundation Council is entitled to name "*at any time and in its sole unfettered and absolute discretion*" any individual or legal entity (or class of such persons) as members of the "*Class of Beneficiaries*".

151.3.   Article 3.2 provides that the Foundation Council may "*(i)n the same way*" (i.e. in their sole, unfettered and absolute discretion) declare that any "*Beneficiary*" shall cease to be a member of the "*Class of Beneficiaries*".

151.4.   Article 3.3 provides that any changes to the "*Class of Beneficiaries*" shall only be implemented with the prior consultation of the Protector. This consultation provision does not displace or detract from the sole, unfettered and absolute discretion of the Foundation Council as expressly set out in Articles 3.1 and 3.2.

151.5.   Article 4 provides that the Foundation Council has "*sole, unfettered and absolute discretion*" to decide on:

151.5.1.   "*the manner and extent of a benefit, if any, and the granting of a benefit or other right, if any*" (Article 4.1);

151.5.2.   "*any cancellation of a granted benefit, or the granting of a benefit or other right*" (Article 4.2).

151.6.   Article 4.3 provides that "*(n)o present or future member of the Class of Beneficiaries shall have any claim whatsoever to be named as Beneficiary of the Foundation or to be granted a benefit or other right*".

151.7.   Article 4.4 provides that "*(n)o decision of the Foundation Council in the exercise of its sole, unfettered and absolute discretion shall be open to challenge by any person including, without limitation, any beneficiary or excluded beneficiary or any person purporting to have an interest actual or contingent in the Foundation or its assets*".

151.8.   Article 5 provides that "*(n)o Beneficiary shall have any automatic right of access to information about the Foundation or its financail or other affairs*".

151.9.   Article 8.1 provides that the responsibilities of the Protector include (among others) to "*ensure compliance by the Foundation Council with the purposes of the Foundation and to safeguard the rights and interests of the Beneficiaries*". This

does not displace or detract from the absolute discretion of the Foundation Council to remove named members of the class of beneficiaries, as set out above.

151.10.    Article 8.2 provides that "*the Protector shall exercise his powers in the best interests of the Foundation and for the best interest of the Beneficiaries taking into consideration the wishes of the Settlor*".

151.11.    Article 9 provides that the Protector is entitled to serve notice in writing and thereby be discharged as Protector.

151.12.    Article 11 provides that the Regulations shall be governed by and construed in accordance with the laws of the Republic of Panama.

151.13.    In the premises:

151.13.1.    The identification of a person as a beneficiary under Article 2 does not confer any vested interest and remains subject to the absolute discretion of the Foundation Council as to whether and how to confer any right or benefit pursuant to Article 4.

151.13.2.    It is denied (if alleged) that the Foundation Council was required to inform the beneficiary or beneficiaries identified in Article 2 (or seek their consent) before exercising the powers set out in Article 3.1 or 3.2 of the regulations. In any event Mr Anufriev did not understand there to be any such requirement.

151.13.3.    It is denied (if alleged) that the Protector was required to inform the beneficiary or beneficiaries identified in Article 2 (or seek their consent) before serving notice of resignation pursuant to Article 9. In any event Mr Anufriev did not understand there to be any such requirement.

152. As to paragraph 135:

    152.1. It is admitted that under the terms of the Regulations of Tribatline dated 13 June 2016 and the Regulations of Merenguito and Nuptials dated 18 August 2016, Mrs Bourlakova was the only person identified as a beneficiary under Article 2. This did not confer any vested interest on Mrs Bourlakova, nor did Mr Anufriev understand Mrs Bourlakova to have any such interest. Paragraph 151.13 above is repeated.

    152.2. It is admitted that Mrs Bourlakova ceased to be identified as a beneficiary under Article 2 of each set of Regulations shortly before the dissolution of the Foundations on about 25 May 2018, by virtue of resolutions passed by the Foundation Councils to amend the Foundation Regulations and thereby replace her. Mr Anufriev was not a member of the Foundation Councils and, as set out below, he had stepped down as Protector before Mrs Bourlakova was replaced. The date on which the Foundation Councils passed these resolutions is therefore outside of his knowledge. Mr Anufriev understood that the decisions of the Foundation Councils were taken lawfully in accordance with the applicable Foundation Regulations.

    152.3. No admissions are otherwise made.

153. Paragraph 136 comprises allegations by the Claimants regarding the "*events leading up to the dissolutions*" of Tribatline, Merenguito and Nuptials. It is denied that Mrs Bourlakova is entitled to pursue any claim against Mr Anufriev in respect of these matters. Paragraph 150.2 above is repeated. Without prejudice to that point:

    153.1. Subparagraph (a) is admitted save that:

        153.1.1. No admission is made as to whether or not Mrs Bourlakova and Veronica were informed that Mr Anufriev had stood down as Protector.

153.1.2. In any event, Mr Anufriev was not (and did not believe himself to be) required to inform Mrs Bourlakova or Veronica that he had stood down. Paragraph 151.13 is repeated.

153.2. As to subparagraphs (a.1), (a.3) and (a.7), it is admitted and averred that Mrs Kazakova was appointed as protector of Tribatline, Merenguito and Nuptials and accepted her appointment by letters dated 27 April 2018 (and signed by Mrs Kazakova on that date).

