# Exhibit 2

IN THE HIGH COURT OF JUSTICE                Claim No.BL-2020-001050
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
BUSINESS LIST (ChD)

BETWEEN:

|       |                                                                        |
|-------|------------------------------------------------------------------------|
| (1)   | **LOUDMILA BOURLAKOVA**                                                |
| (2)   | **HERMITAGE ONE LIMITED**                                              |
| (3)   | **GREENBAY INVEST HOLDINGS LIMITED**                                   |
|       | **(formerly known as Maravan Services Limited)**                       |
| (4)   | **VERONICA BOURLAKOVA**                                                |

<u>**Claimants**</u>

*— and —*

|       |                                              |
|-------|----------------------------------------------|
| (1)   | **OLEG BOURLAKOV**                           |
| (2)   | **DANIEL TRIBALDOS**                         |
| (3)   | **LEO SERVICES HOLDING LTD**                 |
| (4)   | **LEO TRUST SWITZERLAND AG**                 |
| (5)   | **REUWEN SCHWARZ**                           |
| (6)   | **SEMEN ANUFRIEV**                           |
| (7)   | **NIKOLAI KAZAKOV**                          |
| (8)   | **VERA KAZAKOVA**                            |
| (9)   | **COLUMBUS HOLDING AND ENTERPRISES SA**      |
| (10)  | **FINCO FINANCIAL INC**                      |
| (11)  | **GATIABE BUSINESS INC**                     |
| (12)  | **EDELWEISS INVESTMENTS INC**                |
| (13)  | **IPEC INTERNATIONAL PETROLEUM CO INC**      |

<u>**Defendants**</u>

---

## DEFENCE OF THE SECOND AND

## FOURTH DEFENDANTS

---

## A.    I N T R O D U C T I O N

### A.1    Preliminary matters

1.    This is the Defence of the Second Defendant ("**Mr Tribaldos**") and the Fourth Defendant ("**Leo Trust**") to the Amended Particulars of Claim dated 16 October 2023 (the "**POC**").

2.    References to Paragraphs are to paragraphs of the POC unless otherwise stated.

3.    Save as expressly admitted or denied below, each and every allegation made in the POC is not admitted and the Claimants are required to prove the same.

4.    Certain definitions and abbreviations are adopted from the POC and capitalised terms not otherwise defined herein have the meaning given to them in the POC, but no admissions are made thereby.

5.    Where an admission is made of any particular allegation, it is an admission of fact and not an admission of the knowledge of that fact by either Mr Tribaldos or Leo Trust at the material times, unless otherwise indicated.

### A.2    Summary of this Defence

6.    The Claimants' case as against Mr Tribaldos and Leo Trust depends on showing, under whatever system of governing law may apply, that they were co-conspirators and/or joint tortfeasors in a strategy pursued by Mr Bourlakov, Mr Kazakov and Mrs Kazakova, and with the participation of Mr Anufriev, to defraud Mrs Bourlakova and her daughters out of their rightful share of the family assets following the divorce. The role played by Mr Tribaldos and Leo Trust is principally that they are alleged to have "forged" documents reflecting liabilities to Mr Kazakov and entities connected with him. That case is false:

(1) Leo Trust is a provider of corporate and fiduciary services, and administers client's corporate structures on their instructions. It did not advise Mr Bourlakov on how to manage his overall assets, but only on some of the technical aspects of the various holding structures he used.

(2) Consistent with that role, Mr Tribaldos was told in or around April 2018 by Mr Bourlakov and Mr Anufriev of Mr Bourlakov's partnership with Mr Kazakov. He was further told that Mr Kazakov had previously concealed his wealth from the Russian state for tax reasons and wished now to make full disclosure of that wealth in Russia, necessitating that the position be regularised. Mr Tribaldos honestly and reasonably believed that position. Mr Kazakov was being advised on the Russian tax position by Mr Igor Veneditkov of DLA Piper's Moscow office, who was responsible for ensuring that the steps taken complied with Russian tax law.

(3) To that end, on instructions from Mr Bourlakov via Mr Anufriev, Mr Tribaldos and Leo Trust caused the conclusion of documents reflecting certain liabilities more fully set out below, bearing dates in the past. Mr Tribaldos understood that these dates reflected the dates on which the liabilities had in fact been incurred, based on instructions from Mr Anufriev. Mr Tribaldos (and Leo Trust) understood at the time that those liabilities were genuine and had arisen at the dates borne on the documents, but were not formalised at the time.

(4) At the time, Mr Tribaldos was, consistent with his limited role in relation to Mr Bourlakov's assets, unaware of the marital breakdown and divorce between Mr Bourlakov and Mrs Bourlakova. Mr

3

Tribaldos does not know whether the Kazakov partnership was genuine and/or whether the purpose of recording the liabilities in question was to defraud Mrs Bourlakova and her daughters. If it was for the purpose of defrauding Mrs Bourlakova and her daughters, Mr Tribaldos was not aware of that purpose, and did not participate in it.

(5) Mr Tribaldos and Leo Trust had no motive to participate in the alleged fraud. Unlike the other individual Defendants, who the Claimants allege were remunerated by Mr Bourlakov for their participation in the alleged scheme, it is not alleged against Mr Tribaldos or Leo Trust that they received any benefit from their participation, and in fact they did not (save for payment of ordinary invoices for Leo Trust's work administering the relevant companies).

## B.   DETAILED RESPONSE TO SECTION A POC

7. No admissions are made as to the first, second and third sentences of Paragraph 1, save that it is admitted that Mr Bourlakov died in June 2021.

8. The fourth sentence of Paragraph 1 is admitted.

9. No admissions are made as to the fifth sentence of Paragraph 1. Further:

(1) As pleaded below at Paragraph 28(3), Mr Tribaldos did not deal directly with Mrs Bourlakova.

(2) In consequence, Mr Tribaldos would have known of the divorce only if he had been informed of it by Mr Bourlakov or Mr Anufriev. They did not so inform him.

(3) Mr Tribaldos was not aware of the divorce until some time in early 2019, although he cannot now recall precisely when. Mr Tribaldos

4

first learned of the divorce when he made enquiries of Mr Anufriev following the receipt of letters from Taylor Wessing LLP on behalf of Mrs Bourlakova, the first of which was received on 25 January 2019. Mr Tribaldos believes he did not learn of the divorce immediately following that correspondence, but at some later time.

10.     No admissions are made as to Paragraphs 2-3.

11.     As to Paragraph 4, no admissions are made as to the conduct of any other Defendants, but it is denied that either Mr Tribaldos or Leo Trust have acted in combination with any other Defendant, whether as alleged or at all.

12.     Paragraph 5 is a summary of the allegations which follow, which Mr Tribaldos and Leo Trust plead to at the appropriate point below. No admissions are made as to whether Mr Bourlakov had any "strategy" as alleged, but it is denied that Mr Tribaldos or Leo Trust participated in any such strategy if it existed.

13.     No admissions are made as to the first sentence of Paragraph 6.

14.     As to the second sentence of Paragraph 6, no admissions are made, save that it is denied in so far as it is alleged that Mr Tribaldos or Leo Trust participated in any such concealment.

15.     The third sentence of Paragraph 6 is denied so far as it concerns Mr Tribaldos, Leo Trust (and Leo England). In so far as any destruction of documents took place, none of Mr Tribaldos, Leo Trust or Leo England participated or assisted in it.

16.     The allegations in Paragraph 7 are denied. These allegations are pleaded in greater detail at Paragraphs 158-163, and Mr Tribaldos and Leo Trust rely on their pleading responsive to those allegations at Paragraphs 298-313 below.

5

17.　　The first sentence of Paragraph 7A is embarrassing for its failure to specify which documents are referred to, or which matters complained of in the proceedings they are alleged to be relevant to. Without prejudice to that position:

(1)　　No admissions are made as to the Claimants' alleged discovery, and/or the materiality of that discovery. In 2021, following a review of their documents by PiShift AG on instructions from Klein Rechtanswalte (a Swiss law firm), Leo Trust and Mr Tribaldos gave voluntary disclosure to the Claimants of all documents identified by that review in connection with the matters which are the subject of this litigation. The Claimants have thus had in their control since 2021 a significant number of documents relevant to their allegations.

(2)　　In so far as it is alleged, it is denied that Leo Cyprus held documents for or on behalf of Leo Trust. Leo Cyprus provided accounting services to Leo Trust, including in respect of the companies which are the subject of the Claimants' allegations. As a result, Leo Cyprus was provided with documents for the purpose of performing those services.

(3)　　As admitted in Paragraph 18 below, Leo Cyprus also provided IT support services to Leo Trust until June 2020. In connection with those services, Leo Cyprus had unrestricted access to Leo Trust's server and the documents located on it. As set out in Paragraph 110 below, Mr Tribaldos and Leo Trust do not know whether and to what extent Leo Cyprus obtained and held documents located on Leo Trust's server.

18.　　The second sentence of Paragraph 7A is admitted.

19.    The third and fourth sentences of Paragraph 7A are embarrassing in their lack of particularity, but are understood to be references to the more detailed allegations at Paragraph 163B. Mr Tribaldos and Leo Trust rely on their pleading responsive to those allegations at Paragraphs 315-318 below.

20.    As to the first sentence of Paragraph 7B:

(1)    The fact and date of the Cyprus AP Order are admitted.

(2)    It is denied that the purpose of obtaining the Cyprus AP Order was to prevent the destruction of Leo Cyprus' documents.

(3)    Neither Mr Tribaldos nor any person acting with his consent or authority destroyed any documents held by Leo Cyprus.

21.    The second sentence of Paragraph 7B is embarrassing in its lack of particularity, but is denied.

22.    As to the third sentence of Paragraph 7B:

(1)    Save as admitted in sub-paragraphs (2)-(5) below, this sentence is denied. Leo England took steps to "obtain control" of Leo Cyprus because of the conduct of Rudan Business Holdings S.A ("**Rudan**") and the directors of Leo England connected to it, including Mr Schwarz.

(2)    On 6 October 2020, Mr Roman Keller and other members of the board of Leo Cyprus obtained an *ex parte* injunction from the Cypriot court preventing Leo England from appointing additional directors of Leo Cyprus.

(3)    On 14 April 2021, the Cypriot court discharged that injunction on the application of Leo England, Mr Tribaldos and Tridan Trusted

Advisors AG ("**Tridan**"), finding *inter alia* that the applicants for the injunction had obtained it through material non-disclosure.

(4)  Following the setting aside of the injunction, Leo England exercised its right (as the sole shareholder of Leo Cyprus) to appoint new directors of Leo Cyprus. Those directors were Mr Tribaldos, Johann Behrens (a German lawyer), Kyriakos Kyriakou and Christos Koshiaris.

(5)  To that extent, it is admitted that Leo England "obtained control" of Leo Cyprus in April 2021. It follows that Mr Tribaldos was not "*in control*" of Leo Cyprus between 6 October 2020 and 14 April 2021.

23.  No admissions are made as to Paragraph 8, save that Paragraph 12 above is repeated as regards the allegation of Mr Bourlakov's "strategy".

24.  The first sentence of Paragraph 9A is not admitted.

**B.1  The other Claimants and Defendants**

25.  **H1 and Greenbay**: No admissions are made as to Paragraphs 10-11. Leo Trust did not administer either H1 or Greenbay, which are respectively Isle of Man and Seychelles-incorporated companies. In consequence, neither Mr Tribaldos nor Leo Trust has any knowledge of who the beneficial owners of H1 or Greenbay were.

26.  **Mr Tribaldos**: As to the first sentence of Paragraph 12:

(1)  It is admitted that Mr Tribaldos provided corporate services to Mr Bourlakov, in his capacity as a director and employee of Leo Trust.

(2)  It is further admitted that these services were connected with, *inter alia*, offshore holding structures for Mr Bourlakov's wealth.

(3)     Mr Bourlakov was originally a client of Panazur Corporate and Shipping Services S.A. ("**Panazur**"), a fiduciary and corporate services business founded by Mr Tribaldos' father, Rogelio Tribaldos. Mr Bourlakov became a client of Panazur in 1993.

(4)     Thereafter, Mr Bourlakov remained a client of Rogelio Tribaldos through various entities related to Morgan & Morgan Group ("**MMG**"), of which Rogelio Tribaldos was a Senior Partner.

(5)     It is denied that Mr Tribaldos at any time provided advice to Mr Bourlakov in connection with his offshore holding structures, save so far as is consistent with Paragraph 27 below.

27.    As to Leo Trust's role in relation to Mr Bourlakov's portfolio:

(1)     Leo Trust provided corporate and fiduciary services and administration to Mr Bourlakov and his companies.

(2)     Leo Trust would from time-to-time advise on the technical aspects of a particular transaction, such as the required number of board members or the requirements in a particular jurisdiction for company incorporation.

(3)     Neither Mr Tribaldos nor Leo Trust ever advised Mr Bourlakov on management of his overall assets, or on whether he should effect particular structures or transactions. That role, so far as Mr Tribaldos understood, was performed by Mr Anufriev, who worked closely with Mr Bourlakov and was his personal lawyer, or by other external consultants including lawyers, accountants and financial advisors.

