# Exhibit 3

First and Fourth Claimants
Victoria Sarah Pigott
First
Exhibit VP1
19 March 2024

**IN THE HIGH COURT OF JUSTICE**   **Claim No: BL-2020-001050**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**BUSINESS LIST (CHD)**

**B E T W E E N :**

**(1) LOUDMILA BOURLAKOVA**
**(2) HERMITAGE ONE LIMITED**
**(3) GREENBAY INVEST HOLDINGS LIMITED**
**(FORMERLY KNOWN AS MARAVAN SERVICES LIMITED)**
**(4) VERONICA BOURLAKOVA**

**Claimants**

—and—

**(1) OLEG BOURLAKOV**
**(2) DANIEL TRIBALDOS**
**(3) LEO SERVICES HOLDING LIMITED**
**(4) LEO TRUST SWITZERLAND AG**
**(5) REUWEN SCHWARZ**
**(6) SEMEN ANUFRIEV**
**(7) NIKOLAI KAZAKOV**
**(8) VERA KAZAKOVA**
**(9) COLUMBUS HOLDING AND ENTERPRISES SA**
**(10)     FINCO FINANCIAL INC**
**(11)     GATIABE BUSINESS IN**
**(12)     EDELWEISS INVESTMENTS INC**
**(13)     IPEC INTERNATIONAL PETROLEUM CO INC**

**Defendants**

---

**FIRST AFFIDAVIT OF VICTORIA SARAH PIGOTT**

---

1

I, **VICTORIA SARAH PIGOTT**, of **MISHCON DE REYA LLP, AFRICA HOUSE, 70 KINGSWAY, LONDON WC2B 6AH** state on oath as follows:

## A.     INTRODUCTION

1.     I am a solicitor and a Partner at Mishcon de Reya LLP ("**Mishcon**"), which is instructed by the Applicants, namely Loudmila Bourlakova ("**Loudmila**") and Veronica Bourlakova, the Fourth Claimant ("**Veronica**"), who are the First and Fourth Claimants in Claim No BL-2020-001050 (the "**Main Claim**"). Mishcon is also instructed by the other Claimants in the Main Claim and by Veronica in Claim No BL-2023-000141 (the "**Protective Claim**").

2.     I am one of the Partners at Mishcon with day-to-day conduct of these proceedings on behalf of the Claimants, and I am duly authorised by Loudmila and Veronica (the "**Applicants**") to make this affidavit on their behalf.

3.     I make this affidavit:

   3.1     in support of the Applicants' application made by notice dated 19 January 2024 {**A1/1/1**} for a worldwide freezing order and ancillary relief against the Twelfth Defendant ("**Edelweiss**") (the "**WFO Application**");

   3.2     in support of Veronica's application made by notice dated 28 February 2024 {**H/1/1**} for an asset preservation order against Hemaren Stiftung ("**Hemaren**") and Edelweiss in the form of the draft at {**H/4/1**} (the "**APO Application**"); and

   3.3     in opposition to various applications made by the Respondents as detailed below.

4.     The Applicants previously also sought a worldwide freezing order and ancillary relief against the Sixth Defendant ("**Mr Anufriev**"), the Seventh Defendant ("**Mr Kazakov**") and the Eighth Defendant ("**Mrs Kazakov**" and together with Mr Kazakov: the "**Kazakovs**"). As I explain below, the application is no longer pursued against Mr Anufriev and the Kazakovs.

5.     The Applicants have previously adduced two affidavits and one witness statement in support of these applications:

   5.1     The First Affidavit of Naomi Frances Ruth Simpson dated 17 January 2024 ("**Simpson A1**") in support of the WFO Application.

2

5.2 The Second Affidavit of Ms Simpson dated 11 February 2024 ("**Simpson A2**"), also in support of the WFO Application.

5.3 The First Witness Statement of Ms Simpson dated 28 February 2024 ("**Simpson W1**") in support of the APO Application.

6. The Kazakovs, Mr Anufriev and Edelweiss have also issued applications seeking materially the same relief in respect of their information, specifically:

6.1 Injunctions against the Applicants restraining use of potentially confidential/privileged information belonging to Mr Anufriev, the Kazakovs and Edelweiss;

6.2 orders requiring the Applicants (and this Firm) to provide affidavits disclosing instructions, reports and communications relating to the acquisition and use of that potentially confidential/privileged information;

6.3 various associated heads of relief; and

6.4 an adjournment of the Applicants' applications (the "**Privilege Injunction Applications**").

7. The last of the Privilege Injunction Applications, issued on behalf of Edelweiss, was served on this firm at 12:59 pm on 19 March 2024 (the date of this present Affidavit).

8. The Respondents have filed the following evidence:

8.1 On behalf of Mr Anufriev:

8.1.1 The First Affidavit of Mr Anufriev dated 12 March 2024 ("**Anufriev 1**").

8.1.2 The First Affidavit of Rosslynn Yin dated 12 March 2024 ("**Yin 1**") and Exhibit SA1.

8.2 On behalf of the Kazakovs:

8.2.1 The Second Witness Statement of Mr Kazakov dated 8 March 2024 (in Russian) and an English translation ("**Kazakov 2**") and Exhibit NK1.

8.2.2   The Eleventh and Twelfth Witness Statements of Elizabeth Ann Seborg dated 8 and 9 March 2024 respectively ("**Seborg 11**" and "**Seborg 12**" respectively) and Exhibits EAS12, EAS13, EAS14, and EAS15. Ms Seborg is a Partner in the firm of English solicitors acting for the Kazakovs ("**PCB Byrne**").

8.2.3   The First Witness Statement of Inga Dorothee Ludewig dated 8 March 2024 ("**Ludewig 1**") and Exhibit IL1. Ms Ludewig is a solicitor in the law firm Larson LLP.

8.3   On behalf of Edelweiss:

8.3.1   The First Affidavit of Erika Oses dated 8 March 2024 ("**Oses 1**") and Exhibit OS1. Ms Oses purports to be a director of Edelweiss.

8.3.2   The report of Mr Philip Allister dated 8 March 2024 (the "**Allister Report**"). Mr Allister is a forensic accountant with Berkeley Research Group (UK) Limited (Dubai branch), who was instructed by Edelweiss to prepare a report on its asset position and on outflows from three of its bank accounts.

9.   Hemaren is yet to serve evidence in response to the APO Application.

10.   I confirm that where the facts and matters contained in this affidavit are within my own knowledge, they are true. Where the facts are not within my own knowledge, I have identified my sources of information or belief and I believe them to be true.

11.   Insofar as communications referred to in this affidavit are subject to legal professional privilege or any other legal privilege, nothing in this affidavit is intended to waive the same and I am not authorised to do so.

12.   I attach hereto a bundle of documents to which I will refer in the course of this affidavit which is labelled "**VP1**". References in this affidavit to page numbers are to the numbered pages in Exhibit VP1.

13.   In this affidavit:

13.1   I adopt defined terms from Simpson A1, Simpson A2 and Simpson W1 unless otherwise indicated.

4

13.2    Where I refer to acts of Edelweiss, Gatiabe or Jovellanos, that is without prejudice to the Claimants' position as to whether those purporting to act on behalf of Edelweiss, Gatiabe or Jovellanos have the necessary authority to do so.