153.3. As to subparagraphs (a.2), (a.4) and (a.8), it is admitted that the Foundation Councils passed the identified resolutions. Mr Anufriev will rely on those resolutions for their full terms and effect at trial. The date on which these resolutions were passed is outside of Mr Anufriev's knowledge: as noted above, he had resigned as Protector on 27 April 2018.

153.4. As to subparagraph (a.5):

153.4.1. The first sentence is admitted, save that Mr Bourlakov was the actual (and not merely purported) founder of each of these Foundations.

153.4.2. The second two sentences are not admitted.

153.5. As to paragraph (a.6):

153.5.1. The existence of the Mandate Agreements is admitted. Mr Anufriev will rely on these for their full terms and effect at trial.

153.5.2. The final sentence is not admitted. Mr Anufriev did not understand the Mandate Agreements to indicate that any interest of Mr Kazakov was as a nominee for Mr Bourlakov: as set out in paragraph 4 above, Mr Anufriev understood that there was a partnership arrangement between Messrs. Bourlakov and Kazakov and that it was a matter for them to implement as they saw fit. Nor did Mr Anufriev believe there to be any misappropriation or attempted misappropriation of Edelweiss, Columbus or Hydrangea: as set out in paragraph 152 above, he understood that the

decisions of the Foundation Councils were taken lawfully in accordance with the applicable Foundation Regulations.

153.6.  As to subparagraph (b):

153.6.1.  The first sentence is admitted, save that the characterisation of Columbus as the "*principal*" asset of Tribatline prior to its dissolution is too vague to allow for a specific response and in any event not admitted.

153.6.2.  As to the second sentence, it is admitted that Edelweiss was in fact transferred to Merenguito and onto Hemaren. Mr Anufriev advances no case (and does not admit the Claimants' case) as to the legal validity of these transfers as he does not claim to be the owner of Edelweiss. Paragraph 112.3 above is repeated.

153.6.3.  The third sentence is not admitted.

153.6.4.  As to the final sentence:

(a)   Mr Anufriev advances no case (and makes no admissions regarding the Claimants' case) as to the ownership of Edelweiss or the legal validity of its transfer.

(b)   This sentence is otherwise admitted.

153.7.  As to subparagraph (c):

153.7.1.  It is admitted that the shares in Hydrangea were transferred to Cantucci.

153.7.2.  It is admitted that Mr Bourlakov was the sole named beneficiary of Cantucci until his death.

154.   As to paragraph 136A:

154.1. The first two sentences repeat APOC paragraph 19. Mr Anufriev's response is as set out in paragraph 26 above.

154.2. The third and fourth sentences are not admitted.

155. As to paragraph 136B:

155.1. It is admitted that IPEC issued a share certificate to Anahill as alleged. Is is not admitted (if alleged) that the issuance of this share certificate was ineffective.

155.2. It is admitted that Mr Bourlakov was the sole named beneficiary of Anahill until his death.

156. As to paragraph 137:

156.1. Mr Anufriev's understanding of the position regarding the *de facto* control of Edelweiss, Columbus, Finco, IPEC and Hydrangea was as set out in paragraphs 25, 26, 28, 29 and 37 above.

156.2. It is admitted that Mr Bourlakov was an authorised sole signatory on Edelweiss' UBS bank account. Mr Kazakov was also an authorised sole signatory from 2018 onwards.

156.3. No admissions are otherwise made.

157. As to paragraph 138:

157.1. As to the first sentence, it is admitted that under the Wlamil Regulations dated 25 July 2019, Mr Kazakov is the sole named beneficiary.

157.2. As to the second sentence, paragraph 30.4 above is repeated.

157.3. The third sentence is admitted, save that Mr Kazakov was added as an identified beneficiary of Hemaren in June 2018 (not 2019).

157.4.  As to the fourth sentence, paragraph 30.4 above is repeated.

158.  Paragraph 139 is noted.

<u>Alleged involvement of Mrs Kazakova and Mr Kazakov</u>

159.  Paragraphs 140 to 143 make no allegations against Mr Anufriev and are not admitted.

<u>Alleged involvement of Mr Tribaldos, Leo England and Leo Trust</u>

160.  As to paragraph 143A:

160.1.  The Claimants allege that a strategy for "*misappropriating*" or "*attempting to misappropriate*" Columbus, Hydrangea, Edelweiss and Finco was discussed, developed and agreed by Mr Anufriev (among others) at some point between February 2018 and 27 April 2018. Mr Anufriev was the Protector of Tribatline and Merenguito during this period and this allegation is a matter which the Mrs Bourlakova is not entitled to pursue in the present proceedings by virtue of the arbitration clauses pleaded in paragraph 150 above.