(4)     Leo Trust did not know about Mr Bourlakov's overall asset position, save that it was aware in general that he and his family were worth

billions of dollars. By way of example, Leo Trust and its predecessors played no or little role in the ownership or administration of La Reserve or The Black Pearl, and did not manage companies incorporated in the Isle of Man or Seychelles (such as H1 and Greenbay).  References to Mr Bourlakov's assets below (and in particular, to Mr Bourlakov's "portfolio" of assets in Paragraph 28 below) are only to those foundations and companies which expressly fell within the scope of Leo Trust's corporate and fiduciary services mandates.

28.   As to Mr Tribaldos' personal involvement with Mr Bourlakov and his assets:

   (1)   Mr Tribaldos began working part-time at MMG/Panazur in around 2005, whilst he was still at university. He became a full-time employee of MMG/Panazur in 2008 (whilst still completing his university studies).

   (2)   Mr Tribaldos first became aware that Mr Bourlakov was a client of MMG and Panazur in around 2007. At that time, he was not responsible for Mr Bourlakov's relationship with MMG (which was managed at times by various employees within MMG/Panazur's private client teams, and in 2007 was managed by Mr Gabriel Tribaldos, a cousin of Mr Tribaldos).

   (3)   Mr Tribaldos had no dealings with Mrs Bourlakova at any stage.

   (4)   So far as Mr Tribaldos can recall, he began doing some work for Mr Bourlakov's portfolio of assets in around 2007, under the supervision of Mr Gabriel Tribaldos. At the time, the work undertaken by Mr Tribaldos relating to Mr Bourlakov's assets constituted a very small proportion of Mr Tribaldos' work.

(5)   At some point in around 2011, on a date Mr Tribaldos cannot now recall, Mr Bourlakov's portfolio of assets was transferred within MMG/Panazur from Mr Gabriel Tribaldos to other staff members. Mr Tribaldos took responsibility for it in 2016 following the retirement of Mr Jürg Brinkmann, who had been managing the portfolio at that time.

(6)   Mr Tribaldos did not handle Mr Bourlakov's affairs on a day-to-day basis, but dealt principally with meetings with Mr Bourlakov and Mr Anufriev. Ms Andrea Stadelmann handled the day-to-day administration of Mr Bourlakov's structures and the portfolio, on instructions from Mr Anufriev.

29.   As to the second sentence of Paragraph 12:

(1)   It is denied that Mr Tribaldos is the ultimate beneficial owner of the majority of the shares in Leo England.

(2)   The share capital of Leo England is owned 50% by Tridan, and 50% by Rudan. Tridan is ultimately beneficially owned by Mr Tribaldos. Rudan is owned by Solaro AG, and the shares in Solaro AG are held on trust for the Capri Family Trust, a trust for the benefit of the descendants of Mr Shlomo (Tom) Wyler. Mr Tribaldos is therefore the ultimate beneficial owner of 50% of the shares in Leo England, and no more.

(3)   It is further denied that Mr Tribaldos, whether through Tridan or otherwise, controlled the majority of the voting rights in Leo England.

30.   The third sentence of Paragraph 12 is admitted, save that:

(1)     Mr Tribaldos was not a director of Leo England between 24 April 2013 and 6 February 2014.

(2)     The reference to "Leo Services" is vague and unclear, but it if it is intended to be a reference to Leo Services AG, then that reference is admitted.

31.     **Leo England**: The first sentence of Paragraph 13 is admitted. At the date of its incorporation and until 2017, Leo England was known as MMG (UK) Holding Ltd.

32.     The second sentence of Paragraph 13 is admitted, save that on 5 August 2020, Leo England sold Leo Trust to Reno Ltd, a UAE-incorporated company, for CHF1.

33.     The third sentence of Paragraph 13 is admitted, save that it is denied that the effect was to make Leo Cyprus an indirect wholly owned subsidiary of Leo England. Leo Trust was no longer owned by Leo England at this date.

34.     As to the fourth sentence of Paragraph 13, Paragraphs 30(1) and 32 above are repeated.

35.     **Leo Trust**: The first sentence of Paragraph 14 is admitted.

36.     The second sentence of Paragraph 14 is admitted. More particularly:

(1)     In 2010, Rogelio Tribaldos and the partners of MMG agreed to establish MMG Trust (Switzerland) AG ("**MMG Trust**"), which would operate alongside Panazur.

(2)     In 2012, MMG Trust was transferred into the ownership of Leo England (which was known at the time as MMG (UK) Holding Ltd), as described in Paragraph 31 above.

(3)     Between 2012 and 2015, MMG established three other Swiss-incorporated companies, namely MMG Zurich AG, MMG Wealth AG and MMG Economics and Research AG. These companies, together with MMG Trust, are referred to below as the "Swiss MMG Entities".

(4)     In 2015, the Swiss MMG Entities were merged into a single entity, MMG Zurich AG ("**MMG Zurich**").

(5)     In 2017, MMG agreed to sell its European business to Mr Tribaldos, following the retirement of Rogelio Tribaldos in 2015. As part of this transaction:

(a)     The Capri Family Trust acquired its interest, via Rudan, in Leo England, as described above at Paragraph 29(2) above.

(b)     All relevant corporate entities were renamed, with the "Leo" name replacing the "MMG" name. This included the change in name of Leo England described above at Paragraph 31 above. MMG Zurich was renamed Leo Services AG.

(c)     Leo England incorporated a new Swiss entity, Leo Trust, in October 2017.

(d)     All assets and liabilities of Leo Services AG were transferred to Leo Trust on 28 March 2018.

37.     The third sentence of Paragraph 14 is admitted, save that:

(1)     The allegation that Leo Trust and Leo Services AG "provided fiduciary and corporate services to Mr Bourlakov" is vague and imprecise. It is admitted only in so far as consistent with Paragraphs 26(5) and 27(4) above.

(2)     The allegation that Leo Trust and Leo Services AG were "used as repositories of Bourlakov family assets" is embarrassing in its lack of particularity. No admissions are made thereto.

38.    The fourth sentence of Paragraph 14 is overly broad, embarrassing in its lack of particularity, and fails to specify which asset holding structures and/or companies, trust and foundations and/or documents are referred to. Pending proper particularisation of those allegations, it is admitted that in general terms Leo Trust and Leo Services AG did on occasion provide those services, save that it is denied that they advised on the asset holding structure. Paragraphs 26(5) and 27(4) above are repeated.

39.    As to the fifth sentence of Paragraph 14:

(1)     It is admitted that Mr Tribaldos was a director of Leo Trust at all material times.

(2)     Save as aforesaid, this sentence is denied. Paragraph 29(2) above is repeated.

40.    **Mr Schwarz**: No admissions are made as to the first sentence of Paragraph 15.

41.    The second sentence of Paragraph 15 is admitted.

42.    Mr Schwarz was associated with and acted on behalf of Rudan in matters concerning the management and control of Leo England and Leo Trust.

43.    **Mr Anufriev**: The first sentence of Paragraph 16 is admitted.

44.    No admissions are made as to the second sentence of Paragraph 16, save as is consistent with Paragraph 45 below.

45.    As to the third sentence of Paragraph 16:

(1)     Mr Tribaldos and Leo Trust can admit Mr Anufriev's role only in so far as they are aware of it. Mr Tribaldos and Leo Trust do not know what role Mr Anufriev played in relation to those of Mr Bourlakov's assets which they did not administer.

(2)     From at least 2016, Leo Trust received all instructions in connection with Mr Bourlakov's assets from Mr Anufriev. Mr Tribaldos understood that Mr Anufriev spoke on behalf of Mr Bourlakov and later, Mr Kazakov, because neither of them spoke sufficient English or German to convey instructions properly. In practical terms, the fact that Mr Bourlakov and Mr Kazakov did not speak sufficient English made it difficult for them to give direct instructions to Leo Trust.

(3)     Mr Anufriev's role in giving such instructions was established and/or confirmed *inter alia* by (i) the Mandate Agreements pleaded at Paragraph 136.a.6 POC and Paragraph 261 below, which provided for Mr Anufriev to give instructions in respect of each of the operations of Cantucci, Hydrangea, Hemaren, Edelweiss, Anahill and Columbus, (ii) delegated authority provided by Mr Bourlakov in client identification sheets for MMG Zurich expressly nominating Mr Anufriev as a designated point of contact for all communication purposes, including but not limited to the client identification sheet signed by Mr Bourlakov on 21 December 2016;  and (iii) his role as Protector of Tribatline, Merenguito, Nuptials until 27 April 2018, in which role he was entitled to give instructions to the Foundation Councils thereof.

(4)     Mr Tribaldos understood that, whilst Mr Anufriev was responsible for managing practical aspects of Mr Bourlakov's structures and giving instructions to (at least) Leo Trust, he had no meaningful

decision-making power in respect of those assets and acted on instructions from Mr Bourlakov. Mr Tribaldos understood that Mr Anufriev was acting with Mr Bourlakov's authority, as formalised in the manner described at paragraph 45(3) above. Mr Tribaldos and Leo Trust were aware that Mr Anufriev was an authorised representative of, and effectively managed, the Bourlakov family office during the relevant period. Paragraph 103(1) below is repeated.

(5) Save as aforesaid, no admissions are made.

46. **Mr Kazakov and Mrs Kazakova**: Paragraph 17 is admitted.

47. **Columbus**: The first two sentences of Paragraph 18 are admitted, save that no admissions are made as to Mrs Bourlakova and Veronica's state of knowledge.

48. As to the third sentence of Paragraph 18:

(1) To the best of Mr Tribaldos' recollection, Tribatline was a "shelf" foundation, incorporated in advance to be provided to a client at a later date.

(2) In March 2014, Tribatline was taken over by Mr Bourlakov. However, no regulations were made for Tribatline until 13 June 2016.

(3) The effect of there being no regulations (and therefore no named beneficiary) was that Mr Bourlakov was assumed to own the Foundation's assets.

(4) It is admitted that Mrs Bourlakova became the sole beneficiary of Tribatline from 13 June 2016, when the first set of regulations for Tribatline were concluded.

(5)     No admissions are made as to the state of Mrs Bourlakova's knowledge.

(6)     Save as aforesaid, this sentence is admitted.

49.   As to the fourth sentence of Paragraph 18:

(1)     It is admitted that the shares in Columbus were owned by Anahill from on or around 25 May 2018.

(2)     In so far as it is alleged, it is denied that the shares in Columbus were transferred by Anahill. The share certificate held by Tribatline was withdrawn and invalidated by a resolution of Columbus' board of directors dated 23 May 2018. The same resolution resolved to issue a new share certificate in the name of Anahill.

50.   The fifth sentence of Paragraph 18 is admitted, save that no admissions are made as to the Claimants' state of knowledge.

51.   **Finco**: The first and second sentences of Paragraph 19 are admitted.

52.   As to the third sentence of Paragraph 19:

(1)     No admissions are made as to the Claimants' state of knowledge of the beneficial ownership of Finco.

(2)     Finco had issued bearer shares, such that Mr Tribaldos and Leo Trust cannot be certain who the beneficial owner of Finco was throughout the relevant period.

(3)     It is admitted that Mr Bourlakov was the ultimate beneficial owner of Finco as at 15 March 2014.

53.   As to the fourth sentence of Paragraph 19:

(1)     From 7 September 2018 onwards, the shares in Finco were owned by Delos. Delos held those shares on trust for Mr Bourlakov. Delos is an entity owned by Leo Trust, which provides nominee shareholding services, and does not have beneficial interests in the underlying assets it holds.

(2)     It is denied that the shares in Finco were transferred to Delos by Tribatline. The share certificate held by Tribatline was withdrawn and invalidated by a resolution of Finco's board of directors on 7 September 2018.

(3)     Tribatline had been dissolved on 25 May 2018, prior to Finco's reactivation.

54.     The fifth sentence of Paragraph 19 is denied, save that it is admitted that Tribatline had been dissolved by 7 September 2018. Paragraph 53 above is repeated. Tribatline did not transfer the shares in Finco to Delos – Finco itself cancelled the share certificate previously held by Tribatline, and then issued a new share certificate in favour of Delos.

55.     Save that (so far as Mr Tribaldos and Leo Trust were aware) the transfer of Finco to Wlamil by Delos was not "purported" but genuine and effective, the sixth and seventh sentences of Paragraph 19 are admitted.

56.     No admissions are made as to the eighth sentence of Paragraph 19.

57.     As to the ninth sentence of Paragraph 19, it is admitted that in an email dated 14 April 2020 to Marios Charalambides and Dimitar Jauch of Leo Trust, Mr Tribaldos referred to Mr Bourlakov as the "client" in discussing the preparation of accounts for Finco, Gatiabe, Jovellanos and Wlamil.

58.   As to the tenth sentence of Paragraph 19, it is denied that this email evidences the "true nature of the relationship between Mr Bourlakov and Mr Kazakov", whatever that is intended to mean. Given that instructions from both Mr Bourlakov and Mr Kazakov came from Mr Anufriev, Mr Tribaldos made a mistake in referring to Mr Bourlakov as the client.

59.   **Gatiabe**: The first sentence of Paragraph 20 is admitted.

60.   The second sentence of Paragraph 20 is admitted, save that no admissions are made as to Mrs Bourlakova's absence of knowledge of or consent to that reactivation.

61.   As to the third sentence of Paragraph 20, these allegations are dealt with where they are set out more fully below.

62.   No admissions are made as to the fourth-sixth sentences of Paragraph 20, save that the terms of the email chain referred to in the sixth sentence are admitted (as to which Paragraph 57 above is repeated).