13.3 References to documents in the Opus hearing bundle are in the form {**volume/tab/page**}.

## B.    THE FEBRUARY HEARING

14.    The Applicants' WFO Application originally came before the Court on 21 and 22 February 2024. As the Court will recall, shortly before that hearing:

14.1    Mr Anufriev applied by notice dated 20 February 2024 to vacate (alternatively, adjourn) the hearing of the WFO Application {**F/1/2**}.

14.2    The Kazakovs also applied by notice dated 20 February 2024 to adjourn the hearing of the WFO Application, and for directions for the filing of further evidence {**F/2/1**}.

15.    At the hearing itself, the Court dealt with the adjournment applications first. Ultimately, on 22 February 2024, Richard Smith J made a Consent Order (the "**Consent Order**") **[VP1/1-4]** which, amongst other things:

15.1    Recorded in the 5th recital that the Applicants had not relied on the report by CT dated 17 January 2024, including the schedules and Exhibit CT1 (the "**CT Report**") at the hearing on 21 and 22 February 2024.

15.2    Recorded in the 6th recital that the Court had accepted Mr Kazakov's undertaking that, until final determination of the WFO Application or further order of the Court, he would not procure Edelweiss to deal with, diminish or dispose of its assets save for (1) in the ordinary course of its business, or (2) to pay reasonable legal expenses.

15.3    Recorded in the 7th recital that the Court had accepted Edelweiss's undertaking that, until final determination of the WFO Application or further order of the Court, it would not deal with, diminish or dispose of its assets save for (1) in the ordinary course of its business, or (2) to pay reasonable legal expenses.

15.4    Adjourned the hearing of the WFO Application to a two-day hearing on 26 and 27 March 2024 (paragraph 1).

## C.    DEVELOPMENTS FOLLOWING THE FEBRUARY HEARING

16.    Following the February hearing, there have been a number of material developments, which I summarise below.

*i.*    *The service, APO, and joinder applications*

17.    On 28 February 2024, the Claimants filed a further application {**H/1/1**}, by which they sought:

17.1    Permission to serve the application out of the jurisdiction and by alternative methods on Hemaren, Wlamil Foundation, Delos Global SA and Jovellanos Investments Corp (the "**Additional Defendants**") (the "**Service Application**").

17.2    An APO (at an on-notice hearing) against Hemaren and Edelweiss. As far as Edelweiss is concerned, the APO is now the primary basis of the injunctive relief that is being sought against it, although the WFO Application is maintained against it insofar as it is necessary to rely on the WFO jurisdiction (as opposed to the jurisdiction to grant proprietary injunctions).

17.3    An order joining the Additional Defendants to the proceedings, granting the Claimants permission to amend the Re-Amended Claim Form and Amended Particulars of Claim in the form of the drafts at {**H/7/1**} and {**H/8/1**}, and making other consequential directions (the "**Joinder Application**").

18.    On 5 March 2024, Richard Smith J made an Order granting the Service Application (the "**Service Order**") [**VP1/5-8**]. Paragraph 6 of the Service Order provided that the APO Application would be heard at the hearing listed for 26 and 27 March 2024.

19.    The APO Application materials were served on Edelweiss on 28 February 2024 and the Service Order was served on Edelweiss on 6 March 2024 via email [**VP1/9-12**]. They were also served on the Additional Defendants using the methods set out in the Service Order, on 5 March 2024 by email [**VP1/13-21**] and additionally by post (posted on 6 March 2024), and the Claimants have received delivery confirmations in respect of each of them (Hemaren on 11 March 2024, Wlamil Foundation on 11 March 2024, Delos Global on 15 March 2024 and Jovellanos Investments Corp on 11 March 2024) [**VP1/22-37**].

20.    None of the Additional Defendants have so far applied to set aside the Service Order.

6

*ii.* *Developments in the Interpleader Proceedings*

21. The Interpleader Proceedings are addressed at paragraphs 245 to 249 of Simpson A1, paragraphs 10 to 14 of Simpson A2, and paragraphs 19 and 20 of Simpson W1.

22. By way of update, a hearing in the Interpleader Proceedings took place in Bahamas on 12 March 2024. At that hearing, the Bahamian Court made an Order **[VP1/38-40]** pursuant to which:

    22.1    Pictet Bahamas is to administer Edelweiss's Pictet Bahamas account in accordance with the existing banking mandate (including instructing third parties in respect of the purchase and/or sale of investments held in the account);

    22.2    Save for the payment of ordinary expenses relating to the account and its administration, any payment out to the defendants to the Interpleader Proceedings (i.e. Edelweiss, Hemaren, Loudmila and Veronica) or to any third parties must be agreed in writing by all the parties, or ordered by the Court.

23. The effect is that the funds in the Pictet Bahamas account are now frozen. However, no such freeze applies to any other Edelweiss account.

24. The Bahamian Court also directed that Loudmila and Veronica's application for a stay of the Interpleader Proceedings (pending resolution of these English proceedings) be heard on 15 October 2024.

25. I believe it is also relevant to the WFO and APO Applications that, as I understand from the Applicants' Bahamas counsel, at the hearing:

    25.1    Edelweiss and Hemaren were jointly represented;

    25.2    counsel for Edelweiss and Hemaren suggested that they may seek to challenge the entire Interpleader Proceedings on the basis that: (i) Loudmila and Veronica's involvement in them constituted a breach of Panamanian law; and (ii) Pictet Bahamas should not have brought the Interpleader Proceedings at all, on the basis that this too constituted a breach of Panamanian law; and

25.3    counsel for Edelweiss and Hemaren initially opposed the relief set out at paragraph 21 above (to which all the other parties had agreed prior to the hearing), but ultimately reluctantly agreed to it.

26.    I believe this shows that: (i) those behind Hemaren, i.e. the Kazakovs, have practical (but the Claimants say illegitimate and unlawful) control of Edelweiss; and (ii) Hemaren and Edelweiss remain set on obtaining and maintaining free access to Edelweiss's assets and funds, to deal with as they, the Kazakovs and Mr Anufriev wish without reference to the Applicants and without regard to the fact that (a) ownership of Edelweiss is disputed and (b) the entitlement of those who claim to be acting on Edelweiss' behalf in giving instructions to Pictet Bahamas is disputed.

*iii.*    *The ASI Application*

27.    Details of the Bankruptcy Application filed by Mr Kazakov in Russia are set out in paragraphs 15 to 25 of Simpson A2. As foreshadowed in that affidavit, the Applicants have applied, by application notice dated 28 February 2024, for an anti-suit injunction against the Kazakovs (the "**ASI Application**"), on the basis that the Bankruptcy Application is vexatious and oppressive.

28.    As set out at paragraph 19 of Simpson A2, the Bankruptcy Application is due to be heard on 20 March 2024. However, pursuant to the Consent Order of Richard Smith J dated 12 March 2024 **[VP1/41-45]**, Mr Kazakov has undertaken to the Court to seek an adjournment of that hearing and the Applicants understand that he has now filed an application to that effect with the Russian Court.