160.2.  Without prejudice to that point, it is denied that Mr Anufriev was aware of (or involved in) any such strategy.

160.3.  The balance of the paragraph does not make any allegations against Mr Anufriev and is not admitted.

<u>Alleged involvement of Mr Anufriev</u>

161.  As to paragraph 144:

161.1.  Regarding the first sentence, it is denied that Mr Anufriev "*specifically sought to obtain*" Panamanian foundations which had been incorporated in 2003. The proposal to use foundations incorporated some years before was made by Mr Bourlakov and Mr Anufriev conveyed those instructions to Mr Tribaldos and Leo

Trust. Veronica was herself present at the first meetings with Leo Trust in Zurich in 2014 at which this proposal was made.

161.2. As to the second sentence:

161.2.1. As set out immediately above, the request to use foundations incorporated some years before was made by Mr Bourlakov. It is not admitted that Mr Bourlakov had no good reason for his request and, as noted above, Veronica was herself present at the meetings when this proposal was first made.

161.2.2. The allegation regarding "*likely*" motivation is not a proper form of pleading and in any event it is denied that Mr Anufriev had the alleged motivation. Mr Anufriev did not understand that the purpose of using vintage foundations was to support any "*contention*" regarding Mr Kazakov's rights. Further and in any event, Mr Anufriev believed (and continues to believe) that there was a partnership between Messrs. Bourlakov and Kazakov. Paragraph 4 above is repeated.

162. As to paragraph 144A:

162.1. It is denied that Mr Anufriev was "*instrumental*" in "*procuring*" the steps identified in APOC 136(a.1)-(a.8):

162.1.1. Mr Anufriev himself stood down as protector of Tribatline, Merenguito and Nuptials as set out in paragraph 153.1 above. The allegation that Mr Anufriev procured his own resignation is not understood.

162.1.2. Mr Anufriev did not procure the decision by Mrs Kazakova to accept her appointment as the new protector, or the decisions of the Foundation Councils to pass the amendments or resolutions addressed in paragraphs 153.2 and 153.3 above.

162.1.3. Mr Anufriev did not procure Mr Bourlakov's letters of wishes or the Mandate Agreements that he entered into with Leo Trust as addressed in paragraphs 153.4 and 153.5 above.

162.1.4. Mr Anufriev did not procure the share transfers made by the foundations in accordance with their resolutions. To the extent that Mr Anufriev played any role in relation to these transfers, it was by relaying instructions from Mr Bourlakov to Mr Tribaldos and/or Leo Trust and requesting updates from Mr Tribaldos and/or Leo Trust to follow up on the implementation of these instructions.

162.2. As to the Claimants' characterisation of Mr Anufriev as "*Mr Bourlakov's right hand man*", paragraph 3 above is repeated. In any event it is denied that Mr Anufriev's role supports the alleged inference.

162.3. The allegation that Mr Anufriev was "*or is likely to have*" been "*actively involved in implementing*" Mr Bourlakov's instructions in relation to Anahill, Hemaren, Edelweiss, Finco, IPEC and Columbus is not a proper form of pleading and is in any event too vague to allow for a specific response.

162.4. As to the matters upon which the Claimants say they intend to rely at subparagraphs (a)-(c), it is denied that any of these particularises or supports the allegations in paragraph 144A. Without prejudice to that:

162.4.1. It is admitted that notifications dated 1 June 2018 were filed stating that Mr Anufriev had custody of accounting records and supporting documents for Cantucci, Merenguito, Hemaren and Anahill. The relevant records were at that time in the course of being prepared.

162.4.2. It is admitted that Mr Anufriev accepted appointments as the protector of Cantucci, Anahill and Hemaren on or around 23 January 2019.

162.4.3. The alleged involvement in procuring the execution of the Edelweiss Loan Document is denied. Paragraphs 120-127 above are repeated.

163.   As to paragraph 144B:

    163.1.   Paragraph 150 above is repeated. The Claimants have not identified any primary fact or matter to support their allegation of knowledge on the part of Mr Anufriev, still less one deriving solely from a role other than as Protector of Tribatline, Merenguito, and/or Nuptials.

    163.2.   Without prejudice to that point, it is not admitted that Mr Bourlakov had the alleged strategy to "*misappropriate",* and in any event denied that Mr Anufriev was aware of the alleged strategy.

<u>Alleged effect of the above</u>

164.   As to paragraph 145:

    164.1.   It is not admitted that Mrs Bourlakova or Veronica was the beneficial owner of Columbus, Finco, Hydrangea, IPEC or Edelweiss at any stage. Mr Anufriev did not understand Mrs Bourlakova or Veronica to be the beneficial owner of any of these companies; his understanding was as set out in paragraphs 25-26, 28-29 and 37 above. Paragraph 5 above is repeated.

    164.2.   If (which is not admitted) Mr Bourlakov "*appropriated"* or "*attempted to misappropriate"* these companies from Mrs Bourlakova or Veronica, Mr Anufriev was not aware of that.

    164.3.   As to the allegation that Mr Anufriev provided "*assistance"* in Mr Bourlakov's alleged (but not admitted) appropriation and attempted misappropriation of these companies, it is denied that Mr Anufriev knowingly did so.