63.   **Edelweiss**: The first sentence of Paragraph 21 is admitted.

64.   As to the second sentence of Paragraph 21, this allegation is addressed below at Paragraph 178 below.

65.   As to the third sentence of Paragraph 21:

(1)   The cancellation of the Edelweiss bearer shares is addressed below at Paragraph 178(3) below.

(2)   Mr Anufriev provided instructions that the shares in Edelweiss were to be transferred to Merenguito in or around April 2015, as recorded in a series of emails between Mr Anufriev and Jurg Brinkmann and Sylvia Buchen, both of MMG Zurich, between 26 March and 9 April

2015. Consistent with this, draft minutes of a meeting of Merenguito's board dated 14 April 2015 were prepared accepting the contribution of the shares in Edelweiss by Veronica.

(3)     Thereafter, the ability to in fact effect this process was delayed by the need for the bearer shares to be delivered to MMG.

(4)     It is admitted that the share certificate recorded that the change had been effected on 9 April 2015, consistent with the date the instructions were given, but that the share certificate was not in fact signed until on or around 28 January 2016.

66.     The fourth sentence of Paragraph 21 is admitted. As recorded in the Declaration of Trust executed by Merenguito on 18 August 2016, Merenguito (which was referred to therein as the "Nominee") held the shares in Edelweiss on trust for Veronica.

67.     The fifth sentence of Paragraph 21 is admitted.

68.     The sixth sentence of Paragraph 21 is admitted, save that no admissions are made as to Mrs Bourlakova or Veronica's state of knowledge. The regulations of Merenguito were amended by an Amendment dated 27 April 2018.

69.     As to the seventh sentence of Paragraph 21:

(1)     On 27 April 2018, the Foundation Council of Merenguito resolved that Merenguito should be dissolved. The deed dissolving Merenguito was completed on 15 May 2018.

(2)     It is admitted that, on 23 May 2018, Edelweiss's board resolved to invalidate the previous share certificate and issue a new share certificate to Hemaren.

(3)    So far as Mr Tribaldos and Leo Trust were aware at the time, this action was not "purported" but genuine and effective.

(4)    Save as aforesaid, no admissions are made.

70.    No admissions are made as to the eighth-tenth sentences of Paragraph 21.

71.    **IPEC**: The first sentence of Paragraph 22 is admitted.

72.    The second sentence of Paragraph 22 is admitted, save that no admissions are made as to the alleged awareness of Mrs Bourlakova and Veronica.

73.    The third and fourth sentences of Paragraph 22 are admitted.

74.    The fifth sentence of Paragraph 22 is admitted, save that the date of reactivation was 8 August 2020 and no admissions are made as to Mrs Bourlakova's absence of knowledge or consent to that reactivation.

75.    The sixth sentence of Paragraph 22 is admitted, save that the issue of the share certificate to Anahill was not purported but (so far as Mr Tribaldos and Leo Trust were aware at the time) genuine and effective.

76.    **Anahill, Hemaren and Wlamil**: The first sentence of Paragraph 23 is admitted.

77.    As to the second sentence of Paragraph 23:

(1)    At the material times, it appeared to Mr Tribaldos and Leo Trust that Mr Bourlakov had *de facto* control over Anahill and Hemaren, but that Mr Kazakov had control of Wlamil (and Gatiabe).

(2)    Save as aforesaid, no admissions are made.

78.    The third and fourth sentences of Paragraph 23 are admitted.

79.     No admissions are made as to the fifth sentence of Paragraph 23.

80.     **Jeswalt, Egerson and Chasehill**: No admissions are made as to Paragraphs 24-26. MMG/Panazur, and thereafter Leo Trust, did not administer any of Jeswalt, Egerson and Chasehill.

81.     **Jovellanos**: Paragraph 26A is admitted, save that:

(1)     No admissions are made as to Mrs Bourlakova's lack of knowledge or consent as alleged in the first and second sentences.

(2)     No admissions are made as to whether Mrs Bourlakova has held the entirety of the shares in Jovellanos, whether since December 2014 or at all, as alleged in the second sentence.

(3)     It is admitted, as alleged in the fourth sentence, that the bearer shares were cancelled and shares were issued to Delos in their stead.

(4)     No admissions are made as to whether the cancellation and issue of the bearer shares was done invalidly as alleged. So far as Mr Tribaldos and Leo Trust were aware at the time, the transfer was valid and effective.

(5)     No admissions are made as to the fifth sentence.

(6)     The text of the email referred to in the sixth sentence is admitted, but no admissions are made as to whether it supports the Claimants' case as alleged.

82.     **Nuptials**: The first sentence of Paragraph 26B is admitted. To the best of Mr Tribaldos' recollection, Nuptials was a "shelf" foundation, and was not used until March 2014 at the earliest.

83.   No admissions are made as to the second sentence of Paragraph 26B, save that it is admitted that Cantucci became the sole beneficiary of Nuptials on or around 27 April 2018, by means of an amendment to the Regulations of Nuptials of that date. Mr Tribaldos and Leo Trust believe that Nuptials had no regulations in place until on or around 18 August 2016.

84.   The text of the letter in the third sentence of Paragraph 26B is admitted. The letter was written because Heda Airlines had requested confirmation of Nuptials' beneficial owners for its own KYC purposes.

85.   The fourth sentence of Paragraph 26B is noted. Veronica's claims against Mr Tribaldos and Leo Trust on that basis are denied.

86.   **Cantucci**: Paragraph 26C is admitted.

87.   **Hydrangea**: Paragraph 26D is admitted.

**B.2    The alleged origins of the Bourlakov family wealth**

88.   Save that it is admitted that Novoroscement was sold in around 2007, no admissions are made as to Paragraph 27. At the time of that sale, Mr Tribaldos was not working for Mr Bourlakov or his family within MMG (though he remembers general discussion about the sale).

89.   As to the first sentence of Paragraph 28, it is noted that Mr Bourlakov and Mr Kazakov did so contend until Mr Bourlakov's death, and Mr Kazakov continues to so contend. Mr Tribaldos and Leo Trust do not know, and take no position in this litigation on, whether that contention is true. Mr Tribaldos was so informed by Mr Bourlakov in 2018, and Mr Tribaldos reasonably believed him, as follows:

(1)   Prior to 2018, Mr Bourlakov had reorganised his assets on a number of occasions, including distributing them between members of his

23

family. In general terms, the stated reason given to Mr Tribaldos for these changes was to protect Mr Bourlakov's assets from the Russian state. When the events described in sub-paragraphs (2)-(8) below occurred, Mr Tribaldos and Leo Trust did not consider the information they received surprising because they were accustomed to assets connected to Mr Bourlakov having their beneficial owners changed, including transfers to other family members (of which Mr Kazakov was one).

(2)  Mr Tribaldos does not recall precisely when he was first told about Mr Bourlakov's partnership with Mr Kazakov. Mr Tribaldos' calendar records meetings with Mr Anufriev in Zurich on (at least) 19, 25, 26 and 27 April 2018. Mr Bourlakov was present at some of these meetings, though Mr Tribaldos does not now recall which ones. Mr Kazakov and Mrs Kazakova were also present at at least one of these meetings.

(3)  At these meetings, Mr Bourlakov and Mr Anufriev explained that Mr Kazakov had been Mr Bourlakov's business partner since the Soviet era, and was entitled to half of Mr Bourlakov's assets.

(4)  Mr Bourlakov and Mr Anufriev explained that the reason the Kazakov partnership had not been disclosed until that point was for tax purposes. Mr Kazakov was a Russian resident subject to Russian tax, whereas Mr Bourlakov was a resident in Monaco and therefore liable to tax only on his property, not on income.

(5)  Mr Tribaldos was told by Mr Bourlakov and Mr Anufriev that, by April 2018, Mr Kazakov had decided to make voluntary disclosure to the Russian authorities concerning his tax obligations. Russia announced in early 2018 a tax amnesty in respect of foreign assets,

which Mr Tribaldos was told Mr Kazakov wished to take advantage of. This, Mr Tribaldos was told, meant that the joint assets held by Mr Bourlakov for Mr Kazakov needed to be separated out. Consistent with that account, Mr Tribaldos and Marios Charalambides (the CEO of Leo Cyprus) attended meetings in Riga with DLA Piper Russia, who were advising Mr Kazakov on the tax issues arising.

(6)     Leo Trust had no responsibility for how the split of assets between Mr Bourlakov and Mr Kazakov was to be effected. Rather, Leo Trust would be responsible for effecting the instructions it was given as to how this split was to be achieved.

(7)     At these meetings, Mr Tribaldos was shown bank statements from UBS showing substantial payments from Gatiabe to Mr Kazakov in 2007. Leo Trust retains a version of those statements which show that on 29 March 2007, Gatiabe transferred to Finco USD 1,349,443,000. This was the sum ultimately incorporated into the loan agreement between Finco and Gatiabe, which was raised at the first meeting in which Mr Tribaldos was told about Mr Kazakov's interest in the relevant assets.

(8)     As a result, Mr Tribaldos understood that there had been and was a partnership between Mr Bourlakov and Mr Kazakov, on terms that Mr Kazakov was entitled to 50% of Mr Bourlakov's assets (the "**Kazakov partnership**").

90.   No admissions are made as to the second, third and fourth sentences of Paragraph 28.

91.   Paragraph 29 in general is embarrassing in its lack of particularity. No admissions are made thereto. If the allegation made in the first sentence is

true, then that supports the reasonableness of Mr Tribaldos' belief as to the existence of the Kazakov partnership.

92. No admissions are made as to Paragraphs 30-31.

93. Mr Tribaldos later learned (in or around 2020, from Mr Anufriev) that the reason for the frequent changes in beneficial ownership of assets under Mr Bourlakov's control was that, following the sale of Burneftgaz, the government of the Russian Federation changed its stance towards the purchaser of those shares, and ultimately recovered them from the purchaser. Mr Bourlakov feared that the government of the Russian Federation would also seek to recover the proceeds of the sale from him, which prompted the transfer of a number of assets to Mrs Bourlakova and Veronica.

**B.3    Mrs Bourlakova and Veronica's alleged assets**

94. As to Paragraph 32, it is admitted that in general terms there was a reorganisation of Mr Bourlakov's assets in or around 2014, although Mr Tribaldos was not contemporaneously aware of this reorganisation. The alleged transfers referred to are pleaded in further detail later in the POC, and this Defence responds to them accordingly at the appropriate point.

95. At all material times, Mr Tribaldos and Leo Trust understood that Mr Bourlakov was responsible for controlling all assets owned, legally or beneficially, by members of the Bourlakov family. Mr Bourlakov, and through him Mr Anufriev, had actual and/or ostensible authority to give instructions on behalf of Mrs Bourlakova and their daughters.

96. No admissions are made as to Paragraph 32A, save as is consistent with Paragraph 178 below.

97.     No admissions are made as to Paragraph 33. Mr Kazakov's absence of involvement in the 2014 transfers was not inconsistent with the account given to Mr Tribaldos of the Kazakov partnership and the reason it had not been referred to sooner. Paragraph 89 above is repeated.

**B.4     The alleged breakdown of marital and familial relations**

98.     As to Paragraph 34:

(1)     No admissions are made as to the alleged breakdown in marital or familial relations, save that it is admitted that Mrs Bourlakova filed a divorce petition in Monaco in December 2018.

(2)     Mr Tribaldos did not know of the divorce until early 2019. Paragraph 9 above is repeated.

(3)     No admissions are made as to whether Mr Bourlakov had any "strategy" as alleged, but it is denied that Mr Tribaldos or Leo Trust participated in any such strategy if it existed.

**B.5     The alleged lies about the Bourlakov family's assets and/or their true value**

99.     No admissions are made as to Paragraphs 35-40, which contain no allegations against Mr Tribaldos or Leo Trust.

100.    No admissions are made as to Paragraph 41, save that:

(1)     As to the second sentence of Paragraph 41.h., it is admitted that both documents referred to in this sentence exist.  It is denied that the loan agreement between Finco and Gatiabe is a "forgery" (whatever that is intended to mean). It is admitted that the document is back-dated. A draft (without party names) was produced by Oliver Kälin of Kälin

Krausz Rechtsanwälte, and then populated with details by Ms Andrea Stadelmann, on instructions from Mr Anufriev (including at a meeting on 23 October 2018). The directors of Finco and Gatiabe (ie. those directors who held office as at the date on the face of the relevant document) duly signed the document in early November 2018.

(2)  As to the first sentence of Paragraph 41.i.i., it is admitted that Mr Bourlakov arranged the production of a loan agreement between Gatiabe and Jovellanos as alleged. It is admitted that this loan agreement was back-dated, but denied that it was a "forgery" (whatever that is intended to mean). Mr Tribaldos was told by Mr Anufriev that DLA Piper Moscow had advised that it was necessary for the document to be back-dated to avoid the scrutiny of the Russian tax authorities. No admissions are made as to whether Mrs Bourlakova was unaware of this loan.

(3)  The allegation in the first sentence of Paragraph 41.j. is embarrassing in its lack of particularity, in particular failing to specify (i) who the individuals referred to are, and (ii) what the terms of any such representations were. In so far as this is an allegation against Mr Tribaldos or Leo Trust, no admissions are made save so far as consistent with Paragraph 149 below.