29.    Without waiver of privilege, I understand that any adjournment will be at the discretion of the Russian Court, and so it may be necessary for Veronica and Loudmila to seek further, urgent relief from the English Court (depending on the decision of the Russian Court at that hearing).

30.    Subject to that, the ASI Application has been listed to be heard by Richard Smith J on the first available date after 18 April 2024. PCB Byrne's letter of 15 March 2024 (responding to my firm's letter of 14 March) recognised that, once there was clarity on the length of the adjournment of the Bankruptcy Application the parties would be able to have an informed discussion about a revised timetable and the Kazakovs were "*willing to be sensible*" in that regard **[VP1/46-47]**.

*iv.*    *The Privilege Injunction Applications*

8

31.    On Saturday 9 March 2024, the Kazakovs served an application seeking: (i) delivery up of documents allegedly containing their privileged and confidential information; and (ii) related restraining injunctions in relation to the use of that information and the Applicants' continuing instruction of persons who have received it (the "**Kazakov Privilege Injunction Application**"). Although the application referred to a draft Order, that was only provided on 11 March 2024 **[VP1/48-54]**.

32.    On 14 March 2024, Mr Anufriev served an application seeking essentially the same relief as the Kazakovs' Privilege Injunction Application (the "**Anufriev Privilege Injunction Application**").

33.    Edelweiss made a similar application four hours before this Affidavit was due to be sworn (the "**Edelweiss Privilege Injunction Application**", and together with the other Respondents' privilege injunction applications, the "**Privilege Injunction Applications**").

34.    I address the Privilege Injunction Applications in Section E below.

*v.*      *Non-reliance on the CT Report, Edelweiss asset disclosure and the scope of the Applicants' applications*

35.    As the Court recorded in the 6th recital to the Consent Order, the Applicants did not rely on the CT Report at the hearing on 21 and 22 February 2024.

36.    Pursuant to the Consent Order, the Applicants were required to confirm by 27 February 2024 whether they intended to rely on the CT Report at the adjourned hearing. Given the complexity and seriousness of the issues raised by the CT Report and the challenges to the authenticity of the materials contained within it, the Applicants were bound to take all steps available to them to investigate and explore the position, including with the involvement of CT. Those investigations were not complete by 27 February 2024 so the Applicants informed the Respondents on that date that they were not yet in a position to say that they would not rely on the CT Report at the 26-27 March 2024 hearing **[VP1/55-57]**. The Applicants recognise that there will be costs consequences for having taken that position but feel that they had no real choice in the circumstances in which they found themselves.

37.    Having investigated the matter as best they can (and without waiver of privilege in those investigations) and in the light of the evidence filed on behalf of Mr Anufriev and the Kazakovs, the Applicants have again withdrawn any reliance upon the CT Report for the purpose of the present application. The Respondents were made aware of this on 15 March 2024, at the same

time that the Kazakovs and Mr Anufriev were told that the Applicants no longer sought a WFO against them: **[VP1/58-59]**.

38.     As explained further below, on the basis of the evidence adduced by the Kazakovs and Mr Anufriev, it would appear that the Applicants have been the victims of a fraud or hoax in relation to the CT Report, the contents of which now appear (on the basis of the evidence filed by the Respondents) in large part to have been fabricated.

39.     Further, evidence filed by Edelweiss (in Oses 1 and the Allister Report) has disclosed that Edelweiss has a portfolio with a current value of over US$ 843 million. The amount of the WFO originally claimed against the Kazakovs and Mr Anufriev was US$ 902 million.

40.     In those circumstances, the Applicants have carefully considered the scope of the relief that it is appropriate to seek, and have concluded that:

40.1    It would be inappropriate and disproportionate to maintain the WFO Application against Mr Anufriev or the Kazakovs, and so the Applicants do not maintain the WFO Application against them;

40.2    The **APO** Application **is** being pursued against Hemaren and Edelweiss; and

40.3    The **WFO** Application **is** being pursued against Edelweiss, but **only** insofar as it is necessary to rely on the WFO jurisdiction (as opposed to the jurisdiction to grant proprietary injunctions) in order to obtain some or all of the relief against Edelweiss that is being sought on the APO Application.

41.     There is therefore no need for an adjournment of the WFO Application as sought by Mr Anufriev and the Kazakovs. Although it is matter for argument, it is respectfully submitted that there are no grounds for the application against Edelweiss or Hemaren to be adjourned.

**D.      REPLY EVIDENCE RE THE REVISED WFO AND APO APPLICATIONS**

*i.      Serious issue to be tried/good arguable case*

42.     Perhaps the most notable aspect of the evidence served by the Respondents to the WFO and APO Applications is the lack of engagement on their part with the merits. None of them has contested that there is a good arguable case against them on the merits. None of them has taken

10

the opportunity to try to explain how, for example, they contend that Hemaren and not Veronica could possibly be the true owner of Edelweiss as a matter of fact or Panamanian law. The significance of this will be addressed in submissions in due course.

43.   Similarly, there has been very little engagement on any of the issues relied upon as giving rise to a risk of dissipation (to the extent that this must be shown for the purpose of the APO). None of the Respondents offers any undertaking or assurance as to the extent to which Edelweiss will (or will not) maintain its assets rather than dissipate them prior to judgment.

*ii.*      *Damages not an adequate remedy*

44.   None of the Respondents have provided any evidence contesting the point made at paragraphs 26 to 28 of Simpson W1 as to why damages would not be an adequate remedy.

*iii.*      *Balance of convenience/injustice*

45.   There are a number of points in the Respondents' evidence which go to the balance of convenience, but it will be submitted that they simply illustrate that the balance comes down in favour of the relief being sought by the Applicants.

46.   **First**, the Respondents' evidence gives rise to serious concerns that Edelweiss's assets are at risk of being paid away in a manner that will reduce Edelweiss's value and therefore prejudice Veronica as its true owner. There are a number of aspects to this:

46.1      First, those currently in practical control of Edelweiss have made clear that they are not neutral. The Applicants believe that Hemaren, which purports to own Edelweiss, is controlled by Mr Kazakov, and Edelweiss's current purported directors appear to be aligned with him. In paragraph 8 of Oses 1, for example, Ms Oses, who purports to be a director of Edelweiss, states that "*until and unless the Court decides otherwise, I and the other directors of [Edelweiss] consider that we are obliged to treat the current share register, which shows that Hemaren is the owner of the shares in [Edelweiss], as representing the correct legal position*". The sole beneficiary of Hemaren is Mr Kazakov and its protector is Mr Anufriev. They are in practical control of Edelweiss. It is instructive that when information was provided to the Applicants about Edelweiss' financial position prior to the last hearing, it was provided by the Kazakovs, not Edelweiss itself.

46.2      That is a remarkable and concerning position:

46.2.1   As Mr Lee explains in his Fourth Expert Report, there is nothing in Panamanian law which requires directors (or purported directors) to treat a share register as representing the correct legal position.