    164.4.   The paragraph is otherwise not admitted.

165.   As to paragraph 146.

    165.1.   The reference in the chapeau to "*that time*" is vague.

165.2. Regarding subparagraph (a):

165.2.1. Mr Bourlakov explained to Mr Anufriev in around May 2018 that Edelweiss had net assets of approximately USD $600 million due to substantial credit lines and options pending. The allegation that those assets are "*likely"* to be worth approximately USD $1 billion today is not a proper form of pleading and in any event is not admitted.

165.2.2. As to the final sentence of subparagraph (a), Mr Anufriev understood that the Edelweiss Loan Document recorded a legally binding agreement, but that it was not anticipated that this loan would be repaid save where Mr Bourlakov required this (for example, in circumstances of necessity or emergency), as set out in paragraph 6.6.3 above. No admission is therefore made as to its impact on the value of Edelweiss.

165.3. Regarding subparagraph (b):

165.3.1. The first sentence is not admitted.

165.3.2. As to the second sentence, Mr Anufriev understood that the Columbus assignment was "*genuine and enforceable*", but that it was not anticipated that the debt owed by H1 would be repaid save where Mr Bourlakov required this (for example, in circumstances of necessity or emergency), as set out in paragraph 6.6.3 above. No admission is therefore made as to its impact on the value of Edelweiss.

165.4. As to subparagraphs (c) and (d), Mr Anufriev understood that these agreements and assignments were valid, but that it was not anticipated that the debts would be repaid save where Mr Bourlakov required this (for example, in circumstances of necessity or emergency), as set out in paragraph 6.6.3 above. No admission is therefore made as to the alleged value of the assets of Finco and IPEC.

165.5. Subparagraph (e) is not admitted. Mr Anufriev understood that in 2018 Hydrangea did not have any "*net*" assets because its assets were outweighed by its liabilities.

166.  As to paragraph 146A:

    166.1.  As to the first sentence:

        166.1.1.  No admission is made as to the information currently available to the Claimants.

        166.1.2.  It is denied that any sums have been misappropriated by or on instructions from Mr Anufriev.

    166.2.  As to the second sentence, it is admitted that there were transfers between different accounts in Edelweiss' name. The particulars and alleged values of those transfers are not admitted.

    166.3.  As to the third sentence, it is denied that Columbus is accurately characterised as a "*third party*". Mr Anufriev understood that Edelweiss and Columbus were members of the same group as addressed in paragraph 5.3.3 above. In any event the alleged value of the transfers made to Columbus is not admitted.

    166.4.  The fourth sentence is not admitted.

    166.5.  As to the fifth sentence, if (which is not admitted) any assets have been misappropriated Mr Anufriev was not aware of that.

    166.6.  No admissions are otherwise made.

## C4.   Alleged misappropriation of Edelweiss' assets through the alleged use of forged documents

167.  As to paragraph 147:

    167.1.  No admission is made as to which documents the Claimants have seen and their understanding.

167.2. Regarding subparagraph (a), the existence of the Finco/Edelweiss document is admitted. It is admitted and averred that Mr Tribaldos produced this document on instructions from Mr Bourlakov relayed by Mr Anufriev in around 2019.

167.3. Subparagraph (b) is not admitted. It is denied (if alleged) that Edelweiss made any payment to Finco in reliance on the Finco/Edelweiss document.

167.4. Subparagraph (c) is not admitted.

168. Paragraph 148 is not admitted.

169. Paragraph 149 is not admitted.

170. As to paragraph 150:

170.1. It is not admitted that the Finco/Edelweiss document is a forgery, and in any event denied that Mr Anufriev knew that it was a forgery:

170.1.1. Mr Tribaldos prepared the Finco/Edelweiss document and assured Mr Anufriev that he was acting accordance with Panamanian law.

170.1.2. As the Claimants correctly accept, there was in fact a transfer of assets from Finco to Edelweiss. It is denied (if alleged) that Mr Anufriev understood this transfer to be gratuitous. Such a gratuitous transfer would have been inconsistent with Mr Bourlakov's established business practice of using loans as a method of moving money between companies in order to protect against the perceived risk of attack by third parties. Paragraphs 6.6.2-6.6.5 above are repeated.

170.1.3. Mr Anufriev was informed by Mr Bourlakov and believed that the Finco/Edelweiss document served to record a genuine pre-existing transaction between Finco and Edelweiss which had taken place in 2011 (before Mr Anufriev began his role as Director of Mr Bourlakov's Family Office).

170.2. The Claimants allege that Finco and Edelweiss had "*the same effective beneficial owner*" at the time of the transfer from Finco to Edelweiss in 2011. While Mr Anufriev did not take up his role as Director of Mr Bourlakov's Family Office

until 2012 and has no direct knowledge of any prior period, this description is consistent with Mr Anufriev's understanding as set out in paragraphs 26 and 28 above, namely that the beneficial owner at this time was Mr Bourlakov (subject to such interest as he had agreed with Mr Kazakov, which was a matter for Mr Bourlakov and Mr Kazakov to implement as they saw fit). Mr Anufriev did not believe it was unlawful or inappropriate for the Finco/Edelweiss document to formally record what was an intra-group transaction.

171. As to paragraph 151:

171.1. It is admitted and averred that the Finco/Edelweiss document was produced in around 2019 by Mr Tribaldos and Leo Trust on instructions from Mr Bourlakov which were relayed by Mr Anufriev.