(4)  The documents pleaded in the sub-paragraphs to Paragraph 41.j. are admitted, save that:

(a)  There are two Corporate Depositors forms dated 5 December 2014, one each in relation to Gatiabe and Jovellanos, and not one as alleged in the first sentence of sub-paragraph 41.j.iv.

28

(b)   The UBS records referred to in the first sentence of sub-paragraph 41.j.v. are heavily redacted, such that any relevant context to the sentence relied on is absent. No admissions are therefore made as to the second sentence of sub-paragraph 41.j.v.

(5)   The first and fourth sentences of Paragraph 41.k.i are admitted. Mr Tribaldos and Leo Trust learned of Mr Kazakov's claimed interest in the relevant assets in the circumstances described at Paragraph 89 above.

(6)   As to the second sentence of Paragraph 41.k.i:

(a)   Mr Tribaldos and Leo Trust have not been able to locate a passport scan for Mr Kazakov dated 4 April 2018. Accordingly, no admissions are made as to the existence or receipt of any such passport scan.

(b)   It is admitted that Leo Trust was provided with an Identification Sheet dated 27 April 2018 for Mr Kazakov.

(7)   As to the fifth and sixth sentences of Paragraph 41.n., it is admitted that Mr Kazakov declared an average gross annual income of US$100,000 – 1m on the Leo Trust Identification Sheet referred to. Mr Tribaldos did not himself read this document at the time, and does not know who (if anyone) else at Leo Trust did so.

101.   Paragraph 42 as a whole is a statement of the Claimants' intention to seek early disclosure of certain documents. This is not an appropriate function of a statement of case. It is noted that the Claimants have not in fact sought early disclosure of any such documents. In any event, as explained in Paragraph 17(1) above, in early 2021 Mr Tribaldos and Leo Trust provided

voluntary disclosure to the Claimants of a large number of documents which are the subject of this litigation. The Claimants' account of the documentary material based on which their claims have been pleaded is therefore seriously and materially incomplete.

102.  The second sentence of each of Paragraphs 42.a and 42.b is an assertion about what those documents will show if disclosed. This is not an appropriate function of a statement of case. It is admitted that, in general terms, Leo Trust does not hold documents referring to Mr Kazakov being a beneficial owner of the companies owned or controlled by Mr Bourlakov as alleged in the second sentence of Paragraph 42.a. Leo Trust learned of Mr Kazakov's interest in those assets as described above at Paragraph 89 above.

103.  No admissions are made as to Paragraph 44, which concerns Mr Anufriev's knowledge, save that:

(1)  Paragraph 44.a is admitted and averred in so far as Mr Tribaldos and Leo Trust were aware of the position. Mr Anufriev was, as Mr Tribaldos understood it, principally responsible for the management of Mr Bourlakov's assets. Paragraph 45(4) above is repeated.

(2)  Paragraph 44.e is denied. Mr Tribaldos did not participate in any discussions in which it was said or suggested that the Kazakov partnership was a "mere device".

**B.6    Alleged mediations in Monaco**

104.  No admissions are made as to Paragraphs 45-56. Mr Tribaldos did not participate in any of the mediations or discussions referred to therein.

**B.7    Alleged demands for payment by Mr Kazakov**

105.  No admissions are made as to Paragraphs 57-61.

**B.8    Mr Bourlakov's declaration**

106.    As to Paragraph 62:

    (1)    It is admitted that Mr Bourlakov executed a declaration on 20 December 2018. The declaration was in French, and recorded that it had been translated to Mr Bourlakov by Mr Anufriev.

    (2)    Mr Tribaldos and Leo Trust had no involvement in the creation or execution of the declaration, and were not aware of it until they learned of it from these proceedings.

    (3)    Paragraph 62 does not correctly characterise the terms of the operative part of the declaration. The declaration was to the effect that all the fruits of Mr Bourlakov's business activities of any kind and in any field belonged as to half to Mr Kazakov.

    (4)    No admissions are made as to whether the declaration repeated alleged representations made in London in April 2018, or as to whether any such representations were false.

107.    No admissions are made as to Paragraphs 63-65.

**B.9    The alleged involvement of Mr Tribaldos and Leo Trust in the matters pleaded in Section A6 POC**

108.    As to the first sentence of Paragraph 66:

    (1)    It is admitted that Mr Tribaldos and Leo Trust had been involved in the administration of part of Mr Bourlakov's asset holding structure.

    (2)    It is denied, save as is consistent with Paragraph 27 above, that either Mr Tribaldos or Leo Trust "advised" Mr Bourlakov on his asset holding structure or "managed" that structure. In particular, Leo Trust

31

had no power to make decisions about Mr Bourlakov's asset holding structure or the allocation or management of assets.

109. The second and third sentences of Paragraph 66 are embarrassing in their lack of particularity. No admissions are made thereto.

110. As to the fifth sentence of Paragraph 66, Paragraphs 17(2) and 17(3) above are repeated. In so far as Leo Cyprus held relevant documents in its role as a service provider to Leo Trust, it held them because certain documents were provided to it for the purpose of performing its accounting role on behalf of the relevant companies. It is denied in so far as it is alleged that "many" relevant documents would have been held by Leo Cyprus in its role as a service provider, whatever that is intended to mean. It does not automatically follow that Leo Cyprus would hold "many" relevant documents in its former capacity as an IT support services provider until mid-2020.  In particular, Leo Trust held the master files of client documents in Switzerland, and thus it is unlikely that any significant volume of documentation would be independently held by Leo Cyprus. To the extent that Leo Cyprus "held" a significant volume of documents, Mr Tribaldos and Leo Trust believe it obtained those documents from Leo Trust's server without Leo Trust's knowledge or consent.

111. As to Paragraph 67:

(1) It is denied that Mr Tribaldos and/or Leo Trust knew that the Kazakov partnership was false. Paragraph 89 above is repeated.

(2) It is therefore denied that Mr Tribaldos, Leo Trust and/or Leo Cyprus had or have documents contradicting Mr Bourlakov's alleged misrepresentations. No admissions are made as to whether any such misrepresentations were made.

(3)     No admissions are made as to what Mr Bourlakov may have believed about the ostensible need for Mr Tribaldos and Leo Trust's support for his alleged misrepresentations.

(4)     It is denied, in so far as it is alleged, that:

(a)     Mr Tribaldos or Leo Trust did in fact provide any such support.

(b)     Mr Tribaldos or Leo Trust produced or assisted in the production of any forged or sham documents.

(c)     Mr Tribaldos or Leo Trust destroyed any documents which contradicted the alleged misrepresentations.

112.    Paragraph 68 is denied in its entirety:

(1)     It is denied, in so far as it is alleged, that Mr Tribaldos or Leo Trust participated in any fraudulent activity.

(2)     It is further denied that Mr Tribaldos provided any such explanation to Mr Bourlakov. It was in any event not true that Leo England would remove any directors or employees of Leo Trust and Leo Cyprus to support fraudulent activity by Mr Bourlakov.

(3)     Although Paragraph 68 fails to state when it is alleged that this explanation was provided, it is inferred that the Claimants intend to allege that it was in or around the period February-June 2018 (being the period stated in Paragraph 69). It is denied that at this time Mr Tribaldos controlled any of Leo Trust, Leo England or Leo Cyprus:

(a)     Leo England had three directors, namely Mr Tribaldos, Paul Goldwin (a chartered accountant and partner in PKF

33

Littlejohn LLP, Leo England's accountants) and Mr David Miller (a solicitor and partner in Bolt Burdon, Leo England's solicitors). Mr Goldwin and Mr Miller were independent of Mr Tribaldos. Mr Tribaldos therefore did not control Leo England.

(b)     In consequence, Mr Tribaldos also did not control Leo Trust or Leo Cyprus.

(c)     Further, Leo Trust had four directors, who included Mr Schwarz and Mr Edgar Kircher, who were associated with Rudan, and were independent of Mr Tribaldos. This was a further reason why Mr Tribaldos did not control Leo Trust.

(d)     The directors of Leo Cyprus were Mr Tribaldos, Marios Charalambides, Roman Keller and Andreas Ioannou. Mr Keller was also associated with Rudan. Mr Charalambides and Mr Ioannou were employees of Leo Cyprus who had been appointed as directors.

113.    As to the first sentence of Paragraph 69, only those occasions on which Mr Bourlakov visited Zurich to meet with Mr Tribaldos are within Mr Tribaldos and Leo Trust's knowledge. The meetings pleaded at Paragraph 89(2) above are admitted and averred.

114.    As to the second sentence of Paragraph 69:

(1)     It is admitted that an apparent purpose of these visits was for Mr Bourlakov and Mr Anufriev to discuss and give effect to the Kazakov partnership.

(2)     No admissions are made as to whether Mr Bourlakov had a "strategy" as alleged. If he did, Mr Tribaldos was not aware of it.

(3)     It is therefore denied that the purpose of these meetings was for Mr Bourlakov and Mr Anufriev to inform Mr Tribaldos of the "strategy" alleged by the Claimants.

115.    The first sentence of Paragraph 70 is denied. Paragraphs 89 and 114 above are repeated.

116.    As to the second sentence of Paragraph 70:

(1)     Paragraph 100(6)(a) above is repeated as to the allegation that Mr Kazakov started providing KYC documents to Leo Trust on 4 April 2018.

(2)     No agreement was reached as alleged in the first sentence of Paragraph 70, such that there is no date by which that agreement had been reached.

(3)     Save as aforesaid, this sentence is denied.

117.    As to the third sentence of Paragraph 70, to the best of Mr Tribaldos' recollection, no meeting took place with Mr Bourlakov, Mr Kazakov (or Mr Anufriev) prior to 5 April 2018. If such a meeting did take place, it is denied that there was any discussion of a "strategy" for the discussions to take place in London, with which Mr Tribaldos had no involvement.

118.    Paragraph 71 is denied in its entirety. As it purports to be only a summary of other paragraphs of the POC, those allegations are pleaded to below where they arise.

119.    Paragraph 72 is denied in its entirety. Paragraph 106(2) above is repeated.

**B.10    Alleged consequences of the representations alleged in Section A7**

120.    No admissions are made as to Paragraphs 73-74.

## C.    RESPONSE TO SECTION B POC

121.    The documents referred to in Paragraphs 75-78, and their terms, are admitted. In each case, it is admitted that the documents were not executed on the date they bear on their face, but at a later date. Save as aforesaid, it is not admitted that it is correct to describe any of the documents as only "purporting" to be such documents. So far as Mr Tribaldos and Leo Trust were aware, they were genuine and effective. Paragraph 89(7) above is repeated as to the reasonableness of Mr Tribaldos' belief in the existence of these liabilities.

122.    As to Paragraph 79:

(1)    The first sentence is admitted, save that it is denied that the declaration of trust was entered into by Delos "purportedly" as the holder of the shares in Gatiabe. Delos was in fact the legal owner of the shares in Gatiabe.

(2)    The second sentence is admitted. The documents were signed on or around 15 October 2018.

(3)    The third sentence is noted.

123.    No admissions are made as to the first, second or fourth sentences of Paragraph 80.

124.    As to the third sentence of Paragraph 80, this allegation is addressed at Paragraph 149 below.

36

125.    Save that it is not correct to characterise any of the documents referred to as "forgeries", whatever that is intended to mean, the first sentence of Paragraph 81 is admitted. In so far as it is alleged, it is denied that Mr Tribaldos intended to produce or assist in producing any documents which were "forgeries" or would be used fraudulently.

126.    The second sentence of Paragraph 81 is admitted and averred. By way of example, the Gatiabe-Jovellanos loan agreement was sent in draft to Mr Anufriev on 20 March 2019, and then returned by Mr Anufriev later that day with comments, including noting that the sum payable was the purchase price for 67.71% of the issued share capital of Novoroscement (which Mr Tribaldos and Leo Trust did not know).

127.    As to Paragraph 82:

(1)    It is admitted that the relevant individuals were no longer directors at the time the documents were signed.

(2)    In the case of (at least) the Finco/Gatiabe loan, the Gatiabe resolution and the Finco resolution, the documents were signed after the time at which the individuals who signed them ceased to be directors. They were signed by the directors who were in office at the date which the document bore, and on which Mr Tribaldos understood that the underlying agreement had in fact been reached.

(3)    Mr Tribaldos cannot now recall how the Gatiabe/Jovellanos loan agreement came to be signed. It is possible that the signatures were applied to the documents electronically using "blancos", which were copies of signatures held by Leo Trust to be applied to documents. Blancos were sometimes used by Morgan & Morgan or by Leo Trust with Morgan & Morgan's express and/or implied consent.

37

(4)    It is denied, in so far as it is alleged, that the fact that signatures were applied by someone other than the signatories (if that was the case) was wrongful or supports the Claimants' case against Mr Tribaldos and/or Leo Trust.

128.    The first sentence of Paragraph 83 is denied so far as it concerns Mr Tribaldos:

(1)    Mr Tribaldos was shown UBS bank statements by Mr Bourlakov and Mr Anufriev which demonstrated the transfer of funds from Gatiabe to Finco. In particular, Gatiabe's bank statement for the period 1 January 2007 to 31 March 2007 shows a payment from Gatiabe to Finco of USD 1,349,433,000 (being the same figure contained in the Finco/Gatiabe loan agreement).

(2)    Mr Tribaldos was shown this extract at the first meeting where the Kazakov partnership was explained to him, as to which Paragraph 89 above is repeated. Mr Tribaldos asked whether the payment from Gatiabe to Finco had actually been made, he was shown the bank statement extract on Mr Anufriev's phone.