46.2.2   On the facts, there is every reason <u>not</u> to treat the share register as representing the correct legal position. There has been a wholesale failure to produce any evidence of any "*corporate acts*" which could lead to a conclusion that the share register – which shows Hemaren as being the owner of Edelweiss – is correct: see paragraph 103 of the Judgment of Richard Smith J at {**C/26/26**}. This is a fundamental gap that has still not been filled. That is particularly troubling in the light of the Defence of the Second and Fourth Defendants at paragraph 127, in which he sets out his understanding of the manner in which corporate acts have been purportedly carried out.

46.3   The stance being taken by the purported directors of Hemaren, including Ms Oses, on other matters also show that they do not intend to, "*hold the ring*" pending judgment in these proceedings. The stance being taken by Edelweiss in relation to the Interpleader Proceedings has been noted above. In addition, and of particular concern, is the fact that Edelweiss's Defence in these proceedings makes clear that its directors are prepared to treat sham loans that are obviously fictitious as genuine: see paragraph 115(a) at {**C/23/25**}, which states that Edelweiss proceeds on the basis that Forged Edelweiss-Finco Loan, which is a forgery for all of the reasons given at paragraph 120.5 of Simpson A1, plus those that are evident from paragraph 127 of the Defence of the Second and Fourth Defendants, is genuine. Edelweiss knows that at the time the loan documents were actually executed, the persons who purported to sign those documents on its behalf were not directors of Edelweiss.

46.4   The purported directors have also allowed tens of millions of dollars to be paid away from Edelweiss for the benefit of the Kazakovs and/or without any proper justification, as explained further below. The reality appears to be that the purported directors will follow Mr Kazakov's and Mr Anufriev's instructions.

46.5   Second, <u>Mr Anufriev</u> has confirmed at paragraphs 37 and 38 of Anufriev 1 that he has a power of attorney over Edelweiss's Pictet Bahamas and Pictet Geneva bank accounts. Mr Anufriev quibbles with the Applicant's characterisation that he has "*control*" over these

bank accounts. But the point is that he has a legal power to cause payments to be made out of the accounts. He claims that the effect of the power is that he ought only to use it to make payments on Edelweiss's behalf. But it is clear that, as things stand, he could cause Edelweiss's monies to be paid away if he wanted to – or if he was directed to by those currently in practical control. There is ample evidence set out in the Applicants' previous evidence that Mr Anufriev is aligned with the Kazakovs and has played a key role in, amongst other things, the production of forged documents.

46.6    Third, <u>Mr Kazakov</u> has confirmed at paragraph 14 of Kazakov 2 that he has signatory rights over Edelweiss's UBS Switzerland accounts. Mr Kazakov also, of course, has overall practical control of Edelweiss through Hemaren.

46.7    Fourth, Ms Oses discloses at paragraphs 27 to 29 of Oses 1 that Alve Finance AG ("**Alve**") holds an advisory mandate with respect to Edelweiss's investment portfolios and sits on an "*Advisory Board*" along with two other (unnamed) members. Ms Seborg has also exhibited a letter from Mr Vitaly Lipanov, the CEO of Alve, at EAS12/287 in which he describes Alve as having advised since 2009 without interruption in relation to assets "*settled or controlled by Mr Bourlakov and/or Mr Nikolai Kazakov*". It is not clear whether Mr Lipanov currently exercises any control over Edelweiss's assets. However, his continued involvement is concerning. I understand from the Applicants that, since Mr Bourlakov's death in 2021, Mr Lipanov has sided firmly with Mr Kazakov. This is apparent not only from the terms of his letter but also from an email exchange between Mr Lipanov and Loudmila shortly after Mr Bourlakov's death (which followed a telephone conversation between them), in which Mr Lipanov: (i) refused to divulge any information about Edelweiss's investments to Loudmila; (ii) stated that Mr Kazakov was now his "*client*"; and (iii) further asserted that Mr Kazakov "*has been a partner of* [Mr Bourlakov] *since the 80s. This was known to me and obvious to everyone, including from the founding documents of many companies of those times*" **[VP1/60-65]**. It is therefore clear that Mr Lipanov has chosen to support the fraudulent Kazakov Partnership fiction.

46.8    Fifth, while the Applicants necessarily have only a partial picture at this stage, it is clear on the available material that substantial sums have already been extracted from Edelweiss by or for the benefit of the Kazakovs. The picture is only partial at this stage because: (i) Mr Allister, the accountant instructed by Edelweiss, has only reviewed limited documents – only current portfolio valuations as at 13 February 2024 and bank statements from July

2020 to January 2024; and (ii) Edelweiss has refused the Applicants' requests for the underlying documents **[VP1/66-89]**. However, from the Allister Report, the following is evident:

46.8.1   As explained in paragraph 107 of Simpson 1, in January 2018, Edelweiss had assets of around US$ 715 million. According to paragraph 2.2.3 of the Allister Report, by 31 December 2022, it had assets of US$ 744 million. That is an increase of around only US$ 30 million over five years. As Oxera explain in their letter dated 18 March 2024, had Edelweiss's portfolio been invested in even a passive tracker fund (such as one tracking the S&P 500 index or standard MSCI World index) during that, it would have returned c. 38 - 57% **[VP1/90-92]**. In fact, Edelweiss's investment portfolio increased by only about 4%, meaning that either: (i) it dramatically underperformed the market for a number of years; or (ii) there were substantial withdrawals made in that period. Since Edelweiss has refused to disclose any bank statements at all, making it impossible for the Applicants (and the Court) to know what the position actually is, it will be submitted that the clear inference is that significant sums were extracted from Edelweiss between January 2018 and December 2022.

46.8.2   In any event, the Allister Report discloses payments of nearly US$ 30 million to various of the Defendants in these proceedings between 20 July 2020 and 13 February 2024 (see paragraph 6.2.7). These include: (i) at least US$ 12.6 million to Mr Kazakov (who also received an additional EUR 15 million in April 2020, as confirmed in paragraph 6.3.4); and (ii) US$ 7 million to Columbus. From the correspondence exhibited at NK1/3, the payments to Columbus appear to relate to the Black Pearl.

46.8.3   In relation to the payments to Mr Kazakov, his evidence at paragraph 23 of Kazakov 2 is that funds from Edelweiss have been used to pay his living expenses and "*legal fees of the global dispute*". The Allister Report also identifies around US$ 5 million of legal fees that have been paid by Edelweiss (see paragraph 6.2.7), presumably directly, though whose legal fees they were is wholly unclear.

46.8.4    The use of Edelweiss assets for this purpose is presumably by the Kazakovs' choice because there is no evidence to suggest that they are not in control of very substantial other assets.

46.8.5    Over US$ 7 million was also paid to so-called "*Edelweiss-related entities*" (see paragraph 6.2.7) – despite Ms Oses accepting at paragraph 22 of Oses 1 that those entities "*are not owned by [Edelweiss]*" and as far as she is aware are owned or controlled by Cantucci.