171.2. The paragraph is otherwise not admitted.

172. Paragraph 152 is not admitted.

173. As to paragraph 153:

173.1. It is denied that Mr Anufriev was aware that there was no loan between Finco and Edelweiss or that any documents would need to be forged in order to evidence such an agreement. Paragraph 170 above is repeated.

173.2. The paragraph is otherwise not admitted.

174. As to paragraph 154:

174.1. The allegation of sham is vague. The Claimants have not identified (a) which individuals' states of mind are alleged to be relevant for the purposes of this allegation; (b) on what basis the states of mind of those individuals are said to be attributable to Finco and Edelweiss; or (c) what primary facts and matters are said to support the allegation that those individuals did not intend for the Finco/Edelweiss document to take effect in accordance with its terms.

174.2. The paragraph is not admitted.

175. Paragraph 155 is not admitted.

176. As to paragraph 156:

176.1. As to sub-paragraph (a):

176.1.1. It is admitted that Finco was dissolved in November 2014 and reactivated on 30 August 2018.

176.1.2. Mr Anufriev did not understand that the directors of a dissolved company are required under Panamanian law to collect in debts and discharge liabilities immediately upon dissolution. His understanding, based on advice provided by Leo Trust in 2014 and confirmed by Mr Tribaldos in 2018, was as set out in paragraph 98.5.2 above.

176.1.3. No admissions are otherwise made.

176.2. Subparagraph (b) is not admitted.

176.3. As to subparagraph (c), if (which is not admitted) the Finco/Gatiabe or Finco/Edelweiss documents were forged, including with the alleged objective, it is denied that Mr Anufriev knew that this was the case.

176.4. Subparagraph (d) is not admitted, save that it is denied that Mr Anufriev has produced or relied upon any forged or sham documents.

176.5. As to subparagraph (e):

176.5.1. Mr Anufriev will rely as necessary on the Cyprus AP documents for their full terms and effect;

176.5.2. It is denied that the reference to a "*Resolution for the Transfer of Assets*" in 2011, and/or the existence of the tripartite agreement between Finco, Edelweiss and UBS dated 17 March 2011, is inconsistent with the transfer between Finco and Edelweiss being made by way of loan.

177. Paragraph 157 is noted as an assertion regarding documents the Claimants intend to seek by way of early disclosure and what those documents will allegedly show. These assertions are not appropriate for a statement of case and are not admitted.

**D.**    **Alleged destruction of documents allegedly evidencing A-C above**

178.  Paragraphs 158-163D make no allegation against Mr Anufriev and are not admitted.

**E.**    **Mr Schwarz's alleged concealment of evidence of wrongdoing**

179.  Paragraphs 164-166 make no allegation against Mr Anufriev and are not admitted.

**Choice of Law**

180.  Paragraph 167 is admitted as a summary of Articles 2 and 4 of the Rome II Regulation (the "**RIIR**") to which Mr Anufriev will refer at trial for its full terms and effects.

181.  As to paragraph 168:

181.1.  No admission is made as to "*the Bourlakov family's asset holdings*". Paragraph 11.3 above is repeated.

181.2.  The balance of the paragraph is noted.

**Claims allegedly arising out of Sections A and B above**

182.  As to the law applicable to the claims allegedly arising from APOC Sections A and B:

182.1.  For the purposes of Article 4(1) RIIR, the relevant damage occurred (or the likely damage would have occurred) in Monaco. The alleged purpose of the alleged misrepresentations was: (i) to pressurise Mrs Bourlakova into accepting a reduced sum in settlement of her divorce with Mr Bourlakov; and (ii) to pressurise Veronica into transferring to Mr Bourlakov assets that had allegedly been given to her (and/or allowing those assets to be used as part of the divorce settlement). Mrs Bourlakova and Mr Bourlakov were habitually resident in Monaco at all material times and the rights arising out of their divorce were likely to be enforced by Mrs Bourlakova in Monaco (as she has in fact sought to do).

182.2.  Further or alternatively, it is clear from all the circumstances that the alleged tort/delict is manifestly more closely connected with Monaco than England for the purposes of Article 4(3) of the Rome II Regulation:

182.2.1. The claims by Mrs Bourlakova against Mr Bourlakov are governed by Monegasque law under Article 4(2) of the Rome II Regulation by virtue of their common habitual residence in Monaco. The claims against Mr Anufriev (and the other defendants) are very closely connected with the claim against Mr Bourlakov and should also be governed by Monegasque law.

182.2.2. Insofar as the Claimants have articulated any claim against Mr Anufriev that is not covered by the applicable arbitration clauses (addressed in paragraph 150 above), it concerns his performance of his role as Director of Mr Bourlakov's Family Office which was established and operated in Monaco.

182.2.3. The matters identified in paragraphs 182.1 above constitute further significant connecting factors with Monaco.

182.2.4. The connection to England is limited and amounts to no more than the use of England as the location for some (but not all) of the negotiations out of which the claims allegedly arise.