(3)    As a matter of Swiss law, a payment from one party to another is considered a loan bearing interest in the absence of any reason to treat it otherwise. Mr Tribaldos was entitled to believe (and did in fact believe) that the payment from Gatiabe to Finco had given rise to a loan relationship between Gatiabe and Finco.

(4)    Mr Tribaldos therefore reasonably believed that Gatiabe had made a loan to Finco in March 2007, and was therefore not aware (if the same is true) that there was no loan such that documents would need to be forged to create or support a purported liability to Gatiabe.

38

129.   No admissions are made as to the second sentence of Paragraph 83, the true reason for the transfer from Gatiabe to Finco in 2007 being outside the knowledge of Mr Tribaldos and Leo Trust.

130.   No admissions are made as to Paragraph 84, save that it is admitted as alleged in Paragraph 84.b that no resolution to enter into the Finco/Gatiabe loan was passed in around March 2007.

131.   No admissions are made as to the first sentence of Paragraph 85.

132.   The second sentence of Paragraph 85 is admitted, save that it is denied that the documents referred to are properly characterised as "forged".

133.   The third sentence of Paragraph 85 is admitted, save that (so far as Mr Tribaldos and Leo Trust were aware) the transfer of Gatiabe to Wlamil by Delos was not purported but genuine and effective.

134.   As to the fourth sentence of Paragraph 85, Paragraph 77 above is repeated. Save as aforesaid, no admissions are made.

135.   No admissions are made as to the fifth sentence of Paragraph 85.

136.   As to the first sentence of Paragraph 86:

   (1)    The declaration of trust was prepared by Andrea Stadelmann.

   (2)    It is therefore admitted that it was prepared on instructions from Mr Tribaldos, in his capacity as a director of Leo Trust.

   (3)    It is denied that it was prepared with the knowledge and permission of Leo England.

   (4)    It is denied that it was prepared by Mr Tribaldos himself.

   (5)    Save as aforesaid, no admissions are made.

137. The second sentence of Paragraph 86 is admitted.

138. In the premises, the third sentence of Paragraph 86 is irrelevant, and Mr Tribaldos and Leo Trust do not plead to it.

139. The fourth sentence of Paragraph 86 is denied. Paragraph 89 above is repeated.

140. The first sentence of Paragraph 87 is admitted, save that no admissions are made that the sums due pursuant to the Finco/Gatiabe document are "purported" only.

141. No admissions are made as to the second sentence of Paragraph 87. Mr Tribaldos honestly and reasonably believed that such a loan existed. Paragraph 128 above is repeated.

142. As to the third sentence of Paragraph 87:

    (1)   No admissions are made as to whether the Finco/Gatiabe loan existed.

    (2)   It is denied, in so far as it is alleged, that Mr Tribaldos or Leo Trust were aware that no such loan existed.

    (3)   The accounts were prepared by accountants within Leo Cyprus, who corresponded with Mr Anufriev (typically via Ms Stadelmann). No allegation of wrongdoing is made against any of those individuals in the POC.

143. No admissions are made as to the fourth and fifth sentences of Paragraph 87, although it is admitted that in general Mr Anufriev would have been responsible for addressing the Russian tax implications of such arrangements.

144. As to Paragraph 88 in general, although the chapeau to this paragraph states that the Claimants rely on the facts which follow, it does not set out which of their preceding allegations are said to be demonstrated by the facts relied upon. In the premises, no admissions are made as to any inference which the Claimants may seek to draw from those facts or matters.

145. The first sentence of Paragraph 88.0 is embarrassing in its lack of particularity, in failing to specify which emails are referred to. Further, the Claimants have not disclosed the Cyprus AP documents, such that Mr Tribaldos and Leo Trust cannot admit or deny their contents. Without prejudice to that, it is admitted in general terms that there were emails between Leo Trust and Leo Cyprus in or about this period relating to preparing backdated accounts for Gatiabe in 2015 and 2016.

146. No admissions are made as to the second sentence of Paragraph 88.0. Paragraph 145 above is repeated.

147. Sub-paragraph 88.0.i is admitted.

148. As to sub-paragraph 88.0.ii:

(1) No admissions are made as to the first sentence.

(2) As to the second sentence, it is admitted that an addendum to the Finco/Gatiabe document was prepared, the effect of which was that simple interest would be payable at 2% per annum from 1 January 2014. The addendum was prepared on instructions from Mr Anufriev, on the basis that Mr Bourlakov and Mr Kazakov had previously agreed to lower the interest rate on the Finco/Gatiabe loan.

(3) No admissions are made as to the third sentence, save that (i) it is denied that this document was a "forgery", whatever that is intended

to mean, and (ii) in so far as it is alleged, it is denied that Mr Tribaldos or Leo Trust shared the alleged purpose of misleading Mrs Bourlakova as to the sums due from Finco to Gatiabe, if that purpose was in fact held by anyone.

149.    As to sub-paragraph 88.0.iii:

(1)    Save that it is denied that this document was a "forgery", the first sentence is admitted.

(2)    The second sentence is admitted.

(3)    As to the third sentence, no admission is made as to whether the entire sum due from Finco to Gatiabe became due from Gatiabe to Jovellanos "as a result of" these contracts. Mr Tribaldos understood that the Gatiabe-Jovellanos loan agreement was prepared as part of the tax disclosure exercise to the Russian authorities, which was intended to reflect pre-existing liabilities between the relevant companies rather than generate new ones.

(4)    As to the fourth sentence, Paragraph 148(3) above is repeated *mutatis mutandis*.

(5)    The fifth sentence is denied. It presupposes the very thing in issue in these proceedings, namely whether all of Finco, Gatiabe and Jovellanos were owned and/or controlled by Mr Bourlakov.

(6)    No admissions are made as to the sixth and seventh sentences.

150.    No admissions are made as to Paragraph 88.a. Mr Tribaldos was told that the purpose of the Finco/Gatiabe document was to reflect a genuine obligation as between Finco and Gatiabe. In so far as it is alleged, it is denied that Mr Tribaldos or Leo Trust were aware of any other purpose. Mr Tribaldos held

a reasonable belief in the existence of the relevant transaction having been provided with corroborating evidence in the form of UBS bank statements by Mr Anufriev and Mr Bourlakov, as pleaded at Paragraphs 89(7) and 128 above.

151.   Paragraph 88.b is admitted.

152.   As to Paragraph 88.c:

(1)   The first and second sentences are admitted. One of the directors of Finco was no longer alive, and so only one signature was applied.

(2)   No admissions are made as to the third sentence.

153.   No admissions are made as to Paragraph 88.d.

154.   The first sentence of Paragraph 88.e is admitted.

155.   No admissions are made as to the second sentence of Paragraph 88.e. Further:

(1)   There was at the time no obligation on Panamanian companies to maintain financial records. As a result, the nominee directors of Panamanian companies would not necessarily know what assets or liabilities were held by the companies they were directors of.

(2)   As a result, it was common for companies to be mistakenly dissolved whilst they still had assets and/or liabilities, and common for such dissolved companies to be reactivated at a later stage on account of them continuing to hold assets and/or liabilities.

156.   The first sentence of Paragraph 88.f is denied. Gatiabe's directors would not have known about the loan to Finco, given that in their roles as nominee directors they acted as directors for thousands of companies.

157. The third sentence of Paragraph 88.f is admitted, but it is denied that any inference follows therefrom.

158. No admissions are made as to the first sentence of Paragraph 88.g.

159. The second sentence of Paragraph 88.g is admitted, but it is denied that any inference follows therefrom.

160. As to Paragraph 88.h:

   (1)   The first sentence is admitted.

   (2)   The second sentence is denied, save that it is admitted that the result of the loan agreements is that Finco had substantial assets.

   (3)   As to the third-fifth sentences, Paragraphs 155-156 above are repeated *mutatis mutandis*. Finco's directors would not have known about the loan from Gatiabe. Save as aforesaid, no admissions are made.

161. As to Paragraph 88.i, Paragraph 89 above is repeated.

162. No admissions are made as to Paragraphs 88.j-k, which are outside the knowledge of Mr Tribaldos and Leo Trust.

163. As to Paragraph 88.l, no admissions are made. Mr Tribaldos honestly and reasonably believed the account he was told of the Kazakov partnership.

164. Paragraph 88.m is admitted, but it is denied that any inference follows therefrom.

165. No admissions are made as to Paragraph 88.n, which is outside the knowledge of Mr Tribaldos and Leo Trust.

166. Paragraph 88.o is embarrassing in its lack of particularity. It is denied, in so far as it is alleged, that Mr Tribaldos was at any time aware of such forgeries.

167.   As to Paragraph 89 in general, Paragraph 101 and the first sentence of Paragraph 102 above are repeated *mutatis mutandis*. It is admitted that any such documents which were obtained would show no record of the Finco/Gatiabe loan.

168.   No admissions are made as to Paragraph 90, which is outside the knowledge of Mr Tribaldos and Leo Trust.

169.   No admissions are made as to Paragraphs 90A-B, save that:

   (1)   Paragraph 90A.a is admitted, save that it is denied that the Gatiabe Bearer Share Certificate was valid until 26 January 2022.

   (2)   Save that no admissions are made as to Mrs Bourlakova's alleged lack of knowledge or consent, the first sentence of Paragraph 90A.c is admitted.

   (3)   The facts alleged in the first sentence of Paragraph 90A.d are admitted, save that it is not admitted that the actions referred to were only "purported" – to the best of Mr Tribaldos and Leo Trust's knowledge, they were genuine and effective.

   (4)   The facts alleged in Paragraphs 90A.e-f and 90A.h-i are admitted.

   (5)   Mr Tribaldos and Leo Trust take no position as to the various allegations of Panamanian law made, and the consequent allegations about the beneficial ownership of Gatiabe and Jovellanos.

## C.1   Mr Kazakov's alleged ownership of assets

170.   Paragraph 91 is admitted as a statement of Mr Bourlakov's position. As set out above, Mr Tribaldos does not know if that position is true or false.

171. No admissions are made as to Paragraphs 92-94. Mr Tribaldos and Leo Trust had no role in the creation of any security interest in any of the assets referred to or any security in respect of the Finco/Gatiabe transaction.

172. Save that no admissions are made as to whether Mr Anufriev was involved or assisted in the preparation or execution of any such documents, the first sentence of Paragraph 95 is denied. Notwithstanding that this sentence appears to contain an allegation of fraud against Mr Tribaldos, no primary facts are identified to form the basis for this allegation. The allegation is also embarrassing in its lack of particularity, in failing to specify what involvement or assistance Mr Tribaldos is alleged to have had or given.

173. The second sentence of Paragraph 95 is denied. Notwithstanding that this sentence appears to contain an allegation of fraud against Mr Tribaldos, no primary facts are identified to form the basis for this allegation.

174. The third sentence of Paragraph 95 is denied as regards Mr Tribaldos. Paragraph 89 above is repeated.

175. No admissions are made as to Paragraph 96.

## D.   RESPONSE TO SECTION C POC

### D.1   The alleged ownership of Edelweiss

176. The first sentence of Paragraph 96A is a summary of an allegation made in more detail below, and is dealt with where it arises.

177. No admissions are made as to any of the facts and matters set out in Paragraph 96B. Mr Tribaldos was not aware of Mr Bourlakov and Mrs Bourlakova's domestic arrangements.

178.   As to Paragraph 96C, Mr Tribaldos and Leo Trust take no position on who the ultimate beneficial owner of Edelweiss is. As to the facts and matters relied on:

(1)   Paragraph 96C.a. is admitted.

(2)   No admissions are made as to Paragraph 96C.b.

(3)   The first sentence of Paragraph 96C.c is admitted. The back-dating took place in circumstances where MMG Zurich had received clear instructions in or around April 2015 from Mr Anufriev that the shares in Edelweiss were to be transferred to Merenguito, *inter alia* by reason of the communications pleaded by the Claimants in Paragraph 96C.d.

(4)   As to Paragraph 96C.d, it is admitted that the share certificate was not issued on 9 April 2015. Each of the communications referred to in the sub-paragraphs thereto is admitted.

(5)   The first sentence of Paragraph 96C.e. is admitted, save that no admissions are made as to whether it is accurate to describe the transfer of the shares on either occasion described as "purported".

(6)   No admissions are made as to the second sentence of Paragraph 96C.e.

(7)   Paragraph 96C.f. is admitted, save that no admissions are made as to the validity of the actions taken at that meeting.

(8)   Paragraph 96C.g is admitted, save that no admissions are made as to whether 100 shares were "duly" issued to Veronica.

(9)   No admissions are made as to Paragraphs 96C.h.

(10)   Paragraphs 96C.i.-j are admitted.

179.   No admissions are made as to Paragraphs 96D-F.

**D.2   Alleged attempts to misappropriate or devalue H1 or its assets**

180.   Paragraphs 97-98 are admitted. The resolution of 5 September 2017 also resolved to close Edelweiss's account with Credit Suisse Zurich, the US$1.664m being the only money remaining in that account.

181.   No admissions are made as to Paragraph 99.

182.   The first sentence of Paragraph 100 is admitted as a partial summary of the relevant email. Mr Anufriev was responding to an email from Anne-Marie Forget of Credit Suisse AG, enclosing documents to be completed in order to effect such a transaction.