46.8.6    The Allister Report also suggests that nearly US$ 17 million has been paid by Edelweiss in relation to the Black Pearl (other than the payments made to Columbus addressed above). However, significantly, Mr Kazakov admits at paragraph 41 of Kazakov 2 to having treated at least some payments made by Edelweiss in connection with the Black Pearl as if they came from him personally and/or were made on his behalf. This is also the position he has taken in proceedings in Cyprus, as referred to in our second letter to PCB Byrne dated 5 March 2024 which is exhibited at NK1, pages 8-11.

46.8.7    There is also evidence that payments out have been made that are not reflected in the Allister Report. Mr Kazakov's evidence at paragraph 32 of Kazakov 2 is that Edelweiss's assets have been used to fund Cantucci. Similarly, Ms Oses states at paragraph 34 of Oses 1 that Edelweiss's assets are used to pay professional fees on behalf of Hemaren, including legal expenses.

46.9.    Sixth, Mr Anufriev's evidence at paragraph 42 of Anufriev 1 is that Mr Bourlakov and Mr Kazakov had at one stage decided to transfer Edelweiss's entire portfolio to Gatiabe. That plan was based on the forged loan agreements, as is clear from the document that Mr Anufriev refers to (NS1/841). For whatever reason, the plan was not pursued. But it got at least as far as providing UBS with a draft of the instruction letter from Mr Kazakov (in his capacity as beneficial owner of Edelweiss) to the directors of Edelweiss requesting the transfer of all cash and securities held in the UBS account to a UBS account to be opened in the name of Gatiabe together with a draft instruction letter from Edelweiss to UBS making the same request: **[VP1/93-103]**. The Respondents sought confirmation from UBS that the draft documents were sufficient for UBS' purposes.

46.9    The Respondents obviously felt themselves to be sufficiently in control of Edelweiss to be able to procure it to act at their behest without impediment.

46.10   The Respondents do not explain why this plan was not pursued but it seems likely that the reason was that UBS would not agree to it. But the fact that it was even considered – and developed to the point of giving instructions and asking for documents to be drafted in relation to it – is a vivid illustration of what Mr Kazakov might be prepared to do if he felt it was in his interests to move assets as this litigation progresses towards trial.

47.    In light of all of those facts, plus the facts underlying the substantive claim itself (and all the matters referred to in the Applicants' evidence as tending to show a risk of dissipation on the part of the Kazakovs and Mr Anufriev), whilst the Applicants do not accept that, in the context of the APO Application, it is necessary for them to establish a real risk of dissipation, it will be submitted that there is plainly such a risk in this case.

48.    **Secondly**, there is no suggestion in the Respondents' evidence that Edelweiss has any independent business, aside from managing and trading in and out of positions in its investment portfolio. It is, to put it in colloquial terms, a "pot" that holds money for the ultimate benefit of whoever is its true owner. This is a highly material consideration when it comes to the balance of convenience/injustice, because the potential damage to Veronica if an injunction is not granted is, it is submitted, quite obviously greater than the potential damage to Edelweiss from a properly crafted injunction. In fact, the making of such an order should not result in any damage to Edelweiss whatsoever.

49.    In that regard, the Applicants are willing to agree to a carve-out which would allow Edelweiss to: (i) deal with its assets in the ordinary course of its business; and (ii), in addition, maintain the lending that it has historically advanced in relation to the maintenance of the Black Pearl.

50.    The Applicants do not however accept that any carve-out should extend so as to permit Edelweiss: (i) to make payments to third parties that are not required to maintain its asset portfolio and/or its own proper functioning; (ii) to fund the living expenses or legal fees of any other persons, including the Kazakovs and Hemaren; or (iii) to actively contest the dispute in these proceedings as to its own true ownership.

51.    Aside from prejudice in relation to the ordinary conduct of Edelweiss's business (which can be adequately addressed by carve-outs of the type explained above), the Respondents have not

identified any prejudice that will be caused to Edelweiss (or, indeed the Kazakovs) by the making of the order sought, and no such prejudice is otherwise apparent.

iv.      *The position of Hemaren*

52.   Hemaren has not responded to the APO Application. In those circumstances, Veronica simply maintains the application as against it as it was put in Simpson W1.

## E.      THE PRIVILEGE INJUNCTION APPLICATIONS

i.      *The engagement of CT*

53.   CT is a private company established in 2002 that operates in a variety of jurisdictions. It was founded by, and I believe it to be under the control of, Sir Lynton Crosby AO and Mark Textor. It undertakes research, campaigns, intelligence and advisory work. CT's intelligence practice uses its global network to provide intelligence, investigations, deep due diligence, asset tracing, wealth authentication, data analytics, digital investigations and forensics for clients including law firms, corporate and private clients {**A/13/5**}.

54.   CT describes itself as *"an established and reputable firm with a proven track record of assisting clients in a variety of circumstances, including litigation support and dispute resolution. It is staffed by individuals who have distinguished careers and reputations. The majority of its senior team have the benefit of years of public service in related fields, working for intelligence agencies and in law enforcement, as well as experienced former bankers and accountants"* {**A/13/5**}.

55.   This description was consistent with Mishcon's understanding and experience of CT's reputation, general capabilities and suitability for assisting in the investigation of a complex fraud dispute of the type in which the parties to these proceedings are engaged.

56.   A substantial part of the purpose of the Application is to establish that communications between this firm and CT relating to CT's investigations are not privileged because of the iniquity exception.

57.   As has been made clear, the Applicants no longer rely upon the materials in the CT Report because they accept, on the basis of the evidence adduced by the Respondents, that the material in the CT Report is unreliable and that most of it appears to be fictitious. In the circumstances,

the Applicants have instructed no further investigations by CT and have no intention of doing so. The relationship between the Applicants and CT has largely broken down.

58.   The result is that it is unlikely that the Applicants (or this Firm) will ever be able to obtain more information about the precise means by which CT conducted its investigations beyond that set out in the CT Report itself. The CT Report sets out both (a) the limits of CT's own understanding of the identity of the underlying sources and (b) CT's concerns regarding the safety of the sources should further details be revealed. I would respectfully suggest that such concerns on the part of CT are wholly unsurprising. The Applicants and this Firm do not know the extent to which CT has been able to maintain contact with the Underlying Sources via the Field Team since the last hearing (to the extent that those Underlying Sources exist).

59.   I note that there is no allegation that the Applicants, or this Firm, knew anything more about the means by which information was obtained beyond the information set out in the CT Report.

60.   I note that at paragraph 26 of the CT Report the statement (signed on behalf of CT with the knowledge that it would be put before the Court) that "*In its work on the Project, CT has acted in accordance with all applicable laws. CT adheres to the local laws of the countries in which it is working.*" The CT Report also describes the Field Team as "*professional investigators, licensed where necessary in the jurisdictions where they operate.*"

61.   Similarly, in evidence given by Mr Curley of CT in the case of *Green v. CT Group Holdings Ltd* [2023] EWHC 3168 (Comm), he made clear that the investigations in that case were conducted lawfully. Those investigations involved, in particular, at least one member of the same Field Team as was used in this case and the CTR Source.

62.   Mr Curley's evidence must have been confirmed by a formal statement of truth and I do not believe it would have been put forward by Quinn Emanuel or their leading counsel if there were no conceivable possibility of it being true.