183. In the circumstances:

183.1. Paragraph 169 is denied:

183.1.1. The claims are not governed by English law but by Monegasque law for the reasons set out above.

183.1.2. It is in any event denied that fees incurred by lawyers or other professionals amount to relevant damage, or that the location of the professionals that Mrs Bourlakova has chosen to instruct amounts to the place in which damage occurred (or was likely to occur), for the purposes of Article 4 RIIR.

183.1.3. Even on the Claimants' case, the claims would not be exclusively governed by English law. Mrs Bourlakova claims to have paid lawyers and other professionals in multiple countries (APOC paragraph 185). If (which is denied) the receipt of such professional fees can constitute

115

relevant damage for the purposes of Article 4 RIIR, the Claimants' claims would be governed by different laws in respect of the fees received in each relevant country.

183.2. Paragraph 170 is noted as a summary of Mrs Bourlakova's alternative contention that Monegasque law governs the claims said to arise from APOC Sections A and B. Mr Anufriev agrees with that contention for the reasons set out above.

184. As to paragraph 171:

184.1. The first sentence is admitted.

184.2. As to the second sentence, it is denied that Mr Anufriev's actions involved fault under Article 1229 of the Monegasque Civil Code.

184.3. As to the third sentence, Mr Anufriev responds below to the allegations (all of which are denied) that he has committed offences under the Monegasque Penal Code.

184.4. Paragraph 171 (and Schedule 1 to the APOC) are otherwise not admitted.

185. Paragraph 172 is denied insofar as it concerns Mr Anufriev and otherwise not admitted. In particular:

185.1. The applicable law is Monegasque law (and not English law) for the reasons set out above. There is no concept of "*unlawful means conspiracy*" under Monegasque law (which is the applicable law for the reasons set out above).

185.2. In any event:

185.2.1. It is denied that Mr Anufriev entered into an agreement or combination as alleged.

185.2.2. It is denied that Mr Anufriev had the knowledge or intention alleged.

185.2.3. It is denied that Mr Anufriev created the identified documents: his role in conveying instructions in respect of those documents was as set out in paragraphs 74-76, 84-98 and 104-108 above.

185.2.4. It is in any event denied that the mere creation of the identified documents is capable of constituting an unlawful means.

185.2.5. In the circumstances, it is denied that Mr Anufriev is liable for unlawful means conspiracy.

185.3. The balance of paragraph 172 does not make allegations against Mr Anufriev and is not admitted.

186. Paragraph 172A is denied insofar as it concerns Mr Anufriev and otherwise not admitted. In particular:

186.1. It is denied that Mr Anufriev practised deceit as alleged or at all.

186.2. It is denied that Mr Anufriev acted pursuant to (or was otherwise aware of) a common design that fraudulent misrepresentations should be made to Mrs Bourlakova and Veronica.

186.3. The balance of paragraph 172A is not admitted.

187. Paragraphs 173-179 make no allegation against Mr Anufriev and are not admitted.

188. Paragraph 180 is denied:

188.1. The applicable law is Monegasque law (and not English law) for the reasons set out above. There is no tort of "*deceit*" under Monegasque law.

188.2. It is in any event denied that Mr Anufriev made (or joined in) the alleged false representations.

188.3. It is denied that the Claimants have pleaded a viable cause of action in deceit in any event: on their own case, the alleged deceit was unsuccessful (see APOC paragraph 74) and accordingly the Claimants were not induced by and/or have not relied upon the alleged misrepresentations.

188.4. It is denied that "*legal or other fees*" (APOC paragraph 74) or "*investigation and legal costs*" (APOC paragraph 185) are recoverable as damages under: (a) Monegasque law; or (b) English law (if applicable), at least to the extent that they were incurred in connection with the present proceedings.

189.  As to paragraph 181:

189.1. It is denied that Mr Anufriev is liable under Articles 1229 and/or 1231 of the Mongasque Civil Code as alleged or at all.

189.2. As to the alleged false representations:

189.2.1. It is denied that Mr Anufriev made any of the alleged representations.

189.2.2. If (which is not admitted) the alleged representations were made and were false, it is denied that Mr Anufriev knew them to be so.

189.2.3. It is denied that Mr Anufriev co-operated with the alleged false representations, of which (if they existed) he was unaware.

189.3. As to the alleged forged and/or sham documents:

189.3.1. It is denied that Mr Anufriev gave instructions for the creation of the identified documents: his role in relaying instructions from Mr Bourlakov was as set out in paragraphs 74-76, 84-98 and 104-108 above.

189.3.2. It is not admitted that these documents were forgeries or shams, and in any event denied that Mr Anufriev knew them to be so.

189.3.3. It is not admitted (if alleged) that these documents were used to cause harm to Mrs Bourlakova, and in any event denied that Mr Anufriev knew that they would be so used.

189.4. As to the 20 December 2018 declaration:

189.4.1. It is denied that Mr Anufriev executed this document. His limited involvement in respect of this document was as set out in paragraph 74 above.

189.4.2. It is not admitted that the 20 December declaration is false, and in any event denied that Mr Anufriev knew it to be so.

189.4.3. In the circumstances, it is denied that Mr Anufriev acted under false pretences, used fraudulent tactics or attempted to defraud Mrs Bourlakova as alleged or at all.