183.   No admissions are made as to Paragraphs 100-106, save that it is admitted as alleged in Paragraph 105 that a loan agreement was produced between Edelweiss and H1. This document was signed on or around 22 May 2018.

184.   The first sentence of Paragraph 107 is admitted.

185.    No admissions are made as to the second and third sentences of Paragraph 107.

186.    The first sentence of Paragraph 108 is admitted, save that no admissions are made as to whether it is correct to describe the persons in question as only "purporting" to act on behalf of Edelweiss. Mr Tribaldos was asked by Mr Anufriev to procure that this letter be sent, but did not know why Mr Anufriev wished the letter to be sent.

187.    As to the second sentence of Paragraph 108:

(1)     No admissions are made as to whether the date of 10 September 2015 was an error. The loan agreement was sent to Leo Trust by Mr Anufriev, although it appears to have been prepared by Hafner & Hochstrasser, a Swiss law firm.

(2)     It is denied that the Edelweiss Loan Document was not in existence on 4 October 2018. Paragraph 183 above is repeated.

188.    The first sentence of Paragraph 109 is admitted, save that (i) no admissions are made as to whether the lawyers in question (RKR Rechtsanwalte of Zurich) had not been validly appointed to act for Edelweiss, and (ii) no admissions are made as to whether the Edelweiss Loan Document was received with that letter for the first time.

189.    No admissions are made as to Paragraph 110, save that in so far as it is alleged that Mr Tribaldos or Leo Trust are acting dishonestly in respect of the Edelweiss Loan Document, the same is denied.

190.    As to the first sentence of Paragraph 111:

(1)     The Edelweiss Loan Document was not discussed with Mr Tribaldos before it was executed, whether "specifically" or at all.

(2)     No admissions are made as to whether it is correct to describe the Edelweiss Loan Document as "purported" only.

(3)     The allegation that the Edelweiss Loan Document was executed in circumstances where Mr Tribaldos had "agreed to support Mr Bourlakov's strategy" is embarrassing in its lack of particularity, and is denied. If Mr Bourlakov had a "strategy", Mr Tribaldos did not know about it.

(4)   It is denied that Mr Tribaldos assisted in the creation of any forged or sham documents, or agreed to do so.

(5)   Save as aforesaid, no admissions are made.

191.   The relevance of the second sentence of Paragraph 111 is not understood. Mr Tribaldos would not have taken any steps to support the allegedly sham agreement, and in consequence the factual allegation is denied.

192.   Paragraph 112 is admitted.

193.   The first sentence of Paragraph 113 is admitted. By the same email, Mrs Bourlakova also requested that all liabilities of IPEC under the loan expiring on 10 September 2015 be transferred to H1.

194.   No admissions are made as to the second or third sentences of Paragraph 113.

195.   As to the first sentence of Paragraph 114:

(1)   The IPEC/H1 loan agreement was entered into in or around October 2015. Leo Trust's records show that MMG Zurich sent an email to Morgan & Morgan to obtain the signatures of IPEC's directors on the agreement (which was already signed by H1) on 12 October 2015.

(2)   No admissions are made as to why the loan agreement was entered into, or whether there was a genuine intention that H1 would be under an obligation to make a repayment to IPEC.

(3)   In so far as it is alleged that Mr Tribaldos and Leo Trust were aware that there was no intention that H1 would be under a genuine obligation to repay IPEC, the same is denied.

50

196. As to the second sentence of Paragraph 114, it is admitted that IPEC was dissolved in May 2016. The inference sought to be drawn therefrom is not admitted.

197. No admissions are made as to the third sentence of Paragraph 114.

198. No admissions are made as to the fourth and fifth sentences of Paragraph 114.

199. As to the final sentence of Paragraph 114, it is admitted that IPEC was reactivated on or around 28 July 2020, but it is denied that the Columbus assignment was a forgery (and, in consequence, it is also denied that the reactivation followed the discovery by Mrs Bourlakova and H1 of the same).

200. The first sentence of Paragraph 115 is denied. As far as Mr Tribaldos and Leo Trust were aware:

(1) To the best of Mr Tribaldos' recollection, the reason for the assignment was that Mr Bourlakov wished to recover the debt from Hermitage One, but did not wish to wait until IPEC had been reactivated (which, at that time, could have taken up to 2 months).

(2) The Columbus assignment reflected what Mr Tribaldos and Leo Trust understood to be a genuine arrangement between IPEC and Columbus.

(3) Panamanian companies were entitled to take steps even whilst dissolved to realise assets, which included assigning their assets to third parties for recovery. Morgan & Morgan, a reputable Panamanian law firm, procured the signature of the assignment notwithstanding that (as they were aware) IPEC had been dissolved.

201.   The second sentence of Paragraph 115 is admitted, save that it is denied that this was done with the knowledge or permission of Leo England.

202.   The third sentence of Paragraph 115 is admitted and averred.

203.   No admissions are made as to the first sentence of Paragraph 116.

204.   The second sentence of Paragraph 116 is admitted.

205.   As to the first sentence of Paragraph 117:

    (1)   It is admitted that the assignment agreement between Columbus and IPEC was not in place prior to May 2018.

    (2)   No admissions are made as to state of knowledge or intentions of Mr Bourlakov or Mr Anufriev.

    (3)   It is denied that any documents were forged for the purpose of evidencing the agreement between IPEC and Columbus. So far as Mr Tribaldos and Leo Trust were aware, there was a genuine arrangement between IPEC and Columbus to be given effect to.

    (4)   Save as aforesaid, no admissions are made.

206.   In the premises, no admissions are made as to the second-fourth sentences of Paragraph 117.

207.   No admissions are made as to the fifth sentence of Paragraph 117.

208.   As to the sixth sentence of Paragraph 117, Mr Tribaldos' understanding was as set out above at Paragraph 200 above. No admissions are made as to the true position.

209.   Paragraph 118 is admitted.

210.    As to Paragraph 119 in general, although the chapeau to this paragraph states that the Claimants rely on the facts which follow, it does not set out which of their preceding allegations are said to be demonstrated by the facts relied upon. In the premises, no admissions are made as to any inference which the Claimants may seek to draw from those facts or matters.

211.    As to the first sentence of Paragraph 119.a, it is admitted that the Columbus assignment states that it was signed by Ms Aoun and Ms Ponce (both on behalf of IPEC). It is denied that it states that it was signed by Mr Arcia.

212.    The first and second sentences of Paragraph 119.a are admitted.

213.    As to the third sentence of Paragraph 119.a:

    (1)    It is admitted that the Columbus assignment was not entered into in May 2016.

    (2)    The Columbus assignment does not state what capacity Ms Aoun signed it in.

    (3)    No admissions are made as to whether Panamanian law required Ms Aoun to state that she was signing it in her capacity as liquidator.

    (4)    Save as aforesaid, no admissions are made.

214.    As to the fourth sentence of Paragraph 119.a:

    (1)    Mr Arcia did not sign the document.

    (2)    It is admitted that Ms Ponce signed the document, and that she was a director of IPEC at the relevant time.

    (3)    No admissions are made as to what Mr Arcia or Ms Ponce would have done in the hypothetical scenario posited by the Claimants.

215.     No admissions are made as to Paragraph 119.b-c.

216.     As to the first sentence of Paragraph 119.d, it is denied in so far as it is alleged that there is no resolution of the board of IPEC resolving to assign the loan to Columbus. Such a resolution was signed by the relevant directors no later than 22 May 2018.

217.     The allegation in the second sentence of Paragraph 119.d is noted, but is dealt with where it arises below.

218.     Paragraph 119.e is admitted, save that the first sentence improperly speculates as to what invoices which are yet to be disclosed may show.

219.     Paragraph 119.f is embarrassing in its lack of particularity, and no admissions are made thereto.

220.     As to Paragraph 120 in general, Paragraph 101 and the first sentence of Paragraph 102 above are repeated *mutatis mutandis*. It is admitted that Leo Trust's invoices for the period described do not include any record of work done on the assignment in the period identified.

## D.3    Alleged attempts to devalue Greenbay and its assets

221.     Paragraph 121 is admitted. The letter identified that the loan had been made in the form of securities on 23 September 2008. The Claimants plead in Paragraph 124 that this transfer was made.

222.     Paragraph 122 is admitted.

223.     Paragraph 123 is admitted.

224.     The first sentence of Paragraph 124 is admitted and averred. Mr Tribaldos' understanding, consistent with the position under Swiss law, was that this transfer was assumed to be a loan bearing the prescribed rate of interest.

225.   The second sentence of Paragraph 124 is admitted.

226.    No admissions are made as to the third sentence of Paragraph 124. Paragraph 224 above is repeated.

227.   Paragraph 125 is admitted. At the date of IPEC's liquidation and dissolution, IPEC's directors and liquidator were not aware of the loan from IPEC to Greenbay.

228.   Paragraph 126 is admitted.

229.   As to Paragraph 127:

   (1)   The first sentence is denied.

   (2)   The second sentence is admitted. The IPEC minutes were prepared in draft for the first time on or around 3 October 2018 by Mr Tribaldos.

   (3)   The third sentence is denied. Paragraph 224 above is repeated.

230.   As to the first sentence of Paragraph 128:

   (1)   As to the creation of the IPEC minutes, Paragraph 229(2) above is repeated.

   (2)   It is therefore denied that the IPEC minutes were produced with the assistance of Mr Tribaldos. He produced them himself.

   (3)   It is denied that the IPEC minutes were prepared with the knowledge and permission of Leo England.

   (4)   Save as aforesaid, no admissions are made.

231.   The second sentence of Paragraph 128 is admitted.

232.   As to Paragraph 129, Mr Tribaldos cannot now recall how signatures were applied to the IPEC minutes. No admissions are made.

233.   As to the first sentence of Paragraph 130:

(1)   No admissions are made as to state of knowledge of Mr Bourlakov or Mr Anufriev.

(2)   It is denied that any documents were forged for the purpose of evidencing the agreement between IPEC and Finco.

(3)   In so far as the same is alleged, no admissions are made as to the existence of any document other than the IPEC minutes reflecting the matters referred to in this paragraph.

(4)   Save as aforesaid, no admissions are made.

234.   In the premises, no admissions are made as to the second-fourth sentences of Paragraph 130.

235.   The first sentence of Paragraph 131 is not understood. The IPEC minutes are not a document of a type which falls or could fall within the definition of a sham in English law, and no other meaning to the term is identified.

236.   As to the second sentence of Paragraph 131:

(1)   Minutes of a meeting of the IPEC board of directors dated 15 April 2016 recorded IPEC's decision to cede its loan to Greenbay, and to enter into an Assignment Agreement accordingly.

(2)   The minutes of this meeting were produced in or around October 2018.

(3)   Save as aforesaid, no admissions are made.

56

237.   As to Paragraph 132 in general, although the chapeau to this paragraph states that the Claimants rely on the facts which follow, it does not set out which of their preceding allegations are said to be demonstrated by the facts relied upon. In the premises, no admissions are made as to any inference which the Claimants may seek to draw from those facts or matters.

238.   As to Paragraph 132.a:

(1)   The first sentence is admitted, save that no admissions are made as to whether it is correct to describe the signatures as "purported" only. Mr Tribaldos cannot now recall how signatures were applied to the IPEC minutes.

(2)   The second sentence is admitted.

(3)   No admissions are made as to the third or fourth sentences.

239.   Paragraph 132.b is admitted.

240.   The first and second sentences of Paragraph 132.c are admitted.

241.   No admissions are made as to the third-sixth sentences of Paragraph 132.c.

242.    No admissions are made as to Paragraph 132.d.

243.   The first sentence of Paragraph 132.e is admitted.

244.   No admissions are made as to the second and third sentences of Paragraph 132.e.

245.   No admissions are made as to Paragraph 132.f.

246.   The first, second and third sentences of Paragraph 132.g.1 are admitted as a partial summary of the relevant communications.

247.    No admissions are made as to the fourth sentence of Paragraph 132.g.i.

248.    Paragraph 133 as a whole is a statement of the Claimants' intention to seek early disclosure of certain documents. This is not an appropriate function of a statement of case. It is noted that the Claimants have not in fact sought early disclosure of any such documents.

249.    The second sentence of each of Paragraphs 133.a and 133.b is an assertion about what those documents will show if disclosed. This is not an appropriate function of a statement of case. Without prejudice to that position, it is admitted that the documents would, if disclosed, show no record of Finco having an asset worth US$ 249,678,340, or any record of Leo Trust's work in the relevant period on the assignment from IPEC to Finco of a loan due to Maravan/Greenbay.

**D.4    The dissolution of Tribatline, Merenguito and Nuptials, and alleged misappropriation of Columbus, Finco, IPEC and Hydrangea**

250.     Paragraph 134 is admitted as a partial summary of the Regulations of Tribatline, Merenguito and Nuptials.

251.    The first sentence of Paragraph 135 is admitted in respect of the period after 18 August 2016, but no admissions are made prior to that date.

252.    As to the second sentence of Paragraph 135, it is admitted that one or the other position is correct. Mr Tribaldos and Leo Trust do not know which.

253.    No admissions are made as to the third and fourth sentences of Paragraph 135.

254.    As to Paragraph 136 in general, although the chapeau to this paragraph states that the Claimants rely on the facts which follow, it does not set out which of their preceding allegations are said to be demonstrated by the facts relied

upon. In the premises, no admissions are made as to any inference which the Claimants may seek to draw from those facts or matters.