63.   Much of the information obtained by CT in the investigation that was the subject of *Green* appears to have been obtained (if it was authentic) in a similar manner to the information in the CT Report. Mr Charles Hollander KC, sitting as a Deputy Judge of the High Court, found on the basis of Mr Curley's evidence that:

"*Nor would I have been satisfied that there was a good arguable case of wrongdoing against CT Group*" (paragraph 59).

"*For the avoidance of doubt, I do not consider that the evidence before the court demonstrates wrongdoing or improper behaviour by CT Group. Exactly how the information was obtained is referred to in Mr Curley's evidence and I am not prepared to indulge in speculation which goes beyond that*" (paragraph 65).

64. The Applicants, and this Firm, accepted the assurance set out in paragraph 26 of the CT Report. The Applicants and this Firm have always believed that CT has acted in precisely that manner. I note that since the date of the last hearing CT has confirmed in statements to the national press that (a) it was confident it had acted lawfully in connection with the CT Report and (b) it remains confident that the information in the CT Report is genuine: **[VP1/104-107]**.

65. Naturally, this Firm and the Applicants take very seriously any suggestion that they may have behaved inappropriately.

66. I believe that I cannot, without waiver of privilege that would in effect give the Applicants the relief they are seeking, give details of the communications between the Firm and CT (or communications between this firm and CT's lawyers, Quinn Emanuel, who acted for CT in the *Green* case) that bear on the belief of this Firm and the Applicants that CT has acted in a manner consistent with the assurances it has given the Court in the CT Report.

67. In correspondence between the parties, this Firm has referred to CT's terms of business and to the terms of this Firm's retainer of CT in order to respond to allegations that this Firm and the Applicants must have been aware that documents had been obtained unlawfully. The Kazakovs responded (via paragraph 63 of Seborg 12) that this constituted or gives rise to a waiver of privilege. The position taken appears to be that the Applicants cannot effectively defend themselves from the very serious allegations being made without conceding a major part of the relief that is being sought in the Privilege Injunction Application (because in so defending themselves they will waive privilege, regardless of whether it can be established that the iniquity exception applies).

68. I would respectfully submit that:

68.1   The terms of business and the terms of the retainer referred to and relied upon in correspondence are not privileged (at least insofar as they do not tend to reveal matters over which privilege can be claimed) so that no waiver has been made; and

68.2   If and to the extent that the terms are privileged, they have not been deployed in evidence (and will not be deployed in evidence) and so no collateral waiver has been made.

69.   The Applicants and this Firm would very much like to be able to rely upon the terms of business and the terms of the retainer in order to justify their position but in the light of the position taken by the Kazakovs, the Applicants do not feel able to do so without a preliminary ruling of this Court that the documents (or parts of documents) that are sought to be deployed are not privileged.

70.   I would also respectfully submit that, to the extent that the Applicants are not able to refer to material without a collateral waiver of privilege that would effectively grant to Mr Anufriev and the Kazakovs the relief they are seeking, the Court should make all appropriate assumptions in favour of the Applicants and of this Firm (and, indeed, of CT).

71.   As stated above, there is no allegation that the Applicants or this Firm knew anything more about the means by which information was acquired other than what appears from the CT Report. I do however point out that whether the documents were obtained unlawfully depends upon a large number of facts, including but not limited to:

71.1   the place in which the documents were obtained (which might itself give rise to complex questions of fact and law);

71.2   the laws in each relevant place;

71.3   the precise methods used in different places to obtain documents or data;

71.4   the identity, capacity and authority of the persons performing the relevant acts;

71.5   the belief(s) and motivations of the persons performing the acts;

71.6   whether or not the data (i) was sought for the purpose of revealing iniquity or (ii) in fact did so or (iii) was thought to do so;

71.7    whether the data was thought to relate to (and be material to the recovery of) assets stolen by the Applicants or the fruits of those assets.

72.    As stated, this Firm and the Applicants believed that the CT group was acting lawfully and that it wished to act lawfully. As a corollary, where there might be alternative means by which information could be obtained, we believed that CT would choose a lawful method rather than an unlawful one. We also believed that if there were no legal means of obtaining any particular item of information then the information simply would not be obtained.

73.    The Applicants believe (and have at all material times believed) that:

73.1    the alleged Kazakov partnership is a fraudulent device used by the Kazakovs (and Oleg Bourlakov, when he was alive) in order to conceal the true ownership of assets and deal with them in a manner designed to defeat the Applicants' rights;

73.2    this wrongdoing included the forgery of loan and other documents and the use and abuse of international asset protection structures;

73.3    Mr Anufriev and the Kazakovs at least sought to use forged loans in order to take (at least) hundreds of millions of US$ out of Edelweiss;

73.4    to the extent available to them, Mr Anufriev and the Kazakovs will (before trial) deal with assets under their control in a manner designed to defeat the consequences of any adverse judgment.

74.    In particular, it is the Applicants' case that Mr Kazakov is in wrongful and unlawful control of Edelweiss and its very substantial assets, as explained above.

75.    The basis and strength of the Applicants' case in relation to the facts and matters set out above will be dealt with in written and oral submissions.

76.    It is in those circumstances that the Applicants sought to discover what they could as to how Mr Anufriev and the Kazakovs were (and are) dealing with assets under their control.

77.    It now appears, on the basis of the evidence adduced by Mr Anufriev and the Kazakovs, that much of the material produced by CT is fictitious. Nevertheless, the Applicants (and this Firm) believed that the information was reliable. By its nature, that information was apt to enhance concerns felt

by the Applicants as to the steps that were being taken to dissipate assets. The Applicants infer that if this information was fabricated by CT's sources, it was fabricated with that purpose in mind and with the intention of inducing the Applicants to commission more work at greater expense.

78.     Examples of the information that was produced included the email purporting to be from Mr Anufriev to Mr Kazakov, discussing the movement of various assets into the KESK Foundation (a Foundation that exists and is controlled by the Kazakovs): **{B3/17/58-59}**. That email was produced by CT in about November 2021. The Applicants (and this Firm) believed that email to be authentic. It seemed consistent with everything that the Applicants knew (or suspected) as to the manner in which Mr Anufriev and the Kazakovs had acted and were likely to continue to act, insofar as they were able (even on their own case as to the alleged Kazakov partnership). The Applicants have always acted in the belief that their conduct was required (and justified) in order to prevent the Defendants getting away with their fraud and effectively making off with the assets that they stole.

79.     The Applicants' continuing instructions to CT in relation to possible asset dissipation resulted from all these facts. As the Court knows, CT provided data relating to purported asset dissipation that took place until about the Spring of 2023. As the Court is also already aware, efforts were then made to corroborate the information already obtained.

*ii.*        *The allegations regarding unlawful obtaining of documents*

80.     Mr Anufriev and the Kazakovs have identified a limited number of non-privileged documents obtained by CT that they consider contain genuine information (see Seborg 12 paragraphs 37-39 and 44-45).