190. Paragraphs 182-184 make no allegation against Mr Anufriev and are not admitted.

191. As to paragraph 185:

191.1. The costs allegedly incurred by Mrs Bourlakova (and the purpose for which they were allegedly incurred) are not admitted.

191.2. The allegation that Mrs Bourlakova has incurred costs "*otherwise as a result of the matters set out above*" is vague and not admitted.

191.3. In any event:

191.3.1. It is denied that Mr Anufriev has committed any of the alleged "*wrongful acts*" or that the alleged costs are attributable to such acts.

191.3.2. It is denied that "*investigation and legal costs*" are recoverable as damages under any of the causes of action asserted by the Claimants under Monegasque or English law (in the latter case, at least to the extent they arise in connection with the present proceedings).

192. As to paragraph 186:

192.1. The matters in respect of which the Claimants seek declarations are outside Mr Anufriev's knowledge, and his knowledge and belief in respect of those matters was as set out in paragraphs 74-76, 84-98 and 104-108 above.

192.2. In any event it is denied that declaratory relief is appropriate as against Mr Anufriev where he is not (nor is he even alleged to be) a party to the Kazakov partnership or any of the transactions recorded in the identified documents and he asserts no interest in the assets the subject-matter of or affected by those transactions.

193. As to paragraph 186A, it is denied that any declaration against Mr Anufriev is appropriate where he asserts no interest in these companies. In particular, Mr Anufriev is not (and

does not claim to be) the holder of the shares in Gatiabe or Jovellanos or the beneficial owner of those companies (or indeed any of the companies whose ownership is in dispute in these proceedings).

**Claims allegedly arising out of Sections C1, C2 and C4 above**

194. Paragraph 187 is denied. Whether the identified documents are forgeries or shams, or whether they take effect as valid and enforceable contracts, falls to be determined under the putative applicable law of the contract.

195. As to paragaphs 188-190:

    195.1. The matters on which the Claimants seek declarations are outside the scope of Mr Anufriev's knowledge, and his knowledge and belief in respect of those matters was as set out in paragraphs 120-135 and 142-148 above.

    195.2. In any event it is denied that declaratory relief is appropriate as against Mr Anufriev where he is not a party to the transactions recorded in the identified documents and he asserts no interest in the assets the subject-matter of or affected by those transactions.

196. As to paragraph 191:

    196.1. The first four sentences are denied:

        196.1.1. It is denied that English law is the applicable law. Paragraphs 182-183 above are repeated *mutatis mutandis*.

        196.1.2. It is in any event denied that fees incurred by lawyers or other professionals amount to relevant damage, or that the location of the professionals that Mrs Bourlakova has chosen to instruct amounts to the place in which damage occurred (or was likely to occur), for the purposes of Article 4 RIIR.

        196.1.3. The allegation of an "*objective*" to cause harm to Mrs Bourlakova is denied so far as it concerns Mr Anufriev and otherwise not admitted.

196.2. As to the final two sentences, it is admitted and averred that Monegasque law is the applicable law for the reasons set out in paragraph 182 above.

197. Paragraph 191A is denied insofar as it concerns Mr Anufriev and otherwise not admitted. Paragraph 185 above is repeated.

198. Paragraphs 192-193 make no allegation against Mr Anufriev and are not admitted.

199. Paragraph 194 is denied. He is not liable under Articles 1229 and/or 1231 of the Monegasque Civil Code as alleged or at all. Mr Anufriev neither committed nor attempted to commit a forgery, nor gave instructions for the commission of a forgery.

200. As to paragraph 195:

200.1. The costs allegedly incurred by Mrs Bourlakova (and the purpose for which they were allegedly incurred) are not admitted.

200.2. The allegation that Mrs Bourlakova has incurred costs "*otherwise as a result of the matters set out above*" is vague and not admitted.

200.3. In any event:

200.3.1. It is denied that Mr Anufriev has committed any of the alleged wrongful acts or that the alleged costs are attributable to such acts.

200.3.2. It is denied that "*investigation and legal costs*" are recoverable as damages under any of the causes of action asserted by the Claimants under Monegasque or English law (in the latter case, at least to the extent they arise in connection with the present proceedings).

**<u>Injunction</u>**

201. As to paragraph 196, it is denied that the Claimants are entitled to any injunction against Mr Anufriev. Without prejudice to the generality of that plea, it is denied that the injunctive relief claimed against Mr Anufriev is appropriate where he is not a party to the Kazakov partnership or to any of the transactions recorded in any of the identified documents and he asserts no interest in the assets the subject-matter of or affected by those transactions.

**Claims allegedly arising out of Sections C0 and C3 above**

202. As to paragraphs 196A and 196B, it is denied that any declaration against Mr Anufriev is appropriate in circumstances where Mr Anufriev is not (and does not claim to be) the holder of the shares in Edelweiss or its beneficial owner.

203. As to paragraph 197:

   203.1. It is admitted that Panamanian law applies to the identified claims.

   203.2. It is admitted that Nuptials, Tribatline and Merenguito were Panamanian foundations operating under Panamanian law and that Columbus, Edelweiss, Finco, Hydrangea and IPEC are all incorporated in Panama.