255.  As to Paragraph 136.a:

(1)  The first and second sentences are admitted.

(2)  No admissions are made as to whether Mrs Bourlakova and Veronica were informed that Mr Anufriev would be standing down as protector, but it is admitted that he did so by way of letters of resignation dated 27 April 2018.

256.   Each of Paragraphs 136.a.1-3 are admitted.

257.  Paragraph 136.a.4 is admitted, save that both the amendment to the Regulations and the motion for Merenguito's liquidation were passed on 27 April 2018. They were signed by no later than 23 May 2018.

258.  The first sentence of Paragraph 136.a.5 is admitted.

259.  No admissions are made as to the second and third sentences of Paragraph 136.a.5.

260.  The first-fourth sentences of Paragraph 136.a.6 are admitted.

261.  As to the fifth sentence of Paragraph 136.a.6:

(1)  No admissions are made as to whether the Mandate Agreements demonstrate Mr Bourlakov's ongoing control of Cantucci, Anahill and Hemaren.

(2)  It is denied that the Mandate Agreements demonstrate the involvement of Mr Tribaldos and Leo Trust in the alleged misappropriation of Edelweiss, Columbus and Hydrangea. On the

contrary, the provisions of the Mandate Agreements demonstrate that Mr Tribaldos and Leo Trust were acting on instructions from Mr Bourlakov, rather than devising or advising on any part of Mr Bourlakov's strategy:

(a)   The Mandate Agreements make no provision for any advice to be given by Leo Trust as to such matters.

(b)   By Clause 1.1, Leo Trust was mandated to reinstate the relevant Foundation, and administer, manage and supervise it. That was the extent of Leo Trust's duties.

(c)   By Clause 2.1, Leo Trust was to act with regard to the structure's affairs under normal circumstances only on written instructions from the Principal (Mr Bourlakov) or his nominees. Oral instructions would occasionally be permitted. Leo Trust had no mandate to act otherwise than in accordance with such instructions.

262.   Save that Mrs Kazakova was appointed as Protector of Nuptials on 27 April 2018, and it is denied that her letter was only purportedly dated 27 April 2018, Paragraph 136.a.7 is admitted. The letter was signed no later than 23 May 2018.

263.   Save that the amendment to the Regulations and the motion of the Foundation Council were dated 27 April 2018, Paragraph 136.a.8 is admitted.

264.   As to Paragraph 136.b:

(1)   The first two sentences are admitted, save that it is not admitted that the transfers of Edelweiss were "purported" – so far as Mr Tribaldos and Leo Trust were aware, they were genuine and effective.

(2)   No admissions are made as to whether Mrs Bourlakova was informed of the changes to the class of beneficiaries or Veronica was informed of the transfer, as alleged in the third sentence.

(3)   The fourth sentence is admitted.

265.   Paragraph 136.c is admitted.

266.   The first and second sentences of Paragraph 136A are admitted, save that it is not admitted that the transfers of Finco to Delos and Wlamil were only "purported" – so far as Mr Tribaldos and Leo Trust were aware, they were genuine and effective.

267.   No admissions are made as to the third and fourth sentences of Paragraph 136A.

268.   Paragraph 136B is admitted, save that it is denied that the share certificate issued by IPEC to Anahill was "purported" only – so far as Mr Tribaldos and Leo Trust were aware, it was genuine and effective.

269.   No admissions are made as to Paragraphs 137 and 138.

**D.5   Alleged involvement of the Defendants**

270.   The first and third sentences of Paragraph 140 are admitted. No admissions are made as to the second and fourth sentences.

271.   No admissions are made as to Paragraph 141. Mr Tribaldos and Leo Trust were not parties to any discussions between Mr Bourlakov and Mr Kazakov or Mrs Kazakova concerning any attempts to defraud Mrs Bourlakova or her daughters.

272.   Save that it is admitted that Mrs Kazakova agreed to Anahill, Hemaren and Cantucci being made beneficiaries of Tribatline, Merenguito and Nuptials

respectively, as alleged in the first sentence, no admissions are made as to Paragraph 143.

273. The allegations made against Mr Tribaldos and Leo Trust in Paragraph 143A are made without foundation, and are insufficiently pleaded. In particular, the Claimants fail to identify what involvement it is alleged that Mr Tribaldos had in the alleged "strategy", and in large part fails to identify any primary facts on the basis of which it is alleged that Mr Tribaldos participated in the fraud alleged or was dishonest in respect of any such participation. The remainder of this section is pleaded without prejudice to that general position.

274. As to the first sentence of Paragraph 143A:

(1) It is denied that Mr Tribaldos was party to any discussion about the misappropriation (attempted or actual) of any of Columbus, Hydrangea and Edelweiss, or the reactivation and misappropriation of Finco.

(2) It is admitted that, at meetings in or around April 2018, Mr Tribaldos was informed by Mr Bourlakov and Mr Anufriev of certain changes to be made to the corporate structures in question to reflect the Kazakov partnership. Paragraph 89 above is repeated.

(3) No admissions are made as to whether Mr Bourlakov had a "strategy". If he did, Mr Tribaldos was not a party to it.

(4) Save as aforesaid, no admissions are made.

275. The second sentence of Paragraph 143A is denied. Mr Tribaldos, in his role as an officer of Leo Trust, agreed to effect the instructions that he was given

by Mr Bourlakov and Mr Anufriev. It is denied that the was aware of or agreed to participate in any misappropriation (if the same occurred).

276. As to the third sentence of Paragraph 143A:

(1)   It appears that the Claimants intended to allege that Mr Bourlakov needed Leo Trust's assistance with his "strategy" and/or the alleged misappropriation. If so, that is denied. The alleged fraud (if it exists) did not require any participation from Leo Trust (or Mr Tribaldos), and they were not aware of any alleged "strategy" and/or misappropriation.

(2)   No admissions are made as to Mr Bourlakov's alleged beliefs or motivations in respect of Leo Trust's role.

(3)   It is denied, if it is alleged, that Mr Tribaldos and Leo Trust in fact provided any such assistance.

(4)   It is admitted that Leo Trust was responsible for communicating with the Foundation Council of each of the Foundations.

(5)   Save as aforesaid, no admissions are made.

277. The fourth sentence of Paragraph 143A is embarrassing in its lack of particularity. Paragraph 261(2) above is repeated as regards the Mandate Agreements.

278. As to the fifth sentence of Paragraph 143A:

(1)   It is admitted that Mr Tribaldos conveyed Mr Bourlakov's instructions to take the steps set out in that sentence to others at Leo Trust.

(2)    It is denied that Leo England knew of or gave permission for these steps to be taken or instructions to be conveyed.

(3)    It is denied, in so far as it is alleged, that Mr Tribaldos thereby gave any assistance to Mr Bourlakov in any improper or fraudulent conduct.

279.    No admissions are made as to Paragraphs 144-144B, save that (i) it is admitted that Mr Anufriev was Mr Bourlakov's "right hand man" and primarily responsible for advising Mr Bourlakov on his asset holding structures; (ii) the notification forms pleaded in sub-paragraph 144A.a are admitted.

280.    No admissions are made as to Paragraphs 145-146, save that it is admitted as alleged in Paragraph 146.a that Edelweiss had net assets in excess of US$700m in January 2018 (according to a statement of assets as at 24 January 2018 supplied by UBS).

281.    No admissions are made as to Paragraph 146A. Mr Tribaldos and Leo Trust were not aware of any such transfers of Edelweiss's assets.

282.    As to the chapeau to Paragraph 147, no admissions are made as to the Claimants' state of knowledge at any time.

283.    Paragraph 147.a is admitted, save that the document was drafted in March 2019 and signed on or around 14 March 2019.

284.    No admissions are made as to Paragraph 147.b.

285.    Paragraph 147.c is admitted, save that no admissions are made as to whether those individuals had not been validly appointed as directors of Edelweiss. On 11 April 2019, Mr Anufriev instructed Ms Stadelmann of Leo Trust to

prepare documents for Edelweiss to transfer its assets to Finco. Those documents were signed on or around 13 May 2019.

286. Paragraph 148 is denied, save that if Mr Bourlakov procured that any such directors be misled, Mr Tribaldos and Leo Trust did not know about that.

287. No admissions are made as to Paragraph 149.

288. No admissions are made as to Paragraphs 150-153, save that if the Finco/Edelweiss document was produced by Leo Trust or Mr Tribaldos, then it is denied that it was a forgery as alleged in the first sentence of Paragraph 150. Mr Tribaldos has no recollection of the Finco/Edelweiss document.

289. No admissions are made as to Paragraph 154.

290. No admissions are made as to Paragraph 155, which concerns Mr Bourlakov's purposes in procuring the Finco/Edelweiss document. Mr Tribaldos did not know what those purposes were.

291. As to Paragraph 156 in general, although the chapeau to this paragraph states that the Claimants rely on the facts which follow, it does not set out which of their preceding allegations are said to be demonstrated by the facts relied upon. In the premises, no admissions are made as to any inference which the Claimants may seek to draw from those facts or matters.

292. The first sentence of Paragraph 156.a is admitted. No admissions are made as to the second and third sentences.

293. No admissions are made as to Paragraph 156.b-c.

294. Paragraph 156.d is embarrassing in its lack of particularity. It is denied, in so far as it is alleged, that Mr Tribaldos was at any time aware of such forgeries.

295. No admissions are made as to the invoices referred to in Paragraph 156.e.i.

65

296. Save that no admissions are made as to the fourth sentence, Paragraph 156.e.ii is admitted.

297. Paragraph 157 as a whole is a statement of the Claimants' intention to seek early disclosure of certain documents. This is not an appropriate function of a statement of case. It is noted that the Claimants have not in fact sought early disclosure of any such documents. There were no accounts prepared contemporaneously for Finco or Edelweiss for the period 2011-2018, because there was no legal requirement for such accounts to be prepared.

## E.   RESPONSE TO SECTION D POC

298. As to Paragraph 158:

   (1)   The general allegation that "the forged or sham documents" were produced by or on instructions from Mr Tribaldos is over-broad and does not admit of a proper response. It is denied that Mr Tribaldos participated in the creation of any forged or sham documents.

   (2)   It is admitted that, save for the July 2018 declaration of trust, the documents referred to were produced within Leo Trust on instructions from Mr Tribaldos (who had in turn taken his instructions from Mr Bourlakov and Mr Anufriev).

   (3)   Save as aforesaid, no admissions are made.

299. Paragraph 159 is denied. Paragraphs 27-28, 89 and 112 above in particular are repeated.

300. As to the first sentence of Paragraph 160:

   (1)   It is denied that Mr Tribaldos falsified documents, whether on Mr Bourlakov's instructions or otherwise.

     (2)     Rudan has so alleged in proceedings brought by it under s.994 Companies Act 2006 against Tridan, Mr Tribaldos and Leo England under Claim Number CR-2020-004010, and also in the Swiss Civil petition referred to. It is denied that Rudan in fact believes those allegations, which are made as part of a campaign by Rudan and the Capri Family Trust against Mr Tribaldos, for reasons which are nothing to do with that allegation. The falsification allegations in the Rudan proceedings are an artificial device which form part of a wider and unrelated shareholder dispute, with those allegations being parasitic on the falsification allegations being advanced by the Claimants in these proceedings.

     (3)     Save as aforesaid, no admissions are made.

301.   As to the second sentence of Paragraph 160, the Swiss Civil petition referred to is admitted as a document. It is denied that its contents are true. Paragraph 300(2) above is repeated.

302.   The third sentence of Paragraph 160 is admitted. The NKF review was authorised by Mr Schwarz, Mr Keller and Mr Kircher, who did so in order to advance the interests of the Capri Family Trust and not because they had any genuine belief that wrongdoing had occurred.

303.   The fourth sentence of Paragraph 160 is admitted. Those proceedings were unsuccessful.

304.   The fifth sentence of Paragraph 160 is admitted, but the account given therein is seriously and materially incomplete. The prosecutor did make such an order, but it was ultimately withdrawn following a challenge brought by Leo Trust before the Swiss courts.

305.   The chapeau of Paragraph 161 is denied. None of the actions referred to in the sub-paragraphs which follow was taken for any purpose connected with Mr Bourlakov's alleged strategy. It is further denied that Mr Tribaldos or Leo Trust had engaged in any unlawful activity.

306.   Paragraph 161.a is denied. As pleaded above at Paragraph 112(3)(a) above, the other two directors of Leo England were Mr Goldwin and Mr Miller. They resigned because:

(1)   In the case of Mr Goldwin, he was informed in 2019 by the Ethics Partner at his firm, PKF Littlejohn, that the firm did not wish its partners to have ongoing directorships of any client where the firm performed services for the client company. He resigned in February 2020.

(2)   Mr Miller resigned because Mr Goldwin had involved him as a director of Leo Trust in the first place, and he did not wish to remain a director without Mr Goldwin.

307.   Paragraphs 161.b-c are admitted. It is denied that these actions were taken for any improper purpose, whether as alleged or at all:

(1)   There was an ongoing power struggle within Leo Trust, connected to the dispute between Mr Tribaldos and Tridan on the one hand, and the Capri Family Trust and Rudan on the other.

(2)   From September 2019 onwards, the Capri Family Trust had stopped making pension payments to Mr Tribaldos' parents, which were due and payable, and shortly thereafter, Mr Schwarz had sought to suggest to Mr Tribaldos that he could not be paid for the work he had done for Leo Trust in 2020.