81.     According to the CT Report, those documents were obtained by CT's "*Sources A*" (i.e. multiple persons "*who were in a position to provide information about [Mr Anufriev] and [Mr Kazakov]*") **{A/13/19}**. One obvious possibility is that Sources A were genuine whistleblowers connected to the family office, motivated to provide their assistance in righting the wrongs committed by the Defendants against the Applicants.

82.     Ms Seborg appears to suggest in Seborg 12 at paragraph 36 that CT's sources gained wholesale access to Mr Kazakov's inbox.ru mailbox and this enabled them to review hundreds of emails between Mr Kazakov and his legal advisors and extract the same. Concerns are also expressed at paragraph 44 about potential access to Mrs Kazakova's emails.

83.    There is inevitably an element of speculation as to how these documents were obtained and I am not in a position to go beyond what I have already said about the information that was given to this firm by CT or the means by which it was obtained. There are a number of other potential explanations for at least many of the facts that Ms Seborg is seeking to explain. I also note that there are serious concerns as to the credibility of the Kazakovs as witnesses, in particular in the light of their conduct at and before the jurisdiction challenge heard by Trower J. Mr Kazakov's witness statement in opposition to this application represents a further not-taken opportunity to explain the false evidence he gave in relation to the jurisdiction application.

84.    Most importantly, I note that it is not alleged that the Applicants (or this Firm) knew about any wholesale hacking of any Kazakov mailbox or received the product of any such exercise (though, to be clear, this Firm did receive some documents in addition to those exhibited to the CT Report).

iii.    _Forged documents_

85.    As the Court is aware, Mr Anufriev's and the Kazakovs' evidence is that vast majority of the documents and information produced by CT are fictitious. At paragraphs 47 – 52 of Seborg 12, Ms Seborg asserts that certain of the apparently forged documents contain genuine information that is not otherwise in the public domain or are manipulations of genuine documents. She states that the Kazakovs' position is that: (i) they do not know how CT could have obtained information about the matters in question except through unauthorised access to Mr Kazakov's email account and (ii) genuine material from Mr Kazakov's email account appears to have been used to bolster the appearance of the apparently forged emails' authenticity.

86.    Neither I nor the Applicants know whether this is true, and there are other potential explanations, at least in relation to the majority of the documents. Even if this was done, however, it is not clear to me on the basis of the evidence adduced by the Kazakovs that the genuine documents were obtained by hacking. In any event, I note that there is no suggestion (and there cannot sensibly be any suggestion) that any such genuine documents were provided to this Firm or to the Applicants. This Firm and the Applicants simply have the product, i.e. the documents that are alleged to be fictitious and that are obviously unreliable in the light of the evidence now available (which is why they are not relied upon).

iv.    _Issues relating to privilege_

87.    One aspect of the Privilege Injunction Applications that is a particular focus of Mr Anufriev and the Kazakovs is the question of privileged documents.

88.    At paragraph 145 of Simpson A1, Ms Simpson stated that "*Prior to the provision to my firm by CT of materials which might have been subject to legal privilege, those materials were subjected to a privilege review by independent counsel (i.e. counsel with no prior involvement in these proceedings or the dispute, engaged only for the purpose of that review), pursuant to which potentially privileged material was removed from the batch of documents provided to my firm*" {**A/4/54**}.

89.    To give some further detail of the review of potentially privileged material obtained by CT:

89.1    This Firm first became aware that CT may have obtained a tranche of documents containing potentially privileged information on Friday 4 August 2023, and understood that the material was provided to CT by Sources A. The Applicants were not aware that CT may have obtained privileged documents prior to that date and nor, so far as I am aware, did anyone else.

89.2    This Firm decided that it would not review or take possession of any material that was potentially subject to privilege and that it would make arrangements for such material to be subject to a privilege review to extract potentially privileged material before it was provided to this Firm. Independent counsel as described in Simpson A1 ("**IC**") were appointed for that purpose.

89.3    The IC were:

89.3.1    James Shaw, appointed in August 2023; and

89.3.2    Tamara Oppenheimer KC, appointed in January 2024.

89.4    The materials in question were provided directly to IC by CT for review.

89.5    Translations of foreign-language documents were carried out primarily by machine translation tool. In a limited number of cases, where machine translation was not possible, IC obtained translations either from the company Transperfect, or from CT Group's in-house resource.

89.6    IC reviewed all of the material before disclosing to this Firm any documents which did not, in the IC's view, potentially attract privilege.

90.    There are two exceptions and paragraph 145 of Simpson A1 needs to be qualified to that extent.

91.    The first exception relates to four specific documents, Ms Simpson has asked me to convey her sincere apologies to the Court and to Mr Anufriev and the Kazakovs in this regard – she had no intention to mislead and did not have this incident in mind when making Simpson A1.

92.    Contrary to the process outlined above, on one occasion CT sent this Firm in error four documents directly that are potentially privileged (albeit without warning that they were potentially privileged).

93.    One of those documents was read by Ms Simpson who formed the view that it was likely to be subject to prima facie privilege but that the iniquity exception applied. Her view (and a summary of her understanding of the content of the document) was shared with a small number of other key solicitors at this Firm working on the matter, including me. As a result, she made some very limited and focused use of the document. The Applicants have explained to PCB Byrne the reason that Ms Simpson took the view (which others at the Firm shared) that the document was subject to the iniquity exception and that the use to which the document was put was appropriate and necessary. PCB Byrne have confirmed that any confidentiality or privilege in the document belongs to their clients.

94.    PCB Byrne have also confirmed that they do not consent to any of the content of the document being referred to in this Affidavit so I am unable, unfortunately, to give any further explanation of my Firms' conduct to the Court. I will however swear a further Affidavit dealing with the matter that I will not file and will not serve on anyone other than PCB Byrne.

95.    I assume in these circumstances that the Respondents do not intend (at least at present) to pursue any complaint as to that conduct. If any complaint is pursued, we will obviously have to be given the opportunity to explain our conduct.

96.    As I have said, the view taken by this Firm is that the document cannot be either confidential or privileged by reason of the iniquity exception. Indeed, that iniquity is such that it may have an important bearing on the Respondents' applications for relief and the basis on which they suggest that the Applicants ought to be deprived of relief by reason of their "*unclean hands*". It might also

be relevant to at least some of the relief sought against the Respondents in their Privilege Injunction Applications.

97. The Applicants are currently considering their position in this regard and it may become necessary to obtain an early direction from the Court as to whether or not the document is privileged.

98. The four documents were thereafter sent to IC for their review and, so far as we have been able to ascertain, have not been looked at or accessed again by anyone at this Firm. The four documents have not been saved on this Firm's systems.

99. For the avoidance of doubt, neither the Applicants, nor any other of this Firm's clients, nor any other agents or advisors to (or family members of) the Claimants, was provided with or given access to any of the documents.

100. Following the issue of privileged material from CT being raised by Mr Anufriev and the Kazakovs in correspondence, the ICs categorised the material they had reviewed and the relevant materials were dealt with as follows **[VP1/108-111]**:

    100.1 On 6 March 2024, six documents in which Mr Anufriev potentially held privilege (or had been copied to him) were sent directly by IC to Mr Anufriev's English solicitors, Asserson.