   203.3. No admissions are made as to the relevance of Schedule 2 to the APOC.

204. Paragraph 198 is admitted.

205. Paragraphs 199 and 199A do not make any allegation against Mr Anufriev and are not admitted.

206. As to paragraph 199B:

   206.1. The alleged primary offence by Mr Bourlakov under Articles 220, 243 and/or 253 of the Panamanian Penal Code is vague in that it fails to identify:

      206.1.1. What "*financial inducement*" was allegedly offered by Mr Bourlakov to Mrs Kazakova;

      206.1.2. What "*obligations under the [Foundation] Regulations*" Mrs Kazakova was allegedly being induced to breach.

   206.2. If (which is not admitted) Mr Bourlakov committed the alleged primary offence, it is denied that Mr Anufriev was aware of that; there is accordingly no viable basis upon which Mr Anufriev could be secondarily liable.

   206.3. Mrs Bourlakova has failed to articulate any viable basis for alleging liability on the part of Mr Anufriev as an "*instigator or participant*" that can be brought in

the present proceedings consistently with the arbitration clauses in the charters of the relevant Panamanian Foundations. Paragraph 150 above is repeated.

206.4. The allegation that Mr Anufriev is "*liable as instigator or participant*" is vague in that it fails to specify: (a) the mental and conduct elements of the primary offences allegedly committed by Mr Bourlakov under Articles 220, 243 and/or 253 of the Panamanian Penal Code; (b) on what basis it is alleged that those mental and conduct elements are satisfied as against Mr Bourlakov; (c) the alleged mental and conduct elements for liability as an "*instigator or participant*" under Panamanian law; or (d) on what basis it is alleged that those elements are satisfied as against Mr Anufriev.

206.5. In any event it is denied that Mr Anufriev is liable as instigator or participant. He was not aware of Mrs Kazakova receiving any remuneration for her role as protector, or of any offer by Mr Bourlakov to Mrs Kazakova of any financial inducement to breach her obligations under the Foundation Regulations.

207. Paragraphs 199C and 199D make no allegation against Mr Anufriev and are not admitted.

208. As to paragraphs 199E to 200:

208.1. It is denied that Mr Anufriev is liable pursuant to Articles 128 and 129 of the Panamanian Penal Code as alleged or at all. Paragraph 206 is repeated.

208.2. The asserted cause of action has no proper basis as a matter of Panamanian law. Claims based on Articles 128 and 129 (and Articles 220, 243 and 253) of the Panamanian Penal Code must, in the absence of criminal proceedings, be brought under Article 1644 of the Panamanian Civil Code. The Claimants advance no claim under Article 1644 of the Panamanian Civil Code and instead purport to assert a freestanding cause of action, which does not exist under Panamanian law.

208.3. The asserted cause of action is in any event time-barred under Panamanian law:

208.3.1. By virtue of Article 34C and 1706 of the Panamanian Civil Code, the applicable limitation period is one year from the date on which the Claimants knew (having actual or constructive knowledge) of the alleged wrongful acts or damage giving rise to their claims.

123

208.3.2. Pending the provision of disclosure and further information, Mr Anufriev is unable to plead when the Claimants had actual knowledge of the alleged wrongful acts or damage relied upon. The Claimants had at least constructive knowledge of such acts by reason of Public Deeds No. 6700, 6701 and 6702 as recorded with the Panamanian Public Registry on 25 May 2018 (being resolutions of the Foundation Councils of Tribatline, Merenguito and Nuptials dissolving each of those foundations). The Panamanian Public Registry can be freely consulted by any person as set out in Article 1755 of the Panamanian Civil Code.

208.3.3. In the circumstances, the Claimants' claim is time-barred.

208.4. It is not admitted that Mrs Bourlakova or Veronica have suffered the alleged losses, or that the alleged losses were caused by the alleged wrongful acts, and they are required strictly to prove the same.

208.5. If and to the extent that loss has been suffered by Mrs Bourlakova or Veronica (which is not admitted), such loss is reflective of the loss suffered by the relevant companies and/or foundations (both as a matter of Panamanian law and English law) and neither Mrs Bourlakova nor Veronica can claim in respect of such loss.

**Claims allegedly arising out of Section D above**

209.   Paragraphs 201-207 make no allegation against Mr Anufriev and are not admitted.

**Claims allegedly arising out of Section E above**

210.   Paragraphs 208-210 make no allegation against Mr Anufriev and are not admitted.

**Interest**

211.   As to paragraph 211, it is denied that the Claimants are entitled to interest as alleged or at all.

**Prayer**

212.   Insofar as the relief sought in the prayer is sought against Mr Anufriev, it is denied.

213. It is further denied that any of the declaratory relief sought by the Claimants is appropriate as against Mr Anufriev.

214. It is denied that the Claimants are entitled to any relief against Mr Anufriev as alleged or at all.

**ANDREW SCOTT KC**

**AJAY RATAN**

**STATEMENT OF TRUTH**

I believe that the facts stated in this Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: _____

Full name: Semën Anufriev

Date:   24 November 2023