(3)     The other directors of Leo Trust – Mr Schwarz, Mr Keller and Mr Kircher – were at that time attempting to force Mr Tribaldos off the board of Leo Trust.

(4)     As a result, Mr Tribaldos took the decision to exercise Leo England's rights to remove the other directors of Leo Trust.

308.   In the premises, Paragraph 162 is denied in its entirety.

309.   As to the first sentence of Paragraph 163:

(1)     It is admitted that Dimitar Jauch disconnected Leo Trust's internet (though not its servers) around this time. This was because it was believed that Leo Trust was subject to a data breach.

(2)     Mr Tribaldos believes that Mr Jauch also covered up the cameras in Leo Trust's offices (which had in any event only recently been installed) in the context of the data breach feared. Mr Tribaldos did not instruct or arrange this.

(3)     Save as aforesaid, no admissions are made.

310.   As to the second sentence of Paragraph 163, Mr Dimitar Jauch sought administrative access to the server, but not for the purpose of destroying documents. Mr Tribaldos did not seek administrative access to the server.

311.   As to the third sentence of Paragraph 163, the Claimants' reliance on the pleadings filed by Solaro AG and BN Finanz is noted. Those parties are in dispute with Mr Tribaldos, as pleaded at Paragraph 300(2) above. It is denied, in so far as it is alleged, that those pleadings are reliable accounts of the events which in fact took place. Further, Mr Tribaldos and Leo Trust are not aware of any such "note" as alleged. Save as aforesaid, no admissions are made.

312.   As to the fourth sentence of Paragraph 163:

   (1)   Mr Jauch (and not Mr Tribaldos) obtained administrative access to Leo Trust's servers on or around 24 May 2020.

   (2)   It is denied that this was done for the purpose of, or resulted in, the destruction of any documents.

313.   As to the fifth sentence of Paragraph 163:

   (1)   It is denied that Mr Tribaldos or any employee of Leo Trust acting on instructions from Mr Tribaldos destroyed any documents held electronically by Leo Trust.

   (2)   It is further denied that Mr Tribaldos or Leo Trust have participated in any of the wrongs complained of in the POC (if those wrongs took place).

   (3)   Save as aforesaid, no admissions are made.

314.   Paragraph 163A is embarrassing in its lack of particularity. No admissions are made.

315.   As to Paragraph 163B.a:

   (1)   It is admitted that Mr Jauch sought administrator access.

   (2)   The Claimants fail to identify any instruction given by Mr Tribaldos to Leo Cyprus. Pending particularisation of that instruction, no admissions are made.

   (3)   It is denied that Mr Tribaldos did so because he wished to destroy documents and the inference drawn is unsustainable. It is denied that he wished to destroy documents or in fact did so.

316. Paragraph 163B.b is denied, save that it is admitted that Marios Charalambides of Leo Cyprus did refuse to grant Mr Jauch administrator access. The reason Mr Charalambides did so was because Mr Charalambides had sided with Rudan in the dispute about control of Leo Trust referred to above. Mr Charalambides subsequently and unlawfully diverted a large number of Leo Cyprus' clients to a company he runs, of which Mr Schwarz serves as a director.

317. Paragraphs 163B.c-d are admitted.

318. As to Paragraph 163B.e, it is admitted that Leo Cyprus' directors refused to comply with the resolution, but denied that they did so because they feared that Mr Tribaldos would "complete destruction of incriminating documents" (although this was part of their stated reasoning). They did so because they were siding with Rudan in the dispute referred to above.

319. As to the first two sentences of Paragraph 163C, Paragraph 20 above is repeated.

320. The third sentence of Paragraph 163C is denied.

321. As to the first sentence Paragraph 163D:

   (1)   No admissions are made as to the effect of the Cyprus AP Order on the Claimants' ability to preserve relevant documents.

   (2)   It is admitted that the documents held by Leo Cyprus were a subset of those held by Leo Trust in Switzerland.

   (3)   Save as aforesaid, no admissions are made.

322. The second and third sentences of Paragraph 163D are denied. There was no document destruction at Leo Trust in Switzerland.

323.     No admissions are made as to Paragraphs 164-166.

## F.     ALLEGED CAUSES OF ACTION

### F.1     Choice of law

324.     Paragraph 167 is admitted as a summary of the relevant provisions of the Rome II Regulation.

325.     No admissions are made as to the first sentence of Paragraph 168. The second sentence is noted.

### F.2     Claims arising out of Sections A and B POC

326.     Mr Tribaldos and Leo Trust admit that Mrs Bourlakova's claims arising out of Sections A-B POC are governed by English law. They make no admissions as to the factual allegations on which Mrs Bourlakova relies as justifying that connection, which are in the premises irrelevant. As a result, no admissions are made to a substantial number of allegations in this section of the POC, and they are not specifically responded to in this Defence.

327.     No admissions are made as to the third sentence of Paragraph 169. If Mrs Bourlakova has incurred any sums, whether substantial or not, in fees, then they were not caused by any wrong in which Mr Tribaldos participated.

328.     The first sentence of Paragraph 172 is not a proper plea of unlawful means conspiracy, failing to identify inter alia:

(1)     When or how the agreement or combination was formed;

(2)     Which representations and/or "forged or sham documents" are referred to;

(3)   On what basis the mere "creation of forged or sham documents" is alleged to be an unlawful means, if any;

(4)   From what primary facts either the alleged combination or the alleged intention to injure Mrs Bourlakova is inferred.

329.   Without prejudice to that position, the first sentence of Paragraph 172 is denied in its entirety:

(1)   If there was such an agreement or combination, Mr Tribaldos and Leo Trust were not parties to it.

(2)   It is denied that Mr Tribaldos and/or Leo Trust were aware of any intention to use unlawful means, whether as alleged or at all, in furtherance of any combination.

(3)   If the same is alleged, it is denied that the mere creation of a "forged or sham document" may constitute an unlawful means for the purposes of an unlawful means conspiracy.

(4)   It is denied that Mr Tribaldos or Leo Trust had any intention to harm Mrs Bourlakova.

(5)   For the reasons pleaded in Paragraph 332(2) below, it is denied that Mrs Bourlakova has pleaded a complete cause of action in deceit or fraudulent misrepresentation, in particular because there is no plea of reliance.

330.   As to the second sentence of Paragraph 172, it is denied that there was any destruction of documents. In consequence, and in any event, it is denied that such destruction either evidences Mr Tribaldos or Leo Trust being parties to the conspiracy or alleged, or as amounting to further participation in that conspiracy.

331.    Paragraph 172A is embarrassing in failing to specify how Mr Tribaldos or Leo Trust is alleged to have furthered the commission of any deceit perpetrated by any other person. It is in any event denied.

332.    As to Paragraph 182:

(1)     This paragraph is unclear, and appears to advance a case (contrary to the first sentence of Paragraph 172 and Paragraph 172A) that Mr Tribaldos and Leo Trust are liable in deceit by reason of having prepared the documents listed (as opposed to being liable for Mr Bourlakova and/or Mr Anufriev and/or Mr Kazakov's deceit). If that is the case the Claimants advance, then it is insufficiently pleaded to be possible to respond to.

(2)     Without prejudice to that position, this paragraph is denied. In particular:

(a)     It is denied that Mr Tribaldos prepared or gave any instructions for the preparation of the 20 December 2018 declaration or any documents concerning the Black Pearl, Silver Angel or La Reserve. Paragraph 27(4) above is repeated.

(b)     It is denied that Mr Tribaldos knew, when preparing or giving instructions for the preparation of the other documents referred to, that any of Mr Bourlakov, Mr Anufriev and Mr Kazakov intended to harm Mrs Bourlakova. Paragraph 89 above is repeated.

(c)     The case in deceit is defective in that (i) it does not plead any contract entered into or step taken by Mrs Bourlakova in reliance on the alleged misrepresentations; (ii) on the contrary,

74

Mrs Bourlakova's own pleaded case at Paragraphs 73-74 is that the alleged deceit has not been successful, and (iii) her own pleaded case at Paragraph 74 is also that she has sought to establish the falsity of the alleged representations, such that it is clear that she did not believe them. No cause of action in deceit therefore lies.

333. In circumstances where it is common ground between Mrs Bourlakova and Mr Tribaldos/Leo Trust that English law governs her claims against them, no response is necessary to Paragraphs 183-184.

334. No admissions are made as to Paragraph 185, save that it is denied that legal or investigative costs are recoverable as damages for deceit or unlawful means conspiracy.

335. As to Paragraphs 186-186A, Mr Tribaldos and Leo Trust take no position on whether the Claimants are entitled to such declarations, and therefore no admissions are made.

**F.3   Claims arising out of Sections C1, C2 and C4 POC**

336. Mr Tribaldos and Leo Trust admit that the claims against them arising out of Sections C1, C2 and C4 POC are governed by English law.

337. Paragraph 187 is not understood. Whilst a factual inquiry will be necessary to determine whether the documents referred to were forgeries/shams, the allegation is part of the Claimants' case under Monegasque law.

338. Mr Tribaldos and Leo Trust take no position on whether the Claimants are entitled to the declarations sought, and therefore no admissions are made as to Paragraphs 188-190.

339.   The first sentence of Paragraph 191 is denied. Paragraph 89 above is repeated.

340.   As to the balance of Paragraph 191, in circumstances where it is common ground between Mrs Bourlakova and Mr Tribaldos/Leo Trust that English law governs her claims against them, no response is necessary.

341.   The first sentence of Paragraph 191A is not a proper plea of unlawful means conspiracy. Paragraph 329 above is repeated mutatis mutandis.

342.   Without prejudice to that position, Paragraph 191A is denied, because:

   (1)   If there was such an agreement or combination, Mr Tribaldos and Leo Trust were not parties to it.

   (2)   It is denied that Mr Tribaldos and/or Leo Trust were aware of any intention to use unlawful means, whether as alleged or at all, in furtherance of any combination.

   (3)   If the same is alleged, it is denied that the mere creation of a "forged or sham document" may constitute an unlawful means for the purposes of an unlawful means conspiracy.

   (4)   It is denied that Mr Tribaldos or Leo Trust had any intention to harm Mrs Bourlakova.

343.   No admissions are made as to Paragraphs 192 and 194.

344.   In circumstances where it is common ground between Mrs Bourlakova and Mr Tribaldos/Leo Trust that English law governs her claims against them, no response is necessary to Paragraph 193.

345.   No admissions are made as to Paragraph 195.

**F.4**   **Injunction**

346.   It denied that the Claimants are entitled to an injunction as sought in Paragraph 196:

(1)   Mr Tribaldos and Leo Trust are not alleged by any party to be parties to a partnership with Mr Bourlakov and Mr Kazakov, or have any right to enforce it, and therefore could not purport to enforce that partnership.

(2)   Mr Tribaldos and Leo Trust are not parties to any of the documents which the Claimants seek to have declared as forgeries or shams, or have any rights to enforce them.

(3)   Mr Tribaldos and Leo Trust have not sought to date, and could not, bring such proceedings.

**F.5**   **Claims arising out of Sections C0 and C3 POC**

347.   No admissions are made as to which law governs the claims alleged to arise out of Sections C0 and C3 POC.

348.   No admissions are made as to Paragraph 196B, because Mr Tribaldos and Leo Trust take no position as to whether the Claimants are entitled to such a declaration.

349.   No admissions are made as to Paragraphs 198-199.

350.   Paragraph 199A is embarrassing in its lack of particularity, and in particular for failing to specify:

(1)   What legal principles govern whether a person is an instigator of a criminal act.

(2)    What acts Mr Tribaldos and Leo Trust are said to have done which render them liable as instigators.

(3)    In the premises, Paragraph 199A is liable to be struck out, and is in any event denied.

351.    No admissions are made as to Paragraphs 199B-200.

**F.6    Claims arising out of Section D POC**

352.    No admissions are made as to the first sentence of Paragraph 201.

353.    As to the second sentence of Paragraph 201, no admissions are made as to what costs may have been incurred by Mrs Bourlakova, and she is required to prove the same.

354.    No admissions are made as to Paragraph 202.

355.    Paragraph 204 is denied in its entirety. For the reasons aforesaid, neither Mr Tribaldos nor Leo Trust destroyed or concealed documents held by Leo Trust at all; alternatively, did not do so unlawfully, wilfully or negligently. In the premises, no claim arises out of the matters pleaded in Section D POC.

**F.7    Claims arising out of Section E POC and interest**

356.    No admissions are made as to Paragraphs 208 and 210.

357.    As to Paragraph 209, it is denied that Mr Tribaldos and Leo Trust engaged in any wrongdoing or otherwise participated in the matters complained above. No admissions are made as to Mr Schwarz's liability otherwise.

358.    Paragraph 211 is denied. Mrs Bourlakova and Veronica are not entitled to interest, whether as alleged or at all.

**BEN WOOLGAR**

**29 January 2024**

SECOND DEFENDANT

I believe that the facts stated in this Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ...............................

Full name:    Daniel Tribaldos

Date:         29 January 2024

FOURTH DEFENDANT

The Fourth Defendant believes that the facts stated in this Defence are true. The Fourth Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Fourth Defendant to sign this Statement of Truth on its behalf:

Signed: ...............................

Full name:    Daniel Tribaldos

Position:     Chairman of the Board of Directors

Date:         29 January 2024