    100.2 On 7 March 2024, 32 of documents in which the Kazakovs potentially held privilege (or had been copied to them) were sent directly by IC to PCB Byrne.

    100.3 On 7 March 2024, two documents in which KESK potentially had privilege were sent directly by IC to KESK's lawyers, Frederic de Baets.

    100.4 On 15 March 2024, following agreement from all relevant parties (i.e. all potential privilege holders), the four documents identified at paragraph 90 above and 23 documents in relation to which IC had not been able to identify the potential privilege holder were sent directly to PCB Byrne.

    100.5 In addition, three documents in which Edelweiss potentially held privilege were sent to its solicitors, Madison, on 14 March 2024.

101. This Firm also proposed that copies of the materials should be dealt with as follows:

101.1   Save in relation to the four documents identified at paragraph 91 above, it was made clear that if the documents were confirmed to be authentic, and were claimed by the respective party to be privileged, this Firm would ask CT and IC to delete them from their systems.

101.2   If no privilege was claimed, it was made clear that we would ask CT and IC to delete them from their systems upon an undertaking being given that the documents would be retained and reviewed for disclosure in these proceedings.

101.3   Given the specific circumstances relating to the four documents identified at paragraph 90 above (and in particular the fact that one of the documents was read and used in circumstances that might become a matter of controversy between the parties), we were not in a position to confirm that the documents would be deleted, but confirmation was given that the documents would not be looked at by anyone at this Firm or used in any way without giving anyone claiming privilege over them advance notice.

102.   Asserson, PCB Byrne and Madison were asked by this Firm to confirm whether: (i) their clients accepted that the documents sent to them by IC were authentic and (ii) whether they asserted privilege in them. To date, none of them have answered that question.

103.   The second exception was only discovered on 15 March 2024 when members of this Firm were examining the CT materials for the purpose of responding to the Privilege Injunction Application. In the course of that review, one member of our team found a circa one page document, at least some of which may be privileged. As soon as the lawyer appreciated that the document might be privileged, she ceased her review and it was quarantined. The document has now been removed from our document management system and otherwise it has been quarantined. As far as we can ascertain, the document had not previously been reviewed by anyone at this Firm (and Ms Simpson has informed me that she was not aware of it). The document will be sent to PCB Byrne.

*v. The relief sought by Mr Anufriev and the Kazakovs*

104.   On the basis of the evidence in this Affidavit, and for reasons that will be amplified in submission, the Applicants do not accept that documents (still less all document) relating to the instruction of the CT Group, the furtherance of its investigation and the use of the Applicants' Confidential / LPP Information (as defined) are not subject to any privilege, or that they are disclosable documents in these proceedings.

27

105.   Furthermore:-

105.1   The CT Report and Simpson A1 have been referred to extensively in open court. The controversy in relation to the authenticity of the materials in the CT Report has been referred to in the national press. There is at **[VP1/104-107]** a copy of a report in the Financial Times concerning this, which quotes from the CT Report. The FT were not tipped off about the hearing by the Applicants.

105.2   It is not clear to me precisely what is encompassed by "Springboarded Materials" but as far as I am aware, there are no such materials other than the CT Report. As mentioned in Simpson A1, the Applicants have sought (and now obtained) an order under Section 1782 of the United States Code seeking materials from The Clearing House Payments Company LLC. Copies of the application documents and the order are at **[VP1/112-606]**. As the Respondents also know, the Applicants have relied upon three SWIFT documents purporting to show payments from Edelweiss to Mr Kazakov in Swiss injunctive proceedings. Mr Kazakov now says that these documents are forgeries.

105.3   The vast majority of the material in the CT Report is said by the Respondents to be fictitious. Although it is suggested that some of the fictitious information is based upon in possession of that authentic material. In these circumstances, little if any of the material provided by CT can be regarded as reliable so as to make its possession by third parties seriously damaging to the Respondents.

105.4   As explained above, steps have been taken to ensure that the Applicants have not come into possession of the Respondents' privileged information.

106.   Nevertheless, the Applicants accept that it is appropriate to comply with some of the requests made by the Kazakovs and Mr Anufriev. For the purposes of what follows, "Information" refers to all of the Respondents' confidential or privileged information provided to the Applicants (or their agents) by CT but excludes information contained in the CT Report and its exhibit. Information will include all such information without prejudice to whether the information is not confidential or privileged by reason of the iniquity exception. There will obviously need to be a fair amount of fine tuning but the essence of the Applicants' proposals are set out below:-

28

106.1    The Applicants will deliver up or procure the delivery up of all Information that is in their possession or in the possession of this firm, their counsel (including Review Counsel) or any of their foreign lawyers (without any waiver of the Applicants' privilege).

106.2    The Applicants will identify and destroy all documents (including all copies) which contain the Information which are in their possession or in the possession of Mr Gliner.

106.3    The Applicants will use their best endeavours to procure the destruction of all documents (including all copies) which contain the Information which are in the possession or control of this firm, their counsel (including Review Counsel) or any of their foreign lawyers, save as may be required for legal, regulatory and/or similar purposes (including any dispute with CT). This firm will of course cooperate fully in ensuring that this obligation can be complied with so far as is reasonably practicable. To the best of my knowledge and belief there has been very limited dissemination of the Information to advisers of the Applicants or any family member other than Mr Gliner.

106.4    The Applicants will issue a written instruction to the CT Group to seek that it and its agents take the steps set out in 106.1 and 106.2 above.

106.5    The Applicants will not make any further use of the Information save as may be required in order to comply with legal and/or regulatory requirements.

106.6    The Applicants will not instruct or continue the instruction of the CT Group or its agents or sub-contractors in these or any related proceedings save insofar as may be necessary or appropriate in order to respond to actual or potential allegations or complaints made against the Applicants or their agents in connection with instructions already given to the CT Group.

106.7    The Applicants will (by themselves or by a Partner of Mishcon de Reya) swear, file, and serve on the Applicants an affidavit providing the following information to the best of their knowledge and belief:

106.7.1 Confirmation of compliance with paragraphs 106.1-106.4 above.

106.7.2 Identification of each and every individual to whom the Applicants' Information has been provided or communicated, to the best of the knowledge of each

Applicant (other than partners or employees of Mishcon de Reya and counsel instructed by them).

106.7.3 An account of all steps taken by each Applicant (as applicable) to prevent the misuse of and procure the destruction of Information in the possession of these individuals.

106.7.4 Particulars of any other investigations commissioned by or on behalf of the Applicants into the Respondents which led to the acquisition of confidential or privileged information belonging to the Respondents.

**SWORN** at:                            )
                                          )
On 19ᵗʰ MARU 2024                        )
                                          )  _____
                                             Victoria Sarah Pigott

Before me, ~~a solicitor~~ / commissioner
of oaths                                     _____
Name:  K· S· SREEKUMAR                      Signed

Address:  125 KWASWAY
          HOCBORN
          London
          WC236-4

Kurupath Sathyanath Sreekumar
Notary Public
England & Wales
Date: 19-03-2024
protocol no:- 046-324
email:- info@holbornnotary.com

30